# 18-1589(L)

## 18-1910(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

REZA ZARRAB, aka Riza Sarraf, CAMELIA JAMSHIDY, aka Kamelia Jamshidy, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, aka Can Sarraf, aka Kartalmsd, MEHMET ZAFER CAGLAYAN, aka Abi, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants,*

MEHMET HAKAN ATILLA,

*Defendant-Appellant-Cross-Appellee.*

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT-CROSS-APPELLEE MEHMET HAKAN ATILLA

JOHN P. ELWOOD
JOSHUA S. JOHNSON
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW,
 Suite 500 West
Washington, DC 20037
(202) 639-6500

VICTOR J. ROCCO
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Defendant-Appellant-
 Cross-Appellee Mehmet Hakan
 Atilla*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTION............................................................................1

STATEMENT OF ISSUES .............................................................1

INTRODUCTION .........................................................................2

STATEMENT OF THE CASE........................................................6

    A.    Procedural History................................................................6

    B.    Iran Sanctions Regime .........................................................8

        1.    International Emergency Economic Powers Act ......................8

        2.    Iranian Transactions and Sanctions Regulations ..................11

        3.    Iranian Financial Sanctions Regulations...............................12

        4.    Gold-Transactions Regulations.............................................15

        5.    Summary of Iran Sanctions...................................................15

    C.    Zarrab's Alleged Scheme ...................................................16

    D.    The Absence of Evidence Atilla Knew Zarrab's Alleged Scheme Would Use U.S. Banks.....................................................20

    E.    Atilla's Interactions With U.S. Treasury Officials ...........................22

    F.    The District Court Refused to Allow the Defense to Present Evidence the Government's Principal Witness Said in a Recorded Jailhouse Conversation That "You Have to Admit to Something You Haven't Done," and "Once You Admit Your Guilt, You Are Set Free"....................................................23

SUMMARY OF ARGUMENT ........................................................27

ARGUMENT ...............................................................................29

I.    The District Court Erred by Instructing the Jury That It Could Convict Atilla of Conspiring to Violate IEEPA if It Found That He Conspired to Evade or Avoid the Imposition of Secondary Sanctions ..........................29

    A.    Standard of Review .............................................................30

    B.    IEEPA Does Not Criminalize Conspiracies to Evade or Avoid the Imposition of Secondary Sanctions.................................31

    C.    The IEEPA Jury Instructions Were Legally Erroneous ....................43

i

D.    The Instructional Errors Entitle Atilla to a New Trial on the
      IEEPA-Conspiracy and Money-Laundering Counts...........................44

II.   Atilla Is Entitled to Judgment of Acquittal on Counts 2-4 and 6 Because
      the Government Presented No Evidence Atilla Knew the Alleged
      Scheme Would Involve U.S. Banks ...............................................................47

      A.    Standard of Review ................................................................49

      B.    The Government's Evidence of Knowledge Was Insufficient ..........50

III.  Atilla Is Entitled to a Judgment of Acquittal on, or Dismissal of,
      Count 1 Because Vague Judge-Made Criminal Law Under 18 U.S.C.
      § 371 Cannot Be Used to Supplement IEEPA Sanctions Regulations ........56

      A.    Standard of Review ..........................................................57

      B.    This Court Should Not Supplement IEEPA Sanctions
            Regulations With a Vague, Common-Law Gloss on § 371's
            Plain Text ................................................................58

IV.   The District Court Abused Its Discretion by Precluding the Defense
      From Confronting Zarrab With, and Presenting to the Jury, Evidence
      Zarrab Said in a Recorded Jailhouse Conversation That in the United
      States, "You Have to Admit to Something You Haven't Done," and
      "Once You Admit Your Guilt, You Are Set Free" ......................................67

      A.    Standard of Review ................................................................68

      B.    The Defense Was Entitled to Introduce Evidence of Zarrab's
            Jailhouse Conversation to Prove Zarrab's Bias and to Contradict
            His Sworn Testimony That He Did Not Make the Recorded
            Statements ................................................................68

      C.    The District Court's Rationale for Exclusion Is Mistaken.................74

      D.    The Rulings Were Not Harmless ......................................................77

CONCLUSION.................................................................................80

CERTIFICATE OF COMPLIANCE........................................................82

CERTIFICATE OF SERVICE .............................................................83

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Adamo Wrecking Co. v. United States*,
434 U.S. 275 (1978) ........................................................................40

*Air Wis. Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014) ........................................................................10

*Bryan v. United States*,
524 U.S. 184 (1998) ........................................................................36

*Chapman v. California*,
386 U.S. 18 (1967) ..........................................................................78

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ........................................................................63

*Davis v. Alaska*,
415 U.S. 308 (1974) ................................................................. 69, 73

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) ........................................................................78

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........................................................................35

*Friends of Animals v. Clay*,
811 F.3d 94 (2d Cir. 2016) ..............................................................33

*General Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ........................................................36

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................................................24

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ................................................................. 54, 55

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........................................................... 42, 65, 66

*Hammerschmidt v. United States*,
265 U.S. 182 (1924) ........................................................................59

*Holmes v. South Carolina*,
547 U.S. 319 (2006) ................................................................. 68, 77

**Cases—Continued:** Page(s)

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ...........................................................................49

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ...........................................................................39

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................. 40, 41, 64

*Kotteakos v. United States*,
   328 U.S. 750 (1946) ...........................................................................78

*Lamborn v. Dittmer*,
   873 F.2d 522 (2d Cir. 1989). .............................................................75

*Lawton, ex rel. United States v. Takeda Pharm. Co.*,
   842 F.3d 125 (1st Cir. 2016) .............................................................53

*Looper v. Morgan*,
   No. H-92-0294, 1995 U.S. Dist. LEXIS 10241 (S.D. Tex. June 30, 1995).........42

*M. Kraus & Bros., Inc. v. United States*,
   327 U.S. 614 (1946) ................................................................. 41, 42

*Marinello v. United States*,
   138 S. Ct. 1101 (2018) ..................................................... 29, 42, 65, 66

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ...........................................................................37

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ...........................................................................39

*Mutual Life Ins. Co. of N.Y. v. Hillmon*,
   145 U.S. 285 (1892) ...........................................................................71

*Neder v. United States*,
   527 U.S. 1 (1999) ................................................................. 45, 58

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
   839 F.3d 1 (D.C. Cir. 2016)........................................................... 35, 36

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
   881 F.3d 75 (D.C. Cir. 2016) (en banc) ...........................................35

*Regan v. Wald*,
   468 U.S. 222 (1984) ...........................................................................10

**Cases—Continued:**                                                   **Page(s)**

*Republic Bank & Tr. Co. v. Bear Stearns & Co.*,
683 F.3d 239 (6th Cir. 2012) ................................................. 52

*RJR Nabisco, Inc. v. European Cmty.*,
136 S. Ct. 2090 (2016) ...................................... 37, 39, 64

*Rogers v. Tennessee*,
532 U.S. 451 (2001) ................................................. 60

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018) ................................................. 40

*Skilling v. United States*,
561 U.S. 358 (2010) ...................................... 40, 42, 44, 65

*Tanner v. United States*,
483 U.S. 107 (1987) ................................................. 65

*United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*,
460 F.3d 853 (7th Cir. 2006) ................................................. 53

*United States ex rel. McBride v. Halliburton Co.*,
848 F.3d 1027 (D.C. Cir. 2017) ................................................. 62

*United States ex rel. Quinn v. Omnicare Inc.*,
382 F.3d 432 (3d Cir. 2004) ................................................. 53

*United States v. Abel*,
469 U.S. 45 (1984) ...................................... 69, 71, 74

*United States v. Alston*,
77 F.3d 713 (3d Cir. 1996) ................................................. 62

*United States v. Andrews*,
681 F.3d 509 (3d Cir. 2012) ................................................. 47

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ................................................. 49

*United States v. Ballistrea*,
101 F.3d 827 (2d Cir. 1996) ................................................. 60

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2012) ...................................... 2, 11, 30, 40

*United States v. Best*,
219 F.3d 192 (2d Cir. 2000) ................................................. 71

**Cases—Continued:** Page(s)

*United States v. Beverly*,
  5 F.3d 633 (2d Cir. 1993) ..................................................... 75

*United States v. Blackwood*,
  456 F.2d 526 (2d Cir. 1972) ................................................. 75

*United States v. Blum*,
  62 F.3d 63 (2d Cir. 1995) ............................................... 69, 77

*United States v. Bonventre*,
  646 F. App'x 73 (2d Cir. 2016) ............................................ 55

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012) ......................................... *passim*

*United States v. Coven*,
  662 F.2d 162 (2d Cir. 1981) ................................................. 75

*United States v. Crim*,
  451 F. App'x 196 (3d Cir. 2011) .......................................... 59

*United States v. Dambelly*,
  714 F. App'x 87 (2d Cir. 2018) ........................................... 55

*United States v. DiMaria*,
  727 F.2d 265 (2d Cir. 1984) .......................................... 71, 80

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) .......................................... 44, 46

*United States v. Figueroa*,
  548 F.3d 222 (2d Cir. 2008) .......................................... 68, 77

*United States v. Giovannetti*,
  919 F.2d 1223 (7th Cir. 1990) ............................................ 55

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002) .................................................. 49

*United States v. Granderson*,
  511 U.S. 39 (1994) ............................................................. 40

*United States v. Harvey*,
  547 F.2d 720 (2d Cir. 1976) ...................................... 69, 71, 75

*United States v. Homa Int'l Trading Corp.*,
  387 F.3d 144 (2d Cir. 2004) ................................................ 36

**Cases—Continued:** Page(s)

*United States v. Hoskins*,
  No. 16-1010-cr, 2018 WL 4038192 (2d Cir. Aug. 24, 2018) ...................... 39, 61

*United States v. Jackson*,
  882 F.2d 1444 (9th Cir. 1989) ................................................................73

*United States v. James*,
  609 F.2d 36 (2d Cir. 1979) ............................................................. 71, 74

*United States v. Klein*,
  247 F.2d 908 (2d Cir. 1957) ........................................................... 59, 60

*United States v. Kohan*,
  806 F.2d 18 (2d Cir. 1986) ....................................................................79

*United States v. Lanier*,
  520 U.S. 259 (1997) ...................................................................... 35, 60

*United States v. Macias*,
  786 F.3d 1060 (7th Cir. 2015) ....................................................... 54, 55

*United States v. Moran-Toala*,
  726 F.3d 334 (2d Cir. 2013) ..................................................................46

*United States v. Olano*,
  507 U.S. 725 (1993) .............................................................................78

*United States v. Rosenblatt*,
  554 F.2d 36 (2d Cir. 1977) ...................................................................66

*United States v. Sheehan*,
  838 F.3d 109 (2d Cir. 2016) ..................................................................47

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017) .......................................................... 45, 47

*United States v. Strother*,
  49 F.3d 869 (2d Cir. 1995) ............................................................ 68, 72

*United States v. Temple*,
  447 F.3d 130 (2d Cir. 2006) ..................................................................49

*United States v. Trzaska*,
  111 F.3d 1019 (2d Cir. 1997) .................................................................72

*United States v. Tussa*,
  816 F.2d 58 (2d Cir. 1987) ...................................................................78

**Cases—Continued:** Page(s)

*United States v. Valle,*
807 F.3d 508 (2d Cir. 2015) ................................................................40

*United States v. Vilar,*
729 F.3d 62 (2d Cir. 2013) .......................................................... 39, 58

*United States v. Weiss,*
930 F.2d 185 (2d Cir. 1991) ...............................................................68

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
136 S. Ct. 1989 (2016) .......................................................................62

*Wearry v. Cain,*
136 S. Ct. 1002 (2016) .......................................................................24

*Yates v. United States,*
354 U.S. 298 (1957) ...........................................................................44

**Statutes:**

18 U.S.C. § 371 ............................................................................ *passim*

18 U.S.C. § 1344 ....................................................................................8

18 U.S.C. § 1349 ....................................................................................8

18 U.S.C. § 1956(h) ...............................................................................8

18 U.S.C. § 2339B ...............................................................................38

18 U.S.C. § 3231 ....................................................................................1

22 U.S.C. § 8804(a), (c) ................................................................ 15, 16

26 U.S.C. § 7212 ..................................................................................65

28 U.S.C. § 1291 ....................................................................................1

50 U.S.C. § 1701(a) ...............................................................................9

50 U.S.C. § 1702(a)(1) ................................................... 9, 10, 36, 61

50 U.S.C. § 1702(a)(2) .........................................................................37

50 U.S.C. § 1704 ...............................................................................9, 61

50 U.S.C. § 1705 ....................................................................................8

50 U.S.C. § 1705(a) ...................................................................... 11, 31

50 U.S.C. § 1705(c) ....................................................... 3, 11, 31, 36

**Statutes—Continued:** Page(s)

50 U.S.C. § 4305 ......................................................................10

50 U.S.C. §§ 1701-1702 .........................................................61

Antiterrorism and Effective Death Penalty Act of 1996,
  Pub. L. No. 104-132, 110 Stat. 1214 ..................................38

First War Powers Act,
  ch. 593, 55 Stat. 838 (1941) ...............................................10

Intelligence Reform and Terrorism Prevention Act of 2004,
  Pub. L. No. 108-458, 118 Stat. 3638 ..................................38

Iran Freedom and Counterproliferation Act of 2012,
  Pub. L. No. 112-239, 126 Stat. 1632 (2013) .......................15

Iran Threat Reduction and Syria Human Rights Act of 2012,
  Pub. L. No. 112-158, 126 Stat. 1214 ..................................14

National Defense Authorization Act for Fiscal Year 2012,
  Pub. L. No. 112-81, 125 Stat. 1298 (2011) .......................... 13, 14, 16

Trading with the Enemy Act,
  ch. 106, 40 Stat. 411 (1917) ...............................................10

**Regulations:**

31 C.F.R. § 535.329 ...............................................................37

31 C.F.R. § 560.203 (2012) ................................................ 12, 31

31 C.F.R. § 560.204 ........................................................... 11, 12

31 C.F.R. § 560.205 ...............................................................12

31 C.F.R. § 560.314 ...............................................................12

31 C.F.R. § 560.410 ...............................................................11

31 C.F.R. § 561.203 ........................................................... 13, 32

31 C.F.R. § 561.203(a) ...........................................................13

31 C.F.R. § 561.203(g) ....................................................... 14, 16

31 C.F.R. § 561.203(h) ...........................................................14

31 C.F.R. § 561.203(j)-(k) ................................................... 14, 16

31 C.F.R. § 561.204 ........................................................... 13, 32

31 C.F.R. § 561.204(b)(1) ......................................................13

**Regulations—Continued:**                                        **Page(s)**

31 C.F.R. § 561.204(d)(1) ...................................................... 14, 16

31 C.F.R. § 561.204(f)(2) ...................................................... 14, 16

31 C.F.R. § 561.205 ....................................................................14

31 C.F.R. § 561.205(a)............................................................ *passim*

31 C.F.R. § 561.306 ..................................................................13

31 C.F.R. § 561.307 ..................................................................13

Foreign Assets Control Regulations: Miscellaneous Amendments,
    19 Fed. Reg. 5481 (Aug. 27, 1954) ................................... 10, 37

Iranian Financial Sanctions Regulations,
    78 Fed. Reg. 16,403 (Mar. 15, 2013) ..................................14

Iranian Transactions Regulations,
    77 Fed. Reg. 64,664 (Oct. 22, 2012) ...................................11

**Executive Orders:**

Exec. Order No. 12,959,
    60 Fed. Reg. 24,757 (May 6, 1995).....................................32

Exec. Order No. 13,059,
    62 Fed. Reg. 44,531 (Aug. 19, 1997) ................................32

Exec. Order No. 13,224,
    66 Fed. Reg. 49,079 (Sept. 23, 2001) ................................32

Exec. Order No. 13,599,
    77 Fed. Reg. 6659 (Feb. 5, 2012) .......................................32

Exec. Order No. 13,645,
    78 Fed. Reg. 33,945 (June 3, 2013).....................................31

Executive Order 13,622,
    77 Fed. Reg. 45,897 (July 30, 2012) .......................... *passim*

**Rules:**

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................1

Fed. R. Crim. P. 29(a) ......................................................... 57, 58

Fed. R. Crim. P. 29(b) .........................................................7, 50

Fed. R. Crim. P. 52(a) ..............................................................77

**Rules—Continued:** Page(s)

Fed. R. Evid. 103(a) ................................................... 78

Fed. R. Evid. 403 ...................................................... 77

Fed. R. Evid. 608 ...................................................... 74

Fed. R. Evid. 608(b) ............................................. 74, 75

Fed. R. Evid. 613(b) ................................................. 72

Fed. R. Evid. 803(3) .................................................. 71

## Other Authorities:

3 Christopher B. Mueller & Laird C. Kirkpatrick,
*Federal Evidence* (4th ed. 2017) ................................ *passim*

Abraham S. Goldstein, *Conspiracy to Defraud the United States*,
68 Yale L.J. 405 (1959) ........................................ 63, 64, 66

Amanda Sloat, *Why Turkey Cares About the Trial of Reza Zarrab*,
Brookings Institution (Nov. 22, 2017), https://brook.gs/2rt6xI4. ........................39

Ambrose Bierce, *The Devil's Dictionary* .................................64

Andrew W. Shoyer, Sidley Austin LLP, *Sanctions (OFAC) Compliance
Update* (May 12, 2016), http://bit.ly/2jIGV5I ......................................34

David J. Brummond, OFAC, *US Sanctions Implementation for the Shipping
Industry*, http://bit.ly/2IcoZuI ................................................34

*Iran Nuclear Deal Oversight: Implementation and Its Consequences
(Part II): Hearing Before the H. Comm. on Foreign Affairs*,
114th Cong. (2016)................................................18

Matthew Palmer, *The Dishonest Diplomat: How a Critical Profession Got a
Bad Rap*, Time, June 23, 2014, https://ti.me/2l5f4gV ........................................64

Perry S. Bechky, *Sanctions and the Blurred Boundaries of International
Economic Law*, 83 Mo. L. Rev. 1 (2018) ............................................34

S. Rep. No. 95-466 (1977) ................................................10

U.S. Dep't of Treasury, Iran Sanctions, http://bit.ly/2Lev8fP ................................16

U.S. Dep'ts of Treasury & State, *Guidance Relating to the Lifting of Certain
U.S. Sanctions Pursuant to the Joint Comprehensive Plan of Action on
Implementation Day* (Jan. 16, 2016), http://bit.ly/2l80qoW ........................ 13, 15

**Other Authorities—Continued:** **Page(s)**

U.S. Dep't's of Treasury & State, *Guidance Relating to the Provision of Certain Temporary Sanctions Relief in Order to Implement the Joint Plan of Action Reached on November 24, 2013, Between the P5+1 and the Islamic Republic of Iran* (Jan. 20, 2014), http://bit.ly/2NxbxEe..........................15

## JURISDICTION

The district court had jurisdiction over this criminal prosecution under 18 U.S.C. § 3231. Mehmet Hakan Atilla timely noticed appeal of the May 16, 2018 final judgment on May 25. SPA64-68; A982; *see also* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the district court erred by instructing jurors they could convict Atilla of conspiring to violate the International Emergency Economic Powers Act ("IEEPA") if they found he conspired to evade or avoid the imposition of secondary sanctions—contrary to plain regulatory language and the longtime view of the agency responsible for sanctions enforcement.

2.      Whether the government presented insufficient evidence Atilla knew the alleged sanctions-avoidance scheme would use U.S. banks.

3.      Whether Atilla was entitled to a judgment of acquittal on—or, alternatively, dismissal of—the charge of conspiring to defraud the United States because 18 U.S.C. § 371 cannot be used to supplement IEEPA sanctions regulations.

4.      Whether the district court abused its discretion by precluding the defense from confronting the government's star cooperating witness with, and presenting to the jury, evidence that the witness said in a recorded jailhouse

conversation that in the United States, "you have to admit to something you haven't done," and that "once you admit your guilt, you are set free."

## **INTRODUCTION**

This case involves a scheme orchestrated by Reza Zarrab, a citizen of Turkey and Iran, to circumvent U.S. sanctions against Iran from approximately 2010 to 2015. *See, e.g.*, A239-40. The government alleges that beginning in 2012, Zarrab used Türkiye Halk Bankasi A.Ş. ("Halkbank"), a Turkish bank 51% owned by the Turkish state, to conduct transactions that violated U.S. sanctions. *See* A361-67. According to the government, defendant-appellant Mehmet Hakan Atilla, then one of Halkbank's twelve deputy general managers, coached Zarrab on how to avoid detection and engaged in allegedly deceptive activities to reduce the risk U.S. regulators would impose "secondary sanctions" on Halkbank, restricting its access to the U.S. financial system. Since his surprise arrest at JFK airport during a routine business trip in March 2017, Atilla has been continuously incarcerated, severely undermining his ability to prepare with counsel for trial, and keeping him thousands of miles from his wife, son, and home in Turkey.

This case is remarkable—even unprecedented—in two respects.

*First:* Previous IEEPA prosecutions have generally involved so-called "primary sanctions" prohibiting transactions between *U.S. persons* and Iran. *See, e.g.*, *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012). This case represents the

first time the government has sought to impose criminal penalties for actions taken to evade or avoid the imposition of "secondary sanctions"—i.e., restrictions on accessing the U.S. financial system imposed on *foreigners* whom the Treasury Secretary determines have done business with Iran. The district court erroneously held that a foreigner can be subjected to up to 20 years' imprisonment for allegedly conspiring outside of the United States to evade or avoid the imposition of secondary sanctions in furtherance of U.S. foreign-policy objectives. *See* 50 U.S.C. § 1705(c). That conclusion directly conflicts with the longstanding views of the agency charged with administering and enforcing the Iran sanctions regime. And it is impossible to square with the governing regulations, which proscribe only evading or avoiding already existing prohibitions imposed as a result of the Treasury Secretary's determination that a foreign party has engaged in sanctionable conduct. 31 C.F.R. § 561.205(a).

Once that error is corrected, the prosecution's entire case crumbles. The government presented *no* evidence (much less legally sufficient evidence) to support its alternative allegation that Atilla knew Zarrab's alleged scheme would involve the use of U.S. banks (indeed, that weakness prompted the government to belatedly pursue its flawed secondary-sanctions theory). And Atilla's conviction under 18 U.S.C. § 371 is legally flawed because that statute's prohibition against conspiring to defraud the United States cannot be read to impose open-ended sanctions-related

3

obligations beyond those the detailed sanctions regulations themselves establish. Atilla is thus entitled to a judgment of acquittal on all counts.

*Second:* This case is remarkable because of the lengths to which the government went (and the depths to which it stooped) to secure a conviction. To decrease his exposure, Zarrab, who made hundreds of millions of dollars as the scheme's mastermind and paid millions in bribes, struck a deal with the government and testified as the prosecution's star witness against Atilla, who—it is undisputed— neither received nor requested bribes, and never received more than his modest salary of approximately $100,000 per year. A693; *see also, e.g.*, A406. Without Zarrab, the government would effectively have been left to stake its case on facially ambiguous documents and recordings with a gap-riddled chain of custody, all stolen from Turkish investigative files and smuggled out of Turkey by a former police officer who jumped bail, remains a fugitive from Turkish criminal charges, and was at the time of trial being supported and housed entirely by the U.S. government. The government tried to portray Atilla as an "architect" and "mastermind[]" in a sanctions-busting operation Zarrab began years earlier without him, A339, though the district judge, after considering all the testimony, called Atilla a "sometimes reluctant[]" "cog in the wheel" of Zarrab's scheme who was simply "doing his job" and "following orders in large measure from his boss" at the bank. A969-73, A976.

4

Emblematic of the government's questionable tactics, at 10:42 p.m. on the Saturday before the Tuesday start of Zarrab's cross-examination, the prosecution belatedly produced critical impeachment evidence: a recording of a jailhouse phone call—which the prosecution left to the defense to translate from the original Azeri—in which Zarrab, the government's star witness, told his uncle that in the United States, "you have to admit to something you haven't done" to be "set free" from jail. A829-30.  Zarrab's statements powerfully demonstrate his motive and intent to lie about the very scheme at issue to obtain a reduced sentence.  But remarkably, when Zarrab on cross-examination denied making the recorded statements, the government let the lie go uncorrected, and the court prevented the defense from setting the record straight by confronting Zarrab with the recording and introducing it and a translated transcript into evidence.  Zarrab was the foundation of the government's entire case.  The prosecution relied on him—and often him alone—to authenticate dubious stolen evidence, to explain how facially ambiguous evidence allegedly implicated Atilla, and to suggest without corroboration that Atilla knew the general purposes for which Iran's funds would be used after their withdrawal from Halkbank.  At minimum, the erroneous exclusion of compelling evidence of this crucial witness's bias and motive to lie demands a new trial.

## STATEMENT OF THE CASE

### A.  Procedural History

The government charged Atilla with participating in Reza Zarrab's scheme to circumvent U.S. sanctions against Iran from approximately 2012 to 2015.  SPA37, SPA46.  Over five months after Atilla's arrest, and only 82 days before jury selection, the government filed a superseding indictment significantly expanding the charges against Atilla and introducing the theory that U.S. law criminalizes conspiracies to evade or avoid the imposition of secondary sanctions.  *Compare* A169-97, *with* A198-250.  After the denial of Atilla's motion to dismiss the indictment, SPA2-12, the case proceeded to a jury trial before Judge Richard M. Berman.  The government's eleventh-hour production of thousands of documents— many untranslated or heavily redacted—and the defense's difficulty in securing testimony from Turkish witnesses compelled the defense to request postponing the November 2017 trial date.  *See* A290, A295-97, A324-30.  The court repeatedly refused to postpone the trial (even by just two weeks),[1] A294, A304-06, A331-33, but later postponed sentencing *one month* to review submissions, A960, A965.

At trial, the government principally relied on Zarrab's testimony and on wiretap recordings and other evidence stolen from Turkish investigative files by a

---

[1] Although the court postponed *jury selection* until after Thanksgiving, that at most postponed opening statements by one day.  *See* A309-10.

former Turkish police officer, Huseyin Korkmaz, who had hired smugglers to help him escape criminal charges in Turkey. *See, e.g.*, A620-26, A658, A668-69, A676, A678-80, A683, A685, A687. Korkmaz's testimony amounted to introducing the Turkish police file of the Zarrab investigation, drawing repeated objections and ultimately a mistrial motion based on Korkmaz's lack of personal knowledge for his testimony and his introduction of multiple levels of hearsay. *See* A782-98. At the end of the government's case-in-chief, the defense moved for a judgment of acquittal. A810-17. The court reserved decision on that motion and then denied it after trial. SPA36-60; *see also* Fed. R. Crim. P. 29(b).

During the government's cross-examination of Atilla, who testified in his own defense, the prosecutor asked whether he "remember[ed]" a report by a purported "expert" from the Turkish "bank regulator" that "concluded that [Atilla] violated the resolutions imposing sanctions on Iran." A704. The court initially overruled the defense's objection to this facially improper question, which sought to elicit inadmissible hearsay and to smuggle into evidence a purported legal conclusion on an ultimate issue from a supposed "expert" whom Atilla had no opportunity to confront. *See id*. The question was also misleading: The purported expert's conclusion was premised on the *assumption*—which the prosecution's question omitted—that documentation underlying Zarrab's transactions was "fictitious." A707, A841. After further argument, the court eventually reversed course and

7

sustained the defense's objection.  *See* A708.  Yet the court denied Atilla's mistrial

motion, allowing the case to proceed to verdict by a jury incorrectly and improperly

told that a regulatory "expert" had found Atilla guilty of violating the very sanctions

regulations at issue.  A847-53.

    After deliberating four days, the jury convicted Atilla of conspiring to defraud

the United States, in violation of 18 U.S.C. § 371 (Count 1); conspiring to violate

IEEPA, in violation of 50 U.S.C. § 1705 (Count 2); bank fraud, in violation of 18

U.S.C. § 1344 (Count 3); conspiring to commit bank fraud, in violation of 18 U.S.C.

§ 1349 (Count 4); and conspiring to commit money laundering, in violation of 18

U.S.C. § 1956(h) (Count 6).  A761.  The jury acquitted Atilla of substantive money

laundering (Count 5).  *Id*.

    The court sentenced Atilla to 32 months' imprisonment and imposed $500 in

special assessments.  SPA66-67.  Atilla remains incarcerated.

### B.    Iran Sanctions Regime

#### 1.    International Emergency Economic Powers Act

The core of this case is the government's allegation that Atilla violated the

International Emergency Economic Powers Act by joining Zarrab's alleged

conspiracy to circumvent U.S. sanctions against Iran.  IEEPA authorizes the

President to take certain actions "to deal with any unusual and extraordinary threat,

which has its source in whole or substantial part outside the United States, to the

national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). In 50 U.S.C. § 1702(a)(1), Congress specified the scope of the President's authority to address such emergencies:

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) investigate, regulate, or prohibit—
>
> > (i) any transactions in foreign exchange,
> >
> > (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
> >
> > (iii) the importing or exporting of currency or securities,
>
> by any person, or with respect to any property, *subject to the jurisdiction of the United States*; [and]
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, *subject to the jurisdiction of the United States* . . . .

50 U.S.C. § 1702(a)(1) (emphasis added); *see also id.* § 1704 (authorizing President to issue implementing regulations).

9

Congress enacted IEEPA in 1977 "to revise and delimit the President's authority" to regulate economic transactions under section 5(b) of the Trading with the Enemy Act, ch. 106, 40 Stat. 411, 415 (1917) (codified as amended at 50 U.S.C. § 4305), after which 50 U.S.C. § 1702(a)(1) was modeled. S. Rep. No. 95-466, at 2 (1977); *see also Regan v. Wald*, 468 U.S. 222, 227-28 (1984) (IEEPA authorities "essentially the same as those in § 5(b)"). IEEPA reiterates verbatim section 5(b)'s limitation of presidential authority to transactions "by any person, or with respect to any property, subject to the jurisdiction of the United States." First War Powers Act, ch. 593, 55 Stat. 838, 839-40 (1941). When Congress enacted IEEPA, the phrase "person . . . subject to the jurisdiction of the United States" had a well-understood meaning. It covered U.S. citizens and residents, persons "actually within the United States," corporations organized under U.S. law, and organizations "owned or controlled" by persons in those categories. Foreign Assets Control Regulations: Miscellaneous Amendments, 19 Fed. Reg. 5481, 5481-82 (Aug. 27, 1954) (codifying definition and noting it was "not new"). Absent from that definition is any suggestion that non-U.S. citizens residing and conducting activities in foreign countries might qualify as persons "subject to the jurisdiction of the United States," and thus subject to the President's regulatory authority under section 5(b)—and, by extension, IEEPA. *See Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014)

10

("when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word" (citation omitted)).

IEEPA provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [the Act]." 50 U.S.C. § 1705(a). IEEPA provides a criminal penalty of up to 20 years' imprisonment and a fine of up to $1,000,000 for a "person who willfully commits, willfully attempts to commit, or willfully conspires to commit or aids or abets in the commission of, an unlawful act." *Id.* § 1705(c).

### 2. Iranian Transactions and Sanctions Regulations

Pursuant to a series of executive orders under IEEPA, the Treasury Department issued the Iranian Transactions Regulations (later renamed the Iranian Transactions and Sanctions Regulations). *See* Iranian Transactions Regulations, 77 Fed. Reg. 64,664, 64,664 (Oct. 22, 2012). These regulations generally prohibit "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204; *see also* 31 C.F.R. § 560.410. This Court has held that "the execution on behalf of others of money transfers from the United States to Iran is a 'service'" under the regulations. *United States v. Banki*, 685 F.3d 99, 106 (2d Cir. 2012) (citation omitted).

11

The prohibition in § 560.204 is limited to conduct emanating "from the United States" or undertaken "by a United States person"—i.e., a U.S. citizen, permanent resident, entity organized under U.S. law, or "person in the United States." 31 C.F.R. § 560.314. The only provision of the Iranian Transactions and Sanctions Regulations expressly prohibiting conduct by non-U.S. persons is 31 C.F.R. § 560.205, which the government has made no effort to show Atilla violated.

Before October 2012, § 560.203 of the Iranian Transactions Regulations provided: "Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." 31 C.F.R. § 560.203 (2012). Effective October 22, 2012, § 560.203 was amended to read:

> (A) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

> (B) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

77 Fed. Reg. at 64,668.

### 3. Iranian Financial Sanctions Regulations

The Iranian Financial Sanctions Regulations provide for "secondary sanctions"—i.e., sanctions "directed toward non-U.S. persons for specified conduct involving Iran that occurs entirely outside of U.S. jurisdiction and does not involve

12

U.S. persons."  U.S. Dep'ts of Treasury & State, *Guidance Relating to the Lifting of Certain U.S. Sanctions Pursuant to the Joint Comprehensive Plan of Action on Implementation Day* 4 n.3 (Jan. 16, 2016), http://bit.ly/2l80qoW ("*JCPOA Guidance*"); *accord* A348.  Sections 561.203 and 561.204 authorize the Treasury Secretary to prohibit U.S. financial institutions from opening or maintaining correspondent and payable-through accounts for foreign financial institutions "upon a determination by the Secretary of the Treasury that [the] foreign financial institution has knowingly" conducted or facilitated "any significant financial transaction" with certain Iranian entities[2] or for the purchase or acquisition of Iranian petroleum, petroleum products, or petrochemical products.  31 C.F.R. §§ 561.203-.204; *see also id.* §§ 561.306-.307.  Section 561.203 implements section 1245 of the National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298, 1647-50 (2011) ("NDAA"), and section 561.204 implements Executive Order 13,622, 77 Fed. Reg. 45,897 (July 30, 2012).

Sections 561.203-.204, as well as the Act and executive order on which they were based, contain several exceptions allowing foreign banks to facilitate certain Iran-related transactions without becoming subject to the imposition of secondary

---

[2] These entities include the Central Bank of Iran, the National Iranian Oil Company, the Naftiran Intertrade Company, and Iranian financial institutions included in the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.  *See* 31 C.F.R. §§ 561.203(a), 561.204(b)(1).

sanctions. At all relevant times, a humanitarian exception permitted such banks to facilitate sales of food, medicine, or medical devices to Iran. *See* NDAA § 1245(d)(2), 125 Stat. at 1648; Exec. Order No. 13,622 § 1(d), 77 Fed. Reg. at 45,897-98; 31 C.F.R. §§ 561.203(g), 561.204(d)(1). In addition, until February 2013, Turkish banks could facilitate transactions involving Iranian petroleum-sale proceeds because Turkey was significantly reducing Iranian-oil purchases. *See* NDAA, § 1245(d)(4), 125 Stat. at 1648-49; 31 C.F.R. § 561.203(h). After section 504 of the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, 126 Stat. 1214, 1261-62, took effect on February 6, 2013, such transactions would expose Turkish banks to secondary sanctions unless they involved bilateral trade between Turkey and Iran. *See* 31 C.F.R. §§ 561.203(j)-(k), 561.204(f)(2).

Effective March 15, 2013, the Treasury Department added a section to the Iranian Financial Sanctions Regulations providing:

> (a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

> (b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

Iranian Financial Sanctions Regulations, 78 Fed. Reg. 16,403, 16,408 (Mar. 15, 2013) (codified at 31 C.F.R. § 561.205).

### 4.    Gold-Transactions Regulations

Effective July 31, 2012, Executive Order 13,622 provided for the imposition of secondary sanctions on persons whom the Treasury Secretary, in consultation with the Secretary of State, "determin[ed] . . . ha[d] materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, . . . the purchase or acquisition of . . . precious metals," such as gold, "by the Government of Iran."  Exec. Order No. 13,622 § 5, 77 Fed. Reg. at 45,899-900. It was, however, not sanctionable to facilitate gold sales involving nongovernmental Iranian individuals and entities until July 1, 2013, the effective date of new restrictions imposed by section 1245 of the Iran Freedom and Counterproliferation Act of 2012, Pub. L. No. 112-239, 126 Stat. 1632, 2009-11 (2013) (codified at 22 U.S.C. § 8804(a), (c)).

### 5.    Summary of Iran Sanctions

U.S. sanctions against Iran underwent significant changes during 2012-2015.[3] To summarize a few important changes and key dates:

---

[3] Highlighting the mutable and politically charged nature of U.S. sanctions against Iran, the United States in January 2014 began easing sanctions in exchange for limits on Iran's nuclear program.  *See* U.S. Dep'ts of Treasury & State, *Guidance Relating to the Provision of Certain Temporary Sanctions Relief in Order to Implement the Joint Plan of Action Reached on November 24, 2013, Between the P5+1 and the Islamic Republic of Iran* (Jan. 20, 2014), http://bit.ly/2NxbxEe; *JCPOA Guidance*, *supra*; *see also* A640, A962-64.  The U.S. government, however, recently decided to withdraw from the agreement and resume enforcement of the suspended

15

- At all relevant times, sales of food, medicine, or medical devices to Iran could be facilitated without sanctions risk. *See* NDAA § 1245(d)(2), 125 Stat. at 1648; Exec. Order No. 13,622 § 1(d), 77 Fed. Reg. at 45,897-98; 31 C.F.R. §§ 561.203(g), 561.204(d)(1).

- Beginning February 6, 2013, aside from bilateral trade between Turkey and Iran, facilitating transactions involving proceeds from Iranian petroleum sales was sanctionable. *See* 31 C.F.R. §§ 561.203(j)-(k), 561.204(f)(2).

- Beginning July 1, 2013, facilitating any gold sale to or from Iran was sanctionable. *See* 22 U.S.C. § 8804(a), (c). Before that date, it was not sanctionable for a foreign financial institution to facilitate gold transactions between Turkey and nongovernmental individuals and entities in Iran.

## C.    Zarrab's Alleged Scheme

Until his arrest, Atilla served as one of approximately a dozen deputy general managers of Halkbank. A690-91. In early 2012, Zarrab attempted to recruit Halkbank to participate in his Iranian sanctions-evasion scheme but was initially rebuffed by Halkbank's then-General Manager, Suleyman Aslan. A367-68. Zarrab testified that he then bribed Turkey's Economy Minister to direct Halkbank to do business with him. A368-71. According to Zarrab, after his meeting with the Minister, General Manager Aslan agreed to assist Zarrab with transferring funds from Iranian oil and gas sales out of Halkbank. *See* A371. The government did not allege (much less offer evidence) that Atilla played any role in Aslan's alleged

---

sanctions. *See* U.S. Dep't of Treasury, Iran Sanctions, http://bit.ly/2Lev8fP (last visited September 5, 2018).

decision; indeed, Zarrab testified he did not even meet Atilla until late 2012, several months after Aslan allegedly agreed to help. A472, A483. According to Zarrab, Aslan solicited and received millions in bribes. A396-98; *see also, e.g.*, A403, A406. It is undisputed that Atilla neither received nor requested any bribes. A406, A482, A606, A671.

Zarrab allegedly used Halkbank to perform one narrow task: transferring proceeds from Iranian oil and gas sales sitting in Halkbank accounts to companies in Dubai that Zarrab owned or controlled. As even the prosecution described "the Halkbank part of [Zarrab's scheme]," "[t]he whole purpose of this is to get that money to Dubai." A717. Zarrab initially structured these transactions to look like gold transactions with nongovernmental Iranian individuals and entities, which were not sanctionable under U.S. law before July 1, 2013. *See* A374-77, A955; *see also supra* p. 15. Once sanctions on gold transactions tightened, Zarrab switched tracks, attempting to pass off the bulk of his transactions as sanctions-exempt food sales. *See* A429-33, A956; *see also supra* pp. 13-14. *Every* transaction involving Halkbank was conducted in euros or Turkish liras; U.S. dollars were never used. *See, e.g.*, A374-77, A429-33, A955-56 (describing transactions in euros); *see also* A384 (Zarrab: gold transactions involved "euros and Turkish liras").

Even in the government's telling, Halkbank's (and Atilla's) involvement in Zarrab's scheme ended once the Iranian funds were out of Halkbank and with

Zarrab's companies in Dubai. From that point, Zarrab—acting without Halkbank or Atilla—allegedly used the funds to make payments to various non-U.S. entities to which the Iranians owed money. *See, e.g.*, A360, A376-77, A431. It is undisputed that neither the originators of these transfers (i.e., Zarrab's companies in Dubai) nor their recipients were located in the United States. Nevertheless, some of these "downstream" payments were made in U.S. dollars and cleared through U.S. banks. *See, e.g.*, A365, A469, A546. To make those payments, Zarrab's companies in Dubai had to convert the funds that had been denominated as euros or liras while at Halkbank into U.S. dollars. *See* A471. International electronic funds transfers involving the exchange of foreign currencies into U.S. dollars are frequently, but not always, cleared through U.S. banks. *See, e.g.*, A667; *Iran Nuclear Deal Oversight: Implementation and Its Consequences (Part II): Hearing Before the H. Comm. on Foreign Affairs*, 114th Cong. 27 (2016) (statement of Adam Szubin, Acting Under Secretary, U.S. Dep't of Treasury) ("[E]very foreign bank in the world has U.S. dollars in their possession."). The government does *not* allege Atilla was personally involved in any wire transfers cleared through U.S. banks.

Indeed, over a nearly month-long trial, the government presented little evidence implicating Atilla in any way. In stark contrast to Aslan, who traded hundreds of text messages with Zarrab, A482, the government presented no text messages between Atilla and Zarrab, *see* A483. The government introduced into

18

evidence the transcripts of only *four* wiretapped calls between Atilla and Zarrab, totaling around 12 minutes.[4]  *See* A854-55 (February 6, 2013); A863-69 (April 10, 2013); A856-60 (July 9, 2013); A861-62 (September 26, 2013).

Generally, the calls addressed documentation for Zarrab's transactions at Halkbank.  *See, e.g.*, A855 ("partnership structure" documentation); A856-60 (bills of lading and "field of business" documentation); A864, A868 ("letter of credit," "customs documents," and "ship loading documents"); A456 (gold-transaction documentation).  Indeed, Zarrab admitted he *lied* to Atilla in an April 10, 2013 call to conceal that Zarrab's purported food transactions were fake and he was not actually transporting food to Iran.  A512-13, A541; *see also* A421.  After the April 10 call, Zarrab groused to an employee that Atilla's inquiries had thrown "a wrench in the gears" of Zarrab's scheme.  A873; *see also* A428.  Unsurprisingly, given Atilla's inquiries and documentation demands, Zarrab testified he "did not like" Atilla.  A482.

At sentencing, the district court expressly rejected the government's unproven suggestion that Atilla was the "chief architect" and "mastermind" of Zarrab's alleged

---

[4] Former Turkish police officer Huseyin Korkmaz testified regarding two additional purportedly wiretapped calls between Zarrab and Atilla on July 2, 2013.  *See* A663-64.  Because Korkmaz did not have the underlying recordings, *id.*, he purported to testify from memory regarding the contents of the over four-year-old calls, though he had listened to hundreds or thousands of calls, A659.  According to Korkmaz, the calls addressed issues related to Zarrab's purported food transactions.  *See* A663-64.

scheme.  A970-71, A973; *cf.* A339.  The court applied a Sentencing Guidelines § 3B1.2(b) minor-role reduction because Atilla was "substantially less culpable" than other scheme participants.  A969.  It then varied downward from the 97-121 month guidelines range it calculated, imposing a 32-month sentence.  A975; SPA66. In doing so, the court found Atilla was a "sometimes reluctant[]" "cog in the wheel" of Zarrab's scheme and was simply "doing his job" and "following orders in large measure from his boss."  A969-73.  The court also emphasized that, unlike others, Atilla "was not a beneficiary of" Zarrab's scheme.  A973.

### D. The Absence of Evidence Atilla Knew Zarrab's Alleged Scheme Would Use U.S. Banks

The government presented no evidence Atilla knew Zarrab's alleged scheme would involve the use of U.S. banks.  As purported proof that Atilla was aware U.S. banks would be used, the government relied on Zarrab's general testimony that Atilla was apprised that the ultimate objective of Zarrab's scheme was to fulfill "international money orders" for the Iranians.  *E.g.*, A384.  The government relied heavily on an October 2012 meeting Zarrab claims Atilla attended.  *See* A392-93; *see also* A717.  *But see* A694-95, A699, A709-10 (Atilla's counter-testimony). Zarrab testified that at that meeting, Iranian oil-company officials allegedly asked Halkbank to intermediate their "international payments" directly, cutting out Zarrab. A393; *accord* A547.  According to Zarrab, that request was denied, but the Iranian

officials were told they "could continue on within the existing system"—i.e., using Zarrab to facilitate their transactions.  A393.

Zarrab, however, did not testify that Atilla was ever told that *any* of the Iranians' "international payments" would even be made in U.S. dollars, rather than in the denominations that *all* of the funds were in while at Halkbank (Turkish liras and widely accepted euros), or in yen, pounds, yuan, or any of the world's many other currencies.  Each of the transactions Halkbank made that was discussed at trial was denominated in euros or Turkish liras; there is no evidence Halkbank *ever* conducted *any* transaction in another currency in furtherance of Zarrab's alleged scheme.  *See supra* p. 17.  Nor did Zarrab testify that Atilla was ever apprised that the payments Zarrab was making from Dubai, after Halkbank was out of the picture, would be cleared through U.S. banks, rather than banks in Europe, China, or elsewhere.

Indeed, Atilla firmly admonished Halkbank employees in a May 2013 email never to "send US banks transactions related to Iran," even if they involved humanitarian transactions not subject to U.S. sanctions.  A921-26; *see also* A711.  Atilla was adamant:  "Do not do USD [U.S. dollar] transactions in any way whatsoever [in matters involving Iran]."  A921-26.

21

### E.    Atilla's Interactions With U.S. Treasury Officials

Atilla's Halkbank duties occasionally required him to interact with U.S. Treasury Department officials, including Under Secretary David Cohen and Office of Foreign Assets Control ("OFAC") Director Adam Szubin, both of whom testified at trial.    The government alleges Atilla "deceiv[ed] [these] officials in order to conceal [Zarrab's] scheme," A959, by falsely claiming Halkbank had performed "due diligence" to avoid transactions potentially subject to U.S. sanctions, A712.

The record, however, shows that in a February 2013 meeting, Atilla warned Treasury officials that Halkbank was having "great difficulty in trying to determine the origin of [gold transactions], and the ultimate destination." A888; *see also* A629. Atilla also sought guidance from U.S. officials, asking Under Secretary Cohen at an October 2014 meeting whether the government intended to sanction Zarrab. A579, A919-20. Cohen refused to answer. A579, A920.

Although the government alleges Atilla impaired Treasury officials' ability "to enforce and administer" U.S. sanctions against Iran, A721, Cohen's and Szubin's testimony makes clear that their interactions with Atilla were not part of any law-enforcement investigation of Halkbank's dealings with Zarrab. *See* A587 (Cohen: "I was not conducting an investigation."); A612 (Cohen: "[M]y job wasn't to be an investigator."); A647 (Szubin could not recall "ever discuss[ing] Mr. Zarrab with

22

anyone from Halkbank"). To this day, the Treasury Department has not designated Halkbank for the imposition of secondary sanctions. *See, e.g.*, A584.

### F. The District Court Refused to Allow the Defense to Present Evidence the Government's Principal Witness Said in a Recorded Jailhouse Conversation That "You Have to Admit to Something You Haven't Done," and "Once You Admit Your Guilt, You Are Set Free"

In response to the government's belated document productions, the district court on Tuesday, November 28, 2017, ordered the government to produce "[a]ll *Brady* material … by 6:00 pm" that day. A331. The government nonetheless waited until 10:42 p.m. on Saturday, December 2—in the middle of Zarrab's direct examination, and just days before his cross-examination began—to produce recordings of five telephone calls Zarrab made while detained. A764, A767, A775. Although the recordings were in Azeri, the government provided only brief English summaries of the calls rather than complete, translated transcripts. A767-68, A777-78.

But even the summaries made clear that one recording—a September 15, 2016 call between Zarrab and his uncle Ahad—threatened to destroy the credibility of the government's star witness. The government's summary reported that Zarrab said:

> [I]n such a country [as the United States], in order to get out or get a reduced sentence, you need to admit to crimes *you haven't committed*. . . . [I]n America in order to make it out of prison you need to admit to something *you haven't committed*.

A777 (emphasis added).

23

Although belatedly produced,[5] the summary was accurate.  When the defense

finally translated and transcribed the call, it read:

> Zarrab:    Here, when you come around and say "OK, yes, I did this
>            shit", look, this leaves you in peace.  Once you confessed … ,
>            they do not mess up with you.
>
> Ahad:      Yes
>
> Zarrab:    Did you get it?  I have already partially admitted my guilt.
>
> Ahad:      Oh, you should not do that.  Why did you?
>
> Zarrab:    Baba, I have no choice.  What should I have done?  Do you
>            want me to get life sentence?
>
> Ahad:      Baba, what could be the sentence now?
>
> Zarrab:    10 years, 10, 10.
>
> Ahad:      What's the difference between 10 and 20 years?
>
> Zarrab:    There is a huge difference, baba.  What do you mean what
>            difference?  A huge difference.
>
> Ahad:      Baba
>
> Zarrab:    There is a huge difference between 10 and 11 years.
>            Godspeed.  Do you know what a year means to me?  What do
>            you mean the difference between 10 and 20 years?

---

[5] The government argued—and, remarkably, the district court apparently agreed—that the November 28 order requiring production of "[a]ll *Brady* material" did not apply to Zarrab's jailhouse recording because it is impeachment material governed by *Giglio v. United States*, 405 U.S. 150 (1972). *See* A763, A765-66, A475. *Giglio*, however, merely "clarif[ied] that the rule stated in *Brady* applies to evidence undermining witness credibility." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam).

24

Ahad:     But, you, but.  I am saying that you haven't done anything.  What are you talking about?  [Unintelligible].

Zarrab:    But there is no law here.  There is no rule of law here, look.  Here, *you have to admit to something you haven't done*.  This is how it works here.  This country is like this.  Look, *you have to say you have done something you haven't*.

          . . . .

Zarrab:    This oppression that exists here, it is only in America.  It doesn't happen in other countries.  Where there is no such oppression in the country, they can't play around.  They can either know before you admit guilt.  In that case they come and say, for example, take these shops [sic] and fuck off and give up your shops [sic].[6]  But *once you admit your guilt, you are set free.  That's it, getting free.  It is like you swallow it.*

A828-30 (emphasis added).

Zarrab's credibility, bias, and motive to lie were central issues at trial.  A jury could reasonably conclude based on this call that Zarrab intended to lie about his conduct to seek a shorter prison sentence.  Zarrab plainly stated his objective was "getting free," A830, and even a one-year sentence reduction would make a "huge difference" to him, A829.

The government, of course, could try to present a different interpretation of Zarrab's statements—arguing perhaps (as it did in briefing to the district court) that

---

[6] Zarrab may have used "shops" as slang or idiomatically (or even as code) for "guys."  *See, e.g.*, A385-86, A659 (Zarrab used code words in alleged scheme).

25

Zarrab's statements "you have to admit to something you haven't done" and "once you admit your guilt, you are set free" were actually "two completely distinct thoughts."  A835-36.  *But see* A777 (government summary of Zarrab's statements).  But the jury never had an opportunity to consider what inferences should be drawn from the jailhouse conversation, because the court precluded the defense from presenting evidence of the conversation.

During cross-examination, defense counsel asked Zarrab whether he had told his uncle during a jailhouse call "that, in this country, you have to admit to something you haven't done in order to become free; once you admit your guilt, you become free."  A543.  Remarkably, Zarrab responded, "That is absolutely not correct."  *Id*.

Defense counsel sought to contradict Zarrab by confronting him with the recording.  *Id*. ("Your Honor, I'd like to play a recording that's in Azeri for impeachment purposes.  I have a transcript.").  Far from seeking to correct its witness's false testimony, the government objected.  *Id*.  The court barred the defense from playing the recording, instructing it instead to "[a]sk [Zarrab] whether he spoke to his uncle and what did he say."  *Id*.

Protected from any risk he would be contradicted by the recording, Zarrab again lied in response to the defense's further questioning:

> Q.   You spoke with your uncle about how you get out of jail in the United States, correct?
>
> A.   That is not correct, ma'am.

26

Q.   You didn't tell him that you have to admit to something you haven't done in order to get free?

A.   That is not correct, ma'am.

A544.

During its case in chief, the defense again tried to set the record straight, moving to introduce into evidence the recording of Zarrab's jailhouse conversation and the defense's translated transcript. A822-25. As the motion explained, Zarrab's statements were "both admissible and highly relevant" because they "evince[d] the fact that he was prepared to lie in order to obtain a better deal" from the government. A825; *see also* A824 (arguing that Zarrab's stated "belief that a prospective cooperating defendant had to lie in order to obtain an acceptable deal from the Government constitute[d] a remarkable commentary on the motive underlying his trial testimony"). The district court denied the motion. SPA34.

## SUMMARY OF ARGUMENT

1.   The district court's instruction that the jury could convict Atilla of conspiring to violate IEEPA based on the theory that he conspired to evade or avoid the imposition of secondary sanctions conflicts with the longstanding position of the agency charged with sanctions administration, the plain language of IEEPA and the regulatory provisions at issue, the presumption against extraterritoriality, the rule of lenity, and the Due Process Clause. The relevant provisions only forbid transactions that evade or avoid *existing* "prohibitions" already imposed on a foreign financial

27

institution's ability to open or maintain U.S. accounts. *E.g.*, 31 C.F.R. § 561.205(a). They do not prohibit efforts to evade or avoid the *imposition* of secondary sanctions.

2.    The prosecution presented *no* evidence (much less legally sufficient evidence) that Atilla knew Zarrab's alleged sanctions-avoidance scheme would involve the use of U.S. banks. The prosecution's *only* alleged evidence of Atilla's knowledge was Zarrab's testimony that Atilla allegedly knew funds withdrawn from Halkbank would be used to make "international payments" for Iran. *E.g.*, A393. That is insufficient to establish Atilla knew the payments, which Zarrab made on his own, without Atilla's or Halkbank's involvement, would be made with U.S. dollars—as opposed to, for example, the Turkish liras or widely accepted euros the funds were denominated in while at Halkbank—much less that the downstream transactions would be cleared through U.S. banks, rather than banks in Europe, China, or elsewhere.

3.    Atilla's conviction for conspiring to defraud the United States fails because novel (and vague) judge-made expansions on 18 U.S.C. § 371's plain text cannot be used to supplement the sanctions regulations issued under IEEPA—which, as explained above, do not prohibit the alleged secondary-sanctions evasion efforts on which the § 371 charge is premised. There is no justification for this Court to venture into the foreign-relations arena by, in a common-law fashion, using a broad interpretation of § 371 to protect the Executive from alleged sanctions-avoidance

28

schemes that the Executive has refrained from using its ample IEEPA regulatory authority to proscribe. At minimum, the Court should reverse Atilla's § 371 conviction because the government did not establish that Atilla conspired to obstruct "a particular administrative proceeding," such as a formal Treasury Department investigation of Halkbank or Zarrab. *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018).

4. During trial, the government belatedly produced a recorded jailhouse call in which Zarrab, the government's star witness, said that in the United States, "you have to admit to something you haven't done," and "once you admit your guilt, you are set free." A829-30. The district court abused its discretion and violated Atilla's right to present a complete defense by precluding Atilla from using the recording and a translated transcript to contradict Zarrab's denials on cross-examination that he made the recorded statements and to demonstrate Zarrab's bias and motive to testify falsely to obtain a reduced sentence.

## **ARGUMENT**

## I. **The District Court Erred by Instructing the Jury That It Could Convict Atilla of Conspiring to Violate IEEPA if It Found That He Conspired to Evade or Avoid the Imposition of Secondary Sanctions**

The heart of this case is the government's allegation in Count 2 that Atilla conspired to violate IEEPA. The government asserted two alternative theories on this count. *See* A779-81. First, Atilla allegedly conspired to evade or avoid the

29

imposition of secondary sanctions on Halkbank by working to conceal sanctionable conduct. *See* A721 (government alleges conspiracy "to avoid being penalized by the Treasury Department, to avoid the prohibitions that come with being blacklisted, the prohibitions on being able to maintain access to the U.S. financial system"). Second, Atilla allegedly conspired to cause U.S. banks to provide prohibited financial services for the ultimate benefit of the Iranian government and other sanctioned entities. *See id.* (government argues Atilla conspired to assist Iran with conducting transactions "through the U.S. financial system").

Both theories fail, for different reasons. As explained below in Section II, the second theory fails because the government presented *no* evidence (much less legally sufficient evidence) that Atilla knew Iranian funds would be cleared through U.S. banks. This section focuses on the government's first theory. That theory is legally untenable because it is not a crime under IEEPA to engage in conduct that might result in the imposition of secondary sanctions or to evade or avoid the imposition of such sanctions. Because the jury instructions erroneously allowed the jury to convict Atilla for conspiring to engage in such non-criminal conduct, Atilla is entitled to a new trial.

### A.  <u>Standard of Review</u>

This Court reviews instructional-error claims *de novo*. *See Banki*, 685 F.3d at 105.

### B.    IEEPA Does Not Criminalize Conspiracies to Evade or Avoid the Imposition of Secondary Sanctions

The plain language of IEEPA and the executive orders and regulations at issue makes clear that it is not a crime for an individual to conspire to evade or avoid the imposition of secondary sanctions.  IEEPA makes it a crime for a person to "willfully commit[]" or "willfully conspire[] to commit … an unlawful act described" in 50 U.S.C. § 1705(a).  50 U.S.C. § 1705(c).  Section 1705(a), in turn, provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [IEEPA]."

The government's first theory of liability depends on the premise that a person violates a "license, order, regulation, or prohibition issued under [IEEPA]" by evading or avoiding the imposition of secondary sanctions.  The parties' dispute turns on the proper interpretation of the "evasion or avoidance" provisions contained in various executive orders and regulations.  As relevant here, those provisions closely resemble the language of 31 C.F.R. § 561.205(a), the "evasion or avoidance" provision in the Iranian Financial Sanctions Regulations, so the analysis for all such provisions would be similar.[7]  Section 561.205(a) provides:  "Any transaction on or

---

[7] *See* 31 C.F.R. § 560.203(a); Exec. Order No. 13,622 § 9(a), 77 Fed. Reg. at 45,900; Exec. Order No. 13,645 § 13(a), 78 Fed. Reg. 33,945, 33,950 (June 3, 2013).  Several evasion-or-avoidance provisions are clearly inapplicable here because they expressly apply only to transactions by "United States person[s] or within the United

31

after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate *any of the prohibitions set forth in this part* is prohibited." 31 C.F.R. § 561.205(a) (emphasis added).

The problem with the government's theory is that U.S. law does *not* "prohibit[]" conduct that *could provide a basis* for secondary sanctions, but is not yet the subject of such sanctions. Instead, sanctionable conduct might *result* in the imposition of prohibitions: The regulations provide that the Treasury Secretary may "prohibit U.S. financial institutions from opening [or maintaining] a correspondent account or a payable-through account" for foreign financial institutions, *but only* "upon a determination by the Secretary of the Treasury that [the] foreign financial institution has knowingly" conducted or facilitated "any significant financial transaction" with designated Iranian entities or for the purchase or acquisition of petroleum, petroleum products, or petrochemical products from Iran. 31 C.F.R. §§ 561.203-.204. Thus, the regulations make clear there is no "prohibit[ion]" until the Treasury Secretary has made the requisite "determination."

The government's theory that it is a crime to conspire to evade or avoid the determinations that *might lead to* the imposition of "prohibitions on being able to

---

States." Exec. Order No. 12,959 § 1(g), 60 Fed. Reg. 24,757, 24,758 (May 6, 1995); Exec. Order No. 13,059 § 2(f), 62 Fed. Reg. 44,531, 44,532 (Aug. 19, 1997); Exec. Order No. 13,224 § 2(b), 66 Fed. Reg. 49,079, 49,080 (Sept. 23, 2001); Exec. Order No. 13,599 § 5(a), 77 Fed. Reg. 6659, 6660 (Feb. 5, 2012).

maintain access to the U.S. financial system" has no textual basis. A721. For the government's theory to work, § 561.205(a) would need to be rewritten to prohibit transactions that evade or avoid "*the imposition of* prohibitions." As written, however, § 561.205(a) only applies to transactions that evade or avoid an *existing* "prohibition" that has already been imposed on a foreign financial institution's ability to open or maintain U.S. accounts. That necessarily follows from the fact that the very same provision prohibits "caus[ing] a violation of … prohibitions," which would be impossible for as-yet-unimposed prohibitions. Section 561.205(a) is thus inapplicable because the Treasury Department never prohibited Halkbank from opening or maintaining U.S. accounts. The district court thus erred by charging the jury on that theory. *See Friends of Animals v. Clay*, 811 F.3d 94, 98 (2d Cir. 2016) ("a court must give effect to a regulation's plain language").

The prosecution's expansive view of IEEPA and the Iran sanctions regime, which was embodied in the district court's jury instructions, conflicts with the Treasury Department's longstanding interpretation, IEEPA's text and structure, and fundamental principles of statutory construction.

To begin: The Treasury Department's longstanding interpretation of the relevant statutes, regulations, and executive orders contradicts the prosecution's position. Mid-trial, the prosecution filed a letter containing a devastating admission: OFAC, the Treasury Department agency primarily responsible for administering and

33

enforcing the Iran sanctions regime, *see* A560, A625-26, "has historically taken the position that the prohibitions contemplated by the secondary sanctions—including implementing enforcement actions, levying fines, or taking other punitive measures for violating the prohibitions—attach only after a foreign financial institution has been sanctioned by the Secretary of the Treasury." A780. The prosecution tried to blunt the effect of that admission by emphasizing OFAC had "not previously been confronted" by facts precisely like the supposedly "unique circumstances of this case." A779. But the prosecution's eleventh-hour damage control cannot hide that *the agency charged with sanctions administration has "historically taken" the very position the defense pressed here*: "[P]unitive measures" are unavailable until "a foreign financial institution has been sanctioned." A780. Indeed, the Treasury Department has repeatedly acknowledged in public statements that it lacks direct regulatory authority over foreign entities and that sanctionable conduct by foreign persons *is not criminal*.[8] Thus, OFAC's longstanding view forecloses the

---

[8] *See, e.g.*, A913 (Cohen: "We don't have any jurisdiction to tell any foreign company or foreign bank what it can or cannot do."); David J. Brummond, OFAC, *US Sanctions Implementation for the Shipping Industry* 7, http://bit.ly/2IcoZuI (secondary sanctions involve "No Civil or Criminal Penalty"). Accordingly, sanctions-law practitioners have repeatedly expressed the view that secondary sanctions do not entail "criminal or civil penalties." Andrew W. Shoyer, Sidley Austin LLP, *Sanctions (OFAC) Compliance Update* 7 (May 12, 2016), http://bit.ly/2jIGV5I; *accord, e.g.*, Perry S. Bechky, *Sanctions and the Blurred Boundaries of International Economic Law*, 83 Mo. L. Rev. 1, 10 (2018) ("While

34

prosecution's position that it is a crime to evade or avoid the *imposition* of secondary sanctions. *Cf. PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 42 (D.C. Cir. 2016) (rejecting new enforcement agency's novel statutory interpretation that conflicted with prior agency's "longstanding interpretation").[9]

OFAC's historical understanding of the Iran sanctions regime not only militates against adopting the prosecution's position here; it also raises serious due-process problems. Prosecuting Atilla based on a novel interpretation of the sanctions laws inconsistent with the longstanding views of the agency charged with administering them violates the fundamental due-process principle that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (due process prohibited agency from penalizing conduct occurring before change in interpretation); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) ("due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir.

---

primary sanctions may be enforced by criminal prosecution or civil fines, secondary sanctions are enforced by economic measures." (footnote omitted)).

[9] Although the en banc court disagreed with part of the *PHH Corp.* panel's decision, it reinstated the portions cited here. *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 83 (D.C. Cir. 2016) (en banc).

1995) (similar). Retroactively applying the prosecution's newly minted legal theory to Atilla's past conduct flunks "Rule of Law 101." *PHH Corp.*, 839 F.3d at 48.

Furthermore, OFAC's historical interpretation of the relevant laws demonstrates Atilla could not have acted with the requisite scienter of willfulness. *See* 50 U.S.C. § 1705(c); *see also* SPA22, SPA26-27 (to convict on IEEPA-conspiracy charge, jury had to find Atilla willfully participated in conspiracy). To establish Atilla acted "willfully," the prosecution had to prove he "acted with knowledge that his conduct was unlawful." *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) (per curiam) (quoting *Bryan v. United States*, 524 U.S. 184, 191-92 (1998)). Atilla could hardly have known that seeking to evade or avoid the *imposition* of secondary sanctions was unlawful when the very agency charged with administering U.S. sanctions had "historically taken the position" that "punitive measures" could be imposed "only *after* a foreign financial institution has been sanctioned." A780 (emphasis added).

OFAC's traditional understanding of its IEEPA authorities—that is, Atilla's position here—accords with that statute's language and structure. The government's (and the district court's) position, by contrast, conflicts with it at every turn. To start, it conflicts with IEEPA's limitation of presidential regulatory authority to persons or property "subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1). As explained above, *see supra* pp. 10-11, persons "subject to the jurisdiction of the

United States" are U.S. citizens and residents, persons "actually within the United States," corporations organized under U.S. law, and organizations "owned or controlled" by persons in those categories. 19 Fed. Reg. at 5481-82; *accord* 31 C.F.R. § 535.329. IEEPA does not authorize the Executive Branch to prohibit foreign nationals, such as Atilla, from taking actions outside of the United States to evade or avoid the imposition of secondary sanctions on foreign persons. In instructing the jury that it could convict Atilla for engaging in such conduct, the district court violated the limitations Congress placed on the President's IEEPA authority.

The absurdity of the government's expansive view of IEEPA is underscored by its implications for a provision authorizing the President to require third parties to prepare reports or produce documents as "necessary to enforce the provisions" of IEEPA. 50 U.S.C. § 1702(a)(2). Under the government's reading, IEEPA authorizes the President to require any foreigner anywhere in the world to prepare reports and produce documents to assist in determining whether that foreigner is evading or avoiding the imposition of secondary sanctions. Nothing in IEEPA indicates that Congress intended to grant the President authority to "regulate the world" by dragooning foreigners into assisting with enforcing U.S. secondary-sanctions regulations. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). As

former Treasury Department Under Secretary David Cohen conceded on cross-examination, that agency does "not directly regulate foreign financial institutions," and "as a general matter," Treasury's OFAC lacks "authority to demand" reports from foreigners about wholly foreign transactions. A583, A587.

The history of 18 U.S.C. § 2339B, which criminalizes material support for foreign terrorist organizations, confirms that Congress did not intend IEEPA to have broad extraterritorial application. Similar to IEEPA, § 2339B originally applied only to persons "within the United States or subject to the jurisdiction of the United States." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 303, 110 Stat. 1214, 1250-53. Congress subsequently deleted that phrase while amending § 2339B to authorize prosecution of any offender "brought into or found in the United States" for conduct "occur[ring] outside the United States." Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 6603(c)-(d), 118 Stat. 3638, 3762-63. That Congress deemed it necessary to amend § 2339B to reach foreigners committing acts abroad demonstrates Congress did not believe the prior statutory language—the identical "subject to the jurisdiction of the United States" language still in IEEPA—was broad enough to have that reach.

In addition, applying IEEPA's criminal-penalty provision to a *foreign* national who allegedly conspired *outside of the United States* to evade or avoid the imposition of secondary sanctions on a *foreign* entity violates the well-established presumption

38

against extraterritorially applying U.S. statutes. *See RJR Nabisco*, 136 S. Ct. at 2100-01; *accord Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010); *United States v. Hoskins*, No. 16-1010-cr, 2018 WL 4038192, at *22-24 (2d Cir. Aug. 24, 2018); *see also United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (presumption "applies to criminal statutes"). Because IEEPA contains no "clear, affirmative indication" Congress intended the statute to have such broad extraterritorial application, the government's reading of the statute must be rejected. *RJR Nabisco*, 136 S. Ct. at 2101; A917 (Cohen: "None of our authorities are extraterritorial.").

This case illustrates the important role the presumption against extraterritoriality plays in "avoid[ing] … international discord." *RJR Nabisco*, 136 S. Ct. at 2100; *accord Kiobel*, 569 U.S. at 115-16. Because this prosecution involves allegations that Turkish government officials were bribed to facilitate a Turkish state-owned bank's involvement in a scheme to circumvent U.S. sanctions against Iran, it has caused significant tension in U.S.-Turkey relations. *See, e.g.*, A961 (Turkish-embassy letter to State Department expressing "deep concern" about this case); *see also* Amanda Sloat, *Why Turkey Cares About the Trial of Reza Zarrab*, Brookings Institution (Nov. 22, 2017), https://brook.gs/2rt6xI4.

The "familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" also militates against construing

IEEPA and the executive orders and regulations at issue as criminalizing conspiracies to evade or avoid the imposition of secondary sanctions. *Skilling v. United States*, 561 U.S. 358, 410 (2010) (citation omitted); *see also Banki*, 685 F.3d at 108-12 (applying principle in vacating convictions for violating Iran sanctions regulations). Where, as here, "text, structure, and history fail to establish that the Government's position is unambiguously correct," the Court must "resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994); *accord United States v. Valle*, 807 F.3d 508, 526 (2d Cir. 2015); *see also Adamo Wrecking Co. v. United States*, 434 U.S. 275, 285 (1978) ("doubts are resolved in favor of the defendant" (citation omitted)).

Finally, if the provisions here criminalized evading or avoiding the imposition of secondary sanctions, there is little question they would be unconstitutionally vague. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[T]he doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct" is punishable "and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality op.);

40

*accord id.* at 1224, 1227-28 (Gorsuch, J., concurring in part and concurring in judgment).

The district court instructed the jury that IEEPA is violated "if the conspirators believed that … sanctions could be imposed, and acted in that belief in agreeing to engage in a transaction or transactions designed to avoid the imposition of those sanctions"; in other words, "avoiding the imposition of sanctions by unlawfully concealing the true nature of a transaction" is a criminal offense. SPA27. This interpretation of the sanctions laws lacks "sufficient definiteness" to satisfy due process. *Kolender*, 461 U.S. at 357. To understand why, it is important to recall that it is common ground that U.S. law does not purport to prohibit foreigners from doing business with Iran; it only provides that their access to the U.S. financial system might be restricted if they do so. *See, e.g.*, A276, A351. Understandably, persons who do business with Iran might hesitate to publicize that fact, and indeed, there is no obligation for foreigners to notify the Treasury Department when they engage in sanctionable transactions. The district court's (and the prosecution's) position thus requires drawing a line between lawful nondisclosure and unlawful sanctions avoidance. "The dividing line between unlawful evasion and lawful action cannot be left to conjecture." *M. Kraus & Bros., Inc. v. United States*, 327 U.S. 614, 621 (1946) (opinion of Murphy, J.). But the text of IEEPA and the relevant regulations and executive orders provides no guidance on how to draw the line. The

district court's and prosecution's position thus "impermissibly delegates" this "basic policy" question to prosecutors, judges, and juries "for resolution on an ad hoc and subjective basis"—the precise danger the void-for-vagueness doctrine aims to avoid. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *see also M. Kraus*, 327 U.S. at 622 (opinion of Murphy, J.) ("A prosecutor in framing an indictment, a court in interpreting the Administrator's regulations or a jury in judging guilt cannot supply that which the Administrator failed to do by express word or fair implication."); *Looper v. Morgan*, No. H-92-0294, 1995 U.S. Dist. LEXIS 10241, at *39 (S.D. Tex. June 30, 1995) (government's "broad interpretation" of evasion-or-avoidance provisions in Libyan sanctions laws "raise[d] serious issues concerning vagueness").

Because the district court's and prosecution's expansive interpretation of the sanctions laws' evasion-or-avoidance provisions raises serious due-process concerns, it must be rejected. *See Skilling*, 561 U.S. at 408-09 (rejecting interpretation that "would raise the due process concerns underlying the vagueness doctrine"); *cf. Marinello v. United States*, 138 S. Ct. 1101, 1105, 1108 (2018) (rejecting "broad interpretation" of statute prohibiting corrupt endeavors to "obstruct or impede" the "due administration of [the Internal Revenue Code]" based on concerns of "lack of fair warning and related kinds of unfairness"). According to their plain language, the evasion-or-avoidance provisions come into play only *after*

the U.S. government has imposed a specific "prohibition," such as prohibiting a particular financial institution from opening or maintaining U.S. accounts.

## C.   The IEEPA Jury Instructions Were Legally Erroneous

The district court erred in instructing the jury in accordance with the prosecution's novel, expansive interpretation of the sanctions laws' evasion-or-avoidance provisions.   Specifically, the court erred in providing the following instruction regarding the evasion-or-avoidance theory:

> [I]t is not necessary for the foreign financial institutions to have been sanctioned before the conspirators agreed to engage in the transaction for the purpose of evading or avoiding the prohibitions that could result in the imposition of sanctions.   It is sufficient if the conspirators believed that the sanctions could be imposed, and acted in that belief in agreeing to engage in a transaction or transactions designed to avoid the imposition of those sanctions.   In other words, avoiding the imposition of sanctions by unlawfully concealing the true nature of a transaction would violate the prohibition on evading or avoiding the prohibition.

SPA27; *see also* A740 (defense objection).   For the reasons explained above, the court was wrong to instruct the jury that it could convict based on the theory that Atilla conspired to "avoid the imposition of … sanctions."   SPA27.

The court further erred in rejecting the defense's requests for the following instructions:

- A substantive IEEPA violation requires proof that "the activity for which the defendant is charged had some connection to the United States either by involving a United States person in the conduct or by causing goods, services or technology to be exported or re-exported from the United States, as part of the defendant's scheme.   In other words, the violative conduct has to go through the United States.   A

43

United States correspondent account not connected to the conduct at issue is not enough." A740.

- "If you find Mr. Atilla did not know the transactions were sent through the U.S., then you must acquit him on the charge of conspiring to export U.S. services to Iran or the government of Iran." *Id.*

- "Conspiring to do activity that is merely sanctionable is not a crime." *Id.*

- "Mere statements that fail to disclose sanctionable activity are not sufficient to convict because they are not transactions within the meaning of the evasion avoidance regulation." *Id.*

- Engaging in sanctionable conduct could only result in a person being "sanctioned, not convicted of a crime." *Id.*

### D.    The Instructional Errors Entitle Atilla to a New Trial on the IEEPA-Conspiracy and Money-Laundering Counts

Because the district court instructed the jury on a legally erroneous theory of liability, Atilla is entitled to a new trial. "[C]onstitutional error occurs" where, as here, "a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Skilling*, 561 U.S. at 414 (citing *Yates v. United States*, 354 U.S. 298 (1957)). The instructional error would be harmless only if "the jury would have necessarily" convicted Atilla under the government's alternative IEEPA theory that he conspired to cause U.S. banks to provide prohibited financial services for the ultimate benefit of the Iranian government and other sanctioned entities. *United States v. Ferguson*, 676 F.3d 260, 277 (2d Cir. 2011); *see also* A721. "The Government bears the burden of establishing harmlessness"

44

beyond "a reasonable doubt." *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017) (citation omitted).

The government cannot meet that burden here. At trial, Atilla vigorously disputed the government's contention that he knew the alleged scheme would involve the use of U.S. banks, a necessary element to convict Atilla under the government's alternative IEEPA theory. Indeed, the government's weakness on that theory appears to be the reason why, just 82 days before jury selection, the government filed a superseding indictment departing from the responsible agency's longtime view of the law and for the first time introducing the theory that U.S. law criminalizes conspiracies to evade or avoid the imposition of secondary sanctions. Atilla contends the government's evidence of knowledge was so lacking that he is entitled to judgment as a matter of law. *See infra* Section II. Therefore, it is impossible to say with *any* confidence—much less "beyond a reasonable doubt"— that the jury would still have convicted Atilla of conspiring to violate IEEPA if instructed correctly. *Neder v. United States*, 527 U.S. 1, 19 (1999) ("If … the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.").

45

The jury's inconsistent verdicts on the non-IEEPA counts do not support a harmlessness finding. Nothing in this case's facts or the jury's instructions can explain the jury's decision to acquit Atilla of substantive money laundering but convict him of bank fraud. Under the court's instructions, the bank-fraud conviction should logically have resulted in a money-laundering conviction because the alleged bank fraud involved transferring funds to the United States from a foreign country.[10] *See* SPA20-21 (money-laundering instruction charged jury to convict if Atilla "caused … funds … to be … transferred" to the United States to promote bank fraud). The inconsistent verdicts suggest jury confusion or a compromise verdict. Either way, given the inconsistency, the jury's votes to convict on certain counts, such as bank fraud, do not provide a sufficient basis for inferring the jury "would have necessarily" convicted on the IEEPA-conspiracy count, even without the erroneous evasion-or-avoidance instructions. *Ferguson*, 676 F.3d at 277; *see also United States v. Moran-Toala*, 726 F.3d 334, 344 (2d Cir. 2013) ("inconsistency in the jury's verdicts" complicates harmless-error review because Court can "do no more than try to guess which of the inconsistent verdicts is the one the jury really meant" (citation omitted)); *cf. United States v. Andrews*, 681 F.3d 509, 528 n.17 (3d

---

[10] Despite the inconsistency, "the Double Jeopardy Clause bars any retrial" of Atilla on the substantive-money-laundering count because he was acquitted on that count. *United States v. Moran-Toala*, 726 F.3d 334, 341 (2d Cir. 2013).

46

Cir. 2012) ("[i]n some instances, it may be problematic to look to a defendant's conviction on one count and conclude that an error as to another count was harmless").

Therefore, Atilla is entitled to a new trial on the IEEPA-conspiracy charge (Count 2). *See United States v. Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016) ("An erroneous instruction, unless harmless, requires a new trial." (citation omitted)). The instructional error also entitles Atilla to a new trial on the money-laundering-conspiracy count (Count 6) because the money-laundering instructions effectively incorporated the erroneous IEEPA charge; the court instructed the jury that it could convict Atilla of conspiring to launder money if it found that the money transfers at issue promoted the alleged IEEPA conspiracy. *See* SPA21; *see also Silver*, 864 F.3d at 124.

## II. Atilla Is Entitled to Judgment of Acquittal on Counts 2-4 and 6 Because the Government Presented No Evidence Atilla Knew the Alleged Scheme Would Involve U.S. Banks

The district court erred by denying Atilla's motion for a judgment of acquittal on the IEEPA conspiracy (Count 2), bank fraud (Count 3), bank-fraud conspiracy (Count 4), and money-laundering conspiracy (Count 6) charges because the government presented *no* evidence—much less legally sufficient evidence—that Atilla knew Zarrab's alleged sanctions-avoidance scheme would involve the use of U.S. banks. *See* SPA36-60. It is undisputed that the bank fraud and bank-fraud-

47

conspiracy counts required proof that Atilla knew U.S. banks would be used.  *See* SPA19-20 (bank-fraud instructions: jury had to find Atilla acted "knowingly, willfully, and with specific intent" to defraud or wrongfully obtain the property of U.S. banks); SPA19 (instructing jury that "law relating to bank fraud … also appl[ies] … to the conspiracy to commit bank fraud").  The government's only legally viable IEEPA-conspiracy theory similarly required proof that Atilla knew the alleged scheme's transactions would pass "through the U.S. financial system." A721.[11]  And the money-laundering-conspiracy count relied on the IEEPA-conspiracy, bank-fraud, and bank-fraud-conspiracy counts as the charged objects of the alleged money laundering.  *See* SPA21.  Therefore, if Atilla is entitled to a judgment of acquittal on those other counts, the money-laundering-conspiracy conviction fails as well.  Also, Atilla could not have conspired to transfer money "from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States"—

---

[11] *Accord* SPA26 (instructing jury that sanctions regulations prohibited "the execution of dollar denominated money transfers from the United States" on behalf of Iranian government or persons); *see also* SPA24-26 (conspiracy requires proof defendant acted "with knowledge of [conspiracy's] unlawful purposes"); SPA26 (jury required to find Atilla "knowingly and willfully participated in a conspiracy to engage in conduct that would have violated IEEPA"); *cf. supra* Section I (arguing that government's alternative IEEPA theory based on evading or avoiding sanctions' imposition is legally erroneous).

as required for the money-laundering-conspiracy conviction—unless he knew the charged scheme would use U.S. banks. *Id.*

## A.   Standard of Review

This Court reviews *de novo* whether the government presented sufficient evidence to "reasonably support a finding … beyond a reasonable doubt" that Atilla knew Zarrab's alleged scheme would involve the use of U.S. banks. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *see also United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006).   Because Atilla moved for judgment of acquittal immediately after the government closed its evidence, and the district court reserved ruling on the motion until after trial, *see* SPA38-40, this Court may consider only the evidence presented in the government's case-in-chief in evaluating Atilla's sufficiency argument.   *See* Fed. R. Crim. P. 29(b) & advisory committee notes to 1994 amendments; *see also United States v. Autuori*, 212 F.3d 105, 108 (2d Cir. 2000).   If "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," and the defendant is entitled to acquittal.   *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (citation omitted); *accord United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

**B.**    **The Government's Evidence of Knowledge Was Insufficient**

The government's *only* alleged evidence of Atilla's knowledge of the use of U.S. banks was Zarrab's testimony that Atilla allegedly knew that after funds were removed from Halkbank, they would be used to fulfill "international money orders" or make "international payments" for Iran. *E.g.*, A384, A393. That is simply not sufficient to support a finding beyond a reasonable doubt that Atilla knew the scheme would use *U.S. banks*. To state the obvious, "international payments" can be—and frequently are—completed without any part of the transaction being cleared through the United States. For example, international payments are routinely made through non-U.S. banks using euros. The government's own expert witness, Mark Dubowitz of the Foundation for Defense of Democracies, testified that the euro is "accepted worldwide." A354; *see also id.* ("[I]f … the Iranian government … , wants to buy anything from overseas companies, those companies . . . . want to be paid in dollars *or Euros* . . . ." (emphasis added)). Particularly given Atilla's well-documented insistence on avoiding dollar-denominated transactions when dealing with Iranian funds, *see* A921-26 ("[d]o not do USD transactions"), the government needed to present additional evidence to prove Atilla knew the international payments here would involve the use of U.S. banks. Because the government failed to do so, Atilla is entitled to a judgment of acquittal.

50

Attempting to salvage the government's case, the district court emphasized the following testimony of Deutsche Bank employee Douglas Sloan:

> [T]he Iranian economy is predominantly petroleum based. The petroleum industry is predominantly U.S. dollar based. In order for the Iranian economy to function, it, therefore, must conduct a lot of its business in U.S. dollars. Because of the prohibitions involving trading transaction facilitating [sic] on behalf of Iranians and Iranian persons, and because their economy is dependent on U.S. dollar-denominated transactions because of the oil, third parties are often utilized to disguise the transactions.

A655; *see also* SPA58. Although not mentioned in the district court's Rule 29 decision, Mark Dubowitz similarly testified that the "majority of trade in global energy markets is denominated in U.S. dollars," but he acknowledged that "the Euro[] [and] the Swiss franc are used as alternatives." A353.

Sloan's and Dubowitz's testimony does not help the government. Regardless whether the "petroleum industry is predominantly U.S. dollar based" generally, A655, it is undisputed that *every one* of Halkbank's transactions in oil-and-gas proceeds were denominated in "euros and Turkish liras," *not* dollars. A384; *see also supra* p. 17. Unless (oil rich) Iran used the funds withdrawn from Halkbank to purchase petroleum—and Atilla knew that—testimony that the "petroleum industry is predominantly U.S. dollar based" is simply irrelevant, given that the petroleum-industry proceeds Halkbank handled were undisputedly denominated in Turkish

51

liras and euros.[12]   A655.   The testimony merely indicates that, absent sanctions, *buyers* of Iranian petroleum might be expected to pay Iran in U.S. dollars.   The testimony has no bearing on whether *Iran's* "international payments" for products *it* purchased—using funds denominated in Turkish liras and euros when Halkbank last held them—were likely to be denominated in dollars, much less cleared through U.S. banks.

In any event, any inferences that *might* be drawn from Sloan's and Dubowitz's testimony are too speculative to sustain Atilla's convictions.   *See Coplan*, 703 F.3d at 76 ("speculation and surmise" cannot sustain conviction (citation omitted)).   The district court appears to have concluded that since the "Iranian economy is predominantly petroleum based" and the "petroleum industry is predominantly U.S. dollar based," Atilla must have known that some of Zarrab's transactions for the Iranians would be cleared through U.S. banks.   A655.   Courts, however, refuse to allow litigants to rely on such "probabilistic reasoning" based on "industry-wide" data to satisfy even civil pleading or summary-judgment standards.   *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 257 (6th Cir. 2012) (addressing

---

[12] At trial, the government offered examples of the entities Zarrab's companies allegedly paid in dollars, such as Shanghai Huisheng Plastic Products Company and P.T. South Pacific Viscose.   *See* A463-64, A469, A768, A875-85.   The government presented no evidence that Atilla was aware of those transactions—which occurred after Halkbank's involvement had ended—or even of the possibility that companies would insist on being paid in dollars rather than euros.

Federal Rule of Civil Procedure 9(b)); *see also Lawton, ex rel. United States v. Takeda Pharm. Co.*, 842 F.3d 125, 132 (1st Cir. 2016) ("aggregate … data" insufficient to satisfy Rule 9(b) (citation omitted)); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 439-40, 443 (3d Cir. 2004) (fact that pharmacy dispensed approximately 60% of its medications to Medicaid patients insufficient at summary judgment to establish that pharmacy submitted false claims to government); *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856-57 (7th Cir. 2006) (similar to *Quinn*). It is untenable to uphold Atilla's *criminal* conviction based on the theory that Atilla *must have* drawn an inference— i.e., petroleum transactions generally involve dollars, therefore Zarrab's transactions will use U.S. banks—of the type courts hold is too speculative even under the lower proof standards of *civil* litigation. *Cf. Quinn*, 382 F.3d at 443 n.16 (rejecting "'must have been' theory of liability").

The government might invoke the concept of "conscious avoidance" or "willful blindness" to try to establish Atilla's knowledge that Zarrab's scheme would use U.S. banks. To establish knowledge based on a willful-blindness theory, the government must prove that Atilla "subjectively believe[d] that there [was] a high probability" the scheme would use U.S. banks and that Atilla took "deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*,

563 U.S. 754, 769 (2011). The government failed to present sufficient proof of either willful-blindness prerequisite.

First, a reasonable jury could not find beyond a reasonable doubt that Atilla was subjectively aware of a "high probability" the scheme would use U.S. banks. *Id.* Again, the government's *only* knowledge evidence was Zarrab's testimony that Atilla allegedly knew the funds from Halkbank would be used to make "international payments" for Iran. *E.g.*, A393. As explained above, alleged knowledge that Zarrab would make "international payments" is an insufficient basis for inferring Atilla believed there was a high probability the transactions would pass through U.S. banks. *See supra* pp. 50-53.

Second, the government presented no evidence Atilla took "deliberate actions to avoid learning" about the scheme's downstream use of U.S. banks *after* Iranian funds were withdrawn from Halkbank. *Global-Tech*, 563 U.S. at 769. The government alleges only that Atilla participated in transferring funds to Dubai. *See supra* pp. 17-18. Zarrab and his employees alone handled the "international payments" made after the funds left Halkbank. *See* A360 (Zarrab: "I made the international payments."). Atilla would have needed to go out of his way to learn that some of those payments were cleared through U.S. banks. A finding of willful blindness is inappropriate in such cases. *See, e.g.*, *United States v. Macias*, 786 F.3d 1060, 1064 (7th Cir. 2015) (willful-blindness instruction improper where

defendant's role in conspiracy "did not require him to know how the money [he agreed to transport] had been obtained"); *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990) (willful-blindness instruction improper even though defendant could have learned of illegal activity by slightly diverting from his daily commute).

Even if Atilla failed "to display curiosity" regarding how Zarrab used the funds withdrawn from Halkbank, that is insufficient to establish willful blindness. *Macias*, 786 F.3d at 1063 (quoting *Giovannetti*, 919 F.2d at 1228). Atilla did not undertake "active efforts … to avoid knowing" about the scheme's use of U.S. banks.[13] *Global-Tech*, 563 U.S. at 770. To the contrary, he actively sought to prevent Halkbank from "send[ing] US banks transactions related to Iran" or "do[ing] USD [U.S. dollar] transactions in any way whatsoever [in matters involving Iran]." A921-26. Under these circumstances, knowledge of Zarrab's use of U.S. banks cannot be ascribed to Atilla under a willful-blindness theory.

---

[13] Panels of this Court have indicated in *non-precedential* summary orders that a "conscious-avoidance instruction may be given even when the defendant has taken no active measures to avoid learning of criminal activity." *United States v. Dambelly*, 714 F. App'x 87, 88 (2d Cir. 2018) (summary order); *accord, e.g.*, *United States v. Bonventre*, 646 F. App'x 73, 86 (2d Cir. 2016) (summary order). That position cannot be reconciled with the Supreme Court's express rejection in *Global-Tech* of the Federal Circuit's willful-blindness standard because it did not "require active efforts … to avoid" knowledge. 563 U.S. at 770. In any event, however the willful-blindness standard should be articulated, it clearly is not satisfied here. *See id.* at 769 ("[W]illful blindness … surpasses recklessness and negligence.").

55

Because the government presented *no* evidence Atilla knew Zarrab's alleged scheme would use U.S. banks, Atilla is entitled to reversal and entry of a judgment of acquittal on the IEEPA-conspiracy, bank-fraud, bank-fraud-conspiracy, and money-laundering-conspiracy charges (Counts 2, 3, 4, and 6).

## III. Atilla Is Entitled to a Judgment of Acquittal on, or Dismissal of, Count 1 Because Vague Judge-Made Criminal Law Under 18 U.S.C. § 371 Cannot Be Used to Supplement IEEPA Sanctions Regulations

The prosecution here was unprecedented in yet another respect: Atilla was convicted in Count 1 of conspiring "to defraud the United States" in violation of 18 U.S.C. § 371 based on the theory that he "ma[de] it more difficult" for the Treasury Department to enforce U.S. sanctions against Iran, SPA23 (jury instructions), by allegedly lying "to Treasury so that they would not be able to investigate the sanctions evasion that they were concerned about," A721 (government's summation); *see also* A238 (indictment charged Atilla with conspiring "to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws"). Although amorphous, the government's § 371 theory appears to have been premised primarily on the notion that Atilla's allegedly deceptive conduct impeded the Treasury Department's ability to designate Halkbank for the imposition

of secondary sanctions.[14]  In pursuing this theory—which no appellate court appears to have ever addressed, much less adopted—the prosecution turned to judge-made common law under § 371 to supplement the Executive Branch's own sanctions regulations, which as explained above do *not* proscribe efforts to evade or avoid the imposition of secondary sanctions.   *See supra* Section I.   As this Court has recognized, such efforts to further expand the bounds of the common-law accretions courts have made to § 371 "warrant[] considerable judicial skepticism," and they should be rejected here.  *Coplan*, 703 F.3d at 61.  Atilla is entitled to a judgment of acquittal on (or, alternatively, dismissal of) the § 371 charge.

## A. <u>Standard of Review</u>

This Court reviews *de novo* whether Atilla is entitled to a judgment of acquittal on the § 371 charge.  *See supra* p. 49.

Atilla initially articulated his legal objections to that charge in his motion to dismiss the indictment.  *See* A269-73.  Because the district court's denial of that motion, *see* SPA2-12, was the law of the case, Atilla's Rule 29(a) motion at trial did not dwell at length on the legal arguments regarding the § 371 charge that the court had already rejected.  But the Rule 29(a) motion did reassert those arguments, thus

---

[14] *See, e.g.*, A276 (government asserts alleged fraud allowed Halkbank to maintain its "relationship with … U.S. banks"); A820 ("Atilla tried to 'deceive Treasury' by assuring them that Halk Bank was taking steps to comply with sanctions . . . .").  If the government has a different understanding of its § 371 theory, the onus is on it to explain that theory, and identify where in the record it was articulated.

preserving for appeal the issue whether Atilla is entitled to a judgment of acquittal on the § 371 charge. *See, e.g.*, A810 (moving for judgment of acquittal "on all six counts," including § 371 charge); A811 (arguing that "government cannot proceed to the jury on [a sanctions] evasion theory" under § 371); A812 (applying government's § 371 theory "to a foreigner is legally unjustifiable and unprecedented").

Even if Atilla had not preserved his § 371 arguments in his Rule 29(a) motion, he indisputably did so in his motion to dismiss the indictment. Therefore, Atilla also contends that the district court erred by refusing to dismiss that charge from the indictment. This Court reviews the denial of Atilla's motion to dismiss *de novo*. *See Vilar*, 729 F.3d at 79.

### B. This Court Should Not Supplement IEEPA Sanctions Regulations With a Vague, Common-Law Gloss on § 371's Plain Text

The government's theory is inconsistent with § 371's text. "It is a well-established rule of construction that [w]here Congress uses terms that have accumulated settled meaning under … the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder*, 527 U.S. at 21 (citation omitted). Under that rule, this should be an easy case. "At common law, the words 'to defraud' meant to deprive another of *property rights* by dishonest means." *Coplan*, 703 F.3d at 59

(emphasis added). The government, however, has never alleged Atilla sought to deprive the United States of any "property."

Lacking any foundation for its theory in the statutory text, the government instead relies on a "common law" expansion of § 371 adopted by courts. *Id.* at 61. Highlighting that the expansive fraud theory is a creation of the judiciary, not Congress, it is commonly called a "*Klein* conspiracy"—named after a leading case espousing the theory, *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957). *Klein* concluded that § 371's prohibition against conspiracies to defraud the United States "not only includes the cheating of the Government out of property or money, but 'also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.'" *Id.* at 916 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).

This case, however, is not *Klein*. *Klein*—like most of its progeny—involved a conspiracy to "imped[e] and obstruct[] the Treasury Department in the collection of income taxes." *Id.*; *see also United States v. Crim*, 451 F. App'x 196, 200 n.1 (3d Cir. 2011) ("'*Klein* Conspiracy' … has become the generic term for a conspiracy to frustrate the government (*usually the IRS*) in its lawful information gathering functions." (emphasis added)). Such a conspiracy arguably satisfies the common law's property-based definition of fraud because it involves a "scheme for obstructing the Government's knowledge and collection of revenue due." *Klein*, 247

59

F.2d at 917-18; *see also id.* at 921 (in *Klein*, "tremendous American profits were skillfully concealed from the collectors' eyes"). In any event, it might at least be said that Congress has implicitly acquiesced to *Klein* in the tax arena, where the theory is most well established.

Although courts have occasionally extended *Klein*'s logic to conspiracies not involving tax-evasion efforts, *see, e.g.*, *United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996), it appears that no appellate decision has *ever* affirmed a § 371 conviction based on the theory that a defendant conspired to impair the Treasury Department's "enforcement of economic sanctions" issued under IEEPA. A238. This Court should not be the first. As the Court has recognized, "the *Klein* conspiracy is a common law crime, created by the courts rather than by Congress." *Coplan*, 703 F.3d at 61. Because the "notion of a common-law crime is utterly anathema" under modern law, the novel application of the *Klein* doctrine the government seeks here "warrants considerable judicial skepticism." *Id.* (quoting *Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting)); *see also Lanier*, 520 U.S. at 267 n.6 ("Federal crimes are defined by Congress, not the courts . . . .").

The concerns about protecting government operations underlying the *Klein* doctrine do not justify extending judge-made law to the conduct here for at least three reasons. *First*, Congress in IEEPA empowered the President, not the courts, to impose sanctions to address threats to national security and to adopt regulations

to implement and enforce those sanctions. *See* 50 U.S.C. §§ 1701-1702, 1704. As explained above, in exercising these powers, the President and the Treasury Department have chosen to proscribe transactions undertaken to evade or avoid *existing* prohibitions, such as the prohibition on opening or maintaining a U.S. correspondent or payable-through account for a foreign financial institution that has been subjected to secondary sanctions. *See supra* pp. 31-33. They have *not* issued regulations purporting to prohibit actions taken to evade or avoid the *imposition* of secondary sanctions.

There is no justification for this Court, in common-law fashion (and thus after the fact), to use an expansive interpretation of § 371 to protect the Executive from conduct the Executive has refrained from using its broad regulatory authority under IEEPA to proscribe.[15]  *Cf. United States v. Alston*, 77 F.3d 713, 718-21 (3d Cir.

---

[15] Because 50 U.S.C. § 1702(a)(1) restricts the President's IEEPA regulatory authority to persons or property "subject to the jurisdiction of the United States," IEEPA does not authorize the Executive to prohibit foreign nationals from taking actions outside of the United States to evade or avoid the imposition of secondary sanctions on foreign persons. *See supra* pp. 36-37. But the Executive Branch under IEEPA *could have* prohibited such evasive actions by U.S. citizens or corporations or by foreign nationals while present in the United States; it simply has chosen not to do so. In any event, if IEEPA were interpreted as denying the Executive the authority to prohibit evading or avoiding the imposition of secondary sanctions, that would only *strengthen* the argument that the courts should not circumvent Congress's determination by criminalizing such schemes under § 371. *Cf. Hoskins*, 2018 WL 4038192, at *9 ("conspiracy and complicity liability will not lie when Congress demonstrates an affirmative legislative policy to leave some type of participant in a criminal transaction unpunished").

1996) (prosecution could not avoid heightened *mens rea* requirement for substantive structuring offense by pursuing § 371 conspiracy-to-defraud theory). The President and the Treasury Department are best positioned to determine what conduct "impair[s], impede[s], and obstruct[s] … the enforcement" of their own sanctions regime. A238. Yet they have not purported to proscribe the type of allegedly evasive conduct with which Atilla is charged. To the contrary, OFAC "has historically taken the position" that "punitive measures" to enforce secondary sanctions can be imposed "only after a foreign financial institution has been sanctioned by the Secretary of the Treasury." A780.

Furthermore, the record makes clear that Atilla's conduct was immaterial to the Treasury Department's sanctions-enforcement decisions: Despite its full knowledge of all the evidence presented at Atilla's trial, the Treasury Department *still* has not sanctioned Halkbank. *See* A584; *cf. Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("[M]ateriality look[s] to the effect on the likely or *actual* behavior of the recipient of the alleged misrepresentation." (emphasis added) (citation omitted)); *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (government's decision not to disallow contractor's charged costs after investigation "very strong evidence" of immateriality (quoting *Universal Health*, 136 S. Ct. at 2003)).

First enacted in 1867, § 371's conspiracy-to-defraud provision is a vestige of a time when "the activities of the federal government fast outstripp[ed] the ability of Congress to fashion criminal statutes to guard federal processes."  Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 440 (1959). Here, however, Congress has delegated expansive regulatory authority to the Executive, which has not used that authority to proscribe the conduct at issue.  Since Congress entrusted the implementation and administration of economic-sanctions programs primarily to the President, not the judiciary, this Court should not use § 371 to criminalize conduct that the Executive itself has not seen fit to proscribe.

*Second*, economic sanctions are tools of foreign policy, and foreign-policy decisions "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."  *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).  Determining the extent to which foreigners—especially employees of foreign state-owned companies such as Halkbank—should be subject to punitive measures for allegedly "making it more difficult," SPA23, for the U.S. government to enforce its sanctions against Iran is the sort of "delicate" and "complex" political question "for which the Judiciary has neither aptitude, facilities nor responsibility," *Chicago & S. Air Lines*, 333 U.S. at 111.  Indeed, as explained above, the Turkish government has expressed "deep concern" about this prosecution.  A961; *see also supra* p. 39.  Therefore, the same

63

concerns about avoiding "international discord" underlying the presumption against extraterritorial application of statutes, *RJR Nabisco*, 136 S. Ct. at 2100, similarly militate against construing § 371 retroactively to reach sanctions-evasion conspiracies allegedly carried out by foreigners.

Those concerns are particularly pronounced here because U.S. Treasury officials' interactions with foreign financial institutions—especially state-owned ones like Halkbank—are quasi-diplomatic in nature. *See, e.g.*, A886-99 (State Department cables summarizing Treasury officials' meetings with Halkbank). International diplomacy is not a realm where full candor is generally expected. *See* Ambrose Bierce, *The Devil's Dictionary* (defining "diplomacy" as the "patriotic art of lying for one's country"); *see also* Matthew Palmer, *The Dishonest Diplomat: How a Critical Profession Got a Bad Rap*, Time, June 23, 2014, https://ti.me/2l5f4gV (diplomats cannot be "an open book" and must "cherry-pick … facts, omit the inconvenient from … narratives and manipulate language without mercy").

*Third*, the theory on which Atilla was convicted—i.e., that he allegedly conspired to use "dishonest or deceitful means" to "mak[e] it more difficult for the government to carry out" the Iran sanctions regime, SPA23—is unconstitutionally vague. *See, e.g.*, *Kolender*, 461 U.S. at 357. Expansive interpretations of § 371's conspiracy-to-defraud clause raise significant vagueness concerns. *See* Goldstein,

64

*supra*, at 442.  Extending § 371 to alleged sanctions-evasion schemes like the one at issue would require drawing a line between lawful conduct aimed at furthering a foreign institution's or state's interests, perhaps at the United States' expense, and criminal fraud against the U.S. government.  Because the government's theory here would permit prosecutors, judges, and juries to resolve this "basic policy" question "on an ad hoc and subjective basis"—without any meaningful guidance from § 371's text—the theory violates the void-for-vagueness doctrine.[16]  *Grayned*, 408 U.S. at 108-09.

At minimum, the Court should narrow the government's theory to minimize vagueness concerns.  *See Skilling*, 561 U.S. at 404-09 (narrowly interpreting statute to avoid vagueness).  In doing so, the Court should look to *Marinello v. United States*, 138 S. Ct. 1101 (2018), for guidance.  Like this case, *Marinello* involved a statute aimed at protecting government functions against obstruction.  The statute at issue in *Marinello*, 26 U.S.C. § 7212, prohibits corrupt "endeavors to obstruct or impede[] the due administration" of the Internal Revenue Code.  Emphasizing that a "broad[er] interpretation" of § 7212 could impose criminal liability without "fair warning" of the conduct proscribed—one of the concerns underlying the void-for-

---

[16] Given the serious vagueness concerns here, the rule of lenity also militates against adopting the government's theory.  *Cf. Tanner v. United States*, 483 U.S. 107, 131 (1987) (invoking rule of lenity in holding § 371 does not reach fraud perpetrated against private-entity recipient of government financial assistance and supervision).

vagueness doctrine, *see Grayned*, 408 U.S. at 109—the Supreme Court required the government to prove "a 'nexus' between the defendant's conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action," *Marinello*, 138 S. Ct. at 1108-09.

Similarly here, the Court at minimum should hold that to convict Atilla under § 371, the government had to prove he conspired to obstruct "a particular administrative proceeding," such as a formal Treasury Department investigation of Halkbank or Zarrab. The government made no such showing. The government's § 371 charge was premised on the allegation that Atilla "lied to Treasury" officials David Cohen and Adam Szubin in an effort "to obstruct them from being able to enforce and administer [U.S.] sanctions regulations." A721. As explained above, however, the record makes clear that Cohen's and Szubin's meetings and other communications with Atilla were not conducted in furtherance of any law-enforcement investigation of Halkbank's dealings with Zarrab. *See supra* pp. 22-23; *see also* A587, A612, A647.

\* \* \* \* \*

When construed expansively, § 371 becomes "a Kafkaesque crime, unknown and unknowable except in terms of the facts of each case—and even then, not until the verdict has been handed down." Goldstein, *supra*, at 463; *see also United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977) ("conspiracy-to-defraud prosecutions

66

are scrutinized carefully" given their "peculiar susceptibility to a kind of tactical manipulation which shields from view very real infringements on basic values of our criminal law" (citations omitted)). This is a case in point. Here, a Turkish citizen working for a Turkish state-owned bank was convicted of a felony based on a vague common-law theory never before adopted by any court, even though the President and Treasury Department have not used their ample regulatory authority to prohibit that conduct themselves. This Court should not abet such an abusive construction. Atilla is entitled to a judgment of acquittal on the § 371 charge, or (alternatively) its dismissal.

## IV. The District Court Abused Its Discretion by Precluding the Defense From Confronting Zarrab With, and Presenting to the Jury, Evidence Zarrab Said in a Recorded Jailhouse Conversation That in the United States, "You Have to Admit to Something You Haven't Done," and "Once You Admit Your Guilt, You Are Set Free"

As explained above, *see supra* pp. 23-27, Zarrab—the government's star witness, who testified under a cooperation agreement—told his uncle in a recorded September 2016 jailhouse telephone conversation that in the United States, "you have to admit to something you haven't done," and "once you admit your guilt, you are set free." A829-30. On cross-examination, Zarrab denied making those statements. *See* A543-44. The government not only failed to correct its witness's lies; it successfully opposed the defense's efforts to contradict Zarrab by confronting him with the recording of his conversation, and the court also denied the defense's

67

motion to introduce the recording and a translated transcript into evidence to show Zarrab "was prepared to lie in order to obtain a better deal" from the government. A825; *see also* A543; SPA32-35.  In doing so, the district court abused its discretion and violated Atilla's constitutional right to "a meaningful opportunity to present a complete defense."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation omitted).  The error was not harmless and requires a new trial:  Zarrab's testimony was the foundation of the government's case, and jurors could reasonably interpret his jailhouse statements as expressing an intent to lie about the particular scheme in which Atilla was charged with participating.

### A.    Standard of Review

This Court reviews evidentiary rulings for abuse of discretion.  *See, e.g.*, *United States v. Strother*, 49 F.3d 869, 874-75 (2d Cir. 1995); *United States v. Weiss*, 930 F.2d 185, 197-98 (2d Cir. 1991).  A district court abuses its discretion when its ruling rests on a legal error or clearly erroneous factual finding or otherwise falls outside "the range of permissible decisions."  *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008) (citation omitted).

### B.    The Defense Was Entitled to Introduce Evidence of Zarrab's Jailhouse Conversation to Prove Zarrab's Bias and to Contradict His Sworn Testimony That He Did Not Make the Recorded Statements

Zarrab's recorded statements are classic evidence of bias.  "Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a

witness which might lead the witness to slant … his testimony in favor of or against a party.  Bias may be induced … by the witness' self-interest." *United States v. Abel*, 469 U.S. 45, 52 (1984).  Evidence of bias "is almost always relevant." *Id.*

In his conversation, Zarrab expressly admitted to a particular "self-interest"—obtaining a reduced sentence.  *Id.*  Zarrab said reducing his sentence by even one year would make a "huge difference" to him.  A829.  Zarrab also made clear this self-interest would lead him "to slant … his testimony" against Atilla.  *Abel*, 469 U.S. at 52.  He expressly stated his belief that in the United States, "you have to admit to something you haven't done," and "once you admit your guilt, you are set free."  A829-30.  Reasonable jurors could interpret Zarrab's statements as expressing an intent to lie about the very scheme in which he and Atilla were charged with participating to achieve his intensely desired objective of "getting free."  A830.  The defense "should have been permitted to expose to the jury the facts" of Zarrab's jailhouse conversation, "from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to [Zarrab's] reliability." *Davis v. Alaska*, 415 U.S. 308, 309, 318 (1974) (preventing defendant from inquiring about "possible bias" violated Confrontation Clause); *see also United States v. Harvey*, 547 F.2d 720, 722-24 (2d Cir. 1976) (reversing because bias evidence excluded); *cf. United States v. Blum*, 62 F.3d 63, 66-69 (2d Cir. 1995) (reversing because evidence of witness's motive to falsify document excluded).

69

This evidence was critically important to counter Zarrab's government-elicited testimony that his cooperation agreement required him "[t]o speak exactly the truth," A359, and that to obtain a "substantial assistance" sentence reduction, he needed to "giv[e] truthful information that does not contain any lies," A551. Zarrab even testified that "ma[king] up something bad about Hakan Atilla on the stand" would "be the worst thing that could happen in [his] life" because it would jeopardize a potential sentence reduction. *Id.*; *see also* A734 (prosecution's summation asserted "Zarrab was doing everything he could to make sure he told you the truth"). But as the government's own summary of Zarrab's jailhouse conversation demonstrates, Zarrab there expressed a polar-opposite understanding of how the American legal system operates:

> [Zarrab] says in such a country [as the United States], in order to get out or get a reduced sentence, you need to admit to crimes you haven't committed. . . . [I]n America in order to make it out of prison you need to admit to something you haven't committed.

A777. The jury was entitled to decide which expression of Zarrab's understanding of the importance of truth-telling was more accurate—Zarrab's unguarded statements to his uncle, or his self-serving statements at trial.

The jailhouse conversation was so clearly relevant to assessing Zarrab's credibility that it was undisputed at trial that the defense could *question* Zarrab about the conversation. *See* A543-44. Zarrab, however, refused to admit he "told [his] uncle that, in this country, you have to admit to something you haven't done in order

70

to become free." A543. Indeed, Zarrab even denied that he "spoke with [his] uncle about how you get out of jail in the United States." A544.

The defense was not required to simply "take the answer of the witness" on this crucial bias-related issue. *Abel*, 469 U.S. at 52. It is "well settled" that "bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely." *Harvey*, 547 F.2d at 722; *accord Abel*, 469 U.S. at 52; *United States v. James*, 609 F.2d 36, 46 (2d Cir. 1979); *see also* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:37 (4th ed. 2017) ("[E]xtrinsic evidence of misconduct may be admitted to show that a witness is motivated by bias, interest, or influence . . . ."). Atilla was thus entitled to introduce into evidence the recording and translated transcript of Zarrab's conversation to prove Zarrab had a motive to testify falsely because he had previously expressed an understanding that he needed to lie about his scheme to minimize his sentence.[17]

---

[17] Because the recording was offered to prove Zarrab's "state of mind," it was not excludable as hearsay. Fed. R. Evid. 803(3); *see also United States v. DiMaria*, 727 F.2d 265, 270-72 (2d Cir. 1984). If the recording had been admitted into evidence, the defense could have argued that in the recorded conversation, Zarrab effectively expressed an intention to lie to obtain a reduced sentence, and that this stated intention is evidence Zarrab perjured himself at trial. *See Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 294-300 (1892); *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000).

The recording and transcript were also admissible under Federal Rule of Evidence 613(b) as evidence of a prior inconsistent statement. *See* A823 (defense motion citing Rule 613(b)). Rule 613(b) provides: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." It is "well settled" that two statements can be "inconsistent" for purposes of Rule 613(b) without being "diametrically opposed." *United States v. Trzaska*, 111 F.3d 1019, 1024 (2d Cir. 1997) (citation omitted). The test is whether "there is [a]ny variance between the statement and the testimony that has a *reasonable bearing on credibility*." *Id.* at 1025 (citation omitted).

Zarrab's recorded conversation is "inconsistent" with his sworn testimony that he did not tell his "uncle that, in this country, you have to admit to something you haven't done in order to become free." A543. And it directly contradicts his testimony that he did not speak "with [his] uncle about how you get out of jail in the United States." A544. Because Rule 613(b)'s other requirements were satisfied— the defense afforded Zarrab an opportunity to explain or deny his statements, and the government could have questioned Zarrab about them—the recording and transcript should have been admitted under that rule. *Cf. Strother*, 49 F.3d at 873-

76 (reversing because evidence of prior inconsistent statements erroneously excluded).

At the very least, the district court should have granted the defense's request to confront Zarrab by "play[ing] [the] recording" for him "in Azeri," even if the recording and transcript were not formally admitted into evidence. A543; *see also United States v. Jackson*, 882 F.2d 1444, 1448-49 (9th Cir. 1989) (permitting impeachment with document "never admitted into evidence"). Even where, unlike here, the defense is pursuing forms of impeachment that *cannot* be bolstered by "extrinsic evidence," the cross-examiner "must have a chance to press and even to push the witness," including by confronting the witness with "documents relating to or describing conduct by the witness." Mueller & Kirkpatrick, *supra*, § 6:36. Simply playing the recording for Zarrab in Azeri might have sufficed "to awaken [his] conscience … , perhaps in the end getting at truth [Zarrab sought] to avoid in the beginning." *Id.* The district court abused its discretion by shielding Zarrab from the risk of being contradicted by the recording, which allowed Zarrab to give "questionably truthful answer[s]" with impunity, *Davis*, 415 U.S. at 314, while asserting seconds later that his cooperation agreement required him to "tell[] one hundred percent the truth." A543-44.

## C.    The District Court's Rationale for Exclusion Is Mistaken

The district court cited two legal reasons and two practical considerations to support its decision to exclude the recording and transcript of Zarrab's jailhouse conversation.  None provides grounds for affirming.

The court first concluded that admitting the recording and transcript "would violate Federal Rule of Evidence 608(b)," which provides:  "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."   SPA32.   Rule 608(b), however, "regulate[s] only the use of specific instances of conduct to prove that the witness is a 'bad person' or is a generally untruthful person."  *James*, 609 F.2d at 46; *see also* Fed. R. Evid. 608, advisory committee notes to 2003 amendments.  It does not apply where, as here, the evidence is offered to show a witness's bias (i.e., motive to testify falsely).  *See James*, 609 F.2d at 46 ("court erred in concluding that Rule 608(b) applied" to evidence offered to show "bias" and "motive to testify falsely" (citation omitted)); Mueller & Kirkpatrick, *supra*, § 6:37 (Rule 608(b) "does not bar" extrinsic evidence offered "to show that a witness is motivated by bias, interest, or influence"); *accord Abel*, 469 U.S. at 52, 55-56.  Nor did Rule 608(b) bar defense efforts to present the recording and transcript as evidence of a prior inconsistent statement contradicting Zarrab's testimony about his conversation with his uncle.  *See United States v.*

74

*Beverly*, 5 F.3d 633, 639 (2d Cir. 1993) (Rule 608(b) inapplicable where evidence offered for "impeachment of specific falsehoods"); Mueller & Kirkpatrick, *supra*, § 6:37 ("Rule 608(b) simply does not regulate contradiction" through extrinsic evidence of prior inconsistent statements); *accord Lamborn v. Dittmer*, 873 F.2d 522, 527-28 (2d Cir. 1989).

Second, the district court invoked the rule that "[a] witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral, *i.e.*, as to those matters which are relevant to the issues in the case and could be independently proven." SPA34 (citation omitted). The court concluded that Zarrab's jailhouse conversation "is clearly collateral to the violation of U.S. sanctions" alleged here. *Id*. That conclusion, however, conflicts with black-letter law that evidence of "bias or motive to falsify" is "never collateral." *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir. 1972); *accord, e.g.*, *Harvey*, 547 F.2d at 722 ("well settled … that bias of a witness is not a collateral issue").[18] Furthermore,

---

[18] Although *United States v. Coven*, 662 F.2d 162, 170-71 (2d Cir. 1981) (cited at SPA34), broadly stated in *dicta* (and without supporting citation) that a witness's "state of mind when signing [his] cooperation agreement was a collateral matter," it merely held that the Confrontation Clause did not entitle defendants to inquire into privileged attorney-client communications about such an agreement. *Coven* emphasized that the district court permitted the defendants to ask "direct questions about [the cooperating witness's] state of mind when signing the agreement." *Id.* at 171. Here, by contrast, the court excluded direct evidence of Zarrab's state of mind in the form of his recorded conversation.

75

Zarrab's stated understanding that he needed to lie about the very scheme in which Atilla was charged with participating is not "collateral"; it goes to the heart of the government's allegations in this case. *See* A828-30.

The district court's two practical considerations also do not support excluding the recording and transcript. First, the court asserted that the defense "had the opportunity" to cross-examine Zarrab about the call, but the cross-examination had "little or no probative value to the defense" because "Zarrab repeatedly denied that his statements to his uncle had the meaning that defense counsel sought to attribute to them." SPA33. Zarrab's refusal to admit he made the statements plainly contained in the recording, however, is *precisely why* the defense needed to introduce the recording and the translated transcript into evidence. Zarrab's intransigence hardly supports excluding the recording and transcript, and certainly does not justify refusing to allow the defense to "get[] at [the] truth that [Zarrab sought] to avoid" by playing the recording for Zarrab during his cross-examination. Mueller & Kirkpatrick, *supra*, § 6:36.

Finally, the district court attempted to provide a post-hoc justification for excluding the recording by emphasizing that the defense "made no reference" to the call in its closing argument. SPA34-35. This purported rationale is baffling: Because Zarrab *denied* making the statements contained in the excluded recording, the defense had no evidentiary basis for attributing the statements to him during

76

summation. All the defense had were its cross-examination questions—which, as the court instructed, were "not evidence." SPA15. There can be little doubt that if the court had admitted evidence of Zarrab's conversation, his stated understanding that he needed to lie to obtain a reduced sentence would have been a major theme of the defense's summation. *Cf.* A724 (defense summation argued "Zarrab looks at Hakan Atilla" as a "way to shorten his jail sentence"). That is especially so because Zarrab falsely denied making the statements. As the district court instructed the jury, if it found that a witness had "willfully testified falsely as to a material fact," it could "disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact, is likely to testify falsely about everything."[19] SPA17.

## D. The Rulings Were Not Harmless

The rulings regarding the jailhouse recording and transcript affected Atilla's "substantial rights"; they were not harmless error. Fed. R. Crim. P. 52(a); *see also* Fed. R. Evid. 103(a). Because the rulings violated Atilla's constitutional right "to present a complete defense," *Holmes*, 547 U.S. at 324, any harmlessness claim

---

[19] Because the district court did not invoke Federal Rule of Evidence 403 in excluding the recording and transcript, that rule cannot serve as a basis for affirmance. *See Figueroa*, 548 F.3d at 230. In any event, Rule 403 does not support the court's decision because the recording and transcript "would not have diverted the jury's attention from the central issue of [Atilla's] guilt or innocence; rather, [they] would have aided the jury in making this ultimate determination." *Blum*, 62 F.3d at 68.

should be evaluated under *Chapman v. California*, 386 U.S. 18, 24 (1967), which requires reversal unless the error was "harmless beyond a reasonable doubt." Even if the Court applies the standard for nonconstitutional errors, Atilla is entitled to a new trial unless the Court finds that it is "highly probable" the erroneous exclusion of the recording and transcript "did not contribute" to the guilty verdict. *United States v. Tussa*, 816 F.2d 58, 66-67 (2d Cir. 1987) (citation omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (error not harmless "if one cannot say, with fair assurance, … that the judgment was not substantially swayed by the error"). Under either standard, the government bears the burden of establishing harmlessness. *See United States v. Olano*, 507 U.S. 725, 741 (1993); *Chapman*, 386 U.S. at 24. The government cannot satisfy that burden here.

It is difficult to overstate the importance to the defense of having the opportunity to use Zarrab's jailhouse statements to attack the credibility of his testimony. Zarrab's testimony was the foundation of the government's entire case against Atilla. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("importance of the witness' testimony" relevant to harmlessness inquiry). Indeed, defense counsel told the jury during summation, "If you believe Reza Zarrab, then Mr. Atilla is guilty"—at least under the district court's legally erroneous IEEPA-conspiracy charge. *See supra* Section I. The government used Zarrab to authenticate dubious evidence stolen from Turkish investigative files and relied on him to explain how

78

facially ambiguous evidence implicated Atilla in wrongdoing. *See, e.g.*, A394-96, A416-17, A420-21, A445, A451-53, A455-56, A733; *see also* A802-03, A806-07. It was Zarrab alone who testified that Atilla "helped develop the method and the system" to circumvent U.S. sanctions. A360. And it was Zarrab alone who placed Atilla at the October 2012 meeting where Iranian officials allegedly discussed their objective of making "international payments"—the key testimony on which the government relies in arguing that Atilla was aware Zarrab's scheme would involve the use of U.S. banks. *See supra* pp. 20-21, 50; *see also* A717.

As a practical matter, Atilla's only viable means of fully countering Zarrab's testimony was to attack his credibility. It was thus critical for the defense to have the opportunity to present evidence of Zarrab's stated understanding that he needed to lie about the very scheme at issue to achieve his objective of "getting free." A830; *cf. United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986) ("When an erroneous evidentiary ruling precludes or impairs the presentation of a defendant's sole means of defense, we are reluctant to deem it harmless."). This evidence was especially important to rebut Zarrab's repeated assertions that he understood his cooperation agreement to require him "[t]o speak exactly the truth." A359.

The prosecution's dogged efforts to keep the jailhouse recording and transcript from the jury demonstrate the evidence's potentially devastating impact: If the evidence was "insignificant," the prosecution would not have been "at such

79

pains to have it excluded." *United States v. DiMaria*, 727 F.2d 265, 272 (2d Cir. 1984). Even without the recording and transcript, the jurors obviously struggled with this case, asking the judge on the fourth day of deliberations what they should do if they could not reach agreement on all counts, *see* A927, and acquitting Atilla of substantive money laundering, *see* A761. If the jury had evidence of Zarrab's jailhouse statements, which indicate Zarrab planned to lie to obtain a reduced sentence, there is a significant likelihood the jury would have reached a different verdict. Under these circumstances, the government cannot satisfy its burden of establishing that the erroneous rulings were harmless.

## CONCLUSION

The district court's judgment should be reversed, and this case should be remanded with instructions for the district court to enter a judgment of acquittal. At minimum, the judgment should be vacated, and the case should be remanded for a new trial.

Dated: September 6, 2018   Respectfully submitted,

         */s/ John P. Elwood*

Victor J. Rocco      John P. Elwood
Herrick, Feinstein LLP    Joshua S. Johnson
2 Park Avenue      VINSON & ELKINS LLP
New York, NY 10016    2200 Pennsylvania Ave., NW
Telephone: (212) 592-1400  Suite 500 West
Facsimile: (212) 592-1500  Washington, DC 20037
vrocco@herrick.com    Telephone: (202) 639-6500
         Facsimile: (202) 639-6604
         jelwood@velaw.com

    *Counsel for Mehmet Hakan Atilla*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the word limit of 19,000 words set by this Court's August 29, 2018 order (ECF No. 53) because it contains 18,988 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.


Dated: September 6, 2018   */s/ John P. Elwood*
           John P. Elwood
           VINSON & ELKINS LLP
           2200 Pennsylvania Ave., NW
           Suite 500 West
           Washington, DC 20037
           Telephone: (202) 639-6500
           Facsimile: (202) 639-6604
           jelwood@velaw.com

           *Counsel for Mehmet Hakan Atilla*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on September 6, 2018. All counsel of record in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: September 6, 2018

*/s/ John P. Elwood*
John P. Elwood
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW
Suite 500 West
Washington, DC 20037
Telephone: (202) 639-6500
Facsimile: (202) 639-6604
jelwood@velaw.com

*Counsel for Mehmet Hakan Atilla*

83