# 18-1589(L)

## 18-1910(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

REZA ZARRAB, aka Riza Sarraf, CAMELIA JAMSHIDY, aka Kamelia Jamshidy, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, aka Can Sarraf, aka Kartalmsd, MEHMET ZAFER CAGLAYAN, aka Abi, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants,*

MEHMET HAKAN ATILLA,

*Defendant-Appellant-Cross-Appellee.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPENDIX
## VOLUME II OF IV
### (Pages A251 to A500)

---

GEOFFREY S. BERMAN
UNITED STATES ATTORNEY FOR
 THE SOUTHERN DISTRICT OF
 NEW YORK
SARAH K. EDDY
MICHAEL D. LOCKARD
ASSISTANT UNITED STATES
 ATTORNEYS
One St. Andrew's Plaza, Room 743
New York, New York 10007
(212) 637-2200

*Attorneys for Appellee-Cross-Appellant
 United States of America*

JOHN P. ELWOOD
JOSHUA S. JOHNSON
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW,
 Suite 500 West
Washington, DC 20037
(202) 639-6500

VICTOR J. ROCCO
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Defendant-Appellant-
 Cross-Appellee Mehmet Hakan
 Atilla*

# TABLE OF CONTENTS

PAGE

Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Decision & Order (Sept. 29, 2016), [Dkt. 87] . . . . . . . . . . . . . . . . . . . . . . . . . A107

Decision & Order (Oct. 17, 2016), [Dkt. 90] . . . . . . . . . . . . . . . . . . . . . . . . . . A133

Third Superseding Indictment (Apr. 7, 2017), [Dkt. 212] . . . . . . . . . . . . . . A169

Fourth Superseding Indictment (Sept. 6, 2017), [Dkt. 293] . . . . . . . . . . . . A198

Excerpts from Memorandum of Law in Support of
    Defendant Mehmet Hakan Atilla's Motion to Dismiss
    Superseding Indictment S4, or Alternatively for Severance
    (Oct. 9, 2017), [Dkt. 307] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A251

Excerpts from Government's Memorandum of Law in Opposition to
    Defendant Mehmet Hakan Atilla's Motions to Dismiss the
    Superseding Indictment and for Severance (Oct. 16, 2017),
    [Dkt. 308] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A274

Excerpts from Reply Memorandum of Law in Support of
    Defendant Mehmet Hakan Atilla's Motion to Dismiss
    Superseding Indictment S4, or Alternatively for Severance (Oct.
    23, 2017), [Dkt. 311] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A277

Defense's Letter to Court (Nov. 3, 2017), [Dkt. 326] . . . . . . . . . . . . . . . . . . A289

Defense's Letter with Endorsement from Court (Nov. 3, 2017),
    [Dkt. 327] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A292

Excerpt from Defense's Letter to Court (Nov. 5, 2017), [Dkt. 329] . . . . . . A295

Tr. 1-9 (Nov. 6, 2017), [Dkt. 342] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A298

ii

PAGE

Tr. 1-3 (Nov. 20, 2017), [Dkt. 502] ................................... A307

Order (Nov. 20, 2017), [Dkt. 350] ................................... A310

District Court's Oral Ruling on Defendant Mehmet Hakan Atilla's
    Motion to Dismiss Superseding Indictment S4, or Alternatively
    for Severance, Tr. 12-23 (Nov. 16, 2017), [Dkt. 351] .............. A311

Defense's Motion for a Continuance (Nov. 27, 2017), [Dkt. 360] ....... A324

Order (Nov. 28, 2017), [Dkt. 363] ................................... A331

Trial Tr. 1-4, 17-64, 117-24, 141-48, 165-76, 205 (Nov. 28, 2017),
    [Dkt. 400] .................................................... A334

Trial Tr. 206-09, 258-377 (Nov. 29, 2017), [Dkt. 404] ................ A356

Trial Tr. 378-517, 526-27 (Nov. 30, 2017), [Dkt. 406] ................ A388

Trial Tr. 528-31, 548-623, 628-30 (Dec. 1, 2017), [Dkt. 408] .......... A425

Trial Tr. 631-749 (Dec. 4, 2017), [Dkt. 410] .......................... A447

Trial Tr. 750-850 (Dec. 5, 2017), [Dkt. 412] .......................... A474

Trial Tr. 851-948 (Dec. 6, 2017), [Dkt. 414] .......................... A501

Trial Tr. 949-1096 (Dec. 7, 2017), [Dkt. 416] ......................... A527

Trial Tr. 1097-1241 (Dec. 8, 2017), [Dkt. 418] ....................... A565

Trial Tr. 1242-45, 1286-93, 1326-73, 1378-93, 1402-04
    (Dec. 11, 2017), [Dkt. 420] ................................... A603

Trial Tr. 1405-1524, 1545-52, 1557-64, 1577-80, 1617-20
    (Dec. 12, 2017), [Dkt. 422] ................................... A624

iii

PAGE

Trial Tr. 1621-24, 1641-52, 1697-1704, 1729-40, 1745-52, 1765-68
(Dec. 13, 2017), [Dkt. 424]...................................... A661

Trial Tr. 1769-72, 1789-1830, 1843-50, 1875-78 (Dec. 14, 2017),
[Dkt. 426]..................................................... A674

Trial Tr. 1879-82, 1923-26, 1931-34, 1942-46, 1979-86, 2023-26
(Dec. 15, 2017), [Dkt. 428].................................... A688

Trial Tr. 2027-30, 2155-58, 2163-64 (Dec. 18, 2017), [Dkt. 430] ....... A697

Trial Tr. 2165-68, 2201-2236, 2245-2340 (Dec. 19, 2017),
[Dkt. 432]..................................................... A701

Trial Tr. 2341-2428 (Dec. 20, 2017), [Dkt. 434] ...................... A736

Trial Tr. 2529-40 (Jan. 3, 2018), [Dkt. 440] .......................... A759

Order with Attached Letters from Defense and Government
(Dec. 5, 2017), [Dkt. 369]...................................... A763

Government's Letter to Court (Dec. 6, 2017), [Dkt. 370] ............... A779

Defense's Motion for a Mistrial (Dec. 14, 2017), [Dkt. 377]........... A782

Excerpts from Government's Memorandum of Law in Opposition to
Mehmet Hakan Atilla's Motion for a Mistrial (Dec. 14, 2017),
[Dkt. 378]..................................................... A799

Defense's Motion for a Judgment of Acquittal Under Federal Rule of
Criminal Procedure 29(a) (Dec. 15, 2017), [Dkt. 381]............. A810

Excerpts from Government's Opposition to Defense's Motion for a
Judgment of Acquittal Under Federal Rule of
Criminal Procedure 29(a) (Dec. 16, 2017), [Dkt. 382]............. A818

iv

PAGE

Defense's Motion to Admit Recording and Transcript of
    Reza Zarrab's September 15, 2016 Phone Call
    with his Uncle (Dec. 18, 2017), [Dkt. 384] ........................ A822

Government's Opposition to Defense's Motion to Admit Recording
    and Transcript of Reza Zarrab's September 15, 2016 Phone Call
    with his Uncle (Dec. 18, 2017), [Dkt. 385] ........................ A834

Defense's Motion for a Mistrial (Dec. 20, 2017), [Dkt. 389] ............ A837

Corrected Decision & Order (Dec. 21, 2017), [Dkt. 393] ............... A843

Decision and Order (Jan. 2, 2018), [Dkt. 399] ......................... A847

Government Trial Exhibit 226-T (Transcript of Feb. 6, 2013
    Recorded Phone Call)........................................... A854

Government Trial Exhibit 261-T (Transcript of July 9, 2013
    Recorded Phone Call)........................................... A856

Government Trial Exhibit 269-T (Transcript of Sept. 26, 2013
    Recorded Phone Call)........................................... A861

Government Trial Exhibit 295-T (Transcript of Apr. 10, 2013
    Recorded Phone Call with Time Stamp of 11:45:46 AM)........... A863

Government Trial Exhibit 297-T (Transcript of Apr. 10, 2013
    Recorded Phone Call with Time Stamp of 6:58:31 PM) ............ A870

Government Trial Exhibit 6022 (Oct. 15, 2014 Email
    with Attachment) ............................................... A875

Government Trial Exhibit 6023 (Oct. 18, 2014 Email
    with Attachments) .............................................. A877

Government Trial Exhibit 6027 (Oct. 20, 2014 Email
    with Attachments) .............................................. A883

v

PAGE

Government Trial Exhibit 7020 (State Department Cable
    Summarizing Feb. 12, 2013 Meeting Between Treasury
    Department Officials and Halkbank Officials) ...................... A886

Government Trial Exhibit 7028 (State Department Cable
    Summarizing Sept. 2012 Meeting Between Treasury
    Department Officials and Halkbank Officials) ...................... A891

Government Trial Exhibit 7029 (State Department Cable
    Summarizing Feb. 28, 2013 Meeting Between Treasury
    Department Officials and Halkbank Officials) ...................... A897

Defense Trial Exhibit 200 (Center for Strategic and International
    Studies, "Treasury's Role in National Security" (May 10, 2012)) ... A900

Defense Trial Exhibit 201 (Dow Jones, U.S. Treasury's Top
    Terrorism Cop: How Financial Tools Fight Foes,
    Wall St. J. Blog, June 2, 2014) .................................... A915

Defense Trial Exhibit 212 (Summary of Treasury Under Secretary
    David Cohen's Oct. 10, 2014 Meeting with Halkbank Officials) .... A919

Defense Trial Exhibit 320-T (May 16, 2013 Email from
    Mehmet Hakan Atilla) .......................................... A921

Court Exhibit OO (Jury Note – Jan. 3, 2018), [Dkt. 483] .............. A927

Court Exhibit PP (Court's Response to Jury Note – Jan. 3, 2018),
    [Dkt. 484] ...................................................... A928

Decision and Order (Feb. 7, 2018), [Dkt. 493], Which Includes as
    Attachments Government Demonstrative Exhibit 9502
    (Chart Created by Reza Zarrab to Describe Purported Gold
    Transactions) and Government Demonstrative Exhibit 9503
    (Chart Created by Reza Zarrab to Describe Purported Food
    Transactions) .................................................... A929

vi

PAGE

Excerpts from Government's Sentencing Submission (Apr. 4, 2018),
    [Dkt. 505] .................................................... A957

Order (Apr. 9, 2018), [Dkt. 507] ..................................... A960

Oct. 23, 2017 Letter from Turkish Embassy to U.S. Department of
    State, Exhibit A to Defense's Letter in Response to
    Court's Apr. 10, 2018 Order (Apr. 13, 2018), [Dkt. 509] ........... A961

Excerpt from Government's Letter in Response to
    Court's Apr. 10, 2018 Order (Apr. 13, 2018), [Dkt. 510] ........... A962

Order (Apr. 16, 2018), [Dkt. 511] .................................... A965

Sentencing Hr'g Tr. 1-12, 17-36, 77-83 (May 16, 2018),
    [Dkt. 520] ................................................... A966

Judgment (May 16, 2018), [Dkt. 518] ................................. A977

Defendant Mehmet Hakan Atilla's Notice of Appeal (May 25, 2018),
    [Dkt. 525] ................................................... A982

Government's Notice of Appeal (June 25, 2018), [Dkt. 532] ........... A983

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                              :
UNITED STATES OF AMERICA
                                                              :
            v.                              S4 15 Cr. 867 (RMB)
                                                              :
REZA ZARRAB, et al.,
                                                              :
            Defendants.
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MEHMET HAKAN ATILLA'S
MOTION TO DISMISS SUPERSEDING INDICTMENT S4,
OR ALTERNATIVELY FOR SEVERANCE**


HERRICK, FEINSTEIN LLP                   FLEMING RUVOLDT PLLC
Victor J. Rocco                          Cathy Fleming
Thomas E. Thornhill                      Robert Fettweis, *pro hac vice*
David M. Rosenfield                      1700 Broadway, 28th Floor
2 Park Avenue                            New York, NY  10019
New York, NY  10016

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND................................................................................1

POINT ONE       ATILLA CANNOT BE CHARGED FOR ACTIVITY THAT IS
EXCLUSIVELY FOREIGN BASED WITH NO DIRECT US
EFFECT ..........................................................................4

    1.    IEEPA (International Emergency Economic Powers Act) .....................................5

    2.    Executive Orders 12957 and 12959 ...............................................6

    3.    CISADA (Comprehensive Iran Sanctions, Accountability and Divestment
Act) ..................................................................6

    4.    IFSR (Iranian Financial Sanctions Regulations)........................................7

    5.    The National Defense Authorization Act for FY 2012 ..........................................8

    6.    Executive Order 13622 ......................................................9

    7.    ITRA (Iran Threat Reduction and Syria Human Rights Act) .............................10

    8.    IFCA (Iran Freedom and Counter-Proliferation Act of 2012).............................10

    9.    Executive Order 13645 ......................................................11

POINT TWO       THE SANCTIONS REGIME DOES NOT APPLY CRIMINAL
PENALTIES TO CONDUCT OF A FOREIGNER IN THESE
CIRCUMSTANCES ..................................................13

POINT THREE    THERE IS NO ALLEGATION LINKING ATILLA WITH THE US ...........16

POINT FOUR     THE SANCTIONS LAWS PROVIDE THE EXCLUSIVE BASIS
FOR PUNISHING EVASIVE CONDUCT ....................................19

POINT FIVE      ALTERNATIVELY, IF NOT DISMISSED, MR. ATILLA'S CASE
MUST BE SEVERED FROM MR. ZARRAB'S ...........................23

CONCLUSION ..................................................................24

i

Mehmet Hakan Atilla ("Mr. Atilla") moves to dismiss the charges against him alleged in Indictment S4 ("Indictment").  These charges rest on a fatal misconstruction of the governing statutory and regulatory scheme ("Iranian Sanctions Regime" or "Sanctions Regime") and some alleged, but non-existent connection between Mr. Atilla and the potentially criminal conduct of others. Although pretrial dismissals are disfavored, the Court of Appeals appears to encourage such a pre-trial challenge: the "timing of the defendant's objection [to an indictment] is important to the level of scrutiny employed; a defendant who objects to the indictment before trial . . . is entitled to a more exacting review of the indictment than one who waits until after the trial to object." *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir. 2000), *sub appeal*, 9 F. App'x 45 (2d Cir. 2001).  Where a pleading raises facial concerns about the theory of the prosecution, or the sufficiency of its evidence, it is especially prudent for the Court to parse carefully its boilerplate allegations and require at least an allegation of minimal, critical facts – facts which cannot be mustered here.

## FACTUAL BACKGROUND

Mr. Atilla is an official at Halkbank, a bank owned principally by the Republic of Turkey.  The Indictment alleges that he violated the Iranian Sanctions Regime as a result of activity that occurred entirely *outside* the US.  It then also appears to allege that that foreign activity somehow led to the use of US financial institutions. As a result, Mr. Atilla has been charged with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), conspiracy to commit bank fraud, conspiracy to commit money laundering, substantive bank fraud and money laundering violations, as well as conspiracy to defraud the US.

The Indictment differs in substantial respects from earlier pleadings in this case. Paragraphs 33-55 allege two totally new schemes based entirely outside the US involving Mr. Atilla and his employer, Halkbank. Under the Sanctions Regime these schemes undoubtedly

Iranian sanctions, and here, Mr. Atilla is not charged with activity that evaded or avoided *prohibitions* (as the evasion provision of the Regime requires).

**POINT ONE**
**ATILLA CANNOT BE CHARGED FOR ACTIVITY THAT IS EXCLUSIVELY FOREIGN BASED WITH NO DIRECT US EFFECT**

To the extent the government seeks to charge Mr. Atilla for the activity conducted outside of the US (the activity from ¶ 33 through ¶ 55), it cannot do so. Such a prosecution is not authorized by the Sanctions Regime. It would be an unprecedented exercise of authority by the US. Because of the lack of notice and any nexus to the US, it also would violate the Due Process Clause of the Constitution.

The US started addressing sanctions against Iran back in the 1970s, first blocking Iran's properties held *in the US*. Then, in the 1990s, the US prevented US persons/entities from engaging in commerce with Iran, again prohibiting only US persons/entities from acting. The Obama administration ratcheted up the Sanctions Regime, seeking to isolate Iran from the global financial system. In every instance, as sanctions expanded, they were aimed at prohibiting US persons/entities from dealing with foreign entities that were outside Iran, when those foreign entities supported activities the US did not like because they were helping Iran's efforts.

One thing has remained immutable throughout this entire accretive process: no statute, order or regulation has ever allowed the criminal prosecution of a foreigner for having engaged in conduct that is merely sanctionable. At most, the foreigner has lost the privilege of dealing with the US. Only if it continued to deal with the US or avail itself of US facilities (*e.g.*, banking) after being listed, could it be prosecuted, along with the US entity/person which assisted it, for that conduct alone.

1.  IEEPA (International Emergency Economic Powers Act)

The first statute cited in the Indictment, IEEPA, is the basis for nearly all of the successive executive orders and regulations and even serves as the penalty provision for the three subsequent statutes also cited in the Indictment (NDAA, ITRA and IFCA).

IEEPA states that violations of any "license," "order," "regulation" or "prohibition" "issued" under IEEPA can be prosecuted.  50 U.S.C. §§1705 (a) and (c).  Violations of prohibitions ("prohibitions" being a term of art in the statutes, orders and regulations) provide the basis for US prosecutions – conduct that is disallowed by the law.  And a "prohibition" applies by its express definition to a US person or to conduct emanating from the US (including US persons engaging in commerce with Iran or with an entity on the sanctions list).  *See*, e.g., 31 CFR §560.204 (applying prohibition to exports "from the United States, or by a United States person, wherever located"); 31 CFR §561.204(a) (applying prohibitions and conditions on correspondent account opening/maintenance to "[a] U.S. financial institution").

Although the evasion and avoidance requirement does not have comparable language (meaning it could apply to foreign entities in the first instance), that requirement still applies only to evasion of prohibitions and prohibitions, as mentioned, apply only to US persons or conduct emanating from the US.  Listing on a sanctions list is not a violation of anything – it is, at most, the basis for the US deciding that the listed entity cannot be dealt with *by a US person*.  It is the predicate for a prosecution only when someone with a US connection deals with that listed entity.

OFAC guidance is clearly in line with this reasoning:  "A finding by the Treasury Department that a foreign financial institution knowingly engages in one or more of the sanctionable activities is necessary *before the Treasury Department can prohibit* or impose strict

conditions on the opening or maintaining in the United States of correspondent accounts or payable-through accounts for that foreign financial institution" (emphasis added). (OFAC Iran Sanctions Frequently Asked Questions, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_iran.aspx#cisada, No. 155).

2.   Executive Orders 12957 and 12959

Executive Orders 12957 and 12959, issued on March 15 and May 6, 1995, respectively, essentially state that the US cannot send certain goods, technology or services to Iran. Regulations (the Iranian Transactions and Sanctions Regulations, "ITSR") effected these orders by providing that doing so is prohibited unless the transaction is first licensed. This prohibition includes sending funds from the US or by US persons and any transactions that evade the ITSR. EO 12959 §1(b) and (g); 31 CFR §§560.203-560.204.  These rules do not state that a foreign entity or individual cannot send non-US services to Iran from outside the US.  Thus, Halkbank did not need an OFAC license to provide services to Iran, as it is not a US entity.

3.   CISADA (Comprehensive Iran Sanctions, Accountability and Divestment Act)

CISADA, Pub. L. 111-195, was enacted in 2010.  Although it is not referenced in the Indictment, it forms an important part of the mosaic of the Iranian sanctions framework that is cited in the Indictment, especially the so-called secondary sanctions against foreign financial institutions ("FFIs").  CISADA enables the US to sanction FFIs that are not located in Iran (*e.g.*, Halkbank) if that non-Iranian FFI helps the Central Bank of Iran (or Iranian financial institutions that are on a list) conduct financial transactions that help Iran obtain weapons of mass destruction or directly deal with the Islamic Revolutionary Guard Corps ("IRGC").  Once sanctioned, the foreign non-Iranian bank cannot establish a new US correspondent bank account, and is restricted in its use of any existing US correspondent bank account.

6

Once again, Congress made clear that, *at most,* it could put foreign banks on notice that, if they do certain things the US does not like, they will not be able to use US financial facilities – not that they will be subject to criminal prosecution.

4. IFSR (Iranian Financial Sanctions Regulations)

IFSR regulations were initially issued under CISADA. As the US added sanctions against FFIs that dealt with Iran, IFSR was amended to correspond with those new sanctions under IEEPA, EO 13622, ITRA and the NDAA. IFSR consists of two components: one to punish *subsidiaries of US* financial institutions for doing certain things, and others to *sanction* FFIs not owned or controlled by US financial institutions that do things the US does not like, but can only sanction (put on a list). 31 CFR §§561.201-561.204. Certain relationships with sanctioned entities or individuals then would serve as a basis for prosecuting US individuals or US entities that dealt with them.

Crucially, IFSR allows for the prosecution of an FFI even before it is listed on any sanctions list if it *both* engages in certain transactions involving IRGC *and* is controlled or half or more owned by a US financial institution. *See* 31 CFR §§561.202, 561.701(b)(2). In effect, an FFI that is a US institution's subsidiary is considered a US institution. By so delimiting the prohibition to US controlled institutions, OFAC has emphasized that a US nexus is essential in order to prohibit and punish actions criminally: if an FFI could be prosecuted for any activity that simply could trigger sanctions, any FFI could be prosecuted for any of the conduct articulated in IFSR, not just US controlled FFIs. It would then have been superfluous to authorize prosecution of only those FFIs that are US controlled.

The government's misconstruction of the entire Sanctions Regime to allow for the prosecution of entirely foreign conduct is demonstrated by its reference to IFSR. The Indictment

7

alleges (Ind. ¶ 18) that IFSR allows further *prosecution* of the avoidance or evasion of any of its "provisions."   But according to the express terms of IFSR, only evasion or avoidance of *prohibitions*, not "provisions," can trigger prosecution, and (i) there are no *prohibitions* until entirely foreign conduct is determined to be sanctionable, and (ii) only then are US persons or US entities prohibited from having specified dealings with the sanctioned foreign entity.  *See* 31 CFR §561.301(a).

5.   The National Defense Authorization Act for FY 2012 ("NDAA")

Attached to the NDAA are "sanctions" for FFIs that conduct or facilitate significant financial transactions with the Central Bank of Iran or Iranian financial entities designated under IEEPA.  And there was a 180-day grace period for foreign government-controlled FFIs doing oil transactions, after which that FFI faced *sanctions* unless the foreign nation first reduced its consumption of oil (which Turkey did).  Finally, there is an exception for government-controlled foreign banks, like Halkbank, doing non-oil transactions. Pub. L. 112-81 §1245(d), 22 U.S.C. §8513a(d).

The express basis for prosecution under this NDAA provision is the authority in IEEPA to do so.  So whatever IEEPA reaches criminally, the NDAA's reach is no broader. Because IEEPA only reaches conduct with a US nexus, the NDAA is so limited too.

Once again, the Indictment misrepresents the scope of the NDAA and in doing so, evidences the government's fundamental misconception of its authority to prosecute. Three times in a single paragraph, the Indictment erroneously labels as *prohibitions* conduct that is, by the statute's very terms, merely sanctionable. (Ind. ¶ 12; *see* NDAA at §1245(d)(1)(A) (prohibiting just the opening and maintaining of US correspondent accounts)).  The FFI is not prohibited from engaging in the activity that gets it sanctioned; indeed, it can continue to do that same

activity without prosecution. *Only after that determination* does any NDAA prohibition kick in – a prohibition on opening or maintaining a correspondent account for that FFI *in the US*. *See* NDAA §1245(d)(1)(A); 31 CFR §561.203(a) (providing that prohibitions follow imposition of sanctions); 31 CFR §561.203(c) (providing the IFSR's NDAA-related "prohibitions," all of which apply to US financial institutions).

6. Executive Order 13622

Executive Order 13622, issued July 30, 2012, modifies Executive Order 12957 by creating an additional *power to determine* when certain activity merits *sanctions* against (a) FFIs that purchase from anyone in Iran, including NICO, NIOC (petroleum related Iranian entities) and the Central Bank of Iran unless their country reduced its petroleum purchases; or (b) persons that help the Iranian government obtain precious metals or US notes. If any of these actions occur, the Treasury can *sanction* the foreigner by prohibiting or restricting its US correspondent accounts or prohibiting US transactions in its property. EO 13622 §§1, 5; 31 CFR §561.204.

The Indictment also misconstrues and misstates EO 13622, and, by doing so, again betrays the government's fundamental misunderstanding of the basic structure of the Sanctions Regime and its role in US prosecutions. Paragraph 13 of the Indictment alleges that the President imposed restrictions (implying that he can restrict *an FFI*) when in fact, the only restrictions the President authorized the Treasury Secretary to impose are *not* on how that FFI generally conducts its business (the Executive is powerless to do so), but on how that FFI can interact with *US persons or US entities*. EO 13622 §1(b). In other words, the President cannot stop the FFI from pursuing the conduct the United States has found sufficiently objectionable to sanction the FFI; the FFI is free to keep doing that objectionable conduct as long as it does not

9

involve a US person/entity or US financial institution.  Only then can the US person/entity be prosecuted (and under this Court's ruling, foreign entities as well).  *See* Court Op. at *10.

### 7.   ITRA (Iran Threat Reduction and Syria Human Rights Act)

ITRA, Pub. L. 112-158, amends the NDAA, so its criminal authority is derivative of the NDAA, which itself is derived from IEEPA.  ITRA requires sanctioning of FFIs, including FFIs owned by foreign governments, if they knowingly facilitate significant financial transactions with the Central Bank of Iran or designated Iranian banks unless for purposes of bilateral trade.  ITRA §504(a)(1) (amending NDAA §1245(d), 22 U.S.C. §8513a(d)).  So, for example, where Turkey trades oil with Iran, an FFI can be sanctioned unless the proceeds remain in Turkey, and the item traded to Iran comes from Turkey.  Here, the Indictment portrays ITRA correctly, stating that if an FFI facilitated a transaction that failed to meet the bilateral trade requirements, it is subject to "U.S. sanctions" (Ind. ¶ 15).  In other words, divergence from the ITRA's bilateral trade condition does *not* provide a basis to prosecute the FFI.  It subjects the FFI to sanctions, which then can lead to prosecutable prohibitions under the NDAA (which ITRA amends).

### 8.   IFCA (Iran Freedom and Counter-Proliferation Act of 2012)

After ITRA came IFCA, Pub. L. 112-239, in 2013, which expanded the US effort to target gold transactions with Iran by expanding the ability to *sanction* anyone abroad who engaged in those kinds of transactions with Iran (including with non-government entities).  IFCA §1245(a)(1)(A), 22 U.S.C. §8804(a)(1)(A).

The basis for prosecution under IFCA (as with every other applicable aspect of the Sanctions Regime relevant in this case) is IEEPA:  IFCA refers back to IEEPA's criminal provision, IFCA §1253(b), 22 U.S.C. §8809(b), so, again, its reach is no greater than IEEPA's

(which allows prosecution of only those who violate prohibitions, orders, regulations and licenses – not those who merely engage in conduct that merits sanctions).

Once again, the Indictment gets it wrong by confusing *sanctionable* conduct with conduct that is *prohibited;* and in doing so, yet again, overstates the government's authority to prosecute. Paragraph 16 alleges that under IFCA, *prohibited* activity (which as we have seen throughout the Sanctions Regime may serve as a basis for prosecution) was broadened to include what a foreigner does in an entirely foreign transaction (Ind. ¶ 16). In fact, the subject conduct, trading gold and precious metals with Iran, never has been *prohibited*; it remains sanctionable at most. The Indictment also incorrectly states that additional restrictions were implemented by IFCA (in fact, what IFCA adds are additional triggers for the imposition of sanctions – not restrictions on a foreigner's conduct, because a foreigner is beyond the US's power under the statutes in question, and the US is not authorized to restrict what that foreigner can do (and even under this Court's ruling, only where that foreigner then acts with US entities or individuals).  Court Op. at *10. *See* IFCA §1245(a)(1), 22 U.S.C. §8804(a)(1) (requiring imposition of five or more sanctions described in section 6(a) of the Iran Sanctions Act of 1996, 50 U.S.C. §1701, each of which provides a basis for prohibitions involving US persons).  And the Indictment incorrectly alleges that the *prohibitions* against trading gold with Iran (the violation of which can be prosecuted) have been "broadened" when, in fact, there never were any *prohibitions* against foreigners trading gold with Iran in the first place.

9.   Executive Order 13645

The final piece of the Sanctions Regime relevant to this case (and cited in the Indictment) is EO 13645, issued June 3, 2013, which implemented further rules governing gold transactions. It does *not* prohibit any foreign individual or entity from engaging in gold transactions with Iran

– it simply makes those foreign individuals and entities *sanctionable* if they do so. EO 13645 §7(a).

Once again, at paragraphs 16 and 17, the Indictment misconstrues and misstates the applicable law and alleges that IFCA prohibits dealing in precious metals on behalf of Iran. IFCA did no such thing. Instead, it *addressed* those transactions when conducted by foreigners, allowing the US to sanction foreign individuals and entities and then, *and only then,* to prohibit US persons and US institutions from being used by those sanctioned entities (and prohibit US interactions with those sanctioned entities in those situations as well). *See* IFCA §1245(a)(1), 22 U.S.C. §8804(a)(1) (requiring imposition of five or more sanctions described in section 6(a) of the Iran Sanctions Act of 1996, 50 U.S.C. §1701, each of which provides a basis to prohibit activity by US persons). As it has in every part of the Sanctions Regime, the prohibition was directed at conduct and activity involving US entities or persons.

Beyond the analysis of the statutes, orders and regulations that comprise the Iranian Sanctions Regime, it is instructive that there have been no civil or criminal actions brought against foreign entities or individuals whose conduct is sanctionable, where those entities or individuals did nothing with US individuals or entities. This is significant, for the sanctions in question have been on the books and aggressively enforced by the government for the past 40 years. This includes trying to prosecute or civilly penalize foreigners for continuing to engage in the conduct that got them sanctioned in the first place. The point is driven home further by a comparison to other US statutes that apply their proscriptions to foreign citizens: they do so by clear, express language. *Compare* the Anti-Terrorism Act's express provision on extraterritoriality at 18 U.S.C. §2339B(d) (applying the criminal penalties to non-US persons: "after the conduct required for the offense occurs an offender is brought into or found in the US,

even if the conduct required for the offense occurs outside the United States"), Hostage Taking (at 18 U.S.C. §1203(b)(1)(B)) and Nuclear Materials (at 18 U.S.C. §831(c)(3)) (both of which apply criminal penalties to foreigners found in the United States).

In short, from the time of its inception through the present in each iteration of the Iranian Sanctions Regime, Congress and the Executive have made clear that foreign entities and individuals cannot be prosecuted for entirely foreign conduct.   So no prosecution is authorized on that basis, and if the US were to now seek to prosecute foreigners for entirely foreign activity that has no US nexus, such a prosecution would violate fundamental notions of due process, guaranteed by the Fifth Amendment.  The due process protections apply to Mr. Atilla. *See, e.g., United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

**POINT TWO**
**THE SANCTIONS REGIME DOES NOT APPLY CRIMINAL PENALTIES TO CONDUCT OF A FOREIGNER IN THESE CIRCUMSTANCES**

This Court appears to have concluded that IEEPA and ITSR can be applied to a foreign national involved in conduct emanating from the US or property within the US.  Court Op. at *10. We most respectfully suggest that the Court reached the wrong conclusion.

The analysis of this question starts with *United States v. Bowman*, a Supreme Court decision that expressly left *open* whether US criminal law could be applied to a citizen of Great Britain.  260 U.S. 94, 102-03 (1922).  It is an issue the Supreme Court has never resolved (if anything, the Court arguably has expressed discomfort with extraterritorial application in decisions like *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010)   The presumption against application of US law to foreign nationals is not absolute: Congress can overcome that presumption but the lesson of the case law is that it must do so unambiguously.  Even *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) – a Second Circuit terrorism decision referenced by

this Court in its decision on Zarrab (Court Op. at *9) – held that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Yousef*, 327 F.3d at 86.   As the Circuit observed, while "Congress…may legislate…in excess of the limits posed by international law," there must be legislation that clearly does so – not an after-the-fact interpretation by the prosecution of some unstated authority, which seems to be the case here.  *Id.* at 93.  Thus, although the Court appeared to rely on the need for the US to defend itself as a reason for dispensing with the presumption against extraterritoriality (Court Op. at *8-10), the Sanctions Regime's very careful calibration suggests otherwise.

The Sanctions Regime generally does not express an intention to apply its criminal reach to foreigners conducting their activity abroad.

In concluding that the Sanctions Regime did reach foreigners like Zarrab, this Court appears (in dictum) to have adopted the government's argument that 31 CFR §560.204 must apply to a foreign national because the first clause, addressing the "exportation, re-exportation, sale or supply…from the United States," would be otherwise superfluous given the second clause's wording – "by a United States person…."  Court Op. at *9.  Although the Court did not use the word "superfluous," its analysis appears to have been based on that notion.

However, Section 204's provisions can be read to prohibit different activities.  Section 204 prohibits exports and re-exports *from the US* of certain items by anyone (what we will call Prong 1) *or* export or re-export of certain items *from anywhere only by US persons* (wherever those US persons are located) (what we will call Prong 2).  This Court appears to have reasoned that the fact that the Executive thought it necessary to apply Prong 2 (items that need not have come from the US) only to US persons must mean that Prong 1 (items coming from the US) applies to both US and non-US persons.  But the fact is that Prong 2 can serve a necessary

14

function not served by Prong 1:  Prong 2 covers items where one would not automatically conclude that US persons are prosecutable (items that did not come from the US in the first instance) absent some clear indication of intent.   To ensure that US persons would know that this conduct (relating to items not coming from the US) was reachable no matter where they were located (hardly a self-evident proposition), the Executive presumably determined that it needed to make its intent clear by expressly applying Prong 2 to US persons.   Under this construction, Prong 2 serves a different purpose from Prong 1, meaning that it was not superfluous *even if Prong 1 only covered US persons* (as we contend).

Further, and alternatively, if what we describe as the Court's "superfluous" analysis is to be honored, that analysis must be applied consistently.  By the same reasoning utilized by the Court in interpreting 204, there would be no reason for the same Executive to have enacted only one section later (31 CFR §560.205) a provision that addresses some of the very same conduct listed in section 204, but expressly restricts the prohibition to non-US persons.  In this regard, it cannot be denied that 205 governs the same basic area as 204:  specified items that come directly or indirectly from the US in the first instance.  That is the language used in both 204 and 205.  So if the Court is right that Prong 1 of 204 covers non-US persons (and justifies prosecuting Mr. Atilla), there would have been no need for section 205 because it would simply reiterate what Prong 1 of 204 already authorized.

By singling out non-US persons, Section 205 stands in stark contrast to the other parts of the Sanctions Regime.  It sets forth a clear expression of Executive intent to prohibit acts by a foreign national, unlike the first prong of 204.

If we are right, it follows that the only way that a foreign national can be charged criminally under the Sanctions Regime is if he violates section 205.  *See, e.g., United States v.*

*Quinn*, 401 F. Supp. 2d 80, 103 n. 23 (D.D.C. 2005) (explaining that section 205 was charged because of a defendant who was a foreigner).  And because section 205 is limited to the re-export of items that required a license *in 1995*, and financial services (the basis for the charges in this case) did not require such a license, it would *not* apply to Mr. Atilla even if he re-exported US financial services.

### POINT THREE
### THERE IS NO ALLEGATION LINKING ATILLA WITH THE US

If we are wrong about the application of the Sanctions Regime to foreigners (Point Two), the government still must show that the foreigner, here Mr. Atilla, was knowingly involved in causing US banks to participate in prohibited conduct.  That conduct is described in paragraphs 56 onward, and on the face of the Indictment, there is no adequate basis to link Mr. Atilla to it.

Paragraph 56 discusses a scheme to transform into American dollars, through US banking facilities, the money Mr. Zarrab earned from allegedly illicit Iranian transactions.  This activity is the linchpin of the case against Mr. Zarrab, as the government repeatedly made clear in its opposition to his motion to dismiss an earlier indictment. (Tr. of Proceedings, June 2, 2016 at 45, *United States v. Zarrab*, Case No. 1:15-cr-00867-RMB (Dkt. # 38);   Mem. Opp'n Def. Zarrab's Mot. Dismiss Ind. S2, at 16 n.6 (Dkt. # 75); Tr. of Proceedings, Oct. 5, 2016 at 13, *United States v. Zarrab*, Case No. 1:15-cr-00867-RMB (Dkt. # 88)).

The obvious and fatal failure to link Mr. Atilla to US conduct is nothing new to the government. We have raised this deficiency loudly and clearly twice before, both in Mr. Atilla's bail application and again in his motion to dismiss the original indictment against him, but the government has failed to heed it for, despite superseding the earlier indictment, it has failed to correct this flaw even when just a single allegation of fact would do. To the contrary, the latest

Indictment against Mr. Atilla only underscores the absence of any connection between him and any US related transactions.

*First,* the absence of the requisite link is clear.  Mr. Atilla is not mentioned even once in connection with the US dollar transactions starting at paragraph 56 of the Indictment (nor was he in any earlier versions of the Indictment). That stands in stark contrast to his named involvement in the entirely foreign activity listed in paragraphs 33-55, and to the alleged involvement of Mr. Zarrab and certain of his relatives and business associates in paragraphs 56-84.  The absence of his name is especially meaningful when contrasted with the way his name and alleged conduct (and Halkbank's) courses through paragraphs 33-55, describing the first two schemes in the Indictment.

*Second,* it is clear that no link is alleged because the government *cannot* do so.  Mr. Atilla's purported connection to the US banking system or a US dollar scheme is never once mentioned in any prior indictment, in any document provided by the government in its massive discovery, or in any internal Turkish investigative report recapping extensive investigations by Turkey's prior administration (many of which are hundreds of pages long).  Moreover, the notion that Mr. Atilla was linked to the US transactions is against the overwhelming evidence (and allegations) in this case, for none of the Halkbank food or gold transactions were dollar based. And it is contrary to logic:  for Iran, Mr. Zarrab and even Halkbank, the value from the first two Turkish based schemes (the gold and food/medicine schemes) was available without turning the proceeds of those schemes into dollars. Iran was able to use its funds from oil and gas sales to Turkey, and Mr. Zarrab was paid handsomely (according to the Indictment and discovery materials) for his work as well.

17

The choice to turn the proceeds into dollars was, just as the structure of the Indictment implies, a choice that was neither necessary or inevitable.  The alleged scheme attained its goals: Mr. Zarrab got paid in Euros and Turkish Lira, and Iran got access to funds from its oil sales *before* any US nexus financial transfer.  Mr. Zarrab's further goals were superfluous to Mr. Atilla.

*Third,* the government will not be able to defend its failure to link Mr. Atilla to the US nexus conduct by claiming that the scheme described in paragraphs 56-84 on is interrelated with the earlier described foreign schemes because the wording it chose for its Indictment would undercut that claim.  The Indictment describes three *separate* schemes: "The Gold Export Scheme" (page 16); "The Fraudulent Food and Medicine Trade Scheme" (page 22); and "[The] Scheme To Provide International Wire Transfer Services for the Government of Iran and Iranian Companies and Persons" (page 29).  Any doubt about their separateness is dispelled by the words chosen by the government right at the start of its description of the third scheme (the International Wire Service Scheme, ¶ 56), the only one which allegedly involved US banks:  "*In addition* to providing the Government of Iran access to the proceeds of Iranian oil and gas sales deposited at Turkish Bank-1, the defendants *also* conducted international financial transfers with *these proceeds* and other funds held for the benefit of Iranian companies and individuals…." (emphasis added).   The Indictment does *not* say that these wire transfers, which involved "U.S. financial institutions," were part of a unified overall plan.  To the contrary, the wording – and simple logic – suggests they were separable for, as the Indictment makes clear, Halkbank's involvement was not necessary to the US transfers, and their value was gained without the US connection.

In short, the three schemes were not necessary to each other and, in simple logic (as described above), need not have been.  Their separateness precludes the government from roping in Mr. Atilla by virtue of his connection to the foreign based Schemes 1 and 2.  *Cf. Krulewitch v. United States*, 336 U.S. 440 (1949);  *Lutwak v. United States*, 344 U.S. 604 (1953); *Grunewald v. United States*, 353 U.S. 391 (1957).  Without a basis for prosecuting Mr. Atilla under the Sanctions Regime, the entire Indictment falls, with the exception of the *Klein* conspiracy charged in Count One.  Absent a violation of the Sanctions Regime (which means that Mr. Atilla cannot be held responsible for US financial transfers), the IEEPA counts, the bank fraud counts, and the promotional money laundering counts have no legal basis and must be dismissed.

### POINT FOUR
### THE SANCTIONS LAWS PROVIDE
### THE EXCLUSIVE BASIS FOR PUNISHING EVASIVE CONDUCT

This Court observed that the basis for the alleged *Klein* impairment is the purported effort to strip Iranian entities from the underlying banking transactions that otherwise would have been reviewed by OFAC and rejected.  Court Op. at *8.  This cannot survive against Mr. Atilla.

*First, Klein* does not apply to this case.  The statutes, orders and regulations comprising the Sanctions Regime were intended to occupy the entire field of sanctions, to the exclusion of all other laws, unless expressly included in the Sanctions Regime, and the Sanctions Regime provides that evasion or avoidance of sanctions can be prosecuted *only* with respect to efforts to avoid or evade violations of "prohibitions."  31 C.F.R. §§560.203, 561.205; EO 13622 §9(a); EO 13645 §13(a).

As a matter of foreign policy, implicating the delicate intersection with foreign commerce and affairs, it had to be this way.  *See, e.g.,* Carswell & Davis, *Economic and Financial Pressures,* in *American Hostages in Iran*, at 31 (published by Council on Foreign Relations)

19

(making clear how careful the US was not to offend FFIs because of concerns over the US dollar, US banks and the overall efforts with Iran:  "with the exception of measures taken as a corollary to military action, the sanctions imposed against Iran were the most comprehensive imposed by the United States in this century [the 20th]").  *Cf. ABC Charters, Inc. v. Bronson,* 591 F. Supp. 2d 1272, 1304 (S.D. Fla. 2008) ("The federal government made clear … that it intends to occupy the field when it comes to regulating interactions with Cuba").   As Congress' own Research Service concluded:  the Sanctions regime targeting Iran is "arguably the most complex the United States and the international community have ever imposed on a rogue State."  Rennack, *Iran-US Economic Sanctions,* Congressional Research Service R43311.  The danger of any other interpretation is illustrated by the recent treaty with Iran over nuclear arms (JCPOA).  That treaty lifted certain aspects of the Sanctions Regime.  If the government is right and it could apply other non-Regime statutes to conduct that could have violated these now lifted provisions, the Treaty would be potentially breached by prosecutorial circumvention of Congressionally reviewed terms.

Case law interpreting the *Klein* conspiracy prong of 18 U.S.C. § 371 makes clear that where a scrupulously crafted regulatory scheme articulates clear limitations on the proscription of evasive conduct – conduct identical to that addressed by Section 371 – those specific limitations govern, and *Klein* cannot be used to supplement or end run those specific limitations. The portion of *United States v. Minarik,* 875 F.2d 1186 (6th Cir. 1989) that survives requires this result.

In *Minarik,* the court addressed a *Klein* conspiracy based on a defendant's conduct that impeded the collection of money which he owed the IRS.  Although the Internal Revenue Code specified the circumstances in which a taxpayer can be prosecuted for concealing his assets (*see*

20

26 U.S.C. § 7206), the government chose to proceed under the more general prohibition established by *Klein* under Section 371. The circuit court affirmed the district court's dismissal of the *Klein* count, noting that when Congress addresses a problem in a specific way, the more general fraud clause of Section 371 should not be used to create additional crimes. *Id.* at 1193-94 (emphasis added).

While the expansiveness of the *Klein* doctrine has been questioned by the Second Circuit in *United States v. Coplan,* 703 F.3d 46, 59 (2d Cir. 2012), cautioning against courts, not Congress, creating crimes, our argument does not depend on paring back *Klein.* Instead, the part of the reasoning in *Minarik* that requires courts to give preference to narrower, subsequent statutes designed to fully manage and occupy the area in question (a doctrine that stems from Supreme Court rulings) demands that the evasion/avoidance provision in the Sanctions Regime be given the precedence that Congress meant it to have. Indeed, unlike the situation in *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), where Congress passed the broader statute (18 U.S.C. §1001, the "False Statements Statute") *after* passing the narrower securities statute, the exact opposite occurred here: the Executive enacted its narrower regulations knowing full well that the *Klein* conspiracy doctrine had existed for decades. Allowing a prosecutor to choose which of two statutes (or both) to apply to activity that would violate both laws is quite different from allowing a prosecutor to choose a more general statute (here, Section 371) in order to end run a narrower, carefully crafted proscription tailored to the precise circumstances of the case (here, the Sanctions Regime prohibition on evasion/avoidance). Judge Winter's thoughtful dissent in *Bilzerian* bears repeating – that it would be "somewhat odd" that the same body (there Congress, here the "Executive" would act to render its own actions "superfluous."). 926 F.2d at 1305.

21

When the proper precedence is given, it is clear that the alleged conduct by Mr. Atilla does not violate the narrower, subsequent provision of the Sanctions Regime (charged in Count 2). As mentioned, under the Regime, it is only where actions are taken to divert Treasury from being able to detect violations of *prohibitions* that prosecution may occur. The government gets that *wrong twice* by conveying, in paragraphs 33 and 90, that there are punishable evasions of the "requirements" of "U.S. law" and "restrictions."

With respect to evasion of prohibitions, the government will not be able to claim that Mr. Atilla's purportedly evasive conduct violated the evasion provision in the Sanctions Regime. Without some allegation that Mr. Atilla knew of the US transactions described in the Indictment, he cannot be charged (as he has been in Count Two) with evasion to avoid a prohibition against those transactions. As mentioned, there is no allegation in the Indictment that would suggest that Mr. Atilla knew that US banking facilities would be involved in purely Turkish Lira and Euro denominated transactions. To the contrary, in all of the actions alleged in the Indictment with respect to the disguising of transactions, Mr. Atilla's name is strikingly absent. In fact, in the original indictment against Mr. Zarrab (the focal point of this Court's opinion denying Zarrab's motions), the government laid out 13 instances (¶14 a-m) where the purported *Klein* conspiracy was achieved, and none of those 13 instances mention Mr. Atilla by name or position, directly or indirectly. Indeed, as the government surely knows, to the extent he was involved in the transactions in question, Mr. Atilla took measures to ensure that Iran's connection to those transactions was clear and remained intact and, as discussed, it was neither inevitable nor necessary for the proceeds of whatever Mr. Atilla handled to be turned into dollars.

*Second,* even if *Klein* applied, the charges against Mr. Atilla are deficient. If the *Klein* charge is based on disguising a transaction to deflect US Treasury review, the government must

at least allege that Mr. Atilla knew of a potential US connection to these purely foreign based transactions.  He plainly cannot be charged with attempting to impair or impede a US government function if he did not know of (or had no reason to foresee) such a connection.

Finally, to the extent a *Klein* charge is allowed to remain in the circumstances of this case, Mr. Atilla would have been deprived of adequate notice under the due process clause.  *See, e.g., Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (a statute that "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the essential of due process of law").

**POINT FIVE**
**ALTERNATIVELY, IF NOT DISMISSED,**
**MR. ATILLA'S CASE MUST BE SEVERED FROM MR. ZARRAB'S**

As discussed, there are three separate "schemes" charged in the Indictment, each of which is, in essence, a separate conspiracy.  "The Gold Export Scheme" and the "The Fraudulent Food and Medicine Trade Scheme" both describe Mr. Atilla's connection to some extent.  By contrast, as discussed in detail above in Point Three of this brief, there are no allegations whatsoever concerning Mr. Atilla's participation in the third scheme, the international wire transfer scheme alleged in paragraphs 56-84.  Accordingly, if not dismissed, Mr. Atilla's case must be severed from Mr. Zarrab's.

Fed. R. Crim. P. 8(b) "does not permit joinder of defendants solely on the ground that the offenses charged are of 'the same or similar character.'"  *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).  As the Supreme Court held in *Kotteakos v. United States*, 328 U.S. 750, 775 (1946), it is a "substantial right" of each defendant "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others."

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                        :

UNITED STATES OF AMERICA

                                        :

      - v. -                                  S4 15 Cr. 867 (RMB)

                                          :

MEHMET HAKAN ATILLA,

                                        :

          Defendant.

                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MEHMET HAKAN ATILLA'S
MOTIONS TO DISMISS THE SUPERSEDING INDICTMENT
AND FOR SEVERANCE**

                                      JOON H. KIM
                                        Acting United States Attorney for the
                                        Southern District of New York
                                        *Attorney for the United States of America*

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
  Assistant United States Attorneys
Dean C. Sovolos
  Special Assistant United States Attorney
        *Of Counsel*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................... 1

Background ............................................................................................................................. 2

    A.    The Indictment .................................................................................................... 2

    B.    Offense Conduct ............................................................................................... 3

Discussion ........................................................................................................................... 5

I.    The Motion to Dismiss Should Be Denied ....................................................... 5

    A.    The Indictment Properly Alleges an IEEPA Conspiracy .......................... 5

    B.    The Sanctions Regime Does Not Preclude Count One ......................... 19

II.    Atilla's Motion for Severance Should Be Denied ........................................ 24

CONCLUSION ............................................................................................................... 25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Mehmet Hakan Atilla's motions (1) to dismiss the superseding indictment, S4 15 Cr. 867 (RMB) (the "Indictment" or "Ind.") ("Mot. Dismiss"), and, in the alternative (2) to sever his case from his co-defendant's case, Reza Zarrab ("Mot. Sever," and together with Mot. Dismiss, "Mot."). For the reasons set forth below, the Government respectfully submits that both motions should be denied.

At its core, Atilla's motion to dismiss is a rehash of the argument previously asserted by Zarrab and already rejected by the Court: that the United Sates is powerless to prosecute foreign actors who knowingly and deliberately violate economic sanctions imposed by the United States on the Islamic Republic of Iran. Atilla's variation on this theme is to insert a false distinction into the applicable sanctions laws between conduct by foreign actors – which, according to Atilla, is conveniently only sanctionable but not prosecutable – and activities that are prohibited, for which U.S. persons, but not foreign actors, can be prosecuted. Atilla is wrong. He is charged with participating in a scheme that breached regulations that required foreign banks to make a choice – deal with the United States or deal with Iran. Through fraudulent transactions papered over with false documents, front companies, and lies to U.S. regulators, Atilla and his co-conspirators helped his employer, Türkiye Halk Bankası A.Ş. ("Halk Bank"), a Turkish state-owned bank, double-deal by facilitating transactions involving billions of dollars-worth of Iranian oil proceeds on behalf of the Government of Iran and related entities, while still maintaining Halk Bank's relationship with the U.S. banks. It was a scheme designed with the sole purpose of evading and avoiding U.S. sanctions laws, and facilitated through the bribery of senior Turkish government ministers. Based on a straightforward application of the pertinent

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
UNITED STATES OF AMERICA
                                                                    :
             v.                                   S4 15 Cr. 867 (RMB)
                                                                    :
REZA ZARRAB, et al.,
                                                                    :
             Defendants.
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MEHMET HAKAN ATILLA'S
MOTION TO DISMISS SUPERSEDING INDICTMENT S4,
OR ALTERNATIVELY FOR SEVERANCE**

HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC
Victor J. Rocco                           Cathy Fleming
Thomas E. Thornhill                       Robert Fettweis, *pro hac vice*
David M. Rosenfield                       1700 Broadway, 28th Floor
2 Park Avenue                             New York, NY 10019
New York, NY 10016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.  THE SANCTIONS REGIME DOES NOT CRIMINALIZE CONDUCT THAT IS
    SANCTIONABLE ........................................................................................................ 1

    A.  Activity by foreign banks and their employees that lacks a US connection
        can be sanctioned, leading to their being designated, but not prosecuted ............... 2

    B.  Because there is no pled (or provable) link of Mr. Atilla to the US nexus
        activity, the charges must be dismissed .................................................................. 3

II. THE EVASION/AVOIDANCE PROHIBITION IN THE SANCTIONS REGIME
    ONLY APPLIES TO ACTS THAT EVADE OR AVOID A PROHIBITION,
    WHICH IS NOT ALLEGED HERE ............................................................................ 5

    A.  There must be a prohibition before one can be prosecuted for evading it ............... 6

    B.  *Klein* is not an alternative here ............................................................................... 7

III. EVEN IF CERTAIN ACTS ARE PROHIBITED, MR. ATILLA, AS A
     FOREIGN NATIONAL, CANNOT BE PROSECUTED FOR THEM ........................... 8

CONCLUSION ................................................................................................................ 10

The government's response to Hakan Atilla's motion to dismiss is astonishing in two ways: *first,* it further muddles its already wrong, self-serving portrait of the Iranian Sanctions Regime, by making contradictory statements that are unsupported by the Regime's carefully wrought regulatory structure; and, *second,* it argues that our points simply rehash what Reza Zarrab argued and lost, when our arguments are materially different. The Zarrab Indictment before the Court on his motions to dismiss was distinctly different from the Indictment against Mr. Atilla (Zarrab, for example, was not charged with purely foreign conduct; he conceded, as specifically charged against him, that his conduct had a nexus to the US financial system). Further, when Zarrab's motions were determined, Mr. Atilla had not been charged.

## I.    The Sanctions Regime Does Not Criminalize Conduct That Is Sanctionable

The government scoffs at what it describes as a false dichotomy between conduct that can be sanctioned and conduct that can be prosecuted.  But we did not establish that dichotomy – the Sanctions Regime ("the Regime") plainly did.  Although we have not cited case law for this dichotomy, neither has the government for its unsupportable contrary view, and our construction is apparent from the clear language of the underlying laws, while the government's is at odds with these texts.

No court ever thought it necessary to address the government's expansive theory of criminal liability, presumably because the government has not previously sought to overreach the authority of the Regime in the way it has here: setting up a false dichotomy when it attempts to portray the Regime as an all or nothing proposition – to deal with the United States on its terms or be prosecuted.  Instead, the Regime is a carefully considered effort to control trade with Iran, principally through the powerful incentive of access to the US financial system, not prosecutions.

*A. Activity by foreign banks and their employees that lacks a US connection can be sanctioned, leading to their being designated, but not prosecuted.*

IEEPA's penalties section (50 USC §§ 1705(a) and (c)) only makes illegal conduct that

violates prohibitions, orders, regulations and licenses issued under IEEPA's grant of authority

(50 USC § 1702(a)(1)), which in turn is qualified by the phrase "subject to the jurisdiction of the

United States."  In other words, the Executive does not have free rein to do whatever it wants to

foreigners who act outside the US.

The Regime could not be clearer: a foreign financial institution ("FFI") or employee that

helps Iran conduct non-exempt business *outside the US* is only subject to being sanctioned (*i.e.,*

designated).  There must be a US nexus (*e.g.,* use of US banking relationships), for the US to do

anything more like prosecute.  The various regulations and orders that comprise the Regime have

separate sections devoted to the listing of foreigners and FFIs for *sanctionable activity* versus

*prohibited activity.*  The prohibitions use the word "prohibition" or its variant, or "shall not"

(directives that are then labeled prohibitions by another subsection).  Sanctionable activity can

earn a foreigner a sanction designation, but the action itself is not a violation of anything (order,

license, regulation or prohibition).  It is merely the predicate for a prohibition that can be

prosecuted.

The government seems to recognize this fact in its Indictment:  ¶5 states that "Turkish

Bank 1 [Mr. Atilla's bank] participated in several types of transactions for the benefit of Iran

that, if discovered, would have exposed Turkish Bank 1 to sanctions under US law…."  The

Indictment does not say that those activities (the activities pled against Mr. Atilla as well) would

have subjected the bank or him to prosecution because it would not.  David Cohen, the previous

Treasury Undersecretary responsible for overseeing the Sanctions Regime, made this clear when

addressing the recent North Korea sanctions (*NewsHour,* PBS TV, Sept. 21, 2017):

> this authority allows what are called secondary sanctions on foreign
> financial institutions …. [W]hat it says is … any foreign financial
> institution that is working with designated, so sanctioned, North Korean
> entities can be cut off from the United States.

Finally, the government betrays the utter lack of meaningful authority for its capacious

interpretation of the power to prosecute by doing two other things: turning to the dictionary to

define what violating a prohibition means, and by invoking the other aspects of IEEPA's

criminal prosecution authority (*i.e.,* violations of orders, regulations, or licenses).  The dictionary

definition is superfluous where the statute or regulation clearly delineates the meaning of the

word in question, and as mentioned, the Regime uses the term "prohibition" uniformly to refer

specifically to bans resulting from and predicated on sanctions, not a ban of the activity that

could lead to the initial imposition of a sanction.  And while IEEPA criminally proscribes

violations of orders, regulations or licenses, the actions for which Halkbank or Mr. Atilla could

be sanctioned did not violate anything, for it is not a "violation" of anything to be designated

under the Regime.

So we have not set up a false dichotomy.  We have simply reiterated the distinction that

Congress and the Executive deliberately drew between what can be sanctioned and what is a

crime.

> B.  *Because there is no pled (or provable) link of Mr. Atilla to the US nexus activity,
> the charges must be dismissed.*

Once one accepts that the Regime operates on two levels, the next question is: what, if

anything, did Mr. Atilla do to put himself into the prosecutable category?  The short answer is

nothing.  To do so, the government would have to plead that Mr. Atilla either caused a US

person or financial institution to help Iran (what is sometimes called a "primary" sanctions

violation) or, *once he or Halkbank was sanctioned and designated,* he dealt with a US person or

institution following that designation.  Because neither he nor Halkbank was ever designated, the

only question is whether Mr. Atilla allegedly assisted a US person or institution in helping Iran. The Indictment does not allege that he did.

The Indictment pleads only one US connection – the US financial transfers in ¶¶ 56-84. While that might qualify as a basis for prosecution were Mr. Atilla linked to it, no link is alleged in the Indictment.  Mr. Atilla is not mentioned in *any* of ¶¶ 56-84.  And a trial will not change that because the Court can now conclude that such a link cannot be drawn.

*First,* the US wire transfer scheme described in ¶¶ 56-84 starts by alleging that "the defendants" gave the Iranian government access to proceeds from its oil and gas sales deposited at Halkbank – a wholly foreign activity that, at most, could have earned Halkbank and its involved employees a sanctions designation under the Regime.  By so stating, the Indictment indicates that the scheme had a self-contained purpose: to get Iran access to its proceeds at Halkbank.  The Indictment then goes on to say that "the defendants also conducted" international financial transfers "with these proceeds and other funds," hiding the true nature of these transactions from US regulators.  The description of the international transfers (including US financial involvement) as an "addition[al]" activity cements the notion that it was not integral to the two prior schemes (gold and food in ¶¶ 33-55), but, instead, a separable and separate scheme. Conduct cannot be both "part of" and "additional" at the same time.

Beyond this, the government also has not stated a single connection between Mr. Atilla and the US-related transfer scheme either in the Indictment or in its Opposition Brief.  The failure to do so is meaningful: we have repeatedly pointed out that the absence of any pled connection is fatal, yet the government has merely pointed to vague allegations in the Indictment that Mr. Atilla was at meetings where "financial transfers using the proceeds of Iranian sales of natural gas at [Halkbank]" were discussed.  ¶37.  These allegations do not specify financial

4

transfers *through the US* and even if they did, they would remain woefully short of *an allegation that Mr. Atilla helped further a scheme that involved the use of US banks*.  Nor can the government rescue itself by its time-worn bromide (it is enough to plead the statutory language) because here, the government has pled 27 overt acts that were allegedly part of the US wire transfer conspiracy and *none* of these overt acts mentions Mr. Atilla or Halkbank directly or indirectly.  Indeed, the pleadings suggest to the contrary: that the US related transfers served Zarrab's own purposes.

*Second,* there is nothing about the US transfer scheme <u>as pled</u> from which Mr. Atilla logically would have concluded that it was part of the <u>foreign</u> activity that is alleged against him. As the government has argued (Doc 308, Opp. Memo at 4), Mr. Atilla and the co-defendants engaged in schemes to set up a slush fund for Iran.  That is a goal that is not illegal in itself and, more important, even if it were, would have been as valuable with or without US dollarization. Getting Euros or gold to Iran would be ample reward without more.  To say otherwise would be to claim that without US dollars, a nation cannot survive, even with Euros.

In short, this Indictment does not adequately link Mr. Atilla to the only scheme in which US institutions would have been involved – a scheme wholly separate from the alleged slush fund for Iran that Atilla purportedly helped create.

### II.       The Evasion/Avoidance Prohibition In The Sanctions Regime Only Applies To Acts That Evade Or Avoid A Prohibition, Which Is Not Alleged Here

The government offers an alternative basis for prosecuting Mr. Atilla:  that his actions allowed Halkbank to *evade or avoid* being designated (having sanctions applied to it) under the Regime.  But conduct designed to avoid the imposition of a designation (being sanctioned) is not prosecutable, so evasive activity designed to avoid sanctions cannot be prosecuted either.

*A. There must be a prohibition before one can be prosecuted for evading it*

All of the Regime's regulations and statutes expressly limit the prohibitions on evasion and avoidance to "prohibitions" alone.  So while it is a crime to willfully violate a prohibition, order, regulation or license in the Regime, it is not a crime to evade or avoid anything but a prohibition.  The government conveniently reads that requirement out of the law, claiming that it is sufficient if a person, like Mr. Atilla, acts to avoid his bank being sanctioned because that sanction *could* lead to prohibitions that would then be prosecutable.  But the construction sought by the government would negate the Regime's carefully wrought difference between sanctions and prosecutable events.

Under the government's interpretation, any action that could lead to sanctions *could also* be a basis for some future prohibition, so *all actions, anywhere in the world that could be a basis for sanctions would be prosecutable as criminal evasion or avoidance.*  If the government were right, there would be no separation between "designation" as a sanctioned entity and the "prohibition" against dealing with that designated entity: the two would be one.  The essence of the Regime would be rendered superfluous because anyone then could be prosecuted for actions designed to prevent a sanction (a precondition to a prohibited act with a sanctioned entity).  Yet, as the government recognized in its brief (Opp. at 10), courts must read law in ways that give all parts meaning.

The government does not help itself by its forced analogy to a law punishing travel to avoid prosecution.  Although the Travel Act does not require that a prosecution exist when the traveling occurs, it does require that the defendant *already* acted in a way that could be prosecuted.  Here, as discussed, before there is a prohibition, there is no action for which a prosecution to evade may be brought. *Cf. United States v. Soussi,* 316 F.3d 1095 (10th Cir. 2012) (involving prosecution of US person for evading *extant* prohibition).

Finally, apart from the above argument, the Regime's evasion provisions would be unauthorized or unconstitutionally vague if applied to a prohibition that did not yet exist because the sanction-predicate for the prohibited activity had not yet been imposed.  The evasion charge under IEEPA is likely either (i) outside the scope of the authority delegated by Congress in IEEPA (for IEEPA is silent on punishing evasion); or (ii) violates due process for giving inadequate notice to a reasonable person.  *See, e.g., M Kraus,* 327 U.S. 614, 621 (1946) (in addressing delegation to agency the power to address circumvention and evasion, Court emphasized that the agency's "provisions must be explicit and unambiguous in order to sustain a criminal prosecution; they must adequately inform those who are subject to their terms what conduct will be considered evasive so as to bring the criminal penalties of the Act into operation. …The dividing line between unlawful evasion and lawful action cannot be left to conjecture"). (citation omitted).  *Cf. United States v. Saboonchi,* 2014 U.S. Dist. LEXIS 63321, at *10-15 (D. Md. May 6, 2014) (IEEPA evasion provision sufficiently clear when charge relates to conduct to evade *existing* prohibition against direct dealing with Iran).

### B.  Klein is not an alternative here

The government alternatively argues that *Klein* applies no matter what, citing *Bilzerian.* But the government completely misses our point: we are *not* saying that the government cannot seek to prosecute under two different statutes that both proscribe the same conduct. Instead, we submit that where a more recent statute/regulation specifically addresses but does not proscribe the activity in question, the government cannot end run that statute by resorting to a broader, older law.  Here, that is precisely what would happen if the government's interpretation prevails.

III.     **Even If Certain Acts Are Prohibited, Mr. Atilla, As A Foreign National, Cannot Be Prosecuted For Them.**

Even if the government could theoretically apply some criminal aspect of the Regime to Mr. Atilla's conduct (*e.g.,* that Mr. Atilla is linked to US nexus conduct or his activity constituted prosecutable evasion), he still cannot be prosecuted as a foreign national whose conduct occurred outside the US.  The government offers three ineffective answers: *first,* that our position threatens national security; *second,* that the issue is law of the case so we are out of luck; and *third,* that IEEPA applies to "persons" so foreigners are automatically included.

*First,* the government contends that if they cannot get at Mr. Atilla's conduct criminally, the US is imperiled.  What the government conveniently ignores is that while the Sanctions Regime was designed to deal with a very serious national security threat, it is not limitless.  It does not, for example, empower the President to conduct foreign relations as if we are at war.  Instead, IEEPA's authority applies to property and people "subject to US jurisdiction."  That is a limitation.  Moreover, as we discussed in our opening brief (the government did not respond to this), the Regime's framers were not concerned solely with national security issues – international comity was every bit as important.  Finally, the notion that foreigners are "immune" under our reading of the Regime is absurd: being sanctioned under the Regime is a serious blow to any foreign institution or individual.  That is the point David Cohen himself made above.

*Second,* law of the case does not apply to a defendant who was *not in the case* when the decision was made.  *See, e.g., Cobalt Multifamily Inv'rs v. Arden,* 46 F. Supp. 3d 357, 360 (S.D.N.Y. 2014) (doctrine does not apply before defendant is party).  And especially here, where the Court has spoken on the subject of extraterritorial application of the Regime to foreigners in the context of an indictment (unlike the Indictment in our case now) that did not appear to charge Zarrab for violating the secondary sanctions issued under NDAA, ITRA, IFCA and Executive

Orders 13622 and 13645.  In addition, we have offered a good number of arguments that were

not offered by Zarrab (and notably, the Court's comments on this subject were dicta given

Zarrab's concessions about his conduct in the US).

*Third,* the government stands on its head the long-prevailing black letter Supreme Court

presumption against extraterritorial application of the criminal law absent clear statements by

Congress (or here, its Executive delegate) to the contrary.  *See, e.g, Morrison v. NAB,* 561 U.S.

247 (2010).  It is true that IEEPA applies to "persons," but the government's argument that that

is proof that foreigners can be prosecuted would be tantamount to creating a presumption *in

favor* of extraterritorial application, and that has never been the law.  Indeed, reading the term

"person" so inclusively ignores the fact that the Regime quite often specifies where it applies to

"US persons" and "non-US persons" – designations that would be superfluous (if not

counterproductive) if the statute's application to "person" meant US and non-US at all times.

So, for example, in 31 CFR §§ 560.215 and 561.202, the Executive felt it necessary to spell out

that foreign entities owned by US entities or individuals were subject to prohibitions.  If

foreigners were already subject to prosecution for anything in the Regime, there would be no

need to expressly declare that foreign entities owned by US entities were susceptible to

prosecution.  The same analysis applies to Sections 560.204's intersection with 560.205.  Section

205 states that for "re-exported" items for which licenses were needed in 1995, only non-US

individuals can be prosecuted.  The fact is that re-exports are prohibited by Section 560.204, so if

the government is right that the term "person" means everyone, then non-US persons would be

prosecutable under 204, and 205 would have been superfluous.  (As we noted in our opening

brief, although a foreigner like Mr. Atilla is subject to 560.205, the activity here – financial

services – did not require an export license so this section does not apply to him).

OFAC's guidance, if anything, drives home this point, suggesting that foreign entities are not viewed as prosecutable even when violating prohibitions against dealing with US entities:

> **157. How will the Treasury Department enforce the Iranian Financial Sanctions Regulations (IFSR) with respect to U.S. entities?**
> *Any U.S. person* who violates the correspondent account provisions of the IFSR may be subject to civil penalties of up to the greater of $250,000 or twice the transaction value, and criminal penalties for willful violations of up to $1 million and 20 years in prison.

U.S. Department of the Treasury, Office of Foreign Assets Control, Frequently Asked Question No. 157 (emphasis added).   Here, OFAC addresses who can be penalized civilly or criminally when a sanctioned foreign financial institution ("FFI") deals in U.S. correspondent accounts (a violation of an IFSR prohibition) and singles out only US persons.

Finally, the basic underpinnings of the Regime underscore this point as well, for the Regime expressly uses the word "FFI" or something comparable wherever foreigners run the risk of being designated for their foreign activity.

This advice and the above examples illustrate that unless non-US persons are expressly designated as individuals to whom a provision applies, the provision in question does not apply to them.  And the government's arguments that conspiracy and aiding/abetting somehow enlarge the scope of the Regime cannot change that fact, for it is only what violates the Regime as a completed act that can be the basis for a conspiracy charge, not the other way around. The power to punish a conspiracy does not change the power to prohibit the underlying conduct.

## Conclusion

Once the IEEPA charge falls along with the *Klein* charge, so do the bank fraud and money laundering charges.  And because the alleged US transfer scheme is pled as (and logically is) separate from the wholly foreign conduct in which Mr. Atilla is alleged to have engaged, they are misjoined under Rule 8.

The Law Firm

Fleming . Ruvoldt PLLC

**Cathy Fleming**
**(201) 518-7907 (direct)**
**cfleming@flemingruvoldt.com**

250 Moonachie Road
Suite 501
Moonachie, NJ 07074
(201) 518-7878

1700 Broadway, 28th floor
New York, NY 10019
(212) 706-1850

November 3, 2017

**BY ECF**
Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 17B
New York, NY 10007-1312

Re:     *United States v. Reza Zarrab, et al,* S4 15 Cr. 867 (RMB)

Dear Judge Berman:

The Court has ordered the parties to appear for an argument on the motion for relief from the protective order on November 6, 2017.  We write to request a number of additional issues to be discussed at that time.

Both the Defense and the Government filed their motions *in limine* on October 30, 2017. As a result of those motions, we respectfully suggest the following items for discussion:

1)     As the Court is aware, the defense may call witnesses who are located in Turkey. We intend to make another fact-finding trip soon after the Court rules on the Protective Order motion.  We would also like to discuss a process for keeping the names, identifying information, and summary of testimony of defense witnesses under seal.  We have concerns about witness privacy and witness intimidation before trial and, like the Government, would like witness information to be kept under seal until trial.

We believe it would be useful and expedient to discuss the mechanism for testimony, either through videoconference or via Rule 15 depositions in Turkey.

2)       As part of our motions *in limine*, we have requested a pretrial hearing related to the recordings that the Government intends to offer.  We think it would be prudent to discuss logistics and timing for such a hearing unless the Court grants our motion *in limine* to preclude the recordings on the papers.

3)       We would like to get a schedule for production of *Jencks* materials and marked exhibits.  We still do not know what evidence the Government intends to offer.  Since we need to investigate facts in Turkey, we request early production of *Jencks* and prompt production of marked exhibits so that we can address fact finding, in response, on our next (and hopefully final) fact finding trip to Turkey.  We are, of course, amenable to keeping the *Jencks* materials confidential.  We understand that it is a different category of material than Rule 16 discovery.

4)       We would like to discuss the Government's late disclosure, *ex parte*, to the Court on November 2, 2017 of Rule 16(d) materials which it contends are classified and should not be disclosed to the Defense.

5)       Finally, we would like to discuss a realistic trial date.  Mr. Atilla has consistently pushed hard for trial as quickly as possible but given that there have been late disclosures of discovery in this case, and other issues set forth below, it is just not possible to go forward on the current schedule.  The Defense team has worked with diligence, but we are hampered by logistics as well as the severe limitations of trial preparation with Mr. Atilla being at the MCC.  Given the amount of work that needs to be done – much of it in Turkey – and given that we still do not have marked exhibits or *Jencks* materials, coupled with the need for pretrial hearings and (perhaps) Rule 15 depositions, we do not believe we can realistically pick a jury on November 20-21 and start trial on November 27, 2017.  It is with great reluctance that Mr. Atilla has consented to the Defense requesting a trial date in January 2018.

Respectfully submitted,

HERRICK FEINSTEIN LLP                    FLEMING RUVOLDT PLLC

By: /s/ Victor J. Rocco                  By:  /s/  Cathy Fleming
       Victor J. Rocco                        Cathy Fleming
       Two Park Avenue                        1700 Broadway, 28th floor
       New York, New York 10016               New York, New York 10019
       (212) 592-1400                         (212) 706-1850
       (212) 592-1500 (fax)                   (212) 706-1855 (fax)


cc:    All Counsel

Case 1:15-cr-00867-RMB   Document 326   Filed 11/03/17   Page 1 of 3

The Law Firm

# Fleming . Ruvoldt PLLC

Cathy Fleming
(201) 518-7907 (direct)
cfleming@flemingruvoldt.com

250 Moonachie Road
Suite 301
Moonachie, NJ 07074
(201) 518-7878

1700 Broadway, 28th floor
New York, NY 10019
(212) 706-1850

## MEMO ENDORSED
### P3

November 3, 2017

BY ECF

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 17B
New York, NY 10007-1312

Re:  *United States v. Reza Zarrab, et al,* S4 15 Cr. 867 (RMB)

Dear Judge Berman:

The Court has ordered the parties to appear for an argument on the motion for relief from the protective order on November 6, 2017. We write to request a number of additional issues to be discussed at that time.

Both the Defense and the Government filed their motions *in limine* on October 30, 2017. As a result of those motions, we respectfully suggest the following items for discussion:

1)      As the Court is aware, the defense may call witnesses who are located in Turkey. We intend to make another fact-finding trip soon after the Court rules on the Protective Order motion. We would also like to discuss a process for keeping the names, identifying information, and summary of testimony of defense witnesses under seal. We have concerns about witness privacy and witness intimidation before trial and, like the Government, would like witness information to be kept under seal until trial.

~~Case 1:15-cr-00867-RMB   Document 325   Filed 11/03/17   Page 2 of 3~~

We believe it would be useful and expedient to discuss the mechanism for testimony, either through videoconference or via Rule 15 depositions in Turkey.

2)      As part of our motions *in limine*, we have requested a pretrial hearing related to the recordings that the Government intends to offer. We think it would be prudent to discuss logistics and timing for such a hearing unless the Court grants our motion *in limine* to preclude the recordings on the papers.

3)      We would like to get a schedule for production of *Jencks* materials and marked exhibits. We still do not know what evidence the Government intends to offer. Since we need to investigate facts in Turkey, we request early production of *Jencks* and prompt production of marked exhibits so that we can address fact finding, in response, on our next (and hopefully final) fact finding trip to Turkey. We are, of course, amenable to keeping the *Jencks* materials confidential. We understand that it is a different category of material than Rule 16 discovery.

4)      We would like to discuss the Government's late disclosure, *ex parte*, to the Court on November 2, 2017 of Rule 16(d) materials which it contends are classified and should not be disclosed to the Defense.

5)      Finally, we would like to discuss a realistic trial date. Mr. Atilla has consistently pushed hard for trial as quickly as possible but given that there have been late disclosures of discovery in this case, and other issues set forth below, it is just not possible to go forward on the current schedule. The Defense team has worked with diligence, but we are hampered by logistics as well as the severe limitations of trial preparation with Mr. Atilla being at the MCC. Given the amount of work that needs to be done – much of it in Turkey – and given that we still do not have marked exhibits or *Jencks* materials, coupled with the need for pretrial hearings and (perhaps) Rule 15 depositions, we do not believe we can realistically pick a jury on November 20-21 and start trial on November 27, 2017. It is with great reluctance that Mr. Atilla has consented to the Defense requesting a trial date in January 2018.

Case 1:15-cr-00867-RMB   Document 326   Filed 11/03/17   Page 3 of 3

Respectfully submitted,

HERRICK FEINSTEIN LLP                    FLEMING RUVOLDT PLLC

By: /s/ Victor J. Rocco                  By:  /s/ Cathy Fleming
    Victor J. Rocco                        Cathy Fleming
    Two Park Avenue                        1700 Broadway, 28th floor
    New York, New York 10016               New York, New York 10019
    (212) 592-1400                         (212) 706-1850
    (212) 592-1500 (fax)                   (212) 706-1855 (fax)

cc:    All Counsel

> Respectfully the current schedule is
> not only realistic but it is also Real.
> The parties should meet + confer
> in good faith regarding all the issues
> set forth in this letter + advise the
> court in writing sufficiently in advance
> of Monday's conference (It is helpful
> SO ORDERED
> Date: 11/3/17    Richard M. Berman
>                  Richard M. Berman, USDJ
>
> when counsel cite authorities in
> correspondence with the Court + when
> they avoid last minute proposals.)



**Victor J. Rocco**
Partner
Phone: 212.592.1422
Fax:  212.545.2333
vrocco@herrick.com

November 5, 2017

**SUBMITTED BY ECF**

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Courtroom 17B
New York, NY 10007-1312

**Re:    United States v. Mehmet Hakan Atilla, S4 15 Cr. 867 (RMB)**

Dear Judge Berman:

As ordered by the Court, counsel for the defense and counsel for the government conferred both by email and conference call on Saturday, November 4th, to address the issues in our November 3, 2017 letter (among others).  Unfortunately, we had limited success.

Counsel was able to agree, or at least make progress, on the following issues:

1.      Both sides agree that witness disclosures should remain confidential until the Court has ruled on both our Rule 15 request and application to keep the identity of the proposed witnesses confidential until trial, permitting use by counsel, but preventing public spectacle or witness harassment and intimidation.

2.      The Government has told us that it will provide its trial exhibit list on Monday, November 6, 2017.

3.      Defense counsel gave the government the names of anticipated Rule 15 defense witnesses and has provided summaries of their anticipated testimony.  We request that the Court order that witness information remain confidential between the parties at this point, and if permitted to do so, we will file under seal our Rule 15 application on Monday.

We were not able to agree beyond those issues.

**A.      Defendant seeks an adjournment of the trial; the Government opposes it.**

During the conference, we discussed the reasons we ask for an adjournment.  Pretrial investigation and preparation has been very difficult.  We have worked diligently since the start of this case to identify prospective witnesses, interview them and secure their attendance at trial.

 HERRICK

Honorable Richard M. Berman
November 5, 2017
Page 2

     Mr. Atilla's alleged conduct took place almost exclusively in Turkey and that is where our prospective witnesses reside and documents are located.

     We have come to learn that, unfortunately, things move slowly in Turkey. We have been hampered in our efforts to complete our work, not only by the great distances between us and the witnesses, but by significant language and cultural differences, as well as a Protective Order that has proved unworkable in certain respects. It has taken us an enormous amount of time to sort through the mountains of documents and miles of recorded conversations provided in discovery, most of which are in Turkish or Farsi, and require translation, to say nothing of the time it has taken us simply to understand the complex transactions and complicated regulatory scheme that are at the heart of this case. This has been an ongoing process, but much of this work was required to be done before we could identify witnesses and locate relevant information so we could conduct meaningful interviews of witnesses abroad.

     We have also been slowed by difficulties in developing information here in the U.S. as a result of problems accessing our client and the government's delay in producing basic Rule 16 materials, as evidenced by its recent CIPA filing last Thursday afternoon and our serial requests for all of our client's written or recorded statements, including statements made subsequent to his arrest. We have been receiving basic discovery materials all along which inexplicably has continued, even at this late date.

     This is an extremely complex case and Mr. Atilla's insight and understanding regarding the issues, including basic banking procedures is important to the proper preparation of his defense. Our inability to access him when we need him, because of his detention, has been an added burden to effective and efficient pretrial preparation. Beyond the problems inhibiting physical access to Mr. Atilla while he is detained, we have also encountered significant language and cultural differences that have made communication with him difficult and time consuming.

     Of course, none of these considerations even begins to address the layers of complexity and difficulty that have resulted from the latest superseding indictment, returned on September 6th, a bit more than six weeks prior to the then October 30th trial date. This latest indictment, returned at least three years into the government's investigation and nearly two years after the initial indictment, has added considerably to the burden of investigating and defending against the charges in this case by not only adding four new charges against Mr. Atilla, but also by including pages of new details that it had not provided previously in any of its prior pleadings or included in any particularization of the prior charges against him. It is the government that has been dilatory and delayed the trial, not Mr. Atilla who seeks only sufficient time to defend himself.

 HERRICK

Honorable Richard M. Berman
November 5, 2017
Page 3

We have not yet received marked exhibits or a witness list. We do not know how the government intends to have admitted into evidence at trial important pieces of its proof of the offenses charged. Despite repeated requests for basic information on how the government intends to authenticate the questionable audio recordings, the government has offered no more than an opaque "live witnesses."

In order to identify our proposed Rule 15 witnesses, attorneys from the defense group have already made two trips to Istanbul. We have identified four witnesses to date and are hopeful of an additional two. Of course, we will have to schedule with the proposed Turkish deponents mutually acceptable dates, times and places for their proposed depositions. Upon receiving Your Honor's authorization for Rule 15 depositions, we will promptly undertake to finalize dates. We have begun that process and expect that, if the Court permits the depositions to proceed, we will conclude the examinations by mid-December. The depositions would take place in Istanbul and, once started, we would schedule them on a back- to-back basis until they are concluded in time for the Court to review the videos and rule on each party's objections. Only one trip to Turkey will be necessary.

As counsel for the defendant, we have an obligation to see to it that he has a proper defense. It is our professional judgment that we cannot assure that proper defense without more time to prepare, as well as cooperation from the government in providing materials. We make the request humbly and reluctantly, since our client is in jail, but we cannot proceed unprepared. The defense has worked diligently and tirelessly since the start of this case; our lead counsel unfortunately was unavailable while he recovered for more than six weeks from serious surgery which was unanticipated; we do not seek delay due to dilatory tactics. Indeed it would be senseless to do so: the only party prejudiced by delay is Mr. Atilla who continues in pretrial detention, where he certainly poses no threat to the community. On the other hand, the government can show no prejudice if this trial were to be delayed for the roughly sixty days we will respectfully request of the Court.

### B.   Recordings.

We were unable to resolve this issue. The Government's position is that we are not entitled to know at this time how it intends to prove up the recordings. We believe it is in the best interest of all to deal with the recordings before trial. In fact, we asked for an evidentiary hearing on the recordings in Cathy Fleming's Declaration in Support of Mr. Atilla's Motion *in Limine* to Preclude Recordings. (Doc. 320, at ¶¶ 6, 33.) These are unusual and significant evidentiary issues. If the recordings are precluded, this is a very different case. It should be decided without a waiting jury.

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                   v.                        15 CR 867 (RMB)

5    MEHMET HAKAN ATILLA,

6                   Defendant.

7    ------------------------------x

8                                            New York, N.Y.
                                             November 6, 2017
9                                            11:07 a.m.

10

     Before:
11
                        HON. RICHARD M. BERMAN,
12
                                             District Judge
13

14                            APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     MICHAEL LOCKARD
17   SIDHARDHA KAMARAJU
     DAVID DENTON
18   DEAN SOVOLOS
          Assistant United States Attorneys
19

     HERRICK FEINSTEIN LLP
20        Attorneys for Defendant
     BY:  VICTOR J. ROCCO
21        THOMAS E. THORNILL
          -and-
22   FLEMING RUVOLDT PLLC
     BY:  CATHY ANN FLEMING
23

     ALSO PRESENT:  ASIYE KAY, Turkish Interpreter
24                  SEYHAN SIRTALAN, Turkish Interpreter
                    MICHAEL CHANG-FRIEDEN, Paralegal

25

```
 1              THE COURT:  So, sorry for the brief adjournment of

 2   today's conference, which was a function of the work that the

 3   attorneys did over the weekend, and I just wanted to make sure

 4   I had absorbed all of that before the conference today.  In the

 5   order that was docketed this morning adjourning the conference

 6   from nine to 11, I included a statement that there are from

 7   here through trial no further submissions unless there's prior

 8   order or approval by the Court.  That is my practice in

 9   criminal cases after motions in limine have been filed, so I'm

10   not expecting any further submissions.

11              You'll remember that the purpose of today's conference

12   was and is to resolve the issues between Mr. Atilla's counsel

13   and the government with respect to the protective order

14   agreement relating to documents in this case.  As to that, the

15   parties signed and agreed to this protective order on or about

16   June 19, 2017, and actually entered into that arrangement even

17   before I was involved.  I so ordered that agreement so it has

18   been and is in place.  And that is the prearranged and noticed

19   focus of today's hearing.

20              Before I go any further I should mention that we have

21   Turkish language interpreters here and ask Mr. Atilla if he's

22   able to understand these proceedings with the help of the

23   interpreter.

24              THE DEFENDANT:  Thank you, your Honor.  Yes, I can.

25              THE COURT:  Okay.  So before we turn to the protective
```

1    order, there are a few things I'd like to discuss or

2    underscore, including something so very fundamental in our U.S.

3    system of justice and in our Constitution and which applies in

4    this and every other criminal case, whether the defendant is a

5    U.S. citizen or not, and that is the presumption of innocence,

6    which attached, is attached, has attached to Mr. Atilla and

7    which everyone who is interested in this case should be aware

8    of and understand that it applies, the presumption of

9    innocence, that is, 100 percent, no matter what we say in our

10    discussion today or at any other time during these proceedings

11    in considering and ruling upon defense counsel's various

12    applications, motions, and letters, for example.

13          Mr. Atilla has consistently maintained his innocence.

14    And even if he had not actively and vocally maintained his

15    innocence, he is presumed to be innocent of all the charges

16    against him.  That is and has been true throughout these

17    proceedings and it remains true unless and until such time, if

18    it should occur, he is proven guilty beyond a reasonable doubt

19    after a trial by jury.  And, in addition, Mr. Atilla is

20    entitled and understandably he has also consistently pressed

21    for in this court a speedy trial under our laws and our

22    Constitution.

23          The current trial date of November 27 I believe

24    satisfies Mr. Atilla's request for a speedy trial.  Indeed,

25    that date of November 27, 2017 was requested by defense counsel

1   and I granted that request pushing back the scheduled trial to

2   this, which was then October 30, 2017, to November 27.

3          My recollection is that defense counsel requested

4   adjournments, including adjournment of the first selected trial

5   date, which you'll recall was August 21, 2017, to October 30,

6   2017, and then from October 30 to November 27, in each instance

7   with the expression by or on behalf of Mr. Atilla his

8   expression of eagerness to get to trial and to be vindicated,

9   which by the way I totally understand as well.

10          But just to put a fine point on it, the chronology is

11  as I recall the following, roughly.

12          On April 13, 2017, Mr. Rocco stated that "Mr. Atilla

13  just handed me a note and said I do not want to extend the

14  August 21, 2017 date.  August is too far out."

15          No. 2, by letter, I think this was dated April 21,

16  2017.  Defense counsel, Mr. Rocco, said with respect to

17  adjournment of the trial date, Mr. Atilla now understands that

18  because of the many complexities and challenges presented by

19  this case, it is in his interest, despite his being currently

20  detained, that the August 21 trial date be adjourned for the

21  reasons counsel set forth during the appearance of April 13,

22  2017.  That was in a letter.

23          On April 24, Mr. Rocco said that with that

24  understanding and having a series of conversations with

25  Mr. Atilla and discussed with him the issues that are posed by

1   an August 21 trial date and given the amount of materials and

2   the way we think that discovery will unfold here -- it was in

3   court -- Judge, and it will include going abroad, talking to

4   witnesses abroad and having perhaps foreign depositions,

5   perhaps foreign depositions, I believe that the August 21 trial

6   date is impractical.

7           By order of the Court dated May 16, 2017, I determined

8   that upon defense counsel's request for additional time, the

9   Court is rescheduling this trial of this matter to Monday,

10   October 30, 2017.

11          In June of this year, Mr. Rocco advised the Court that

12   "we are working with the October 30 date in mind as a firm date

13   and Mr. Atilla, who is in custody, is anxious to keep that

14   date."

15          And so on June 12, 2017, in an order put out by me, I

16   stated that the Court notes that it earlier adjourned the trial

17   principally at counsel's or Mr. Atilla's request from August 21

18   to October 30, 2017.

19          Later, after the summer, on September 25, 2017,

20   Mr. Rocco mentioned or stated the following.  "Given what

21   happened to me this summer and given the superseding

22   indictment, it was our intention to come into the court and to

23   request some additional time to prepare for trial and our

24   client has authorized us to make a request to November 27,

25   which is roughly a 28- or 29-day extension, in light of those

1    events."  And, as a result, on September 25, 2017, I issued an

2    order in which I granted defense counsel's request for

3    adjournment of the trial to November 27, 2017.

4           This issue was the principal subject of the

5    correspondence back and forth over the weekend -- two letters

6    from the defense, I think, one on Friday, one on Sunday, and

7    one letter in between from the government.  I think I have that

8    right.

9           So let me just say this in order to save everybody a

10   lot of time, energy, and effort.  I have no doubt that counsel

11   for the government and the defense are fully immersed in the

12   law and the facts of this case and will certain be ready to go

13   on the law and the facts even if they have considerable more

14   hard work to do, as is always true, in the three remaining

15   weeks before trial.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1       THE COURT: Their readiness and preparedness are ably

2   and fully demonstrated in their various thorough motions in

3   limine as to which I am preparing to rule, in their proposed

4   jury instructions which I have not intentionally reviewed, but

5   I thought I saw that they were in excess of 100 pages, and in

6   the defense motion to dismiss this case, which is still

7   pending.

8       So we will pick a jury on November 20, maybe 21 if we

9   need it, as scheduled, and we will have opening statements and

10   the government's first witnesses on November 27 here in this

11   courtroom as stated.

12       Just to close the legal loop, because the thrust of

13   the defense letter over the weekend was the defendant seeking

14   to adjourn the trial until January of 2018.

15       So my conclusion is that having read all of the

16   letters -- I think one dated the 3rd, two dated November 5 --

17   and having reviewed the applicable case law, respectfully no

18   further adjournment is warranted or feasible for the following

19   additional reasons, in addition to the chronology that I just

20   outlined:

21       One, we are on the eve of trial, two weeks from

22   picking a jury and three weeks from the trial. As I said

23   before, all the pretrial filings are in, and they are sub

24   judice.

25       Two, defense counsel agreed that the November 27,

 1    2017, trial date was adequate to accommodate all aspects of the

 2    case, including foreign depositions.

 3          As the government mentions in its letter, it referred

 4    to a conference that we had.  I forget the date of the

 5    conference, but the government said that defense counsel

 6    indicated that an adjournment to the currently scheduled trial

 7    date of November 27, 2017, would be sufficient to address the

 8    defense's anticipated need for testimony from foreign witnesses

 9    noting "that's why we proposed it."

10          Defense counsel also recognized that, "We may find

11    ourselves in the position where, if we don't have the time to

12    do it, that your Honor has our feet to the fire and may say

13    it's too late."  I think those quotes are found also in the

14    government's letter of November 5, 2017.

15          Three, defense has failed to file a Rule 15

16    application for foreign depositions, notwithstanding the fact

17    that foreign depositions have been discussed on the record for

18    months in this case.

19          Four, the Rule 15 process, even if it ever could be

20    completed, would delay the trial at least, at least, well into

21    2018 with both defendants in this case sitting in jail, and

22    that is something that we should not countenance.

23          Such a delay and such an adjournment would totally

24    disrupt these proceedings, and in my judgment, be unfair to the

25    defense.  There are a series of citations cited in the

1    government's letter of November 5 which I have reviewed, those

2    cases, and I incorporate the case law citations from the

3    government's letter into this ruling.

4            So, with that, I would like to turn to the protective

5    order which is, after all, the subject of today's hearing and

6    which defense counsel has sought to eliminate or have

7    eliminated or modify.

8            I'm happy if defense counsel and/or the government

9    wishes to be heard.  I'm also prepared to decide the matter on

10   the submissions.  It's your call.

11           MS. FLEMING:  Your Honor, I'd like to be heard on the

12   protective order.  As you said before, we tried to work within

13   it.  It's been, to a significant degree, unworkable as we've

14   tried to interview witnesses and prepare.  I want to emphasize

15   this is not so that we can in any way make public, take it out,

16   or have it be wholesale or publish the information that is

17   here.

18           I'll focus on the recordings in particular.  We've

19   cited as an example to the Court that there were four

20   recordings which the government contended contained the voice

21   of our client.  One of them we can prove intrinsically that it

22   does not contain the voice of our client.

23           But, unfortunately, it requires playing the recordings

24   for people who are on the recordings or other people identify

25   the voices on the recordings or to help us understand the

HBKJATTC                              Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                              S4 15 Cr. 867 RMB

MEHMET HAKAN ATILLA,

                Defendant.

------------------------------x

                                         November 20, 2017
                                         10:30 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                         District Judge
                                          and a jury




                          APPEARANCES

JOON H. KIM,
        United States Attorney for the
        Southern District of New York
MICHAEL DENNIS LOCKARD,
SIDHARDHA KAMARAJU,
DAVID WILLIAM DENTON, JR.,
DEAN CONSTANTINE SOVOLOS,
        Assistant United States Attorneys

HBKJATTC                      Conference

                    (APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
        Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
        THOMAS ELLIOTT THORNHILL, Esq.
        – and –
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
        ROBERT J. FETTWEIS, Esq.
        – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                    Of counsel


Also Present:
        JENNIFER McREYNOLDS, Special Agent FBI
        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
        MS. ASIYE KAY, Turkish Interpreter
        MS. SEYHAN SIRTALAN, Turkish Interpreter

HBKJATTC                              Conference

```
 1              (In open court)

 2              (Case called)

 3              THE COURT:  So as you're aware, I've had a conference

 4    with both sides to the case, the government and the defense,

 5    and I have had a full discussion, and I understand, although

 6    they were not here, that there is another attorney, a Mr. Todd

 7    Harrison from the McDermott firm who may be added to the

 8    defense team.  I don't know too many details about that.

 9    Counsel have described that as a possibility, and Mr. Rocco or

10    Mr. Dratel indicated that, in fact, that individual has filed a

11    notice of appearance, and so we'll just have to take that one

12    day at a time.

13              But so having made all of those considerations, I am

14    adjourning the trial one week, to a week from today; which is

15    to say, the plan was originally to pick a jury today and

16    tomorrow perhaps if it takes two days.  That will be pushed

17    back, and we'll pick the jury the first thing on Monday, the

18    27th, and then once we get our jury, we will proceed day-to-day

19    from that time forward.

20              So thanks very much.  Good to see you.  I will see you

21    tomorrow afternoon, there is a conference.

22              (Court adjourned)

23

24

25
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/20/17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA,
                              Government,                    15 CR.867 (RMB)

              -against-                                      **ORDER**

MEHMET HAKAN ATILLA,
                              Defendant.
-------------------------------------------------------------X

The trial and jury selection are adjourned for one week and will commence on Monday,

November 27, 2017.  Once the jury is selected we will immediately proceed to openings and

witness testimony.

The conference originally scheduled for 2:00 pm tomorrow, November 21, 2017 is

rescheduled to 10:00 am tomorrow, November 21, 2017.  The Court will also hold a Curcio

hearing at that time with respect to the addition of Todd Harrison, of McDermott Will & Emery

LLP as defense counsel.  Counsel for the Government and the Defense shall submit to the Court

for its review by 5:00 pm today any proposed Curcio questions, reflecting any conflicts of

interest (potential or actual) of McDermott Will & Emery LLP.

Mr. Harrison is also directed to submit to the Court by 5:00 pm today a copy of his firm's

retainer agreement with Mr. Atilla for in camera review.

All Defense counsel are requested to meet and confer prior to tomorrow's conference to

coordinate their respective roles.

Dated: New York, New York
         November 20, 2017

                                          _____
                                          **Hon. Richard M. Berman, U.S.D.J.**

HBGQATIc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3          v.                15 CR 867 (RMB)
4   MEHMET HAKAN ATILLA,
             Defendant.
5   ------------------------------x

6                           New York, N.Y.
                           November 16, 2017
7                           11:00 a.m.

8

9   Before:

10                HON. RICHARD M. BERMAN,
                           District Judge

11

12                  APPEARANCES
    PREET BHARARA
13       United States Attorney for the
        Southern District of New York
    MICHAEL LOCKARD
14    SIDHARDHA KAMARAJU
    DAVID DENTON
15       Assistant United States Attorney

16   HERRICK FEINSTEIN LLP
       Attorneys for Defendant
17    VICTOR J. ROCCO
    THOMAS E. THORNHILL
18

19   FLEMING RUVOLDT PLLC
       Attorneys for Defendant
    CATHY ANN FLEMING
20    ROBERT J. FETTWEIS

21   -Also Present-

22   Special Agent Jennifer McReynolds
    Michael Chang-Friedan
23   Asiye, Interpreter (Turkish)
    Seyhan Sirtalan, Interpreter (Turkish)
24

25

 1   U.S. regulators and to allow funds to be moved through U.S.

 2   banks.

 3               THE COURT:  That otherwise would have been blocked.

 4               MR. LOCKARD:  That's exactly right.

 5               THE COURT:  So I am going to refer to some arguments

 6   that are -- specifically, they are arguments that are presented

 7   or have been presented by counsel.  I may not specifically

 8   refer to in this ruling.  I'm aware of them and incorporated

 9   them into my analysis, and it does not change the outcome that

10   I am about to describe.

11               By way of very brief background, on September 6, 2017,

12   Mr. Atilla was charged, along with eight other

13   co-defendants/co-conspirators including Reza Zarrab, Mehmet

14   Zafer Caglayan, Suleyman Aslan, Levent Balklan, Abdullah

15   Happani, Mohammad Zarrab, Camelia Jamshidy and Hossein

16   Najafzadeh.  So they had been charged together in all counts of

17   a six count superseding indictment, we're referring to it as

18   (S4).  It's a 52-page document, and they are charged with the

19   following crimes:

20               One is a conspiracy to defraud the United States in

21   violation of 18 United States Code, Section 371.  That is Count

22   One, also referred to at times as the Klein conspiracy.

23               They are also charged in Count Two with conspiracy to

24   violate the International Emergency Economic Powers Act, herein

25   referred to and has been referred to this morning as IEEPA.

HBGQATIc

1    That's 50 United States Code, Sections 1701 through 1707, and

2    the Iranian Transactions and Sanctions Regulations, sometimes

3    referred to as ITSR, 31 C.F.R. Parts 560 and 561.

4         And, third, they are charged with bank fraud in

5    violation of 18 United States Code, Sections 1344 and 2.  That

6    is Count Three.

7         Fourth, in Count Four they are charged with conspiracy

8    to commit bank fraud in violation of 18 United States Code,

9    Sections 1344 and 1349.

10        And fifth, they are charged with money laundering in

11   violation of 18 United States Code, Sections 1956(a)(2)(A) and

12   2.  That's Count Five.

13        And finally in Count Six, they are charged with

14   conspiracy to commit money laundering in violation of 18 United

15   States Code, Sections 1956(a)(2)(A) and 1956(h).

16        Those are the six charges which are lodged against all

17   of defendants, including Mr. Atilla.

18        So when I summarize, again, the motion to dismiss, it

19   may not include all of counsel's arguments specifically, but

20   they are all embraced in the ruling.

21        In summary, defense counsel argues, among other

22   things, that the charges against Mr. Atilla are based on

23   conduct entirely outside of the United States which had no

24   impact in the United States and cannot support a criminal

25   charge against him, and that the charges based on the use of

HBGQATIc

 1    the United States financial institutions lack any factual

 2    connection to Mr. Atilla; and even if there were such a factual

 3    connection to him, he could not be prosecuted as a foreigner

 4    for his foreign activity.

 5           Another of defense counsel's arguments is that without

 6    a basis for prosecuting Mr. Atilla under what is described in

 7    the motion papers as the Sanctions Regime, the entire

 8    indictment falls with the exception of the Klein conspiracy

 9    charged in Count One.  Absent a violation of the Sanctions

10    Regime the IEEPA counts, the bank fraud counts and the money

11    laundering counts, according to the defense, have no legal

12    basis and must be dismissed.

13           And with regard to the Klein conspiracy charged in

14    Count One, the defense argues that Mr. Atilla cannot be charged

15    with attempting to impair or impede a U.S. government function

16    if he did not know of, or had reason to foresee, such a

17    connection.

18           Additionally, defense notes that: "We are not saying

19    that the government cannot seek to prosecute under two

20    different statutes that both proscribe the same conduct.

21    Instead, we submit that where a more recent statute or

22    regulation specifically addresses but does not proscribe the

23    activity in question, the government cannot end run that

24    statute by resorting to a broader, older law."

25           Defense counsel states too that this "Court appears to

HBGQATIc

 1    have concluded that IEEPA and ITSR can be applied to a foreign

 2    national involved in conduct emanating from the United States

 3    or property within the United States" but defense counsel

 4    "respectfully suggests that the Court reached the wrong

 5    conclusion."

 6          The government responds -- this is a summary, but it

 7    includes some quotes from the government's brief just as I have

 8    quoted from the defense brief.  The government counters that:

 9    "The indictment clearly describes how the alleged conduct fits

10    together as one coherent conspiracy to remove Iranian oil

11    proceeds held at Halkbank, and to launder them so that the

12    connection between the funds and Iran was obscured, which

13    allowed the money to be used for, among other things,

14    transactions passing through U.S. banks that would otherwise

15    have been blocked."

16          According to the government, the whole point of these

17    transactions was to create a pool of laundered funds for Iran's

18    use; that is, "the conspiracy that Mr. Atilla is alleged to

19    have willfully joined, helped design and lied to U.S.

20    regulators about," these are all allegations, allegations that

21    must be presumed as true on a motion to dismiss.

22          And according to the government, as a member of the

23    conspiracy, Mr. Atilla is responsible for all of the acts

24    encompassed by the conspiracy, including the transactions

25    executed through U.S. banks even if he did not personally

HBGQATIc

1    participate in them.

2              So, as you are aware, in reviewing a motion to dismiss

3    an indictment, the Court must take the allegations of the

4    indictment as true.  A cite for that is *United States v.*

5    *Hashmi*, 2009 WL 4042841, Southern District case from 2009.  And

6    the decision as to whether to prosecute generally rests within

7    the broad discretion of the prosecutor.  A prosecutor's

8    pretrial charging decision is presumed to be legitimate.  This

9    cite is *United States v. Sanders*, 2011 F. 3d 711, a Second

10   Circuit decision of 2000.  "A defendant who is charged with

11   being a participant in a conspiracy, even if he committed no

12   act within the United States, is subject to prosecution in this

13   country so long as one of the conspirators commits an overt act

14   in furtherance of that conspiracy within the territory of the

15   United States."  This quote comes from a relatively recent case

16   called *United States v. Akova*, 2016 WL 7116127 (N.D Georgia

17   2016).

18             An indictment is said to be sufficient if it contains

19   the elements of the offenses charged and fairly informs a

20   defendant of the charges against which he must defend.  This

21   cite is *United States v. Chalmers*, 474 F. Supp. 2d 555, a

22   Southern District case from 2007.  It is also said that "an

23   indictment need do little more than to track the language of

24   the statute charged and state the time and place (in

25   approximate terms) of the alleged crime or crimes."That also is

HBGQATIc

1    from the *Chalmers* case 474 F. Supp. 2d 559.

2              The Court finds that the indictment here (S4) should

3    not be dismissed.  Among other reasons, it contains all of the

4    elements of the offenses charged and fairly informs Mr. Atilla

5    of the charges against which he must defend.  The indictment

6    tracks the statutory language of all of the offenses charged.

7    It describes in detail a "multi-year scheme to violate and

8    evade U.S. are national security controls against the

9    government of Iran."

10             The indictment also explains, among other things, that

11   "the leaders of a Turkish bank majority owned by the Government

12   of Turkey," which is a reference to Halkbank, "knowingly

13   facilitated the scheme, participated in the design of

14   fraudulent transactions intended to deceive U.S. regulators and

15   foreign banks, and lied to U.S. regulators about HalkBank's

16   involvement."  That's a quote from (S4) at paragraph three.

17             The Court further finds that the defendant has had

18   more than adequate notice of the nature of the charges pending

19   against him, including, among other things, from the

20   indictment, the earlier complaint and from discovery.  The cite

21   is *United States v. Wolf*, 2003 WL 2359107.  In that case, the

22   Court denied a motion to dismiss to dismiss the indictment and

23   a motion for a bill of particulars where the indictment "mostly

24   tracked the language of the relevant statutes" and the "alleged

25   fraud" -- this is a different case -- "the alleged fraud in

HBGQATIc

 1    that case is spelled out in far greater detail in the criminal

 2    complaint to which the defense has access."

 3           The Court also notes that in Mr. Atilla's motion for

 4    bail dated July 28, 2017, the defense argued, among other

 5    things, that the criminal charges against Mr. Atilla, which at

 6    that time were two counts, a conspiracy to violate IEEPA and

 7    ITSR and a conspiracy to commit bank fraud, are eminently

 8    defensible.  This is what was stated by defense counsel in the

 9    bail application.  This is defense counsel's point of view.

10    Indeed, the information which has been provided in discovery

11    suggests that the case against him, Mr. Atilla, is tenuous at

12    best.  The charges apparently are predicated on a series of

13    transactions involving a number of Reza Zarrab's companies and

14    Halkbank in 2013, which are described in the complaint leading

15    to Mr. Atilla's arrest.  The transactions took place between

16    Dubai, Iran and Turkey, and involved sales of gold and food

17    between Turkish and Iranian entities for which Halkbank served

18    as the settling bank.  This is all from the submission from the

19    defense with respect to bail.

20           Mr. Atilla, a senior manager at the bank, is allegedly

21    connected to these transactions through a small number of brief

22    recorded Turkish telephone conversations in which various

23    transaction documents relating to the sale of food are

24    discussed by people identified on transcripts as Mr. Atilla and

25    Mr. Zarrab, among others.  It seems to be the government's

HBGQATIc

1   theory that those transactions involve forged or somehow

2   falsified documents and the sales of foodstuff were bogus.

3          Defense counsel further argues that the notion that

4   Mr. Atilla was linked to the U.S. transactions is against the

5   overwhelming evidence and allegations in this case, for none of

6   the Halkbank food or gold transactions were dollar-based.

7          This is now me speaking, not the defense.  The Court's

8   prior jurisdictional analysis regarding defendant Zarrab and

9   other alleged co-conspirators and prior indictments applies to

10  Mr. Atilla.  The indictment alleges that Mr. Atilla, Mr. Zarrab

11  and others were co-conspirators.  The indictment is -- well, I

12  will refer you to my earlier decision and order dated

13  October 17, 2016 in which the motion there, Mr. Zarrab's

14  motion, was denied.

15         The indictment here alleges a domestic nexus between

16  the defendant and his co-conspirators' conduct and the United

17  States, i.e., the exportation of services from the United

18  States.  These also are set forth in the decision and order

19  dated October 17, 2016.  And it is of no legal moment that

20  defendant Atilla is not named in an overt act in paragraphs 56

21  through 84.

22         The Second Circuit Court of Appeals has made it

23  abundantly clear that the execution of money transfers from the

24  United States to Iran on behalf of another, whether or not

25  performed for a fee, constitutes the exportation of a service

HBGQATIc

1    and may be in violation of IEEPA and ITSR.  The cite is *United*

2    *States v. Banki*, 685 F. 3d 99 a Second Circuit decision from

3    2012.

4            Similarly, in *United States v. Homa International*

5    *Trading Corp.* where defendant was convicted of violating the

6    IEEPA and the ITSR by "planning and implementing the transfer

7    of funds from the United States to bank accounts in Iran via

8    Dubai and the UAE," in that case, the Second Circuit rejected

9    defendant's argument on appeal following conviction that there

10   was insufficient evidence to demonstrate that his money

11   transfer services were services prohibited by embargo

12   regulations.  This is a quote from the Second Circuit decision:

13   "In our view, the execution on behalf of others of money

14   transfers from the United States to Iran is a 'service' under

15   the terms of the Embargo."  The Second Circuit also held that

16   "the Embargo's prohibition on the exportation of services

17   applies where the benefit of such services is received in Iran,

18   if such services were performed in the United States."  I refer

19   you also to *United States v. Saboonchi*, 214 WL 1831149 case

20   from Maryland in 2014 where the Court stated that the "embargo

21   to include all exportation and re-exportation, direct and

22   indirect, with the specific destination of Iran...is a simple,

23   unambiguous bar...of all exportation to Iran."

24           The Court finds that the indictment here, the (S4),

25   reflects the elements of each count in the indictment and

HBGQATIc

 1    establishes a sufficient nexus between Mr. Atilla and his

 2    co-conspirators' conduct and the United States.  And,

 3    therefore, the question of whether the IEEPA and the ITSR,

 4    whether they apply extraterritorially, need not be reached.  In

 5    *United States v. Mostafa*, the district court here -- not me,

 6    but another judge here -- held "There is a sufficient domestic

 7    nexus between the allegations...to avoid the question of

 8    extraterritorial application altogether.  Overt acts occurred

 9    in the United States."

10          More recently -- I referred to this case earlier from

11    *United States v. Akova*, that court in Georgia observed the

12    following:  The judge says, "I readily conclude that Congress

13    intended for the IEEPA to apply extraterritorially...

14    Likewise, the ITR [Iranian Transactions Regulations] broadly

15    prohibits anyone, directly or indirectly, from engaging in or

16    facilitating trade between the United States and Iran,

17    including through third countries."

18          The Court goes on to say that:  "It would be illogical

19    to conclude that Congress intended only to prohibit individuals

20    on U.S. soil or U.S. citizens abroad from trading with Iran,

21    but allow foreign persons to export goods from the U.S. to

22    trade with Iran and harm the national security interests of the

23    United States."  Again, the cite is *United States v. Akova*,

24    2016 WL 7118273 (N.D Georgia).

25          In conclusion, the dismissal of an indictment is an

HBGQATIc

1    extraordinary remedy reserved only for extremely limited

2    circumstances implicating fundamental rights, and it is my

3    judgment that such circumstances are not present here.  The

4    cite is *United States v. De La Pava*, 268 F. 3d 157 (2d Cir.

5    2001).

6         Consequently, the motion to dismiss is respectfully

7    denied.

8         The motion to dismiss, as you all are probably aware,

9    also had an alternative branch to it relating to severance, and

10   that alternative branch is similarly denied.

11        Mr. Atilla is charged with participating in the same

12   conspiracies as eight other defendants, i.e., at its core,

13   circumventing U.S. sanctions against Iran via Halkbank.  A

14   non-frivolous conspiracy charge is sufficient to support

15   joinder of defendants under F.R.Cr.P. 8(b), and the fact that

16   evidence may be admissible against one defendant but not

17   against others does not require separate trials, nor in my

18   judgment is there any basis to strike portions of the

19   indictment.  The cite is *United States v. Tomero*, 496 F. Supp.

20   2d 253.  Counsel for Mr. Atilla may renew its applications

21   before such time as the indictment is submitted to the jury

22   should Mr. Atilla ultimately be found guilty.

23        So that is the ruling.  We will take a short break if

24   you'd like -- I would, in any event, like a minute or two --

25   and then turn our attention to the motions in limine

HBGQATIc

```
1              Is that all right with you?

2              MR. LOCKARD:  Yes, your Honor.

3              MR. ROCCO:  Thank you, Judge.

4              (Recess)

5              THE COURT:  So I am not going to be able in ultimate

6    detail to resolve all the motions in limine at this time.  I

7    think I will give you a fair heads up of where I'm heading with

8    respect to each of them.

9              But what I do plan to do is have a further conference

10   on Tuesday at 2:00.  So for that conference, I'm going to need

11   some more detail.  Also, it's my experience that as we get

12   closer to trial, people sometimes slim down their cases, so

13   there may not be as many experts as names are currently

14   floating around and, indeed, there may not be as many fact

15   witnesses as names are floating around.  I don't need to go

16   into all these names, I don't think, at this time and I hope

17   actually that there is some slimming down that occurs before

18   Tuesday.

19             In that connection, we are still looking today for a

20   list of names and places.  We need that for the voir dire.

21             Let me first give you some general outline rulings.

22             First, there is a motion in limine by the defense to

23   preclude recordings from Turkey, I think this is for the 2013

24   period proceedings.

25             Before I get to that, is it the government's intention
```

# The Law Firm

# Fleming . Ruvoldt PLLC

**Cathy Fleming**
**(201) 518-7907 (direct)**
**cfleming@flemingruvoldt.com**

250 Moonachie Road
Suite 501
Moonachie, NJ 07074
(201) 518-7878

1700 Broadway, 28th floor
New York, NY 10019
(212) 706-1850

November 27, 2017

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 17B
New York, NY 10007-1312

Re:    *United States v. Reza Zarrab, et al,* S4 15 Cr. 867 (RMB)

Dear Judge Berman:

As co-counsel for the defendant, we respectfully but urgently request a two-week adjournment in the commencement of the trial in the above matter.  We make this request for multiple reasons.

First, on November 26, 2017 (literally the eve of trial), defense learned for the first time, through our own investigation and not as a result of anything that the Government has delivered to us, of a material violation of the Government's obligations both under *Brady* and under the Jencks Act.  It has come to our attention that, in May 2013, an Undersecretary of the United States Department of Treasury ("Treasury") – an identified Government witness in this case – gave public testimony before Congress that is directly exculpatory of the defendant.  The Undersecretary testified first that, upon its own investigation, Treasury had determined that Turkey had in fact not used gold to finance the purchase of gas from Iran.  He further testified that, in large part, any gold sales from Turkey to Iran (which would include sales through Halkbank (the defendant's employer)) involved sales to private citizens -- permissible under then-existing American sanctions against Iran – and not transactions with the Iranian government.  In so testifying, the Undersecretary clearly implied that at least a portion of his responses were premised upon classified information that he could and would present only in closed session.

Inexplicably, the Government has neither provided a transcript of this testimony nor even notified the defense of its existence among the staggering amount of documents with which it has chosen to inundate the defense starting less than two weeks ago.  For this and other

1

compelling reasons, which we describe below, an adjournment of the trial is necessary to enable the defense to further investigate the ramifications both of the Undersecretary's testimony and the Government's remarkable failure to provide it or even alert us to it.

We submit this request additionally because we have been inundated by the Government's eleventh and twelfth hour productions of an enormous amount of trial exhibits and 3500 material. Those productions – massive when they commenced with the first round of exhibits on November 6, 2017 – have been continuing on a nightly basis since November 18, 2017, with significant additional electronic deliveries late each night or in the early morning hours. (See attached cover emails for these late-delivered materials. The emails generally refer to "draft" exhibits, whatever that might mean.) Despite an intensive seven-day-per week effort both before and after these productions began, the defense has been unable to process, absorb and analyze the recently-delivered materials in a manner that can ensure the defendant will receive a fair trial.

Moreover, the Government's last minute bombardment of evidence is not the only indicium of a deliberate strategy to obstruct the defendant's readiness for trial. Also omitted entirely from its production of 3500 material was a ████████ video for one of the Government's most important witnesses ("the Witness"), whose identity is currently concealed by the Protective Order herein. On the Saturday after Thanksgiving, November 25, the defense had to specifically request the Government to provide this video. Only in response to this request did the Government produce the video, emailing it at 6:14 PM on that Saturday. Upon defense counsels' review of the video, it is clear that the Government's failure to produce this video at all was in direct violation of its constitutionally-imposed *Brady* obligation.

A.    The Undersecretary's Public Testimony and the Government's Brady/Jencks Act Violations.

The indictment in this case charges that, in 2012 and thereafter, the defendant and others "devised a scheme to use exports of Turkish gold to allow Iran access to the proceeds of Iranian oil sales to Turkey, to evade these restrictions, and to deceive foreign banks and U.S. regulators." (¶ 33). Additionally, paragraph 34 of the indictment charges the defendant with falsely representing to Treasury that the gold purchases in question were by private companies, not the government of Iran. The Government has asserted these charges against the defendant in the face of testimony from the previously-mentioned Treasury Undersecretary that the evidence, some of which was apparently classified, was directly to the contrary. Despite the patently exculpatory nature of this testimony, the Government has never mentioned it to the defense, much less provided a transcript for it. As discussed herein, the Government has seen fit to swamp the defense with last-minute mounds of heretofore-unproduced materials. Somehow, though, in the midst of these document dumps, the Government has failed to include a critical item: the prior statement of an important Government witness that, on its face, runs directly contrary to the theory of the indictment.

"Due process requires the disclosure of exculpatory and impeachment evidence material to guilt or innocence be made in sufficient time to permit the defendant to make effective use of that information at trial." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1997). *See also, United*

*States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001).  Failure to make such disclosure "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Here, amazingly, the Government has made no disclosure at all.  Instead, one day before the scheduled start of trial, the defense on its own unearthed the exculpatory information.  That information cries out for further defense investigation. Information obtained on the eve of a trial that already involves a massive last-minute government document production is simply too late. *See e.g., United States v. Deutsch*, 373 F.Supp. 289, 290 (S.D.N.Y. 1974).  ("It should be obvious to anyone involved with criminal trials that exculpatory information may come too late if it is only given at trial. . .").  *In United States v. Snell*, 899 F.Supp. 17, 20 (D. Mass. 1995), the Court aptly summarized the connection between timely production of *Brady* material and the Due Process clause:

> Exculpatory information affects the defense investigation, how it will allocate its resources, the voir dire questions the defense will seek, the framing of opening statements, the nature of the pre-trial research on evidentiary issues and jury instructions, in short, all of the strategic decisions which must be made long in advance of trial.  If this society wants effective defense advocacy, which is, after all, the premise of the Fifth and Sixth Amendments and of the Due Process clause, then, within the limits of the adversary system, information which is exculpatory must be made available to counsel before the trial begins.

This just-discovered *Brady* violation goes directly to the defendant's due process rights under the Constitution. At the very least, the situation compels a continuance of the trial to allow additional defense investigation of this entire situation.

As set forth herein, the defense further requests that the Government present to the court immediately for its review, pursuant to 18 U.S.C. §3500(c), the full text of any redactions that the Government has made to the so-called 3500 materials delivered thus far, and that the statutory procedure mandating preservation of the deleted items be enforced by the Court.

B.     The Massive Last-Minute Document Productions Require a Trial Continuance.

Federal criminal discovery should not be an exercise in either gamesmanship or brinksmanship; the defendant's right to a fair trial hangs squarely in the balance.  Yet, the following chart aptly demonstrates what has been happening routinely in the continuing saga of the Government's last-minute productions:

| Production of Government Exhibits | | |
|---|---|---|
| Date of Production | Documents | Pages |
| Nov. 6, 2017 | 2,881 | 15,434 |
| Nov. 16, 2017 | 39 | 152 |
| Nov. 18, 2017 | 65 | 206 |

| Nov. 18, 2017 | 148 | N/A (audio) |
|---|---|---|
| Nov. 19, 2017 | 26 | 210 |
| Nov. 20, 2017 | 170 | 186 |
| Nov. 21, 2017 | 114 | 346 |
| Nov. 22, 2017 | 39 | 50 |
| Nov. 22, 2017 | 35 | 121 |
| Nov. 23, 2017 (Thanksgiving) | 33 | 134 |
| Nov. 24, 2017 | 27 | 357 |

| Production of 3500 Material | | |
|---|---|---|
| Date of Production | Documents | Pages |
| Nov. 16, 2017 | 566 | 7,692 |
| Nov. 19, 2017 | 45 | 377 |
| Nov. 23, 2017 | 14 | 53 |
| Nov. 26, 2017 | 4 | 42 |

It is well recognized, of course, that consideration of the defendant's request for a continuance lies within the sound discretion of the trial judge. *United States v. Scopo*, 861 F.2d 339, 344 (2d Cir. 1988). A defendant must show "both arbitrariness and prejudice in order to obtain reversal of the denial of a continuance." *United States v. Miller*, 626 F.3d 682, 690 (2d Cir. 2010). "Prejudice in this context means that the defendant must demonstrate that the denial 'substantially impaired the defense.'" *United States v. Al Fawwaz*, 116 F.Supp.3d 194, 208 (S.D.N.Y. 2015), *quoting United States v. Beverly*, 5 F.3d 633, 641 (2d Cir. 1993).

Nevertheless, the United States Supreme Court has cautioned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). There is no mechanical test with respect to requests for a continuance. *United States v. Ellenbogen*, 365 F.2d 982, 986 (2d Cir. 1966). "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite, supra*.

In *United States v. White*, 324 F.2d 814 (2d Cir. 1963), the Second Circuit reversed the district court's denial of a continuance where the defendant sought the testimony of a Government informant as a defense witness, but a doctor testified that, because of illness, the informant would be unable to appear for "a couple of weeks." 324 F.2d at 815. Citing *White*, the court in *United States v. Al Fawwaz*, 116 F.3d at 211, found the following circumstances to be illustrative of situations "in which continuances are appropriate or perhaps even required.":

> They include instances in which (i) the requested delay is of a short (or at least fixed) duration, (ii) the sought-after evidence is specified with particularity, (iii) the proposed evidence is critical to the defense, and (iv) the defendant has not been dilatory.

All of those circumstances either exist in this case or are analogous to those here.

4

C.    <u>Belated Production of Trial Exhibits</u>.

Defendant Atilla has for months repeatedly and vigorously sought pretrial discovery, including the identification of trial exhibits.  On November 6, 2017, the Government furnished a 63-page list of supposed trial exhibits – a list so large that it almost certainly exceeds the actual exhibits that the Government will eventually introduce at trial.  Since then, the exhibit list has burgeoned to 76 pages, with the Government continuing its refusal to delineate which of the listed items it will actually seek to introduce during its case-in-chief, thereby requiring careful defense review of all proffered "exhibits" in the 76 pages.  Only during the evening of Friday, November 24, did the Government identify its initial witnesses and exhibits for the first days of trial, after the Court had instructed it on November 20 to provide this information.

The total production of trial exhibits exceeds 16,000 pages.  That page count, however, does not include a large Excel spreadsheet (Exhibit 8101), produced in the early morning of November 18, 2017, containing over 600,000 rows of data that would take thousands of pages to print.  The most recent production occurred late in the evening on November 24, 2017.  It consisted of 27 additional documents and 357 additional pages.

Despite its best efforts, the defense has simply been unable to effectively and thoroughly review these materials in time for a November 27 trial, to say nothing of the impact this unfamiliarity will have on our ability to make informed and appropriate objections when and if certain exhibits are offered in evidence at trial.

D.    <u>3500 Material</u>.

Similarly, the Government waited until November 16, 2017 to deliver 7,692 pages of so-called 3500 material.  This production, which constituted the first notice to the defense of the identity of some of the Government witnesses, included over 3,000 pages of Turkish language documents – without translations – not previously delivered during discovery.  Since then, the Government has added an additional 430 pages of materials.  Included in this group were materials that the defense had long ago specifically sought during pre-trial discovery.  The most recent delivery occurred on Sunday, November 26, 2017.

Portions of the 3500 production relate directly to the credibility of Government witnesses and thereby constitute *Brady* material.  Under the Due Process Clause, as noted above, exculpatory material must be provided to the defense "in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 13 at 142.  Given the enormous number of documents with which it is dealing, the defense cannot make "effective use" of these materials at trial without the requested continuance.  Neither can it effectively utilize these materials, or any of the other belatedly produced documents, to investigate and develop the defense here.

Included in the November 16 production is a substantial quantity of materials relating to the Witness.  This delivery constituted the first notice that the Witness would appear at trial.  By providing the Witness-related materials a mere eleven days in advance of the scheduled trial, the

Government has precluded not only a thorough review of the documents themselves (especially in light of the concurrent production of so many other pages of material), but has also left the defense with insufficient time to conduct its own investigation of what appears to be the Witness's multi-faceted unsavory and criminal activity over the years. Unless there is a trial adjournment, the defense cross-examination of the Witness will be materially undercut, thereby significantly impeding the defendant's constitutional right to a fair trial.

E.     Facially Unwarranted Redaction of 3500 Material.

Still another problem with the 3500 material has hampered effective trial preparation. Pursuant to the Protective Order governing these documents, the Government has produced two versions: (1) Attorney's Eyes Only and (2) a heavily redacted set designed for presentation to and review by the defendant, but only in the presence of counsel or counsel's paralegals or investigators. Yet, even the attorneys-only materials contain redactions that significantly impede defense investigation, especially at this late hour.

To cite an example, on November 23, 2017 the Government delivered 3500 materials that included a cable from the American Embassy in Turkey in 2013 describing a roundtable meeting concerning American sanctions against Iran. In attendance at the meeting were the previously-mentioned Treasury Under Secretary and members of the Turkish Bankers Association, including but not limited to officials from the defendant's employer, Halkbank. What transpired at the meeting is potentially important to the defense of this case. Yet, inexplicably, the Government has deleted the names of the attending banks other than Halkbank even from the attorneys-only versions. These deletions make it impossible for the defense to consult with any non-Halkbank attendee – all of whom are potential disinterested third-party witnesses – regarding what actually transpired during the meeting.

For another example, paragraph 55 of the indictment alleges that the defendant lied to representatives of Treasury at an October 10, 2014 meeting by denying Halkbank's participation in any transactions intended to evade American sanctions against Iran and claiming to have conducted due diligence in relevant areas. The 3500 material includes a Treasury memo of that very meeting which contains no reference to the defendant's alleged statements. But there are several blacked-out redactions in the memo so there is no way for counsel to determine whether the memo is inconsistent with the allegations in paragraph 55 for impeachment purposes. Thus, in light of the unexplained redactions, the Government has provided only an incomplete record of the single document that memorializes this meeting.

Furthermore, and just as inexplicably, in making these deletions the Government has ignored its obligation, imposed by 18 U.S.C. §3500(c), to first deliver the proposed deletions to the Court for in camera inspection and thereafter, upon defense objections, to have the Court preserve the entire text of the redacted statement for possible appellate review. In the absence of demonstrable good cause, the defense objects to each and every deletion contained in the attorneys-only materials and requests that the Court require immediate presentation to it of the full text of each in accordance with 18 U.S.C. §3500(c), with preservation thereafter for possible appellate review.

F.     Logistical Delays Arising From the Protective Order and the Defendant's Incarceration.

As Your Honor knows, defendant Atilla is in pretrial detention. Under the Protective Order governing the 3500 material, the defendant can be given these materials only while counsel or an employee thereof is with him.  Despite the intense pace of the current defense effort, the Government's belated and ongoing production of a document tsunami has made it impossible for the defense to thoroughly go through the material, review it with the defendant and consult with him as to the formulation of a defense response at trial. Furthermore, the Government's overly-restrictive utilization of the "attorney's eyes only" designation has significantly hindered attorney/client interaction regarding these materials.  We need more time to ensure that the defendant and his lawyers can absorb this massive amount of information and confer meaningfully about these materials before the start of trial.

For all the foregoing reasons, the defense respectfully requests that commencement of trial in this matter be postponed for two weeks, until December 11, 2017.

Respectfully submitted,


HERRICK FEINSTEIN LLP                        FLEMING RUVOLDT PLLC

By: /s/ Victor J. Rocco                          By:  /s/  Cathy Fleming
     Victor J. Rocco                                    Cathy Fleming
     Two Park Avenue                                    1700 Broadway, 28th floor
     New York, New York 10016                           New York, New York 10019
     (212) 592-1400                                     (212) 706-1850


McDERMOTT WILL & EMERY LLP                   LAW OFFICES OF JOSHUA L. DRATEL

By: /s/ Todd Harrison                          By:  /s/ Joshua L. Dratel
     Todd Harrison                                     Joshua L. Dratel
     340 Madison Avenue                                29 Broadway, Suite 1412
     New York, New York 10173                          New York, New York 10006
     212-547-5727                                      212-571-3792

Attachments
cc:     All Counsel

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,
                                    Government,                        15 CR.867 (RMB)

                    -against-                                         **ORDER**

MEHMET HAKAN ATILLA,
                                    Defendant.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/25/17

Defendant's November 27, 2017 letter application to adjourn the trial (submitted on the

very day the trial was to commence) is respectfully denied. While the letter makes one or two

good points, its primary arguments which it boldly puts forward are not persuasive. It is a fair

contention that the Government should  - and the Court hereby orders that it must - give the

Defense more advance notice of its actual witness and exhibit order of presentation for the

ensuing week (along with any remaining 3500 materials) as follows: the balance of witnesses

and materials for this week by 6:00 pm today and by 7:00 pm on Fridays for each week

thereafter. All Brady material should be produced forthwith, i.e., by 6:00 pm today.

What is patently less persuasive about the defense letter is the assertion that there is a

Brady violation with regard to 4 and ½ year old public testimony before the U.S. Congress by a

Treasury Undersecretary (who apparently will be a witness in this case) regarding the sanctions

regime against Iran - or that, with diligence, it took anyone until November 26, 2017 to locate a

public Congressional transcript.)  It is hard to envision this to be a "smoking gun" as the Defense

contends but, in any event, the Defense already knows enough information about the testimony

not to be surprised and to be able effectively to open and to cross examine. The Government

should also make clear that the mystery witness is Mr. Reza Zarrab. (This is something that

experienced counsel knew or should have known for several months.) The FBI video mentioned

by the Defense in its letter should be produced forthwith, if it has not already been.  The Government should now make its case so the public will know what it is all about.  The Government should not engage in any last minute document production and should, as noted, forthwith shine a clear light on the Government case.  Although the Court is not suggesting how the Defense team should prepare for and conduct trial, perhaps it makes the most sense to have part of the (at least) 9 attorneys and unknown number of support personnel combing through the voluminous records <u>while</u> others are in the courtroom, on a regular basis.

Let's not waste more time - let's get to the heart of the matter.  "What are the sanctions against Iran"?  "How, if they did, did Atilla and his alleged coconspirators, including Zarrab, unlawfully violate the sanctions"?  "What role did Mr. Atilla and his alleged conconspirators, including Mr. Zarrab, play in this matter and what did they do"?  The Indictment contains serious charges - let's get right to the heart of these charges, soon, after an appropriate foundation is laid by the Government.  Don't waste time.

**By the way, I adhere to the rule that if one side (either side) runs out of witnesses, it's case is over - no gaps.**

The Defendant's motion to adjourn the trial for 2 weeks (until December 11, 2017) is also denied for the following additional reasons: first: Mr. Atilla consistently has sought and he deserves a speedy trial since the time of his arrest, particularly because he is incarcerated.  He objected (understandably) to the first Defense request to adjourn the trial beyond August 21, 2017 ("August is too far out"); he objected again to the Defense request to adjourn the trial from October 30, 2017 into November.  Second, the Defense team includes very experienced professionals and some 9 plus attorneys and paralegals, etc.  It includes 4 separate law firms who are more than able to litigate professionally this high profile case.  Third, in the Court's

experience, further delay would encourage a rash of new "11th hour" applications from counsel

for both sides as has been the practice up until now.  Fourth, it is totally impractical (unrealistic

really) to start a trial in the middle of December, i.e., only a week or two away from the holiday

season.


Dated: New York, New York
        November 28, 2017


                                          RMB
                                _____
                                Hon. Richard M. Berman, U.S.D.J.

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*November 28, 2017*

*Southern District Court Reporters*

Original File HBSpATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

---

HBS3ATI1     Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4        v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6             Defendant.
 7   ------------------------------x
 8
 9                          November 28, 2017
                            8:45 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                          District Judge
                            and a jury
15
16
17              APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

---

HBS3ATI1     Page 2

```
 1
 2        (APPEARANCES Continued)
 3
 4   HERRICK, FEINSTEIN LLP (NYC)
          Attorneys for defendant Atilla
 5   BY:  VICTOR J. ROCCO, Esq.
          THOMAS ELLIOTT THORNHILL, Esq.
 6        - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10             Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

---

HBS3ATI1     Page 3

1    (In open court; jury and defendant not present)

2    THE COURT: Do you all want to say anything in support

3 or opposition to the motion that's been filed?

4    MS. FLEMING: Yes, your Honor. After the letter was

5 filed --

6    THE COURT: Hold on a second. Your client is not

7 here. Is that all right?

8    MS. FLEMING: Yes. He doesn't know about this yet.

9    THE COURT: He doesn't know about what?

10    MS. FLEMING: He doesn't know what I'm about to tell

11 the Court.

12    THE COURT: He doesn't know about the letter

13 application?

14    MS. FLEMING: We haven't advised him. There is

15 something that happened after the letter application. 40

16 minutes after the letter was filed, we received from the U.S.

17 attorney's office another file containing some 11,000

18 documents, e-mails --

19    THE COURT: I'm going to deal with that. Do you want

20 to be heard in support of your motion or in opposition. That's

21 all I'm asking. Or do you want me to rule on the papers?

22    MS. FLEMING: We want to be heard.

23    THE COURT: Everybody sit down. Go ahead. You've got

24 five minutes.

25    MR. ROCCO: Mr. Fettweis is going to argue this.

---

HBS3ATI1     Page 4

1    MR. FETTWEIS: Good morning. The defense has asked

2 you for a two-week adjournment of the trial.

3    THE COURT: Counsel, I know that. You've got five

4 minutes. I've read the papers. Tell me what is most

5 significant about your application.

6    MR. FETTWEIS: What has happened very recently, your

7 Honor, since the application was filed last night, we received

8 more than 10,000 pages of Jencks material for the government's

9 most important witness, almost all of which is in Turkish.

10 And --

11    THE COURT: Who is the witness?

12    MR. ROCCO: We cannot say, your Honor.

13    THE COURT: You can say.

14    MR. FETTWEIS: Reza Zarrab. We received more than

15 10,000 pages of Jencks material from Mr. Zarrab, mostly

16 involving e-mails in Turkish. And this morning at 5:30 a.m. we

17 received another delivery of government -- of revised

18 government exhibits, and just within the last few minutes we

19 received still another delivery of Jencks material that we

20 haven't had any sort of chance to look at yet.

21    All four law firms in this case, your Honor, and all

22 the lawyers have been working seven days a week, extremely long

23 hours. The lawyers are, as you've indicated yesterday, as you

24 saw yesterday, highly responsible, highly experienced lawyers.

25 We are all saying to you there is simply not enough time to

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 must determine which witnesses you believe and what portion of
2 their testimony you accept, and what weight you attach to it.
3       At times during the trial I may sustain objections to
4 questions that are asked.  And when that happens, I will not
5 permit the witness to answer, or, if, as sometimes happens, the
6 witness has already answered, I shall instruct the jury and the
7 court stenographer that the answer be stricken from the record
8 and that you disregard it and dismiss it from your minds.
9       In reaching your decision, you may not draw any
10 inference from an unanswered question where an objection has
11 been sustained nor may you consider testimony that I have
12 ordered stricken from the record.
13      The law requires that your decision be made solely
14 upon the evidence presented to you.  The items I exclude from
15 your consideration will be excluded because they are not
16 legally admissible as evidence.  The law does not, however,
17 require you to accept all of the evidence that I do admit.
18      In determining what evidence you will accept, you must
19 make up your own minds and do your own evaluation of the
20 testimony given by each of the witnesses and of the documents
21 presented to you, and you determine the weight which you choose
22 to give to each witness's testimony or to an exhibit.  There is
23 no magical formula by which you should evaluate testimony or
24 exhibits.  I will at the end give you some guidelines for
25 determining the credibility of witnesses in my final

1 instructions.
2       At this time, suffice it to say you bring with you to
3 this courtroom all of the experience and background of your
4 lives.  You do not leave your common sense outside the
5 courtroom.  The same types of assessments that you use in your
6 everyday dealings are the assessments that will apply in your
7 deliberations.
8       We've handed out legal pads and pens.  You certainly
9 are free to take notes.  You should be aware that any notes
10 that you take are not evidence in the case.  They are your
11 personal notes and may be used to refresh your own
12 recollection, but they are not considered evidence in the case.
13      Also what is not evidence are the questions and the
14 objections of the attorneys and neither is the testimony that I
15 may instruct you to disregard.  The statements and arguments of
16 the attorneys during any part of the trial are also not
17 evidence, and further, anything that you may see or hear when
18 the court is not in session, even if what you were to see or
19 hear is done or said by one of the parties or one of the
20 witnesses, that would not be evidence.
21      Only what is admitted into evidence here when court is
22 in session and all of the parties and all of the jurors are
23 present may be considered competent evidence.
24      So with that, I'll turn to the government for the
25 first opening statement.

1       MR. DENTON:  Thank you, your Honor.
2       THE COURT:  You bet.
3       MR. DENTON:  This is a case about lies.  Lies that
4 were told to the United States by people doing the bidding of
5 the Islamic Republic of Iran, the world's foremost state
6 sponsor of terrorism.  Lies that threatened the national
7 security of our country.  Lies that were devised and told by
8 this man, Mehmet Hakan Atilla, the defendant.
9       His lies blew a billion-dollar hole in the U.S.
10 economic sanctions on Iran, the laws that were supposed to
11 limit Iran's ability to fund and promote illicit activities by
12 strangling its access to oil money.  Atilla and his lies played
13 a crucial role in giving Iran access to U.S. dollars and
14 American banks.  Access that U.S. laws were meant to preclude.
15      Because the point of Atilla's lies, the object at the
16 end of it all, was to be able to lie to American banks,
17 including banks right here in Manhattan, to trick them into
18 thinking that hundreds of millions of dollars that he was
19 laundering had nothing to do with the government of Iran.  And
20 to do it in a way that would keep the bank where he worked from
21 being blacklisted by the American government.
22      Since 1979, the Islamic Republic of Iran has posed a
23 constant threat to the national security of the United States.
24 To counter that danger, the United States has imposed laws that
25 restrict trade and banking with Iran, what we call economic

1 sanctions, designed to cut Iran off from the money it needs to
2 pay for dangerous activities around the world, and to maintain
3 its repressive regime at home.
4       Those economic sanctions were so effective that by
5 2011, the government of Iran had a problem.  Iran had become
6 such a global outcast that if its government did not find a way
7 to get access to cash, the economy would literally collapse.
8       That's why, in March 2011, the Supreme Leader of Iran,
9 the Ayatollah, called for an economic jihad, a government
10 directed struggle to overcome the embargo, the economic
11 sanctions that were isolating Iran.
12      But to conduct the economic jihad, Iran did not need
13 soldiers.  Iran needed a banker.  To conduct the economic
14 jihad, Iran needed Atilla.  Iran needed Atilla to come up with
15 a way to violate and get around U.S. laws.  To move money
16 around the world, despite U.S. economic sanctions, by hiding
17 the fact that the money belonged to Iran.  Iran needed Atilla
18 to design a secret system for Iran to launder billions of
19 dollars of Iranian money sitting in bank accounts in Turkey.  A
20 plan to fool the U.S. government so the government of Iran
21 could send that money through banks in the United States and
22 Europe.
23      And Atilla was in just the right place to do it.  He
24 worked at a bank in Turkey called Halkbank.  Halkbank is an
25 important place to the government of Iran, because Atilla's

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                November 28, 2017

1  bank was one of the few places in the world willing to let Iran
2  spend the money that it made by selling oil.
3        And at his bank, Atilla was an important man. He's
4  the deputy general manager in charge of international banking.
5  One step below the bank's top executive, the general manager.
6  Atilla's an expert on finance and economic sanctions,
7  particularly on American sanctions. Just the person Iran
8  needed to cover its tracks.
9        So to break U.S. laws in service of Iran, Atilla and
10  his bank agreed to tell one of the biggest lies the banking
11  world has ever known. They lied to hide the fact that Halkbank
12  was laundering billions of dollars in Iranian oil proceeds so
13  the government of Iran could get around U.S. law. They lied to
14  make it seem like Iran's oil money was being used to buy gold
15  for jewelry or shipments of food, when, really, it was being
16  sent through U.S. banks to secretly make payments at the
17  direction of the government of Iran.
18        They lied in ways Atilla specifically designed to
19  violate U.S. laws. They lied with front companies, with forged
20  documents, with fake transactions. They lied to American
21  government officials in meetings, letters and e-mails. And
22  they covered up their lies with millions of dollars in bribes
23  to the highest-level officials of the Turkish government.
24        It is a serious federal crime to conspire to violate
25  the sanctions laws. It is a serious federal crime to lie to

1  the U.S. government agencies charged with implementing those
2  sanctions, to avoid being penalized for breaking them. It is a
3  serious federal crime to launder money for Iran, and to defraud
4  American banks by lying to them. These are serious federal
5  crimes that compromise our national security, and this man
6  committed them, which is why we're here today.
7        So, this opening statement is just a preview of the
8  evidence that you are going to hear during this trial. But
9  before I talk a little more about the facts, I want to say a
10  word about the law.
11        As Judge Berman told you yesterday and today, at the
12  end of the case, he's going to give you instructions on the
13  law, and it is only what he tells you, not what anyone in the
14  courtroom might say, that you are sworn to follow. But I want
15  to try to give you a couple of basic principles now so you know
16  what to listen for as you hear to the evidence.
17        First, as I said, U.S. law makes it a crime to do
18  business for Iran through banks in the United States. In
19  practice, what that means is virtually any significant
20  transaction for Iran in U.S. dollars will break the law.
21  Because to send money electronically -- it's called a wire
22  transfer -- in U.S. dollars, it almost always has to be routed
23  through bank systems located in the United States, including
24  right here in New York.
25        These are powerful laws, because the U.S. dollar is

1  the most stable, most important currency in the world. And
2  you'll learn during this trial that if, like Iran, you can't do
3  business in U.S. dollars, you pretty much can't do business at
4  all.
5        Second, U.S. law gave foreign banks like Atilla's bank
6  a choice. You can either do business with Iran, or you can do
7  business with the United States, but you can't have it both
8  ways. So the law also imposes penalties for double dealing.
9  You cannot play both sides. Hide your business with Iran, lie
10  to the American government about what you're doing to try to
11  avoid being punished for working with the Iranian government.
12        Ladies and gentlemen, there is no doubt that the
13  transactions you're going to hear about in this trial are
14  elaborate. That was on purpose. They had to be. Because the
15  U.S. sanctions laws that we've been talking about are strict,
16  and got progressively stricter, so evading them is no simple
17  matter. But at its core, the evidence at trial will prove that
18  the crime Atilla committed is simple and clear.
19        (Continued on next page)
20
21
22
23
24
25

1        MR. DENTON: He lied. He lied in a lot of different
2  ways. He told lies, straight up falsehoods to U.S. government
3  officials. He taught co-conspirators to lie by telling them
4  how to make fake documents. He facilitated lies to U.S. banks
5  by making it possible for his co-conspirators to pretend, with
6  a straight face, that their money didn't come from the
7  government of Iran. He lied to help Iran repeatedly evade U.S.
8  sanctions to the tune of billions of dollars. Atilla lied
9  because he was the person who knew how.
10        For all these lies to work, it took an expert, someone
11  who had studied the U.S. sanctions in Iran and knew how to get
12  around them. Atilla was the one who could teach everyone how
13  to tell the right lies. Atilla was the one who could design
14  the secret system with the express purpose to evade the U.S.
15  laws that prevented Iran from moving its money.
16        Ladies and gentlemen, you don't need to be a finance
17  expert to know right from wrong. Every one of you knows the
18  difference between a truth and a lie. Every one of you knows
19  the difference between how someone acts when they're honest and
20  how someone acts when they're hiding something. And the
21  evidence will show that lying and hiding is exactly what Atilla
22  did. The evidence is going to pull back the curtain on a fraud
23  of truly global proportions, billions of Iranian dollars moving
24  in a scheme so large that it affected the economies of
25  countries in the Middle East, and so large that it was

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 protected by government ministers in Turkey and Iran.
2      As you'll hear during this trial, Iran has basically
3 one thing that the rest of the world is interested in buying,
4 oil. And because of American economic sanctions on Iran, by
5 2012 Turkey, a country that historically has ties to Iran and
6 shares borders with it, Turkey was the only country in the
7 world willing to buy that oil. The problem is that because of
8 American economic sanctions, Turkey couldn't just give Iran
9 cash to pay for the oil.
10      So billions of dollars in money that Turkey owed Iran
11 for oil was just sitting there, locked up in bank accounts at
12 Atilla's bank. When the Ayatollah declared the economic jihad,
13 all that money in Atilla's bank was a big part of it. Iran
14 needed to find a way to use that money to pay for things all
15 around the world; so Iran found a front man, a gold trader
16 named Reza Zarrab. Zarrab could provide the phony facade,
17 enabling Iran to get access to that money, and Iran would pay
18 him a cut of the profits.
19      So in late 2011 Zarrab wrote two letters, one to the
20 President of Iran and one to the head of the Central Bank of
21 Iran, in which he pledged his allegiance to the economic jihad
22 and offered to help Iran launder its money. And for a plan for
23 how to do it, Iran turns to the bank holding all its money,
24 Halkbank and to Atilla, the bank's head of international
25 banking. Zarrab would provide the means and Atilla would

1 provide the method, the secret system to keep these
2 multimillion-dollar transactions secret.
3      You'll learn about a series of actual meetings in 2012
4 and 2013 where the method was set up, extraordinary meetings,
5 meetings involving people from the very top of the government
6 of Iran, the oil minister, the head of the National Iranian oil
7 Company, Iranian bank chiefs and oil company executives,
8 meetings involving Atilla, the Haltbank general manager,
9 Zarrab, and the Turkish Minister of the Economy.
10      What did they do? They formed a conspiracy, an
11 agreement to break U.S. law. So why was Turkey's Minister of
12 the Economy involved? Two reasons. First, because the
13 government of Turkey owns Atilla's bank; and second, because
14 the minister had been bribed. In exchange for half of Zarrab's
15 profits, Turkey's Minister of Economy agreed to cover for
16 laundering Iranian oil money out of Turkey, out of Atilla's
17 bank.
18      Then Zarrab and the minister he had bought cut
19 Halkbank's general manager in on the deal. For years they paid
20 kickbacks out of the profits Zarrab made from Atilla's system
21 to ministers, customs officials and anyone else in the Turkish
22 government who needed to be bought. And the evidence will show
23 that the co-conspirators agreed on Atilla's method to make it
24 seem as if the money was moving legitimately. See, it wasn't
25 enough just to break the law and send the money to Iran. That

1 didn't do any good because then everyone would still know that
2 the money was dirty, they would know that it belonged to Iran
3 and Iran couldn't do anything with it.
4      So they needed a cover story. They needed to lie.
5 They needed the money look as if it was clean, stripped of any
6 connection to Iran. That way, the co-conspirators could slip
7 that money back into the international financial system,
8 tricking American and European banks into thinking that Iran
9 had nothing to do with all that oil money. Some of you might
10 have heard of money laundering before. That's what it means,
11 cleaning dirty money or lying to make illegal money look
12 legitimate.
13      But this was no ordinary money laundering. As you'll
14 learn, the crucial part of the lie was to make it possible for
15 Iran's money to go through American banks. So Atilla had to
16 come up with a very specific way for his co-conspirators to lie
17 that would fool the American government into thinking that
18 Atilla and his bank were still following U.S. law. So Atilla
19 provided the method to secretly break U.S. law by finding and
20 exploiting two loopholes.
21      So how did it actually work? You'll learn that, at
22 first, the scheme used a loophole that made it legal to sell
23 gold, not to the government of Iran but to private people and
24 companies in Iran. So under the scheme, when an Iranian bank
25 needed to pay someone in U.S. dollars somewhere else in the

1 world, they'd use the Iranian oil money that had accumulated at
2 Halkbank to buy huge quantities of gold from one of Zarrab's
3 front companies.
4      Atilla and his bank gave those front companies
5 instructions on how to paper over the transactions with phony
6 documents. So even though the gold was bought with the Iranian
7 government's oil money, it looked like the gold was sold to
8 private companies in Iran, making it look like they were taking
9 advantage of that loophole. Then, like something out of a spy
10 story, the gold would get packed into suitcases, given to
11 couriers who would take it as luggage on international flights.
12      But instead of going to private companies in Iran,
13 like the fake documents said it was, the couriers would take
14 the gold to Dubai, a city in the United Arab Emirates, the hub
15 of business and finance. Once the couriers got to Dubai, their
16 suitcases full of gold, they'd give the gold to another front
17 company, taking instructions from Iran, which would sell it for
18 U.S. dollars or whatever currency Iran needed.
19      And the plan was massively successful. Before the
20 scheme started in 2011, the entire Turkish economy exported
21 about $55 million worth of gold for Iran. A year later, once
22 the scheme was underway, Zarrab's front companies alone
23 exported almost $6.3 billion in gold. And Atilla was a
24 critical architect of the system responsible for this massive
25 uptick in exports, all driven by the scheme to evade U.S. law.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
November 28, 2017

1     But you don't move billions of dollars for Iran
2 without eventually attracting attention, and the U.S. Treasury
3 Department caught on. They figured out that private citizens
4 in Iran were not buying billions of dollars in gold just for
5 earrings. So the U.S. they changed the law. They closed the
6 loopholes. They said that they would punish banks like
7 Atilla's for selling gold to anyone in Iran, not just the
8 government.
9     And to make sure that Atilla's bank knew that the law
10 was changing, officials from the Treasury Department went to
11 Turkey. They met with Atilla. They met with the head of his
12 bank. They met with the Minister of Economy, and the U.S.
13 government told them that they had to stop what they were
14 doing. And Atilla personally promised the U.S. government that
15 he understood American law and that his bank would stop selling
16 gold to anyone in Iran.
17     But Atilla didn't stop. He just changed the scheme.
18 He found another way to do it. He was the sanctions expert; so
19 not only did he find another loophole, he upgraded the whole
20 scheme. This time, the co-conspirators would use a different
21 exception to the sanction, a humanitarian section, which
22 allowed Iran to use some of its oil money to buy food. So
23 instead of pretending to export gold to Iran, you'll learn that
24 Atilla devised a system to let the coconspirators to pretend to
25 sell food.

1     The rest of the scheme stayed pretty much the same,
2 same front companies that were in the jewelry business, buying
3 literally tons of gold just months before, now all of a sudden
4 were in the food business. You'll hear that they changed their
5 business because Atilla's bank told them to as part of the new
6 system. Atilla's boss was explicit about who masterminded the
7 scheme, referring to it in messages as the method provided by
8 Hakan Atilla,
9     Atilla was the one who called Zarrab to get moving
10 when some of the front companies were slow making the switch.
11 Those front companies could then prepare fake customs
12 documents, from Dubai again, lying that they were selling beef
13 or wheat or frozen chicken breasts to Iran. They made those
14 documents for Halkbank because Atilla told them to, so that his
15 bank could lie and claim to the U.S. that those transactions
16 fit within that humanitarian exception.
17     But there was no food. There were no humanitarian
18 shipments. This time, the lie wasn't just where the gold
19 stopped or whose gold it was, it was all a lie. The whole
20 thing was a sham. There was no food at all. Wheat does not
21 come from Dubai. The city is surrounded on three sides by the
22 Arabian Desert. So instead of doing real business, once again,
23 the government of Iran had turned its cash at Atilla's bank
24 into a slush fund, a pool of money which it could use to send
25 payments through American banks without anyone being the wiser.

1     The evidence will show that the most important part of
2 the scheme was the part that Atilla was directly responsible
3 for, the part that happened at his bank because in all of the
4 versions of the scheme, it was there that the most critical lie
5 was told, the lie that the gold was for things like jewelry or
6 that the money was for food, or even that any food was actually
7 shipped at all. The lie Atilla crafted was the lie that made
8 it look like the money belonged to front companies and not to
9 the government of Iran.
10     And you'll learn about the fake documents that were
11 particularly important to that lie because those documents are
12 what the U.S. government and American banks would look at to
13 make sure that Atilla's bank wasn't violating laws, wasn't
14 doing business for Iran. So the fake documents had to be
15 perfect. But Zarrab wasn't a banker or a sanctions expert. He
16 was the front guy. Atilla was the expert.
17     So the evidence will prove that the defendant coached
18 Zarrab on how to forge the right documents. When Zarrab messed
19 up and submitted documents with obvious mistakes on them,
20 mistakes that could unravel this whole lie, Atilla was the one
21 who told him how to fix it. When there were problems with
22 transactions and Zarrab called the bank's general manager, he
23 said he talked to Atilla to fix it because while many people
24 participated in this fake food scheme, Atilla was the scheme's
25 architect, the man who devised the lies that needed to be told

1 and figured out how to tell it.
2     And again, the method worked. The cash looked like it
3 belonged to those Dubai companies, Atilla's bank looked like it
4 was following U.S. law, and no one knew that, in truth, the
5 money behind it all was the Iran government's oil money. And
6 the evidence will prove that once it was in Dubai, that Iranian
7 government used that money to make it illicit payments all over
8 the world, payments that made the whole process necessary in
9 the first place, including payments through American banks,
10 tricking those banks that never knew they were shelling out
11 U.S. dollars on behalf of the Iranian government. The evidence
12 will show that the entire point of Atilla's scheme was to make
13 those payments possible.
14     And you'll hear that Atilla went beyond just designing
15 this scheme. He actively protected it. Once more, U.S.
16 government saw how much money was moving and that the story
17 just didn't add up. So, again, some of the highest-ranking
18 officials from the U.S. Treasury Department arranged meetings
19 and calls with Atilla's bank to express their concerns.
20 Treasury officials went to Turkey, and Halkbank officials came
21 right here in the United States.
22     And who did Halkbank send to talk to them? Atilla.
23 And what did he say? He lied. He told them that all that
24 gold, gold that was really going to make payments for the
25 Iranian government, that was just for jewelry. The defendant

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 talked to those Treasury Department officials about sending
2 payments for food and lied to the U.S. government about the
3 business that Halkbank was doing with the government of Iran
4 under the guise of a humanitarian exception.
5        He even lied directly about Zarrab, tried to minimize
6 him as just someone who did a little trade business with
7 Halkbank, hiding the fact that Zarrab was moving billions of
8 dollars worth of Iranian oil money and that he had a direct
9 line to the head of the bank and the Turkish Minister of
10 Economy to do it.
11        You'll also learn that the defendant's lies to the
12 U.S. government were not the only way that the members of this
13 conspiracy protected their scheme. They paid millions of
14 dollars in bribes to protect it. Every time the Iranian
15 government sent money through this pipeline, Atilla's bank took
16 a commission and Zarrab took a cut. And from his cut, people
17 got paid. Atilla's boss got a taste, packed for him in cash in
18 shoe boxes. Turkey's Minister of the Economy got half. Other
19 ministers in Turkey got bought off too, and the scheme needed
20 protection because law enforcement was watching and listening.
21        First, it was the Turkish police, regular cops in
22 Istanbul, running a smuggling investigation stumbled onto the
23 corruption of their government, the bribe payments being made
24 to allow Atilla's scheme to proceed. So they did what police
25 do. They did wiretaps, making recordings of phone calls, they

1 did surveillance, they followed the money. And when they
2 conducted searches in late 2013, they found proof of this
3 crime. Those shoe boxes of bribe money at the home of Atilla's
4 boss, ledgers of bribes to ministers, documents in the offices
5 of Atilla's bank and Zarrab's front companies proving the
6 existence of the scheme to launder money for Iran.
7        But those police officers didn't get to see their hard
8 work result in justice in Turkey. You see, all those bribes,
9 all that protection money paid by the co-conspirators? It
10 bought a coverup. Corrupt officials within the Turkish
11 government organized a purge of the cops and prosecutors who
12 ran the case, sent many of them to jail and shut down the
13 investigation. And you'll learn that as part of this coverup,
14 the same corrupt high-ranking Turkish officials instructed
15 Zarrab to put up even more bribe money for the judges, millions
16 and millions in bribes, so that everything could be made to go
17 away. Zarrab paid the money. Co-conspirators got out of jail,
18 and the case the Turkish police had developed was dismissed.
19        While the bribes got rid of the case, they could not
20 get rid of the evidence. The wiretaps of Atilla, Zarrab, other
21 co-conspirators, the documents that had been collected, they
22 all remained in files maintained by the police. But because of
23 the bribes, because of the coverup, they did not see the light
24 of day until now, until this trial here in New York.
25        And you'll hear during this trial that even that close

1 call with Turkish law enforcement did not stop Atilla and his
2 co-conspirators. With their coverup bought and paid for, the
3 scheme went right back to work. It was too lucrative to stop.
4 Following Iranian oil money out of Atilla's bank and out of
5 Iran and to Dubai banks, just like before. Some of the cast
6 changed, the lies stayed the same, and Atilla kept telling
7 them.
8        He was still overseeing the phony paperwork, still
9 lying to the Treasury Department about what his bank was doing,
10 and the scheme was still protected with bribes. This time,
11 paid directly to a fixer for the same dirty Turkish officials
12 who arranged for the corruption cases to disappear. The scheme
13 that Atilla designed wasn't about normal finance, or normal
14 politics. It was a racket, plain and simple.
15        But it turns out the Turkish cops weren't the only
16 ones who were watching. Since 2013, counter-intelligence
17 division of the FBI had also been on the case, running its own
18 independent investigation of Atilla's scheme through the United
19 States. Through painstaking work, executing search warrants
20 for e-mails, reviewing banking records, analyzing export
21 documents, the FBI pieced together what was going on, and the
22 evidence they found tells the same story that the evidence
23 collected by the Turkish police did, the same story that the
24 U.S. Treasury Department suspected; that Atilla was working
25 with Zarrab and the other co-conspirators to launder billions

1 of dollars in Iranian oil money through Halkbank, using phony
2 documents, and that the money was going to payments through
3 American banks with the government of Iran pulling the strings
4 behind the scenes.
5        So what sort of evidence will the United States use to
6 prove its case in this trial? Well, for starters, there will
7 be those recordings. You'll hear Atilla's own words on tape as
8 he coached Zarrab on how to fix errors in fake shipping
9 documents, telling him he needs to correct the paperwork for
10 the front companies so Halkbank can process transactions for
11 Iran. You'll see other members of the conspiracy talking about
12 Atilla.
13        Atilla was so important to the functioning of this
14 conspiracy that when some of them tried to organize a similar
15 setup with a bank in China, Zarrab told them that it wouldn't
16 work unless they found a man like Atilla to help run the secret
17 system. You're going to see key documents collected by the FBI
18 using search warrants and subpoenas. They gathered
19 communications between the co-conspirators, e-mails, text
20 messages, online chats through smart phone programs like
21 WhatsApp. Like messages, where Atilla's boss at Halkbank asked
22 Zarrab if he's okay with the method proposed by Atilla for how
23 to run the scheme.
24        The FBI also found a trail of ledgers showing the flow
25 of Iranian oil money from the bank accounts of Iranians at

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                 November 28, 2017

1  Halkbank, out to the accounts of the scheme's front companies,
2  and then on to front companies in Dubai, accompanied by fake
3  documents claiming that hundreds of thousands of tons of food
4  were shipped to Iran, food that never existed.
5        You're going to see plane tickets and export documents
6  for those couriers, carrying gold in suitcases, to money
7  exchangers in Dubai.  And you'll see the point of it all, the
8  instructions from Iran to the co-conspirators for where they
9  wanted their money paid, and then the corresponding records
10  from the American banks that unwittingly processed Iran's
11  orders.  Each piece is a link in the chain, the story of
12  Atilla's secret system.
13        And you're going to get help in understanding that
14  system and how all these documents and recordings and documents
15  fit together from witnesses who will tell you about the scheme
16  from the inside and from the outside.  You'll hear about it
17  from the inside from Reza Zarrab himself.  Because of his
18  participation in this scheme, Zarrab has pleaded guilty to
19  violating U.S. laws.  He has accepted responsibility for
20  busting sanctions and laundering money, and he has decided to
21  cooperate with the government.
22        It's because of his crimes, because he was part of the
23  same conspiracy as Atilla, that he can tell you the inside
24  story and expose the truth behind all those elaborate lies.
25  He'll tell you the story firsthand, as he lived it, of how

1  Atilla instructed him on how to tell the right lies so that
2  together they could move billions of dollars for Iran.  He'll
3  walk you through the wiretaps and calls that he was a part of,
4  like those calls with Atilla orchestrating a scheme.
5        He'll go step by step through the shipping documents
6  and bank ledgers and payment instructions from Iran and the
7  money out of the American banks, the evidence collected by the
8  FBI showing you how it fits together.  The true story of all
9  the lies.
10        And you'll also learn more about the scheme from the
11  outside, from one of the Turkish police officers who uncovered
12  the conspiracy in Turkey.  He'll tell you about their
13  painstaking work to build their case and all the evidence they
14  collected, and you'll see how, from the outside of the scheme,
15  they uncovered the same story that you'll hear about from
16  Zarrab on the inside.  And he'll tell you about how all his
17  hard work was swept under the rug by the Turkish government,
18  how he was falsely sent to jail just for doing his job and how
19  he fled his homeland to come to the United States.
20        Other witnesses will tell you about being lied to by
21  Atilla.  Two former undersecretaries of the treasury, the top
22  officials in the U.S. government charged with implementing
23  American sanctions on Iran will testify about their meetings
24  and phone calls with the defendant, about how they made sure
25  that he understood exactly what U.S. law required, how they

1  warned him not to launder money for Iran, and about how Atilla
2  lied to them, promised that Halkbank was doing real diligence
3  on all these transactions, that Halkbank was committed to
4  complying with U.S. law and that, of course, none of those
5  billions of dollars was for the government of Iran.
6        You'll hear from witnesses who work at banks here in
7  New York, who will tell you about how international
8  transactions, like the ones we're talking about, get processed,
9  and you'll hear from experts who will help you understand the
10  economics here.  The scheme Atilla devised was so much money
11  that it literally changed the course of nations, and so it's
12  important to understand what was happening in the Middle East
13  during that time period after 2010 to see why the Iranian and
14  Turkish governments were so desperate for Atilla's conspiracy
15  to succeed.
16        Like I said when I started here, this is just a
17  preview.  This is just to give you some context for all the
18  evidence that you'll see and hear in the next couple of weeks.
19  At the end of this trial, after all the testimony is in, all
20  the exhibits Judge Berman talked about that have been received
21  and the recordings played, we'll have a chance to talk to you
22  about how the evidence proves the defendant's guilt beyond a
23  reasonable doubt.
24        For now, I just want to ask you all to do three things
25  during this trial.  Pay close attention to all the evidence.

1  Follow Judge Berman's instructions on the law, and like he told
2  you, use your common sense, the same common sense you use every
3  day.  Every one of you knows what it means to tell a lie.
4  Every one of you knows how people act when they are doing
5  something shady or in secret.  Just apply that common sense as
6  you assess the evidence that you see and hear in this trial.
7        If you do those three things, you will give Hakan
8  Atilla what everyone is entitled to in this courtroom, a fair
9  and just trial.  And if you do all of that, you will reach the
10  only conclusion supported by evidence, that Atilla is guilty,
11  guilty of participating in a conspiracy to break U.S. sanctions
12  on Iran and of conspiring to lie to the U.S. Treasury
13  Department about it; guilty of conspiring to cheat American
14  banks, deceiving them by hiding the fact that the money that
15  they were moving really belonged to the government of Iran;
16  guilty of money laundering, of washing the mark of Iran's
17  economic jihad off those dollars so that they could be used,
18  used to pay millions in bribes to Turkish government officials,
19  and used to turn U.S. dollars into Iran's wages of sin.  Guilty
20  beyond a reasonable doubt.  Thank you.
21        THE COURT:  Thank you, counsel.  Hold on one second.
22        (Pause)
23        Thanks a lot.  Mr. Rocco?
24        MR. ROCCO:  Thank you.  Your Honor, the prosecution
25  team, ladies and gentlemen of the jury, my name is Victor

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 Rocco, and it's my privilege, along with Cathy Fleming, Todd
2 Harrison and Joshua Dratel, to represent Hakan Atilla.
3     Economic jihad, an economic holy war, these are the words of
4 Reza Zarrab, one of the government's principal, if not the
5 government's principal, witness in this case. They are words
6 that he wrote to the then-president of Iran, pledging to fight
7 U.S. economic sanctions. Who knows whether Zarrab wrote that
8 letter out of religious zealotry or sheer opportunism, but not
9 surprisingly, Reza Zarrab joined the struggle and made a
10 fortune for himself.
11     There's another war going on in this case. On the one
12 side is Reza Zarrab. The evidence will show that he waged a
13 jihad, an economic jihad against the United States, sanctions
14 against Iran for years and years. He made hundreds of millions
15 of dollars, as a result of which he used to buy jets and yachts
16 and people. During the jihad, he paid tens of millions of
17 dollars to people all over the world.
18     Now, when talking about Mr. Zarrab, please understand
19 that he was eventually arrested here in the U.S. for
20 masterminding this worldwide conspiracy and jailed. Then,
21 because he's the master of the deal, he made the deal of a
22 lifetime, a deal with the government, what we call a plea deal,
23 in which he agreed to plead guilty and to cooperate against
24 Mr. Atilla. In exchange, Zarrab got what he hopes to be a
25 get-out-of-jail-free card, possible witness protection for him

1 and his family and perhaps an opportunity to stay here in the
2 United States forever. It's already paid off for him. He's no
3 longer in jail. He's squirreled away with some FBI agents in
4 some unknown place.
5     On the other side of the jihad, the war that's being
6 fought is Hakan Atilla. He's a Turkish civil servant. He's an
7 officer at Halkbank, and as you heard from the government,
8 Halkbank is -- the majority of it is owned in a major way by
9 the Turkish government. In other words, the Turkish government
10 is the majority shareholder of the bank, but there are other
11 interests in the bank, outside interests, private interests,
12 all over the world.
13     Halkbank is known as Turkey's principal conduit to its
14 lawful business with Iran. There's no surprise that Halkbank
15 does business with Iran. The whole world knows it. The Office
16 of Foreign Assets Control, a division of the Department of
17 Treasury knows it, and watched Halkbank and its dealings with
18 its neighbor, Iran, and watched the flow of money between
19 Turkey and Iran. No surprises.
20     The evidence will show that Hakan Atilla is not
21 corrupt. He took no bribes. He took none of the tens of
22 millions of dollars that Zarrab salted all over the world.
23 Hakan Atilla is a hard-working person like all of you, a senior
24 bank officer.
25     What happens? He gets arrested and is being

1 prosecuted not in Turkey, here in the United States for doing
2 what, in fact, was his job. Ladies and gentlemen, how's that
3 getting things completely backwards? Turning things upside
4 down, turning them on their head? I submit to you that we just
5 fell into a rabbit hole, only this isn't like Alice in
6 Wonderland. It's real life, with real human consequences
7 because Hakan Atilla and his family have been devastated by
8 this prosecution.
9     Now, that's what the evidence in this case is all
10 about. That's what the evidence will show, a dedicated,
11 hard-working civil servant caught in the middle of a storm, a
12 swirling, huge international storm of intrigue, lies and
13 massive corruption. Hakan Atilla is just another one of Reza
14 Zarrab's many victims, a hapless and helpless pawn.
15     So you will hear evidence from the witness stand in
16 the form of testimony and exhibits will be offered, and the
17 evidence in this case will be massive. There will be a tsunami
18 of evidence that will be presented by the government in this
19 case. That evidence, I submit to you, is essentially about one
20 man and his scheme, Reza Zarrab, and the huge web of deceit and
21 corruption that he wrought over three continents and who is now
22 being coddled by our government.
23     Most remarkably about all of this is how much of this
24 occurred right under the eyes of OFAC, right under the eyes of
25 the United States Department of Treasury. This trial, ladies

1 and gentlemen, I submit to you, is really the Reza Zarrab show.
2     Now, don't be deceived by the mountains of evidence,
3 fancy exhibits, technical testimony about recorded calls and
4 wiretaps, references you'll hear to judicial coups in Turkey, a
5 Turkish investigation, where discredited prosecutors and
6 investigators were fired. These things sound like they're
7 right out of a James Bond movie, a John Le Carre novel. Ask
8 yourself, as you hear this evidence, what does this evidence
9 say about Hakan Atilla? Not what it says about Reza Zarrab,
10 though pay attention to that as well, though, because it tells
11 you everything that you need to know about Reza Zarrab.
12     I submit to you that, virtually, the evidence here
13 shows nothing more than the fact that Hakan Atilla is innocent
14 of the charges against him. He was misled and duped by Zarrab.
15 He was misled and duped by his own boss, Suleyman Aslan, who
16 became a pawn of Zarrab. He was mislead by his boss, who was
17 paid millions of dollars. He was misled by Reza Zarrab, as
18 Halkbank employees were misled by Reza Zarrab.
19     I ask you to follow the evidence in this case, keep
20 your eye on the bouncing ball. The evidence will tell you who
21 the real culprits are and who should be punished. We're not
22 here to defend Hakan Atilla's bosses. We're not here to defend
23 his employer. We're here to defend Hakan Atilla. We're not
24 here to defend the Republic of Turkey or Turkish ministers. We
25 have one client and one client only. Along with Cathy Fleming

**A343**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 and our team, we're here privileged to be here representing
2 Hakan Atilla,
3      Some months ago, Mr. Atilla was arrested. He stood in
4 the well of this court and entered a plea of not guilty. He's
5 persisted in that plea. He stands here today, before all of
6 you, each of you, prepared to defend himself against the
7 charges and to accept your verdict.
8      I say it's our privilege to represent Mr. Atilla
9 because as he stands in front of you, he's presumed innocent.
10 Presumption of innocence is no abstract concept. It's a real,
11 living protection, a protection that protects each one of us.
12 It requires you to believe Hakan Atilla is innocent unless and
13 until you determine, based on all the evidence -- evidence, not
14 surmise, not suspicion, not speculation, but evidence.
15      You've taken a solemn oath to maintain that
16 presumption, to honor that presumption, and I know that you
17 will honor it. Mr. Atilla is Turkish, but just like we
18 Americans, he's protected by the presumption of innocence.
19 Presumption of innocence is one of the strongest presumptions
20 under law because wrapped inside of it, it carries two
21 additional protections in criminal cases that are equally
22 sacred, the highest standard of proof the law knows, proof
23 beyond a reasonable doubt, and the further requirement that
24 it's the prosecution's burden, the prosecution's burden always
25 to establish guilt beyond a reasonable doubt.

1      Mr. Atilla is assumed, presumed innocent, and the
2 burden of proving otherwise is always, always on the
3 government, and the government must overcome that presumption
4 by proof beyond a reasonable doubt to your satisfaction. The
5 burden never shifts from the government to the defense. The
6 defendant in a criminal case can choose to do nothing. He
7 doesn't have to call witnesses. He doesn't have to
8 cross-examine witnesses. He doesn't have to take the witness
9 stand. He can stand mute. The burden is on the government to
10 prove Hakan Atilla's guilt beyond a reasonable doubt.
11      Daniel Webster, the Great American statesman and
12 lawyer, famously once said that "Justice is man's greatest
13 enterprise in life." Man's greatest enterprise in life. You
14 are just about to enter that great enterprise.
15      Now, who is Hakan Atilla? He's 47 years old. He's
16 Turkish born and bred. He speaks good, but not perfect,
17 English. That's why we have interpreters here interpreting for
18 him. He's married with a child in college. He's worked for
19 Halkbank for 22 years, his entire career since graduating from
20 college. Halkbank is a large bank. It's one of the sixth --
21 it's either the sixth or eighth largest bank in Turkey. It has
22 900 branches, 17,000 employees. It's, as I said earlier,
23 Turkey's major conduit for business with Iran.
24      Hakan's wife also works at the bank. They're decent,
25 hard-working people. He's a civil servant. He makes $120,000

1 a year. He's paid no bonuses. He owns no stock in the bank.
2 He's paid a straight salary. Hakan rose through the ranks of
3 the bank to become one of eight, more or less -- the number
4 changes from time to time -- deputy general managers of the
5 bank. He's in charge of the bank's international banking
6 department. He's responsible for Halkbank's relationships with
7 foreign banks and their investors.
8      He has no responsibility -- he has no responsibility
9 for approving the commercial transaction -- for approving
10 commercial transactions, and he approved none of the commercial
11 transactions in this case. Those transactions are approved by
12 the foreign operations department of the bank, and that
13 department is supervised by another deputy general manager,
14 another VK deputy general manager of the bank.
15      Hakan was arrested when he came to the United States
16 last March with some business colleagues on a routine business
17 trip. Since then, he's been jailed and separated from his
18 family. Hakan came here twice after Reza Zarrab was arrested
19 by the United States a year earlier, in March of 2016. And
20 when Zarrab was arrested, it was front-page news in Turkey. It
21 was news here in the United States. It was news all over the
22 world. Anyone whoever knew of or dealt with Reza Zarrab knew
23 that he was arrested and, by the way, he was arrested, not
24 surprisingly, getting off a private jet at Disney World with
25 $100,000 in spending money for a family vacation. $100,000 in

1 spending money, that's more -- twice as much as the average
2 American makes in a year. To Reza Zarrab, it was pocket
3 change.
4      Even though Zarrab had been arrested a year earlier,
5 Hakan thought that he had nothing to fear in coming to the
6 United States on business. Why would he? He'd done nothing
7 wrong. He actually came here first in September of 2016, went
8 back to Turkey, and then came again six months later, roughly
9 six months later, in March of 2017. But again, had nothing to
10 fear because four years earlier, in a Turkish criminal
11 investigation involving many of the very transactions that are
12 at issue in this case, Hakan spent four, four-and-a-half hours,
13 on New Year's Eve in December '13 being interviewed by Turkish
14 investigators as part of the Turkish investigation that the
15 government referenced earlier.
16      He had nothing to hide. He was never arrested or
17 charged with a crime in Turkey. Others, including Reza Zarrab
18 and Hakan's then boss Suleyman Aslan, were arrested. There
19 will be no evidence that Hakan Atilla was ever bribed, not a
20 scintilla of evidence. Unlike his boss, who was paid millions
21 of dollars in bribes.
22      So, now, who's Reza Zarrab? Well, you know that he's
23 the mastermind of a worldwide massive sanctions avoidance and
24 money laundering scheme that made him fabulously wealthy. He's
25 also a master deal maker, and a pillar on which the government

Case 18-1910, Document 26, 09/26/2018, 2383242, Page101 of 257

**A344**

1  has chosen, our government has chosen, to rest its case against
2  Hakan Atilla. Zarrab, Reza Zarrab, I would submit to you, will
3  seem valid in a suit.
4       The evidence will certainly show him to be a man you
5  can't trust. Zarrab is guilty of more than just masterminding
6  vast sanctions and a money laundering scheme, offering to fight
7  an economic jihad on behalf of Iran against the United States.
8  The evidence will show you that on the way to doing that, he
9  did other bad things. He paid fortunes in bribes, fortunes in
10  bribes to businessmen and government leaders all over the
11  world, in Russia, in China, in Iran and in Turkey, and he did
12  it to get what he wanted, anything and everything that he
13  wanted.
14       Whether it was to avoid sanctions or destroying
15  competitors or their businesses or even buying his brand of
16  justice, he paid money upfront. To Zarrab, bribery was a way
17  of life, a never-ending story. He never saw a bribe he didn't
18  like. To Zarrab, everyone has a price, everything has a price,
19  nothing is too small for a bribe, nothing is too large for a
20  bribe. One of the recordings that the government referenced
21  earlier on, the government's own proof, Zarrab actually says
22  everyone's got a price.
23       The evidence will show that Zarrab's bribes also
24  didn't stop when he was arrested and jailed here in the United
25  States. When he was in jail, after he was arrested, he

1  continued to pay bribes. He bribed a prison guard and other
2  prisoners so he would have special privileges and special
3  treatment, forbidden access to food, to special food, to
4  liquor, to drugs and to women. Old habits die hard, or maybe
5  they don't die at all.
6       The evidence will show that Zarrab went through dozens
7  of lawyers, high-priced. Paid millions of dollars in legal
8  fees to get himself out of a jam, out of this jam. He even
9  hired Rudy Giuliani and a former attorney general of the United
10  States to help him out. When that failed, when he couldn't get
11  himself out, that technique didn't work, he resorted to
12  something else. He failed to them, all that money, all those
13  legal fees failed to get him what he wanted.
14       Hakan Atilla became Zarrab's ace in the hole, a
15  commodity, something he could sell, someone that Zarrab sees as
16  his get-out-of-jail card, his E-ZPass to a reduced jail
17  sentence, or no jail time at all. By testifying against Hakan
18  Atilla, Zarrab hopes that he can buy his freedom, a shortcut
19  back to his lavish life of the rich and famous.
20       At some point the government is going to put Reza
21  Zarrab on the witness stand. It will open a sewer in this
22  courtroom and Zarrab will crawl out, the same Zarrab who
23  pledged to wage economic jihad against the United States and is
24  now being coddled by the government. The government will hold
25  its nose and tell you what a bad guy Reza Zarrab is, he's a

1  liar, a cheat, a corrupter of men on a staggering scale, a
2  one-man crime waive.
3       It will put him on the witness stand and parade a long
4  list of his lies, deceptions and crimes in front of you, but
5  the government will also tell you that it takes its witnesses
6  where it finds them and tell you that Reza Zarrab has finally
7  found religion, he's reformed because it's in his best
8  interests to do so. The government will ask you to believe
9  him. Ask yourself -- the government will ask you, why would
10  Reza Zarrab implicate Hakan Atilla in his crimes? I submit to
11  you, ladies and gentlemen, the reason is obvious. Reza Zarrab
12  knows the value of a down payment. Hakan Atilla is his down
13  payment to his way to Zarrab's way to a cushy lifestyle.
14       If you think for a moment, for one second that Reza
15  Zarrab would let the truth stand in his way to a sentencing
16  break, whether he cares what happens to Hakan Atilla, Zarrab
17  would not know Hakan Atilla if he tripped over him. They
18  existed on different planets, in different galaxies. They have
19  different values, different priorities. All of that's true.
20  They lived in separate universes until came to see that Hakan
21  Atilla was his get-out-of-jail-free card, his E-ZPass to a
22  lesser sentence. I'm going to ask you, as Zarrab testifies, as
23  you listen to his testimony, please bear all of this in mind.
24  This is part of the government's case against Hakan Atilla.
25       Now, what will the evidence show to be the

1  indisputable facts? I think the evidence will show that Hakan
2  Atilla, the so-called architect of this scheme, rarely
3  communicated with Zarrab. They weren't friends, confidantes or
4  conspirators. They didn't even like each other. Reza Zarrab
5  saw Hakan Atilla as an obstacle, a monkey wrench in his
6  schemes, someone who got in his way. He even complained about
7  him to his friend, Suleyman Aslan. He claimed that Atilla was
8  getting in his way.
9       So what did Zarrab do? He did what he does best. He
10  went around Hakan Atilla, directly to Suleyman Aslan, Hakan's
11  boss, the guy that Zarrab bought for millions and millions of
12  dollars in bribes. He went to Suleyman for what he wanted. In
13  the recordings, by the way, Zarrab actually brags about his
14  techniques. He says if the difficult one won't do it, then go
15  to a higher one. If the difficult one won't do it, just go
16  over his head.
17       The evidence will show that during the roughly 15
18  months during which the Turkish authorities were wiretapping
19  and listening to these telephone conversations, Atilla spoke to
20  Zarrab six times, six times. By contrast, he spoke to Suleyman
21  Aslan 32 times, but they communicated by chat. There are
22  thousands in the same period, thousands of chats and text
23  messages back and forth between Suleyman Aslan and Zarrab.
24  There's not a text message or chat in that same period with
25  Hakan Atilla.

**A345**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1    Atilla may have seen Zarrab at the bank on occasion,
2 but never alone, perhaps once or twice. They never socialized
3 or met outside the bank. Their six telephone conversations
4 lasted a total of 22 minutes and 51 seconds over a 15-month
5 period. The average call is less than four-minutes long.
6 Weeks, even months go by where there's no contact between
7 Atilla and Zarrab. There is constant contact between Zarrab
8 and Suleyman Aslan in the same period of time.
9    Again, follow the money. Where do you go? Who do you
10 talk to when you're paying someone off? That's the person you
11 pay. So I suppose the old adage, you want to know what
12 happened? Follow the money and the money leads -- goes from
13 Reza Zarrab directly to Suleyman Aslan.
14    Now, money buys access and control, and no one knows
15 that better than Reza Zarrab. He's been doing it for years and
16 years and years. And as I say, the evidence will show that the
17 real culprit at Halkbank is its former chief executive officer,
18 who shamelessly took millions of dollars in bribes from Zarrab
19 and became his tool before they both were ultimately caught up
20 in a corruption scandal in Turkey and arrested.
21    Those bribes, the bribes that were paid to Suleyman
22 Aslan, were based on commissions that Aslan was paid for the
23 transactions that Zarrab did with the bank. He was paid
24 between three and four dollars per thousand dollars, or roughly
25 three-tenths of a percent. The evidence will show you that

1 based on that, that Aslan had every reason in the world to push
2 these transactions through Halkbank. Hakan Atilla had none.
3 He took nothing from Reza Zarrab. He was indebted to no one.
4    Now, that's part of the government's case. Let's talk
5 about another part. It's goldmine of conversations, recorded
6 conversations, which I submit to you, in fact, is a minefield
7 of reasonable doubt. What do the recordings say and what don't
8 they say? First, they're in Turkish and they're ambiguous and
9 they're confusing because they say many things. They say many
10 different and contradictory things, but they also tell you, if
11 you listen closely to them, read the transcripts, that there's
12 a story of deception and secrecy that demonstrates that Hakan
13 Atilla isn't in the middle of this, isn't the architect of this
14 scheme. He is the odd man out.
15    The recordings are interesting for the way in which
16 Zarrab and Hakan speak to each other. Don't only read the
17 transcripts, but even though the recordings are in Turkish,
18 listen to them. I'd ask you to do that, please, because the
19 recordings, the sound tells you a lot. Listen to the tone of
20 their conversation, the voice inflection, compare the formal
21 and distant way that Reza Zarrab speaks to Hakan Atilla on the
22 six occasions that their conversations are recorded, with the
23 familiar way that he speaks to his own comrade. This is
24 Zarrab's comrade, Abdullah Happani, his sidekick, and more
25 importantly, the warm way that he talks to Suleyman Aslan in

1 the chats.
2    You'll see the chats. You can read the chats and see
3 the way that they talk to each other, the way they communicate
4 with each other. It's a constant back and forth. It's like
5 two unholily lovers. What's not on these recordings is more
6 important, to my mind, and I urge you to consider what I'm
7 saying to you. What's not on the recordings is more important
8 than what's on the recordings. With Hakan, there are no
9 friendly exchanges, no terms of endearment, no banter, no
10 secrets, no intimacies. The conversations are brief and
11 strictly business. There is no discussion of politics or
12 social events, just business.
13    No one talks about phony documents or making things up
14 or forgery, at least not with Hakan Atilla. There's no secret
15 words or codes or clandestine requests to meet. Nobody says
16 there's no food involved in these transactions. Hakan Atilla
17 and Reza Zarrab talk about some problems, some documents that
18 accompanied some shipments of food. Hakan Atilla and Zarrab
19 talk about food and the necessary documentation for some of
20 these transactions, which isn't surprising.
21    If these were totally made up, bogus shipments, why
22 don't they talk about that directly in these conversations?
23 Why all the back and forth? As you listen to the tapes, or the
24 recordings or you read the transcripts, why all the back and
25 forth about particulars? Instead they discuss discrepancies in

1 documents that simply prevent transactions from being proposed
2 or processed through the bank. It sounds like an ordinary
3 conversation between a bank employee, who's trying to help a
4 long-time and important bank customer.
5    Reza Zarrab did not show up one day on the doorstep of
6 Halkbank and start doing large amounts of business with the
7 bank. Reza Zarrab's family was in the jewelry business. They
8 were well known, a Turkish businessman who did years of
9 business transactions with Halkbank. He was a well-known and
10 well-regarded customer of the bank.
11    It sounds like -- as I say, these conversations sound
12 like ordinary conversations between a bank employee, who's
13 trying to help a long-time customer, an important customer of
14 the bank, to document properly transactions so that the
15 transactions can be paid. That's what bankers do. They help
16 customers. There's nothing sinister or criminal about that.
17    (Continued on next page)
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

| Hbs3ati3 | Opening - Mr. Rocco | Page 57 |

1    MR. ROCCO: In fact, when they have conversations,
2 Hakan doesn't say we're going to do things this way or we're
3 going to do things that way. There is an open debate about the
4 nature of the documentation. He's not the person who approves
5 the transactions. He said I will talk to my colleagues, and
6 the matters are worked out ultimately by people not involved in
7 Hakan Atilla.
8    There is nothing in the evidence to say that these
9 conversations were nefarious. As I say, it's just someone
10 trying to do his job. Hakan Atilla had no motive to do
11 otherwise.
12    As you listen to the evidence in this case, as you see
13 Reza Zarrab on the witness stand, ask yourself why would Reza
14 Zarrab need Hakan Atilla or anyone's help to help falsify
15 documents. You'll hear that Reza Zarrab was accomplished at
16 doing this stuff long before he ever saw Hakan Atilla, long
17 before he ever knew Hakan Atilla. He was expert. He is a
18 master of deception. He did not need Hakan Atilla's help in
19 telling him how to falsify documents. You'll hear that from
20 the recordings that the government will play for you that are
21 submitted in evidence.
22    He had been falsifying documents and misleading people
23 for years. Hakan Atilla is doing his business for the bank
24 when he's dealing with Reza Zarrab. There is nothing in the
25 evidence that you'll hear to suggest that Hakan Atilla knows

| Hbs3ati3 | Opening - Mr. Rocco | Page 58 |

1 that his boss has been corrupted, because he's been paid
2 massive bribes and he's owned by Reza Zarrab and he's doing
3 Reza Zarrab's bidding.
4    By the way, why would Suleyman Aslan compromise
5 himself? Why would he tell, go to Hakan Atilla and tell Hakan
6 Atilla that he is being paid millions of dollars in bribes by
7 Reza Zarrab? Suleyman Aslan knew everything that was going on
8 with Zarrab. He knew of his deceptions. Aslan is driving the
9 bus deciding what's to be done. Why would Hakan suspect his
10 boss of wrongdoing? The evidence will show that Suleyman Aslan
11 actually goes to his people in the operations department to
12 make sure that things went the way that Suleyman Aslan and Reza
13 Zarrab wanted them to go. He doesn't trust Hakan Atilla to do
14 it. He does it himself.
15    The evidence will show that Suleyman Aslan and Zarrab
16 were playing a game and that Hakan Atilla was the odd man out.
17    As Aslan is busy stuffing his pockets or his shoeboxes
18 with Zarrab's bribes, he's using Hakan as a foil to give people
19 in the bank the impression that it's business as usual and
20 everything is on the up and up.
21    Now, let's talk a little bit about the recordings that
22 were made during the Turkish investigation because they are a
23 story in their own right. There are literally thousands of
24 recorded conversations that were intercepted by Turkish law
25 enforcement over a period of roughly 15 months. As I say,

| Hbs3ati3 | Opening - Mr. Rocco | Page 59 |

1 among these thousands of phone calls, there are six between
2 Reza Zarrab and Hakan Atilla. Only six. Unlike the
3 conversations with Suleyman Aslan where there are thousands
4 of chats and texts. Zarrab doesn't have Hakan Atilla's telephone
5 number, cell phone number, in his contacts. He does have
6 Suleyman Aslan's telephone number and cell number in his
7 contacts.
8    The recordings come from a controversial Turkish
9 investigation, something that's been described as a judicial
10 coup d'etat. The investigation roiled Turkey. It turned
11 Turkey upside down with allegations of wrongdoing on the parts
12 of the investigators, the prosecutors, and the judges who ran
13 the investigation. It's a political potboiler, a mess, and
14 it's damaged Turkey internally.
15    The people who ran this investigation are partisan.
16 They're partisan at least to the extent that they have a vested
17 interest in the investigative work they did. Those people
18 weren't satisfied when the investigation was discredited in
19 Turkey, and maybe that's a human reaction to months of very
20 hard work.
21    What did they do? They broke Turkish law. They
22 brought the fruits of their investigation, some of them, here
23 to the United States. In doing it, as I say, they broke
24 Turkish law. That's not the way governments communicate with
25 governments. You don't have police officers take the invest --

| Hbs3ati3 | Opening - Mr. Rocco | Page 60 |

1 the fruits of an investigation, investigative fruits, and just
2 take them out of their country and bring them to a foreign
3 country.
4    Ask yourselves what would you think if an American
5 prosecutor did that. If the reverse was true. Took evidence
6 that taxpayers in America paid for, and brought it someplace
7 else to be used as a basis for a prosecution.
8    The evidence will show that these people not only took
9 the law in their own hands, they had a powerful motive to prove
10 to the entire world that they were right, and that the Turkish
11 government was wrong. Halkbank -- just one further thought on
12 the evidence. That evidence was accumulated back in 2013.
13 It's been four long years. Who knows what in that cache still
14 exists. What evidence is missing from that stolen bundle of
15 evidence. Who knows what's been destroyed or mislaid as a
16 result of the very unorthodox way that crucial evidence has
17 been handled. How can you trust partisans or how can you trust
18 anything they've touched.
19    Now, the government made a big deal about lies that
20 were made by employees of Halkbank. They actually in opening
21 did not reference only Mr. Atilla. On four or five occasions,
22 the word used was "they." Ladies and gentlemen, Mr. Atilla is
23 a he. He's one person. We don't speak about guilt in criminal
24 cases as being collective. There is no "they." It's what you
25 attribute, what you put right at the feet of Hakan Atilla that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                November 28, 2017

| Hbs3ati3 | Opening - Mr. Rocco | Page 61 |

1  incriminates him or exculpates him. It's not what they did at
2  Halkbank.
3        You'll hear from witnesses who worked for or who used
4  to work for the Office of Foreign Asset Control which is part
5  of the Treasury Department. The U.S.'s Iranian sanctions
6  regime isn't the law of the world. It isn't the law of Turkey.
7  Turkey didn't create the sanctions regime, and Halkbank and
8  Turkey have no obligation to follow it, to enforce it, or to
9  police it. It has no obligation, none, not at all.
10       Halkbank decided voluntarily to stay away from
11 activity that would cause the U.S. government to sanction.
12 Now, sanction means that the U.S. government ultimately has
13 right to prohibit U.S. institutions from doing business with
14 foreign banks. Halkbank is a foreign bank. Halkbank does
15 complies with sanctions, of course it wants access to the U.S.
16 financial markets because, admittedly, U.S. financial markets
17 are the most important financial markets in the world. They
18 need access to U.S. financial institutions. Halkbank does.
19       Obviously, though, Turkish banks don't start every
20 transaction with the same mindset that U.S. banks start
21 transactions. This isn't a bank on Wall Street. It is a
22 Turkish bank 5,000 miles away. Different language, different
23 culture, different customs.
24      The prosecutor here wants to put an American lens over
25 everything everywhere. But that's not the way things work in

| Hbs3ati3 | Opening - Mr. Rocco | Page 62 |

1  the real world. Turkey is 5,000 miles away and it doesn't
2  always see things the way the U.S. sees things. It is a
3  neighbor of Iran. They share a common border. They're major
4  trade partners and they have mutual influences over each other.
5  The American government knows that. OFAC knows that.
6        These sanctions are mind-numbingly complex to ordinary
7  Americans. Even to American lawyers and bankers. And they're
8  constantly changing. They're so complex that the government
9  needs an expert to testify here to you to explain what those
10 sanctions are and how they've evolved over the years.
11       The evidence will show that Hakan Atilla knew the U.S.
12 sanctions regime and generally understood it. Halkbank and
13 Hakan Atilla wanted to comply with U.S. sanctions and OFAC's
14 rules. They didn't want to be cut off, as I say, from the U.S.
15 banks. Halkbank isn't regulated, is not regulated, by OFAC.
16 And OFAC never notified Hakan Atilla or Halkbank that it was
17 investigating the bank for sanctions violations. To the
18 contrary, OFAC continually praised Halkbank for its help. And
19 Halkbank is known to OFAC as Turkey's main channel for trade
20 with Iran. And OFAC knew that the bank took its responsibility
21 seriously. Hakan Atilla met and communicated with OFAC, but
22 these contacts by and large were often for educational
23 purposes.
24       Halkbank didn't hide from OFAC. How could it?
25 Everyone knew that Iran and Turkey share a common border. And

| Hbs3ati3 | Opening - Mr. Rocco | Page 63 |

1  they also know, knew that Halkbank regularly sought guidance
2  from OFAC with respect to changing rules and with respect to
3  certain transactions. If a transaction raised a question,
4  Halkbank raised it with OFAC. Halkbank continually brought
5  things to OFAC's attention. Where are they hiding?
6        It was no secret that Halkbank facilitated
7  transactions with Iranian banks or that it was dealing with
8  Reza Zarrab. OFAC knew that, but never put Zarrab on the
9  sanctions list. Hakan Atilla suggested in a meeting with OFAC
10 in October of 2014 to put Reza Zarrab on the sanctions list.
11 As we stand here today, after Reza Zarrab has already pled
12 guilty to violating sanctions, guess who is still not on the
13 sanctions list? Reza Zarrab.
14       Ask yourself with all the resources that the United
15 States has behind it, that OFAC and the Department of Treasury,
16 the United States Department of Treasury didn't know that Reza
17 Zarrab was violating U.S. sanctions, the very sanctions that
18 OFAC was created to enforce. If OFAC didn't know it, and if
19 OFAC was misled, how does the U.S. government, how does the
20 prosecution expect Hakan Atilla to have known it? Hakan Atilla
21 doesn't have the FBI at his disposal. Hakan Atilla doesn't
22 have the CIA at his disposal. He works for a bank in Turkey.
23 Ask yourself why is the double standard?
24       Standing in judgment of a fellow human being with a
25 family, a wife and son, in a court of law is a difficult thing

| Hbs3ati3 | Opening - Mr. Rocco | Page 64 |

1  to do. It requires you to decide facts that may result in
2  someone being punished under the law. It requires, I submit to
3  you, hard work, fortitude, and an openmindedness. Most of all,
4  it requires you to undertake what you do, keeping an open mind
5  and bearing in mind the presumption of innocence that Hakan
6  Atilla enjoys under the law. And at the same time, bearing in
7  mind the very high burden that the government has to prove
8  guilt beyond a reasonable doubt. As I say, and as Judge Berman
9  will instruct you, the burden that never shifts.
10       I submit to you that the government's evidence in this
11 case will not meet that high burden.
12       Just one last word. There is a great monument to
13 freedom a couple of blocks away from here, The Freedom Tower,
14 and we know, all of us know what happened there. That tower,
15 as magnificent as it is, in comparison to the monument to
16 freedom and democracy that's represented by this courthouse,
17 this courtroom, where justice is meted out, by a jury, every
18 day, without fear or favor, is the greatest monument to me that
19 exists in our democracy and to our freedoms.
20       You've sworn, you've taken an oath this morning and
21 sworn to judge Hakan Atilla on the basis of evidence that's
22 produced in this courtroom alone. If you were charged, you
23 would have the right to expect nothing less than that if you
24 were on trial. I ask you to honor that oath. Thank you.
25       Thank you, Judge.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

HBS3ATl5                                              Page 117

1   earlier allowed the testimony, so the government indicated at
2   that time that they would try and be as non-duplicative as
3   possible. So we'll have the jury and see if they're there.
4           MR. LOCKARD: Your Honor, would you like the witness
5   to start back up in the stand?
6           THE COURT: You can since it's a witness that's
7   already been called.
8           (Continued on next page)

HBS3ATl5           Palluconi - Direct                 Page 118

1           (Jury present)
2           THE COURT: We're going to have our witness and we'll
3   pick up with the direct examination.
4           THE DEPUTY CLERK: Ma'am, before we begin I'd like to
5   remind you that you're still under oath.
6           Thank you.
7   BY MR. LOCKARD:
8   Q. Good afternoon, Ms. Palluconi.
9   A. Good afternoon.
10  Q. Why don't we start where we left off before the lunch
11  break. We were talking about certain designations that OFAC
12  has made pursuant to the Weapons of Mass Destruction
13  Proliferators Sanction Program. And we had just looked at some
14  designations made in 2007 of Iran's IRGC and Bank Mellat.
15          THE COURT: Do you all have it on your screen?
16          A JUROR: No.
17          THE COURT: I don't either.
18          MR. LOCKARD: I think it's revving up.
19          THE COURT: Okay. There we go.
20          MR. LOCKARD: Thank you, Mr. Chang-Frieden.
21  Q. All right. So, under the Weapons of Mass Destruction
22  Proliferators Program, what happened with respect to the
23  National Iranian Oil Company in 2012?
24  A. So in September, the National Iranian Oil Company, or NIOC,
25  was identified by OFAC as an agent or affiliate of the IRGC,

HBS3ATl5           Palluconi - Direct                 Page 119

1   that's Iran's Islamic Revolutionary Guard Corps.
2   Q. What, if any, steps did the OFAC take as a result of
3   identifying NIOC as an agent or affiliate of the IRGC?
4   A. So the SDN list was updated to reflect that NIOC was an
5   agent or affiliate of the IRGC, and a special tag was put on
6   the SDN list so the regulated public could be aware of this.
7   Q. So now let's talk about 2013. And what happened in 2013
8   with respect to NICO?
9   A. So following NIOC's identification, they were further
10  designated under the Executive Order 13382, and following that,
11  because NICO is owned or controlled by NIOC, NICO was likewise
12  designated under Executive Order 13382, and its property and
13  interest in property was blocked under that order.
14  Q. So, we've touched on NICO previously and the fact it was
15  identified as part of the government of Iran under a separate
16  OFAC identification. When you say that NICO is owned or
17  controlled by the National Iranian Oil Company, very generally
18  speaking, what is NICO?
19  A. So, NICO was basically a foreign trade arm of NIOC. So
20  facilitating a trade of petroleum products outside of Iran.
21  Q. Have various individuals and officers affiliated with NICO
22  also been designated, been placed on the SDN list?
23  A. Yes.
24  Q. So, we've been discussing a series of sanctions regulations
25  targeting things like blocking property in the United States or

HBS3ATl5           Palluconi - Direct                 Page 120

1   prohibiting the export of services out of the United States or
2   the import of those services into the United States.
3           Is there another type of sanctions program that OFAC
4   implements and administers?
5   A. Yes. So the comprehensive trade embargo that we were
6   talking about shorthanded by calling it primary sanctions as
7   opposed to a different type of sanction that OFAC administers,
8   which is the so-called secondary sanctions.
9   Q. What is the difference between a primary sanctions program
10  and a secondary sanctions program?
11  A. So, a secondary sanctions program principally targets the
12  activity of non-U.S. persons conducted outside of the United
13  States or outside the involvement of any U.S. persons. And if
14  a, for example, if the Treasury Departments determines that
15  certain activity, certain sanctionable activity has occurred,
16  then they can cut off that foreign party from access to the
17  United States. Principally the financial system for the
18  authorities that Treasury administers.
19  Q. So in other words, if that entity engages in transactions
20  that do not go through the United States but nonetheless fall
21  under a category of sanctioned conduct, OFAC can take what
22  kinds of steps?
23  A. So, for example, the secondary sanctions we have in the
24  banking sector, if OFAC were to determine that the sanctionable
25  conduct occurred, it could issue such determination and with

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                              *November 28, 2017*

1  respect to a foreign bank, for example, that engaged in that
2  activity, they could put them on a special list called a 561
3  list, and that basically says that that foreign bank can no
4  longer -- well, it prohibits U.S. financial institutions for
5  holding correspondent or payable-through accounts for that
6  foreign bank.
7      MR. HARRISON: I couldn't hear part of the answer.
8      (The record was read)
9  Q.  When you say correspondent account or a payable-through
10  account, on a very general level, what kind of account is that?
11  A.  It is essentially when a U.S. bank holds an account for a
12  foreign bank and it enables that foreign bank to process
13  payments through that account or hold deposits in the account.
14  A payable-through account similarly is a correspondent account,
15  but it enables them direct or indirect access for the customers
16  of that foreign bank to likewise float transactions through the
17  U.S.
18  Q.  So, has OFAC implemented secondary sanctions relating to
19  Iranian, specifically its oil industry?
20  A.  Yes.
21  Q.  And its financial industry?
22  A.  Yes.
23  Q.  So let's look at the next slide.
24      Generally speaking, what are the statutes, executive
25  orders, and other authorities that are listed in this slide.

1  A.  So this slide outlines a variety of secondary sanctions
2  under either statutory authority or executive order.
3  Q.  So let's take them one by one.  Starting with the
4  December 11, 2011 statute called the 2012 National Defense
5  Authorization Act.  What is this act, the NDAA, say about
6  secondary sanctions with respect to Iran?
7  A.  So it would require these prohibitions or the conditions on
8  U.S. correspondent or payable-through accounts of foreign banks
9  if OFAC were to determine that the foreign bank has knowingly
10  conducted or facilitated a significant financial transaction
11  with the Central Bank of Iran or any designated financial
12  institution.
13  Q.  Are there exceptions to this sanctions program?
14  A.  There's two principal exceptions under this sanctions
15  program.  The first is for transactions in the sale of food,
16  medicine or medical devices to Iran.  So a foreign bank that
17  engages in those transactions would not be subject to these
18  sanctions on the basis of those transactions.
19      The second category is transactions by foreign banks
20  in countries that have been determined to significantly reduce
21  their purchases of Iranian crude oil.
22  Q.  Is the exception related to food, medicine and medical
23  devices, is that found in other places in the Iran sanctions
24  program?
25  A.  It is.  So, under our primary sanctions, for example, the

1  prohibitions of U.S. persons and activity in the U.S., there
2  are what we call general licenses, they're authorizations that
3  enable the sale of similar commodities by U.S. persons to Iran
4  either if they fall under that general license or there is a
5  provision where parties could write in and ask for a specific
6  license from OFAC for a particular transaction or set of
7  transactions.
8  Q.  Why is there, generally speaking, an exception for trade
9  involving food, medicine or medical devices?
10  A.  Essentially it extends from a policy, foreign policy to
11  enable these types of transactions for the Iranian people.
12  Q.  Let's look at the next authority in this timeline,
13  Executive Order 13622.  Does that order from July of 2012
14  obtain provisions relating to secondary sanctions on Iran?
15  A.  It does.
16  Q.  Advance to the next slide.  What kind of secondary
17  sanctions does this executive order have specifically with
18  respect to the petroleum industry?
19  A.  So, this executive order, which builds upon the foundation
20  of secondary sanctions, has the same sort of prohibitions on
21  the opening or maintaining of correspondent or payable-through
22  accounts if the foreign bank is determined to have knowingly
23  conducted or facilitated a significant financial transaction
24  for NIOC or NICO or for petroleum purchases from Iran.
25  Q.  How does this provision differ from the provision that we

1  looked at under the NDAA relating to Central Bank of Iranian
2  designated banks?
3  A.  So the NDAA focused on particular banks being involved in
4  the transaction.  Either the Central Bank of Iran or
5  designated -- a designated Iranian bank.  Here, this builds
6  upon it sort of filling a gap that even if these Iranian
7  financial institutions weren't involved, if it involves sales
8  by NIOC or NICO or any other entity that's for petroleum
9  purchases from Iran, this would expose that activity to
10  secondary sanctions.
11  Q.  Are there also exceptions to this sanctions provision under
12  the July 2012 executive order?
13  A.  Yes.
14  Q.  What are those?
15  A.  So these are the same two, from a substantive perspective,
16  the same two exceptions that we just discussed.  The first is
17  for the sale of food, medicine or medical devices to Iran.  And
18  the second is for transactions by foreign banks in countries
19  that have been determined to have significantly reduced their
20  purchases of Iranian crude oil.
21  Q.  What, if any, relationship is there between Executive Order
22  13622 and the IEEPA, the statute that we talked about in your
23  testimony this morning?
24  A.  So Executive Order 13622 is promulgated under the authority
25  of IEEPA as an executive order issued by the president.  So it

**A350**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1 sanctions as part of lots of different issues that I covered
2 from an international trade lawyer perspective.
3 Q. So it's fair to say that -- my point is simple. It took
4 you some period of time as a trained lawyer to understand these
5 sanctions regime; am I correct?
6 A. I think to be an expert. I would say I came into OFAC
7 understanding the premise of the sanctions regime, but not how
8 the president issues an executive order or -- things from an
9 administrative law perspective that I had to learn once I
10 joined the legal team supporting OFAC.
11 Q. Is it fair to say that in explaining to others the
12 sanctions regime itself, that took you some time to acquire
13 that as a separate skill?
14 A. I don't think so.
15 Q. Have you, in the course of learning the sanctions, is it
16 also true that the sanctions regime is changing?
17 A. Yes, that's accurate.
18 Q. I think you testified on direct examination that in the
19 period of 2012-2013, it had changed. Am I correct?
20 A. Yes, that's correct.
21 Q. Part of your learning the sanctions regime is keeping up
22 with what I'll describe as an evolving set of rules?
23 A. That's correct.
24 Q. And you do that how, Ms. Palluconi?
25 A. Well, as an agency lawyer responsible for helping the

1 agency craft regulations and craft guidance, it's working,
2 working through the authorities, taking the statute, and
3 helping advise what was my client at the time, OFAC, develop
4 the guidance for the regulated community, for the public to
5 explain those statutory sanctions, to develop the regulations
6 for the public so they understand what the requirements are.
7 Q. Is it fair to say that OFAC doesn't regulate foreign banks?
8 A. So OFAC is not a banking regulator, that's correct.
9 Q. But OFAC interacts with foreign banks, foreign financial
10 institutions; am I correct?
11 A. That's correct.
12 Q. And OFAC regularly interacts with foreign banking
13 institutions; is that correct?
14 A. That's accurate.
15 Q. In dealing with foreign banking institutions, is it OFAC's
16 mission to help foreign banks understand the sanctions regime?
17 A. I think that's part of its mission.
18 Q. Does OFAC do that by -- is there a formal discourse? Is
19 there a way that a foreign bank interacts with OFAC in terms of
20 training? Are there formal training seminars?
21 A. So one group within OFAC is called our compliance group.
22 Among other things that they are charged with outreach
23 principally to banks. They have relationships with U.S. banks,
24 with banks all over the world. One avenue for informal
25 outreach and discussion and training, they have a hotline where

1 they answer questions, for example. They have an e-mail
2 account where they issue guidance informally via e-mail for
3 questions that come in.
4 Q. I think you mentioned something called FAQs on your direct
5 examination. What are the FAQs?
6 A. So these are frequently asked questions. This is one
7 mechanism that OFAC uses to issue guidance to the public. It's
8 published on our website.
9 Q. Does OFAC issue FAQs with respect to the Iranian sanction
10 regime?
11 A. Yes.
12 Q. Does OFAC keep count of the number of FAQs that it issues
13 on the Iranian sanctions regime?
14 A. I know it keeps count across sanctions programs. I can't
15 recall if they counted up within each separate program.
16 Q. Am I wrong to say that there are approximately 400 FAQs for
17 the Iranian sanction regime alone?
18 A. I don't know the -- I don't know the exact number for Iran
19 alone. But a lot. Definitely a lot.
20 Q. Would it be in -- I don't want you to guess, but is it a
21 fair estimate that it's roughly 400?
22 A. I really don't recall. I haven't counted them up.
23 Q. When OFAC interacts with foreign banks, and is it fair to
24 say that they are giving guidance to foreign banks, that OFAC
25 will meet with foreign banks, OFAC representatives?

1 A. Yes, OFAC representatives have met with foreign banks.
2 Q. Both here in the United States and overseas?
3 A. I believe so, yes.
4 Q. Is that something that you do?
5 A. In the counsel's office, no, not normally.
6 Q. It would be fair to say that you've never met Mr. Atilla?
7 A. Not that I recall, no.
8 Q. Have you ever met with representatives of Halkbank?
9 A. No, not that I recall.
10 Q. As part of your direct testimony, I think that you
11 identified a series of entities that were pursuant to the ITSR
12 and to Executive Order 13599, specially designated by OFAC.
13 Among those organizations were Bank Sarmayeh. Do you recall
14 that?
15 A. Yes, I believe that was on the list.
16 Q. Was Bank Sarmayeh identified as an arm or part of the
17 Iranian government?
18 A. I would have to go back to that determination. But it's --
19 13599 blocks Iranian financial institutions, and it's
20 definitely an Iranian financial institution.
21 Q. Does that mean it's owned or controlled by the government
22 of Iran?
23 A. Not necessarily.
24 Q. So, what other way would it be designated pursuant to
25 Executive Order 13599?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

| HBS3ATI5 | Palluconi - Cross | Page 145 |
|---|---|---|

1  A.  So we use the term "identify" because they meet the
2  definition.  They're already blocked under the definition.
3  OFAC identifies these entities just to be helpful.
4       There were two different bases within that executive
5  order.  One is to be the government of Iran, or the other is to
6  be an Iranian financial institution.  And obviously it is an
7  Iranian financial institution.  I don't recall if OFAC further
8  made a determination on whether it was the government of Iran.
9  Q.  The sanctions regime, under the sanctions regime there is
10  nothing illegal about, let's say, Halkbank, a Turkish bank,
11  doing business with Bank Sarmayeh, correct?  It's not a
12  violation of the law?
13  A.  As long as it doesn't involve the U.S. financial system or
14  U.S. persons.
15  Q.  Precisely.  And in fact, all those entities that you
16  identified on that slide, NIOC, NICO, Bank Mellat, there is
17  nothing illegal or unlawful about Turkish banks dealing with
18  those entities, provided that they do not involve a U.S.
19  financial institution.  Am I correct?
20  A.  Well, could be sanctionable.
21  Q.  Okay.  But sanctionable is not -- sanctionable, you correct
22  me if I'm wrong, sanctionable isn't unlawful or illegal.  Am I
23  correct?
24  A.  Tell me what you mean by "unlawful."
25       THE COURT:  Now we're going the wrong way.

| HBS3ATI5 | Palluconi - Cross | Page 146 |
|---|---|---|

1       MR. ROCCO:  Thank you, Judge.  I understand.  And I
2  think a lot of her testimony came very close to that line.
3       THE COURT:  Let's pick up from here.
4  Q.  I believe you testified that Turkey qualified for an
5  exemption under the reduced petroleum purchase exemption; am I
6  correct?
7  A.  Yes, significantly reduced.
8  Q.  That's a determination that was made by OFAC?
9  A.  By the State Department.
10       (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HBSPATI6 | Palluconi - Redirect | Page 147 |
|---|---|---|

1  Q.  And the State Department then reports that to OFAC?
2  A.  They publish it.  Certainly on their website and maybe also
3  on the federal register.
4  Q.  Oaky.
5       MR. ROCCO:  Your Honor, just one second.
6       (Pause)
7       It was a pleasure.  Thank you.  It was nice meeting
8  you.
9       THE COURT:  Thanks very much.
10       MR. ROCCO:  Thank you, your Honor.
11       THE COURT:  Any further questions?
12       MR. LOCKARD:  Just very briefly, your Honor.
13  REDIRECT EXAMINATION
14  BY MR. LOCKARD:
15  Q.  So, Ms. Palluconi, Mr. Rocco had asked you some questions
16  about Bank Sarmayeh, and Bank Sarmayeh was identified as an
17  Iranian financial institution, was not designated under the
18  sanctioning program; is that right?
19  A.  Right.  The Executive Order 13599 is not a designation.  It
20  doesn't have to be designation because it's already blocked by
21  our regulation by the definition of an Iranian financial
22  institution.
23  Q.  And I think as you testified on direct, the Iranian
24  National -- the National Iranian Oil Company and the Naftiran
25  Intertrade Company, NIOC and NICO, both of them were

| HBSPATI6 | Palluconi - Recross | Page 148 |
|---|---|---|

1  designated; is that right?
2  A.  They were both identified and then later designated.  They
3  were identified as the government of Iran by OFAC, and then
4  later designated under our executive order for weapons of mass
5  destruction proliferators and their supporters.
6  Q.  So with the secondary sanctions relating to financial
7  transactions for or on behalf of a designated entity, would
8  those apply to transactions that Bank Sarmayeh conducted for
9  NIOC or NICO?
10  A.  If it were on behalf of them.  So, again, the criteria is
11  that the foreign bank knowingly conducted significant
12  transactions.  So if the foreign bank was aware, it had
13  knowledge or reason to know, then they could be subject to
14  sanction.
15       MR. LOCKARD:  Nothing further, your Honor.
16       THE COURT:  Is that it?  We will excuse the witness
17  then and ask for the government's next witness.
18       MR. ROCCO:  Your Honor, I just have one second before
19  we leave this witness.
20       (Pause)
21       Your Honor, if I may?
22  RECROSS EXAMINATION
23  BY MR. ROCCO:
24  Q.  Ms. Palluconi, have you read the indictment in this case?
25       THE COURT:  Is this the subject of the redirect?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1  on the Islamic Revolutionary Guard and Iran's export of
2  advanced weaponry.
3  Q.  So I want to talk now a little bit about the Islamic
4  Revolutionary Guard Corps, which you've mentioned a number of
5  times.  So first of all, does this page, page 6, reflect when
6  the IRGC was designated?
7  A.  Yes.  The IRGC was designated in 2007.  It was
8  designated -- the IRGC was designated for its role in
9  proliferation activities and the IRGC Quds force, which is its
10  overseas arm through which it conduct the majority of terrorist
11  activities.  It was also designated at the same time for
12  terrorism.
13  Q.  Mr. Dubowitz, you mentioned earlier, when you were talking
14  about the role of the Iranian government in the Iranian
15  economy, the role played by the Islamic Revolutionary Guard
16  Corps.  What is the Guard Corps' role with respect to the
17  Iranian economy?
18  A.  The Guard Corps is a major player in the Iranian economy.
19  There are estimates that it controls somewhere between 20 and
20  40 percent of the economy, and that its annual income may be as
21  high as a-sixth of Iran's total GEP.  It's heavily involved in
22  the financial sectors, commercial sectors, extensive interest
23  in construction, and energy and the defense industries.  It
24  controls billions of dollars in companies and corporate
25  businesses.

1          And the IRGC controls, either directly or in
2  cooperation with the numerous defense companies, about
3  20 percent of the Tehran Stock Exchange, which is Iran's main
4  stock exchange.  So extensive corporate, economic and financial
5  holdings in Iran.
6  Q.  When you say that the Islamic Revolutionary Guard Corps
7  controls companies, are you talking about formal or informal
8  control?
9  A.  Both, actually.  So they have formal control through
10  shareholding, through a presence on boards of directors.  They
11  also have informal control and significant influence through
12  the placement of key personnel in companies, and also the role
13  of the IRGC, given its formidable strength and rivalship in
14  Iran, there are indirect ways that the IRGC can persuade and
15  influence how economic decisions are made and how contracts are
16  given.
17  Q.  So you mentioned particular individuals.  Do members of the
18  IRGC play any notable role in the Iranian economy?
19  A.  They do.  Many IRGC commanders, former commanders take
20  positions in the economy, in major state-owned entities, in the
21  energy sector, and financial sector throughout Iran's economy,
22  particularly in the more strategic sectors of the economy, the
23  lucrative and important sectors to Iran's overall industrial
24  growth and its national security.
25          And these current and former IRGC commanders have

1  significant influence over the economy, as well as many of them
2  get very wealthy in those positions.
3  Q.  Are you familiar with a man named Rostam Ghasemi?
4  A.  Yes, I am.
5  Q.  And who is Rostam Ghasemi?
6  A.  So Rostam Ghasemi is also one of the IRGC commanders that I
7  mentioned earlier.  He was former head of the IRGC conglomerate
8  called Khatam al-Anbiya, KAA.  He was also the former Minister
9  of Petroleum between 2011 and 2013.
10  Q.  If we can go to the next page, please.  What is the
11  significance of the Ministry of Petroleum in Iran?
12  A.  One of Iran's most important ministries because of the
13  significant role that petroleum plays in Iran's economy; so
14  it's a significant ministry in controlling Iran's oil
15  production, in making decisions about foreign firms and their
16  investment in the energy sector, and is involved in decisions
17  on Iran's export of oil and natural gas.  So it's a significant
18  ministry with a lot of influence.
19  Q.  When you say that it's a significant ministry, given the
20  role of petroleum in Iran's economy, can you tell us a little
21  bit more about the role that oil production and exportation
22  plays in Iran's economy?
23  A.  So oil, both production and export, comprise somewhere in
24  the neighborhood of 20 to 25 percent of Iran's total GEP.  Iran
25  is a significant natural gas producer, maybe the second largest

1  natural gas reserves in the world, mostly after Russia, third
2  or fourth oil reserves in the world; so Iran is a major energy
3  player.  It's a member of OPEC.  The ministry of petroleum is,
4  again, a significant role for anybody to have in the Iranian
5  regime, the Iranian elite, where you can wield enormous
6  influence.
7          MR. DENTON:  Your Honor, may I approach?
8          THE COURT:  Sure.
9  Q.  Showing you what's been marked as Government Exhibit 6,
10  Mr. Dubowitz, do you recognize Government Exhibit 6?
11  A.  I do.  That's Rostam Ghasemi, who is the former Minister of
12  Petroleum for the government of Iran.
13          MR. DENTON:  The government offers Government
14  Exhibit 6.
15          THE COURT:  I'll allow it.
16          MR. HARRISON:  Same objection.
17          THE COURT:  I'll allow it.
18          (Government's Exhibit 6 received in evidence)
19  BY MR. DENTON:
20  Q.  Mr. Dubowitz, is there a particular company responsible for
21  oil production in Iran?
22  A.  There is.  It's the National Iranian Oil Company, or NIOC,
23  N-I-O-C.
24  Q.  So what is the National Iranian Oil Company?
25  A.  So that's the state-owned company that is overseen by the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 28, 2017

1   Minister of Petroleum, and it's responsible for oil and natural
2   gas production and distribution.
3   Q.  And why is oil and natural gas production and distribution,
4   as you were describing it earlier, particularly important to
5   Iran's economy?
6   A.  Iran is a major player in energy markets, natural gas
7   markets, oil markets.  It exports today about two-and-a-half
8   million barrels a day of crude oil.  It's involved in natural
9   gas development and increasingly in natural gas export to
10  regional markets, and it's the source of a significant percent
11  of Iran's overall national wealth.
12  Q.  You referred a number of times to the export of energy
13  products by these companies.  What is the significance of the
14  fact that Iran is exporting oil and natural gas?
15  A.  Well, Iran has been involved in global energy markets; so
16  it operates overseas.  It exports oil to major economies like
17  the European Union, to China, to Japan, South Korea, and there
18  was a period of time where sanctions were particularly
19  impactful.  It had a significant impact on Iran's ability to
20  export oil and natural gas and created serious economic
21  difficulties for the Iranian government.  So if Iran can't
22  export its oil and natural gas, if it can't actually
23  participate in energy markets, it has a significant impact on
24  the Iranian government.
25  Q.  What is the currency of Iran?

1   A.  The currency is rial.
2   Q.  Is the Iranian rial a currency that is used in global
3   energy markets?
4   A.  It is not.
5   Q.  What currencies are typically used in global energy
6   markets?
7   A.  The most important currency is the U.S. dollar; so majority
8   of trade in global energy markets is denominated in U.S.
9   dollars but also the European -- the Euro, the Swiss franc are
10  used as alternatives, but the U.S. dollar is the most
11  important.
12  Q.  And why are those currencies used and not the rial?
13  A.  The major reason is those currencies are fully convertible
14  into other currencies.  So you're able to exchange the U.S.
15  dollar with every currency in the world.  The rial is not
16  convertible.
17          They are also very reliable currencies.  The U.S.
18  dollar does not fluctuate wildly; so it's a fairly dependable
19  and predictable currency.  Whereas, the Iranian rial has
20  fluctuated significantly over a number of years, certainly I've
21  been analyzing this.  And there are very deep U.S.
22  dollar-denominated capital markets.  So in terms of equity
23  markets and debt markets, there's a significant percentage of
24  those markets that is denominated in the U.S. dollar.
25  Q.  So we've been talking about that National Iranian Oil

1   Company.  Is there also a particular company principally
2   responsible for natural gas production in Iran?
3   A.  There is.  It's the National Iranian Gas Company, the NIGC.
4   Q.  Can we go to the next page, please.  And, again, what is
5   the NIGC?
6   A.  So it's a state-owned company, like the National Iranian
7   Oil Company, except it's responsible for the sale and export of
8   natural gas, and it's heavily involved in Iran's natural gas
9   production, as well as looking at natural gas domestic
10  consumption and increasingly expanding Iran's ability to export
11  its natural gas.
12  Q.  And, again, have both the NIOC and the NIGC been designated
13  under U.S. sanctions laws?
14  A.  They have.
15  Q.  Mr. Dubowitz, are you familiar with a concept of a front
16  company?
17  A.  I am.
18  Q.  What is a front company?
19  A.  A front company is used to disguise or hide the role of a
20  designated company, a sanctioned company in a trade.  So if you
21  want to do a business transaction but you want to obscure the
22  role of the sanctioned company, you would create what is known
23  as a front company, which would be set up for the purposes of
24  hiding and obscuring that role.
25  Q.  Do the National Iranian Oil Company and the National

1   Iranian Gas Company ever use front companies in connection with
2   their operations?
3   A.  They do.
4   Q.  Why do they use front companies?
5   A.  So they would use front companies because both the National
6   Iranian Oil Company and the National Iranian Gas Company were
7   sanctioned under U.S. law, and so in order to do a transaction,
8   especially during a certain time period when these sanctions
9   were applied internationally, they set up front companies,
10  overseas front companies.  They could then operate and sell oil
11  and do these kinds of deals and hide the role of the original
12  sanctioned company in that transaction.
13  Q.  If we could go to the next page, please.
14          Mr. Dubowitz, what are the companies listed here?
15  A.  So there are three companies, Naftiran Intertrade Company,
16  which is known as NICO; Naftiran Intertrade Company Sarl, NICO
17  Sarl; and Hong Kong Intertrade Company known as HKICO.
18  Q.  And what, if any, relationship do these companies have to
19  the NIOC and NIC that you were just talking about?
20  A.  So all three of them are subsidiaries of the National
21  Iranian Oil Company.
22  Q.  Have these companies been designated under U.S. sanctions?
23  A.  Yes.
24  Q.  Why have they been designated?
25  A.  They were designated originally back in 2008 because they

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                                            November 28, 2017

| HBSPATI6 | Dubowitz - Direct | Page 173 |
| --- | --- | --- |

1  were owned or controlled by the government of Iran, and then
2  HKICO was known as an a NIOC front company in 2012, and then
3  NICO was designated in 2013 because it was owned or controlled
4  by the National Iranian Oil Company, which itself had been
5  designated because of its role in supporting proliferation.
6  Q.  And based on your research and expertise, what did these
7  companies do for the parent entity, the National Iranian Oil
8  Company?
9  A.  So they serve as a overseas trading arm.  They provide the
10  parent company with access to foreign exchange and foreign
11  exchange funding in hard currency.  And so their role is really
12  to help facilitate these trades, help to finance these trades,
13  and increasingly as the parent company was sanctioned, obscure
14  the role of the parent company in these overseas activities.
15  Q.  When you say hard currency, what do you mean by that?
16  A.  Hard currency would be convertible currencies like the U.S.
17  dollar or the Euro, currencies that are reliable, easily
18  convertible and accepted worldwide.
19  Q.  And so in describing the role of these companies as to
20  provide foreign exchange in hard currency for the NIOC, why
21  does the NIOC need foreign exchange or hard currency?
22  A.  So the NIOC needs hard currency to pay for anything that it
23  wants to import from around the world.  So if NIOC, or really
24  the Iranian government in general, wants to buy anything from
25  overseas companies, those companies don't want to be paid in

| HBSPATI6 | Dubowitz - Direct | Page 174 |
| --- | --- | --- |

1  rials.  They want to be paid in dollars or Euros, and so these
2  overseas arms of the National Iranian Oil Company, their job is
3  to go out and ensure if Iran is selling its oil or natural gas,
4  that it gets access to dollars or Euros, to hard currency that
5  it can either use to buy what it needs and/or send that money
6  back to Iran so the Iranian government has access to hard
7  currency for its own economic needs.
8  Q.  If we could go to Page 12, please.  Just shifting gears
9  briefly for a moment.  Mr. Dubowitz, what is Mahan Air?
10  A.  So Mahan Air is one of Iran's largest commercial airlines.
11  Q.  And has Mahan Air been designated under U.S. sanctions
12  laws?
13  A.  It has.  It was designated in 2011 under executive order
14  13224 for providing support to the Iranian Revolutionary Guard
15  Quds force, which the airline was sending weapons and funds and
16  personnel to Syria and to Iraq, and so it was designated for
17  its support for terrorism.
18       MR. DENTON:  Your Honor, I don't know if you were
19  intending to take an afternoon break.  If we were, this would
20  be a good point or I'm happy to continue.
21       THE COURT:  Is that a polite way of asking for a
22  break?
23       MR. DENTON:  I just wanted to flag this as a breaking
24  point.
25       THE COURT:  I'm happy to take five minute if the jury

| HBSPATI6 | Dubowitz - Direct | Page 175 |
| --- | --- | --- |

1  wants to.  We'll take a five-minute break.
2       (Jury not present)
3       THE COURT:  Okay.  We'll take five minutes.
4       (Recess)
5       (Continued on next page)

| HBSPATI6 | Dubowitz - Direct | Page 176 |
| --- | --- | --- |

1       (At the side bar)
2       THE COURT:  It's juror No. 8.  These are my notes from
3  when you all picked her, but she says that she has to go to
4  school three days a week and works two days a week.  She did
5  say she had no spare time in answer to that question.
6       MR. ROCCO:  And I remember --
7       THE COURT:  So she wanted to be out this morning.  We
8  said -- I said that, no, you'd have to stay for today, and I
9  would discuss it.  In part, I did that because I don't want to
10  encourage anybody else thinking, oh, I'll just come in and say
11  to the judge it's just not working for me, kind of thing;
12  so....
13       MR. ROCCO:  I do remember -- I do better remembering
14  faces, your Honor.  I'd like to see her again, but I think I
15  have no objection to letting her go.
16       THE COURT:  We have plenty of alternates.
17       MS. FLEMING:  You should never keep anybody on a jury
18  that doesn't want to be here.
19       MR. ROCCO:  Well, I'd like to see her.
20       THE COURT:  I think that's fair.  And would you take a
21  look also at juror number --
22       MR. ROCCO:  17?
23       THE COURT:  We have 18.  Yeah, the guy who's been two
24  down from her or three.  Yeah, juror No. 11.  So I have
25  personally noticed he's asleep almost the entire time,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    November 28, 2017

Page 205

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                              Page
 3    JAMES ATWATER
 4   Direct By Mr. Kamaraju . . . . . . . . . . . .68
 5   Cross By Mr. Rocco . . . . . . . . . . . . . .76
 6    LISA PALLUCONI
 7   Direct By Mr. Lockard . . . . . . . . . . . .92
 8   Cross By Mr. Rocco . . . . . . . . . . . . . 138
 9   Redirect By Mr. Lockard . . . . . . . . . . 147
10   Recross By Mr. Rocco . . . . . . . . . . . . 148
11    MARK DUBOWITZ
12   Direct By Mr. Denton . . . . . . . . . . . . 150
13                  GOVERNMENT EXHIBITS
     Exhibit No.                             Received
14    1  . . . . . . . . . . . . . . . . . . . . .70
15    75   . . . . . . . . . . . . . . . . . . . .71
16    1600, 1800   . . . . . . . . . . . . . . . .73
17    70   . . . . . . . . . . . . . . . . . . . .75
18    8041   . . . . . . . . . . . . . . . . . . 137
19    8001   . . . . . . . . . . . . . . . . . . 155
20    9  . . . . . . . . . . . . . . . . . . . . 159
21    10   . . . . . . . . . . . . . . . . . . . 161
22    6  . . . . . . . . . . . . . . . . . . . . 168
23    4  . . . . . . . . . . . . . . . . . . . . 187
24    2  . . . . . . . . . . . . . . . . . . . . 196
25    3, 5, 7   . . . . . . . . . . . . . . . . . 198
```

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

---

*CORRECTED*

*November 29, 2017*

---

*Southern District Court Reporters*

Original File HBT3ATIF -corrected.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

**CORRECTED**
November 29, 2017

---

HBTPATI1                                              Page 206

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4          v.                       S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6               Defendant.
 7   ------------------------------x
 8
 9                               November 29, 2017
                                      9:15 a.m.
10
11
12   Before:
13               HON. RICHARD M. BERMAN,
14                                 District Judge
15                                  and a jury
16
17               APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

---

HBTPATI1                                              Page 207

```
 1
 2          (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
            - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
            - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                      Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

---

HBTPATI1                                              Page 208

1   (Trial resumed.  Jury not present)
2   (At the side bar)
3   THE COURT: I don't know whose issue it is.
4   MS. FLEMING: I think it's everybody's.
5   MR. ROCCO: MSNBC had a piece last night on Zarrab, a
6   long piece, more than a couple of minutes.  Now I didn't see it
7   directly, your Honor.  This has been reported to me.
8   THE COURT: On whose show?
9   MR. ROCCO: MSNBC.  I don't know which show, but I
10  know it was broadcast at least twice, and my concern is that
11  the jury saw it, and I'm asking that the Court inquire of the
12  jury this morning whether they've seen anything involving this
13  case on the media.
14  THE COURT: Okay.
15  MR. KAMARAJU: I mean, I think --
16  THE COURT: They have an instruction.
17  MR. KAMARAJU: I was going to say that it seems to me
18  the simplest thing would be --
19  THE COURT: That I gave to them every day.
20  MR. KAMARAJU: I think that the simple thing would be
21  if your Honor wants to instruct them again about media coverage
22  and don't follow it.  If somebody has seen it, they'll say.
23  MR. ROCCO: That's fine.
24  THE COURT: I will do that.  I'll do it at the end of
25  the day because they're not going to see it during the day, and

---

HBTPATI1                                              Page 209

1   I'll underscore it --
2   MR. ROCCO: Fine.
3   THE COURT: -- at that time.  How about that; is that
4   fair?
5   MR. ROCCO: Yes.
6   MS. FLEMING: I know Rachel Maddow did a very long
7   piece a couple of weeks ago, a whole segment on basically
8   Zarrab and the whole case.
9   THE COURT: Oh, really?
10  MS. FLEMING: Yes.  There was a big piece on it.
11  MR. ROCCO: The whole thing.  And the problem with
12  this is there's so much press from so many different angles.
13  Now it's about Flynn and what Zarrab is doing with Flynn.
14  THE COURT: Are you calling him?
15  MR. KAMARAJU: I will say that I don't anticipate any
16  testimony about Michael Flynn and, at most, he'll be in our
17  rebuttal case.
18  MS. FLEMING: You never know.  We may issue a subpoena
19  for him.
20  MR. ROCCO: If we're here long enough.
21  THE COURT: Did you have something?
22  MR. KAMARAJU: The only other thing, we had the
23  prospect of Mr. Zarrab diagramming.  Your Honor just wanted to
24  think about it, and I anticipate it may come up relatively
25  early this morning.  I just wanted to check.

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBT3ATI2 | Djahanbani - Cross | Page 258 |
|---|---|---|

1 Q. Not in any batch, sir?
2 A. I may have, yes.
3 Q. You may have? Do you recall that you did, sir?
4 A. No, not 100 percent.
5 MS. FLEMING: Thank you.
6 THE COURT: Okay. Thanks very much. We'll excuse the
7 witness. Thank you.
8 (Witness excused)
9 MR. KAMARAJU: Your Honor, this might be a good time
10 to take a quick break.
11 THE COURT: We'll take a quick break and I'll excuse
12 the jury and anybody else if they wish. Just two minutes.
13 (Recess)
14 (Jury present)
15 THE COURT: So we'll have the next government witness.
16 MR. KAMARAJU: Thank you, your Honor. The United
17 States calls Reza Zarrab.
18 May I proceed?
19 THE COURT: Hold on a second.
20 THE DEPUTY CLERK: Sir, I'm going to swear you in
21 first. If you can raise your right hand. Do you solemnly
22 swear or affirm that you will justly, truly, fairly and
23 impartially interpret these proceedings to the best of your
24 ability, so help you God?
25 THE INTERPRETER: I do.

| HBT3ATI2 | | Page 259 |
|---|---|---|

1 THE DEPUTY CLERK: Could you please state your name
2 for the record.
3 THE INTERPRETER: Tekin Esendal, T-E-K-I-N
4 E-S-E-N-D-A-L.
5 THE DEPUTY CLERK: Thank you, sir.
6 Sir, could you please stand and raise your right hand.
7 Do you solemnly swear or affirm that the testimony that you
8 shall give this Court and jury in this issue now on trial shall
9 be the truth, the whole truth, and nothing but the truth, so
10 help you God?
11 THE WITNESS: Yes, ma'am.
12 THE DEPUTY CLERK: Could you please state your name
13 for the record.
14 THE WITNESS: Reza Zarrab.
15 THE DEPUTY CLERK: Could you spell your first name as
16 well as your last name.
17 THE WITNESS: (In English) R-E-Z-A Z-A-R-R-A-B.
18 THE DEPUTY CLERK: Thank you, sir. You may be seated.
19 THE COURT: For the jury, Mr. Zarrab is going to speak
20 in Turkish and the gentleman to his right is going to translate
21 into English.
22 REZA ZARRAB,
23 called as a witness by the Government,
24 having been duly sworn, testified as follows:
25 DIRECT EXAMINATION

| HBT3ATI2 | Zarrab - Direct | Page 260 |
|---|---|---|

1 BY MR. KAMARAJU:
2 Q. Good morning, Mr. Zarrab.
3 A. Good morning, sir.
4 Q. Where were you born, sir?
5 A. In Iran, Tehran.
6 Q. Are you a citizen of Iran?
7 A. Yes, sir.
8 Q. How long did you live in Iran?
9 A. Approximately until I was a year and a half old.
10 Q. Where did you live after that?
11 A. In Turkey, and for a short period of time in Dubai.
12 Q. Are you a citizen of Turkey?
13 A. Yes, sir.
14 Q. Is there a Turkish version of your name that you go by?
15 A. Yes.
16 Q. What is that?
17 A. Reza Sarraf.
18 Q. Sir, in addition to the Turkish and Iranian citizenships,
19 do you hold any other citizenships?
20 A. Yes, I have, sir.
21 Q. What other citizenships do you hold?
22 A. I'm also a Macedonian citizen.
23 Q. How old are you, sir?
24 A. 34, sir.
25 Q. Are you married?

| HBT3ATI2 | Zarrab - Direct | Page 261 |
|---|---|---|

1 A. Yes, sir.
2 Q. Do you have any children?
3 A. I have a daughter.
4 Q. Where do your wife and daughter live?
5 A. In Istanbul, Turkey.
6 Q. Sir, do you speak English?
7 A. Yes, I do, but not perfectly.
8 Q. Is it your first language?
9 A. No, sir.
10 Q. What is your first language?
11 A. Turkish.
12 Q. Are you more comfortable today testifying with the
13 assistance of a Turkish interpreter?
14 A. Yes, of course.
15 MR. KAMARAJU: Your Honor, may I approach?
16 THE COURT: Yes.
17 Q. I'm showing you what has been marked as Government Exhibit
18 20 for identification.
19 Do you recognize that exhibit?
20 A. Yes.
21 Q. What is it?
22 A. My picture.
23 MR. KAMARAJU: Your Honor, the government offers
24 Government Exhibit 20.
25 THE COURT: I'll allow it.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

**CORRECTED**
November 29, 2017

| HBT3ATl2 | Zarrab - Direct | Page 262 |
|---|---|---|

1     MS. FLEMING: No objection.
2     (Government's Exhibit 20 received in evidence)
3     MR. KAMARAJU: Your Honor, may I publish Government
4  Exhibit 20?
5     THE COURT: Sure.
6     MR. KAMARAJU: Thank you.
7  Q. Sir, I'd like to direct your attention to March of 2016.
8  A. Yes, sir.
9  Q. Where were you living at that time?
10 A. Istanbul, Turkey.
11 Q. Did you travel to the United States during that month?
12 A. Yes, I did, sir.
13 Q. Where did you travel to?
14 A. From Istanbul to Miami.
15 Q. Were you traveling alone?
16 A. No, sir.
17 Q. Who were you traveling with?
18 A. Together with my family.
19 Q. What was the purpose of that trip?
20 A. A family vacation and also taking my daughter to
21  Disneyland.
22 Q. What happened when you arrived in the United States?
23 A. I was arrested.
24 Q. Who arrested you, sir?
25 A. FBI.

| HBT3ATl2 | Zarrab - Direct | Page 263 |
|---|---|---|

1  Q. Were you interviewed by the FBI agents after they arrested
2   you?
3  A. Yes, I was.
4  Q. Were you completely truthful with them during that
5   interview?
6  A. I did not, no.
7  Q. Why not, sir?
8  A. I did not know what I was facing, and after a long trip, I
9   was shocked and I -- I couldn't give the right answers.  I was
10  afraid.
11 Q. Sir, after you were arrested, were you interviewed by a
12  pretrial services officer in Miami?
13 A. Yes, in Miami, yes.
14 Q. Were you completely truthful during that interview?
15 A. Not exactly.  Not wholly.
16 Q. After you were arrested, did you hire attorneys to explore
17  whether you could be released pursuant to a prisoner exchange?
18 A. Within the legal limits, yes, of course.
19 Q. To your knowledge, did those attorneys in fact explore
20  those options?
21 A. Yes, sir.
22 Q. Were they successful?
23 A. No.
24 Q. Did there come a time when you met with the FBI again?
25 A. Yes, sir.

| HBT3ATl2 | Zarrab - Direct | Page 264 |
|---|---|---|

1  Q. How did that come to be?
2  A. After I decided to cooperate with the government, I had a
3  meeting with the FBI.
4  Q. At the time you began to cooperate with the government, had
5   Hakan Atilla already been arrested?
6  A. Yes, sir.
7  Q. Did anyone else attend those meetings?
8  A. My lawyers and the prosecution.
9  Q. Sir, have you pleaded guilty to any crimes in the United
10  States?
11 A. Yes, sir.
12 Q. What are those crimes?
13 A. I pled guilty to seven crimes.
14     (In English) Defrauding United States, violating IEEPA
15  sanctions, money laundering, conspiracy to money launder, bank
16  fraud, conspiracy for bank fraud, paying bribe for federal
17  prison guard.
18 Q. In connection with your guilty plea, did you enter into a
19  cooperation agreement with the United States?
20 A. Yes, sir.
21 Q. What do you understand your primary obligations to be under
22  that cooperation agreement?
23 A. Yes.
24 Q. What are those obligations?
25 A. Three main things:  To speak exactly the truth, to

| HBT3ATl2 | Zarrab - Direct | Page 265 |
|---|---|---|

1  cooperate with the United States government, never to commit
2   any crime after this.
3  Q. What is your understanding of what happens if you fulfill
4   those obligations?
5  A. Can I hear the question once more?
6  Q. Certainly.  What do you understand happens if you fulfill
7   your obligations under the cooperation agreement?
8  A. The government will write a 5K1 letter to the Court.
9  Q. What do you understand would be in that 5K letter?
10 A. All the crimes that I have committed, all the help that I
11  provided to the United States government, good and bad,
12  everything.
13 Q. Sir, why did you decide to cooperate?
14 A. Cooperation was the fastest way to accept responsibility
15  and to get out of jail at once.
16 Q. Has anybody promised you what your sentence will be?
17 A. Definitely not.
18 Q. Who will determine your sentence?
19     THE INTERPRETER: May I have that --
20 Q. Who will determine your sentence?
21 A. Honorable judge.
22 Q. What do you understand will happen if you don't fulfill
23  your obligations under the cooperation agreement?
24 A. The prosecution will not write the 5K1 letter.
25 Q. Could you be prosecuted for any additional crimes if you

**A360**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

HBT3ATI2      Zarrab - Direct      Page 266

1  don't testify truthfully?
2  A.  Yes, of course.
3  Q.  Sir, you testified earlier about hoping to get out of jail.
4  Are you currently in the custody of the Federal Bureau of
5  Investigation, the FBI?
6  A.  Yes, sir.
7  Q.  Are you monitored continuously by FBI agents?
8  A.  Yes, sir.
9  Q.  Do they have you staying in a hotel somewhere?
10  A.  No, sir.
11  Q.  Are you free to come and go as you please?
12  A.  Definitely not.
13  Q.  How long have you been held in the custody of the FBI?
14  A.  A couple of weeks.
15  Q.  Where were you before that?
16  A.  MDC Brooklyn jail.
17  Q.  Where were you before the MDC?
18  A.  MCC Manhattan jail.
19  Q.  Prior to being taken into FBI custody, have you been in
20  jail since the day you were arrested by the FBI?
21      Prior to having been taken into FBI custody a couple
22  of weeks ago, have you been in jail since the day you were
23  arrested by the FBI?
24  A.  Yes.
25  Q.  You testified that you pleaded guilty to bribing a federal

HBT3ATI2      Zarrab - Direct      Page 267

1  corrections officer.  Is that right?
2  A.  Yes, sir.
3  Q.  Could you please generally describe for the jury what made
4  you guilty of that crime.
5  A.  I bribed the prison guard to bring me alcohol and to let me
6  use his cell phone.
7  Q.  The other crimes that you pleaded guilty to --
8  A.  Yes.
9  Q.  Do those relate to a scheme to evade U.S. sanctions?
10  A.  Yes, sir.
11  Q.  Generally speaking, could you please describe what that
12  scheme was to the jury.
13  A.  I will try to explain it as best my knowledge and in the
14  simplest way.
15      The funds of Iranians which accumulated to gas and oil
16  sales, and on the other side the Iranians had the international
17  payment orders.  I received those orders, and I made their
18  international financial payments.  Their income from gas and
19  oil sales was accumulated in Halkbank.  Taking those moneys out
20  of Halkbank, I made the international payments.
21  Q.  Okay.  Sir, we'll talk about that scheme in a little more
22  detail.  But, looking around the courtroom, do you recognize
23  anyone who participated in that scheme with you?
24  A.  Yes, sir.
25  Q.  Could you please describe where that person is sitting.

HBT3ATI2      Zarrab - Direct      Page 268

1  A.  He's on the defense table.
2  Q.  Okay.  Could you please describe him by an article of
3  clothing that he's wearing.
4  A.  Yes.  He's wearing a gray suit, he has a dark red tie.
5      MR. KAMARAJU: Your Honor, would the record reflect
6  that Mr. Zarrab has identified the defendant.
7      THE COURT: Is he sitting next to counsel, to your
8  knowledge?
9      THE WITNESS: Yes.  Right there.
10      THE COURT: The record will so reflect that the
11  witness has identified Mr. Atilla.
12  BY MR. KAMARAJU:
13  Q.  What is the defendant's name?
14  A.  Hakan Atilla, Mr. Hakan Atilla.
15  Q.  Who is Hakan Atilla?
16  A.  He's the deputy general manager of Halkbank in Istanbul,
17  Turkey, and he's also the head of the international branch of
18  that bank.
19  Q.  Sir, what is Halkbank?
20  A.  It is a Turkish bank in Turkey.
21  Q.  Mr. Zarrab, generally speaking, how did Hakan Atilla help
22  you with the scheme that you described?
23  A.  I will try to explain in the simplest way.
24      To be able to realize the payments of the Iranians,
25  and to be able to take the money out of Halkbank, he helped

HBT3ATI2      Zarrab - Direct      Page 269

1  develop the method and the system that we used to improve the
2  system, and he made sure that the system and method worked.
3  Q.  Why did you need a system to withdraw money from Halkbank?
4  A.  Because the Iranians could not use the income they
5  developed from the oil and gas sales, they could not use that
6  money for their international payments.
7  Q.  When you say Hakan Atilla helped to design the system, what
8  do you mean?
9      MS. FLEMING: Objection, your Honor.
10      THE COURT: Overruled.
11  A.  Hakan Atilla is the most knowledgeable person about the
12  sanction rules in the bank.  He made contributions to make our
13  scheme look like it's complying with the American sanctions.
14  Q.  Okay.  We'll talk about those contributions in a little
15  more detail.
16      First I'd like to ask you some questions about
17  yourself.  Okay?
18  A.  Of course.
19  Q.  Before you were arrested in the United States, did you
20  work, sir?
21  A.  Yes, sir.
22  Q.  What did you do for work?
23  A.  I have a foreign exchange bureau, and I would do foreign
24  exchange transactions and money transfers.  Also construction
25  sector, I had a furniture producing factory, and a shipbuilding

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBT3ATI2        Zarrab - Direct        Page 270

1  in the maritime sector.
2  Q. For the record, could you explain what you mean by foreign
3  exchange business?
4  A. Receiving from customers some money in any denomination,
5  and changing it with another kind of currency.
6  Q. How did you learn that business?
7  A. That's my father's profession.
8  Q. Does your father have such a business?
9  A. Yes, sir.
10 Q. What is the name of that business?
11 A. Al Nafees Exchange.
12 Q. Where is Al Nafees Exchange located?
13 A. In Dubai.
14 Q. What country is Dubai in?
15        THE INTERPRETER: What country?
16 Q. What country is Dubai in?
17 A. United Arab Emirates.
18 Q. Do you have any other family members who worked at Al
19 Nafees?
20 A. Yes, sir.
21 Q. Who is that?
22 A. My big brother.
23 Q. How long did you work at Al Nafees Exchange?
24 A. Approximately two years.
25 Q. What did you do after you left?

HBT3ATI2        Zarrab - Direct        Page 271

1  A. I went on doing my own foreign exchange business.
2  Q. You testified that in addition to foreign exchange, you had
3  other businesses that you were in; is that right?
4  A. Yes, sir.
5  Q. I believe you mentioned a shipping business?
6  A. Yes, sir.
7  Q. What are some of the other businesses that you were
8  involved in?
9  A. Furniture production, building construction, also while I
10 was working with my father in Dubai, I participated in the tea
11 trade.
12 Q. About how old were you when you participated in the tea
13 trade?
14 A. Maybe 16, 17.
15 Q. Turning back to your currency exchange businesses, what are
16 the names of some of those businesses?
17 A. Beginning with the Royal Group, Durak Doviz, Atlantis
18 Capital General Trading, Centrica, Tasbasi Doviz. Some of
19 these are owned by me, and some of these are under my control.
20 There are also different, many companies.
21 Q. And the companies that you named, are those under Royal
22 Group?
23 A. Yes, all of those work under the roof of my Royal Group.
24 Q. To be clear, Royal Group is your business?
25 A. Yes, sir, I'm the owner of Royal Group.

HBT3ATI2        Zarrab - Direct        Page 272

1  Q. Mr. Zarrab, when you first started your money changing
2  business, what kind of customers typically used your services?
3  A. Turkish, Azeri, and the Azeri that live in Russia and also
4  some of them Iranians.
5  Q. Was a big part of your business Iranian customers at that
6  time?
7  A. No.
8  Q. Did there come a time when you started to get more Iranian
9  customers?
10 A. Yes, sir.
11 Q. Approximately when did that start?
12 A. Approximately within the year of 2010.
13 Q. What happened with your Iranian business at that time?
14 A. Iranian trade become alive in Turkey very much.
15 Q. Around that time, were you introduced to any significant
16 Iranian customers?
17 A. After finding access to be able to take the Iranian money
18 out of the bank, yes.
19 Q. Who is Huseyin Agajooni?
20 A. He's my first customer, when I started doing high-volume
21 business with the Iranians in Turkey, he's also a person that I
22 made partners with.
23 Q. When you say he was your customer, what did you do for
24 Agajooni?
25 A. Mr. Agajooni was taking money out of Iran from the Iranian

HBT3ATI2        Zarrab - Direct        Page 273

1  banks and Iranian foreign exchange offices, and was bringing it
2  to Aktif Bank, and I was exchanging it to tomans and giving it
3  to the customers.  To the Iranian customers in Iran, as tomans.
4  Q. So --
5  A. I want to correct something in the recording.  Mr. Agajooni
6  was sending money to the Iranian banks -- from the Iranian
7  banks.  You see.
8  Q. So.  Let's break that down a little bit.  First of all, you
9  referred to something called a toman.  What is that?
10 A. It is the Iranian money.
11 Q. Why did Agajooni need you to get the money out of Iran?
12        THE INTERPRETER: Once more, please.
13 Q. Why did Agajooni need you to get the money?
14 A. Because of the sanctions, Iranians were not allowed to
15 access their own money.  There were limited persons who can get
16 their money out of there, and I was one of them.
17 Q. Now, you also mentioned Aktif Bank; is that right?
18 A. Yes, sir.
19 Q. I believe your testimony was that you received money from
20 Agajooni at Aktif Bank; is that right?
21 A. The money sent by Mr. Agajooni came to Aktif Bank, and I
22 was able to take the money out of Aktif Bank.
23 Q. What is Aktif Bank?
24 A. It is an investment bank in Turkey.
25 Q. And the sanctions that you testified about before, do you

**A362**

HBT3ATI2          Zarrab - Direct          Page 274

1 understand that they apply to transactions involving Aktif
2 Bank?
3 A. This is a whole -- so the instructions that were given to
4 me by the Iranians to make international payments, that money I
5 took from the Aktif Bank. It's a whole thing.
6 Q. Did you have to remove it from Aktif Bank because of the
7 sanctions?
8 A. Yes, because the Iranians could not make their payments
9 directly, they used me as a go between.
10 Q. When you were first approached about performing financial
11 services for Agajooni, did you have a bank account already at
12 Aktif Bank?
13 A. No, sir.
14 Q. When you agreed to work with Agajooni, did you approach
15 Aktif Bank about opening such an account?
16 A. Yes, yes, I made that demand.
17 Q. Were you able to open an account at Aktif Bank at that
18 time?
19 A. No, in my first attempt, I was unsuccessful.
20 Q. Were you told why you would not be allowed to open an
21 account there?
22 A. Yes.
23 Q. Why was that?
24 A. In my first attempt, Aktif Bank told me that the customers
25 who worked with Iran need a special permission to open an

HBT3ATI2          Zarrab - Direct          Page 275

1 account. And that permission was never given. And in my first
2 attempt, the account was never opened.
3 Q. After you were initially rejected by Aktif Bank, did you
4 give up with opening an account there?
5          THE COURT: Did what?
6 Q. Did you give up on opening an account there?
7 A. No.
8 Q. What did you do?
9 A. I started to try again.
10 Q. What are some of the steps you took to try again?
11 A. I called Mr. Egemen Bagis, who is the E.U. minister of
12 Turkey, which I interact socially, and I asked for his help in
13 that subject.
14          MR. KAMARAJU: I'd like to show the witness Government
15 Exhibit 13 please, your Honor.
16          THE COURT: Okay.
17          MR. KAMARAJU: For identification.
18          THE COURT: All right.
19 Q. Do you recognize that?
20 A. Yes, sir.
21 Q. What is it?
22 A. It a picture of Honorable Mr. Egemen Bagis.
23          MR. KAMARAJU: The government offers Government
24 Exhibit 13.
25          THE COURT: I'll allow it.

HBT3ATI2          Zarrab - Direct          Page 276

1          (Government's Exhibit 13 received in evidence)
2          MR. KAMARAJU: We'd ask permission to publish it for
3 the jury.
4          THE COURT: Sure.
5          MR. KAMARAJU: Can you pull it up on the jury screens.
6          THE COURT: I think we're going to change interpreters
7 at the moment. So I'll ask Christine to swear in the second
8 interpreter.
9          MS. FLEMING: Judge, I didn't have a chance to do it,
10 but I'd like to object on relevance grounds.
11          THE COURT: Okay. Overruled.
12          THE DEPUTY CLERK: Raise your right hand, please. Do
13 you solemnly swear that you will justly, truly, fairly and
14 impartially interpret these proceedings to the best of your
15 ability, so help you God?
16          THE INTERPRETER: Yes, I do.
17          THE DEPUTY CLERK: Could you please state your full
18 name for the record.
19          THE INTERPRETER: Bulent Bulut, B-U-L-E-N-T B-U-L-U-T.
20 Q. Sir, what did you ask Egemen Bagis to do?
21          MS. FLEMING: Objection, Judge. Hearsay.
22          THE COURT: Overruled.
23          THE INTERPRETER: I still did not hear the last part
24 of that question. What did you ask?
25 Q. What did you ask Mr. Egemen Bagis to do?

HBT3ATI2          Zarrab - Direct          Page 277

1 A. I asked Mr. Egemen Bagis to help me in opening that bank
2 account.
3 Q. What specifically did you ask him to do?
4 A. I asked him if he had known the general manager of the
5 bank. He told me that they had known each other previously
6 from the United States. And he arranged for an appointment. I
7 went to the meeting.
8 Q. What is the position of general manager at a Turkish bank?
9 A. He would be the individual that has the highest authority
10 in the bank, the person that would be directing the bank.
11 Q. Did Bagis introduce you to the general manager of Aktif
12 Bank?
13 A. Yes, Mr. Egemen arranged for the appointment, and I went to
14 the meeting.
15 Q. After that meeting, were you able to open an account at
16 Aktif Bank?
17 A. Yes, sir.
18 Q. Did you ultimately receive money for Agajooni at the bank
19 accounts held at Aktif Bank?
20 A. Yes, sir.
21 Q. Did you ultimately return it to Agajooni in Iran?
22 A. Yes, sir.
23 Q. Initially, approximately how much money per day were you
24 processing for Agajooni?
25 A. In the beginning the transactions started at between 5 to

A363

| HBT3ATI2 | Zarrab - Direct | Page 278 |
|---|---|---|

1  10 million euros.

2  Q.  Just for the record, what is a euro?

3  A.  The joint currency used by the European Union.

4        THE COURT: That amount was per day?

5        THE WITNESS: At the very beginning that was the

6  volume of transactions per day.

7  Q.  Was that on behalf of Agajooni's Iranian customers?

8  A.  Yes, sir.

9  Q.  Did there come a time when your business with Agajooni

10  began to slow down?

11  A.  There was, sir.

12  Q.  Why did that happen?

13  A.  Because we used almost all of the funds that the Iranians

14  had at Aktif Bank.

15  Q.  What did you do after that?

16  A.  I tried to find other customers who had funds there.

17  Q.  Were you looking for other Iranian customers?

18  A.  Certainly.

19  Q.  Were there any specific kinds of Iranian customers you were

20  looking for?

21  A.  Of course, I was after the customers that would possibly

22  have the most money in Turkey.

23  Q.  Which kinds of customers were those?

24  A.  The Central Bank of Iran, Mellat Exchange.

25  Q.  Okay. Let's start with the Central Bank of Iran. What is

| HBT3ATI2 | Zarrab - Direct | Page 279 |
|---|---|---|

1  your understanding of what that is?

2  A.  It is the Central Bank of Iran, the safe of the government

3  of Iran.

4  Q.  By safe, do you mean that's where they keep money?

5  A.  It's the authority that has authority over the Iranian

6  currency.

7  Q.  Did you approach the Central Bank of Iran about doing

8  business with them?

9  A.  Yes, sir.

10  Q.  How did you approach them?

11  A.  Through the acquaintances of my father, a meeting

12  organized where my father was also present.

13  Q.  Approximately how many meetings did you have initially with

14  the Central Bank of Iran?

15  A.  On the first day of meetings, there were two meetings.

16  Q.  Who attended the the first meeting?

17  A.  I attended that one. My father did. Mr. Bahmani, who was

18  the president of the Central Bank of Iran, attended.

19        (Continued on next page)

20

21

22

23

24

25

| HBTPATI3 | Zarrab - Direct | Page 280 |
|---|---|---|

1  Q.  And what was discussed at that meeting?

2  A.  During that meeting, those individuals who had been working

3  with the Central Bank at that time, I mentioned to the Central

4  Bank that I could provide a better price point than those

5  individuals, in terms of delivery of bank notes such as cash,

6  U.S. dollars, delivering bills, currencies, and I told them

7  that I could also provide the market stability for the Iranian

8  currency on their behalf.

9  Q.  Now, did Bahmani agree to your proposal?

10  A.  Yes, sir.

11  Q.  And after he agreed to your proposal, what happened next?

12  A.  He called over Ms. Kian Irad to his room, who was the

13  person responsible at that time, and there was a meeting

14  organized with the technical team.

15  Q.  And what was the purpose of the meeting with the technical

16  team?

17  A.  It was the devising or drafting of an agreement between us

18  and the Central Bank discussing the conditions, the terms of

19  that agreement.

20  Q.  Who was at that second meeting?

21  A.  Ms. Kian Irad, Mr. Godarzi, Mr. Yakubi, Mr. Tarelli and

22  Mr. Bibi.

23  Q.  I'm not going to ask you who all those people are, but who

24  is Mr. Bibi?

25  A.  He was the head of the Herasat department within the

| HBTPATI3 | Zarrab - Direct | Page 281 |
|---|---|---|

1  Central Bank.

2  Q.  What is Herasat?

3  A.  Herasat is the intelligence department of the Central Bank

4  of Iran.

5  Q.  Now, were you also able to reach an agreement to provide

6  financial services to the Central Bank of Iran?

7  A.  Yes, sir.

8  Q.  And I believe you testified that one of those services was

9  delivery of cash to the Central Bank of Iran; is that right?

10  A.  Yes, that's correct, sir.

11  Q.  What is your understanding of why the Central Bank of Iran

12  needed cash delivered?

13  A.  They were holding reserves of cash at their Central Bank.

14  I don't know the exact reason behind it, but that's what it

15  was.

16        MS. FLEMING: Judge, can we get a time frame?

17  Q.  Approximately when was this?

18  A.  It's between 2010 and 2011.

19  Q.  Did there come a time when you stopped providing these

20  services directly to the Central Bank of Iran?

21  A.  Yes, sir.

22  Q.  And did you try to restart that direct relationship with

23  the Central Bank of Iran?

24  A.  Yes, sir.

25  Q.  Now, what did you try to do to try to reestablish that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBTPATI3          Zarrab - Direct          Page 282

1   relationship?
2   A. I have made a few attempts. One of them was when I wrote a
3   letter to -- another letter to the Central Bank of Iran.
4   Q. And did you write any other letters as well?
5   A. Yes.
6   Q. I'd like to show you what's been marked as Government
7   Exhibit 901 and 901-T. 901-T has already been introduced
8   subject to connection. Apparently, we are having a technical
9   difficulty; so I'm going to show you a hard copy.
10  MR. KAMARAJU: Are we still able to pull it up for the
11  jury? May I approach, your Honor?
12  THE COURT: Sure.
13  MR. KAMARAJU: My apologies, your Honor.
14  THE COURT: That's fine. Do you have an extra one?
15  MR. KAMARAJU: Yes, I'll bring one up for you.
16  BY MR. KAMARAJU:
17  Q. While we're pulling that up, let me ask. Do you recognize
18  Government Exhibit 901?
19  A. Yes, sir.
20  Q. What is it?
21  A. This is one of the letters that I had written up.
22  MR. KAMARAJU: Can everybody see it on their screens?
23  THE COURT: I have it on mine.
24  MR. KAMARAJU: Your Honor, to be clear, I think
25  there's a dispute. The government would offer Government

HBTPATI3          Zarrab - Direct          Page 283

1   Exhibit 901.
2   THE COURT: Okay. I'm going to allow it.
3   MS. FLEMING: We object on relevance and 403.
4   THE COURT: I'm going to allow it.
5   (Government's Exhibit 901 received in evidence)
6   THE COURT: Can you all see it?
7   JUROR: No.
8   MR. KAMARAJU: In the meanwhile I'm going to take it
9   back and publish it physically with the jury. It's back on?
10  JUROR: Yes.
11  THE COURT: Do you have the two on your screen?
12  THE WITNESS: Yes, sir.
13  THE COURT: And, jury, you have the two on your
14  screen?
15  JUROR: Yes.
16  THE COURT: Okay, good.
17  BY MR. KAMARAJU:
18  Q. Now, Mr. Zarrab, who is this letter addressed to?
19  A. To Ahmadinejad.
20  Q. Who is that?
21  A. It's the president of the Republic in Iran during that time
22  period.
23  Q. And why is this letter addressed to him?
24  A. I will summarize. An Iran businessman with good political
25  clout told me that he could reintroduce me back into working

HBTPATI3          Zarrab - Direct          Page 284

1   with the Central Bank of Iran. He said he had a good
2   relationship -- good relations with Ahmadinejad himself and
3   Ahmadinejad's office, and asked me to draft a letter to
4   Ahmadinejad, and this is that letter.
5   Q. And as a result of drafting this letter, were you
6   ultimately successful in reestablishing a relationship with the
7   Central Bank of Iran?
8   A. No, sir.
9   MR. KAMARAJU: Now, Mr. Chang-Frieden, could you
10  please show the witness, with Court's permission, Government
11  Exhibit 4539 and 4539-T, which I believe has been admitted
12  subject to connection.
13  Q. So let's start with 4539. Do you recognize this document?
14  A. Yes, sir.
15  Q. What's the date of the document?
16  A. December 3rd, 2011, sir.
17  Q. And what is it?
18  A. It's an electronic mail.
19  Q. And could we flip to the second page of that document,
20  please.
21  Do you recognize what we're looking at here?
22  A. Yes, sir.
23  Q. What is it?
24  A. This is the first letter that I had written to the Central
25  Bank, sir.

HBTPATI3          Zarrab - Direct          Page 285

1   MR. KAMARAJU: Your Honor, the government would offer
2   Government Exhibit 4539 and 4539-T.
3   MS. FLEMING: Objection, hearsay and 403.
4   THE COURT: I'll allow that.
5   (Government's Exhibits 4539 and 4539-T received in
6   evidence)
7   MR. KAMARAJU: And could we publish that, please,
8   Mr. Chang-Frieden.
9   Everybody got it? Okay. Great.
10  BY MR. KAMARAJU:
11  Q. So tell us again, what was the purpose of this letter?
12  A. After I had made that agreement with the Central Bank, my
13  business with them was short-lived. So this was for me to be
14  able to work with them again, that this was an attempt in that
15  regard.
16  Q. Now, did you draft Government Exhibit 4539 and the
17  attachment?
18  A. No, sir.
19  Q. Who drafted Government Exhibit 4539?
20  A. Mr. Soroush Najafzadeh.
21  Q. And who drafted the letter to the Central Bank of Iran
22  that's attached?
23  A. Soroush Najafzadeh.
24  Q. Who is Soroush Najafzadeh?
25  A. Soroush Najafzadeh is the son of Hossein Najafzadeh.

**A365**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

---

1  Q.  Okay.  And who is Hossein Najafzadeh?
2  A.  Mr. Najafzadeh is the person at the head of Mellat Exchange
3   and is CEO.
4  Q.  What is the Mellat Exchange?
5  A.  Mellat Exchange is the exchange office owned by Mellat
6   Bank, sir.
7  Q.  And what is Mellat Bank?
8  A.  It's one of the biggest government banks in Iran.
9  Q.  Now, were you aware of any other names that Hossein
10   Najafzadeh was called?
11  A.  Yes, sir.
12  Q.  What were those other names?
13  A.  Hossein Nafti.
14  Q.  What does Nafti mean?
15  A.  It means petrol, petroleum.
16  Q.  And in what language is that?
17  A.  In Farsi, sir.
18  Q.  And what's your understanding of why he was called that?
19  A.  Hossein Najafzadeh was one of the largest customers of the
20   Iranian oil companies, and they were working with the Mellat
21   Bank.
22  Q.  Now, what's your understanding of why it was important that
23   he worked with a lot of Iranian oil companies?
24      Let me repeat that.  What was your understanding of
25   why it was important that he worked with a lot of Iranian oil

---

1   companies?
2      MS. FLEMING: Can we have the basis of the
3   understanding, your Honor?
4      THE COURT: Overruled.
5  A.  Because the proceeds of the Iranian government was all
6   consisting of oil and gas sales.
7  Q.  Now, you testified earlier that you were trying to develop
8   a business relationship with Bank Mellat; is that right?
9  A.  With Mellat Exchange, yes, sir.
10  Q.  And why did you want to work with Mellat Exchange?
11  A.  Because Mellat Exchange had a really high volume of
12   transactions and the funds they had in Turkey were high as
13   well.
14  Q.  Did you meet with Hossein Najafzadeh about developing a
15   relationship with Mellat Exchange?
16  A.  Could you repeat that question, please.
17  Q.  Did you meet with Hossein Najafzadeh about developing a
18   relationship with Mellat Exchange?
19  A.  Yes, sir.
20  Q.  And were you ultimately able to reach such an agreement?
21  A.  Yes, I did, sir.
22  Q.  What services were you supposed to provide pursuant to that
23   agreement?
24  A.  The agreement had two aspects to it.  One part of that was
25   to get their money that they had in Turkey and pay it to them

---

1   in tumens.
2      The second part of this was to fulfill the
3   international money transfer orders for Mellat Exchange.
4  Q.  And could you explain a little bit about what you mean by
5   international money transfer orders?
6  A.  Of course.  It entails being able to fulfill any need for
7   money payments that need to be made worldwide.
8  Q.  And what is your understanding of why Mellat Exchange
9   needed you to conduct those payments for it?
10  A.  Since they did not have direct access to the funds to be
11   able to fulfill these, they needed me.
12  Q.  Okay.  Now, to your knowledge, could Bank Mellat conduct
13   financial transactions through U.S. banks, at that time?
14  A.  No, sir.
15  Q.  And what's your understanding of why that was?
16  A.  That was due to the existing embargo, sir.
17  Q.  When you are referring to the embargo, is there any
18   specific countries that you're referring to imposing that
19   embargo?
20  A.  It was the embargo by the United States of America and also
21   the embargoes by the United Nations.
22  Q.  What would happen if a U.S. bank knew that a transaction
23   that it was presented with was on behalf of Bank Mellat?
24      MS. FLEMING: Objection.
25      THE COURT: Sustained.  Could you rephrase that.

---

1  Q.  What's your understanding of what a U.S. bank would do if
2   it knew that Bank Mellat was involved in the transaction?
3  A.  They would not have intermediated that.
4  Q.  And what's your understanding of why they wouldn't have
5   done that?
6  A.  Due to the embargo sanctions and the regulations that were
7   put in place by the United States of America.
8  Q.  Did you, in fact, conduct financial transfers for Bank
9   Mellat that were processed by U.S. banks?
10  A.  Yes, sir.
11  Q.  And in order to do that, did you have to conceal any
12   information?
13  A.  Yes, sir.
14  Q.  What type of information would you need to conceal?
15  A.  I needed to conceal that this was a payment related to
16   Iran.
17  Q.  And were any of your transactions ever rejected by a U.S.
18   bank?
19  A.  Yes, there were times where that happened.
20      MR. KAMARAJU: Your Honor, just as a matter of
21   scheduling, I don't know if you intended to take a morning
22   break.
23      THE COURT: I was just going to turn to the jury.  Do
24   you want to take five minutes at this time, or do you want to
25   keep going until lunch?  Go ahead.

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBTPATI3          Zarrab - Direct          Page 290

1      MR. KAMARAJU: Okay. Sounds good to me.
2      THE COURT: Counsel, maybe I should ask, do you want
3  to take five minutes?
4      MR. KAMARAJU: I'm fine to proceed, your Honor.
5      THE COURT: Go ahead.
6      MR. ROCCO: Your Honor, my advanced age, can I step
7  out or be excused?
8      THE COURT: Sure, sure.
9      MR. KAMARAJU: May I proceed then, your Honor?
10     THE COURT: Yes.
11  BY MR. KAMARAJU:
12  Q. Now, Mr. Zarrab, you testified that Hossein Najafzadeh,
13    that he worked for Mellat Exchange; is that right?
14  A. Yes, sir.
15  Q. And I believe you testified that Mellat Exchange was Bank
16    Mellat's exchange house; is that right?
17  A. Yes, sir.
18  Q. And could you tell us, what is an exchange house?
19  A. It's an institution that changes or exchanges several
20    different currencies and makes currency transfers.
21  Q. Do Iranian exchange houses deal in Iranian currency?
22  A. Iranian exchange offices work in a different way in
23    comparison to the other exchange offices in other parts of the
24    world. Yes, they can also do transactions using Iranian money,
25    but the main objective is to broker the international money

HBTPATI3          Zarrab - Direct          Page 291

1    transfers that their banks cannot do.
2  Q. Did there come a time when you were approached by a
3    representative of another Iranian exchange house?
4  A. Yes, sir.
5  Q. Which exchange house was that?
6  A. Sarmayeh Exchange.
7  Q. And what is Sarmayeh Exchange?
8  A. It's the exchange office owned by the Sarmayeh Bank.
9  Q. And what is Sarmayeh Bank?
10  A. It's an Iranian bank.
11  Q. Who was the Sarmayeh Exchange representative that
12    approached you?
13  A. Mr. Rajaeieh.
14  Q. Okay. And what is Mr. Rajaeieh's first name, if you know?
15  A. Mohammad Reza Rajaeieh.
16      MR. KAMARAJU: Your Honor, with the Court's
17    permission, I'd like to show the witness Government Exhibit 8
18    for purposes of identification.
19      THE COURT: I'll allow it.
20      MR. KAMARAJU: May I approach, your Honor?
21      THE COURT: Sure.
22      MR. KAMARAJU: Thank you.
23  BY MR. KAMARAJU:
24  Q. I'm putting in front of you what's also been marked as
25    Government Exhibit 8. Do you recognize that?

HBTPATI3          Zarrab - Direct          Page 292

1  A. Yes, sir.
2  Q. What is it?
3  A. It's a picture of Mr. Rajaeieh.
4      MR. KAMARAJU: Your Honor, the government offers
5    Government Exhibit 8.
6      THE COURT: I'll allow it.
7      MS. FLEMING: Objection, relevance.
8      (Government's Exhibit 8 received in evidence)
9      MR. KAMARAJU: And permission to publish, your Honor?
10     THE COURT: Yes.
11     MR. KAMARAJU: Thank you.
12  BY MR. KAMARAJU:
13  Q. Now, when did you first meet Rajaeieh?
14  A. I first met him in Azerbaijan.
15  Q. Approximately when was that meeting?
16  A. I think it was by the end of 2010 or maybe within 2011.
17  Q. What was the purpose of that meeting?
18  A. He told me that there's a meeting by a businessman, whom I
19    met before, in Azerbaijan and this was between this businessman
20    and Iranian officials, and he wanted me to participate in that
21    meeting.
22  Q. And did you end up agreeing to do any business as a result
23    of that meeting with Rajaeieh?
24  A. No, sir.
25  Q. Now, after that meeting in Azerbaijan, did you meet with

HBTPATI3          Zarrab - Direct          Page 293

1    Rajaeieh again?
2  A. Yes, I have, sir.
3  Q. Approximately when was the next meeting that you had with
4    Rajaeieh?
5  A. After returning from Azerbaijan and Turkey, in a short
6    while, we had a meeting.
7  Q. And what was the purpose of that meeting?
8  A. Rajaeieh wanted to work with me at Sarmayeh Exchange.
9  Q. What did he want you to do for Sarmayeh Exchange?
10  A. Just as I am making for Mellat Exchange, he wanted me to
11    broker the international payments of Sarmayeh Exchange. In
12    short, to take the money which was lying in Halkbank and make
13    international payments using that money.
14  Q. We'll come back to Halkbank in a second, but at that
15    meeting, did you agree to work with Rajaeieh?
16  A. No, sir.
17  Q. Why not?
18  A. I was already working with Mellat Exchange with my full
19    capacity, and I didn't need another customer.
20  Q. Did there come a time when that changed?
21  A. Yes, it did, sir.
22  Q. Why did it change?
23  A. There was some cold wind blowing in my relationship with
24    Mellat Exchange; so I accepted to work with Sarmayeh Exchange.
25  Q. And I'm going to have to ask you, what do you mean by "a

HBTPATI3          Zarrab - Direct          Page 294

1  cold wind" in your relationship?
2  A.  Mr. Najafzadeh did try to circumvent me and try to work
3  with his own children.  Because they violated the principle of
4  working only with me, so I needed the urge to reinforce my
5  customer base.
6  Q.  Did that cause you to have another discussion with
7  Rajaeieh?
8  A.  Yes, we made a meeting -- we had a meeting.
9  Q.  At that time, did you agree to do transactions on behalf of
10  Sarmayeh Exchange?
11  A.  He told me that they have a very high volume of funds; so I
12  accepted.
13  Q.  Now, at the time you agreed to work with Sarmayeh Exchange,
14  were you still processing transactions through Aktif Bank in
15  Turkey?
16  A.  Aktif Bank, at that period of time, had stopped my
17  transactions.
18  Q.  Do you have an understanding of why they stopped your
19  transactions?
20  A.  They received a warning from the United States, and they
21  stopped brokering those transactions, and they were partly
22  working directly by themselves.
23  Q.  When you say they were working directly, what do you mean?
24  A.  Aktif Bank was working directly with the Iranians, and I
25  was eliminated.

HBTPATI3          Zarrab - Direct          Page 295

1  Q.  Now, was the Aktif Bank business a significant source of
2  your income?
3  A.  Absolutely, yes.
4  Q.  And what happened to your income when that business
5  stopped?
6  A.  It was diminished.
7  Q.  At that point, did you seek out other sources of income?
8  A.  I tried to work with Halkbank to go on doing.
9  Q.  Why did you want to work with Halkbank at that time?
10  A.  Because the entire amount of money that is owned by the
11  Iranians was already deposited in Halkbank.
12  Q.  How did you learn that there was Iranian money held at
13  Halkbank at that time?
14  A.  Many times when payments were sent to me in Aktif Bank,
15  when there was a delay in the payments, either the Aktif Bank
16  representatives or the Iranian bank representatives were
17  telling me that the money transfer was held in Halkbank.  In
18  addition, it was evident that the Iranian oil money was
19  accumulated in Halkbank.
20        THE COURT:  Counsel, could you give us a time frame?
21        MR. KAMARAJU:  Absolutely.
22  Q.  Approximately when did you decide to first approach
23  Halkbank?
24  A.  Beginning of 2012, sir.
25        THE COURT:  2012, did you say?

HBTPATI3          Zarrab - Direct          Page 296

1        THE INTERPRETER:  Yes, sir.
2  A.  I want to reiterate something.  I had an account and I had
3  relations and transactions with Halkbank before 2012.  I had
4  received the money that was for the machinery export to the
5  factory that was established by my father to Halkbank.
6  Q.  So let me ask a clearer question then, for the record.
7  Approximately when did you decide to approach Halkbank about
8  the Iranian oil proceeds that were held there?
9  A.  In 2012.
10  Q.  Now, Mr. Zarrab, who is Ahmet Alacaci?
11  A.  He's a jeweler established in Istanbul, Turkey.
12  Q.  Okay.  And does he trade in any precious metals?
13  A.  Yes, sir.
14  Q.  What kinds of precious metals does he trade-in?
15  A.  Ingot gold.
16  Q.  How did you first meet Alacaci?
17  A.  Through the introduction of Turker Sargin, who was a person
18  who was working for me in my establishment at that time.
19  Q.  Now, did you ever discuss the Iranian oil proceeds held at
20  Halkbank with Alacaci?
21  A.  Ahmet Alacaci told me but through the gold trade he will be
22  able to extract money from Halkbank.
23  Q.  And did you test out his idea?
24  A.  Yes, of course.
25  Q.  Why did you test it out?

HBTPATI3          Zarrab - Direct          Page 297

1  A.  Because had the system worked, we would have devised a way
2  to get the Iranian money out of Halkbank.
3  Q.  And did it work?
4  A.  Yes, it did.
5  Q.  Okay.  Now, at a high level, what was the system that
6  Alacaci had proposed?
7        THE COURT:  You mean summary?
8  Q.  Yes, just summarizing it.
9  A.  Payments would come to Halkbank in exchange for gold
10  purchases from Iran and Alacaci would take that money, buy gold
11  and export the gold and would pay the money to us, and then we
12  could realize the international money transfers on behalf of
13  the Iranians using that money.
14  Q.  Did you work with Alacaci to do that?
15  A.  Yes, we did, sir.
16  Q.  Did there come a time when you approached Halkbank about
17  working with them directly and not through Alacaci?
18  A.  I wanted to work with Halkbank directly without eliminating
19  Alacaci, and I made an application for that.
20  Q.  What caused you to want to work with Halkbank directly?
21  A.  Their transaction volume was very high, and as a person
22  who's already doing this, I wanted to be the first source in
23  this business.
24  Q.  Now, did you approach someone at Halkbank about doing that?
25  A.  Yes.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBTPATI3          Zarrab - Direct          Page 298

1  Q.  Who did you approach at Halkbank?
2  A.  I spoke with the general manager of Halkbank.
3  Q.  And at that time, who was the general manager of Halkbank?
4  A.  Mr. Suleyman Aslan.
5        MR. KAMARAJU: Your Honor, may I approach?
6        THE COURT: Yes.
7  Q.  I'm showing you what's been marked for identification as
8  Government Exhibit 17.  Do you recognize that?
9  A.  Yes, sir.
10 Q.  What is it?
11 A.  It's a photograph of Mr. Suleyman Aslan.
12       MR. KAMARAJU: Your Honor, the government would offer
13 Government Exhibit 17.
14       THE COURT: I'll allow it.
15       (Government's Exhibit 17 received in evidence)
16       MR. KAMARAJU: And permission to publish, your Honor?
17       THE COURT: Sure.
18       MS. FLEMING: Again, can we just get a time?
19       THE COURT: Okay.
20       MS. FLEMING: Judge, I have not objected to leading.
21       THE COURT: We'll --
22       MS. FLEMING: -- but now I'd like --
23       THE COURT: One thing at a time.  So we're going to
24 get a time frame, counsel.
25       MR. KAMARAJU: My next question, your Honor.

HBTPATI3          Zarrab - Direct          Page 299

1  BY MR. KAMARAJU:
2  Q.  Approximately when did you approach Suleyman Aslan?
3  A.  Beginning of 2012.
4  Q.  Did you end up meeting with Aslan?
5  A.  Yes, I did, sir.
6  Q.  What did you discuss with him during that first meeting?
7  A.  I wanted to broker a gold trade.
8  Q.  Did Aslan agree to let you do that?
9        MS. FLEMING: Objection to leading, Judge.
10       THE COURT: Overruled.
11 A.  He did not, sir.
12 Q.  Did he tell you why not?
13 A.  He said I am too popular to do the gold trade, and I'm a
14 person who's very transparent, everybody can see.
15 Q.  What did you understand him to mean that you were popular?
16 A.  Because my wife was a famous artist in Turkey, I was a
17 person who was within the public eye all the time.
18 Q.  What did you do after Suleyman Aslan turned you down?
19 A.  I went on trying to convince the bank to let me do the gold
20 trade again.
21 Q.  And did you speak with anybody outside of the bank about
22 trying to do the gold trade at that time?
23 A.  Yes, I did.
24 Q.  Who was that?
25 A.  Mr. Zafer Caglayan.

HBTPATI3          Zarrab - Direct          Page 300

1  Q.  At that time, who was Zafer Caglayan?
2  A.  Mr. Zafer Caglayan was the economy minister at that period
3  of time.
4  Q.  The economy minister of which country?
5        THE COURT: At which time?
6        THE INTERPRETER: I'm sorry?
7  Q.  Which country?
8  A.  Republic of Turkey.
9        THE COURT: And when was this?
10       THE WITNESS: End of 2011, beginning of 2012.
11       MR. KAMARAJU: Your Honor, may I approach?
12       THE COURT: Sure.
13 Q.  I'm showing you what's been marked for identification as
14 Government Exhibit 12.  Do you recognize that document?
15 A.  Yes, sir.
16 Q.  What is it?
17 A.  It's a photograph of Mr. Zafer Caglayan.
18       MR. KAMARAJU: Your Honor, the government would offer
19 Government Exhibit 12.
20       MS. FLEMING: Objection, relevance.
21       THE COURT: I'll allow it.
22       (Government's Exhibit 12 received in evidence)
23       MR. KAMARAJU: Permission to publish, your Honor?
24       THE COURT: Yes.
25 BY MR. KAMARAJU:

HBTPATI3          Zarrab - Direct          Page 301

1  Q.  Now, when you contacted Zafer Caglayan, did you know him?
2  A.  May I take the question once more, please.
3  Q.  Sure.  At the time you contacted him about the Halkbank
4  business, did you know Zafer Caglayan?
5  A.  Yes, sir.
6  Q.  How did you know him?
7  A.  I had previously met him.
8  Q.  Where had you met him?
9  A.  As acquaintance.  He eats in the same fish restaurant that
10 we went as a family.  We saw each other and we met there.
11 Q.  Why did you contact him after Aslan turned you down?
12 A.  Because he was the economy minister of the Republic of
13 Turkey, and I was thinking that the bank -- bank's rejection of
14 my proposal was baseless because in the same period of time
15 they let somebody else do it.  They had already made a trial
16 using Ahmet Alacaci; so I asked him why the bank is rejecting
17 me just because I was a person in the public eye, and if he can
18 help me with this matter or not.
19 Q.  What did Caglayan say?
20 A.  He said he would look at it and get back to me.
21 Q.  Now, during that conversation, did you tell Caglayan what
22 it is you were trying to do at Halkbank?
23 A.  Yes, sir.
24 Q.  Did that include the connection to Iran?
25 A.  Yes, of course.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

**CORRECTED**
November 29, 2017

| HBTPATI3 | Zarrab - Direct | Page 302 |
|---|---|---|

1 Q. Now, after you had that discussion with Caglayan, did you
2 hear from him again?
3 A. Yes, sir.
4 Q. Approximately when did you hear from him again?
5 A. In a very short while he called me.
6 Q. And what did you discuss during that conversation?
7 A. We had a face-to-face meeting.
8 Q. And what did you discuss during that meeting?
9 A. He got some more information about the details of the
10 trade. He asked about the profit margins, and he said I can
11 broker this, providing there's a profit share 50/50.
12 Q. Did you agree to pay Zafer Caglayan 50 percent of your
13 profits?
14 A. Yes.
15 Q. Now --
16     MS. FLEMING: Can we get a time, Judge, please?
17     THE COURT: Okay. If you remember the time you had
18 this agreement?
19     THE WITNESS: 2012.
20     THE COURT: Any month, can you remember?
21     THE WITNESS: Beginning of 2012.
22     MR. KAMARAJU: Your Honor, also, I think we're about
23 to come to a document.
24     THE COURT: Okay.
25     MR. KAMARAJU: Actually, let's do that.

| HBTPATI3 | Zarrab - Direct | Page 303 |
|---|---|---|

1     Mr. Chang-Frieden, could you please. I'd like to show
2 the witness Government Exhibit 3730 marked for identification.
3  BY MR. KAMARAJU:
4 Q. Now, Mr. Zarrab, do you recognize this exhibit?
5 A. Yes, sir.
6 Q. Okay. What is it?
7 A. That's an e-mail.
8 Q. Who is sending this e-mail?
9 A. Abdullah Happani.
10 Q. Who is Abdullah Happani?
11 A. He is the second authorized person after me in the company
12 that I own.
13 Q. And who is receiving this e-mail?
14 A. It's me, sir. Myself.
15     MR. KAMARAJU: And can we turn to the next page,
16 please, Mr. Chang-Frieden.
17 Q. Generally speaking, what are we looking at here,
18 Mr. Zarrab?
19 A. We're talking about in this exhibit the amount of bribe
20 paid to Mr. Zafer Caglayan as a result of the trade that was
21 made.
22     MR. KAMARAJU: Your Honor, the government would offer
23 Government Exhibit 3730.
24     MS. FLEMING: Objection, relevance.
25     THE COURT: I'll allow it.

| HBTPATI3 | Zarrab - Direct | Page 304 |
|---|---|---|

1     MS. FLEMING: Objection to the foundation.
2     THE COURT: I'll allow it.
3     (Government's Exhibit 3730 received in evidence)
4     MR. KAMARAJU: And could we please publish that
5 exhibit to the jury? If you can turn back the page, please.
6     THE COURT: It would be helpful to know about its
7 preparation.
8     MR. KAMARAJU: Could we turn to Page 2 of the exhibit.
9  BY MR. KAMARAJU:
10 Q. Now, you testified that this document relates to bribe
11 payments made to Caglayan; is that right?
12 A. Yes, sir.
13 Q. Who prepared this document?
14 A. That's an internal accounting record of ours.
15 Q. And internal to one of your companies?
16 A. Yes, sir.
17 Q. And what was the purpose of preparing this document?
18 A. It was the accounting of 50 percent of the trade that was
19 made, that the payments that came, and the record of the money
20 that was paid out.
21 Q. Okay. Let's look at the first column, the one marked --
22 what is that labeled?
23 A. Transaction date.
24 Q. And it says "tran date" there; is that right?
25 A. Yes, sir. It's an abbreviation.

| HBTPATI3 | Zarrab - Direct | Page 305 |
|---|---|---|

1 Q. What is that called for --
2     THE COURT: I'm sorry. For the record, you said it's
3 an abbreviation?
4     THE INTERPRETER: Yes, "it's an abbreviation."
5 Q. What does that column represent?
6 A. The date of the payment of the money.
7 Q. And what's the date of the first payment reflected here?
8 A. March 19, 2012.
9 Q. Do you see the column labeled "narration"?
10 A. Yes, sir.
11 Q. And what's that column intended to represent?
12 A. It's the explanation column.
13 Q. Okay. So let's look at the entry in this column for the
14 first payment. What does it say there?
15 A. "Cash to Cha."
16 Q. And what does that mean?
17 A. The cash that was sent to Caglayan.
18 Q. Now, let's go to the next column. What's that mean?
19 A. FCy.
20 Q. And what does that column represent?
21 A. The currency of the money that was paid.
22 Q. And what currency is listed here for the first payment?
23 A. Euro.
24 Q. And let's go over to the next column. What does that
25 column represent?

**A370**

| HBTPATI3 | Zarrab - Direct | Page 306 |
| --- | --- | --- |

1  A. Debit.
2  Q. And what does that column mean?
3  A. The amount of money paid.
4  Q. And what is the amount reflected in the debit column of the
5   first payment?
6  A. 1,750,000 Euros.
7  Q. We can take that exhibit down for a moment. I'd like to
8   show you what's been marked as Government Exhibit 3733. Do you
9   recognize that exhibit?
10  A. Yes, sir.
11  Q. What is it?
12  A. That's an e-mail.
13  Q. Who sends this e-mail?
14  A. Myself.
15  Q. And who receives the e-mail?
16  A. Again, myself.
17  Q. Could we turn to the second page of the exhibit.
18   Mr. Zarrab, what are we looking at here?
19  A. That's the statement of account for Mr. Zafer Caglayan.
20   This is the internal accounting of our company.
21  Q. So is it like the prior exhibit we looked at?
22  A. Yes, sir, but this also includes different money,
23   currencies.
24   MR. KAMARAJU: Your Honor, the government would offer
25  Government Exhibit 3733.

| HBTPATI3 | Zarrab - Direct | Page 307 |
| --- | --- | --- |

1   MS. FLEMING: Your Honor, objection, foundation,
2  hearsay and relevance.
3   THE COURT: Okay. So let's hear a little bit about
4  the document.
5   MR. KAMARAJU: Sure.
6  BY MR. KAMARAJU:
7  Q. Could you explain what this document is?
8  A. This is the record for the monies that were paid to
9   Mr. Zafer Caglayan.
10  Q. And who prepared this record?
11  A. My accounting.
12  Q. And what was the purpose of this document being prepared?
13  A. To give it to Mr. Zafer Caglayan.
14  Q. And why did you need to give it to Mr. Zafer Caglayan?
15  A. There was some kind of a discrepancy between the monies
16   that he received and the monies that he paid.
17   MR. KAMARAJU: Your Honor, the government would offer
18  Government Exhibit 3733.
19   MS. FLEMING: Same.
20   THE COURT: We'll allow it.
21   (Government's Exhibit 3733 received in evidence)
22   MR. KAMARAJU: Could we publish that for the jury,
23  please.
24   (Continued on next page)
25

| HBT3ATI4 | Zarrab - Direct | Page 308 |
| --- | --- | --- |

1  Q. I'm not going to walk through the document. Turn to page
2   two, please.
3   Could you explain for the jury generally what this
4   document is.
5  A. This is the list of moneys that were paid to Mr. Zafer
6   Caglayan from the income that was -- from the -- the profit
7   that was generated through the Iranian trade.
8   MR. KAMARAJU: You can take that exhibit down.
9   THE COURT: Just a second. This is from what period?
10  Beginning when and ending when?
11   THE WITNESS: March 19, 2012 is beginning, it goes
12  until 27th of March 2013.
13   THE COURT: It is an itemization of all the payments
14  made to that individual.
15   THE WITNESS: No. There are more payments that were
16  not included in this list.
17   THE COURT: So, just staying with this list for a
18  moment, is there a total of the number of payments made between
19  March 12 and March 19?
20   THE WITNESS: Yes, as a euro there is.
21   THE COURT: Where is that total?
22   THE WITNESS: Total is 31,589,500 euros. That's the
23  part that's only euros.
24   THE COURT: I see.
25   THE WITNESS: There are different currencies here.

| HBT3ATI4 | Zarrab - Direct | Page 309 |
| --- | --- | --- |

1  $4,696,911, 2,465,000 Turkish liras, also there are other
2  payments which was not reflected in this statement of account.
3   THE COURT: Thank you.
4  Q. So Mr. Zarrab, I'll ask you. How much in euros in total
5   did you pay Zafer Caglayan in connection with the business at
6   Halkbank?
7  A. I'm thinking that I paid bribe in the amount of 45 to 50
8   million euros.
9  Q. I believe you testified that you paid him in other
10   currencies as well?
11  A. Yes, sir.
12  Q. What other currencies were those?
13  A. Turkish lira and United States dollars.
14  Q. Approximately how much in U.S. dollars did you pay Zafer
15   Caglayan in connection with the Halkbank?
16  A. I think approximately $7 million or so I have paid.
17  Q. How about Turkish lira, approximately how much did you pay
18   in Turkish lira to Zafer Caglayan in connection with the
19   Halkbank scheme?
20  A. 2,465,000 Turkish liras.
21  Q. Let's turn back to that meeting that you had with Zafer
22   Caglayan when you agreed to make these payments, okay?
23  A. Yes, sir.
24  Q. After that meeting with Zafer Caglayan, did you meet with
25   Suleyman Aslan again?

A371

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBT3ATI4 | Zarrab - Direct | Page 310 |
| --- | --- | --- |

1 A. Yes, I did.
2 MS. FLEMING: I have to object to the leading. This
3 is too important an area to have the leading.
4 THE COURT: Go ahead.
5 MS. FLEMING: We really need to get dates too.
6 THE COURT: Yes. Go ahead.
7 Q. What did you discuss with Aslan?
8 A. I explained to Mr. Suleyman Aslan the summary of my meeting
9 with Zafer Caglayan, that the account will be opened and I
10 could broker the gold trade.
11 Q. Approximately when did this meeting with Aslan occur?
12 A. Beginning of 2012.
13 Q. Did Aslan agree that you could broker those transactions at
14 Halkbank?
15 A. Yes, he did.
16 Q. I believe you testified earlier that you had agreed to work
17 with Rajaieh at Sarmayeh Exchange?
18 THE COURT: Are you moving to another topic?
19 MR. KAMARAJU: I am.
20 THE COURT: This might be a good time for us to take
21 our lunch break. It's 12:25. So if the jury could be back
22 here at quarter to 2, we'll pick up with additional testimony
23 at that time.
24 (Recess)
25 (Continued on next page)

| HBT3ATI4 | Zarrab - Direct | Page 311 |
| --- | --- | --- |

1 AFTERNOON SESSION
2 1:40 p.m.
3 (At the sidebar)
4 THE COURT: A technical problem has surfaced with
5 respect to the overflow courtroom. In short, it is that the
6 exhibits are displayed in the overflow courtroom before they
7 have been admitted as exhibits in the main courtroom. It is a
8 technical problem that I'm told can't be fixed, at least until
9 the end of the week or when we're not in the courtroom.
10 So, counsel and I have discussed the issue, and one of
11 the ways to solve the problem, so to speak, is just to cut off
12 the exhibit feed to the overflow courtroom, and I think that
13 both sides seem to be agreeable to that.
14 MR. KAMARAJU: We're fine with that, your Honor.
15 MR. ROCCO: We're fine.
16 THE COURT: Let's see if they can do it.
17 (In open court; jury present)
18 THE COURT: Two things. One is for the jury, that
19 we've asked that they warm up the room a little bit. I didn't
20 think it was a problem but I saw one juror wearing gloves and a
21 scarf and a hat.
22 And the other is for the people in the overflow
23 courtroom, which I think is on the 14th floor, there is some
24 technical problem which has not been experienced in the main
25 courtroom where we are. Down there is that there is difficulty

| HBT3ATI4 | Zarrab - Direct | Page 312 |
| --- | --- | --- |

1 with displaying exhibits on a separate screen. So, the
2 solution, it is not a great one, but they won't, in the
3 overflow courtroom, to be able to see the exhibits. They'll be
4 able to hear and see the proceeding, but not the exhibits.
5 With that, we'll turn to the direct examination of
6 Mr. Zarrab.
7 THE DEPUTY CLERK: Sir, before we begin I'd like to
8 remind you that you are still under oath.
9 THE WITNESS: Yes.
10 MR. KAMARAJU: May I proceed, your Honor?
11 THE COURT: Sure.
12 BY MR. KAMARAJU:
13 Q. Before the break, Mr. Zarrab, do you remember testifying
14 about payments you made to Zafer Caglayan?
15 A. Yes, sir.
16 Q. What form did those payments take?
17 A. In cash, as valuable items, and also bank wire transfers.
18 Q. Were there any transfers to members of Caglayan's family?
19 A. There were, sir.
20 Q. Sir, I am showing you what's been marked as government
21 exhibit 3660. Sir, do you recognize this document?
22 A. Yes, sir.
23 Q. What is it?
24 A. It is an electronic mail.
25 Q. Who sent this e-mail?

| HBT3ATI4 | Zarrab - Direct | Page 313 |
| --- | --- | --- |

1 A. Umut Bayraktar.
2 Q. Who is that?
3 A. Umut Bayraktar is one of the staff members I had working
4 for me at that time in my company.
5 Q. Was he involved in your businesses with Halkbank?
6 A. For a while.
7 Q. What is the date of this e-mail?
8 A. November 1st, 2012.
9 Q. Could we turn to the second page, please. I don't want you
10 to read from the document. Could you just generally describe
11 what this is.
12 A. It is a bank receipt.
13 MR. KAMARAJU: Your Honor, the government would offer
14 Exhibit 3660.
15 MS. FLEMING: Objection. Foundation, hearsay.
16 THE COURT: Let's hear a little more about it.
17 Q. I'm sorry. Could you repeat what this document was?
18 A. It is a bank receipt showing the payment that was made to
19 Zafer Caglayan's sibling.
20 Q. Was there a payment made to Zafer Caglayan's sibling?
21 A. Yes, sir.
22 THE COURT: Could you tell us when and how much, etc.,
23 etc.
24 Q. Approximately when was that payment made?
25 A. It was October 31, 2012, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBT3ATI4 | Zarrab - Direct | Page 314 |
|---|---|---|

1 Q. Approximately how much was that payment for?
2 A. It was 2,465,250 Turkish liras.
3 Q. Do you know why that payment was made?
4 A. Yes.
5 Q. Why was it made?
6 A. It was a payment that was made to look as if it was made in
7 exchange for gold trade, but it was, in reality, a payment that
8 was made through the Iranian trade.
9     THE COURT: Through what?
10    THE WITNESS: Through the profit that was obtained
11 from Iranian trade.
12    MR. KAMARAJU: Your Honor, the government would offer
13 Government Exhibit 3660.
14    MS. FLEMING: Same objection.
15    THE COURT: I'll allow it.
16    MR. KAMARAJU: And also 3360-T, which was previously
17 admitted subject to connection.
18    THE COURT: I'll allow that too.
19    (Government's Exhibit 3660, 3660-T received in
20 evidence.)
21    MR. KAMARAJU: Can we please publish that to the jury.
22 Can we pull up 3660-T, the translation. On 3660 can we also go
23 to the second page of that.
24 Q. On 3660, the second page, does that document list a
25 receiver of funds?

| HBT3ATI4 | Zarrab - Direct | Page 315 |
|---|---|---|

1 A. Yes, it is shown.
2 Q. I'm sorry who is listed as the receiver?
3 A. Mehmet Senol Caglayan.
4 Q. Do you know who that is?
5 A. Yes.
6 Q. Who is that?
7 A. Zafer Caglayan's sibling.
8 Q. Does the document show who sent those funds?
9 A. Yes.
10 Q. What is listed on the document as who sent those funds?
11 A. Cihan Kiymetli Madenler LTD.
12 Q. Do you know what that is?
13 A. Yes.
14 Q. What is it?
15 A. It's one of the gold companies that was working under the
16 umbrella of Royal Group and in our control.
17 Q. Could you explain what you meant when you said this related
18 to the profits from the Iranian business.
19 A. Of course. I'll summarize it shortly.
20     The proceeds that were obtained from the oil and gas
21 sales of Iran, which had been accumulating at Halkbank, and
22 there are financial transactions that the Iranians have in
23 exchange for these. And removing the funds from Halkbank, in
24 order to remove the money from Halkbank and to execute these
25 international money transfers for the Iranians, so this is the

| HBT3ATI4 | Zarrab - Direct | Page 316 |
|---|---|---|

1 profit that is received from this entire system. So this is a
2 part of it.
3 Q. Why was it being paid to Mehmet Senol Caglayan?
4 A. At the request of Mr. Zafer Caglayan.
5 Q. I believe you testified earlier about conversations you had
6 with Rajaeieh; is that right?
7 A. That is correct.
8 Q. I'd like to direct your attention to early 2012. Do you
9 recall having any conversations with Rajaeieh during that time
10 period about Halkbank?
11 A. I recall, sir.
12 Q. What did you discuss?
13 A. Mr. Rajaeieh said that there were 2 billion euros that were
14 at Halkbank for Sarmayeh Bank or for Sarmayeh Exchange.
15 Q. Do you know what the source of those euros were?
16 A. This is the proceeds that Iran was receiving for oil and
17 gas sales that it was making to Turkey.
18 Q. How do you know that?
19 A. Based on what Mr. Rajaeieh told me during that meeting, in
20 our conversations during that meeting, and I also knew that
21 Turkey was buying oil and gas from Iran. And also, the
22 purchasers of this foreign countries who were purchasing same,
23 the moneys paid for those purchases were also coming to
24 Halkbank, some part of that was coming.
25     So, in the end, as a summary of our meeting with

| HBT3ATI4 | Zarrab - Direct | Page 317 |
|---|---|---|

1 Mr. Rajaeieh, he said that there was international transaction
2 for 2 billion euros or equivalent that was in different
3 currencies, so that is what our meeting consisted of.
4 Q. Do you know who Sarmayeh's customers were at that time?
5 A. Companies that belonged to the Iranian oil ministry, the
6 oil ministry and other companies.
7 Q. Have you ever heard of something called NIOC?
8 A. Yes, I heard, sir.
9 Q. What is NIOC?
10 A. National Iran Oil Company. It is a petroleum company that
11 is affiliated with the Iranian oil industry.
12 Q. What does NIOC do?
13 A. NIOC sells the crude oil of Iran.
14 Q. I'm showing you what's been marked for identification as
15 Government Exhibit 3727. If we can start at the top e-mail.
16 A. Yes, sir.
17 Q. Do you recognize this document?
18 A. Yes, I recognize this.
19 Q. What is it?
20 A. It is an electronic mail.
21 Q. Who is it from?
22 A. Mohammed Alipoor.
23 Q. Who is that?
24 A. Mohammed Alipoor is the second person in charge of a
25 company called NICO who operates under the NIOC under Iranian

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

1  oil ministry.
2  Q. What is NICO?
3  A. NICO is a government company who also sells petroleum
4  products of Iran, just like NIOC does, but does so in a more
5  flexible way.
6  Q. What do you mean by more flexible?
7  A. This is like a front company, since there was more
8  bureaucracy involved with NIOC, NICO had more range of
9  movement, in terms of its authority to make decisions.  It is a
10  form of the branch of NIOC, it is a bureaucratic system of NIOC
11  made simple in a company.
12  Q. What is the date at the top e-mail?
13  A. March 18, 2013.
14  Q. Can we scroll down on the e-mail.  What do you see there?
15  A. It is an electronic mail.
16  Q. What is the date of that e-mail?
17  A. 3/15/2013.
18  Q. Could you summarize what the e-mail is about.
19  A. The summary of the e-mail is this.  This was the minutes
20  from the meeting that Sarmayeh Exchange had with NIOC.  Because
21  the largest customer that NIOC had was Sarmayeh Exchange.  As
22  NICO and NIOC are one and the same anyway.
23        MR. KAMARAJU: The government would offer Government
24  Exhibit 3727.
25        MS. FLEMING: Objection.  Foundation, hearsay and

1  relevance.
2        THE COURT: I'm going to allow it.
3        (Government's Exhibit 3727 received in evidence)
4        MR. KAMARAJU: Can we publish that.  Can we blow up
5  the bottom e-mail, please, Mr. Chang-Frieden.
6  Q. Mr. Zarrab, do you recognize any of the e-mail addresses
7  that are on this document?
8  A. There are some that I recognize among them.
9  Q. Which ones do you recognize?
10  A. I recognize the e-mail address for Mohammed Alipoor,
11  Jashnsaz Seifollah, Rajaeieh, and Imam Mehdizadeh.
12  Q. Which e-mail do you recognize as Rajaeieh's e-mail?
13  A. M_Rajaeieh@Yahoo.com.
14  Q. Which e-mail do you recognize as Imam Mehdizadeh?
15  A. ImamMehdizadeh@Yahoo.com.
16  Q. Do you see the name there -- I'm going to butcher it I'm
17  sure.  But Seifollah Jashnsaz?
18  A. Yes, sir.
19  Q. Do you know who that is?
20  A. I know, sir.
21  Q. Who is that?
22  A. He is the authority at the head of NICO.
23  Q. Sir, were you a gold trader?
24  A. Money transfers and gold trade done together.
25  Q. Were you ever involved in a gold transaction that didn't

1  involve an Iranian client?
2  A. I did, sir.
3  Q. Do you think you would be able to diagram for the jury what
4  that kind of transaction would look like?
5  A. Of course.
6        MR. KAMARAJU: Your Honor, with the Court's
7  permission, I would like to ask for Mr. Zarrab to be allowed to
8  diagram on the poster board over there.
9        THE COURT: Behind the interpreter?
10        MR. KAMARAJU: Yes, behind the interpreter.
11        THE COURT: And this would be for what purpose?
12        MR. KAMARAJU: We'll use it as a demonstrative, your
13  Honor.
14        THE COURT: Okay.  I'll allow it.
15  Q. Mr. Zarrab, could you please step off the witness stand.
16        MR. KAMARAJU: Your Honor, may I approach to hand him
17  some pens?
18        THE COURT: Sure.
19        MR. KAMARAJU: Can everybody see if it's right there?
20        A JUROR: No.
21        MR. KAMARAJU: Mr. Zarrab, if you can move it just a
22  little bit.
23        THE COURT: Can you all see, or no?  I see one hand.
24        MR. KAMARAJU: Maybe if we can have the interpreter
25  move to the other side.

1        THE COURT: Bring it right out there where the
2  interpreter is standing.
3        MR. KAMARAJU: Can everybody see?  Thank you, your
4  Honor.
5  A. So the diagram that I've been asked to draw is one that
6  gold trade transaction that does not involve Iran; is that
7  correct?
8  Q. Yes, that's right.
9        Mr. Zarrab, what is the first step in one of those
10  transactions?
11  A. The first step is one -- I'll give an example from Dubai
12  that would be the company or the person that we would sell the
13  gold to in Dubai.
14        This is our company that I will place here as the
15  seller. Royal Group is my company, we'll sell the gold.  And
16  the buyer company in Dubai, as an example, is the Bin Sabt
17  Company in Dubai.
18  Q. What is that company?
19  A. The largest gold bullion buyer and seller in Dubai.
20  Q. What happens next?
21  A. For the gold that we're going to sell, the price and
22  fineness of that gold that we would sell would be established
23  first.  The amount is then determined.  So I will give an
24  example for a 100-kilogram transaction.  Gold transaction.
25        In this case, Royal would sell 100 kilograms of gold

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

HBT3ATI4      Zarrab - Direct      Page 322

1 bars to Bin Sabt into the account of a company that's
2 affiliated with Royal Group in Turkey. I will give an example
3 of Finansbank here.
4 Q. What is Finansbank?
5 A. Finansbank is a Turkish bank located in Turkey. In there,
6 there is an account for Royal Group.
7 Q. What happens next?
8 A. The information between Royal Group and Bin Sabt as to this
9 sale that was agreed upon, including who would be the receiver,
10 the amount and the unit price would be put in writing as a pro
11 forma.
12 Q. Then what?
13 A. There is a Bank of Baroda in Dubai. And the Bank of Baroda
14 would have an account for Bin Sabt. I will draw the money
15 movement with the red marker. Bank of Baroda would have an
16 instruction to Finansbank. And an amount that would be for the
17 100 kilograms of gold would be sent from the Bin Sabt account
18 into the Royal account. Let's say $15 million. We would
19 receive plus 15 million in our account, and $15 million would
20 be debited from Bin Sabt's account.
21      And as for the movement of the goods, I will draw that
22 in with a blue marker. In exchange for that payment, then the
23 Royal Group would send 100 kilograms of gold, and in exchange
24 for that, there would be a shipment documentation for this.
25 This is gold from oil.

HBT3ATI4      Zarrab - Direct      Page 323

1 Q. What kinds of documentation would be associated with this
2 transaction?
3 A. A pro forma document, when the money -- when the payment is
4 made, there would be a SWIFT message, and let me load the goods
5 and there would be a cargo loading document that would show
6 that. And the transaction would be completed as such.
7      MR. KAMARAJU: With the Court's permission I will mark
8 this as Government Exhibit 9501 and offer it as a
9 demonstrative.
10      THE COURT: I'll allow it. Did you have more
11 questions of Mr. Zarrab?
12      MR. KAMARAJU: No, I'll move on.
13      (Government's Exhibit 9501 received in evidence)
14 Q. Mr. Zarrab, did any of the gold transactions that you were
15 involved in involve Sarmayeh Exchange?
16 A. Certainly.
17 Q. Of those transactions, did any of them also involve
18 Halkbank?
19 A. In general.
20 Q. Would you be able to diagram a transaction involving
21 Sarmayeh and Halkbank?
22 A. You mean the Iranian money transfer and gold combined?
23 Q. Would you be able to diagram one of those transactions?
24 A. Certainly.
25      MR. KAMARAJU: With the Court's permission, I ask that

HBT3ATI4      Zarrab - Direct      Page 324

1 Mr. Zarrab be allowed to do that.
2      THE COURT: Sure.
3      MR. KAMARAJU: Is that good for everybody?
4 A. This is, I'll be drawing the gold trade with Iran here.
5      MR. HARRISON: With your permission, Judge, I can't
6 see from there.
7      THE COURT: That's fine.
8 A. Primarily the transaction, the transaction would primarily
9 begin with Iran selling crude oil and gas to Turkey. I'm
10 placing that company here.
11 Q. What company is that?
12 A. It is NIOC. National Iran Oil Company.
13 Q. Who would NIOC sell oil to in Turkey?
14 A. It would sell crude oil to Tupras. It would sell national
15 gas to Botas.
16 Q. What is Tupras?
17 A. Tupras is the refinery company that would purchase the
18 crude oil from Iran in Turkey.
19      Now I will draw Botas.
20 Q. Please.
21 A. And Botas would be purchasing gas.
22 Q. What happens after NIOC sells gas or oil to one of those
23 companies?
24 A. NIOC would deliver oil and gas to Tupras and Botas. And as
25 a result of this, Tupras and Botas would owe money to NIOC.

HBT3ATI4      Zarrab - Direct      Page 325

1 Q. What happens next?
2 A. Tupras, Botas, and NIOC have accounts at Halkbank.
3 Q. What is that box that you're drawing; what does that
4 represent?
5 A. I will draw the companies that would have accounts at
6 Halkbank within this box. After the oil sale has been
7 executed, then again I will draw the money movement with a red
8 marker. Within Halkbank, Botas and Tupras would make their
9 payment to NIOC.
10 Q. What happens after the money comes into the NIOC account?
11 A. Here I'm going to give you an example for 50 million euros.
12 Then the bank in Iran would get on line.
13 Q. Explain what you mean.
14 A. Now I'm going to draw the example for Sarmayeh in Iran.
15      Sarmayeh Bank in Iran, I will put the accounts that
16 are at Sarmayeh Bank inside this box.
17      With the blue marker I'm going to mark the Iranian
18 money orders. Sarmayeh Exchange, Sarmayeh Exchange receives
19 the international money order from NIOC.
20 Q. What do you mean when you say "international money order"?
21 A. I mean they're payments that they need to pay, that they
22 need to make worldwide. This could be anywhere from China to
23 Singapore to Taiwan, anywhere worldwide. And in different form
24 currencies.
25      Sarmayeh Exchange has a front company called Toseh

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBT3ATI4          Zarrab - Direct          Page 326

1   Tejarat.
2   Q.  Why does Sarmayeh Exchange need a front company?
3   A.  The company had been formed in order for the gold trade to
4   happen, so it is not just a currency exchange office making
5   this transaction.
6           (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HBTPATI5          Zarrab - Direct          Page 327

1   Q.  Why is that important?
2   A.  In order for this to fit in with the nature of the
3   business, so that it would appear to be a real trade.
4           Sarmayeh Bank has an account within Halkbank.  As a
5   seller of all the orders that have been put in, NIOC will
6   transfer money with Halkbank to Sarmayeh Bank.
7   Q.  Why would the NIOC transfer that money to the Sarmayeh
8   Bank?
9           MS. FLEMING: Objection, foundation.
10          THE COURT: Overruled.
11          THE WITNESS: Can I continue?
12          THE COURT: Yes.
13  A.  Because NIOC is not able to make international money
14  transfers to Halkbank.
15  Q.  Why not?
16  A.  Based on the regulations and sanctions put in place by the
17  United States, as well as the United Nations.  In short, they
18  have restrictions on the payments for themselves.
19  Q.  So what happens after the money goes into the Sarmayeh
20  account?
21  A.  Here, I'm giving an example of NIOC sending 20 million
22  Euros to Sarmayeh Bank.  Sarmayeh Bank would end up with 20
23  million.  20 million Euros would be deducted out of NIOC's
24  account, and they would be left with a 30 million Euro balance.
25  At this point, my company would get on line with this

HBTPATI5          Zarrab - Direct          Page 328

1   transaction.
2   Q.  How so?
3   A.  The next step is for Sarmayeh to give me the money so that
4   I can fulfill its international money order request or, in
5   short, I need to have the money so I can make the payment for
6   that transaction.
7   Q.  How do you get the money?
8   A.  At this point, I'm going to place my own company inside the
9   Halkbank box.  Safir Altin is one of the gold companies that I
10  have, that I own.
11  Q.  So what happens next?
12  A.  Sarmayeh Bank will send a telex to Halkbank.
13  Q.  What is a telex?
14  A.  It's one of the communications methods that I use between
15  banks.  It would give the order to take 20 million out of
16  Sarmayeh's account and move it into Safir's account.
17  Q.  Would there be any reason given for that transfer?
18  A.  Of course.  There would be some information inside this
19  telex.
20  Q.  What kind of information?
21  A.  The seller's name, which would be Toseh Tejarat, and the
22  receiver's name, which would be Safir, which is me, and the
23  nature of the transaction.  It would say gold because I'm
24  giving an example for gold trade.
25  Q.  Then what happens?

HBTPATI5          Zarrab - Direct          Page 329

1   A.  20 million Euros would arrive in Safir's account.  That 20
2   million Euros would be deducted from Sarmayeh's account.
3   Q.  Then what?
4   A.  Now, just as the pro forma example that I provided in the
5   previous example, there is the company that supplies the gold
6   for this.  I will place that one in a box now.
7   Q.  Mr. Zarrab, I believe you testified about a pro forma, what
8   is that?
9   A.  Pro forma is a pro forma invoice that would show the
10  amount, the number, the unit price of the gold that would be
11  exchanged between my company Safir and Toseh Tejarat.
12  Q.  Who would the pro forma be submitted to?
13  A.  It would be given to the bank and also to Sarmayeh with --
14  the number would be given to Sarmayeh.
15  Q.  So what's the next step?
16  A.  Safir Altin would then transfer this money to its supplier,
17  and 20 million Euro would be deducted from Safir's.
18  Q.  What would happen next?
19  A.  All these transactions would be taking place within the
20  Halkbank.  The next step would be to remove this money out of
21  Halkbank.
22  Q.  Before you do that, why were these transactions taking
23  place within Halkbank?
24  A.  Because the Iranian money is within Halkbank, and by moving
25  this money around within Halkbank, we're getting this close to

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

---

HBTPATI5          Zarrab - Direct          Page 330

1  the point where it could leave Halkbank. In fact, one of the
2  methods that was designed is this, because NIOC would not be
3  able to do this directly.
4  Q. Why not?
5  A. Due to the embargo and the sanctions of the United States,
6  as well as the embargoes and sanctions and regulations of the
7  United Nations.
8  Q. Typically, how would you get the money out of Halkbank?
9  A. I will continue to draw, please. Rona would have an
10  account in Denizbank in Turkey in a different bank. Either in
11  Euros or the Turkish lira, the money would be transferred from
12  the Roman account in Halkbank and to its own account in
13  Denizbank.
14  Q. What is Denizbank?
15  A. The Turkish bank.
16  Q. What happens after this?
17  A. Halkbank would send a message to Denizbank, and money would
18  be removed or deducted from Rona's account at Halkbank and
19  would arrive at its account in Denizbank.
20  Q. Then what would happen?
21  A. And now the Royal Bank would get back the money again. So
22  within this money movement, the international money order that
23  Sarmayeh had given to Sarmayeh Exchange would arrive in my
24  office. This is a payment order.
25  Q. Would you do anything with that payment order?

---

HBTPATI5          Zarrab - Direct          Page 331

1  A. Of course. Once we receive this money, then we would begin
2  executing this transaction, but we're not there yet. So then
3  we would purchase gold worth 20 million Euro from Rona. In
4  other words, that money would be converted into gold. So let's
5  give you an example for 200 kilograms.
6      Royal would purchase 200 kilograms of gold from Rona.
7  Now, Royal has 200 kilograms of gold in its hands, which is
8  equivalent to the 20 million that was up here. We would
9  receive this gold from Rona physically. My staff members would
10  go to the Rona office with suitcases, and they would load it in
11  the suitcases and come back.
12  Q. What would they do with the suitcases?
13  A. Now, we would be at the point where we would be exporting
14  this gold because we would need to close that transaction up
15  here.
16  Q. How would you close that transaction?
17  A. Based on the direction provided by Halkbank, if the final
18  destination for this is Iran, then it would be shown as
19  destination Iran. So let me give an example for your eye. I
20  will continue.
21  Q. So what would happen then?
22  A. These couriers, I mean physically would transport the gold
23  to Dubai. But all the customs document that's made in Turkey,
24  the document would show the final destination is Iran,
25  transiting through Dubai.

---

HBTPATI5          Zarrab - Direct          Page 332

1  Q. Why would the documents show -- well, did the gold ever end
2  up in Iran?
3  A. The gold would never go to Iran.
4  Q. What happened to the gold?
5  A. They would go to our office in Dubai.
6  Q. And what would happen to it there?
7  A. 200 kilograms were taken from Royal. Now, in my company in
8  Dubai, in Atlantis' safe there would be 200-kilos of gold.
9  Q. And what would happen to it then?
10  A. Now, it would be at a point where this gold would be sold
11  and would be converted back into cash.
12  Q. Before you get there, why didn't you ship the gold to Iran?
13  A. Because there's no need for gold or money in Iran. We need
14  to make the international payments for it. I would not be able
15  to make the international payments with money that's in Iran.
16  Q. So why do the documents say that they were going to Iran?
17  A. Halkbank told us that, based on regulations for a while,
18  that we would need to put Iran on the documents, and that's why
19  we put Iran.
20      MS. FLEMING: Objection to "Halkbank told us," Judge.
21      THE COURT: Overruled.
22  Q. Who did you discuss that with at Halkbank?
23  A. It would be me.
24  Q. And who at Halkbank did you speak with?
25  A. With Mr. Suleyman or with Mr. Hakan Atilla.

---

HBTPATI5          Zarrab - Direct          Page 333

1  Q. Now, you testified that there was cash -- well, let's go
2  back. What did you do with the gold that was in your Dubai
3  office?
4  A. Now would be the point where we would sell this gold. The
5  Bin Sabt company that I had mentioned earlier in Dubai, we
6  would sell the 200 kilos of gold to Bin Sabt, to it, and we
7  would get dirham in return for that.
8  Q. What are dirhams?
9  A. Dirham is a local currency in Dubai, in the United Arab
10  Emirates.
11  Q. And just for the convenience of the record, could you spell
12  dirham?
13  A. D-H-S.
14  Q. So what happens with the dirhams after you have them?
15  A. Let's say 20 million Euros would be the equivalent of about
16  50 million dirhams. Since there is little room left over
17  there, I'm going to have to continue from this side.
18  Q. What are you drawing now?
19  A. Rostamani Exchange.
20  Q. What is that?
21  A. It's an exchange office that is involved in financial
22  transactions and financial transfers in Dubai.
23  Q. So what happened next?
24  A. And they have an account with Standard Charter in the
25  United States.

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBTPATI5 | Zarrab - Direct | Page 334 |
|---|---|---|

1 Q. So what happens after that?
2 A. So we would pay this 50 million dirhams to Rostamani, and
3 in return for that, the Royal office, Royal's Istanbul office
4 would take the international money order that I had received to
5 the Dubai office, to Atlantis, and Atlantis would give it to
6 Rostamani. So Atlantis is my company. And as a result, the
7 instruction and the money would have joined together. In other
8 words, the blue and the red lines would merge here.
9 Q. Then what would happen?
10 A. As an example, this is an example, Bank of China, it would
11 go to the X company, which is the information that was given by
12 Iran in the first place. I will give an example for $10
13 million. Rostamani would send its message to Standard Charter
14 U.S.A. If Bank of China has an account with Standard Charter,
15 then the money would transfer to them through that account. If
16 there is not an account there, then another American bank would
17 be used as intermediary.
18     MR. KAMARAJU: So, may I approach, your Honor?
19     THE COURT: Yes.
20 Q. Mr. Zarrab, what is the purpose of this part of the
21 diagram?
22 A. I did not see where you were pointing.
23 Q. Okay. Let me try it again. What was the purpose of this
24 part of the diagram?
25 A. Here, the money that cannot be sent out, it's getting that

| HBTPATI5 | Zarrab - Direct | Page 335 |
|---|---|---|

1 money to this point from there. In other words, it's
2 connecting that with this here. That section is the heart of
3 all of this.
4 Q. Okay. And just so we're clear on the record, could you
5 tell us what section you're describing specifically?
6 A. I'm talking about the Halkbank section.
7     MR. KAMARAJU: Your Honor, the government would ask to
8 mark this as Government Exhibit 9502 and offer it as a
9 demonstrative.
10     THE COURT: So I'm going to allow that.
11     (Government's Exhibit 9502 received in evidence)
12     THE COURT: So I'm selfless and defer always to the
13 jury, and since I haven't seen that diagram, I'm going to ask
14 Mr. Zarrab. How many separate transactions, approximately,
15 would you demonstrate on that last diagram to get the money
16 from where it couldn't leave, to where it could leave,
17 approximately?
18     THE WITNESS: I will count.
19     THE COURT: Approximately.
20     THE WITNESS: Approximately, a minimum of ten.
21     THE COURT: Got it. Thank you.
22     THE WITNESS: Can I be seated?
23     THE COURT: Yes. Can you just move that diagram over
24 here.
25     MR. KAMARAJU: Is that all right, your Honor?

| HBTPATI5 | Zarrab - Direct | Page 336 |
|---|---|---|

1     THE COURT: Yes.
2     THE INTERPRETER: We're going to switch real quick.
3     THE COURT: Sure.
4     THE INTERPRETER: We're going to switch interpreters.
5     THE COURT: Yes.
6     (Pause)
7 BY MR. KAMARAJU:
8 Q. Mr. Zarrab, I'd like to show you what's been marked for
9 identification as Government Exhibit 3800. If we can blow up
10 the top there?
11     MS. FLEMING: I'm sorry, ours isn't working.
12     MR. KAMARAJU: My apologies, your Honor. We appear to
13 have lost defense counsel's table; so I'm handing them a hard
14 copy.
15     THE COURT: You lost?
16     MR. KAMARAJU: Their screens aren't working.
17 BY MR. KAMARAJU:
18 Q. Mr. Zarrab, do you recognize this exhibit?
19 A. Yes, sir.
20 Q. How do you recognize it?
21 A. It's an electronic mail.
22 Q. And how do you know?
23 A. I'm the sender, and the receiver is -- it was sent to me.
24 Q. I'm sorry, I couldn't hear you.
25 A. It was sent to me.

| HBTPATI5 | Zarrab - Direct | Page 337 |
|---|---|---|

1 Q. And let me just be clear, are you referring to the bottom
2 part of the document or the top part of the document?
3 A. This e-mail is coming to me.
4 Q. Okay.
5     MS. FLEMING: Your Honor, no objection to this
6 document.
7     MR. KAMARAJU: Okay.
8     THE COURT: Okay.
9     MR. KAMARAJU: Then, your Honor, the government offers
10 Government Exhibit 3800.
11     THE COURT: Then I'll allow it. It would be funny if
12 I didn't.
13     MR. KAMARAJU: Yes, there's always a first.
14     (Government's Exhibit 3800 received in evidence)
15     MR. KAMARAJU: Could we publish for the jury.
16 BY MR. KAMARAJU:
17 Q. Mr. Zarrab, do you see at the top there? Who's listed in
18 the "to" line?
19 A. Levent Balkan.
20 Q. Who is Levent Balkan?
21 A. He is one of the authorized persons who worked at Halkbank
22 during that period and who is involved in a part of the
23 operation.
24 Q. Okay. At that time, where in Halkbank did Levent Balkan
25 work?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBTPATI5 | Zarrab - Direct | Page 338 |
|---|---|---|

1  A. In the international department.
2  Q. Can we turn to the exhibit -- I'm sorry, to the second
3   page, please. Mr. Zarrab, what are we looking at here?
4  A. May I look at it?
5  Q. Please.
6  A. Yes.
7  Q. What is it?
8  A. That's the instruction for a money transfer from NIOC
9   account to Sarmayeh Bank account within the Halkbank. I can
10   show it on my diagram, if you want.
11  Q. I think we'll ask you to do that a little bit later, but
12   for the moment, is this reflected on your diagram?
13  A. Yes, of course.
14  Q. Okay. You can take that down.
15       Mr. Zarrab, I'd like to show you what's been marked
16   for identification as Government Exhibit 304-T, which has been
17   admitted subject to connection. Can we turn to the second
18   page. Mr. Zarrab, could you take a moment to review this
19   exhibit?
20  A. Yes, sir.
21  Q. Do you recognize this exhibit?
22  A. Yes, I do, sir.
23  Q. Could we turn to the first page of the document, please.
24   Now, Mr. Zarrab, do you recognize this?
25  A. Yes, sir.

| HBTPATI5 | Zarrab - Direct | Page 339 |
|---|---|---|

1  Q. What is this document?
2  A. It's a transcription of a telephone call.
3  Q. Have you reviewed this transcription before?
4  A. Yes, sir.
5  Q. Do you remember this call?
6  A. Yes, sir.
7  Q. Did you participate in this call?
8  A. Yes, I participated.
9  Q. Did this call relate to the Iranian business at Halkbank?
10       MS. FLEMING: Objection, your Honor, to the form.
11       THE COURT: Sustained.
12  Q. What does this call relate to?
13  A. This is related to the general manager of Halkbank and
14   myself, and it's about a credit transaction within Halkbank. I
15   want to correct this. There may be a translation mistake. The
16   telephone conversation has two sectors. The first part is
17   about the credit that I have asked for, and the second part is
18   related to the Iranian business, Iranian transaction.
19       MR. KAMARAJU: Your Honor, the government would offer
20   Government Exhibit 304-T.
21       THE COURT: I'll allow it.
22       MS. FLEMING: Judge, is there -- I think the
23   appropriate method is to have the underlying recording go into
24   evidence, and then have this go in. And I also assume that
25   this would go in as an 801(d)(2)(E) and it will go in subject

| HBTPATI5 | Zarrab - Direct | Page 340 |
|---|---|---|

1  to.
2       MR. KAMARAJU: Your Honor, I'd like to have a sidebar
3  on this.
4       THE COURT: Yes, come up.
5       (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HBTPATI5 | Zarrab - Direct | Page 341 |
|---|---|---|

1       (At the side bar)
2       THE COURT: Let me just see if I understand this. So
3  this purports to be a transcript of a phone call between Zarrab
4  and Aslan, right?
5       MS. FLEMING: Right. So there's --
6       THE COURT: Hold on. So it's got the names in one
7  column, the English translation in another, and the Turkish
8  language in a third column.
9       MS. FLEMING: Right.
10       THE COURT: He wants to enter it, and you think what?
11       MS. FLEMING: There's a couple. First of all, in
12  terms of the co-conspirator statement, I understand you're
13  going to let it in under 801(d)(2)(E), subject to a connection
14  in the conspiracy.
15       Secondly, they have to authenticate the identification
16  that's on the front of it as to all the identifying information
17  as to how it was authenticated there, because you know that
18  there's an issue with recordings.
19       And, third, I think that even though it's a Turkish
20  language, I think the appropriate way to do it is the recording
21  gets admitted, and then if there's a transcript and they can
22  authenticate the transcript with the other information or take
23  it off the front page with the identifying information, or make
24  it -- put the rest of it in, but until they can identify when
25  that's taken and the rest of it, I object to the jury seeing

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBTPATI5          Zarrab - Direct          Page 342

1  that.
2          THE COURT: You mean until it's played?  You want it
3  to be played first?
4          MS. FLEMING: Until they can identify the dates and
5  the rest of the information as to when it's there.  He can
6  identify his voice, I get that.
7          MR. KAMARAJU: He can also identify who else is on the
8  call.
9          MS. FLEMING: He can identify who's on the call.  Like
10  I said, I get that.  The other information as to where it's
11  from --
12          THE COURT: You can ask if he remembers the call, and
13  if he remembers the conversation as a result --
14          MR. KAMARAJU: I believe he testified he does remember
15  the call.
16          THE COURT: You could do it on more detail.  That
17  would satisfy me.
18          MS. FLEMING: I'm saying the front page of it that has
19  that information, we're challenging the wiretap information as
20  being valid.  I don't think that should be shown to the jury,
21  and they're going to call somebody who's going to try to
22  identify it.
23          MR. ROCCO: It's also hearsay.  That doesn't come in.
24          THE COURT: That's a different issue.
25          MR. ROCCO: I'm not talking about the co-conspirator.

HBTPATI5          Zarrab - Direct          Page 343

1          The substance of the document comes in --
2          THE COURT: I'm going to allow --
3          MR. ROCCO: I got that.
4          THE COURT: -- the CD and then this purports to be a
5  reflection of the CD; so I'm still not understanding what your
6  problem is.
7          MR. ROCCO: I'm not going to -- go ahead, Cathy.
8          THE COURT: You're objecting to something on here?
9          MS. FLEMING: Yes.
10          THE COURT: Which?
11          MS. FLEMING: I object that somebody else put all this
12  on, in terms of reflecting what was done in terms of call ID,
13  target phone number, et cetera until that's --
14          THE COURT: You can indicate how this --
15          MR. KAMARAJU: Sure.  He's not the witness to do that,
16  but we do intend to call a witness who's going to be able to
17  provide that information.
18          THE COURT: So we'll do that subject to -- did you ask
19  for it to be subject to that?
20          MR. KAMARAJU: I didn't.  I'm happy to.  I think it
21  makes sense to publish it to the jury, at least the subsequent
22  transcript part.
23          THE COURT: Yes.
24          MS. FLEMING: And then, secondly, even though it's
25  Turkish, we are requesting that the underlying -- the recording

HBTPATI5          Zarrab - Direct          Page 344

1  go into evidence.  We want to play inflections and challenge on
2  the rest of it with these recordings.
3          MR. KAMARAJU: If the defense counsel wants to
4  introduce specific calls into evidence, they can do that.
5          THE COURT: You're not planning to?
6          MR. KAMARAJU: There are some calls that we may, but
7  I'm not intending to do it for all of the hundreds of calls
8  because typically a transcript --
9          THE COURT: It's fair.
10          MS. FLEMING: I think we offer it under completeness,
11  under 104 that under completeness, they should get it.
12          THE COURT: I have to look at that.
13          MS. FLEMING: That, in fairness, it ought to be
14  considered together.
15          THE COURT: Maybe you can write a little letter about
16  that together.  Seriously.
17          MR. ROCCO: No, no, we'll do that.
18          MS. FLEMING: All right.
19          THE COURT: It seems to me, ultimately, this is
20  entitled to come in, but if it needs to be, you know, made a
21  little bit more precise to satisfy you, I don't mind that.
22          MS. FLEMING: I love that the standard will be
23  satisfying me.
24          MR. KAMARAJU: So just to be clear, your Honor, if we
25  publish it to the jury, we should start publishing it on the

HBTPATI5          Zarrab - Direct          Page 345

1  second page?
2          MR. ROCCO: Yes.
3          MS. FLEMING: Yes.
4          THE COURT: For now, unless you can, through him,
5  satisfy that issue.  Still, candidly, I'm not sure I understand
6  the issue, but if you can --
7          MR. KAMARAJU: That's fine.  I'll just ask
8  Mr. Chang-Frieden to go to the second page and then publish it
9  to the jury.
10          THE COURT: That's fine.
11          MS. FLEMING: Thank you, your Honor.
12          (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBTPATI5 | Zarrab - Direct | Page 346 |
|---|---|---|

1     (In open court)
2     THE COURT: So we're going to take a five-minute
3  break, and then we'll resume right after that.
4     (Jury not present)
5     (Recess)
6     (Jury present)
7     THE COURT: Okay. Please be seated, everybody. Just
8  for your planning, I think we'll go another hour, until around
9  4:30, and then we'll let the jurors go home and have a good
10  night.
11     MR. KAMARAJU: Thank you, your Honor. May I proceed,
12  your Honor?
13     THE COURT: Sure.
14     MR. KAMARAJU: Mr. Chang-Frieden, could you turn to
15  Page 2 of Government Exhibit 304-T, and can we publish that to
16  the jury, please.
17     THE COURT: Yes.
18  BY MR. KAMARAJU:
19  Q. Now, Mr. Zarrab, who are you speaking with during this
20  call?
21     THE COURT: Do you remember having this conversation
22  as reflected in the transcript?
23     THE WITNESS: Yes, Honorable Judge.
24  Q. Now, on this page -- so let me ask you. Who were you
25  speaking with during this call?

| HBTPATI5 | Zarrab - Direct | Page 347 |
|---|---|---|

1  A. Ms. Zeynep Ersun.
2  Q. Who is that?
3  A. Assistant secretary to Mr. Suleyman Aslan, and Mr. Suleyman
4  Aslan himself.
5  Q. Okay. Now, do you see three-quarters down the page where
6  you say "thank God"?
7  A. Yes, sir.
8  Q. What does Aslan say in response?
9  A. There are no problems there related to this, only now a
10  little ago Mr. Hakan Atilla told me that NIOC has the 70
11  million transferred to your account.
12  Q. What did you understand him to be saying there?
13     THE COURT: Excuse me, was it from or to your account?
14     THE WITNESS: This transfer was made directly from
15  NIOC account to my account.
16     THE COURT: Okay.
17  BY MR. KAMARAJU:
18  Q. What did you understand him to be saying there?
19  A. There has been a mistake being made.
20  Q. What kind of mistake?
21  A. A big mistake.
22  Q. Why would it be a big mistake?
23  A. So Iranian side made the mistake --
24     THE COURT: You're too close --
25  A. -- by sending the sanction money to my account directly,

| HBTPATI5 | Zarrab - Direct | Page 348 |
|---|---|---|

1  without passing through the bank.
2     (Continued on next page)

| HBT3ATI6 | Zarrab - Direct | Page 349 |
|---|---|---|

1  Q. Why would that be a mistake?
2  A. I could not receive money directly from NIOC.
3  Q. Why not?
4  A. Because of the rules and regulations of the United States,
5  and United Nations, I could not receive gold or -- I'm sorry.
6  Gas or oil money directly to my account.
7  Q. Who did you understand him to be referring to when he said
8  Hakan Atilla?
9  A. Mr. Hakan Atilla, who is the head of international
10  department.
11  Q. Is that the defendant?
12  A. Yes, sir.
13  Q. If we could turn to page three -- I'm sorry. Let me stay
14  on page two.
15     Do you see where Aslan says "But it's a direct one"?
16     THE INTERPRETER: We don't have that page.
17     THE COURT: You might.
18     THE INTERPRETER: Yes, we have it, I'm sorry.
19     MR. KAMARAJU: With your permission, maybe I'll hand
20  up a hard copy to the interpreter.
21     THE COURT: I think they found it. But no problem.
22     MR. KAMARAJU: Just in case it's helpful.
23     THE INTERPRETER: Thank you very much.
24  Q. So what did you understand him to be saying there?
25  A. As it was necessary to send it from NIOC to an Iranian

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBT3ATI6          Zarrab - Direct          Page 350

1 bank, by mistake it was sent directly to my account.
2 Q. Let's look at your response.
3 A. "No, not direct. They made a mistake. It will go to
4 Sarmayeh, Shahr Bank, Bank Shahr. You stop it and I will get
5 it corrected. They are stupid, they are retarded."
6 Q. What do you mean when you said it will go to Sarmayeh?
7 A. The money was supposed to be sent from the NIOC account
8 directly to Sarmayeh bank, or to Shahr bank, which is a
9 different bank. To their account.
10 Q. Would that step have been reflected on your diagram,
11 Government Exhibit 9502?
12 A. Yes, that was the step which indicates the money passing
13 from NIOC to Sarmayeh. But there is no indication of any
14 payment that's coming directly to me from NIOC in the diagram
15 that I had made.
16 Q. Why is that?
17 A. Because it was not supposed to be, they could not send it
18 to me because of the sanctions, regulations and rules. If they
19 would be able to send it to me, they could also be able to make
20 their own foreign payments in the world.
21      MR. KAMARAJU: Can we turn to page three, please.
22 Q. Do you see at the top where you say "Please process this as
23 a null transaction as if it never happened"?
24 A. I see that, sir.
25 Q. What did you mean there?

HBT3ATI6          Zarrab - Direct          Page 351

1 A. This is a restricted transaction, so it just disregard this
2 all together.
3 Q. Are you asking Halkbank to disregard it?
4 A. Yes, sir.
5 Q. Do you see a little further down where Aslan says "No, they
6 can't transfer this money to you, this, this is exactly the
7 kind of issue that is subject to sanction"?
8 A. Yes, sir.
9 Q. What did you understand Aslan to be saying there?
10 A. This is exactly contradictory to the American sanctions.
11 Q. Why was that?
12 A. Because it's coming to my account directly from NIOC, in
13 contradiction of the sanctions rules.
14 Q. Mr. Zarrab, in connection with the Government Exhibit 9502,
15 the diagram of Iranian gold transactions, was there any
16 documentation provided in connection with those transactions?
17 A. Yes, of course.
18 Q. Was it you who provided documents?
19 A. They were prepared by my company.
20 Q. What kinds of documents did you provide?
21 A. Pro forma invoice.
22 Q. What's that?
23 A. I'm talking according to the schematics that I draw. The
24 details and information related to the gold trade between Toseh
25 and Safir.

HBT3ATI6          Zarrab - Direct          Page 352

1 Q. Okay. Were there any other documents?
2      THE COURT: Excuse me, I had a question. You used the
3 phrase "pro forma" just now. I think you used it before too.
4 What do you mean by pro forma?
5      THE WITNESS: Yes, your Honor. I will explain it
6 right now.
7      Pro forma is the first step before the final invoice.
8 Q. So, what's the difference between a pro forma invoice and a
9 final invoice?
10 A. There are may be a lot of differences that may happen
11 between the date of the pro forma invoice, and the date of the
12 final invoice. For example, the exchange rate may change, the
13 other information may change, it's like a template of the trade
14 that will be made.
15      THE COURT: Got it.
16 Q. Just to wrap that up. When do you submit the pro forma
17 invoice?
18 A. We firstly give Iran only the number of the pro forma
19 invoice. Because gold is not transported to Iran, physically.
20 These are all, you know, regulations, rules, formalities.
21 Q. What would a pro forma be used for in a non-Iranian oil
22 transaction?
23 A. Plays the same role, but at that time it will be a real
24 trade.
25 Q. When in the process would you submit a final invoice?

HBT3ATI6          Zarrab - Direct          Page 353

1 A. That's a final invoice because all the information on the
2 invoice is set. So the exchange rate and other information,
3 and also, export documentation or customs documentation is also
4 submitted together with the final invoice to the bank. And
5 also the vendors invoice will be submitted.
6 Q. What is a customs declaration?
7 A. The export documents that will be made in Turkey while you
8 are exporting the gold out of Turkey.
9 Q. Are customs declarations used in your normal gold trade?
10 A. Yes, of course.
11 Q. What kind of information is typically contained on the
12 customs declaration?
13 A. The buyer, the country that it will be exported to, the
14 exporter, the amount, and also some more information that I
15 cannot remember right now.
16 Q. Mr. Zarrab, I'd like to show you what's been marked for
17 identification as Government Exhibit 3585. Let's look if we
18 can blow up the top part of that page. Do you recognize this
19 document?
20 A. I recognize it, sir.
21 Q. What is it?
22 A. It is an electronic mail, sir.
23 Q. Who is it from?
24 A. Gita Taheri.
25 Q. Who is Gita Taheri?

**A382**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

| HBT3ATI6 | Zarrab - Direct | Page 354 |
| --- | --- | --- |

1 A. Gita Taheri is one of my staff members that worked at my
2    Royal Group at that time.
3 Q. Who is this e-mail to?
4 A. It's to me, sir.
5 Q. What is the date of the e-mail?
6 A. May 15, 2012.
7        MR. KAMARAJU: Can we turn to the next page, please.
8 Q. Do you recognize this?
9 A. Yes, sir.
10 Q. What is it?
11 A. It is a Republic of Turkey customs declaration.
12 Q. Are there any goods listed on that declaration?
13 A. Yes, sir.
14 Q. What goods are listed there?
15 A. Gold bars, sir.
16        MR. KAMARAJU: The government would offer Exhibit
17    3585.
18        MS. FLEMING: Objection. Foundation and hearsay.
19        THE COURT: Do you want to explore a little bit more?
20        MR. KAMARAJU: Sure.
21 Q. Do you see Halkbank on this document anywhere?
22 A. Yes, sir.
23 Q. Was this document prepared in connection with -- withdrawn.
24        Do you see any Iranian bank information on this
25    document?

| HBT3ATI6 | Zarrab - Direct | Page 355 |
| --- | --- | --- |

1 A. I see, sir.
2 Q. What is that information?
3 A. Bank Pasargad, Tehran, Iran, sir.
4 Q. Is this document related to the scheme you diagrammed in
5    Government Exhibit 9502?
6 A. Yes, sir.
7        MR. KAMARAJU: The government offers Government
8    Exhibit 3585.
9        THE COURT: I'll allow it.
10        (Government's Exhibit 3585 received in evidence)
11 Q. What language is the document in, sir?
12 A. It's in Turkish, sir.
13 Q. Is the ultimate destination of the gold reflected on this
14    document?
15 A. Yes, it shown, sir.
16 Q. What's written there?
17 A. It's Iran Islamic Republic.
18 Q. Mr. Zarrab, did you export any gold to Iran using money
19    held at Halkbank?
20 A. No, sir.
21 Q. Did you always list Iran as the ultimate country of
22    destination on customs declarations?
23        MS. FLEMING: Objection.
24 A. No, sir.
25 Q. What determined what you wrote as the ultimate destination?

| HBT3ATI6 | Zarrab - Direct | Page 356 |
| --- | --- | --- |

1 A. Halkbank, sir.
2 Q. Is this document --
3        THE COURT: Could you explain that? I didn't
4    understand. Would you ask the question again.
5        MR. KAMARAJU: Sure.
6 Q. You testified that you prepared, your company prepared
7    customs declarations in connection with the scheme described in
8    Government Exhibit 9502. Is that right?
9 A. Yes, sir.
10 Q. Did those customs declarations declare an ultimate
11    destination for the gold?
12 A. Yes, sir.
13 Q. What country is reflected on the exhibit before you as the
14    ultimate destination?
15 A. Islamic Republic of Iran, sir.
16 Q. Was that the case for all the customs declarations that you
17    prepared as part of this scheme?
18 A. No, sir. Other countries were also written there, sir.
19 Q. What determined what country you listed there?
20        THE COURT: You mean what factors? Is that what
21    you're asking?
22        MR. KAMARAJU: I can ask it that way, your Honor.
23 Q. What factors determined what countries you listed there?
24 A. Sir, we were writing this at the direction of Halkbank,
25    depending on whatever they said. If they said Iran, we would

| HBT3ATI6 | Zarrab - Direct | Page 357 |
| --- | --- | --- |

1    put Iran. If not, we would put Dubai.
2 Q. Who did you discuss that with at Halkbank?
3 A. Mr. Suleyman Aslan and Mr. Hakan Atilla.
4 Q. I'd like to show you what's been marked for identification
5    as Government Exhibit 229-T.
6        MR. KAMARAJU: Mr. Chang-Frieden, if we can turn to
7    the second page of that exhibit.
8 Q. Mr. Zarrab, just take a moment to review this exhibit,
9    please.
10 A. Of course. I reviewed it, sir.
11 Q. What is this document?
12 A. It is a transcript of a phone conversation.
13        MS. FLEMING: Judge, I need to be heard on this. I
14    need to be heard on this.
15        THE COURT: Well, okay. Do you want to make a speech?
16        MS. FLEMING: No, I think -- I would be happy to do it
17    here, but I don't think you'd like it.
18        THE COURT: Okay. So quickly though.
19        (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

HBT3ATI6          Zarrab - Direct          Page 358

1        (At the sidebar).
2        THE COURT: Can I take a look with you.
3        MS. FLEMING: Yes.
4        THE COURT: Go ahead, Ms. Fleming.
5        MS. FLEMING: Judge, the reason I brought it up here
6    is there is a reference to a Hakan in here.  This is not Hakan
7    Atilla.  And --
8        THE COURT: So we can make that clear.
9        MS. FLEMING: I just asked --
10       MR. DENTON: How do you know that?
11       MS. FLEMING: Because I've read the transcripts.
12       MR. KAMARAJU: That's a question for cross.
13       MS. FLEMING: I think that's really misleading to put
14   this in front of the jury the way this examination is going and
15   suggest it's him.
16       THE COURT: I don't know how much --
17       MR. KAMARAJU: I can ask him.
18       THE COURT: Hakan is probably as common as Richard is
19   in New York.
20       MS. FLEMING: I think it's more common.
21       (Continued on next page)
22
23
24
25

HBT3ATI6          Zarrab - Direct          Page 359

1        (In open court)
2    BY MR. KAMARAJU:
3    Q.  Do you recognize this exhibit?
4    A.  I recognize it, sir.
5    Q.  What is it?
6    A.  It is a transcript of a phone conversation.
7    Q.  Do you remember it?
8    A.  I remember, sir.
9        THE COURT: You remember the conversation?
10   Q.  Do you remember the telephone conversation?
11       THE WITNESS: Yes, your Honor.
12   Q.  Who participated in the conversation?
13   A.  It is Abdullah Happani and myself.
14   Q.  Remind us who Abdullah Happani is.
15   A.  Abdullah Happani is the second person in charge in my Royal
16     company after me.
17   Q.  Without reading from the document, what is the general
18     substance of the conversation you had with Happani here?
19   A.  With regards to the gold exports we were doing through
20     Halkbank, due to some changes in the U.S. embargo regulations,
21     this is a conversation where we're discussing the final
22     destination about the gold trade would be changing.
23       MR. KAMARAJU: The government would offer Government
24   Exhibit 229-T subject to connection and ask that we be allowed
25     to publish it from page two on.

HBT3ATI6          Zarrab - Direct          Page 360

1        THE COURT: I'm going to allow it.
2        (Government's Exhibit 229-T received in evidence)
3    Q.  All right.  Now, do you see at the top of page two you say
4    "I talked to Hakan and they are going to transfer soon"?
5    A.  I see it, sir.
6    Q.  What did you mean there?
7    A.  Money had been sent to our account from Iran, from either
8     Sarmayeh Bank or some other bank.  The money -- the money had
9     not been received by us yet.  It had not been deposited at this
10    point.  I'm saying that I had just spoken to Mr. Hakan Atilla
11     and that the money would be deposited soon.
12   Q.  Do you see two boxes down where you say "Also, call that
13    Mr. Zhini and tell him Mr. Reza has talked to Mr. Hakan and
14     there was a problem but it has been resolved"?
15   A.  I see it, sir.
16   Q.  What did you mean there?
17   A.  Mr. Zhini was the branch manager where our account resides.
18    I'm telling him to follow up on the fact that I had talked to
19    Mr. Hakan, and that the transfer would be made soon.
20   Q.  What was the problem that you were referring to?
21   A.  Since there was regulation changes within the U.S. embargo
22    during that time, the bank was going to determine the final
23    destination point that should be on the customs declarations.
24   Q.  How did you learn about the change in the regulations?
25   A.  From the bank, sir.

HBT3ATI6          Zarrab - Direct          Page 361

1    Q.  Who did you discuss it with at the bank?
2    A.  With Mr. Hakan Atilla, sir.
3    Q.  Do you see further down when you say "Um, for the exports
4     write 'transit to Iran through Dubai' on the declarations
5     again."
6    A.  Yes, sir.
7    Q.  What did you mean there?
8    A.  For a while, prior to this conversation, we were putting
9     the final destination point as Dubai.  I'm telling Abdullah we
10    have to go back to putting Iran down.  And I'm saying that in
11    order for it to be Iran, we need to start using physical
12    couriers to do this.
13   Q.  Why would you need to use physical couriers in that case?
14   A.  When we were sending it to Dubai, since it was going
15    actually to Dubai, we were using a shipment company.  So during
16    the time where the bank was accepting the final destination
17    point being Dubai, the gold was being sent through a cargo
18    service.
19       But when it changes to Iran, since the gold cannot go
20    to Iran, and since they will not go to Iran, the couriers would
21    look as if they are going to Iran via Dubai, but they would
22    unload the gold in Dubai and would return back to Turkey.
23   Q.  So, why is it that you could use a cargo service if the
24    gold was listed as going to Dubai?
25   A.  Because the gold was actually going to Dubai.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

1 Q. Why did that matter?
2 A. So for that, the information put on the declaration or the
3   customs document was correct.
4 Q. How did you make it -- why did you then have to switch to
5   couriers?
6 A. Because we needed to go back to Iran.
7 Q. How did you make it look like they were going back to Iran?
8 A. We went back to the courier system, couriers were taking
9   the gold physically from Turkey to Dubai, and they were
10  supposed to carry it physically to Iran after Dubai. But they
11  were not doing that transport. They were taking it to our
12  office in Atlantis in Dubai, and they were leaving them there.
13 Q. Mr. Zarrab, do you see a little further, two blocks down on
14  this where you say "Brother, there is no way. That is what the
15  regulations indicate. Do that for 10 days -- for a week."
16 A. Yes, sir.
17 Q. What did you mean there?
18 A. I mean when the bank told us that this is a regulation,
19  that's what we need to do, that's what we had to do. It was
20  not up to us, it was not our choice.
21 Q. Who did you discuss that with at the bank?
22 A. Mr. Suleyman Aslan and Mr. Hakan Atilla.
23 Q. Do you see a little further down where you say "They
24  should, um, review the regulation, this is what the regulations
25  say at the present time."

1 A. Yes, sir.
2 Q. What did you mean there?
3 A. Mr. Hakan Atilla was supposed to review the regulations,
4   and provide guidance on this. And I am saying that it had
5   changed to Iran, and that's what we need to do at this point.
6   And what I said was that that's what it appears to be at this
7   point.
8 Q. The scheme that you diagrammed in Government Exhibit 9502,
9   did you actually use that at any point?
10 A. Can you repeat the question, please?
11 Q. Let me rephrase.
12     The scheme that you diagrammed in Government Exhibit
13  9502. Did you withdraw money from Halkbank using that scheme?
14 A. Of course, we withdrew all of it from Halkbank anyway.
15 Q. Approximately how much money did you withdraw from Halkbank
16  as part of that scheme?
17 A. A few billion.
18     THE COURT: A what?
19     THE INTERPRETER: A few billion.
20     THE WITNESS: A few billion.
21     THE COURT: Billion what, euros, dollars?
22     THE WITNESS: Procurement of euros. It is euros and
23  Turkish liras, and referring to it as euros only as an
24  equivalent of euros.
25 Q. And the few billion euros that you withdrew, was it all

1   sent to Dubai ultimately?
2 A. You mean the gold, physically?
3 Q. Yes. Let me say that question better.
4     The few billion euros that you testified about, was
5   that used to purchase gold?
6 A. This few billion euros is the money where we fulfilled the
7   international money orders that we had received from Iranians
8   under the disguise of gold trade.
9 Q. Did you discuss that with people at the bank?
10 A. Certainly.
11 Q. Who did you discuss it with at the bank?
12 A. Mr. Suleyman Aslan, and Mr. Hakan Atilla.
13 Q. Were there other people you talked about it with at the
14  bank?
15 A. With Mr. Levent Balkan.
16 Q. Anyone else?
17 A. These were the people that I remember at the senior level
18  that I -- that I conversed with at a general level. And in
19  later time periods with Hakan Aydogan, with Mr. Saeed Ahmet.
20 Q. I'd like to show you what's been marked for identification
21  as Government Exhibit 3582. Do you recognize this document?
22 A. I recognize it, sir.
23 Q. What is it?
24 A. Electronic mail.
25 Q. How do you recognize it?

1 A. This e-mail had been sent to me, sir.
2 Q. Who sent it to you?
3 A. Emir Eroglu.
4 Q. Who is that?
5 A. Emir Eroglu is one of my staff members that worked at my
6   company during that time frame.
7 Q. What is the date of the e-mail?
8 A. May 7, 2012.
9 Q. Can we turn to the next page of the exhibit. And do you
10  recognize this, Mr. Zarrab?
11 A. Yes, sir.
12 Q. What is it?
13 A. The account information and the address information for my
14  companies' accounts at Halkbank.
15 Q. What were these accounts used for?
16 A. This account was used for gold trade.
17     MR. KAMARAJU: The government would offer Government
18  Exhibit 3582.
19     MS. FLEMING: No objection.
20     THE COURT: I'll allow it.
21     (Government's Exhibit 3582 received in evidence)
22     MR. KAMARAJU: Can we please publish the second page.
23 Q. Do you see a bank identified here?
24     THE COURT: First of all, is this in Turkish?
25     THE WITNESS: Yes, your Honor.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

CORRECTED
November 29, 2017

1    MR. KAMARAJU: Thank you, your Honor.
2 Q. Do you see a bank name identified here?
3 A. Yes, sir.
4 Q. Do you see the name of one of your companies identified
5   here?
6 A. Yes, sir.
7 Q. What is the name of that company?
8 A. Safir Altin Ticaret Ithalatve Ihracat LTD Company.
9 Q. Is that the Safir that you drew up on Government Exhibit
10   9502?
11 A. Yes, sir.
12 Q. Down at the bottom of the document, do you see what appears
13   to be a string of numbers there?
14 A. I see that, sir.
15 Q. What is the first string of numbers, the one at the top?
16 A. These are account numbers.
17 Q. Do you see at the end of that top string of numbers it says
18   TL?
19 A. Yes, sir.
20 Q. What is that?
21 A. This is my Turkish lira account number.
22 Q. Just to be clear, where is this account held?
23 A. Halkbank of Turkey.
24 Q. Are there any other currency accounts listed on this
25   document?

1 A. Yes, sir.
2 Q. What other currency accounts are listed?
3 A. Dollars and euros, sir.
4 Q. Were these accounts used as part of the scheme that you
5   diagrammed in Government Exhibit 9502?
6 A. The ones in Turkish liras and euros, sir.
7    MS. FLEMING: Can I hear that answer again?
8    THE INTERPRETER: The ones in Turkish liras and euros,
9   sir.
10 Q. I'd like to show you what's been marked for identification
11   as Government Exhibit 201-T.
12    MR. KAMARAJU: Can we go to page two of that exhibit.
13 Q. Take a moment to review that, Mr. Zarrab.
14 A. Yes, sir.
15 Q. Do you recognize it?
16 A. Yes, sir.
17 Q. What is it?
18 A. It is a transcript of a telephone conversation.
19 Q. Do you remember this telephone call?
20 A. Yes, sir.
21 Q. Who participated in the call?
22 A. Abdullah Happani and myself, sir.
23 Q. What is the general substance of the conversation?
24 A. The orders that were sent by Sarmayeh Bank were being paid
25   with a delay because of the shortage of low supply of dirhams

1   in Dubai and this was about that.
2    MR. KAMARAJU: The government offers Government
3   Exhibit 201-T subject to connection and ask to publish it from
4   page two on.
5    THE COURT: I'll allow it.
6    MS. FLEMING: On the transcripts I just have the same
7   objections I've put. I don't have to keep jumping up and down
8   if you let me have a continuing objection.
9    THE COURT: Sure.
10    (Government's Exhibit 201-T received in evidence)
11 Q. Mr. Zarrab, do you see where you say around the middle of
12   the page "She's not nursing it, brother, Sarmayeh came in today
13   but the woman didn't process it. You should personally get
14   involved in this dirham business."
15 A. Yes, sir.
16 Q. What did you mean there?
17 A. What I had drawn on the diagram with blue lines regarding
18   the instructions. Those instructions were being received, but
19   the woman who was dealing with these dirham payments in our
20   company had not made these payments yet.
21 Q. Who is that woman that you're referring to?
22 A. Kamelia Jamshidy.
23 Q. Did she work for you?
24 A. Yes, sir.
25 Q. If you look down a little further, two blocks down you say,

1   do you see where you say, "Okay, but let's speed it up a bit
2   and at least take care of these guys' transactions."
3 A. Yes, sir.
4 Q. What did you mean there?
5 A. I mean, speed up these transactions, the transactions that
6   are pending with from Sarmayeh, fulfill those. International
7   payments, speed those up.
8 Q. Then do you see where Happani responds "They request it at
9   banks out of your control and so on. I mean, all of a sudden."
10 A. I see it, sir.
11 Q. What did you understand Happani to be saying there?
12 A. Sometimes, and many times, Sarmayeh would have dirham
13   payments also. The banks that they indicate in relation to
14   these requested payments in Dubai, I didn't have -- we didn't
15   have accounts or didn't have access, easy access to these.
16 Q. Then do you see a little while down where Happani says
17   "Okay, well, we'll speed things up. We have taken it easy with
18   dirham for a couple of days. I wanted to send more to cikonova
19   and so on."
20 A. I see it, sir.
21 Q. What did you understand him to mean when he said "We'll
22   speed things up"?
23 A. What he's saying is I would ensure that dirham is
24   accumulated in Dubai by sending more gold to Dubai.
25 Q. Where he said "I wanted to send more to cikonova and so

Case 18-1910, Document 26, 09/26/2018, 2383242, Page143 of 257

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

1  on," what did you understand him to mean there?
2  A. Cikonova was a code that we used amongst ourselves within
3  my staff members and myself for transactions that don't reflect
4  real transactions -- fake transactions. We would use the word
5  cikonova. Sometimes there was no export of gold out of Turkey.
6  When gold was not sent out physically, we were ending up with
7  less dirhams in Dubai. This is what I mean here. In other
8  words, Abdullah is telling me we have shortage of dirhams
9  because of that.
10 Q. Were the transactions that you did or that you diagrammed
11  in Government Exhibit 9502, were those cikonova?
12 A. No. No. It was real gold, most of that was sent out or
13  exported out of Turkey.
14     MR. KAMARAJU: I'm happy to press on, but I'm moving
15  to another section.
16     THE COURT: I think we'll stop a little early, but
17  we're making good progress. So we'll excuse the witness for
18  today.
19     (Witness is not present)
20     THE COURT: Before I excuse the jury, I just want to
21  remind you, as I do each day, first, please do not talk with
22  each other about this case or about anyone who has anything to
23  do with it until the end of the case when you go to the jury
24  room to deliberate to decide on your verdict.
25     Second, please don't talk with anyone else about the

1  case or about anyone who has anything to do with it until the
2  trial has ended, and you've been discharged as jurors. And by
3  "talk," I'm referring to e-mailing, texting, tweeting,
4  blogging, I'm also referring to any type of communication in
5  any forum, including without limitation Facebook, MySpace,
6  Twitter, Instagram, Snapchat, etc.
7     Additionally, do not remain in the presence of other
8  persons who may be discussing this case, either orally or
9  online. "Anyone else" includes members of your family and your
10  friends, and embraces social media. You may tell them that you
11  are a juror in a case, but please don't tell them anything else
12  about the case, until after you've been discharged by me.
13     Third, do not let anyone talk to you about the case or
14  about anyone who has anything to do with it. And if someone
15  should try and talk to you about the case, please report that
16  to Christine or me immediately.
17     And as I said before in this regard, attorneys and
18  defendants are not supposed to talk to jurors, even to offer a
19  friendly greeting. So if you happen to see any of them outside
20  the courtroom, they will, as they should, ignore you and please
21  don't take offense. They'll only be acting properly by doing
22  so.
23     And fourth, do not read any news or internet stories
24  or articles or blogs or listen to any radio or cable television
25  or TV or internet reports about the case or about anyone who

1  has anything do with it.
2     And lastly, fifth, please do not do any type of
3  research or any type of investigation about the case on your
4  own. As I suggested on the first day, and of course it still
5  applies, the parties are entitled to have you personally render
6  a verdict in this case on the basis of your independent
7  evaluation of the evidence that is presented here in the
8  courtroom. So, obviously, speaking to others about the case,
9  even including family members, before you deliberate, or
10  exposing yourself to evidence outside the courtroom in any way
11  could compromise your jury service and fairness to the parties.
12     So, we've had a good day and making good progress.
13  We'll see you tomorrow at 9:15. Thanks very much.
14     (Jury excused)
15     THE COURT: I don't know if you have anything for me.
16  I have one small item for you. One small concern that I have.
17     During the last break, I inquired of the agent who
18  accompanies Mr. Zarrab whether there was any reason that
19  Mr. Zarrab could not appear in court in civilian clothes. And
20  the agent said he knew of none. Typically, though, he would
21  need a court order to that effect.
22     My feeling is, and my experience is, that it's hard
23  enough to appear in court as a party under any circumstances,
24  and certainly no reason, if the individual wishes, there is
25  certainly no reason to make things more difficult by not

1  providing, for example, a shirt and a tie or jacket or
2  whatever. And just wanted you all to know that I would sign an
3  order to that effect every time that an attorney would ask me,
4  and I would do the same in this case if I were asked.
5     MR. KAMARAJU: Your Honor, I understand the Court's
6  point. I do think we need to look at this in a bit of context.
7  Defense counsel --
8     THE COURT: I'm not -- I just want to make sure things
9  are fair. And as I say, I think it is hard enough to appear
10  here, especially if you are a party. And I'm just sharing --
11  I'm not directing that anything happen. It is just my based on
12  my observations and my experience.
13     MR. KAMARAJU: Your Honor, we can certainly ask
14  Mr. Zarrab if he has a preference.
15     THE COURT: If he wishes to.
16     MR. KAMARAJU: We will do that.
17     THE COURT: Okay. So then also we had, I can't
18  remember the name, there is a witness, Turkish witness who is
19  coming up I think next week, you said, and it was the subject
20  of one of the defense's subpoena requests. I asked if that
21  person were represented by counsel. And that person is not,
22  and nobody had any objection, so we're appointing a CJA counsel
23  and that person is Susan Kellman.
24     MS. FLEMING: Okay.
25     THE COURT: So it would probably be best to be in

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

**CORRECTED**
**November 29, 2017**

HBT3ATI6                                                    Page 374

```
1   contact with Ms. Kellman with respect to that subpoena.  Okay?
2       Great, thanks.  I'll see you tomorrow.
3       MR. KAMARAJU: Thank you, your Honor.
4       (Adjourned until November 29, 2017, at 9:15 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 376

```
1        1204-T through 1208-T, 1266-T
2        through 1293-T, 2001-T through
3        2004-T, 2007-T through 2011-T
4   2015-T, 2016-T, 2019-T through 2022-T,  . . . 231
5        2024-T through 2041-T, 2043-T,
6        2044-T, 2045-T, 2047-T through
7        2054-T, 3614-T, 3617-T,
8        3622-T,
9   3623-T, 3629-T, 3631-T through 3636-T,  . . . 232
10       3639-T through 3649-T, 3651-T,
11       3655-T, 3658-T, 36-59-T,
12       3660-T, 3664-T, 3666-T,
13       3668-T, 3670-T,
14  3675-T, 3676-T, 3679-T, 3680-T, 3682-T . . . 232
15       through 3687-T, 3689-T, 3691-T
16       through 3694-T, 3706-T,
17       3708-T, 3710-T, 3744-T,
18       3746-T, 3753-T
19  3760-T through 3764-T, 3787-T through . . . . 232
20       3792-T, 4658-T through 4663-T,
21       4788-T, 4790-T
22  1297-T, 1298-T, 3228-T, 3231-T   . . . . . . 256
23  3254-T through 3256-T, 3292-T, 3309-T  . . . 257
24  3312-T, 3314-T, 3316-T, 3319-T, 3322-T  . . 257
25  3323-T, 4539-T, 735-T, 737-T, 901-T   . . . . 257
```

Page 375

```
1                   INDEX OF EXAMINATION
2   Examination of:                              Page
3    BULENT BULUT
4   Direct By Mr. Sovolos . . . . . . . . . . . 222
5   Cross By Ms. Fleming . . . . . . . . . . . . 232
6   Redirect By Mr. Sovolos  . . . . . . . . . 250
7    ANUSH DJAHANBANI
8   Direct By Mr. Lockard . . . . . . . . . . . 253
9   Cross By Ms. Fleming . . . . . . . . . . . . 257
10   REZA ZARRAB
11  Direct By Mr. Kamaraju . . . . . . . . . . 260
12              GOVERNMENT EXHIBITS
13  Exhibit No.                             Received
14   201-T through 233-T, 236-T, 238-T . . . . . 231
15          through 269-T, 273-T, 274-T,
16          276-T through 279-T
17   288-T, 291-T, 293-T through 298-T,  . . . . 231
18          300-T, 301-T, 304-T through
19          390-T, 314-T, 316-T, 326-T,
20          336-T through 357-T,
21   359-T, 380-T, 381-T, 721-T, 726-T, . . . . 231
22          727-T, 734-T, 736-T, 740-T,
23          745-T, 749-T, 750-T, 752-T,
24          818-T through 822-T
25   827-T, 1001-T through 1004-T, 1201-T, . . . . 231
```

Page 377

```
1    20   . . . . . . . . . . . . . . . . . . 262
2    13   . . . . . . . . . . . . . . . . . . 276
3    901  . . . . . . . . . . . . . . . . . . 283
4    4539 and 4539-T  . . . . . . . . . . . . 285
5    8    . . . . . . . . . . . . . . . . . . 292
6    17   . . . . . . . . . . . . . . . . . . 298
7    12   . . . . . . . . . . . . . . . . . . 300
8    3730  . . . . . . . . . . . . . . . . . 304
9    3733  . . . . . . . . . . . . . . . . . 307
10   3660, 3660-T   . . . . . . . . . . . . . 314
11   3727  . . . . . . . . . . . . . . . . . 319
12   9501  . . . . . . . . . . . . . . . . . 323
13   9502  . . . . . . . . . . . . . . . . . 335
14   3800  . . . . . . . . . . . . . . . . . 337
15   3585  . . . . . . . . . . . . . . . . . 355
16   229-T  . . . . . . . . . . . . . . . . . 360
17   3582  . . . . . . . . . . . . . . . . . 365
18   201-T  . . . . . . . . . . . . . . . . . 368
19
20
21
22
23
24
25
```

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*November 30, 2017*

*Southern District Court Reporters*

Original File HBUPATIF.txt

**Min-U-Script® with Word Index**

**A389**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  UNITED STATES OF AMERICA,
 4            v.                    S4 15 Cr. 867 RMB
 5  MEHMET HAKAN ATILLA,
 6            Defendant.
 7  ------------------------------x
 8
 9                         November 30, 2017
                                9:15 a.m.
10
11
12  Before:
13            HON. RICHARD M. BERMAN,
14                              District Judge
                                and a jury
15
16
17                  APPEARANCES
18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL D. LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID W. DENTON, JR.,
21  DEAN C. SOVOLOS,
         Assistant United States Attorneys
22
23
24
25
```

```
 1
 2           (APPEARANCES Continued)
 3
 4
    HERRICK, FEINSTEIN LLP (NYC)
 5       Attorneys for defendant Atilla
    BY:  VICTOR J. ROCCO, Esq.
 6       THOMAS ELLIOTT THORNHILL, Esq.
             - and -
 7  FLEMING RUVOLDT, PLLC
    BY:  CATHY ANN FLEMING, Esq.
 8       ROBERT J. FETTWEIS, Esq.
             - and -
 9  LAW OFFICES OF JOSHUA L. DRATEL, P.C.
    BY:  JOSHUA LEWIS DRATEL, Esq.
10            Of counsel
11
12  Also Present:
13       JENNIFER McREYNOLDS, Special Agent FBI
         MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14       MS. ASIYE KAY, Turkish Interpreter
         MS. SEYHAN SIRTALAN, Turkish Interpreter
15       MR. M. TEKIN ESENDAL, Turkish Interpreter
         MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

1      (At the sidebar)

2      MR. ANELLO: Two quick applications. One is that

3  Mr. Zarrab would be more comfortable if he could be in civilian

4  clothes today.

5      THE COURT: No problem.

6      MR. ROCCO: No objection.

7      MR. KAMARAJU: And the government doesn't object. But

8  just because, for example, defense counsel opened on --

9      THE COURT: Hold on one second though. We should

10  indicate that you are.

11      MR. ANELLO: I'm counsel for Reza Zarrab in connection

12  with his appearance as a witness.

13      MR. KAMARAJU: Obviously the government doesn't object

14  to that in light of the concerns raised yesterday. But we

15  would note that given that defense counsel opened on the

16  concept of coddling Mr. Zarrab, and I believe in particular

17  used the line "he's reasonable doubt in a suit," we just intend

18  to elicit testimony as to why he's in different clothes and he

19  is still in custody this morning.

20      MR. ROCCO: They didn't want to concede when he's in a

21  suit he is reasonable doubt.

22      THE COURT: Two things. My remarks yesterday were

23  just an observation. I wasn't directing anybody to do

24  anything. But it's such common practice that I don't think it

25  needs any discussion, to be honest with you. If you feel you

1  have to, I guess you can. But really, it happens all the time

2  in my experience. And when the application is made, I always

3  grant it. It is up to you.

4      MR. KAMARAJU: It would be a very quick part at the

5  beginning, your Honor. I don't intend to belabor it.

6      THE COURT: All right. We should do it quickly

7  because they haven't brought up Mr. Atilla because Mr. Zarrab

8  is here. So we'll bring Mr. Zarrab out. Then we get

9  Mr. Atilla. We can't start without Mr. Atilla.

10      MR. ANELLO: Okay. The other issue, your Honor, is

11  yesterday, we got served with a subpoena, apparently a subpoena

12  for records. At this point, I've taken a look at it, it's

13  subject to many objections, it is wildly improper. But I think

14  what I would like to do is have an opportunity to talk to the

15  defense counsel, see if it can be worked out and narrowed. We

16  may still have issues and we may be before your Honor with a

17  motion. But, even the scheduling of that is something I would

18  want to talk to defense counsel.

19      MR. ROCCO: We offered this to Mr. Anello yesterday

20  and we're happy to talk to him.

21      THE COURT: Whenever you find time.

22      MR. ANELLO: Thank you, Judge.

23      THE COURT: I'm going to bring up Mr. Zarrab and then

24  Mr. Atilla.

25      (In open court; jury not present)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBU3ATI1                    Page 382

1      THE COURT: I think we're still waiting for one juror.
2  I think we probably have another five minutes or so.
3      MR. KAMARAJU: Your Honor, at a point in the direct
4  testimony I'm also going to put that one back up.
5      THE COURT: Do you need that closer because it's
6  harder to see?
7      MR. KAMARAJU: I was going to ask the witness to do
8  the same thing he did yesterday.
9      THE COURT: Sure. Could we have the jury here now.
10     (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HBU3ATI1          Zarrab - Direct          Page 383

1      (Jury present)
2      THE COURT: We'll continue with the direct examination
3  of Mr. Zarrab.
4      THE DEPUTY CLERK: Sir, before we begin I'd like to
5  remind you that you're still under oath.
6      THE WITNESS: Yes.
7      THE DEPUTY CLERK: You can be seated. Thank you.
8  REZA ZARRAB,
9      called as a witness by the Government,
10     having been previously sworn, testified as follows:
11 DIRECT EXAMINATION (Continued)
12 BY MR. KAMARAJU:
13 Q. Good morning Mr. Zarrab.
14 A. Good morning, sir.
15 Q. Just quickly, I couldn't help but notice you're wearing
16   different clothes today. Why is that?
17 A. Yes, my lawyers informed me yesterday that I could wear
18   different clothes with the permission of the honorable judge,
19   so I am wearing the clothes that they brought for me.
20 Q. To be clear, are you still in the custody of the FBI?
21 A. Yes, sir.
22 Q. Why were you moved to the custody of the FBI?
23 A. For security purposes, for the threats that I had
24   perceived.
25 Q. Has anybody made any promises to you about whether you'll

HBU3ATI1          Zarrab - Direct          Page 384

1  be returned to the bureau of prisons after your testimony?
2  A. No.
3  Q. Has anybody made any promises to you as to whether you'll
4   be returned to the bureau of prisons after trial?
5  A. No.
6      THE COURT: So, counsel, Mr. Anello will appreciate
7   that I may be overly sensitive to the clothing issue, and the
8   reason is that I'm always hearing in the back of my head my
9   wife saying "What are you wearing?" So, anyway.
10     MR. KAMARAJU: I don't have any more questions, your
11  Honor.
12 Q. Mr. Zarrab, I'd like to direct your attention to October of
13   2012.
14 A. Yes, sir.
15 Q. Were you still conducting the Iranian gold business at
16   Halkbank?
17 A. Yes, sir.
18 Q. Did you have meetings about that business that month?
19 A. Yes, sir.
20 Q. Approximately when was your first set of meetings during
21   that month?
22 A. It was about the beginning of October.
23 Q. Who was the first meeting with?
24 A. It was between me and Iranians.
25 Q. Where was that meeting?

HBU3ATI1          Zarrab - Direct          Page 385

1  A. It was at Swissôtel in Istanbul, Turkey.
2  Q. Who attended that meeting?
3  A. From the Iranian side, those from NIOC and from NICO. And
4   then Indians who were purchasers of oil from Iran joined. And
5   also another individual from Turkish petroleum companies also I
6   remember that came and left.
7  Q. Do you remember which of the Iranian officials were at that
8   meeting?
9  A. Those that I remember include Nikousokhan, Mr. Alipoor,
10   Mr. Rajaeieh was there, Mr. Jashnsaz was there, Mr. Ghalebani
11   came and left.
12 Q. Let's go through that. Who is Nikousokhan?
13 A. The person at the head of the financial department within
14   NIOC, the person with the highest authority in that department.
15 Q. Remind us what is NIOC.
16 A. (In English) National Iran Oil Company.
17   (Through Interpreter) National Iranian Oil Company, the
18   government owned Iran's petroleum company.
19 Q. Who is Alipoor?
20 A. Alipoor is the second person authority after Mr. Jashnsaz
21   that works at NICO, which is affiliated with NIOC.
22 Q. Remind us who is Rajaeieh.
23 A. Rajaeieh, Mr. Rajaeieh is at the head of Sarmayeh Exchange.
24   He is the CEO and he's the person with the most authority in
25   there.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    November 30, 2017

| HBU3ATI1 | Zarrab - Direct | Page 386 |
|---|---|---|

1  Q.  Who is Jashnsaz, if I got that right?
2  A.  Mr. Jashnsaz is is the highest authority in NICO company
3  which is affiliated with NIOC.
4  Q.  Who is Ghalebani?
5  A.  Mr. Ghalebani was the highest authority in charge of NIOC
6  during that time period.
7  Q.  I believe you've testified there was some Indian
8  individuals there.  Who were they?
9  A.  I don't remember the name of the company that they
10  represented.  But, I believe that it started with an H, and
11  this was the company that would be -- that was buying crude oil
12  products from Iran from -- Indian company that was buying
13  petroleum products from Iran.
14  Q.  What was the purpose of the meeting?
15  A.  In summary, the meeting entailed the moneys that were
16  accumulating in India just as the crude oil sales proceeds were
17  accumulating in Halkbank in Turkey.  We discussed how to move
18  the accumulated money from India to Turkey.
19        MR. KAMARAJU: Your Honor, with the Court's
20  permission, I'd ask that Mr. Zarrab be allowed to explain using
21  the diagram.
22        THE COURT: Sure.
23  Q.  Mr. Zarrab, could you please come down off the witness
24  stand.  And if you could explain what you mean using Government
25  Exhibit 9502.  Maybe turn it a little.

| HBU3ATI1 | Zarrab - Direct | Page 387 |
|---|---|---|

1        MR. ROCCO: We'd like to see it.
2        MS. FLEMING: Turn it this way, a little bit.
3        MR. ROCCO: Thank you.
4        THE COURT: Can the jurors see?
5        A JUROR: Yes.
6  Q.  Okay.  Could you please describe what you were summarizing
7  a moment ago.
8  A.  In short, in order for what I'll say to make sense, I will
9  go over this diagram that I had drawn yesterday in terms of the
10  section that pertains to what I will talk about.
11        The crude oil that NIOC sells to Turkey, they would
12  sell to different countries just the same way.  For example,
13  they sell to India, they sell to China, they sell to Korea,
14  they sell to Japan.  These are the ones that I remember, there
15  are different countries such as Italy also.
16        And India is one of the countries that purchases crude
17  oil from NIOC, just like the Republic of Turkey.  The proceeds
18  that accumulate in the NICO account in India from the sales
19  obtained from the crude oil sales --
20        THE INTERPRETER: I'm being asked to correct.  NICO is
21  corrected as NIOC.
22  A.  So the attempt was to bring that accumulated money over to
23  Halkbank.
24  Q.  What was the purpose of bringing that money to Halkbank?
25        MS. FLEMING: Objection, your Honor.

| HBU3ATI1 | Zarrab - Direct | Page 388 |
|---|---|---|

1        THE COURT: Overruled.
2        THE WITNESS: Should I continue?
3        THE COURT: Yes.
4  A.  In order to use the money within the same system, because
5  this system was not feasible in India, it was easier to access
6  the money at Halkbank to be used in Turkey.
7  Q.  Okay, Mr. Zarrab, if you could please return to the witness
8  stand.
9        I'd like to show you what's been marked for
10  identification as Government Exhibit 202-T.  If we can publish
11  that -- not -- sorry.  Withdrawn.  If we can just show that to
12  the witness starting at page two.
13        Mr. Zarrab, just take a moment to review this, please.
14  A.  Yes, sir.
15  Q.  Do you recognize this exhibit?
16  A.  I recognize it, sir.
17  Q.  What is it?
18  A.  This is a transcript of a phone conversation between myself
19  and Mr. Onur Kaya.
20  Q.  Do you remember this phone call?
21  A.  I remember, sir.
22  Q.  Do you remember listening to this phone call?
23  A.  Yes, sir.
24  Q.  Who participated in the call?
25  A.  Onur Kaya and myself.

| HBU3ATI1 | Zarrab - Direct | Page 389 |
|---|---|---|

1  Q.  Do you remember approximately when this call occurred?
2  A.  Approximately the beginning of October.
3  Q.  Which year?
4  A.  2012.
5  Q.  Who is Onur Kaya?
6  A.  Mr. Onur Kaya was the chief of staff for Mr. Caglayan, who
7  was the minister of the economy in Turkey at that time.
8  Q.  You testified that you listened to a recording of this
9  call; is that right?
10  A.  That is correct, sir.
11  Q.  Did that recording accurately capture the conversation you
12  had with Kaya?
13  A.  Yes, sir.
14        MR. KAMARAJU: Your Honor, the government would offer
15  Government Exhibit 202-T and would ask to be able to publish it
16  starting at page two to the jury.
17        MS. FLEMING: First of all, I think that this is
18  subject to further authentication.  But also, Judge, I think
19  you gave me a continuing objection on relevance and hearsay
20  grounds.
21        THE COURT: It doesn't go from one day to the next.
22  You have to start over.
23        MS. FLEMING: I'm starting over.  Objection on hearsay
24  and relevance grounds.
25        THE COURT: Overruled.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI1 | Zarrab - Direct | Page 390 |
|---|---|---|

1      (Government's Exhibit 202-T received in evidence)
2      MR. KAMARAJU: If we can put that up from page two.
3   Q.  Mr. Zarrab, do you see near the top of the page where you
4   say "Will Mr. Minister be in Turkey at the end of this week on
5   Thursday or Friday?"
6   A.  Yes, sir.
7   Q.  Who are you referring to as Mr. Minister?
8   A.  Mr. Zafer Caglayan.
9   Q.  Why were you asking whether he was going to be in Turkey at
10   that time?
11   A.  Because the Mr. Minister had a trip abroad, and I wanted to
12   confirm whether he'd be in Turkey or not.
13   Q.  What was the purpose of confirming whether he would be in
14   Turkey?
15   A.  We were going to organize a meeting between the Iranian
16   delegates and the minister.
17   Q.  Why were you trying to organize that meeting?
18   A.  During that timeframe, any meetings with the Iranians,
19   including NIOC, the oil minister, Sarmayeh Bank, I was
20   organizing about 90 percent of these meetings of these
21   individuals or these people with Mr. Minister, Zafer Caglayan.
22   Q.  Do you recall if you were able to arrange a meeting at this
23   time with Zafer Caglayan?
24   A.  I don't remember specifically for this date, but we got
25   together many times.  I mean, a meeting between Mr. Zafer

| HBU3ATI1 | Zarrab - Direct | Page 391 |
|---|---|---|

1   Caglayan and Iranians occurred many times, that I also
2   attended.
3   Q.  I'd like to show you what's been marked for identification
4   as Government Exhibit 204-T.  Turn to page two, please.  Just
5   take a moment to review that, sir.
6   A.  Of course.
7   Q.  Do you recognize that document?
8   A.  I recognize it.
9   Q.  What is it?
10   A.  It is a transcript of a phone conversation.
11   Q.  Have you listened to that phone conversation?
12   A.  I listened to it.
13   Q.  Do you remember that call?
14   A.  I remember it.
15   Q.  Who participated in the call?
16   A.  Murat Sengun and myself.
17   Q.  Who is Murat Sengun?
18   A.  During that time, he was the chief of traffic department in
19   Istanbul police department.
20   Q.  Approximately when did this call occur?
21   A.  In the beginning of October, during the same time frame,
22   these are within very close time frame to each other.
23   Q.  And the recording you listened to, did it accurately
24   capture the conversation you had?
25   A.  Yes, sir.

| HBU3ATI1 | Zarrab - Direct | Page 392 |
|---|---|---|

1   Q.  What was the purpose of your discussion with Sengun?
2   A.  We had a meeting with Iranian delegates at Halkbank, we
3   were to leave Swissôtel and go to Halkbank for the meeting.
4   Since the meeting at Swissôtel was delayed, we were late for
5   Halkbank.  So I asked for permission from the chief of traffic
6   department in Istanbul police department for me to be able to
7   use the emergency lane in getting there.
8      MR. KAMARAJU: The government would offer Government
9   Exhibit 204-T subject to connection and ask to publish it for
10   the jury beginning at page two.
11      MS. FLEMING: No objection with that subject to
12   connection.
13      THE COURT: Okay, I'll allow it.
14      (Government's Exhibit 204-T received in evidence)
15   Q.  Mr. Zarrab, do you see near the top where you refer to "I'm
16   taking this oil minister of Iran and the entire Iranian oil
17   delegation to Halkbank to the general director there"?
18   A.  I see it, sir.
19   Q.  What did you mean there?
20   A.  As I mentioned earlier, the NICO and NIOC officials that
21   had come from Iran, however, the Iranian oil minister did not
22   attend this meeting.  I did not see the Iranian oil minister
23   during this time frame.
24      MR. KAMARAJU: We can take that down.
25   Q.  Was there a meeting at Halkbank that day?

| HBU3ATI1 | Zarrab - Direct | Page 393 |
|---|---|---|

1   A.  Certainly.
2   Q.  Did you attend that meeting?
3   A.  Yes.
4   Q.  Who was at that meeting?
5   A.  There were those from the Iranian side, such as those from
6   NIOC and from NICO, I was there, and officials from Halkbank
7   were there.
8   Q.  Let's start with the Iranians.  Who was there from what you
9   called the Iranian side?
10   A.  Mr. Nikousokhan was there, Mr. Alipoor was there,
11   Mr. Rajaeieh was there, these are the individuals that I
12   remember.
13   Q.  Who was there from Halkbank?
14   A.  The general manager of Halkbank Suleyman Aslan was there,
15   and also Mr. Hakan Atilla, who was the head of the
16   international department was there.
17   Q.  Was that the defendant?
18   A.  Yes, sir.
19   Q.  Where was this meeting?
20   A.  It was at the headquarters building of the Halkbank.
21   Q.  What was the purpose of the meeting?
22   A.  This meeting had two purposes.  The first one was
23   transferring the money that had accumulated in India from the
24   proceeds of NIOC crude oil sales to India.  And secondly, the
25   Iranians put pressure and made a request from Halkbank to be

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI1 | Zarrab - Direct | Page 394 |

1 able to make their international payments.
2 MR. KAMARAJU: With the Court's permission, I'd ask
3 that Mr. Zarrab be able to use the demonstrative Government
4 Exhibit 9502.
5 THE COURT: Okay, sure.
6 Q. Mr. Zarrab, could you explain to the jury what you were
7 just testifying about.
8 A. The first part was to bring the NIOC money that's in India
9 into the NIOC account at Halkbank.
10 And the second part, the request that came from Iran
11 in this meeting, was NIOC was requesting that Halkbank
12 intermediate or broker the international payment requests on
13 their behalf directly. In other words, the NIOC officials, the
14 Iranians wanted to access this part, by skipping over these
15 steps, they wanted to reach this step directly themselves.
16 In other words, they were going to give instructions
17 to Halkbank, in other words, this blue arrow there, showing the
18 instructions would have come directly to Halkbank, and then
19 from there, they were requesting that the international payment
20 orders that they had be handled directly from there.
21 Q. Let's start with the first part. Bringing the money into
22 Halkbank. Was that discussed at the meeting?
23 A. Yes, it was discussed.
24 Q. What were the results of that discussion?
25 MS. FLEMING: Can we get who said what as opposed to

| HBU3ATI1 | Zarrab - Direct | Page 395 |

1 what was discussed.
2 THE COURT: You'll get a chance on cross, too.
3 MR. KAMARAJU: I intend to ask specifically, your
4 Honor.
5 Q. What was discussed at that meeting?
6 A. In that first part, a method, a system was discussed in
7 terms of how we would bring the money from India into Turkey.
8 And that was a very complicated system. If you wanted, I would
9 be happy to draw that one too.
10 Q. I think we'll skip the drawing on that one.
11 A. But shortly, that method was discussed. So, an account
12 would be created within Halkbank for this Indian company. And
13 the buyer of crude oil in India would be depositing the money,
14 the payment directly to its account at Halkbank, to the account
15 that would be opened. And then the funds would be -- would go
16 from there to another Turkish bank, to Arap Turk Bank. And
17 then I was supposed to get it out of there, in exchange for
18 gold.
19 Q. And then what would you do with the gold?
20 A. I would convert it into cash, and would be making
21 international payments.
22 Q. Did Halkbank agree to that request?
23 MS. FLEMING: Objection.
24 THE COURT: Overruled.
25 A. They accepted on condition. They gave one condition with

| HBU3ATI1 | Zarrab - Direct | Page 396 |

1 their acceptance.
2 Q. First of all, who communicated Halkbank's acceptance?
3 A. Mr. Suleyman Aslan.
4 Q. What was the one condition you referred to?
5 A. That the whole agreement would be thrown away if the fact
6 that this account would be opened for the Indians at Halkbank
7 would leak out to the media.
8 Q. Now, you mentioned there was a second topic discussed at
9 that meeting. What was that?
10 A. Yes. Within the second part they were requesting that
11 Halkbank ease on the application of regulations, and allow them
12 to deal with their international payments directly.
13 Q. Who made that request from the Iranian side?
14 A. Mr. Nikousokhan, Mr. Alipoor.
15 Q. Did anyone from Halkbank respond?
16 A. Yes.
17 Q. What happened next?
18 A. Mr. Suleyman Aslan said that this was not possible, that
19 they would not be intermediary for making the international
20 payments of Iran. But that they could continue to do their
21 transactions through the existing system.
22 Q. What, if anything, was he doing while he said that?
23 A. Certainly. He was pointing at me as the existing system.
24 Q. What happened next?
25 A. Iranians requested again.

| HBU3ATI1 | Zarrab - Direct | Page 397 |

1 Q. Then what happened?
2 A. Mr. Hakan Atilla also said this is not possible, that it
3 wouldn't -- it would be impossible.
4 Q. What, if anything, was he doing when he said that?
5 A. He stated that this would not be possible, and he referred
6 to his Mr. general manager what he had said about this, that
7 this could continue on within the existing system.
8 Q. Mr. Zarrab, you can return to the witness stand.
9 What did you understand Suleyman Aslan to be saying
10 when he said they could continue to use the existing system?
11 A. I understand that he's referring to what I drew on the
12 diagram, and the system that involves the gold trade -- gold
13 trade system there.
14 Q. What did you understand the defendant to be saying when he
15 referred to the existing system?
16 A. Mr. Hakan Atilla was referring to his Mr. general manager,
17 and he was saying that you can use the existing system.
18 Q. I'd like to show you what's been marked for identification
19 as Government Exhibit 6043. Do you recognize this document?
20 A. Yes.
21 Q. What is it?
22 A. It is an electronic mail.
23 Q. Are there two e-mails reflected here?
24 A. I did not understand the question.
25 Q. Sure. It was poorly worded.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI1 | Zarrab - Direct | Page 398 |

1    Looking at the bottom of the page, what do you see
2 there?
3 A. I see an e-mail that was sent from Royal Denizcilik.
4 Q. Do you recognize that e-mail address?
5 A. Yes, it is an e-mail address that's from, that's used
6  within one of my companies.
7 Q. Where is the e-mail sent to?
8 A. To Parham Moslehi.
9 Q. Do you know who that is?
10 A. During that time, this was an individual for Sarmayeh Bank,
11  Sarmayeh Exchange, that the person was based in Turkey at that
12  time, was an employee, was an official of this organization.
13    (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

| HBUPATI2 | Zarrab - Direct | Page 399 |

1 Q. Okay. Now, looking at -- what's the date of that e-mail?
2 A. October 12th, 2012.
3 Q. Now, looking at the top of the page, what do you see there?
4 A. I see that an e-mail had been sent from Mr. Moslehi Parham.
5 Q. And who was it sent to?
6 A. To Imam Mehdizadeh.
7 Q. Who is that?
8 A. This was the right-arm person, the second person in charge
9  after Rajaeieh at Sarmayeh Exchange during that period.
10 Q. Could you turn to the second page of the exhibit, please.
11  Do you recognize what's on the second page of this exhibit?
12    THE INTERPRETER: We lost it.
13 Q. It's back. Do you recognize what's on the second page of
14  this exhibit?
15 A. Yes, sir.
16 Q. What's there?
17 A. There are business cards.
18 Q. Do you recognize any of those business cards?
19 A. There are some that I recognize.
20 Q. Do you recognize any business cards for people who were at
21  your meeting at Halkbank?
22 A. Yes, there are.
23    MR. KAMARAJU: Your Honor, the government would offer
24  Government Exhibit 6043.
25    MS. FLEMING: Objection, relevance and 403.

| HBUPATI2 | Zarrab - Direct | Page 400 |

1    THE COURT: I'll allow it.
2    (Government's Exhibit 6043 received in evidence)
3    THE COURT: On my screen it looked like there were two
4  copies of the same set of cards, sort of like in 3D; is that
5  right?
6    MR. KAMARAJU: I think there was a zoom in is what
7  happened.
8    THE COURT: So there's just one set?
9    MR. KAMARAJU: One set.
10    THE COURT: Do you want to go through those cards so
11  everybody understands?
12    MR. KAMARAJU: Yes, that was my request, to put them
13  up for the jury now. Can we publish.
14 BY MR. KAMARAJU:
15 Q. Now, you testified that you recognize some of these cards;
16  is that right?
17 A. Yes, sir.
18 Q. Whose cards do you recognize?
19 A. Kadri Kaleli.
20 Q. Who was that?
21 A. The person that I had mentioned earlier as the person that
22  had attended the meeting at Swiss Hotel representing a Turkish
23  petroleum company. This was Kadri, Mr. Kadri Kaleli that was
24  from the Turkish Petroleum International Limited.
25 Q. Do you recognize anybody else's card on here?

| HBUPATI2 | Zarrab - Direct | Page 401 |

1 A. Mr. Suleyman Aslan, the general manager at Halkbank.
2  Mr. Hakan Atilla.
3 Q. Anyone else?
4 A. No, I don't recall the rest.
5 Q. I'd like to show you what's been marked for identification
6  as Government's Exhibit 205-T. Take a second and look through
7  that, sir. Do you recognize it?
8 A. Yes.
9 Q. What is it?
10 A. The transcript of a phone conversation.
11 Q. Do you remember this call?
12 A. I remember.
13 Q. Have you listened to a recording of this call?
14 A. Yes, I listened.
15 Q. Did that recording accurately capture your conversation?
16 A. Yes, it was reflecting.
17 Q. And who participated in that call?
18 A. It was Mr. Ozgur Erker and myself.
19 Q. Who is Ozgur Erker?
20 A. Ozgur Erker was one of the officials with authority that
21  worked at Arap Turk Bank during that period.
22 Q. And what is Arap Turk Bank?
23 A. It's a bank in Turkey.
24 Q. Approximately when did this call occur?
25 A. Within the same month of October.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1  Q. Do you recall when it occurred in relation to the meeting
2   at Halkbank?
3  A. Certainly.
4  Q. And when did it occur in relation to that meeting?
5  A. After the meeting that was held at Halkbank.
6  Q. And could you summarize the purpose of this call?
7  A. What I had explained on the diagram earlier about bringing
8   money over from India, Indian money over, and we were to
9   transfer that money from Halkbank to Arap Turk Bank.
10       MR. KAMARAJU: Your Honor, the government would offer
11  Government Exhibit 205-T, and ask for permission to publish it
12  to the jury.
13       MS. FLEMING: As long as it's subject to the
14  authentication, no objection otherwise.
15       MR. KAMARAJU: Yes, your Honor, subject.
16       THE COURT: I'll allow it.
17       (Government's Exhibit 205-T received in evidence)
18  BY MR. KAMARAJU:
19  Q. Now, Mr. Zarrab, do you see near the top of the page where
20   you say "I'm talking to Halk, okay"?
21  A. Yes, sir.
22  Q. What did you mean there?
23  A. I'm stating that I discussed this matter with Halkbank, and
24   I'm receiving the final comments from Mr. Ozgur.
25  Q. And a couple of blocks down there, do you see where you

1   say: "Umm, it's almost finished, it will go there, then to
2    you, and then from you to me"?
3  A. Yes, I remember.
4  Q. What did you mean there?
5  A. With the first step, the Indian money, it would be sent
6    from India to Halkbank, and from their own accounts that was in
7    Halkbank, it would then go to their own accounts at Arap Turk
8    Bank, and from their account at Arap Turk Bank, it was going to
9    go to my account, and then it would be converted into gold and
10   would be used in that trade.
11  Q. Why was the money supposed to go from Halkbank to Arap Turk
12   Bank?
13  A. In order to put another bank in the process to conceal the
14   origin of the money.
15  Q. And was that discussed at the meeting at Halkbank in
16   October of 2012?
17  A. Yes, this was discussed as a method.
18  Q. Okay. And do you see about halfway down the page where
19   Erker said: "Which country are they from"?
20  A. Yes, I see it.
21  Q. What did you understand him to be asking?
22  A. He's asking which countries the money will be coming from.
23  Q. And how do you respond?
24  A. Italy, India.
25  Q. And then do you see two blocks down, where you say: "It's

1   complicated"?
2  A. Yes, I see it.
3  Q. What did you mean by that?
4  A. Because we were planning to bring their money over from
5   other countries, as well, using the same method.
6  Q. Do you see a little further down, just two blocks,
7   where you say: "Okay. You will receive TL from Turkey," and
8   the transcript says: "He/she says he/she is sending TL to
9   Turkey as well and that this doesn't concern him/her. Do you
10  understand?" Do you see that?
11  A. Yes, I see that.
12  Q. Okay. So what did you mean there?
13  A. After the money would arrive from India into their account
14  at Halkbank, Halkbank was to convert that into Turkish Liras.
15  Since it was going to send it in Turkish Liras over to Arap
16  Turk Bank, since it was not going to go through international
17  correspondent, and since it was in Turkish Liras, which meant
18  it would go as EFT, Halkbank was saying it doesn't concern us.
19  We can send this to whomever you would like because they were
20  not concerned about the international banking regulations.
21  Q. Why was it significant to you that this was going to be
22   sent in Turkish Lira?
23  A. In order for them to not be using the international banking
24   members.
25       I'd like to give two brief examples about this. If it

1   were in dollars, it would have had to go through the United
2   States on its way to Arap Turk Bank. If it were in Euros, it
3   would have had to go through Europe to come in. For that
4   reason, being in Turkish Liras, this would stay within Turkey.
5  Q. And why was it important that it stayed within Turkey?
6  A. So that it would not get hung up with international
7   filters; so that it will not draw attention.
8  Q. So do you see next where Erker says: "So is Halk saying
9   okay"?
10  A. Yes, sir.
11  Q. What did you understand him to be asking?
12  A. He's asking has Halkbank agreed to use this method, to use
13   this system.
14  Q. And how do you respond?
15  A. I say, yes, Halkbank said okay.
16  Q. Do you see next, do you see where he asks you: "Okay. Do
17   you mean that includes sending it to me"?
18  A. Yes.
19  Q. What did you understand him to be asking?
20  A. In other words, so does Halkbank agree to send the money to
21   Arap Turk Bank after the money comes into Halkbank?
22  Q. And how did you respond?
23  A. I did not give specific facts, but I said Arap Turk and
24   Garanti.
25  Q. Now, do you see a little further down where you say: "I

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1  just need to wrap things up with Suleyman"?
2  A. Yes.
3  Q. What were you referring to there?
4  A. After I would receive this approval from Arap Turk Bank, I
5  was to go back to Mr. Suleyman and ask for or receive his final
6  approval, and tell him that Arap Turk had agreed to this and
7  receive his final approval that it would be okay to send over
8  to Arap Turk and close up this leg of this system.
9  Q. Okay. And do you see a little way down where Erker says:
10  "There -- I mean, you need to talk to him"?
11  A. Yes, sir.
12  Q. What did you understand him to be saying there?
13  A. He is saying after it comes to Halkbank, as it goes to Arap
14  Turk Bank, you need to talk to them. You need to make that
15  clear with them.
16  Q. Okay. And then do you see where you respond, and it
17  carries over to the next page. "Brother, we talked things out
18  with Hakan and others"?
19  A. Yes, sir.
20  Q. What did you mean there?
21  A. I'm stating that we had talked to Atilla, Mr. Hakan Atilla,
22  and there was no problem.
23  Q. And can we just scroll down a little bit further to where
24  Erker says: "I mean, where? What will you tell me? Will you
25  tell me to send it here or send it there? I mean, what are you

1  going to tell me?" Do you see that?
2  A. Yes, sir.
3  Q. What did you understand him to be asking you?
4  A. He is asking, so will you be asking me to make these
5  international payment requests that come from the Iranians,
6  he's asking me whether he would receive these and be asked to
7  do them.
8  Q. And how do you respond?
9  A. I say no.
10  Q. Now, when you said we talked it out with -- we talked with
11  Hakan and others, what were you referring to?
12  A. I'm telling Mr. Ozgur Erker that I had talked to Atilla and
13  we had reached an agreement on this, to do this with Halkbank.
14  Q. Now, did you speak with Suleyman Aslan after this call?
15  A. I was in contact with Mr. Suleyman Aslan very often; so I
16  would have possibly talked to him.
17         MR. KAMARAJU: We can take that down.
18  Q. Did you speak with Suleyman Aslan about the business that
19  was supposed to go through Arap Turk?
20  A. Yes, I met, sir.
21  Q. And what did you discuss with Aslan?
22  A. There was a meeting that was held with Mr. Suleyman during
23  that time. During that meeting, this topic was discussed.
24  Q. Okay.
25  A. And he provided the final approval on it.

1  Q. Approximately when did that meeting occur?
2  A. I mean, it was the beginning of October. It was right
3  after we had talked with the Iranians.
4  Q. And where did you meet with Aslan at that time?
5  A. It was at Halkbank.
6  Q. How many offices did Halkbank have at that time in
7  Istanbul?
8  A. So I don't know the count. There would be many branches
9  for Halkbank, but for this meeting I remember Mr. Suleyman
10  asked me to come over to his old office at the old headquarters
11  building.
12  Q. What did Suleyman Aslan say to you during that meeting?
13  A. Mr. Suleyman Aslan said that he had some personal concerns
14  and issues, that he was taking a large amount of risk, and that
15  he was feeling uncomfortable about this, and he expressed all
16  his concerns, and expressed that he wanted to ensure his future
17  in some way, and he also stated his expectations.
18  Q. Let's start with the first thing he said. What did you
19  understand him to mean by risk?
20  A. That Caglayan had given him the instructions, but he,
21  himself, was taking on all the risks.
22  Q. What was that risk?
23  A. That he would stick out in front of the Americans and that
24  he would draw attention, that he was constantly receiving
25  warnings.

1  Q. Warnings from who?
2  A. From America.
3  Q. Warnings about what?
4  A. About the concerns that the United States had about the
5  Iranian transactions that they were conducting.
6  Q. And what did you understand Aslan to mean when he talked
7  about being concerned for his future?
8  A. He was asking for money.
9  Q. Did you agree to pay him money?
10  A. I took it as that. I was looking at it warmly, and that I
11  would look into it and I'd get back to him about it.
12  Q. Why did you need to get back to him about it?
13  A. Because I needed to get approval from Mr. Zafer Caglayan.
14  Q. I'd like to show you what's been marked as Government
15  Exhibit 206-T. Would you just take a moment to look at that,
16  please.
17  A. Yes, sir.
18  Q. Do you recognize this exhibit?
19  A. I recognize it, sir.
20  Q. What is it?
21  A. It's a transcript of a phone conversation.
22  Q. Did you participate in this conversation?
23  A. Yes, sir.
24  Q. Do you remember that conversation?
25  A. I remember, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1  Q. Have you listened to a recording of that conversation?
2  A. I listened to it, sir.
3  Q. And does the recording accurately capture your
4    conversation?
5  A. It reflected, sir.
6  Q. Approximately when did this call take place?
7  A. It was after I had left Mr. Suleyman Aslan's office.
8  Q. And who were you speaking with during this call?
9  A. This is Abdullah Happani and myself.
10 Q. We've heard Mr. Happani's name before, but could you remind
11   us who he is?
12 A. Abdullah Happani is the second person with authority within
13   my companies, after myself, during that time frame.
14 Q. Could you describe the general purpose of this call?
15 A. I'm conveying a summary of my meeting with Mr. Suleyman
16   after I had left that meeting.
17       MR. KAMARAJU: Your Honor, the government offers
18 Government Exhibit 206-T, subject to connection, and would ask
19 to be able to publish it starting at page 2.
20       THE COURT: I'll allow it.
21       (Government's Exhibit 206-T received in evidence)
22 BY MR. KAMARAJU:
23 Q. So, Mr. Zarrab, looking at the top, do you see where you
24   say: "Fine. I was with Mr. Suleyman. I just left"?
25 A. Yes, sir, I see it.

1  Q. What did you mean there?
2  A. I'm saying that I had just left the meeting with
3    Mr. Suleyman Aslan.
4  Q. And which meeting were you referring to?
5  A. I'm talking about the meeting that I just explained earlier
6    about, the meeting where Mr. Suleyman had mentioned his worries
7    and concerns and expectations.
8  Q. And do you see where Happani says: "What is he saying"?
9  A. Yes.
10 Q. What did you understand him to mean there?
11 A. He's asking why Mr. Suleyman had called me in.
12 Q. And what do you say in response?
13 A. I'm saying: This place is taken care of, just like Abi."
14 Q. What did you mean by that?
15 A. I'm saying that just like Zafer Caglayan, this one is
16   asking for money too.
17 Q. And you see then he asked "How"?
18 A. I see it, sir.
19 Q. And what do you say in response?
20 A. I say the same type same arrangement as Abi.
21 Q. Who is Abi?
22 A. Zafer Caglayan.
23 Q. And do you see a little further down -- actually, just
24   because we talked about it yesterday, remind us, who is
25   Caglayan?

1  A. Caglayan is the former minister of economy that was
2    minister during that time frame.
3  Q. Now, do you see a couple of blocks down where you say:
4    "It's even the same arrangement as Abi. You know, it's the
5    same system"?
6  A. Yes, sir.
7  Q. What did you mean there?
8  A. It's the share of the profit margin.
9  Q. Now, do you see Happani's response where he says: "Well,
10   then, will he take care of the jobs that the guys have"?
11 A. Yes, I see it.
12 Q. And what did you understand him to be asking you?
13 A. He is asking, so will he assist with the transfer of money,
14   of Iranian money to India and those places, will he help with
15   that.
16 Q. And how do you respond?
17 A. I say, yes, he will help. Anything that involves me, that
18   involves us, he will help.
19 Q. Now, what do you mean by anything that involves you, he
20   will help?
21 A. I'm referring to requests that would go from me. I'm
22   talking about the trade deals that would involve me.
23 Q. Okay. And do you see where Happani asks you next: "So,
24   should a separate one be used for him"?
25 A. I see it, sir.

1  Q. What do you understand him to be asking you?
2  A. So since Zafer Caglayan was a part of the proceeds that
3    were obtained in the trade that we were part of, from the
4    companies, from the money that we were bringing in, he is
5    asking, so should we establish a new company, a different
6    company that allows Zafer Caglayan to do this.
7  Q. Why would you need to establish different companies?
8  A. Just so that so that our partnership with Zafer Caglayan
9    would not get mixed up.
10 Q. To be clear, mixed up with who?
11 A. I mean, the funds that were being paid to Caglayan out of
12   our current accounts. He's talking about the bribes that will
13   be paid out from Suleyman Aslan from then on with the new
14   account.
15 Q. Do you see where Happani says: "No, I understand, but if
16   we use the existing one, won't the brother know"?
17 A. Yes, I see it.
18 Q. Okay. What do you understand him to be asking you there?
19 A. Caglayan says he was checking our bank statements from time
20   to time to see what was coming in. He is saying, will he not
21   notice that we're doing trade with Suleyman Aslan, as well, or
22   through Suleyman Aslan, as well.
23 Q. And what do you say in response?
24 A. I say Zafer Caglayan will know.
25 Q. And how will he know?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                          November 30, 2017

1  A.  Because before Suleyman Aslan called me in, I had talked to
2  Zafer Caglayan, and after my meeting with him, I also talked
3  with Zafer Caglayan and got his approval; so I was not going to
4  do anything without his knowledge.  And at the end of the day,
5  we did not do anything -- sorry, we did not hide anything from
6  Zafer Caglayan.  We did everything within his knowledge.  We
7  used the existing accounts, and to Mr. Zafer, we gave the share
8  that was accumulating from that.
9  Q.  Now, do you see a little further down where Happani says:
10  "Good, then.  May it be well.  They should open that channel so
11  that he can take care of the jobs that the guys have"?
12  A.  I see it, sir.
13  Q.  What did you understand him to be saying there?
14  A.  He is saying so long as he takes care of the business about
15  bringing money from abroad for the Iranians.
16  Q.  Now, at the bottom of that page, as it carries over, do you
17  see where you say:  "I also received the okay for Ziraat Bank
18  and Vakif.  They will get going as well.  The Iran business
19  will get moving"?
20  A.  Yes, I see it.
21  Q.  What did you mean there?
22  A.  During that time period, Ziraat Bank and Vakif Bank also
23  wanted to participate in Iranian business.  I had talked to
24  Mr. Zafer Caglayan.  If Ziraat Bank and Vakif Bank were to
25  begin also, he was going to direct me towards those banks, and

1  the accounts would be opened, and I would be working with those
2  banks in the same way.
3  Q.  And what's Ziraat Bank?
4  A.  It's a bank in Turkey.
5  Q.  And what's Vakif?
6  A.  Vakif Bank is also a bank in Turkey.
7  Q.  Okay.  And do you see two boxes down, where you say:  "The
8  prime minister gave orders to Ziraat and Vakif as well"?
9  A.  Yes, I see it.
10  Q.  What did you mean there?
11  A.  Mr. Zafer had told me that Mr. Prime Minister had given
12  approval for this work with, for Ziraat and Vakif to do this
13  work, and I'm conveying that to Mr. Happani.
14        THE INTERPRETER: "The Iranian trade" should be added
15  in what was translated.
16  Q.  At that time, who was the prime minister of Turkey?
17  A.  Mr. Recep Erdogan.
18  Q.  Now, do you see where Happani says:  "We were expecting
19  Ziraat -- I mean, they were already talking about that"?
20  A.  Yes, sir.
21  Q.  What did you mean there?
22  A.  We were constantly overhearing that Ziraat was going to
23  start with Iranian trade, too.  I mean that one.
24  Q.  And do you see near the bottom, where you say:  "Well,
25  there are still more.  There are three billion Euros"?

1  A.  Yes.
2  Q.  What did you mean by that?
3  A.  I am stating that Iranians still had three billion Euros
4  deposit or ready at Halkbank.
5  Q.  And how did you learn that?
6  A.  During my meeting with Mr. Suleyman, Mr. Suleyman looked up
7  the overall balance within the system and he turned to me and
8  gave me that balance.
9  Q.  And to be clear, which meeting with Aslan are you referring
10  to?
11  A.  I'm referring to the meeting that was held in person in the
12  old office.
13  Q.  Okay.  I'd like to show you what's been marked for
14  identification as Government Exhibit 207-T.  Take a moment to
15  review that call.  Do you recognize that exhibit?
16  A.  I recognize it, sir.
17  Q.  What is it?
18  A.  It's a transcription of a phone conversation.
19  Q.  Did you participate in that phone conversation?
20  A.  Yes, sir.
21  Q.  Do you remember the call?
22  A.  I recall, sir.
23  Q.  Have you listened to a recording of this call?
24  A.  I listened to it, sir.
25  Q.  Did the recording accurately capture your conversation?

1  A.  Yes, sir.
2  Q.  Approximately when did this call occur?
3  A.  These are all within a few days.  They are very close
4  together with each other, and it's after I had met with
5  Suleyman Aslan.
6  Q.  Could you summarize the general purpose of this call?
7  A.  I had mentioned that I need to receive final approval from
8  Suleyman Aslan, from the previous phone conversation
9  transcription, and, here, I'm saying that I did speak to
10  Suleyman Aslan and I did receive the final approval.
11  Q.  And I should have asked before, but who were you speaking
12  with during this call?
13  A.  This is Ozgur Erker and myself.
14        MR. KAMARAJU: Your Honor, the government offers
15  Government Exhibit 207-T, subject to connection.
16        MS. FLEMING: Subject to connection and
17  authentication.
18        THE COURT: I'll allow it.
19        (Government's Exhibit 207-T received in evidence)
20        MR. KAMARAJU: Could we please publish that, beginning
21  on Page 2.
22  BY MR. KAMARAJU:
23  Q.  Do you see about a third of the way down the page, where
24  you say:  "I spoke with Halk -- with Suleyman"?
25  A.  Yes, sir.

**A399**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                          November 30, 2017

1  Q. And then what did you mean by that?
2  A. I'm telling him that I had met with Suleyman Aslan.
3  Q. And then two blocks down, do you see where you say: "Okay.
4    We agreed about the job that we had discussed"?
5  A. Yes, sir.
6  Q. And what were you referring to there?
7  A. I'm saying that we reached an agreement about the meeting
8    with Halkbank, the first meeting with Halkbank earlier, where
9    we had discussed bringing money from India to Halkbank.
10 Q. Now, do you see where Erker asks you: "Did you mention
11   us"?
12 A. Yes, sir.
13 Q. What did you understand him to be asking?
14 A. He is asking whether I conveyed that the funds would then
15   be transferred to Arap Turk. He's asking whether an agreement
16   was reached on that matter as well.
17 Q. And how do you respond?
18 A. I say yes, I mentioned it.
19 Q. And do you see where you ask: "Should I not have
20   mentioned"?
21 A. Yes, I see it, sir.
22 Q. What did you mean there?
23 A. I'm saying, so should I not have told Suleyman Aslan that
24   we're going to transfer to Arap Turk.
25 Q. And what does he say in response?

1  A. He says: "No, I was just asking."
2  Q. And then do you see where you say: "No. I did mention.
3    He just said 'There are two Indian companies. They should take
4    those two and send them over to us.' He said, 'Hand washes
5    hand, then the hand washes the face"?
6  A. Yes, I see that, sir.
7  Q. What were you saying there?
8  A. Mr. Suleyman is saying that we could use the same system at
9    Halkbank at Arap Turk Bank. He's saying there could be two
10   accounts opened at Arap Turk Bank for Indian companies, and
11   then the monies that would be received at Arap Turk Bank would
12   be sent over to Halkbank. In other words, this is the template
13   of the system in reverse, just copied and pasted.
14 Q. And what do you understand the phrase "hand washes hand,
15   then the hand washes the face" to mean?
16 A. What Suleyman was saying is by sending the money from here
17   to Arap Turk, we're assisting them and, in return, they should
18   just help us too.
19 Q. Okay. Do you see where you say, two blocks down there:
20   "There are also two Indian companies, Baharat, B-a-h-a-r-a-t,
21   and H -- H-M-E-L, okay"?
22 A. I see it, sir.
23 Q. What were you saying there?
24 A. Mr. Suleyman had asked for these two -- for accounts to be
25   opened for these two companies. He was saying that money

1    should come through these two.
2  Q. Okay. And do you see where you say: "He said for those
3    two, they should help us"?
4  A. Yes, sir.
5  Q. What does that mean?
6  A. Mr. Suleyman is saying that Arap Turk Bank should bring the
7    funds over for these two companies, and then they should assist
8    us in transferring that money over from there to Halkbank and
9    he was requesting that I mention this to Arap Turk Bank.
10 Q. And then do you see where he asks you: "So I will receive
11   Euros and then send the funds over to them"?
12 A. Yes, sir.
13 Q. What do you understand him to be asking?
14 A. So he's saying, so we'll need the money come to India --
15   will any money come from Arap Turk in Euros.
16 Q. Did you respond?
17 A. I'm explaining that, yes, it would come there in Euros, and
18   then it would be converted into Turkish Liras and would be
19   transferred to Halkbank as Turkish Liras.
20 Q. Okay. We can turn to the next page, please. Do you see
21   near the top where Erker asks you: "Are your guests gone"?
22 A. Yes, sir.
23 Q. I guess he asks it twice. What do you say in response?
24 A. In summary, I'm saying that some have left and some are
25   still here, and on Monday Mr. Bahmani would be there also.

1  Q. Who were the guests?
2  A. The delegates from the Iranian petroleum companies.
3  Q. And who did you mean when you say Bahmani?
4  A. It's the president of the Central Bank of Iran.
5  Q. And do you see a little further down, where you say: "As
6    of next week, Ziraat and Vakif will also be engaged"?
7  A. Yes, I see it.
8  Q. What did you mean there?
9  A. Just as I have explained to Abdullah Happani in the
10   previous transcripts, Ziraat and Vakif will start to do trading
11   on the following week.
12 Q. Do you see where he then asks you with whom did you speak
13   in Ziraat and Vakif?
14 A. Yes, I see it, sir.
15 Q. Okay. And a couple of blocks down you then say: I spoke
16   with Ankara?
17 A. Yes, I see it, sir.
18 Q. What did you mean, "I spoke with Ankara"?
19 A. I'm referring to Mr. Zafer Caglayan.
20 Q. And then you see where you say: "Mr. Prime Minister and
21   Ali Babacan gave approval. It's finished already"?
22 A. Yes, I see that, sir.
23 Q. What were you saying there?
24 A. So what I'm saying is that's -- the prime minister of that
25   time period, Recep Tayyip Erdogan, and minister of the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBUPATI2    Zarrab - Direct    Page 422

1 treasury, Mr. Ali Babacan, had given instructions, had given
2 order for them to start doing this trade. And with "for them,"
3 I mean the banks.
4 Q. How did you learn about that order?
5 A. From Mr. Zafer Caglayan.
6 Q. Can we turn to the next page of the exhibit?
7      THE COURT: Before you do, what was the name of the
8 minister of the treasury?
9      THE WITNESS: Ali Babacan, your Honor.
10      MR. KAMARAJU: Thank you, your Honor. I should have
11 asked that question.
12 Q. Could you turn to the next page of the exhibit, page 4,
13 please. And do you see at the top they won't be able to --
14 where you say: "They won't be able to pull it through"?
15 A. Yes, sir.
16 Q. What did you mean there?
17 A. What I'm saying is that, first, the officers within the
18 bank, they don't know the system, they're not familiar with the
19 system; so they won't be able to pull it off. And I'm also
20 saying that the banks themselves have connections with
21 New York, with the United States, and I'm basically adding my
22 own opinion there about Ziraat and Vakif Bank and their
23 connections.
24 Q. Okay. What does Erker respond to what you say?
25 A. He says: "They are hesitating because they have their

HBUPATI2    Zarrab - Direct    Page 423

1 things in New York, you know, their affiliates."
2 Q. And what did you understand him to mean by that?
3 A. I suppose Ziraat has a branch in New York, and in terms of
4 the effect of the sanctions on them, this might be higher
5 because they have that branch in New York.
6      MR. KAMARAJU: Your Honor, I don't know when you were
7 planning to take the morning break.
8      THE COURT: I do. This is a good time to take a
9 five-minute break.
10      (Jury not present)
11      (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HBUPATI2    Zarrab - Direct    Page 424

1      (At the side bar)
2      MR. KAMARAJU: I just wanted to note I noticed during
3 some of the testimony, there was some laughter in the back of
4 the courtroom.
5      MS. FLEMING: It's the journalists understanding
6 Turkish.
7      THE COURT: I assume it's people understanding
8 Turkish.
9      MR. KAMARAJU: I just wanted to note that some of the
10 jurors had responded or at least noticed it. I don't think
11 there's anything to be done about it right now.
12      MS. FLEMING: I think the rest of us laugh when it
13 gets translated into English. I think they get it in Turkish
14 first.
15      MR. KAMARAJU: I just wanted to note that, in case
16 it's a problem.
17      THE COURT: There are a lot of Turkish people. I
18 don't know if they're journalists.
19      (Recess)
20      (Continued on next page)
21
22
23
24
25

HBU3ATI3    Zarrab - Direct    Page 425

1      (In open court; jury present)
2      THE COURT: We'll pick up with the direct examination.
3      THE DEPUTY CLERK: Sir, just to remind you, you're
4 still under oath.
5      THE WITNESS: Yes.
6      MR. KAMARAJU: May I proceed, your Honor?
7      THE COURT: Yes.
8 BY MR. KAMARAJU:
9 Q. Mr. Zarrab, I'd like to show you what's been marked for
10 identification as Government Exhibit 208-T. Just take a moment
11 to look at that.
12      Do you recognize it?
13 A. Yes, sir.
14 Q. What is it?
15 A. It is a transcript of a phone conversation.
16 Q. Do you remember this call?
17 A. I recall, sir.
18 Q. Did you participate in this call?
19 A. Yes, sir.
20 Q. Have you listened to a recording of this call?
21 A. Yes, sir.
22 Q. Did the recording accurately capture your conversation?
23 A. Yes, it reflected, sir.
24 Q. Who participated in the call?
25 A. Suleyman Aslan and myself.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1 Q. Approximately when did this call take place?
2 A. At a later date than my meeting with Suleyman Aslan.
3 Q. About how long after that meeting was it?
4 A. A few days.
5 Q. What was the general purpose of this call?
6 A. Mr. Suleyman Aslan had meetings with -- between Halkbank
7 and Iranian delegates as well as other Iranian individuals, and
8 I was not present at that meeting, I did not attend that
9 meeting. And Mr. Aslan is talking about that meeting.
10      MR. KAMARAJU: The government offers Government
11 Exhibit 208-T subject to connection and ask to publish it
12 beginning at page two.
13      MS. FLEMING: Subject to authentication, your Honor.
14      THE COURT: I'll allow it.
15      (Government's Exhibit 208-T received in evidence)
16 Q. Mr. Zarrab, do you see at the top near the top where Aslan
17 says "We were with Mr. minister and others. I defended the
18 matter just like we talked about yesterday. He said 'We are
19 not doing those,' such as opening accounts for every company
20 and so on."
21 A. Yes, sir.
22 Q. What did you understand him to mean by that?
23 A. If we recall the meeting where -- the meeting with Halkbank
24 where I was in attendance, in that meeting, there was the
25 request made by the Iranians in order for them to be able to

1 make the international payments directly through Halkbank.
2 Q. Do you see where he goes on to say "However, I indicated
3 that, um, you were ready in terms of bringing and sending money
4 through the existing system."
5 A. Yes, sir.
6      MR. KAMARAJU: Your Honor, I'd ask that Mr. Zarrab be
7 able to use Government Exhibit 9502 to help explain his
8 testimony.
9      THE COURT: Okay.
10 Q. What part of this scheme is Mr. Aslan discussing with you
11 at this point?
12      THE COURT: Excuse me, counsel, when you say "the
13 scheme," are you referring to what's been referred to as the
14 existing system? Does this chart depict the existing system?
15      MR. KAMARAJU: Yes, your Honor. I can ask the witness
16 to clarify that.
17 Q. Does Government Exhibit 9502 depict the system or the
18 existing system?
19      MS. FLEMING: Objection.
20      THE COURT: Overruled.
21 A. Yes.
22 Q. What part of the existing system do you understand Aslan to
23 be referring to here?
24 A. We need to look at the system this way. The system is like
25 one whole picture. The system has one purpose. It is to

1 fulfill the Iranian request to its final destination. In other
2 words, taking the Iranian money and getting to its final
3 destination. And the system and all these methods that are
4 laying in between those, these are just tools and accessories
5 in order to reach this point.
6      And what Mr. Aslan is referring to in this phone
7 conversation, the requests of Iranians in order to reach this
8 point, he is explaining that they could do that through the
9 existing system. During that time frame, this refers to the
10 gold trade that was happening within the Halkbank, in Halkbank.
11 Q. When Aslan says you were ready in terms of bringing and
12 sending money through the existing system, what did you
13 understand him to mean?
14 A. Mr. Aslan is saying that your money is reaching its final
15 destination already, there is already a system in place for
16 that, there is already a person that is dealing with that,
17 indicating myself. And he's saying this already is working,
18 and you already have a system that does this.
19 Q. If you could return to the witness stand.
20      Do you see where Aslan says "We said you would be able
21 to make the payment for this thing through the methods we have
22 been using thus far."
23      THE INTERPRETER: I'm sorry, I didn't see it.
24 Q. I'll ask the question again.
25 A. Yes, sir, I see it.

1 Q. What did you understand him to mean by that?
2 A. So what he's saying is the Iranians have an existing system
3 and they can take care of -- they can fulfill their payment
4 request through that existing system already. There was a
5 request for a gas payment also, and he's referring to that
6 payment as well and saying don't pressure us, you already have
7 a system in place, and you can use that system to make whatever
8 payment you wish to make.
9 Q. To your knowledge, was this the first time that Aslan had
10 been asked by Iranians to make direct payments?
11 A. No. During the meeting where I was present, this request
12 had already been mentioned as well.
13 Q. Remind us, was there anybody else at Halkbank in attendance
14 at that meeting?
15 A. At the meeting where I was present with -- during the
16 meeting with Halkbank and Iranian delegates, from Halkbank
17 Mr. Suleyman Aslan and Mr. Hakan Atilla were in attendance.
18 Q. So, if you could look down at the bottom of page two, you
19 say "Okay, so you deflected it, right?" Then it goes over to
20 the next page, "I mean you told them it wouldn't work."
21 A. Yes, sir.
22 Q. What did you mean by that?
23 A. So, I'm saying so you told the Iranians that they can't do
24 this directly themselves, right? And I'm saying you told them
25 that they cannot eliminate me, circumvent me in the system,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBU3ATI3          Zarrab - Direct          Page 430

1   right?
2   Q. How does he respond?
3   A. He says "Exactly, right, right, exactly."
4   Q. Do you see next where you ask "Do you think it would be
5     appropriate for me to sit down and talk with Dr. Bahmani?"
6   A. Yes, sir, I see it.
7   Q. What were you asking there?
8   A. I'm asking Mr. Suleyman Aslan's opinion. This is in
9     regards to the president of the Central Bank of Iran, I'm
10    asking whether me meeting with Bahmani would be beneficial.
11  Q. Beneficial to what?
12  A. To increase the trade volume and also while the Iranians
13    were in a tight spot in order to leverage this as a way to
14    amend my relationship with the Central Bank of Iran.
15  Q. Have you testified before about that relationship?
16  A. Yes, sir.
17  Q. Do you see where Aslan responds "Before him, though, um, in
18    my opinion, the person that should have priority is, um, just a
19    second. Let me say," and then after you say something he goes
20    on to say "Nikousokhan."
21  A. Yes, I see it, sir.
22  Q. What did you understand him to be saying there?
23  A. That Bahmani would not be beneficial and talking with
24    Nikousokhan would be more beneficial.
25  Q. Okay. What do you say in response?

HBU3ATI3          Zarrab - Direct          Page 431

1   A. So, what I'm saying is, yes, I'm agreeing with Mr. Aslan,
2     I'm saying that I'm already in contact with Nikousokhan, and in
3     terms of the control of the oil money of Iran, since that
4     control is with Mr. Nikousokhan, I am endorsing what he said,
5     and saying that yes, that would be a better individual to talk
6     to. And I'm saying that I'm already in contact with that
7     person.
8   Q. Going back to page two quickly. I believe you testified
9     about a gas payment; is that right?
10  A. Yes, sir.
11  Q. Could you explain what you meant by that?
12  A. The Iranians were purchasing gas from Turkmenistan and
13    since they were making these purchases, they owed money to
14    Turkmenistan. And they want to make that payment, make the
15    payments related to that.
16  Q. Is that relationship reflected on Government Exhibit 9502?
17  A. Yes, sir.
18  Q. What's the company on Government Exhibit 9502 that would be
19    involved in gas payments?
20  A. It's Sarmayeh, sir.
21  Q. Do you see where you say "Yes, as for the gas, I wanted to
22    tell you Iran says Sarmayeh doesn't have sufficient liquidity
23    for gas."
24  A. Yes, sir.
25  Q. What did you mean there?

HBU3ATI3          Zarrab - Direct          Page 432

1   A. The Iranian gas fund, the gas payments typically accumulate
2     within the Parsian Bank under Halkbank. And they're saying
3     that they don't have enough liquidity at Sarmayeh to be able to
4     make these payments. Or make this payment.
5   Q. What is Parsian Bank?
6   A. It is a large bank in Iran.
7   Q. So when you say Parsian Bank existed under Halkbank, what
8     do you mean?
9   A. Just like Sarmayeh, as I had drawn on the diagram, many
10    Iranian banks have accounts under Halkbank. And Parsian is
11    among those.
12  Q. Do you see where Aslan responds "If so, they will transfer.
13    They will transfer."
14  A. Yes, sir.
15  Q. What did you understand him to mean there?
16  A. So, meaning that they could move from the existing NIOC,
17    they could move it directly from the existing -- he's saying
18    that they could send from NIOC and they could send from Parsian
19    and they should just do it within. Through those.
20  Q. I'd like to show you what's been marked for identification
21    as Government Exhibit 209-T. Take a moment to review that
22    document, please, sir.
23  A. Yes, sir.
24  Q. Do you recognize it?
25  A. Yes, I recognize it, sir.

HBU3ATI3          Zarrab - Direct          Page 433

1   Q. What is it?
2   A. It is a transcript of a phone conversation.
3   Q. Do you remember this call?
4   A. I recall, sir.
5   Q. Did you participate in this call?
6   A. Yes, sir.
7   Q. Have you listened to a recording of this call?
8   A. I listened to it, sir.
9   Q. Did the recording accurately capture your conversation?
10  A. Yes, sir.
11  Q. Approximately when did this call take place?
12  A. It is a short time after I had met with Mr. Suleyman Aslan
13    at his old office, within a few weeks of that meeting.
14  Q. Who else participated in this call?
15  A. Abdullah Happani, sir.
16  Q. Generally speaking, what was the purpose of this call?
17  A. I'm instructing him to send money to Mr. Suleyman Aslan, to
18    prepare that money to send it to Suleyman Aslan.
19        MR. KAMARAJU: The government offers Government
20    Exhibit 209-T subject to connection and ask to publish it
21    beginning at page two.
22        MS. FLEMING: Judge, as long as it's subject to
23    authentication as well.
24        THE COURT: I'll allow it.
25        (Government's Exhibit 209-T received in evidence)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI3 | Zarrab - Direct | Page 434 |
|---|---|---|

1 Q. Mr. Zarrab, do you see at the top where you say "We will
2 send two to Levent's boss on Monday, get it ready."
3 A. Yes, I see it, sir.
4 Q. What were you saying there?
5 A. I mean Levent Balkan when I say Levent, so I'm saying we're
6 going to send two million to Levent's boss on Sunday.
7 Q. Who is Levent's boss?
8 A. Suleyman Aslan.
9     MR. KAMARAJU: Your Honor, may I approach?
10    THE COURT: Yes.
11 Q. I'm showing you what's been marked as Government Exhibit 14
12 for identification. Do you recognize that exhibit?
13 A. Yes, sir.
14 Q. What is it?
15 A. It a photograph of Mr. Levent Balkan.
16    MR. KAMARAJU: The government offers Government
17 Exhibit 14 and ask for permission to publish.
18    MS. FLEMING: No objection.
19    THE COURT: I'll allow it. Objection is noted. I'll
20 allow it.
21    MS. FLEMING: Judge, I said "no objection."
22    THE COURT: I'm sorry. Okay. I'll allow it without
23 objection.
24    (Government's Exhibit 14 received in evidence)
25 Q. Why were you directing Happani to send money to Suleyman

| HBU3ATI3 | Zarrab - Direct | Page 435 |
|---|---|---|

1 Aslan?
2 A. Pursuant to our meeting with Mr. Suleyman at his old
3 office, and since I'd already received approval from Mr. Zafer
4 Caglayan, I was making this payment.
5 Q. Do you see where you say "I organized it"?
6 A. Yes, sir.
7 Q. What did you mean by that?
8 A. I don't understand it fully, sir. I don't recall what that
9 was referring to.
10 Q. Do you see where you say a little bit down "You will see on
11 Sunday, okay?"
12 A. Yes, sir.
13 Q. What were you asking him to do?
14 A. I'm telling Abdullah Happani that it will be sent on
15 Sunday.
16 Q. Do you see where Happani says a couple blocks down, "Okay,
17 how, how did you talk, anyway we will do this face to face."
18 A. Yes, sir.
19 Q. What did you understand him to mean by that?
20 A. He's asking what percentage point we would have agreed with
21 Mr. Suleyman. He's asking what that percentage point is that
22 would be paid as bribe.
23 Q. What do you understand him to mean when he says "We will do
24 this face to face"?
25 A. He's saying we would meet face to face when I arrive at the

| HBU3ATI3 | Zarrab - Direct | Page 436 |
|---|---|---|

1 office.
2 Q. Do you see about halfway down the page where you say "But
3 this, this man is necessary for us, no matter what."
4 A. Yes, sir.
5 Q. What did you mean when you said that?
6 A. I'm saying that since Suleyman Aslan holds the position of
7 general manager at Halkbank, which is a critical position, I'm
8 saying, and Suleyman is an important person.
9 Q. Do you see where Happani says "He is necessary, also one
10 can never tell, just might get very strong tomorrow."
11 A. Yes, sir.
12 Q. What did you understand Happani to be saying there?
13 A. During this time frame, our transaction volume was not that
14 high, it was low. And Abdullah Happani is saying here that it
15 might increase in the future, and that this may come handy. Or
16 in other words, Abdullah Happani had found 2 million to be a
17 little too much.
18 Q. What do you mean by that?
19 A. In other words, as an initial payment, 2 million is a lot
20 of money. It is a lot. And in comparison to the profit margin
21 that I have, he's saying that he's finding it a little too
22 much, but he also says it's not that important. And what he's
23 saying is once the business picks up, then it will make up for
24 that.
25 Q. Do you see where you say "I think, um, his is more

| HBU3ATI3 | Zarrab - Direct | Page 437 |
|---|---|---|

1 important than Abi's."
2 A. Yes, sir.
3 Q. What did you mean there?
4 A. I'm saying that this one is more important than Mr. Zafer
5 Caglayan.
6 Q. Why is that?
7 A. Because Mr. Suleyman Aslan was the person at the head of
8 Halkbank, and since everything is within Halkbank, since we
9 need to get Iranian money out of Halkbank, inasmuch as it was
10 Zafer Caglayan that had given the instruction, Suleyman Aslan
11 could have come up with some problems on the inside, he could
12 have refused it.
13 Q. If we can turn to the next page. Do you see where you say
14 near the top "This is not money thrown out the window, that's
15 what I mean."
16 A. Yes, sir.
17 Q. What did you mean there?
18 A. Since Suleyman Aslan holds an important position and he's
19 in an important role, I'm saying this payment is good and it is
20 important to make.
21 Q. Do you see where you go on to say "Now, for example, these
22 guys, Iran has come, okay, you know, we are making all the
23 payments here, you know, in dirham and this and that."
24 A. Yes, sir.
25 Q. What did you mean by that?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBU3ATI3          Zarrab - Direct          Page 438

1  A. I was fulfilling the international money orders given by
2  Iranians. And the request from the Iranians was for Halkbank
3  to do this directly instead. So here, that's what I mean, if
4  Halkbank were to agree to do this, then I would be completely
5  eliminated.
6  Q. Do you see right below that where you say "Okay, they
7  wanted to do it directly, but these guys threw the ball out of
8  bounds, which pushed Vakif and Ziraat off the circuit."
9  A. Yes, sir.
10 Q. What did you mean by that?
11 A. I'm saying that the Iranians wanted to do this directly,
12 and that they wanted to just do this directly through Ziraat
13 and Vakif also, and I'm relaying that Mr. Suleyman had blocked
14 this and that he was not letting it happen.
15 Q. Could you turn to page five of the exhibit. Or actually
16 page four. Do you see at the bottom where you ask "What is the
17 situation in Dubai?"
18 A. I see it, sir.
19 Q. What are you asking there?
20 A. I'm asking about the dirham cash status for us in Dubai,
21 sir.
22 Q. Why would that be significant?
23 A. In order for us to be able to make the international
24 payments for the Iranians, we need money.
25 Q. Could you turn to page five. Do you see near the top where

HBU3ATI3          Zarrab - Direct          Page 439

1  you say "Well you should send, did you send any gold?"
2  A. Yes, sir.
3  Q. What did you mean by that?
4  A. In order for us to be able to fulfill these payments in
5  Dubai, I'm saying make sure to send more gold so we have more
6  money in Dubai. Just like I had drawn on that diagram.
7  Q. Do you see Happani's response "I did send, I send
8  200 kilograms again."
9  A. Yes, I see it, sir.
10 Q. What did you understand him to be saying?
11 A. He's saying he had sent 200 kilograms.
12 Q. What do you say in response?
13 A. I'm saying if money had come in, why did you send so
14 little.
15 Q. What did you mean by that?
16 A. What I'm saying is if we had received money that would be
17 worth more than 200 kilograms, then why did you send only
18 200 kilograms from us to Dubai.
19 Q. A little further down do you see where Happani says "The
20 incoming money -- no, I'm sending most of that already. Also,
21 it's not like the incoming money is the thing. I mean about 15
22 million came in and we were sending 10 of that."
23 A. Yes, I see it.
24 Q. What did you understand him to be saying?
25 A. Abdullah Happani means that there was not much more money

HBU3ATI3          Zarrab - Direct          Page 440

1  than what's 200 kilograms worth. He's saying what he came in
2  he already sent out 10 million of that, and that's what it was.
3  Q. What do you say in response?
4  A. I'm saying are you sending 10 million.
5  Q. What does he say in response?
6  A. He says what I sent is 200 kilograms worth, which is 12
7  million. He says I'm sending 10 million, 12 million, and the
8  12 million mentioned here is the equivalent of 200 kilograms of
9  gold at that time.
10 Q. Mr. Zarrab, I'd like to show you what's been marked for
11 identification as Government Exhibit 3736. Take a moment to
12 look at that.
13        MR. KAMARAJU: We can also turn to the next page.
14 A. Yes, sir.
15 Q. Let me ask some questions about the first page first. Do
16 you recognize this exhibit?
17 A. I recognize it, sir.
18 Q. What is it?
19 A. It is an electronic mail.
20 Q. Who sent it?
21 A. Abdullah Happani.
22 Q. To whom did he send it?
23 A. It's myself, sir.
24 Q. How do you recognize this e-mail?
25 A. It's the e-mail that I personally used, sir.

HBU3ATI3          Zarrab - Direct          Page 441

1  Q. What is the date of the e-mail?
2  A. April 10, 2013.
3  Q. Can we turn to the attachment. What is the attachment?
4  A. This is the account statement for Zafer Caglayan.
5  Q. What is reflected on the account statement, on this account
6  statement for Zafer Caglayan?
7  A. These are the funds that were paid to Zafer Caglayan.
8        MR. KAMARAJU: The government would offer Government
9  Exhibit 3736 and ask to publish it.
10       MS. FLEMING: Objection for hearsay and foundation.
11       THE COURT: Do you want to go through the statement
12 somewhat.
13       MR. KAMARAJU: Sure, your Honor.
14 Q. So, what is the title of this document?
15 A. (In English) "Statement of Account."
16 Q. What does statement of account mean?
17       MS. FLEMING: Your Honor, he's reading from a document
18 not in evidence.
19       THE COURT: I'll allow it. Go ahead.
20 A. Can you please repeat the question?
21 Q. Sure. What does statement of account mean?
22 A. It is an internal accounting record that we have within our
23 company.
24 Q. Who prepared this record?
25 A. Our accounting, and it would be mainly controlled by

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1  Abdullah Happani.
2  Q.  For what purpose was this record prepared?
3  A.  To keep record of moneys that were paid in order to
4   reconcile the funds that we were receiving from the Iranian
5   trade, or with the moneys that were being paid out.
6  Q.  Why did you need to reconcile those two things?
7  A.  So I was paying 50 percent of -- the specific amount of
8   50 percent to Zafer Caglayan with regard to the Iranian trade
9   that we were conducting.  And a sum of those profits had to be
10  calculated.  And this is to keep an accounting record of how
11  much we had paid and how much is still to be paid on the
12  record.
13       MR. KAMARAJU: The government would offer Government
14  Exhibit 3736.
15       THE COURT: I'll allow it.
16       (Government's Exhibit 3736 received in evidence)
17       MR. KAMARAJU: Can we publish to the jury, your Honor?
18       THE COURT: Yes.
19       MR. KAMARAJU: Can we go to page two, please,
20  Mr. Chang-Frieden, thank you.
21  Q.  Let's start with the first column on the left.  You see the
22   one that's labeled tran date?
23  A.  Yes, sir.
24  Q.  What does that column represent?
25  A.  The date that the transaction had been executed.

1  Q.  Do you see the column next to it, value date?
2  A.  Yes, sir.
3  Q.  Do you know what that column represents?
4  A.  Yes, if the transaction involves a future payment date,
5   then the record date would be different from that.
6  Q.  Do you see the column next to it?
7  A.  Yes, sir.
8  Q.  What does that column show?
9  A.  It shows the type and nature of the transaction.
10  Q.  Let's go to the next column, the column titled number.
11       THE COURT: Could you stay on that so we could
12   understand the different types of transactions.
13       MR. KAMARAJU: Certainly.
14  Q.  So let's look at the first row.  What type, what is listed
15   under the type column?
16  A.  PV.
17       (Continued on next page)
18
19
20
21
22
23
24
25

1  Q.  What does PV mean?
2  A.  It's abbreviation for payment voucher.
3  Q.  And what does that mean?
4  A.  It means it's a record of a payment made.  It's a payment
5   that was made out of our safe.
6  Q.  And do you see the entry in that same column for the next
7   row?
8  A.  Yes, sir.
9  Q.  What's written there?
10  A.  AD.
11  Q.  And what does that mean?
12  A.  It's an abbreviation for advice.
13  Q.  What does advice mean?
14  A.  It represents a transfer between our accounts within our
15   accounting software.
16  Q.  And do you see in the same column, the last row?
17  A.  I see it, sir.
18  Q.  What's written there?
19  A.  DBN.
20  Q.  And what does DBN mean?
21  A.  It's an abbreviation for debit note, sir.
22  Q.  And what's a debit note?
23  A.  It's a record of debiting, sir.
24  Q.  The next column over, the number column?
25  A.  That's the record number for this transaction within our

1   accounting software.
2  Q.  And let's go to the next column.  What's that?
3  A.  It's the explanation made with regards to the transaction,
4   sir.
5  Q.  For the record, that's the column titled Narration; is that
6   right?
7  A.  Yes, sir.
8  Q.  The next column over, titled --
9       THE COURT: Could we have an explanation?
10       MR. KAMARAJU: Certainly.
11  Q.  So let's look at the top, under Narration?
12  A.  Yes, sir.
13  Q.  What does it say there?
14  A.  It says "cash to Umit."
15  Q.  What does that mean?
16  A.  The name of the person that took the money to Caglayan.
17  Q.  What's that person's name here?
18  A.  Umit.
19  Q.  Okay.  Now, the next column over?
20       THE COURT: Before you get to that, so in that column,
21   the second entry is Duman?
22       THE WITNESS: Yes, sir.
23       THE COURT: And is that a person?
24       THE WITNESS: It's the name of the company owned by my
25  brother, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBUPATI4        Zarrab - Direct        Page 446

1 THE COURT: And if you could just go down the column
2 and tell us what the different -- Sadik, for example, and then
3 Yusuf?
4 THE WITNESS: Your Honor, Sadik is the name of the
5 person that took the money on that particular date to Zafer
6 Caglayan. Yusuf, Saatci Yusuf represents the amount of money
7 that was paid for the watch that had been paid by the
8 individual and the payment that was paid to Saatci Yusuf. It's
9 the amount of money that was paid at the direction of
10 Mr. Zafer.
11 Q. Just to clarify, what watch are you referring to?
12 A. Many watches. I don't know which one this represents.
13 Q. Do you see the row in red, that's highlighted in red?
14 A. Yes, sir.
15 Q. What's the date of that transaction?
16 A. It's October 15th, 2012, sir.
17 Q. And what does it say in the narration field?
18 A. "Cash to SLMN."
19 Q. What does that mean?
20 A. It was the money that was sent to Mr. Suleyman.
21 Q. Which Suleyman?
22 A. Suleyman Aslan.
23 Q. And how much money was sent to Suleyman Aslan in this
24 payment?
25 A. Two million Euros.

HBUPATI4        Zarrab - Direct        Page 447

1 Q. And we haven't talked about it yet, but the column that
2 says Balance, what does that refer to?
3 A. It's the sum of payments that have been made.
4 Q. And what's that sum? What's that figure for the line in
5 red?
6 A. It's 27,989,500. I'd like to clarify this. This two
7 million amount was entered into Zafer Caglayan's account by
8 mistake. It was removed later on. This 27,989,500 Euros is
9 not the sum of monies that were paid to Suleyman Aslan.
10 Q. Thank you for that clarification. There's one other thing
11 I want to clarify. The tran date and the value date fields,
12 just to be clear, on those dates, is the month the first or
13 second date reflected?
14 A. The months are shown as the second. In other words, the
15 months are in the middle, sir.
16 Q. Thank you. Now, could we go back to page 1 of the exhibit.
17 What's the subject of this e-mail?
18 A. Cag.
19 Q. Do you know what that's a reference to?
20 A. It represents Zafer Caglayan.
21 Q. And what's the name, the file name of the attachment?
22 A. That is Cag also.
23 Q. And what's that a reference to?
24 A. And that represents that this was the account statement for
25 Zafer Caglayan.

HBUPATI4        Zarrab - Direct        Page 448

1 Q. I believe you testified yesterday that there was some
2 discrepancy involving payments to Caglayan; is that right?
3 A. I had referred to the numbers, amounts not being consistent
4 and maybe that was misunderstood.
5 Q. What did you mean by that?
6 A. It means Mr. Zafer Caglayan and us, there was some
7 discrepancy between the amounts that we had sent and what was
8 due.
9 Q. What was that discrepancy?
10 A. For example, the amount that had been paid to Suleyman
11 Aslan was erroneously entered into the Zafer Caglayan's
12 account, and I had to make that payment out of my own pocket.
13 Q. How much was that payment?
14 A. Two million Euros.
15 Q. Now, Mr. Zarrab, did you bribe anyone else other than
16 Suleyman Aslan at Halkbank?
17 A. No, absolutely not.
18 Q. Did you bribe Levent Balkan?
19 A. No, absolutely not.
20 Q. Did you bribe the defendant?
21 A. No, absolutely not.
22 Q. Why didn't you bribe anybody else at Halkbank?
23 A. I was already giving bribes to the Turkish minister of
24 economy. I was also giving these to the person at the head of
25 Halkbank, to its general manager. I didn't feel a need to pay

HBUPATI4        Zarrab - Direct        Page 449

1 any other to any other individuals.
2 MR. KAMARAJU: Your Honor --
3 A. In terms of the mentioned individuals, there was no request
4 made by them either.
5 MR. KAMARAJU: Your Honor, I'm happy to proceed now,
6 but I am going to turn to another section; so I just wanted to
7 let you know, in case...
8 THE COURT: Yes, let's go another ten or 15 minutes.
9 MR. KAMARAJU: Okay.
10 Q. Now, the meeting that you had at Halkbank, I believe you
11 testified it involved bringing Iranian money into Turkey; is
12 that right?
13 A. Yes. Yes, that was one part of it.
14 Q. Did you ever try to copy the system that you had at
15 Halkbank in any other country?
16 A. Yes, we tried to.
17 Q. What other countries?
18 A. For example, in China.
19 Q. I'd like to show you what's been marked for identification
20 as Government Exhibit 3631. Just take a moment to review that,
21 please. Do you recognize that document?
22 A. I recognize it, sir.
23 Q. What is it?
24 A. Electronic mail.
25 Q. Who sent it?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    November 30, 2017

HBUPATI4          Zarrab - Direct          Page 450

1  A.  Ruchan Bayar.
2  Q.  Who is Ruchan Bayar?
3  A.  He is one of the staff members that worked in my company
4   during that time period.
5  Q.  And who received the e-mail?
6  A.  Me, sir.
7  Q.  And how do you recognize the e-mail?
8  A.  This is the e-mail address used by me personally, sir.
9  Q.  What's the date of the e-mail?
10 A.  September 10th, 2012.
11      MR. KAMARAJU: Mr. Chang-Frieden, could we bring up
12  along side of that for the witness and counsel and the Court,
13  Government Exhibit 3631-T.  It has been admitted subject to
14  connection.
15 Q.  Now, Mr. Zarrab, what was the general purpose of Government
16  Exhibit 3631?
17 A.  This is like an information report.  Ruchan Bayar is
18  summarizing for me what we would need to do in our attempts to
19  order to copy our system over there.
20      MR. KAMARAJU: Your Honor, the government would offer
21  3631 into evidence and ask to publish it, and 3631T.
22      MS. FLEMING: Objection, foundation, relevance and
23  hearsay.
24      THE COURT: Yes, so let's have a little bit more on
25  foundation.

HBUPATI4          Zarrab - Direct          Page 451

1       MR. KAMARAJU: Okay.
2  BY MR. KAMARAJU:
3  Q.  You mentioned that you were -- what was the purpose of the
4   business in China?
5  A.  That would be the Chinese version of what we were doing in
6   Turkey, which is to take the money out, out of the Chinese
7   banks that would have accumulated from crude oil sales to
8   China, and use that money to make international payments.
9       MS. FLEMING: Your Honor, I withdraw my objection.
10      THE COURT: Withdraw it?
11      MS. FLEMING: Withdraw it.
12      THE COURT: Okay.  Go ahead.
13      MR. KAMARAJU: Then, your Honor, the government offers
14  Government Exhibit 3631.
15      THE COURT: I'll allow them both.
16      (Government's Exhibits 3631 and 3631-T received in
17  evidence)
18      MR. KAMARAJU: Maybe for ease of reading,
19  Mr. Chang-Frieden, we could just publish 3631-T, unless
20  everybody wants the Turkish version.
21  BY MR. KAMARAJU:
22 Q.  So, Mr. Zarrab, what is the subject line of this e-mail?
23 A.  This is a summary.  It's a summary for forming or
24  establishing companies in China.
25 Q.  And why did you need to establish a company in China?

HBUPATI4          Zarrab - Direct          Page 452

1  A.  In Turkey, as well, we were getting the money out through
2   companies, and we needed to establish the same system there.
3  Q.  Okay.  And did you ever establish a company in China?
4  A.  Yes, sir.
5  Q.  And do you see, I guess it's No. 5 on the list?
6  A.  Yes, sir.
7  Q.  It says: "Turhan Yilmaz will make USD 200,000 capital
8   transfer from Istanbul on the 16th of September"?
9  A.  I see it, sir.
10 Q.  Who is Turhan Yilmaz?
11 A.  Turhan Yilmaz is one of the staff members that worked at my
12  company during that time period.
13      THE COURT: Could you explain four also before that?
14 Q.  Sure.  Mr. Zarrab, if you look at the fourth item on the
15  list, what do you understand Ruchan Bayar to be saying there?
16 A.  That the company would be established by September 16th and
17  that an account for the company named ABLES would be opened
18  within the Construction Bank of China.  He's saying that he had
19  received the initial approval for that.
20 Q.  And the sixth item on the list says -- do you see where it
21  says: "We will start the business on the 16th of September
22  with one million Euro transfer from Capital Bank"?
23 A.  Yes, sir.
24 Q.  What do you understand that's in reference to?
25 A.  In other words, he's saying that we're going to run a trial

HBUPATI4          Zarrab - Direct          Page 453

1   transaction at the amount of one million Euros.
2  Q.  Did you actually start the business in China?
3  A.  Yes, we started it, sir.
4  Q.  And did it progress?
5  A.  For a certain period, sir.
6  Q.  What stopped it?
7  A.  The banks.
8  Q.  Which banks were those?
9  A.  Bank of Kunlun, Ping An Bank, Bohai Bank, all the banks
10  that we were working with, they stopped it.  The banks that
11  realized that this had something to do with Iran, they
12  immediately stopped it.
13      THE COURT: Those banks that you mentioned, are those
14  Chinese banks?
15      THE WITNESS: Yes, your Honor.  Except for Bank of
16  Kunlun.  Bank of Kunlun was already a bank that was an
17  intermediary bank for Iranian transactions.
18      THE COURT: How long were you up and running, so to
19  speak?
20      THE INTERPRETER: Could you repeat that, sir?
21      THE COURT: How long was he operating before it was
22  stopped in China?
23      THE WITNESS: It was a few months.
24      MR. KAMARAJU: Your Honor, I was just about to start
25  sort of a string of exhibits; so it might make sense to take a

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBUPATI4 | Zarrab - Direct | Page 454 |

1    break now.
2         THE COURT: Okay. All right. I'm happy to take the
3    lunch break now. If everybody could be back at 2:00. It's 20
4    to 1:00 now, and if the jurors wish, they can use the cafeteria
5    on the 8th floor. Thanks a lot. We'll see you.
6         (Jury not present)
7         THE COURT: Okay. We'll see everybody at 2:00.
8    Thanks a lot.
9         (Pause)
10        THE COURT: Counsel, could you come up for a minute,
11   or I'll come there.
12        (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

| HBUPATI4 | Zarrab - Direct | Page 456 |

1    okay. Then I'll see you at 2:00.
2         MS. FLEMING: Thanks, Judge.
3         MR. KAMARAJU: Thank you.
4         (Luncheon recess)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HBUPATI4 | Zarrab - Direct | Page 455 |

1         (At the side bar)
2         THE COURT: I just was going to ask if you have sort
3    of an approximation of where we are on Mr. Zarrab's direct?
4         MR. KAMARAJU: I'd say --
5         THE COURT: I won't hold you to it.
6         MR. KAMARAJU: I appreciate that. I think we've
7    probably gotten through about half.
8         THE COURT: Half? So your anticipation is that he'll
9    go --
10        MR. KAMARAJU: I think he'll go into --
11        THE COURT: -- next week or finish Friday?
12        MR. KAMARAJU: Well, I think he may go into like the
13   beginning of Monday.
14        THE COURT: I see.
15        MS. FLEMING: On direct?
16        MR. KAMARAJU: Possible.
17        THE COURT: Okay.
18        MS. FLEMING: I'm ready to start.
19        THE COURT: What, cross?
20        MS. FLEMING: I'm ready any time.
21        THE COURT: I think you have to wait for him to
22   finish.
23        MS. FLEMING: Really? Can't we do it
24   subject-by-subject? That would be a good way to do it.
25        THE COURT: If you have two separate proceedings. No,

| HBUPATI4 | Zarrab - Direct | Page 457 |

1         A F T E R N O O N   S E S S I O N
2              2:06 P.M.
3         (In open court; jury present)
4         THE COURT: How is everybody? Please be seated, and
5    we'll continue with the direct examination of Mr. Zarrab.
6         THE DEPUTY CLERK: Mr. Zarrab, I'd like to remind you
7    that you're still under oath.
8         THE WITNESS: (In English) Yes, ma'am.
9         MR. KAMARAJU: May I proceed?
10        THE COURT: Yes.
11        MR. KAMARAJU: Thank you, your Honor.
12   BY MR. KAMARAJU:
13   Q. Now, Mr. Zarrab, I think when we broke we were talking
14   about the business in China; do you remember that?
15   A. Yes, that's right.
16   Q. I'd like to show you what's been marked for identification
17   as Government Exhibit 3748. Take a moment to review it.
18   A. It's not up yet. It's up.
19   Q. If you'd just take a moment to review that. Do you
20   recognize it?
21   A. Yes, sir.
22   Q. What is it?
23   A. Electronic mail.
24   Q. Let's start at the bottom of the document, what do you see
25   there?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1  A. It's information about the company that we had established
2   in China, the ABLES Tianjin International Trading Company, and
3   also a text of -- it's a text. It's a draft text that was
4   prepared to be presented to the banks in China.
5  Q. Okay. And is that draft text contained in an e-mail?
6  A. Yes, sir.
7  Q. And who sends that e-mail?
8  A. The person that sends it to me is Ruchan Bayar.
9  Q. And just remind us who is Ruchan Bayar?
10 A. He is a personnel that was working in my company during
11  that time. He was dealing with the Chinese matters during that
12  time.
13 Q. And what's the date of the e-mail?
14 A. July 3rd, 2013.
15 Q. And the text contained in the e-mail, does that relate to
16  the business you were doing in China?
17 A. Yes, it's related to the Iranian trade.
18     MR. KAMARAJU: Your Honor, the government would offer
19  Government Exhibit 3748 and ask that it be published.
20     THE COURT: I'll allow it.
21     (Government's Exhibit 3748 received in evidence)
22 BY MR. KAMARAJU:
23 Q. Okay. So let's turn to the text that you testified before.
24  Tell us again, what is that?
25 A. In shortly -- in summary, this was a reference letter that

1  was written to be presented to banks in China.
2  Q. And why did you need to present a reference letter to banks
3   in China?
4  A. Ruchan Bayar in China said that he had a need for this
5   because your business in China was not as easy as it was in
6   Turkey. We were facing some problems there, and this was at
7   his request.
8  Q. And what kind of problems was your business facing?
9  A. They were not conducting the transactions.
10 Q. And do you know why they weren't conducting the
11  transactions?
12 A. They were suspicious that the transactions might be related
13  to Iran.
14 Q. Did you try to get this reference letter?
15 A. Yes.
16 Q. What steps did you take to try to get the reference letter?
17 A. I made the request to the ministry of interior.
18 Q. Who did you convey that request to?
19 A. To the son of the minister of interior, at that time, of
20  the Republic of Turkey by the name of Muammer Guler.
21 Q. And what was the son's name?
22 A. Can you repeat the question, please?
23 Q. Yes, I'm sorry. What was the son's name?
24 A. Baris Guler.
25     MR. KAMARAJU: Okay. May I approach, your Honor?

1  Q. I'm showing you what's been marked for identification as
2   Government Exhibit 15; do you recognize that?
3  A. Yes, I recognize it.
4  Q. What is it?
5  A. It's a photograph of Mr. Muammer Guler.
6     MR. KAMARAJU: Your Honor, I'd offer Government
7  Exhibit 15.
8     THE COURT: I'll allow it.
9     (Government's Exhibit 15 received in evidence)
10    MR. KAMARAJU: Permission to publish?
11    THE COURT: Sure.
12 BY MR. KAMARAJU:
13 Q. So while that's going up, let me ask you. Why did you
14  approach the Turkish minister of the interior's son about this
15  letter?
16 A. Baris Guler was working as a consultant for our companies
17  during that time while he was the -- while his dad was the
18  minister of interior.
19 Q. And how did you communicate with Baris Guler?
20 A. I met in person. I communicated via telephone. I messaged
21  through WhatsApp.
22 Q. Okay. Were you ultimately successful in obtaining the
23  letter?
24 A. Yes, sir.
25     MR. KAMARAJU: Your Honor, may I approach?

1     THE COURT: Yes.
2  BY MR. KAMARAJU:
3  Q. I'm showing you what's been marked for identification as
4   Government Exhibit 3750. Do you recognize that document?
5  A. Yes, I recognize it.
6  Q. Okay. What is it?
7  A. It's the letter that the minister of interior Muammer Guler
8   had written to the bank in China.
9  Q. Okay. And is the document an e-mail?
10 A. Yes. I received it as an e-mail, and I sent it forward to
11  Ruchan Bayar as an e-mail as well.
12 Q. And who did you -- I'm sorry, withdrawn. You said you sent
13  it to Ruchan Bayar?
14 A. Yes. Yes, sir, in a report to be forwarded to the banks in
15  China.
16    MR. KAMARAJU: Your Honor, the government would offer
17 Government Exhibit 3750.
18    THE COURT: Is it on the screen?
19    MR. KAMARAJU: It appears not to be. Let me just
20 check real quick.
21    MS. FLEMING: Objection, relevance.
22    THE COURT: Any way to enlarge that?
23    MR. KAMARAJU: I believe it's in Turkish.
24    THE COURT: Yes. Is there a translation?
25    MR. KAMARAJU: No, I'm sorry. We don't have a

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                  November 30, 2017

1   translation of this one, your Honor.
2        THE COURT: I'll allow it for whatever it's worth.
3        (Government's Exhibit 3750 received in evidence)
4        MR. KAMARAJU: Okay. I don't intend on asking him a
5   lot of questions about the text of the document. In fact, I
6   don't intend to ask him any questions about the text of the
7   document.
8   BY MR. KAMARAJU:
9   Q. You said you transmitted this letter to Ruchan Bayar,
10   right?
11   A. Yes, that's correct.
12   Q. Did you have to pay anyone to obtain this letter?
13   A. Yes.
14   Q. How much did you have to pay?
15   A. Approximately one $100,000.
16   Q. And who did you pay that to?
17   A. To Baris Guler.
18   Q. If we could please, I'd like to show you what's been marked
19   for identification as Government Exhibit 232-T. The second
20   page, please.
21   A. Yes, sir.
22   Q. Okay. Do you recognize the exhibit?
23   A. Yes, I recognize it.
24   Q. What is it?
25   A. It's a transcription of a phone conversation.

1   Q. Did you participate in this conversation?
2   A. Yes, sir.
3   Q. Have you listened to a recording of this conversation?
4   A. Yes, I listened to it, sir.
5   Q. Did the recording accurately capture your conversation?
6   A. Yes, it reflected, sir.
7   Q. And who participated in this call?
8   A. Ruchan Bayar and myself.
9   Q. And what generally was the purpose of this call?
10   A. With regard to Iranian trade. He was giving me information
11   about a bank in China, after his communications with them.
12        MR. KAMARAJU: Your Honor, the government would offer
13   Government Exhibit 232-T subject to connection.
14        MS. FLEMING: And subject to authentication.
15        THE COURT: Okay. I'll allow it.
16        (Government's Exhibit 232-T received in evidence)
17        MR. KAMARAJU: Could we please publish that starting
18   at page 2.
19   BY MR. KAMARAJU:
20   Q. Now, if you could look down to about near the bottom of the
21   page where you say: "Of course, like Levent Balkan"?
22   A. Yes, I see it.
23   Q. What were you trying to say there?
24   A. I'm giving Levent Balkan at Halkbank just as an example, a
25   person like Levent Balkan as an example.

1   Q. What did you mean, "a person like Levent Balkan"?
2   A. During a phone conversation with Ruchan Bayar, Ruchan Bayar
3   was conveying to me the summary of his meeting. In order for
4   me to understand the positions that were held by the
5   individuals that were at his meeting, we were doing a
6   comparison of these individuals with individuals at Halkbank,
7   the positions, so that we can understand these positions.
8        So I'd like to give you an example such as this one.
9   The X person that he might be meeting with, he has tried to
10   express that this would be a counterpart or an equivalent of
11   the position that was held by Levent Balkan in Turkey. So here
12   I'm asking him, so like Levent Balkan?
13   Q. And what was your understanding of Levent Balkan's role at
14   Halkbank?
15   A. Mr. Levent Balkan, while he was still within the bank, he
16   participated very closely in the daily transactions that we
17   were running with Iran at that time.
18   Q. Okay. And now, I guess it's two blocks down, where
19   Bayar says: "Then there is a lower-ranked man that is on our
20   side, and then there is a Suleyman."
21   A. Yes, I see it.
22   Q. What did you understand him to be saying there by "there is
23   a lower-ranked man that is on our side"?
24   A. He had given money to a lower-ranked person at the bank
25   branch and that person had accepted that; so he's referring to

1   the lower-ranked person.
2   Q. And what is your understanding of what he means when he
3   says "then there is a Suleyman"?
4   A. He is referring to Suleyman Aslan as an example at
5   Halkbank.
6   Q. And what was your understanding of Suleyman Aslan's role at
7   Halkbank?
8   A. Suleyman Aslan is the general manager of Halkbank and was
9   the person with the highest authority there.
10   Q. Can we turn to page 3, please. And do you see at the top
11   where Bayar says: "So Mr. Wo definitely doesn't want to work
12   with us -- for sure, one hundred percent. First of all, he
13   says we can't do intermediary trade through them."
14   A. Yes, I see it.
15   Q. What did you understand him to be saying there?
16   A. That the person at the bank, Mr. Wo, did not want to be
17   participating in the trade with Iran, especially intermediate
18   trade with Iran as an intermediary on their part.
19   Q. And then two blocks down, do you see where he says:
20   "Second, they absolutely never allow gold, jewelry items or
21   nuggets;" do you see that?
22   A. Yes, I see it, sir.
23        (Continued on next page)
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI5 | Zarrab - Direct | Page 466 |

1  Q. What did you understand him to mean there?
2  A. He's saying that the bank is absolutely not allowing the
3  same trade that we're doing at Halkbank to occur in China.
4  Q. Can we turn to page five. Do you see at the bottom where
5  you say "There is only one opposition man, they have him tied
6  up tight." My apologies. Bayar says "There is only one
7  opposition man, they have him tied up tight. He's like Hakan,
8  I mean, exactly, he's in charge of foreign trade,
9  international -- he's the business manager."
10      Do you see that?
11 A. Yes, I see it.
12 Q. What did you understand him to mean when he said "There's
13 only one opposition man, they have him tied up tight"?
14 A. A different Iranian person was partially working with the
15 bank, the equivalent of Mr. Hakan, would be the head of the
16 international department at the Chinese bank. That person was
17 in close relationship with this other person, and for that
18 reason, he was not allowing another person to come in to do the
19 trade.
20 Q. Who did you understand him to be referring to when he said
21 Hakan?
22 A. Mr. Hakan Atilla.
23 Q. Could we turn to page 11, please. Do you see near the top
24 of the page where you say "Without you baiting the person who
25 is in Hakan's boss' position at the bank or" -- and you get

| HBU3ATI5 | Zarrab - Direct | Page 467 |

1  interrupted, "the one who is in Hakan's position, the one who
2  is in opposition, nothing will happen."
3      Do you see that?
4  A. Yes.
5  Q. What did you mean there?
6  A. Without giving a bribe, a share or money to the person who
7  is in the same position as Suleyman Aslan in China, or without
8  giving money -- without giving bribes to the person who is
9  blocking Ruchan who was in the same position as Hakan Atilla in
10 the bank in China. I'm saying there is no way he can pull this
11 off.
12 Q. How long did your business in China last? Your Iranian
13 business in China?
14 A. A few months.
15 Q. What caused it to stop?
16 A. Banks.
17 Q. What made the banks stop the business?
18 A. As soon as they understood that the money trade had
19 something to do with Iran, they stopped it. In other words,
20 they stopped it as soon as they understood or as soon as the
21 suspicion formed that these moneys were involved in making
22 international payments on behalf of Iran.
23      THE COURT: Could I see counsel just for a minute at
24 the sidebar.
25      (Continued on next page)

| HBU3ATI5 | Zarrab - Direct | Page 468 |

1      (At the sidebar)
2      THE COURT: I'm not exactly understanding. We're off
3  in China now with this last hour or so.
4      MR. KAMARAJU: Well, I think there were a couple of
5  different things, but I'm about to end the China piece.
6      THE COURT: So they folded the China piece. The
7  Chinese did.
8      MR. KAMARAJU: The Chinese did. I'm about to dial it
9  back to Halkbank with two questions and be done.
10      But the purpose of it was, frankly, to show the
11 relationship and understanding among co-conspirators of various
12 people's roles at the bank and how they interacted with the
13 Iranian business at Halkbank.
14      So, the last call we went through where they went
15 through three high-ranking Halkbank individuals, including the
16 defendant, and analogized them to people at the Chinese bank.
17      MR. ROCCO: What is the relevance of that?
18      MR. KAMARAJU: Their understanding.
19      MS. FLEMING: How is it not hearsay?
20      MR. ROCCO: It's pure hearsay.
21      MR. KAMARAJU: It is a co-conspirator statement.
22      THE COURT: Whatever. I think we should get back to
23 Turkey.
24      MR. KAMARAJU: I'm going to ask one more very short
25 question on it. It won't be on any document. And we'll be

| HBU3ATI5 | Zarrab - Direct | Page 469 |

1  back in Turkey.
2      (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1          (In open court)
2     BY MR. KAMARAJU:
3 Q. Mr. Zarrab, I think I asked you how long did the Iranian
4   business in China last. Let me ask you this: How long did the
5   Iranian business at Halkbank last?
6 A. From 2012 until I got arrested.
7 Q. I'd like to show you what's been marked for identification
8   as Government Exhibit 2511. Do you recognize that document?
9 A. Yes, sir.
10 Q. What is it?
11 A. This is an electronic mail.
12 Q. Did you receive this e-mail?
13 A. No, sir.
14 Q. Do you recognize any of the e-mail addresses identified on
15   this e-mail?
16 A. There are ones that I do know.
17 Q. Let's start with the sender. Do you recognize the sender?
18 A. No, I only know it's from Halkbank.
19 Q. Let's look at the "to" line. Do you recognize any e-mail
20   addresses on the "to" line?
21          MS. FLEMING: Objection.
22          THE COURT: Overruled.
23 A. Yes, I know, sir.
24 Q. Whose e-mail address do you recognize on that?
25 A. Sinem and Umut.

1 Q. Who is Sinem?
2 A. Sinem was one of my personnel who worked in my company at
3   that period of time.
4 Q. And who is Umut?
5 A. Umut's full name, Umut Bayraktar, is also one of the
6   persons who were working for me as a personnel in my company.
7 Q. Just to be clear, which of the e-mail addresses on the "to"
8   line belong to Sinem?
9 A. The first one.
10 Q. Which one belongs to Umut?
11 A. The second one.
12 Q. What is the date of the e-mail?
13 A. July 24, 2013.
14 Q. Do you recognize any e-mail addresses on the cc line?
15 A. There are ones that I do, yes.
16 Q. Which ones do you recognize?
17 A. Mujgan Beyhan.
18 Q. Who is that?
19 A. She's one of the authorized persons in Halkbank where we
20   had our account in the branch.
21 Q. What is the subject line of this e-mail?
22 A. That's a record of closed and unclosed transactions for the
23   moneys that came to Safir and Royal companies from outside the
24   country. For exports, closing records.
25          MR. KAMARAJU: Can we turn to Government Exhibit

1   2511-1, please.
2 Q. Mr. Zarrab, is this one of the attachments that was
3   described in the prior exhibit?
4          MS. FLEMING: Judge.
5          THE COURT: Is that a question?
6          MS. FLEMING: Objection. No foundation.
7          THE COURT: I didn't understand the question.
8          MR. KAMARAJU: I asked if this was one of the
9   documents that was referred to in the prior exhibit.
10          THE COURT: I'll allow that. Go ahead.
11 A. Yes. That's one of the attachments of the previous e-mail.
12 Q. What is written at the top of the attachment?
13 A. Royal Maritime, Iranian transactions by the date 8/2/2013.
14 Q. What is Royal Maritime?
15 A. A company that was owned by me.
16 Q. Do you have an understanding of what this document is?
17 A. Yes, of course.
18 Q. What is it?
19 A. We had a limited amount of time to do the exports for the
20   moneys that came to the Halkbank account. So firstly we were
21   taking the money out of Halkbank, and later, in the period
22   either 30 days or 60 days, which I don't remember exactly, we
23   were supposed to realize the export as an exchange for the
24   amount of money that was received. We had to do the gold
25   export equivalent to the amount that we received in money. I

1   can show it on the drawing if they want.
2          MR. KAMARAJU: With your Honor's permission.
3          THE COURT: I'm trying to figure out what this
4   document is.
5          MR. KAMARAJU: I thought he might explain on there,
6   but I'm happy to ask him some more question first.
7          THE COURT: You put it up on the screen, right?
8          MR. KAMARAJU: Yes.
9          MS. FLEMING: He testified he never saw it.
10 Q. When you referred to gold exports, was there any sort of
11   reconciliation process you had to go through?
12 A. Yes, we had to send the equivalent amount of gold for the
13   money that is coming in.
14 Q. Who did you have to reconcile with?
15 A. With Halkbank.
16 Q. Why did you have to do those reconciliations?
17 A. Because the documents of the money that came had to be
18   reconciled within the bank with the exports that are made.
19 Q. I'm not sure -- I cut you off.
20 A. So this is the record of what we were doing to reconcile
21   the Iranian transaction, we were covering it with gold.
22 Q. Are you familiar with the recordkeeping process for the
23   reconciliation?
24 A. Yes, generally I know, but mainly my personnel was in
25   contact with the bank, and they would do the details.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1 Q. Is your familiarity with your company's reconciliation
2 process?
3 A. Yes.
4 Q. Did that process involve receiving information from
5 Halkbank?
6 A. Yes, of course.
7 Q. Looking at Government Exhibit 2511-1, are these the kinds
8 of documents you received from Halkbank as part of that
9 reconciliation process?
10 A. Yes, sir.
11 Q. I'd like to show you what has been marked as Government
12 Exhibit 2511-2. Is this one of the documents that was referred
13 to in Government Exhibit 2511?
14 A. Yes, sir.
15 Q. Looking at the document, do you recognize it as --
16     THE COURT: Is it an attachment to the e-mail? Is
17 that what it is, another attachment?
18     MR. KAMARAJU: Yes, your Honor.
19     THE WITNESS: Yes, sir.
20 Q. Do you recognize Government Exhibit 2511-2 as the kinds of
21 documents your company would receive as part of the
22 reconciliation process?
23 A. Yes, sir.
24 Q. I'd like to show you what's been marked as Government
25 Exhibit 2511-3. Is this another attachment to the e-mail that

1 was Government Exhibit 2511?
2 A. Yes, sir.
3 Q. Is this another example of the kinds of documents you would
4 receive from Halkbank as part of the reconciliation process?
5 A. Yes, sir.
6 Q. Finally I'd like to show you what's been marked as
7 Government Exhibit 2511-4. Is this another attachment to
8 Government Exhibit 2511?
9 A. Yes, sir. It is a list of amounts that came from Iran,
10 which belongs to another company of ours.
11 Q. Which company is that?
12 A. Safir Gold.
13 Q. Ultimately, what was the purpose of the reconciliation
14 process?
15 A. The documents at the bank for the money that came from Iran
16 to do the documentation and to close it and then organize the
17 documents, indicating the ultimate arrival point within the
18 directions given by the bank.
19 Q. You testified about two e-mails of yours -- I apologize.
20 Two employees of yours who received this e-mail. Do you
21 remember that?
22     MS. FLEMING: Objection.
23     THE COURT: Sustained.
24 A. Yes, sir.
25     THE COURT: Hold it.

1     MR. KAMARAJU: Can we turn back to Government Exhibit
2 2511.
3 Q. Looking at the "to" line.
4 A. Yes, sir.
5 Q. Whose e-mail addresses are those?
6 A. These are the e-mails for the two persons who are the
7 personnels who worked for my company.
8 Q. Did those employees have any responsibilities relating to
9 the reconciliation process?
10 A. Yes. These are the authorized personnel who were in touch
11 with the Halkbank to ensure the closing of the account.
12 Q. Were they responsible for receiving information from
13 Halkbank related to closing accounts?
14 A. Yes, sir.
15     MR. KAMARAJU: The government would offer Government
16 Exhibit 2511, 2511-1, 2511-2, 2511-3 and 2511-4.
17     MS. FLEMING: Objection. Hearsay and foundation.
18     THE COURT: We'll have to defer that for now. We'll
19 come back to it later.
20     MR. KAMARAJU: Okay, I'll move on.
21 Q. I'd like to show you what's been marked as Government
22 Exhibit 211-T for identification. Do you recognize this
23 exhibit?
24 A. I do, sir.
25 Q. What is it?

1 A. That's a transcription of a telephone conversation.
2 Q. Did you participate in this conversation?
3 A. Yes, sir.
4 Q. Do you remember the call?
5 A. I do remember, sir.
6 Q. Have you listened to a recording of the conversation?
7 A. Yes, I did, sir.
8     MS. FLEMING: No objection, subject to connection and
9 authentication.
10     THE COURT: I'll allow it.
11     MR. KAMARAJU: The government offers Government
12 Exhibit 211-T and ask to publish it beginning at page two.
13     THE COURT: Okay.
14     (Government's Exhibit 211-T received in evidence)
15 Q. So, look down I think at the bottom of the page where it
16 starts to run to the next one. Do you see where -- I don't
17 think I asked you because the exhibit came in.
18     Who is this call with?
19 A. Between Levent Balkan and myself.
20 Q. So do you see near the bottom of the page where Balkan says
21 "Now this we received a sum of money from HSBC," and it
22 continues onto the next page. "One and 800 dollars."
23 A. Yes, I see that, yes.
24 Q. Then do you see where he goes on to say "It was received at
25 Safir from your personal account."

**A414**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                     November 30, 2017

1  A. Yes, sir.
2  Q. What did you understand Balkan to be saying there?
3  A. I had sent $1.8 million from my personal account in HSBC
4     bank to the Safir company account.
5  Q. Did that transfer have anything to do with the Iranian
6     business?
7  A. No, definitely not.
8         MS. FLEMING: Objection. Relevance.
9  Q. Do you see where Balkan says about midway down through the
10    page "Okay, can we think strategically here briefly."
11 A. Yes, sir.
12 Q. What did you understand him to mean there?
13 A. He says we have to think about this transaction from a
14    strategic point of view.
15 Q. Do you see where he goes on to say "I mean, I'm talking
16    about, one, American bank, two, dollars, three, Safir, I mean,
17    many factors all bundled up here."
18 A. Yes, sir. I see that.
19 Q. What did you understand him to be saying?
20 A. Mr. Levent Balkan in this telephone conversation is
21    indicating that $1.8 million payment, when it was sent from
22    HSBC to Halkbank, because it has to be cleared over the United
23    States, the sender is Safir on one side, and the company Safir
24    is a company who trades with the Iran. He sees that as a
25    threat to the system that is working within the Halkbank, and

1  he thinks that it may harm the system that's going on in
2     Halkbank.
3  Q. How do you respond?
4  A. I'm asking will there be a problem. I'm trying to
5     understand the problem.
6  Q. Can we turn to page -- do you see a little further down
7     where Balkan says "The balance, the balance is not important.
8     What's more important is security."
9  A. Yes, sir.
10 Q. What did you understand him to mean there?
11 A. There was a holiday in Turkey at that period of time, I
12    wanted this $1.8 million to stay in Halkbank. And Mr. Levent
13    Balkan is indicating that the moneys, that $1.8 million staying
14    in their bank is not important. The more important thing for
15    the longevity of the system that's in progress should be able
16    to keep on going. It shouldn't be in any way risked. And that
17    system is the gold trade which I had drawn out the schematics
18    for.
19        MR. KAMARAJU: We can take that down.
20 Q. Did you ever come to learn that the U.S. sanctions
21    concerning gold trading were going to change?
22 A. Yes, I did.
23 Q. Do you remember approximately when you learned that?
24 A. In the beginnings of 2013.
25 Q. Were you informed of those changes by anyone?

1  A. Yes.
2  Q. How were you initially informed of those changes?
3  A. Mr. Suleyman Aslan came into contact with me and explained
4     to me that there will be changes in the sanctions -- in the
5     sanctions regulations regarding gold.
6  Q. I'd like to show you what's been marked for identification
7     as Government Exhibit 1002. If we can also bring up 1002-T
8     which has been admitted subject to connection.
9         Do you recognize Government Exhibit 1002?
10 A. Yes, I do, sir.
11 Q. What is it?
12 A. WhatsApp messages between myself and Suleyman Aslan.
13 Q. What did you use WhatsApp to communicate with Suleyman
14    Aslan about?
15        THE COURT: As reflected in this exhibit or just
16    generally?
17        MR. KAMARAJU: I mean generally.
18 A. Generally, we were writing on WhatsApp the sensitive
19    subjects, the private subjects, and important subjects.
20 Q. Whose idea was it to use WhatsApp to communicate about
21    those things?
22 A. I don't recall whose idea originally it was, but we were
23    just writing to each other.
24 Q. Does Government Exhibit 1002 reflect your WhatsApp
25    communication with Suleyman Aslan?

1  A. Yes, sir.
2  Q. Do you recognize communications that you had via WhatsApp
3     on Government Exhibit 1002?
4  A. Yes, sir.
5         MR. KAMARAJU: Your Honor, the government would offer
6     Government Exhibit 1002 subject to connection and ask to
7     publish it and Government Exhibit 1002-2.
8         MS. FLEMING: Your Honor, this is -- may I be heard on
9     it?
10        THE COURT: Why don't you approach for a minute.
11    (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI5 | Zarrab - Direct | Page 482 |
|---|---|---|

1    (At the sidebar)
2    MS. FLEMING: I have 1002-T. This is a condensed
3    version. The real WhatsApp of these guys is many stacks and
4    many thousands of calls. This is, you know, a quarter of an
5    inch.
6    THE COURT: Okay.
7    MS. FLEMING: It looks like a continuous, it is not
8    the form that it's in. It is not the real way it should be
9    done.
10    THE COURT: Okay.
11    MS. FLEMING: So, one of our points on opening was
12    that there are thousands and thousands of e-mails and all the
13    rest of it. This is not the way it's done, and this isn't the
14    way.
15    THE COURT: I don't know what you're saying. I really
16    don't.
17    MS. FLEMING: This is not the way that the -- this
18    makes it a much more sort of evil document, if I can put it
19    that way. It really emphasizes.
20    THE COURT: On cross-examination you would bring that
21    out. Right?
22    MS. FLEMING: No.
23    THE COURT: You're not denying the documents, are you?
24    MS. FLEMING: No, but this is not the way the document
25    exists. They've changed the document.

| HBU3ATI5 | Zarrab - Direct | Page 483 |
|---|---|---|

1    THE COURT: But you'll point that out. You mean
2    they're not continuous?
3    MS. FLEMING: Right, they're not continuous. They've
4    deleted things and they have changed the document. This isn't
5    how it exists. What they've done is they've condensed it.
6    They've taken out all the in between.
7    MR. KAMARAJU: No, we didn't. Your Honor, that's a
8    forensic report that was obtained during the Turkish
9    investigation. We're going to have a witness who will testify
10    to that.
11    THE COURT: Okay.
12    MR. KAMARAJU: Just a totally separate point, would it
13    be possible to give the witness just a comfort bathroom break?
14    THE COURT: Sure.
15    We're going to take a five-minute break.
16    But wait. Stay here.
17    (Jury excused)
18    MS. FLEMING: These look very different from what we
19    have.
20    THE COURT: You can talk about it later.
21    MS. FLEMING: All right.
22    THE COURT: I'm having a little trouble understanding
23    where the focus is going. So I think I've been generous in
24    allowing you background, there is a lot of background. It is
25    about the sanctions, etc., etc. But, ultimately this case --

| HBU3ATI5 | Zarrab - Direct | Page 484 |
|---|---|---|

1    and not even ultimately. Initially is about Mr. Atilla. So,
2    you're not saying much now about Mr. Atilla that I'm gathering.
3    MR. KAMARAJU: So --
4    THE COURT: He's charged in six counts.
5    MR. KAMARAJU: I understand, your Honor. Now, to be
6    clear, one of those counts is a money laundering count based on
7    one thing, foreign bribery.
8    THE COURT: I get that.
9    MR. KAMARAJU: But we are turning, there is a pivotal
10    change and we opened on it in the sanctions law that we are
11    exploring right now.
12    THE COURT: And the point being?
13    MR. KAMARAJU: And Mr. Atilla's role in that is to, as
14    alleged, is to digest that change, digest the sanctions, figure
15    out the loopholes and then convey them to the other members of
16    the co-conspirators to say, hey, this document that you've got
17    doesn't look right. Right. It's got mistaken information
18    that's going to draw scrutiny.
19    In order to explain why that's important, why we have
20    to talk about what the sanctions are, and sort of the -- we are
21    turning now into that period where he is making those
22    communications. But we have to be able to explain why it went
23    from gold and it is ultimately going to switch to commodities.
24    Those are the two loopholes in the sanctions that they take
25    advantage of.

| HBU3ATI5 | Zarrab - Direct | Page 485 |
|---|---|---|

1    THE COURT: Why don't we just ask.
2    MR. KAMARAJU: Ask?
3    THE COURT: What were the changes.
4    MR. KAMARAJU: We can. But I don't think --
5    Mr. Zarrab can testify to his understanding of the changes
6    but --
7    THE COURT: Who is going to do that?
8    MR. KAMARAJU: To the changes?
9    THE COURT: Yes.
10    MR. KAMARAJU: I think they've already been -- they're
11    already in evidence.
12    THE COURT: But that's what I'm trying to understand.
13    What are you doing?
14    MR. KAMARAJU: I'm trying to show Halkbank's
15    instructing Zarrab or directing him as to what the changes are.
16    Because that's ultimately what the charges are.
17    THE COURT: Through these documents?
18    MR. KAMARAJU: I'll give you an example.
19    MS. FLEMING: What we have, Judge, is him saying what
20    the understanding of other people saying things are.
21    THE COURT: I got it.
22    MR. KAMARAJU: These documents, for example, include,
23    from Suleyman Aslan, they include statements like the gold is
24    going to change. Here you go.
25    THE COURT: So --

**A416**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBU3ATI5 | Zarrab - Direct | Page 486 |
|---|---|---|

1        MR. KAMARAJU: That's what I'm going to get to.
2        THE COURT: You're going to get to one particular
3   thing that involves --
4        MR. KAMARAJU: I was going to point to particular
5   ones.
6        THE COURT: Okay.
7        MR. KAMARAJU: And then there are calls that interact
8   with this document, so I was going to go through those. Those
9   involve -- Mr. Atilla is part of those calls. He's not part of
10  all of them.
11       THE COURT: The sooner you get back to Mr. Atilla, the
12  better we'll all be.
13       MR. KAMARAJU: I understand. We have to prove the
14  conspiracy. That's our challenge. We have to prove all the
15  elements.
16       THE COURT: You have to prove he's in it.
17       MR. KAMARAJU: Of course. We're very mindful we have
18  to tie him to the conspiracy.
19       THE COURT: It seems we're drifting a little bit.
20       MR. KAMARAJU: Over the break I'll try to trim it down
21  also.
22       THE COURT: Okay.
23       (Recess)
24       (Jury present)
25       THE COURT: We'll continue with direct examination.

| HBU3ATI5 | Zarrab - Direct | Page 487 |
|---|---|---|

1   Go ahead, counsel.
2        MR. KAMARAJU: Thank you, your Honor.
3   BY MR. KAMARAJU:
4   Q. I'm showing you what's been marked as Government Exhibit
5   226-A.
6        MR. KAMARAJU: Your Honor, may I approach?
7        THE COURT: Yes.
8   Q. Do you recognize that?
9   A. Yes, sir.
10  Q. What is it?
11  A. CD.
12  Q. Do you know what's on that CD?
13  A. Yes, it is a transcription of a phone conversation and the
14  audio file.
15  Q. How do you recognize it?
16  A. Because I listened to it and then I initialed it.
17  Q. Who is the audio conversation with?
18  A. It's between myself and Mr. Hakan Atilla.
19  Q. Generally speaking, do you recall the subject matter of the
20  conversation?
21  A. It's about trade with Iran.
22       MR. KAMARAJU: Your Honor, the government would ask to
23  admit Government Exhibit 226-A.
24       THE COURT: I'll allow it, hearing no objection.
25       MS. FLEMING: Subject to authentication, your Honor.

| HBU3ATI5 | Zarrab - Direct | Page 488 |
|---|---|---|

1        (Government's Exhibit 226-A received in evidence)
2        MR. KAMARAJU: Can we publish it? It is an audio
3   recording, your Honor.
4        THE COURT: Okay.
5        (Audio recording playing)
6   Q. I'd like to show you for identification what's been marked
7   as Government Exhibit 226-T.
8   A. Please. There is nothing on the screen. It's up now.
9   Q. Page two. Do you recognize this document?
10       MS. FLEMING: No objection, subject to authentication.
11       THE COURT: Okay. We'll allow it. But do you
12  recognize it?
13       THE WITNESS: Yes, sir.
14       MR. KAMARAJU: The government would offer Government
15  Exhibit 226-T and ask to publish it to the jury.
16       THE COURT: Okay.
17       (Government's Exhibit 226-T received in evidence)
18  Q. Who is on this call?
19       THE COURT: I'm sorry. The question was who was in
20  the call we just heard?
21       MR. KAMARAJU: Yes.
22  A. It's me, Ms. Muge, the secretary at Halkbank who transfers
23  the call, and Mr. Hakan Atilla. It is a telephone
24  transcription amongst us, the call from amongst us.
25       THE COURT: So you mean between you and Mr. Atilla?

| HBU3ATI5 | Zarrab - Direct | Page 489 |
|---|---|---|

1   Is that what you're saying?
2        THE WITNESS: Yes, your Honor.
3        THE COURT: Okay. Go ahead.
4        MR. KAMARAJU: Okay.
5   Q. Do you see where Atilla says "Um, for the pending items,
6   partnership structure didn't have an official document ID or
7   registration or anything. That's why they cannot use it in the
8   transaction."
9   A. Yes, sir.
10  Q. What did you understand him to be saying there?
11  A. That the amounts being sent from Iran, and the partnership
12  structure documents pertaining to the companies who are sending
13  these amounts --
14       THE COURT: Is what?
15       THE INTERPRETER: Partnership structure documents
16  pertaining to these companies who are sending these amounts.
17  A. -- would have to be submitted to Halkbank.
18       MS. FLEMING: Your Honor, translation issue. It is
19  "shareholder agreement."
20       THE COURT: Sit. Please. Go ahead.
21  Q. What is your understanding of the document that he's
22  referring to?
23  A. It is a document that would show the partnership structure
24  of the companies in Iran who are sending money to Safir and
25  Royal.

**A417**

HBU3ATI5      Zarrab - Direct      Page 490

1 Q. Would the document disclose the Iranian ownership of the
2 company?
3 A. Yes, sir.
4 Q. How would it get sent to the bank?
5      THE COURT: What?
6 Q. How would it get sent to the bank?
7 A. It would be translated, it would receive an apostille in
8 Iran, it would be endorsed, approved, and the original as well
9 as an e-mail would be forwarded to the bank.
10 Q. Were you ever told why the bank needed this kind of
11 document?
12 A. Certainly.
13 Q. What were you told?
14 A. After a while, regarding the gold trade, there was some
15 changes made in the United States sanctions and regulations.
16 The companies that were sending moneys and appear to be buyers
17 of gold, these companies could not have anybody or any agency
18 that would be associated or affiliated with the government over
19 there in Iran.
20      However, I'd like to underline this. That in response
21 to the money that was coming in, gold was never sent to Iran.
22      MS. FLEMING: Move to strike as non-responsive.
23      THE COURT: I'll allow it.
24 Q. Now, why were you dealing with Hakan Atilla on this issue?
25 A. During time periods where transactions may be hanging or

HBU3ATI5      Zarrab - Direct      Page 491

1 money transfers may be delayed, there were times that we would
2 either reach out to Mr. Hakan Atilla or there were times that
3 he might reach out to us.
4 Q. Why would you reach out to Hakan Atilla?
5 A. Because the person in charge of the part that would pertain
6 to where our money was getting stuck, where our money was
7 getting delayed, was Mr. Hakan Atilla.
8 Q. I'd like to show you what's been marked as --
9      THE COURT: Before you do, I'd like to more fully
10 understand this call. Did you call him or did he call you?
11      THE WITNESS: Based on what could be understood from
12 listening to the audio of this call, it appears that they had
13 called me, sir.
14      THE COURT: And they called you for what purpose?
15      THE WITNESS: In order to inform me, your Honor, what
16 was holding up the pending or the missing money and what
17 document was needed.
18      THE COURT: But in the call, he asks you for some
19 documentation; is that the purpose of this call?
20      THE WITNESS: Yes, your Honor.
21      THE COURT: Do you say you are going to find it for
22 him or get it for him?
23      THE WITNESS: Yes, your Honor.
24      THE COURT: And that information is what exactly? Is
25 that in the highlighted box on the screen in yellow?

HBU3ATI5      Zarrab - Direct      Page 492

1      THE WITNESS: This is the official document that would
2 need to be sent with regard to the company that had sent the
3 money from Iran, and it would need to be translated and
4 certified. It would be an official document, your Honor.
5      THE COURT: Okay. Is that what he's asking for?
6      THE WITNESS: Yes, your Honor.
7      THE COURT: Okay.
8 BY MR. KAMARAJU:
9 Q. I'd like to show you what has been previously admitted as
10 Government Exhibit 1000-2 and 1000 -- sorry. 1002 and
11 Government Exhibit 1002-T.
12      THE COURT: Is this the document you were looking at
13 before?
14      MR. KAMARAJU: Yes, your Honor. It may be easier --
15 that's fine.
16      Mr. Chang-Frieden, can you turn to page seven on
17 Exhibit 1002-T. And can you turn to page six on 1002.
18      Your Honor, the pages are slightly off because of the
19 translation.
20 Q. Mr. Zarrab, do you see a message with a time stamp
21 05.02.2013, 21:00:21?
22 A. If you can zoom in a little bit, please.
23 Q. Do you see that message?
24 A. Yes, sir.
25 Q. Who is it from?

HBU3ATI5      Zarrab - Direct      Page 493

1 A. This is from Mr. Suleyman Aslan.
2      MR. KAMARAJU: Is there a way, Mr. Chang-Frieden, to
3 blow up the same message on 1002-T?
4      THE COURT: That's the translation?
5      MR. KAMARAJU: Yes.
6 Q. Do you see where Aslan says "There are a couple of subjects
7 which we have to talk with you."
8 A. Yes, I see that, sir.
9 Q. Then the next message, do you see where it says "Famous
10 date of February 6 has arrived. Oil income cannot be used for
11 the trade of valuable metals."
12 A. Yes, sir, I see that.
13 Q. What did you understand him to mean there?
14 A. Mr. Suleyman Aslan, the general manager of Halkbank, he is
15 telling me that the February 6 date arrived and that we would
16 not be able to get money out of Halkbank through gold trading
17 any longer.
18      (Continued on next page)
19
20
21
22
23
24
25

**A418**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBUPATI6          Zarrab - Direct          Page 494

1  Q. And not the next message, but the message after that, do
2  you see where he says: "There's a huge demand in food,
3  medicine and similar commodities"?
4  A. Yes, sir.
5  Q. Now, Mr. Zarrab, other than your tea business, had you ever
6  traded food before?
7  A. I had sent sesame from Dubai to Turkey a few times.
8  Q. Were you a medicine trader?
9  A. No, sir.
10  Q. And had you ever done any food trade through Halkbank
11  before this time?
12  A. No, sir. I never conducted food trade with Iran in the
13  past.
14  Q. So what's your understanding of why Suleyman Aslan was
15  telling you about the demand for food and medicine?
16  A. He is recommending and advising us that we would not be
17  able to move the existing oil money of Iran that's in Halkbank,
18  we won't be able to move it out through gold trade anymore and
19  that we would now need to do food and medicine trade to be able
20  to do so. In other words, he's giving us direction regarding
21  this matter.
22  Q. Okay. And do you see where you ask: "I'm ready for your
23  visit whenever you want. When does the precious metal ban
24  thing start"?
25  A. Yes, sir. I see that.

HBUPATI6          Zarrab - Direct          Page 495

1  Q. Does he tell you when it starts?
2  A. He doesn't say it in this particular message, but in
3  another message that will come, he will say that.
4  Q. And what does he tell you?
5  A. If I can please see that on the screen. *"Right now, it's
6  not stopped. There is time until the beginning of July, but
7  the amount is limited. We can only channelize the oil money to
8  food and medicine."
9      So he's saying that you won't be able to do this
10  through gold until the beginning of July, that there's time
11  until after the beginning of July, but that we would be able to
12  use the limited funds through food and medicine trade.
13  Q. And you see at the very bottom where you say: "Hopefully,
14  we will create solutions for all of those"?
15  A. Translate the Turkish version of it. Yes, sir.
16  Q. Did you ever meet with Suleyman Aslan to discuss switching
17  to the food trade?
18  A. Yes, sir.
19  Q. Approximately when was that first?
20  A. It was about this time. It would be just soon after this.
21  In other words, within a month or so after this.
22  Q. And what did you discuss with Aslan at that meeting?
23  A. We talked about how we would be able to get money out of
24  Halkbank through the food trade. We talked about that method
25  and that system.

HBUPATI6          Zarrab - Direct          Page 496

1  Q. I'd like to show you what's marked as Government
2  Exhibit 291-T. Do you recognize this document?
3  A. Yes, sir.
4  Q. What is it?
5  A. Transcription of a phone conversation.
6  Q. Do you remember this call?
7  A. I remember, sir.
8  Q. Did you participate in it?
9  A. Yes, sir.
10  Q. Have you listened to a recording of this call?
11  A. I listened to it, sir.
12  Q. And did the recording accurately capture your conversation?
13  A. Yes, sir.
14  Q. And who are you speaking with during this call?
15  A. With Abdullah Happani, sir.
16  Q. And approximately when was this call?
17  A. After I had left the meeting that I had with Mr. Suleyman.
18      MR. KAMARAJU: The government would offer Government
19  Exhibit 291-T.
20      MS. FLEMING: No objection subject to authentication
21  and connection.
22      THE COURT: I'll allow it.
23      (Government's Exhibit 291-T received in evidence)
24      MR. KAMARAJU: And I'll ask to publish it beginning on
25  page 2 initially.

HBUPATI6          Zarrab - Direct          Page 497

1  BY MR. KAMARAJU:
2  Q. Do you see at the top, where Happani asks: "Did you go to
3  the meeting"?
4  A. Yes, sir.
5  Q. What did you understand him to be asking you there?
6  A. He's asking me if I had gone to the meeting with Suleyman
7  Aslan, or if I had this conversation with him.
8  Q. And what do you tell him?
9  A. I say, yes, I left. I met and I left.
10  Q. Do you see where the transcript says: "He/she says, 'Do
11  some food'"?
12  A. Yes, sir, I see that.
13  Q. Okay. What are you referring to there?
14  A. I'm conveying to Mr. Abdullah that Mr. Suleyman is telling
15  us that we need to do some food in addition to the gold trade.
16  Q. And do you see where you say: "They will stop the gold in
17  a month and a half"?
18  A. I see it, sir.
19  Q. What did you understand that -- what were you saying there?
20  A. I am saying that the diagram that I had drawn before, that
21  system, we will not be able to use that system to be able to
22  get money out of Halkbank anymore. In other words, we will not
23  be able to use gold trade to remove money out of Halkbank from
24  that point forward.
25  Q. So what were you going to have to do?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBUPATI6          Zarrab - Direct          Page 498

1  A. Would need to find a new method and a new system.
2  Q. And do you see where you say --
3      THE COURT: As of what date, do you remember?
4      THE WITNESS: Approximately the fourth month.
5      THE COURT: In 2000 and --
6      THE WITNESS: 2013, your Honor.
7  BY MR. KAMARAJU:
8  Q. Okay. Do you see where you say it says: "Do food. He/she
9   says, 'If nothing else, I'll extend it for two three months.'
10  He/she keeps saying 'do food'"?
11  A. Yes, sir, I see that.
12  Q. What did you mean there?
13  A. Mr. Suleyman is telling me that we need to go towards food
14   because once the United States says you cannot remove money
15   through gold trade, through the sanctions, we will not be able
16   to do that, and that we would need to go towards another trade.
17   Suleyman is advising me on that.
18      The most that he could do is to extend the period
19   where the gold trade could still be conducted for a few months.
20   And for that reason, he is advising that we need to move
21   towards food and that the gold was not a permanent solution any
22   longer.
23  Q. Do you see where he asks you: So we do not have to send it
24   from Turkey?
25  A. Yes, sir.

HBUPATI6          Zarrab - Direct          Page 499

1  Q. What's your understanding of why -- what he meant there?
2  A. So during this part of the phone conversation, Abdullah
3   Happani gets confused because Abdullah Happani is used to the
4   gold trade and the gold method. We send gold to Dubai and
5   convert it into cash. He doesn't understand how we would do
6   this through food.
7  Q. And why doesn't he understand?
8  A. Because in order to make the international payments for
9   Iranians, you need to get money out of Halkbank and need to
10   convert it into cash and make international payments with that.
11   With gold, you can take one ton or five tons of gold per day
12   and convert it into cash. But this is not possible through
13   food products because there's no actual trade involved.
14  Q. What do you mean, there's no actual trade?
15  A. Well, gold is just the tool or an accessory in terms of
16   Iran being able to make their international payments. Since he
17   thinks that food would not be compatible with that, that's why
18   he gets confused.
19  Q. Could we turn to Page 3. And do you see where -- the next
20   page. Do you see where you say: "It's not a big deal. He/she
21   says, 'Provide it, how you provide it is not a problem; provide
22   it.' He/she says 'Provide cikina.' He/she says 'Have him/her
23   send cikina, it's not a problem'"?
24  A. Yes, I see that.
25  Q. What did you mean by that?

HBUPATI6          Zarrab - Direct          Page 500

1  A. Since Abdullah could not understand this on the phone, I'm
2   trying to explain it to him. I'm telling Abdullah that no real
3   food would be sent. I'm telling him that the man is telling us
4   to submit fake documents. That's what I'm saying. That's what
5   I am referring to.
6  Q. I'd like to show you what's been marked for identification
7   as Government Exhibit 236-T. Do you recognize the exhibit?
8  A. Yes, sir.
9  Q. What is it?
10  A. Transcription of a phone conversation.
11  Q. Do you remember the call?
12  A. Yes, I remember, sir.
13  Q. Did you participate in the call?
14  A. Yes, sir.
15  Q. Did you listen to a recording of this call?
16  A. I listened to it, sir.
17  Q. Did the recording accurately capture your conversation?
18  A. It reflected so, sir.
19  Q. And who participated in the call?
20  A. It's Abdullah Happani and myself, sir.
21      MR. KAMARAJU: Your Honor, the government is going to
22   offer Government Exhibit 236-T.
23      MS. FLEMING: No objection, subject to authentication
24   and connection.
25      THE COURT: I'll allow it.

HBUPATI6          Zarrab - Direct          Page 501

1      (Government's Exhibit 236-T received in evidence)
2      MR. KAMARAJU: And could we publish that?
3      THE COURT: Yes.
4      MR. KAMARAJU: Starting on page 2.
5  BY MR. KAMARAJU:
6  Q. Do you see at the top there where you say: "Okay, all
7   right, brother. Thank you. Abdullah, I just left Halk.
8   He/she says, 'Get started on that food'"?
9  A. Yes, sir.
10  Q. And what did you understand it -- withdrawn.
11      What did you mean by that?
12  A. What I mean here is that I had left the meeting at Halkbank
13   again, and Halkbank had told me that we need to start on food
14   again. Halk is saying start on food; so I'm telling him that
15   we're being told that we need to start on food.
16  Q. Okay. Now, can we go to Page 3. Do you see where Happani
17   says: "In fact, let's let started right away through Volgam,
18   if you like"?
19  A. I see it, sir.
20  Q. What is Volgam?
21  A. Volgam is also another company that is owned by me, and
22   it's a company that we use under the umbrella of Royal.
23  Q. Okay. I'd like to show you Government Exhibit 1002-T and
24   1002 again, I believe page 13 on both exhibits. If we can just
25   blow up communication 09.04.2013, at the top of the screen,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBUPATI6 | Zarrab - Direct | Page 502 |
|---|---|---|

1  8:40:55. We'll just be here very briefly, but Mr. Zarrab, what
2  are we looking at here?
3  A. This is messages on WhatsApp between myself and Suleyman
4  Aslan, sir.
5  Q. And who sent this message?
6  A. I'm the sender, sir.
7  Q. And what did you say to Suleyman Aslan?
8  A. I say: "My dear general manager, I started food today."
9  In other words, I'm saying the food trade has started.
10  Q. Now, had you actually shipped any food through Halkbank by
11  April 9, 2013?
12  A. No.
13  Q. Okay. Could we turn to page 14 at of 1002-T and blow up
14  the message at 11:47:27 on April 9th?
15  A. Yes, sir.
16      MR. KAMARAJU: Your Honor, may I approach?
17      THE COURT: Yes.
18  Q. I'm showing you what's been marked for identification as
19  Government Exhibit 295-A. Do you recognize that?
20  A. Yes, sir.
21  Q. What is it?
22  A. This is a CD containing a phone conversation in transcript
23  and audio form.
24  Q. And how do you recognize the CD?
25  A. I listened to the CD, and I had my initials on it, sir.

| HBUPATI6 | Zarrab - Direct | Page 503 |
|---|---|---|

1  Q. And what is it an audio recording of?
2  A. It's a phone conversation that takes place between myself
3  and Hakan Atilla, sir.
4  Q. And can we bring up on the screen Government Exhibit 295-T,
5  and turn to the second page.
6      Mr. Zarrab, do you recognize Government Exhibit 295-T?
7  A. Yes, sir. I recognize it.
8  Q. What is it?
9  A. It's a phone conversation that takes place between myself
10  and Mr. Hakan Atilla.
11  Q. Is it a transcript of the conversation that occurs in
12  295-A?
13  A. Yes, sir.
14      MR. KAMARAJU: Your Honor, the government would offer
15  Government Exhibits 295- --
16      THE COURT: Do you want to play it?
17      MR. KAMARAJU: Sure. I was going to play it right
18  after. Can we --
19      THE COURT: Well, play it now.
20      MR. KAMARAJU: Okay. I just thought we should admit
21  it first, but I'm happy to play it.
22      THE COURT: Okay. Sure.
23      MS. FLEMING: Subject to authentication and
24  connection.
25      THE COURT: Yes, right, right.

| HBUPATI6 | Zarrab - Direct | Page 504 |
|---|---|---|

1      MR. KAMARAJU: I don't know how -- well, I'd also
2  offer Government Exhibit 295-T.
3      THE COURT: Okay.
4      MS. FLEMING: Same objection.
5      (Government's Exhibits 295-A and 295-T received in
6  evidence)
7      MR. KAMARAJU: Mr. Chang-Frieden, can we play
8  Government Exhibit 295-A.
9      (Audiotape being played)
10      MR. KAMARAJU: We can pause that. I was going to
11  refer to the transcript, your Honor, but I'm happy to continue
12  playing the call.
13      THE COURT: If you have a whole transcript, you need
14  the whole phone conversation.
15      MR. KAMARAJU: That's fine. Continue the call.
16      (Audiotape being played)
17  BY MR. KAMARAJU:
18  Q. Okay. Now, Mr. Zarrab, who were you speaking with?
19  A. Mr. Hakan Atilla.
20  Q. Do you remember when this call was?
21  A. It should be approximately the fourth month.
22  Q. Of what year?
23  A. The fourth month. I'm not sure that I remember the date
24  correctly. It could be a fourth, fifth or the sixth month, but
25  it should be the fourth month.

| HBUPATI6 | Zarrab - Direct | Page 505 |
|---|---|---|

1  Q. And what was the general subject matter of the call?
2  A. This is a phone conversation related to the food trade
3  brokering business that I had discussed with Mr. Suleyman
4  Aslan.
5  Q. And why are you speaking about it with Mr. Atilla?
6  A. I don't recall exactly, and it could be that Mr. Atilla had
7  called me at the direction of the branch perhaps, but that's
8  why -- or perhaps I called Mr. Atilla and this could be at the
9  direction of the branch.
10  Q. Do you see on the second page --
11      MR. KAMARAJU: Oh, your Honor, I can't remember if I
12  admitted the government exhibit.
13      THE COURT: I think you did.
14      MR. KAMARAJU: Okay.
15      THE COURT: But we'll admit it.
16  BY MR. KAMARAJU:
17  Q. Do you see on the second page where you say: "The other
18  day our dear general manager and I came to a mutual agreement
19  about a matter. We are starting the food transactions"?
20  A. Yes.
21  Q. And you see, what is Atilla's response?
22  A. He says, yes, I have knowledge of this matter.
23  Q. And you refer to -- you see an amount for testing purposes
24  has come to Royal?
25  A. Yes.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

HBUPATI6      Zarrab - Direct      Page 506

1  Q. What did you mean by that?
2  A. There was a payment that had come to Royal, but the money
3   had not been deposited into the account yet, just as it would
4   be waiting in the times of gold trade. And in previous times
5   when the money would be delayed at Halkbank, I would be talking
6   to Mr. Atilla. And here, to Mr. Hakan Atilla, I'm stating the
7   same to Mr. Atilla. I'm saying that the payment had been
8   received by Royal and that the workers at the bank, those
9   individuals at the bank, are asking for the documentation for
10  the food trade, but based on my conversation with Mr. Suleyman,
11  we were supposed to submit these documents to the bank after
12  three or four days.
13 Q. Do you see where you say that "Food is a little different
14  than gold"?
15 A. Yes, I see that.
16 Q. What were you saying there?
17 A. Now, Mr. Hakan knew, based on my -- Mr. Hakan knew --
18  Mr. Hakan was aware, based on the result of my meeting with
19  Mr. Suleyman, that the food trade would be started. However,
20  I'm trying to explain to Mr. Hakan Atilla that this food trade
21  would be different than the gold trade.
22 Q. And why would it be different?
23 A. Because with the gold, there is export of goods out of
24  Turkey, but with the food, it was going to look as if it was
25  being sent in as a transit from Dubai over to Iran.

HBUPATI6      Zarrab - Direct      Page 507

1  Q. And what did Atilla ask you in response?
2  A. He says can it be done through a letter of credit? Why
3   payment upfront?
4  Q. What did you understand him to be asking you there?
5  A. Can you repeat the question, please.
6  Q. Sure. What did you understand him to be saying there?
7  A. As of this whole conversation, Mr. Hakan Atilla was aware
8   that we were going to be involved and we were going to be
9   conducting food trade, that is as of that day. However, at
10  this time, Mr. Hakan Atilla did not know that this transaction
11  would not involve actual trade. So Mr. Hakan Atilla is trying
12  to understand this during this phone conversation.
13 Q. Now, do you see where, turning to that same page, you say:
14  "The credit -- doing the letter of credit would add time. I
15  mean, it would cause a delay in my procedure"?
16 A. Yes, sir.
17 Q. What did you mean by that?
18 A. Since there would be no actual goods being sent, there was
19  no way that we could have done this through a letter of credit
20  anyway.
21 Q. Now, could you turn to page 3, and do you see where Atilla
22  says: "Let me look into that, Mr. Reza. I mean, this
23  structure is not what I thought, to be honest"?
24       THE INTERPRETER: Which part is that?
25 Q. Do I have the wrong page? I'll check one thing. On this

HBUPATI6      Zarrab - Direct      Page 508

1  page, my apologies, do you see where it says: "Let me look
2  into that, Mr. Reza. I mean, the structure is not what I had
3  thought, to be honest"?
4  A. Yes, I see that, sir.
5  Q. What did you understand him to mean there?
6  A. Mr. Hakan Atilla had understood, through his general
7  manager or perhaps through the branch, that there would be real
8  food trade, and now he's saying in this phone call that this is
9  not as I had thought. So he's clearly stating that this does
10  not match up with what he had heard.
11 Q. What did you do after this phone call?
12 A. Then I had a conversation with Mr. Suleyman Aslan.
13 Q. Where was that conversation?
14 A. It was at the bank.
15 Q. When did that conversation happen?
16 A. Possibly on the same day.
17 Q. What did you talk about with Aslan during that meeting?
18 A. I went and I told Mr. Suleyman that I had talked to
19  Mr. Hakan and that Mr. Hakan did not understand the matter
20  completely, and I asked him how we should go about it.
21 Q. And how did he respond?
22 A. Could you repeat the question, please?
23 Q. How did he respond?
24 A. The best I remember is that he gave orders to unblock the
25  transaction and to go ahead and carry it out.

HBUPATI6      Zarrab - Direct      Page 509

1  Q. And do you remember who he gave those orders to?
2  A. To Mr. Hakan Atilla.
3       MS. FLEMING: Can we get a foundation for that, Judge?
4       THE COURT: Keep going.
5  Q. How do you know that that's who he gave the orders to?
6  A. Because he called in my presence as he gave these
7   instructions.
8       THE COURT: Who did? Who called?
9       THE WITNESS: Mr. Suleyman Aslan, your Honor.
10      THE COURT: And he called who?
11      THE WITNESS: Mr. Hakan Atilla, your Honor.
12      THE COURT: And you were on the call, or you heard the
13  call?
14      THE WITNESS: I was face to face with Suleyman Aslan
15  during a meeting at this time, sir.
16 BY MR. KAMARAJU:
17 Q. Could you please bring up Government Exhibit 297-T. Do you
18  recognize this?
19 A. If I may look at it real quick, please.
20      (Pause)
21      Yes, sir.
22 Q. Do you recognize this? What is it?
23 A. I recognize it, sir. It's a transcription of a phone
24  conversation.
25 Q. Did you participate in the call?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

| HBUPATI6 | Zarrab - Direct | Page 510 |
|---|---|---|

1 A. Yes, sir.

2 Q. Do you remember the call?

3 A. I remember, sir.

4 Q. Who participated in the call?

5 A. It was Abdullah --

6 THE INTERPRETER: It's cutting out, sorry.

7 A. It was Abdullah Happani and myself.

8 Q. What was the purpose of the call?

9 A. I was informing Abdullah Happani following my meeting with

10 Mr. Suleyman Aslan, sir.

11 MR. KAMARAJU: The government offers Government

12 Exhibit 297-T.

13 MS. FLEMING: Subject to connection and

14 authentication.

15 THE COURT: I'll allow it.

16 (Government's Exhibit 297-T received in evidence)

17 MR. KAMARAJU: And could we publish that, beginning at

18 page 2, please.

19 BY MR. KAMARAJU:

20 Q. Now, do you see where you say: "I am resolving that thing,

21 the matter about closing." It's a little bit down the page.

22 A. Yes, sir.

23 Q. What did you mean there?

24 A. I had discussed with Suleyman Aslan the matter of closing

25 down Ahmet Alacaci's account.

| HBUPATI6 | Zarrab - Direct | Page 511 |
|---|---|---|

1 Q. And remind us who is Ahmet Alacaci?

2 A. Ahmet Alacaci is a friend of Turker Sargin, who is in my

3 company and who is the individual who had told me that a gold

4 trade might be possible.

5 Q. At this time, was he one of your competitors?

6 A. Yes. Initially, I was using his companies and, later on,

7 he began to do his own trade with Iran.

8 Q. And why were you asking Aslan to close his account?

9 A. Because Ahmet Alacaci knew that I was giving a share of the

10 profit to Zafer Caglayan, and he knew that our costs, my costs,

11 were higher than his, and since he wasn't making any payments

12 to anybody and the share of Zafer Caglayan, he was putting a

13 price out there in the market that was much lower than ours.

14 Because of that, I had discussed this with Mr. Suleyman Aslan,

15 and I'm talking about that here.

16 Q. Could you turn to the next page of the exhibit. Actually,

17 could we keep going? Okay. Stop there.

18 Okay. Do you see where you say: "My dear, we will do

19 that anyway." It's about in the middle of the page. "We are

20 starting that. They placed a roadblock today, and I went there

21 and had it removed you see"?

22 A. Yes.

23 Q. What did you mean?

24 A. But just as I explained earlier, Mr. Hakan Atilla did not

25 know about this matter as of the first time that we had met; so

| HBUPATI6 | Zarrab - Direct | Page 512 |
|---|---|---|

1 I approached Mr. Suleyman regarding this matter and came to a

2 solution.

3 Q. Do you see further down where you say: "The man made the

4 call in my presence"?

5 A. Yes, sir.

6 Q. "And said: 'You will do this job, do you understand'"?

7 A. Yes, sir.

8 Q. What did you mean there?

9 A. Mr. Suleyman called Mr. Hakan in my presence and told him

10 that they will do this business, and I'm conveying this to

11 Mr. Abdullah Happani.

12 Q. Do you see where you say: "Hakan Atilla threw a wrench in

13 the gears, and he threw this thing"?

14 A. Yes.

15 Q. What did you mean by that?

16 A. Just as it was heard in the first phone conversation

17 earlier, Hakan Atilla was not open to this idea for it to be

18 conducted.

19 Q. And then do you see where Happani asks you: "So is he

20 going to receive the six into the account now"?

21 A. Yes, sir.

22 Q. What's your understanding of what he was asking you?

23 A. So referring to the payments for which I have called

24 Mr. Hakan, he's asking for a confirmation as to whether that

25 amount would be deposited or not.

| HBUPATI6 | Zarrab - Direct | Page 513 |
|---|---|---|

1 Q. And how do you respond?

2 A. I'm saying that they were going to deposit it into the

3 account. It was going to happen.

4 Q. Now, could you please play -- or my apologies. Could we

5 please pull up Government Exhibit 298-T. Just take a second

6 here.

7 A. Yes, sir.

8 Q. Do you recognize it?

9 A. Yes, sir.

10 Q. What is it?

11 A. It's a transcript of a phone conversation.

12 Q. Did you participate in that call?

13 A. Yes, sir.

14 Q. Do you remember it?

15 A. I remember it, sir.

16 Q. Have you listened to a recording of that call?

17 A. I listened to that, sir.

18 Q. Did it accurately capture your conversation?

19 A. Yes, sir.

20 Q. Who participated in that call?

21 A. It was Hakkan Aydogan from Halkbank and myself.

22 Q. Who is Hakkan Aydogan?

23 A. Hakkan Aydogan is another staff member that worked at

24 Halkbank with regards to foreign transactions.

25 Q. And what was the general purpose of this call?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

1 A. We had discussed the food trade with Mr. Suleyman; so this
2   is in regards to that.
3 Q. And was this before or after your meeting with Suleyman
4   Aslan?
5 A. It's after that, sir.
6 Q. And do you remember why you were talking to Aydogan?
7 A. Mr. Aydogan possibly had received a call from the branch;
8   so he's just trying to figure out the matter.
9       (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 Q. What were you discussing with him at this time?
2 A. That we would be brokering food trade, that would do food
3   trade.
4       MR. KAMARAJU: Your Honor, the government offers
5   Government Exhibit 298-T.
6       THE COURT: I'll allow it.
7       (Government's Exhibit 298-T received in evidence)
8       MS. FLEMING: Subject to authentication and
9   connection.
10      MR. KAMARAJU: Could we please put up Government
11  Exhibit 1002 and 1002-T. Can we go to page 22 on 1002-T, and
12   page 20 on 1002.
13      Can we start at the message that's on 21.04.2013,
14   13:04:13.
15 Q. Do you see that message where you ask Suleyman Aslan "What
16   do you think about the news that showed up in the U.S.A. media.
17   Will that restrict you in a serious manner?"
18 A. Yes, sir.
19 Q. What did you mean by that?
20 A. There were news on the media regarding the embargo and the
21   sanctions by the United States, the gold trade, and I'm
22   referring to this in this.
23 Q. Do you see two messages down where Aslan says "They say
24   that the gold trade should be sanctioned."
25 A. I see it, sir.

1 Q. Do you see later in the that same message that he says
2   "Hurriyet says in headlines that United States lawmakers wanted
3   Halkbank to be sanctioned."
4 A. Yes, I see that, sir.
5 Q. Do you see there is a message on 22.04.2013, 07:02:22. Do
6   you see where it says "We will discontinue brokerage in the
7   gold trade by the end of May. We will determine the absolute
8   end date after talking to you."
9 A. Yes, I see that, sir.
10 Q. What did you understand him to mean there?
11 A. He says there is no change to the current system at this
12   point, but that he would stop the gold trade by the end of May,
13   but that he would discuss with me the final date for that trade
14   to occur by discussing this with me.
15      THE COURT: Counsel, I think this is going to be a
16   good time we stop, because I have to take up something with you
17   all. Is that okay with you?
18      MR. KAMARAJU: I was going to ask about one more
19   message or two more messages. It is two very short ones. I'll
20   read them into the record.
21      THE COURT: When you go to the Turkish bath, you're
22   going to sweat.
23      MR. KAMARAJU: That is totally fair.
24 Q. Do you see where Suleyman Aslan says the message at
25   4.22.2013, at 7:25:55, "No, we don't have a problem in the

1   food. Do you have a problem with the method proposed by Hakan
2   Atilla?"
3       THE COURT: With what?
4 Q. With the method proposed by Hakan Atilla?
5 A. Yes, sir.
6 Q. Do you see where it say related to the food trade payments?
7       THE INTERPRETER: Could you repeat that, please?
8 Q. Do you see where it says related to the food trade
9   payments?
10      THE INTERPRETER: It's not up yet.
11 A. Yes.
12 Q. What do you say in response?
13 A. I say, "No, that is absolutely a very correct method."
14      MR. KAMARAJU: Your Honor, those are the few messages
15  I was hoping to complete today.
16      THE COURT: We'll pick up with that tomorrow. Thanks.
17  So we'll excuse the witness. And we'll excuse the jury too.
18  I'll give the jury the instructions.
19      (Witness not present)
20      THE COURT: Do you all want to leave? You can if you
21  wish.
22      So the instructions are, first, don't talk to each
23  other about the case or about anyone who has anything do with
24  it until the end of the case when you go to the jury room to
25  deliberate.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

November 30, 2017

Page 526

1               INDEX OF EXAMINATION

2    Examination of:                        Page

3     REZA ZARRAB

4    Direct By Mr. Kamaraju . . . . . . . . . . . 383

5               GOVERNMENT EXHIBITS

6    Exhibit No.                        Received

7     202-T   . . . . . . . . . . . . . . . . . 390

8     204-T   . . . . . . . . . . . . . . . . . 392

9     6043    . . . . . . . . . . . . . . . . . 400

10    205-T   . . . . . . . . . . . . . . . . . 402

11    206-T   . . . . . . . . . . . . . . . . . 410

12    207-T   . . . . . . . . . . . . . . . . . 417

13    208-T   . . . . . . . . . . . . . . . . . 426

14    209-T   . . . . . . . . . . . . . . . . . 433

15    14      . . . . . . . . . . . . . . . . . 434

16    3736    . . . . . . . . . . . . . . . . . 442

17    3631 and 3631-T  . . . . . . . . . . . . . 451

18    3748    . . . . . . . . . . . . . . . . . 458

19    15      . . . . . . . . . . . . . . . . . 460

20    3750    . . . . . . . . . . . . . . . . . 462

21    232-T   . . . . . . . . . . . . . . . . . 463

22    211-T   . . . . . . . . . . . . . . . . . 477

23    226-A   . . . . . . . . . . . . . . . . . 488

24    226-T   . . . . . . . . . . . . . . . . . 488

25    291-T   . . . . . . . . . . . . . . . . . 496

Page 527

1     236-T   . . . . . . . . . . . . . . . . . 501

2     295-A and 295-T  . . . . . . . . . . . . . 504

3     297-T   . . . . . . . . . . . . . . . . . 510

4     298-T   . . . . . . . . . . . . . . . . . 515

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 1, 2017*

*Southern District Court Reporters*

Original File HC13ATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                Defendant.
 7   ------------------------------x
 8
 9                             December 1, 2017
                                    9:04 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                              District Judge
                                and a jury
15
16
17              APPEARANCES
18   JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
         Assistant United States Attorneys
22
23
24
25
```

```
 1
 2         (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5       Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10        Of counsel
11
12   Also Present:
13       JENNIFER McREYNOLDS, Special Agent FBI
         MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14       MS. ASIYE KAY, Turkish Interpreter
         MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

1    (Trial resumed; jury not present)

2    THE COURT: So please be seated.  There are a couple

3 of things that I want to go over with the lawyers before we

4 start the trial for today, and I think there's three, as I

5 remember.

6    First thing is that after we broke up, the District

7 Executive and his staff I think solved the problem of the feed

8 into the overflow courtroom and, as I understand it, not being

9 technologically particularly savvy, they drew a feed from the

10 jury box down to the overflow courtroom.  So they'll, down

11 there, be able to see or not see what the jury can see.

12    In other words, so presumably a document, before it's

13 entered, will not be seen, and after it's entered, will be

14 seen, just as the jury.  So that's the ideal solution and Ed

15 Friedland and his team, who are in the back there, are

16 responsible for doing it.  They did it last night; so that's

17 good news.

18    MR. DENTON: Just one more thing, to follow up on

19 that, your Honor.  The U.S. Attorney's Office is also making

20 published exhibits available electronically at the end of the

21 day for the press, subject to some logistical difficulties with

22 respect to the subject to connection issues that we'll discuss.

23    THE COURT: But you're not doing that such that it

24 will slow down the trial, right?

25    MR. DENTON: No, definitely not.

1    THE COURT: You're not diverting your own time and

2 resources, so to speak?

3    MR. DENTON: No.

4    THE COURT: Do you have help doing that?

5    MR. DENTON: We think we found an efficient solution,

6 your Honor.

7    THE COURT: Great, great.  So that's good.

8    The second is that I looked over the transcript and my

9 notes yesterday.  One reason I don't like to have sidebars or

10 too many, sometimes they're inevitable, is that it interrupts

11 the flow of the examination or wherever we are in trial, and

12 I'm a little bit concerned that I may have done that yesterday,

13 particularly at the end of the day when -- I don't remember

14 where exactly.  I think it was a transcript the government was

15 talking about, and I think I said, Are we done, and something

16 to that effect, and the government said, well, just a couple

17 more questions.

18    I think the effect of my having that sidebar before

19 that was to condense that a little bit too much.  So if you

20 need to, or Mr. Kamaraju is doing it, go over that again, the

21 end part, I think that's fair.  So then that's two.

22    Three is the question about authentication.  So,

23 again, this is somewhat by memory, which is mine, certainly

24 fallible, but my recollection is that over the last -- there's

25 Tuesday, Wednesday, Thursday -- well, three days of testimony,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 1, 2017

| HC13ATI2 | Zarrab - Direct | Page 548 |
|---|---|---|

1      (In open court)
2      THE COURT: I think we have the jury here and we'll
3  continue with the direct examination of Mr. Zarrab.
4      (Jury present)
5      THE COURT: So we're going to continue with the
6  government's direct examination of Mr. Zarrab.
7      THE DEPUTY CLERK: Sir, before we begin, I'd like to
8  remind you, you're still under oath.
9      THE WITNESS: Yes, ma'am.
10  REZA ZARRAB,
11     called as a witness by the Government,
12     having been previously sworn, testified as follows:
13  DIRECT EXAMINATION (Continued)
14  BY MR. KAMARAJU:
15  Q.  Good morning, Mr. Zarrab.
16  A.  Good morning, sir.
17  Q.  Do you recall yesterday I think we ended discussing a time
18     period in April of 2013.  Do you remember that?
19  A.  Yes, sir.
20       MR. KAMARAJU: Mr. Chang-Frieden, if you can pull up
21  Government Exhibit 1002-T.
22  Q.  I believe this is where we ended.  Do you see at the top
23     where you ask, "Hopefully we don't have a problem in the food
24     subject, do we?"
25  A.  Yes, sir.

| HC13ATI2 | Zarrab - Direct | Page 549 |
|---|---|---|

1  Q.  What did you mean by that?
2  A.  As I had mentioned yesterday, this is at the direction of
3     Mr. Suleyman Aslan, and as the gold restrictions are about to
4     begin, the direction was for us to start food.  And I'm asking
5     whether there would be any problem with the food starting, and
6     I'm trying to get a confirmation on whether there was any issue
7     with that.
8  Q.  At the time you sent this, were you actively sending food?
9  A.  You mean physically, food?
10  Q.  Yes.
11  A.  No, I never sent food, physically.
12  Q.  Do you see next where Aslan says, "No, we don't have a
13     problem in the food, do you have a problem with the method
14     proposed by Hakan Atilla?"
15       Then he goes on to say, "Related to the food trade
16     payments."  Do you see that?
17  A.  Yes, I see that, sir.
18  Q.  What did you understand him to mean?
19  A.  We had held conversations about how the food transactions
20     would be handled with the bank, what methods would be used,
21     he's asking whether the latest method that we had reached an
22     agreement on, that whether I had any problems with that.  And
23     this is the method that Mr. Hakan Atilla had also provided
24     guidance in and made additions to.  And that provided -- and
25     he's asking me if this last template was something that I had

| HC13ATI2 | Zarrab - Direct | Page 550 |
|---|---|---|

1  agreed with, and if there are any issues that I may have had
2     with it.
3  Q.  If we can go to your response which I believe is the next
4     message down on both exhibits.  How do you respond?
5  A.  I say, "No.  That is absolutely a very correct method."
6  Q.  So at the time that you were exchanging these messages with
7     Suleyman Aslan, had you discussed a method to do food payments
8     with Hakan Atilla?
9  A.  Yes, I had talked to, met with Mr. Suleyman Aslan and
10     Mr. Hakan Atilla, on this method.
11  Q.  So we'll get into the particulars of that method in a
12     moment.  But, do you remember testifying yesterday about a
13     telephone conversation you had with Hakan Atilla?
14  A.  Yes, I remember that.
15  Q.  Do you remember testifying that during that conversation,
16     it was your belief that Mr. Atilla didn't know that there was
17     no food involved in the transactions?
18  A.  Yes, absolutely.  In that conversation, Mr. Hakan Atilla
19     had no clue that there would be no actual food being sent.
20  Q.  Was that conversation before or after this WhatsApp
21     exchange with Suleyman Aslan?
22  A.  That conversation was before this WhatsApp messages that
23     we're looking at here.
24  Q.  So, I'd like to focus on the time period between that, the
25     phone conversation you testified about, and these WhatsApp

| HC13ATI2 | Zarrab - Direct | Page 551 |
|---|---|---|

1  messages.  Okay?
2       So, after you had that phone conversation with Hakan
3     Atilla, what did you do?
4  A.  I met with Suleyman Aslan at the bank.
5  Q.  I believe you testified about that meeting before, right?
6  A.  Yes, sir.
7  Q.  Could you describe for the jury what happened at that
8     meeting.
9  A.  Of course.  I'll summarize shortly.
10       In that meeting with Suleyman Aslan, I explained to
11     Mr. Suleyman that the amount was not being deposited into the
12     account with regards to food.  I said that Mr. Hakan Atilla had
13     no information about this matter.  I said that Mr. Hakan Atilla
14     had no information that food was not being actually sent.  I
15     said he suggested to me over the phone that this should be done
16     with a letter of credit.  And just as I said yesterday, he then
17     made a phone call, and he instructed Mr. Hakan to go ahead and
18     carry out this transaction.
19  Q.  You mentioned a letter of credit.  What is that?
20  A.  It is a method of payment that is used in real trade
21     situations where it is a letter that is written from one bank
22     to the other bank, whereas when the goods are loaded, the bank
23     would release the payment to the other bank by providing this
24     letter upfront.
25  Q.  So, to be clear, does the payment get sent before the goods

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

1   are loaded?
2   A. It would come to the bank as a letter of credit. Since I
3     never used a letter of credit in my life, I don't have much
4     information in that regard, so I know only roughly.
5   Q. Would you have been able to obtain a letter of credit if
6     you never actually sent any food?
7         MS. FLEMING: Objection, Judge.
8         THE COURT: Overruled. If you know.
9   A. No, it would not have happened with letter of credit.
10  Q. The conversation that you had with Suleyman Aslan, was that
11    in reference to any particular financial transaction?
12  A. Yes, it was related to a pending amount of money, it was
13    money that was waiting and we -- and I also talked to him about
14    the system in general.
15  Q. What did you discuss about the system in general?
16  A. In summary, we talked about what we could do, what I could
17    provide as sufficient documentation for this, and I mentioned
18    that the customs documentation that I had utilized in my tea
19    trade before, that I could provide that document also. So we
20    talked about that in general.
21        And Mr. Suleyman said let's see these documents, and
22    then let's develop the final version of how this would be
23    executed.
24  Q. The payment that had been delayed, was it processed after
25    this meeting?

1   A. Perhaps it was with some delay. Because we had a specific
2     period of time in which we had to provide documentation for
3     food trade transactions. In other words, we had some time in
4     order for us to be able to get the documentation and submit
5     them to the bank afterwards.
6         MR. KAMARAJU: Mr. Chang-Frieden, can we pull up
7     Government Exhibit 297-T, please, this was previously admitted
8     in evidence, and publish it from page two. Could we keep going
9     to the next page, please. I'm sorry, one more page. And
10    towards the bottom of the page.
11  Q. First of all, who is this conversation with?
12  A. This is between Abdullah Happani and myself.
13  Q. Why were you calling Happani at this time?
14  A. After I had left the meeting at the bank, I'm giving a
15    summary of the bank to Abdullah Happani.
16        THE COURT: Giving a summary of what?
17        THE INTERPRETER: Summary of the meeting to Abdullah
18    Happani.
19  Q. So, we looked at this call briefly yesterday. But I want
20    to ask you, at the top, do you see "The man made the call in my
21    presence"?
22  A. Yes, sir.
23  Q. What do you mean there?
24  A. I'm saying that Mr. Suleyman Aslan had called Mr. Hakan
25    Atilla in my presence.

1   Q. What do you go on to say?
2   A. I say he said he will do this job.
3   Q. After that, you say, "Hakan Atilla threw a wrench in the
4     gears and he threw this thing."
5   A. Yes, I'm telling Abdullah Happani that Hakan Atilla was
6     blocking this, he was throwing a wrench in the gears.
7   Q. What do you mean by that?
8   A. I mean, during that day, Mr. Hakan Atilla was throwing a
9     wrench in the gears in order to block this transaction.
10  Q. Is that why you spoke to Suleyman Aslan?
11  A. Certainly, that's why I want to do a meeting, and I told
12    him Mr. Hakan Atilla had no information about this matter.
13  Q. What does Happani ask you?
14  A. He is asking so are they receiving into the account now.
15  Q. What is "the six"?
16  A. It is a reference to the 6 million transaction that was
17    sent from Iran.
18  Q. How do you respond to Happani?
19  A. I say they call me and they were going to move it over and
20    deposit it. And the bank had questions, they had called me,
21    and right during that time, but I was unable to answer the call
22    because it was right during that time.
23  Q. What did you mean by the bank had questions?
24  A. I mean, I don't remember what it was, the bank had a
25    question, I don't know what it was. I did not answer that

1     phone call, so I don't know what it could have been. But, it
2     could have been that they were going to ask when the document
3     would be ready regarding this transaction. So I don't remember
4     exactly what it may have been.
5         But, as a result of the meeting, as I left
6     Mr. Suleyman Aslan, my understanding was that the transaction
7     would be taken care of and the money would be transferred.
8         MR. KAMARAJU: Mr. Chang-Frieden, can we please pull
9     up Government Exhibit 298-T. I believe it has also been
10    admitted in evidence. Publish that from page two.
11  Q. Mr. Zarrab, who is this call with?
12  A. It's with Mr. Hakkan Aydogan.
13  Q. Who is that?
14  A. Hakkan Aydogan was an individual that worked at a lower
15    rank within the international department of Halkbank.
16  Q. Do you recall when this call occurred?
17  A. It was after the meeting.
18  Q. Just to be clear for the record, which meeting are you
19    talking about?
20  A. It is after the meeting that I had had with Mr. Suleyman
21    Aslan.
22  Q. Now, do you see on page two where you say, "Now look, let
23    me explain the transaction to you in general."
24  A. Yes, I see that.
25  Q. Prior to this conversation, had you ever spoken to Hakkan

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 1, 2017

HC13ATI2        Zarrab - Direct        Page 556

1    Aydogan about doing the food business?
2  A.  No, I had not talked to him regarding this matter.
3  Q.  Do you remember testifying about meetings in October of
4    2012 at Halkbank?
5  A.  Yes, I remember that.
6  Q.  Was Hakan Aydogan in those meetings?
7  A.  No, he was not.
8  Q.  Do you remember you testified about meeting with Suleyman
9    Aslan on a few occasions prior to this call?
10 A.  I remember that.
11 Q.  Was Hakkan Aydogan in those meetings?
12 A.  No, Hakkan Aydogan was not in those meetings.
13 Q.  Was Hakan Atilla in any of those meetings?
14 A.  There were times where Hakan Atilla was present in
15   meetings.
16 Q.  What was your understanding of Hakkan Aydogan's role at
17   Halkbank?
18 A.  Hakkan Aydogan was one of the bank employees that was
19   dealing with Iranian transactions.
20       (Continued on next page)
21
22
23
24
25

HC1PATI3        Zarrab - Direct        Page 557

1  Q.  Okay.  And how was his role different than Hakan Atilla's?
2  A.  The role of Mr. Hakan Atilla was that he was the person
3    with the highest authority.  He was at the head of the
4    international department.  In quick summary, Hakan Aydogan was
5    not a person that I was corresponding with at that time that
6    much.
7  Q.  Now, in this call, if you go on to the next thing you say,
8    do you see at the bottom where you say:  "Here's how it is.  In
9    Dubai, there is a serious volume of food going from Iran to
10   Dubai"?
11 A.  Yes, I see that.
12 Q.  What did you mean by that?
13 A.  Just as I had explained to Mr. Hakan Atilla in the morning,
14   this is yet another time now I'm trying to explain this to
15   Mr. Hakkan Aydogan.
16 Q.  Now, subsequent to this call with Hakkan Aydogan, did you
17   meet with Suleyman Aslan again?
18 A.  Could you repeat the question again?
19 Q.  Sure.  After you had this call with Hakkan Aydogan, was
20   there another meeting with Suleyman Aslan?
21 A.  You mean later, after this phone conversation?
22 Q.  Yes.
23 A.  Yes.
24 Q.  Approximately when was that meeting?
25 A.  It would be very close.  It would not be that far from each

HC1PATI3        Zarrab - Direct        Page 558

1    other.  It would be within the same month.
2  Q.  And was there anyone else at that meeting?
3  A.  In one of them there was.
4  Q.  Okay.  Who was that?
5  A.  Mr. Hakan Atilla.
6  Q.  Okay.  Did that meeting occur before or after the WhatsApp
7    chats that we looked at with Suleyman Aslan earlier today?
8  A.  It was before because the WhatsApp messages that we were
9    looking at, it shows that the method was complete.  In other
10   words, the meeting that was held between me and Mr. Suleyman
11   and Mr. Hakan, in that meeting we finalized this final version
12   of how this method would work and how the system would be
13   implemented.
14 Q.  Where was that meeting?
15 A.  At Halkbank.
16       MR. KAMARAJU:  Your Honor, with the Court's
17   permission, I'd ask that, as he describes the contents of the
18   meeting, Mr. Zarrab is allowed to diagram it as a
19   demonstrative, as he did yesterday.
20       THE COURT:  That's fine.  One thing, Mr. Zarrab, who
21   was at the meeting that you just talked about?
22       THE WITNESS:  Mr. Suleyman Aslan, general manager of
23   Halkbank, Mr. Hakan Atilla and myself, and we finalized the
24   system and the method by discussing it.
25       THE COURT:  At this meeting?

HC1PATI3        Zarrab - Direct        Page 559

1       THE WITNESS:  Yes, in that meeting, your Honor.
2       THE COURT:  Okay.
3  BY MR. KAMARAJU:
4  Q.  So, Mr. Zarrab, would you mind describing -- and as you're
5    going, if you could diagram it, I think that would be helpful,
6    with the Court's permission.
7       MR. KAMARAJU:  Can everybody see?  Sorry, except for
8    your Honor.
9       THE COURT:  That's okay.  Don't worry about me.
10 BY MR. KAMARAJU:
11 Q.  Okay.  So in a typical food transaction that would be run
12   through the method that we discussed, what would be the first
13   thing that happens?
14 A.  You mean within the system that we utilized?
15 Q.  Yes.
16       THE COURT:  So is this going to be the post-gold
17   system?
18       THE WITNESS:  Yes, your Honor, but it was also
19   utilized along with gold, too.
20       THE COURT:  Okay.
21       THE WITNESS:  In other words, both systems worked
22   alongside each other, and when gold stopped, then we turned to
23   food.  And when Mr. Hakan Atilla found a loophole with regards
24   to the gold, then we continued on with gold later as well.
25 BY MR. KAMARAJU:

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

1 Q. And what did you draw up there?
2 A. It's the NIOC, the National Iranian Oil Company, it's the
3   seller of oil products in Iran. The first leg of this
4   transaction again begins with Iran selling crude oil and gas to
5   Turkey. Tupras in Turkey buys crude oil from NIOC, and Botas
6   buys natural gas from NIOC in Turkey. NIOC sends the product
7   to Tupras and Botas, and after that, Tupras and Botas make
8   their payments to NIOC.
9 Q. And remind us, what is Tupras?
10 A. Tupras is a petroleum refinery company located in Turkey.
11 Q. And Botas?
12 A. Botas is a gas company. It's the company that buys gas
13   from Iran.
14       These payments take place within Halkbank. After
15   this, the NIOC would transfer this money over to a bank in Iran
16   in order to facilitate its access to this money.
17 Q. And why did it transfer the money to the Iranian bank?
18 A. Because NIOC would not be able to make the international
19   payments that I'm about to draw in a little bit directly by
20   itself.
21 Q. Why not?
22 A. Due to regulations of the U.S. embargo and also due to
23   international sanctions.
24 Q. Did you discuss that fact with anybody at NIOC?
25 A. Many times. In fact, NIOC had that request to be able to

1   make these payments directly through the bank, as well, and
2   they were not able to do so.
3 Q. Did you discuss it with anybody at Halkbank?
4 A. In my presence, during a meeting when I attended, Halkbank
5   was approached with this request to be able to make these
6   payments directly, and they were refused and I was at that
7   meeting.
8 Q. And when you say Halkbank, who from Halkbank was at that
9   meeting?
10 A. Mr. Suleyman Aslan and Mr. Hakan Atilla.
11 Q. So what happened next?
12 A. NIOC would transfer the money to the account of Sarmayeh
13   Bank within Halkbank.
14 Q. Okay. And what happens after that? What did you draw up
15   there?
16 A. Iran Sarmayeh Bank. Underneath that, Sarmayeh Exchange,
17   and underneath that is Toseh Tejarat.
18 Q. Remind us, what is Toseh Tejarat?
19 A. Toseh Tejarat was a company that was established by
20   Sarmayeh Exchange. That is a front company that makes their
21   transactions appear as if they are commercial transactions.
22 Q. Was that the same company that was involved in the gold
23   trade?
24 A. Yes. It was utilizing gold, as well, and there were other
25   companies also.

1 Q. So what happens after that?
2 A. NIOC would send payments instructions to Sarmayeh Exchange.
3 Q. Okay. And what would be typically contained in those
4   payment instructions?
5 A. The recipient of this money, the beneficiary's name, the
6   final destination bank, the currency, and the account
7   information for the company. It's a payment instruction.
8 Q. Okay. What happens after the payment instruction gets sent
9   to Sarmayeh?
10 A. I'm drawing this with regards to food.
11 Q. What's that?
12 A. Volgam Gida is the food company that I own. It's the
13   company through which I run the food business.
14 Q. And when you say it's the company that you own, did Volgam
15   ever ship any actual food?
16 A. No, never.
17 Q. So what happens then? What's then?
18 A. Centrica Company is a company in Dubai that is owned by my
19   group in Dubai.
20 Q. Has Centrica ever shipped out any food, actual food?
21 A. There was -- within the food trade, there was never an
22   instance where food was ever sent to Iran. This was all a
23   system that was developed in order to be able to make the
24   international payments that we're instructed. So the purpose of
25   this was to get the money out of Halkbank, where it had

1   accumulated. So it's the food version of the gold.
2 Q. Okay. So what happens after that?
3 A. Sarmayeh Bank would send a message to Halkbank. It would
4   be a telex. As a result of that, money would be transferred
5   from Sarmayeh's account to Volgam.
6 Q. Okay. Would there be a reason given for that transfer?
7 A. It would contain the pro forma number, and the food would
8   be specified, but on this paper, it would show the pro forma
9   number.
10 Q. Okay. And what is the pro forma number in reference to?
11 A. In other words, that would be the number of the first pro
12   forma that our company, Volgam, would have cut for Toseh
13   Tejarat.
14 Q. And was that intended to reflect the food transaction
15   between Volgam and Toseh Tejarat?
16 A. Yes.
17 Q. So what happens after that?
18 A. This money would be transferred into the Centrica account
19   within Halkbank.
20 Q. And would there be a reason given for that internal
21   transfer?
22 A. This would be the supplier of food in appearance.
23 Q. And to make sure we're clear, who would be the supplier of
24   food in appearance?
25 A. Centrica Dubai company.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                December 1, 2017

HC1PATI3          Zarrab - Direct          Page 564

1  Q.  And what would Volgam appear to be?
2  A.  The company that is selling the food to Iran.
3  Q.  And both of those companies are under your control?
4  A.  Yes.  Certainly, sir.
5  Q.  So what happens after the money gets transferred into the
6  Centrica account?
7  A.  There are two separate, different methods.  I will draw the
8  first one at this point, Bank of Baroda in Dubai.  Within the
9  Bank of Baroda in Dubai, there would be an account for Centrica
10  Dubai or the Centrica Company or Atlantis Trading.  And here,
11  we had this other company that was a food company, Atlantis
12  General.
13  Q.  What is Atlantis General?
14  A.  It's a food supplier.  In other words, for a certain period
15  of time we used Atlantis General, and we would be using
16  Centrica Dubai for a certain period of time.
17  Q.  Who controlled Atlantis General?
18  A.  It was a Royal Group, which was me.
19  Q.  And when you say Atlantis was a food supplier, do you mean
20  that it supplied real, physical food?
21  A.  None of the companies that I'm drawing on this diagram here
22  would ever be involved in sending actual food because there was
23  no actual trade out there.  This was just an accessory in order
24  to be able to carry out the money orders.
25  Q.  So what happens next?

HC1PATI3          Zarrab - Direct          Page 565

1  A.  Halkbank would send a message to Bank of Baroda.  Centric
2  or Atlantis, whichever one is working at that point, that money
3  would be transferred into the account of that one.  So now, the
4  money is in Dubai, in Baroda.  This is just an example that I'm
5  drawing here; so it would be in Bank of Baroda, either in
6  Centrica Dubai or Atlantis, and in this example, I'm using
7  Centrica Dubai.
8  Q.  What happens next?  We're going to see if we can get you a
9  darker marker.  Here, why don't you try this one.  That's fine.
10  Please proceed.
11  A.  So, of course, as this transaction is being carried out,
12  the payment instruction would have been received by my company,
13  Royal Group.
14  Q.  Okay.  So what happens then?
15  A.  The money would be in control of Atlantis and Centrica, in
16  their accounts in Dubai.
17  Q.  So what would you do with the money?
18  A.  We would take the payment instructions that we had received
19  from Iran and direct it towards our company Atlantis in Dubai.
20  Q.  Why would you do that?
21  A.  Can you rephrase the question, please?
22  Q.  Sure.  What was the purpose of transmitting the payment
23  instruction from your company from -- to the company in Dubai?
24  A.  In order to be able to make the payments, you need to have
25  the money.  Since the money is in Dubai here, that's why it is

HC1PATI3          Zarrab - Direct          Page 566

1  here.  In this diagram that is true, the money is now in Dubai.
2  But there are times when we got the money out in Turkey and
3  sent it out of Turkey, but that is not an example I'm depicting
4  here.
5  Q.  Okay.  So let's keep going with this one.  So what do all
6  the color lines mean?  Can you tell us what you're writing?
7  A.  The orange color is to show money movement, and the blue
8  one shows the initial payment order that was put in by Iran or
9  by Iranians.  And in Dubai, just like it was with the gold, the
10  both, the blue and the orange, merge, they come together.  In
11  other words, the money and the instructions merged together.
12       Then, the Rostamani Exchange makes the payment at the
13  order of -- that is received from our company.
14  Q.  Why is Rostamani Exchange used to make that payment?
15  A.  Rostamani Exchange, if this were a U.S. dollars exchange,
16  would use its accounts at Standard Charter in the U.S.A.  But,
17  first, this Euro would be converted into dirhams and we would
18  make the payment to Rostamani in dirhams.
19  Q.  Remind us again, what is dirhams?
20  A.  Dirham is the local currency used in Dubai, in United Arab
21  Emirates.
22       If this were a dollar transaction, the amount of this
23  transaction would be transferred by Rostamani to Standard
24  Charter, and a copy of that would also be sent to the Bank of
25  China at the end of this, let's say $25 million or one or three

HC1PATI3          Zarrab - Direct          Page 567

1  or five million.
2       The transaction that had started here gets merged with
3  the money right here, and here it would be finalized.  So the
4  transaction got started up here, gets finished up down here,
5  which means that the Iranian's money orders would be fulfilled
6  in whatever currency and wherever they had requested them to be
7  made.  This would be fulfilled.
8       At this point, the transaction side of this at
9  Halkbank would not be completed because we need to submit
10  documentation to the Halkbank that would be corresponding to
11  the money that we had received.
12  Q.  What kind of documentation did you need to submit?
13  A.  First, pro forma invoice; second, final invoice; third
14  customs declaration; fourth, the shipping document; and fifth
15  would be supplier invoice and the instructions.
16  Q.  When would you typically submit those documents?
17  A.  Just like it was with gold, we had a certain period of time
18  to be able to submit these documents; so within that time
19  period after the completion of the transaction, we would submit
20  these documents.
21  Q.  And what was the purpose of submitting that documentation
22  to Halkbank?
23  A.  That is in order to conceal this transaction.  That's where
24  the method and the system kicks in place.  So the summary of
25  this entire transaction is that it is there to make it appear

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 1, 2017

HC1PATI3          Zarrab - Direct          Page 568

1  as if it was a food trade transaction and not a money transfer
2  transaction.
3        And, also, in the meeting that was held with
4  Mr. Suleyman and with the meeting with the three people, in
5  other words, Mr. Hakan Atilla, was the discussion of this
6  method and designing of this method.
7  Q. Okay. Before we turn to that, let me ask one quick
8  question. You've said that parts of this are just like it was
9  with the gold; do you remember that?
10 A. Yes, absolutely.
11 Q. What parts overlap with the gold transaction here?
12 A. The purpose and the result. Here and here.
13 Q. Okay. So let's talk about what's different. What's
14 different between the food system and the gold system?
15 A. With the gold, the gold was being exported from Turkey over
16 to Dubai. In other words, there was a physical export that was
17 being made, and it was being reflected in the export for
18 Turkey.
19 Q. And what about the food?
20 A. There was nothing out there as far as -- in terms of food.
21 Q. So how would you make it look as if there were actual food
22 transactions?
23 A. We were submitting fake documents to the bank.
24 Q. So you testified earlier that parts of this system were
25 agreed to during the meeting with Aslan and Atilla; is that

HC1PATI3          Zarrab - Direct          Page 569

1  right?
2  A. Yes, that's correct.
3  Q. Could you describe for the jury what those are?
4  A. In that meeting, everybody had contributions made with
5  regards to this system. For example, the idea of transferring
6  the money from Volgam to Centrica within Halkbank was from
7  Mr. Hakan Atilla.
8  Q. Did he have give a reason for why he proposed that?
9  A. Because he did not want the payment coming from Iran to
10 Volgam, he didn't want that going directly to Dubai.
11 Q. What was your understanding of when he said he didn't want
12 the payment going directly from Volgam to Dubai?
13 A. So all concerns that Mr. Levent Balkan had, they were all
14 coming back together.
15 Q. Could you describe those concerns again?
16 A. It's Iranian transaction, it's Volgam, it's owned by Iran.
17 The fact that it would be shown in international banking
18 transactions even if it's in Euros, it would show the relation
19 to Iran. Otherwise, there was no technical instruction for
20 Volgam being able to send money directly to Centric and Dubai,
21 and Halkbank could also make a direct payment to Atlantis or
22 Centrica Dubai through Bank of Baroda.
23       In that case, the sender would have shown up as Volgam
24 and the recipient would have shown up as Centrica. In this
25 example, the sender is Centrica and so is the recipient. When

HC1PATI3          Zarrab - Direct          Page 570

1  the sender and recipient are the same, the transaction would
2  not draw attention at the correspondent banks.
3  Q. Is there anything else discussed during that meeting?
4  A. Yes. I told the individual that I would be using small
5  vessels. Based on my tea trade experience, that I would be
6  able to provide documentation that would show that I would be
7  using small vessels.
8  Q. Let's be clear. You said the individual, who are you
9  referring to?
10 A. I did not mean a specific individual. What I meant was I
11 was speaking at that meeting; so we were discussing as a group.
12 There was nothing specific individual with this.
13 Q. Okay.
14 A. Mr. Hakan Atilla asked for a bill of lading. He asked
15 whether we could provide a bill of lading.
16 Q. What's a bill of lading?
17 A. This document that shows the loading onto vessels.
18 Q. And what kind of information is typically reflected on a
19 bill of lading?
20 A. The company that sent the goods, the goods, the destination
21 point, the amount and the shipping company, in other words,
22 which vessel was transporting it.
23 Q. Had you had experience with bills of laiding before?
24 A. No, I didn't have much experience. I was sending the tea
25 to Iran on these small vessels in the past.

HC1PATI3          Zarrab - Direct          Page 571

1  Q. Remind us, how old were you when you were doing that tea
2  business?
3  A. Between 16 and 17.
4  Q. So how did you respond when Atilla asked you whether you
5  could provide a bill of lading?
6  A. I said, of course, we can submit that.
7  Q. And what did he say in response?
8  A. Then he said when the bill of ladings are entered, there is
9  some questioning on the loading of the goods in terms of large
10 companies, you know that, right? In other words, whether the
11 goods were sent or not could be traced.
12 Q. And what was your understanding of what he meant by that?
13 A. That is to mean that the lower-rank employees at the bank,
14 or other people elsewhere, when they enter this number for the
15 bill of lading, they would be able to trace whether the
16 shipment actually occurred or not, such as for large companies,
17 like Maersk, they would be able to look that up.
18 Q. Why would that be a problem?
19 A. Because there were never goods shipped. So I told him that
20 we could not submit that. I said, we could provide the
21 documentation from other small vessels. Since the small
22 vessels are not affiliated with large companies, there would be
23 no tracing of it.
24       Here, there is one section missing.
25 Q. Okay. What is it?

A433

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                         December 1, 2017

| HC1PATI3 | Zarrab - Direct | Page 572 |
|---|---|---|

1 A. Later on, at certain times we used another Turkish bank
2 between Bank of Baroda and Halkbank.
3 Q. Did you want to try to add that to your diagram?
4 A. If there's space, I will do so.
5 Q. What would happen with this additional Turkish bank?
6 A. From Centrica or Atlantis, it would go to the Centrica
7 account within Türkiye Finans Bank in Turkey. From there, it
8 would be sent to the Centrica account in Dubai, and there was a
9 specific reason for this.
10 Q. What was that?
11 A. Since Bank of Baroda knew that Halkbank was a correspondent
12 for Iranian transactions, it began to feel a concern in terms
13 of transactions coming from Halkbank.
14 Q. Who at Halkbank was concerned about that? Withdrawn,
15 withdrawn.
16     MS. FLEMING: Your Honor, there's no question pending.
17     THE COURT: Yes, there's no question.
18 Q. So why was an additional Turkish bank involved?
19 A. Bank of Baroda began to feel concern with regards to
20 transactions that were coming directly from Halkbank.
21 Q. How would this address that concern?
22 A. Because Türkiye Finans Bank was not doing any trade with
23 Iran. So within this system, the connection to Iran is
24 completely cut out.
25 Q. Was that your idea, to involve another Turkish bank?

| HC1PATI3 | Zarrab - Direct | Page 573 |
|---|---|---|

1 A. Yes.
2 Q. Was that discussed at the meeting?
3 A. No.
4 Q. Was there anything else discussed at the meeting that you
5 were testifying about between Aslan, Atilla and yourself?
6 A. No. In general, this is what I remember.
7 Q. Now, did you come to any agreement about what documents
8 would be provided?
9 A. Yes.
10 Q. So what types of documents were you going to provide after
11 this meeting?
12 A. The documents that I have written down right here
13 pertaining to loading onto small vessels, the invoice of the
14 supplier company that is sending to Volgam. So everything that
15 I have written down here as a list.
16 Q. Mr. Zarrab, I'm going to ask you to return to the witness
17 stand.
18     MR. KAMARAJU: And, your Honor, with the Court's
19 permission, we would mark what Mr. Zarrab has drawn as
20 Government Exhibit 9503 and offer it as a demonstrative.
21     THE COURT: I'll allow it.
22     (Government's Exhibit 9503 received in evidence)
23 BY MR. KAMARAJU:
24 Q. Showing you what's been marked for identification as
25 Government Exhibit 745, do you recognize this exhibit?

| HC1PATI3 | Zarrab - Direct | Page 574 |
|---|---|---|

1 A. Yes, I recognize it.
2 Q. What is it?
3 A. This is an abbreviated version of the diagram that's there.
4     THE COURT: You mean that you just drew?
5     THE WITNESS: Yes, your Honor. It's an abbreviated
6 version of that, but it shows the same thing.
7 BY MR. KAMARAJU:
8 Q. Do you know who drew it?
9 A. It was me.
10 Q. Was it drawn before you were arrested?
11 A. I don't recall the time.
12 Q. Was it drawn before you were arrested in Miami?
13 A. That is definite.
14 Q. And you said it was an abbreviated version of what's
15 depicted in Government Exhibit 9503; is that right?
16 A. Yes, sir.
17 Q. Does it depict either the food or the gold system?
18 A. Yes, sir. In fact, it says food.
19     MR. KAMARAJU: Your Honor, the government would offer
20 Government Exhibit 745 and ask permission to publish it.
21     MS. FLEMING: Objection, hearsay, Judge.
22     THE COURT: I'll allow it.
23     (Government's Exhibit 745 received in evidence)
24     MR. KAMARAJU: If we could publish that,
25 Mr. Chang-Frieden.

| HC1PATI3 | Zarrab - Direct | Page 575 |
|---|---|---|

1 BY MR. KAMARAJU:
2 Q. Okay. So let's just start at the top left, okay? Do you
3 see where it says "IR bank"?
4 A. Yes, sir.
5 Q. What's that?
6 A. Bank in Iran.
7 Q. Okay. And then do you see the next box down?
8 A. I see it, sir.
9 Q. What's written there?
10 A. It says "Halk," sir.
11 Q. And what's that a reference to?
12 A. It's Halkbank, sir.
13 Q. Do you see the two boxes below Halkbank?
14 A. Yes, sir.
15 Q. What are those intended to depict?
16 A. It depicts the buyer that would be buying the food in Iran,
17 and also, it shows the supplier company that would be supplying
18 the food.
19     (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 1, 2017

| HC13ATI4 | Zarrab - Direct | Page 576 |
|---|---|---|

1 Q. Okay. It appears there is a word written in Turkish to the
2   right there. Do you see that?
3 A. Yes, sir.
4 Q. What word is written there?
5 A. Gida.
6 Q. Do you know what "Gida" is in English?
7 A. (In English) Food.
8 Q. Is there a box below that?
9 A. There is, sir.
10 Q. What's that box?
11 A. It's Halk, Halkbank, sir.
12 Q. So, the two Halkbank boxes and the two boxes in between
13   those, what is that intended to depict?
14 A. It's a diagram showing that there would be a transfer made
15   within Halkbank, between two companies such as here, from the X
16   company to the A company, and following that, then the money
17   would be sent out of Halkbank just like I had drawn on the
18   diagram over there earlier.
19 Q. Okay. Do you see what is the box drawn below the lowest
20   Halkbank box?
21 A. It is Dubai, sir.
22 Q. What is below that?
23 A. It goes into a different section there. And there is Royal
24   there.
25 Q. What is Royal?

| HC13ATI4 | Zarrab - Direct | Page 577 |
|---|---|---|

1 A. It is a company owned by me.
2 Q. Then what is to the right of that?
3 A. Deniz, which represents DenizBank.
4 Q. What is to the right of that?
5 A. It's the symbol for dollars.
6 Q. What is depicted to the right of the dollar sign?
7 A. Then it shows arrows, meaning the international payments
8   were being made.
9 Q. Mr. Zarrab, is this the system that you agreed to with
10   Hakan Atilla?
11 A. Yes.
12     MR. KAMARAJU: We can take that down.
13 Q. You testified that there were certain documents that you
14   had to obtain for this system; is that right?
15 A. That is correct.
16 Q. Did you make efforts to get those documents?
17 A. A lot.
18 Q. Were you making efforts to get those documents even before
19   the meeting with Hakan Atilla?
20 A. Of course, I actually took samples of documents that I
21   could be submitting, I took those to the meeting.
22 Q. I'd like to show you what's been marked for identification
23   as Government Exhibit 238-T. Take a moment to review that,
24   please. Thank you.
25     Do you recognize the exhibit?

| HC13ATI4 | Zarrab - Direct | Page 578 |
|---|---|---|

1 A. Yes, I recognize it, sir.
2 Q. What is it?
3 A. Transcript of a phone conversation.
4 Q. Do you remember the call?
5 A. Yes, I remember, sir.
6 Q. Were you a participant in the call?
7 A. Yes, sir, I was a party to this.
8 Q. Have you listened to an audio recording of the call?
9 A. Yes, I listened to it, sir.
10 Q. Did the recording accurately capture your conversation?
11 A. Yes, sir.
12 Q. Was that conversation in Turkish?
13 A. Yes, it was in Turkish.
14 Q. Does this transcript reflect the Turkish phrases that were
15   used during that conversation?
16 A. I don't understand the question fully. Can you please
17   repeat.
18 Q. That was a poorly worded question is what I'll say.
19     Does the transcript here, 238-T, properly reflect the
20   conversation in Turkish?
21 A. Yes, sir, it reflects it.
22 Q. Who were you speaking with?
23 A. Serdar, who is an employee of mine who was working in Dubai
24   during that time.
25 Q. What was the general purpose of the call?

| HC13ATI4 | Zarrab - Direct | Page 579 |
|---|---|---|

1 A. I had called, the purpose of this call was, I had called
2   him to discuss the documents that we can obtain to be able to
3   submit to Halkbank.
4     MR. KAMARAJU: The government would offer Government
5   Exhibit 238-T into evidence.
6     MS. FLEMING: Objection.
7     THE COURT: I'm going to allow it.
8     (Government's Exhibit 238-T received in evidence)
9     MR. KAMARAJU: Can we publish that from page two to
10   the jury, please.
11 Q. Do you see near the top of the page, where you say "Serdar,
12   do you know those langes, those wooden ships that transport
13   goods to Iran?"
14 A. Yes, sir.
15 Q. What did you mean here?
16 A. In Dubai, right by the shoreline, you can actually see,
17   those that are driving by the shore from their cars, they can
18   see the wooden vessels that are docked on the side. They are
19   the small tonnage vessels, because this is a shore that is a
20   short distance from Iran, and this is where the shipping can
21   occur. These vessels are there.
22 Q. Were you referring to the same kinds of vessels that you
23   proposed using during the meeting with Aslan and Atilla?
24 A. Yes. I am preparing documentation that could be submitted.
25   And I'm telling Serdar to go and obtain documentation regarding

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 1, 2017

HC13ATI4          Zarrab - Direct          Page 580

1  these vessels, these ships. I mean, I was going to take these
2  documents with me to the meeting and show them during the
3  meeting.
4  Q. Do you see a little further down where you say, "Go to the
5  customs office in Qoor and pick up two books of manifests,
6  blank manifests. Companies fill those out, you know."
7  A. I see that, sir.
8  Q. What did you mean by that?
9  A. Previously, but first I'd like to explain the part about
10  Qoor. Qoor is the harbor where these small vessels are docked.
11  And over there, there is a customs building that pertains to
12  these.
13        I'm providing with directions to go to that customs
14  building there, and in that building, on the information desk,
15  there are blank manifest documents. So, when I was sending tea
16  to Iran, I would be doing the same thing with that trade. I
17  would go into the building, pick up a blank manifesto, and I
18  would fill out the loading information on there to use it
19  as a document.
20  Q. Do you see a little further down where you say, "You fill
21  it out, you know, and then the customs office applies the
22  signature and the stamp."
23  A. Yes, I see that, sir.
24  Q. What did you mean?
25  A. I'm describing the procedure here, just as I said earlier,

HC13ATI4          Zarrab - Direct          Page 581

1  you'd pick up the manifest, you fill it out with the loading
2  information, and you take this document then to a customs
3  officer within the same building, and have him stamp that
4  document indicating that it had been exported, that this was
5  sent out of Dubai.
6  Q. I'd like to show you what's been marked for identification
7  as Government Exhibit 240-T. Do you recognize the exhibit?
8  A. Yes, sir, I recognize it.
9  Q. What is it?
10  A. It is a transcript of a phone conversation.
11  Q. Do you remember the call?
12  A. Yes, I remember, sir.
13  Q. Were you a participant in the call?
14  A. Yes, sir, I had taken part.
15  Q. Have you listened to an audio recording of this call?
16      MS. FLEMING: No objection, subject to connection.
17      THE COURT: Go ahead. You can still ask your
18  questions.
19      MR. KAMARAJU: Sorry?
20      THE COURT: I said you can still ask the questions.
21      MS. FLEMING: Sorry, I thought I was helping.
22  A. Yes, I have listened to it, sir.
23  Q. Does the audio recording accurately capture the
24  conversation?
25  A. Yes, sir.

HC13ATI4          Zarrab - Direct          Page 582

1  Q. Does this transcript accurately reflect the Turkish portion
2  of that conversation?
3  A. Yes, sir.
4  Q. Who are you speaking with?
5  A. Abdullah Happani.
6      MR. KAMARAJU: Your Honor, the government would offer
7  Government Exhibit 240-T.
8      THE COURT: I'll allow it.
9      (Government's Exhibit 240-T received in evidence)
10      MR. KAMARAJU: If we can put that up on the screen.
11  Q. Do you see third box down where you say, "I wanted to say,
12  let's not do rice for the first one, let's do sugar. Um,
13  Gudarzi can research his prices right away. He had obtained a
14  pro forma from that Brazilian company in the past."
15  A. Yes, I see that, sir.
16  Q. What are you referring to there?
17  A. I'm telling Abdullah Happani that we should not do rice as
18  the first transaction.
19  Q. Why not?
20  A. Gudarzi was an individual that was working in Turkey at
21  that time on behalf of Sarmayeh Bank, Sarmayeh Exchange. They
22  previously had obtained pricing information from Brazil for
23  sugar. And independently from me, they had wanted to send
24  sugar, real sugar, to Iran.
25      Since Mr. Gudarzi had obtained this information in the

HC13ATI4          Zarrab - Direct          Page 583

1  past, and since he had an office within our office, what I'm
2  saying is by using this information, since we don't know
3  anything about food, we could use this sugar information to
4  submit.
5  Q. Where did Gudarzi work again?
6  A. Gudarzi worked for Sarmayeh Exchange, but he had a room
7  within my company.
8  Q. I'd like to show you now what's been marked for
9  identification as Government Exhibit 244-T. Do you recognize
10  this exhibit?
11  A. Yes, sir.
12  Q. What is it?
13  A. It is a phone conversation between myself and Abdullah
14  Happani. It is a transcript of it.
15  Q. Do you remember the call?
16  A. I remember, sir.
17  Q. And you mentioned you were a participant to the call?
18  A. Yes, sir.
19  Q. Have you listened to a recording of this call before?
20  A. I listened to it, sir.
21  Q. Did the recording accurately capture your conversation?
22  A. Yes, sir.
23  Q. Does this transcript properly reflect the Turkish that was
24  used during that conversation?
25  A. Yes, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

| HC13ATI4 | Zarrab - Direct | Page 584 |

1 Q. What was the general purpose of this call?
2 A. It is about funds that were hit to Halkbank, the funds that
3 were sent to Halkbank, I'm asking Abdullah who had hit the
4 money and who had done the back and forth.
5 Q. What do you mean by "hit?"
6 A. That's just a term that is used to say whether they had
7 sent it from Iran.
8     MR. KAMARAJU: The government would offer Government
9 Exhibit 244-T.
10     THE COURT: I'll allow it.
11     MR. KAMARAJU: And ask for permission to publish it
12 beginning at page two.
13     THE COURT: Okay.
14     (Government's Exhibit 244-T received in evidence)
15     MR. KAMARAJU: Can we turn to page three of the
16 document, please.
17 Q. Do you see where you say, "Have you received the customs
18 document."
19     It's about the middle of the page.
20 A. Yes, I see that, sir.
21 Q. Why were you asking Happani for the customs documents?
22 A. I had asked for documentation from Dubai from Serdar and
23 others, I'm asking him so that did Serdar go and do you have
24 the manifests there.
25 Q. Do you see a little further down where you say, "Have have

| HC13ATI4 | Zarrab - Direct | Page 585 |

1 him or her make 10 copies of what I sent to the office. Put
2 them in the safe. This is very important. If they get
3 misplaced, our business stops."
4 A. Yes.
5 Q. What did you mean there?
6 A. There was perhaps a document that had been received to be
7 submitted to the bank in Iran. I'm -- I'm referring to that
8 document.
9     I'd like to make a correction.
10     There was a document that was sent from Iran to us in
11 order to be submitted to the bank. I'm saying that he should
12 get it translated, and put it in a safe. Make a photocopy of
13 it and put it in the safe, because it's a very important
14 document.
15 Q. Why was that document so important?
16 A. Because the bank was going to request this document from
17 others that work with the bank, and these individuals were not
18 going to be able to provide this document, and this is -- this
19 was important because of that.
20 Q. What general type of document are we talking about?
21 A. So, we were provided with a certain document that indicated
22 that Safir was authorized to send goods, gold, into Iran, that
23 there was this permission provided for them to do importing
24 into Iran of such goods.
25 Q. So, were you continuing to do the gold business at the same

| HC13ATI4 | Zarrab - Direct | Page 586 |

1 time as you were starting the food business?
2 A. Yes, initially they were going -- happening together.
3 Q. I'd like to show you what's been marked for identification
4 as Government Exhibit 300-T. Do you recognize it?
5 A. Yes, sir.
6 Q. What is it?
7 A. It is a transcript of a phone conversation.
8 Q. Were you a participant to the conversation?
9 A. Yes, sir.
10 Q. Do you remember the conversation?
11 A. I remember, sir.
12 Q. Have you listened to an audio recording of the
13 conversation?
14 A. I listened to it, sir.
15 Q. Did it accurately capture your conversation?
16 A. Yes, sir.
17 Q. Does this transcript properly reflect the Turkish that was
18 used during that conversation?
19 A. Yes, sir.
20 Q. What was the general purpose of this call?
21 A. If I may ask for just a minute to read it.
22 Q. Of course.
23     So, what was the general purpose of the call?
24 A. We were, in general, we were talking about our competitor,
25 Ahmet Alacaci. In addition to that, Abdullah is referring to

| HC13ATI4 | Zarrab - Direct | Page 587 |

1 what I had drawn on this diagram earlier, about gold, when we
2 were transferring money from Safir to Rona, there was a request
3 for -- the bank was requesting supplier invoice.
4     So, this is a phone conversation that encompasses many
5 topics. So one of them was the currency exchange rate
6 differences that would occur, and I was talking about that.
7 And if there is anything specific that you want me to say out
8 of that, I can do that.
9 Q. Sure.
10     MR. KAMARAJU: Your Honor, I'd offer Government
11 Exhibit 300-T and ask to publish it and I can direct Mr. Zarrab
12 to a specific page to discuss.
13     THE COURT: I'll allow it.
14     (Government's Exhibit 330-T received in evidence)
15 Q. Could you turn to page three. I'm sorry, it starts at the
16 bottom of page two.
17     Do you see the section there at the last box where
18 Happani says, "No, there is this thing in addition to the one
19 month. Because of this invoice, this thing."
20     Do you see the box that starts there?
21 A. Yes, sir.
22 Q. What did you understand Happani to be telling you there?
23 A. That there was a lot of up and downs with gold during that
24 time period between Turkey and Dubai. For each kilogram of
25 gold, there was a difference of $1,000. In other words, when

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

1  we take gold to Turkey and export it to Dubai, to sell, in
2  other words, to convert it into cash so that we can fulfill the
3  Iranian money instructions, so, this difference in price, it
4  was so much per kilogram.  Abdullah is telling me that talk to
5  the bank, I don't want to be buying gold at this time.  They
6  should not be asking for a supplier invoice.  He says they
7  should not be asking for this for about a month or so.
8  Q.  Could we turn to page four.  You see that second full block
9  there where you say, "Every time I call, I owe something.
10  Every time I call.  Do you understand?  Maybe it's a trivial
11  thing, but I don't know.  Long live Photoshop.  Just give it to
12  them and let them print away.  What could happen?"
13  A.  Yes, I see that.
14  Q.  What did you mean there?
15  A.  The bank was asking for the partnership structure document
16  for a company, this had come up yesterday too.  So, they were
17  saying that one of those documents was missing a signature, it
18  was missing the apostille on that document.
19       So, Abdullah is telling me, regarding that document,
20  that I should call the bank and that they should accept that
21  document.  And I'm saying that every time I call Mr. Suleyman I
22  end up being indebted.  So, because of that, I'm saying there
23  is this one signature missing in this document, just use
24  Photoshop and go ahead and give it to the bank.
25       MR. KAMARAJU: Your Honor, I don't know if you wanted

1  to take the midmorning break now.
2       THE COURT: Yes, we're going to take a break now.  And
3  I think we'll take a 15-minute break.
4       (Jury excused)
5       (Witness not present)
6       MR. ROCCO: Your Honor, do we need the most wanted
7  list in front of the jury constantly?  Can we have it taken
8  down, please?
9       THE COURT: Sure.
10       MS. FLEMING: Your Honor, for completeness we'd like
11  that recording played.  I thought we were going to play all the
12  recordings.
13       THE COURT: I did too.
14       MR. ROCCO: So did I.
15       MR. KAMARAJU: I'm sorry, I misunderstood.  I thought
16  there were specific ones.
17       MS. FLEMING: I didn't want to keep interrupting but I
18  was trying to help shorten things.
19       THE COURT: I was concerned about one in particular
20  that you are going to play first or whatever.  Right?
21       MR. KAMARAJU: Yes.
22       THE COURT: But, that was, I was thinking the same
23  thing, that we'd play them all and get them into evidence that
24  way.  Even though, it will just take time because they're in
25  Turkish I assume.

1       MR. KAMARAJU: We're happy to do that.  Just so, maybe
2  if ultimately all the parties are going to agree to put them in
3  evidence, can I offer them subject to connection without having
4  to show each one to Mr. Zarrab?
5       And the only reason I say that, the way we
6  authenticated them yesterday was Mr. Zarrab initialed the CD
7  containing the audio recording that he had listened to and we
8  played that recording.  He identified the CD from that
9  recording.  We don't have individualized signed CDs for all of
10  them.  He will testify, as he has I believe, that he listened
11  to the recording that's referenced in the exhibit.  After he
12  says that, could we then play the recording at that point?
13       THE COURT: Sure.
14       MS. FLEMING: I think if you do that, and maybe what
15  we can do is after hours do individual CDs so it's for the
16  record or something so that -- right now you've got them all as
17  a huge file that they may not all come in, right.  I think you
18  have to make a CD of what actually is played at some point for
19  the record.
20       THE COURT: Oh.
21       MR. KAMARAJU: I think we're going to reference the
22  fact that certain exhibits are being played.
23       MS. FLEMING: You have to make a exhibit physically if
24  it ever goes up to another court as to exactly what was played.
25       I believe our plan is to introduce a CD

1  of all of the audio.
2       MS. FLEMING: I don't think you're going to get all
3  the audio in.
4       THE COURT: You can work this out.
5       Here's the plan.  The plan is we've got some muffins
6  for the jury, and so that's why we'll take a little longer than
7  usual.  Like 15, maybe 20 minutes.  And then we'll come back
8  and go until 2 o'clock and that will be it for today.
9       MS. FLEMING: Thank you.
10       THE COURT: You are going to play that?
11       MR. KAMARAJU: We can play this one.
12       THE COURT: When they come back in?
13       MR. KAMARAJU: The one we were just talking about?
14       THE COURT: The one from yesterday.
15       MR. KAMARAJU: Sure.
16       THE COURT: If you want to play this one too, that
17  would be fine.
18       MR. KAMARAJU: Okay.
19       (Recess)
20       (Continued on next page)
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

HC1PATI5      Zarrab - Direct      Page 592

1    (In open court; jury not present)
2    THE COURT: So we're going to see if the jury is ready
3  to come back in.
4    (Jury present)
5    THE COURT: Okay. Everybody can be seated.
6    THE DEPUTY CLERK: Sir, again, I'd like to remind you
7  that you're still under oath.
8    THE WITNESS: Thank you.
9    MR. KAMARAJU: Mr. Chang-Frieden, can you please pull
10  up the transcript for Government Exhibit 206-T.
11    This exhibit was previously admitted.
12  BY MR. KAMARAJU:
13  Q. Have you taken a second to review that?
14  A. Yes, sir.
15  Q. And have you listened to a recording of that conversation
16  before?
17  A. Yes, sir.
18    MR. KAMARAJU: At the Court's suggestion, I'd like to
19  publish the audio for Government Exhibit 206-T, which we will
20  mark as Government Exhibit 206-A later.
21    THE COURT: They're going to play the recording so it
22  will be part of the record.
23    (Audiotape played)
24  BY MR. KAMARAJU:
25  Q. Mr. Zarrab, do you remember that call?

HC1PATI5      Zarrab - Direct      Page 593

1  A. I remember it, sir.
2  Q. And what were you describing for Happani in that call?
3  A. I'm giving him a summary after I had just left the meeting
4    that I had with Mr. Suleyman.
5  Q. Was it at that meeting that you agreed to pay bribes to
6    Suleyman Aslan?
7  A. Yes, sir.
8  Q. And were you still paying bribes to Suleyman Aslan at the
9    time that you met with him and Atilla to devise the system?
10  A. Is the question pertaining to food?
11  Q. Yes. I should have been specific. Yes, the food system.
12  A. Yes, I was giving bribes to Mr. Suleyman Aslan.
13    MR. KAMARAJU: Mr. Chang-Frieden, could you bring up
14  Government Exhibit 207-T.
15  Q. Now, Mr. Zarrab, do you remember this telephone call?
16  A. I remember it, sir.
17  Q. Did you listen to a recording of it?
18  A. I listened to it, sir.
19    MR. KAMARAJU: And the government would ask to play
20  the audio, which we will mark later as Government
21  Exhibit 207-A.
22    THE COURT: Okay.
23    (Audiotape played)
24  BY MR. KAMARAJU:
25  Q. Mr. Zarrab, do you remember that call?

HC1PATI5      Zarrab - Direct      Page 594

1  A. Yes, sir.
2  Q. And maybe if we could turn to the third page of the
3    transcript. Do you see there at the top Erker asks you: "Are
4    your guests gone?" and I guess he asks it twice, and then do
5    you see where you respond: "No, they are here. Bahmani will
6    come on Monday"?
7  A. Yes, sir.
8  Q. Remind us who Bahmani was?
9  A. He's the president of the Central Bank of Iran.
10  Q. And had you previously met with him?
11  A. Yes, I had met with him, sir.
12  Q. And I believe you testified that you had met with other
13    Iranian officials, as well, in connection with the Halkbank
14    business; is that right?
15  A. Yes, that is correct, with Iranian delegates.
16  Q. Did you meet with any Iranian delegates or representatives
17    around the time that you came up with the proposed food method?
18  A. Yes. There was one that I was constantly in contact with
19    Iranians, and there was conversation during this time period
20    also.
21    The Iranians were constantly coming and going to and
22    from Turkey from the oil ministry.
23  Q. And what was the Iranians' primary concern during this
24    time?
25    MS. FLEMING: Objection.

HC1PATI5      Zarrab - Direct      Page 595

1    THE COURT: During which time?
2  Q. I'll direct your attention to April of 2013.
3  A. The Iranians don't care about the internal system that is
4    used, whether it be the gold system or the food system. Their
5    only concern is that a system may be cut off, resulting in
6    their international payments not being made.
7  Q. And what prompted you to begin to explore switching from
8    the gold system to the food system?
9  A. Due to changes in the U.S. embargo, as well as restrictions
10    on this with regards to gold paid and payments made to Iran
11    through that. We were going to be restricted in being able to
12    make payments to Iran, and that's why a change to food was
13    necessary.
14  Q. Thank you.
15    MR. KAMARAJU: Mr. Chang-Frieden, could you please
16    pull up Government Exhibit 238-T.
17    This is one of the calls that we looked at earlier
18    today. With the Court's permission, we will play the audio and
19    mark it later.
20    THE COURT: Yes.
21    THE WITNESS: Certainly.
22    (Audiotape played)
23  BY MR. KAMARAJU:
24  Q. Mr. Zarrab, do you remember having that phone call?
25  A. Yes, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 1, 2017

HC1PATI5          Zarrab - Direct          Page 596

1    MR. KAMARAJU: I'd like to go on to Government
2  Exhibit 240-T. This is on a call we had seen earlier this
3  morning. Your Honor, may I play the audio?
4    (Audiotape played)
5  BY MR. KAMARAJU:
6  Q. And, Mr. Zarrab, do you remember having that telephone
7  call?
8  A. Yes, I remember, sir.
9    MR. KAMARAJU: I'd like to pull up Government
10  Exhibit 244-T, and with the Court's permission, we will play
11  the audio.
12    THE COURT: Sure.
13    (Audiotape played)
14  BY MR. KAMARAJU:
15  Q. Now, I believe you testified during this call you were
16  talking about obtaining customs documents; is that right?
17  A. Yes. So I'm asking whether they had arrived or not.
18  Q. Did you use customs documents in both the gold system and
19  the food system?
20  A. No, these customs documents were only for use within the
21  food system.
22    MR. KAMARAJU: Now, could we please bring up the
23  transcript for Government Exhibit 300-T, please.
24    And, your Honor, may we play the audio?
25    THE COURT: Sure.

HC1PATI5          Zarrab - Direct          Page 597

1    (Audiotape played)
2  BY MR. KAMARAJU:
3  Q. Now, Mr. Zarrab, I believe before we broke, this is the
4  call that we were dealing with; so I'm going to ask you a
5  couple more questions about it. Okay?
6    Do you see where you say: "Just get it printed. What
7  could happen? We had those from a while back anyway. They
8  won't go into so much detail. We already know that the
9  partnership structure is not problematic"?
10  A. Yes, sir.
11  Q. And then you go on to say: "The approval, if it happens,
12  don't give the man the approval yet, okay?"
13  A. Yes, sir.
14  Q. What were you saying there?
15  A. So this money that had been sent belongs to a customer by
16  the name of Miandapci. This individual, this Iranian
17  individual had already sent to us a wire in the past. We had
18  already received his company's partnership structure from that
19  previous transaction; so we already had it.
20    So we already knew that within that partnership
21  structure there was nothing related to the Iranian government;
22  so we know that it was there. But since that document was
23  missing, they were not depositing the money into the account;
24  so there was something missing within the apostille of this
25  document.

HC1PATI5          Zarrab - Direct          Page 598

1  Q. Why was it important that there was no connection to the
2  Iranian government?
3  A. It was important to the bank because of the regulations in
4  the bank.
5  Q. Did you discuss that with anyone at the bank?
6  A. This was not an issue during the previous version of the
7  regulations, but when the regulations changed, I received a
8  call from the bank notifying me of the need.
9    THE COURT: Which bank are you referring to?
10  Q. I was referring to Halkbank, but to clarify, sir, which
11  bank were you talking about?
12  A. Halkbank, your Honor.
13  Q. And do you remember who you spoke with at Halkbank about
14  it?
15  A. No, I don't. It was a call that had come from the branch
16  during that time.
17    MR. KAMARAJU: Can we please pull up Government
18  Exhibit 306-T, and this one I don't believe has been admitted
19  yet.
20    THE COURT: Has not?
21    MR. KAMARAJU: Has not been admitted.
22  BY MR. KAMARAJU:
23  Q. Mr. Zarrab, would you take a moment to look at that.
24    (Pause)
25  A. Yes, sir.

HC1PATI5          Zarrab - Direct          Page 599

1  Q. Do you recognize that exhibit?
2  A. I recognize it, sir.
3  Q. What is it?
4  A. The transcript of a phone conversation.
5  Q. Did you participate in this conversation?
6  A. Yes, I took part, sir.
7  Q. And do you remember the call?
8  A. I remember it, sir.
9  Q. What was the general purpose of the call?
10  A. Since within the food system, in the method that I
11  described earlier, a supplier company would be needed by
12  Halkbank for the Iranian food system, I am telling my employee
13  Sadegh Rastgar, to go to Dubai as soon as possible to go ahead
14  and take care of the necessary steps so that the company could
15  be established so that we can take care of what's needed.
16    MR. KAMARAJU: Your Honor, the government would offer
17  Government Exhibit 306-T and ask to play the audio.
18    MS. FLEMING: Subject to connection.
19    THE COURT: I'll allow it.
20    (Government's Exhibit 306-T received in evidence)
21    (Audiotape played)
22  BY MR. KAMARAJU:
23  Q. Now, do you see where you say "Sadegh, I need a favor.
24  Have them issue a Dubai visa very quickly," that section there?
25  A. Yes, sir, I see that.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

---

HC1PATI5          Zarrab - Direct          Page 600

1  Q. And you go on to say: "Did you hear me? Also, go to Dubai
2  and register a food company there in Bulbuyan's name"?
3  A. Yes, sir.
4  Q. And then: "Bring its documents over in order to open an
5  account here. Did you hear me? The gold business will stop as
6  of next Wednesday"?
7  A. Yes, I see that, sir.
8  Q. What did you mean there?
9  A. I'm saying that since the gold trade is about to stop and
10  we need to complete the infrastructure for the food system, I'm
11  telling my employee, Sadegh, to go ahead and go to Dubai and
12  establish a company under the name of one of my employees
13  there, by the name of Bulbuyan, and go ahead and get that taken
14  care of, obtain the documents and bring them over so we can go
15  on with this, in order to open the account for it at Halkbank.
16  Q. Okay. And on Government Exhibit 9503, the diagram you drew
17  of the food system, what company would you be talking about
18  here?
19  A. So I can't see from here, but what I'm referring to on that
20  diagram is the supplier company. So I'm referring to, let's
21  say, Atlantis General Trading or Centrica, though Centrica
22  comes at a later date. I'm just referring to the company that
23  would be needed to show as a supplier company for this
24  transaction. That's what I'm referring to.
25  Q. Do you remember approximately when this call took place?

---

HC1PATI5          Zarrab - Direct          Page 601

1  A. I don't recall. It must be within that time frame of the
2  food trade, which is probably around the fourth or the fifth
3  month of the year. I don't recall the exact time, but it
4  should be about that time.
5  Q. So directing your attention to May of 2013, were there any
6  meetings with any Iranian officials during that month?
7  A. Yes, there was one. There was a meeting held.
8  Q. Were you part of that meeting?
9  A. I had attended some portions of it.
10  Q. While you were at the meeting, who else was in attendance?
11  A. There were a few meetings.
12  Q. Okay. Let's start with the first one.
13  A. The minister of oil from Iran and his delegation had come
14  with him. By the oil minister of Iran, I mean Ghasemi.
15  Q. Anyone else?
16  A. And all the members of the delegation that came with him.
17  Jashnsaz, Kikousokhan, Alipour, Rajaeieh. There was an
18  individual by the name Gormi.
19  Q. Do you know who that is?
20  A. I had met this individual there only. I had not had any
21  close relationship with him beforehand. He is an individual at
22  a very high level within the foreign affairs ministry of Iran,
23  but I don't have much information about this individual.
24  Q. Okay. In addition to the Iranian individuals you
25  mentioned, was there anybody else at the meeting?

---

HC1PATI5          Zarrab - Direct          Page 602

1  A. There were others in there too that I did not know. Since
2  the minister came with his own delegation, it was a large
3  delegation, and there were others in that delegation.
4  Q. Where did the meeting take place?
5  A. It was at the Marriott Hotel in Ankara.
6  Q. And what was the purpose of the meeting?
7  A. Mr. Suleyman Aslan attended the first meeting. Again, just
8  as always, there was a topic of Iranians wanting to bring their
9  money that was in Japan over; so that was discussed. In other
10  words, they were trying to transfer their money in Japan into
11  Halkbank and that's what was discussed.
12      Aside from that, again, the Iranian's put pressure on
13  Mr. Suleyman on their ability to make direct payments on their
14  own. So that was the scope. There was only Mr. Suleyman Aslan
15  for Halkbank at that meeting.
16  Q. Okay. Now, you testified about two companies in Turkey
17  that would receive -- that would pay NIOC, Tupras and Botas; is
18  that correct?
19  A. Yes, that is correct, sir.
20      (Continued on next page)

---

HC13ATI6          Zarrab - Direct          Page 603

1  Q. What is Botas?
2  A. Botas is the company that is buying the gas.
3  Q. Were Iranian gas proceeds ever used to fund the purchase
4  and export of gold -- withdrawn. Let me ask a better question.
5      Were Iranian gold proceeds held at Halkbank between
6  2012 and 2013 ever used to purchase gold for export?
7      THE COURT: I think you said Iranian gold proceeds.
8  Do you want to ask that again?
9      MR. KAMARAJU: Third time is the charm hopefully, your
10  Honor.
11  Q. Were the proceeds from the sales of Iranian gas that were
12  held at Halkbank between 2012 and 2013 ever used to fund the
13  purchase of gold and export?
14  A. Yes.
15  Q. So, were there times when both oil, Iranian oil proceeds
16  and Iranian gas proceeds helped to fund the gold business that
17  you were doing?
18  A. That is correct, sir.
19  Q. Did there come a time when that stopped and you were only
20  using the proceeds from gas sales?
21  A. Yes.
22  Q. Why did that happen?
23  A. There were changes made to the embargo regulations in the
24  U.S. I will provide a very short summary of that.
25      NIOC, the Iranian government, the proceeds that they

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

HC13ATI6     Zarrab - Direct     Page 604

1 were receiving from their sales of oil, the crude oil, the
2 United States banned the use of that money in purchasing gold
3 and using it for purchase of gold.
4 Q. How did you learn about that?
5 A. I discussed this matter with Mr. Suleyman, and there was a
6 loophole in the regulation of the embargo, and this loophole
7 was identified by Mr. Hakan Atilla.
8 Q. How did you learn it was identified by Atilla?
9 A. During my meeting with Mr. Suleyman, Mr. Suleyman said that
10 Mr. Hakan Atilla had worked on the regulation, that he had
11 reviewed the regulations, and since the regulations said
12 "petroleum products," by pointing out the weakness in that
13 verbiage that was used, he said gas would not be counted as a
14 petroleum product.
15     And based on that, a brand new system and method was
16 designed within Halkbank for that.
17 Q. Okay. I don't think I'm going to ask you to draw that one
18 right now, but could you summarize what that new system
19 entailed?
20 A. It's pretty simple so I won't draw it, but if you want I
21 can show it on the diagram that is already there.
22     MR. KAMARAJU: Your Honor?
23     THE COURT: Sure.
24 A. At Halkbank, Sarmayeh bank had one account for euros or
25 Parsian had one account for euros. Normally, at a bank in an

HC13ATI6     Zarrab - Direct     Page 605

1 account for a certain currency, there would be only one such
2 currency account for a company.
3     So with the diagram that I had drawn, there was one
4 account for NIOC. So within the bank, a second account was
5 established for every one of these. And Tupras then sent oil
6 payments to NIOC's oil account separately, and Botas' was going
7 there separately. So they separated oil and gas payments. So,
8 they were not putting everything in one basket. They separated
9 it so they were putting it into two separate baskets.
10 Q. Why did they separate it?
11 A. Because the money that was coming into Tupras could only be
12 used to broker food trade or medicine or humanitarian aid.
13 However, the proceeds that were coming in through the gas
14 purchases, since the embargo regulation had said petroleum
15 products, that one was available to be used for gold trade.
16     So, after this, while doing gold trade from Sarmayeh
17 or Parsian, the money was coming to the gold company. If it
18 was for food trade, then it was coming from or through their
19 petroleum account.
20     So, over here, it was basically merging back together
21 again, but within the bank they had been separated based on
22 that purpose. So that's the short version of it.
23 Q. You can return to the witness stand. Thank you,
24 Mr. Zarrab.
25     Mr. Zarrab, the Iranian gas sale proceeds held at

HC13ATI6     Zarrab - Direct     Page 606

1 Halkbank, who did they ultimately belong to?
2 A. They were Iranians.
3 Q. Which Iranians?
4 A. The government of Iran.
5     MR. KAMARAJU: Mr. Chang-Frieden, can we pull up
6 Government Exhibit 1002-T and 1002 and go to page 41.
7 Q. Do you see where you say, "Parsian wanted to send our bank
8 200 million and they were going to transfer it over to us.
9 This site did not accept 202, they said we no longer accept
10 202."
11 A. Yes, I see that, sir.
12 Q. What were you saying there?
13 A. As I had mentioned yesterday, there are many accounts
14 within Halkbank belonging to Iranian banks. So, from the funds
15 that are at the Parsian bank for NIOC, 200 million Turkish
16 liras was supposed to be sent to the bank that I was working
17 with, which was the Parsian Bank.
18     THE INTERPRETER: Correction. To Sarmayeh Bank.
19 A. And we were to make the Iranian payments from there. So I
20 was explaining to the general manager, Suleyman Aslan, that
21 they said they would send over 200 million, but the 202 was not
22 accepted because 202 could not be accepted any longer.
23 Q. Do you know what that 200 million Turkish lira payment was
24 with regards to?
25 A. Since it's coming from Parsian, it's most likely it is for

HC13ATI6     Zarrab - Direct     Page 607

1 gas. Since it's Parsian, it is likely gas. Because the gas
2 payments were typically committing it to Parsian Bank.
3 Q. What's the date of that communication?
4 A. 28/5/2013.
5 Q. Does Aslan respond?
6 A. He would have responded. I can't see.
7 Q. Okay. What's he say in response?
8 A. He says, "I'm looking into it, Mr. Reza. There shouldn't
9 be such a restriction. There must be something else but I will
10 solve the problem, Mr. Reza."
11     MR. KAMARAJU: Mr. Chang-Frieden, can we please pull
12 up Government Exhibit 3799 and show it for identification.
13 Q. Take a moment to review the document, please.
14 A. I see it, sir.
15     MR. KAMARAJU: Can we turn to the next page, also.
16     THE WITNESS: Would it be possible to enlarge this a
17 little more? Yes, sir.
18 Q. Do you recognize Government Exhibit 3799?
19 A. I recognize it, sir.
20 Q. What is it?
21 A. This is a message for money that was sent from Parsian to
22 the Credit Institute for Development, that is under the
23 Sarmayeh Bank. It is a bank that we were working with.
24 Q. Let's turn to the first page of the exhibit. What are we
25 looking at here?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                          December 1, 2017

1 A. If we may go back to the SWIFT portion, because there was
2  an error and there was a portion about Halkbank, and I think
3  there was an error in conveying that portion so I want to
4  correct it.
5 Q. Okay.
6 A. So this message involves asking for transfer of 50 million
7  euros from Parsian's account that was within Halkbank.
8 Q. We'll come back to the SWIFT in a second. Let's go back to
9  the first page.
10     What are we looking at here, Mr. Zarrab?
11 A. It is an electronic mail.
12 Q. Who is it from?
13 A. It's from me, sir.
14 Q. Who is it to?
15 A. Mr. Hakan Atilla, sir.
16 Q. What is the date of the e-mail?
17 A. May 29, 2013, sir.
18 Q. How do you recognize the document?
19 A. It's my e-mail, sir; it's one that I had sent.
20 Q. What's the subject line?
21 A. Forward SWIFT 202 50 million.
22     MR. KAMARAJU: The government would offer Government
23  Exhibit 3799.
24     MS. FLEMING: Judge, can I just confer for one minute?
25     (Pause)

1     MS. FLEMING: Thank you, Judge.
2     MR. KAMARAJU: Your Honor, the government offers
3  Government Exhibit 3799.
4     THE COURT: I'll allow it.
5     (Government's Exhibit 3799 received in evidence)
6     MR. KAMARAJU: Can we publish that, please?
7     THE COURT: Sure.
8 Q. First, on the e-mail portion, under the "to" line, after
9  the e-mail address there, do you see where it says to
10  Mr. Alipour?
11 A. Yes I see that, sir. To Mr. Alipour enteghali bank.
12 Q. Do you recognize who Mr. Alipour is there?
13 A. Yes, sir. It's Mr. Alipour at NICO. He's the second
14  person after Mr. Jashnsaz.
15 Q. Do you know what enteghali bank is?
16 A. Enteghali bank means in Farsi language the transaction
17  between two banks. It's a bank-to-bank transfer.
18 Q. Let's turn to the next page. What is this?
19 A. It is a message, sir.
20 Q. What kind of message?
21 A. It is a communications message that is used between banks.
22 Q. Do you see at the top where it says, near the top, where it
23  says Parsian Bank?
24 A. I see it, sir.
25 Q. What is Parsian Bank?

1 A. It is a bank in Iran, sir.
2 Q. Do you see on this document, do you recognize what Parsian
3  Bank is supposed to represent?
4 A. I can see it, sir.
5 Q. Do you see below it, it says Credit Institute for
6  Development?
7 A. I see that as well, sir.
8 Q. Do you know what that is?
9 A. I know, sir.
10 Q. What is it?
11 A. This is a bank in Iran who is the receiver in Halkbank.
12  Sarmayeh and Bank Mellat typically worked with the Credit
13  Institute, and especially Bank Mellat would generally make its
14  payments through the Credit Institute.
15 Q. Remind us, what is Bank Mellat?
16 A. Mellat Bank is one of the largest banks in Iran.
17 Q. Going down to what appears to be the second section. Do
18  you see the line that starts 32A?
19 A. I see it, sir.
20 Q. At the top there. What information is being conveyed in
21  that section?
22 A. That's the effective date for the transaction, currency,
23  and the amount, the number.
24 Q. What amount is reflected here?
25 A. It is 50 million euros.

1 Q. What is the date of the transaction?
2 A. It's May 28, 2013.
3 Q. The next box or section, it starts 50K. Do you see that?
4 A. I see it, sir.
5 Q. What information is conveyed in this section?
6 A. It shows the customer name that initially made the order
7  for this wire.
8 Q. Who is list here as the customer?
9 A. N.I.G.
10 Q. Do you know what that is?
11 A. No, I don't know exactly. It might represent National
12  Iranian Gas, but I'm not sure.
13     MS. FLEMING: Objection, your Honor. Move to strike.
14     THE COURT: Overruled.
15 Q. The next box, 53A, what's that section? What is that
16  section intended to show?
17 A. It's the sender correspondent bank.
18 Q. What bank is listed there?
19 A. It is the Halkbank of Turkey Incorporated.
20 Q. Is that Halkbank?
21 A. Yes, sir.
22 Q. Then the next box down, where it says receiver's
23  correspondent, what information is that section supposed to
24  show?
25 A. This is the correspondent for the receiver, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

1 Q. What bank is listed there?
2 A. Halkbank of Turkey.
3 Q. Is that Halkbank?
4 A. Yes, sir.
5 Q. What does it mean that the sender's correspondent account
6   and the receiver's correspondent account is the same?
7 A. Since the transaction is occurring within the bank, between
8   accounts, that's why it would show the same under sender and
9   receiver. So this is a transfer within the bank.
10 Q. Who is the transfer from?
11 A. So the order was received from the N.I.G. company, but the
12   money is coming from Parsian Bank.
13 Q. Who is the transfer to?
14 A. To the Credit Institute for Development Bank.
15 Q. Why did you send this SWIFT to Hakan Atilla?
16 A. In order for Mr. Hakan Atilla to follow up on the
17   transaction.
18 Q. Why did you want Hakan Atilla to follow up on the
19   transaction?
20 A. Since it was a transaction that involved the international
21   department, since it was an inner bank transaction, I wanted
22   him to follow up and see that the money was transferred and
23   deposited into the account.
24      MR. KAMARAJU: Mr. Chang-Frieden, would you please go
25   back to Exhibit 1002-T, and go to page 45 on 1002-T.

1 Q. So do you see the message at the top there, 17/6/2013,
2   10:49:24.
3 A. English and Turkish views are different.
4 Q. One second. Is that right?
5 A. Yes, that's correct, sir.
6 Q. Do you see where you say, "Want to start the food business
7   as of today in a very fast manner. I hope it's okay with you."
8 A. Yes, sir.
9 Q. What did you mean by that?
10 A. We were to stop the gold trade right away and turn pretty
11   quickly to food trade only. That's what we were doing.
12 Q. Do you see where Aslan responds, "If there are no problems
13   related to the method and documentation of course you can
14   start."
15 A. Can I get the question one more time, please.
16 Q. One second. We just had a little hiccup there. Okay.
17      So, do you see where Aslan says, "As far as we spoke
18   with Mr. Hakan Atilla, we have no problems related" -- my
19   apologies. Do you see where Aslan says --
20      MR. KAMARAJU: The box above, Mr. Chang-Frieden,
21   sorry.
22 Q. "If there were no problems related to the method and
23   documentation, of course you can start."
24 A. Yes, sir.
25 Q. What did you understand him to be saying there?

1 A. So he's saying the final version of the method and the way
2   which I had drawn earlier, he's saying that's good and we can
3   go ahead and get started on that.
4 Q. What do you say in response?
5 A. I say "As far as we spoke with Mr. Hakan Atilla, we have no
6   problems related to methods and documentation."
7 Q. Do you see where Aslan says, "Fine, then start. But then
8   again, don't start too fast. You will accelerate later."
9 A. Yes, sir.
10 Q. What did you understand him to be saying there?
11 A. So he's saying you should go slowly, you should not just
12   get into it so fast and push it so much where you get a brand
13   new company, and start pulling 30 to 40 million of transactions
14   per day. Until the system is established, he wants the system
15   to be established first.
16 Q. Do you have an understanding of why he wanted the system to
17   be established first?
18 A. Whenever transactions or a new method is started, of course
19   there might be some hiccups.
20      MR. KAMARAJU: Mr. Chang-Frieden, can we turn to page
21   49 of the same exhibit.
22 Q. Do you see at the top where you say, "My dear general
23   manager, I may have some problems related to the bank's new
24   documentation guidelines related to our latest transactions."
25 A. Yes, sir.

1 Q. What did you mean by that?
2 A. So, the bank, the branch, had started to ask for additional
3   documents on top of the method and the way that we had already
4   agreed upon.
5 Q. Was that a problem?
6 A. It was a big problem.
7 Q. Why?
8 A. Because there was no actual transfer products, so the
9   document that they were requesting, requiring, was near
10   impossible to obtain.
11 Q. What does Aslan respond?
12 A. He says, "I will solve that subject. Don't worry,
13   Mr. Reza."
14 Q. Mr. Zarrab, I'd like to show you what's been marked for
15   identification as Government Exhibit 316-T. Do you recognize
16   that exhibit? It's not on the screen. Sorry.
17      Take a moment to review it, please.
18 A. Yes, sir.
19 Q. Do you recognize it?
20 A. I recognize it, sir.
21 Q. What is it?
22 A. It is a transcript of a phone conversation that was between
23   myself and Suleyman Aslan.
24 Q. Do you remember the call?
25 A. I remember it, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

1  Q.  Generally speaking, what was the call about?
2  A.  This was in regards to the document and the documentation
3  problem we had been experiencing, which we had messaged about
4  earlier.  In other words, about the requirements that were
5  being brought up by the lower ranked employees.
6          MR. KAMARAJU: The government would offer Government
7  Exhibit 316-T and ask to publish the transcript and play the
8  audio.
9          THE COURT: I'll allow it.
10         (Government's Exhibit 316-T received in evidence)
11         (Audio recording playing)
12         THE COURT: Counsel, we're going to take a two-minute
13  break.  I will excuse the jury first.
14         (Jury excused)
15         (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1          THE COURT: Can I see counsel for a minute.
2          (At the sidebar)
3          THE COURT: So, this is a topic I raised actually a
4  couple of times already with you all.  And it has to do with
5  Juror Number 10, who I mentioned to you on at least one or two
6  occasions.
7          I have a direct line of sight to him, and he's just
8  sleeping.  He's slept all day today.  Wakes up for a second or
9  so, has a sip of water, goes right back to sleep.  So it is my
10  plan to excuse him.
11         MR. ROCCO: It is formally Juror Number 11.
12         THE COURT: I think it's 10.
13         MR. ROCCO: He was 11.  He's moved up to 10.  I cannot
14  see him.  I've tried to see him.  But the monitor is in the
15  way.  So I can't --
16         MS. FLEMING: The only time I watched him, he was
17  awake.  But I didn't watch him today.
18         THE COURT: I've been watching him all day long.  And
19  I'm going to excuse him.  Do you have any objection?  It could
20  be over your objection if you object.
21         MS. FLEMING: I object.
22         MR. KAMARAJU: We don't have a problem.
23         THE COURT: I think I have the authority to do it on
24  my own, just as monitor of the proceeding.
25         MR. KAMARAJU: Yes, your Honor.

1          THE COURT: Just for the record, so today it's almost
2  100 percent of the time that he's been here.  It's now 1:40.
3  And on the other occasions, it was at least -- this is an
4  estimate -- 40 percent of the days, so that I don't think is
5  adequate.
6          MR. ROCCO: Your Honor, after you brought it to our
7  attention the first time, I noticed the second day he was
8  actually taking notes.
9          THE COURT: I'm not so sure he does.  So he woke up
10  today and took his pad, put it in his hand, and then as he was
11  looking at the pad, he went right back onto his hand and right
12  back asleep.  So maybe he was on that occasion.
13         MR. ROCCO: Your Honor, I haven't seen him for the
14  past two days.
15         MR. KAMARAJU: I won't take offense to any of this.
16         THE COURT: We'll do it at the end of the day.  Not in
17  front of anybody.  Just say thanks for your service and you're
18  excused.
19         MR. KAMARAJU: Are we still planning to go until
20  2 o'clock?
21         MR. ROCCO: Our objection is noted.
22         (Recess)
23         (Jury present)
24         THE COURT: We're going to, as I mentioned, end in
25  about 15 minutes for this week.  I'll give you instructions

1  before you leave and then we'll see you again on Monday.
2          MR. KAMARAJU: May I proceed, your Honor?
3          THE COURT: Sure.
4  BY MR. KAMARAJU:
5  Q.  Mr. Zarrab, when we broke we were talking about Government
6  Exhibit 316-T.  If we can pull that back up on everybody's
7  screen.
8  A.  Yes, sir.
9  Q.  So do you see on the first page where you say, "I mean,
10  they're different things.  The request from the support staff
11  at headquarters vary and change often."
12  A.  Yes, sir.
13  Q.  What did you mean there?
14  A.  So I tried to explain to Mr. Suleyman that there are some
15  requests coming that are beyond the scope of the method and the
16  system that we had agreed upon.
17  Q.  Could we turn to page three, please.  You see at the bottom
18  of the page, where you say, "So once the company that sold us
19  the goods cuts the final invoice, we can make the transfer to
20  them, then Mr. Hakan said that this might cause problems in the
21  future."
22          Do you see that block?
23  A.  Yes, I see that.
24  Q.  What did you mean there?
25  A.  So, this is within the Halkbank, the supplier company that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

| HC13ATI6 | Zarrab - Direct | Page 620 |

1  was requested, what we were saying was as the money comes to
2  Volgam Food, we want to be able to handle this transaction.
3  Whereas Mr. Hakan was saying it would be better if the customs
4  document was received and submitted also to be able to do this.
5  Q.  At the time of this call, were you speaking with Atilla
6  about documentation-related issues?
7  A.  Yes, there was a phone conversation during this time frame
8  of this call.
9  Q.  Do you remember generally what you said during that
10  conversation?
11  A.  So, there was an abnormal occurrence within the bank during
12  this time.  So, the low-ranked staff, the support staff, they
13  were not supposed to ask for these documents from us.  So, and
14  as I told the general manager, we have made a technical error
15  and we had sent a large amount.  And the low-ranked employees
16  at the bank who did not know about the situation -- and when I
17  say "the situation," I'm referring to employees that did not
18  know about the system not involving real food.  This resulted
19  in some suspicion amongst those individuals and they began to
20  request more documentation.
21       So, I'm trying to explain that, but as of this stage,
22  I didn't know what the problem was.
23  Q.  Could we turn to page six of the exhibit.  Do you see about
24  midway down the page, you said, "Mr. dear general manager, it
25  is sufficient, but, um, actually it does not get stuck at

| HC13ATI6 | Zarrab - Direct | Page 621 |

1  Mr. Hakan so much.  Where it gets really stuck is lower."
2  A.  Yes, I see that, sir.
3  Q.  What did you mean there?
4  A.  So, I'm saying this is not getting stuck at Mr. Hakan
5  Atilla, it's getting stuck at the lower ranks.
6  Q.  Do you see where Aslan goes on to say, "It does not get
7  stuck at Hakan Atilla either, does it?  Where it gets stuck is
8  lower, much lower."
9  A.  So, as you listen to the voice recording, you can actually
10  see that Aslan was overlapping as I was saying what I was
11  saying.  So in the transcript here, it looks different, but in
12  the actual recording, you can see that he's saying Hakan Atilla
13  just as I'm saying Hakan.  And thus, this is not two different
14  Hakans.  We're just talking about Hakan Atilla and it is
15  overlapping.  So we're both referring to Hakan Atilla.
16  Q.  Okay.  What is your response to what Aslan says?
17  A.  I say, "No, it's getting stuck lower."
18       MR. KAMARAJU: Mr. Chang-Frieden, can we pull up
19  Government Exhibit 261-T.
20  Q.  Mr. Zarrab, please take a moment to review that.
21  A.  Yes, sir.
22  Q.  Do you recognize it?
23  A.  I recognize it, sir.
24  Q.  What is it?
25  A.  It is a transcript of a phone conversation between myself

| HC13ATI6 | | Page 622 |

1  and Mr. Hakan Atilla.
2  Q.  Do you remember the call?
3  A.  I remember, sir.
4  Q.  What was the general subject of the call?
5  A.  There were two subjects, sir.  For one of those, they
6  thought that a transaction had erroneously arrived at Volgam
7  for gold.  And for the second one, with regards to the fake
8  customs documents that we had submitted to the bank, Mr. Hakan
9  Atilla was making phone calls and giving warnings about the
10  mistakes that we were making.
11       MR. KAMARAJU: The government would offer Government
12  Exhibit 261-T and ask to play the audio and publish the
13  transcript to the jury.
14       THE COURT: Okay.  I'll allow it.
15       (Government's Exhibit 261-T received in evidence)
16       (Audio recording playing)
17       MR. KAMARAJU: Your Honor, I intend to spend some time
18  on this call.  So do you want me to keep going?
19       THE COURT: No, it is just about 2 o'clock.  I think
20  we'll excuse the witness.  See you on Monday.
21       (Witness not present)
22       THE COURT: If the jury will just remain for a minute
23  I'll give you my instructions and you can go home too.
24       We've had a good week, and I appreciate your help and
25  your service.

| HC13ATI6 | | Page 623 |

1       So, between now and Monday, we'll pick up Monday at
2  9:15.  I remind you, please don't talk to each other about the
3  case or about anyone who has anything to do with it, until the
4  end of the case when you go to the jury room to deliberate on
5  your verdict.
6       Second, do not talk with anyone else about the case or
7  about anyone who has anything to do with it until the trial has
8  ended and you've been discharged as jurors.
9       Third, don't let anyone talk to you about the case or
10  about anyone or anything to do with it.  If someone should try
11  and talk to you about the case, please report that to Christine
12  or myself immediately.
13       Fourth, do not read any news or internet stories or
14  articles or blogs or listen to any radio or TV or cable reports
15  about the case or about anyone who has anything to do with it.
16       And fifth, please don't do any type of research or any
17  type of investigation about the case on your own.
18       So, good week, and I'll see you all 9:15 on Monday.
19  Thanks so much.
20       (Jury excused)
21       THE COURT: Maybe we can get a little preview of
22  what's next, what to anticipate for next week from the
23  government.
24       MR. KAMARAJU: Yes, your Honor.  I anticipate the
25  direct will be over for Mr. Zarrab on Monday.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 1, 2017

---

HC13ATI6        Page 628

 1   had --
 2       THE COURT: You know, I'm still as perplexed as I was
 3   before. Frankly, I mean, this is just off the cuff. I think
 4   between the government of the United States at the front table,
 5   and the defense at the back, including the bank owned by
 6   51 percent by the government of Turkey, if you aren't able to
 7   arrange for video depositions, I'm frankly mystified, both of
 8   you. I don't mean to blame one or the other. But it strikes
 9   me that where there is a will, there is a way, and this is not
10   even complicated. I didn't think these witnesses coming here
11   in person was all that complicated. We've been talking about
12   this a month or more. And certainly I don't think that a
13   deposition with you all from New York and witnesses there would
14   be complicated.
15       I'm still surprised. You're welcome still to try and
16   I urge you to do it. And I think if you put your minds to it,
17   I've always thought that it would happen. But it hasn't
18   happened.
19       MS. FLEMING: Thank you, Judge.
20       THE COURT: There is one or small thing. Not so the
21   small I guess. I raised with you, well, with counsel at
22   sidebar earlier in the week, unfortunately on I think two
23   occasions, it was my observation that one of the jurors in my
24   direct line of sight has been sleeping almost the whole trial.
25   I have to tell you today almost all day.

---

HC13ATI6        Page 629

 1       He seemed like a very nice fellow, but not
 2   surprisingly, when we did the voir dire, if you remember, in
 3   answer to my question what do you like to do in your spare
 4   time, he said sleep. And that maybe should have told us.
 5       So anyway, I think under the Federal Rules of Criminal
 6   Procedure 24(c) and cases including U.S. v. Peters, 617 F.2d
 7   503, that's a Seventh Circuit case, I think I have that
 8   authority.
 9       I think that there is perhaps an objection from the
10   defense and no objection from the government. But I plan to
11   notify that juror that, with thanks, we thank him for his
12   service up until now, but he's excused from the rest of the
13   trial.
14       I just don't think a juror can perform his duties, him
15   or her, unless they pay attention to what's going on in the
16   courtroom. And like I say, today to me was the icing on the
17   cake. Almost the entire time the juror was here, he was -- and
18   really sound asleep, too, I might say. Not just dozing.
19       So, anyway, that's what I plan to do. So have a great
20   weekend and I'll see you all Monday at 9:15.
21       (Adjourned until December 4, 2017, 9:15 a.m.)
22
23
24
25

---

Page 630

 1              INDEX OF EXAMINATION
 2   Examination of:                  Page
 3   REZA ZARRAB
 4   Direct By Mr. Kamaraju . . . . . . . . . . . 548
 5             GOVERNMENT EXHIBITS
 6   Exhibit No.               Received
 7   9503   . . . . . . . . . . . . . . . . . . . 573
 8   745   . . . . . . . . . . . . . . . . . . . 574
 9   238-T   . . . . . . . . . . . . . . . . . . 579
10   240-T   . . . . . . . . . . . . . . . . . . 582
11   244-T   . . . . . . . . . . . . . . . . . . 584
12   330-T   . . . . . . . . . . . . . . . . . . 587
13   306-T   . . . . . . . . . . . . . . . . . . 599
14   3799   . . . . . . . . . . . . . . . . . . . 609
15   316-T   . . . . . . . . . . . . . . . . . . 616
16   261-T   . . . . . . . . . . . . . . . . . . 622
17
18
19
20
21
22
23
24
25

---

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 4, 2017*

*Southern District Court Reporters*

Original File HC4pATIf.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 4, 2017

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  UNITED STATES OF AMERICA,
 4            v.                      S4 15 Cr. 867 RMB
 5  MEHMET HAKAN ATILLA,
 6                Defendant.
 7  ------------------------------x
 8
 9                            December 4, 2017
                              9:15 a.m.
10
11
12  Before:
13                 HON. RICHARD M. BERMAN,
14                                   District Judge
                                     and a jury
15
16
17                 APPEARANCES
18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL D. LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID W. DENTON, JR.,
21  DEAN C. SOVOLOS,
         Assistant United States Attorneys
22
23
24
25
```

```
 1
 2          (APPEARANCES Continued)
 3
 4
    HERRICK, FEINSTEIN LLP (NYC)
 5       Attorneys for defendant Atilla
    BY:  VICTOR J. ROCCO, Esq.
 6       THOMAS ELLIOTT THORNHILL, Esq.
         - and -
 7  FLEMING RUVOLDT, PLLC
    BY:  CATHY ANN FLEMING, Esq.
 8       ROBERT J. FETTWEIS, Esq.
         - and -
 9  LAW OFFICES OF JOSHUA L. DRATEL, P.C.
    BY:  JOSHUA LEWIS DRATEL, Esq.
10                 Of counsel
11
12  Also Present:
13       JENNIFER McREYNOLDS, Special Agent FBI
         MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14       MS. ASIYE KAY, Turkish Interpreter
         MS. SEYHAN SIRTALAN, Turkish Interpreter
15       MR. M. TEKIN ESENDAL, Turkish Interpreter
         MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

```
 1        (Pages 633-647 SEALED by order of the Court)
 2        THE COURT: We're going to do a head count of the
 3  jurors.
 4        The jurors are all here and we're going to start
 5  momentarily.
 6        MR. KAMARAJU: Your Honor, should we bring out
 7  Mr. Zarrab first?
 8        THE COURT: Hold on one second.
 9        (Jury present)
10        THE COURT: Good morning, everybody.  Nice to see you.
11  We're going to continue with the direct examination of
12  Mr. Zarrab.
13        THE DEPUTY CLERK: Before we begin, I'd like to remind
14  you that you're still under oath.
15        THE WITNESS: Yes.
16        MR. KAMARAJU: May I proceed, your Honor?
17        THE COURT: Yes.
18  REZA ZARRAB,
19     called as a witness by the Government,
20     having been previously sworn, testified as follows:
21  DIRECT EXAMINATION (Continued)
22  BY MR. KAMARAJU:
23  Q.  Good morning, Mr. Zarrab.
24  A.  Good morning, sir.
25  Q.  Now, do you recall when we broke we were talking about some
```

```
 1  telephone calls?  Do you remember that?
 2  A.  Yes, I remember, sir.
 3  Q.  I'd like to show you what's already been admitted as
 4  Government Exhibit 1002-T and 1002.  Do you have those on your
 5  screen?
 6  A.  Yes, sir.
 7        MR. KAMARAJU: Can we put it up on the jurors' screens
 8  as well, please.
 9  Q.  So, let's start at the top there.  Do you see where
10  Suleyman Aslan writes, "The totals may not be suitable for
11  actual food exports."
12  A.  Yes, I see that, sir.
13  Q.  What did you understand him to be saying there?
14  A.  Here he's saying that the wire amount that came from Iran
15  to my food company, since that amount was too large, he's
16  saying that it does not match up with an actual food trade
17  amount.
18  Q.  Do you see that he says, "I'm having them look at this."
19  A.  Yes, sir.
20  Q.  What did you understand him to be telling you there?
21  A.  That he's having that looked into, that he and his team
22  are looking into it.
23  Q.  Who typically was part of Suleyman Aslan's team?
24        MS. FLEMING: Objection.  Foundation.
25        THE COURT: Overruled.
```

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

1 A. It was Mr. Suleyman Aslan, and also his foreign
2 transactions people, and also that would be Mr. Hakan Atilla,
3 Mr. Levent Balkan, depending on the personnel that was working
4 there at that time.
5 Q. Do you see how you respond, "I will divide the figures even
6 more."
7 A. Yes, I see that, sir.
8 Q. What did you mean by that?
9 A. What I mean by that is I would tell them to send numbers
10 that are smaller than what had been sent. And I'm just saying
11 we would divide them further.
12 Q. Why was that necessary?
13 A. Just as Mr. Suleyman had said, for this to appear to be
14 compliant with an actual food trade transaction.
15 Q. If we can look down at the next message, where you say, "If
16 you see fit, we will make the numbers 5 million."
17 A. Yes, I see that, sir.
18 Q. What were you saying there?
19 A. What I'm saying to Mr. Suleyman, that if you see fit, we
20 can make it so that the large transfer amounts coming from Iran
21 could be in segments of 5 million each.
22 Q. How does he respond?
23 A. He says "That will be better."
24 Q. Do you see where you then say, "I'll have to give a lot of
25 bills of lading for big amounts anyway."

1 A. Yes, sir, I see that.
2 Q. What did you mean there?
3 A. What I meant there was to say, as I said before, these
4 ships were small, and in order to show this shipment, I would
5 need to provide many bills of laiding to show that many ships
6 were -- as if they were taking this shipment.
7 Q. Why would you need to submit many bills of lading?
8 A. As I mentioned before, these ships that were going from --
9 or going to Iran were small tonnage ships. The big tonnage
10 ships required bills of lading that could be traced, and the
11 smaller ships could not be traced in going from Dubai to Iran.
12 That's why the bills of lading would be needed.
13 Q. Why would it be a problem that larger vessels could be
14 traced?
15 A. Because no food product was ever being sent.
16 Q. How does he respond?
17 A. He says "Bills of lading are okay, but," then he asks, "can
18 you obtain inspection certificates."
19 Q. What are inspection certificates?
20 A. It's a company that would come and do an inspection on the
21 ship as to what products were on the ship, and also the quality
22 of the goods. So normally it is a company that assesses the
23 quality of the goods.
24 (Continued on next page)
25

1 Q. Okay. And what did you understand him to be asking you
2 when he asked you whether you could obtain those?
3 A. So he's asking me, what can you obtain? What can you
4 bring? That's what we're talking about in our conversation.
5 Q. And how did you respond?
6 A. I said, of course.
7 Q. Now, would you be able to obtain inspection certificates if
8 you weren't actually loading food on your vessels?
9 THE INTERPRETER: Could you repeat that question,
10 please.
11 Q. Sure. Would you be able to obtain inspection certificates
12 if you weren't actually loading food onto your vessels?
13 A. During that time period, we could not obtain any anyway.
14 Q. Why not?
15 A. Because there was no product or food being sent. There was
16 just no product out there.
17 Q. Do you see where he says: "Will be good; so let's make the
18 amounts smaller, like five to six million;" and then in the
19 next message, he says: "You had said you were loading smaller
20 ships"?
21 A. One minute. Yes. Yes, I see where he says that, "Will be
22 good; so let's make the amounts smaller, like five to six
23 million."
24 Q. Do you see where he goes on to say: "You had said you were
25 loading smaller ships"?

1 A. Yes.
2 Q. What do you understand him to be saying there?
3 A. In previous meetings as we talked about the system, I had
4 told them that big ships could be a problem in terms of bills
5 of lading and traceability. So he knew that I would be making
6 shipments to Iran on smaller vessels, which would not be
7 traceable. So he is saying, you had already told me that you
8 would be using smaller ships, and that's what we did. So he
9 refers to those vessels, basically.
10 Q. And had you discussed using smaller ships with the
11 defendant?
12 A. Of course. The method that we had reached an agreement on
13 with Mr. Suleyman was the method that had been suggested by
14 Mr. Hakan, and this is the method that was agreed on.
15 Q. Now --
16 A. And -- excuse me.
17 Q. Sorry?
18 A. And this was a part of that method.
19 Q. Now, what do you say in response?
20 A. I say: "Of course my general manager."
21 Q. And do you see where he responds: "It will be more
22 consistent that way"?
23 A. Yes, sir.
24 Q. What did you understand him to be saying there?
25 A. What he's saying here is that it would be more consistent

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 4, 2017

HC4PATI2          Zarrab - Direct          Page 654

1    and more real, and it would appear to be as if this is actual
2    trading if we were to use the smaller vessels, if we were to
3    reduce the amount.  That way, the bills of lading would be more
4    consistent with the trade.
5    Q.  Okay.  And do you see then, after you respond, he says
6    "Carg and Bun's figures are like that"?
7    A.  Yes, sir, I see that.
8    Q.  Okay.  What did you understand him to be saying there?
9    A.  He's saying that Cargill and Bunge have numbers such as
10   these.  These are two companies, large companies, that do food
11   trade with Iran, and he's saying that their numbers are like
12   that.  What he's say saying is since these companies are
13   involved in actual food trades, these are their numbers and you
14   should do it like their numbers are.
15   Q.  Are you familiar with Cargill?
16   A.  I had heard about them.
17   Q.  And how about Bunge?
18   A.  Yes, I had heard about Bunge as well.
19   Q.  Were they competitors of yours?
20   A.  Yes and no.
21   Q.  Okay.  Could you explain what you mean?
22   A.  I'll try and summarize the best I can.  No, we were not
23   competitors because they were sending real food and we were
24   not.
25        And the reason why I said, yes, we were competitors,

HC4PATI2          Zarrab - Direct          Page 655

1    is this.  Since they were also using the Iranian money that's
2    in Halkbank for their business, they were lowering the amount
3    that I was going to get out of Halkbank and utilize.  In other
4    words, the amount of money that would be left in Halkbank to be
5    used, the higher that amount, it was better for me.
6    Q.  And to be clear, Cargill and Bunge, they were depleting
7    that amount?
8    A.  Of course.  Cargill and Bunge were getting money out of
9    Halkbank as well, and they were utilizing those funds out of
10   Halkbank.  And as they used, that was depleting the amount for
11   sure.
12   Q.  I'd like to show you what's been marked as Government
13   Exhibit 316-T.  We listened to this call and this transcript
14   already.  Can you take a moment to look at that.  If we could
15   turn to page 6, please.
16        Now, near the bottom, do you see where you say: " I
17   mean, I want -- I mean, I want to say something, for instance.
18   I go to take care of SGS, then in no time, they call back and
19   say, 'no, it should be this.'  I resolve that, then two hours
20   later they call back and say, 'no, it should be like that.'"?
21   A.  Yes, I see that, sir.
22   Q.  What did you mean by that?
23   A.  During this time frame, there was a problem with the
24   transaction at the bank, and it was a serious problem.  And
25   because of the seriousness of the problem, the low-rank

HC4PATI2          Zarrab - Direct          Page 656

1    employees in the bank had become suspicious, and due to that,
2    more documents were being requested by them in addition to what
3    had been discussed and what had been agreed upon.
4        And in relation to that, what I'm saying here is that
5    they asked for SGS inspection documents.  So I go out, I take
6    care of that, I come back, and in no time, they happen to be
7    asking for something else, then.
8    Q.  Okay.  And we'll come back to the problem in a second.  Do
9    you see where he responds: "Okay, Mr. Reza.  I'll gather up all
10   my colleagues tomorrow and go over these one by one.  Then I'll
11   tell you clearly which documents are needed and which are not.
12   In fact, I'll even get the items removed that you had not been
13   asked to provide in the beginning.  That's because we got into
14   this business based on that, we have started doing this work
15   based on that"?
16   A.  Yes, I see that, sir.
17   Q.  What did you understand him to be saying there?
18   A.  What Mr. Suleyman is referring to here is that he does not
19   understand why these documents were being requested as well,
20   and he says, I will get my team together and I will look into
21   those.  He's saying that you -- and by "you" he's referring to
22   me.  He's saying there are things that we had agreed upon in
23   the beginning.  And I'll continue once that's translated.
24        So he's saying that you got into this business, and we
25   got into this business upon that agreement, and we need to and

HC4PATI2          Zarrab - Direct          Page 657

1    we will continue in that understanding.  And, in fact, what
2    he's also saying here is that any document that they're asking
3    for that you had not agreed to in the beginning, I'm going to
4    ask them to take those documents out and get them out of what
5    they had requested as well.
6    Q.  Now, you referred to an agreement.  What agreement are you
7    referring to?
8    A.  I'm referring to the method and system that we had agreed
9    upon.
10   Q.  And when you say "that we had agreed upon," who are you
11   referring to?
12   A.  I'm referring to the method that was designed with
13   Mr. Suleyman, myself and Mr. Hakan Atilla.
14   Q.  And approximately when was that agreement reached?
15   A.  So just as we are about to start the food trade, that we
16   come to an agreement on dates, let's do a correction.  What I
17   meant was I'm talking about the dates where we had come to an
18   agreement right before the final food trade plan had been put
19   in place and that we had agreed upon.  And I would think that
20   would be approximately fourth or fifth month of the year.
21   Q.  Okay.  Now, do you see on page 7, where you say -- it's
22   near the bottom, the third box down -- "I mean, I'm trying to
23   create a pool over there, you know.  Otherwise, it won't be
24   sufficient for all of this"?
25   A.  If I can look at the transcript from just a little higher

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

HC4PATI2          Zarrab - Direct          Page 658

1  than this to see what this sentence was. By looking at the
2  partial sentence here, I can't tell. If we can make it just a
3  little smaller so I can see. This is good. I understand.
4       So since we had turned to food completely after gold,
5  so I'm talking about that on the phone, and I'm saying since
6  the entire pool now consists of food and I'm saying if they
7  continue like this, if they continue to change the documents on
8  me, I cannot keep up with it.
9  Q. Now, if we can turn the page, please, do you see at the
10  top, you say: "I made a technical error there. For instance,
11  the numbers that we -- I sent were too high. I made a
12  technical error there"?
13  A. Yes, sir; I see that.
14  Q. What were you referring to?
15  A. What I'm saying here is that we had made a technical error
16  here by sending large numbers. So one of the technical errors
17  made was this one, and the second big technical error was that
18  in a wheat shipment, we had put on the Certificate of Origin
19  for the wheat as being Dubai. That was the second biggest one
20  we made.
21  Q. Why is that an error?
22  A. Because wheat doesn't grow in Dubai.
23  Q. And had you discussed that error with anybody at the bank?
24  A. Yes, with Mr. Hakan Atilla.
25  Q. And what did you discuss with Atilla about that error?

HC4PATI2          Zarrab - Direct          Page 659

1  A. So when some sensitivity arose during this time, Mr. Hakan
2  Atilla came to me and said, when the document shows the origin
3  of wheat as Dubai, in our meeting -- and in our meeting, what
4  he was saying was when the origin of the wheat shows Dubai,
5  that draws a lot of attention within the bank.
6  Q. And did he say why that was?
7  A. No. I already understood why that was.
8  Q. Now, did you say that that was at a meeting that he said that?
9  A. No, I meant a meeting on the phone. It's a conversation on
10  the phone.
11  Q. Now, if we can continue down on page 8, do you see where
12  you say: "So we get stuck in the lower ranks. It's not
13  related to Mr. Hakan"?
14  A. Yes, sir.
15  Q. What did you mean there?
16  A. What I mean is that we're not getting stuck with Mr. Hakan
17  Atilla. We are getting stuck with lower-ranked employees.
18  Q. I'd like to go back to Government Exhibit 1002-T and 1002,
19  and we're on page 47. Do you see at the bottom there, where
20  Suleyman Aslan says: "I will make a small decrease in the
21  amount of commission for transit food trade"?
22  A. Yes, sir; I see that.
23  Q. What did you understand him to be saying there?
24  A. I had asked him previously whether the commission collected
25  by the bank for food transactions could be reduced or not. So

HC4PATI2          Zarrab - Direct          Page 660

1  here, he's responding to that, and he's saying that he would be
2  making a small amount of reduction in the commission for
3  transit food trade.
4  Q. Was the bank earning commissions on the transit food trade?
5  A. Of course. They were taking commissions from both the
6  gold, as well as the food.
7  Q. And what was the bank's commission rate?
8  A. The highest amount of commission that I paid was one
9  percent.
10  Q. Is that on a per-transaction basis?
11  A. I'm talking about the number that is in-coming into our
12  account. I'm talking about a percentage on the funds that are
13  coming in. So what I said was it would be one percent
14  commission on the highest amount coming in.
15  Q. Okay. Now, could we turn to page 50 on 1002-T, please, and
16  do you see where Aslan says: "Good morning, Mr. Reza.
17  Mr. Hakan will probably call you today. There are two
18  subjects: A, the company whose name starts with the letter V,
19  its business line is not compatible. If possible, please
20  change that. B, there is another incompatibility related to
21  the capacity of the ships that do the transportation"?
22  A. Yes, I see that, sir.
23  Q. What did you understand him to be saying there?
24  A. Mr. Suleyman is referring to the phone conversation that we
25  listened to at court on Friday, and he's saying that Mr. Hakan

HC4PATI2          Zarrab - Direct          Page 661

1  would be calling me about two topics. One of them is the
2  company that starts -- the company name that starts with V,
3  which refers to Volgam.
4       So they were talking about a mixup, where gold was
5  coming in instead of food or food was coming instead of gold
6  and they were referring to that mix up. In the phone
7  conversation, Mr. Hakan was telling me to change that. So what
8  Mr. Suleyman is referring to here is that phone conversation;
9  so that first one, and for the second one, he is saying that
10  there is some incompatibility related to the ships.
11  Q. Okay. And do you see then where he goes on to say: "Just
12  listen to him, then we will talk again"?
13  A. Yes, I see that, sir.
14  Q. And what did you understand him to be saying there?
15  A. Here, he is saying, just listen to Mr. Hakan, and if
16  anything happens after that, we'll talk about it.
17  Q. And who are you referring to when you say Mr. Hakan?
18  A. Mr. Hakan Atilla.
19  Q. And how do you respond?
20  A. I'm saying, good morning, my general manager. I will look
21  into both of these matters.
22  Q. Can we look at Government Exhibit 261-T number. Pull it up
23  on everyone's screens, please.
24       Now, do you remember this?
25  A. Yes, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

HC4PATI2     Zarrab - Direct     Page 662

1 Q. Was this the telephone call you were just testifying about?

2 A. Yes, sir.

3 Q. Now, do you see on page 2, where Atilla says: "A transfer

4 came in...from a different company. Umm, it is in your thing.

5 It is in TL, and is approximately four and a half million"?

6 A. Yes, I see that.

7 Q. What did you understand him to be saying there?

8 A. Just as I had said earlier, here, he is talking about an

9 incompatibility with the amount that had been sent by a company

10 and the content or the nature of the goods involved in this

11 transaction. In other words, he's saying that gold and food

12 transactions were getting mixed up.

13 Q. Okay. And can we look down to the next thing he says:

14 "Since the field of business does not match the nature of those

15 things that we are doing, can you change this to the other

16 side?" Do you see that?

17 A. Yes, sir, I see that.

18 Q. What did you understand him to be saying there?

19 A. He's saying that change the company that the money had come

20 in to.

21 Q. What do you mean by "change the company"?

22 A. So what he's saying here is that, as an example, if this

23 were to be a gold transaction and the money had come in to

24 Volgam, he's saying change that to Safir before that

25 transaction.

HC4PATI2     Zarrab - Direct     Page 663

1 Q. And why would you need to make that change?

2 A. Because one of the companies was involved in food and the

3 other one was for gold trade.

4 Q. Now, you mentioned Volgam a couple of times, what is that?

5 A. Volgam is one of the companies that I own and that I used

6 within Halkbank. It works with food products.

7 Q. Okay. And how do you -- do you see where you say: "Why

8 does it not match, Mr. Hakan"?

9 A. Yes, sir.

10 Q. What were you asking?

11 A. I'm trying to figure out why the transaction is not

12 matching up. I'm asking Mr. Hakan so that I can understand why

13 there is that.

14 Q. And how does he respond to you?

15 A. Mr. Atilla says: "Umm, it -- because Volgam's, Umm, well,

16 its field of business has to do with the other side mostly, as

17 you know, for the most part, the precious assets."

18 Q. What did you understand him to mean when he said "its field

19 of business has to do with the other side mostly"?

20 A. Mr. Hakan Atilla thought that Volgam was for gold because

21 that's what it was established for in the beginning. It was

22 being used for gold trade, but that had been changed to food.

23 Q. Why does it matter that Volgam had been used for gold

24 before?

25 A. Because that is not possible to have food and gold all

HC4PATI2     Zarrab - Direct     Page 664

1 within one company, and we had separated those as gold and food

2 in the business. In other words, technically it's possible,

3 the company could sell both gold and food, but we had chosen to

4 separate those.

5 Q. And why had you decided to do that?

6 A. This was completely my own personal choice, just so that

7 the two companies did not get mixed up. In other words, so

8 that the documentation for the incoming transactions, and as

9 far as how they would close the transactions at the bank would

10 be easier, so we can follow up on those in an easier way.

11 Q. And what do you say to Atilla in response?

12 A. I say: "No, we changed that, Mr. Hakan. We submitted the

13 related documents to the bank months ago."

14 Q. Can we turn to page 3, please, and do you see where Atilla

15 says: "Then there's the matters with the bills of lading" --

16 around the middle of the page -- "As you know, we had talked

17 about this with you previously"?

18 A. Yes, I see that, sir.

19 Q. What did you understand him to be saying to you there?

20 A. So he is about to get into a conversation about bills of

21 lading. This would be a topic related to the smaller ship

22 matter that we had discussed earlier.

23 Q. And when you say when you discussed earlier, what are you

24 referring to?

25 A. In the previous conversation, I had mentioned this method

HC4PATI2     Zarrab - Direct     Page 665

1 with the smaller ships, and that's what I'm referring to.

2 Q. Do you see where Atilla then says: "Umm, now, of course,

3 with regard to the vessels named in there regarding the loads,

4 their loads need to comply with their capacities"?

5 A. Yes, I see that, sir.

6 Q. What did you understand him to be telling you there?

7 A. So what he's saying here is that the ships that are

8 mentioned on the documentation by name, these ships need to

9 comply with their own capacities. We need to have ships with

10 the right capacity on the documentation. So the products that

11 were shown as being loaded did not match up with the capacity

12 of the vessels.

13 Q. Why would that be an issue?

14 A. Because then the fakeness of the documents would be pretty

15 obvious to the bank personnel, and that the trade is not real

16 trade would be pretty obvious.

17 Q. Do you see where he says next: "Now, these vessels, umm,

18 some of them are very large vessels"?

19 A. Yes, sir.

20 Q. What do you understand him to be referring to?

21 A. What he's saying is that the ships that are here appear to

22 be much larger than the one that you had mentioned before. He

23 says there are 50,000-ton, 80,000-ton, 90,000 ton ships here.

24 Q. And do you see down at the bottom where he says: "You

25 know, those small ones, the ones you had declared previously"?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                      December 4, 2017

HC4PATI2          Zarrab - Direct          Page 666

1  A.  Yes, sir.
2  Q.  And on the next page, he goes on to say:  "That go in
3  between, these are not like these"?
4  A.  So he's saying that these are large ships.  These are not
5  like the small ships that I had mentioned going over to Iran.
6  Q.  Do you see a little further down, where he says:  "Umm,
7  therefore, umm, I would kindly ask that the guys take a look at
8  compliance between the loads and the tonnages"?
9  A.  Yes, I see that, sir.
10 Q.  And what did you understand him to be asking you to do?
11 A.  Here, he is saying that the documents should be prepared
12 more carefully and that the staff members should care to ensure
13 that the loading amounts match up with the capacities.
14 Q.  And what do you say in response?
15 A.  I say:  "Of course.  Do you mean that they should look at
16 the ones involving large vessels?"  I'm trying to figure out.
17 Q.  What were you asking him?
18 A.  So I'm trying to figure out what document had the error,
19 the large ships, the small ships?  They all seemed to be mixed
20 up.
21 Q.  And do you see where he responds:  "Umm, they should look
22 at the opposite.  The small ones as well.  Now, for example,
23 the bill of lading may be somewhat doable, you know, with the
24 large vessels, since the vessel is large"?
25 A.  He's saying they should look into both the big ship ones

HC4PATI2          Zarrab - Direct          Page 667

1  and the small ship ones, and he's saying that when the ships
2  are large, then there might be a possibility for a bill of
3  lading and that they should look into that.  Or what he's
4  saying is that with the big ships, there might be a possibility
5  of larger tonnage capacity, but with the smaller ships, that
6  would not be possible.
7  Q.  Okay.  And do you see where he says:  "As for the small
8  ones, the relatively smaller ones, such as vessels with
9  capacities between 13,000 and 14,000 tons, when their loads are
10 20,000, then that becomes different and odd"?
11 A.  Yes, sir, I see that.
12 Q.  What did you understand him to be telling you?
13 A.  What Mr. Hakan Atilla is saying here is that you made it
14 appear as if you had loaded 20,000 tons on vessels with a
15 capacity of 13 to 14,000 tons, and when that happens, that just
16 becomes odd.
17 Q.  Can we turn to page 5, and do you see just about the middle
18 of the page where Atilla says:  "The load should match up"?
19 A.  Yes.
20 Q.  What did you understand him to be saying?
21 A.  What Mr. Hakan Atilla is saying here is that the tonnage
22 capacity of the vessel should match up with the products that
23 you're saying you're loading onto that vessel.  So what he's
24 saying is that you cannot load 20,000 tons of product onto a
25 14,000-ton-capacity vessel, and they should be very careful

HC4PATI2          Zarrab - Direct          Page 668

1  about that.
2      So he's saying write it down as if you had loaded
3  14,000 tons of product onto a vessel with 14,000-ton capacity.
4  He's saying that they should be compatible.
5  Q.  I'd like to show you what's been marked for identification
6  as Government Exhibit 922.  Do you recognize this document?
7  A.  Yes, I recognize it, sir.
8  Q.  What is it?
9  A.  It's a customs declaration form, sir.
10 Q.  Is this one of the forms you previously testified about?
11 A.  Yes, sir.  It is one of the documents that I had testified
12 about before.
13 Q.  Was this used as part of your business?
14     THE INTERPRETER: Can you repeat that, please?
15 Q.  Yes, let me rephrase that.  Were these kinds of documents
16 used as part of your business?
17 A.  Yes, sir.  They were being used.
18     MR. KAMARAJU: Your Honor, the government would offer
19 Government Exhibit 922.
20     MS. FLEMING: Objection, your Honor, foundation.
21     THE COURT: I'll allow it.
22     (Government's Exhibit 922 received in evidence)
23     MR. KAMARAJU: Can we please publish.
24     THE COURT: Yes.
25 BY MR. KAMARAJU:

HC4PATI2          Zarrab - Direct          Page 669

1  Q.  So do you see at the top right there where it says, Dubai
2  Customs?
3  A.  Yes, I see that, sir.
4  Q.  What's that a reference to?
5  A.  It's the customs in Dubai.
6  Q.  Okay.  And why would you use forms related to Dubai customs
7  as part of your business?
8  A.  Because the food was being declared as if it was going from
9  Dubai.
10 Q.  And what's the purpose of this form?
11 A.  The purpose of this form is to show the name of the vessel,
12 what was loaded and that the product had been loaded on the
13 ship, and the customs, where the loading had been carried out.
14 Q.  Who typically completes this form?
15 A.  It would be the staff members that work in my company.
16 Q.  Would these forms be submitted to Halkbank?
17 A.  Yes, sir.
18 Q.  Let's walk through some of the fields that are in here.  Do
19 you see the field that says, Final Destination?
20 A.  Yes, sir.
21 Q.  What's that field supposed to represent?
22 A.  It's the final destination point or the country that the
23 product was destined for.
24 Q.  So what typically would be in this field as part of your
25 food business?

**A454**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 4, 2017

| HC4PATI2 | Zarrab - Direct | Page 670 |
|---|---|---|

1 A. Iran.
2 Q. Was any food actually exported by your companies from Dubai
3 to Iran?
4 A. My companies, nor I, have never sent any food to Iran.
5 Q. Okay. Do you see where it says, Exporter?
6 A. Yes, sir.
7 Q. What does that mean?
8 A. It's the field where the name of the company exporting the
9 food products would be written down.
10 Q. And then do you see further down where it says, Marks and
11 Number, in the second row?
12 A. Yes, sir.
13 Q. What is that a reference to?
14 A. Perhaps it was the code of the product or something.
15 Q. Okay. And the next column over, where it says, G/weight?
16 A. Yes.
17 Q. Okay. And what is that?
18 A. It's the weight, the gross weight.
19 Q. Is that gross weight figure what you and Atilla were
20 discussing previously?
21 A. I did not understand the question.
22 Q. Do you remember in the prior exhibit you and Mr. Atilla
23 were talking about tonnages?
24 A. Yes, I remember that, sir.
25 Q. Would the tonnage of a shipment be reflected on this

| HC4PATI2 | Zarrab - Direct | Page 671 |
|---|---|---|

1 document?
2 A. Yes. On this document here, it would be shown how much
3 products had been sent.
4 Q. And where on this document would that information be
5 reflected?
6 A. It would show up where it would say the total tonnage.
7 Q. Looking at the column, Country of Origin --
8 A. Yes, sir.
9 Q. -- what is that field supposed to represent?
10 A. The origin of the goods that were being shipped.
11 Q. Okay. And what would typically be listed in that field
12 here?
13 A. The origin of the goods that are being shipped.
14 Q. Okay. I'd like to show you what's been marked as
15 Government Exhibit 359-T for identification. Just take a
16 moment to review that.
17 A. Yes, sir.
18 Q. Do you recognize this exhibit?
19 A. Yes, I recognize it, sir.
20 Q. What is it?
21 A. It's the transcript of a phone conversation.
22 Q. Do you remember this call?
23 A. Yes, I remember, sir.
24      MR. KAMARAJU: Your Honor, if I could have one quick
25 second.

| HC4PATI2 | Zarrab - Direct | Page 672 |
|---|---|---|

1      (Pause)
2 Q. Did you participate in this call?
3 A. Yes, sir.
4 Q. Have you listened to a recording of this conversation?
5 A. Yes, I listened to it, sir.
6 Q. Did that recording accurately capture your conversation in
7 Turkish?
8 A. Yes, it reflected, sir.
9 Q. Who were you speaking with during this call?
10 A. Abdullah Happani.
11 Q. Did he work for you?
12 A. Yes, sir.
13 Q. And what was the general nature of this call?
14 A. Based on what I could see on this page, it appears that
15 it's about funds that were being sent, and it seems that some
16 funds had not been sent out of Halkbank yet, and we're just
17 talking about slowing that down, that kind of thing.
18      (Continued on next page)
19
20
21
22
23
24
25

| HC4PATI2 | Zarrab - Direct | Page 673 |
|---|---|---|

1 HC43ATI3          Zarrab - Direct
2 Q. So, those are related to the business you were doing at
3 Halkbank?
4 A. Yes, sir.
5      MR. KAMARAJU: The government would offer Government
6 Exhibit 359-T and ask to be able to play the audio, which is
7 marked 359-A.
8      MR. ROCCO: Subject to connection.
9      THE COURT: Sure. Did you also mean to play the prior
10 call?
11      MR. KAMARAJU: We had played that on Friday, your
12 Honor.
13      (Government's Exhibit 359-T received in evidence)
14      (Audio recording playing)
15 Q. Mr. Zarrab, do you remember that call?
16 A. Yes, sir, I remember it.
17      MR. KAMARAJU: Can we start at page two.
18 Q. Do you see near the bottom of the page, where Happani says,
19 "I mean, I have 23 million TL there, I have 4 million euros, I
20 mean, we're waiting for their things. Oh, did you say
21 Suleyman?"
22 A. Yes, I see that, sir.
23 Q. What did you understand him to be saying there?
24 A. What Mr. Abdullah Happani is saying and referring to is
25 that we had received 23 million Turkish liras and 4 million

**A455**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 4, 2017

| HC4PATI2 | Zarrab - Direct | Page 674 |
|---|---|---|

1  euros at the bank, but that we had not removed out of the bank
2  yet.
3  Q. What did you understand him to mean when he said, "Oh, did
4  you say Suleyman?"
5  A. Earlier in this conversation, just above this, there was a
6  mention of Suleyman by me, so he's just asking so what did you
7  mean by that.
8  Q. How do you respond?
9  A. I'm saying that we would be sending money to him tonight.
10 Q. Why would you send him money?
11 A. So, based on the agreement that we had made, the agreement
12 that we had had back in 2012, I was sending certain amounts as
13 agreed upon, based on the transactions to Mr. Suleyman as
14 bribe.
15 Q. Do you see where Happani asks you "How much are you going
16 to send?"
17 A. Yes, sir; I see that, sir.
18 Q. And you respond "I don't know. Take a look at what we came
19 in through food and such."
20 A. Yes, I see that.
21 Q. And then you go on to say "In total. Let's calculate
22 something based on that and send it out."
23 A. Yes, I see that, sir.
24 Q. What did you mean by that?
25 A. What I'm saying here is that look at all the transactions

| HC4PATI2 | Zarrab - Direct | Page 675 |
|---|---|---|

1  from Iran, a total of that, including food and everything, and
2  there would be a profit that would be generated from the
3  incoming amounts. I'm just telling him to calculate something
4  based on the incoming amounts and send something accordingly.
5  Q. Do you see where you say on that same page near the top
6  "That's because Suleyman does all -- all of the coordination at
7  the moment."
8  A. Yes, I see that, sir.
9  Q. What did you mean by that?
10 A. So, what I'm saying here is that since Mr. Suleyman is at
11 the top of the bank, and that he has charge of the bank, so I'm
12 saying he has all the power, all the control, and all the
13 coordination with regards to work.
14     MR. KAMARAJU: Can we turn to page four.
15 Q. Do you see near the top where you say, "You were careful
16 about those things, the bills of lading that you just turned
17 in, right?"
18 A. Yes, sir, I see that.
19 Q. What were you saying there?
20 A. So, what I'm saying here is that after the warning that I
21 had received and that I had conveyed to my staff, about the --
22 the numbers that were not matching in terms of tonnage on the
23 bills of lading, I'm just saying you pay attention to those
24 now, are you making sure that they are in compliance.
25 Q. Which warning are you referring to?

| HC4PATI2 | Zarrab - Direct | Page 676 |
|---|---|---|

1  A. I'm talking about the warning from Mr. Hakan Atilla.
2  Q. Mr. Zarrab, was there a time when you were using both the
3  gold and food systems?
4  A. Certainly.
5  Q. Was that after the bank had told you that gold would come
6  to an end?
7  A. Certainly. We did not do any food transactions or food
8  trade until which time when we had heard that we would get into
9  issues with the gold trade.
10 Q. I'd like to show you what's been marked for identification
11 as Government Exhibit 269-T.
12     THE COURT: We're going to take a two-minute break and
13 excuse the jury.
14     (Recess)
15     (Jury present)
16     THE DEPUTY CLERK: I remind you that you're still
17 under oath.
18     THE WITNESS: Yes, ma'am.
19     MR. KAMARAJU: May I proceed, your Honor?
20     THE COURT: Sure.
21 BY MR. KAMARAJU:
22 Q. I believe when we broke, Mr. Zarrab, we were looking at
23 Government Exhibit 269-T.
24 A. Yes, sir.
25 Q. Do you recognize that exhibit?

| HC4PATI2 | Zarrab - Direct | Page 677 |
|---|---|---|

1  A. Yes, I recognize it, sir.
2  Q. What is it?
3  A. It's a transcript of a phone conversation, sir.
4  Q. Do you remember this call?
5  A. Yes, sir, I remember it.
6  Q. Did you participate in it?
7  A. Yes, sir, I participated.
8  Q. Who else participated in it?
9  A. It's me, and the female individual, the secretary that had
10 transferred the call, and Mr. Hakan Atilla.
11 Q. Have you listened to a recording of this call?
12 A. Yes, sir.
13 Q. Did the recording accurately capture your conversation in
14 Turkish?
15 A. Yes, sir.
16 Q. Did this call relate to your business at Halkbank?
17 A. Yes, sir.
18     MR. KAMARAJU: Your Honor, the government offers
19 Government Exhibit 269-T, and ask for permission to publish the
20 transcript and play the audio.
21     THE COURT: That's allowed.
22     (Government's Exhibit 269-T received in evidence)
23     (Audio recording playing)
24 Q. Mr. Zarrab, do you remember that call?
25 A. Yes, I remember it.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 4, 2017

HC4PATI2          Zarrab - Direct          Page 678

1  Q.  Do you see about in the middle of the page where Atilla
2  says "I have a request, it is with regard to the trade that
3  took place previously."
4  A.  Yes, sir.
5  Q.  What do you understand that to mean?
6  A.  It is the gold trade, sir.
7  Q.  What was Atilla asking you?
8  A.  It just means that the transaction had not been closed, and
9  the gold had been received, and the money had been taken out of
10  Halkbank, but the export had not been carried out yet.  So this
11  is a reference to closing out that transaction where the export
12  was pending.
13        In other words, the documents pertaining to the gold
14  in the export had not been submitted to the bank at this point
15  yet.
16  Q.  Why did you need to submit documents to close out a
17  transaction?
18  A.  All the transfers that come into my accounts at Halkbank,
19  every single one of them need to be closed through some trade
20  transaction.  So, those that pertain to gold trade, they need
21  to be closed through documentation provided with gold export.
22  And those that pertain to food trade, then they would be closed
23  with documentation such as the one that you had shown earlier,
24  like the bill of lading, like that example document, those
25  would be provided for that to close the food trade transaction.

HC4PATI2          Zarrab - Direct          Page 679

1  Q.  So, was it a regular part of your business to submit those
2  kinds of documents to Halkbank to close transactions?
3  A.  Certainly.  This is the last leg for the transaction.  It
4  is the last leg of the transaction at Halkbank, the
5  documentation being submitted to the bank needs to be done --
6  this cannot be done without this leg.  So it is an important
7  part of the transaction.
8  Q.  So was there a process for your business and Halkbank to
9  make sure that the documents that were necessary to close the
10  transaction had been submitted?
11  A.  Yes, that was an important part of it.
12  Q.  Were you personally involved in that process?
13  A.  As shown in the example here, I was getting involved
14  whenever there was some problem with the transaction or some
15  delay or any issue between the branch staff and my own staff,
16  that's when I would get involved.
17  Q.  Were you personally involved in the underlying interactions
18  between the branch staff and your staff?
19  A.  So, that would be rare with regards to anything involving
20  the branch.  I was mostly involved in things at the
21  headquarters level.
22  Q.  Were you generally aware of what the process at the branch
23  entails?
24  A.  Yes, I know.
25  Q.  Did your business regularly receive documents from Halkbank

HC4PATI2          Zarrab - Direct          Page 680

1  as part of that process?
2        THE INTERPRETER: Could you repeat that question,
3  please.
4  Q.  Sure.  Did your business regularly receive documents from
5  Halkbank as part of the closing process?
6  A.  Now, I don't know how frequent that was happening, but of
7  course there was a need for them to communicate, to come to an
8  agreement about what had been submitted, what had been
9  submitted correctly to what had been missing, so that
10  communication was there.
11  Q.  Were you generally aware of what kind of documentation
12  might be involved in those communications?
13  A.  Certainly.  They would be be the documents that would pertain
14  to the transactions that are coming to the bank from Iran.
15  Q.  As part of your business, did you rely on documentation
16  provided to you from Halkbank?
17  A.  I could not understand the question completely.  If you can
18  repose.
19  Q.  As part of your business, did you rely on documents
20  provided to your business by Halkbank?
21  A.  Certainly.
22  Q.  I'd like to show you what has been marked for
23  identification as Government Exhibit 2511.  Do you recognize
24  this document?
25  A.  Yes, sir.

HC4PATI2          Zarrab - Direct          Page 681

1  Q.  What is it?
2  A.  It is an e-mail that was sent from personnel that deals
3  with the bank records at the Halkbank to my personnel that
4  deals with the transactions.
5  Q.  Which of your personnel is reflected on this document?
6  A.  Sinem, who was working with me during that time period, and
7  also Umut Bayraktar, who was another employee who was working
8  with me during that period.
9  Q.  Do you recognize the domain RoyalTK.com?
10  A.  Yes, sir, that's the domain that we use for our company's
11  e-mail communications.
12  Q.  Your employees that are reflected in this e-mail, were they
13  involved -- withdrawn.
14        Your employees that are reflected on this e-mail, did
15  their duties include being part of the closing process?
16  A.  Yes, sir.  In other words, it was related to the sending of
17  the documents in order to close the transaction at the bank.
18  Q.  I'd like to show you what had been marked as Government
19  Exhibit 2511-1 for identification.  Do you recognize the
20  document?
21  A.  Yes, sir, I recognize it.
22  Q.  Is this an example of the kind of document your company
23  would receive from Halkbank as part of the closing process?
24  A.  Yes, sir.  This is the system that would show the Iranian
25  trade that I was doing with Halkbank.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

HC4PATI2    Zarrab - Direct    Page 682

1  Q. What type of information is generally reflected on 2511-1?
2  A. The company that sends the funds, the amount --
3  THE COURT: Maybe you can go through the column
4  headings since it's in Turkish.
5  MR. KAMARAJU: My plan had been to publish it for the
6  jury, to go through the headings.
7  MS. FLEMING: My objection is to foundation and
8  hearsay.
9  THE COURT: It's going to come in either way.
10  MR. KAMARAJU: The government would offer Government
11  Exhibit 2511-1 and ask to publish it to the jury subject to
12  connection.
13  THE COURT: I'll allow it.
14  (Government's Exhibit 2511-1 received in evidence)
15  Q. Let's start with column A.
16  A. Yes, sir.
17  Q. What is column A?
18  A. Column A would be the name of the Iranian company that is
19  sending money to the company that's owned by me, Royal
20  Maritime.
21  Q. So, for example, what is Bank Keshavarzi?
22  A. Bank Keshavarzi is an Iranian bank, sir.
23  Q. Let's look at column B. What's column B?
24  A. That's the date that the payment had been sent, sir.
25  Q. And let's move on to column C, what's that?

HC4PATI2    Zarrab - Direct    Page 683

1  A. That would be the reference for wire transfer that was
2  sent, sir.
3  Q. And column D?
4  A. So, that would be the amount that had been sent from Iran.
5  Q. What is column E?
6  A. That would be the number for the pro forma invoice.
7  Q. Remind us what is a pro forma invoice?
8  A. When funds are sent to us from Iran, since the amount
9  that's being sent needs to be matched to a trade, either in
10  gold or in food, regarding that, when the money is being sent
11  we would provide a pro forma number to Iran. This pro forma
12  number would be indicated under the description section of the
13  message that would be sent from the Iranian bank as the money
14  is sent to us to -- in the message to Halkbank as the money is
15  sent to us.
16  And the documents that we provide to the bank would
17  match up with that number that was provided.
18  Q. Let's turn to the next column, column F. What's that?
19  A. That would be the total amount in U.S. dollar equivalency.
20  Q. What do you mean by that exactly?
21  A. In other words, it would show the U.S. dollar equivalency
22  for all of the amounts that they had sent.
23  Q. What about column G, what's that?
24  A. And that would show the amount that needs to be closed in
25  the euro currency in terms of the amount of money that was sent

HC4PATI2    Zarrab - Direct    Page 684

1  in total.
2  Q. I'd like to show you what's been marked for identification
3  as Government Exhibit 2511-2. Do you recognize this document?
4  A. Yes, sir.
5  Q. Is this an example of the kinds of documents you would get
6  as part of the closing process from Halkbank?
7  A. Yes, sir. This is a version of the document that in this
8  case would show more detail about the transactions.
9  MR. KAMARAJU: The government would offer Government
10  Exhibit 2511-2 subject to connection and ask to publish it.
11  MS. FLEMING: Objection foundation and hearsay.
12  THE COURT: I'll allow it.
13  (Government's Exhibit 2511-2 received in evidence)
14  Q. Let's do the same thing with this document. Let's start
15  with column A. What is column A?
16  A. That would be name of the company that is sending funds
17  from Iran to my company, Royal Maritime.
18  Q. What is column B?
19  A. The amount that pertains to the trade, in this case this is
20  gold, so that's the amount of gold.
21  Q. Do you see in column B at the top where it says GR in
22  parentheses?
23  A. You mean column B?
24  Q. Yes. Column B, row 3.
25  A. Yes, sir.

HC4PATI2    Zarrab - Direct    Page 685

1  Q. What is GR?
2  A. It's the amount of gold in grams.
3  Q. What is column C?
4  A. That's the unit price, sir.
5  Q. The unit price per any particular calculation?
6  A. Certainly. So it's in terms of the gold price, this would
7  be the unit price pertaining to the amount that was shown. So
8  this is the unit price for the unit that's shown in column B.
9  Q. What is column D?
10  A. D column is the section that shows the final destination
11  country that should be used for the export that's being carried
12  out.
13  Q. When you say used for the export that's being carried out,
14  what do you mean?
15  A. I will summarize shortly.
16  In gold trade, based on the United States embargo
17  regulations, sometimes the exports needed to show Iran as a
18  final destination point, and during the time periods where
19  there was softening in the sanctions, and that was not
20  mandatory, during those times we were also able to put down the
21  real destination point for gold, such as Dubai.
22  Q. So, for example, column D, row 5, where it says Iran for
23  Azar Rahbar.
24  A. Yes, sir.
25  Q. Was there gold actually shipped to Iran as part of that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 4, 2017

| HC4PATl2 | Zarrab - Direct | Page 686 |
|---|---|---|

1   transaction?
2   A. Sir, the gold trade that I was running with Iran, the bar
3     was never sent to Iran.
4   Q. Let's look at column E. What's that?
5   A. That's the type of goods.
6   Q. And what's reflected in column E, row 5, as the type of
7     good?
8   A. It's gold bars, sir.
9   Q. What about column F?
10  A. It is the date for the commercial invoice, sir.
11  Q. And column G?
12  A. And that's the invoice number for that.
13  Q. Let's just keep going to the right. Column H.
14  A. And that's the date for the customs declaration, sir.
15  Q. And column I?
16  A. That would be the number for the customs declaration, sir.
17  Q. What's column J?
18  A. The amount that is on the invoice in terms of its U.S.
19    dollar equivalent.
20  Q. And column K?
21  A. And that would be the amount in euro currency.
22  Q. What about column L?
23  A. That would be the U.S. dollar equivalent.
24  Q. And --
25  A. For the total.

| HC4PATl2 | Zarrab - Direct | Page 687 |
|---|---|---|

1   Q. What about column M?
2   A. And the M column would show that total in euro currency
3     now.
4        So if you were to look on the 15th row of this, so
5     between rows 5 and 15, the moneys that had been received from
6     Azar Rahbar company, the total for that, is shown on 15-M as a
7     total.
8   Q. What's the total listed there?
9   A. That would be 24,435,896 euros.
10  Q. I'd like to show you what's been marked for identification
11    as Government Exhibit 2511-3. What is this document?
12  A. So this would be the same template, this would be the Safir
13    Gold version of the Royal Maritime document that was there.
14    And Safir is a company that I own.
15  Q. So, this document has the same information in it but for a
16    different company?
17  A. Yes, it is exactly the same.
18       MR. KAMARAJU: The government would offer Government
19    Exhibit 2511-3, subject to connection.
20       MS. FLEMING: Objection. Foundation and hearsay.
21       THE COURT: I'll allow it.
22       (Government's Exhibit 2511-3 received in evidence)
23  Q. I'd like to show you what's been marked for identification
24    as Government Exhibit 2511-4. What's this?
25  A. This is the Excel table that shows the detailed view in the

| HC4PATl2 | Zarrab - Direct | Page 688 |
|---|---|---|

1   same way as it was shown earlier for the other.
2   Q. So, does this document show the same information but for a
3     different company?
4   A. Yes, but the destination point here would be shown
5     different.
6       MR. KAMARAJU: The government would offer Government
7    Exhibit 2511-4 subject to connection.
8       MS. FLEMING: Objection, lack of foundation and
9    hearsay.
10      THE COURT: I'm going to allow it.
11      (Government's Exhibit 2511-4 received in evidence)
12      MR. KAMARAJU: Can we publish that for the jury,
13   please.
14  Q. Mr. Zarrab, do you see column D?
15  A. Yes, sir.
16  Q. I think it says Varis Ulkesi?
17  A. Yes, sir.
18  Q. What does that represent?
19  A. That's the final destination point for the gold.
20      (Continued on next page)
21
22
23
24
25

| HC4PATl4 | Zarrab - Direct | Page 689 |
|---|---|---|

1   Q. Now, could we scroll down to row 2429, please. Okay. So
2     remind us what column A represents again?
3   A. That's the name of the company that is sending money to us
4     from Iran, sir.
5   Q. Okay. And who is the customer reflected in row 2429?
6   A. It is Toseh Tejarat, sir.
7   Q. What is that?
8   A. It is the front company that is being used by Sarmayeh
9     Exchange that was shown on the gold diagram that I had drawn
10    earlier.
11  Q. Let's scroll over to column D for that same row.
12  A. Yes, sir.
13  Q. What's listed as the country of destination here?
14  A. Iran, sir.
15  Q. And what's the date of the transaction?
16  A. The date of the transaction, although it would not show it
17    here, this is the date for the invoice, which is April 24,
18    2012. In the other document, I would be able to see the
19    transaction date, but what I can say is there would not be much
20    of a difference between the incoming date and the invoice date;
21    so they would be close together.
22  Q. Let's scroll down to -- well, just to be clear, what is the
23    invoice date, then, for this transaction?
24  A. It is 4-24-2012, sir.
25  Q. Now, let's scroll down, please, to row 2474, and who is the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

1   Iranian customer for this transaction?
2   A. It's the same, Toseh Tejarat, sir.
3   Q. And what's listed here as the country of destination?
4   A. United Arab Emirates, sir, in other words, Dubai.
5   Q. And what is the invoice date for this transaction?
6   A. It is 8-3-2012, sir.
7   Q. Okay. And can we now scroll down to 3057, please. Who is
8     the customer in this transaction?
9   A. It's Toseh Tejarat, sir.
10  Q. What is listed as the country of destination here?
11  A. It's Iran, sir.
12  Q. What is the invoice date for this transaction?
13  A. It's 2-21-2013, sir.
14  Q. Okay. For the three transactions that we just looked at,
15    was the gold involved in those transactions all shipped to the
16    same country?
17  A. All the documentation, no, but in reality, yes.
18  Q. Okay. So let's talk about reality. In reality, what
19    country was the gold shipped to?
20  A. All of the gold involved in real trade was exported to
21    United Arab Emirates.
22  Q. So why did the documentation sometimes list it as going to
23    Iran?
24  A. This is not something that involves me or my personnel. In
25    other words, this is not something that would be decided by

1   myself or my personnel. This is something that comes from the
2     bank.
3   Q. Who did you discuss it with at the bank?
4   A. There were times that I discussed it with Suleyman Aslan,
5     and there were times that I discussed it with Mr. Hakan Atilla.
6       MR. KAMARAJU: Can we please bring up Government
7     Exhibit 229-T, and this has been previously admitted; so I ask
8     that we publish it from page 2.
9       And, your Honor, this is one of the calls that we had
10    previously not played the recording for; so I would ask to be
11    able to play the recording?
12      THE COURT: Okay. Do you want to start with that?
13      (Audiotape played)
14  BY MR. KAMARAJU:
15  Q. Mr. Zarrab, do you remember having that call?
16  A. Yes, sir.
17  Q. And who were you speaking with?
18  A. It's Abdullah Happani and myself, sir.
19  Q. And does Government Exhibit 229-T capture the Turkish part
20    of that conversation?
21  A. I did not understand that question, sir.
22  Q. Sure. Is Government Exhibit 229-T an accurate reflection
23    of that conversation?
24  A. Yes, sir, it reflects so.
25  Q. Okay. Do you see at the top where you say: "I talked to

1   Hakan"?
2   A. Yes, sir, I see it.
3   Q. Who is Hakan?
4   A. Hakan Atilla, sir.
5   Q. Do you see a little later down where you say: "Also, call
6     that Mr. -- Mr. Zihni and tell him that Mr. Riza had talked to
7     Mr. Hakan, and that there was a problem but it has been
8     resolved"?
9   A. Yes, I see that, sir.
10  Q. Who is Mr. Hakan?
11  A. Hakan Atilla, sir.
12  Q. And what did you mean when you said "there was a problem
13    but it has been resolved"?
14  A. So since the final destination point for gold was not
15    determined yet, whether it should be Iran or Dubai, that needed
16    to be clarified.
17  Q. When you say the final destination needed to be clarified,
18    are you referring to documents?
19  A. Certainly. I'm talking about what should be shown on the
20    document, whether it's Dubai or Iran.
21  Q. And what had you spoken about with Atilla?
22  A. So he was going to look into it and research it, whether it
23    should be Iran or Dubai. For us, it was easier for us to write
24    down United Arab Emirates.
25  Q. Why would it be easier?

1   A. Because when the final destination point indicated on the
2     document showed the actual, the real destination point, we were
3     able to use a shipment company in order to send the gold. And
4     during those periods when we could send gold with a shipping
5     company, the sending or shipment of the gold was costing us
6     much less, and we were also able to insure it, and we were able
7     to send it in a more secure way.
8   Q. Why would writing Iran on the declaration prevent you from
9     using a shipping company?
10  A. Because a shipping company could not write Iran on a
11    document when the goods are being sent to Dubai. This was a
12    technical issue, and the only way that we could send it that
13    way was through couriers.
14  Q. Do you see later on on this call, where you say: "Umm, for
15    the exports" -- it's near the top. You say: "Umm, for the
16    exports write 'Transit to Iran through Dubai' on the
17    declarations again. It may become necessary for you to go back
18    to passengers again"?
19  A. Yes, sir.
20  Q. What did you mean there?
21  A. What I'm saying here is that you should write "transit to
22    run through Dubai" on the customs declarations because we may
23    need to go back to the passengers again.
24  Q. And why were you instructing him to write "transit to Iran
25    through Dubai"?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

1   A.  Because at the request of the bank, we may need to change
2   the final destination point that was being shown as Dubai to
3   show as Iran.
4   Q.  And who did you speak with at the bank about that?
5   A.  Previously, I had talked to Mr. Suleyman Aslan, and I had
6   also talked with Mr. Hakan Atilla.
7   Q.  Okay.  Do you see where Happani responds:  "That would be
8   bad"?
9   A.  Yes, I see that, sir.
10  Q.  Why would it be bad?
11  A.  Because the cost would increase, that's number one.  And as
12  a second point, when we go back to couriers and we look at the
13  amount involved in gold trade, for example, in order to be able
14  to export 500 kilograms in a day, there was a need for 15
15  people.  So operationally, this is very difficult and it's very
16  costly.
17  Q.  Do you see where you respond:  "Brother, there is no other
18  way.  That is what the regulations indicate.  Do that for ten
19  days -- for a week"?
20  A.  Yes, sir; I see that.
21  Q.  What did you mean?
22  A.  So I'm trying to explain to Abdullah, it's not like it's up
23  to me.  This is the request from the bank, and whatever we
24  gotta do, we gotta do.
25  Q.  How did you learn that that is what the regulations

1   indicate?
2   A.  I mean, with -- when I had conversed with Mr. Hakan, he had
3   said that he was still looking into it, and he would report on
4   it.
5   Q.  Okay.  And when you say Mr. Hakan, who are you referring
6   to?
7   A.  Mr. Hakan Atilla.
8   Q.  And what regulations are you referring to?
9   A.  I'm talking about the embargo regulations.
10  Q.  Which embargo?
11  A.  The embargo and sanctions of the United States.
12  Q.  Now, do you see where you say:  "They should, umm, review
13  the regulations.  This is what the regulations say at the time.
14  Okay?"
15  A.  Yes, sir; I see that.
16  Q.  What did you mean by that?
17  A.  So I'm saying the bank should look into the regulations
18  and, right now, that's what the regulations say.
19      MR. KAMARAJU:  Your Honor, I'm not sure what time you
20  plan to take a lunch break.  I was going to change to another
21  section.
22      THE COURT:  We'll go for another ten minutes or so.
23  Q.  All right.  Now, Mr. Zarrab, between -- withdrawn.
24      Mr. Zarrab, did you conduct food business with Iranian
25  oil proceeds of Halkbank?

1   A.  I did, sir.
2   Q.  Okay.  And I'm going to direct your attention to
3   December 17th, 2013.
4   A.  Yes, sir.
5   Q.  What happened on that day?
6   A.  I was detained.
7   Q.  Who detained you?
8   A.  It was the financial unit in Turkey.
9   Q.  Okay.  Were you detained by Turkish law enforcement?
10  A.  Yes, sir.
11  Q.  Were you ever placed in prison in Turkey?
12  A.  Yes, I was later arrested and was sent to prison.
13  Q.  Were you ever released?
14  A.  Yes, I was released.
15  Q.  How did you secure your release?
16  A.  So my lawyers came, we conversed, and I was released.
17  Q.  And did you make any payments in connection with your
18  release?
19  A.  Yes, I did, sir.
20  Q.  Were those payments bribes?
21  A.  Partly.
22  Q.  After you were released, did you make any efforts to
23  restart your business?
24  A.  Yes, sir.
25  Q.  What did you do to restart your business?

1   A.  I talked to Halkbank again.
2   Q.  Okay.  So let's just start at the beginning.  What happened
3   after you were released?
4   A.  After a while, I got in contact with Halkbank in order to
5   be able to start the trade up again.
6   Q.  Who did you speak with at Halkbank?
7   A.  With the general manager of Halkbank.
8   Q.  And at that time, who was with the general manager of
9   Halkbank?
10  A.  Mr. Ali Fuat Taskinoglu.
11  Q.  What happened to Suleyman Aslan?
12  A.  So while I was in prison, after the 17th of December 2013,
13  the general manager of the bank, Suleyman Aslan, was changed.
14  Mr. Suleyman was also in prison.
15  Q.  Okay.  What did you speak with Taskinoglu about?
16  A.  I said I wanted to continue with my business in the same
17  system again.
18  Q.  And how did he respond?
19  A.  So we held a meeting that included a few individuals from
20  the branch where we were banking and also some individuals from
21  the foreign transactions department at headquarters.  In other
22  words, Mr. General manager sent me to another floor for foreign
23  transactions.
24  Q.  And do you remember who was at that meeting?
25  A.  Yes, there were a few people from the branch and Mr. Hakkan

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

| HC4PATI4 | Zarrab - Direct | Page 698 |
| --- | --- | --- |

1  Aydogan was there.
2  Q.  Was Levent Balkan there?
3  A.  No, sir.  Mr. Levent Balkan was not working at Halkbank at
4    that time.
5  Q.  What did you talk about at that meeting?
6  A.  We talked about the documents, the documentation system
7    that would be needed at the bank in order to restart the
8    business.
9  Q.  And what kinds of documents were those?
10  A.  Well, I cannot remember because the list was so long.
11  Q.  Okay.  Were there any documents in particular that
12    concerned you?
13      THE INTERPRETER: Could you repeat that, please.
14  Q.  Yes.  Were there any documents in particular that concerned
15    you?
16  A.  For example, they were asking us to do the trade through
17    letters of credit.
18  Q.  Okay.
19  A.  And as far as documentation, there were many other
20    documents as well.
21  Q.  Okay.  What did you do then?
22  A.  I left the bank, and then I had a conversation with
23    Mr. General Manager again, and I gave information to
24    Mr. General Manager about the documents that I would not be
25    able to submit.

| HC4PATI4 | Zarrab - Direct | Page 699 |
| --- | --- | --- |

1  Q.  What did you tell him?
2  A.  So I said the letter of credit would not work.  I would not
3    be able to continue with the transaction involving a letter of
4    credit, and I stated that I could do it with the existing --
5    with the way that it was working in the past.  In that system,
6    I could do it.
7  Q.  How did he respond?
8  A.  He said he would look into it and get back to me.
9      MR. KAMARAJU: Your Honor, is this a good time or
10    should I keep going?
11      THE COURT: No, I think we will take a lunch break.
12    We'll excuse the jury.  It's quarter to 1:00.  I'll ask you to
13    be back at 2:00.
14      (Jury not present)
15      (Witness temporarily excused)
16      THE COURT: Okay.  We'll see everybody at 2:00.
17      MS. FLEMING: Thank you, Judge.
18      MR. LOCKARD: Thank you, your Honor.
19      (Luncheon recess)
20
21
22
23
24
25

| HC4PATI4 | Zarrab - Direct | Page 700 |
| --- | --- | --- |

1      A F T E R N O O N   S E S S I O N
2      2:08 P.M.
3      (In open court; jury present)
4      THE COURT: Okay.  Please be seated, everybody.
5      THE DEPUTY CLERK: Sir, again, before we begin, I'd
6    like to remind you that you're still under oath.
7      THE WITNESS: (In English)  Yes.
8      MR. KAMARAJU: May I proceed, your Honor?
9      THE COURT: Yes.
10  BY MR. KAMARAJU:
11  Q.  Now, Mr. Zarrab, I think when we broke for lunch, we were
12    talking about your efforts to restart your business.  Do you
13    remember that?
14  A.  Yes, sir.
15      MS. FLEMING: I'm sorry, your Honor, could the
16    interpreter speak louder, please.
17      THE COURT: Please sit down.  Go ahead.
18  Q.  Now, I believe you were testifying about a meeting you had
19    with Ali Fuat Taskinoglu?
20      THE COURT: You have to speak a little louder.
21  A.  Yes, sir.  I was talking about the meeting I had with Ali
22    Fuat Taskinoglu.
23  Q.  Why don't you tell us what happened at that meeting?
24  A.  In the second meeting, we talked about the documents that I
25    will submit to the bank.  He told me that I have to use a

| HC4PATI4 | Zarrab - Direct | Page 701 |
| --- | --- | --- |

1    company, a different company, which I do not own, for food
2    transactions.
3  Q.  Did he tell you why you needed to do that?
4  A.  I think there was too much coverage in the media related to
5    the documents that I gave to -- I mean, too many documents were
6    around in the media related that they are false documents
7    before December 17.
8  Q.  What media coverage are you referring to?
9  A.  When I was detained on December 17, one of the allegations
10    against me was that the documents that we used were false
11    documents.  That's why.
12  Q.  Now, how did you respond to Ali Fuat's request?
13  A.  I said, yes, all right, we can utilize a different company,
14    but I reiterated that I would like to use my own company for
15    gold trade.
16  Q.  Why did you want to use your own company for gold trade?
17  A.  Because there were exports in gold trades, and I would like
18    my company to be involved in those gold trades, to those
19    exports.
20  Q.  Was there anything else discussed at that meeting?
21  A.  He told me he will get back to me to finalize the
22    documentation issue.
23  Q.  Approximately when was this meeting?
24  A.  I don't remember the exact date.  It was a couple of months
25    after I was released from jail.  Should be like mid-2014.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 4, 2017

| HC4PATI4 | Zarrab - Direct | Page 702 |
| --- | --- | --- |

1  Q.  And when were you released from jail?
2  A.  February 28th, 2014.
3  Q.  So you mentioned this meeting was a few months after that;
4  is that right?
5  A.  Yes, a couple of months later, yes.
6  Q.  What, if anything, happened after that meeting?
7  A.  We had another meeting.  I had three or four meetings with
8  Mr. Ali Fuat, approximately.  In one of them, Mr. Hakkan
9  Aydogan was also present, and in one of them, one of the
10 meetings, Mr. Hakan Atilla.  So lastly, the bank asked for an
11 inspection certificate.
12 Q.  Okay.  So let's take those one by one.  So you mentioned a
13 meeting with Ali Fuat where Hakkan Aydogan was there; is that
14 right?
15 A.  Yes, sir.
16 Q.  What did you talk about at that meeting?
17 A.  The meeting was about the documentation that will be
18 submitted to the bank and also another company, which has
19 nothing to do with me, to use for food trade.
20 Q.  Okay.  And what was the purpose of that other company?
21 A.  In the trade that was after I was detained and released, it
22 was not appropriate for me to be seen as the owner of a company
23 which is doing the food trade.
24 Q.  You also mentioned a meeting with Ali Fuat in which Atilla
25 was present; is that right?

| HC4PATI4 | Zarrab - Direct | Page 703 |
| --- | --- | --- |

1  A.  Yes, sir.
2  Q.  And can you tell us what was discussed at that meeting?
3  A.  In that meeting, the inspection certificate demand from the
4  bank was discussed.
5  Q.  And what do you mean by the inspection certificate demand?
6  A.  In addition to all the previous documents that we have
7  already submitted to the bank, in addition to the documents
8  that we have submitted before my arrest, with the
9  recommendation of Mr. Hakan, an inspection certificate was also
10 demanded by the bank.
11 Q.  Who do you mean when you say Mr. Hakan?
12 A.  Mr. Hakan Atilla.
13 Q.  And what exactly is an inspection document that you were
14 talking about?
15 A.  This is a document which indicates the type of the product,
16 where it was sent, where it was loaded, where it will be
17 discharged, et cetera.
18 Q.  Okay.  And what was the nature of the request from the
19 bank?  What did they ask you specifically?
20 A.  Mr. Hakan told Mr. Ali Fuat Taskinoglu that asking or
21 demanding an inspection certificate would be good for the bank
22 and for the bank's line of business.
23 Q.  What do you mean by "line of business"?
24 A.  For the bank to stay in the secured position related to
25 documentation, that's why.

| HC4PATI4 | Zarrab - Direct | Page 704 |
| --- | --- | --- |

1  Q.  Did you respond?
2  A.  Yes, sir.
3  Q.  What did you say?
4  A.  I said, okay, yes.
5  Q.  Now, at this time, had you begun planning to physically
6  send food products?
7  A.  No, sir.
8  Q.  How would you get an inspection report?
9  A.  A couple of -- the names of a couple of companies were
10 discussed which were used by the Iranians.
11 Q.  Okay.  Tell us about that discussion?
12 A.  There were a couple of companies which were used by the
13 Iranians, which also the bank was familiar with.  The names
14 were SGS, Kotechna and Baltic and those names were discussed in
15 that meeting.
16 Q.  And who brought those names up?
17 A.  These names were among the names that were accounted by
18 Mr. Hakan Atilla that they are favorable by the bank.
19 Q.  Now, did you say, during that meeting, that you would now
20 be physically sending food?
21         THE COURT:  That you would what?
22 Q.  That you would now be physically sending food?
23 A.  No.  I never spoke about that subject, no.
24 Q.  Did you tell anybody, during that meeting, that you would
25 be making physical exports of food?

| HC4PATI4 | Zarrab - Direct | Page 705 |
| --- | --- | --- |

1  A.  In none of the meetings that I have made after
2  December 17th with the bank, I never mentioned that I'm going
3  to do physical food exports because there was no such subject.
4  Q.  What do you mean by that?
5  A.  Because I have never sent physical food products to Iran.
6  Q.  What, if anything, happened after that meeting?
7  A.  We continued our gold and food trade right where we left
8  it.
9  Q.  So the bank agreed to continue working with you?
10 A.  Yes, sir.
11 Q.  Now, did you agree to bribe anyone at the bank after that?
12 A.  I have never bribed any Halkbank employee after
13 December 17.
14 Q.  So to be specific, did you offer bribes to Ali Fuat?
15         THE INTERPRETER:  I'm sorry?
16 Q.  Did you offer bribes to Ali Fuat?
17 A.  Neither I made any propositions to Ali Fuat Taskinoglu to
18 give him a bribe, nor did he ever ask me to do something like
19 that.
20 Q.  Were you able to restart your business at Halkbank?
21 A.  Yes, sir.  Yes.  I continued my trade in the old fashioned
22 way.
23 Q.  And when you say "the old fashioned way," what are you
24 referring to?
25 A.  With gold and food.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 4, 2017

| HC4PATI4 | Zarrab - Direct | Page 706 |
|---|---|---|

1      MR. KAMARAJU: Your Honor, may I approach?
2      THE COURT: Sure.
3   Q. I'm showing you what's been marked for identification as
4   Government Exhibit 6022, 6018, 6031, 6021, 6023, and 6027.
5      Maybe if we could pull that up on the screen for the
6   witness, the Court and defense counsel.
7      So let's start with Government Exhibit 6022?
8   A. Yes, sir.
9   Q. Do you recognize what this is?
10  A. Yes, I recognize this.
11  Q. What is it?
12  A. This is an electronic mail, sir.
13  Q. Who is the e-mail from?
14  A. "Asghari" n.asghari@ex-sa.com.
15  Q. Do you recognize that domain?
16  A. Yes, I know, sir.
17  Q. What is that domain?
18  A. This is a domain name used by Sarmayeh Exchange.
19  Q. How do you know that?
20  A. Because we have received a lot of e-mails, and this is a
21   company that we work with, and I also receive personal e-mails
22   from that domain, that's how I know it.
23  Q. Do you know this specific e-mail address?
24  A. Is the question whether if I know the Asghari address?
25  Q. Yes.

| HC4PATI4 | Zarrab - Direct | Page 707 |
|---|---|---|

1   A. No, I don't know specifically Asghari as an address.
2   Q. Now, can you go down to the "to" line?
3   A. Yes, sir.
4   Q. Do you recognize that e-mail addresses on that line?
5   A. Yes, I know both of them.
6   Q. Okay. Let's start with the first one. Whose e-mail
7   address is that?
8   A. This is the e-mail address of Camellia Jamshidy. I want to
9   correct something. This is one of the addresses that is used
10  by Camellia Jamshidy. She also has other e-mail addresses.
11  Q. And who is Camellia Jamshidy?
12  A. Camellia Jamshidy is a person with the authorization rank.
13  I'm on top; after me, Mr. Abdullah, and after this,
14  Ms. Camellia works for us.
15  Q. And was she involved with your Iranian business at
16  Halkbank?
17  A. Yes. She works in the section which receives the payment
18  orders from Iran, that's what she does. She's the person, the
19  authorized person, who would carry out the payment orders that
20  are issued by the Iranians.
21  Q. Okay. Let's go to the next e-mail address on that line.
22  A. Yes, sir.
23  Q. Whose e-mail address is that?
24  A. This is a person who works for me in my company as a
25   personnel. It's Gita Taheri, that's her address.

| HC4PATI4 | Zarrab - Direct | Page 708 |
|---|---|---|

1   Q. What's the date of the e-mail?
2   A. October 15, 2014, sir.
3   Q. Can we turn to the next page of the exhibit, please. Do
4   you recognize what this is?
5   A. Yes, sir.
6   Q. What is it?
7   A. This is a payment instruction or order sent by Sarmayeh
8   Exchange to our company.
9   Q. Okay. Was it a regular part of your business to receive
10  these kinds of payment instructions?
11  A. This is the first step in our business.
12  Q. And what's the purpose of this document?
13  A. This is the payment order sent by the Iranians, which is to
14  the two addresses which are indicated in this document. It's
15  basically telling me make payments to those two addresses.
16     (Continued on next page)
17
18
19
20
21
22
23
24
25

| HC43ATI5 | Zarrab - Direct | Page 709 |
|---|---|---|

1   Q. By addresses, what do you mean?
2   A. The end point where the money is supposed to go, it is
3   either a company or a person.
4      MR. KAMARAJU: The government would offer Government
5   Exhibit 6022.
6      MS. FLEMING: Objection. Foundation and hearsay.
7      THE COURT: I'll allow it.
8      (Government's Exhibit 6022 received in evidence)
9   Q. Could you turn to the second page of the exhibit.
10  A. Can we take the question once more, please. The number of
11  the exhibit?
12  Q. 6022.
13  A. This is the one on the screen right now?
14  Q. Yes.
15     MR. KAMARAJU: Mr. Chang-Frieden, can you blow up the
16  middle section of the document.
17  Q. Do you see, Mr. Zarrab, where it says Shanghai Huisheng
18  Plastic?
19  A. Yes, sir, I see that.
20  Q. What is that?
21  A. The receiver of the money that has to be paid. To put it
22  in a simpler way, the Iranian is telling me pay money to
23  Shanghai Huisheng Plastic Company.
24  Q. How much money are they telling you to pay?
25  A. For the specific transaction, their demand is $92,723.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 4, 2017

| HC43ATI5 | Zarrab - Direct | Page 710 |

1 Q. Do you see the number 7702 written there?
2 A. Yes, sir.
3 Q. What does that number represent?
4 A. Every transaction, every transaction has a specific
5 transaction number which is used between Sarmayeh Exchange and
6 ourselves just to be able to keep track of that transaction.
7 Q. Is there any other payment instruction on this document?
8 A. Yes, I do, sir there is another one.
9 Q. What's the other one?
10 A. The company called P.T. South Pacific Viscose.
11 Q. How much were they supposed to be paid?
12 A. In this specific payment instruction, it's $45,639.
13        MR. KAMARAJU: Mr. Chang-Frieden, can we please put up
14 for the witness Government Exhibit 6018.
15 Q. It is up on the screen. Do you recognize this document?
16 A. Yes, I do, sir.
17 Q. What is it?
18 A. This is an electronic mail, sir.
19 Q. Who is it from?
20 A. There are two sections, which section are you asking about?
21 Q. That's a good point. Why don't we start with the bottom
22 section.
23 A. Yes, of course, sir.
24 Q. Who is that from?
25 A. This is from a person called Alizadeh and he's sending it

| HC43ATI5 | Zarrab - Direct | Page 711 |

1 if the e-mail address M.Alizadeh@EX-SA.com.
2 Q. Is that the Sarmayeh Exchange domain?
3 A. Yes, sir.
4 Q. Who is that e-mail being sent to?
5 A. It was sent to Camellia Jamshidy's e-mail address.
6 Q. Was there anybody else listed on that e-mail?
7 A. Also it was cc'd to Gita Tahery in Royal at Gmail.com.
8 Q. Now we'll look at the top section. Is that another e-mail?
9 A. This is the forwarded section of the same e-mail.
10 Q. Who forwarded the e-mail?
11 A. Camellia Jamshidy sent it from Camellia.Royal@Yahoo.com.
12 Q. Who did she send it to?
13 A. To the address of Aykut which is Aykut_Okumus@Yahoo.com.
14 Q. Do you know who that is?
15 A. Yes, sir, I know. Mr. Aykut is also one of my personnel
16 which worked for me in that period of time.
17 Q. What's the date of the e-mail?
18 A. October 13, 2014, sir.
19 Q. What's the subject of the e-mail?
20 A. SWIFT.
21 Q. What is a SWIFT?
22 A. It is a payment instruction sent by one bank to another
23 bank, it's one of the -- it's a kind of messaging between the
24 bank branches.
25 Q. Could you turn to the next page of the exhibit. Are SWIFT

| HC43ATI5 | Zarrab - Direct | Page 712 |

1 messages a regular part of your business?
2 A. Yes, sir, of course, it's a way of sending money, and it's
3 how we take the money or get the money.
4 Q. Does your business regularly receive SWIFT communications?
5 A. Yes, of course, we received either the SWIFT or the
6 instruction. This is the first or the second leg of our
7 business. Sometimes the money is sent first, sometimes the
8 instruction is sent first.
9 Q. What are we looking at, at this page of the exhibit?
10 A. This is a message sent by Toseh Tejarat, which is a front
11 company for Sarmayeh Exchange bank, which was sent to Mars
12 Valuable Metals and Food Incorporated, which is owned -- which
13 is a company which is not owned by me, but controlled by me.
14        MR. KAMARAJU: Government would offer Government
15 Exhibit 6018.
16        MS. FLEMING: Objection. Foundation and hearsay.
17        THE COURT: I'll allow it.
18        (Government's Exhibit 6018 received in evidence)
19        MR. KAMARAJU: Can we publish that at page two,
20 please.
21 Q. Mr. Zarrab, do you see at the top of the message where it
22 says "sender"?
23 A. Yes, sir, I see that.
24 Q. Who is listed as the sender there?
25 A. Sarmayeh Bank, sir.

| HC43ATI5 | Zarrab - Direct | Page 713 |

1 Q. Right below that, do you see where it says "receiver"?
2 A. Yes, sir. Turkish Halkbank.
3 Q. Going down below to that heading that says "message text."
4 Do you see a line that starts with 32A?
5 A. Yes, sir, I see that.
6 Q. What information is conveyed in that section?
7 A. First the value date of the transaction, the type of bank,
8 the type of currency that has been sent, the amount of the
9 money that was sent.
10 Q. The next box down, the one that starts with 50K.
11 A. Yes, sir.
12 Q. What does that field represent?
13 A. This section includes the name of the company which gives
14 the instruction and the address that this money has to be paid
15 to.
16 Q. So, is this company -- what company is listed there?
17 A. Toseh Tejarat Sarmayeh Padyar Qeshm.
18 Q. I want to make sure we're clear. Is that the company
19 that's receiving money?
20 A. No, this is the company that's sending the money out from
21 Iran.
22 Q. Let's go down to the next field. What does the field
23 "ordering institution" mean?
24 A. The bank that was sending the money, the bank that was
25 giving the payment order.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

HC43ATI5          Zarrab - Direct          Page 714

1 Q. Then you see it says "sender's correspondent" in the next
2   line down?
3 A. Yes, sir.
4 Q. What's listed there?
5 A. Turkish Halkbank, sir.
6 Q. The next field, see where it says "account with
7   institution"?
8 A. Yes, sir.
9 Q. What does that field represent?
10 A. This section indicates where the account of Mars Valuable
11   Metals Company is.
12 Q. What bank is listed there?
13 A. Turkish Halkbank, sir.
14 Q. What does it mean that the sender's correspondent field and
15   the account with institution field both have the same bank?
16 A. This means that the Sarmayeh Bank and Halkbank have
17   accounts in the same domain or same place. Which means that
18   this money will be taken out of the account of Sarmayeh Bank,
19   which resides at Halkbank.
20 Q. Where will the money be sent?
21 A. It will go to the account of Mars Valuable Metals and Food
22   foreign trade company account, which is also in the Halkbank.
23 Q. Finally you see where it says "beneficiary customer name"?
24 A. Yes, sir.
25 Q. What does that field represent?

HC43ATI5          Zarrab - Direct          Page 715

1 A. The receiver company's account number and name of the
2   company which will receive the money, which is inside Halkbank.
3 Q. What's that company?
4 A. Mars Kiymetti Madenler Ve Gida, sir.
5 Q. I'd like to show you what's been marked for identification
6   as Government Exhibit 6031. Do you recognize the document?
7 A. Yes, yes, sir, I do.
8 Q. What is it?
9 A. It is an electronic mail.
10 Q. Who sent it?
11 A. Kamelia Jamshidy, sir.
12 Q. Who did she send it to?
13 A. Ms. Alizadeh who works at Sarmayeh Exchange.
14 Q. What is the date of the e-mail?
15 A. October 28, 2014, sir.
16   MR. KAMARAJU: Can we turn to the next page, please.
17 Q. Do you recognize this document?
18 A. Yes, of course, sir.
19 Q. What is it?
20 A. This is the account statement of Sarmayeh Exchange which is
21   in our accounting.
22 Q. When you say in our accounting, does that mean Sarmayeh
23   Exchange's account with your company?
24 A. Of course, Sarmayeh Exchange has an account in my
25   accounting department, to be able for us to follow up on the

HC43ATI5          Zarrab - Direct          Page 716

1   transactions. It's some kind of a ledger.
2 Q. Who typically prepares this ledger?
3 A. The accounting department, sir.
4 Q. To be clear, is that your accounting department?
5 A. The accounting personnel who work in my company.
6 Q. What is the purpose of preparing this document?
7 A. This is a statement of account, which, like every
8   individual may have in the bank something like that, this is
9   the statement of account for Sarmayeh Bank, which is kept and
10   followed up in my company.
11 Q. What kind of information is reflected on this page?
12 A. The moneys that were sent by Sarmayeh are written here, and
13   also the moneys that we pay out according to their instructions
14   are also written here. And also the exchanges and their money,
15   the different kinds of currencies.
16   MR. KAMARAJU: Government would the offer Government
17   Exhibit 6031.
18   MS. FLEMING: Objection. Foundation and hearsay.
19   THE COURT: I'll allow it.
20   MR. KAMARAJU: Can we publish that to the jury,
21   please.
22   THE COURT: Yes.
23   (Government's Exhibit 6031 received in evidence)
24 Q. Let's just look through this first page. You see in the
25   column all the way on the left, the one titled "tran. date"?

HC43ATI5          Zarrab - Direct          Page 717

1 A. The transaction date.
2 Q. Then do you see where it says "type" in the next column?
3 A. Yes.
4 Q. What is that information?
5 A. The type of transaction, which is in our accounting
6   department.
7 Q. Then the next column titled "number," what does that mean?
8 A. It is the registration number of the transaction.
9 Q. Then the column titled "narration." What does that mean?
10 A. That's the explanation of the transaction. It is the
11   explanation of to whom it was paid, why it was paid, where did
12   the money came from, things like that.
13 Q. The next column over, do you see it says "FCy"?
14 A. It is the type of currency of the payment.
15 Q. And the next column that says "debit." What does that
16   mean?
17 A. That's the amount that we pay out.
18 Q. And the next column over is "credit." What's that?
19 A. It is the column where the money that they sent to us will
20   be indicated.
21 Q. And then the next column is "balance." What does that
22   mean?
23 A. The difference or the balance of between the money that was
24   sent and that was received.
25 Q. And then the final column, it says "sign." What is that?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 4, 2017

| HC43ATI5 | Zarrab - Direct | Page 718 |

1  A. It is the symbol to indicate whether it's a debtor or a
2   creditor.
3  Q. Do you see near the top where it says "period"?
4  A. Yes, sir, I see that.
5  Q. What does that indicate?
6  A. The period of time where this statement of account
7   indicates.
8  Q. So, the activity reflected in this account occurred within
9   that period; is that right?
10 A. Yes, sir.
11      THE COURT: Counsel, you might walk through one of
12  those transactions so we can understand it a little bit
13  clearer.
14      MR. KAMARAJU: Absolutely, your Honor.  If I can turn
15  to the second to last page of the exhibit.
16      THE COURT: Okay.
17      MR. KAMARAJU: There is a transaction that's worth
18  looking at.
19 Q. So, is this a similar statement of account?
20 A. This is like a ledger of the same account statement in a
21  different money type.
22 Q. What currency is this one in?
23 A. USD.
24 Q. Is that dollars?
25 A. Yes, American dollars, sir.

| HC43ATI5 | Zarrab - Direct | Page 719 |

1  Q. Could you look down at the seventh row.  The transaction
2   date of October 15, 2014.
3  A. 82504 transaction number.  Is that it?
4  Q. Yes.
5  A. Yes, sir.
6  Q. What is the date of this transaction?
7  A. October 15, 2014, sir.
8  Q. What is written in the -- I think you already mentioned.
9   What is the transaction number?
10 A. 82504 and the number which we have.
11 Q. I skipped one column so let's go back.  Do you see where it
12  says the column for "type"?
13 A. FSN?
14 Q. Yes.
15 A. That's the type of transaction, how it was registered.
16 Q. What does FSN mean?
17 A. Foreign transactions.
18 Q. You see the one the entry right above that, CBS?
19 A. It's like an abbreviation to the exchange of currencies.
20  Which means a currency exchanged from one type of currency to
21  another one, like between dollars and euros.
22 Q. So, sticking with transaction number 82504.
23 A. Yes, sir.
24 Q. What is in the narration field?
25 A. First of all there is 7702, this is first reference between

| HC43ATI5 | Zarrab - Direct | Page 720 |

1  Sarmayeh Exchange and my company.  And the name of the company
2   which the payment will be made or has met, Shanghai Huisheng
3   Plastic Products Company.
4  Q. If we go over to the next column, it says USD, right?
5  A. Yes, sir.
6  Q. What does that indicate?
7  A. Currency type, which means that payment was made in
8   American dollars.
9  Q. Do you see the debit column for that transaction?
10 A. Yes, sir.
11 Q. What's the amount?
12 A. $92,723.
13 Q. Let's look at the next transaction, 82505.
14 A. Yes, sir.
15 Q. What's that transaction date?
16 A. October 15, 2014, sir.
17 Q. What type of transaction is that?
18 A. That's again an international transaction.
19 Q. What is listed in the narration field?
20 A. The reference number of the transaction, and then P.T.
21  South Pacific Viscose.
22 Q. What currency is that transaction in?
23 A. Dollars, sir.
24 Q. What's the amount?
25 A. $45,639.

| HC43ATI5 | Zarrab - Direct | Page 721 |

1  Q. I'd like to turn to an earlier page.  The 13th page of the
2   exhibit.  I think I might have gone too far.  Let's try page
3   14.
4      MR. KAMARAJU: If I may have one moment, your Honor.
5   Just make sure I have the right page.
6  Q. Mr. Zarrab, this is blown up, but can you tell what
7   currency these transactions are in?
8  A. These are euros, sir.  These are made in euros.
9  Q. Do you see transaction 84653?
10 A. Yes.
11 Q. What's the date of that?
12 A. October 14, 2014.
13 Q. Do you see what's listed there, AD, in the next column?
14 A. Yes, sir.
15 Q. What does that mean?
16 A. It means advice.  It is a type of transaction.
17 Q. What type of transaction is an advice transaction?
18 A. In the same accounting system, money transfer from one
19  account to another account is called advice.  Like in the same
20  domain, from book to book.
21 Q. Okay.  Do you see the narration field there?
22 A. Yes, I do.
23 Q. What's listed there?
24 A. There are a couple of transactions, but the top line says
25  Sarmayeh-Mars.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                              December 4, 2017

HC43ATI5          Zarrab - Direct          Page 722

1 Q. What currency is that transaction in at the top?
2 A. Euros, sir.
3 Q. Then do you see there is a figure entered into the credit
4   column?
5 A. Yes, I see that.
6 Q. What is represented there?
7 A. This indicates the number that was sent by Sarmayeh Bank to
8   Toseh Tejarat to me.
9 Q. Are there a few such transactions reflected there?
10 A. Yes, they're all showing the same kind of thing.
11      MR. KAMARAJU: Can we turn to the next page.
12 Q. Do you see the fourth row down number 83559.
13 A. Yes, I see that.
14 Q. Let's talk about what's shown there.
15 A. They are changing, exchanging their euros to dollars, so
16   that they can cover the dollar transaction.
17 Q. Let's look at the one below that.
18 A. That's the same thing, that represents the same thing.
19   They are changing their money, their euros, 36,158.30, to
20   dollars to be able to cover the 45,639 transaction.
21 Q. So what's the amount of dollars that are involved in
22   transaction 83559?
23 A. $97,397.
24 Q. What's the number of dollars involved in the next
25   transaction?

HC43ATI5          Zarrab - Direct          Page 723

1 A. $45,639, sir.
2      MR. KAMARAJU: Mr. Chang-Frieden, can we go back to
3   the second-to-last page of the exhibit. Can we blow up rows
4   seven and eight again.
5 Q. What do these two rows represent?
6 A. These are the transactions that we made for Sarmayeh
7   Exchange in the dollar currency.
8 Q. How many dollars are involved in transaction 82504?
9 A. Can we have the transaction number once more, please?
10 Q. Sure. 82504.
11 A. $92,723, sir.
12 Q. How about in transaction 82505?
13 A. $45,639.
14 Q. Is that the same amount that was reflected on the last page
15   we were looking at?
16 A. Yes, sir.
17 Q. I'd like to show you what's been marked for identification
18   as Government Exhibit 6021. Do you recognize it?
19 A. Yes, I recognize.
20 Q. What is it?
21 A. It is an electronic mail, sir.
22 Q. Who sent it?
23 A. There are three sections in that electronic mail, which
24   section are you asking about?
25 Q. Let's focus on the top section.

HC43ATI5          Zarrab - Direct          Page 724

1 A. Yes, sir.
2 Q. Who sent that e-mail?
3 A. Aykut Okumus, sir.
4 Q. That person works for you?
5 A. One of the persons who were working for me in that period
6   of time.
7 Q. Who received the e-mail?
8 A. Kamelia Jamshidy, sir.
9 Q. What is the date of the e-mail?
10 A. October 15, 2014, sir.
11 Q. Can you turn to the first page -- sorry, the third page of
12   the exhibit.
13      Do you recognize this?
14 A. Yes, sir, I do.
15 Q. What is it?
16 A. That's a message.
17 Q. What kind of message is it?
18 A. It a SWIFT telex message.
19 Q. Who is listed as the sender in this SWIFT message?
20 A. Turkey Finansbank.
21 Q. Is this SWIFT message of the same kind as the ones you
22   previously testified about?
23 A. Yes.
24      MR. KAMARAJU: The government would offer Government
25   Exhibit 6021 and ask to publish.

HC43ATI5          Zarrab - Direct          Page 725

1      MS. FLEMING: Objection. Foundation and hearsay.
2      THE COURT: I'll allow it.
3      (Government's Exhibit 6021 received in evidence)
4      MR. KAMARAJU: If we can publish that page.
5   I think we may have lost some of the screens but not
6   all of them.
7      THE COURT: Is the jury able to see it or no?
8      A JUROR: These two monitors are down.
9      MR. KAMARAJU: If your Honor approves, I'll hand the
10   hard copy.
11      THE COURT: Sure.
12      MR. KAMARAJU: Sorry about that. Here is another one
13   from defense counsel.
14 Q. Okay. So, you identified who the sender was. Who is the
15   receiver in this circumstance?
16 A. Standard Chartered Bank in Germany.
17 Q. Let's go down into the message text. What's the date of
18   the transaction reflected in this document?
19 A. 10/14/2014, sir.
20 Q. What currency does this transaction involve?
21 A. Euros, sir.
22 Q. What is the value of the transaction?
23 A. 2,255,000 euros.
24 Q. Who is the ordering customer in this transaction?
25 A. The information in the 50F section, Centrica General

**A468**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

HC43ATI5    Zarrab - Direct    Page 726

1    Trading, LLC.
2  Q.  Remind us, what does "ordering customer" mean?
3  A.  The company who orders Turkey Finansbank to send out this
4    money.
5  Q.  What is Centrica?
6  A.  This is the food supplier which I used in food
7    transactions, that's a company within Halkbank.
8  Q.  When you say a company within Halkbank, do you mean a
9    company that has an account in Halkbank?
10  A.  Which also has an account in Halkbank, that's the company,
11    yes.
12  Q.  Going down to the next field.  What's listed there as the
13    account with institution?
14  A.  Bank of Baroda, sir, in United Arab Emirates in Dubai.
15  Q.  What's the beneficiary customer?
16  A.  Centrica General Trading.
17  Q.  What does it mean that the ordering customer and the
18    beneficiary are both the same?
19  A.  In short, in short and simply, I'm trying to put --
20    Centrica is taking money out of its account in the Turkish bank
21    and sending the money to Bank of Baroda in Dubai.
22    By this transaction, we are forwarding the money from
23    Turkey to Dubai.  We're changing, we are moving the money from
24    here to here.
25  Q.  Let's be clear when you say that.  Moving the money from

HC43ATI5    Zarrab - Direct    Page 727

1    where?
2  A.  We're taking the money from Turkey and taking -- sending it
3    to Dubai.
4  Q.  I'd like to show you what's been marked for identification
5    as Government Exhibit 6023.
6    THE INTERPRETER: I'm sorry?
7  Q.  I'm showing you what's been marked for identification as
8    Government Exhibit 6023.
9    Do you recognize that document?
10  A.  Yes, sir.
11  Q.  What is it?
12  A.  It is an electronic mail, sir.
13  Q.  What's the date?
14  A.  18 October, 2014, sir.
15  Q.  Who sent it?
16  A.  Rafique Chilwan.
17  Q.  Do you know who that is?
18  A.  I don't know that, no.
19  Q.  Who received the e-mail?
20  A.  Jafar Saeid.
21  Q.  Who is that?
22  A.  This is a personnel, a person who was working for me in my
23    company in Dubai called Centrica.
24  Q.  You see the subject line?
25  A.  Yes, sir, I do.

HC43ATI5    Zarrab - Direct    Page 728

1  Q.  What is it?
2  A.  Al Rostamani 5 tt.
3  Q.  Do you know what Rostamani is?
4  A.  It is an exchange office called Rostamani Exchange, which I
5    have indicated in my schematics as I drew.
6  Q.  Can we turn to the second page of the exhibit, please.
7    Blow that up.
8    Do you recognize what this is?
9  A.  Yes.
10  Q.  What is it?
11  A.  This is a receipt given to us by Rostamani related to the
12    transaction.
13    MR. KAMARAJU: The government would offer Government
14    Exhibit 6023.
15    MS. FLEMING: Objection.  Foundation and hearsay.
16    THE COURT: I'll allow it.
17    (Government's Exhibit 6023 received in evidence)
18    MR. KAMARAJU: Can we publish this page, please.
19    This time we got it?
20    A JUROR: Yes.
21    MR. KAMARAJU: Great.
22  Q.  Now, Mr. Zarrab, do you see a section on this report called
23    "beneficiary details"?
24  A.  Yes, sir, I see that.
25  Q.  What information is identified there?

HC43ATI5    Zarrab - Direct    Page 729

1  A.  The company that the money is going to.  The receiver of
2    the money that will be sent by Rostamani.
3  Q.  What company is that in this example?
4  A.  Shanghai Huisheng Plastic Products Company Limited.
5  Q.  How much is being sent?
6  A.  $92,723, sir.
7  Q.  What country is it being sent to?
8  A.  China.
9  Q.  Do you see the section below -- what bank is it being sent
10    to?
11  A.  Bank of China.
12  Q.  Do you see the section titled "customer details" down at
13    the bottom?
14  A.  Yes, sir.
15  Q.  What does that section describe?
16  A.  This is the information about the company which gives this
17    instruction to Rostamani.
18  Q.  Which company is that here?
19  A.  Centrica General Trading.
20  Q.  Is that the same company that we saw in the last document?
21  A.  Yes, sir.
22  Q.  Can we turn to the next page of the exhibit.
23    Let's take a look at the beneficiary detail section
24    for this.  So who is the beneficiary of this transaction?
25  A.  P.T. South Pacific Viscose.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 4, 2017

| HC43ATI5 | Zarrab - Direct | Page 730 |
| --- | --- | --- |

1 Q. How much is supposed to be sent?
2 A. $45,639, sir.
3 Q. Where is it suppose supposed to be sent?
4 A. Indonesia.
5 Q. What bank?
6 A. Bank Negara Indonesia.
7 Q. What company is listed under the customer details as
8  sending it?
9 A. Centrica General Trading, sir.
10     MR. KAMARAJU: Your Honor, I'd like to show the
11  witness what has been marked as Government Exhibit 6207 for
12  identification.
13     THE COURT: All right.
14 Q. Do you recognize this document?
15 A. Yes, sir.
16 Q. What is it?
17 A. It is an electronic mail.
18 Q. What is the date of the mail?
19 A. October 20, 2014, sir.
20 Q. Who sends the e-mail?
21 A. Kamelia Jamshidy.
22 Q. Who receives it?
23 A. Gita Tahery.
24 Q. Can we turn to the second page, please. What are we
25  looking at here?

| HC43ATI5 | Zarrab - Direct | Page 731 |
| --- | --- | --- |

1 A. That's a SWIFT message.
2 Q. Is it related to the transaction we've been discussing?
3 A. Yes, sir.
4     MR. KAMARAJU: The government would offer Government
5  Exhibit 6027.
6     MS. FLEMING: Objection. Foundation and hearsay.
7     THE COURT: I'll allow it.
8     (Government's Exhibit 6027 received in evidence)
9     MR. KAMARAJU: If we can publish to the jury beginning
10  at the second page.
11 Q. Let's just start near the top.
12 A. Let's start.
13 Q. Who is identified as the sender?
14 A. Al Rostamani International Exchange Dubai.
15 Q. What is that?
16 A. Rostamani Exchange, who is sending the money from Dubai.
17 Q. What is listed as the receiver?
18 A. Standard Chartered Bank, New York.
19 Q. What does it mean that Standard Chartered Bank is listed
20  there as the receiver?
21 A. This message, which was sent by Al Rostamani Exchange, is
22  coming to Standard Chartered Bank in New York.
23 Q. What is it telling Standard Chartered Bank to do?
24 A. It is going to tell Standard Chartered Bank in a little
25  while to make a payment to the Chinese bank.

| HC43ATI5 | Zarrab - Direct | Page 732 |
| --- | --- | --- |

1 Q. Which Chinese bank?
2 A. Bank of China, the transaction.
3 Q. Who is the ordering customer for that payment?
4 A. Can we look back down.
5     Centrica General Trading.
6 Q. Who is the beneficiary of that payment?
7 A. Shanghai Huisheng Plastic Products Company Limited, sir.
8 Q. What is the amount of the payment?
9 A. $92,723, sir.
10 Q. What is the date of the payment?
11 A. October 21, 2014, sir.
12 Q. If we can turn to the next page. What's this?
13 A. This is SWIFT message.
14 Q. Who is the sender?
15 A. Al Rostamani International Exchange, Dubai.
16 Q. What is the receiver bank?
17 A. Standard Chartered Bank, New York.
18     (Continued on next page)
19
20
21
22
23
24
25

| HC4PATI6 | Zarrab - Direct | Page 733 |
| --- | --- | --- |

1 Q. Okay. And who is the ordering customer for this
2  transaction?
3 A. Centrica General Trading.
4 Q. Who's the beneficiary?
5 A. PT South Pacific Viscose.
6 Q. What's the amount of the transaction?
7 A. $45,639.
8 Q. Could we put up Government Exhibit 6022 again and turn to
9  the second page and blow up that middle section. Tell us what
10  this is again?
11 A. It's a payment instruction sent to us by the Iranians.
12 Q. Who's the beneficiary of the first payment?
13 A. Shanghai Huisheng Plastic Product Company Limited.
14 Q. And what's the amount?
15 A. $92,723, sir.
16 Q. Who is the beneficiary of the second transaction?
17 A. PT South Pacific Viscose, sir.
18 Q. What's the amount of that?
19 A. 45,639, sir.
20 Q. Now, Mr. Zarrab, the exhibits that we've been looking at,
21  are they all related in some way?
22 A. Yes, sir. They're all together.
23 Q. Okay. And what do you mean "they're all together"?
24 A. So it shows the legs that are followed from the beginning
25  to the end in terms of this transaction.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                  December 4, 2017

HC4PATI6          Zarrab - Direct          Page 734

1  Q.  Is that transaction an example of what you've got on
2   Government Exhibit 9503?
3  A.  Yes, sir.
4  Q.  Would you be able to show the jurors where those various
5   legs fit in on 9503?
6  A.  Certainly, sir.
7       MR. KAMARAJU: With the Court's permission I'd ask --
8       THE COURT: We're going to take a two-minute break
9   first, and then we'll continue.
10      MR. KAMARAJU: All right.
11      (Jury not present)
12      THE COURT: Please be seated.  We'll take five or ten
13  minutes.
14      (Recess)
15      MR. KAMARAJU: Your Honor, before we bring the jury
16  in, I was wondering if we could have just a two-second sidebar.
17      THE COURT: Yes.
18      (Continued on next page)
19
20
21
22
23
24
25

HC4PATI6          Zarrab - Direct          Page 735

1       (At the side bar)
2       THE COURT: What do you have?
3       MR. KAMARAJU: Just as a matter of scheduling, after
4   Mr. Zarrab is done with this, my plan had been to play the
5   remaining audio from the calls so we can get that on the
6   record.  I just want you to know we totaled it up, and it's
7   about two hours.
8       THE COURT: All of it?
9       MR. KAMARAJU: All of it together.  There are some
10  calls that are 25 minutes or so, I think one or two.  So I just
11  wanted to raise that before we started playing them.
12      MS. FLEMING: We don't want it all played.  We just
13  want the audios to be in evidence so if the jury wants to play
14  them, they can play them.
15      MR. ROCCO: No, I'm sorry.  I think they should be
16  played.
17      MS. FLEMING: Two hours?
18      MR. ROCCO: I didn't hear that part.
19      MR. KAMARAJU: We're happy to play them. I know your
20  Honor had --
21      THE COURT: I want them in; so....
22      MS. FLEMING: Plus, they've already gone through the
23  transcripts.
24      THE COURT: Do we have to do them all at the same
25  time?  Do you care?

HC4PATI6          Zarrab - Direct          Page 736

1       MS. FLEMING: Well, he's almost done.
2       THE COURT: No, no, but do you care if we do them all
3   at the same time?
4       MS. FLEMING: No, I don't care if we don't do them.
5   I'd rather just put them into evidence and move on.
6       THE COURT: Okay.  I'll think of something.  Go ahead.
7   How much more time do you have with him?
8       MR. KAMARAJU: So this may take like another 15
9   minutes.
10      THE COURT: Okay.
11      MR. KAMARAJU: And probably ten minutes, then my plan
12  had been just to do the calls and try to finish up.
13      THE COURT: So do you know the length of them?
14      MR. KAMARAJU: Yes.  I think, these are roughs, there
15  are a couple that are a few minutes.  Most of them are under
16  ten minutes.  I think there are two of them that are a little
17  bit longer.
18      THE COURT: So do all the short ones.  After that,
19  we'll see where we are then and then --
20      MR. KAMARAJU: Yes.
21      (Continued on next page)
22
23
24
25

HC4PATI6          Zarrab - Direct          Page 737

1       (In open court; jury present)
2       THE COURT: Please be seated.
3       THE DEPUTY CLERK: Sir, I'd like to remind you that
4   you're still under oath.
5       THE COURT: Go ahead.
6  BY MR. KAMARAJU:
7  Q.  Now, Mr. Zarrab, I think you were finished explaining that
8   all of the exhibits we looked at were sort of part of a common
9   transaction; is that right?
10 A.  Yes, sir.
11      MR. KAMARAJU: With the Court's permission, I'd like
12  to have Mr. Zarrab approach Government Exhibit 9503.
13      THE COURT: Sure.
14 BY MR. KAMARAJU:
15 Q.  It's okay.  I'll hand you documents.  You can just come
16  down here.
17      Mr. Chang-Frieden, if we could please put up
18  Government Exhibit 6022 so everybody can see it.
19      So tell us again what this is?
20 A.  This is the payment instruction that we received from
21  Sarmayeh Exchange.
22 Q.  Okay.  And could you explain on Government Exhibit 9503
23  what stage that document relates to?
24 A.  It's the blue section over here.  In other words, the money
25  order that was sent from Sarmayeh Exchange to us.

**A471**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

| HC4PATI6 | Zarrab - Direct | Page 738 |

1 Q. Okay. And I'll show you what's been marked as Government
2 Exhibit 6018.
3     Can we pull that up, too, please.
4     Now, tell us again, what is that?
5 A. These are messages pertaining to the payments that Sarmayeh
6 Exchange had made to us. So these messages are represented by
7 this line over here, and it shows the amounts that were sent
8 from Sarmayeh Bank to Halkbank, and it could be Mars but it's
9 not here. After 2014, or as of 2014, after my arrest and
10 release, I had worked with Mars, but prior to Mars it was
11 Volgam. So it would correspond with this section right here.
12 Q. Okay. So let's be clear. Where would Mars fit in on that
13 diagram?
14 A. It would be either in place of Volgam or right next to
15 Volgam, but either way, it would be within the box of Halkbank.
16 Q. Okay. What would happen pursuant to that instruction?
17 A. Just as it is mentioned in this document here, with
18 Sarmayeh Bank's order, the money from Toseh Tejarat's account
19 would go into the Mars account. And I can add Mars over here,
20 if you'd like.
21 Q. No, that's okay. And what happens after the money goes
22 into the Mars account?
23 A. Just as I had drawn here, instead of Volgam, the money
24 would go from Mars over to Centrica accounts within the
25 Halkbank.

| HC4PATI6 | Zarrab - Direct | Page 739 |

1 Q. Okay. Showing you now, and if we could bring up, 6021.
2 What is that?
3 A. And this is the document, that is the message that is sent,
4 in order to get the money from the Centrica account here in
5 Turkey, such as in Türkiye Finans Bank, over to the Centrica
6 account in Dubai.
7 Q. Okay. And what was the purpose of moving it to Centrica in
8 Dubai?
9 A. It's just getting closer to its final destination. As it
10 leaves that section there, it's just reaching down to where its
11 final destination is.
12 Q. And what currency is it typically in at this point?
13 A. In general, it would be Euros in this area.
14 Q. Okay. Now, showing you what's been marked as Government
15 Exhibit 6031, what is that, again?
16 A. These are the transaction records or the transaction
17 statement for Sarmayeh Exchange that is within our group here.
18 Q. Okay. And what happens to the Euros when they get to
19 Dubai?
20 A. Once it reaches Dubai, it would be given to Dubai. The
21 money, along with the instructions, it would be given to
22 Rostamani Exchange with the instructions to be fulfilled.
23 Euros would be converted into dirhams, and the dirhams would be
24 paid to Rostamani Exchange and the transaction would go on.
25 And this would be the record of the money that had come and

| HC4PATI6 | Zarrab - Direct | Page 740 |

1 what would be sent out as the record of that group right here.
2 It's basically a ledger.
3 Q. Okay. Now, I'm going to show you what's been marked as
4 Government Exhibit 6027, if we could pull that up.
5     Remind us, what is that?
6 A. So this would be the documentation of Rostamani Exchange
7 asking the Standard Chartered Bank to move money into Bank of
8 China and the X company here in this case would be the Shanghai
9 Huisheng Plastic Company.
10     So what's happening is that Rostamani Exchange would
11 send instructions for Standard Chartered to move the money to
12 Bank of China, and then from Bank of China, that money would be
13 sent over to its final destination, which would be the Shanghai
14 Huisheng Plastic Company. In other words, in this example, the
15 money reached this point. In other words, the instructions up
16 here were fulfilled.
17 Q. Okay. Now, how does the payment get from Dubai to China?
18 A. Rostamani Exchange has an account with Standard Chartered
19 Bank in New York, and they have funds in that account. And
20 Bank of China also had an account with Standard Chartered in
21 New York. And in this message, what's being instructed for
22 Standard Chartered in New York is this. The message is, take
23 $92,723 from my money and transfer it to Bank of China's
24 account so that Bank of China would make that payment to
25 Shanghai Huisheng Plastic Company.

| HC4PATI6 | Zarrab - Direct | Page 741 |

1 Q. And do you remember we listened to a telephone call between
2 you and Mr. Atilla where you discussed tonnages and bills of
3 lading?
4 A. Yes, sir.
5 Q. What part of the process did that pertain to?
6 A. That pertains to the list of documents that are needed in
7 order to close the transaction within Halkbank; so it certainly
8 belongs to this Halkbank box right here. So in other words, it
9 is the closing of the transaction regarding the money that was
10 taken out right here.
11 Q. Mr. Zarrab, you can return to the witness stand. Thank
12 you.
13     MR. KAMARAJU: Now, your Honor, with the Court's
14 permission, we had previously entered some transcripts. At
15 this time, we thought we'd play audio for a couple of those.
16     THE COURT: Yes. Could I see the list, and I'll
17 indicate how much time you have?
18     MR. KAMARAJU: Yes, your Honor, and I just have a
19 couple more questions after that.
20     THE COURT: Do you want to ask some questions after
21 this?
22     MR. KAMARAJU: Yes, or I could ask them now, if you
23 like.
24     THE COURT: I would ask them now, unless it's part of
25 your plan to do it later.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        December 4, 2017

| HC4PATI6 | Zarrab - Direct | Page 742 |
|---|---|---|

1      MR. KAMARAJU: No, it's okay. I'll ask them now, your
2  Honor.
3  BY MR. KAMARAJU:
4  Q. Mr. Zarrab, when did you begin your Iranian business at
5  Halkbank?
6  A. Approximately in the beginning of 2012, sir.
7  Q. And when did you end that business?
8  A. When I was arrested in Miami in March of 2016.
9  Q. Now, was Suleyman Aslan there during that entire period?
10 A. No, sir. He was not there constantly.
11 Q. Was Levent Balkan there during that entire period?
12 A. No, sir. Mr. Levent Balkan was not there throughout the
13 whole time either.
14 Q. Was Hakkan Aydogan there during that entire period?
15 A. No, sir. Mr. Hakkan Aydogan was not there during that
16 whole time either.
17 Q. Was Ali Fuat there during that entire period?
18 A. No, sir. Mr. Ali Fuat came later.
19 Q. During that entire period, who was the deputy general
20 manager for international banking at Halkbank?
21 A. Mr. Hakan Atilla.
22      MR. KAMARAJU: Your Honor, are there certain calls
23 you'd like us to play?
24      THE COURT: All right. So what I've done is these are
25 some of the transcripts that have not been played into the

| HC4PATI6 | Zarrab - Direct | Page 743 |
|---|---|---|

1  record, and you may remember that I suggested that we have them
2  all in the record. So they're in Turkish, and we're going to
3  play a series of them now, just to get them into the record,
4  understanding that unless you speak Turkish, you may not
5  understand what they're saying.
6      MR. KAMARAJU: Mr. Chang-Frieden, could you bring up
7  Government Exhibit 201-T.
8      THE COURT: Counsel, you're going to indicate which
9  transcript tape that you play corresponds with it?
10     MR. KAMARAJU: I'm going to pull them up. With the
11 Court's permission, can we please play the audio for this?
12     THE COURT: Do you want to indicate just for the
13 record the date of the transcript, if you know it?
14     MR. KAMARAJU: Sure. Could we go back to the page
15 before? The date listed on the transcript is September 19th,
16 2012.
17     THE COURT: Do you know approximately how long the
18 recording is going to be?
19     MR. KAMARAJU: I believe it's about a minute and a
20 half, your Honor, and this is Government Exhibit 201-T. If we
21 can play the corresponding audio, which is marked as Government
22 Exhibit 201-A.
23     (Audiotape played)
24     MR. KAMARAJU: Your Honor, we can go on to 202-T.
25     THE COURT: Sure.

| HC4PATI6 | Zarrab - Direct | Page 744 |
|---|---|---|

1      MR. KAMARAJU: Mr. Chang-Frieden, if you could pull
2  that up, please. I'm not seeing a date reflected on the front.
3  This is Government Exhibit 202-T.
4      With the Court's permission, we would play Government
5  Exhibit 202-A.
6      THE COURT: Approximately how long is it?
7      MR. KAMARAJU: About a minute, your Honor.
8      THE COURT: Okay.
9      (Audiotape played)
10     MR. KAMARAJU: Now, Mr. Chang-Frieden, could we pull
11 up Government Exhibit 204-T.
12     Your Honor, the audio for this is about a minute.
13     THE COURT: Okay.
14     MR. KAMARAJU: If we could play that,
15 Mr. Chang-Frieden.
16     (Audiotape played)
17     MR. KAMARAJU: Now, your Honor, if we can go to 205-T.
18     THE COURT: Sure.
19     MR. KAMARAJU: Mr. Chang-Frieden, if you can pull that
20 up.
21     And the audio for that is two minutes.
22     (Audiotape played)
23     MR. KAMARAJU: Your Honor, if we can go to 208-T, it's
24 also about two minutes.
25     THE COURT: Sure.

| HC4PATI6 | Zarrab - Direct | Page 745 |
|---|---|---|

1      MR. KAMARAJU: If you can pull that up,
2  Mr. Chang-Frieden, please. Thank you.
3      (Audiotape played)
4      MR. KAMARAJU: Your Honor, the next call is 209-T.
5  It's about five minutes.
6      THE COURT: Okay.
7      MR. KAMARAJU: Bring that up and play that. Thank
8  you.
9      (Audiotape played)
10     MR. KAMARAJU: Your Honor, the next call is 211-T, and
11 it's four minutes. Okay.
12     Mr. Chang-Frieden, would you mind pulling that up and
13 playing that audio.
14     (Audiotape played)
15     (Continued on next page)
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 4, 2017

| HC43ATI7 | Zarrab - Direct | Page 746 |
|---|---|---|

1     MR. KAMARAJU: Your Honor, next call on the list is
2  136-T and it's two minutes. You can pull that up.
3     (Audio recording playing)
4     MR. KAMARAJU: Your Honor, the next call is 138-T and
5  it is a minute. Pull that up, Mr. Chang-Frieden.
6     (Audio recording playing)
7     MR. KAMARAJU: Your Honor, the next call is 140-T, and
8  it is about a half a minute.
9     (Audio recording playing)
10    MR. KAMARAJU: Your Honor, the next call is 244-T and
11  it is about three minutes.
12    (Audio recording playing)
13    MR. KAMARAJU: Your Honor, the next call is 297-T and
14  it is about four minutes.
15    THE COURT: That would be our last one. Let's play
16  that.
17    MR. KAMARAJU: Okay.
18    (Audio recording playing)
19    THE COURT: So, that's it for today. We're making
20  good progress. Before I give you my instructions for tomorrow,
21  tomorrow I'm planning to finish at 4, 30 so if anybody needs to
22  make any plans about that, 4:30 we'll be out.
23    And then remember my instructions between now and
24  tomorrow: First, please don't talk to each other about this
25  case or about anyone who has anything to do with it until the

| HC43ATI7 | Zarrab - Direct | Page 747 |
|---|---|---|

1  end of the case when you go to the jury room to deliberate on
2  your verdict.
3    Second, do not talk with anyone else about this case
4  or about anyone who has anything to do with it, until the trial
5  has ended and you've been discharged as jurors.
6    Third, please do not let anyone talk to you about the
7  case or about anyone who has anything to do with it. And if
8  someone should try and talk to you about the case, please
9  report that to Christine or me immediately.
10    Fourth, do not read any news or internet stories or
11  articles or blogs or listen to any radio or TV or cable reports
12  about the case or about anyone who has anything to do with it.
13    Lastly, please don't do any type of research or
14  investigation about the case on your own.
15    So, as I say, we're making good progress. Tomorrow
16  I'll give you an update on where I think we are. And see you
17  at 9:15. Thanks a lot.
18    (Jury excused)
19    (Witness not present)
20    THE COURT: Counsel, can I have a list of recordings
21  just to know how much time we need?
22    MR. KAMARAJU: I just placed a dot next to what's
23  already been played today.
24    THE COURT: Okay. More than a half hour left?
25    MR. KAMARAJU: I believe so because I think one of the

| HC43ATI7 | Zarrab - Direct | Page 748 |
|---|---|---|

1  calls is about 25 minutes on its own.
2    THE COURT: So first thing when we resume tomorrow,
3  I'll want to do a bunch of these. So I'll check them off by
4  time so you know.
5    MR. KAMARAJU: Okay.
6    THE COURT: It is a little over a half hour the ones I
7  checked off, and I'll have to figure out when that 25-minute
8  call is.
9    MR. KAMARAJU: The ones you put arrows to are the ones
10  you want to do tomorrow?
11    THE COURT: If you don't mind.
12    (Adjourned until December 5, 2017, at 9:15 a.m.)

| | Page 749 |
|---|---|

1            INDEX OF EXAMINATION
2  Examination of:               Page
3  REZA ZARRAB
4  Direct By Mr. Kamaraju . . . . . . . . . . . 648
5           GOVERNMENT EXHIBITS
6  Exhibit No.              Received
7  922  . . . . . . . . . . . . . . . . . . 668
8  359-T  . . . . . . . . . . . . . . . . . 673
9  269-T  . . . . . . . . . . . . . . . . . 677
10  2511-1  . . . . . . . . . . . . . . . . 682
11  2511-2  . . . . . . . . . . . . . . . . 684
12  2511-3  . . . . . . . . . . . . . . . . 687
13  2511-4  . . . . . . . . . . . . . . . . 688
14  6022  . . . . . . . . . . . . . . . . . 709
15  6018  . . . . . . . . . . . . . . . . . 712
16  6031  . . . . . . . . . . . . . . . . . 716
17  6021  . . . . . . . . . . . . . . . . . 725
18  6023  . . . . . . . . . . . . . . . . . 728
19  6027  . . . . . . . . . . . . . . . . . 731

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*MEHMET HAKAN ATILLA,*

---

*December 5, 2017*

---

*Southern District Court Reporters*

Original File HC5PATIF.txt
**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI1                                    Page 750

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                      S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                 Defendant.
 7   ------------------------------x
 8
 9                              December 5, 2017
                                    9:26 a.m.
10
11
12   Before:
13                 HON. RICHARD M. BERMAN,
14                                  District Judge
                                    and a jury
15
16
17                   APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19          Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

HC5PATI1                                    Page 751

```
 1
 2            (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
             - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
             - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                              Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

HC5PATI1        Trial                       Page 752

1    (Trial resumed)

2    (In open court; jury not present)

3    THE COURT: Please be seated. So this morning within,
4 I don't know, the last 20 minutes or so, I placed on the public
5 docket both the defense letter dated yesterday, December 4, and
6 the government's response, which I asked for by yesterday
7 evening and which I received; so it's also dated December 4.

8    These letters discuss, as you're probably aware or
9 maybe you're aware, the recent discovery given to the defense
10 by the government. So those letters are both on the public
11 docket, and I also included a short order ruling on the
12 discovery materials, and I did that because I think it's very
13 important that everyone be able to see and read both sides of
14 the story regarding the legal import of those discovery
15 materials.

16    The defense letter was on the docket yesterday
17 temporarily, as I understand it, and I think it was there
18 because it was not marked subject to a protective order and it
19 was withdrawn because it was, in fact, subject to a protective
20 order. My feeling is that since it was already viewed and
21 widely commented upon publicly, without the benefit of knowing
22 the other side of the story, there is no longer any good reason
23 for that letter or the government's response not to be publicly
24 available, and so they are both.

25    As I mentioned in my order, I do not believe the

HC5PATI1        Trial                       Page 753

1 material discussed in the defense letter is Brady material. It
2 is not exculpatory, as that term was used in the Brady case,
3 nor is it the basis of a defense, as that phrase is used in
4 Brady. At the same time, those materials may certainly be used
5 by the defense to impeach, if the defense wishes to use it in
6 that fashion.

7    Now, as to the timeliness of the disclosures, I do not
8 find that the government violated my order regarding Brady
9 materials. At the same time, I do believe that the government
10 should, and is directed to, make disclosures more promptly
11 going forward than it perhaps has done in the past and in
12 accordance with the Court's recent discussions with the
13 parties, which, as I remember correctly, should be Friday
14 evenings by 7:00 for the following week. I'm not sure, but I
15 think that these materials were produced on Sunday; is that
16 right?

17    MR. KAMARAJU: Saturday.

18    THE COURT: Saturday at 11:57 p.m. In any event, I'd
19 like to get those to the defense by Friday, as I recently
20 discussed with all of you. So that's it with respect to those
21 letters.

22    What I'm going to do today, now that the jury is
23 already here, I want to play some more of those transcripts and
24 perhaps get that all completed. If counsel for the government
25 could show me that list of remaining transcripts.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI1     Trial     Page 754

1    MR. KAMARAJU: Yes, your Honor.
2    (Pause)
3    THE COURT: Okay. So let's play the ones that have
4 the arrow next to it. Does that leave only the 25-minute
5 transcript, if we do that?
6    MR. KAMARAJU: I believe there's one more. I think
7 that's a nine-and-a-half minute call, I believe. If I could
8 have one minute, I'll see if that's right.
9    (Pause)
10    Yes, your Honor. I think there's one more, that's
11 298-T, that's nine-and-a-half minutes.
12    THE COURT: So let's play that also now, and we'll
13 have that one remaining, which I'm going to do sometime today
14 as well.
15    MR. KAMARAJU: Okay. And then, your Honor, as far as
16 any more for the government's direct, my colleagues remind me
17 there are a couple of exhibits I forgot to move into evidence
18 through Mr. Zarrab. I plan to do that.
19    THE COURT: Well, he's going to be on the stand for
20 the transcript part anyway; so if you need more with him
21 afterwards, that's fine.
22    MR. KAMARAJU: Okay.
23    THE COURT: And even ask him the same kind of
24 preliminary questions about the recordings that you're about to
25 play.

HC5PATI1     Zarrab - Direct     Page 755

1    MR. KAMARAJU: Okay.
2    THE COURT: Okay. So let's get the jury.
3    (Jury present)
4    THE COURT: Hi, how are you? So please be seated,
5 everybody.
6    THE DEPUTY CLERK: Sir, before we begin, I'd like to
7 remind you that you're still under oath.
8    THE WITNESS: (In English) Yes.
9    THE COURT: So I've asked the government to continue
10 with some of those recordings, and counsel will indicate, as
11 usual, which transcript it pertains to and reflect that
12 transcript on your screens. So if you wish to follow along,
13 you can do that.
14    MR. KAMARAJU: May I proceed, your Honor?
15    THE COURT: Yes.
16    MR. KAMARAJU: So the first call is Government
17 Exhibit 291-T.
18 REZA ZARRAB,
19    called as a witness by the Government,
20    having been previously duly sworn, testified as follows:
21 DIRECT EXAMINATION
22 BY MR. KAMARAJU:
23 Q. Mr. Zarrab, do you remember this call?
24 A. Yes, I remember, sir.
25 Q. Have you listened to a recording of it?

HC5PATI1     Zarrab - Direct     Page 756

1    THE COURT: Can you speak into that microphone.
2    MR. KAMARAJU: Sure.
3 Q. Have you listened to a recording of it?
4 A. Yes, sir. I listened to it.
5    MR. KAMARAJU: Your Honor, with the Court's
6 permission, we'd like to play the audio for 291-T.
7    THE COURT: And it's about how long?
8    MR. KAMARAJU: And it is about nine minutes.
9    THE COURT: Okay.
10    (Audiotape played)
11 BY MR. KAMARAJU:
12 Q. Now, Mr. Zarrab, was that a recording of the conversation
13 reflected in Government Exhibit 291-T?
14 A. Yes, sir.
15 Q. And does Government Exhibit 291-T accurately reflect that
16 conversation?
17 A. Yes, sir.
18    MR. KAMARAJU: With the Court's permission, we'd go on
19 to the next call.
20    THE COURT: Sure.
21    MR. KAMARAJU: It's Government Exhibit 297-T. It's
22 approximately four minutes.
23    THE COURT: Okay.
24    (Audiotape played)
25 BY MR. KAMARAJU:

HC5PATI1     Zarrab - Direct     Page 757

1 Q. Now, Mr. Zarrab, was that a recording of a conversation
2 reflected in Government Exhibit 297-T?
3 A. Yes, sir.
4 Q. And does Government Exhibit 297-T accurately reflect that
5 conversation?
6 A. Yes, sir.
7    MR. KAMARAJU: Your Honor, the next call is Government
8 Exhibit 298-T. It's about nine-and-a-half minutes.
9    THE COURT: Okay.
10    (Audiotape played)
11 BY MR. KAMARAJU:
12 Q. Now, Mr. Zarrab, was that conversation the conversation
13 reflected in Government Exhibit 298-T?
14 A. Yes, sir.
15 Q. And does Government Exhibit 298-T accurately reflect the
16 conversation we just heard?
17 A. Yes, sir.
18    MR. KAMARAJU: Your Honor, the next call is Government
19 Exhibit 300-T. It's about four minutes.
20    THE COURT: All right.
21    (Audiotape played)
22 BY MR. KAMARAJU:
23 Q. Now, Mr. Zarrab, was that a recording of the conversation
24 reflected in Government Exhibit 300-T?
25 A. Yes, sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 5, 2017

HC5PATI1          Zarrab - Direct          Page 758

1  Q. And does Government Exhibit 300-T accurately reflect the
2  conversation we just heard?
3  A. Yes, sir.
4          MR. KAMARAJU: All right. Your Honor, the next call
5  is Government Exhibit 304-T, and it's about six minutes.
6          THE COURT: Okay.
7          (Audiotape played)
8  BY MR. KAMARAJU:
9  Q. Mr. Zarrab, was that a recording of the conversation
10  reflected in Government Exhibit 304-T?
11  A. Yes, sir.
12  Q. And does Government Exhibit 304-T accurately reflect the
13  conversation we just heard?
14  A. Yes, sir.
15          MR. KAMARAJU: Your Honor, the last call is Government
16  Exhibit 306-T.
17          THE COURT: How long?
18          MR. KAMARAJU: It's about a minute.
19          THE COURT: Yes. You know what, I think I'm going to
20  do the long one too, actually.
21          MR. KAMARAJU: Okay.
22          THE COURT: Because it's part of Mr. Zarrab's
23  testimony; so I don't know how we would do it otherwise.
24          MR. KAMARAJU: Okay. We'll cue that up for after.
25          (Audiotape played)

HC5PATI1          Zarrab - Direct          Page 759

1  BY MR. KAMARAJU:
2  Q. Mr. Zarrab, was that a recording of the conversation
3  reflected in Government Exhibit 306-T?
4  A. Yes, sir.
5  Q. And does Government Exhibit 306-T accurately reflect that
6  conversation?
7  A. Yes, sir.
8          MR. KAMARAJU: So the next one we discussed,
9  Government Exhibit 232-T, it's about 25 minutes.
10          THE COURT: Okay. This is the last one, right?
11          MR. KAMARAJU: Your Honor, I believe there's actually
12  just one more. I'm just figuring out how long it is. We'll go
13  to 232-T and move on.
14          THE COURT: This is the longer one?
15          MR. KAMARAJU: Yes.
16          THE COURT: So bear with us. It's, what, 25 minutes?
17          MR. KAMARAJU: 25 minutes.
18          (Audiotape played)
19          (Continued on next page)
20
21
22
23
24
25

HC53ATI2          Zarrab - Direct          Page 760

1  Q. Mr. Zarrab, did we just listen to a recording of a
2  conversation reflected in Government Exhibit 232-T?
3  A. Yes, sir.
4  Q. Does Government Exhibit 232-T accurately reflect the
5  conversation we just heard?
6  A. Yes, sir.
7          MR. KAMARAJU: Last one, your Honor.
8          THE COURT: One more?
9          MR. KAMARAJU: Government Exhibit 229-T, and it is
10  about two and a half minutes long.
11          THE COURT: Okay.
12          (Audio recording playing)
13  Q. Mr. Zarrab, did we just hear a conversation that was
14  reflected in Government Exhibit 229-T?
15  A. Yes, sir.
16  Q. Does Government Exhibit 229-T accurately reflect that
17  conversation?
18  A. Yes, sir.
19          MR. KAMARAJU: I believe that's all the calls, your
20  Honor.
21          THE COURT: Great. Thanks for your patience. I think
22  it is helpful that everybody knows what the jury knows.
23          Do you have anything else for Mr. Zarrab?
24          MR. KAMARAJU: I have another 15 minutes or so.
25          THE COURT: Do you need a break? We'll take a

HC53ATI2          Zarrab - Direct          Page 761

1  five-minute break.
2          (Jury excused)
3          THE COURT: We'll resume in about five minutes.
4  Thanks.
5          (Recess)
6          (In open court; jury present)
7          THE DEPUTY CLERK: Sir, again I'd like to remind you,
8  you're still under oath.
9          THE WITNESS: Yes, ma'am.
10          MR. KAMARAJU: May I proceed, your Honor?
11          THE COURT: Sure.
12  BY MR. KAMARAJU:
13  Q. Mr. Zarrab, I'd like to show you what has been marked for
14  identification as Government Exhibit 1270, 1270-T, 1271,
15  1271-T, 1272, 1272-T, 1273, 1273-T, 1274, 1274-T, 1275, 1275-T,
16  1276, 1276-T, 1277, 1277-T, 1278, 1278-T, 1279, 1279-T and 1280
17  and 1280-T.
18          MR. KAMARAJU: All the exhibits that I mentioned that
19  are dash T have already been admitted subject to connection.
20          MS. FLEMING: We stipulated to the translation, your
21  Honor.
22          MR. KAMARAJU: May I approach?
23          THE COURT: Yes.
24          MR. KAMARAJU: I thought it might be easier for a hard
25  copy for you.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 5, 2017

| HC53ATl2 | Zarrab - Direct | Page 762 |
|---|---|---|

1          THE COURT: Thanks.
2 Q. Mr. Zarrab, can you just take a moment to review those
3    exhibits.
4 A. Yes, sir.
5 Q. Have you had a moment to look at them?
6 A. Yes, sir.
7 Q. Do you recognize them?
8 A. Yes, sir, I recognize them.
9 Q. What are they?
10 A. They're messages.
11 Q. Who are the participants to those messages?
12 A. They are messages between myself and my lawyer who had
13    political connections.
14 Q. Approximately when did these communications take place?
15 A. In the year of 2014 and continuing from there.
16 Q. What was the general topic of these conversations?
17 A. They're about Halkbank and about the Iranian trade with the
18    bank.
19 Q. Do these communications -- I'm sorry, you said they
20    occurred in 2014?
21 A. Yes, sir. The best I can remember.
22 Q. Generally speaking, what were you discussing about Halkbank
23    and the Iranian business?
24 A. This is about continuing on with the existing -- the former
25    system at Halkbank for this trade.

| HC53ATl2 | Zarrab - Direct | Page 763 |
|---|---|---|

1 Q. So are these communications about your attempts to restart
2    your business at Halkbank?
3 A. Yes, sir.
4          THE COURT: This is after the December arrest in 2013?
5          THE WITNESS: Yes, your Honor.
6          MR. KAMARAJU: The government would offer Government
7    Exhibit 1270, 1270-T, 1271, 1271-T, 1272 -- actually, 1272,
8    1273, 1274, 1275, 1276, 1277, 1278, 1279 and 1280.
9          MS. FLEMING: Can we get the the name of the lawyer
10    whose name was on it?
11 Q. What's the name of the attorney?
12 A. Mustafa Dogan.
13          MR. KAMARAJU: Government will offer them.
14          THE COURT: I'll allow them.
15      (Government's Exhibit 1270 through 1280 received in
16    evidence)
17 BY MR. KAMARAJU:
18 Q. I didn't have a lot of questions on those, Mr. Zarrab.
19    I'd like to show you a different exhibit. Government
20    Exhibit 6012. Can you take a look at that.
21 A. Yes, sir.
22 Q. Do you recognize it?
23 A. I recognize it, sir.
24 Q. What is it?
25 A. It's electronic mail, sir.

| HC53ATl2 | Zarrab - Direct | Page 764 |
|---|---|---|

1 Q. Who sends the e-mail?
2 A. Jafar Saeid, sir.
3 Q. Who is that?
4 A. It is one of the employees that worked in my company during
5    that time frame, sir.
6 Q. Who receives the e-mail?
7 A. Aykut Okumus, sir.
8 Q. Remind us who that is.
9 A. Aykut Okumus is one of the employees that worked in my
10    company during that period of time, and he worked in the
11    department that had communication with the bank.
12 Q. What is the date of the e-mail?
13 A. August 5, 2013, sir.
14 Q. We can turn to the next page of the exhibit.
15          Do you recognize what's here?
16 A. I recognize it, sir.
17 Q. What is it?
18 A. This is a sample invoice. It is one of those documents
19    that we turn in to Halkbank. It is among those documents that
20    would be submitted to Halkbank.
21 Q. Can we go to the next page, please.
22          Do you recognize this?
23 A. Yes, sir.
24 Q. What is it?
25 A. And this also is one of the documents that is part of the

| HC53ATl2 | Zarrab - Direct | Page 765 |
|---|---|---|

1    documentation that would be submitted to the bank, to Halkbank.
2 Q. Was that type of document submitted regularly to the bank?
3 A. This is one of those documents that would fall into the set
4    of documents that we turn in to submit to the bank per
5    transaction, sir.
6          MR. KAMARAJU: The government would offer Government
7    Exhibit 6012 and ask to publish it to the jury.
8          MS. FLEMING: Objection. Foundation and hearsay.
9          THE COURT: I'll allow it.
10          MR. KAMARAJU: If we can go back to page two.
11      (Government's Exhibit 6012 received in evidence)
12 Q. Remind us again what this document is.
13 A. It is a pro forma or it's an invoice, and it is the invoice
14    that shows what would correspond with the payment that had been
15    sent from Iran.
16 Q. Does this invoice reflect what goods are supposedly being
17    shipped?
18 A. On the document.
19 Q. Yes.
20 A. In other words, there is no real products being shipped.
21    Only on the document. This document shows it as if they are,
22    yes.
23 Q. What does the document say is being shipped?
24 A. (In English) Frozen chicken leg.
25 Q. Where does it say frozen chicken leg comes from?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC53ATI2          Zarrab - Direct          Page 766

1  A. It shows under the item "description" section.
2  Q. What country does the frozen chicken leg originate in?
3  A. Ukraine.
4  Q. What is the quantity of the frozen chicken leg that's
5    reflected on this document?
6  A. It's 4,365 tons.
7  Q. Where are the frozen chicken legs supposed to be delivered?
8  A. To Iran.
9  Q. Where on this document do you see that?
10  A. When we look that the document as it's shown on the screen,
11    from the very top it is the second box down and over, and it
12    says "final delivery place."
13  Q. Do you see the box that says "amount" on almost the bottom
14    right of the screen there?
15  A. Yes, sir.
16  Q. What's that?
17  A. It's the total amount for the chicken legs.
18  Q. What is listed there?
19  A. 5,107,050 euros, sir.
20  Q. Do you see where it says "name of the beneficiary company"?
21  A. Yes, I see that, sir.
22  Q. What's that field represent?
23  A. So this is the name of the buyer's account, and it
24    represents the money that would be sent for the chicken legs
25    for this transaction.

HC53ATI2          Zarrab - Direct          Page 767

1  Q. Do you see where it says "name of the bank"?
2  A. Yes, sir.
3  Q. What is listed there?
4  A. This is the name of the bank that the money would be sent
5    to from Iran and that money would be received at.
6  Q. On this document, which bank is that?
7  A. Turkey Halkbank.
8       MR. KAMARAJU: Can we go to the next document.
9  Q. What's this?
10  A. This is also one of those documents that would be turned to
11    the bank as documentation.
12  Q. What does this document reflect?
13  A. This also has some information about the transaction.
14  Q. Do you see where it says "frozen chicken leg"?
15  A. Yes, I see that, sir.
16  Q. What is that a reference to?
17  A. This is the product that's supposedly going to Iran.
18       MR. KAMARAJU: Can we turn to the next document.
19  Q. What are we looking at here?
20  A. This is the SWIFT message, the telex message that was sent
21    from Iran for the payment to be made with Halkbank.
22  Q. When you say "payment," what is it payment for?
23  A. For the frozen chicken legs.
24       MR. KAMARAJU: Can we go to the next document, please.
25  Q. What's this?

HC53ATI2          Zarrab - Direct          Page 768

1  A. And this is the instruction by Royal Company saying that
2    the money should be transferred to the Halkbank account of the
3    supplier company, and by Royal I mean the company that I own.
4    And by Atlantis Capital General Trading, I mean the company
5    that is under my control.
6       MR. KAMARAJU: Can we look at the next one.
7  Q. What's this?
8  A. This is an instruction from Atlantis Capital Trading to
9    Halkbank. And with this document, Atlantis accepts to receive
10    the money that would be coming from Royal account.
11       MR. KAMARAJU: Can we move to the next one, please.
12  Q. What's this document?
13  A. And this is the supplier invoice that Atlantis Capital
14    General Trading had cut for Royal Maritime.
15  Q. If we can look at the next document.  What's this?
16  A. It is not very legible, but I'm testifying based on its
17    similarity to the documents that we had seen.  It is a customs
18    document.  It is a Dubaian customs document.
19  Q. Does it show that frozen chicken legs were exported?
20  A. Yes, sir, that's written.
21  Q. Could we look at the next document.  What's this?
22  A. This is a bill of lading, sir.
23  Q. What is reflected under the description of goods?
24  A. Frozen chicken legs, sir.
25  Q. Do you see at the top where it says "declaration of

HC53ATI2          Zarrab - Direct          Page 769

1    export"?
2  A. Yes, sir.
3  Q. Did you say this was a bill of lading?
4  A. This is a bill of lading.  I had mentioned the small
5    vessels that were going to and from Iran.  And for those
6    vessels, this represents the customs exit form.  For example,
7    it could also show all the information related to the transport
8    such as the ship's information, so it goes for anything for
9    those types of small vessel shipments.
10  Q. Can we look at the next document, please.  What's this?
11  A. I can't see the top section.
12       THE COURT: Do you all have it?  There you go.  Is
13    that better?
14       MR. KAMARAJU: We'll try again.
15  Q. What is this?
16  A. And this is the final invoice that was cut by Royal, sir.
17  Q. When would you typically cut the final invoice?
18  A. At the last, the final phase.
19  Q. Do you see at the top where it says "Credit Institution for
20    Development"?
21  A. Yes, I see that, sir.
22  Q. What is that?
23  A. This is the name of an Iranian bank, sir.
24  Q. From these documents, can you tell what role the Iranian
25    bank was supposed to be playing in this transaction?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC53ATI2    Zarrab - Direct    Page 770

1 A. The frozen chicken legs were purchased by the Iranian bank,
2 sir.
3 Q. Mr. Zarrab, were you ever in the frozen chicken leg
4 business?
5 A. I've never traded chicken, sir.
6 Q. I'd like to show you what has been marked for
7 identification as Government Exhibit 6013.
8    Do you recognize this exhibit?
9 A. Yes, sir, I recognize it.
10 Q. What is it?
11 A. It is an electronic mail, sir.
12 Q. Who sent it?
13 A. Jafar Saeid, sir.
14 Q. Who is it sent to?
15 A. Aykut Okumus, sir.
16 Q. Do both of those people work for you?
17 A. Yes, both of these individuals were among the personnel
18 that worked with me at that time.
19    MR. KAMARAJU: Can we turn to the next page of the
20 exhibit, please. Blow that up.
21 Q. What's this?
22 A. This is a document that is for a different product, but is
23 one that was within the set of documents that we had looked at
24 earlier.
25 Q. So, is this an example of the kind of document you

HC53ATI2    Zarrab - Direct    Page 771

1 submitted to Halkbank?
2 A. Yes, sir.
3 Q. What kind of document is this?
4 A. It's the pro forma, the first invoice, sir.
5    MR. KAMARAJU: If we can turn to the next, turn to the
6 next page.
7 Q. What's this?
8 A. This is the message that's sent so that the money would be
9 sent from the Iranian bank to our account, sir.
10 Q. Mr. Zarrab, is this a package of documents that would
11 typically be submitted to Halkbank?
12 A. Yes, sir.
13    MR. KAMARAJU: Government would offer Government
14 Exhibit 6013.
15    MS. FLEMING: Objection. Foundation and hearsay.
16    THE COURT: I'll allow it.
17    (Government's Exhibit 6013 received in evidence)
18    THE COURT: Are you going to ask more questions about
19 it?
20    MR. KAMARAJU: Yes, just a couple.
21    THE COURT: Sure. For example, what product is
22 covered?
23    MR. KAMARAJU: Yes, your Honor. That's exactly what I
24 was going to ask.
25 Q. We're on page two of the exhibit. I believe you testified

HC53ATI2    Zarrab - Direct    Page 772

1 this is a pro forma invoice; is that right?
2 A. Yes, sir, that's correct.
3 Q. Does it relate to a purported shipment of goods?
4 A. Only on the document, sir.
5 Q. What goods are shown on the document?
6 A. (In English) Coconut virgin oil.
7 Q. Where is the coconut virgin oil supposed to originate?
8 A. Indonesia.
9 Q. How much coconut virgin oil was supposed to be shipped?
10 A. 2,360 tons.
11 Q. What's the amount of the transaction?
12 A. 5,074,000 euros, sir.
13 Q. Who is selling the coconut virgin oil, according to the
14 document?
15 A. Royal Maritime Industrial Machinery Company, which is the
16 company that I own, sir.
17 Q. Who is listed on the document as the buyer for the coconut
18 virgin oil?
19 A. Credit Institute for Development.
20 Q. Remind us, what's that?
21 A. This is an Iranian bank, sir.
22 Q. I'd like to show you what's been marked for identification
23 as Government Exhibit 6014.
24 A. Yes, sir.
25 Q. Do you recognize this document?

HC53ATI2    Zarrab - Direct    Page 773

1 A. I recognize it, sir.
2 Q. What is it?
3 A. It's an electronic mail, sir.
4 Q. Who is it from?
5 A. Jafar Saeid, sir.
6 Q. Who is it to?
7 A. Aykut Okumus, sir.
8 Q. Do they both work for you?
9 A. Yes, sir, both of these individuals worked for my company
10 during that period of time.
11 Q. What's the date of the e-mail?
12 A. August 5, 2013, sir.
13 Q. Can we turn to the next page, please. What's this?
14 A. This is also the initial invoice, the pro forma invoice
15 that is provided by our company, sir.
16 Q. When you say provided by your company, who would it be
17 provided to?
18 A. This is one of those documents that belongs to the package
19 of documents that are given to the bank.
20    MR. KAMARAJU: The government would offer Government
21 Exhibit 6014.
22    MS. FLEMING: Objection. Foundation and hearsay.
23    THE COURT: I'll allow it.
24    (Government's Exhibit 6014 received in evidence)
25    MR. KAMARAJU: If we can publish that at page two,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC53ATl2          Zarrab - Direct          Page 774

1   please.
2   Q.  What good is listed on this document as being shipped?
3   A.  Frozen chicken breast.
4   Q.  According to the document, where does the frozen chicken
5   breast come from?
6   A.  It's Brazil, sir.
7   Q.  According to the document, where does it go?
8   A.  Bandar Abbas, Iran, sir.
9   Q.  According to the document, how much frozen chicken breast
10  was supposed to be shipped?
11  A.  745 tons, sir.
12  Q.  What was the amount of the transaction?
13  A.  It is 5,114,425 euros -- excuse me.  Turkish lira, sir.
14  Q.  Who is supposed to be selling the frozen chicken breast,
15  according to the document?
16  A.  It's Royal Maritime Industrial Machinery Company, which is
17  the company that I own, sir.
18  Q.  Who is supposed to be buying the frozen chicken breast,
19  according to the document?
20  A.  Credit Institution for Development, sir.
21      MR. KAMARAJU: Last one.  Could we please pull up for
22  identification Government Exhibit 6015.
23  Q.  Do you recognize it?
24  A.  Yes, sir, I recognize it.
25  Q.  What is it?

HC53ATl2          Zarrab - Direct          Page 775

1   A.  It is an electronic mail, sir.
2   Q.  Whose it from?
3   A.  From Jafar Saeid, sir.
4   Q.  Who is it to?
5   A.  Aykut Okumus, sir.
6   Q.  What's the date of the e-mail?
7   A.  August 5, 2013, sir.
8       MR. KAMARAJU: Can we turn to the next page, please.
9   Q.  What's this?
10  A.  It the pro forma invoice that was submitted by our company,
11  the company that I own, to the bank.
12      MR. KAMARAJU: The government would offer Government
13  Exhibit 6015.
14      MS. FLEMING: Objection.  Foundation and hearsay.
15      THE COURT: I'll allow it.
16      (Government's Exhibit 6015 received in evidence)
17      MR. KAMARAJU: And ask to publish at page two.
18      THE COURT: Okay.
19  Q.  Mr. Zarrab, according to the document, what goods were
20  supposed to be shipped?
21  A.  Virgin olive oil, sir.
22  Q.  How much virgin olive oil was supposed to be shipped?
23  A.  1,011 tons, sir.
24  Q.  What was the value of the transaction?
25  A.  It is 5,095,440.

HC53ATl2          Zarrab - Direct          Page 776

1   Q.  According to the document, who was selling the virgin olive
2   oil?
3   A.  The Royal Maritime and Industrial Machinery Trade Company,
4   sir.
5       THE COURT: The amount you stated is in what currency?
6       THE WITNESS: Turkish lira, your Honor.
7   Q.  Who is supposed to be buying the virgin olive oil,
8   according to the document?
9   A.  Credit Institute for Development, sir.
10  Q.  Mr. Zarrab, have you ever traded coconut virgin oil?
11  A.  I've never traded coconut oil.
12  Q.  Have you ever traded frozen chicken breasts?
13  A.  No.  I've never done frozen chicken legs either.
14  Q.  Have you ever traded virgin olive oil?
15  A.  No, sir, I never traded olive oil either.
16  Q.  Did you ever tell anyone at Halkbank that you did trade any
17  of those products?
18  A.  No.  They only had what's shown on the documents.
19  Q.  Are the documents that we've been looking at, are those the
20  kinds of documents you were discussing with Halkbank?
21  A.  Yes, sir.  These are the documents that are presented to
22  Halkbank from our company.
23  Q.  Are these the kinds of documents that you were discussing
24  with Hakan Atilla?
25  A.  Yes, sir.  It is among the set of documents, the

HC53ATl2          Zarrab - Cross          Page 777

1   documentation, that was agreed upon in the beginning.
2       MR. KAMARAJU: If I could have just one moment, your
3   Honor.
4       No further questions at this time, your Honor.
5       THE COURT: Thank you.  Ms. Fleming for
6   cross-examination.
7       MS. FLEMING: Thank you, your Honor.
8       Your Honor, may I proceed?
9       THE COURT: Sure.
10  CROSS-EXAMINATION
11  BY MS. FLEMING:
12  Q.  Good morning, Mr. Zarrab.  My name is Cathy Fleming, and
13  along with the other people at the counsel's table, I represent
14  Mr. Atilla.
15  A.  Good morning, ma'am.
16  Q.  We met briefly once at the MDC for about a minute, correct?
17  A.  No, ma'am.
18  Q.  You don't remember meeting me at the MDC to find out when
19  your lawyers were going to leave so we would have the
20  opportunity to meet with our client?
21  A.  I remember, ma'am.
22  Q.  You have declined to meet with any of us with your lawyers
23  so that we could interview you and ask you any of the facts;
24  isn't that true?
25  A.  I have met with this lady twice, that was also in the back

**A482**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

| HC53ATI2 | Zarrab - Cross | Page 778 |
|---|---|---|

1   during a court hearing. So not once, but I had met her twice.
2        That's why I had said no to one time, ma'am.
3   Q. So when I was speaking with my client in the back, you saw
4   me, correct? That's what you're referencing?
5   A. The lady, just like in the MDC, as she was passing by she
6   said hello, hello, and passed by just like during that time.
7   Q. But you have refused to be interviewed by Mr. Atilla's
8   counsel in the presence of your lawyers just so we could ask
9   you about questions before this trial; isn't that true?
10  A. Yes, I refused to meet with Mr. Hakan Atilla's lawyers.
11  Q. And that is because you were angry at what Mr. Atilla and
12  his lawyers said about you in motion papers; isn't that
13  correct?
14  A. It is absolutely not correct, no.
15  Q. Isn't that what you had your lawyer tell us?
16  A. It is one of those things that I had asked him to convey.
17  Q. Let me just ask you a couple of questions to make clear
18  what we heard on direct.
19        You never paid a bribe to Mr. Atilla, correct?
20  A. No, I have never paid bribes to Mr. Hakan Atilla, ever.
21  Q. And Mr. Atilla has never asked you for any money, ever,
22  correct?
23  A. That is correct; Mr. Hakan Atilla has never requested any
24  money from me, ever.
25  Q. And you are aware that he was never fond of you; is that

| HC53ATI2 | Zarrab - Cross | Page 779 |
|---|---|---|

1   fair to say?
2   A. That is fair, ma'am.
3   Q. It's fair that you did not like him either?
4   A. That is fair, ma'am.
5   Q. It's also fair to say that during the time of your business
6   at Halkbank, you complained about Mr. Atilla to his boss,
7   Mr. Suleyman Aslan?
8   A. Sometimes, ma'am.
9   Q. In fact, in addition to the recording we heard where you
10  called him a wrench in the gears, you have complained about him
11  at other times, correct?
12  A. That is absolutely correct, ma'am.
13  Q. It's also true that in your phones he was never -- he was
14  not in your contacts that we have here in discovery, correct?
15  A. That is correct. Mr. Hakan Atilla's phone number is not
16  among the contacts that was in the discovery.
17  Q. And we have seen in Exhibit 1002 and 1002-T approximately
18  1,000 or slightly more than 1,000 messages between you and
19  Mr. Suleyman Aslan; is that correct?
20  A. I don't know the count of the messages, but it is true that
21  I was in a more regular contact with Mr. Suleyman Aslan; that
22  is correct.
23  Q. More regular contact. Do you agree with me that there are
24  approximately 55 pages contained in Government Exhibit 1002,
25  and approximately 15 to 20 messages per page?

| HC53ATI2 | Zarrab - Cross | Page 780 |
|---|---|---|

1   A. As I said, I don't recall, I don't know the page count.
2   But it is true that I was in a close relationship with
3   Mr. Suleyman Aslan.
4        MS. FLEMING: Your Honor, may I approach?
5        THE COURT: Sure.
6   Q. And your chats with Mr. Aslan only covered the period from
7   December 2012 through approximately the end of November 2013;
8   isn't that correct?
9   A. I don't know the exact date range that is reflected on the
10  document that you're holding, ma'am.
11  Q. In addition to Mr. Aslan, you had chats with a number of
12  other people, correct?
13  A. Can I get a more specific question?
14  Q. Do you remember whether in 2012 and 2013 whether you did
15  WhatsApp chats with any other people?
16  A. Of course, there would have been many messaging sessions.
17  Q. Do you remember -- withdrawn.
18        MS. FLEMING: Your Honor, may I approach?
19        THE COURT: Sure.
20  Q. I'm going to show you what's been entered into evidence as
21  Government Exhibit 1002 and ask you to take a look at
22  Government Exhibit 1002 and see if that helps your memory on
23  what time frame is covered by those chats with Suleyman Aslan.
24  A. On this document that was handed to me just now, the date
25  range shows that the messaging began on December 23, 2012, and

| HC53ATI2 | Zarrab - Cross | Page 781 |
|---|---|---|

1   ended on November 22, 2013.
2   Q. You have 1002, which is the Turkish version. Can you tell
3   us how many pages are contained reflecting that approximate 11
4   months and then approximately how many messages there are per
5   page?
6        MR. KAMARAJU: Objection.
7        THE COURT: I'll allow it.
8   A. The page count of the document I was just handed over to me
9   appears to be 49. And the message count that I counted on the
10  first page is 16, ma'am.
11       (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

1 Q. And it's true, is it not, that you never had a single chat
2　message with Mr. Atilla, correct?
3 A. I don't recall whether there was any message with
4　Mr. Atilla, but I just don't recall.
5 Q. He's not in your phone is he? His number is not in your
6　phone, is he, sir?
7　　　THE COURT: We've been over that, haven't we?
8　　　THE INTERPRETER: Could you please repeat that?
9　　　MS. FLEMING: Withdrawn.
10 Q. You've had, since you were arrested in this case, the
11　discovery in this case, correct?
12 A. By discovery, I don't know what you mean.
13 Q. Did you receive, as a defendant in this case, all of the
14　recordings that were provided by the government for you to
15　review?
16 A. It is true that discovery documents were provided to my
17　lawyers since my arrest, and this evidence was provided from
18　time to time in part, and I don't know what date range or what
19　it covered as far as what was provided to us.
20 Q. You certainly listened to many, many recordings in Turkish,
21　have you not, sir?
22　　　THE COURT: You mean here in court or outside?
23　　　MS. FLEMING: No, outside. Prior to coming to court.
24 A. I don't understand exactly what you mean by "many."
25 Q. Before you agreed to cooperate with the government, you

1　certainly listened to some of your recorded conversations in
2　discovery, correct?
3 A. No, that is absolutely not correct.
4 Q. You had not listened to any of your conversations before
5　you made a decision to plead guilty?
6 A. When the CD came, out of curiosity I opened up and I
7　listened to a few, but I didn't listen to the rest because I
8　already knew them from December 17th.
9 Q. So you had listened to them back in Turkey, back in
10　December 2013, January 2014?
11　　　MR. KAMARAJU: Objection.
12 A. That is not correct.
13 Q. And after you agreed to plead guilty with the government,
14　you certainly listened to many of the recordings more than
15　you've heard played in this courtroom, correct?
16 A. No, it was not many more than this. Maybe a few more,
17　maybe a few less, I don't know.
18 Q. You listened to less calls in preparation for trial than
19　you heard here in the courtroom; is that your testimony?
20 A. No, I'd like to correct what was understood. What I meant
21　was the use of the saying in Turkish more or less. So what I
22　meant was that I listened to the conversations. I have not
23　listened to hundreds of them, not that many, but I have
24　listened to more or less the conversations that you're
25　referring to.

1 Q. And -- There's no question.
2 A. And, again, I'd like to make sure this is on the record,
3　that we're talking about a Turkish --
4 Q. There's no question.
5　　　THE COURT: He's answering your question.
6　　　MS. FLEMING: Your Honor, I think I'm asking questions
7　yes or no.
8　　　THE COURT: Well, if that's the case, we haven't done
9　that yet.
10　　　MS. FLEMING: Well, I'd ask the Court to please
11　instruct the witness to answer my questions responsively.
12　　　THE COURT: You have to ask the question yes or no.
13 BY MS. FLEMING:
14 Q. Have you listened to more than 50 calls in Turkish before
15　you came to court?
16　　　THE COURT: Yes or no?
17 Q. Yes or no.
18 A. I don't remember the count.
19 Q. Have you listened to more than four calls with Mr. Atilla's
20　voice on it?
21 A. I listened to four. I don't recall anything over that.
22 Q. Now, you've been involved in the cash exchange business and
23　various -- the various kinds of businesses that you've
24　described here, since at least 2010; yes or no?
25 A. Yes, ma'am.

1 Q. And you did not even meet Mr. Atilla until sometime late in
2　2012, according to your testimony, correct? Yes or no.
3 A. Yes, ma'am.
4 Q. Now, you told us in this court that you remember him at an
5　October meeting in 2012; do you remember that?
6 A. I did not mean that as the first ever meeting, ma'am.
7 Q. You told us that you remembered him being at a meeting
8　where you discussed business related to what you called the
9　Iranian business in October 2012; yes or no?
10 A. Yes, ma'am, that's correct.
11 Q. But in preparation for testimony and in your proffers, do
12　you remember telling the prosecutors and the FBI that you
13　remembered definitely Levent Balkan being there, but you
14　weren't sure if Mr. Atilla was there for that one? Do you
15　remember that; yes or no?
16 A. No, that is not correct.
17 Q. Do you remember meeting with members of the prosecution
18　team on August 23rd, 2017? It was your very first proffer
19　meeting. Do you remember that meeting?
20 A. I don't recall it as a date. What I remember is the first
21　proffer meeting; that is correct.
22 Q. But you don't remember telling those prosecutors -- I'll
23　withdraw it and ask it differently.
24　　　In fact, didn't you tell those prosecutors in that
25　proffer meeting that Balkan was definitely there, not sure if

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI3     Zarrab - Cross     Page 786

1   Atilla was there for that one; yes or no?
2 A. No, ma'am, that is not correct.
3 Q. Now, you also testified to a number of meetings with
4   Mr. Atilla. It is true, is it not, sir, that you have met with
5   Mr. Atilla approximately a handful of times?
6 A. That is correct, ma'am.
7 Q. And by a handful of times, you mean you've met with him
8   approximately five times?
9 A. I counted the fingers on both hands, ma'am.
10 Q. So a handful of times to you means ten? That's a yes?
11 A. I don't recall the exact count for those, ma'am.
12 Q. Do you recall telling the prosecutors and the FBI that you
13   had met with Mr. Atilla a handful of times; yes or no?
14 A. I have expressed to the prosecutor's office that I did not
15   have many meetings with Mr. Hakan Atilla, and that is correct.
16 Q. Now, you've had other involvement with money exchange and
17   money laundering schemes in other countries other than Turkey,
18   correct? Yes or no.
19 A. It is true that I was involved in money exchange pertaining
20   to Iranian trade that was done outside of the country of
21   Turkey; that is correct.
22 Q. Isn't it also true that you were involved in money
23   laundering involving Russia prior to 2010?
24 A. No, that is not correct, ma'am.
25 Q. Wasn't your chauffeur stopped at the border with $150

HC5PATI3     Zarrab - Cross     Page 787

1   million in cash in connection with your dealings in Russia in
2   2010 -- in 2007, I believe it was, yes or no? '7.
3 A. No, ma'am; that is not correct.
4 Q. Was your chauffeur ever stopped at the border in customs
5   with $150 million in cash?
6 A. My driver was never stopped in Russia with $150 million in
7   cash ever, ma'am.
8 Q. It was at the Turkey border, wasn't it, with customs, in
9   connection with business involvement -- let's just stop at
10   that. Wasn't he stopped at the Turkey customs with 150 million
11   in cash?
12 A. No, that is absolutely not correct, ma'am.
13 Q. You also were involved in business in China, correct? And
14   in connection -- correct, yes or no?
15 A. That is absolutely correct, ma'am.
16 Q. And you also had a business partner in Iran, correct?
17 A. Yes, ma'am; that is correct.
18 Q. And his name was what, sir?
19 A. There were different ones from time to time. Which time
20   frame are you referring to?
21 Q. Were you partners with somebody named Babak Zanjani?
22 A. There was never a time of partnership with the individual
23   named Babak Zanjani, ma'am.
24 Q. Didn't you have business with Babak Zanjani?
25 A. In trade, just like with other Iranians. That individual

HC5PATI3     Zarrab - Cross     Page 788

1   had sent money to my account too, ma'am.
2 Q. In addition to trade and sending money to your account,
3   didn't you, in fact, keep some of his money in your accounts on
4   his behalf?
5 A. That is absolutely not correct, ma'am.
6 Q. Didn't you purchase or be involved in a business deal with
7   him involving a plane from Ghana that had gold, 1.5 million
8   tons of gold that landed in Turkey? Excuse me. I think I
9   misspoke. 1.5 tons of gold, not 1.5 million tons of gold.
10 A. It is true that Babak Zanjani had sent one-and-a-half tons
11   of gold from Ghana to us to sell to my company in Turkey. That
12   is correct, ma'am.
13 Q. And, in fact, sir, you had problems in Iran in relationship
14   with that and other business deals; isn't that true?
15         THE COURT: I'm sorry, I didn't get the question.
16 Q. You have problems in Iran, you have legal problems if you
17   go to Iran; isn't that true?
18 A. To my knowledge, there is not any, ma'am.
19 Q. Have you told the prosecutors that you have not gone back
20   to Iran for a number of years because you've been concerned
21   about going there?
22 A. Of course, I have always had concerns about going to Iran,
23   but that's because of my lifestyle.
24 Q. And you have no concerns about any of your legal exposure
25   in Iran based on your business dealings, is that what you're

HC5PATI3     Zarrab - Cross     Page 789

1   telling us? Yes or no?
2 A. Under normal circumstances, there should not be any
3   concern.
4 Q. How about now, do you have any concern, because of your
5   legal problems, of going to Iran; yes or no?
6 A. Certainly there is.
7 Q. And how about your relationship with Babak Zanjani, do you
8   have any concerns about going to Iran based on your
9   relationships with him; yes or no?
10 A. My concern about going to Iran or not going to Iran has
11   nothing to do with my relationship with Babak Zanjani, ma'am.
12        MS. FLEMING: Your Honor, I'm saying "yes or no" at
13   the end of my questions. May I ask that the Court please
14   instruct the witness to answer my questions.
15 Q. You testified on the first day, in response to questions,
16   that cooperation is the fastest way to accept responsibility
17   and to get out of jail at once. Isn't that what you said; yes
18   or no?
19 A. Yes, I did say that that was the fastest method.
20 Q. And, indeed, since you have agreed to cooperate, your life
21   has improved in the United States, correct? Yes or no?
22 A. I don't understand what you mean by standard of life; so I
23   can't answer that question.
24 Q. Well, you're no longer in the MDC, are you, sir? Yes or
25   no?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI3  Zarrab - Cross  Page 790

1 A. Correct, I am not at the MDC, ma'am.
2 Q. And the MDC is a jail that's in Brooklyn, correct?
3 A. Yes, ma'am; that's correct.
4 Q. It's very unpleasant, correct?
5 A. We should not be offensive to the MDC that much.
6 Q. You have to wear prison clothes, correct?
7 A. During certain hours, ma'am.
8 Q. You're locked up at the times they tell you you need to be
9 locked up, correct?
10 A. Absolutely so, ma'am.
11 Q. There are a significant number of rules that make -- there
12 are a significant number of rules, correct?
13 A. Yes, ma'am; that is correct.
14 Q. You have to eat whatever the MDC puts out in front of you,
15 correct?
16 A. No; that is not correct, ma'am.
17 Q. You eat what they prepare in their cafeteria and put out,
18 correct?
19 A. No; that is not correct, ma'am.
20 Q. You can't order in, can you?
21 A. No. We can cook it ourselves.
22 Q. And, in fact, you have very much wanted to be out of jail
23 since you were arrested, correct? Yes or no.
24 A. Yes, ma'am; that is absolutely correct.
25 Q. And you have very much wanted to get out at least on bail

HC5PATI3  Zarrab - Cross  Page 791

1 before you are sentenced, correct?
2 A. When I was arrested earlier on, we did make an application
3 for being released on bail; that is correct, ma'am.
4 Q. And even after that, when you started cooperating, you and
5 your lawyers have discussed with the prosecutors that you would
6 like to make an application for bail; it will be discussed
7 after trial, correct?
8 A. It is true that my lawyers will be meeting in order to
9 discuss the bail conversation after the trial; that is correct,
10 ma'am.
11 Q. And you've been told that while there are no promises or
12 guarantees, that it will be discussed after this trial whether
13 you can get out on bail, right?
14 A. It is my understanding that an application for bail could
15 be made at any time, and there is the possibility of having a
16 conversation of bail after the trial too, yes.
17 Q. Now, you also told us that your cooperation agreement --
18   THE COURT: Excuse me. "Us," being?
19   MS. FLEMING: All of us in the courtroom.
20   THE COURT: "You testified," right?
21   MS. FLEMING: Yes.
22 Q. When you testified --
23 A. Yes, ma'am.
24 Q. -- you told the jury that you had three main obligations
25 under your cooperation agreement. You said you needed to speak

HC5PATI3  Zarrab - Cross  Page 792

1 exactly the truth; isn't that correct?
2 A. Yes, ma'am.
3 Q. You said you needed to cooperate with the United States; is
4 that correct?
5 A. Yes, ma'am.
6 Q. And you said you need never to commit any crime after this?
7 A. Yes, ma'am.
8 Q. That's correct? And you said, in exchange, you will get a
9 5K letter to the Court, which will explain all of the crimes I
10 have committed, all the help I have provided to the United
11 States government, good and bad and everything? Did I say it
12 accurately?
13 A. Yes, ma'am.
14 Q. But your cooperation agreement actually requires you to do
15 more than that, doesn't it, sir?
16 A. For example?
17   MS. FLEMING: Your Honor, may I use the easel?
18 Q. Your cooperation agreement is written, isn't it?
19 A. Yes, ma'am.
20 Q. And your cooperation agreement requires that you provide
21 "substantial assistance in the investigation or prosecution of
22 others;" isn't that correct, sir?
23 A. I don't remember the verbatim that's mentioned in the
24 agreement, but the fact that I would be cooperating and
25 providing information is correct, ma'am.

HC5PATI3  Zarrab - Cross  Page 793

1   MS. FLEMING: Your Honor, may I approach?
2   THE COURT: Sure.
3 Q. Mr. Zarrab, would you look at that. Read it to yourself.
4 A. Which section, ma'am?
5 Q. I'm going to direct your attention to it in one minute. On
6 page 5, in the middle of the page, the second full paragraph
7 down, starting in the middle, if you could look at that to
8 yourself. There's a sentence that says: "In addition, if this
9 office determines that the defendant has provided substantial
10 assistance" --
11   MR. KAMARAJU: Objection, your Honor. She's reading.
12   THE COURT: Sustained.
13 Q. Would you read the sentence that starts "In addition" to
14 yourself.
15   THE INTERPRETER: Can I just read it real quick so I
16 can also help him? Excuse me, does it start with "In addition,
17 if this office"?
18   MS. FLEMING: May I go point it out, your Honor?
19   THE COURT: Sure.
20   MS. FLEMING: Thank you. Got it?
21   THE INTERPRETER: Excuse me. So you highlighted the
22 whole section.
23   THE COURT: Counsel, could you point it out to the
24 witness and not the interpreter.
25   MS. FLEMING: I'm sorry, I thought -- right here.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 5, 2017

HC5PATI3          Zarrab - Cross          Page 794

1  A.  I'm reading, ma'am.  "In addition" --
2  Q.  Don't read it out loud.  Read it to yourself, please.
3  A.  Okay.
4        (Pause)
5        If you can translate this for me so I understand what
6  it says.
7        MS. FLEMING: Could you please do it without the
8  microphone.
9        THE INTERPRETER: Without the microphone?
10       MS. FLEMING: Please.
11       (Pause)
12  A.  Yes, ma'am, I read it.
13  Q.  Does that refresh your recollection that you are required,
14  under your plea agreement, to provide substantial assistance in
15  an investigation or prosecution in order for the government to
16  make a 5K1.1 motion?
17  A.  Yes, it reminds me that I need to provide substantial
18  assistance, and I also know that I need to provide substantial
19  assistance.
20  Q.  And the 5K motion can only be made by the government,
21  correct?
22  A.  Yes, ma'am.
23  Q.  And a 5K motion is made by the government if they believe
24  you have complied with all of your obligations under the
25  agreement, including providing substantial assistance, to ask

HC5PATI3          Zarrab - Cross          Page 795

1  the sentencing judge to sentence you below the sentencing
2  guidelines; isn't that correct?
3  A.  Yes; that is correct, ma'am.
4  Q.  And if you do not comply with those understandings,
5  including providing substantial assistance, it is correct, is
6  it not, that the government is released from its obligation to
7  make a 5K motion?
8  A.  There are many obligations that I need to fulfill within my
9  cooperation agreement with the government, and this is one of
10  those.
11  Q.  And it is the government who decides if you have fulfilled
12  them, correct?
13  A.  That is correct, ma'am, absolutely.
14  Q.  And if the government decides you have not fulfilled them,
15  they are released from their obligations, correct?
16  A.  That is correct, ma'am.
17  Q.  Now, from the first day that you were arrested by the FBI,
18  you have been told by the government, meaning the FBI, that it
19  was in your best interest to cooperate, correct?
20  A.  That is correct.  When I was arrested the first time at the
21  airport, that was mentioned to me.
22  Q.  And do you recall that they told you that you were facing
23  years and years in jail?
24  A.  Yes, ma'am; that's correct.
25  Q.  And do you recall the FBI agent telling you, the more you

HC5PATI3          Zarrab - Cross          Page 796

1  help us, the more we can help you with the amount of time you
2  will see in prison?
3  A.  I don't recall those sentences exactly, ma'am.
4  Q.  I'll come back to that.
5  A.  Certainly.
6  Q.  And you lied to the FBI when you were arrested, correct?
7  A.  Yes; that is correct, ma'am, I did lie.
8  Q.  You were arrested in Miami, correct?
9  A.  Yes, ma'am.  I was arrested in Miami; that is correct.
10  Q.  And you spent a few weeks in Miami before you were sent up
11  to New York; is that also correct?
12  A.  Yes, ma'am; that is correct as well.
13  Q.  But you had your lawyers make their first proffer to the
14  government in August of 2016; is that correct?
15  A.  I don't recall the exact date of the first ever proffer
16  regarding cooperation with the government.
17  Q.  Was it a few months after you were arrested?
18  A.  No, ma'am.
19  Q.  It was before Mr. Atilla had been arrested; isn't that
20  true?
21  A.  What are you referring to?  I don't understand the question
22  very well.
23  Q.  When your attorneys went in and your attorneys made their
24  first proffer, do you recall that?
25  A.  The time that my lawyers went in and discussed the details

HC5PATI3          Zarrab - Cross          Page 797

1  about cooperation with the government was before Mr. Atilla was
2  arrested; that is correct, ma'am.  But I did not enter into a
3  cooperation at that time.
4  Q.  And the way it works is that an attorney goes in and tells
5  the government what information you have about criminal
6  activity, correct?
7        MR. KAMARAJU: Objection.
8        THE COURT: I'll allow it.  I'm not sure it's so easy
9  to understand that question.
10       MS. FLEMING: Judge, I'm doing my best.
11       THE COURT: No, no, I know.  Maybe you could rephrase
12  that.
13  BY MS. FLEMING:
14  Q.  With the first meeting, your attorneys met with the
15  government and you were not present, correct?
16  A.  Yes, ma'am.
17  Q.  And do you understand that to be an attorney proffer?
18  A.  No, ma'am.
19  Q.  Do you understand that the attorneys discussed with the
20  government what information you might have, to see whether a
21  cooperation agreement will be of interest to the government?
22  A.  Yes, ma'am.
23  Q.  And it's fair to say that your attorneys never mentioned
24  the name of Mr. Atilla when they went and met before he was
25  arrested, fair?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI3          Zarrab - Cross          Page 798

1 A. During their first meeting, they did not talk about any
2 names, ma'am.
3 Q. The process that goes forward, you waited -- it took a year
4 between that first meeting and your second meeting, your second
5 attorney proffer to continue discussions with the government
6 about cooperating; is that fair to say?
7 A. No, that would not be fair, ma'am.
8 Q. How long was it between your first proffer session and the
9 second; do you remember?
10 A. I never attended a proffer session with the prosecutors a
11 year ago, ma'am.
12 Q. All right. Let me rephrase my question.
13 A. Please.
14 Q. The first time you attended a proffer session with the
15 government was in August of 2017; is that correct?
16 A. Yes, ma'am; that is correct.
17 Q. And your lawyers had met with the government approximately
18 a year before that for the first time to discuss it, but it had
19 not gone through; is that fair?
20 A. That they -- it was approximately a year when they had
21 first had that meeting, yes; that would be fair, ma'am.
22 Q. Now, in between, in that year, you had attorneys in Turkey
23 and in the United States who were trying to secure your release
24 through political means; isn't that true?
25 A. Within the bounds of law, they did make efforts, and that

HC5PATI3          Zarrab - Cross          Page 799

1 is correct, ma'am.
2 Q. And, in fact, you hired Rudy Giuliani and former Attorney
3 General Michael Mukasey as your attorneys in the United States
4 to try to work out a solution for you in Turkey, correct?
5 A. That is correct, ma'am.
6 Q. And you believed that this was going to work for a year,
7 correct?
8 A. I thought that it may become possible, ma'am.
9 Q. And, in fact, you are furious with people in Turkey that it
10 did not work; isn't that true?
11 A. I don't have any anger towards anybody, ma'am.
12 Q. A proffer process -- I'd like to focus you on after you
13 agreed to cooperate with the government, what that process
14 looks like, okay?
15 A. Go ahead, ma'am.
16 Q. So in August of 2017, your American attorneys went in again
17 and made a second attorney proffer to the United States
18 government and started the process for you to cooperate again,
19 correct?
20 A. That is not correct, ma'am.
21 Q. Didn't your attorneys meet with the U.S. Attorneys on
22 August 17th, 2017, to start the process again for you?
23 A. They did that, ma'am.
24 Q. And then you went in and met with the prosecutors and FBI
25 and did something called a proffer; is that correct?

HC5PATI3          Zarrab - Cross          Page 800

1 A. That is correct, ma'am.
2 Q. Now, a proffer means that they interview you and you tell
3 them what you know, and then the government tells you --
4      THE COURT: Do you want him to answer it?
5      MS. FLEMING: I'm trying to finish the question,
6 Judge.
7      THE COURT: Oh.
8 Q. -- and in order for the government to tell you whether they
9 are willing to enter into a cooperation agreement with you?
10 A. That is correct, ma'am.
11 Q. And, in fact, you signed something called a proffer
12 agreement. Do you remember doing that?
13 A. I remember, ma'am; that's correct.
14 Q. And the government agrees it won't use directly against you
15 what you tell them in the proffer agreement?
16 A. During that first meeting, that proffer agreement was
17 presented to me and was read to me and was also interpreted
18 into Turkish for me, but I don't recall all the paragraphs and
19 all the conditions set therein; so I don't want to misinform or
20 provide a wrong answer because I don't recall all those things.
21 Q. Do you remember how many sessions you had with the members
22 offer the U.S. Attorney's Office and the FBI before they agreed
23 that they would have a cooperation agreement with you?
24 A. I don't recall the exact count of meetings, ma'am.
25 Q. Does the number 12 meetings sound correct?

HC5PATI3          Zarrab - Cross          Page 801

1 A. Sounds fair, ma'am.
2 Q. And they were long sessions, weren't they?
3 A. Yes, ma'am; they were long sessions.
4 Q. And then after -- I'll go through in more detail, but after
5 they -- after those 12 sessions, the government said, yes,
6 we'll enter into the cooperation agreement with you, right?
7 A. Despite the fact that I don't recall the exact count of
8 those meetings, it is true that after so many meetings, they
9 did say that they were willing to enter into cooperation
10 agreements and sign it; that is correct, ma'am.
11 Q. And the cooperation agreement is what we talked about
12 before, where you have obligations and the government has
13 obligations under that, for you to plead guilty, correct?
14 A. That is correct, ma'am.
15 Q. Now, after you entered into the cooperation agreement, you
16 pleaded guilty to a number of crimes, correct?
17 A. That is correct, ma'am.
18 Q. And you pleaded guilty to seven crimes; is that correct?
19 A. That is correct, ma'am.
20 Q. And you did that on October 25th, this year, right?
21 A. I don't recall the exact date, ma'am.
22 Q. Approximately, does that sound right?
23 A. I think it would be fair if we would say it was during that
24 time frame somewhere.
25 Q. And since the day that you pleaded guilty, you have been

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 5, 2017

HC5PATI3          Zarrab - Cross          Page 802

1   with the U.S. Attorney's Office or the FBI almost every day; is
2    that fair to say?
3   A.  That would be fair to say, ma'am.
4   Q.  Did you have meetings with them over this past weekend?
5    I'm not talking about just being in the custody of the FBI this
6    past weekend.
7          THE COURT:  Wait, wait.  What's the question?
8          MS. FLEMING:  I'm about to ask the question of
9    meetings.  I'm giving the instruction.
10  Q.  I'm not talking about just being in the custody of the FBI,
11   but did you have meetings with members of the United States
12   Attorney's Office even over this past weekend?
13  A.  That is correct that I had meetings, ma'am.
14  Q.  And would it be fair to say that, in total, since August of
15   2017, you have had more than 35 sessions with the United States
16   Attorney's Office discussing the facts of this case?
17  A.  I don't recall the number, ma'am.
18  Q.  It has been many days; is that fair to say?
19  A.  That would be fair, absolutely, ma'am.
20  Q.  And it's been many hours; is that fair to say?
21  A.  That would be fair to say, as well, ma'am.
22          MS. FLEMING:  Your Honor, what time do you want to
23   break?  I am about to go into a new area.
24          THE COURT:  We can break now.  So let's take our lunch
25   break and pick up again at 2:00, how's that?

HC5PATI3          Zarrab - Cross          Page 803

1          (Jury not present)
2          THE COURT:  They want to know if you want the
3    exhibits.
4          MS. FLEMING:  I know.  I'm going to leave them up
5    there.  It's Jencks material; it's not an exhibit.
6          THE COURT:  You might want to.
7          MS. FLEMING:  I'm happy to take it back now.  I just
8    didn't want to keep going back and forth.
9          THE COURT:  Okay.
10          MS. FLEMING:  Your Honor, may I come get it?
11          THE COURT:  Yes, sure.  Okay.  We'll see you at 2:00.
12          (Luncheon recess)
13
14
15
16
17
18
19
20
21
22
23
24
25

HC53ATI4          Zarrab - Cross          Page 804

1              AFTERNOON SESSION
2                 2:00 p.m.
3          (In open court; jury present)
4          THE DEPUTY CLERK:  Sir, before we begin, I'd like to
5    remind you, you're still under oath.
6          THE WITNESS:  Yes, ma'am.
7          THE COURT:  Ms. Fleming.
8          MS. FLEMING:  Thank you, your Honor.  May I continue?
9          THE COURT:  Yes.
10  BY MS. FLEMING:
11  Q.  Mr. Zarrab, when we broke we were talking about your
12   proffer and the timeline.
13          During the process of meeting with the prosecutors,
14   you actually did work on the various transcripts that we've had
15   here in court; isn't that correct?
16  A.  Which meetings are you referring to?
17  Q.  When you met with the prosecutors in preparation for trial,
18   you listened to recordings and made corrections to the
19   transcripts; is that correct?
20  A.  Yes, ma'am.  In the transcripts that were in Turkish, I did
21   try to make corrections where there were things either missing
22   or were not understood.  I tried to make corrections on those.
23  Q.  And you also did the same thing for the Turkish and English
24   interpretation on the chats, on the various chats that were
25   Turkish and English; is that correct?

HC53ATI4          Zarrab - Cross          Page 805

1   A.  That is not correct, ma'am.
2   Q.  You didn't make any corrections on Mr. Aslan's chats, on
3    the translations?
4   A.  It's regards to the English sections of the chats with
5    Mr. Aslan, I had nothing to do with that, and I did not make
6    any corrections.
7   Q.  You did go through on Mr. Aslan's chats and make notations
8    as to which chats were important, didn't you?
9   A.  With regards to the chats with Mr. Suleyman Aslan on
10   WhatsApp, I did go through those, and I did mark them as
11   sections and I did try to make relevant -- put the relevant
12   sections together, where possible, ma'am.
13  Q.  And you highlighted those that were important by putting
14   stars next to them, correct?
15  A.  Those that were very important for me, I did put a star
16   next to them, and I did say that they were very important for
17   me.
18  Q.  You actually wrote the word "important" in English next to
19   some of them, correct?
20  A.  Yes, there are sections where I did write down "important,"
21   ma'am.
22  Q.  In addition in these sections when you were getting ready
23   for trial in this matter, you also drew a number of charts for
24   the members of the FBI and the prosecution team, correct?
25  A.  Can I get the question one more time, please?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                      December 5, 2017

| HC53ATI4 | Zarrab - Cross | Page 806 |

1  Q.  During this trial preparation period, you prepared charts,
2  you drew charts for members of the prosecution team, correct?
3  A.  Yes, ma'am, just like the diagrams that I had drawn here, I
4  had drawn some diagrams, charts, for the prosecution also.
5  Q.  And you prepared Excel spreadsheets for members of the
6  prosecution team, correct?
7       THE INTERPRETER: I'm being asked to repeat it again.
8  A.  No, that is not correct.  What I did was I prepared that
9  Excel file for my own use, and later I presented that Excel
10  file to prosecution so that it could be used as evidence as
11  needed in the trial.
12       Because among my obligations is the presenting of all
13  my work, things I might work on, to the prosecution.
14  Q.  And that is in connection with your providing substantial
15  assistance in the investigation and prosecution of others,
16  correct?
17  A.  In terms of assistance, the most important thing is to tell
18  the truth, ma'am.
19  Q.  In addition, during your proffer sessions, before you were
20  preparing for trial, before you pled guilty, you discussed with
21  the government ways that you could trap people to bring them to
22  the United States so they could be arrested or to other places
23  in the world -- let me withdraw it.
24       You discussed with the government ways to trap people
25  so that they could be arrested and brought to the United

| HC53ATI4 | Zarrab - Cross | Page 807 |

1  States; is that correct?
2  A.  We did not converse about anybody specific to be trapped.
3  However, as a result of my cooperation, had there been a
4  request from the prosecutor's office, had there been such a
5  request, then I would be obligated to fulfill that, ma'am.
6  Q.  Do you recall telling the prosecutors that you believed you
7  could get Rajaeieh to Germany?
8  A.  I did tell the prosecutor's office that Mr. Rajaeieh
9  travels to Germany frequently, and that there might be a
10  possibility for Rajaeieh to travel to Germany, ma'am.
11  Q.  And yes or no:  Did you tell them that you owe him 15 to 20
12  million dollars, and that could be used as a way to trap him?
13  A.  I did not say 15 to 20.  I did say that there was an
14  approximately $14 million debt.  And I did say that, that's
15  correct, ma'am.
16  Q.  And there are other people who you told the government
17  about where their passports were, where they traveled, in order
18  to tell them where they might be able to find them, correct?
19       THE INTERPRETER: Could you repeat that question,
20  please.
21  Q.  You told the government about other people's travel habits
22  throughout Europe, correct?
23  A.  Within the scope of all the questions that were asked to
24  me, I did provide all the truthful answers that I had for those
25  to the prosecutor's office, ma'am.

| HC53ATI4 | Zarrab - Cross | Page 808 |

1  Q.  When you were arrested in Miami, you had arrived in Miami
2  in a private jet, correct?
3  A.  No, ma'am, that is not correct.
4  Q.  You were carrying approximately $103,000 in currency; is
5  that correct?
6  A.  I was carrying $102,000, ma'am.
7  Q.  And that was for your trip to Disney World; is that
8  correct?
9  A.  This was the money that would be needed for our trip that
10  was for 10 days, for seven individuals, in the United States
11  for this trip.
12       MS. FLEMING: Your Honor, may I approach the easel?
13  Q.  Mr. Zarrab, I would like to talk about what your agreement
14  provided that you would plead guilty to.  Now, you had a plea
15  agreement that obligated you to plead guilty to certain crimes,
16  correct?
17  A.  Yes, ma'am, that's correct.
18  Q.  You have in fact pleaded guilty to those crimes, correct?
19  A.  For seven charges, that's correct, ma'am.  I did plead
20  guilty to those seven charges.
21  Q.  Could you identify them for me, please.
22  A.  Certainly.  One, conspiracy to defraud United States.  Two,
23  conspiracy to violate IEEPA sanctions charge.
24       It's possible that I may miss some legal terms in
25  there, but madam would know.

| HC53ATI4 | Zarrab - Cross | Page 809 |

1       (In English) Money laundering, conspiracy for money
2  laundering, bank fraud.
3  Q.  What else?
4  A.  (In English) Conspiracy for bank fraud.
5  Q.  What else?
6  A.  (In English) Bribing federal prison guard.
7  Q.  Corrections officer; is that fair to say?  Federal guard?
8  A.  The guard, the warden at the jail.  I don't know what you
9  would want to use in English for that.
10  Q.  And do you know how many years in jail you are facing as a
11  maximum sentence for all of these crimes?
12       MR. KAMARAJU: Objection, your Honor.
13       THE COURT: Sustained.
14       MS. FLEMING: Judge, may I be heard?
15       THE COURT: No.
16  Q.  As a result of agreeing to plead guilty to these crimes,
17  you were also told that you would not be charged with other
18  crimes, correct?
19  A.  I don't know about the legal terms that may be used in
20  there.  Those are what my lawyers would handle.  But as far as
21  what the --
22       THE INTERPRETER: I'm going to have to ask him to
23  repeat again.
24  A.  So just the section that I am aware of, and the part that
25  my lawyers advised me of, it's stated that if I were to commit

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC53ATI4  Zarrab - Cross  Page 810

1 a crime again, that could be investigated, I could be
2 prosecuted, and I could be charged with that again.  One of
3 these, for example, is if I were to lie, I could be charged
4 with a new charge.
5 Q.  Do you recall that your plea agreement says if you live up
6 to your plea agreement, that there are other crimes that you
7 have already committed that you will not be charged for?
8 A.  There are crimes that are outside the jurisdiction of the
9 United States, so there are those crimes where United States
10 does not have jurisdiction over them anyway.  And I don't know
11 if the madam is referring to any other crimes other than those.
12 Q.  Do you recall whether your plea agreement provides that you
13 will not be charged with making material misstatements to FBI
14 agents after you were arrested in your post-arrest interview?
15 A.  It is correct that there would be no new prosecution on
16 that crime.  But, what I understand is that during sentencing,
17 the misrepresentations made to the FBI would also be taken into
18 consideration in terms of what sentence I might receive.
19 Q.  Do you also understand that, pursuant to your plea
20 agreement, you will not be prosecuted for making material
21 misrepresentations during an interview with the pretrial
22 services officer in Florida after you were arrested; yes or no?
23 A.  Just the same with the previous, this would also be one
24 where there would not be a new investigation regarding this
25 charge, but that in my sentencing, the Court would consider

HC53ATI4  Zarrab - Cross  Page 811

1 this in sentencing me, and this would be one of the factors
2 that would be considered for sentencing.
3 Q.  So the answer to my question as to whether you will be
4 charged is "no."
5   THE COURT:  What was your question?
6   MS. FLEMING:  Whether he would be charged with a new
7 crime, yes or no.
8   THE COURT:  I don't know if that was exactly.  Let's
9 have a readback of the question.
10   (The record was read)
11   MS. FLEMING:  I stand corrected, your Honor.
12 Q.  Do you also understand --
13   THE COURT:  Do you want him to answer or no?
14 Q.  Please.  Can you answer that yes or no?
15 A.  Yes, there would be no new investigation opened with
16 regards to this.
17 Q.  Do you understand if you live up to your plea agreement,
18 you will not be charged with smoking synthetic marijuana on one
19 occasion in the MCC in 2016, to the extent that you have
20 disclosed such participation to the office, as of the date of
21 your plea agreement; yes or no?
22 A.  I don't know whether this is a crime or not in law.  It may
23 be a regulation within the jail.  And my answer then is no,
24 there would be no investigation open with regards to this.  In
25 other words, even without this agreement.

HC53ATI4  Zarrab - Cross  Page 812

1 Q.  Putting aside that last one that you don't know if it is a
2 crime or not, you understand that the other crimes that you
3 will not be prosecuted on are serious offenses.
4 A.  I am aware that they're serious offenses, but the crimes
5 that I have pleaded guilty to are much more serious offenses.
6 Q.  These crimes that you're not being prosecuted for happened
7 in 2016 in the United States, correct?
8 A.  That is correct, ma'am.
9 Q.  These crimes that you're not being prosecuted for all
10 happened after you were arrested, correct?
11 A.  That is correct, ma'am.
12 Q.  And what you referenced earlier about there are other
13 crimes that the United States does not have jurisdiction that
14 you are not being prosecuted for, are other crimes that you've
15 told the U.S. attorney's office about that you've committed in
16 other countries, correct?
17 A.  If you're referring to the bribes that I had paid in Turkey
18 that I mentioned in the court also, then that is a yes.
19 Q.  It's more than bribes to officials in Turkey, isn't it,
20 Mr. Zarrab?  Under your plea agreement, you are also not
21 going -- the office has said it's not -- has no jurisdiction
22 over paying bribes to corporate representatives in or between
23 2002 and March of 2016; isn't that correct?
24   THE INTERPRETER:  Could you repeat what
25 representatives again, please?

HC53ATI4  Zarrab - Cross  Page 813

1   MS. FLEMING:  Corporate.  Corporate bribery.
2 A.  I did not bribe my own company employees.  That may be a
3 translation issue.
4 Q.  Your plea agreement reflects that there is no prosecution
5 because of no jurisdiction for procuring prostitutes for others
6 in or about 2013; is that correct?
7 A.  Yes, ma'am, that is correct.
8 Q.  It also says that you will not be prosecuted because of no
9 jurisdiction for understating your income on your Turkish tax
10 returns, your filings, between 2002 and March of 2016.  Isn't
11 that correct?
12 A.  Because it is not within the jurisdiction, it is also true
13 that there will be no prosecution on that one as well, ma'am.
14 Q.  But in fact you did understate your Turkish filings for
15 2002 through 2016, correct?
16 A.  That is absolutely correct, ma'am.
17 Q.  You also are not being prosecuted because of no
18 jurisdiction for assaulting another individual in the Republic
19 of Turkey in or about 2014; is that correct?
20 A.  I was prosecuted for that in Turkey already, ma'am.
21   MR. KAMARAJU:  Your Honor, if defense counsel intends
22 to go through other provisions of the cooperation agreement, it
23 makes sense to offer it so the jury can follow along.
24   MS. FLEMING:  Your Honor, they're welcome to do their
25 examination any way they want.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 5, 2017

| HC53ATI4 | Zarrab - Cross | Page 814 |

1    THE COURT: Can you all come up for a short sidebar.
2    (At the sidebar)
3    THE COURT: It is my practice always to give defense
4  counsel latitude in asking questions, but I have to say I
5  really don't know where this is all leading and what is the
6  significance of, for example, here is a concrete example which
7  I couldn't understand at all. So, he's charged with and pled
8  to seven counts, and you asked him to remember, and you are
9  drawing on the chalkboard the seven counts or however many he
10  gives you.
11    What's the point of that? Why couldn't you just ask
12  him, since you like to have yes or no answers, did you plead to
13  defrauding banks, yes or no? Did you plead to conspiracy to
14  defraud banks, yes or no?
15    This is really going nowhere.
16    MS. FLEMING: Well, with respect, your Honor, I don't
17  agree, and, frankly, I've never had a Court preclude me finding
18  out how much time someone was facing before, ever.
19    THE COURT: You didn't know how to ask the question.
20  There is a very simple way to ask that question and you weren't
21  even in the universe of how to ask that question. So think
22  about that. Talk to Mr. Rocco. Or maybe even the prosecutors
23  could give you a hand on that.
24    Really. I'd like to get to this case pretty soon.
25    (Continued on next page)

| HC53ATI4 | Zarrab - Cross | Page 815 |

1    (In open court)
2    MS. FLEMING: Your Honor, we agree we'll put the plea
3  agreement into evidence.
4    THE COURT: Great.
5    MS. FLEMING: Let's move it. Let's mark it as
6  Defendant's Exhibit 12. We already premarked some exhibits.
7  We'll substitute a clean one. I had marked this to show the
8  witness.
9    THE COURT: Sure.
10    (Defendant's Exhibit 12 received in evidence)
11  Q. You discussed that you had pled guilty to bribing a guard
12  while you were in prison here in the United States, correct?
13  And you -- why don't you describe for us what you did.
14    THE COURT: I don't know if that's the way to ask the
15  question. Do you want to ask him what did he do that caused
16  him to plead guilty to that charge? Is that the question you
17  want to ask?
18    MS. FLEMING: Sure, Judge.
19  Q. What did you do that caused you to plead guilty to that
20  charge?
21  A. I bribed a guard in the jailhouse where I was being held,
22  ma'am.
23  Q. How much did you pay the guard?
24  A. Approximately $45,000, ma'am.
25  Q. How did you get $45,000 to this guard?

| HC53ATI4 | Zarrab - Cross | Page 816 |

1  A. Along with my other expenses, as money was being sent from
2    Turkey, this amount was sent and it was paid.
3  Q. Who paid it to him?
4  A. The madam attorney that I had during that time who was
5    present here at that time.
6  Q. A Turkish attorney, correct?
7  A. Yes, ma'am, a Turkish attorney.
8  Q. In exchange for that $45,000, this guard brought you
9    alcohol; is that correct?
10  A. Not only alcohol, ma'am.
11  Q. What else did he bring you?
12  A. A few times I used the personal cell phone of this guard as
13    well, ma'am.
14  Q. Did he also give you medication?
15  A. Yes, ma'am. A few times when I had a cold, he brought
16    Dayquil and I took Dayquil.
17  Q. Other than getting it in the commissary, you're not allowed
18    to do that in the MCC without going to the commissary, correct?
19  A. It is true that Dayquil is not sold at the jail commissary,
20    ma'am.
21  Q. And by using a cell phone that the guard provided you, you
22    were not on the prison system where the phone calls are
23    recorded; isn't that correct?
24  A. That is absolutely correct, ma'am. That phone would not be
25    recorded.

| HC53ATI4 | Zarrab - Cross | Page 817 |

1  Q. Who did you use that phone to call, the cell phone?
2  A. My wife, also to talk with my daughter with video, and with
3    one of my lawyers and one time with my uncle, based on my
4    recollection. I also recall that I had talked to my sister,
5    based on my recollection.
6  Q. Anyone else?
7  A. These are the ones that I remember, ma'am.
8  Q. And again, to be clear, the attorney you spoke with is an
9    attorney in Turkey, not in the United States, correct?
10  A. Yes, ma'am, that is absolutely correct.
11  Q. Now, did you violate other rules while you were in the MCC
12    or the MDC?
13  A. I did at MCC, ma'am.
14  Q. Did you pay other inmates so that you could use their
15    telephone time?
16  A. It is true that when my 300 minutes were up, I did pay
17    other inmates to be able to use their minutes, ma'am.
18  Q. Did you also pay people to sit at a computer so that if you
19    wanted to use the e-mails, you wouldn't have to wait in a line?
20  A. That is not correct, ma'am.
21  Q. Back in 2015, you and Suleyman Aslan had a conversation on
22    chat concerning why you had not been put on the OFAC list; do
23    you recall that?
24  A. I remember that, ma'am.
25  Q. As you sit here today, are you on the OFAC list yet?

**A492**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

---

HC53ATI4      Zarrab - Cross      Page 818

1  A.  As of now, I don't know, ma'am.
2  Q.  Has anyone ever told you, you are on the OFAC list?
3         MR. KAMARAJU: Objection.
4         THE COURT: Overruled.
5  A.  There hasn't been anybody who told me I was on OFAC list up
6  until this point, ma'am.
7  Q.  And do you recall what your conversation with Mr. Aslan was
8  about why you weren't on the OFAC list in 2015?
9  A.  I remember it partially, ma'am.
10  Q.  Do you remember saying you weren't on it because you hadn't
11  violated any sanctions?
12  A.  This is a long message, ma'am, and what I'm telling
13  Mr. Suleyman Aslan is that with these money transfers, there
14  was no payment with regards to weapons or anything nuclear, and
15  that's why I was not put on the OFAC list.
16  Q.  Didn't you say because we didn't violate any embargo?
17  A.  If you were to cut the beginning and the latter part of the
18  conversation and you look at that one sentence only, that would
19  be correct, ma'am.
20  Q.  Part of your plea agreement is that you've agreed to
21  forfeit whatever it is that you personally derived from this,
22  these schemes and the crimes to which you pled guilty; isn't
23  that correct?
24  A.  That is correct, ma'am.
25  Q.  How much money did you make from all of these crimes?

---

HC53ATI4      Zarrab - Cross      Page 819

1  A.  I don't recall how much exactly, ma'am.
2         (Continued on next page)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

HC5PATI5      Zarrab - Cross      Page 820

1  Q.  How about generally, do you recall how much money generally
2  you made between 2010 and 2016 from all of these schemes that
3  you've told us about for the last four days?
4  A.  I don't remember exactly, but it could be $100 million,
5  maybe more than that, maybe $150 million.
6  Q.  How did you make money on these transactions?
7  A.  I made money along with everybody else.
8  Q.  How did you make the money on these transactions?
9  A.  Through the payment orders that I had received from the
10  Iranians, by fulfilling these orders for the Iranians, by using
11  the proceeds that Iran had deposited in Halkbank for its oil
12  sales to Turkey.
13  Q.  And did you get a commission cut?
14  A.  In my previous answer I had already mentioned that I had
15  received a commission on these. It might have been a
16  translation error. Let's just make sure that's corrected.
17  Yes, ma'am, I did receive commission.
18  Q.  And what percentage commission did you receive?
19  A.  Ma'am, are you asking what the total is, or are you asking
20  what was left for me?
21  Q.  What was left for you? What was your commission that you
22  made on these deals?
23  A.  After paying the commission for the bank, and after paying
24  the other bribes, and after deducting all of the expenses, it's
25  approximately 0.4 or 4 per thousand to 5 per thousand, ma'am.

---

HC5PATI5      Zarrab - Cross      Page 821

1  Q.  Now, banks take commissions on legitimate transactions,
2  don't they, Mr. Zarrab?
3  A.  Banks get their cut from transactions that are executed,
4  ma'am.
5  Q.  And -- withdrawn.
6         You told us during your direct examination that prior
7  to going to Halkbank, you had been involved with a number of
8  other banks in various schemes, correct?
9  A.  Do you mean the Aktif Bank, ma'am?
10  Q.  That's one of them, right?
11  A.  Yes, ma'am. In early 2010, I did work with Aktif Bank.
12  Q.  And is there a bank called Agajooni? I'm sorry for the
13  pronunciation. A-g-a-j-o-o-n-i.
14  A.  I'll make the correction on that one. It's Agajooni,
15  ma'am, and it's an exchange office in Iran with which I was
16  working. It's actually an individual, a partner individual
17  that I was working with in Iran. It is not a bank, ma'am.
18  Q.  Thank you. Did you also work with Bank Mellat and its
19  exchange?
20  A.  It is true that I worked with Mellat Exchange, which is
21  affiliated with Bank Mellat, ma'am.
22  Q.  And that was before you had approached Halkbank, correct?
23  A.  That is correct, ma'am.
24  Q.  And you also approached the Central Bank of Iran; is that
25  correct?

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI5    Zarrab - Cross    Page 822

1  A. That's correct, ma'am.
2  Q. And you did that through your father?
3  A. Yes, ma'am.
4  Q. And you worked with them before you worked with Halkbank?
5  A. I worked with them before I was working with Halkbank,
6  that's correct, ma'am.
7  Q. Now, your father has an exchange -- and again forgive me
8  for the pronunciation -- Al Nafees Exchange? Did I say it
9  correctly?
10  A. You pronounced it perfectly well, ma'am.
11  Q. That's one. And you worked with Al Nafees Exchange,
12  correct?
13  A. That is correct, ma'am.
14  Q. That's a money exchange business in Dubai?
15  A. It's an exchange office that was in Dubai in that time
16  period, that is correct, ma'am.
17  Q. And what years did you work with Al Nafees?
18  A. To the best of my recollection, it was between when I was
19  16 and 17, ma'am.
20  Q. And did you have business with the Al Nafees Exchange after
21  you started working?
22  A. I could not perceive what time period you are referring to;
23  so if you can please rephrase with a more specific range.
24  Q. Let me withdraw. During the time frame between 2010 and
25  2015, who owned Al Nafees?

HC5PATI5    Zarrab - Cross    Page 823

1  A. It was my father, ma'am.
2  Q. Did you have any ownership interest in Al Nafees during
3  that time period?
4  A. I never had any partnership or any shares held with
5  Al Nafees at any given time, ma'am.
6  Q. Were you aware of the business of Al Nafees during that
7  time frame that you were also working in money exchange, 2010
8  to 2015?
9       THE INTERPRETER: Could you repeat that question,
10  please.
11  Q. Were you aware of your father's business, Al Nafees, during
12  that time frame, 2010 to 2015?
13  A. It would not be fair to say that I knew everything, but, of
14  course, I was aware of what was going on.
15  Q. Were you aware that your father was accused of violating
16  U.S. sanctions?
17  A. Yes, ma'am. I had heard about it.
18  Q. And that was in August of 2014?
19  A. No, ma'am, that was much before that.
20  Q. You're aware that he paid a penalty in August of 2014; is
21  that fair?
22  A. That would not be fair, ma'am, because my dad did not pay a
23  fine.
24  Q. Do you know what stripping is in connection with money
25  exchange transfers?

HC5PATI5    Zarrab - Cross    Page 824

1  A. I don't know, ma'am.
2       MS. FLEMING: Your Honor, we want to play some
3  recordings to authenticate them, just the voice recordings.
4  They're in Turkish. We will have to connect them up with an
5  interpreter later. May we do that now?
6       THE COURT: I'm not sure I understand.
7       MS. FLEMING: We have some recordings that we want to
8  use. We are going to have to -- we have sent transcripts, but
9  we just need to play them and have them identify voices with
10  the witness.
11       THE COURT: The recordings of Mr. Zarrab?
12       MS. FLEMING: Yes. We just need him to identify the
13  voices. They're in Turkish. If you want to give the --
14       THE COURT: There's not going to be any translation.
15       MS. FLEMING: There won't be any questioning about it
16  except who's on it.
17       THE COURT: Is there going to be a translation?
18       MS. FLEMING: Yes, down the road, when our interpreter
19  is on.
20       THE COURT: Oh, not today?
21       MS. FLEMING: No. It's not our case. Our interpreter
22  will be on during our case.
23       THE COURT: I'm not sure I understand. You're going
24  to ask him questions in English?
25       MS. FLEMING: Judge, I'm going to have him

HC5PATI5    Zarrab - Cross    Page 825

1  authenticate the recordings.
2       THE COURT: I know, but how are you going to do that?
3  Are you going to ask him --
4       MS. FLEMING: I was going to ask him if he recognizes
5  the voices and identify the speakers, and then we'll deal with
6  it later.
7       THE COURT: Sure.
8       MS. FLEMING: Okay.
9       (Pause)
10       Thank you. Judge, I'll do this after the break.
11  We'll work it out with them after the break.
12       THE COURT: Okay.
13       MS. FLEMING: I'll go on to something else.
14  BY MS. FLEMING:
15  Q. Mr. Zarrab, you've described for us earlier about some of
16  the documents that your office had created that were false; do
17  you remember that?
18  A. Documents?
19  Q. You've identified for us some exhibits this morning that
20  you said were not real documents, they reflected fake
21  transactions?
22  A. The ones that I had said that they were false?
23  Q. Yes.
24  A. Yes, ma'am.
25  Q. And, in fact, you had entire portions of your offices that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI5          Zarrab - Cross          Page 826

1  were devoted to getting these false documents; isn't that fair
2  to say?
3  A. Not necessarily departments, but a few people.
4  Q. And so, for example, one of the false documents, one kind
5  of false document that you had in your business was you had an
6  actual stamped customs document that you would present to the
7  banks, correct?
8  A. That is absolutely correct, ma'am.
9  Q. And I want to focus. Let's break it down into the two
10  kinds of transactions. All right? I want to break this down
11  to the gold transactions.
12  A. Go ahead, ma'am.
13       THE INTERPRETER: For translation, sorry.
14  Q. One of the things you told us is that there really was
15  gold?
16  A. Most of the time, yes, ma'am.
17  Q. In the China recordings that we heard this morning, there
18  was no gold, right?
19  A. With regards to gold trade, the same system was also
20  attempted in China but refused by the bank in China. So the
21  answer for madam's question would be, no, and that we had made
22  attempts to run gold trade and the same system in China as
23  well.
24  Q. The gold trade that was done with Halkbank was, in fact,
25  you really had gold; there was actual gold bars, correct?

HC5PATI5          Zarrab - Cross          Page 827

1  A. Yes, ma'am.
2  Q. And that started, you identified for us, somewhere around
3  October of 2012, and I believe you told us the last payments
4  were made sometime at the end of May 2013 or mid-June 2013; is
5  that right?
6  A. No, that is not correct, ma'am.
7  Q. You described for us that Mr. Atilla was the head of
8  international banking. That's what you thought his title was,
9  correct?
10  A. Mr. Hakan Atilla is at the head of the international
11  department at Halkbank; that is correct, ma'am.
12  Q. And you repeatedly called him the deputy general manager,
13  correct?
14  A. Yes, the deputy general manager, the head person in the
15  international department, ma'am.
16  Q. You're aware, are you not, that Halkbank, at the time, had
17  seven or eight deputy general managers, depending on what month
18  it was during that 2002 to 2015 time frame, correct?
19  A. No, ma'am, I didn't. I do not know.
20  Q. Now, you've talked about dealing with the staff several
21  times during your testimony, at Halkbank.
22  A. Yes, it is true that I mentioned that I had spoken with
23  various staff members at this bank.
24  Q. And you also talked about you spoke with people at the
25  branch, correct?

HC5PATI5          Zarrab - Cross          Page 828

1  A. No, ma'am. What I testified to was that with the branch,
2  very minimal level. It would be my personnel and my company
3  that would be speaking to branch staff members.
4  Q. And what branch did your businesses bank with at Halkbank?
5  A. It's the corporate branch in Ikitelli, ma'am.
6  Q. And do you know approximately how many branches there are
7  of Halkbank in Turkey?
8  A. I don't know the number, ma'am.
9  Q. Now, you would leave the dealing with the people at the
10  branch up to your staff people, correct?
11  A. With regards to our branch? Yes, ma'am.
12  Q. But you were aware that at Halkbank headquarters, there was
13  a staff that dealt with foreign operations and sanctions,
14  correct?
15  A. That is not correct, ma'am. I was not aware.
16  Q. Did you ever deal with somebody named Binnur, B-i-n-n-u-r?
17  Do you remember speaking with Binnur at Halkbank?
18  A. The name Binnur sounds familiar, but I cannot recall any
19  conversation that I may have had with Miss Binnur at the time,
20  ma'am.
21  Q. Do you remember speaking -- forgive me with the
22  pronunciation. Do you remember speaking with anyone named
23  Seydit, S-e-y-d-i-t, at Halkbank?
24  A. You may be referring to Mr. Seydit Ahmet; is that correct,
25  ma'am?

HC5PATI5          Zarrab - Cross          Page 829

1  Q. Yes.
2  A. Yes, that is absolutely correct, ma'am, with Mr. Seydit
3  Ahmet, I had conversation during 2014 and 2015, after my arrest
4  and mostly during the year 2015.
5  Q. I want to show you what's been marked as Defendant's
6  Exhibit 102. Do you recognize Defendant's Exhibit 102?
7  A. So I see that it's a business card.
8  Q. Do you recognize it?
9  A. So I see it as a business card. If I may get the question
10  a little more specific? I don't understand what you're asking
11  exactly.
12  Q. Have you ever had the business card of Hakkan Aydogan?
13  A. I may have received it. I don't recall, ma'am.
14  Q. Do you know what his title is at Halkbank?
15  A. After my arrest and in 2014, when I went to Halkbank to
16  meet with Mr. Ali Fuat initially, I met with Mr. Hakkan
17  Aydogan.
18  Q. My question is, do you know what his title is?
19  A. I know that he was working with foreign transactions.
20  That's all, ma'am.
21  Q. Have you ever heard of the department foreign operations?
22  A. Yes, I'm familiar with that phrase from the bank, the
23  operations section. I recall that from the bank.
24  Q. And do you know whether Hakkan Aydogan was the head of
25  foreign operations during the -- withdrawn.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 5, 2017

| HC5PATI5 | Zarrab - Cross | Page 830 |
|----------|----------------|----------|

1      Do you know whether Hakkan Aydogan took the job of
2  Levent Balkan when he left Halkbank?
3  A.  I was not mentioned that Levent Balkan had left and Hakkan
4  Aydogan came in in his place.  That's not something I recall;
5  so I don't know.
6  Q.  Do you know what Levent Balkan's title was when he was at
7  Halkbank?
8  A.  I don't know what his title may have been on his business
9  card, but I know that he was involved in the operational side
10 of things, and I did have communication with Mr. Levent Balkan,
11 ma'am.
12     THE COURT:  Do you want to take a five-minute break?
13 Remember, we're going to end today at 4:30; so let's take a
14 five-minute break.
15     (Jury not present)
16     (Recess)
17     (Jury present)
18     THE COURT:  Please be seated, everyone, and we'll
19 continue with the cross-examination of Mr. Zarrab.
20     MS. FLEMING:  Thank you.  Your Honor, may I proceed?
21     THE COURT:  Yes.
22     THE DEPUTY CLERK:  Sir, you're still under oath.
23     THE WITNESS:  (In English)  Yes.
24 BY MS. FLEMING:
25 Q.  You used a phrase in some of the recordings that we heard

| HC5PATI5 | Zarrab - Cross | Page 831 |
|----------|----------------|----------|

1  this morning and over the last few days of "cikinova" or
2  "cikina."  Those are references to false documents; is that
3  correct?
4  A.  Yes, ma'am.  Cikinova is a term that we use amongst
5  ourselves when referring to any trade that does not involve
6  real trade and also any documents that may contain false
7  information.
8  Q.  And that phrase was around before you ever went to
9  Halkbank, wasn't it, sir?
10 A.  That is not correct, ma'am.
11 Q.  Could we pull up 201-T, please.  Could I ask that the front
12 page -- looking at page 2.  201-T is in evidence.
13     Do you remember what the date of this call is?
14 A.  The date is actually on the screen, ma'am.
15 Q.  Well, does that help you remember the date?
16 A.  It says September 19th, 2012, ma'am.
17     MS. FLEMING:  Could we publish that to the jury, that
18 page, please?
19     THE COURT:  Sure.
20 Q.  And if you look down at the bottom, you use the term
21 "cikinova;" do you see that, sir?  Happani uses it at the
22 second-from-the-bottom?
23 A.  Yes, I see that, ma'am.
24 Q.  I'd like to go back to discussing the customs documents,
25 the documents that were presented.  And, again, looking at the

| HC5PATI5 | Zarrab - Cross | Page 832 |
|----------|----------------|----------|

1  gold transactions --
2  A.  Yes, ma'am.  Go ahead.
3  Q.  -- the documents that are presented have actual customs
4  seals on them, don't they?
5  A.  So we're talking about gold, ma'am, right?
6  Q.  Yes.
7  A.  Yes, ma'am; that is correct.
8  Q.  And, in fact, you're aware that at a company in Turkey,
9  like Halkbank, they can look online to see whether, in fact,
10 the customs document matches up online to whether the goods
11 have actually gone out through customs as reflects on the
12 document, correct?
13 A.  I don't know what Halkbank may or may not be able to check
14 within their own internal systems online, ma'am.
15 Q.  And when you talked about passengers in some of the
16 conversations, the way gold was actually transported was by
17 suitcases or valise, by people physically carrying it, correct?
18 A.  That is correct, ma'am.
19 Q.  And it's wrapped and it's sealed, correct?
20 A.  So I did not see how it would be packed inside the suitcase
21 myself directly, but I presume that's how it is, ma'am.
22 Q.  And it has the markings on the package that seals, that
23 shows the weight and the purity of the gold in the package,
24 correct?
25 A.  If what you're referring to is the markings on each of the

| HC5PATI5 | Zarrab - Cross | Page 833 |
|----------|----------------|----------|

1  bars that indicates the fineness and the kilogram of that
2  particular bar, that would be correct, ma'am.
3  Q.  But also on the package, so that customs can verify the
4  weight and purity of the gold that is going out through customs
5  in the sealed package, that is going through its borders;
6  you're aware of that, sir, aren't you?
7  A.  I've never seen that package, ma'am.
8  Q.  And Halkbank required that those custom documents be
9  returned to Halkbank after the goods had passed through
10 customs, correct?
11 A.  That is correct, as I had testified before, we were
12 submitting all of the documentation, customs documentation,
13 after the export to Halkbank, ma'am.
14 Q.  And in addition, when the gold was destined to go to Iran,
15 at the times that it was required to be done when it was going
16 to Iran, Halkbank required that boarding passes for the flight
17 of the passengers carrying the gold be submitted to Halkbank,
18 didn't it?
19 A.  That is absolutely correct, ma'am.
20 Q.  And to make it clear, when the order comes in to buy the
21 gold, a customer has purchased the gold, the goods go out
22 through customs and the transfers are -- the documentation is
23 supposed to come back before the transaction is completed,
24 correct?
25 A.  That is not correct, ma'am.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC5PATI5          Zarrab - Cross          Page 834

1  Q.  But what happens here is there were advance payments
2   against the transfers, correct?
3  A.  There were payments that were made in advance, yes, and
4   after the export of the gold, we had a certain period within
5   which we needed to get the documentation and submit them to the
6   bank, but that would be after the export.
7  Q.  Correct.
8  A.  In other words, the money -- in other words, there was a
9   period of time between the time that money would be received by
10  us and the gold would be exported.
11 Q.  Okay.  But when you got involved, it would be because the
12  bank was holding up the payments to your companies because the
13  documentation had not been provided, correct?
14 A.  No.
15 Q.  The conversations that we have heard in the last few days,
16  you are complaining about it getting held up because the staff
17  is not releasing the payments?
18 A.  With specific reference to the call, the conversation that
19  I testified about before, which was with Abdullah Happani, I'm
20  talking about why the payment had not been transferred yet.
21  And what I want to clarify with the madam here is that it was
22  not only when the bank had not transferred the money that I was
23  getting involved in this transaction.
24 Q.  But at least some of the time it was because you were upset
25  because the bank had not transferred the funds yet, correct?

HC5PATI5          Zarrab - Cross          Page 835

1  A.  No, I was not getting upset.  It's not necessarily getting
2   upset.  I was just trying to figure out why the money was not
3   being transferred.
4  Q.  You were calling the bank to find out why the money had not
5   been transferred, that's why you were involved, right?
6  A.  That is correct, in some examples, ma'am.
7  Q.  And you don't deal with the people at the branch, right?
8  A.  I would talk with them sometimes, but when the matter is
9   not resolved at the branch level, then I would talk with people
10  at the headquarters level.
11 Q.  I thought you told us before the break that you always
12  leave talking to the branch to the people in your staff?
13 A.  Before the break, that is not the sentence that I used.
14  What I said was I rarely speak with the branch, and I would
15  generally leave the conversations with the branch to my staff
16  members.
17       (Continued on next page)
18
19
20
21
22
23
24
25

HC53ATI6          Zarrab - Cross          Page 836

1  Q.  You are aware that Mr. Atilla's job was not to be over the
2   foreign operations group, aren't you, sir?
3  A.  I did not know every single responsibility that may have
4   been given to Mr. Hakan Atilla within the bank.  I'm -- I was
5   not his boss, and I don't know what his entire list of
6   responsibilities may have consisted of.
7  Q.  How many times did you speak to Levent Balkan during the
8   time you were dealing with Levent Balkan at Halkbank?
9  A.  I don't recall clearly, ma'am.
10 Q.  Did you know Levent Balkan before October of 2012 when you
11  went to Halkbank?
12 A.  I knew him before, yes, ma'am.
13 Q.  How did you know him before?
14 A.  From the bank regarding the transactions, I had conversed
15  with him before.
16 Q.  Had you ever met him before 2012?
17 A.  I don't recall, ma'am.
18 Q.  Do you recall that Mr. Balkan left the bank somewhere in or
19  about February of 2013?
20 A.  I don't recall the exact date, ma'am, but I do recall that
21  after a while, Levent Balkan had left Halkbank.
22 Q.  Do you remember that you would go to him when you had a
23  problem with money not being transferred and speaking to him
24  about documentation that was missing?
25 A.  Sometimes, but I don't recall that exactly or in a specific

HC53ATI6          Zarrab - Cross          Page 837

1  way.
2  Q.  You spoke with him more than you spoke ever with
3   Mr. Atilla; isn't that true?
4  A.  There is a high possibility that I had talked to him more
5   than Mr. Hakan Atilla, ma'am.
6  Q.  Do you remember speaking to Mr. Levent Balkan, for example,
7   about partnership structures of companies in Iran?
8  A.  I mean, I don't recall the specific conversation that madam
9   might be referring to, but if my memory could be refreshed,
10  maybe I could remember a specific conversation on that.
11 Q.  I'm asking what you remember in general.  You've testified
12  for a few days as to your memory.  What do you remember in
13  general?
14      THE COURT:  What do you mean, what do you remember in
15  general?
16 Q.  What do you remember without having to refresh your
17  recollection about how many times you spoke with Levent Balkan?
18 A.  Madam, I need to be 100 percent correct and truthful in
19  what I say here, and the reason why I mentioned or had this
20  question for you is because I cannot make or come up with
21  opinions or estimate things because I need to be -- because I
22  need to be 100 percent correct in what I say here.
23 Q.  Do you remember any conversations that you had with Levent
24  Balkan about partnership structures without me showing you a
25  piece of paper?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

HC53ATI6                Zarrab - Cross                Page 838

1  A. Right now, I don't recall that. But for example, I
2  remember the HSBC for 1,800,000. That phone conversation where
3  the 1,800,000 was mentioned. I recall that one.
4  Q. Do you remember a conversation where you're telling
5  Mr. Happani send two to Levent's boss? Do you remember that
6  conversation?
7  A. That one, I recall absolutely very clearly, ma'am.
8  Q. And you said send it to Levent's boss, not to Mr. Atilla's
9  boss, didn't you, Mr. Zarrab; yes or no?
10  A. Yes, ma'am, that absolutely correct. I said send to
11  Levent, Mr. Levent Balkan's boss, that is absolutely correct.
12  Q. In fact, that was in connection with the October 2012
13  transaction that you testified about where Mr. Suleyman first
14  approached you for getting cut into your deal; do you remember
15  that?
16  A. It was in October 2012 that Mr. Suleyman Aslan had
17  approached me about receiving a bribe. But to tie that to a
18  specific transaction would not be fair.
19  Q. Going back to the partnership structure.
20  A. Of course, ma'am.
21  Q. Halkbank required that in connection with gold transactions
22  with Iran, that if there were sales to companies in Iran, a
23  partnership structure of the company be provided, correct?
24  A. Just as I had testified earlier, madam, Halkbank requested
25  that the companies that send money to our account from Iran,

HC53ATI6                Zarrab - Cross                Page 839

1  their documentation, their partnership structure, be presented
2  to the bank; that's correct, ma'am.
3  Q. It was partnership or shareholder structure to show they
4  were private companies and not connected to the government of
5  Iran, correct?
6  A. It was a document that was requested by the bank in order
7  to show that the company did not have any government agency or
8  individuals that are affiliated with the government amongst its
9  partnership, ma'am.
10  Q. And in fact, the first conversation on the telephone that
11  you had with Mr. Atilla in February of 2013 was him following
12  up on where was the partnership structure, correct?
13  A. It would not be correct to say that. That may have been my
14  first conversation with Mr. Atilla. But I do recall that this
15  was a conversation with Mr. Atilla about the partnership
16  structure document that was needed.
17  Q. The first telephone -- are you done?
18      The first telephone conversation we had here in
19  evidence is February 6, 2013.
20      MS. FLEMING: Can we pull up GX 226, please.
21  A. Ma'am, I don't have the evidence, so I don't know that the
22  first conversation we have on evidence to be on certain date, I
23  just don't have them with me.
24  Q. Your phones were wiretapped in Turkey for a significant
25  period of time, weren't they, sir?

HC53ATI6                Zarrab - Cross                Page 840

1  A. That is correct, ma'am.
2  Q. There were many, many, many calls of yours that were
3  captured on a wiretap, right?
4  A. It is true that many were recorded, ma'am.
5  Q. Have you seen any in this courtroom or any that you have --
6  withdrawn.
7      Have you reviewed any conversations with Mr. Atilla
8  that are before February 6, 2013, any recorded telephone
9  conversations?
10  A. I did not look at the dates. I did not look at the
11  specifics, ma'am.
12      MS. FLEMING: You can take that down. Thank you.
13  Q. In addition to the customs declarations and the boarding
14  passes and the partnership structures, there were other
15  documents that Halkbank required in connection with the gold
16  sales, correct?
17  A. That is correct, ma'am.
18  Q. You described for us earlier a pro forma invoice that was
19  the first document that you supplied, correct?
20  A. Pro forma invoice is also among those documents that are
21  presented to the bank, yes, ma'am.
22  Q. Then also, is there a document at the end that ties it all
23  up, that the transaction is filled, it's completed?
24  A. So, they would all be sent to the bank as a package, ma'am.
25  Q. And your companies actually provided real boarding passes

HC53ATI6                Zarrab - Cross                Page 841

1  for real flights that went to Iran, correct?
2  A. That would be partial. There were some transactions that
3  involved the boarding passes showing that, and there were some
4  transactions that did not involve such.
5  Q. There was certain times that it was required and certain
6  times it was not, correct, Mr. Zarrab?
7  A. Do you mean between Dubai and Iran, ma'am?
8  Q. I misunderstood your answer. Are you saying that you
9  send people -- withdrawn.
10      Are you saying you would buy tickets to Iran with
11  stopovers in Dubai, provide the tickets -- is that -- are you
12  saying that you would provide the tickets that show through to
13  Iran but people would get off in Dubai?
14  A. Yes, ma'am.
15  Q. You provided tickets and boarding passes that showed
16  through to Iran, correct?
17  A. Yes, ma'am.
18  Q. On other documents -- withdrawn.
19      Let's go to the October transactions you talked about.
20      MS. FLEMING: Could we pull up, please, and just show
21  the transcript for 205-T. And I'd like to look at page three.
22  Q. Mr. Zarrab, you say here to Mr. Erker, "But do you know
23  what these idiots are missing out on, you will be collecting
24  all the money."
25  A. Yes, ma'am.

A498

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 5, 2017

| HC53ATI6 | Zarrab - Cross | Page 842 |

1  Q. Can you explain what you mean by that, please?
2  A. I'm talking about the companies that would be sending money
3   from India and Italy, ma'am.
4  Q. You're not talking about Halkbank being the idiots?
5  A. Madam, the funds were to come from India and from Italy.
6  Q. Would you go to page two, please. Would you look up where
7   the middle of the page where it says "It's complicated." Next
8   to it, it says "karmasik." If I've said that anywhere near
9   close.
10       Is the translation for "karmasik," is it "it's
11  complicated" or "it's mixed"?
12       MR. KAMARAJU: Objection.
13       THE COURT: I'll allow it.
14  A. Ma'am, there are many translators in this courtroom. And
15   my English is not up to making that translation here.
16  Q. Is the reference to -- is the reference to the fact that
17   the moneys are mixed; is that's what is being discussed there?
18  A. No, ma'am, that's not what I mean.
19  Q. A little further down, Mr. Zarrab, you're telling Mr. Erker
20   "I did not provide them with a specific name, I said it could
21   be Arab-Turk, Garanti." Do you see that?
22  A. Yes, ma'am, I see that.
23  Q. But you knew at that time who it was going to be, correct?
24  A. No, ma'am, I did not know.
25       MS. FLEMING: I'm sorry, this is in evidence. The

| HC53ATI6 | Zarrab - Cross | Page 843 |

1   jurors should have this on. Sorry.
2       THE COURT: They don't have it.
3       MS. FLEMING: Now I'm done with it.
4  Q. I'd like to pull up if we could GX 211 which is in
5   evidence.
6       And does that help you with the date, Mr. Zarrab, as
7   to what date that conversation is?
8  A. It's October 24, 2012, ma'am.
9  Q. This is a conversation between you and Mr. Balkan, correct?
10       MS. FLEMING: This is not in evidence yet. Can we
11   pull up GX 219. Can you turn to the next page, please.
12  Q. Mr. Reza, do you recognize this call from the transcript?
13   And my next question is going to be have you listened to the
14   recording?
15  A. If you can allow me some time to review the transcript real
16   quick.
17  Q. Please.
18  A. That's fine? Thank you.
19       (Pause)
20  A. Ma'am, if possible, can we also look at the next page as
21   well?
22       MS. FLEMING: Turn to the next page, please.
23       (Pause)
24  A. And also to the next page, please?
25       (Pause)

| HC53ATI6 | Zarrab - Cross | Page 844 |

1  A. Yes, ma'am, I recall this conversation.
2  Q. Do you recall whether you have listened to the conversation
3   and compared it to the transcript?
4  A. I don't remember that, ma'am.
5       MS. FLEMING: Your Honor, can we play Government
6   Exhibit 219, let him follow along, and I would actually move it
7   into evidence. I don't know if the government has an
8   objection.
9       MR. KAMARAJU: We don't object, your Honor. The jury
10   should follow along at the same time.
11       MS. FLEMING: Thank you.
12       (Government's Exhibit 219 received in evidence)
13       MS. FLEMING: Just start at page two, please.
14       THE COURT: Do they have it on their screen?
15  Q. Just as we're getting ready to start, who are the
16   participants?
17       THE COURT: Can you get it to that screen?
18       MS. FLEMING: Do you have it for the jury?
19  Q. Who are the participants to this conversation?
20  A. It appears to be the Ms. Secretary that had transferred the
21   call at the bank, and also it is myself and Levent Balkan.
22       MS. FLEMING: Could I impose on the government to play
23   it? Government Exhibit 219?
24  Q. While we're waiting for that to be hooked up, could we also
25   show you Government Exhibit 273, just not to the jury, just to

| HC53ATI6 | Zarrab - Cross | Page 845 |

1   Mr. Zarrab.
2       Could you look at Government Exhibit 273 and see if
3   you have listened to this recording and if you recognize this
4   transcript.
5  A. I recall this conversation, ma'am. But I don't remember
6   whether I listened to it or not.
7       MS. FLEMING: Your Honor, when we're ready to hook up,
8   we would also move Government Exhibit 273 into evidence.
9       MR. KAMARAJU: No objection.
10       THE COURT: I'll allow it.
11       (Government's Exhibit 273 received in evidence)
12  Q. Who are the participants on Government Exhibit 273, the
13   transcript that's in front of you, Mr. Zarrab?
14  A. It's Ms. Mehtap from Halkbank and myself, sir.
15  Q. Mehtap works in the foreign operations department at
16   headquarters at Halkbank, correct?
17  A. I don't remember exactly, ma'am.
18  Q. Let me show another one. Can we show just to Mr. Zarrab GX
19   215.
20       Would you please look at Government Exhibit 215 and
21   tell us whether you recognize this one from the transcript and
22   whether you've listened to this recording.
23  A. Ma'am, if possible, can we also go to the third page of
24   this transcript, please?
25  Q. Sure.

**A499**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 5, 2017

HC53ATI6        Zarrab - Cross        Page 846

1  A. Yes, ma'am, I remember this conversation and this
2  transcript.
3        MS. FLEMING: We would move 215 in evidence.
4        MR. KAMARAJU: No objection, your Honor.
5        THE COURT: I'll allow it.
6        (Government's Exhibit 215 received in evidence)
7  Q. Who are the participants to Government Exhibit 215, that
8  call?
9  A. That would be Mr. Levent Balkan and myself, ma'am. But
10 whether I had listened to it or not, I do not remember.
11 Q. Showing you what's been marked as Government Exhibit 221.
12 Just do Mr. Zarrab.
13       Mr. Zarrab, would you look at that and see whether you
14 recognize it and whether you compared it to a recording.
15 A. If possible, the same way, if you can please go to the next
16 page. Thank you, ma'am.
17       MS. FLEMING: Mr. White, next page?
18 A. I remember this, ma'am.
19 Q. Do you remember whether you've listened to the recording?
20 A. I do not remember that, ma'am.
21       MS. FLEMING: We would move Government Exhibit 221
22 into evidence.
23       MR. KAMARAJU: No objection.
24       THE COURT: I'll allow it.
25       (Government's Exhibit 221 received in evidence)

HC53ATI6        Zarrab - Cross        Page 847

1        MS. FLEMING: Is 225 in evidence? Can we show
2  Government Exhibit 225 to Mr. Zarrab only.
3  A. I remember this conversation, ma'am.
4        MS. FLEMING: Your Honor, we'd move Government Exhibit
5  225 into evidence.
6        MR. KAMARAJU: I think we had it in evidence but we
7  don't object either way.
8        THE COURT: I'll allow it if it's not already in.
9        (Government's Exhibit 225 received in evidence)
10       MS. FLEMING: Do you want me to play a couple of them
11 right now, Judge? There are a couple quick ones.
12       THE COURT: Sure.
13       MS. FLEMING: Ready? Could we start with -- let's
14 start with Government Exhibit 215.
15       THE COURT: How long is that, do you know?
16       MS. FLEMING: None of them are long, your Honor.
17       THE COURT: Play one.
18       MS. FLEMING: All right.
19       THE COURT: Maybe we'll start with that tomorrow
20 morning. It's almost 4:30.
21       MS. FLEMING: Thank you, your Honor.
22       THE COURT: We'll excuse the jury for today with my
23 same instructions, please don't talk to each other about the
24 case or about anyone who has anything to do with it.
25       Please be seated, everybody. Could you please be

HC53ATI6        Zarrab - Cross        Page 848

1  seated.
2        Please don't talk to each other about the case or
3  about anyone who has anything to do with it until the end of
4  the case when you go to the jury room to deliberate.
5        Second, do not talk with anyone else about the case or
6  about anyone who has anything to do with it until the trial has
7  ended, and you've been discharged as jurors.
8        Third, do not let anyone talk to you about the case or
9  about anyone who has anything to do with it, and if someone
10 should try and talk to you about the case, please report that
11 to Christine or me immediately.
12       Fourth, do not read any news or internet stories or
13 cable or articles or blogs or listen to any radio or TV or
14 cable TV or internet reports about the case or about anyone who
15 has anything to do with it.
16       And fifth, please do not do any type of research or
17 any type of investigation about the case on your own. So,
18 we're making good progress. I'll let you go for today and I'll
19 see you at 9:15 tomorrow morning. Thanks a lot.
20       (Jury excused)
21       THE COURT: Ms. Fleming, we'll line up the recordings
22 for tomorrow.
23       MS. FLEMING: Yes.
24       THE COURT: You'll line them up for tomorrow morning?
25       MS. FLEMING: Maybe we can impose on the paralegal who

HC53ATI6        Zarrab - Cross        Page 849

1  never sleeps.
2        THE COURT: I'll see everybody in the morning. And
3  the CSO will tell you when the coast is clear. Thank you.
4        MR. KAMARAJU: Thank you, your Honor.
5        (Adjourned until December 6, 2017, at 9:15 a.m.)

Min-U-Script®        Southern District Court Reporters        (25) Pages 846 - 849

**A500**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                   December 5, 2017

Page 850

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   REZA ZARRAB

 4   Direct By Mr. Kamaraju . . . . . . . . . . . 755

 5   Cross By Ms. Fleming . . . . . . . . . . . . 777

 6                  GOVERNMENT EXHIBITS

 7   Exhibit No.                             Received

 8    1270 through 1280  . . . . . . . . . . . . 763

 9   6012     . . . . . . . . . . . . . . . . . 765

10   6013     . . . . . . . . . . . . . . . . . 771

11   6014     . . . . . . . . . . . . . . . . . 773

12   6015     . . . . . . . . . . . . . . . . . 775

13   219   . . . . . . . . . . . . . . . . . . . 844

14   273   . . . . . . . . . . . . . . . . . . . 845

15   215   . . . . . . . . . . . . . . . . . . . 846

16   221   . . . . . . . . . . . . . . . . . . . 846

17   225   . . . . . . . . . . . . . . . . . . . 847

18                  DEFENDANT EXHIBITS

19   Exhibit No.                             Received

20    12   . . . . . . . . . . . . . . . . . . . 815

21

22

23

24

25
```