# 18-1589(L)
## 18-1910(XAP)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

◆

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

REZA ZARRAB, aka Riza Sarraf, CAMELIA JAMSHIDY, aka Kamelia Jamshidy, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, aka Can Sarraf, aka Kartalmsd, MEHMET ZAFER CAGLAYAN, aka Abi, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants,*

MEHMET HAKAN ATILLA,

*Defendant-Appellant-Cross-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME III OF IV
### (Pages A501 to A758)

GEOFFREY S. BERMAN
UNITED STATES ATTORNEY FOR
  THE SOUTHERN DISTRICT OF
  NEW YORK
SARAH K. EDDY
MICHAEL D. LOCKARD
ASSISTANT UNITED STATES
  ATTORNEYS
One St. Andrew's Plaza, Room 743
New York, New York 10007
(212) 637-2200

*Attorneys for Appellee-Cross-Appellant*
*  United States of America*

JOHN P. ELWOOD
JOSHUA S. JOHNSON
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW,
  Suite 500 West
Washington, DC 20037
(202) 639-6500

VICTOR J. ROCCO
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for Defendant-Appellant-*
*  Cross-Appellee Mehmet Hakan*
*  Atilla*

# TABLE OF CONTENTS

PAGE

Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Decision & Order (Sept. 29, 2016), [Dkt. 87] . . . . . . . . . . . . . . . . . . . . . . . . A107

Decision & Order (Oct. 17, 2016), [Dkt. 90] . . . . . . . . . . . . . . . . . . . . . . . . A133

Third Superseding Indictment (Apr. 7, 2017), [Dkt. 212] . . . . . . . . . . . . . . A169

Fourth Superseding Indictment (Sept. 6, 2017), [Dkt. 293] . . . . . . . . . . . . A198

Excerpts from Memorandum of Law in Support of
    Defendant Mehmet Hakan Atilla's Motion to Dismiss
    Superseding Indictment S4, or Alternatively for Severance
    (Oct. 9, 2017), [Dkt. 307] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A251

Excerpts from Government's Memorandum of Law in Opposition to
    Defendant Mehmet Hakan Atilla's Motions to Dismiss the
    Superseding Indictment and for Severance (Oct. 16, 2017),
    [Dkt. 308] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A274

Excerpts from Reply Memorandum of Law in Support of
    Defendant Mehmet Hakan Atilla's Motion to Dismiss
    Superseding Indictment S4, or Alternatively for Severance (Oct.
    23, 2017), [Dkt. 311] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A277

Defense's Letter to Court (Nov. 3, 2017), [Dkt. 326] . . . . . . . . . . . . . . . . . . A289

Defense's Letter with Endorsement from Court (Nov. 3, 2017),
    [Dkt. 327] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A292

Excerpt from Defense's Letter to Court (Nov. 5, 2017), [Dkt. 329] . . . . . . A295

Tr. 1-9 (Nov. 6, 2017), [Dkt. 342] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A298

ii

PAGE

Tr. 1-3 (Nov. 20, 2017), [Dkt. 502] ................................... A307

Order (Nov. 20, 2017), [Dkt. 350] ................................... A310

District Court's Oral Ruling on Defendant Mehmet Hakan Atilla's
    Motion to Dismiss Superseding Indictment S4, or Alternatively
    for Severance, Tr. 12-23 (Nov. 16, 2017), [Dkt. 351] .............. A311

Defense's Motion for a Continuance (Nov. 27, 2017), [Dkt. 360] ....... A324

Order (Nov. 28, 2017), [Dkt. 363] ................................... A331

Trial Tr. 1-4, 17-64, 117-24, 141-48, 165-76, 205 (Nov. 28, 2017),
    [Dkt. 400] ..................................................... A334

Trial Tr. 206-09, 258-377 (Nov. 29, 2017), [Dkt. 404] ................. A356

Trial Tr. 378-517, 526-27 (Nov. 30, 2017), [Dkt. 406] ................. A388

Trial Tr. 528-31, 548-623, 628-30 (Dec. 1, 2017), [Dkt. 408] ........... A425

Trial Tr. 631-749 (Dec. 4, 2017), [Dkt. 410] .......................... A447

Trial Tr. 750-850 (Dec. 5, 2017), [Dkt. 412] .......................... A474

Trial Tr. 851-948 (Dec. 6, 2017), [Dkt. 414] .......................... A501

Trial Tr. 949-1096 (Dec. 7, 2017), [Dkt. 416] ......................... A527

Trial Tr. 1097-1241 (Dec. 8, 2017), [Dkt. 418] ....................... A565

Trial Tr. 1242-45, 1286-93, 1326-73, 1378-93, 1402-04
    (Dec. 11, 2017), [Dkt. 420] .................................... A603

Trial Tr. 1405-1524, 1545-52, 1557-64, 1577-80, 1617-20
    (Dec. 12, 2017), [Dkt. 422] .................................... A624

iii

PAGE

Trial Tr. 1621-24, 1641-52, 1697-1704, 1729-40, 1745-52, 1765-68
(Dec. 13, 2017), [Dkt. 424] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A661

Trial Tr. 1769-72, 1789-1830, 1843-50, 1875-78 (Dec. 14, 2017),
[Dkt. 426] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A674

Trial Tr. 1879-82, 1923-26, 1931-34, 1942-46, 1979-86, 2023-26
(Dec. 15, 2017), [Dkt. 428] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A688

Trial Tr. 2027-30, 2155-58, 2163-64 (Dec. 18, 2017), [Dkt. 430] . . . . . . . A697

Trial Tr. 2165-68, 2201-2236, 2245-2340 (Dec. 19, 2017),
[Dkt. 432] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A701

Trial Tr. 2341-2428 (Dec. 20, 2017), [Dkt. 434] . . . . . . . . . . . . . . . . . . . . . A736

Trial Tr. 2529-40 (Jan. 3, 2018), [Dkt. 440] . . . . . . . . . . . . . . . . . . . . . . . . A759

Order with Attached Letters from Defense and Government
(Dec. 5, 2017), [Dkt. 369] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A763

Government's Letter to Court (Dec. 6, 2017), [Dkt. 370] . . . . . . . . . . . . . . A779

Defense's Motion for a Mistrial (Dec. 14, 2017), [Dkt. 377] . . . . . . . . . . . A782

Excerpts from Government's Memorandum of Law in Opposition to
Mehmet Hakan Atilla's Motion for a Mistrial (Dec. 14, 2017),
[Dkt. 378] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A799

Defense's Motion for a Judgment of Acquittal Under Federal Rule of
Criminal Procedure 29(a) (Dec. 15, 2017), [Dkt. 381] . . . . . . . . . . . . . A810

Excerpts from Government's Opposition to Defense's Motion for a
Judgment of Acquittal Under Federal Rule of
Criminal Procedure 29(a) (Dec. 16, 2017), [Dkt. 382] . . . . . . . . . . . . . A818

iv

PAGE

Defense's Motion to Admit Recording and Transcript of
Reza Zarrab's September 15, 2016 Phone Call
with his Uncle (Dec. 18, 2017), [Dkt. 384] ........................ A822

Government's Opposition to Defense's Motion to Admit Recording
and Transcript of Reza Zarrab's September 15, 2016 Phone Call
with his Uncle (Dec. 18, 2017), [Dkt. 385] ........................ A834

Defense's Motion for a Mistrial (Dec. 20, 2017), [Dkt. 389] ............ A837

Corrected Decision & Order (Dec. 21, 2017), [Dkt. 393] ............... A843

Decision and Order (Jan. 2, 2018), [Dkt. 399] ......................... A847

Government Trial Exhibit 226-T (Transcript of Feb. 6, 2013
Recorded Phone Call)........................................... A854

Government Trial Exhibit 261-T (Transcript of July 9, 2013
Recorded Phone Call)........................................... A856

Government Trial Exhibit 269-T (Transcript of Sept. 26, 2013
Recorded Phone Call)........................................... A861

Government Trial Exhibit 295-T (Transcript of Apr. 10, 2013
Recorded Phone Call with Time Stamp of 11:45:46 AM)........... A863

Government Trial Exhibit 297-T (Transcript of Apr. 10, 2013
Recorded Phone Call with Time Stamp of 6:58:31 PM) ............ A870

Government Trial Exhibit 6022 (Oct. 15, 2014 Email
with Attachment) ............................................... A875

Government Trial Exhibit 6023 (Oct. 18, 2014 Email
with Attachments) .............................................. A877

Government Trial Exhibit 6027 (Oct. 20, 2014 Email
with Attachments) .............................................. A883

v

PAGE

Government Trial Exhibit 7020 (State Department Cable
  Summarizing Feb. 12, 2013 Meeting Between Treasury
  Department Officials and Halkbank Officials) ..................... A886

Government Trial Exhibit 7028 (State Department Cable
  Summarizing Sept. 2012 Meeting Between Treasury
  Department Officials and Halkbank Officials) ..................... A891

Government Trial Exhibit 7029 (State Department Cable
  Summarizing Feb. 28, 2013 Meeting Between Treasury
  Department Officials and Halkbank Officials) ..................... A897

Defense Trial Exhibit 200 (Center for Strategic and International
  Studies, "Treasury's Role in National Security" (May 10, 2012)) ... A900

Defense Trial Exhibit 201 (Dow Jones, U.S. Treasury's Top
  Terrorism Cop: How Financial Tools Fight Foes,
  Wall St. J. Blog, June 2, 2014) ................................... A915

Defense Trial Exhibit 212 (Summary of Treasury Under Secretary
  David Cohen's Oct. 10, 2014 Meeting with Halkbank Officials) .... A919

Defense Trial Exhibit 320-T (May 16, 2013 Email from
  Mehmet Hakan Atilla) ........................................... A921

Court Exhibit OO (Jury Note – Jan. 3, 2018), [Dkt. 483] .............. A927

Court Exhibit PP (Court's Response to Jury Note – Jan. 3, 2018),
  [Dkt. 484] ..................................................... A928

Decision and Order (Feb. 7, 2018), [Dkt. 493], Which Includes as
  Attachments Government Demonstrative Exhibit 9502
  (Chart Created by Reza Zarrab to Describe Purported Gold
  Transactions) and Government Demonstrative Exhibit 9503
  (Chart Created by Reza Zarrab to Describe Purported Food
  Transactions) .................................................. A929

vi

PAGE

Excerpts from Government's Sentencing Submission (Apr. 4, 2018),
    [Dkt. 505] ..................................................... A957

Order (Apr. 9, 2018), [Dkt. 507] ...................................... A960

Oct. 23, 2017 Letter from Turkish Embassy to U.S. Department of
    State, Exhibit A to Defense's Letter in Response to
    Court's Apr. 10, 2018 Order (Apr. 13, 2018), [Dkt. 509] ........... A961

Excerpt from Government's Letter in Response to
    Court's Apr. 10, 2018 Order (Apr. 13, 2018), [Dkt. 510] ........... A962

Order (Apr. 16, 2018), [Dkt. 511] ..................................... A965

Sentencing Hr'g Tr. 1-12, 17-36, 77-83 (May 16, 2018),
    [Dkt. 520] ..................................................... A966

Judgment (May 16, 2018), [Dkt. 518] ................................. A977

Defendant Mehmet Hakan Atilla's Notice of Appeal (May 25, 2018),
    [Dkt. 525] ..................................................... A982

Government's Notice of Appeal (June 25, 2018), [Dkt. 532] ........... A983

# In The Matter Of:

*UNITED STATES OF AMERICA v.*

*MEHMET HAKAN ATILLA,*

*December 6, 2017*

*Southern District Court Reporters*

Original File hc6PatiF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

---

HC63ATI1      Page 851

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                 Defendant.
 7   ------------------------------x
 8
 9                           December 6, 2017
                             9:15 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                              District Judge
                                and a jury
15
16
17                 APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

---

HC63ATI1      Page 852

```
 1
 2        (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10             Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15        MR. M. TEKIN ESENDAL, Turkish Interpreter
          MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

---

HC63ATI1      Page 853

1     (At the sidebar)

2     THE COURT: There is a small point I want to go over.

3 A couple of the jurors have asked if they could have some time

4 this week separately to review their notes, because there is a

5 lot to absorb. So I was going to propose to them that they

6 could do it one of these days, we'll give them maybe an extra

7 half hour on a lunch break. But I would instruct them that

8 they can't talk among themselves. It is only for the purpose

9 of --

10     MR. KAMARAJU: Right.

11     THE COURT: -- reviewing their notes.

12     MS. FLEMING: That's new.

13     MR. KAMARAJU: I think that's okay, but can we just

14 think about it and revisit it at lunch?

15     THE COURT: Sure.

16     (In open court)

17     MR. KAMARAJU: Your Honor, we had spoken yesterday

18 about transcripts that the defense wanted to put up for the

19 jury. We're fine with showing those to the jury and having

20 them being offered subject to connection for when they put on

21 their translator, subject to our right to put in a competing

22 transcript if we think there is a problem.

23     THE COURT: Fine.

24     (Jury present)

25     THE COURT: We're going to pick up with the

---

HC63ATI1      Zarrab - Cross      Page 854

1 cross-examination of Mr. Zarrab by Ms. Fleming.

2     THE DEPUTY CLERK: Sir, before we begin, I'd like to

3 remind you that you're still under oath.

4     THE WITNESS: Yes, ma'am.

5     THE DEPUTY CLERK: Thank you.

6     MS. FLEMING: Thank you, your Honor. May I proceed?

7     THE COURT: Yes.

8   REZA ZARRAB,

9 CROSS-EXAMINATION

10 BY MS. FLEMING:

11 Q. Good morning, Mr. Zarrab.

12 A. Good morning, ma'am.

13 Q. Mr. Zarrab, you were arrested in Miami in March of 2016,

14   correct?

15 A. That is correct, ma'am.

16 Q. Mr. Atilla was arrested a year, approximately a year later

17   in March of 2017; do you recall that?

18 A. I don't recall the exact date, but I remember that it was

19   long after I was arrested, ma'am.

20 Q. You were shocked that he was arrested, weren't you, sir?

21 A. Yes, that is correct.

22 Q. You told people that you were shocked he was arrested at

23   the time, correct?

24 A. Yes, that is correct, ma'am.

25     MS. FLEMING: May I ask the government, did you put

---

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                December 6, 2017

HC63ATI1        Zarrab - Cross        Page 855

1   3655-T into evidence?
2          MR. KAMARAJU: I don't think so.
3          MS. FLEMING: Can we pull up 3655, please, just for
4   Mr. Zarrab and not for the jury yet.
5   Q. Mr. Zarrab, do you recognize the names that are here in the
6   "to" and "from" line?
7   A. Yes, I recognize them, ma'am.
8   Q. Is the person who works at Royal one of your employees,
9   Umut, the first person in the "from" line, is that an employee
10  of yours at Royal?
11  A. Yes, he was one of the employees that worked for me as a
12  member of the personnel during that time frame, ma'am.
13  Q. Do you recognize Exhibit 3655 as an e-mail to you?
14  A. Yes, ma'am.
15         MS. FLEMING: Would you turn to the next page and then
16  the third page for Mr. Zarrab.
17  Q. Do you recognize 3655 as being a record that you keep in
18  the ordinary course of your business?
19  A. These are the bits of information about the companies that
20  I own.
21         MS. FLEMING: Your Honor, I would move 3655 into
22  evidence.
23         THE COURT: What is it?  Is it a document?
24         MS. FLEMING: Yes, a document.  It is an e-mail with
25  an attachment.

HC63ATI1        Zarrab - Cross        Page 856

1          MR. KAMARAJU: No objection.
2          THE COURT: I'll allow it.
3          (Government's Exhibit 3655 received in evidence)
4          MS. FLEMING: Can we please put it on the screen for
5   the jury.
6   Q. Looking at these pages, these show the dates of
7   establishment of a number of your companies; is that correct,
8   Mr. Zarrab?
9   A. That is correct, ma'am.
10  Q. So Royal Holding Incorporated was established as of
11  December 27, 2010; is that correct?
12  A. I mean, I don't recall the exact date.  But based on this
13  document here, that's what it looks like.
14  Q. And Government Exhibit 3655 shows us on page three, the
15  second one up on the screen, that Safir Gold Trade was
16  established on April 10, 2012, doesn't it, sir?
17  A. Based on the document that is shown here, it shows that it
18  was 4/10/2012.  But I don't recall the exact date of
19  establishment.
20  Q. You are the one who established those companies, correct?
21  A. Companies are established by accountants in Turkey, but
22  these companies were established under my name.
23  Q. They were established at your direction, correct, sir?
24  A. That is absolutely correct.
25  Q. Thank you.

HC63ATI1        Zarrab - Cross        Page 857

1          MS. FLEMING: Can we pull up Government Exhibit 3799
2   which I believe is in evidence.  Could we show the second page
3   of this.
4   Q. Going back to the first page of Government Exhibit 3799,
5   you identified this as an e-mail that you recognized that you
6   had sent to Mr. Atilla at Halkbank.  Do you remember testifying
7   to that, sir?
8   A. Yes, ma'am, that's correct.
9   Q. Did Mr. Atilla reply?
10  A. I don't recall, ma'am.
11  Q. Have you seen in all of the discovery or in any of the
12  documents in preparation for trial, out of all the documents
13  that you've seen from your e-mails, have you seen a reply from
14  Mr. Atilla?
15  A. I did not see all of the e-mails that I may have received,
16  and I did not see all the documents in discovery.  And to the
17  best of my recollection, I don't remember seeing a reply to
18  this e-mail right here, ma'am.
19  Q. Thank you.
20         MS. FLEMING: You can take that down.
21         Your Honor, may I approach, and with the government's
22  permission, I'd like to use their blackboard with all the
23  photos on it for a moment.
24         THE COURT: Sure.
25         MR. KAMARAJU: Of course.

HC63ATI1        Zarrab - Cross        Page 858

1   Q. Mr. Zarrab, are you able to see this, the blackboard with
2   all the photographs on it?
3   A. I don't see all of them, but I see them partially, yes.
4   Q. Let me turn it a little bit.  Is that better?
5   A. Yes, ma'am.
6   Q. Now, do you recognize Mr. Ghasemi?
7   A. It is true that I saw Mr. Ghasemi at a meeting in Turkey
8   once, so I know him from that; that is correct, ma'am.
9   Q. So you have met him once, Mr. Ghasemi?
10  A. Yes, ma'am, that is correct.
11  Q. Mr. Mahmoud Bahmani.  Am I saying that correctly?
12  A. Since I don't know him, I don't know the pronunciation of
13  his name that well either.  But I don't know him.
14  Q. And you've never met Mr. Bahmani; is that correct?
15  A. I did meet with Dr. Bahmani of the Central Bank, but the
16  picture that is shown here looks different than Dr. Bahmani
17  that I know, and it could happen in pictures it might look
18  different.
19  Q. But you don't recognize this photograph as being the person
20  you know as Mr. Bahmani?
21  A. I mean, I've met with Dr. Bahmani once at the Central Bank
22  in Iran.  But when I look at this picture of him, I just don't
23  recall the person that I had met.
24  Q. You met him at the Central Bank of Iran?
25  A. Yes, ma'am, we met at a meeting at the Central Bank in Iran

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                              December 6, 2017

HC63ATI1          Zarrab - Cross          Page 859

1  where my father was also present.
2  Q.  This fellow, Mr. Hashem Pouransari, do you see that
3   photograph?
4  A.  I see the picture, I see him, ma'am.
5  Q.  Do you know him?
6  A.  I don't recall, ma'am.
7  Q.  So you don't know if you've ever met him either, correct?
8  A.  I don't recall, ma'am.
9  Q.  Mr. Seifollah Jashnsaz, have you ever met him?
10  A.  Yes, with Mr. Seifollah Jashnsaz, I have met with him a few
11   times and I have met with him in person, so I have.
12  Q.  Have you ever met Mr. Ali Khamenei, the Supreme Leader of
13   Iran?
14  A.  I have never met with the Ali Khamenei here who is
15   described as the Supreme Leader of Iran.
16  Q.  Have you ever met with Mahmoud Ahmadinejad, who is the
17   former president of Iran?
18  A.  I have never met with Mr. Ahmadinejad either, ma'am.
19  Q.  Thank you.
20      MS. FLEMING:  We'll take this down.
21  Q.  I would just like to clear something up from yesterday.  I
22   asked you questions about the Al Nafees Exchange having been
23   sanctioned by OFAC.  Do you remember those questions?
24  A.  Yes, ma'am, you had asked questions about Al Nafees
25   yesterday, that's correct.

HC63ATI1          Zarrab - Cross          Page 860

1  Q.  You told us yesterday that Al Nafees had never paid a fine
2   for sanctions, correct?
3  A.  I don't recall any fines that may have been paid by Al
4   Nafees in a sanctions-related issue until I was arrested.  If
5   such a fine had been paid after I was arrested, I don't know
6   about that.
7  Q.  You do recall that sanctions were assessed against Al
8   Nafees before you were arrested, don't you, sir?
9  A.  Yes, it is correct that I had received information that
10   indicated Al Nafees had received a warning with regards to
11   OFAC.
12  Q.  More than a warning, they had in fact been assessed a
13   penalty by OFAC; do you remember that?
14  A.  I had information that OFAC had assessed a fine against
15   them.  I know that too.  That's correct, ma'am.
16  Q.  When we left off yesterday, we were talking about
17   Mr. Balkan.
18      MS. FLEMING:  Your Honor, I think we're organized with
19   recordings today.
20  Q.  So just to put you back as to where we are.
21      THE COURT:  Me or him?
22      MS. FLEMING:  Mr. Zarrab.  Your Honor, I would never
23   put you back where we are.  Only the witness.
24      THE COURT:  I don't want to be there either.
25      MS. FLEMING:  I know better.

HC63ATI1          Zarrab - Cross          Page 861

1  Q.  Mr. Zarrab, just to remind you, you had testified about a
2   meeting on October 4 at Halkbank, correct?
3  A.  I did talk about a meeting within the month of October.  I
4   don't remember the exact date now.
5  Q.  You identified that there were a number of people from
6   Halkbank who were present, correct?
7  A.  That is correct, ma'am.
8  Q.  You testified that it was Suleyman Aslan and Mr. Atilla,
9   correct?
10  A.  In the meeting that was held along with the Iranians;
11   that's correct, ma'am.
12  Q.  You did not say that Mr. Levent Balkan was there, did you,
13   sir?
14  A.  That is correct, ma'am.
15      MS. FLEMING:  Your Honor, I'd like to bring up 1 and
16   1-T.  I believe we have an agreement that these are in subject
17   to authentication of the translations on the first page.  So we
18   can put them right in front of the jury and play -- excuse me.
19   Defense Exhibit 1, and put up 1-T for the jury.
20      MR. KAMARAJU:  Yes, your Honor, subject to connection.
21      THE COURT:  Okay.
22      MS. FLEMING:  So bring up 1-T first, please.
23   Excuse me, your Honor.  Go to page two please, I'm
24   sorry.  Now can you play the recording, please.
25   I'm sorry, your Honor.

HC63ATI1          Zarrab - Cross          Page 862

1      THE COURT:  That's all right.
2      (Audio recording playing)
3  Q.  Mr. Zarrab, do you recognize the voices on this call?
4  A.  Yes, ma'am, I recognize them.
5  Q.  Who are they?
6  A.  It's Mr. Suleyman Aslan and myself, ma'am.
7  Q.  This is a phone conversation that took place within a day
8   or so after the meeting you have described at which
9   Mr. Suleyman and Mr. Atilla was at Halkbank?
10  A.  I don't remember the exact dates but it is after that,
11   ma'am; that's correct.
12  Q.  You were meeting with Mr. Suleyman at his old office in
13   Gayrettepe, correct?
14  A.  That is correct, ma'am.
15  Q.  That was not the current headquarters of Halkbank in
16   Istanbul, was it?
17  A.  No, ma'am, that was not the current headquarters.  They had
18   moved already.
19  Q.  You've never been to Mr. Atilla's office, have you?
20  A.  I don't remember ever going into Mr. Hakan's office at the
21   bank, ma'am.
22  Q.  Do you know even what floor Mr. Atilla's office is on at
23   the headquarters of Halkbank?
24  A.  The Halkbank headquarters is a highrise, it has many
25   floors, and I don't know which floor Mr. Hakan's office might

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                          December 6, 2017

1  have been.
2  Q. At the headquarter building, not this building where you're
3    meeting Mr. Aslan in this conversation, Mr. Aslan's office was
4    on the first floor of the headquarter building, correct?
5  A. Which headquarters again, ma'am?
6  Q. The headquarters of Halkbank, the new one, not the
7    Gayrettepe, if I'm saying it right.
8  A. No, that is not correct, ma'am. Mr. Suleyman had two
9    offices. One was at an upper level, one was at a lower level.
10  Q. When you say lower level, that was the ground floor of the
11    bank when you come in?
12  A. Yes, one of them was at the entry level to the building,
13    ma'am.
14  Q. Did you ever go to his upper floor office?
15  A. Certainly I have, ma'am.
16  Q. What floor was it on?
17  A. When you visit Halkbank, they have a different system when
18    you get into the building. So you're greeted by security
19    individuals, and they go into the elevator, they use their
20    cards, they take you upstairs, and they take you over to the
21    office you're supposed to be visiting. And as far as where
22    Mr. Suleyman's office may have been, I don't remember the floor
23    that he may have been at.
24        MS. FLEMING: Could we pull up, please, what's in
25    evidence as Government Exhibit 209. Second page, please. We

1  don't need to play this one. We've played it.
2  Q. Directing your attention, please, to the first several
3    lines of the translation for 209. This is within several days
4    of your meeting with Mr. Aslan that we just looked at where you
5    met him in the old office, correct?
6  A. I don't recall the exact date, but this is a conversation
7    that occurred after the meeting that I had with Mr. Suleyman at
8    his offices in Gayrettepe.
9  Q. You're telling Mr. Happani "We will send two to Levent's
10    boss on Monday," correct?
11  A. That is absolutely correct, ma'am.
12        MS. FLEMING: Can we pull up 211-T which is in
13    evidence, please. Page two.
14  Q. This is another conversation between you and Levent Balkan
15    in October of 2012; isn't it, Mr. Zarrab?
16  A. The date that is shown on this document reads October 24,
17    2012. I don't recall the date exactly myself.
18  Q. During this time period you recall, do you not, that you
19    were dealing with Levent Balkan with regard to matters
20    involving the bank?
21  A. During this time frame, I do recall that I had conversed
22    with and met with Mr. Levent Balkan on matters related to
23    transactions, ma'am; that is correct.
24        MS. FLEMING: Can we pull up, please, and play 11-T.
25    Defense Exhibit 11-T which we've agreed will go in subject to

1  connection, your Honor. Go to page two, please.
2  Q. This is a conversation between you and Ruchan Bayar; isn't
3    that correct, sir?
4        MS. FLEMING: Can we play the recording please.
5        (Audio recording playing)
6  Q. This conversation takes place approximately a year later,
7    in October of 2013, correct?
8  A. The date that is shown on this document here is October 17,
9    2013, ma'am, so that is correct.
10  Q. Levent Balkan has been gone from Halkbank for months at
11    this point, hasn't he?
12  A. Though the exact date is unknown, based on this
13    conversation, it is understood that he had left a long time
14    before this conversation; that is correct, ma'am.
15  Q. And you're still discussing what his role had been with
16    regard to you and your business at Halkbank, correct?
17  A. It would not be correct to say that we are talking
18    specifically about my business with regards to Levent Balkan,
19    but we are talking about Levant Balkan's involvement with
20    Iranian trade in general. That's what it is, ma'am.
21        MS. FLEMING: Can we show Government Exhibit 273-T.
22    273 is in evidence? Page two, please. This is in evidence,
23    right?
24        MR. KAMARAJU: Yes.
25        MS. FLEMING: Can we play Government Exhibit 273,

1  please.
2  Q. Just before we play it, this is a conversation between you
3    and Mehtap who works at Halkbank, correct?
4  A. That is correct, ma'am.
5  Q. This is back, we're going back now to November 2012?
6  A. I don't recall the exact date of the conversation, ma'am,
7    but the document here shows that the conversations had occurred
8    on November 12, 2012.
9  Q. And Mehtap is a person, a woman who works in the
10    operations, foreign operations department at Halkbank, correct?
11  A. It would not be correct for me to say that Ms. Mehtap
12    worked at a certain place. I can't say her title. I don't
13    know it. But I can say that she was an employee of the
14    Halkbank at that time, ma'am.
15        MS. FLEMING: Can we play the recording, please. 273,
16    Government Exhibit.
17        (Audio recording playing)
18        (Continued on next page)
19
20
21
22
23
24
25

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                    December 6, 2017

HC6PATI2          Zarrab - Cross          Page 867

1  Q. Mr. Zarrab, your companies were good-sized clients for
2  Halkbank, correct?
3  A. You mean that I was a good customer, big customer for them?
4  Is that what you mean?
5  Q. Yes.
6  A. Yes, I would guess so, based on the commissions that were
7  paid.
8  Q. And the employees treated you with respect, didn't they?
9  A. Halkbank personnel, the employees, always treated me with
10  respect in every aspect, as it's also heard in these phone
11  conversations, and I also, likewise, always treated them with
12  respect as well.
13  Q. And it's true that even when they were nagging you for
14  documents, they treated you with respect, correct?
15  A. Just as I said earlier, there was never a time where we
16  faced any disrespect from the employees there, and likewise, I
17  have never shown any lack of respect to them either.
18  Q. And if we could move back to page 4, here, please.
19  Ms. Mehtap is telling you that there's been a change in the
20  OFAC regulations, correct?
21  A. Yes; that is correct, ma'am.
22  Q. And she is telling you that if you knowingly conduct
23  transactions that have known direct or indirect association to
24  the Iranian government, it's a problem, correct?
25  A. That is correct, ma'am.

HC6PATI2          Zarrab - Cross          Page 868

1  Q. And you say to her: "We don't have any transactions like
2  that anyway," correct?
3  A. Of course that's what I was going to say. That's correct,
4  ma'am.
5  Q. So you lied to her?
6  A. Since Ms. Mehtap did not know all the aspects and all the
7  details about the business that we conduct, of course I did lie
8  to her, ma'am.
9  Q. So you lied to the Halkbank employees who didn't know all
10  the aspects and all the details of the business you conducted,
11  correct?
12  A. I have never briefed Halkbank employees on what business we
13  run, what it was and what trade it was. Those that knew were
14  only at the higher levels, and the lower ranks never knew what
15  we were doing.
16  Q. So you lied to the people at Halkbank that didn't know all
17  of the transactions as you just described it; is that what
18  you're telling the Court?
19  A. Whenever I received a call from a support employee at
20  Halkbank, a lower-ranked employee at Halkbank, about our trade,
21  of course I did not go into the detail about this was a
22  transaction related to NIOC of Iran.
23       And there's one thing that I want to emphasize. In
24  fact, on the phones we never spoke openly anyway. However,
25  Ms. Mehtap had absolutely no information, and I should mention

HC6PATI2          Zarrab - Cross          Page 869

1  it.
2  Q. You lied to her, correct?
3  A. That is absolutely correct, ma'am.
4  Q. And you lied to other employees of Halkbank, correct?
5  A. To those employees that did not know. Whenever they asked
6  questions, I did lie; that is correct, ma'am.
7  Q. And you told us that you lied to Hakkan Aydogan on an
8  April 10th call yesterday, correct?
9  A. That is correct, ma'am. In that conversation with Hakkan
10  Aydogan, I am not having a conversation with him about the
11  nature of this business.
12  Q. All right. Could we bring up, please, Government
13  Exhibit 215 and put -- and display 215-T to the jury.
14       This is a conversation between you and Mr. Balkan in
15  November 2012, correct?
16       THE COURT: Do you want page 2?
17       MS. FLEMING: Page 2.
18  A. I, myself, don't remember what the exact date of the
19  conversation was, but on this document that is shown here, the
20  date shows up as November 15th, 2012; that is correct, ma'am.
21  Q. And it's between you and Mr. Balkan?
22  A. That is correct, ma'am. This is a conversation between
23  myself and Mr. Levent Balkan. It's a transcript of it.
24       MS. FLEMING: Would you please play 215, Government
25  Exhibit 215.

HC6PATI2          Zarrab - Cross          Page 870

1       (Audiotape played)
2  Q. Now, if I can direct your attention to page 3, you just
3  said a minute ago that you were careful about not talking about
4  things on the phone, correct?
5  A. To not mention things very openly. In fact, if it were to
6  be completely closed off, then we would not have any of these
7  conversation transcripts anyway.
8  Q. Well, you talked about it a lot because we have a lot of
9  these phone calls, don't we?
10  A. Yes, ma'am. It's true that there are many phone
11  transcripts.
12  Q. And here, you say: "Okay. Let's talk about that face to
13  face." Do you see that?
14  A. Yes, ma'am; I see that.
15  Q. There are no such phrases in any of your conversations with
16  Mr. Atilla, are there?
17  A. To the best of my recollection, in all the conversations
18  that I listened to so far, I don't recall that, ma'am.
19  Q. In the four telephone conversations we had, with you and
20  Mr. Atilla, never once does he say, let's go talk about that
21  not on this phone, does he, sir?
22  A. I don't know how many conversations there might have
23  between myself and Mr. Atilla, but within those that I had
24  heard so far, either at the trial here or prior to, I don't
25  recall him ever uttering those words, no.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

| HC6PATI2 | Zarrab - Cross | Page 871 |
| --- | --- | --- |

1 Q. And the next two lines on page 3, Mr. Balkan says: "If
2 necessary, we can get Mr. Suleyman as well;" do you see that?
3 A. Yes, ma'am; I see that.
4 Q. He doesn't say, let's get Mr. Atilla, does he?
5 A. No, ma'am. He's not saying let's get Mr. Atilla either.
6     MS. FLEMING: Could we bring up Government
7 Exhibit 217, which I think is in evidence. Let me confirm it.
8 This hasn't been played. The government has graciously agreed
9 we can play it.
10     THE COURT: It has not been played before?
11     MS. FLEMING: Can we bring up 217-T, and then -- I'm
12 sorry, it's 219, 219.
13     THE COURT: Has it not been played yet?
14     MS. FLEMING: It's 219.
15     THE COURT: It hasn't been played before?
16 Q. And, Mr. Riza, this is a call, after an unidentified
17 female, between you and Mr. Balkan again in December 2012,
18 correct?
19 A. That is correct, ma'am.
20     (Audiotape played)
21 Q. If I can direct your attention to the bottom of page 4, do
22 you see that Mr. Balkan says: "I'll do it that way. I'll go
23 ahead and give the approval, then"?
24 A. Yes, I see that, ma'am.
25 Q. And you knew that Levent Balkan, in his position at

| HC6PATI2 | Zarrab - Cross | Page 872 |
| --- | --- | --- |

1 Halkbank, had the authority to approve transactions such as you
2 were discussing, correct?
3 A. I know that Mr. Levent Balkan has decision-making
4 authority, but what I don't know is whether he goes back and
5 talks or receives approval from somebody else within the bank
6 for decisions that he's making.
7 Q. Is there a reason that -- withdrawn.
8     But when he says: "I'll go ahead and give the
9 approval, then," he's not saying I'll go up the chain and get
10 approval, is he?
11 A. Of course he's not, and I didn't say that he was either
12 anyway.
13 Q. And you don't know -- withdraw it.
14     His direct report was Mr. Suleyman, wasn't it?
15 A. I don't know that, ma'am.
16 Q. You knew he was the head of the foreign operations
17 department, Mr. Balkan?
18 A. I don't know his exact job title, but I know that during
19 that time frame, he was one of the individuals, important
20 individuals that was involved in Iranian transactions at the
21 bank, ma'am.
22 Q. Now, we've heard a lot about the Iranian transactions.
23 Your companies also had legitimate business, correct? You had
24 real estate businesses and furniture businesses and other
25 businesses, correct?

| HC6PATI2 | Zarrab - Cross | Page 873 |
| --- | --- | --- |

1 A. Yes, ma'am; that is correct, that they existed.
2 Q. Sorry, I keep interrupting. I do apologize. I think I'm
3 starting to understand Turkish.
4     And, in fact, you kept your accounts for those
5 legitimate businesses and transactions at Halkbank as well,
6 correct?
7 A. That is partially correct, ma'am.
8 Q. You had some of them there, correct?
9 A. That is correct, ma'am.
10 Q. You had other accounts even in other countries, Dubai and
11 other places where you did business, correct?
12 A. With regards to money transfers, I did have accounts in
13 many places, but as far as my furniture business, my maritime
14 business or my construction business, all those accounts were
15 within the boundaries of the country of Turkey.
16 Q. And you were married to a very famous pop star in Turkey,
17 correct?
18 A. That is correct, ma'am.
19 Q. She's well known throughout Turkey, correct?
20 A. That is correct, ma'am.
21 Q. And the two of you were very frequently in celebrity pages
22 of magazines and the newspapers, correct?
23 A. That we were on there may not be very correct to say, but
24 there were many bits of news that were published about us in
25 the newspapers and magazines; that is correct, ma'am.

| HC6PATI2 | Zarrab - Cross | Page 874 |
| --- | --- | --- |

1 Q. And there were pictures of you with your lovely homes,
2 correct?
3 A. That is correct, ma'am. The pictures that would have been
4 taken by the media of my home may have been published.
5 Q. And there were pictures of you and your wife on yachts that
6 you built or owned, correct?
7 A. It is true that there are pictures of me and my wife, my
8 family on the yacht that I had owned, and these were pictures
9 that were taken secretly by media, and they were published as
10 such; that is correct, ma'am.
11 Q. And when you bought your wife a large ring for your
12 marriage, that was well publicized, correct?
13 A. Since about 99 percent of the news that were published in
14 the media about us and what I may have given to my wife were
15 all bogus and false news, I don't know which one you might be
16 referring to here. But it is true that the media published a
17 lot of news about us.
18 Q. And you were a celebrity in Turkey during this time period,
19 2012, 2013, correct?
20 A. Since I was married to a famous person, that is true that I
21 was very visible.
22     MS. FLEMING: Could we please put up 221-T and -- just
23 give me a minute.
24     (Pause)
25     I have the gracious ascent of the government to play

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                    December 6, 2017

HC6PATI2        Zarrab - Cross            Page 875

1   221-T.
2   Q. Page 2, please. And this is a conversation on
3   December 25th, 2012, between yourself and ultimately Levent
4   Balkan; is that correct?
5   A. I don't recall the exact date of my conversation with
6   Mr. Balkan, but what's shown on this document as the date of
7   the conversation is December 25th, 2012, ma'am.
8   Q. Thank you.
9        MS. FLEMING: Could you play it, please.
10       (Audiotape played)
11  Q. Now, directing your attention to page 3, Mr. Balkan is
12  telling you that his colleague is requesting an invoice and a
13  declaration; do you see that?
14  A. That is correct. I see that.
15  Q. And do you understand that that is a colleague from
16  Halkbank looking for documents for a gold transaction?
17  A. That is what is understood from the phone conversation;
18  that is correct, ma'am.
19  Q. Do you remember this conversation?
20  A. I remember, ma'am; that's correct.
21  Q. Up at the top of page 3, Mr. Balkan is saying: "Did you
22  ask for that, the partnership structure;" do you see that? And
23  you respond: "Brother, they asked for Dinar Co.'s," right?
24  A. No. I'd like to correct this area here. It may not have
25  been understood correctly by madam here. I presume, in this

HC6PATI2        Zarrab - Cross            Page 876

1   phone conversation, that what Levent Balkan was asking me to
2   submit was the documentation for Dinar Co. I presumed in the
3   conversation that he had asked for the partnership structure of
4   Dinar Co. and then the conversation goes into Balkan saying,
5   no, the colleagues are asking for an invoice, bill of lading
6   and declaration, and that's what we talk about then.
7   Q. And you say -- withdrawn.
8        The partnership structure is because Halkbank requires
9   documents to show who the partnership or shareholders are of a
10  company in Iran, to be sure that it is not government related,
11  correct?
12  A. As I had mentioned before, among the documents that
13  Halkbank required, this document about partnership structure,
14  showing the Iranian companies did not have relations with the
15  Iranian government, was among these documents also; so that is
16  correct.
17  Q. And then a little farther down, you say: "I didn't call.
18  You know, it comes every day." Do you see that, in the middle
19  of page 3? Are you speaking to Mr. Balkan, or are you speaking
20  to somebody away from the phone?
21  A. I'm saying to someone else, ma'am.
22       MS. FLEMING: Could we pull up, please, Government
23  Exhibit 225 and T. And I would ask that we play 225.
24  Q. Before we do, this is a conversation in January 2013
25  between yourself and, ultimately, Mr. Balkan, correct?

HC6PATI2        Zarrab - Cross            Page 877

1   A. I don't recall the exact date of the conversation, but what
2   is shown on this document as the date of the conversation is
3   January 21st, 2013, and the parties in this conversation are
4   myself, Ms. Neslihan from Halkbank, and Mr. Levent Balkan,
5   ma'am.
6        MS. FLEMING: Can we play it, please.
7        (Pause)
8        THE COURT: Ms. Fleming, we're going to take a
9   two-minute break. So we'll excuse the jury.
10       (Jury not present)
11       THE COURT: Thanks.
12       MS. FLEMING: No, thank you, Judge.
13       (Recess)
14       (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

HC63ATI3        Zarrab - Cross            Page 878

1        (In open court; jury present)
2        THE COURT: We'll continue with the cross-examination.
3        THE DEPUTY CLERK: Sir, again I'd like to remind you,
4   you're still under oath.
5        THE WITNESS: Yes, ma'am.
6        MS. FLEMING: Thank you, Judge Berman. May I proceed?
7        THE COURT: Yes.
8   BY MS. FLEMING:
9   Q. I believe we were just about to play Exhibit 225.
10       (Audio recording playing)
11  Q. I'd like to direct your attention to the middle of page two
12  on, and you told Mr. Levent, "I wish we at least we had the
13  opportunity to say good-bye to Mr. Levent, we should have
14  thanked him for treating us well and valuing us all this time."
15  Correct?
16  A. Yes, I see that, ma'am.
17  Q. You were being very gracious and telling him how much you
18  appreciated him, correct?
19  A. I appreciate graciously everybody that worked at Halkbank,
20  ma'am.
21  Q. The call we played earlier, Defendant's Exhibit 11 and
22  11-T, which took place in October 2013, you told Ruchan Bayar
23  that you had caused him to be fired from Halkbank; do you
24  remember that conversation?
25  A. Yes, that's correct, ma'am, I remember that.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                              December 6, 2017

| HC63ATI3 | Zarrab - Cross | Page 879 |
| --- | --- | --- |

1  Q. Were you lying to Mr. Ruchan Bayar about having him fired
2   at Halkbank?
3  A. There were some times -- some periods of time that
4   Mr. Levant Balkan was getting into our company account,
5   including getting our company account statements, and also
6   sharing secrets of our -- about our trade, the trade that we
7   were conducting. And as he was doing these things, I reported
8   this to Halkbank general manager at that time. And the
9   conclusion that was reached was what Halkbank had decided to on
10  its own. And if we can emphasize the fact that what he was
11  relaying, he was relaying these to our competitors.
12 Q. And you knew that at the time that you told Mr. Balkan you
13  wanted to thank him for treating you so well; is that correct?
14 A. There are two separate issues at hand here. One is that
15  what Mr. Levant Balkan had done for is throughout his tenure at
16  the bank was most appreciated. But the fact that he conveyed
17  information to our competitors such as our account statements
18  and our trade secrets, that does not mean that all the work
19  that he has provided for us should be erased all together. So
20  he had provided much assistance to us during our Iranian trade
21  business, and these are two separate issues.
22 Q. But as you are here testifying today, it's your belief that
23  you are part of the reason that he was -- withdrawn.
24      You believe he was fired from Halkbank; is that your
25  belief?

| HC63ATI3 | Zarrab - Cross | Page 880 |
| --- | --- | --- |

1  A. I don't know whether Mr. Levant Balkan was fired or if he
2   had separated from his job at the bank. This is completely
3   something that was done internally within the bank, and I don't
4   know what had happened.
5      MS. FLEMING: Can we pull up, please, what's in
6   evidence as Government Exhibit 6043. Page two, please.
7  Q. You identified on direct examination these as being a
8   series of business cards that had been sent to you on or about
9   October 12.
10     MS. FLEMING: Can we go to the prior page please.
11 Q. 2012. Do you see that?
12 A. That is not correct, ma'am. There might be perhaps a
13  misrecollection or maybe misunderstanding there.
14 Q. You were not sent this, you were not sent a copy of these
15  business cards by this e-mail on October 12, 2012?
16 A. I'm wondering if madam is talking about a different piece
17  of evidence. I wonder if it is possible that the exhibits got
18  mixed up. This is one that was sent out from Royal Maritime,
19  it's not one that was received by Royal Maritime.
20 Q. So you're not even on this e-mail, correct?
21 A. No. What I'm trying to say here, what I'm trying to
22  clarify here is the e-mail was from the Info@Royalcraft
23  address, and what madam had said was this was received by me,
24  I'm trying to clarify that's not the case.
25 Q. Thank you for the correction. Did you personally send this

| HC63ATI3 | Zarrab - Cross | Page 881 |
| --- | --- | --- |

1  e-mail?
2  A. No, ma'am. I don't recall sending this. The
3   Info@Royalcraft address was not used personally by me.
4  Q. If we can go back to page two, please. You identified that
5   you recognized the business cards of I believe you said three
6   people here. Mr. Atilla's, Mr. Aslan's, and I believe you said
7   the fellow from Turkish Petroleum International Company. Am I
8   correct?
9  A. That is correct, ma'am.
10 Q. You do not even know who the other people are that are
11  contained on page two of the e-mail that is Government Exhibit
12  6043 that comes from your company but not from you, correct?
13 A. What I'm stating is that I don't recall them, ma'am.
14     MS. FLEMING: Can I ask that we put up 2-T, I think we
15  have an agreement that is in. Go to page two, please.
16 Q. Could you explain to us who the other caller to this call
17  is?
18 A. Nesteren Zarei Deniz.
19 Q. Who is that?
20 A. Nesteren Deniz Zarei is a woman.
21 Q. Where does she work?
22 A. She has her own company, she works independently on her
23  own.
24 Q. What kind of business does she have?
25 A. She brokers Iranian trade as well. In other words, she's a

| HC63ATI3 | Zarrab - Cross | Page 882 |
| --- | --- | --- |

1  commissioned person, a person that receives commissions in the
2   middle of the trade.
3  Q. At this time, in 2013, did she participate in the gold
4   trade with Iran?
5  A. I don't remember, ma'am, I don't recall.
6  Q. Do you remember what kind of business at all she did
7   participate in with Iran?
8  A. Of course I recall the parts that pertain to me. And I can
9   explain those if you'd like.
10 Q. Just tell me what kinds of goods did she participate in
11  that you remember.
12 A. As I had just testified, I don't know what business she is
13  involved in. I know the part that pertains to me. And in
14  that, she and I were working together on money transfer trade,
15  and she would receive business from Iranian banks, and she
16  would get her commission from that type of business. And she
17  would work with me, she would send those jobs to me, we would
18  work together on those. So in short, she was one of my
19  clients.
20 Q. Was she a front company?
21 A. No.
22 Q. Was she Turkish?
23 A. If I know correctly, I believe she is a citizen of Iran and
24  Turkey.
25     MS. FLEMING: Can we please play the call that is 2-T.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                        December 6, 2017

HC63ATI3         Zarrab - Cross              Page 883

1         (Audio recording playing)
2    Q.  I'd like to direct your attention to page two of
3    Defendant's Exhibit 2-T.
4    A.  Go ahead, ma'am.
5    Q.  You told us that you worked with Ms. Deniz?
6    A.  Many times, ma'am.
7    Q.  You worked with her on Iranian transfers?
8    A.  That is correct, ma'am.
9    Q.  Just to be clear, not all business between Turkey and Iran,
10   including with gold, violates sanctions, does it at this time?
11   A.  I would only know my own trade that I'm conducting.  There
12   is no way that I would know what other people might be doing in
13   their trade.
14   Q.  All right.  Now, directing your attention to page two.  You
15   say at the bottom "No, Halkbank wouldn't know things like
16   that."  You see that?
17        And then a little farther down you tell her, "No, no.
18   It only acted as an intermediary for accredited transit."
19        Do you see that?
20        By "it," do you mean Halkbank?
21   A.  So, in this phone conversation, if you were to take a row
22   and dismiss all that was before and after that row, each row
23   can mean something different on its own.
24        So, evaluation of this section should be made based on
25   listening to the call from the very beginning of it and the

HC63ATI3         Zarrab - Cross              Page 884

1    information that was provided from the beginning onward.
2         So what Ms. Nesteren is saying is Sarmayeh is getting
3    a certain amount of money set aside at Central Bank of Iran for
4    customers, and Sarmayeh is getting 5 percent.  And they are
5    getting their cut from that commission of the 5 percent, and
6    they're giving me the two and a half percent commission.  And
7    they're having me do the transaction.
8         So, what I mean here, where I say No, Halkbank
9    wouldn't know things like that, this section, so here I'm
10   talking about the procedure that happens within Iran.  I'm
11   talking about Halkbank not knowing Sarmayeh getting 5 percent
12   from its money transfer from the Central Bank of Iran.
13   Q.  That's because you didn't tell Halkbank what you were doing
14   after you left Halkbank, correct?
15   A.  At Halkbank, specific people at Halkbank had information
16   about the business that I conduct, most definitely.
17   Q.  Did Mr. Atilla design this two and a half percent
18   commission that you have here, too?  Was this part of his grand
19   plan for you?
20   A.  In terms of determining the two and a half percent
21   commission that I would be receiving, Mr. Hakan Atilla would
22   not have any part in that.  But in terms of the system that was
23   developed for me to be able to utilize this two and a half
24   percent commission, in there, Mr. Hakan had a role.
25   Q.  He had done that as of February 13, 2013; that's what your

HC63ATI3         Zarrab - Cross              Page 885

1    testimony is?
2    A.  I don't know exact dates on this.  What I'm saying is at
3    the beginning of the food trade, where the method and the
4    system was developed at Halkbank, Mr. Hakan Atilla had his
5    contributions into that.  In terms of the dates and the other
6    information, that would not be correct to say.
7    Q.  There is no question pending.
8         Your discussion here on page two, you're discussing
9    about Halkbank acting as an intermediary for accredited
10   transit.  Do you see that?
11   A.  That is correct, ma'am.
12   Q.  Let's turn to 3-T.
13        MS. FLEMING:  This is Defendant's 3-T.  Which, again,
14   your Honor, we have by stipulation.  This is subject to our
15   case.
16        Could you put up page two, please, of 3-T.  Would you
17   play, please, 3-T.
18        I guess I'm asking you to play Exhibit 3.  3-T is the
19   transcript.  Thank you.
20        (Audio recording playing)
21   Q.  This is a conversation between you and Ruchan Bayar in
22   March 2013; is that correct?
23   A.  I don't recall the date exactly, ma'am, but the date that's
24   shown on this document is March 1st, 2013; that is correct.
25   And the phone conversation is between myself and Ruchan Bayar.

HC63ATI3         Zarrab - Cross              Page 886

1    That is correct, ma'am.
2    Q.  If I direct your attention to page three, you are
3    discussing with Mr. Bayar in the middle of the page to the
4    bottom that you need to get a customs declaration, correct?
5    A.  Yes, ma'am, I see that.
6    Q.  Are you discussing with him how to get a legitimate customs
7    declaration?
8    A.  If we compare it to the one in Turkey, then, yes, ma'am.
9    Q.  If you look at whether it's a Chinese one, is it still
10   legitimate for China?
11   A.  At least there were products or goods involved in the
12   business, the customs documents we were running out of China.
13   In the ones we were running out of Turkey, there was never a
14   real trade involved.
15   Q.  This is in March 2013, correct?
16   A.  That is correct, ma'am.
17   Q.  Turning to page four.  Mr. Bayar tells you that "Their
18   documents and contracts need to be prepared and the stamps are
19   with us ready."  Do you see that?
20   A.  I see that, ma'am.
21   Q.  Now, you're not discussing postal stamps, are you, sir?
22   A.  No.  He's talking about stamps for the documents that would
23   be between companies here, ma'am.
24   Q.  These were going to be stamps that would be fake documents
25   made to look like legitimate documents, correct?

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                December 6, 2017

HC63ATI3          Zarrab - Cross          Page 887

1  A.  Here, we are talking about the stamp for the stationery
2   that would be used for the Tianjin Company in China which was
3   under my control.
4  Q.  So, would you agree with me that if you did not explain
5   this, this would be -- some people could read this phrase
6   differently?
7        MR. KAMARAJU:  Objection, your Honor.
8        THE COURT:  Sustained.
9  Q.  Turning to page six.  At the top Mr. Bayar says to you,
10   "Um, three more companies of ours are almost complete.  They're
11   still not complete."  Do you see that?
12  A.  I see that, ma'am.
13  Q.  Are these front companies that you are putting together?
14  A.  Yes, ma'am, these are front companies that we're about to
15   establish.
16  Q.  You and Mr. Bayar were establishing these companies?
17  A.  They were being established at my direction by Mr. Bayar in
18   China, but they were being established under the names of other
19   individuals and not under the name of Mr. Bayar.
20  Q.  You go on to discuss with him that even if somebody doesn't
21   want to talk money, or a bribe, that you should give him a
22   watch anyway.
23        Do you see that?  Looking at the bottom of page eight.
24  A.  You can mark it here, please?
25  Q.  At the bottom of page eight you say -- Mr. Bayar says, "I

HC63ATI3          Zarrab - Cross          Page 888

1   said let's get this man a watch, a Rolex worth 30, $40,000.
2   Even if he is not taking money, let's make it a gift."
3        Do you see that, that you are discussing with him?
4  A.  I see the section where Ruchan Bayar is saying this to me,
5   ma'am; that's correct.
6  Q.  You agreed with him, didn't you?
7  A.  If Mr. Ruchan wanted to get a watch and give it to a bank
8   official, I would have definitely approved of it, ma'am.
9  Q.  On the next page, on nine, you told Mr. Bayar, looking at
10   the middle of the page, that a relative of yours used to say
11   that "when it comes to prostitutes and officers, tip them in
12   advance, he would say."  Do you see that?
13  A.  I see that, ma'am.
14  Q.  Then Mr. Bayar says a little bit down, "In fact, if you
15   were to give it to people when you have no business with them,
16   later they would all do this job for you for much less."
17        Do you see that?
18  A.  I see that, ma'am.
19  Q.  You believe, and have said, that you believe every person
20   has a price.  Correct?
21  A.  Everyone who is inclined to be bribed has a price, ma'am;
22   that is correct.
23  Q.  You have said everyone has his price, haven't you?  Those
24   words, sir?
25  A.  The words are correct, but what I mean in that sentence, as

HC63ATI3          Zarrab - Cross          Page 889

1   the person who is saying it, is that I had meant that those
2   that are inclined to receive bribes do have a price.
3  Q.  So the person who says the words should be the person who
4   interprets the words, correct?
5        MR. KAMARAJU:  Objection.
6        THE COURT:  Sustained.
7        MS. FLEMING:  Can we show what's marked as Exhibit
8   291, please.  I think this is in.
9        I'm sorry.  Can you go to page two, please.
10        I'd like to replay this.  Government Exhibit 291.
11        THE WITNESS:  This was played before, I remember it.
12   But if you'd like to play it again, certainly.
13        MS. FLEMING:  Thank you.  I was asking the judge.
14        Is it all right, your Honor?
15        THE COURT:  Yes.
16        MS. FLEMING:  Thank you.  Could we replay, please,
17   291.
18        (Audio recording playing)
19        (Continued on next page)
20
21
22
23
24
25

HC6PATI4          Zarrab - Cross          Page 890

1  BY MS. FLEMING:
2  Q.  That's a conversation between you and Mr. Happani that took
3   place at the end of March 2013; is that correct?
4  A.  First of all, I'd like to apologize to the madam because I
5   thought that the question has been posed to me before we had
6   listened to this call; so I apologize for that one.
7        I don't recall the date of this call, but based on
8   what's shown on the document, it shows that it's March 26,
9   2013, ma'am.
10  Q.  If I could direct your attention to page 3 and at 291-T,
11   down towards the bottom, you are telling Mr. Happani to provide
12   cikina?
13  A.  Cikinova.
14  Q.  And that, you told us, means false documents, correct?
15  A.  Cikinova is a term that we used amongst the personnel of
16   mine for any trade that was not real and any trade that did not
17   include -- involve real goods, ma'am.
18  Q.  The next sentence you say is, on page 3:  "The system is
19   ready.  I mean, it's not a big deal."  Do you say that,
20   Mr. Zarrab?
21  A.  Yes, ma'am, that's what I said.
22  Q.  Then you say:  I will fly to Dubai right away and will
23   arrange for the things, the documents, the cikinova documents.
24   Do you say that?
25  A.  Yes, ma'am; I said that.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

HC6PATI4      Zarrab - Cross      Page 891

1      MS. FLEMING: Your Honor, just for planning purposes,
2  I have one more short call in this series, and then I have --
3      THE COURT: Go ahead.
4      MS. FLEMING: -- another one. Okay. Could we pull up
5  Government Exhibit 236-T, which I believe is in evidence.
6  Page 2, please. And could we play Government Exhibit 236-T.
7      (Audiotape played)
8  BY MS. FLEMING:
9  Q. And I'm directing your attention, please, to the last page
10  of the conversation, page 3.
11  A. Go ahead, ma'am.
12  Q. Do you see that Mr. Happani says: "Whatever the system is,
13  let's get started right away, brother. In fact, let's get
14  started right away through Volgam, if you like." Do you see
15  that?
16  A. Yes, ma'am; I see that.
17  Q. And you ultimately used Volgam as a food company, correct?
18  A. It is true that I had used Volgam as a food company, but if
19  we were to look at the sentence just above this, it would also
20  show that the system was not ready yet.
21  Q. If we look at the prior conversation I just played, it says
22  the system is ready; doesn't it, sir?
23  A. The system was ready in terms of only the documents that
24  would be obtained from Dubai. In terms of those customs
25  documentation that would be obtained from Dubai, that's what I

HC6PATI4      Zarrab - Cross      Page 892

1  was saying, and I'll continue. But in terms of what it says
2  here, that we would hit money from Halkbank directly to Dubai,
3  ma'am, we have never sent directly any money from Halkbank to
4  Dubai. So that's why I said here that the system was not ready
5  yet.
6      MS. FLEMING: Your Honor, do you want to break, or do
7  you want me to keep going?
8      THE COURT: Keep going.
9      MS. FLEMING: This is the new -- All right.
10  Q. Let's turn to -- you testified that this system that you
11  have said that Mr. Atilla designed, you had a meeting with him
12  sometime in April of 2013, correct?
13  A. That is not correct.
14  Q. When did you -- oh, you said sometime in the fourth or the
15  fifth month of the year; is that what your testimony was?
16  A. In the question that madam asked me, it could be deduced
17  that the system was developed by -- completely by Mr. Atilla.
18  In fact, in my testimony, what I had mentioned was in the
19  development of the system, Mr. Atilla had made contributions to
20  it.
21  Q. And the meeting where Mr. Atilla made contributions,
22  according to you, happened when?
23  A. I don't recall the exact date, ma'am.
24  Q. Can you give us any help on pinning down a date when this
25  meeting took place?

HC6PATI4      Zarrab - Cross      Page 893

1  A. It could be the fourth month, it could be the fifth month.
2  If madam has anything that -- any document that she could
3  provide that could refresh my mind, I'm ready to look at that.
4  Q. Well, you spent, you told us, 35 sessions with the
5  prosecution team after you agreed to cooperate, correct?
6  A. I do not --
7  Q. You had -- I'm sorry.
8  A. I do not recall the exact number, ma'am. What I had said
9  was it may be approximately 35. I don't know the exact number.
10  Q. You spent many, many hours looking at the evidence in this
11  case, correct?
12  A. Of course during our meetings, there were times that we had
13  looked at evidence, but I do not have a count of how many hours
14  or for how long I may have looked at them.
15  Q. And initially you told the prosecution team that you
16  believed the meeting happened April 4th, 2013, correct?
17  A. No, ma'am. I don't recall such a thing.
18      MS. FLEMING: Your Honor, may I have a moment?
19      THE COURT: Sure.
20      (Pause)
21  Q. Do you remember, after reviewing some transcripts and
22  recordings with the prosecutors, saying that upon further
23  review, you thought the date might be a little bit later than
24  April 4th?
25  A. I don't recall ever saying anything to the prosecution in

HC6PATI4      Zarrab - Cross      Page 894

1  terms of what date that may have been.
2  Q. You don't remember ever discussing the dates of this
3  meeting, where Mr. Atilla made the contributions, in the last
4  several months?
5  A. It is correct that the fourth month or the fifth month,
6  just as I have said here today, I would have said that same
7  time frame to the prosecutor's office as well, ma'am; that is
8  correct.
9  Q. But you have no recollection, between the time you started
10  cooperating and today, of ever telling them that this meeting
11  took place prior to April 5th, 2013?
12  A. So I recall that I had mentioned during or in between the
13  fourth and the fifth month, but I don't recall giving a
14  specific date, ma'am.
15      MS. FLEMING: Could we pull up Government
16  Exhibit 298-T. I'm sorry, wrong one. I said the wrong one.
17  It is 295-T. Page 2, please. I'd like to play this call,
18  please. Government's Exhibit 295.
19      (Audiotape played)
20  Q. Now, Mr. Reza, this is the call that you told us Mr. Atilla
21  clearly had no idea that there were any false food products
22  involved in this, correct?
23  A. As I had testified before, Mr. Hakan Atilla, as of this
24  phone conversation, has no information as to there being no
25  food products being sent from Dubai to Iran. He was informed

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                                December 6, 2017

| HC6PATI4 | Zarrab - Cross | Page 895 |

1  that the food trade would be taking place, but as to the fact
2  that no goods would be sent as of this time, he has no clue.
3  Q.  We'll get to that in this call, you lie to him, don't you?
4  A.  In this conversation, I'm trying to tell him that -- of
5  course, I'm trying to tell him that there would be something
6  sent from Dubai, and this is so much different than what
7  Mr. Suleyman Aslan and we had talked about; so it is correct,
8  he does not have the information I'm trying to explain to him
9  here.
10 Q.  So you lied to Mr. Atilla, correct?
11 A.  Yes, that is correct, ma'am.
12 Q.  And you lied to him as of April 10th, 2013, at 11:45 in the
13 morning, correct?
14     MR. KAMARAJU: Your Honor?
15 A.  I don't recall the exact time or the date, but if what is
16 written here is correct, then that is correct, ma'am.
17 Q.  You lied to him --
18     THE COURT: So, counsel, I think this would be a good
19 time for us to take our lunch break. We'll see everybody back
20 here at 2:00.
21     MS. FLEMING: Thank you, your Honor.
22     (Jury not present)
23     THE COURT: See you at 2:00.
24     MS. FLEMING: Thank you, your Honor.
25     (Luncheon recess)

| HC6PATI4 | Zarrab - Cross | Page 896 |

1          A F T E R N O O N   S E S S I O N
2                    2:00 P.M.
3     (Jury not present)
4     (At the side bar)
5     THE COURT: Is it okay? And by "okay" I mean whether
6  the jurors could have time in the jury room to look at their
7  respective notes at their request.
8     MS. FLEMING: I'd give them the afternoon off, if you
9  want. Works for me.
10    THE COURT: It depends on where we are in the
11 calendar.
12    MR. KAMARAJU: From our perspective, I think it's
13 fine, as long as they're instructed not to deliberate and to
14 keep an open mind until deliberations begin.
15    THE COURT: I usually also instruct at the end --
16 maybe I did already at the beginning -- that notes are not
17 evidence.
18    MR. ROCCO: Yes, I think that that's --
19    THE COURT: Did someone else have something else?
20    MR. ROCCO: Mr. Denton, had a good suggestion, but if
21 your Honor's practice is to let the jurors leave the pads
22 behind, might the Court allow the jurors to take their pads
23 with them?
24    THE COURT: Home, you mean?
25    MR. ROCCO: No, no.

| HC6PATI4 | Zarrab - Cross | Page 897 |

1     THE COURT: Oh, into the jury room?
2     MR. ROCCO: Yes.
3     THE COURT: That's the idea.
4     MR. ROCCO: But I mean regularly, as opposed to just
5  on special occasions.
6     THE COURT: I think not. I mean, I think not.
7     MR. ROCCO: Okay.
8     THE COURT: They didn't ask.
9     MS. FLEMING: What if they lose one.
10    MR. ROCCO: That's right, but also, I think in most
11 cases where jurors take notes, they basically keep their pads
12 with them at the end of the day.
13    THE COURT: I do think that the possibility is that
14 somebody will forget to take it or take it home. This is all
15 they asked to do, was just to have some time. I thought we
16 would do it over a lunch break, maybe add an extra half hour
17 added onto lunch.
18    MR. KAMARAJU: That's fine with us.
19    MR. ROCCO: Okay. Thank you, your Honor.
20    THE COURT: Thanks very much.
21    MS. FLEMING: I apologize, Judge, for keeping my hands
22 in my pocket because it's freezing in here.
23    THE COURT: I know. Everyone is coughing, including
24 myself.
25    MR. KAMARAJU: One thing, he may require a couple more

| HC6PATI4 | Zarrab - Cross | Page 898 |

1  bathroom breaks this afternoon. It's up to you, your Honor, if
2  you want it on the record.
3     THE COURT: Sure, why not.
4     MR. KAMARAJU: Just because of a health condition.
5     THE COURT: Yes, so typically what he's done is sort
6  of signal me, can I have a break, and that's when I --
7     MR. KAMARAJU: If it's okay, I'll just tell
8  Mr. Anello.
9     THE COURT: Do you have any idea how often?
10    MR. KAMARAJU: I don't. I think the same schedule,
11 but I don't think it needs to be every five minutes.
12    THE COURT: You don't have to inquire about that, just
13 say it's fine.
14    MR. KAMARAJU: Okay.
15    MS. FLEMING: And, your Honor, I appreciate your
16 asking me, but honestly, you can just feel free to just....
17    THE COURT: Well, I particularly did because we were
18 in the middle of some things.
19    MS. FLEMING: It's okay.
20    MR. KAMARAJU: Of course, we don't want that to be the
21 case, if you're in the middle of a line of question.
22    MR. DENTON: Your Honor, we had a short letter that we
23 wanted to submit. The government doesn't actually ask for any
24 action. It's just something we want to put on the record in
25 writing about our treasury witnesses. We didn't want to submit

**A514**

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                            December 6, 2017

| HC6PATI4 | Zarrab - Cross | Page 899 |
|---|---|---|

1  it without asking for permission.
2      THE COURT: You mean, you want to put it up on the
3  docket?
4      MR. DENTON: Yes.
5      THE COURT: Yes, sure.
6      MR. DENTON: We can give you a copy now.
7      THE COURT: I don't know the reason, but we'll take
8  it, and give it to them.
9      MR. DENTON: That's fine.
10      THE COURT: Okay.  I think we're ready to roll.
11      MR. DENTON: And we'll file it as soon as we get out
12  of court.
13      (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

| HC6PATI4 | Zarrab - Cross | Page 900 |
|---|---|---|

1      (In open court)
2      THE DEPUTY CLERK: Ready?
3      THE COURT: Yes.
4      (Jury present)
5      THE COURT: Please be seated, everybody, and we'll
6  continue with the cross-examination by Ms. Fleming.
7      MS. FLEMING: Thank you, your Honor.  May I proceed?
8      THE COURT: Yes.
9      THE DEPUTY CLERK: One moment, counsel.  Sir, I'd just
10  like to remind you that you're still under oath.
11      THE WITNESS: (In English)  Yes.
12  BY MS. FLEMING:
13  Q.  Before we broke, Mr. Reza, I asked you whether you recalled
14  discussing with members of the prosecution team fixing a date
15  for this meeting where Mr. Atilla was supposed to have helped
16  improve the system.  Do you recall me asking you those
17  questions?
18  A.  Yes, ma'am.
19  Q.  And you told us you didn't remember that, correct?
20  A.  Yes, ma'am.
21      MS. FLEMING: I'd like to ask that only for
22  Mr. Atilla, not the jury -- sorry, Mr. Zarrab, not the jury,
23  would you bring up 3501-52, and would you please go to the
24  second page.
25  Q.  Reading to yourself, please, not saying anything out

| HC6PATI4 | Zarrab - Cross | Page 901 |
|---|---|---|

1  loud -- and if you need the interpreter to help, could you
2  please do it without the microphone -- would you look at the
3  section that starts four, five?
4      THE COURT: Could you tell us what this is?
5      MS. FLEMING: It's Jencks material, your Honor.
6      THE COURT: What does it purport to be, notes?
7      MS. FLEMING: Yes.
8      THE COURT: Is it from Mr. Atilla?  Did he write
9  these?
10      MS. FLEMING: Mr. Zarrab.  I think you caught my --
11      MR. KAMARAJU: Your Honor, I'll have to explain at the
12  sidebar, but these are not notes that Mr. Zarrab has written.
13      THE COURT: Okay.
14  BY MS. FLEMING:
15  Q.  Could you read that, please, and see if that refreshes your
16  recollection.
17      (Pause)
18      Did you have a chance to read it?
19  A.  Yes, ma'am.
20  Q.  Does that refresh your recollection that on November 14th,
21  2017, you told members of the prosecution team that the meeting
22  you have described to us took place on April 5th, 2013?
23  A.  No, it absolutely does not refresh my memory.  I don't
24  recall ever mentioning such a date in here, ma'am.
25  Q.  Could you take that down, please.  Now, in preparation for

| HC6PATI4 | Zarrab - Cross | Page 902 |
|---|---|---|

1  testimony, you also prepared timelines for the members of the
2  prosecution team; isn't that correct?
3  A.  That is not correct, ma'am.
4  Q.  Did you work with members of the prosecution team to
5  prepare Excel spreadsheet timelines?
6  A.  That is not correct, ma'am.
7      MS. FLEMING: Would you bring up, please, just for
8  Mr. Zarrab, not the jury, 3501-054.
9      MR. KAMARAJU: Objection, your Honor.
10      THE COURT: Could I take a look?
11      MS. FLEMING: I was going to ask the refresh
12  recollection question, your Honor.
13      THE COURT: Why don't you come here.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                December 6, 2017

HC6PATI4          Zarrab - Cross          Page 903

1      (At the side bar)
2      THE COURT: Okay. So the question is, what do you
3  want to show him?
4      MS. FLEMING: I was going to show him what was
5  provided to us in 3500 material.
6      THE COURT: What is it?
7      MS. FLEMING: I believe it is a timeline. He
8  testified before that he prepared Excel spreadsheets, and it is
9  timelines, including spellings that look like it's somebody who
10  was in a foreign language. Chief, for example, is spelled
11  C-h-e-e-f.
12      THE COURT: But you have no knowledge that it is his.
13      MS. FLEMING: Well, only what he testified to earlier.
14  What I was going to do was ask him if it refreshes his
15  recollection.
16      MR. KAMARAJU: He didn't say he didn't remember. The
17  question was, did you prepare timelines with the prosecutor's
18  help. He said no.
19      MS. FLEMING: That's different, all right.
20      (Continued on next page)
21
22
23
24
25

HC6PATI4          Zarrab - Cross          Page 904

1      (In open court)
2   BY MS. FLEMING:
3  Q. Did you, at any point, look at any timelines that were
4  prepared with the prosecution team in preparation for trial?
5  A. The Excel documents containing a timeline is a document
6  that I had prepared for myself to help me remember things. It
7  was not something that was prepared with the prosecution team.
8  Q. Did you provide that Excel spreadsheet to the members of
9  the prosecution team?
10  A. All the work that I have done since I'm supposed to turn
11  them over to prosecution as evidence, even if it's work that I
12  have done on my own, I have submitted everything as evidence to
13  them, ma'am, yes.
14  Q. What was the title of the timeline Excel spreadsheet that
15  you prepared? What's across the top of it?
16  A. I don't remember, ma'am.
17  Q. How many versions of the Excel spreadsheet that you
18  prepared did you provide to the prosecution?
19  A. I don't remember the number, ma'am.
20  Q. Did you keep all versions of it, or did you rewrite over
21  them?
22  A. No, I saved each of them as separate versions, ma'am.
23      MS. FLEMING: May I have a minute?
24      (Pause)
25      Your Honor, can I ask just for Mr. Zarrab, that

HC6PATI4          Zarrab - Cross          Page 905

1  3501-54 be shown to him so that he can identify it?
2      THE COURT: Yes.
3      MS. FLEMING: Not for the jury, please.
4   BY MS. FLEMING:
5  Q. Mr. Zarrab, would you look at 3501-54, and would you tell
6  us whether that is one of the Excel spreadsheet iterations that
7  you just described?
8  A. Yes, ma'am.
9  Q. It is. Could we scroll through the pages, and would you
10  identify and see whether all of the pages are pages that you,
11  in fact, identified -- I'm sorry, bad question.
12      Is this the entire document, that is 3501-54, are
13  these all pages on an Excel spreadsheet that you prepared?
14  A. It is in the same format as the Excel spreadsheet that I
15  had prepared. Whether this is the one I had prepared or not, I
16  don't know. It looks identical as to the one that I had
17  prepared.
18  Q. Would you look at pages 3 to 4, please, and reading to
19  yourself, would you see whether there are any entries related
20  to a meeting involving Hakan Atilla --
21      MR. KAMARAJU: Objection.
22      THE COURT: I'll allow it.
23  Q. -- and yourself between April 4th and April 22nd, 2013,
24  meetings with Hakan Atilla?
25  A. Can we go to the fourth page, please?

HC6PATI4          Zarrab - Cross          Page 906

1  Q. I can't hear you, I'm sorry.
2      THE INTERPRETER: Can we go over to the fourth page,
3  please.
4      MS. FLEMING: Yes, can we go over to page 4, please.
5  Q. You've had an opportunity to review it?
6      THE DEPUTY CLERK: One second, counsel. I'm switching
7  batteries in the microphone. Thank you.
8   BY MS. FLEMING:
9  Q. Have you had an opportunity to review 3501-54, on pages 3
10  to 4?
11  A. Yes, ma'am, I have.
12  Q. And there are no entries for any meetings involving --
13      THE COURT: That's not -- is that a question or are
14  you testifying?
15      MS. FLEMING: I was going to say "is there" at the
16  end, your Honor.
17      THE COURT: I think you should ask the question.
18   BY MS. FLEMING:
19  Q. I am correct, am I not, sir, that there are no entries for
20  any meetings between you and Mr. Hakan Atilla between the time
21  period of April 4th through April 22nd, 2013?
22      MR. KAMARAJU: Objection, your Honor.
23      THE COURT: I'll allow it.
24  A. In this version, that does not exist, ma'am.
25  Q. And you created this by using recordings such as the

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

| HC6PATI4 | Zarrab - Cross | Page 907 |

1 recordings we've been listening to here, in part; isn't that
2 correct?
3 A. No, not just the recordings, ma'am.
4 Q. And you used the recordings as part of what you used to
5 create this document, correct?
6 A. It is true that I used the phone conversations also in
7 order to refresh my mind, ma'am.
8 Q. And the version that we are looking at is created as of
9 November 16th, 2017, correct, sir?
10 A. That is -- the date that is shown on this document is
11 11-16-2017, ma'am.
12 Q. We were discussing before lunch April 10th, 2013; do you
13 remember that?
14 A. Yes, ma'am, I remember.
15 Q. And do you recall that we had just played for the jury
16 Government Exhibit 295? Do you recall that?
17 A. I remember, ma'am.
18     MS. FLEMING: And may I impose on you, Mr. White, so
19 that the jury can see this, Government Exhibit 295-T, page 2?
20     May I approach the easel, your Honor?
21 Q. Can you see, Mr. Reza? And the call on GX295 is the call
22 where you say, and you have testified, that Mr. Atilla knows
23 nothing about the food being fake, correct?
24 A. This is the phone conversation where Mr. Atilla has no
25 information about the food trade not being real.

| HC6PATI4 | Zarrab - Cross | Page 908 |

1 Q. And that's on April 10th, 2013, at 11:45 a.m., correct?
2 A. Pursuant to the document that I'm being shown here. I
3 cannot see this.
4     MR. KAMARAJU: Is that all right, your Honor?
5     THE COURT: Oh, yes. It's okay for you, but not for
6 me because I can't see it either.
7     So to eliminate the suspicion, what have you got on
8 the board?
9     MS. FLEMING: I'm sorry. I should read it out loud.
10 What I have written here, please tell me if you agree,
11 "April 10, 2013, GX," Government Exhibit, "295, 11:45 a.m."
12     THE COURT: That's it?
13     MS. FLEMING: That's it.
14 A. Yes, ma'am.
15     MS. FLEMING: Could I ask that we bring up Government
16 Exhibit 238, which I believe is in evidence, 238-T, page 2,
17 please. Could we please play Government Exhibit 238.
18     THE COURT: Have we before?
19     MR. KAMARAJU: Yes, your Honor.
20     MS. FLEMING: All right. Apparently, Mr. White
21 doesn't have that one; so we'll skip playing that one.
22 Q. This is the conversation on April 10th, 2013, at 8:52 in
23 the morning; do you see that?
24 A. Based on the document that I'm being shown here, that is
25 correct.

| HC6PATI4 | Zarrab - Cross | Page 909 |

1 Q. And this is the phone call, Government Exhibit 238, where
2 you have Serdar, one of your employees, go pick up customs
3 books, manifests; is that correct?
4 A. That is correct, ma'am.
5 Q. And that was for the reason that you wanted to have blank
6 manifests in order to make cikinova, documents for cikinova,
7 correct?
8 A. This is one of the documents that we would be submitting to
9 the bank as part of that package to be sent to the bank, and
10 this one would pertain to food trade that would not involve any
11 real food trade; so in that sense, it is correct, ma'am.
12 Q. And this call was before your call to Mr. Atilla, correct?
13 A. Based on this document, that is correct, ma'am.
14     MS. FLEMING: Your Honor, with your permission, I'm
15 simply going to add Government Exhibit 238 and the time of the
16 call. So I have placed on the board "GX238, 8:52 a.m."
17     Next, I'm going to ask to pull up Government
18 Exhibit 297, which is in evidence.
19 Q. Do you see that Government Exhibit 297 is a phone call
20 between you and Mr. Happani on April 10th at 6:58 p.m.?
21 A. Based on the document that I am being shown, I see that,
22 ma'am.
23     (Continued on next page)
24
25

| HC63ATI5 | Zarrab - Cross | Page 910 |

1 Q. Could I ask that you turn to page four. Do you see halfway
2 down, this is the call where you say to Mr. Happani, "Hakan
3 Atilla threw a wrench in the gears and he threw this thing."
4 Do you see that?
5 A. Yes, I see that, ma'am.
6 Q. A little bit above that, you say "The man made the call in
7 my presence." Just below that you say, "and said 'you will do
8 this job.'" Do you see that?
9 A. I see that, ma'am.
10 Q. You testified the other day -- withdrawn.
11     Am I correct that you testified the other day that
12 between the phone call in the morning and this phone call at
13 6:58, you went to the bank and met with Suleyman Aslan?
14 A. I did not testify as to the date and the time of day of
15 that, but it is true that I did say that I had met with
16 Suleyman Aslan on that day.
17 Q. It was between the time of the call in the morning when
18 Mr. Atilla did not know what was going on with the
19 transactions, and the time that you told Mr. Happani about
20 this, correct?
21 A. It is true that I visited with Mr. Suleyman at Halkbank
22 after I had talked with Mr. Hakan Atilla; that is correct,
23 ma'am.
24 Q. That same day, correct?
25 A. Yes, ma'am. Based on this document.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

| HC63ATI5 | Zarrab - Cross | Page 911 |

1    MS. FLEMING: Your Honor, may I approach the easel?
2  Q. I'm going to add here -- this call took place at
3    6:58:31 p.m., correct?
4  A. Based on the document that's being shown to me, that is
5    correct, ma'am.
6  Q. So I have added to the board "Government Exhibit 297, at
7    6:58 p.m."
8        You already had an appointment to see Mr. Aslan that
9    day; isn't that correct?
10  A. Yes, that is correct, I went to the bank in order to meet
11    with Mr. Suleyman Aslan on that day, ma'am.
12  Q. You had made an appointment on April 9 in order to see
13    Mr. Aslan on April 10, correct?
14  A. I don't remember when I made that appointment, ma'am.
15    MS. FLEMING: Could we pull up 1002-T, please. It's
16    in evidence. And go to pages 14 to 15.
17  Q. Do you see on the bottom of page 14 -- I'm sorry this is
18    the English version. Let me get you the Turkish version.
19        Do you see at the bottom -- it is a different page.
20    MS. FLEMING: Go one page back. We're looking for the
21    entry for 4/9.
22  Q. Do you see the entry at April 9, bottom of page 14 in the
23    English that says "My dear general manager, I would like to
24    visit you at a convenient time if it's okay with you." Do you
25    see the response Mr. Suleyman says "Tomorrow at 4 p.m. is

| HC63ATI5 | Zarrab - Cross | Page 912 |

1    convenient."
2  A. I see that, ma'am.
3    MS. FLEMING: If you can go to the next page. You can
4    take that down.
5  Q. So you went to the bank on April 10. Do you remember what
6    time in fact you went to the bank?
7  A. No, I don't remember exactly, no.
8    MS. FLEMING: Your Honor, may I approach?
9    THE COURT: Yes.
10  Q. I'd like to show you -- I have to mark it. Sorry.
11        I'd like to show you what's been marked Defendant's
12    903 and I'll ask you if you will look at it and see if it
13    refreshes your recollection as to what time you visited
14    Halkbank on April 10, 2010.
15  A. There is a time mentioned here that as to when I had gone,
16    but looking at it does not refresh my mind.
17  Q. Does it refresh your recollection that you kept your
18    appointment at 4 o'clock on April 10?
19  A. I did go to Halkbank on April 10 in order to meet with
20    Mr. Suleyman Aslan. But whether that was at 3:30, 4:30 or
21    5 o'clock, I don't recall.
22    MS. FLEMING: Come we bring up, please, Government
23    Exhibit 298-T. This is in evidence. Page two, please.
24  Q. This is the conversation that you had and testified about
25    with Hakan Aydogan. Do you remember testifying to that?

| HC63ATI5 | Zarrab - Cross | Page 913 |

1  A. Yes, ma'am, I remember it.
2  Q. This call to Mr. Aydogan was on April 10, at 8:02 p.m.;
3    isn't that correct?
4  A. Based on the document that I'm being shown here, that is
5    correct.
6    MS. FLEMING: Your Honor, I have written "GX 298,
7    8:02 p.m." on the board.
8  Q. You testified on December 1st that you had, prior to this
9    telephone conversation on April 10, had never spoken to Hakan
10    Aydogan about doing the food business; do you remember
11    testifying to that?
12  A. I would have said that I don't remember having that
13    conversation.
14  Q. Do you remember being asked on December 1st, page 555, the
15    following question and giving the following answer:
16    "Q. Prior to this conversation, had you ever spoken to Hakan
17    Aydogan about doing the food business?
18    "A. No. I had not talked to him regarding this matter."
19        Do you remember giving that answer to that question?
20  A. I don't recall exactly, but if it's on court records, it
21    is correct.
22  Q. And that was December 1st. Correct?
23  A. I don't recall the date either because I've been testifying
24    for a few days now.
25  Q. If you look at the first lines, three lines on Government

| HC63ATI5 | Zarrab - Cross | Page 914 |

1    Exhibit 298, you say "Mr. Hakan, greetings again."
2  A. Yes, ma'am, I see that.
3  Q. And then you go on -- the next line Mr. Aydogan says, "Um,
4    sorry, I did not" unintelligible "at the meeting for."
5        Do you see that line?
6  A. Yes, ma'am, I see that.
7  Q. When had you spoken to Mr. Hakan Aydogan that you were
8    giving him greetings again at 8:02 on April 10, 2013?
9  A. If I recall correctly, we had possibly exchanged phone
10    calls, and when I had called he had said he was in a meeting
11    and he would return to me later, and then he called me back.
12  Q. Was that on the same day, April 10, 2013, that you had this
13    conversation that he would call you back?
14  A. I recall that to be so, ma'am.
15  Q. Was this after Mr. Suleyman Aslan called Mr. Atilla in your
16    presence at the meeting that afternoon at Halkbank and ordered
17    him to do the job?
18  A. That time, I remember it to be after that, ma'am.
19  Q. You remember it after the meeting where Mr. Suleyman in
20    your presence called and told Mr. Atilla to do the job?
21  A. That is what I remember to be, ma'am; that's correct.
22  Q. So on the board, you don't remember the time, but it was
23    somewhere in the afternoon that you were in Mr. Suleyman's
24    presence for your 4 o'clock appointment, correct?
25  A. That is correct, ma'am.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

HC63ATI5              Zarrab - Cross              Page 915

1  Q. Do you remember how long you were with Mr. Suleyman at your
2    appointment at Halkbank?
3  A. I do not remember, ma'am.
4  Q. But after that meeting, and before 8:02 with Government
5    Exhibit 298, you had a brief call with Mr. Aydogan?
6  A. Not a conversation. Just that he was not available, that
7    he would return back to me.
8  Q. Was it a phone call or a meeting while you were at
9    Halkbank?
10 A. I recall it to be a phone conversation, ma'am.
11       MS. FLEMING: Over on the right under the appointment
12   and above anything else, I'm going to put "conversation with
13   Hakan Aydogan."
14 Q. In any of the recordings that you have reviewed or listened
15   to, in discovery or your 35 meetings with the prosecution team,
16   have you seen a recording with Hakan Aydogan on April 10, 2013,
17   other than Government Exhibit 298 that we've played?
18 A. I don't recall such conversation among the conversations
19   that I listened to.
20 Q. But you are sure you did not have a meeting in person with
21   Mr. Hakan Aydogan while you were at Halkbank on April 10, 2013.
22 A. I don't recall having a face-to-face meeting with Mr. Hakan
23   Aydogan on that day, ma'am.
24       MS. FLEMING: You can take that down, please.
25   Can we please put up and play Defense Exhibit 4-T. Go

HC63ATI5              Zarrab - Cross              Page 916

1    to page two, please.
2  Q. Do you recognize --
3        MS. FLEMING: Let's play the call first. Can we
4    please play Defendant's Exhibit 4. Play that, please,
5    Mr. White.
6        (Audio recording playing)
7  Q. That's another call with Serdar who works for you?
8  A. Yes, ma'am, that's correct.
9  Q. Is this also a conversation about picking up the documents
10   at customs?
11 A. That is correct, ma'am, that's what it's about.
12 Q. This one is at 11:43 a.m. on April 10, correct?
13 A. In line with the document that I'm being shown here, that
14   is correct, ma'am.
15       MS. FLEMING: I'm putting up on the board, your Honor,
16   "Defendant's Exhibit 4, at 11:43 a.m."
17       You can take that down, Mr. White.
18 Q. Mr. Suleyman picked up the phone in your presence and
19   called Hakan Atilla and said "You will do this job." Do you
20   recall that, correct?
21 A. Yes, ma'am, I remember.
22 Q. And then you met with him shortly after that to go over the
23   plans that he was going to help you improve on your system; is
24   that correct?
25       THE COURT: Who is the "he"?

HC63ATI5              Zarrab - Cross              Page 917

1        MS. FLEMING: Mr. Zarrab and Mr. Atilla.
2        THE COURT: What was the question?
3        MS. FLEMING: Now you push me, Judge. I'll start
4    over.
5  Q. After this April 10 meeting with Mr. Suleyman, you had a
6    meeting with Mr. Atilla and Mr. Suleyman, correct?
7  A. As I have testified before, I did not recall the time of
8    this meeting with Mr. Hakan Atilla and Mr. Suleyman, ma'am.
9  Q. It was an important enough event that Mr. Suleyman Aslan
10   picked up the phone in your presence and called Mr. Atilla and
11   said "You will do this job," correct?
12 A. Doing the food trade was certainly very important, so that
13   is correct, ma'am.
14 Q. And yet, you cannot tell us with any more specificity than
15   it was the fourth or the fifth month of the year of 2013 that
16   you had this important meeting with Mr. Atilla?
17 A. Ma'am, the seat that I'm in over here gives me the
18   responsibility to speak 100 percent truthfully as to what I
19   remember. When I do not remember something, I cannot speak to
20   that. I cannot speak to that.
21 Q. And you can't give us any better date than the fourth or
22   the fifth month of the year in 2013, despite working on Excel
23   spreadsheets and putting -- listening to all the recordings and
24   looking at all the discovery and records in this matter for the
25   last several months; is that correct?

HC63ATI5              Zarrab - Cross              Page 918

1  A. That is how it is, ma'am. If there was any specific
2    information, I would have mentioned it now.
3        MS. FLEMING: Can we pull up 5-T, please, page two.
4  Q. When do you remember speaking next to Mr. Atilla? Can you
5    give us any time or date when you next remember speaking to him
6    after the April 10, 2013, phone call that we've put on the
7    board?
8  A. No, ma'am.
9        THE COURT: We're going to take a two-minute break.
10   (Recess)
11   (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

HC63ATI5    Zarrab - Cross    Page 919

1    (At the sidebar)
2    THE COURT: I'm just looking over the December 6
3    letter from the government, and I want to know from the
4    defense, do you want to respond?
5    MR. ROCCO: Yes.
6    THE COURT: In writing?
7    MR. ROCCO: Yes.
8    THE COURT: And realistically, when do you want to do
9    that?
10    MR. ROCCO: We'll try to have it to you early this
11    evening, Judge.
12    THE COURT: Okay.
13    MR. ROCCO: We're working on it as we speak.
14    THE COURT: Okay. Then I think we should have some
15    oral discussion of it.
16    MR. ROCCO: Sure.
17    THE COURT: Probably 9 o'clock I'd say.
18    MR. ROCCO: At 9?
19    THE COURT: Is that okay?
20    MR. ROCCO: Yes.
21    MR. DENTON: That's fine. We were not asking for any
22    action on the Court's part. We just wanted to let you know.
23    THE COURT: Understood. Okay. So, I think I would
24    probably give you each 10, 15 minutes. Is that enough?
25    MR. ROCCO: That's fine with me, Judge.

HC63ATI5    Zarrab - Cross    Page 920

1    THE COURT: In the morning at 9 o'clock.
2    (Continued on next page)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HC63ATI5    Zarrab - Cross    Page 921

1    (In open court; jury present)
2    THE COURT: Ms. Fleming, we'll continue with your
3    cross.
4    THE DEPUTY CLERK: Sir, again to remind you that
5    you're still under oath.
6    THE WITNESS: Yes.
7    THE DEPUTY CLERK: Thank you.
8    MS. FLEMING: Your Honor, may I proceed?
9    THE COURT: Yes.
10    MS. FLEMING: Thank you.
11    Q. I believe we were about to play 5-T. Does everybody have
12    it?
13    (Audio recording playing)
14    Q. I'd like to direct your attention to page one at the
15    bottom, Mr. Zarrab. And first, Binnur is an employee from
16    Halkbank, correct?
17    A. That is correct, ma'am.
18    Q. She's an employee in the foreign operations department at
19    Halkbank; is that correct?
20    A. I do not remember, ma'am. I seem to remember that perhaps
21    she was at a branch, a branch employee. But, I don't remember
22    where, how, or what title she held, so I don't remember.
23    Q. You have a hard time remembering which employee is who at
24    Halkbank; is that fair to say?
25    A. No, that would not be fair.

HC63ATI5    Zarrab - Cross    Page 922

1    Q. Down at the bottom, you say to Binnur from Halkbank when
2    she asks about the invoice document, "They will all be from
3    Dubai for now. Yesterday, um, we talked with, um, what was the
4    gentleman's name, um, with Mr. Hakan."
5    Do you see that?
6    A. Yes, ma'am.
7    Q. You spoke with two Hakans on the day before, April 10,
8    correct?
9    A. That's correct, ma'am.
10    Q. Which Hakan are you talking about in that part of the
11    conversation?
12    A. It could be either of the Mr. Hakans, ma'am.
13    Q. When you go to page three, it says at the top "Yesterday we
14    talked regarding all the documents. The customs. First, we
15    will give you a pro forma invoice."
16    Do you see that paragraph?
17    A. Yes, ma'am, I see that.
18    Q. If goes on to say "We will get the money in the account.
19    We will give you the pro forma invoice of the company, from
20    which we will purchase the sugar, purchase the rice, purchase
21    the wheat and purchase the soy. We will send the money there."
22    Do you see that?
23    A. Yes, ma'am, I see that.
24    Q. Who is the "we" that you are telling Binnur from Halkbank
25    that you discussed all the documents on April 10, 2013?

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

HC63ATI5          Zarrab - Cross          Page 923

1  A. It's myself, Mr. Suleyman, Mr. Hakan, both Mr. Hakans.
2  Q. Both Mr. Hakans.
3  A. Yes, when we look at the previous conversations, we know,
4  we see that I had talked with both Hakans on the day before.
5  Q. But, you had not discussed with Mr. Atilla the day before
6  that you would give the pro forma invoice of the company from
7  which you would purchase the sugar, purchase the rice, purchase
8  the wheat, and purchase the soy, did you, sir?
9  A. It may not be the exact rice, sugar, or wheat or soy, but
10  someone who knows the business, if someone knows the business
11  would listen to this conversation, that they would be able to
12  easily tell that I'm talking about the same thing.  In other
13  words, this is describing the exact same thing as a whole.
14  Q. You're talking to Mr. Atilla in the morning about his
15  understanding that there would be a letter of credit in place
16  for these food transactions; isn't that correct, sir?
17  A. It is not me that is telling this to Mr. Hakan Atilla.
18  Mr. Hakan Atilla himself is saying this.  And whether he had
19  concluded this from a conversation with the branch or perhaps
20  through his general manager, I don't know how he may have had
21  that perception.  But, he's the one that is talking about the
22  use of the letter of credit in conjunction with the food trade.
23  I'd like to emphasize that's how he thought, that's how he
24  perceived it.
25  Q. And he was talking about payment for the foods, correct?

HC63ATI5          Zarrab - Cross          Page 924

1  A. Yes, ma'am.
2  Q. And again, he thought these were real food transactions.
3  You've told us that, correct?
4  A. As of that date, he certainly thought these were real food
5  transactions, ma'am; that is correct.
6  Q. Then you spoke that evening to Hakan Aydogan and you lied
7  to him about what the transactions would be, correct?
8  A. Mr. Hakan Aydogan did not have information as to the
9  reality of this trade either, ma'am; that is correct.
10  Q. So you lied to him, correct?
11  A. That is correct, yes, ma'am.
12  Q. And now on April 11, the next morning, at 9:33 you're lying
13  to Binnur at Halkbank, correct?
14  A. Since Ms. Binnur does not have information on this either,
15  that is correct, ma'am.
16        MS. FLEMING: Could we please pull up Government
17  Exhibit 240-T.  I don't remember if we played this one.  It
18  would probably be quicker if we played it than talking about
19  it.
20  Q. This is a conversation between you and Mr. Happani?
21  A. That is correct, ma'am.  This is a phone conversation
22  between myself and Mr. Abdullah Happani.
23        (Continued on next page)
24
25

HC6PATI6          Zarrab - Cross          Page 925

1  Q. And you call him within minutes of speaking to Binnur,
2  correct?
3  A. I did not look at the time that was indicated on the
4  previous recording in terms of timing.  I just do not remember.
5  Q. And you tell Mr. Happani, let's do researches on the prices
6  right away and do sugar.  He had obtained a pro forma from that
7  Brazilian company in the past.  Do you see that?
8  A. I'm saying that Mr. Gudarzi could quickly resource this
9  because Mr. Gudarzi had obtained a pro forma invoice from
10  Brazil pertaining to sugar in the past.
11  Q. And you told us that Mr. Gudarzi actually had an office
12  physically located within your offices, correct?
13  A. That is absolutely correct.
14  Q. Now, your offices were not near Halkbank, were they, or in
15  Halkbank?
16  A. Our office was not within Halkbank, no.
17        MS. FLEMING: Could we pull up Government
18  Exhibit 300-T.  300T is in evidence and we've played it.
19  Q. Do you remember this call, Mr. Zarrab?
20  A. I remember, ma'am.
21  Q. Now, this is a call where you are complaining to
22  Mr. Happani about all the documents that are being asked of you
23  from the people at Halkbank; isn't that correct?  In part.
24  There's other parts of the conversation, but in part?
25  A. I'd like to answer this question with remembering what is

HC6PATI6          Zarrab - Cross          Page 926

1  there; so if you can turn to that page and highlight that
2  section for me, then I can answer.
3  Q. Let's start on page 2, at the bottom.
4  A. Yes, ma'am.
5  Q. Do you see at the bottom of page 2, Mr. Happani is telling
6  you that he did what you recommended but the accounting
7  department is being difficult?
8  A. Yes, ma'am, I see that.
9  Q. And if you go further down, the bottom of the page going
10  over, Mr. Happani tells you:  "There is this thing in addition
11  to the one month.  Because of this invoice, this thing" and
12  then it goes on to talk about the difference in prices of gold;
13  do you see that?
14  A. Yes, ma'am, I see that.
15  Q. And this pertains to you are having issues with regard to
16  the fluctuating prices of gold, and you don't want Halkbank to
17  be nagging you for documents at this time, correct?
18  A. That is not correct.  What we have here is that Mr. Happani
19  is requesting from me, due to the abnormal difference in gold
20  prices, that the documents being requested be delayed by about
21  a month or so.
22  Q. And you told us, you testified that Halkbank wanted you to
23  turn documents in within a certain period of time, correct?
24  A. Yes, ma'am; that is correct.
25  Q. And then if you go down to the bottom of page 3,

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                                December 6, 2017

| HC6PATI6 | Zarrab - Cross | Page 927 |
| --- | --- | --- |

1  Mr. Happani says that: "We had turned in the partnership
2  structure to the bank, but it's not certified.  They want a
3  certified copy;" do you see that?
4  A.  Yes, ma'am, I see that.
5  Q.  And the partnership structure is what you testified about
6  before, which is Halkbank required partnership or shareholder
7  structures for Iranian companies to make sure they were not
8  directly or indirectly owned by the Iranian government,
9  correct?
10 A.  That is correct, ma'am.
11 Q.  And if you go over to page 4, this is where you say you
12 don't want to be calling the man, basically, Mr. Suleyman; is
13 that correct?
14 A.  Yes.  I mean Mr. Suleyman Aslan in that section; that is
15 correct, ma'am.
16 Q.  And then you say:  "Long live photo shop," correct?
17 A.  That is correct, ma'am.
18 Q.  And your reference to "just get it printed;" do you see
19 that?
20 A.  Yes, ma'am, I see that.
21 Q.  Turning to what is in evidence as Government Exhibit 244,
22 please, T.  Do you remember this conversation?  We played this
23 one, I believe.
24 A.  I remember ma'am yes.
25 Q.  Now, if you look at the bottom of page 2, Mr. Happani is

| HC6PATI6 | Zarrab - Cross | Page 928 |
| --- | --- | --- |

1  telling you, we have their six million and change in Turkish
2  Lira and we have nothing else in the moment; do you see that?
3  A.  Yes, ma'am, I see that.
4  Q.  And then if you go over to page 3, you ask Mr. Happani, on
5  April 16th, 2013:  "Have you received the customs documents?"
6  Do you see that?
7  A.  Yes, ma'am, I see that.
8  Q.  And Mr. Happani says:  "Yes, the documents arrived, but I
9  haven't had a chance to do anything with it yet"?
10 A.  Yes, ma'am, I see that.
11 Q.  A little farther down, you instruct Mr. Happani to have
12 someone make ten copies of what you sent to the office and put
13 them in the safe, it's very important, correct?
14 A.  So that is not the entire sentence there.  The sentence
15 that was mentioned by madam is not complete.  What I'm saying
16 in that section, in that sentence, is that of the documents
17 that I sent to the office, make ten copies, put them in the
18 safe, this is very important, and if they get misplaced, our
19 business stops, and also send it as-is for translation, as-is.
20 That's what I was saying.
21 Q.  Were these -- was this document the certified copy of a
22 document from Iran that only your company could get?  Is that
23 what you're referencing here that you wanted copies of?
24 A.  Yes.  We had obtained a document from Iran in order to be
25 able to stop our competitors, and this is that document that

| HC6PATI6 | Zarrab - Cross | Page 929 |
| --- | --- | --- |

1  I'm talking about here, ma'am.
2  Q.  We'll get to that probably tomorrow, but one of your
3  competitors was somebody named -- forgive me for my
4  pronunciation -- Mr. Alacaci?
5  A.  Mr. Ahmet Alacaci, that is correct, ma'am.
6  Q.  And then a little later you say:  "Oh, and I wanted to ask
7  if the customs paperwork had arrived from Dubai;" is that
8  right?
9  A.  Yes, ma'am, I see that.
10 Q.  Mr. Happani tells you that you're still waiting for those
11 documents, correct?
12 A.  Yes, that is correct, ma'am.
13 Q.  And these are the blank customs documents that you had
14 requested earlier, on April 9th and April 10th, correct?
15 A.  Yes; that is correct, ma'am.
16 Q.  I'd like to pull up 6T and then play Defense Exhibit 6,
17 please, which we've agreed to put in subject to connection.
18     (Audiotape played)
19     Mr. Zarrab, is that you on the conversation on
20 April 17th, 2013, at 5:15 p.m.?
21 A.  It is myself and my uncle who are the participants in this
22 phone conversation, and the date and the time of this
23 conversation as shown on the document provided to me here is
24 April 17th and 5:15, ma'am.
25 Q.  This conversation is actually in Azerbaijani instead of

| HC6PATI6 | Zarrab - Cross | Page 930 |
| --- | --- | --- |

1  Turkish, correct?
2  A.  That is a different dialect; that is correct, ma'am.
3  Q.  The reference that your uncle says to, it is a difficult
4  job here, they are not giving it, do you know why?  And then
5  down below he says:  "I want a colored photocopy of it,
6  colored."  To what is your uncle referencing?
7  A.  Ma'am, if we were to go back to the other conversations
8  regarding my request from Serdar, I'm saying that he should get
9  them to my uncle, and my uncle was in Dubai during that time
10 frame also.  But since they're not going to the customs
11 building in Kor that I had told him, that is why they are
12 unable to obtain this document.  In other words, they had gone
13 to the wrong customs building, and that's why they're unable to
14 get this document.
15 Q.  And you're talking about he's trying to obtain for you
16 customs documents from Dubai; is that correct?
17 A.  It's the bill of lading, ma'am, that's what I'm referring
18 to.
19 Q.  So he's trying to obtain for you bills of lading that are
20 blank that you can fill out and use for your business?
21 A.  They're referring to the documents that I've been shown by
22 the prosecution earlier, ma'am.
23 Q.  And this conversation, where you asked your uncle to get
24 involved, is as of April 17th, 2013, correct?
25 A.  Based on this document that is shown to me, that's what it

A522

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                December 6, 2017

| HC6PATI6 | Zarrab - Cross | Page 931 |
| --- | --- | --- |

1  is. I don't personally recall what the date was, ma'am.
2  Q. Do you remember if you were in Dubai at about that time,
3   when your uncle was looking for these documents?
4  A. What I remember is this, ma'am, since they were not able to
5   go to the correct place and get these documents in Dubai, I
6   ended up going to Dubai myself and went to the right place and
7   got these documents myself.
8  Q. And do you remember if you went to Dubai in that time
9   frame, in that April time frame?
10 A. I don't remember exactly, but that could be.
11     MS. FLEMING: Could we pull up and play, please, play
12  Defendant's Exhibit 8, which is being admitted subject to --
13  and pull up transcript 8-T.
14     (Audiotape played)
15     Could we pull up, please, Government Exhibit 1002-T
16  and go to page 19. I'm sorry, Page 20. The wrong page.
17 A. If I may please request that the Turkish version is also
18  placed on the screen?
19 Q. And for the Turkish version, we're going to look for the
20  entry that is April 16, 2013, at 14:12:33.
21     And if we look in the English, do you see that it says
22  that you have landed in Dubai and will return tomorrow night?
23 A. Yes, I see that, ma'am.
24 Q. So you are in Dubai on April 16th and returning on the
25  night of April 17th, correct?

| HC6PATI6 | Zarrab - Cross | Page 932 |
| --- | --- | --- |

1  A. It shows that I have gone to Dubai on 16th of April, but as
2   to the return date, there is nothing specific here, and I don't
3   recall when I had returned from Dubai either.
4  Q. Do you see the reference, "I will return tomorrow night"?
5  A. Yes, ma'am, I see that, but I could have returned on the
6   same day, I could have returned a day late or I could have
7   returned earlier. It could be that the plane had taken off at
8   a different or delayed time; so it would not be right for me to
9   give a certain date for that.
10 Q. Do you have any recollection of meeting with Mr. Atilla on
11  April 16th or 17th?
12 A. No, I don't remember anything like that, ma'am.
13     MS. FLEMING: Could we pull up, please, Defendant's
14  Exhibit 9-T.
15     Are we going until 5:00 or 4:30? I'll time it.
16     THE COURT: 4:30.
17     MS. FLEMING: Can we pull up 9-T, and this is a call
18  on April 19th, 2013, at 12:32.
19     (Audiotape played)
20     Could we please pull back up both the English and the
21  Turkish versions of Government Exhibit 1002, and on the
22  English, I'd like you to go to page 21 and on the Turkish, it
23  will correspond to April 18th, 2013, at 11:00.
24 A. If I may please have the reference for the row again,
25  please.

| HC6PATI6 | Zarrab - Cross | Page 933 |
| --- | --- | --- |

1  Q. It is for April 18, 2013, at 11:00.
2  A. It came up now. Thank you.
3  Q. By the way, 11:00 is not actually 11:00 a.m. in Istanbul,
4   is it? It's -- the time stamp reflected in these records has a
5   three-hour difference from the actual time; isn't that correct?
6  A. I have no information with regards to that, ma'am.
7  Q. Would you look at that April 18, 2013, and do you see that
8   you say: "Have a good day, my dear general manager. I
9   returned. The translations are ready. If you are available, I
10  would like to submit them tomorrow to you." Do you see that?
11 A. Yes, I see that, ma'am.
12 Q. And Mr. Suleyman replies that: "Of course. I'll be
13  expecting you at 11," and he says: "AA will also come."
14     AA is Ahmet Alacaci, isn't it?
15 A. Yes, ma'am, that is Ahmet Alacaci.
16 Q. And that is the person who is the competitor that
17  Mr. Suleyman is keeping out of competing with you in business,
18  correct?
19 A. Yes, ma'am, that is correct.
20 Q. Now, before we read the next sections, you go to Halkbank
21  on April 19th, 2013. Does this refresh your recollection that
22  you're there on that date?
23 A. Based on the conversations that are shown here, that's what
24  looks like to be the case, but I don't remember the exact date
25  myself. But based on what I see here, that seems to be the

| HC6PATI6 | Zarrab - Cross | Page 934 |
| --- | --- | --- |

1  case.
2  Q. And did you have the specific conversation you talked
3   about, with Mr. Hakan Atilla at that meeting at Halkbank on
4   April 19th, 2013?
5     THE INTERPRETER: Could you please repeat that
6   question?
7  Q. Did you have a specific conversation where you say he told
8   you how to improve the process with Mr. Hakan Atilla at
9   Halkbank on April 19th, 2013?
10 A. I did not understand the question very well. Are you
11  referring to a meeting that was held on April 19th?
12 Q. I'm asking -- you have told us about a meeting with you and
13  Mr. Suleyman Aslan and Mr. Atilla in which you say he told you
14  how to structure the process, your system?
15 A. Yes. As in his contributions and his additions to it, yes,
16  there was such a meeting.
17 Q. Did that happen at Halkbank on April 19th, 2013, according
18  to you?
19 A. I do not remember, ma'am.
20 Q. Looking at Government Exhibit 1002 and starting with what's
21  reflected as the time at 10:25 on April 19th, 2013 -- I think I
22  misspoke. April 13th -- sorry, April 19, 2013, 10:25; do you
23  see that?
24 A. If you could please put up the Turkish version too.
25 Q. That would help.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

| HC6PATI6 | Zarrab - Cross | Page 935 |

1  A. Yes, ma'am.
2  Q. Would you read down for the next few lines, where it says:
3  "My dear general manager, we came face to face with AA at the
4  door." That's Mr. Alacaci, right?
5  A. Yes, ma'am, this is Ahmet Alacaci, that is correct, ma'am.
6  Q. And if you read down, you can see that Mr. Suleyman tells
7  you --
8  A. I'm unable to see it. If it could be brought up on the
9  screen, please.
10      MS. FLEMING: You have to do it in Turkish, please,
11  Mr. White.
12  Q. If you read down, Mr. Suleyman tells you that he had
13  conversations with Mr. Alacaci telling him that basically you
14  brought appropriate documents, but his were insufficient,
15  correct?
16  A. I'd like to request this one thing from the defense
17  counsel, please, as they bring up these messages, if they could
18  also please include who the sender was so that there's no
19  mixup. I would request that.
20  Q. It's a fair request.
21  A. Thank you very much. Okay. Now, we can look at it. Go
22  ahead, please.
23  Q. And Mr. Suleyman is telling you that, in essence, he told
24  Mr. Alacaci that Mr. Alacaci's documents were insufficient,
25  yours were fine, correct?

| HC6PATI6 | Zarrab - Cross | Page 936 |

1  A. Yes, ma'am, that is correct.
2  Q. Now, do you remember specifically this meeting with
3  Mr. Alacaci and you at Halkbank?
4  A. I did not have a meeting with Mr. Alacaci at the bank. We
5  just came face to face.
6  Q. Do you remember the coming face to face with him at the
7  bank that day?
8  A. Yes, ma'am, I remember that.
9  Q. So do you remember -- after meeting with him on that day,
10  do you remember having a meeting you've described with
11  Mr. Hakan Atilla, who described the system you've testified
12  about here? Was it that day, following you seeing Mr. Alacaci
13  at Halkbank?
14  A. As I had mentioned earlier, I do not recall that, ma'am.
15  Q. If we go back to what we just looked at, 9-T -- well,
16  before we do that, do you remember anything about your meeting
17  with Mr. Suleyman at Halkbank on April 19th, 2013, after you
18  came face to face with Mr. Alacaci at the door on your way in?
19  A. The only thing, the most important thing that I recall from
20  that date is that I had run into Mr. Alacaci because that one
21  had historical meaning for me.
22  Q. When you look back at what we looked at as Government
23  Exhibit 1002, you had indicated that you had received
24  translations, and you would like to submit them tomorrow to
25  you; do you remember reading that a minute ago?

| HC6PATI6 | Zarrab - Cross | Page 937 |

1  A. Yes, ma'am. I remember that.
2  Q. Do you remember submitting translations to Mr. Suleyman
3  Aslan on April 19th, 2013?
4  A. I recall taking documents for Mr. Suleyman Aslan on that
5  day, ma'am.
6  Q. Do you recall thinking documents? I'm sorry?
7      THE INTERPRETER: Taking.
8  Q. Taking. Do you remember giving them to him on that day?
9  A. I remember, ma'am.
10      THE COURT: Ms. Fleming, can I see you just for a
11  minute with counsel.
12      (Continued on next page)

| HC6PATI6 | Zarrab - Cross | Page 938 |

1      (At the side bar)
2      THE COURT: Could I get an estimate of where this
3  is -- how long?
4      MS. FLEMING: I guess I'm pretty close to finishing
5  April.
6      THE COURT: Are you serious?
7      MS. FLEMING: Yes.
8      THE COURT: And then what?
9      MS. FLEMING: I have July.
10      THE COURT: How much time?
11      MS. FLEMING: Probably until lunch tomorrow. I have
12  July calls. Judge, it will play out.
13      THE COURT: So then you're going to want redirect?
14      MR. KAMARAJU: Yes, but I can be pretty efficient with
15  that.
16      THE COURT: I'm just trying to figure out the schedule
17  for the balance of this week. Are you calling these government
18  witnesses this week; is that the plan?
19      MR. KAMARAJU: Yes.
20      THE COURT: They would come when, next?
21      MR. KAMARAJU: There's one very short FBI witness.
22      THE COURT: And then?
23      MR. KAMARAJU: And then --
24      THE COURT: How many are there of them?
25      MR. KAMARAJU: Three.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                          December 6, 2017

HC6PATI6        Zarrab - Cross        Page 939

1      MR. DENTON: Two who are substantive, and one is very
2   brief.
3      THE COURT: I'm revisiting the motions in limine first
4   on this issue. My gut reaction is that I would expand the
5   cross-examination, but that's just a gut reaction based on the
6   letter that was submitted today, but when you respond, I want
7   you to indicate what you think the implications are.
8      MR. ROCCO: To the defense?
9      THE COURT: Yes.
10     MR. ROCCO: You bet.
11     THE COURT: Yes.
12     MR. ROCCO: You got it, Judge.
13     THE COURT: So that's what I'm trying to -- I was
14  hoping to finish earlier so we could devote more time to this
15  issue, which seems to me to be more pressing than, forgive me,
16  asking him for the three or four hundredth time if he remembers
17  the date of the meeting.
18     MS. FLEMING: Judge, I promise it will play out.
19  Judge, I promise it will play out.
20     THE COURT: Okay. I'm sure. Okay. So we'll go to
21  4:30.
22     MR. ROCCO: Thank you, Judge.
23     MS. FLEMING: And I'm almost done with April; so when
24  I finish, that will be good.
25     THE COURT: Okay.

HC6PATI6        Zarrab - Cross        Page 940

1      (In open court)
2      THE COURT: Okay. We're going to take a two-minute
3   break.
4      (Jury not present)
5      THE COURT: So we're going to take a two-minute break.
6      (Recess)
7      (Jury present)
8      THE COURT: Okay. Please be seated. We're just about
9   to go about five more minutes. We're going to end at 4:30 this
10  evening.
11     MS. FLEMING: Your Honor, may I proceed?
12     THE COURT: Yes, sure.
13     THE DEPUTY CLERK: You're still under oath, sir.
14     THE WITNESS: (In English) Yes.
15  BY MS. FLEMING:
16  Q. I would just like to finish up on the conversation 9-T.
17  A. Yes, ma'am.
18  Q. All right. Can we go back to 9-T, please. I just want to
19  finish up quickly. This is the call on April 19th, after you
20  had seen Mr. Alacaci?
21  A. Yes, that's correct, ma'am.
22  Q. And you tell Mr. Happani when you come back: "Abdullah, I
23  swear I forgot to talk about the invoice"?
24  A. Just to make sure that there's no misunderstanding, this is
25  not that I'm not coming anywhere. This is on the phone, and

HC6PATI6        Zarrab - Cross        Page 941

1   I'm talking to Mr. Abdullah.
2   Q. "I swear I forgot to talk about the invoice"?
3   A. Yes, ma'am.
4   Q. You testified at the end of -- that after you had been
5   arrested and then you were released -- withdrawn. Bad
6   question, sorry.
7      You were arrested in Turkey in December of 2013,
8   correct?
9   A. Yes, ma'am; that is correct.
10  Q. And you were in jail in Turkey for several months; isn't
11  that correct?
12  A. I was in jail for 76 days, ma'am; that's correct.
13  Q. And when you came out, after some period of time, the
14  charges against you were dismissed?
15  A. It is true that, for all involved in that investigation,
16  that there was a decree to drop the charges; that is correct,
17  ma'am.
18  Q. And after that decree from the courts, it was very highly
19  publicized that that decree had come out and that you had been
20  exonerated, correct?
21  A. On the TV and the press there was much news mentioned about
22  the charges being dismissed; that is correct, ma'am.
23  Q. And, in fact, you did a TV interview of some length about
24  the process and answered questions on television, correct?
25  A. If I recall correctly, that interview had happened prior to

HC6PATI6        Zarrab - Cross        Page 942

1   the decree of dismissal, ma'am.
2   Q. But it was after you were released from jail, correct, in
3   Turkey?
4   A. That is absolutely correct, ma'am, yes.
5   Q. And you issued a press release indicating that you were not
6   guilty of any of these charges, correct?
7   A. I don't recall me covering anything in any of my sentences
8   that I -- statements that I may have made, but I do recall that
9   I made statements about the gold trade, and to that effect too,
10  yes, ma'am. Excuse me. About gold smuggling accusations that
11  were against me, I remember making statements about that,
12  ma'am.
13  Q. And to be clear, you said the accusations against you were
14  false?
15  A. I did say that those accusations about gold smuggling were
16  false; that is correct, ma'am.
17  Q. And, again, very widely publicized throughout Turkey,
18  correct?
19  A. That is correct. They were publicized, ma'am.
20  Q. Now, you returned to Halkbank, and you want to be a
21  customer at the bank, correct?
22  A. I was already a customer at Halkbank, ma'am.
23  Q. And you wanted to resume the business is what you testified
24  to two days ago, correct?
25  A. That is absolutely correct; yes, ma'am.

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,

December 6, 2017

1  Q. And in response to the prosecutor's questions, you said,
2  well, Mr. Suleyman Aslan was gone at that point, correct?
3  A. Yes, that is absolutely correct, ma'am.
4  Q. And Mr. Levent Balkan was gone at that point, correct?
5  A. Yes --
6  Q. So you approached --
7  A. -- Mr. Levent Balkan was not at Halkbank as of that time
8  either, ma'am, that is correct.
9         (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q. So you approached Ali Fuat at Halkbank to see if you could
2  pick up the business again, correct?
3  A. I had a conversation with Mr. Ali Fuat, but prior to
4  conversing with Mr. Ali Fuat, I had made another attempt,
5  ma'am.
6  Q. But you didn't reach out and go to Mr. Hakan Atilla, who
7  you said was instrumental in designing your scheme, correct?
8  A. I went to individuals that were much higher than Mr. Hakan
9  Atilla, ma'am.
10       MS. FLEMING: Judge, I think this is an appropriate
11  time to break, if it's okay with the Court.
12       THE COURT: It is. We are going to stop for today.
13  Here's what I'd like to do. I'm going to give you my
14  instructions in a moment. But it's my understanding that all
15  or some of you have interest in taking some time to review your
16  notes. Is that correct?
17       A JUROR: Yes.
18       THE COURT: So my proposal is that you do that
19  tomorrow morning. So when you come, 9:30, Christine will have
20  your notes in the jury room.
21       Now, you can't deliberate, right. Because that's
22  going to be one of the instructions that I give. And also,
23  remember that notes are not evidence. The notes are solely for
24  the purpose of refreshing your own recollection of what you
25  perceive the evidence to be.

1       So with that, let me give you my instructions and
2  we'll adjourn until tomorrow. First, please do not talk with
3  each other about this case or about anyone who has anything to
4  do with it, until the end of the case, when you go to the jury
5  room to decide or deliberate on your verdict.
6       When you review your notes, that's not to be
7  deliberation. You understand that.
8       Second, do not talk with anyone else about this case
9  or about anyone who has anything to do with it, until the trial
10  has ended, and you have been discharged as jurors.
11       Third, do not let anyone talk to you about the case,
12  or about anyone who has anything to do with it, and if someone
13  should try and talk to you about the case, please report that
14  to Christine or me immediately.
15       Fourth, do not read any news or internet stories or
16  articles or blogs or listen to any radio or television or cable
17  television or internet reports about the case or about anyone
18  who has anything to do with the case.
19       And fifth, please do not do any type of research or
20  any type of investigation about the case on your own.
21       So, good day. And we'll see you at 9:30 tomorrow.
22       (Jury excused)
23       (Continued on next page)
24
25

1       THE COURT: I'm going to give you each 10 minutes
2  thereabouts tomorrow for oral argument on the issues raised in
3  the government's letter. And Mr. Rocco, when are we going to
4  get your response to that letter?
5       MR. ROCCO: As quickly as --
6       THE COURT: I know, but I'm trying --
7       MR. ROCCO: Hopefully by 8 or 9 o'clock the latest,
8  your Honor.
9       THE COURT: Okay. Fair enough. And Mr. Anello, does
10  he have a copy also?
11       MR. KAMARAJU: No, but we can give him one.
12       THE COURT: You should share a copy with him too.
13       MR. DENTON: Just one thing briefly, we wanted to make
14  a record about the transcripts that were shown to the jury
15  today in connection with the defense exhibits. The transcripts
16  and translations of the recordings marked as defense exhibits.
17       THE COURT: Right.
18       MR. DENTON: Those transcripts and translations were
19  first provided to the government late last night. I think
20  after the end of the court day. It is not something we'd ever
21  seen before, so this is not a situation like government
22  exhibits that are marked out of discovery. We saw those for
23  the first time. We did not have a chance to have someone
24  review them, so they include things like footnotes with
25  interpretations.

**A526**

UNITED STATES OF AMERICA v.
MEHMET HAKAN ATILLA,                                                    December 6, 2017

| | |
|---|---|
| HC63ATI7 | Page 947 |

1        THE COURT: I noticed it had footnotes.

2        MR. DENTON: We did not want to object because we did

3    not want to run the risk of making this even more

4    incomprehensible to the jury without having some sort of

5    document to read.  But this is part and parcel of something we

6    noted on Friday, which is we have received no discovery and no

7    expert report of any kind from the defense.

8        We're happy to go along to get along to a certain

9    point, but I think we're getting to the point where, when we're

10    seeing things for the first time the night before, we're going

11    to start objecting to their introduction the next day.

12        THE COURT: Fair enough.  See you tomorrow.

13        (Adjourned until December 7, 2017, at 9 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| | Page 948 |

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3     REZA ZARRAB

4    Cross By Ms. Fleming . . . . . . . . . . . . . 854

5                    GOVERNMENT EXHIBITS

6    Exhibit No.                              Received

7     3655     . . . . . . . . . . . . . . . . . . 856

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A527**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*
*MEHMET HAKAN ATILLA,*

---

*December 7, 2017*

---

*Southern District Court Reporters*

Original File HC7PATIF.txt
**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                          December 7, 2017

HC7PATI1                                        Page 949

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4           v.                        S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                  Defendant.
 7   ------------------------------x
 8
 9                             December 7, 2017
                                   9:00 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                             District Judge
                                 and a jury
15
16
17                  APPEARANCES
18   JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
         Assistant United States Attorneys
22
23
24
25
```

HC7PATI1            Trial                        Page 950

```
 1
 2          (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5       Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6       THOMAS ELLIOTT THORNHILL, Esq.
             - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8       ROBERT J. FETTWEIS, Esq.
             - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10           Of counsel
11
12   Also Present:
13       JENNIFER McREYNOLDS, Special Agent FBI
         MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14       MS. ASIYE KAY, Turkish Interpreter
         MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

HC7PATI1            Trial                        Page 951

1          (Trial resumed; jury not present)
2          THE COURT: Please be seated.  So in just a moment
3   we're going to have some oral argument on an issue that has
4   come up with respect to some of the witnesses that the
5   government has yet to call.  So just give me one minute and
6   I'll be right back.
7          (Pause)
8          So by way of background, the correspondence which has
9   given rise to today's pretrial proceedings, is a letter that
10  the government wrote on December 6th, 2017, and to which also
11  on December 6th, yesterday, the defense responded.
12         Why don't I just start with the government.  You did
13  not, in your letter, seek any particular application is my
14  understanding, but why don't you just present the background of
15  the issue.
16         MR. LOCKARD: Yes, your Honor.  The reason we didn't
17  include any request for Court action is because we don't think
18  any is required.  We learned from discussions with OFAC --
19         THE COURT: You never would have known that at 1:30
20  this morning when I was reading the defense letter, which was a
21  little bit later than 8:00 p.m.
22         MR. ROCCO: I thought it was 9:00, I apologize.
23         THE COURT: Who's counting, Mr. Rocco.  But, anyway,
24  go ahead.
25         MR. LOCKARD: Yes, your Honor.  So our letter was

HC7PATI1            Trial                        Page 952

1   intended to bring to the Court's and defense counsels'
2   attention basically an issue that we learned from our
3   discussions with OFAC that we don't think has any legal or
4   evidentiary effect in these proceedings, but given the fact
5   that it has been an issue of discussion and of motion practice,
6   we thought the better practice was just to bring the issue to
7   the Court's attention so that defense counsel could make
8   whatever applications they thought were appropriate.  Our view
9   is that nothing has changed, nothing should change.
10         So basically what our letter describes, and I'm going
11  to put this in the context of what I understand to be defense
12  counsel's positions from their letter of yesterday evening.  I
13  want to start by defining what the scope of the issue is
14  because I think the letter from defense counsel addresses an
15  issue of different scope and different consequence than what it
16  is that we're talking about in this case.
17         What we're talking about in this case is essentially
18  OFAC's experience with the avoidance prohibitions in the
19  secondary sanctions, which has been the topic of both briefing
20  and testimony in these proceedings.  And the bottom line of it
21  is that OFAC has no experience with applying the avoidance
22  prohibition in circumstances like this one because it has not
23  encountered any circumstances like this one.
24         And by "circumstances like this one," what I mean is
25  evidence demonstrating that a foreign financial institution has

A529

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

1  engaged in a considered, intentional and prolonged practice of
2  deception, including the direction of creating false documents,
3  including assisting and establishing a scheme involving layered
4  transactions and layered entities.
5       All of which has the ultimate goal of being able to
6  engage in financial transactions that subject that bank to
7  sanctions under OFAC's regulations including, in particular,
8  losing its ability to have corresponding accounts in United
9  States and to be able to have access to the U.S. financial
10 system, engaging in that kind of conduct to be able to both
11 have the Iran business and avoid the imposition of the
12 secondary sanctions.  OFAC --
13      THE COURT: In effect what you're saying by hiding
14 this scheme -- so, more or less, I think you're saying it's a
15 case of first impression because this is not even at the front
16 end, it's before the front end of the sanctions scheme.  You're
17 saying it's a conspiracy designed to prevent the regulators, if
18 you will, from knowing that there is such a scheme.
19      MR. LOCKARD: That's exactly right, your Honor.  So
20 the regulations, from a regulatory perspective, provide OFAC
21 with a series of tools that it can use to encourage or
22 discourage conduct, and one of those tools is the ability to
23 impose these sanctions that cut foreign financial institutions
24 off from the U.S., which is an important and, in some cases,
25 virtually life-threatening event for a financial institution.

1       What's alleged in this case, and what we think the
2  evidence has shown and will continue to show, is that there was
3  intentional conduct by high-level officers at that bank to
4  prevent Treasury from being able to use those tools by engaging
5  in sanctionable conduct and not just hiding it but actively
6  deceiving Treasury about it.
7       THE COURT: When you're saying by high-level
8  officers --
9       MR. LOCKARD: I mean the general manager of the bank,
10 the deputy general manager of the bank and several department
11 heads.
12      THE COURT: Or stated in other terms, the persons that
13 you feel are engaged in this broad conspiracy?
14      MR. LOCKARD: That's correct, your Honor.  The
15 defendant and his co-conspirators.
16      So what we have alerted --
17      THE COURT: Which of course would include Mr. Zarrab,
18 too.
19      MR. LOCKARD: Yes.  Not as a member of the foreign
20 financial institution, but certainly as a co-conspirator.
21      THE COURT: Right.
22      MR. LOCKARD: So what we've alerted the Court to and
23 defense counsel to, is OFAC does not have experience with
24 addressing a situation like that and has not had an opportunity
25 to consider what avoiding prohibitions means under the

1  regulations in that context.
2       So this is not about what the sanctions define as
3  sanctionable conduct.  I think there has already been expert
4  testimony about that fact.  There has been cross-examination
5  about that fact.  I think there is largely not a lot of
6  disagreement about what conduct the sanctions define as
7  sanctionable at the time.  This case is about the Court's
8  providence to determine under the law when that can become a
9  willful violation of the IEEPA for avoiding these sanctions.
10      There has been cross-examination, for example, of the
11 OFAC expert witness, Ms. Palluconi, about what conduct is
12 sanctionable, both direct and cross-examination about what
13 consequences can follow from the imposition of sanctions, what
14 prohibitions follow from the imposition of sanctions, and I
15 think the Court drew the correct line when the expert witness
16 was questioned about when that becomes unlawful because that is
17 a question for the Court to answer in its instructions to the
18 jury.  And that's the line that the government is asking the
19 Court to continue to draw with respect to the cross-examination
20 of witnesses.
21      THE COURT: So just one quick question.  So are you
22 saying -- I think you are, and to my knowledge it may well
23 be -- is this case here in the Southern District a case of
24 first impression?
25      MR. LOCKARD: In that respect, it is.

1       THE COURT: Okay.
2       MR. LOCKARD: Yes.
3       THE COURT: Mr. Rocco?
4       MR. ROCCO: Good morning, Judge.
5       THE COURT: Good morning.
6       MR. ROCCO: So we addressed most of these issues in
7  the late-hour submission last night.  I tried my best, your
8  Honor, to get it to you on time or roughly within that time,
9  that window.
10      The effect of what the government has done here on the
11 defense is essentially deprive us of the opportunity to try
12 to -- or tried to deprive us of the opportunity to explore
13 what, in effect, became a drumbeat over years by two of its
14 witnesses as to the effect of these secondary sanctions because
15 it has always been the rule, it has always been stated by
16 people at OFAC when meeting foreign financial institutions like
17 Halkbank, that the consequence of violating sanctions is
18 sanctions, that it is not a criminal prosecution.
19      And we're not talking about whether OFAC is enforcing
20 the law or not enforcing the law.  By the way, it's Department
21 of Treasury that defines -- it's essentially been delegated the
22 authority to define what sanctions are and what remedies are
23 appropriate.  We're not talking about decisions to prosecute,
24 but here, it has been made clear time and time again that the
25 only consequence of violating sanctions is to be barred from

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

1 the American financial system and not -- no one was ever told
2 in these meetings, educational seminars, face-to-face meetings
3 with the bank, that someone stood in danger of being prosecuted
4 or that their conduct is unlawful.
5      So that whether you're violating sanctions or whether
6 you're evading or avoiding someone detecting sanctions being
7 violated, that is not a prohibited act that serves as a
8 foundation for a criminal prosecution. That's what makes this
9 case a case of first impression and a case that's unique.
10     When it comes to the interaction, what people from
11 OFAC told Halkbank and told Mr. Atilla, essentially, is that if
12 you violate sanctions, you stand to be barred from the American
13 financial system. That's it. And here, we have a unique
14 statute --
15     THE COURT: They told them that directly?
16     MR. ROCCO: They told them that directly, your Honor.
17     THE COURT: Somebody said to him if you violate
18 sanctions --
19     MR. ROCCO: The consequence is being barred from the
20 American financial institution. No one ever said that it was
21 illegal to violate sanctions or it was unlawful to violate
22 sanctions, and that's the heightened scienter requirement of
23 IEEPA. Essentially, in order to be to be prosecuted under
24 IEEPA, in order to be convicted under IEEPA -- you will charge
25 the jury according to the law and the decision is yours, your

1 Honor.
2      But as I read the law, the requirement is willfulness,
3 and willfulness in this context is knowledge that the activity
4 is unlawful. And what we have here is this cacophony of
5 statements that never led people to believe that they could be
6 prosecuted.
7      THE COURT: You're not disputing that there can be
8 criminal prosecutions in the context of the sanctions, do you?
9      MR. ROCCO: There certainly can be criminal
10 prosecutions in the context of sanctions for violating primary
11 sanctions, for violating secondary sanctions, but in instances
12 where the conduct abroad has an impact here in the United
13 States and where the defendant knows that the conduct abroad
14 has impact here in the United States and that defendant also
15 knows that his acts are unlawful, that's fairly unique to the
16 sanctions regime.
17     This what I call uber requirement or super-scienter
18 requirement that there's also knowledge of wrongdoing or
19 unlawfulness, and that's what's so important about the
20 testimony of these witnesses because they're going to testify
21 that they weren't telling people that their conduct was
22 unlawful or illegal. They've told people that if you engage in
23 this kind of conduct, you can be barred from the American
24 financial system. So that's one argument, Judge.
25     The second is, essentially, I think what's happened

1 here because this prosecution is so unique, is that the
2 Department of Justice is acting like the Department of
3 Treasury. It is the Treasury Department that gets to make the
4 rules, and the Treasury Department rules did not prohibit this
5 kind of conduct. It made it sanctionable but not prosecutable.
6      The third argument we make is essentially this is
7 burden shifting. They are essentially saying that we can offer
8 this evidence only if the defendant testifies, and that seems
9 to me, under Litvak and a whole series of cases involving
10 financial crimes, that it's never the burden of the defendant
11 to prove his good faith. It is always the government's
12 responsibility, the government's burden to prove beyond a
13 reasonable doubt --
14     THE COURT: So there's a quote in the papers from a
15 Southern District case, I think it was Judge Keenan's case,
16 perhaps.
17     MR. ROCCO: Yes, Banki.
18     THE COURT: Banki. And there is a quoted phrase in
19 there that I don't know that it shifts the burden. Judge
20 Keenan would never shift the burden of proof in a criminal
21 case, but it does talk about the absence of -- I forget the
22 exact phrase, but it does talk about the absence from the
23 defense side of any indication of reliance --
24     MR. ROCCO: Well, as I recall Banki, Judge --
25     THE COURT: I'm just talking about the narrow phrase

1 that you objected to, that you say shifts the burden of proof
2 in a criminal proceeding unlawfully. Do you remember that
3 phrase?
4      MR. ROCCO: I don't. I disagree -- I don't disagree.
5 Banki is right because Banki, on its facts is right, and Banki
6 was relying on what, in effect, was no statement, no action or
7 inaction. We're, in effect, saying that there was a positive
8 interaction, that there were statements made that the defendant
9 or people at Halkbank are entitled to rely on, and we're
10 entitled -- I think the government has a burden here to
11 overcome. And we have a right to explore on cross-examination
12 the effect of those statements, what those statements were and
13 the effect that it had on -- here, on Mr. Atilla.
14     THE COURT: Okay. So just one question I have for
15 you, and then I'll take a couple of minutes and rule. I don't
16 think it's all that complicated, actually, the issue that's
17 presented.
18     But so how could the OFAC representatives, who
19 interacted with your client, have given any guidance to your
20 client about activity which, through deception, allegedly, they
21 were unaware of?
22     MR. ROCCO: Well, the proviso allegedly -- I think the
23 proviso allegedly is important because, quite frankly, I think
24 that the conduct here that ultimately led to this prosecution
25 was conduct that OFAC had a general idea of occurring.

A531

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

1          OFAC was focused already on Zarrab, I believe as early
2  as 2012, Judge, especially when the Al Nafees Exchange ran into
3  problems with OFAC, and there were interactions -- there were
4  discussions about OFAC.  In fact, in one meeting in October of
5  2014, Mr. Atilla asked, I think it was -- it was then Under
6  Secretary Cohen, to put Zarrab on a sanctions list and said,
7  because OFAC raised questions about whether Halkbank should be
8  dealing with Zarrab.
9          In fact, I'd say it was a warning.  I think the
10  response was both put him on the sanctions list so we're
11  prohibited from dealing with him, and OFAC never did that.  In
12  fact, I think Mr. Zarrab testified on cross-examination that
13  he's still not on the sanctions list.
14          THE COURT: I got it.
15          MR. ROCCO: So there was -- OFAC wasn't shy about
16  giving advice, wasn't shy about asking questions or, in fact,
17  wasn't shy about -- Halkbank wasn't shy about answering
18  questions or asking questions of OFAC.  There was a strong
19  track record of interaction between Halkbank and OFAC.
20          THE COURT: Okay.  Last word.  You get the last word.
21          MR. LOCKARD: Just in an effort --
22          THE COURT: I think maybe you should go there.
23          MR. ROCCO: My client asks to make clear that it was
24  the then-general manager of the bank who had the discussion
25  about Mr. Zarrab.

1          THE COURT: That would be --
2          MR. ROCCO: His name was Ali Fuat.  He was general
3  manager in 2014.
4          THE COURT: So you're talking about 2014?
5          MR. ROCCO: Meeting with OFAC and, well, it was a
6  meeting between OFAC and Halkbank, representatives of Halkbank.
7          THE COURT: And maybe I misunderstood you.
8          MR. ROCCO: No, I apologize, Judge, if I confused you.
9          THE COURT: You're saying that Halkbank asked OFAC to
10  put Mr. Zarrab on the sanctions list?
11          MR. ROCCO: Oh, yes.  Oh, yes.
12          THE COURT: In that meeting?
13          MR. ROCCO: In 2014, yes.  Yes.
14          THE COURT: Okay.  I got it.  Last word from
15  Mr. Lockard.
16          MR. LOCKARD: Thank you, your Honor, and just to be
17  both brief and hopefully helpful, I just want to make clear
18  again what the scope of the issue is.  We have no dispute with
19  the proposition that defense counsel is entitled to explore
20  what it is that Mr. Atilla was told in his meetings with
21  Treasury officials.  That, of course is relevant to his state
22  of mind, and defense counsel can then argue from those
23  discussions what it is that Mr. Atilla understood.
24          And if their argument is that he believed that it was
25  lawful to deceive the Treasury Department about the conduct the

1  bank was engaged in, that's an argument that they can make.
2  That's, obviously, a slight recast of the argument, but they're
3  certainly entitled to make arguments about Mr. Atilla's state
4  of mind based on what he was told.
5          I think what we are asking the Court to enforce in the
6  questioning of witnesses, is the line between fact testimony
7  and legal opinion, which is the Court's province, and also to
8  limit testimony about statements to people who are not
9  Mr. Atilla, which are not relevant to Mr. Atilla's state of
10  mind, as Judge Keenan, we think, correctly observed in the
11  Banki case.
12          So I think that really is the narrow way that this
13  plays out in terms of the witness testimony, and that's the
14  line that we're asking the Court to draw.
15          THE COURT: I got it.  Okay.  So I'm going to take a
16  couple of minutes and then give you a ruling.
17          As a practical matter, we have told the jury -- I
18  think I raised with everybody the issue that the jury was
19  looking for some time this week to review their notes, as to
20  which I instructed them they could do that, but they couldn't
21  deliberate.  Anyway, now is the time that the jury was doing that.
22  So we have, I think, at least until 10:30 before we can resume
23  the trial because the jury was, in fact, doing that.  So there
24  you go.
25          MR. LOCKARD: Your Honor, since nature abhors a

1  vacuum, there are a couple of issues that we'd also like to
2  raise with the Court.  They're very brief.
3          THE COURT: Nature may, but judges don't.
4          MR. LOCKARD: So with the Court's permission, there
5  are just a couple of things we'd like to flag.  So the first
6  issue is a scheduling issue.
7          THE COURT: Yes.
8          MR. LOCKARD: And it arises because the next several
9  witnesses on the government's witness list, three out of the
10  next four, are people who have come in from out of town --
11          THE COURT: Right.
12          MR. LOCKARD: -- in order to testify.
13          THE COURT: Yes.
14          MR. LOCKARD: So that has presented a scheduling
15  problem because we have had them available since earlier this
16  week, based on sort of evolving estimates of how long
17  cross-examination of Mr. Zarrab would take, which happens and
18  we understand.
19          But it has also had a consequence of having several
20  people from out of town waiting for several days, which has
21  presented some scheduling conflicts and some issues.  And so
22  we'd like to make a proposal on how to resolve those in the
23  next couple of days.  We essentially have two alternative
24  proposals, either of which would work for the government, that
25  we wanted to present.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

---

| HC7PATI1 | Trial | Page 965 |

1        THE COURT: Have you presented them to the defense?

2        MR. LOCKARD: We have raised them. I don't know if

3 they have a position on either one of those proposals, but we

4 have flagged what it is we intend to ask for.

5        MR. ROCCO: I'm sorry. We spoke for a couple of

6 minutes, and I haven't had a chance to talk to co-counsel about

7 it.

8        THE COURT: Why don't you do that now, while I'm doing

9 this, since we have the time.

10       MR. LOCKARD: Yes, your Honor.

11       MR. ROCCO: And I think that your Honor's ruling may

12 also affect how long my cross-examination is, and that may

13 affect the scheduling as well.

14       THE COURT: Well, I think his remarks are really

15 aimed, so to speak, at Ms. Fleming more than anything else.

16       MR. ROCCO: Oh, I hope not.

17       MR. LOCKARD: My remarks are just aimed at trying to

18 provide some scheduling --

19       THE COURT: No, no, but I mean if they were here and

20 they were available to testify this morning, you could call

21 them, except we haven't finished with Mr. Zarrab.

22       MR. LOCKARD: We'll discuss it with defense counsel.

23 Just to flag it for the Court, the proposals would involve

24 either, with the Court's permission, to have potentially a gap

25 in testimony at the end of the day tomorrow, or to end up

---

| HC7PATI1 | Trial | Page 966 |

1 taking a witness out of turn early next week, basically to

2 interrupt one witness to put on another witness and then resume

3 the first witness.

4        THE COURT: I'm pretty flexible, but I don't really

5 want people hanging around all week, if possible.

6        MR. LOCKARD: Yes, sir.

7        THE COURT: Or more than necessary; so why don't you

8 talk about that. Was there something else?

9        MR. LOCKARD: The second issue, your Honor, is related

10 to an issue that we had flagged yesterday about the production

11 and use of transcripts of calls, the translations of calls --

12       THE COURT: Right.

13       MR. LOCKARD: -- by the defense. And so we received

14 another batch last night, which we have not had an opportunity

15 to review. They are of calls that I believe we have produced

16 at least draft translations of in the past, and we don't know

17 what differences there are between the ones that we received

18 and the ones that are going to be used today.

19       So it does present us with a little bit of a problem

20 in knowing how to deal with those translations, to the extent

21 that they are used today in court. So we wanted to, first of

22 all, just object to their use and, in the alternative, to ask

23 that if they are used, that they be used only as an aid to the

24 witness and that they not be published to the jury until such

25 time as they are able to be received in evidence.

---

| HC7PATI1 | Trial | Page 967 |

1        THE COURT: So that's something else you can talk

2 about in the next couple of minutes or so. All right?

3        MR. LOCKARD: Thank you, your Honor.

4        THE COURT: Okay. That's very helpful.

5        (Recess)

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

| HC73ATI2 | | Page 968 |

1        (In open court; jury not present)

2        THE COURT: I have brief comments which will include

3 the discussion about which we've heard oral argument this

4 morning. And when that is finished, and it will only take a

5 minute or two, we'll call in Mr. Zarrab and -- oh. Before we

6 do that. Is there any resolution of the scheduling issue?

7        MR. LOCKARD: Yes, your Honor. So with the Court's

8 leave, the proposal would be to continue with the witness order

9 as we had currently planned, which will have after Mr. Zarrab

10 finishes, Special Agent Rob Tringale, followed by David Cohen.

11 Where we're asking for the Court's leave, if Mr. Cohen finishes

12 before the end of the day tomorrow, our next witness would then

13 be available Monday morning, leaving a little bit of a gap.

14 That's why we'd ask for the Court's permission to proceed in

15 that matter.

16       THE COURT: Gap between Mr. Cohen and Monday?

17       MR. LOCKARD: Yes, your Honor.

18       THE COURT: That's fine with me. Sure.

19       MR. LOCKARD: Sorry, so then the other corollary to

20 that is the witness who otherwise would have followed Mr. Cohen

21 is not available again until Tuesday. So we would then pick up

22 Monday, and with the Court's leave again, interrupt whichever

23 witness is testifying Monday for Mr. Adam Szubin to testify on

24 Tuesday morning, and then when his testimony is complete, to

25 then resume with the witness who was on the stand.

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

HC73ATI2                                                          Page 969

1      THE COURT: I have no problem with that. I have no
2  problem with going out of order if it is okay with all of you.
3      MR. LOCKARD: Thank you, your Honor.
4      THE COURT: Once I give the ruling then we'll call in
5  Mr. Zarrab, and the jury is ready, and so we'll continue with
6  cross-examination. So the ruling is as follows:
7      Based on the entire record in this matter, and now I'm
8  referring to both the Zarrab proceedings, let's call them, and
9  the Atilla proceedings, because there is some obvious overlap
10 between them, and that record includes two separate motions to
11 dismiss, which dealt in some detail, I might say, with the
12 sanctions, among other things, with the sanctions regimes we've
13 been discussing throughout the trial but in particular this
14 morning. And along with such related issues as criminal
15 prosecutions, primary and secondary sanctions,
16 extraterritoriality. The record also includes bail
17 applications made both by Mr. Zarrab and Mr. Atilla,
18 suppression motions. Also very extensive, perhaps
19 unprecedentedly so, certainly in my experience, series of
20 Curcio proceedings as well as extensive motion in limine
21 practice about which counsel have submitted briefing. And also
22 supplemental letters, including the two letters dated
23 December 6, 2017, about which we have heard this morning during
24 the oral argument.
25     So, having made and done that review, I find as

HC73ATI2                                                          Page 970

1  follows:
2      First, the record throughout this case, in my opinion,
3  is extremely thorough, comprehensive, and I'm pleased to tell
4  you consistent; two, the record supports the Court's overriding
5  goal, which has been to treat Mr. Zarrab and Mr. Atilla fairly
6  throughout these proceedings, and to accord them due process
7  and speedy resolutions of their respective cases; three, the
8  government anticipates calling as witnesses in the near future
9  a number of current and former U.S. Department of Treasury
10 officials who, it is my understanding, will testify as fact
11 witnesses about their interactions with Turkish banking and
12 government officials, and, among the list of banking officials
13 is Mr. Atilla. This is entirely appropriate for the government
14 to do. And fourth, defense counsel will be permitted to
15 cross-examine the witnesses that I've referred to, relating
16 their cross-examination to the direct examination, and defense
17 counsel will also be permitted, on cross, to include limited
18 questioning regarding historical OFAC enforcement practices and
19 guidance.
20     So with that, we'll ask to have Mr. Zarrab and then
21 the jury.
22     (Continued on next page)
23
24
25

HC73ATI2                        Zarrab - Cross              Page 971

1      (Jury present)
2      THE DEPUTY CLERK: Sir, before we begin, I'd like to
3  remind you, you're still under oath.
4      THE COURT: We will continue with the
5  cross-examination of Mr. Zarrab.
6      MS. FLEMING: Thank you, your Honor.
7  REZA ZARRAB,
8  CROSS-EXAMINATION
9  BY MS. FLEMING:
10 Q.  Good morning, Mr. Zarrab.
11 A.  Good morning, ma'am.
12 Q.  Yesterday, I showed you one of the timelines that you had
13 created, and my question was whether you had identified in that
14 timeline any meeting between the time period of April 10, 2013,
15 and April 22, 2013, a meeting with Mr. Hakan Atilla.
16     Remember that question?
17 A.  Yes, ma'am.
18 Q.  And you told me not in that version of the timeline you had
19 created. Do you remember that answer?
20 A.  Yes, ma'am.
21 Q.  So I would like to show you what's been marked as 3501-54,
22 3501-025, 3501-055, 3501-021, 3501-23 --
23     MR. KAMARAJU: Your Honor, we object.
24     THE COURT: These are what?
25     MS. FLEMING: Timelines. And 3501-24.

HC73ATI2                        Zarrab - Cross              Page 972

1      May I approach, your Honor?
2      THE COURT: I think it would be easier if you did one
3  at a time, to be honest with you.
4      MS. FLEMING: May I have them identified? May I try
5  to speed it up by having him identify them all? I think I can
6  do it in a couple of questions, your Honor.
7      THE COURT: Go ahead.
8      MS. FLEMING: May I approach?
9  Q.  Mr. Zarrab, would you look through the exhibits I've just
10 handed you, and they are marked on the side with a sticker just
11 to show you date range.
12     Would you tell us, please, whether those are timelines
13 you created.
14 A.  Yes, ma'am.
15 Q.  Those are all timelines you created when you were working
16 with the prosecution team during the time of your cooperation
17 with the prosecution; is that correct?
18 A.  Yes, ma'am.
19 Q.  Would you look through the exhibits I just handed you
20 during the time ranges marked on the side with the yellow
21 stickers, from April 10, 2013, until April 22, 2013, and see
22 whether you have identified any meetings with Mr. Atilla during
23 those date ranges.
24     MR. KAMARAJU: Your Honor, objection. She's asking
25 about documents that are not in evidence.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 7, 2017

| HC73ATI2 | Zarrab - Cross | Page 973 |
|---|---|---|

1     MS. FLEMING: They're not in evidence.
2     THE COURT: He said they're not.
3 Q. Do you remember --
4     MS. FLEMING: Allow me to withdraw and redo it.
5 Q. Do you remember having any meetings with Mr. Atilla?
6     THE COURT: No. Okay. Go ahead.
7 Q. Do you recall any meetings with Mr. Atilla between April 10
8  and April 22, 2013?
9     THE COURT: You mean apart from the documents?
10     MS. FLEMING: Apart from the documents.
11 A. I do not remember, ma'am. I do not remember the exact date
12  of a meeting.
13     MS. FLEMING: I'd like to pick back up -- I'd like to
14  play a recording. We're not putting transcripts up, your
15  Honor -- wait. May I have a minute, please.
16     (Pause)
17     MS. FLEMING: We have a stipulation, your Honor, so it
18  saves us some time. Thank you.
19     Could I ask, please, that we pull up 316-T and I
20  believe it's in evidence. Could I ask that 316 be played to
21  the jury and displayed for the jury.
22     THE COURT: Has it been already on the government's
23  case or no?
24     MR. KAMARAJU: Yes, your Honor.
25     THE COURT: Sure.

| HC73ATI2 | Zarrab - Cross | Page 974 |
|---|---|---|

1     (Audio recording playing)
2 Q. Do you remember this call, Mr. Zarrab?
3 A. Yes, ma'am, I remember it.
4 Q. And this call took place on July 2, 2013, correct?
5 A. Based on the document that is being shown to me, that is
6  correct, ma'am.
7 Q. In this call you are complaining to Suleyman Aslan that you
8  are having problems because the staff at Halkbank is giving you
9  a problem about demanding different documents at different
10  times, correct?
11 A. That is correct; yes, ma'am.
12 Q. If I could direct your attention to page three, please. Do
13  you see at the bottom where you have a reference to Mr. Hakan
14  on the very bottom entry?
15 A. Yes, ma'am.
16 Q. I think you told us that's Hakan Atilla, correct?
17 A. Yes, ma'am.
18 Q. Do you see that what you're complaining about is that
19  Mr. Hakan said this might cause us problems in the future. Do
20  you see that?
21 A. Not as a complaint, but I see that, ma'am.
22 Q. And then you say "He said that the goods should be sent by
23  the person and then we should make the transfer into the
24  person's account." Do you see that?
25 A. Yes, ma'am, I see that.

| HC73ATI2 | Zarrab - Cross | Page 975 |
|---|---|---|

1 Q. So you are reporting to Mr. Aslan that Hakan Atilla has
2  been telling you he wants the goods to be sent first, and then
3  the money will be transferred into the person's account,
4  correct?
5 A. That is correct, but I'm referring to goods that do not
6  exist, ma'am.
7 Q. If you go to page four, you are saying that you had -- you
8  first had some difficulties with him about that, and then got
9  over that issue of Mr. Atilla wanting you to send the goods
10  first, and then the payment would ship. Do you see that?
11 A. So, I don't see any disagreement here between us in terms
12  of what I said. In Turkish, I'm just saying that there was
13  that issue and we got over it and we're ready to move on.
14 Q. Then the next issue that you bring up is that you have been
15  asked if you can provide an SGS inspection certificate; do you
16  see that?
17 A. Yes, ma'am.
18 Q. You actually explained to Mr. Aslan what an SGS inspection
19  is, correct?
20 A. Yes, I explained to Mr. Suleyman Aslan; that is correct,
21  ma'am.
22 Q. On December 4 you testified that it was at a meeting in --
23  after Ali Fuat was at the bank and after you had been arrested
24  and you had returned, that you had a meeting and the concept of
25  an inspection certificate was raised; do you remember that

| HC73ATI2 | Zarrab - Cross | Page 976 |
|---|---|---|

1  testimony?
2 A. I don't recall the exact date of December 4, but I do
3  recall that I testified about an inspection document related to
4  this time, yes.
5 Q. You told us that Mr. Atilla discussed companies that would
6  be acceptable to the bank for inspection certificates,
7  including SGS, Kotechna, and Baltic. Do you remember that?
8 A. That is correct, ma'am, I remember saying that these would
9  include SGS, Kotechna, and Baltic and a few others that I could
10  not remember at the time; that is something that I said, yes.
11 Q. You also told us it was difficult to get an SGS inspection
12  certificate because they actually inspect the goods on the
13  ships to make sure that -- to check what the goods are or the
14  products are that are being shipped, correct?
15 A. That is correct, yes, ma'am.
16 Q. What is SGS?
17 A. It is an inspection company, ma'am, to the best of my
18  knowledge.
19 Q. It is a quality inspection, correct?
20 A. When I was involved in tea trade from 16 to 17, we were
21  using SGS to ensure that the quality of the tea that the
22  customer had ordered was the tea that we were sending, so that
23  is correct, ma'am, yes.
24 Q. Your tea trade was legitimate, correct?
25 A. Yes, ma'am, that is correct.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                                  December 7, 2017

HC73ATI2          Zarrab - Cross          Page 977

1  Q. If I could direct your attention to page six in the middle.
2     You explained that the sentences were -- you refer to Mr. Hakan
3     and Mr. Aslan is referring to Hakan Atilla, that you talked
4     over each other at the same time. Do you remember that?
5  A. That is correct, ma'am, I remember that.
6  Q. What you are telling him, isn't it correct -- withdrawn.
7        Isn't it correct that what you are telling Mr. Aslan
8     is it doesn't get stuck at Mr. Hakan so much. Do you see that?
9  A. I remember that, yes.
10 Q. A little farther down, Mr. Aslan is trying to calm you
11    down; isn't that correct?
12 A. I was already calm during the phone conversation, but
13    Mr. Aslan is saying he's going to go ahead and solve it.
14 Q. He says at the bottom of page six "I'll gather up all my
15    colleagues tomorrow and go over these one by one." Do you see
16    that?
17 A. Yes, ma'am, I see that.
18 Q. And do you understand him to be telling you that he's going
19    to talk to everyone in the foreign operations department who
20    has been asking you for documents?
21 A. I do not know to which employee he was referring to when he
22    said he would gather everybody and talk to everyone in that
23    section, ma'am.
24 Q. Am I correct that he then says, "Then I'll tell you clearly
25    which documents are needed and which are not."

HC73ATI2          Zarrab - Cross          Page 978

1  A. Yes, ma'am, I see that. I recall the conversation but I
2     don't want to go off of what's in my memory, if you can also
3     show on the page please, so I can see it.
4        MS. FLEMING: Please go to page seven.
5  Q. Mr. Aslan then goes on to tell you a little farther in the
6     conversation, if you want to scroll through seven and eight,
7     please, when you're ready. That he will talk to his colleagues
8     and get it lightened for you.
9        Do you see that?
10 A. Which page are we on now? Would it be possible to
11    highlight it so we can move faster in getting to that?
12        MS. FLEMING: Put up seven and eight, please.
13 Q. If you could look, please, on page -- at the top of page
14    eight. Mr. Aslan says "I'll lighten things up after I talk to
15    my colleagues tomorrow. I'll expedite it, okay?"
16        Do you see that?
17 A. Yes, ma'am, I see that.
18 Q. Then a little farther down on eight, you tell him "So we
19    get stuck in the lower ranks. It is not related to Mr. Hakan."
20    Do you see that?
21 A. Yes, ma'am.
22 Q. Is that Hakan Atilla again?
23 A. Yes, ma'am, that is Mr. Hakan Atilla.
24 Q. That's a reference going back to where you said earlier it
25    doesn't get stuck so much; isn't that correct?

HC73ATI2          Zarrab - Cross          Page 979

1  A. Yes, ma'am, that is the same thing that I'm saying, my
2     things were not getting stuck at or with Mr. Hakan Atilla that
3     much; that is correct.
4  Q. That much, right?
5  A. Yes, ma'am, that is correct.
6  Q. Getting stuck somewhat, but not that much; is that correct?
7        THE COURT: That wasn't the testimony. So if you're
8     going to ask a question, ask it.
9        MS. FLEMING: If we can go please to T 1002 at page 50
10    in the English version. And it is July 9, if we can please
11    bring the Turkish up, too. It is July 9 at 8:36.
12        THE WITNESS: If I can get the Turkish version also
13    that corresponds with this.
14        MS. FLEMING: Can you highlight the Turkish one,
15    please, Mr. White.
16        THE WITNESS: I see the Turkish section now, ma'am.
17 Q. In that WhatsApp chat in the morning on July 9, Mr. Aslan
18    is giving you a heads up that Mr. Hakan is going to probably
19    call you today and on two subjects, correct?
20 A. That is correct, ma'am.
21 Q. He tells you that the first relates to whether the company
22    that starts with the letter V has the field of business
23    properly in its documents. And the second issue is there is an
24    incompatibility related to the capacity of the ships.
25 A. Yes, ma'am.

HC73ATI2          Zarrab - Cross          Page 980

1  Q. In fact, Mr. Atilla called you later that morning, correct?
2  A. I don't recall the exact date, whether it happened on that
3     morning or not, I don't recall. But I did have a conversation
4     with Mr. Hakan Atilla on those two topics, that is correct.
5  Q. Do you remember having two phone conversations in between
6     this chat and Mr. Hakan Atilla's call to you with Mr. Happani?
7  A. Ma'am, as I had mentioned before, Mr. Happani was my right
8     arm and I would speak to him maybe 50 times a day. So if there
9     is any specific call that you're referring to, if that could be
10    brought up on the screen, that way I could answer your question
11    better and more correctly and with a more material answer as to
12    what you had asked.
13 Q. Do you remember telling Mr. Happani that Mr. Suleyman had
14    told you Volgam had not been entered at Halkbank?
15 A. When you say "not entered," I don't understand what you
16    mean by that.
17 Q. Do you remember having a conversation where you told
18    Mr. Happani that there was a problem with the tonnage, that
19    there was going to be a call about?
20 A. I had had many conversations with Abdullah Happani, and I
21    don't recall anything specific, and I would like to ask if you
22    have anything specific as to a conversation that could be
23    pulled up on the screen so I can refer to it as I answer. So
24    that it would refresh my mind as I answer your question.
25        MS. FLEMING: Your Honor, may I approach?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC73ATI2 | Zarrab - Cross | Page 981 |

1    THE COURT: Sure.
2    Q. I'm going to show you what's been marked as Defendant's
3    Exhibit 901. I'm going to ask you to read it to yourself, and
4    see if it refreshes your recollection as to having a
5    conversation with Mr. Happani on July 9.
6    A. Yes, ma'am, I remember this.
7    Q. So does that refresh your recollection that you had a phone
8    call with Mr. Happani in which you told him that Mr. Suleyman
9    had told you that you added food to Volgam, but the bank had
10   not entered it into their system, meaning that food had not
11   been entered into the system as being associated with Volgam?
12   Do you remember that?
13   A. Yes, ma'am, I remember that.
14   Q. And then Mr. Happani said "I will send them now." Do you
15   remember that?
16   MR. KAMARAJU: Objection, your Honor. She's reading
17   from a document not in evidence.
18   THE COURT: I'll allow it.
19   Q. And then Mr. Happani said "Send them now, please." Do you
20   remember that?
21   A. No, that is not correct. Maybe it is being read
22   incorrectly. What Abdullah Happani is saying is he is sending
23   again to the bank right away.
24   Q. And you told him "No, wait. Let Hakan Atilla call first,
25   because it shouldn't be understood that Mr. Suleyman has

| HC73ATI2 | Zarrab - Cross | Page 982 |

1    contacted us." Isn't that correct?
2    A. That is correct, ma'am.
3    Q. And then later on, you also say -- or withdrawn.
4    You and Mr. Happani discussed that there is a problem
5    with the tonnage. Do you remember that in this phone
6    conversation on July 9?
7    A. I recall talking about the possibility with a problem with
8    the tonnage in this conversation, yes, ma'am.
9    Q. And Mr. Happani says, "Yes, we never looked at that,"
10   correct?
11   A. That is correct, ma'am.
12   Q. And you say, "How are we going to explain that. Let him
13   call." Isn't that correct?
14   A. That is correct, ma'am.
15   Q. Then following that is when Mr. Atilla called you.
16   A. I don't recall the timing, but based on this document it
17   appears that he would have called after this, so that is
18   correct, ma'am.
19   Q. In fact, you never let Mr. Hakan Atilla know that
20   Mr. Suleyman had given you the heads up that he would be
21   calling, did you?
22   A. That is correct, ma'am, I did not tell him.
23   MS. FLEMING: Sorry, your Honor, I have to straighten
24   some of the documents out, it fell after the break. I'll move
25   forward and then come back. I'm just pleased it took three

| HC73ATI2 | Zarrab - Cross | Page 983 |

1    days for it to happen.
2    Could we pull up 269, please.
3    Q. Before we get there, I have one other question. One other
4    area.
5    You had an employee who worked for you named Sinem,
6    S-I-N-E-M?
7    A. That is correct, ma'am.
8    Q. In fact, with regard -- withdrawn.
9    In the business that you were doing, this Iranian
10   business, your part of it, there were many of your employees
11   that knew exactly what was going on, correct?
12   A. Yes, they knew, ma'am.
13   Q. But you did not want Sinem to know what was going on,
14   correct?
15   A. No, that is not correct, ma'am.
16   Q. Don't you have conversations with Mr. Happani in which you
17   tell him that you want him to keep him away from it so he
18   wouldn't know what was going on?
19   A. What I'm saying here is that I don't want Sinem to learn
20   the method with which we are doing this with the bank for food
21   trade. And I'm telling Mr. Happani that I don't want her to
22   learn this in terms of how we're doing it with the bank.
23   Q. There came a point in 2013 where the bank would no longer
24   intermediate gold trades, correct?
25   A. Though I don't remember the exact date, there were times

| HC73ATI2 | Zarrab - Cross | Page 984 |

1    that the gold trade, based on the crude oil sales proceeds, had
2    stopped. That is correct, ma'am.
3    Q. There is also a time it stopped because of the change in
4    the sanctions laws; do you remember that in 2013?
5    A. I'm talking about the exact same thing, ma'am, anyway.
6    Q. The way the gold trades worked were that you would provide
7    a pro forma, send the gold, move the money, and then at the end
8    of the transaction, within a certain period of time, had to get
9    all the documents to Halkbank to complete the paperwork,
10   correct?
11   A. That is not correct, ma'am.
12   Q. You had a certain period of time after you had --
13   withdrawn.
14   You would issue a pro forma invoice, correct?
15   A. That is correct.
16   Q. There would be payment for the purchase, correct?
17   A. That is correct, ma'am.
18   Q. The gold would then be transferred out of the country of
19   Turkey, correct?
20   A. No, that -- this is where it's not correct.
21   Q. You didn't -- there was real gold involved in your
22   transactions. You've told us that, correct?
23   A. That is absolutely correct. But what is incorrect is the
24   order of what was mentioned here by madam.
25   Q. Getting to the end, after the gold has moved, and the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

HC73ATI2    Zarrab - Cross    Page 985

1 payment has been made for the gold, your company has a certain
2 period of time to get the documents back to Halkbank to show
3 that the shipping and the export and the rest of it was done,
4 correct?
5 A. That is not correct, ma'am.
6 Q. You didn't have to provide the customs documents until
7 after the gold had left the country, did you, sir?
8 A. So, the time frame, the period that is allowed to our
9 company by the bank was between the time that the money would
10 arrive, and the time that the gold would be exported out. We
11 were given a certain amount of time to receive the money and to
12 prepare for the export, do the export, and then we needed to
13 get this package of documentation and take it to the bank,
14 after the export. But the time, the period that was extended
15 to us was for between the payment, receipt of payment, and
16 export of gold.
17 Q. But after Halkbank's piece of it was finished, meaning the
18 transfer of the money, you still had time to get the documents
19 back to the bank so they could complete their paperwork,
20 correct?
21 A. Yes. We were being given a specific period of time in
22 order for us to export the gold, ma'am.
23 Q. There were times that people at the bank would call you to
24 say please get the documents in, we've made payment, and we
25 need the documents to close out the transactions, correct?

HC73ATI2    Zarrab - Cross    Page 986

1 A. That is correct, ma'am. They were getting in contact with
2 us regarding this matter from the bank; that is correct.
3 Q. When they would call you and say we need the document, your
4 companies would in fact send the documents to Halkbank,
5 correct?
6 A. Sometimes the documents that we would submit were not
7 getting on record quickly. So there was this discrepancy
8 between the branch and the headquarters in terms of getting
9 documents on record. And then there were times where the delay
10 was being caused by us, and if that were to be the case, then
11 we would complete the documentation.
12 Q. You would in fact respond -- withdrawn.
13    MS. FLEMING: Could we play 269, please. It's in
14 evidence. It's short, your Honor.
15    (Audio recording playing)
16 Q. Mr. Reza, this is an example of Mr. Atilla calling you to
17 say the bank is looking for the documents to finish the
18 paperwork, correct?
19 A. That is correct, ma'am, yes.
20 Q. The payments had already been made, correct?
21 A. Yes, ma'am, that is correct.
22 Q. The gold had already been shipped out of Turkey, correct?
23 A. It would be needed that it should have been sent.
24 Q. You in fact got the paperwork back to Halkbank within a
25 reasonable period of time after this call, correct?

HC73ATI2    Zarrab - Cross    Page 987

1 A. I don't remember, ma'am. I don't remember whether the
2 documents had already been submitted and were at the branch or
3 if we had submitted them within a few days after, I don't
4 remember.
5 Q. And I guess what you're saying about the shipments is when
6 Mr. Atilla called you, if the gold hadn't actually already gone
7 yet, you took care of making sure the gold went out so you
8 could then submit the documents back to Halkbank, correct?
9 A. Yes, in fact here I'm telling him that I believed that this
10 had already been exported.
11 Q. By the time of this call, in September 2013, the financial
12 portion at Halkbank had already been completed, correct?
13 A. So, the mention or the reference to financial transaction
14 at Halkbank, I did not understand that section.
15 Q. Withdrawn.
16    MS. FLEMING: I'm done with the recordings. Thank
17 you.
18 Q. I asked you the other day about your driver being caught
19 with cash and you told me I had the facts wrong, correct?
20 A. That is correct, ma'am.
21 Q. Your driver is named Turgut Happani, correct?
22 A. Turgut Happani was an employee of mine that worked with me
23 for a time period, but he was never my driver, ma'am.
24 Q. Forgive me. And in fact, was he an employee of yours
25 during 2011, 2012, 2013?

HC73ATI2    Zarrab - Cross    Page 988

1 A. I don't recall the exact dates, but Turgut Happani was in
2 my personnel and he was one of my employees for a time.
3 Q. Did he work for you back in 2011?
4 A. What I remember is that he might have been working.
5 Q. Was he working for you in 2010, do you remember?
6 A. I remember, he was working with me, ma'am.
7 Q. While he was your employee, was he one of 14 people stopped
8 with suitcases or backpacks of cash by the Russian Federal
9 Customs Services?
10 A. They were not captured by the customs, but they were
11 stopped by the customs, ma'am.
12    MS. FLEMING: Could you show Mr. Zarrab only, not the
13 jury, I think it is 101.
14 Q. Do you recognize what's been marked as Defense Exhibit 101?
15 A. Yes, ma'am, I recognize it.
16 Q. Who is that in the photo?
17 A. That is me, ma'am.
18 Q. Do you recall what year this picture was taken?
19 A. I don't recall the year exactly, ma'am.
20 Q. Do you recall if this was back at the time when your
21 employee was stopped by the people with the cash in the
22 backpack?
23 A. I have a specific memory about this photograph, and the
24 moneys that are shown in this photograph. This money was
25 prepared to be sent to Dubai to be given to the Central Bank of

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

| HC73ATI2 | Zarrab - Cross | Page 989 |
| --- | --- | --- |

1   Iran, and this had nothing to do with Russia.
2       MS. FLEMING: Defendants would move Exhibit 101 into
3   evidence.
4       MR. KAMARAJU: No objection.
5       THE COURT: I'll allow it.
6       MS. FLEMING: Can we publish it to the jury, please.
7       (Defendant's Exhibit 101 received in evidence)
8       MS. FLEMING: May I have a minute, your Honor.
9       Take it down from the jury for one moment, and go to
10  page two of Exhibit 101.  You don't have it?
11      Can we take it down from the jury and I'd like to show
12  you 102.  Maybe 100.
13  Q. Do you recognize the people in 100?
14  A. Yes, ma'am, I recognize them.
15  Q. Who are they?
16  A. The one on the left is an individual by the name Erol who
17  worked in our exchange office at that time as a cashier.  And
18  the person to the right in the middle of the photograph is my
19  cousin, Behrouz Asadi.  And the person standing to the right of
20  that person is Sadegh Rastgard, ma'am.
21  Q. Did he also work for you?
22  A. He worked for me for a period of time; that is correct,
23  ma'am.
24  Q. Was this photo taken at the same time, roughly, as your
25  photo?

| HC73ATI2 | Zarrab - Cross | Page 990 |
| --- | --- | --- |

1   A. That may be, ma'am, because we were sending cash dollars
2   every day.
3       MS. FLEMING: We would move Defendant's Exhibit 100
4   into evidence.
5       THE COURT: I'll allow it.
6       MR. KAMARAJU: No objection.
7       (Defendant's Exhibit 100 received in evidence)
8       (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HC7PATI3 | Zarrab - Cross | Page 991 |
| --- | --- | --- |

1       MS. FLEMING: Could I ask, can you pull up the
2   government exhibit just for not the jury.  I'm sorry, I thought
3   you had already published it.  Would you publish it, please.
4       Would you pull up just for Mr. Zarrab, Government
5   Exhibit 4503, please.
6   Q. Do you see Government Exhibit 4503?
7   A. Yes, ma'am; I can see it.
8       MS. FLEMING: Would you show Mr. Zarrab page 2 of
9   Government Exhibit 4503.
10  Q. Do you recognize that?
11  A. Yes, ma'am; I remember it.
12  Q. Going back to Government Exhibit 4503, is that an e-mail
13  from you to you?
14  A. It was sent from me to me, as well as to Al Nafees' e-mail,
15  ma'am.  There are two e-mails listed here.
16      MS. FLEMING: All right.  We move Government
17  Exhibit 4503 into evidence.
18      MR. KAMARAJU: No objection.
19      MS. FLEMING: And ask that it be published to the
20  jury.
21      THE COURT: I'll allow it.
22      (Government's Exhibit 4503 received in evidence)
23      MS. FLEMING: Mr. White, could you publish it, please,
24  to the jury.
25  BY MS. FLEMING:

| HC7PATI3 | Zarrab - Cross | Page 992 |
| --- | --- | --- |

1   Q. Mr. Zarrab, does that refresh your recollection as to when
2   this photo was taken?
3   A. No, it did not remind me, ma'am, because the date that the
4   photo was taken may be different than the date the photo was
5   e-mailed out.
6   Q. Well, the photo was certainly taken before the date it was
7   e-mailed, correct?
8   A. That is absolutely correct, ma'am.
9   Q. Okay.  You can take that down.
10      You spoke with us about having been charged in Turkey
11  in 2013.  Now, you also told us that -- in this court, that you
12  are, in fact, guilty of at least some of the things you were
13  charged with in Turkey; is that correct?
14  A. That is absolutely correct, ma'am.
15  Q. There, in Turkey, you had a police officer who attempted to
16  blackmail you; isn't that true?
17  A. That is correct, ma'am.
18  Q. You had an officer or police officer who was part of that
19  investigation who attempted to extort money out of you in order
20  to -- sorry, to get money out of you in order to keep from
21  giving evidence over to other people, correct?
22  A. That is not correct, ma'am.  In other words, the reason for
23  the blackmail is not correct, ma'am.
24  Q. There are different political factions -- withdrawn.
25      As of the end of 2013, there are different political

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

HC7PATI3          Zarrab - Cross          Page 993

1   factions and political groups in Turkey, correct?
2   A. So I'm not a political analyst, and I don't understand what
3     the question is, but I know that the administration in Turkey
4     was the same before 2012 and it was the same after 2013; so I
5     don't understand the question.
6   Q. Have you ever heard of Gulenists?
7         MR. KAMARAJU: Objection, your Honor.
8         THE COURT: I'll allow it.
9   A. Yes, ma'am; I had heard.
10  Q. It is a political faction or political group that some
11    people in Turkey follow and believe, correct?
12  A. This group has various names that are used by different
13    groups. For that reason, I don't know whether they're a
14    political group, religious group or a terrorist group. I don't
15    know that, ma'am.
16  Q. By terrorist group, you don't mean physically terror or
17    blowing anything up, correct? We can agree on this, please?
18  A. There's no way that we could agree on that, ma'am, because
19    I don't know what they do.
20  Q. When you were -- After you were charged, in fact, there was
21    an investigation done by parliament, correct?
22  A. Are you referring to an investigation in Turkey?
23  Q. Yes.
24  A. Because there's also an investigation about me currently,
25    as well. So I just want to know which one you're referring to.

HC7PATI3          Zarrab - Cross          Page 994

1   Q. I'm talking about the one in 2013.
2   A. Yes, that is correct, ma'am.
3   Q. And during 2014, the parliament of Turkey was investigating
4     some of the allegations that had been made against people that
5     had immunity, correct?
6         THE COURT: Against what?
7         MS. FLEMING: People who had immunity, meaning people
8     who had official positions that had immunity.
9         THE COURT: I'm not sure I understood the question.
10  BY MS. FLEMING:
11  Q. There was an investigation by parliament, correct?
12        THE COURT: Of what?
13        MS. FLEMING: Of certain persons involved in the
14    investigation. I'm trying to keep this very simple, Judge.
15        THE COURT: I know, but it's not very simple. I mean,
16    there must be --
17        MS. FLEMING: Let me withdraw it and ask a different
18    question.
19  BY MS. FLEMING:
20  Q. Did you submit a letter, signed in connection with
21    evidence, to an investigation that was being conducted by the
22    parliament in Turkey in 2014?
23  A. I don't remember, ma'am.
24  Q. Do you remember signing a declaration to the parliament
25    indicating that certain allegations that you had provided

HC7PATI3          Zarrab - Cross          Page 995

1   bribes in the form of a watch, for example, that it was not a
2     bribe?
3   A. I don't remember, ma'am.
4   Q. Do you remember providing a signed letter to the parliament
5     investigation commission saying that a piano that had been
6     alleged to be a bribe was, in fact, not a bribe?
7   A. I do not remember, ma'am.
8   Q. Mr. Zarrab, have you been charged in Turkey with --
9     withdrawn.
10        In June of 2016, did Turkey charge you with violating
11    the law of protection of cultural and natural assets for doing
12    renovations on your home on the Bosphorus?
13  A. I do not remember the date of that, ma'am, but it is
14    correct that such a charge was made against me.
15  Q. That's a criminal charge in your district in Turkey,
16    correct?
17  A. I suppose so, ma'am.
18  Q. And you were charged with that before you agreed to
19    cooperate with the United States, correct?
20  A. That is correct, ma'am.
21  Q. Are you familiar with a company Azra?
22  A. I had heard of that name, ma'am.
23  Q. Did you have connections to that, your business?
24  A. No, ma'am.
25  Q. Did you have connections with the business Hazer Jewelry,

HC7PATI3          Zarrab - Cross          Page 996

1   H-a-z-e-r?
2   A. No, ma'am.
3   Q. Never, is that correct? Never?
4   A. Yes, ma'am.
5   Q. You became a Turkish citizen in 2007; is that correct?
6   A. Yes, ma'am, that is correct. I don't recall the date. It
7     could be 2006 or 2007, but that is correct, ma'am.
8   Q. And you became a Turkish citizen under a procedure that's
9     known as exceptional status in Turkey, correct?
10  A. I understand that is absolutely not correct, ma'am.
11  Q. And you did not go through the ordinary channels to get a
12    citizenship, did you, sir?
13  A. I followed very ordinary channels, ma'am, and I applied in
14    2001 and I received my citizenship in the time frame of 2006 or
15    2007. I apologize, I need to make a correction on that one. I
16    started it in the year 2000. In other words, it took about six
17    to seven years for me to receive that.
18  Q. As part of the process of becoming a Turkish citizen, you
19    have to fill out an application, correct?
20  A. That is correct, ma'am.
21  Q. And you have to go through an investigation, correct?
22  A. I don't know the internal procedure, ma'am, as far as the
23    citizenship. I don't know what the government does internally
24    about that.
25  Q. You're aware that the tax authorities conduct an

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

| HC7PATI3 | Zarrab - Cross | Page 997 |
| --- | --- | --- |

1   investigation, correct?
2   A. I am not aware of such an investigation with regards to my
3   citizenship application, ma'am.
4   Q. In your application, you had to certify that your taxes
5   were correct, didn't you?
6   A. As of that date, there was no company in my name in Turkey
7   anyway, ma'am; so there was no tax due from it.
8   Q. Well, you told us in connection with your plea that you had
9   understated your income to the Turkish authorities from 2002
10  until 2016, correct?
11  A. That is absolutely correct, ma'am.
12  Q. But you did not become a citizen until 2006 or 2007,
13  correct?
14  A. That is correct, ma'am.
15  Q. So you were understating your income in Turkey for at least
16  a number of years while your citizenship was being processed,
17  correct?
18  A. So in Turkey, when you make a citizenship application --
19  this may be perhaps true for the United States, but in Turkey,
20  there is no procedure as to checking on annual tax declarations
21  after you make the application. In other words, there is no
22  need to update that information.
23  Q. And there's no need to tell the authorities when you're
24  applying for citizenship that your taxes are understated for
25  the years that you're being investigated; is that your

| HC7PATI3 | Zarrab - Cross | Page 998 |
| --- | --- | --- |

1   testimony?
2   A. That is not my testimony. What my testimony is is this.
3   As of the year 2000, when I made the application, I did not
4   have any companies established in Turkey under my name.
5   Q. You told us the other day that you had assets that were in
6   Turkey, your companies were in Turkey, correct?
7   A. As of previous times, before I took the witness seat.
8   Q. And you have investments in Iran, that's correct?
9   A. There was, ma'am.
10  Q. You had iron and steel factories in Iran?
11  A. There is one iron and steel company in Iran that is owned
12  by my father, and I did have a share of that company, ma'am;
13  that is correct.
14  Q. Is there also an auto tire factory or company that's in
15  Iran that you have a share or interest in?
16  A. Such a company, it was owned by my father many years ago,
17  and many years ago my father transferred that company on to my
18  mother for her future, to ensure her future. In such a
19  company, I have no interest or stocks in such a company, ma'am.
20  Q. When you did the television interview in 2014, on
21  television you said that you had ownership of that, didn't you?
22  A. During that 2014 interview, the company that I was
23  referring to was the iron and steel company, and what I
24  declared during that interview is that my family is a wealthy
25  family. So on that television program, what I said was that my

| HC7PATI3 | Zarrab - Cross | Page 999 |
| --- | --- | --- |

1   family had been wealthy for many years.
2   Q. And do you have a construction company in Dubai?
3   A. I did have one, ma'am.
4   Q. Before your plea agreement became public, did you file a
5   petition in Turkey to have your assets released?
6   A. Ma'am, my assets were seized after I began to testify
7   against the defendant, and as of that date that you're
8   referring to, my assets were not -- they were already free, and
9   there was no seizure on them anyway.
10  Q. Mr. Atilla, didn't move to seize your assets, did he?
11  A. I do not believe that Mr. Atilla would have such a thing in
12  Turkey, to move in such a way in Turkey, ma'am. And I do not
13  believe that Mr. Atilla would do such a thing himself either,
14  ma'am.
15  MS. FLEMING: May I have a minute, your Honor?
16  (Pause)
17  MS. FLEMING: I'm wrapping up, your Honor.
18  THE COURT: Well, how much more do you think you have?
19  MS. FLEMING: I have this. I have this. Probably
20  half an hour.
21  THE COURT: I have no way of assessing what "this" is.
22  MS. FLEMING: It's half an hour, unless I drop it.
23  Then it's ten minutes.
24  THE COURT: Well, then let's go. Are we hoping you
25  drop it?

| HC7PATI3 | Zarrab - Cross | Page 1000 |
| --- | --- | --- |

1   MS. FLEMING: You wouldn't be the first, Judge.
2   That's true.
3   BY MS. FLEMING:
4   Q. Mr. Zarrab, you have told many lies in your life; isn't
5   that true?
6   A. There are times and topics for which I have lied in my
7   life, that is correct.
8   Q. Well, you lied in your business exchange -- you lied in
9   your money exchange business, didn't you?
10  A. Sometimes.
11  Q. You lied to the Turkish government every year on your tax
12  returns, correct?
13  A. I don't know what you mean by the Turkish government. Much
14  of the Turkish authorities actually knew what my income was
15  anyway.
16  Q. How about the people of Turkey who benefit from taxes, did
17  they know that you were understating your income?
18  THE COURT: I don't understand that.
19  Q. When you filed your tax returns in Turkey, with whom do you
20  file them?
21  A. I would think that it would be the tax director. It's my
22  accountant that was making these declarations; so it could be
23  customs and tax, it could be tax directorate.
24  Q. But you knew they were understated, correct?
25  A. Absolutely so, ma'am.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

HC7PATI3    Zarrab - Cross    Page 1001

1  Q. And so you were lying to the authorities when you filed
2    your false tax returns, correct?
3  A. To those authorities that did not know, that is correct,
4    ma'am.
5  Q. You lied to your employees at times, correct?
6        THE INTERPRETER: Could you repeat that question,
7    please?
8  Q. You lied to your employees at times; isn't that correct?
9  A. I don't recall that, ma'am.
10 Q. You told us a little earlier that you did not want Simen
11   S-i-m-e-n -- am I saying her name?
12 A. Simen.
13 Q. -- to know all about some of your business; you kept her
14   away from her, correct?
15 A. For a boss to obstruct an employee from getting information
16   in an area where he or she does not have any reason or
17   authority to have that information, I don't believe that counts
18   as lying to that employee, ma'am.
19 Q. That's a boss' prerogative, to keep away information from
20   the lower-level employees, correct?
21 A. That is not correct for always, ma'am.
22 Q. You lied to Halkbank employees, correct?
23 A. Not everybody that Halkbank had detailed information about
24   my business, and to those individuals that did not know the
25   full nature of my business, there are times that I lied, ma'am;

HC7PATI3    Zarrab - Cross    Page 1002

1    that is correct.
2  Q. And you told us here that you lied to Binnur, correct?
3  A. On that transcript that you had shown to me, I did lie to
4    Binnur, Ms. Binnur; that is correct.
5  Q. You lied to Mehmet, correct -- excuse me, Mehtap, Mehtap?
6  A. I don't recall that conversation now; so if you could
7    expand upon what you mean by lying in that context, that would
8    be good.
9  Q. You lied to Hakkan Aydogan, correct?
10 A. That is correct, ma'am, in the transcript of that phone
11   conversation, I did.
12 Q. You lied to Hakan Atilla, correct?
13 A. It is true for that phone conversation where he did not
14   know the goods were not being sent to Iran that I lied, that is
15   correct, ma'am.
16 Q. You lied to banks and businesses by presenting false
17   documents to them, correct?
18 A. It is correct that in making applications with the banks --
19   with some banks, initially, as we start -- as to our
20   transactions being affiliated with Iran, we concealed those
21   with some of those banks; that is correct, ma'am.
22 Q. You lied to your wife, didn't you?
23       THE COURT: Counsel, come up here.
24       (Continued on next page)
25

HC7PATI3    Zarrab - Cross    Page 1003

1        (At the side bar)
2        THE COURT: So I'm a little concerned about your line
3  of questioning. I think if you ever asked me, did I lie to my
4  wife, I may have to say yes. I don't really get where you're
5  going. You asked the question, you lied to banks and
6  businesses. I don't know what that means. You asked the
7  question, you lied to your employees, and then it turned out
8  that you were really take talking about one particular example
9  at the time, Binnur, or whatever the person's name. I think
10 you have to be careful --
11       MS. FLEMING: I know.
12       THE COURT: -- in a United States court, Federal
13 Court, about what you're sort of throwing around. Now, I'm not
14 trying to curtail --
15       MS. FLEMING: I'll be more careful about the wife,
16 Judge. I'm confident that you would not answer the next
17 question the way he will about prostitutes and the rest.
18       THE COURT: I know, but you have to think a little
19 through what questions you're asking, it seems to me.
20       MS. FLEMING: I'm leading up to the lying under oath
21 questions; so those are coming.
22       THE COURT: Well, you know, if that's the question
23 you're really looking for, maybe that's the question you should
24 ask.
25       MS. FLEMING: I'll be more careful in crafting them.

HC7PATI3    Zarrab - Cross    Page 1004

1        THE COURT: You should be careful on these line of
2  questions, I'm saying that. Yes.
3        (Continued on next page)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

| HC7PATI3 | Zarrab - Cross | Page 1005 |
| --- | --- | --- |

1        (In open court)
2        MS. FLEMING: May I proceed, your Honor?
3        THE COURT: Yes.  Hold on one second.
4        (Pause)
5        Go ahead.
6    BY MS. FLEMING:
7    Q.  You told us that you had, in fact -- or, Mr. Zarrab, you,
8      in fact, on numbers of occasions, procured prostitutes?
9        MR. KAMARAJU: Objection, your Honor.
10   Q.  Correct?
11       MS. FLEMING: I was not done with the question.
12   Q.  On business purposes?
13       THE INTERPRETER: Go with the question?
14       THE COURT: Oh, I'm not sure I understood the
15     question.
16   BY MS. FLEMING:
17   Q.  One of the areas in your plea agreement, one of the crimes
18     that was identified, is that you were not -- that there was no
19     jurisdiction; so you were not being prosecuted for what is
20     prostitution, procuring prostitutes for others, correct?
21   A.  That is correct, ma'am.
22   Q.  After your arrest in Turkey in 2013, you lied to the
23     Turkish public by going on television and denying that you had
24     anything to do with violating sanctions, correct?
25   A.  I said that within the limits of Turkish law, ma'am.

| HC7PATI3 | Zarrab - Cross | Page 1006 |
| --- | --- | --- |

1    Q.  And, in fact, you issued a press release on March 10th,
2      2016, in which you also insisted that you have not ever done
3      any business with the money of the State of Iran, correct?
4    A.  I do not recall such a press release, ma'am.
5        MS. FLEMING: Your Honor, may I approach?
6    Q.  I'm showing you what's been marked as Defendant's
7      Exhibit 905.  Does that refresh your recollection?
8    A.  If I may get the Turkish version, it might refresh my
9      memory.
10   Q.  We don't have a Turkish version, I'm sorry.
11       Now, you told us that when you called the police chief
12     in order to use the emergency lane on October 4th, 2012, and
13     told him that you had the oil minister in your car, that that
14     was a lie, correct?
15   A.  That is not -- that is not correct, ma'am.  That is not
16     what my statement was.  I had said that I had the oil minister
17     and the delegation with me.  An oil minister was supposed to
18     come also, but in terms of attending this meeting with
19     Halkbank, his participation was canceled by Iran at the last
20     minute.  And I'd like to underline this also, that I did not
21     need to lie in order to use the emergency lane.  I was using it
22     as I wished anyway.
23   Q.  After your arrest, you were interviewed for a number of
24     days by the Turkish prosecutors about the events that you've
25     testified about here for a number of days, correct?

| HC7PATI3 | Zarrab - Cross | Page 1007 |
| --- | --- | --- |

1    A.  You were talking about questioning me, right, ma'am?
2    Q.  Yes.
3    A.  That is correct, ma'am.
4    Q.  And you lied to the Turkish prosecutors, correct?
5    A.  I had understood that to be U.S. prosecutors in the
6      previous -- in your question.  If you can please go back and
7      repose.
8    Q.  You lied to the Turkish prosecutors when you were
9      interviewed and arrested in 2013, correct?
10   A.  As I was arrested in Turkey in 2013, whether before I was
11     arrested or during my arrest, I did not see a Turkish
12     prosecutor.
13   Q.  When you were interviewed by the Turkish law enforcement
14     authorities, you lied to them, didn't you, sir?
15   A.  Sometimes.
16   Q.  And when you were arrested by the FBI in Miami, you lied to
17     the FBI in Miami, correct?
18   A.  There is a part where I had lied to the FBI as well, ma'am;
19     that is correct.
20   Q.  So you denied any involvement with Iranian sanctions,
21     didn't you?
22   A.  I said that I did not violate the sanctions, that is
23     correct, ma'am.
24   Q.  In fact, you said you didn't understand what an economic
25     jihad was, didn't you?

| HC7PATI3 | Zarrab - Cross | Page 1008 |
| --- | --- | --- |

1    A.  Absolutely, and I was absolutely speaking the truth as
2      well. I did not know, as of that day, what an economic jihad
3      meant.
4    Q.  Hadn't you sent a letter to Mahmoud Ahmadinejad about
5      economic jihad and joining the fight?
6    A.  It is true that I sent a letter to Ahmadinejad, but I
7      cannot read Farsi; so I signed a little letter that was
8      provided to me, and I have never joined the fight for jihad.
9    Q.  Could we pull up Government Exhibit 901-T, please.  901-T,
10     it's in evidence.
11       Mr. Zarrab, you identified 901-T on your direct
12     examination, didn't you, sir?
13   A.  That is correct, ma'am.  That is correct.
14   Q.  But you are saying that you did not know what it said when
15     you sent it to President Ahmadinejad?
16   A.  Certainly I knew what was in there, but I did not choose
17     any specific sentences.  This was prepared and sent to me, and
18     I knew it only globally.
19   Q.  So you did not understand the concept of economic --
20     withdrawn.
21       You did not understand what economic jihad was as of
22     the time of your arrest in March of 2016?
23   A.  That is absolutely correct, but as of today, I do know what
24     it is.
25   Q.  You can take it down, please.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

| HC7PATI3 | Zarrab - Cross | Page 1009 |
|---|---|---|

1      Now, you also gave a statement to the courts in
2  Turkey, didn't you, after you were arrested and charged?
3  A.  Which statement are you talking about?
4  Q.  Didn't you give a sworn statement to the Turkish courts,
5  including saying Mr. Aslan had not received bribes?
6  A.  When I was arrested?  Yes, I did.
7  Q.  And that was under oath, wasn't it, sir, in the Turkish
8  courts?
9  A.  I don't recall whether they put me under oath or not over
10  there.
11  Q.  Didn't matter to you whether you were under oath when you
12  were giving a statement to the courts in Turkey; isn't that
13  correct?
14      THE COURT: I don't understand the question.
15      MS. FLEMING: I'm sorry?
16      THE COURT: I don't understand the question.
17  Q.  You don't remember whether you were under oath when you
18  gave a statement to the courts in Turkey; is that correct?
19  A.  That is correct, ma'am.
20  Q.  During the course of your proffers -- withdrawn.
21      You made a call on September 15th, 2016, to your Uncle
22  Ahad, correct, from the jail?
23  A.  I don't recall the dates, but it is true that I had made
24  many phone calls to my uncle from the jail; that is correct,
25  ma'am.

| HC7PATI3 | Zarrab - Cross | Page 1010 |
|---|---|---|

1  Q.  You told your uncle that, in this country, you have to
2  admit to something you haven't done in order to become free;
3  once you admit your guilt, you become free; isn't that correct?
4  A.  That is absolutely not correct, ma'am.
5      MS. FLEMING: Your Honor, I'd like to play a recording
6  that's in Azeri for impeachment purposes.  I have a transcript.
7      THE COURT: Well, you said you'd be done in a half
8  hour; so you've got about four minutes left.
9      MS. FLEMING: I'd still like to play it.
10      MR. KAMARAJU: We're also going to object to playing
11  the recording.
12      MS. FLEMING: Well, maybe he'll understand it.
13      (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

| HC7PATI3 | Zarrab - Cross | Page 1011 |
|---|---|---|

1      (At the side bar)
2      MS. FLEMING: There's a recorded phone call that we
3  got the other night.  This is the English translation of it.
4  It was in Azeri.  It was hard to get a translator.  I want to
5  play it to impeach him because the translation says exactly
6  what I just talked about.
7      THE COURT: It's a call from him?
8      MS. FLEMING: From him to his uncle over the jail
9  system.  It's recorded.
10      MR. KAMARAJU: The federal rules of evidence do not
11  allow the use of extrinsic evidence to impeach a witness on
12  credibility.
13      MS. FLEMING: It's not to impeach him.  I'm going to
14  play the recording.
15      THE COURT: You just said on the record that you were
16  going to impeach him.  I think you can ask the court reporter
17  to -- hold on -- to go back and see.
18      (Record read)
19      MS. FLEMING: I can't speak Azeri.  I can barely say a
20  word of it.  I can't impeach him in Azeri.
21      THE COURT: You know, as we said at the last break,
22  and as I said, really, I think you're just flailing around a
23  little bit, you know.  You said we were getting to the end.  I
24  think you should get to the goal post.
25      MS. FLEMING: This is what I'm getting at.  I'd like

| HC7PATI3 | Zarrab - Cross | Page 1012 |
|---|---|---|

1  to show it to you.  It's a pretty -- a statement:  Once you
2  admit your guilt, you become free.  Look, there is no rule --
3      THE COURT: We all read about it in The New York Times
4  and 90 other places, and each time it was a different version
5  of it, including your time.
6      MS. FLEMING: Well, we used what the prosecutors gave
7  us as a summary.
8      THE COURT: Why don't you just ask him, as best you
9  can phrase the question, whether that happened or not.
10      MS. FLEMING: I just did.  He denied it.  I have to be
11  able to I peach him with his own statement.
12      THE COURT: Ask him whether he spoke to his uncle and
13  what did he say.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

A544

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

1          (In open court)
2     BY MS. FLEMING:
3   Q.  You spoke with your uncle about how you get out of jail in
4     the United States, correct?
5   A.  That is not correct, ma'am.
6   Q.  You didn't tell him that you have to admit to something you
7     haven't done in order to get free?
8   A.  That is not correct, ma'am.
9   Q.  When you were interviewed by pretrial services, you didn't
10    give them complete answers, that's correct?  In other words,
11    you did not tell the truth to pretrial, did you, sir?
12  A.  That is correct, ma'am.
13  Q.  And what you told us at the very beginning of your
14    testimony is that if you cooperated, it was the quickest way
15    that you knew of to get out of jail, correct?
16  A.  It was through cooperation, and also through fulfilling all
17    the basic elements of the agreement, which includes telling one
18    hundred percent the truth, ma'am.
19  Q.  It also includes substantial assistance in the
20    investigation and prosecution of another, doesn't it, sir?
21  A.  Giving it by reflecting the truth and giving truthful
22    information, ma'am.
23          MS. FLEMING: Your Honor, subject to playing some
24    recordings after we have tied them up, and I don't need the
25    witness to do that, based on stipulations, I'll pass the

1   witness.
2          THE COURT: You're finished?
3          MS. FLEMING: At this point, yes.
4          THE COURT: Okay.  Let's take our lunch break.  It's
5   five to 1:00.  We'll pick up at 2:00.
6          (Jury not present)
7          (At the sidebar)
8          THE COURT: So for the record, but not in front of the
9   jury, so your question, one of the last two or three questions,
10  was not accurate.  You said that he had said that the quickest
11  way out of jail was, I think, to lie about what you did.
12         MS. FLEMING: I said "cooperate," Judge.
13         THE COURT: No.  We'll look back there.  Your first
14  question in that line of questioning was, I thought, that the
15  quickest way out of jail, I think you said was to lie about
16  what happened.  You did.  Let's see.
17         MS. FLEMING: If I did, I really misspoke.  I truly
18  thought I said "cooperate."
19         THE COURT: But that's not accurate either because the
20  quote that you're referring to was to accept responsibility,
21  and you left that out in your quote.  I'm just pointing it out
22  to you, and that's why I've been objecting.  Certainly you're
23  entitled to cross-examine, but you have to be accurate when you
24  do it, and you can't be misleading, in my opinion.  So we could
25  look.

1          MS. FLEMING: I certainly won't try to be.
2          THE COURT: Okay.
3          (In open court)
4          (Lunch recess)
5          (Continued on next page)

1               AFTERNOON SESSION
2                   2:00 p.m.
3          (In open court; jury not present)
4          THE COURT: Before we resume, I'd like to get a handle
5   on where we are, where the government is, and the time frame.
6          MR. DENTON: I think Mr. Kamaraju will have somewhere
7   less than an hour of redirect.  And then there will be the
8   defendant's post-arrest video, which is already in evidence,
9   but we'll play that for jury.
10         THE COURT: How long is that?
11         MR. DENTON: About eight minutes.  There will be a
12  short law enforcement witness, probably not much more than a
13  half an hour, and we'll start with David Cohen.  We expect he
14  will not finish his direct today, but we'll finish it tomorrow,
15  per the schedule that we discussed.
16         THE COURT: Tomorrow you think he'll finish with you,
17  when?
18         MR. DENTON: Probably some time in the midmorning.
19  Assuming we start at 9:15, I would guess probably some time
20  around 10:30 or 11.  And then however long Mr. Rocco needs for
21  cross-examination.
22         THE COURT: Right.  And then after that, do you have
23  any other witnesses for tomorrow?
24         MR. DENTON: No, your Honor.  That was part of the
25  scheduling plan that we were discussing this morning.

**A545**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC73ATI4 | Page 1017 |
|---|---|

1    THE COURT: Depending on the cross, do you have any
2  idea, the jury is asking how long do they think they'll be here
3  tomorrow.
4    MR. ROCCO: Judge, I have no idea what the direct is.
5  So it would be very hard to estimate cross. It would be a
6  substantive cross so subject -- I apologize.
7    I'll be a while with him. It's not going to be a day.
8  Hopefully I could do it in a couple of hours, but I don't want
9  to give an estimate that I'm so uncertain.
10    THE COURT: It sounds likely we'll be done tomorrow by
11  2. Does that sound reasonable?
12    MR. ROCCO: It sounds reasonable.
13    THE COURT: And then I'm trying it figure out when you
14  think you'll rest.
15    MR. DENTON: I think it will probably be towards the
16  later end of next week, your Honor. My guess is either
17  Wednesday or Friday. There is one other witness who is going
18  to be somewhat lengthy on direct and I imagine somewhat lengthy
19  on cross. That makes it a little harder to predict. And then
20  a number of shorter witnesses at the end. Some of the bank
21  witnesses, a summary witness.
22    THE COURT: When you say bank, you mean OFAC?
23    MR. DENTON: No, U.S. bank witnesses.
24    THE COURT: U.S. bank witnesses. Okay. So okay.
25  Let's resume.

| HC73ATI4 | Zarrab - Redirect | Page 1019 |
|---|---|---|

1  BY MR. KAMARAJU:
2  Q.  Good afternoon, Mr. Zarrab.
3  A.  You too as well, sir.
4  Q.  Mr. Zarrab, do you remember during cross-examination
5    defense counsel asked you about public statements you had made
6    where you said you had not violated sanctions?
7  A.  Yes, sir.
8  Q.  Did you in fact plead guilty to violating U.S. sanctions?
9  A.  Yes, sir.
10  Q.  Are you guilty of violating U.S. sanctions?
11  A.  Yes, sir, I'm guilty.
12  Q.  What did you do that made you guilty?
13  A.  Within the sanctions imposed by the embargo, I assisted the
14    Iranians to be able to make their international payments by
15    going above the limits that were set.
16  Q.  Were those limits set by the United States?
17  A.  Yes, sir.
18  Q.  Did you do that with people at Halkbank?
19  A.  Yes, sir.
20  Q.  Did you do it with Levent Balkan?
21  A.  Yes, sir.
22  Q.  Did you bribe Levent Balkan?
23  A.  Absolutely not.
24  Q.  Did you do it with Hakan Aydogan?
25  A.  Yes, sir.

| HC73ATI4 | Page 1018 |
|---|---|

1    (Jury present)
2    MS. FLEMING: Your Honor I need to move an exhibit in
3  on redirect. I want to move in a recording.
4    THE COURT: Okay. You can do it first thing.
5    MR. KAMARAJU: We can do it at sidebar.
6    THE COURT: Ask her. I'm not sure what she's talking
7  about.
8    MS. FLEMING: Let's do it later.
9    MR. KAMARAJU: Your Honor, if we can discuss it later
10  at the sidebar that would be better.
11    THE COURT: Is that all right?
12    MS. FLEMING: Yes, as long as I don't waive because I
13  didn't do it before redirect.
14    THE COURT: Please be seated everybody and we'll have
15  now redirect.
16    THE DEPUTY CLERK: Sir, before we begin, I'd like to
17  remind you you're still under oath.
18    THE WITNESS: Yes, ma'am.
19    THE COURT: By "redirect" we mean questions that
20  relate to the cross.
21    MR. KAMARAJU: Yes, your Honor. I intend to tie
22  everything to something that was on cross.
23    May I proceed?
24    THE COURT: Yes.
25  REDIRECT EXAMINATION

| HC73ATI4 | Zarrab - Redirect | Page 1020 |
|---|---|---|

1  Q.  Did you bribe him?
2  A.  Absolutely not.
3  Q.  Did you do it with Ali Fuat?
4  A.  Yes, sir.
5  Q.  Did you bribe Ali Fuat?
6  A.  Absolutely not, sir.
7  Q.  Did you do it with Hakan Atilla?
8  A.  Yes, sir.
9  Q.  Is that true even though you didn't bribe Hakan Atilla?
10  A.  I have certainly not bribed Mr. Hakan Atilla, sir.
11  Q.  I know you were asked a lot of questions on cross about
12    gold shipments and documentation. But, ultimately, whose money
13    was being used to buy the gold?
14  A.  Iranians, sir.
15  Q.  Were any of those Iranian clients owned by the government
16    of Iran?
17  A.  Some of them, sir.
18  Q.  Can you give me an example?
19  A.  NIOC.
20  Q.  What was the point of you getting NIOC's money?
21  A.  Since they did not have access to their funds due to the
22    embargoes that were put in place by the United States of
23    America, my duty was to get their money out of Halkbank, and
24    utilize it in making their financial international payments,
25    sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC73ATI4 | Zarrab - Redirect | Page 1021 |
| --- | --- | --- |

1 Q. Did you use NIOC's money to make international financial
2 payments?
3 A. Yes, sir.
4 Q. Did some of those financial payments go through U.S. banks?
5 A. Some of them did, yes, sir.
6 Q. What would a U.S. bank had done if it knew NIOC was
7 involved?
8     MS. FLEMING: Objection.
9     THE COURT: Overruled. If you know.
10 A. It would have returned the money to the origin where the
11 sender is, sir.
12 Q. So it wouldn't have processed the transaction; is that
13 right?
14     THE INTERPRETER: Could you repeat that, please?
15 Q. So it wouldn't have processed the transaction, right?
16     THE COURT: Would not?
17 Q. It would not have processed the transaction.
18 A. Yes, sir.
19 Q. I'd like to show you Government Exhibit 304-T which is in
20 evidence. If we could pull that up for the jury as well.
21     On page two, you see near the bottom where Aslan says,
22 "Um, there is no problem over there. However, with regard to
23 the thing, Hakan Atilla has just informed me that there is a 70
24 million transfer thing from, um, NIOC to your account."
25     Do you see that?

| HC73ATI4 | Zarrab - Redirect | Page 1022 |
| --- | --- | --- |

1 A. Yes, sir.
2 Q. Did Hakan Atilla know that the source of the money was
3 NIOC?
4     MS. FLEMING: Objection.
5     THE COURT: If you know.
6 A. Yes, sir. He had notified his general manager because he
7 knew.
8 Q. I want to talk about a timing issue that came up on cross.
9 Do you remember defense counsel asking you some questions about
10 the phrase "cikonova"?
11 A. Yes, sir, I remember.
12 Q. Do you remember being asked whether you had ever used that
13 phrase prior to beginning to work at Halkbank?
14 A. Yes, sir.
15 Q. Do you remember defense counsel showed you a call and asked
16 you to read the date off the transcript?
17 A. Yes, sir.
18 Q. I'd like to show you that call, Government Exhibit 201-T.
19 Is this the call you were asked about on cross-examination?
20 A. Yes, sir.
21 Q. Do you remember defense counsel asked you about what
22 Happani says down at the bottom, where he says "I wanted to
23 send more to cikonova and so on." Do you remember that?
24 A. Yes, sir.
25 Q. Do you remember being asked about the date written on the

| HC73ATI4 | Zarrab - Redirect | Page 1023 |
| --- | --- | --- |

1 transcript, which maybe we can blow back up.
2 A. Yes, sir.
3 Q. What's the date written at the top?
4 A. Based on the document that's being shown to me here, it's
5 September 19, 2012.
6 Q. Do you remember defense counsel on cross-examination asked
7 you whether you'd only started working at Halkbank in October
8 of 2012?
9 A. Yes, sir.
10 Q. I'd like to show you what's been marked as Government
11 Exhibit 3734.
12     MR. KAMARAJU: This is already in evidence so if we
13 could publish it to the jury. If we can turn to the second
14 page, please. Flip that around.
15 Q. So we've looked at this before. Do you remember that,
16 Mr. Zarrab?
17 A. Yes, sir.
18 Q. What is it?
19 A. This is the moneys that were paid to Mr. Zafer Caglayan,
20 sir.
21 Q. Where did the money come from to make those payments?
22 A. From the commissions that I was collecting based on the
23 trade that I was conducting through -- for Iran.
24 Q. Was that trade occurring at Halkbank?

| HC73ATI4 | Zarrab - Redirect | Page 1024 |
| --- | --- | --- |

1 Q. What is the date of the first payment reflected on this
2 document?
3 A. March 19, 2012, sir.
4 Q. So that's about seven months before the call that defense
5 counsel showed you; isn't that right?
6 A. Yes, sir.
7 Q. Do you remember you were asked on cross-examination about a
8 lot of different contacts that you had with Hakan Atilla? Do
9 you remember that?
10 A. Yes, sir.
11 Q. Do you remember being asked questions about a meeting in
12 October of 2012 at Halkbank?
13 A. Yes, sir.
14 Q. Do you remember being asked as to whether it was actually
15 Levant Balkan at that meeting instead of Hakan Atilla?
16 A. Yes, sir, I remember.
17 Q. What was the purpose of that October 2012 meeting?
18 A. It was a meeting where myself and Halkbank had attended,
19 along with oil ministry and NIOC people from Iran.
20 Q. Who was there from Halkbank?
21 A. Mr. Suleyman Aslan and Mr. Hakan Atilla.
22     MR. KAMARAJU: Can we pull up Government Exhibit
23 205-T, please. Just blow that up.
24 Q. Do you remember looking at this call before?
25 A. Yes, sir, I remember.

HC73ATI4          Zarrab - Redirect          Page 1025

1 Q. Who is this call with?
2 A. It's Ozgur Erker and myself, sir.
3 Q. Remind us who that is?
4 A. He's a high-level authority with the Arap Turk Bank, sir.
5 Q. What were you talking to Erker about during this call?
6 A. We're talking about the transfer of money that would be
7 brought from India and Italy on behalf of the Iranians over to
8 Turkey and be transferred to the Arap Turk Bank, sir.
9 Q. Was that the subject of the October 2012 meeting?
10 A. Yes, sir. It was one of the topics of that meeting.
11 Q. What was the other topic?
12 A. The other topic was that the Iranians wanted to be able to
13 make their payments directly from Halkbank, their international
14 payments.
15 Q. So, directly, rather than through you?
16 A. Yes, sir.
17 Q. Okay. If we can go to the bottom of page 205 -- excuse me.
18 Bottom of page two on Government Exhibit 205-T. And do you see
19 the very last line that crosses into the next page, "Brother,
20 we talked things out with Hakan and others."
21         Do you see that?
22 A. Yes, sir.
23 Q. In October 2012, were you dealing with Hakan Aydogan?
24 A. No, sir.
25 Q. So which Hakan are you talking about here?

HC73ATI4          Zarrab - Redirect          Page 1026

1 A. Hakan Atilla, sir.
2     MR. KAMARAJU: Go to Government Exhibit 215-T, please,
3 which is also in evidence. And can we go to page three,
4 please.
5 Q. Down at the bottom of the page, about the fourth block
6 up -- first of all let me ask you, who is this a call with?
7 A. It's between myself and Mr. Levent Balkan.
8 Q. Do you see where he says "Okay. I -- let's talk about
9 that. I'll also ask about the thing. I wasn't too clear about
10 this, what was that about India the other day, brother? I
11 think I missed that when I was on leave."
12 A. Yes, sir.
13 Q. What is he talking about?
14 A. He's asking about the funds that would be brought from
15 India that was mentioned in the meeting that was held with the
16 Iranians.
17 Q. When he says "I think I missed that when I was on leave,"
18 what does that mean?
19 A. Mr. Levent Balkan was not at that meeting, so he's asking
20 me what that India business is.
21 Q. Did you tell him what happened at the meeting during this
22 call?
23 A. Yes. Yes, sir, the rest of the transcript shows.
24 Q. You testified on cross-examination that there came a time
25 when Levant Balkan left, right?

HC73ATI4          Zarrab - Redirect          Page 1027

1 A. That is correct, sir.
2 Q. You were asked questions on cross-examination about the
3 role that you played in Levant Balkan leaving, right?
4 A. Yes, sir.
5 Q. After you were released from prison in Turkey in 2014, you
6 tried to restart your business at Halkbank, right?
7 A. Yes, sir.
8 Q. Was Levant Balkan at Halkbank in 2014 when you tried to do
9 that?
10 A. No, sir, he wasn't.
11 Q. Was Suleyman Aslan there in 2014 when you tried to restart
12 your business?
13 A. No, sir, he wasn't.
14 Q. Was Hakan Atilla there in 2014 when you tried to restart
15 your business?
16 A. Yes, sir.
17 Q. You were also asked about a number of phone calls that you
18 had in the July 2013 period. Do you remember being asked those
19 questions?
20 A. No, I don't know what phone conversation you're talking
21 about exactly, if it could be shown to me on the screen, then
22 it might refresh my memory.
23 Q. Let's talk about some specific ones. Do you remember
24 having a telephone conversation on July 1st, 2013, with
25 Suleyman Aslan about the food trade?

HC73ATI4          Zarrab - Redirect          Page 1028

1 A. I don't recall it exactly by a date, sir. I recall a
2 conversation, but I don't recall the date.
3 Q. Do you remember specifically what was said during that
4 conversation?
5 A. If you could please bring it up on the screen, then I could
6 give you a more accurate answer, sir.
7     MR. KAMARAJU: Your Honor, may I approach?
8     THE COURT: Sure.
9 Q. I'm showing you what's been marked for identification as
10 Government Exhibit 134. If you could just read that to
11 yourself for a moment, please.
12     MS. FLEMING: No English. Your Honor, I object. I
13 don't have an English translation of this.
14     THE COURT: Well, there is nothing to object to for
15 the moment.
16 A. Yes, sir.
17 Q. Does looking at Government Exhibit 134 help refresh your
18 recollection about whether you talked to Suleyman Aslan that
19 day?
20 A. Yes, sir. That is based on the date that is shown on the
21 document that's being shown to me.
22 Q. What did you talk about?
23 A. It was about the commission for food, sir.
24 Q. You remember you also testified about conversations during
25 that time period with Abdullah Happani? Do you remember that?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 7, 2017

1 A. I've had many conversations with Abdullah Happani, sir, and
2 I don't know which one specifically is being referred to here.
3 But it is true that I have talked to Abdullah Happani many
4 times.
5 Q. Do you remember having a conversation on July 2nd, 2013,
6 with Happani about documents that Halkbank was asking for?
7 A. I don't remember the date exactly. But if it is possible
8 to put the transcript on the screen, that would help me.
9        MR. KAMARAJU: Your Honor, may I approach?
10       THE COURT: Yes.
11 Q. I'm showing you what's been marked for identification as
12 Government Exhibit 135.
13 A. Yes, sir, go ahead.
14 Q. Does Government Exhibit 135 help you remember that
15 conversation with Abdullah Happani?
16 A. Yes, sir, I remember that.
17 Q. What did you talk about?
18 A. I am taking with Abdullah Happani about documents that
19 needed to be submitted to Halkbank.
20 Q. Now, do you remember you were asked on cross-examination
21 about a conversation you had with Abdullah Happani?
22 A. Which conversation, sir?
23 Q. The conversation that occurred prior to your July 9, 2013,
24 conversation with Hakan Atilla.
25 A. If possible to put it on the screen.

1 Q. I'm asking whether you remember being asked on
2 cross-examination about that conversation.
3 A. Yes, sir.
4 Q. Do you remember talking to Abdullah Happani after talking
5 to Hakan Atilla?
6 A. Afterward, after I had talked to Hakan Atilla, I would have
7 called -- I would have talked to Abdullah Happani; that would
8 be correct, sir.
9 Q. Do you remember exactly what was said?
10 A. No. I cannot remember the entire thing, no.
11       MR. KAMARAJU: Your Honor, may I approach? Last one.
12 Q. I am showing you what's been marked for identification as
13 Government Exhibit 126.
14 A. Is it possible to scroll down a bit?
15 Q. It may also be easier to look on the document.
16 A. Yes, sir, go ahead.
17 Q. Does that help you remember what you talked about during
18 that call?
19 A. Yes, sir.
20 Q. What did you talk about?
21 A. I'm telling Mr. Abdullah Happani, based on the phone call
22 that I had received from Mr. Hakan Atilla, about them being
23 careful about the loading and the tonnage matter. And I'm
24 saying that he had said don't do it so apparently.
25 Q. What do you mean?

1 A. I mean, he's saying that since not everybody knows at the
2 bank, don't make such mistakes.
3 Q. Now, after July 2013, you were arrested in December; is
4 that right?
5 A. Yes, sir.
6 Q. Do you remember being asked on cross-examination some
7 questions about that?
8 A. Yes, sir.
9 Q. You were one of a number of people who were charged, right?
10 A. Yes, sir.
11 Q. One of the things you were charged with was bribery, right?
12 A. Yes, sir.
13 Q. You were charged with bribing Turkish officials, right?
14 A. Yes, sir.
15 Q. Did you in fact bribe Turkish officials?
16 A. Yes, sir.
17 Q. Do you remember defense counsel asked you on
18 cross-examination about a watch you gave Zafer Caglayan? Do
19 you remember that?
20 A. Yes, sir.
21 Q. Was that a bribe?
22 A. Yes, sir.
23 Q. Do you remember you were asked about a piano that you gave
24 Zafer Caglayan? Do you remember that?
25 A. Yes, sir.

1 Q. Was that a bribe?
2 A. Yes, sir.
3 Q. And do you remember you were asked some questions about the
4 investigation of that, that led to your arrest? Do you
5 remember that?
6 A. Yes, sir.
7 Q. We've listened to a number of recordings during this trial.
8 I'm sure you remember that, right?
9 A. Yes, sir.
10 Q. Do those recordings capture real conversations?
11 A. Yes, sir.
12 Q. Do they capture actual things that were said?
13 A. The ones that I listened to, yes, sir.
14       MR. KAMARAJU: Can we pull up Government Exhibit
15 261-T, please.
16 Q. Do you remember this?
17 A. Yes, sir.
18 Q. This was a call you had with Hakan Atilla, right?
19 A. Yes, sir.
20 Q. If you go to page three, you see where Atilla says "Then,
21 there is the matter with the bills of lading as you know, we
22 had talked about this with you previously."
23 A. Yes, sir.
24 Q. Are those real words? Did Hakan Atilla say that?
25 A. Based on the recording that I listened to, it is certainly

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC73ATl4 | Zarrab - Redirect | Page 1033 |

1  correct, sir.
2  Q. Had you talked about the bill of lading issue with Hakan
3  Atilla before this call?
4  A. Yes, sir.
5  Q. What was the bill of lading issue that you talked about?
6  A. It was the matter about the bills of lading related to
7  large vessels being traceable, sir.
8  Q. Who said those bills of lading were traceable?
9  A. Mr. Hakan Atilla.
10     MR. KAMARAJU: Could we pull up Government Exhibit
11  1002-T and 1002.
12  Q. Do you remember testifying about these before?
13  A. Yes, sir.
14  Q. Are these actual WhatsApp communications you exchanged with
15  Suleyman Aslan?
16  A. Yes, sir.
17  Q. Did you prepare these documents during your preparation for
18  your testimony?
19  A. No, sir.
20  Q. Did you actually receive a message from Suleyman Aslan
21  where he says "No we don't have a problem in the food. Do you
22  have a problem with the method proposed by Hakan Atilla?"
23  A. Yes, sir.
24  Q. Is that a real WhatsApp message you received at the time?
25  A. Yes, sir.

| HC73ATl4 | Zarrab - Redirect | Page 1034 |

1  Q. Were you cooperating in any way with the U.S. government at
2  the time you received this message?
3  A. No, sir.
4  Q. Is the method proposed by Hakan Atilla what you stood up
5  there and drew on that board?
6  A. What I had drawn on the board is the method in its
7  entirety. That included the additions that were made by Hakan
8  Atilla, sir.
9     THE COURT: Counsel, does that have a document number
10  or an exhibit number?
11     MR. KAMARAJU: I should identify it. Thank you, your
12  Honor. I was referring specifically to Government Exhibit
13  9503, which we can pull up.
14  Q. To be clear, does Government Exhibit 9503 reflect Hakan
15  Atilla's contributions to the method?
16  A. Yes, sir.
17  Q. Did you ever talk with the method with Hakan Atilla?
18     THE COURT: I'm sorry, what?
19  Q. Did you ever discuss the method with Hakan Atilla?
20     MR. KAMARAJU: That was a bad question, I'm sorry,
21  your Honor.
22  A. Mr. Suleyman, Mr. Hakan and myself, yes, sir.
23  Q. Do you remember also being asked some questions about being
24  publicly exonerated in connection with the December 2013
25  arrest?

| HC73ATl4 | Zarrab - Redirect | Page 1035 |

1  A. Yes, sir.
2  Q. You testified that you did actually bribe Turkish officials
3  though, right?
4  A. Yes, sir.
5  Q. So how did you get out of those charges?
6  A. I made payments, and partially they were bribes.
7  Q. After you were arrested, do you remember being asked some
8  questions -- withdrawn.
9     Do you remember being asked some questions about
10  restarting your business in Turkey after you were arrested?
11  A. Yes, sir.
12  Q. Was Atilla at the bank at the time?
13  A. Yes, sir.
14  Q. Do you remember being asked on cross-examination whether
15  you had reached out to the Hakan Atilla about restarting your
16  business? Do you remember that?
17  A. Yes, sir.
18  Q. Why didn't you reach out to Hakan Atilla?
19  A. It's -- I got in contact with people that were above Hakan
20  Atilla, sir.
21     (Continued on next page)
22
23
24
25

| HC7PATl5 | Zarrab - Redirect | Page 1036 |

1  Q. And why did you do that?
2  A. In order to start to trade again.
3  Q. I'd like to show you what's been previously entered into
4  evidence as Government Exhibits 1270 through 1280 and the
5  corresponding translations, and I'll just hand you a hard copy.
6     MR. KAMARAJU: If we can bring up 1270 and 12070-T on
7  the screen, that would be great.
8     Your Honor, if it's helpful, I'll provide the Court a
9  copy.
10     THE COURT: Thank you.
11  Q. Now, remind us, what are these?
12  A. They are phone messaging. They are messages.
13  Q. And who are they with?
14  A. These are between myself and my lawyer.
15  Q. Okay. And what was the general purpose of the exhibits
16  that I put in front of you? What was the topic of
17  conversation?
18  A. They're about starting the trade up again at Halkbank.
19  Q. And approximately when did this occur, this conversation --
20  these conversations?
21  A. Possibly in 2014.
22  Q. Okay. Do you see the sentence that starts -- I'll do it in
23  Turkish to make sure -- it starts "Damat"?
24     THE COURT: Where are you, counsel?
25     MR. KAMARAJU: I'm on 1270 and 1270-T. I think it's

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

1   also highlighted on the screen.
2        THE INTERPRETER: The answer was, "Yes, sir."
3   Q. And is this a message from your lawyer?
4   A. Yes, sir.
5   Q. And what do you understand him to be saying here?
6   A. He says this job should definitely be done, that someone
7   said, "This job should definitely be done."
8   Q. Okay. And who is the someone?
9   A. Berat Albayrak.
10  Q. Who is that?
11  A. It's a minister of energy in Turkey. During that time
12  frame, he was not the minister of energy.
13  Q. Okay. Do you see 1270-T?
14  A. Yes, sir.
15  Q. Do you know what "Damat" means in English?
16  A. I don't know, sir.
17  Q. Can we go to Government Exhibit 1271 and 1271-T. Is this a
18  continuation of the private conversation?
19  A. Yes, sir.
20  Q. And do you see near the bottom on the English it says:
21  "...and he would meet with BB and would also summon the general
22  manager"?
23  A. Yes, sir.
24  Q. What do you understand him to be saying there?
25  A. He is saying that he would meet with the prime minister and

1   that, upon calling the general manager over, that the order to
2   start would be given.
3   Q. And who is the general manager?
4   A. Ali Fuat Taskinoglu.
5   Q. And if we go to the next exhibit, 1272, 1272-T, do you see
6   at the top where it says: "The meeting and the situation will
7   be explained to BB on Saturday;" do you see that part?
8   A. Yes, sir.
9   Q. What did you understand him to mean by that?
10  A. That the individual would be told on Saturday, and your old
11  system would be restarted again.
12       THE COURT: Counsel, I know you went over this a
13  minute ago. Who is the individual? Who is BB?
14  A. The prime minister, sir.
15  Q. Now, was Ali Fuat originally resistant to the idea of you
16  restarting the business?
17  A. Well, Mr. Ali Fuat sent me to the lower rank, and the
18  documentation that was requested by the lower rank was not
19  something that was feasible.
20  Q. Okay. And what kind of documentation was that?
21  A. It was a letter of credit and many other things. The list
22  was so long, I cannot even remember.
23  Q. And do you remember you were asked about -- withdrawn.
24       Is that what prompted you to contact your lawyer?
25  A. No. I had already talked with the lawyer, and when this

1   turned out to be the matter, then I talked with the lawyer
2   again.
3   Q. And what were you hoping for when you spoke with your
4   lawyer?
5   A. I mentioned the problems that were there so that these
6   problems could be removed.
7   Q. Okay. Now, do you remember being asked some questions on
8   cross-examination about inspection reports?
9   A. Yes, sir, I remember.
10  Q. Do you remember those being raised in a -- or do you
11  remember discussing those with Suleyman Aslan in 2013?
12  A. I don't recall the date exactly. The exact dates, I don't
13  remember, but I do remember that I had had that conversation.
14  Q. Now, I'd like to show -- could you please take a look at
15  what's been marked as Government Exhibit 1278.
16       And can we also bring up 1278-T.
17       Okay. Do you see where you say -- well, let's be
18  clear. The green messages are things that you say?
19  A. Yes, sir.
20  Q. Do you see where you say: "He is lying. He is playing
21  both sides. He is slowly but surely coming out with the lower
22  staff as well"?
23  A. Yes, sir.
24  Q. What did you mean there?
25  A. I'm explaining that Mr. Ali Fuat was saying, okay, we're

1   doing it, we're doing this, but he was causing this to be
2   jammed up at the lower ranks.
3   Q. And if we could go to 1279 -- well, no, if we could stay
4   there for one second. Do you see there where you say: "I will
5   also submit the inspection document that he wanted"?
6   A. Yes, sir. I see that.
7   Q. What inspection document were you referring to?
8   A. I'm referring to the inspection document that would be
9   presented to the bank that Mr. Hakan Atilla had mentioned in
10  the meeting.
11  Q. Okay. And that meeting occurred in 2014?
12  A. To the best of my recollection, yes, sir.
13  Q. So even though the prospect of an inspection report had
14  been raised in 2013, Atilla was still asking for it in 2014?
15  A. Yes, sir.
16  Q. And if we could go to 1279 and 1279-T?
17  A. Yes, sir.
18  Q. And do you see at the top where it says -- where you say:
19  "Wanted an inspection document. I will submit that as well"?
20  A. Yes, sir.
21  Q. And what were you referring to there?
22  A. It's an inspection document like the one I just testified
23  about, sir.
24  Q. Okay. And do you see where your lawyer sends you a message
25  that says: "But you will prevail against GM and his team, God

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

HC7PATI5          Zarrab - Redirect          Page 1041

1   willing"?
2   A. Yes, sir.
3   Q. What did you understand him to mean?
4   A. He's saying that it will get resolved.
5   Q. And do you see --
6          THE COURT: What does GM stand for?
7          THE WITNESS: General manager, sir.
8          THE COURT: And that would be who?
9          THE WITNESS: The general manager of Halkbank, your
10  Honor.
11         THE COURT: And who was that at this time?
12         THE WITNESS: Ali Fuat Taskinoglu, sir.
13  BY MR. KAMARAJU:
14  Q. And do you see further down where it says: "His team is on
15  our side"?
16  A. Yes, sir.
17  Q. Who was working with Ali Fuat on restarting your business
18  from Halkbank?
19  A. It was Mr. Hakkan Aydogan, Mr. Hakan Atilla was there,
20  Mr. Seyit Ahmet was there.
21  Q. Do you also remember on cross-examination you were asked
22  some questions about your cooperation agreement?
23  A. Yes, sir, I remember.
24  Q. And I believe it was entered into evidence as a defense
25  exhibit, but not published; so could we please publish for the

HC7PATI5          Zarrab - Redirect          Page 1042

1   jury DX-12. Okay. Can we go to the last page first, please.
2          Is that your signature there?
3   A. Yes, sir.
4          MR. KAMARAJU: Okay. And could we turn to page 4, and
5   the paragraph at the very bottom, the one that starts: "It is
6   understood that the defendant's truthful cooperation with this
7   office." I think actually it's the paragraph below that,
8   Mr. Chang-Frieden.
9          THE COURT: It is the what?
10         MR. KAMARAJU: And if we could go to the next page and
11  just blow up the rest of that paragraph.
12  Q. Now, Mr. Zarrab, did you review your cooperation agreement
13  before you signed it?
14  A. Yes, sir.
15  Q. And what's your understanding of the government's
16  obligations with respect to your safety?
17  A. What I understood is to ensure my safety.
18  Q. Okay. And does that include making an application to the
19  witness security program?
20  A. Based on my request, if I were to make such a request, yes,
21  but I have not made such a request.
22  Q. And has anyone promised you what types of steps would be
23  taken to ensure your safety?
24  A. No, sir.
25  Q. Has anyone promised you that you're going to be released

HC7PATI5          Zarrab - Redirect          Page 1043

1   from jail after you testify?
2   A. No, sir.
3   Q. And do you remember you were asked some questions about --
4   withdrawn.
5          Do you remember you were asked some questions about
6   substantial assistance?
7   A. Yes, sir.
8   Q. Okay. Now, what's your understanding of what it means for
9   you to give substantial assistance?
10  A. That is giving truthful information that does not contain
11  any lies.
12  Q. Okay. Can we turn to page 5 of the agreement, please, and
13  it's the second full paragraph.
14         And do you see the sentence that begins: "In
15  addition, if this office determines that the defendant has
16  provided substantial assistance..."?
17  A. Yes, sir.
18  Q. Do you see where it goes on to say "... and if he has fully
19  complied with the understandings specified in this agreement,
20  this office will file a motion pursuant to Section 5K1.1 of the
21  sentencing guidelines...."?
22  A. Yes, sir.
23  Q. What's your understanding of what this means?
24  A. That if I fulfill all my responsibilities under the
25  cooperation, there is a letter called 5K1 will be sent to the

HC7PATI5          Zarrab - Redirect          Page 1044

1   Court.
2   Q. And what are those responsibilities?
3   A. To tell the truth, to cooperate, and to -- and not to
4   commit any more crimes.
5   Q. And if you do those things, what do you understand is going
6   to be in your 5K letter?
7   A. The crimes that I have committed, the assistance that I
8   have provided, everything, good and the bad.
9   Q. Now, is it your understanding that your 5K letter is tied
10  in any way to the outcome of this proceeding?
11  A. Absolutely not.
12  Q. And what's your understanding of what would happen if you
13  made up something bad about Hakan Atilla on the stand?
14  A. That would be the worst thing that could happen in my life,
15  I think.
16  Q. Why is that?
17  A. I wouldn't be able to get a 5K1 letter.
18  Q. And why is that important?
19  A. Along with the crimes that I have committed and all the
20  good and the bad, the 5K letter would give me a chance for a
21  reasonable sentence. And if I were to lie here, then that
22  would come as an addition to the crimes that I have committed,
23  as lying and obstruction of justice as well.
24  Q. Now, do you remember you were asked on cross-examination
25  about when your lawyers first approached the government about

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

1  cooperating versus when you actually started cooperating?  Do
2  you remember that?
3          THE INTERPRETER: Could you repeat that question,
4  please.
5  Q.  Of course.  Do you remember you were asked on
6  cross-examination about when your lawyers first approached the
7  government about you cooperating and when you actually began to
8  cooperate?
9  A.  Yes, sir.
10 Q.  Okay.  And your lawyers first approached the government
11 about cooperating in around August of 2016 or so; is that
12 right?
13 A.  I do not remember clearly that, maybe.
14 Q.  Do you remember that your lawyers first approached the
15 government about cooperating in 2016?
16 A.  Yes, sir.
17 Q.  And when did you actually begin to cooperate with the
18 government?
19 A.  So I started a few months ago.
20 Q.  And did you start after Hakan Atilla had already been
21 arrested?
22 A.  I began long after Mr. Hakan Atilla had been arrested.
23 Q.  And is Hakan Atilla the only individual you provided the
24 government with information about?
25 A.  Can we get the question one more time, please?

1  Q.  Sure.  Is Hakan Atilla the only person you provided the
2  government with information about?
3  A.  No, sir.
4  Q.  Why was there a delay in you actually beginning your
5  cooperation?
6  A.  There were two reasons, main topics.  One was that the
7  political attempts that were being made in order to come to a
8  resolution between the two countries through my lawyers, within
9  the bounds of law and justice.  And, two, is, of course, the
10 difficulties related to cooperation were obvious.
11 Q.  And what do you mean by that?
12 A.  The risks of cooperation.
13 Q.  And were those risks created because of the information --
14 some of the information you've testified about today?
15 A.  I mean, through the course of my testimony overall.
16 Q.  Now, have some of your fears been realized?
17 A.  Yes, sir.
18 Q.  Do you remember defense counsel asked you questions about
19 yachts that you owned?
20 A.  Yes, sir.
21 Q.  Do you remember she asked you questions about a luxury
22 house you owned?
23 A.  Yes, sir.
24 Q.  Do you remember she showed you pictures of you standing
25 next to large stacks of cash?

1  A.  Yes, sir.
2  Q.  To your knowledge, do you still have any of those things?
3  A.  No, sir.  They've all been seized.
4  Q.  What do you mean, they've been seized?
5  A.  All my assets were seized by the Republic of Turkey, and
6  also there were 18 or 19 people whose assets were all seized as
7  well.  And these are individuals that, some of them, I had not
8  met or I did not even know in my life.  And I mean, there are
9  some individuals there that I did not even know existed on
10 earth.  There are some individuals that I don't even know.  So
11 put me aside, there are 18 people out there whose assets were
12 all seized and all their lives.
13 Q.  What was the basis for the seizure?
14 A.  That was because of the investigation that had been
15 conducted about me.
16 Q.  What investigation?
17 A.  An espionage investigation has been opened about me.  So
18 what I'm doing here is being assessed as espionage, and it is
19 as if I had obtained all these assets based on my cooperation
20 here, and that's being projected as espionage.  I didn't
21 understand that all that well myself.
22 Q.  When did the asset seizure happen?
23 A.  The day after I showed up in court, and I mean the day
24 after I took the witness seat.
25 Q.  Do you remember defense counsel asked you questions about

1  how you'd been removed from the MDC and how your life was
2  better now in America?  Do you remember that?
3  A.  Yes, sir.
4  Q.  Why did that happen?
5  A.  Do you mean my removal from MDC?
6  Q.  Why were you taken out of the MDC?
7  A.  I came face to face with an individual who was trying to
8  take my life, and he had pulled a knife on me, and I was about
9  to lose my life.
10 Q.  And did that individual tell you why they pulled a knife on
11 you?
12 A.  Yes, because I was cooperating, because he said that he had
13 heard that I was cooperating, that's why he was doing it.  He
14 said that he had received instructions to kill because I was
15 cooperating.
16 Q.  Did you ask to be removed from the MDC?
17 A.  No, just to the contrary.  Up until that event, I had been
18 asking to be left at the MDC.
19 Q.  Why did you want to stay at the MDC?
20 A.  There were a few friends at MDC that I had made over time.
21 There were a few Turkish friends.  At least there were people
22 that I could speak the same language with over there.  I had
23 gotten used to that.
24 Q.  And are you concerned for your safety?
25 A.  You mean after I was threatened?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                December 7, 2017

| HC7PATI5 | Zarrab - Redirect | Page 1049 |

1  Q. Yes.
2  A. Of course.
3  Q. Are you concerned about the safety of any others?
4  A. Of course.
5  Q. Who are you concerned about?
6  A. My family.
7  Q. And where are they?
8  A. You mean right now?
9  Q. What country are they in?
10  A. In Turkey.
11  Q. Do you think there's anything you could do to get the
12  threats to stop?
13  A. It's possible that if I had not been a witness, there would
14  not have been any threats.
15  Q. But did you choose to be a witness anyway?
16  A. I'm here now. Yes, sir.
17      MR. KAMARAJU: May I have one moment, your Honor?
18      (Pause)
19      No further questions at this time, your Honor.
20      THE COURT: Ms. Fleming, do you have any questions on
21  recross?
22      MS. FLEMING: I do, your Honor, and there's one area I
23  think I need to clear with you before I raise it.
24      THE COURT: Up here. We'll take a two-minute break.
25      (Jury not present)(Continued on next page)

| HC7PATI5 | Zarrab - Redirect | Page 1050 |

1          (At the side bar)
2      THE COURT: And before you start, I think it was
3  before the lunch break you mentioned you wanted to put
4  something on the record sometime today. It doesn't have to be
5  now, but I didn't forget and you certainly can.
6      MS. FLEMING: We can do it later, Judge, that's fine.
7      Yes, I think that the government has just opened the
8  door to an area that I wanted to clear with the Court in terms
9  of the safety. I've expressed to the Court before my
10  scepticism on the story about the shank, and it differs from
11  what we have in the 3500 material a little bit. But today, in
12  the newspaper, it was reported that his cellmate of six months
13  has filed a civil lawsuit against him for repeated sexual
14  assault and abuse, which certainly would be another area and
15  mode of -- now, in the 3500 --
16      THE COURT: Another what?
17      MS. FLEMING: Another area or mode of be getting out
18  of the MDC, if you had, in fact, had an encounter or been
19  sexually assaulting someone. In the 3500 material, we have
20  references to he was asked about sexual assault, which means
21  the government was aware of the allegations, didn't go into any
22  detail, and he denied it.
23      Now, we have a lawsuit that's been filed as of today,
24  publicly about it. We, obviously, don't have any time to
25  investigate it, and we had accepted the 3500 material. And I'm

| HC7PATI5 | Zarrab - Redirect | Page 1051 |

1  certainly not suggesting that the government didn't -- hid
2  anything, I'm not. But I do think it's an area that they've
3  opened up now with all of these threats and why he's out of
4  jail, and I do think that --
5      THE COURT: Whoa, whoa. Specifically, what opened
6  what?
7      MS. FLEMING: I think that the idea --
8      THE COURT: What statement of the prosecution --
9      MS. FLEMING: I think --
10      THE COURT: Just a minute.
11      MS. FLEMING: Okay.
12      THE COURT: What statement of the prosecutor opens the
13  door for you to raise this topic?
14      MS. FLEMING: I think the question of his fear in the
15  jail because somebody pulled a knife on him, and he relates it
16  to the fact that it's from Turkey, as opposed to --
17      THE COURT: What's from Turkey?
18      MS. FLEMING: That the threat --
19      MR. ROCCO: The threat.
20      MS. FLEMING: -- emanates from Turkey, as opposed to
21  perhaps the fact that somebody in jail, who's now accused him
22  of sexual abuse for six months, off and on in jail, I think
23  they --
24      MR. KAMARAJU: First of all, a civil lawsuit filed is
25  nothing but allegations. More importantly, the sexual assault

| HC7PATI5 | Zarrab - Redirect | Page 1052 |

1  allegations happened at the MCC, prior to him being moved to
2  the MDC. This is months ago, at this point. So the idea that
3  there is a motive for him to get away from this person that he
4  supposedly had been sexually abusing for some period of time,
5  he was already away. He was in a totally different jail.
6      He had been put into the SHU, which is reflected in
7  the 3500 materials, at the MCC, transferred to another facility
8  because of the bribery allegations that he has since admitted
9  to and been cross-examined about.
10      This has nothing to do with credibility. You know,
11  it's not a determination. If they insist on asking about it,
12  they're not allowed to bring in extrinsic evidence. I just
13  think it's totally irrelevant, your Honor.
14      THE COURT: I'll have to give it some thought.
15      MS. FLEMING: And the reason I say --
16      THE COURT: I'm skeptical. I haven't read the
17  article. It just was put on my desk.
18      MS. FLEMING: And the reason I bring it up is because
19  the reference in the 3500 material to the fellow who brought
20  out the shank, and we don't have his name or information, but
21  it says he's a member of a gang. And if somebody is sexually
22  abusing someone who is also a member of the gang, the same kind
23  of effects go where they stick up from each other.
24      THE COURT: Where does that come from?
25      MS. FLEMING: Judge, I don't have the allegations. I

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC7PATI5 | Zarrab - Redirect | Page 1053 |

1  don't know.
2  THE COURT: No, but you're making something up here.
3  That's a pretty good story. I don't know where it comes from.
4  MS. FLEMING: I'm an amateur today.
5  MR. ROCCO: It might be a fantasy, your Honor, but
6  quite frankly, I think that -- and we haven't made any
7  decisions about whether we'll even do a recross. But I think
8  it goes essentially to his motive to testify the way he's
9  testified. Who knows who's responsible for an assault. I
10  think we're entitled to raise --
11  THE COURT: Now, you're confusing me because I'm not
12  following you.
13  MR. ROCCO: The question really is what the source of
14  the threat is to him, whether the source of the threat to him
15  is emanating from Turkey or from his sexual -- his misbehavior,
16  his miss-sexual behavior in jail.
17  MR. KAMARAJU: There's no basis to sort of tie the
18  sexual allegations that occurred in the MCC to the threat that
19  occurred in the MDC. If you want to say, that didn't happen,
20  you didn't get threatened and ask him that question, he'll give
21  you whatever his answer is. There's no way to say -- There's
22  no good faith basis to bring that --
23  THE COURT: I'll think about it.
24  MR. ROCCO: With all due respect, while we still have
25  you, your Honor, with all due respect, I think you can make

| HC7PATI5 | Zarrab - Redirect | Page 1054 |

1  that argument to the jury, just like we can make our argument
2  to the jury.
3  MR. KAMARAJU: But you still have to have a good-faith
4  basis to ask the question.
5  MR. ROCCO: Well, I think we do.
6  THE COURT: Okay. Well, I'm very skeptical, frankly,
7  about this topic. I didn't even have a chance to read the
8  article. I don't know what it's about. It sounds like me like
9  Page Six stuff.
10  MR. DRATEL: Well --
11  THE COURT: I don't want to hear anybody else on it.
12  That's what I'm thinking. I'll look at it and give you a
13  decision.
14  MR. ROCCO: Thank you, Judge.
15  THE COURT: Did you want to say --
16  MS. FLEMING: Okay. Let me just -- I just wanted to
17  tell the Court --
18  MR. KAMARAJU: We're going to get out, just because I
19  know you wanted to bring the jury back. I think there's going
20  to be some discussion about this exhibit they want to enter.
21  THE COURT: What?
22  MR. KAMARAJU: What she was talking about introducing
23  before.
24  THE COURT: That's something different.
25  MR. KAMARAJU: I'm sorry. I thought that's what you

| HC7PATI5 | Zarrab - Redirect | Page 1055 |

1  were referring to.
2  MS. FLEMING: That's something different. We can do
3  that after they leave. I don't care about that because we're
4  not going to do it with him anyway; so that doesn't matter.
5  No, what I was going to say, you said before you had
6  heard me say, I think, that I asked him a question about the
7  only way to get out of jail was to lie. I went back and
8  checked the record with the court reporter. I did say
9  "cooperation," not "lie" and I think when your Honor went back
10  and looked at the original transcript, what he originally said
11  on direct was that he accepted responsibility and cooperated
12  was his way to get out of jail.
13  I think a proper question on cross-examination is to
14  say: You wanted to get out of jail and the way to do it was to
15  cooperate. But I did not say "lie" and I said the question
16  more artfully than I just reported it.
17  THE COURT: If I'm wrong, I stand corrected.
18  MS. FLEMING: No, no. I just wanted to make sure
19  because, your Honor, honestly, I would never intentionally
20  misrepresent on a court, and I wanted to make sure you knew
21  that.
22  THE COURT: I know that. So what I was referring to,
23  I looked at the lunch break, was this. This is an article that
24  refers to your letter to me about the jailhouse recording,
25  which says: "In America, in order to make it out of prison,

| HC7PATI5 | Zarrab - Redirect | Page 1056 |

1  you need to admit to something you haven't committed," and the
2  attachment -- that's not your letter. That's a news account of
3  your letter.
4  MS. FLEMING: Right, right.
5  THE COURT: In your attachment to the letter to me is
6  this. This seems to be some sort of summary that the jail
7  officials made of the incident, and it says: "Reza says, 'in
8  such a country, in order to get out -- in order to get out or
9  get a reduced sentence, you need to admit to crimes you haven't
10  committed.'" It goes on to say: "He once again mentions that,
11  in America, in order to make it out of prison, you need to
12  admit to something you haven't committed."
13  MS. FLEMING: Right.
14  THE COURT: So --
15  MS. FLEMING: At first --
16  THE COURT: I'm going to make those court exhibits; so
17  that's what I was referring to.
18  MS. FLEMING: Right, but I was referring to his actual
19  testimony in the courtroom. The trial and the press coverage
20  in this is the last thing I would be quoting from because it's
21  wild, but even our letter, we attached the actual exhibit for
22  the Court.
23  THE COURT: And that's what I'm referring to, is the
24  exhibit that you submitted with your letter.
25  MS. FLEMING: But that wasn't what my question was

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| HC7PATI5 | Zarrab - Redirect | Page 1057 |
| --- | --- | --- |

1 based on.

2 THE COURT: Wait, if you don't mind.

3 MS. FLEMING: Sorry, I apologize.

4 THE COURT: And the article that I found referred to

5 this attachment, or the substance of this attachment, and has

6 the sentence in it that says: "In the letter, Atilla's lawyers

7 told Berman that Zarrab said on the jailhouse recording 'in

8 America, in order to make it out of prison, you need to admit

9 to something you haven't committed.'" That's what I was

10 referring to. If I'm wrong in the record, you have my

11 apologies, but that is what I was talking about.

12 MS. FLEMING: I certainly don't need your apologies,

13 nor ask for them, your Honor. I understand that. We all --

14 but I really was looking at what his original direct

15 examination was.

16 THE COURT: Okay.

17 MS. FLEMING: And his direct line was -- I can pull it

18 out. I have it on the desk. It was -- it was something almost

19 like, I agreed to accept responsibility and cooperate to get

20 out of jail at once. Those are almost his verbatim words, and

21 that's what I was using.

22 THE COURT: Did your question mention that accept

23 responsibility?

24 MS. FLEMING: No. It's cross-examination.

25 THE COURT: You didn't.

| HC7PATI5 | Zarrab - Redirect | Page 1058 |
| --- | --- | --- |

1 MS. FLEMING: I said "jail" but I also didn't say "at

2 once." I said "get out of jail."

3 THE COURT: So now you're refreshing my recollection.

4 Remember, I said I thought the phrase, before I looked, had two

5 aspects, one was accept responsibility and the other was

6 cooperation or --

7 MS. FLEMING: Cooperate.

8 THE COURT: Yes. So that is what I was referring to

9 before. I thought you made it seem as if there was only one

10 aspect and, in fact, there was two. And, you know, acceptance

11 of responsibility is markedly different, is pretty significant,

12 in my opinion, if that's part of the statement, so that's all.

13 MS. FLEMING: I will note he said "yes."

14 THE COURT: He what?

15 MS. FLEMING: He answered it "yes."

16 THE COURT: So okay. Anyway, that's it.

17 MS. FLEMING: Thank you.

18 THE COURT: If you want to add anything to the

19 transcript, feel free.

20 MS. FLEMING: No.

21 THE COURT: Great. So did you have another line of

22 inquiry that you wanted to pursue?

23 MR. ROCCO: We're going to speak for a moment.

24 MS. FLEMING: We're going to talk about whether I do

25 any, and if I do, it's going to be very limited.

| HC7PATI5 | Zarrab - Redirect | Page 1059 |
| --- | --- | --- |

1 The Azeri tape, we want to offer that as a prior

2 inconsistent statement and move it into evidence, but we can do

3 that later.

4 MR. DENTON: Just to be clear, Judge, it's not a sworn

5 statement; so there is no basis for its admission.

6 THE COURT: We're going to discuss that after the jury

7 goes home, but wait. So you're going to meet and confer or

8 confer and tell me whether you want to do any --

9 MS. FLEMING: Recross.

10 THE COURT: -- recross, yes. If you don't, we would

11 excuse the witness and who would come next?

12 MR. LOCKARD: So then we would play about eight

13 minutes of the post-arrest video, and then Special Agent Rob

14 Tringale.

15 THE COURT: Is that okay with you?

16 MR. ROCCO: I think if you're going to play a portion

17 of the post-arrest video, they should play the entire thing.

18 MR. LOCKARD: I don't think the Court wants us to.

19 THE COURT: How long is it?

20 MR. LOCKARD: The actual post-arrest is about eight

21 minutes, but then the tape keeps rolling while there's some

22 processing going on and trying to get the fingerprint machines

23 working. It's 40 minutes of wasted jury time. The actual

24 statements and questions last about eight minutes.

25 MR. ROCCO: I think, just for the record, I think

| HC7PATI5 | Zarrab - Redirect | Page 1060 |
| --- | --- | --- |

1 that -- you want to play his demeanor. I think the jury gets a

2 sense of who he is and what's going on, and I think in order

3 for them to really understand it, we would like the whole tape

4 played. Play the whole thing.

5 MR. LOCKARD: It's a lot of dead air, your Honor.

6 MR. ROCCO: It might be.

7 THE COURT: We don't have to do that today. Can we

8 get the live witness, and do this on another day when maybe

9 it's raining or snowing.

10 MR. LOCKARD: We can do that.

11 MS. FLEMING: Probably snowing.

12 THE COURT: All right. Thanks. So you're going to

13 let me know?

14 MS. FLEMING: Give us two minutes.

15 THE COURT: All right.

16 (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                     December 7, 2017

| HC7PATI5 | Zarrab - Redirect | Page 1061 |
|---|---|---|

1      (In open court)
2      (Recess)
3      MS. FLEMING: Your Honor, we're not going to go into
4  it. We're going to do very brief redirect, and we are not
5  going to go into it.
6      THE COURT: Oh, you have recross?
7      MS. FLEMING: I'm sorry, recross, yes, briefly.
8      (Jury present)
9      THE COURT: Okay. Please be seated. So Ms. Fleming
10 gets a chance to recross. That means cross-examine based on
11 the redirect that you just heard. So it's limited to what
12 you've just heard from government's counsel.
13     THE DEPUTY CLERK: And, sir, before we begin again,
14 I'd like to remind you that you're still under oath.
15     THE WITNESS: (In English) Yes.
16     (Continued on next page)
17
18
19
20
21
22
23
24
25

| Hc73ati6 | Zarrab - Recross | Page 1063 |
|---|---|---|

1      MS. FLEMING: Can you pull up 261, please.
2  A. Yes, ma'am.
3  Q. And he asked you what it meant. Do you recall that?
4  A. What I remember is that question was not related to this.
5     It was related to what I had said to Mr. Happani.
6  Q. So you told Mr. Happani not -- withdrawn. I misunderstood.
7  Withdrawn.
8      You also talked about the fact that the government of
9  Turkey has now seized your assets in Turkey, correct?
10 A. Yes, myself, and 18 more individuals; that is correct,
11 ma'am.
12     THE INTERPRETER: Excuse me. I'm being given a
13 correction, so sorry.
14 A. These 18 individuals were not people that I even knew.
15 Q. Your testimony here is the first time that the truth that
16 you have said about what you did with Turkey and Iran has been
17 publicly aired; isn't that true?
18 A. I did not understand the full nature of that question.
19 Q. The first time that you have admitted in open court or in a
20 public place what you actually did and the crimes you
21 committed, was during your testimony that started last week in
22 this courtroom, correct?
23 A. Yes, ma'am.
24 Q. Prior to that --
25     THE COURT: I think the record probably should reflect

| Hc73ati6 | Zarrab - Recross | Page 1062 |
|---|---|---|

1      MS. FLEMING: May I proceed, your Honor?
2      THE COURT: Yes.
3  RECROSS EXAMINATION
4  BY MS. FLEMING:
5  Q. Mr. Zarrab, you were asked a question about whether on
6  cross you were asked about when you started working with
7  Halkbank. Do you remember that question?
8  A. Yes, ma'am.
9  Q. Do you remember that on cross, the question was, did you
10 meet Mr. Atilla at the end of 2012? Do you remember that?
11 A. Yes, ma'am.
12 Q. You also were asked about the call following -- see if I
13 can break it down.
14     You were asked about calls that you had with
15 Mr. Happani on July 9 with Mr. Atilla right before you spoke to
16 him; do you remember that?
17 A. So, do you mean I had talked with Mr. Hakan and then I
18 talked with Mr. Happani? Is that what you mean?
19 Q. You had a call with Mr. Happani in which you said how are
20 we going to explain this, and then had a call with Mr. Atilla
21 right after that; do you remember that?
22 A. Yes, ma'am, I remember that.
23 Q. Now, the prosecutor put the transcript of Exhibit 261 up,
24 and showed you Mr. Atilla's words and your words. Do you
25 recall that? That was your conversation with Mr. Atilla?

| Hc73ati6 | Zarrab - Recross | Page 1064 |
|---|---|---|

1  that it occurred at the time of his plea.
2      MS. FLEMING: It was sealed, your Honor. My question
3  was public.
4      THE COURT: I'm just saying.
5  Q. So, when you pleaded guilty, you understand that that was a
6  sealed proceeding and it was not available to the public until
7  it was opened during your testimony last week, correct?
8  A. Yes, ma'am.
9  Q. Under your plea agreement with the United States, you had
10 already agreed to forfeit any proceeds that you had from any of
11 these crimes that you have committed, correct?
12 A. Yes, ma'am.
13 Q. To be clear, you are not concerned in any way about your
14 safety from Mr. Atilla, are you, sir?
15 A. I wouldn't know what's inside Mr. Atilla's mind. And I
16 would hope that that would not be the case.
17 Q. You told the prosecutor on redirect that you had somebody
18 who came -- that somebody pulled a knife on you when you were
19 at the MDC and you were afraid; is that correct?
20 A. Yes, ma'am.
21 Q. This is at the same MDC where you had made -- withdrawn.
22     While you were in the jail, MCC or MDC, you had
23 arranged to pay for protection from other prisoners, hadn't
24 you?
25 A. That is absolutely incorrect information.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

| Hc73ati6 | Zarrab - Recross | Page 1065 |
|---|---|---|

1  Q.  You paid for prisoners to sell you their telephone time,
2   correct?
3  A.  Yes, ma'am.
4  Q.  It's true that you paid for some prisoners' private lawyers
5   instead of their publicly appointed lawyers; isn't that
6   correct?
7  A.  During the time that I was in jail, during the time that I
8   was in jail, it is true that I had made a friend, and during
9   certain times that I had made payments so that this individual
10   could retain a lawyer because his legal process was hung up.
11   In order to help this individual to go on with the process, I
12   did give a loan to this person as a debt for this person to
13   pay.  He had already paid his own lawyer, and there was some
14   missing amount, and he asked me for it, and I gave that to him
15   as a loan.
16        THE COURT: Hold on a second.  Could I just see you
17   for a minute.
18        (Continued on next page)
19
20
21
22
23
24
25

| Hc73ati6 | Zarrab - Recross | Page 1066 |
|---|---|---|

1        (At the sidebar)
2        THE COURT: This is not the individual referred to in
3   the newspaper article?
4        MS. FLEMING: No.
5        THE COURT: Is this somebody else?
6        MS. FLEMING: In fact, there are a number of
7   individuals.  He only admits to one.  And I'm not going there,
8   Judge.
9        THE COURT: I didn't think you were.
10        MS. FLEMING: No, I'm not.
11        (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Hc73ati6 | Zarrab - Recross | Page 1067 |
|---|---|---|

1        (In open court)
2   BY MS. FLEMING:
3  Q.  In addition, you had actually bribed a guard at the MCC,
4   correct?
5  A.  Yes, as I had testified earlier, it is true that I bribed a
6   guard at MCC, ma'am.
7  Q.  When you told us a few minutes ago that one of the inmates
8   at the MDC came and pulled a knife on you, you told a different
9   version of that story in the past; isn't that true, sir?
10  A.  No, there is only one version and that's the true version
11   and that's what I said.
12  Q.  Did you tell the prosecutors and the FBI on November 7 that
13   an individual had come in, he had sat down and talked to you,
14   and told you he had been contracted, that he was supposed to
15   kill you, but that you had --
16        THE COURT: You know what?  We're now getting so far
17   in the weeds, I don't think this is helpful at all.
18        MS. FLEMING: One last question on it.
19  Q.  You are aware, sir, that the inmate has denied that this
20   happened, correct?
21  A.  I'm just hearing about it, but that would not be a surprise
22   for me.  Of course he's going to deny it.
23  Q.  As a result of that, you were put in FBI custody, correct?
24  A.  Whether I be placed in FBI custody or custody of someone
25   else, that is all up to the government, it's not something that

| Hc73ati6 | Zarrab - Recross | Page 1068 |
|---|---|---|

1   I can decide.
2  Q.  You're not in jail, are you, sir?
3        THE COURT: Thanks very much.  Okay.  We're going to
4   excuse the witness and have the next government witness.
5        (Witness excused)
6        MR. LOCKARD: The United States calls Special Agent
7   Robert Tringale.
8        THE DEPUTY CLERK: Sir, if you can step up here,
9   remain standing for a moment and then raise your right hand,
10   please.
11        Do you solemnly swear that the testimony that you
12   shall give this court and jury in this issue now on trial shall
13   be the truth, the whole truth, and nothing but the truth, so
14   help you God?
15        THE WITNESS: Yes.
16        THE DEPUTY CLERK: Could you please state your full
17   name for the record.
18        THE WITNESS: Robert Tringale.
19        THE DEPUTY CLERK: Spell your last name, please.
20        THE WITNESS: T-R-I-N-G-A-L-E.
21        THE DEPUTY CLERK: Thank you, sir.  You may be seated.
22   Feel free to pull up the chair and adjust the microphone.
23   ROBERT TRINGALE,
24   called as a witness by the Government,
25   having been duly sworn, testified as follows:

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    *December 7, 2017*

1    DIRECT EXAMINATION
2    BY MR. LOCKARD:
3  Q. Good afternoon, sir.
4  A. Good afternoon.
5  Q. Who is your employer?
6  A. The Federal Bureau of Investigation.
7  Q. What is your title?
8  A. Special agent.
9  Q. For how long have you been a special agent with the FBI?
10 A. Just under three years.
11 Q. Are you currently assigned to any particular squad?
12 A. Yes.
13 Q. What squad is that?
14 A. The Joint Terrorism Task Force.
15 Q. For how long have you been assigned to the Joint Terrorism
16   Task Force?
17 A. Since April of this year.
18 Q. Where were you assigned prior to that?
19 A. In Iranian Counterintelligence Squad.
20 Q. For how long were you assigned to that Iranian
21   Counterintelligence Squad?
22 A. Approximately a year and a half.
23 Q. What types of matters did you principally investigate while
24   you were a member of that squad?
25 A. I worked on traditional counterintelligence investigations

1    and counterproliferation investigations.
2  Q. In the course of your duties as special agent in the
3   Counterintelligence Squad, did you become familiar with an
4   investigation relating to the defendant, Hakan Atilla?
5  A. Yes.
6  Q. When did that investigation begin?
7  A. The spring of 2013.
8  Q. I'd like to draw your attention to March 27, 2017. Was the
9   defendant arrested on that date?
10 A. Yes.
11 Q. Were you present during that arrest?
12 A. I was, yes, I was there.
13 Q. Were you on duty the following day, on March 28?
14 A. Yes.
15 Q. What were your duties on that date?
16 A. The morning of the 28th, I assisted with taking Mr. Atilla
17   from the MCC to pretrial services for his initial appearance.
18 Q. Specifically, where is pretrial services located?
19 A. Here in the courthouse.
20 Q. Were you working with anyone else on that day?
21 A. I was, yes.
22 Q. With whom were you working?
23 A. Another FBI agent.
24 Q. Can you generally describe the process of bringing an
25   arrestee to the courthouse for pretrial processing.

1  A. Yes. We go to the MCC and take custody of the arrested
2   person and we bring them to the courthouse here, and then we
3   check in with pretrial services and for the subject to have
4   their interview with them.
5  Q. For approximately how long were you with the defendant at
6   the courthouse on March 28?
7  A. It was several hours. We had to wait a while for a
8   translator. I'm not sure exactly how long it was. But it was
9   pretty much most of the day.
10 Q. During that time, did you question the defendant about his
11   offense?
12 A. No.
13 Q. Did the defendant say anything about his offense or his
14   arrest?
15 A. Yes.
16 Q. What, if anything, did he say about his arrest?
17 A. It was general comments about how the whole thing was a
18   misunderstanding, that it wasn't possible that he had committed
19   any offenses. Things like that.
20 Q. Did he mention anyone?
21 A. He asked if we knew David Cohen.
22 Q. At that time, did you know who David Cohen was?
23 A. No.
24 Q. Did you have an understanding of why the defendant asked if
25   you knew David Cohen?

1  A. It seemed that --
2        MR. ROCCO: Objection.
3        THE COURT: Sustained.
4        MR. LOCKARD: Just a moment, your Honor. No further
5   questions, your Honor.
6        THE COURT: Any cross?
7        MR. ROCCO: One second, your Honor. We have no cross.
8        THE COURT: Thanks very much.
9        (Witness excused)
10       THE COURT: And we have another government witness, do
11  we not?
12       MR. LOCKARD: Your Honor, the United States calls
13  David Cohen.
14       THE DEPUTY CLERK: Sir, if you can step up here and
15  remain standing for a moment and then raise your right hand,
16  please.
17       Do you solemnly swear that the testimony that you
18  shall give this court and jury in this issue now on trial shall
19  being the truth, the whole truth, and nothing but the truth, so
20  help you God?
21       THE WITNESS: I do.
22       THE DEPUTY CLERK: Could you please state your full
23  name for the record.
24       THE WITNESS: David Cohen, C-O-H-E-N.
25       THE DEPUTY CLERK: Thank you, sir, you may be seated.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

Hc73ati6          Cohen - Direct          Page 1073

1    Feel free to pull up the chair and adjust the microphone as
2    needed.
3      DAVID COHEN,
4        called as a witness by the Government,
5        having been duly sworn, testified as follows:
6    DIRECT EXAMINATION
7    BY MR. LOCKARD:
8    Q.  Good afternoon, sir.
9    A.  Good afternoon.
10   Q.  Can I ask what is your profession?
11   A.  I'm an attorney.
12   Q.  Where do you currently work?
13   A.  The law firm of Wilmer Hale.
14   Q.  For how long have you been with Wilmer Hale?
15   A.  About three months, most recently.
16   Q.  Before most recently joining Wilmer Hale, where did you
17   work before that?
18   A.  Immediately before that, I was the deputy director of the
19   Central Intelligence Agency.
20   Q.  Generally speaking, what were your duties and
21   responsibilities as the deputy director of the CIA?
22   A.  I helped to oversee all of the agency's operations, the
23   collection, analysis, support of all the agency did.
24   Q.  For how long did you hold that position at the CIA?
25   A.  About two years.

Hc73ati6          Cohen - Direct          Page 1074

1    Q.  So that puts us in approximately what time frame?
2    A.  I began in early February of 2015, and ended at the end of
3    the Obama administration, so January 20 of 2017.
4    Q.  Prior to joining the CIA in February of 2015, where did you
5    work before that?
6    A.  The Department of the Treasury.
7    Q.  During what time period did you work with the Department of
8    the Treasury on that occasion?
9    A.  So I started in March of 2009, and was there through
10   January of 2015.
11   Q.  When you started with the Treasury Department, what was
12   your first position in March of 2009?
13   A.  I was initially a nominee and then was confirmed to be the
14   assistant secretary for terrorist financing.
15   Q.  When you ended your tenure at the Treasury Department in
16   early 2015, what was your title at that point?
17   A.  At that point I was the undersecretary for terrorism and
18   financial intelligence.
19   Q.  In your role as the undersecretary for the Office of
20   Terrorism and Financial Intelligence, did you come to be
21   familiar with Halkbank?
22   A.  I did.
23   Q.  What's your understanding of what Halkbank is?
24   A.  Halkbank is a large Turkish state-owned financial
25   institution, like one of the largest banks in Turkey.

Hc73ati6          Cohen - Direct          Page 1075

1    Q.  In your role as undersecretary for the Office of Terrorism
2    and the Financial Intelligence, did you personally communicate
3    with anyone at Halkbank?
4    A.  I did.
5    Q.  With whom did you communicate?
6    A.  I communicated with the then-CEO, essentially, Mr. Aslan; I
7    communicated with Mr. Atilla, who was the, at least at some
8    point during the time I was communicating with Halkbank,
9    essentially the deputy CEO.  Towards the end, after Mr. Aslan
10   left, there was a new CEO, and I met with him as well.
11   Q.  Before we get into those communications specifically, I'd
12   like to ask you just a little bit more about the Office of
13   Terrorism and Financial Intelligence.
14   A.  Okay.
15   Q.  Generally speaking, what does that office do?
16   A.  So that office is one of sort of three major components of
17   the Treasury Department.  Setting aside the IRS, which is
18   entirely separate.
19        Our responsibility, their responsibility, is to
20   oversee the national security portfolio of the Treasury
21   Department.  That includes all of our anti-money laundering,
22   regulatory, enforcement work, as well as our financial
23   sanctions, regulatory, and enforcement work.
24        There is also a small intelligence unit in that part
25   of Treasury, in TFI, in terrorist and financial intelligence,

Hc73ati6          Cohen - Direct          Page 1076

1    that's an analytic unit.  They don't collect intelligence.
2    They analyze and produce financial intelligence.
3    Q.  Does the Office of Terrorism and Financial Intelligence
4    encompass any other agencies or offices, in addition to the
5    office of intelligence analysis you just mentioned?
6    A.  Yeah.  So there are four components that make up TFI.
7    There is the Office of Intelligence and Analysis that I
8    described, there is a policy office, which was the job that I
9    first had as assistant secretary was overseeing the policy
10   office.  And then there were two administrative agencies,
11   there's the Financial Crimes Enforcement Network, which is the
12   administrative agency for the anti-money laundering work, and
13   then the Office of Foreign Assets Control, or OFAC, which
14   oversees the financial sanctions programs.
15   Q.  Just to unpack that a little bit.  You said you initially
16   started out in the policy office?
17   A.  Right.
18   Q.  What do you mean by that?
19   A.  So, the job of the assistant secretary for terrorist
20   financing is to help develop the policies that the other
21   components of that part of Treasury implement.  So I would, I
22   was working on anti-money laundering policy issues that would
23   then be reflected in some of the regulations that FinCEN would
24   implement.  I worked on sanction policy issues that were then
25   reflected in some of the sanctions programs that OFAC would

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

| Hc73ati6 | Cohen - Direct | Page 1077 |
|---|---|---|

1    implement.
2    Q.  Let's talk just for a second about OFAC as well.  What is
3    that agency?
4    A.  So OFAC, the Office of Foreign Assets Control, is an agency
5    that is responsible for implementing financial sanctions
6    programs.  So, all of the government's -- virtually all of the
7    government, the U.S. government financial sanctions programs
8    are created by a statute and then by executive order from the
9    president, which then gets delegated down to the Office of
10   Foreign Assets Control, to develop the regulations, to
11   investigate potential violations, and to implement as the
12   government agency of those programs.  Whether it is the Cuba
13   sanctions, the Russia sanctions, the sanctions against
14   terrorist financing, or the Iran sanctions, there is actually I
15   think as we sit here today 30 different sanctions programs that
16   OFAC implements.
17   Q.  Just to be clear, all of those agencies were within your
18   area of responsibility during the time that you were the
19   undersecretary for the Office of Terrorism and Financial
20   Intelligence?
21   A.  That's right, that's right.
22   Q.  What were your principal personal duties as the
23   undersecretary?
24   A.  There were several.  Part was to oversee the operation of
25   these administrative agencies, the FinCEN and OFAC.  The

| Hc73ati6 | Cohen - Direct | Page 1078 |
|---|---|---|

1    directors of both FinCEN and OFAC reported to me.  So I oversaw
2    their work, I oversaw the work of the Office of Intelligence
3    and Analysis, oversaw the work of the policy shop.
4         I was the principal Treasury representative in the
5    interagency committees that would discuss and debate national
6    security policy.  So I spent a fair amount of time representing
7    the Treasury Department in meetings at the White House with
8    other national security agencies as we were working on various
9    problems around the world.
10        I spent a fair amount of time also traveling overseas
11   meeting with counterparts in other governments, as well as in
12   the private sector, particularly with other -- with banks
13   around the world, to explain to them what U.S. policy was, to
14   encourage them to work with us on the various problems that we
15   were addressing.
16   Q.  Speaking of the topic of banks, what is the principal issue
17   that you would address with foreign banks when you went out on
18   these meetings?
19   A.  Well, it varied, depending on where I was and what we, you
20   know, whether we had any concerns, essentially, with what the
21   bank was engaged in.
22        But essentially what we were trying to do was to
23   explain what our sanctions programs were, explain what our
24   anti-money laundering programs were, to encourage the foreign
25   banks to work with us, and to comply with the U.S. law,

| Hc73ati6 | Cohen - Direct | Page 1079 |
|---|---|---|

1    comply -- there is also some international law that comes into
2    play here.
3         And on occasion, if we had concerns that a financial
4    institution was engaged in transactions, had account holders or
5    was otherwise operating in a way that may conflict with our
6    sanctions programs, we would raise concerns, we would make sure
7    that they understood what the laws were that we were
8    implementing.  And to the best that we could, we would share
9    with them information about the basis of our concern.
10   Q.  Among the sanctions programs that were administered and
11   implemented by the agencies within your office, was the Iran
12   sanctions program one of those sanctions programs?
13   A.  Yes, it was.
14   Q.  Is that among the sanctions programs that you would discuss
15   on these international trips?
16   A.  It was -- it was often the feature of the conversations on
17   these trips.
18   Q.  Are the Iran sanctions among the topics that you discussed
19   with Mr. Aslan, Mr. Atilla, and the other general manager that
20   you mentioned at the Halkbank?
21   A.  Yes.
22   Q.  During approximately what time period did you have
23   communications with Halkbank?
24   A.  Essentially throughout my tenure as undersecretary.  I
25   don't believe that I met with Halkbank, Halkbank executives

| Hc73ati6 | Cohen - Direct | Page 1080 |
|---|---|---|

1    while I was assistant secretary.  I became the undersecretary
2    in early 2011, and I think essentially throughout the period
3    from 2011 through 2015, I had sort of an ongoing conversation
4    with Halkbank executives.
5    Q.  Are there a set of Iran sanctions issues that were a
6    principal focus of your discussions?
7    A.  Well, the sanctions, yeah.  By and large what we were doing
8    during that four-year period was increasing the intensity and
9    the scope of the sanctions as part of our effort to encourage
10   the Iranians to come to a negotiating table about the nuclear
11   program.  So over time, the sanctions ramped up and expanded.
12        So, we would, as we would meet with whether it was
13   Halkbank executives or other financial institutions, explain
14   what the law was.  To the extent we knew where the law was
15   heading, we would forecast things to come.
16        But we were -- depending on where we were in that
17   chronology, describing to the counterparts at these financial
18   institutions and at Halkbank, what the, you know, what the Iran
19   sanctions programs entailed at that time.
20        THE COURT: That four-year period was when to when?
21        THE WITNESS: For me it began in early 2011 through
22   January of 2015.
23        THE COURT: Okay.
24   Q.  You described the sanctions as increasing in both intensity
25   and scope during that time frame.

**A561**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 7, 2017

| Hc73ati6 | Cohen - Direct | Page 1081 |
| --- | --- | --- |

1  A. Yes.
2  Q. Did that apply to any particular aspect of the sanctions
3  program?
4  A. Sure. I think the easiest way to describe it is in the
5  early years of the sanctions program, what we were focused on
6  was transactions and material going to Iran that were -- that
7  would help them build their nuclear program. So we were
8  focused on making sure that, you know, the particular type of
9  steel that is used in the centrifuge didn't go to Iran, and any
10 financial transactions that would support the trade in that
11 kind of steel was being cut off.
12      Over time, we focused more on isolating Iran and the
13 Iranian economy from the international financial sector and
14 international economy. So then we started to focus on some of
15 the Iranian banks that were involved in facilitating some of
16 this illicit trade.
17      And over time, sort of as another step up in the
18 sanctions, focused on Iranian trade in oil, which was their
19 principal export and the principal source of revenue for the
20 Iranian government, and other -- other ways in which the
21 Iranians were trying to protect their economy essentially from
22 the efforts we were undertaking to put pressure on the Iranian
23 government as part of this -- part of what was called the
24 dual-track strategy, to put pressure on the Iranian government
25 while offering the opportunity for a negotiation over their

| Hc73ati6 | Cohen - Direct | Page 1082 |
| --- | --- | --- |

1  nuclear program.
2  Q. During this time period you were discussing these
3  increasingly intense sanctions with Halkbank, you mentioned
4  three principal individuals that you dealt with.
5  A. Yes.
6  Q. Is there any one person that you dealt with most
7  frequently?
8      THE COURT: Did you say mostly of the three?
9  Q. Any one person that you dealt with most frequently.
10 A. I think I dealt most frequently with Mr. Atilla.
11 Q. How did these communications with Halkbank officers occur?
12 A. To some extent in person. We met in Turkey, we met on
13 occasion in Washington. I think there were some phone calls
14 and there was also some correspondence, both by letter and by
15 e-mail.
16 Q. In what language did your communications take place?
17 A. English.
18     THE COURT: English?
19     THE WITNESS: English.
20 Q. When you communicated in English with Halkbank officers,
21 were there Turkish translators present?
22 A. Not typically. I think the last meeting with the new CEO
23 took over after Mr. Aslan, my recollection is that he did not
24 speak English or didn't speak English well. And I think
25 Mr. Atilla translated for him. So to some extent, that

| Hc73ati6 | Cohen - Direct | Page 1083 |
| --- | --- | --- |

1  conversation occurred in Turkish, although not by me. But, the
2  other -- all the other communications with Halkbank, both from
3  my side and from their side, was in English.
4      THE COURT: Excuse me for interrupting. Did you deal
5  with any other Turkish banks?
6      THE WITNESS: Yes.
7      THE COURT: You did?
8      THE WITNESS: Oh, yeah.
9  Q. You mentioned some meetings. Do you recall where those
10 meetings would take place?
11 A. So, I went to Turkey on several occasions. And I think we
12 met both in Ankara and in Istanbul with Halkbank. And I met
13 with other Turkish banks principally in Ankara. But, for
14 instance the Turkish Bankers Association would meet in Istanbul
15 generally. So it was a mix of Istanbul and Ankara. There were
16 also meetings in Washington in my office with Halkbank.
17 Q. Did Mr. Atilla participate in some of those meetings in
18 your office in Washington, D.C.?
19 A. Yes.
20 Q. In those meetings, were there other individuals from the
21 Treasury Department present as well?
22 A. Yes.
23 Q. During the time period that you were having the
24 communications, the meetings, the e-mails, the phone calls that
25 you were participating in, were there others at Treasury also

| Hc73ati6 | Cohen - Direct | Page 1084 |
| --- | --- | --- |

1  communicating with Halkbank about sanctions issues?
2  A. Yes.
3  Q. Do you know who principally was involved in those other
4  additional conversations?
5  A. I think, principally, the director of OFAC, a gentleman
6  named Adam Szubin had some communications with Halkbank.
7      THE COURT: How do you spell that?
8      THE WITNESS: His last name is S-Z-U-B-I-N.
9  A. And I think my deputy in the policy shop in TFI, Daniel
10 Glaser, also had some communications with Halkbank.
11     THE COURT: Glaser?
12     THE WITNESS: G-L-A-S-E-R.
13 Q. In these meetings and communications you had with Halkbank
14 and in particular with Mr. Atilla, did you develop an
15 understanding of Mr. Atilla's level of understanding of
16 sanctions?
17 A. I did.
18 Q. Without telling us what your understanding was, what was
19 that understanding based on?
20 A. Based on the conversations that I had with Mr. Atilla,
21 principally, I mean, there was also, as I said, some written
22 correspondence back and forth. But the -- but the bulk of our
23 interaction was in face-to-face meetings.
24 Q. During those meetings, would Mr. Atilla ask questions?
25 A. Yes.

A562

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 7, 2017

Hc73ati6          Cohen - Direct          Page 1085

1  Q.  And what were the nature of those questions?
2  A.  They were typically clarifying, you know, probing
3  questions.  You know, what these meetings often entailed was I
4  would describe in, you know, five, 10 minutes or so, what the
5  relevant sanctions program was that we were, you know, meeting
6  about at that time.  If we had concerns, I would express what
7  the concerns were.  We would share information to the extent we
8  could about the basis for our concerns.  And then, then there
9  was back and forth where Mr. Atilla would ask clarifying
10  questions, and he would have a conversation about the
11  sanctions.
12  Q.  Were those questions relevant to the conversation that you
13  had been having?
14  A.  Yes.
15  Q.  Did they demonstrate an understanding of the sanctions
16  issues that you had been discussing?
17  A.  I thought they did, yes.
18  Q.  Were there occasions during these discussions, these
19  meetings and phone calls, when you would ask questions of
20  Mr. Atilla?
21  A.  Yes.
22  Q.  Were his answers relevant to the questions that you had
23  asked?
24  A.  Yes.  If they weren't, I would follow up.  But they were.
25  Q.  During these meetings and communications, were there ever

Hc73ati6          Cohen - Direct          Page 1086

1  attorneys present representing Halkbank?
2  A.  Not that I know of.  I mean, so just -- my meetings with
3  Mr. Atilla were not one-on-one meetings.  As I mentioned, there
4  were people from Treasury who were with me, and there was
5  always at least one or two other people from Halkbank who were
6  there.  I don't know whether they were or were not lawyers.
7  They were not introduced to me as lawyers.
8  Q.  Would it be unusual in these kinds of meetings for the bank
9  not to have legal counsel or an outside law firm present?
10  A.  Yeah, well, for -- let me, if I can break that down.
11       For a bank like Halkbank, where it was a large
12  financial institution and we had this sort of ongoing
13  relatively detailed conversation about sanctions, my
14  expectation and my belief was that they had legal counsel that
15  assisted them as they were working, as I thought, to comply
16  with the sanctions programs.
17       There were other banks that I dealt with where it was
18  pretty clear they did not have legal counsel.  But Halkbank I
19  thought did.
20  Q.  I'd like to turn to some of the topics you addressed in
21  these meetings.  Then after we go through the topics, we'll
22  start to go through some particular communications that you had
23  with the bank.
24  A.  Okay.
25  Q.  Now, one of the evolving or intensifying areas of sanctions

Hc73ati6          Cohen - Direct          Page 1087

1  that you had mentioned earlier concerned the Iranian petroleum
2  industry.
3  A.  Yes.
4  Q.  Is that one of the topics you discussed with Mr. Atilla and
5  Halkbank?
6  A.  Yes.
7  Q.  Principally, what are the issues relating to the
8  petroleum-focused sanctions that you discussed with the bank in
9  your meetings?
10  A.  Well, we discussed how that sanction program developed over
11  time.  Which, you know, essentially, sort of in broad outline,
12  we put in place a regime where Iran could sell oil to a
13  purchaser, for the purchaser to be able to essentially pay for
14  that oil to Iran without the bank involved being subject to
15  U.S. sanctions.
16       The purchaser, so in this case Turkey, needed to
17  significantly reduce the amount of oil that they were
18  purchasing over time.  So essentially, the way it worked was
19  every six months, the Secretary of State would have to certify
20  that the country in question was significantly reducing the
21  amount of oil that they were purchasing from Iran.  If he did,
22  then the bank that was involved, in Turkey's case it was
23  Halkbank, that was paying Iran for that oil, could do so
24  without being subject to U.S. sanctions.
25       If the bank was not significantly re -- if the

Hc73ati6          Cohen - Direct          Page 1088

1  country, rather, was not significantly reducing their oil
2  imports, we had then the authority to cut off that bank from
3  the United States.  That was sort of step one.
4       Step two was, and this sort of phased in over time,
5  the -- assuming all of those conditions were met and the bank
6  could pay Iran for the oil purchases without getting
7  sanctioned, the second step was the money that Iran was earning
8  for selling oil to that country could only be used to purchase
9  goods from the country to which it was selling oil.
10       So in Turkey's case, Iran selling oil to Turkey,
11  Turkey is significantly reducing over time the amount of oil
12  that it's buying.  So, the Turkish government would make
13  payments to Iran through an account at Halkbank.  The money
14  that went into the account at Halkbank for Iran could only be
15  used to buy goods from Turkey.  So they couldn't facilitate
16  trade from third countries.  It could just be trade from
17  Turkey.
18       There was some other limitations that were also part
19  of it, but that was sort of the heart of how the oil sanctions
20  worked.
21  Q.  During the time period that you were having these
22  communications with Halkbank, 2011 until about early 2015, what
23  banks in Turkey held Iranian -- the proceeds of sales of
24  Iranian oil?
25  A.  Just Halkbank.  It was the, as I understood it, the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 7, 2017

Hc73ati6              Cohen - Direct              Page 1089

1  designated bank by the government of Turkey to facilitate the
2  oil trade with Iran.
3          THE COURT: When you say "significantly reduce," do
4  you mean -- were there measurements per six months in terms of
5  gallons?
6          THE WITNESS: Yes.
7          THE COURT: Could you give us an example?
8          THE WITNESS: Well, the over all -- so I don't
9  remember the statistics for Turkey in particular. But over
10  all, when we started this, Iran was exporting about two and a
11  half million barrels of oil every month. By about a year into
12  it, they were exporting about a million barrels of oil. So it
13  was a pretty significant reduction overall.
14 Q.  You mentioned that one of the requirements for the use of
15  the proceeds of sales of Iranian oil held at Halkbank at one
16  point involved a requirement that the money be used only to
17  purchase goods produced within Turkey?
18 A.  That's right.
19 Q.  Is that sometimes referred to as a bilateral trade
20  requirement?
21 A.  Right.
22 Q.  Did you develop an understanding of what role Halkbank
23  played in the financing of trade with Iran?
24 A.  Yeah. So, Halkbank, because it was the bank where the
25  account was held for the payment of Iranian oil, had a

Hc73ati6              Cohen - Direct              Page 1090

1  relatively sizable amount of Iranian funds. Iran would use
2  that money to facilitate trade between Iran and Turkey. And so
3  it was -- "it" being Halkbank, was the bank that was sort of
4  principally involved in the trade between Turkey and Iran.
5 Q.  In the sanctions that we're talking about, especially the
6  petroleum-focused sanctions, is there a concept known as
7  humanitarian trade?
8 A.  Yes.
9 Q.  What does that refer to?
10 A.  So, separate and apart from all of the sanction programs,
11  there is an exception that says, you know, we can put in
12  whatever sanctions we want, but humanitarian trade is exempt.
13  So trade in food, in medicine, and in medical devices. There
14  is a Congressional statute that says trade in those categories
15  of goods, food, medicine and medical devices, is exempt from
16  the sanctions.
17          So, for instance, in what I was describing before
18  about the bilateral trade restriction, that didn't apply to
19  trade in food, medicine, and medical devices. Halkbank could
20  facilitate trade from a third country in baby formula going to
21  Turkey -- going to Iran, rather. Could come from another
22  country through Turkey, to Iran.
23 Q.  Is that humanitarian trade exception one of the issues that
24  you discussed with Mr. Atilla and the other Halkbank officers?
25 A.  Yes.

Hc73ati6                                          Page 1091

1          MR. LOCKARD: Your Honor, I know we're close to the
2  end of the day. This is a relatively convenient breaking
3  point, if you're so inclined.
4          THE COURT: Sure. Can we impose on you to come back
5  tomorrow morning?
6          THE WITNESS: Happy to do it.
7          THE COURT: See you all at 9:15. Let me talk to the
8  jury for a minute. Thank you very much, Mr. Cohen.
9          THE WITNESS: Thank you.
10          (Witness not present)
11          THE COURT: We're obviously breaking for the day.
12  Long term I think the government is going to use up most of
13  next week, to the end of the week in any event. Not all the
14  days are going to be full days because people, witnesses are
15  traveling, so some are from out of town. It is hard to get
16  them all here so they can be one after the other.
17          I think that's going to happen tomorrow also. So I
18  don't think we're going to have a full day tomorrow. I don't
19  exactly know when we're going to stop, but I can't imagine that
20  it would be later than 2:30 let's say. Somewhere around, give
21  or take five or 10 minutes. But it won't be -- I don't think
22  it will be much more than that. In fact, it won't be.
23          So, and there will be, I don't know exactly now which
24  days next week might be abbreviated somewhat, but as soon as I
25  have a realistic understanding of what they might be, I'll

Hc73ati6                                          Page 1092

1  share them with you.
2          So, in terms of the over all, we are very much on or
3  ahead of schedule. So we're doing well. And that's about it.
4          So, please don't talk to each other about the case or
5  about anyone who has anything to do with it until the end of
6  the case when you go to the jury room to deliberate.
7          Second, please don't talk with anyone else about the
8  case or about anyone who has anything to do with it until the
9  trial has ended and you've been discharged as jurors.
10          Third, please don't let anyone talk to you about the
11  case or about anyone who has anything to do with it, and if
12  someone should try and talk to you about the case, please
13  report that to Christine or me immediately.
14          You may know tomorrow Christine won't be here.
15  Someone else, Chelsea, who works for me, will fill in for her
16  just for tomorrow.
17          Fourth, don't read any news or internet stories or
18  articles or blogs or listen to any radio or TV or cable or
19  internet reports about the case or about anyone who has
20  anything to do with it.
21          And fifth, please don't do any type of research or
22  investigation about the case on your own.
23          So, thanks very much for your attentiveness, and I'll
24  see you at 9:15 tomorrow.
25          (Jury excused)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 7, 2017

Hc73ati6                                                     Page 1093

1          MS. FLEMING: Judge, the document that we're offering,
2   let me look at the transcript tonight and I'll do it in the
3   morning.
4          THE COURT: Is there a dispute about it?
5          MS. FLEMING: We were going to offer it as a prior
6   inconsistent statement. The government is going to oppose it.
7   Let me pull it all together and that will be easier. They can
8   look at it too.
9          THE COURT: All right. What about that recording.
10  Are we going to do that tomorrow?
11         MS. FLEMING: That's what I'm talking about. Oh, I'm
12  sorry. Different one. Different recording.
13         THE COURT: The video I guess.
14         MR. DENTON: Our position is it is entirely pointless
15  to waste the jury's time. So the government does not intend to
16  play the entire recording. If the defense then wants to make
17  some sort of application under the rule of completeness and
18  they waste the jury's time, that's how we can proceed.
19         THE COURT: How long is your section and how long is
20  the whole thing?
21         MR. DENTON: The actual post-arrest interview is about
22  eight minutes of a tape that's about I think 42 minutes in
23  length.
24         THE COURT: Great. Okay. So we'll talk about it in
25  the morning.

Hc73ati6                                                     Page 1094

1          MS. FLEMING: One other thing to put on the record.
2   It is not a dispute. Which is today we agreed there are some
3   transcripts that we produced that the government wants a chance
4   to look at. We're fine with it. If we have disputes we'll try
5   to work them out. But we agreed that at this point the
6   transcripts all go into evidence subject to working out -- not
7   the transcripts, the underlying recordings go in without having
8   to have played the recordings to Mr. Reza Zarrab so he could
9   identify them in front of the jury and in the other language.
10  And we'll work out with the transcripts. I want to make sure
11  that was on the record.
12         THE COURT: Was my assessment of the next stages and
13  days in the trial relatively accurate, based on what your
14  understanding is?
15         MR. LOCKARD: Yes, your Honor. I think as Mr. Denton
16  explained earlier today, I think we are on track, we think at
17  the current pace, to rest towards the middle to late of next
18  week.
19         THE COURT: You definitely think there will be shorter
20  days next week? All I'm saying, if it is possible to fill in
21  and finish sooner, I would much prefer that if that's feasible.
22         MR. LOCKARD: I think tomorrow is the only scheduling
23  issue we had, and I think we worked out our other scheduling
24  issues, so we should be going continuously.
25         THE COURT: I appreciate that. Thanks very much.

Hc73ati6                                                     Page 1095

1          MS. FLEMING: Thank you.
2          THE COURT: Good night.
3          (Adjourned until December 8, 2017, at 9:15 a.m.)

Page 1096

1                     INDEX OF EXAMINATION
2   Examination of:                              Page
3    REZA ZARRAB
4   Cross By Ms. Fleming . . . . . . . . . . . . . 971
5   Redirect By Mr. Kamaraju . . . . . . . . . .1019
6   Recross By Ms. Fleming . . . . . . . . . . .1062
7    ROBERT TRINGALE
8   Direct By Mr. Lockard  . . . . . . . . . . .1069
9    DAVID COHEN
10  Direct By Mr. Lockard  . . . . . . . . . . .1073
11                    GOVERNMENT EXHIBITS
12  Exhibit No.                             Received
13   4503  . . . . . . . . . . . . . . . . . . . 991
14                     DEFENDANT EXHIBITS
15  Exhibit No.                             Received
16   101  . . . . . . . . . . . . . . . . . . . 989
17   100  . . . . . . . . . . . . . . . . . . . 990

**A565**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 8, 2017*

*Southern District Court Reporters*

Original File HC8pATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 8, 2017

HC83ATI1                                    Page 1097

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4           v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6               Defendant.
 7   ------------------------------x
 8
 9                          December 8, 2017
10                               9:15 a.m.
11
12   Before:
13               HON. RICHARD M. BERMAN,
14                          District Judge
15                          and a jury
16
17               APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

HC83ATI1                                    Page 1098

```
 1
 2           (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                          Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

HC83ATI1                    Cohen - Direct                    Page 1099

1          (In open court)
2          THE COURT: The jury is assembled and they'll be in in
3  a minute, if we could get Mr. Cohen.
4          MR. LOCKARD: He's on his way.
5          THE COURT: We can bring in the jury.
6          (Jury present)
7          THE COURT: Please be seated, everybody. We'll
8  continue with Mr. Cohen.
9          THE DEPUTY CLERK: Mr. Cohen, I'd like to remind you
10 that you're still under oath.
11         THE WITNESS: Thank you.
12         THE COURT: Just a word for the jury. I've been
13 studying my notes, because I don't want you all to get ahead of
14 me.
15         All right. We'll continue with Mr. Cohen.
16 DAVID COHEN,
17    called as a witness by the Government,
18    having been previously sworn, testified as follows:
19 DIRECT EXAMINATION (Continued)
20 BY MR. LOCKARD:
21 Q. Good morning, Mr. Cohen.
22 A. Good morning.
23 Q. So, yesterday before the evening break, we were talking a
24   little bit about the topics that you had discussed with
25   Mr. Atilla and with others at Halkbank relating to the

HC83ATI1                    Cohen - Direct                    Page 1100

1  sanctions against Iran. And I think, in particular, the
2  petroleum-related sanctions.
3  A. Right.
4  Q. I think the topic we had ended on was the humanitarian
5    trade exception to certain other regulations on the use of
6    Iranian oil proceeds.
7  A. Right.
8  Q. So I'd like to now talk about a slightly different part of
9    the Iranian sanctions program.
10         Did the sanctions topics that you discussed with
11   Mr. Atilla and others at Halkbank also include sanctions
12   regulations relating to gold transactions or precious metals
13   transactions?
14 A. Yes, it did.
15 Q. Generally speaking, over the course of your communications
16   with Mr. Atilla and others at Halkbank, what topics did you
17   discuss related to precious metals trade?
18 A. So, over the course of the time that I had communications
19   with Halkbank and Mr. Atilla, the sanctions relating to
20   precious metals, including gold, changed. Initially, there was
21   a requirement in an executive order that said that no one could
22   sell gold to the government of Iran or to anyone working on
23   behalf of the government of Iran. If you did that, you were
24   subject to sanctions. I think that came into effect in July of
25   20 -- I think 2012 if I'm correct.

A567

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                      December 8, 2017

| HC83ATI1 | Cohen - Direct | Page 1101 |
| --- | --- | --- |

1        Then in July of 2013, that provision expanded, and the
2    sanction was that any sale of any precious metals, which
3    includes gold, to anybody in Iran was subject to sanctions.  So
4    it expanded from focused on the sale of gold to the government
5    of Iran, or anybody working on behalf of the government of
6    Iran, to the sale of gold to anybody in Iran.
7  Q.  Again, over the course of your discussions with Mr. Atilla
8    and Halkbank, what particular aspects of that did you discuss
9    in those communications?
10 A.  Well, several different aspects.  First, made sure that the
11   basic requirements were understood.  And then in particular,
12   when the provision was in effect that focused on the sale of
13   gold to Iran or anybody working on behalf of the government of
14   Iran, we spent a fair amount of time talking about how the
15   Iranian government engages in deceptive practices to try to
16   evade sanctions.
17       And our concern was not that there would be some
18   direct transaction with the Central Bank of Iran or some
19   Iranian ministry, but that the Iranian government, which we
20   knew was interested in acquiring gold, would use cutouts, would
21   use front companies, would use mechanisms to hide their
22   involvement in the purchase of gold.  And how it was essential
23   that for the sanctions to operate effectively, that Halkbank,
24   and others for that matter, needed to be cognizant of how the
25   Iranian government would try to do this, and have mechanisms in

| HC83ATI1 | Cohen - Direct | Page 1102 |
| --- | --- | --- |

1    place to prevent it.
2        THE COURT: Could I ask a question.  Did you surmise
3    that they were trying to evade sanctions or you knew it?
4        THE WITNESS: We certainly knew that the Iranians were
5    constantly trying to evade our sanctions, generally.  I think I
6    probably shouldn't say more in open court on that question on
7    gold in particular.
8        THE COURT: Okay.
9        THE WITNESS: Okay.
10 Q.  But in terms of specifically what it is that you
11   communicated to Mr. Atilla and to others at Halkbank, did the
12   concept of Iranian evasion techniques --
13 A.  Mr. Lockard, I'm just thinking about the judge's question.
14       We knew that the Iranian government was interested in
15   acquiring gold.  We knew that the Iranian government had for
16   many years and continuously operated in a way to try to evade
17   our sanctions.  So, there was a linkage there.  Sorry.
18 Q.  Thank you for clarifying.
19       So you just described some of the discussions you had
20   about Iranian evasion techniques and interest with respect to
21   gold trade specifically.  Is that a topic you discussed,
22   evasion issues, evasion techniques, more broadly across the
23   sanctions program?
24 A.  Absolutely.
25       MR. ROCCO: Your Honor, may we have with whom?

| HC83ATI1 | Cohen - Direct | Page 1103 |
| --- | --- | --- |

1  Q.  Specifically in your communications with Mr. Atilla and
2    others at Halkbank.
3  A.  Yes.
4        MR. ROCCO: May we have --
5        THE COURT: Okay.  I got it.  So, if you could reask
6    the question so counsel is satisfied and we understand.
7        MR. LOCKARD: Certainly, your Honor.  We'll try and
8    speed through that part of it.
9        Not speed through your answers, of course.
10 Q.  Did you discuss specifically in communications with
11   Mr. Atilla issues relating to Iranian sanctions evasion
12   interest and techniques beyond just the gold scenario?
13 A.  Yes.  Repeatedly.
14 Q.  What kinds of things did you communicate to Mr. Atilla?
15 A.  Well, we communicated both the general point that the
16   Iranians engage in deceptive practices to evade the sanctions,
17   and sanctions broadly.  And we had seen that for many, many
18   years as the sanctions on -- for instance, we were talking
19   yesterday about sanctions on the weapons proliferation, the
20   nuclear weapons proliferation.
21       We would see the Iranians set up front companies, work
22   with people who had front companies that would be purporting to
23   sell furniture, when really what they were selling was the
24   speciality steel that they needed for their centrifuges.  That
25   sort of technique.

| HC83ATI1 | Cohen - Direct | Page 1104 |
| --- | --- | --- |

1        We've seen the Iranians use financial institutions in
2    Iran that were sort of -- they would use a nesting technique.
3    We had banks in Iran that were subject to sanctions because
4    they were either supporting Iran's nuclear program or
5    supporting Iran's terrorist activity around the world.  Those
6    banks would be nested, their transactions would be nested
7    within other banks that were not subject to sanctions, as a way
8    to try and hide the transactions that were going on.
9        There is a whole host of different techniques that we
10   discussed with Mr. Atilla at Halkbank and we discussed with
11   other banks as well.
12 Q.  Again, over the course of your discussions with Mr. Atilla,
13   did you talk about ways that the bank could attempt to combat
14   those evasion techniques?
15 A.  We did.
16 Q.  What kinds of issues did you talk about on combating
17   evasion?
18 A.  Fundamentally, the way to combat evasion is to know who
19   you're doing business with.  If you make an effort to
20   understand if your customer or the customer that is working
21   with your customer is who they purport to be, and the goods
22   that are being transacted are what they purport to be, you can,
23   in that way, combat the effort to deceive and to engage in
24   transactions or trade that are otherwise prohibited by
25   sanctions.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 8, 2017

HC83ATI1          Cohen - Direct          Page 1105

1 Q. Over the course of your discussions generally, what did
2  Mr. Atilla tell you about Halkbank's efforts to do that kind of
3  due diligence and knowing their customers?
4 A. Mr. Atilla and others from Halkbank assured us repeatedly,
5  and this was a constant topic of conversation in my engagements
6  with Halkbank. Assured us that they had robust compliance
7  programs in place, that they made an effort to know who their
8  customers were, actually who they were, knew what their
9  customers' business was, and were confident that the
10  transactions that Halkbank was facilitating for their customers
11  were permissible transactions under the sanctions.
12 Q. Over the course of your discussions with Mr. Atilla, did
13  you talk about the consequences of engaging in transactions
14  that were contrary to the sanctions?
15 A. We did.
16 Q. What did you tell Mr. Atilla, broadly speaking, on that
17  topic?
18 A. So, I had -- again, Halkbank was not only bank that I dealt
19  with in the world, not in Turkey and elsewhere as well. And so
20  I had developed a relatively standard set of talking points
21  that I would use in these engagements. They would be tailored,
22  obviously, to the particular audience, but there was a general
23  theme of my presentations.
24        So on the consequences of violating sanctions, it
25  depends a little bit what the particular sanction was that we

HC83ATI1          Cohen - Direct          Page 1106

1  were talking about. But, and with financial institutions in
2  particular, I would run through the potential consequences,
3  which included losing their access to the United States.
4        So one of the most powerful threats, essentially, that
5  we had to foreign banks was if you engage in transactions that
6  violate our sanctions, we, in some circumstances, would have
7  the authority to cut off your access, your bank's access to the
8  U.S. financial system. That's a very powerful sanction for a
9  bank, because if they don't have access to the U.S. financial
10  system, it is very difficult for the bank to continue to
11  operate, even in their own jurisdiction. So that was one, was
12  the potential to cut off from the U.S.
13        A second potential consequence was in some
14  circumstances we could, we, the Treasury Department, could
15  apply a civil monetary penalty. So a fine, essentially, on a
16  financial institution that violates our sanctions.
17        And then the third consequence, or a third
18  consequence, was that the basic foundation for our sanctions
19  programs is a statute called IEEPA, stands for the
20  International Economic Emergency Powers Act, that provides the
21  basis both for the civil penalties that could be applied, and
22  also criminal penalties. So, in my sort of standard
23  presentation, I would also note that, you know, at the end of
24  the day, there are criminal penalties that underlie our
25  sanctions programs.

HC83ATI1          Cohen - Direct          Page 1107

1 Q. You talked about one of the consequences or potential
2  consequences of engaging in transactions that violate the
3  secondary sanctions is the restriction or loss of a
4  correspondent account in the U.S.
5        THE COURT: Is what?
6 Q. Restriction or loss of U.S. banking access.
7 A. Right.
8 Q. Were you aware of whether Halkbank had correspondent
9  accounts in the United States?
10 A. Yes, it did.
11        MR. LOCKARD: So, I'd like to pull up for Mr. Cohen
12  Government's Exhibit 8020.
13        Your Honor, if I may approach, I'll hand up a hard
14  copy as well.
15        THE COURT: Okay.
16 Q. Have you had a chance to look at what's been displayed in
17  front of you?
18 A. Yes, I have.
19 Q. Is that a document that you've reviewed prior to your
20  testimony today?
21 A. It is.
22 Q. Is it something that would be helpful in explaining your
23  testimony to the jury?
24 A. I think so.
25        MR. LOCKARD: Your Honor, we'd ask to publish 8020 as

HC83ATI1          Cohen - Direct          Page 1108

1  a demonstrative.
2        THE COURT: Sure.
3        MR. ROCCO: No objection, your Honor.
4 Q. So, Mr. Cohen, we've been talking about the petroleum- and
5  gold-related sanctions involving Iran that were in effect
6  during the time period of your communications with Halkbank.
7        What's shown here on the first page of Exhibit 8020?
8 A. Well, this is a chronology of some of the key statutes and
9  executive orders that relate to the petroleum sanctions, the
10  bilateral trade restriction, and the precious metal sanctions
11  that we were talking about earlier.
12 Q. Rather than march through these right now, as they come up,
13  throughout your testimony, we can just stop and remind the jury
14  of what they are.
15 A. Okay.
16 Q. But for now let's turn to the second slide. Directing your
17  attention to March 14 of 2012. Did you have any communications
18  with Halkbank on that day?
19 A. My recollection is that we met in my office in Washington
20  that day with I believe Mr. Atilla and Mr. Aslan.
21 Q. Before we start talking about the content of that meeting,
22  had you previously met Mr. Atilla and Mr. Aslan or had previous
23  communications with them?
24 A. I'm not certain. I may have. I don't --
25        MR. LOCKARD: Mr. Chang-Frieden, if we can pull up

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 8, 2017

HC83ATI1          Cohen - Direct          Page 1109

 1  Government's Exhibit 7002 for Mr. Cohen.
 2          THE WITNESS: Yeah.
 3  Q.  Mr. Cohen, do you recognize that?
 4  A.  I do.
 5  Q.  How, without telling us what it is, how is it that you
 6     recognize it?
 7  A.  This is a letter that I received from Mr. Aslan.
 8          MR. LOCKARD: The government offers Government Exhibit
 9  7002.
10          MR. ROCCO: No objection.
11          THE COURT: I'll allow it.
12          (Government's Exhibit 7002 received in evidence)
13          MR. LOCKARD: If we can publish for the jury.
14  Q.  So, in this letter dated August 18, 2011, there is a
15     reference -- can you tell us who sent this letter?
16  A.  Mr. Aslan from Halkbank.
17  Q.  Can you just describe generally what is the topic that's
18     being discussed in this letter.
19  A.  The topic is, I had sent a letter on August 5 that, as I
20     recall, we were concerned about Halkbank at that point being a
21     bank that was aggregating oil payments from other
22     countries to Iran.
23          So, in this instance, India is importing oil from
24     Iran.  The payment by the Indian government to Iran for that
25     oil was going to be funneled through Halkbank.

HC83ATI1          Cohen - Direct          Page 1110

 1          And I'm not -- I don't recall precisely what our
 2     concern was in my August 5 letter.  I would be interested to
 3     see that letter.  But there was -- but we were concerned about
 4     Halkbank's role in that payment chain.  And Mr. Aslan was
 5     addressing the concerns that we raised.  Which, based on the
 6     letter, had something to do with whether it was going to be
 7     dollar-denominated transactions, if they were -- so dollar
 8     denominated means they were be being paid in U.S. dollars.
 9          If it is being paid in U.S. dollars, the way the
10     international financial system works, is that the payment, even
11     though it's going from India to Turkey to Iran, if it is in
12     U.S. dollars, it would go through the U.S. financial system.
13     Just that's the way it works.
14          At that time, we were concerned about the use of U.S.
15     dollars, and we were concerned about the banks in Iran that
16     might be on the other end of the transaction as well.
17  Q.  At this time, did you have an understanding of how long
18     Mr. Aslan had been general manager of Halkbank?
19  A.  I don't know that I did.  I had a sense that he was the
20     general manager running the bank.  But I didn't -- I don't
21     remember knowing for how long.
22  Q.  Do you recall whether your August 5 letter was addressed to
23     Mr. Aslan or to somebody else?
24  A.  I don't.  I suspect it was addressed to Mr. Aslan because I
25     tended to correspond with the leader of whatever the bank, the

HC83ATI1          Cohen - Direct          Page 1111

 1  CEO.  But I don't know for sure.
 2          THE COURT: Generally speaking, is that something you
 3  might do if you had a concern, is write somebody a letter?
 4          THE WITNESS: Right.  Particularly if we didn't have
 5  an ongoing conversation, if this was sort of an initial
 6  outreach, and this was relatively soon after I became the
 7  undersecretary.  I had been the undersecretary for six months
 8  at this point.
 9          So I don't remember whether I had met Mr. Aslan
10  previously.  I know that I had visited Halkbank in 2009 on a
11  trip to Turkey, but I just don't remember whether I met
12  Mr. Aslan at that time.
13          MR. LOCKARD: Let's look at a slightly earlier
14  communication.  Mr. Chang-Frieden, if you can pull up
15  Government Exhibit 7001 for Mr. Cohen.
16  Q.  Just focusing down on the bottom quarter of the page.  Do
17  you recognize any of the individuals to whom this communication
18  is addressed?
19  A.  I do.
20  Q.  How do you recognize those people?
21  A.  So, at this point in September 2010, I was the assistant
22  secretary.  Daniel Lawrence Glaser was my deputy, and Colleen
23  Stack worked for Danny.
24          MR. LOCKARD: Government offers Government Exhibit
25  7001.

HC83ATI1          Cohen - Direct          Page 1112

 1          THE COURT: I'll allow it.
 2          (Government's Exhibit 7001 received in evidence)
 3  Q.  Do you recognize --
 4          MR. ROCCO: Your Honor, if I may be heard on this.
 5          THE COURT: You don't need to be.  Do you have an
 6  objection?
 7          MR. ROCCO: I do, your Honor.
 8          THE COURT: Overruled.
 9          MR. ROCCO: I object.
10  Q.  Do you recognize the individual who sent the e-mail?
11  A.  I do.
12  Q.  Who is that sender?
13  A.  Mr. Atilla.
14  Q.  Generally speaking, does this e-mail concern U.S. sanctions
15  programs?
16  A.  Yes.
17  Q.  Can you remind us again what was Mr. Glaser's position in
18  September of 2010 when this was sent?
19  A.  He was the deputy assistant secretary for terrorist
20  financing.  Which is a bit of a misnomer, but that was his
21  title.
22  Q.  Let's back out to again to 8020.  So, focusing in again on
23  March 14 of 2012.  Where was the meeting held?
24  A.  In my office at the Treasury Department.
25  Q.  Who were the participants in that meeting?

**A570**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        December 8, 2017

---

HC83ATI1          Cohen - Direct          Page 1113

1  A.  As I recall, it was Mr. Atilla and Mr. Aslan.  There were
2  certainly other people from the Treasury Department who were in
3  that meeting, because I know that I never met one on one.  But,
4  sitting here right now, I can't tell you who was with me from
5  Treasury.
6  Q.  Do you remember the circumstances under which that meeting
7  came about?
8  A.  As I recall, the Halkbank executives were in Washington for
9  a meeting, the spring meetings of the International Monetary
10  Fund and the World Bank.  They happen every spring.  Lots of
11  government officials and bank executives from around the world
12  descend on Washington for these spring meetings.  And we use
13  that as an opportunity to do meetings with government officials
14  and with bank executives that we have business to transact
15  with.
16  Q.  What were the state of the petroleum-related sanctions that
17  we were just been talking about at the time of this meeting?
18  A.  So, in December 11, 2011, the NDAA was enacted.  That was
19  the significant reduction provision that we were talking about
20  yesterday.  My recollection is that did not go into effect for
21  six months, so it was -- it was not yet effective.  It had been
22  enacted, we knew what the law was, and we knew it was going to
23  go into effect I think in late June or mid June.  So, we were
24  at that point talking with bank executives and with other
25  government officials about the requirement that would soon be

---

HC83ATI1          Cohen - Direct          Page 1114

1  in place to significantly reduce oil imports from Iran, with
2  the penalty being if the country didn't significantly reduce
3  their oil imports, the bank that was involved in making the
4  payments could be cut off from the United States.
5  Q.  What were the topics that you discussed with Mr. Atilla and
6  Mr. Aslan at this meeting in March?
7  A.  So we certainly talked about that, because that was top of
8  mind at that time.  I imagine we talked about other issues
9  relating to Iran sanctions.
10        MR. ROCCO:  Objection, your Honor.  "I imagined."
11        THE COURT:  Sustained.
12        THE WITNESS:  Well --
13        THE COURT:  Best you can remember.
14  A.  As best I remember, we certainly talked about the oil
15  sanctions.  I don't recall specifically the other topics of
16  conversation.  I'm confident that there were others, because we
17  had a sort of an ongoing conversation with Halkbank about a
18  variety of sanctions, including the Iran sanctions, but also
19  our counterterrorism sanctions.  And so, I'm confident we
20  addressed other issues as well but I can't specify exactly what
21  they were.
22        THE COURT:  Do you remember how long the meeting
23  lasted?
24        THE WITNESS:  Probably a 45-minute meeting or so,
25  maybe an hour.

---

HC83ATI1          Cohen - Direct          Page 1115

1  Q.  Mr. Cohen, is there something that I can show you that
2  would refresh your recollection about what was discussed at
3  this meeting?
4  A.  Our normal practice was to make a written record of
5  meetings, whether they were in my office in Washington or when
6  I traveled.  So if there were a document that was sort of a
7  summary record of that meeting, that would help.
8        MR. LOCKARD:  Your Honor, may I approach?
9        THE COURT:  Sure.
10        THE WITNESS:  Thank you.
11        (Pause)
12        THE WITNESS:  Okay.
13  Q.  Have you had a chance to review that?
14  A.  I have.
15  Q.  Does that refresh your memory about the content of the
16  meeting on March 14, 2012?
17  A.  It does.
18        It may have been longer than 45 minutes, Judge.
19  Q.  Can you just describe generally what was discussed, and
20  then I'll ask you a couple of particular followup questions.
21  A.  Sure.  The various topics here are the ones that we talked
22  about at this meeting, so it was largely focused on oil
23  payments, both for Turkey and for other countries.  And what
24  could be used -- what use could be made, rather, of the
25  proceeds of the oil trade.  And then the general topic of the

---

HC83ATI1          Cohen - Direct          Page 1116

1  impact of sanctions on Iran.
2  Q.  Did the issue of what use was being made of Iranian oil
3  proceeds at Halkbank, did the topic of the use of those
4  proceeds come up in this meeting?
5  A.  Yes.
6  Q.  What, if anything, did Halkbank say about how those funds
7  were used?
8  A.  So generally, the Halkbank executives, Mr. Atilla and
9  Mr. Aslan and others, made the point that there was robust
10  trade between Turkey and Iran in a variety of goods.  They
11  share a long border, they're historic trading partners.  And
12  the, one of the things that Halkbank did was to facilitate
13  trade between Turkey and Iran.  But, as a large financial
14  institution that was engaged with trade with Iran, other
15  countries and other businesses outside of Turkey wanted to make
16  use, essentially, of Halkbank's access to the Iranian market.
17  So that Halkbank could help to facilitate transactions and
18  trade from other countries as well.
19        We talked about the humanitarian trade issue, which
20  was again sort of a constant theme of our conversations, was
21  sort of how as the sanctions expanded in scope, the effect of
22  that on Halkbank's facilitation of humanitarian trade.
23        Some more specific detailed questions as well, but
24  that's sort of the general topics.
25  Q.  Did Mr. Atilla or Mr. Aslan say anything about either

---

A571

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC83ATI1          Cohen - Direct          Page 1117

1  currency or gold relating to the Iranian oil proceeds?
2  A. Yeah, as I recall -- just look at this. Gold was a -- a
3  topic of conversation that came up again frequently in our
4  conversations with Halkbank.
5  Q. If you look at the last half of the fourth paragraph on
6  page two, does that refresh your memory on that topic?
7  A. Yeah, I'm looking at that.
8          (Pause)
9  A. Right. Right. So, I do recall the conversation. The
10  conversation involved both physical currency, bank notes, and
11  gold. Because, for reasons I'm happy to explain, from the
12  Iranian perspective, that's something that they were trying to
13  acquire. And we were sensitive to Iran trying to get both
14  physical currency, in particular dollars or euros, as well as
15  acquiring gold.
16  Q. What, if anything, did Halkbank say on that topic?
17  A. They told us that they would not -- were not allowing Iran
18  to acquire gold or bank notes from Halkbank, using the proceeds
19  that Halkbank was holding for Iran from the sale of oil.
20  Q. We talked sort of globally speaking about discussions you
21  had with Halkbank about sanctions evasion techniques. Is that
22  something that was discussed at this meeting?
23  A. Yes.
24  Q. What, if anything, did Mr. Atilla and Mr. Aslan tell you on
25  that point?

HC83ATI1          Cohen - Direct          Page 1118

1  A. So every time that that topic came up, we were assured
2  really of two fundamental things. One was they knew that, they
3  understood that, that Iran would look to use deceptive
4  practices to evade sanctions. And secondly, that they -- that
5  they had mechanisms in place at the bank to ensure that they
6  would detect and prevent Iranian efforts to evade the
7  sanctions.
8  Q. Let's advance to the next slide.
9          Directing your attention to early September of 2012.
10  Did you have any discussions with Halkbank representatives in
11  that time frame?
12  A. I visited Turkey in early September of 2012 and visited
13  Halkbank's -- I actually don't remember if it was in Istanbul
14  or Ankara, but visited Halkbank at the time.
15  Q. Looking at the regulatory context again, what if any recent
16  developments had there been in the sanctions relating to gold
17  or petroleum in Iran?
18  A. So, the TRA, the Iran Threat Reduction and Syrian Human
19  Rights Act was enacted in August of 2012. That was the
20  provision of law that brought into effect the bilateral trade
21  restriction, which, as we talked about yesterday, meant that
22  for countries that were purchasing oil from Iran, so long as
23  they were significantly reducing the amount of oil they were
24  purchasing over time, they could continue to pay Iran for that
25  oil without the bank involved being subject to sanctions.

HC83ATI1          Cohen - Direct          Page 1119

1          And then on top of that, was this new requirement that
2  said they could -- they could pay Iran, so, receive into the
3  account that they held for Iran the proceeds of the oil trade,
4  but Iran could only use that money to facilitate trade between
5  that country and Iran.
6          So, in Turkey's situation and Halkbank's situation,
7  the money that Iran was earning from the sale of oil to Turkey
8  as Turkey was significantly reducing the amount of oil that it
9  was purchasing, that money would go into an account at
10  Halkbank. Iran could use that money from the Halkbank account
11  just to buy goods from Turkey, not to buy goods from elsewhere
12  in the world.
13  Q. Focusing in on your meeting with Halkbank, who were the
14  participants in this meeting in September?
15  A. My recollection is that Mr. Atilla was one of the people
16  that I met with. As I said I think I said yesterday, in all of
17  these meetings there were people on my side, people on their
18  side. So it wasn't a one-on-one meeting, but Mr. Atilla was
19  the principal counterpart as I recall.
20  Q. Generally speaking, what were the issues that were
21  discussed at the September meeting?
22  A. Well, what we were just talking about on bilateral trade
23  restrictions was certainly part of it. I think we -- also
24  talked about gold. The -- I think we skipped over this, but
25  Executive Order 13622 had also been issued over the summer on

HC83ATI1          Cohen - Direct          Page 1120

1  July 30, 2012. That's the executive order that put into place
2  the sanction on the sale of precious metals and bank notes to
3  the government of Iran, though we also talked about that
4  provision.
5          Because that was a sanction on the sale of precious
6  metals or bank notes to the government of Iran or any person
7  acting on the government of Iran's behalf, we talked about
8  Iranian evasion techniques as a way to get around the
9  prohibition on the sale of precious metals or bank notes to
10  Iran. So we talked about evasion.
11          And as I said just a minute ago, in every one of the
12  conversations that we had with Halkbank, they assured us that
13  they were -- that they understood the sanctions and they were
14  complying with the sanctions and had the processes and
15  procedures in place in the bank to detect and prevent sanctions
16  evasion.
17  Q. What, if any, discussions do you recall specifically about
18  gold at this meeting?
19  A. So, I remember that we talked about the new executive
20  order, about what it was focused on. What was sanctioned under
21  this executive order. "Sanctioned" meaning prohibited. And
22  about our concerns that the Iranians would and were trying to
23  evade the sanctions.
24  Q. Do you recall any other specific parts of that discussion?
25  A. Nothing beyond what I've already testified to.

A572

HC83ATI1          Cohen - Direct          Page 1121

1    MR. LOCKARD: Your Honor, if I may approach?
2    THE COURT: Sure.
3    MR. LOCKARD: I'm going to hand the witness what's
4  been marked for identification as 3505-005.
5    THE WITNESS: Thank you.
6  Q. Mr. Cohen, if you can just take a look at this document and
7  let me know when you've had a chance to review it.
8    (Pause)
9  A. Okay.
10  Q. Does that refresh your recollection about the specifics of
11  this meeting?
12  A. It does.
13  Q. So what, if anything, did you talk about specifically about
14  gold transactions at this meeting in September of 2012?
15  A. As I recall, this was the first that we had heard that Halk
16  had been approached to assist in the acquisition in gold by the
17  government of Iran.
18    THE COURT: To what?
19    THE WITNESS: Assist in the acquisition of gold. By
20  the government of Iran.
21  A. So we talked about that. We were assured by Halkbank that
22  they -- they told the government of Iran that they would not
23  assist. And, you know, that sparked a relatively lengthy
24  conversation about the fact that Iran clearly continued to want
25  to acquire gold. We knew that, that they would use whatever

HC83ATI1          Cohen - Direct          Page 1122

1  means and mechanisms and deceptive practices they could devise
2  to try and acquire gold. And Halkbank assuring us that they
3  understood that and would do everything they could to prevent
4  it.
5  Q. During this meeting, what did Halkbank say about its due
6  diligence efforts?
7  A. So in this meeting in --
8    MR. ROCCO: Objection, your Honor. Halkbank doesn't
9  speak.
10  Q. What did Mr. Atilla say about Halkbank's due diligence
11  efforts?
12  A. So in this meeting, and in I think every meeting, we were
13  told by Mr. Atilla and Mr. Aslan, for that matter, when
14  Mr. Aslan was speaking on behalf of Halkbank, that they had
15  both the capability and the intention to ensure that the bank
16  was not used for sanctions evasion.
17  Q. Did Mr. Atilla describe anything relating to the specifics
18  of its due diligence documents or documentary research?
19  A. So, I think in this meeting and in other meetings when we
20  were talking about whatever type of trade was the subject of
21  the sanctions, so this could be -- whether it's gold trade, or
22  to use the example that I've been using previously, the trade
23  in specialty steel for Iran's nuclear program. The way to
24  ensure that, if you're a bank, that you're not facilitating
25  illicit trade, is to know who your customer is, understand what

HC83ATI1          Cohen - Direct          Page 1123

1  their business practices are, make an effort to be informed
2  about the actual goods that are being sold. So that includes
3  practices like getting copies of the bills of lading, the
4  commercial documents that describe the goods that are being
5  exported. It includes doing spot checks on occasion,
6  particularly for large customers of the goods that are being
7  sold. It is a whole host of ways that a well-functioning
8  compliance program operates.
9    And we talked to Halkbank, we talked -- this was part
10  of a conversation that we had with a number of financial
11  institutions around the world, that gave us similar assurances
12  of their both intention and capability to comply with the
13  sanctions.
14  Q. Let's advance to the next slide. Did you have a followup
15  communication with officers from Halkbank after the September
16  meeting?
17  A. Yeah. As I recall, I called Mr. Aslan to voice concerns
18  about the gold trade in particular in November.
19  Q. What prompted you to reach out to Halkbank in November
20  after having just had a meeting in September?
21  A. I must have read something that made me concerned that
22  the -- that there was -- that there was the risk that Halkbank
23  was facilitating trade that violated our sanctions.
24  Q. Is there something that I can show you that might refresh
25  your recollection about the contents of that phone call?

HC83ATI1          Cohen - Direct          Page 1124

1  A. I suspect so. If there were a record of that phone call,
2  that would help.
3    MR. LOCKARD: May I approach, your Honor?
4    THE COURT: Sure.
5    THE WITNESS: Thank you.
6    (Pause)
7    MR. LOCKARD: It is a poltergeist.
8  Q. Mr. Cohen, if you can let me know when you've had a chance
9  to read that.
10  A. Okay.
11  Q. Okay?
12  A. Hmm-hmm.
13  Q. Does that refresh your recollection about the content of
14  your phone call with Mr. Aslan?
15  A. It does.
16  Q. Just specifically, when did that phone call take place?
17  A. November 7, 2012.
18  Q. What did you explain to Mr. Aslan was the purpose of your
19  calling him?
20  A. So the purpose was to amplify the caution that I had
21  conveyed when I was there in September. That was mostly having
22  to do with the fact that Halkbank was becoming increasingly the
23  only linkage between Turkey and Iran, and that as its role in
24  Turkish-Iranian trade became more prominent, and sort of
25  concentrated, that the risk that whatever bad transactions the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 8, 2017

HC83ATI1          Cohen - Direct          Page 1125

1  Iranians wanted to engage in would run through Halkbank was
2  increasing.
3        Your Honor asked me yesterday whether we had --
4        THE COURT: Could you hold on for a second? We're
5  going to take a two-minute break. Okay?
6        MR. LOCKARD: Yes, your Honor.
7        (Recess)
8        (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HC8PATI2          Cohen - Direct          Page 1126

1        (Jury present)
2        THE COURT: Okay. Please be seated, everybody.
3  Mr. Lockard could you go back a question or two.
4        MR. LOCKARD: Yes, your Honor.
5  BY MR. LOCKARD:
6  Q. So, Mr. Cohen, we had just been talking about the
7  November 7th, 2012, phone call with Mr. Aslan?
8  A. Yes.
9  Q. And you were describing what it is that you had described
10  to Mr. Aslan as the purpose of placing that phone call. If you
11  could just remind us again what those purposes were, again to
12  put us back into the context?
13  A. Sure. As I was saying, we had seen a concentration of
14  banking relationships between Turkey and Iran at Halkbank. The
15  Judge had asked me yesterday whether we dealt with other banks
16  in Turkey. We had, and there were other banks that we had some
17  concerns about, and we persuaded some others to end their
18  transactional activity with Iran.
19        The effect of that was, as I said, to concentrate
20  Turkish-Iranian business in Halkbank, which increased the risk
21  that Halkbank would be the conduit for which Iran engaged in
22  its illicit transactional activity. So the purpose of my call
23  was to, as I said, amplify the caution that I had given to
24  Halkbank when I was there in September. That was the purpose
25  of the call.

HC8PATI2          Cohen - Direct          Page 1127

1        THE COURT: You called them?
2        THE WITNESS: Yes.
3  BY MR. LOCKARD:
4  Q. And in order to fulfill that purpose, what did you tell
5  Mr. Aslan during that call?
6  A. Essentially what I just described, that Halk was becoming
7  increasingly the key conduit. We, as I had in September,
8  talked about what was to be the soon-to-be effective bilateral
9  trade restriction; so it was enacted over the summer. It was a
10  180-day phase-in before it became effective law.
11        On February 6th of 2013 it would come into effect, and
12  one of the points that we were making to Halkbank, and to
13  others around the world, was that was, in fact, the effective
14  date, and as of that date, they needed to have in place the
15  mechanism to ensure that they were in compliance with that
16  provision or else risk violating sanctions.
17  Q. And that February 6th effective date, that pertains to the
18  bilateral trade requirement that had been enacted in August?
19  A. That's right.
20  Q. During that conversation, what, if anything, did Mr. Aslan
21  say to you specifically about gold transactions?
22  A. As I recall, he raised the gold issue in this phone call.
23  We had had a conversation about gold when I was in Turkey
24  earlier that fall, and he raised this issue about the amount --
25  essentially, the amount of gold trade between Turkey and Iran

HC8PATI2          Cohen - Direct          Page 1128

1  and their -- it was both a -- as I recall, both a comment on
2  the size of the trade and the assurance that they would comply
3  with the sanctions requirement.
4  Q. And what, if anything, did Mr. Aslan say about the number
5  of Halkbank clients involved in the gold trade?
6  A. So as I -- my recollection is what he told me was that
7  there was a lot of gold trade from Turkey to Iran. I don't
8  remember him saying we had, you know, one customer who was
9  responsible for all of it. The sense I had was that there
10  was -- that this was a robust trade between Turkey and Iran,
11  with lots of participants.
12  Q. Okay. Let's turn to the next slide, and I'd like to show
13  for Mr. Cohen Government's Exhibit 7005. If you could let me
14  know when you've had a chance to take a look at that?
15  A. I have.
16  Q. Do you recognize that?
17  A. I do.
18  Q. And how do you recognize that?
19  A. That's a letter that I sent to Mr. Aslan in December of
20  2012.
21        MR. LOCKARD: The government offers 7005.
22        THE COURT: I'll allow it.
23        MR. ROCCO: No objection.
24        (Government's Exhibit 7005 received in evidence)
25        MR. LOCKARD: And, Mr. Chang-Frieden, if you can just

A574

HC8PATI2          Cohen - Direct          Page 1129

1    zoom back out to the full letter, I think.  Thank you.
2      BY MR. LOCKARD:
3    Q.  What is the date on this letter?
4    A.  December 20th, 2012.
5    Q.  And is that your signature at the bottom?
6    A.  I'm afraid so.
7    Q.  You didn't mention any medical training in your background.
8    A.  You're not the first person to make that joke.
9    Q.  So could you just tell us what is the general topic of this
10   letter?
11   A.  It was gold.  The gold trade between Turkey and Iran was
12   the general topic.
13   Q.  Is there anything that had prompted you to write this
14   letter?
15   A.  Yes.
16   Q.  What had prompted you to write that letter?
17   A.  We saw a news report that Ali Babacan, who was the deputy
18   prime minister of Turkey at the time, had made some public
19   marks, I believe in the Trish parliament, though I'm not sure,
20   that indicated that Turkey was selling gold to the Iranian
21   government.  That was, obviously, highly concerning.
22       At this point in 2012, the executive order that had
23   come into effect over the summer that focused on the sale of
24   gold to the government of Iran was in effect, and we had seen
25   some evidence of an increase in the volume of gold being sold,

HC8PATI2          Cohen - Direct          Page 1130

1    exported from Turkey to Iran.
2       We saw this press report that quoted Deputy Prime
3    Minister Babacan, and as I said, we were very concerned about
4    it and wanted to make sure that Halk was aware of it and aware
5    of the implications of it.
6    Q.  So if you could, just please read the first paragraph of
7    your letter?
8    A.  Sure.  It says: "Dear General Manager Aslan.  I hope this
9    letter finds you well.  I am writing to you regarding Turkish
10   sales of gold to Iran, an issue we have discussed several times
11   over the last few months.  Recent press reports quote Turkey's
12   Deputy Prime Minister Ali Babacan as stating that Turkey is
13   exporting billions of dollars' worth of gold to the government
14   of Iran in order to pay for Turkeys imports of oil from Iran.
15   In particular, Deputy Prime Minister Babacan is reported to
16   have said 'When Turkey buys Iranian oil, we pay for it in
17   Turkish Lira.  However, it is not possible for Iran to take
18   that money as dollars into its own country due to international
19   sanctions.  Therefore, when Iran cannot take this money back as
20   currency, they withdraw Turkish Lira and buy gold from our
21   market.'  The U.S. Department of the Treasury is troubled by
22   these reports.  We are concerned that Turkiye Halk Bankasi,
23   (Halkbank) may be facilitating these sales."
24   Q.  So, Mr. Cohen, what's your recollection of what Mr. Aslan,
25   or more specifically, what Mr. Atilla told you about Halkbank's

HC8PATI2          Cohen - Direct          Page 1131

1    involvement in providing financing for gold sales to Iran and
2    whether it was related to the government of Iran?
3    A.  They, prior to this letter, assured me that they were not
4    doing that.
5    Q.  And what about after the letter?
6    A.  So after the letter, we had a series of additional
7    conversations.  I don't recall receiving a response from
8    Mr. Aslan to this letter, but we had -- there were a series of
9    other conversations that I had with Mr. Atilla and Mr. Aslan
10   after this letter where similar assurances were conveyed.
11   Q.  So if we could go back to Exhibit 8020 and advance to the
12   next slide.  So did there come a time when you met with
13   Mr. Aslan again?
14   A.  Yes.  In February of 2013, I was back in Turkey.
15   Q.  Okay.  And can you remind us what changes or developments
16   had there been in the regulatory landscape between December of
17   2012 and late February of 2013?
18   A.  There were two that were relevant.  The first was, on
19   January 2nd, the President signed the Iran Freedom and
20   Counter-Proliferation Act, IFCA.  One of the provisions from
21   IFCA was a requirement that the sale of precious metals be --
22   the prohibition -- the sanction on the sale of precious metals
23   be expanded so it wasn't focused just on the sale to the
24   government of Iran but to anybody in Iran altogether.  That was
25   enacted on January 2nd.  It also had a 180-day phase-in period;

HC8PATI2          Cohen - Direct          Page 1132

1    so it was going to become effective on July 1st, but that law
2    had been enacted.
3       The second was that the bilateral trade restriction
4    that we've been talking about that was enacted over the summer
5    of 2012 went into effect on February 6th of 2013.
6    Q.  Okay.  And during this meeting in February, what were the
7    topics that you discussed?
8    A.  Certainly those two issues, and as I testified just a
9    moment ago, we were seeing, in trade statistics in particular,
10   an increase in the volume of gold being exported from Iran --
11   sorry, from Turkey to Iran.  Combined with the comments that we
12   were just talking about from the deputy prime minister and
13   other information, we were concerned that Halkbank was
14   facilitating the sale of gold to the government of Iran, and so
15   that was also a topic of conversation.
16   Q.  And do you remember the specifics of those discussions,
17   especially about the gold trade?
18   A.  Not in any more detail than I just testified.
19       MR. LOCKARD:  Your Honor, if I may approach.
20   Q.  It's a little lengthy; so just let me know when you've had
21   a chance to review it.
22   A.  Okay.
23       (Pause)
24       Okay.
25   Q.  And did that refresh your recollection about the contents

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        December 8, 2017

HC8PATI2          Cohen - Direct          Page 1133

1   of the meeting?
2   A. It does.
3   Q. And just for starters, who do you recall being at that
4     meeting?
5   A. I recall Mr. Atilla, others from Halkbank and then, you
6     know, from my side, again, there were people who were with me,
7     but I don't remember exactly who it was.
8   Q. So turning back to gold, what, if anything, did you tell
9     Mr. Atilla about the gold issue?
10  A. So I think this accurately reflects the conversation. We'd
11    been having this conversation about gold now for more than a
12    year and voicing our concern and our increasing concern that
13    Iran was looking to -- was increasingly desperate, frankly, to
14    get gold, as well as get U.S. dollars as well; that the
15    Halkbank was becoming increasingly important as the conduit for
16    transactions between Turkey and Iran; that the deputy prime
17    minister had publicly proclaimed that Turkey was engaging in
18    transactions that were blatantly in violation of our sanctions;
19    that Halkbank, we knew, was -- you know, had told us that they
20    facilitated the export of gold from Turkey to Iran, assuring us
21    that it was gold sales to private Iranian purchasers, not to
22    the government of Iran.
23        We were concerned that some of these private Iranian
24    purchasers may be acting on behalf of the government of Iran;
25    that Halkbank had -- you know, Mr. Atilla and his colleagues

HC8PATI2          Cohen - Direct          Page 1134

1     had told us that -- they were adamant about ensuring that
2     whatever transactions they were facilitating in gold to Iran
3     were to permissible purchasers and not to the government, and
4     that they had the processes in place to execute on that
5     promise.
6        So that my level of concern was quite high, and I
7     think I delivered a pretty stern warning that we were concerned
8     that the assurances that we had been provided over time were in
9     question. I remember this meeting pretty well.
10  Q. And what was Mr. Atilla's response to that warning?
11  A. To reiterate the assurances that they knew who they were
12    dealing with both on the Turkish and on the Iranian side; that
13    everything they did was in compliance with our sanctions; that
14    they were committed to complying with our sanctions; and that
15    they understood -- I remember a particular discussion about the
16    increase in the volume of gold trade and being assured that it
17    was just private Iranian citizens who were buying a lot more
18    gold. So that was sort of the substance of what Mr. Atilla
19    told us, told me.
20  Q. Moving to another sanctions issue. During this meeting,
21    was there discussion about the humanitarian trade, the
22    transactions for the import of food and medicine?
23  A. Yes.
24  Q. And what did Mr. Atilla say about humanitarian trade using
25    Halkbank funds?

HC8PATI2          Cohen - Direct          Page 1135

1   A. So, again, this was also a common theme in our
2     conversations, that humanitarian trade was exempt from our
3     sanctions and so trade in food, medicine, medical devices could
4     be facilitated by the bank with the funds that it had on hand,
5     whether it was trade from Turkey or from third countries; so
6     the bilateral trade restriction didn't apply to humanitarian
7     trade.
8        There was -- as part of that, there were concerns that
9     Halkbank and others banks raised about the reluctance of others
10    to engage in this trade because of fear that it was a way that
11    Iran was looking to evade sanctions by portraying something as
12    baby formula when it was some other prohibited good. And so we
13    had some ongoing conversations about how the sanctions that
14    were in place and that were expanding intersected with the
15    carve-out for humanitarian trade.
16  Q. And what did Mr. Atilla tell you about Halkbank's efforts
17    on that front?
18  A. He told us that they were continuing to do this trade,
19    which I applauded them for. It was important to me, it was
20    important to the U.S. government, more generally, that
21    humanitarian trade continue. We were not trying to stifle
22    humanitarian trade. So he told us that they were doing it. He
23    raised some difficulties they were encountering in facilitating
24    that trade; again, asked questions just to make sure that he
25    understood what was permissible, what was not, but that was the

HC8PATI2          Cohen - Direct          Page 1136

1     substance of it.
2   Q. You mentioned difficulties, what were the nature of the
3     difficulties that were raised?
4   A. So there's sort of two difficulties. One was that the
5     amount of money that was available to facilitate humanitarian
6     trade was reducing because the funds that Halkbank was holding
7     for the Central Bank of Iran from the oil trade, that was
8     decreasing as Iran was selling less oil to Turkey. So there
9     was less money in the Central Bank of Iran's account at
10    Halkbank.
11        That money was being used to facilitate normal trade,
12    you know, furniture and what have you from Turkey, which meant
13    that there was less money available to facilitate humanitarian
14    trade, whether from Turkey or from other countries. So that
15    was one concern.
16        And then the other was a concern about the Iranians
17    trying to use the humanitarian trade exception as a way to
18    facilitate illicit trade, whether in steel for their nuclear
19    program, for their centrifuges, or gold or what have you.
20  Q. And what, if anything, did Mr. Atilla say about Halkbank's
21    customers who were involved in humanitarian trade?
22  A. He assured us that they knew who they were. They knew the
23    goods that were being sold to Iran and that they rejected doing
24    business with businesses that they didn't feel confident that
25    they knew that it was legitimate humanitarian trade that was

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI2          Cohen - Direct          Page 1137

1  being facilitated.
2  Q. Now, you've also talked about discussions about sanctions
3  evasion efforts and sanction evasion techniques. During this
4  meeting, did you have any discussions about particular
5  sanctions evasion techniques?
6  A. Sure. We talked about the use of front companies. We
7  talked about the use of false shipping documents, sort of the
8  whole range, really, of the ways in which Iran would try to
9  evade sanctions. I mean, there are only a few different
10  techniques. There are, like, many different manifestations of
11  it, but there are only a few sort of standard techniques.
12  Q. And in this meeting, were those examples tied to
13  particular examples or particular factual scenarios?
14  A. So gold trade was one of the issues where we talked about
15  these evasion techniques, and then the -- in that we were just
16  talking about humanitarian trade as well, you know, portraying
17  something as a legitimate humanitarian good when it was
18  something else entirely.
19  Q. Are you familiar with Worri Bank and the Industrial Bank of
20  Korea?
21  A. I am.
22      THE COURT: What was the first bank you said?
23      MR. LOCKARD: Worri, W-o-r-r-i, Worri Bank.
24  Q. Did those banks come up in this conversation?
25  A. They did.

HC8PATI2          Cohen - Direct          Page 1138

1  Q. And how did they come up in this conversation with
2  Mr. Atilla?
3  A. So we were worried about Worri Bank and IBK, and we were
4  concerned about transactions that they were engaged in. And we
5  were --
6      THE COURT: In what country were they?
7      THE WITNESS: South Korea.
8  A. I'm pausing because I want to not disclose anything that's
9  classified. We were -- we had made efforts in South Korea to
10  address our concerns with Worri Bank and IBK, and one of the
11  issues that sort of spun off from that was whether they would
12  try to use Halkbank as their entree into Iran if other
13  mechanisms and connections were cut off.
14  Q. So if I understand your answer, there were Iran sanctions
15  evasion issues at those two South Korean banks?
16  A. That's a more succinct way of saying it, yes.
17  Q. So at the time of this meeting in February of 2013, had
18  there been publicly available information about what had
19  happened with those two banks?
20  A. I don't know. I suspect not, but I don't know for sure.
21  Q. Were there any examples drawn from those two banks that you
22  discussed with Mr. Atilla and the other Halkbank participants
23  at this meeting?
24  A. Yes. As reflected here, we sort of highlighted for
25  Halkbank and Mr. Atilla, our concern that --

HC8PATI2          Cohen - Direct          Page 1139

1      MR. ROCCO: Your Honor, excuse me. May we know if the
2  witness is reading from the document?
3      THE COURT: Do you have an objection?
4      MR. ROCCO: I have an objection, your Honor.
5      THE COURT: Okay.
6      MR. ROCCO: I object.
7      THE COURT: Sir, his concern is that you're reading
8  from the document as opposed to remembering.
9      THE WITNESS: Right.
10      THE COURT: Perhaps your recollection being refreshed.
11      THE WITNESS: Right. The document is helping me
12  recall the conversation, which was that --
13      THE COURT: Could you backtrack for a minute?
14      THE WITNESS: Sure.
15      THE COURT: I'm sure everybody understands it, except
16  me, but what was the concern about the relationship of Korea,
17  to Turkey, to Iran?
18      THE WITNESS: We had concern that Worri Bank and the
19  Industrial Bank of Korea, IBK, were involved in transactions
20  that were violating our sanctions.
21      THE COURT: Your sanctions against Iran.
22      THE WITNESS: Against Iran.
23      THE COURT: In that -- how were they doing that?
24      THE WITNESS: I'd rather not say.
25      THE COURT: Oh, okay.

HC8PATI2          Cohen - Direct          Page 1140

1      THE WITNESS: Okay. I -- I'd rather not say --
2      THE COURT: No, I understand.
3      THE WITNESS: Okay. But what we had accomplished,
4  essentially, was to close off the mechanism that Worri Bank and
5  IBK were using that caused us concern about the sanctions being
6  violated. We were aware that those banks, as well as some
7  other banks around the world, seeing that Halkbank had a
8  relationship with Iran that was a robust relationship with
9  Iranian banks, would try to reestablish their relationship with
10  Iran through Halkbank.
11      THE COURT: I see. And Halkbank had this relationship
12  greater than other banks in Turkey?
13      THE WITNESS: Yes. Yes, particularly at this point.
14  As other banks in Turkey had reduced their exposure to Iran,
15  Halkbank was the principal conduit between Turkey and Iran.
16  And other banks around the world knew that, and so for Worri
17  Bank and IBK, as well as some banks in Russia and elsewhere, we
18  were concerned that they would be trying to essentially link up
19  with Halkbank as a way to get access to Iran.
20  BY MR. LOCKARD:
21  Q. I believe that in addition to other Turkish banks stepping
22  back from the Iran business, you testified earlier that
23  Halkbank was the only bank in Turkey where the proceeds of
24  sales of Iranian oil were deposited?
25  A. That's correct.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI2          Cohen - Direct          Page 1141

1  Q. So let's return home from Turkey in February of 2013.
2  A. Okay.
3           MR. LOCKARD: And, Mr. Chang-Frieden, if you could
4  highlight the next line, and also if you could display for
5  Mr. Cohen Government's Exhibit 7022.
6  Q. Okay. Mr. Cohen, do you recognize that?
7  A. I do.
8  Q. And how do you recognize that?
9  A. It's an e-mail from Mr. Atilla to me on July 1st, 2013.
10          MR. LOCKARD: The government offers Government
11 Exhibit 7022.
12          MR. ROCCO: No objection, your Honor.
13          THE COURT: I'll allow it.
14          (Government's Exhibit 7022 received in evidence)
15          MR. LOCKARD: And we ask that it be published for the
16 jury.
17          THE COURT: Sure.
18 BY MR. LOCKARD:
19 Q. Mr. Cohen, what's the date on this e-mail from Mr. Atilla?
20 A. July 1, 2013.
21 Q. And is there any significance to that date from an Iran
22 sanctions point of view?
23 A. That's the date that IFCA, the Iran Freedom and
24 Counter-Proliferation Act, that was enacted on January 2nd, had
25 went into effect. It was 180 days later; so there were a

HC8PATI2          Cohen - Direct          Page 1142

1  variety of provisions in that law. One was, as I testified
2  earlier, it expanded the sanction on the sale of gold from
3  focused on sales just to the government of Iran, to the sale of
4  gold to anybody in Iran.
5  Q. And it's a short e-mail. If you could please read it for
6  the jury?
7  A. "Dear Mr. Cohen. In accordance with the related provision
8  of the National Defense Authorization Act for fiscal year 2013,
9  entered into force on 1 July 2013, we would like to inform you
10 that we, as Turkey Halk Bankasi AS, stopped mediating the
11 transactions of exporters related to the trade of precious
12 metals with Iran as of 10 June 2013. Respectfully submitted
13 for your information. Best regards, M. Hakan Atilla, Deputy
14 General Manager, Halkbank."
15 Q. After this e-mail, did you have any further discussions
16 with Mr. Atilla, or anyone else at Halkbank, about gold
17 transactions with Iran?
18 A. I believe so, yes.
19 Q. We will leave this July 1st e-mail aside for now, and if we
20 could go back to 8020. If we can advance one more, and also
21 display for Mr. Cohen Government's Exhibit 7011.
22          Mr. Cohen, do you recognize that?
23 A. I do.
24 Q. And how do you recognize this?
25 A. It's an e-mail from Mr. Atilla to me in October 2013.

HC8PATI2          Cohen - Direct          Page 1143

1           MR. LOCKARD: The government offers Exhibit 7011.
2           MR. ROCCO: No objection.
3           THE COURT: I'll allow it.
4           (Government's Exhibit 7011 received in evidence)
5           MR. LOCKARD: And ask that it be published to the
6  jury.
7  BY MR. LOCKARD:
8  Q. So, Mr. Cohen, what is the date on this e-mail from
9  Mr. Atilla?
10 A. October 26th, 2013.
11 Q. And it's to you and cc'd to Mr. Aslan?
12 A. That's correct.
13 Q. So we'll talk about a couple particular parts of it, but
14 overall, what is the general topic of this e-mail from
15 Mr. Atilla?
16 A. The oil trade with Iran and how Halk was handling the funds
17 that -- in the Central Bank of Iran account at Halkbank into
18 which the proceeds of the oil trade were deposited.
19 Q. And what specific issues did Mr. Atilla raise with you
20 about that account that held those oil proceeds?
21 A. Essentially, that the account was reducing in value because
22 Iran was selling less oil to Turkey. Turkey was purchasing
23 less oil from Iran, as they were required to do by the
24 significant reduction requirements, and that as a result, Halk
25 was using those funds to facilitate trade from Turkey in

HC8PATI2          Cohen - Direct          Page 1144

1  permissible goods, which meant that there was less money
2  available to facilitate humanitarian trade from Turkey or from
3  elsewhere.
4           MR. LOCKARD: And, Mr. Chang-Frieden, if you could
5  just highlight or call out the sentence below the first two
6  bullet points.
7  Q. And, Mr. Cohen, could you tell us what Mr. Atilla says in
8  this sentence?
9  A. Well, he says: "In addition to the above-mentioned
10 decrease of funds, there has been a continuously increasing
11 transaction demand related to the sale of humanitarian need
12 items (food, medicine, medical devices and agricultural
13 commodities) to Iran."
14 Q. And if you could please continue with the next sentence,
15 that of Mr. Atilla's e-mail?
16 A. "As a consequence, the funds kept in special purpose
17 account of CBI became insufficient to cover all
18 humanitarian-purpose-related transactions and Halkbank needed
19 to stop mediating transactions of foreign companies
20 (established under the jurisdiction of foreign countries) on
21 14th October 2013. This unavoidable change in Halkbank
22 internal policy caused reactions by both foreign companies,
23 including U.S. originated global-market-dominant companies and
24 Iranian civilians."
25 Q. And so having spelled out that Halkbank is no longer

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                           December 8, 2017

HC8PATI2          Cohen - Direct          Page 1145

1  intermediating humanitarian trade for non-Turkish companies,
2  what did Mr. Atilla ask of you and the Treasury Department?
3  A. They essentially wanted permission to take in additional
4  funds into this special purpose account that they had
5  established for the Central Bank of Iran from other banks
6  around the world. So as I understood this, what they were
7  asking was if Iran is selling oil to Korea, for instance, that
8  instead of the payment for that oil being kept in a special
9  purpose account in a Korean bank and just to be used to
10  facilitate bilateral trade from Korea or humanitarian trade,
11  that the funds from Korea could be deposited into the account
12  in Turkey and that they could use those funds to facilitate
13  humanitarian trade worldwide.
14  Q. Could we just turn briefly to the second page of this
15  e-mail. The e-mail has a couple of footnotes. Do you
16  recognize, not specifically, but generally what those footnotes
17  are referring to?
18  A. Yes.
19  Q. And what are they referring to generally?
20  A. So the Office of Foreign Assets Control published
21  frequently asked questions and answers on its website for all
22  of our sanctions programs, including the Iran sanctions
23  programs. The purpose of it is there were frequently asked
24  questions from banks and businesses around the world and the
25  United States that had questions about how the sanctions

HC8PATI2          Cohen - Direct          Page 1146

1  operated.
2         They would publish the question and the answer as
3  guidance to help explain how the sanctions operated. And so
4  the first footnote refers to FAQ No. 259, and the second one
5  referring to FAQ No. 254. I can't tell you what those
6  questions and answers were, sitting here, but that's what those
7  refer to.
8  Q. Did you respond to Mr. Atilla's request, or did somebody
9  else from the Treasury Department respond to Mr. Atilla's
10  request?
11  A. I believe someone else responded.
12  Q. Now, did there come a time after this e-mail in October of
13  2013, when you planned another trip to Turkey to meet with
14  Halkbank and others?
15  A. Yes.
16  Q. And when was that?
17  A. December of 2013.
18  Q. And did you, in fact, travel to Turkey in December of 2013?
19  A. I did.
20  Q. And did you meet with anybody from Halkbank during that
21  trip?
22  A. I don't believe I did.
23  Q. And why did you not meet with anyone from Halkbank?
24  A. So it turned out that my travel to Turkey occurred
25  essentially on the same day that there was a major law

HC8PATI2          Cohen - Direct          Page 1147

1  enforcement action in Turkey, where a number of people were
2  arrested, including Mr. Aslan.
3         That was a problem, but the bigger problem was that we
4  landed in Istanbul, and the traffic getting in from the airport
5  was so terrible that I was stuck in traffic for like four hours
6  around that we couldn't have made the meeting in any event.
7  Q. Now, so during that trip that day, or any other day of that
8  trip, did you meet with anyone from Halkbank?
9  A. I don't believe so.
10  Q. Did there come a time after December of 2013, when
11  Mr. Aslan was no longer the general manager of Halkbank?
12  A. Yes, as of more or less that date.
13  Q. And did you meet with his successor?
14  A. I did.
15         MR. LOCKARD: Mr. Chang-Frieden, if we could pull 8020
16  back up.
17         THE COURT: Not on that trip?
18         THE WITNESS: Not on that trip.
19  Q. Directing your attention to early October of 2014, did you
20  meet with anyone from Halkbank at that time?
21  A. I did.
22  Q. And who did you meet with?
23  A. It was Mr. Atilla and the new CEO of Halkbank, whose name I
24  am not going to try to pronounce.
25  Q. And where did that meeting take place?

HC8PATI2          Cohen - Direct          Page 1148

1  A. In my office in Washington.
2         THE COURT: Just from Halkbank, the two of them or
3  were there more?
4         THE WITNESS: There may have been a third person from
5  Halkbank present as well. And, again, there were people on my
6  side in addition to it.
7  Q. Now, yesterday afternoon we were talking about in what
8  language your communications and meetings with Halkbank
9  occurred. In what language did this meeting take place?
10  A. So from my side, in English. From Halkbank's side, with
11  Mr. Atilla, in English. With Mr. -- begins with a T, the new
12  CEO of Halkbank, as I recall, he spoke in Turkish, translated
13  by Mr. Atilla into English for me. So that was it.
14  Q. And what were the general topics that you discussed at this
15  October meeting with Mr. Atilla and his new general manager?
16  A. So, in part -- it was my first meeting with the new general
17  manager of Halkbank. So, in part, I was introducing myself,
18  did a brief overview, I think, of the depth of the relationship
19  and conversations between the Treasury Department and me and
20  Halkbank that had gone on in the several preceding years.
21         We talked about Mr. Zarrab at that meeting, and I'm
22  sure we talked generally. So at this point, there had been, in
23  the negotiations with Iran, the interim agreement with Iran
24  having to do with its nuclear program that had some limited
25  relaxation of some sanctions.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                     December 8, 2017

HC8PATI2          Cohen - Direct          Page 1149

1    Part of what we were doing, in all of our engagements
2    with foreign banks at this point, was making sure that they
3    understood the very small number of sanctions that had been
4    relieved and the sanctions that still remained in place. So I
5    think we probably talked about that as well.
6  Q. Now, you mentioned Mr. Zarrab. Who did you understand
7    Mr. Zarrab to be at that time?
8  A. A businessman in Turkey who, himself, had been publicly
9    identified as someone involved in gold trades between Turkey
10   and Iran.
11 Q. And who raised Mr. Zarrab?
12 A. I believe Mr. Atilla raised Mr. Zarrab at that meeting.
13 Q. What, if anything, did you ask about Mr. Zarrab?
14 A. So we asked -- it's possible that I raised Zarrab. I
15   actually don't recall precisely. We wanted to know -- I wanted
16   to know what Halkbank's involvement with Mr. Zarrab was or had
17   been and was at that point, what they knew about his business
18   activity. I was interested in learning as much as I could
19   about Mr. Zarrab.
20 Q. And what, if anything, did Mr. Atilla tell you about
21   Mr. Zarrab and his relationship with Halkbank?
22 A. He told us that they had a banking relationship with
23   Mr. Zarrab, that they had lent him money, that he was involved
24   in the trade of gold with Iran, and asked whether Mr. Zarrab --
25   asked or asserted that Mr. Zarrab was not a sanctioned

HC8PATI2          Cohen - Direct          Page 1150

1    individual at that point and asked whether we were intending to
2    sanction him.
3  Q. Did Mr. Atilla provide any additional details about
4    Mr. Zarrab's then-current business with the bank, in October of
5    2014?
6  A. As I recall, he mentioned that they had a loan for some
7    properties that Mr. Zarrab owned. It was -- my recollection is
8    it was a relatively small relationship but that it was ongoing.
9  Q. What, if any, additional information did you ask for about
10   the relationship between Halkbank and Mr. Zarrab?
11 A. I wanted to know what they were willing to tell me about
12   their relationship with Zarrab; so I -- you know, I -- it
13   was -- I asked a few follow-up questions.
14     Ultimately, I think the conversation got shut down by
15   the -- and I actually don't remember if it was Mr. Atilla or
16   his new general manager who essentially said, you know, if he's
17   not -- they asked if we were going to sanction Mr. Zarrab. We
18   told them, I told them, which is a standard response to a
19   question like that, that we don't forecast our enforcement
20   actions. So even if the next day we were planning to sanction
21   somebody, we wouldn't say so. It undermines the effectiveness
22   of the sanctions.
23     So they asked whether we were intending to sanction
24   Zarrab. I told them I wouldn't answer that question, and that
25   was sort of -- that was essentially the end of the

HC8PATI2          Cohen - Direct          Page 1151

1    conversation.
2  Q. What, if anything, did Mr. Atilla say about the bank's
3    willingness or ability to share additional information?
4  A. I was told that -- they told us everything they were
5    intending to tell us about Mr. Zarrab.
6  Q. Now, in describing these series of meetings and
7    communications with Halkbank, I think you expressed, in
8    particular, concerns that manifested in the February 2013
9    meeting in Turkey about the nature of the gold trade that was
10   being facilitated by Halkbank?
11 A. Right.
12 Q. Did you ever receive satisfactory answers to those
13   concerns?
14 A. Not really, I think is the answer to that question. I
15   pause because the answers that we were given were reassuring in
16   that we were told repeatedly, yes, we're aware of your
17   concerns; yes, we're aware of the specific information that
18   you're citing as a basis for your concern.
19     My recollection is that the conversation that we had
20   about Zarrab in 2014 was not the first time that Zarrab had
21   come up in our conversations, that there was, at some point, it
22   may have been in that February '13 meeting or spring '13
23   meeting, where there was some discussion about Zarrab in
24   particular at that meeting. Regardless, we were told: We
25   understand your concern. We are -- you know, we have it under

HC8PATI2          Cohen - Direct          Page 1152

1    control.
2      But I was never fully satisfied that it was completely
3    under control, which is why we kept oncoming back to this, in
4    part, because we kept getting information that raised concerns
5    that it wasn't completely under control.
6      So the answer to your question was, was I fully
7    satisfied with the response? No. What I was being told was
8    sort of what -- I was being assured that everything was okay
9    but I had reason to question whether, in fact, everything was
10   okay.
11 Q. Did Mr. Atilla, or anyone else in Halkbank, ever tell you
12   that the Iranian importers or buyers of the gold that was being
13   facilitated by Halkbank were Iranian banks or companies
14   affiliated with Iranian banks?
15 A. Well, when you say -- can I take that in two parts?
16 Q. Yes.
17 A. I don't remember him saying that the Iranian banks were
18   purchasing the gold. That would have, I think, led to a number
19   of questions that I would have had. Businesses affiliated with
20   Iranian banks, the purchasers presumably had accounts at the
21   banks; so there was an affiliation in that respect, but not the
22   bank itself.
23 Q. So by "affiliated," did anyone -- did Mr. Atilla or anyone
24   else at Halkbank ever suggest or tell you that the importers or
25   buyers of the gold being facilitated by Halkbank were companies

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
December 8, 2017

HC8PATI2          Cohen - Direct          Page 1153

1  owned or controlled by Iranian banks?
2  A. Not that I recall.
3  Q. And did Mr. Atilla, or anyone else at Halkbank, ever tell
4  you that the Halkbank customer -- that there was predominantly
5  one Halkbank customer responsible for the majority of the gold
6  being exported to Iran?
7  A. So as I just testified, I do recall there being a
8  conversation about Mr. Zarrab that predated the October 2014
9  conversation, and Mr. Zarrab being an important gold trader.
10  Whether he was responsible for the majority, I don't recall. I
11  do recall that Mr. Zarrab was a significant player in the gold
12  trade, as I said.
13  Q. Did Mr. Atilla, or anyone else at Halkbank, ever tell you
14  that the Iranian purchasers or importers of gold after July of
15  2013 became importers or purchasers of food and medical
16  products?
17  A. No, that -- no.
18  Q. Did Mr. Atilla, or anyone else at Halkbank, ever tell you
19  that after July of 2013, Mr. Zarrab became an individual
20  involved in importing food and medical products to Iran?
21  A. Not to my recollection.
22      MR. LOCKARD: One moment, your Honor.
23      (Pause)
24      No further questions. Thank you.
25      THE COURT: Okay. Do you all want to take a break at

HC8PATI2          Cohen - Cross          Page 1154

1  this time, or do you want to continue? So we'll continue with
2  cross-examination.
3      MR. ROCCO: If I may, your Honor.
4      THE COURT: Sure.
5  CROSS-EXAMINATION
6  BY MR. ROCCO:
7  Q. Mr. Cohen, good morning. My name is Vic Rocco.
8  A. Good morning.
9  Q. And with my team, we represent Hakan Atilla. By the way,
10  for the record, you met Mr. Atilla on a number of occasions; am
11  I correct?
12  A. Yes.
13  Q. And you recognize him sitting in the courtroom here today?
14  A. Yes.
15  Q. That's the Hakan Atilla you've been talking about while
16  you've been testifying?
17  A. Yes, sir.
18  Q. Am I correct?
19  A. Yes.
20  Q. Mr. Cohen, today you are an attorney in private practice?
21  A. That's right.
22  Q. You're at WilmerHale?
23  A. Right.
24  Q. And you've been there since the change in the
25  administration, roughly?

HC8PATI2          Cohen - Cross          Page 1155

1  A. I actually didn't start back up until September. I took a
2  little break.
3  Q. Good for you. In private practice, and you've been in
4  private practice before, correct?
5  A. Yes.
6  Q. You started back -- practicing back in the early 1990s?
7  A. 1990.
8  Q. And you have -- over the years, you have represented banks
9  and financial institutions?
10  A. Yes.
11  Q. And over the years, with your government work, you've
12  acquired some formidable knowledge about the American sanction
13  regimes, and I think -- is that correct?
14  A. I think so, yes.
15  Q. And the advise you give clients basically relates to that
16  expertise; am I correct?
17  A. To some extent that's right, yes.
18  Q. So that you represent financial institutions in private
19  practice?
20  A. I do.
21  Q. And you represent financial institutions all over the
22  world; am I correct?
23  A. As I say, I've only been back to practice for a couple of
24  months now; so I'm slowly building up my client base. But --
25  so I wish I could say I represented financial institutions all

HC8PATI2          Cohen - Cross          Page 1156

1  over the world. I'm working towards that.
2  Q. So your portfolio includes large financial institutions,
3  correct?
4  A. Yes.
5  Q. And these financial institutions, by and large, especially
6  American financial institutions, have legal departments,
7  correct?
8  A. Yes.
9  Q. And when you interact with these large financial
10  transactions -- institutions, you often deal with these large
11  legal departments; am I correct?
12  A. Yes.
13  Q. Now, yesterday I think you testified that you believed that
14  Halkbank had access or had advice of counsel in its dealings
15  with the Treasury Department; am I correct?
16  A. Yes.
17  Q. Did you ever go to a meeting where you were introduced to a
18  lawyer who represented Halkbank?
19  A. No.
20  Q. Would it be fair to say that it's common, in meetings where
21  lawyers are in attendance, that lawyers identify themselves as
22  lawyers?
23  A. I think that's common, yes.
24  Q. And in your dealings with Halkbank over the years, do you
25  have any recollection of ever dealing with a lawyer who

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    December 8, 2017

| HC8PATI2 | Cohen - Cross | Page 1157 |
| --- | --- | --- |

1   purported to represent Halkbank?
2   A. No one who identified himself or herself as a lawyer, no.
3   Q. Well, let's talk a little bit about these meetings, if we
4   can, and you can help me understand --
5   A. Sure.
6   Q. -- a little bit better. How many times would you say, over
7   the four years, I think your testimony was, that you interacted
8   with Halkbank, how many times did you meet with Mr. Atilla?
9   A. I would say about a half dozen times.
10  Q. And those meetings that you testified were here in
11  Washington, D.C. at your office, correct?
12  A. Some were, yes.
13  Q. And some of those meetings were in Ankara or Istanbul?
14  A. That's right.
15  Q. Did you ever meet one-on-one with Mr. Atilla?
16  A. I don't believe so.
17  Q. Did you, in your meetings here in the United States, in
18  your office, when you met with Mr. Atilla, you met with him
19  with other people from Treasury; am I correct?
20  A. Yes.
21  Q. And at these meetings, Mr. Atilla was accompanied by or
22  accompanied someone else from Halkbank, correct?
23  A. That's my recollection, that's right.
24  Q. In your office, how large were these meetings, how large
25  were the groups?

| HC8PATI2 | Cohen - Cross | Page 1158 |
| --- | --- | --- |

1   A. You know, three on my side, three on his side, sort of that
2   size.
3   Q. Was there ever a translator or interpreter?
4   A. Just that last meeting, Mr. Atilla translated for the
5   new general manager, but not a separate interpreter, as I
6   recall.
7   Q. So let me just see if I have it right. In the meeting that
8   you're referencing, where Mr. Atilla translated for the new
9   general manager, that was in October of 2014; am I correct?
10  A. Yes.
11  Q. So in the meetings in Turkey, did those meetings occur at
12  Halkbank?
13  A. Yes.
14  Q. And, again, was there interpreter at any of those meetings?
15  A. I don't recall there being one.
16  Q. And do you remember how large the group was?
17  A. Essentially the same size, three or four on either side.
18  Q. And during these meetings, there was a note taker from
19  Treasury?
20  A. Right.
21  Q. And the notes were ultimately transformed into a memorandum
22  of some sort?
23  A. So it differed whether we were in the United States or in
24  Turkey.
25  Q. Okay. So let's talk about -- since we were in Turkey,

| HC8PATI2 | Cohen - Cross | Page 1159 |
| --- | --- | --- |

1   let's stick with Turkey, and then we'll come back to
2   Washington.
3   A. Sure.
4   Q. So in Turkey, was there a note taker?
5   A. There was, it was sometimes someone from the Treasury,
6   sometimes someone from the State Department.
7   Q. And so that in your meetings, then, there would be
8   representatives from Halkbank?
9   A. Mmm, hmm.
10  Q. There would be representatives from the Department of
11  Treasury?
12  A. Yes.
13  Q. And because it was overseas, you had a State Department
14  representative there as well?
15  A. Sometimes.
16  Q. Was the State Department representative a member of the
17  consul, the American embassy?
18  A. Typically -- now, it would be someone from the -- either
19  from the embassy or the consulate, depending on whether we were
20  in Ankara or Istanbul. I hesitate because, again, there's a
21  lot of interesse U.S. government activity.
22      When we met with banks, we tended to not bring State
23  Department people with us. We would bring State Department
24  people with us when we met with foreign governments but not
25  with financial institutions. The record of the meeting in a

| HC8PATI2 | Cohen - Cross | Page 1160 |
| --- | --- | --- |

1   foreign country would always be -- would come out as a State
2   Department cable. It wouldn't be a Treasury Department
3   document. It would be a State Department document.
4       I just don't remember whether in every, single one of
5   these meetings we were successful in not having the State
6   Department attend the meeting. I think we were. In which
7   case, the note taker was someone from Treasury, and then they
8   would work with someone from State to do the cable, the record
9   of the meeting.
10  Q. And ultimately, you would receive the cable and read it and
11  approve it?
12  A. Yes.
13  Q. So in DC, when you had these meetings -- by the way, before
14  we leave Turkey, how long did these meetings typically last at
15  Halkbank?
16  A. As I testified earlier, between, I would say, 45 minutes
17  and an hour and a half or so, maybe two hours.
18  Q. Do you have a recollection of meetings going that long,
19  Mr. Cohen?
20  A. In that vicinity. I mean, I don't know. One of the nice
21  things about not being in private practice, I wasn't recording
22  my time.
23  Q. We know what that's about.
24  A. Yes.
25  Q. So in your meetings in DC, is it fair to say that there

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 8, 2017

HC8PATI2          Cohen - Cross          Page 1161

1   were just Treasury representatives, no bother with anybody from
2    State?
3   A. Yes.
4   Q. And representatives of Halkbank?
5   A. Right.
6   Q. And at those meetings, were notes taken?
7   A. Yes.
8   Q. And, again, were the notes reduced to memorandum form?
9   A. Yes, typically e-mail rather than a formal State Department
10   cable.
11   Q. By the way, what would happen to the original notes of
12    those meetings?
13   A. I have no idea.
14   Q. You don't know if they were retained or discarded?
15   A. I don't know.
16   Q. But these were important meetings and the note taking was
17    important; am I correct?
18   A. Yeah.
19   Q. And the idea behind the note taking was to try to capture
20    all the significant discussions; am I correct?
21   A. That is right.
22   Q. And there would be times that you would read a memorandum
23    and make corrections and return it to the author; am I correct?
24   A. That is right, for the cables of foreign -- of meetings in
25    Turkey. I don't believe I had a practice of reviewing the

HC8PATI2          Cohen - Cross          Page 1162

1   e-mail summaries for meetings in Washington.
2   Q. Let's return to Halkbank and lawyers just for a moment. Do
3    you have any idea of whether Halkbank has a legal department?
4   A. I believe they do.
5   Q. Do you know, as opposed to believe?
6   A. I don't recall ever interacting with anyone from Halkbank's
7    legal departments, but it is my understanding a bank of
8    Halkbank's size and prominence would have a legal department.
9    That's my experience.
10   Q. Well, in the United States, certainly a bank of Halkbank's
11    size would have a legal department, correct?
12   A. Yes.
13   Q. And it would have a substantial legal department?
14   A. I would assume so.
15   Q. But we're a nation of laws?
16   A. I agree with that.
17   Q. And sanctions and regulations; am I correct?
18   A. I think that's fair.
19   Q. American institutions tend to lawyer up much more than
20    foreign institutions; isn't that correct, Mr. Cohen?
21   A. I mean, generally speaking, I think that's probably a fair
22    statement.
23   Q. In America, almost everything gets run by a lawyer; isn't
24    that correct?
25   A. No.

HC8PATI2          Cohen - Cross          Page 1163

1   Q. Almost everything at a large institution gets run by a
2    lawyer?
3   A. I don't think that's right either.
4   Q. How about dealing with sanctions, do American institutions
5    rely on their lawyers to advise them as to sanctions?
6   A. They do. They also have large compliance departments that
7    are not run by lawyers.
8   Q. But lawyers interact with those compliance departments,
9    correct?
10   A. I assume so, yes.
11   Q. So let's talk about some of the statements that the
12    Treasury makes, or OFAC makes, with respect to the sanctions
13    and sanctions enforcement. It's true, isn't it, that when
14    public statements are made by someone from Treasury or
15    officials from OFAC, and people like you, that they're thought
16    out and reviewed; am I correct?
17   A. I think that's a little bit of an overstatement.
18   Q. Which part, thought out or --
19   A. I think it depends on what the statement is. You know, if
20    it's a prepared speech, more so than, you know, something that
21    is an interview. So I mean, there are different kinds of
22    statements that come out, some more formal than others. The
23    more formal, the more likely it was subject to review before it
24    came out.
25   Q. Well, in dealing with foreign banks and the importance of

HC8PATI2          Cohen - Cross          Page 1164

1   the American sanction regime, generally, it is important that
2    representatives of the government speak accurately; am I
3    correct?
4   A. Certainly.
5   Q. So that the foreign bankers or foreigners have come to rely
6    on the word of what Americans tell them; am I correct?
7   A. We certainly try to be clear in our communications, yes.
8   Q. Well, when you're dealing with foreign institutions, you
9    don't speak off-the-cuff, is basically my point?
10   A. Well, again, I think it depends a little bit on what the
11    nature of the communication was. In my ongoing conversations
12    with Halkbank, you know, we had lengthy meetings. They were
13    not scripted. I wasn't reading from a -- you know, if we're
14    talking for an hour-long meeting, I'm not reading a speech for
15    an hour to Halkbank, right?
16   Q. I'm sorry, yes. But you're in the sweet spot when you're
17    talking to foreign institutions about the American sanction
18    regime; am I correct?
19       MR. LOCKARD: Objection.
20       THE COURT: Sustained. I'm not sure I understand.
21   Q. Well, it's an area that you're comfortable talking to
22    foreign institutions about?
23   A. That was part of my job, yes.
24   Q. And excuse me. That's what I meant by "sweet spot."
25       MR. ROCCO: And, thank you, Judge.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI2          Cohen - Cross          Page 1165

1  Q. But this was -- in terms of foreign institutions
2  understanding the sanctions regime, part of your purpose was to
3  enlist their cooperation; am I correct?
4  A. Yes.
5  Q. And that was because, really, to make the sanctions program
6  work, American government needs the cooperation of countries
7  all over the world?
8  A. Much more effective the more cooperation we have from
9  foreign governments and foreign financial institutions.
10 Q. And you would agree with me that the American sanctions
11 regime, let's -- when I talk about sanctions regime here, we're
12 talking about Iran, not one of the other, what is it, 30 or so?
13 A. Right.
14 Q. Just for the record. So the American sanctions regime, the
15 Iranian sanctions, it's fair to say, do not regulate the
16 conduct of foreign banks; am I correct?
17 A. So that's a complicated question, Mr. Rocco. I think that
18 is -- as a civil matter, sort of in the -- what the Treasury
19 Department, our jurisdiction, what we -- sort of the
20 enforcement actions that we could take, we did not directly
21 regulate foreign financial institutions, but there's more to
22 the sanctions, and the Iran sanctions in particular, than just
23 what the U.S. Treasury Department had jurisdiction over.
24 Q. Well, certainly the Treasury Department has jurisdiction
25 over American banks, correct?

HC8PATI2          Cohen - Cross          Page 1166

1  A. Yes.
2  Q. And I think, is it fair to say, that you have stated
3  publicly that the American sanctions do not apply
4  extraterritorially; am I correct?
5       MR. LOCKARD: Objection.
6       THE COURT: Overruled. If you did.
7  A. So I don't believe that's a hundred percent accurate, and
8  by that, I mean, American sanctions is a -- is a broad topic.
9  I'm sure I have made comments that the secondary sanctions,
10 particularly in what's known as CISADA, the Comprehensive Iran
11 Sanctions and Divestment Act, I think is what it stands for,
12 that those do not, as a technical legal matter, apply
13 extraterritorially.
14 Q. Let me see if we can help you with this.
15       MR. ROCCO: So, Mr. White, can you bring up DX200?
16 And this, we're not showing it to the jury. Can we go to the
17 second page, please.
18 Q. Do you recall this item? You can read it to yourself.
19 A. I remember the event.
20 Q. Okay. And do you remember what you said at the event?
21 A. Not everything, no.
22 Q. Well, let me see if we can specifically address your
23 attention to statements that you made. It starts with, right
24 there, "Yeah, right."
25       THE COURT: That's a legal expression.

HC8PATI2          Cohen - Cross          Page 1167

1       MR. ROCCO: It's the first one I learned, your Honor.
2  Q. Now, those are --
3  A. Can I just finish reading this?
4  Q. Oh, I'm sorry. Tell me when you're ready.
5       (Pause)
6  A. Can I see the question that preceded this?
7  Q. Sure. Can we scroll?
8  A. Yeah, that's not --
9  Q. Do you have it?
10 A. No.
11 Q. Okay. Can you scroll back a little bit further?
12 A. Right, this is it.
13 Q. Does that help? Thank you.
14       (Pause)
15 A. Mmm, hmm. Okay.
16 Q. So does that -- you have something particular on your mind
17 when you made those statements, and I'm talking here now about
18 extraterritoriality?
19 A. Right.
20 Q. In the sense that you were using it on that occasion. It's
21 fair to say that you don't -- you regulate U.S. banks, meaning
22 OFAC and Treasury don't regulate foreign banks; am I correct?
23 A. That's -- so what we are were talking about here was this
24 law CISADA, which I mentioned, which was a new and -- I'm
25 sorry, I forget the day. I think this was the spring of --

HC8PATI2          Cohen - Cross          Page 1168

1  When was this, spring of '12?
2  Q. This is spring of -- I'm sorry. This is the spring of '12,
3  May 10th.
4  A. So over the, I think, six months earlier or so, this new
5  law went into effect that established these secondary
6  sanctions. They were controversial. It's the first time that
7  we had employed what are called secondary sanctions and --
8  Q. Can you just take a moment, I'm sorry to interrupt you, but
9  because you're talking about secondary sanctions, can you take
10 a moment just to remind us the difference between primary and
11 secondary sanctions?
12 A. Sure.
13 Q. I apologize for interrupting you, but I can't imagine
14 anybody better equipped to do that than you.
15 A. I don't know about that. So the idea of the primary
16 sanction is -- so the gold sanctions are a good example of a
17 primary sanction. That is, if you sell gold to the government
18 of Iran or to Iran generally, that is subject to sanctions.
19 That's a sanction that is put in place under a different
20 statute than the secondary sanctions statute. That statute is
21 IEEPA, which we I think talked about earlier.
22       THE COURT: Which one is which?
23 A. Sorry, the gold sanctions -- so let me try and do this.
24 The gold sanctions were originally under IEEPA, the
25 International Economic -- sorry, International Emergency

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        December 8, 2017

HC8PATI2            Cohen - Cross            Page 1169

1  Economic Powers Act. That's sort of the foundational statute
2  for primary sanctions. It gives the President and then the
3  Treasury Department the authority to define sanctionable
4  conduct and to enforce against those who violate the sanctions.
5  It has both civil provisions that the Treasury Department can
6  apply, and it has criminal provisions that the Justice
7  Department can apply. That's primary sanctions.
8       Secondary sanctions, which this new law, CISADA, put
9  into place, say essentially to a foreign bank, if you engage in
10 conduct with a third party -- so just to give a concrete
11 example. If you, Halkbank, engage in transactions with an
12 Iranian bank that we have designated under our primary
13 sanctions authority for violating our sanctions, we can cut off
14 you, Halkbank, from the United States.
15      It's a secondary sanction because the primary sanction
16 is against the Iranian bank. The secondary sanction is against
17 the Turkish bank. And the consequence of that in what I was
18 talking about here in this event, was in a secondary sanctions
19 context, the penalty is that the bank gets cut off from the
20 United States.
21 Q. And that's essentially -- if you can return then to the
22 document that I'm showing you, that's what your comments --
23 your comments were directed towards secondary sanctions,
24 correct?
25 A. That's correct.

HC8PATI2            Cohen - Cross            Page 1170

1  Q. And talking about secondary sanctions, as opposed to
2  primary sanctions, you were saying that the remedy is if a
3  foreign entity violates U.S. sanctions, it itself can be
4  sanctioned; am I correct?
5  A. Right, and the issue here is, on extraterritoriality, if we
6  cut off, you know, in this instance Halkbank from the United
7  States, are we acting extraterritorially by regulating Halkbank
8  or are we regulating U.S. institutions? And my point, which is
9  a pretty technical legal point, is that the way that you go
10 about cutting off Halkbank from the United States is by telling
11 U.S. institutions they can't deal with Halkbank. So it's not
12 extraterritorial because we are telling U.S. institutions what
13 they can or cannot do.
14 Q. That's precisely right, and you're not telling Halkbank
15 what it can do or what it cannot do; am I correct?
16 A. Well, so the enforcement action is against Halkbank. The
17 application is against U.S. banks.
18 Q. Right. Which means that Halkbank -- and by the way, we'll
19 come back to this later, but Halkbank has never been
20 designated; am I correct?
21 A. That's correct.
22 Q. Halkbank has not been sanctioned, correct?
23 A. I'm just using that as an example.
24 Q. I got it, but I think it needs to be clear for the jury.
25 A. Yes.

HC8PATI2            Cohen - Cross            Page 1171

1  Q. And certainly back at this time, there were no sanctions
2  leveled against Halkbank; am I correct?
3  A. That's right.
4  Q. And Halkbank, in fact, it's one -- in interacting with
5  Halkbank, it's something that you would remind Halkbank of? In
6  other words, that if Halkbank engaged in certain activity, it
7  could be sanctioned, correct?
8  A. Yes.
9  Q. So and your comment here is -- is it fair to say it's
10 something that you frequently had to say about secondary
11 sanctions?
12 A. Yeah, I made this point more than once.
13 Q. Well, there was an interview, do you recall, with the Wall
14 Street Journal back in 2014, you spoke about secondary
15 sanctions?
16 A. I don't recall offhand.
17 Q. Maybe I should show it to you because I think it's
18 important.
19      MR. ROCCO: Can we bring up Exhibit 201 and show it to
20 Mr. Cohen. By the way, before we move off of Exhibit 200, I
21 move Exhibit 200 into evidence.
22      MR. LOCKARD: Objection.
23      THE COURT: I'll allow it.
24      (Defendant's Exhibit 200 received in evidence)
25      MR. ROCCO: Thank you, your Honor.

HC8PATI2            Cohen - Cross            Page 1172

1      BY MR. ROCCO:
2  Q. Let's go to 201. Can you take a look at that, Mr. Cohen.
3  A. I can't. All I see is the cover page.
4  Q. You have to move it to page 3 of 4. I apologize.
5  A. If you don't mind, could you go to page 2, please, first so
6  I can see.
7  Q. Sure. Page 2 is the beginning of the text; so please go to
8  page 2.
9  A. Okay.
10 Q. Got it. Tell me when you're ready.
11 A. I will.
12 Q. Move it.
13 A. Okay. Next page?
14      (Pause)
15      Mmm, hmm.
16      (Pause)
17      okay.
18 Q. Okay. Do you want to go to the third page?
19 A. I've read the third page.
20 Q. Okay. And let me just direct your attention to the
21 language that starts "None of our authorities"?
22 A. Right.
23 Q. Did you read that?
24 A. I did.
25 Q. Do you recall making those statements?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

1  A.  I recall making statements in this context, yes.
2  Q.  Precisely, but can we -- do you recall making that
3  statement?  You read it, and that accurately captures what you
4  said on that occasion?
5  A.  I assume it accurately captures what I said.  I don't
6  remember this interview.  I have no doubt that the Wall Street
7  Journal accurately quoted me in this; so....
8         MR. ROCCO: Your Honor, I move Exhibit 201 into
9  evidence.
10        MR. LOCKARD: Objection, your Honor.
11        THE COURT: What is it, exactly?
12        MR. ROCCO: It is exactly the language --
13        THE COURT: No, no, I mean, what is the --
14        MR. ROCCO: This is an article from the Wall Street
15  Journal.  It's a news wire from the Wall Street Journal.
16        THE COURT: In its entirety?
17        MR. ROCCO: In its entirety, but it's very short.  And
18  specifically --
19        THE COURT: I'll allow it.
20        MR. ROCCO: Thank you, Judge.
21        (Defendant's Exhibit 201 received in evidence)
22  BY MR. ROCCO:
23  Q.  And can we just -- I misplayed this for the jury,
24  Exhibit 200.  So I'm going to correct it with 201.  Can we
25  display now Exhibit 201 to the jury.

1         So, now, directing your attention -- the part of the
2  article we were referencing was the one that refers to "None of
3  our authorities are extraterritorial," correct?
4  A.  Yes.
5  Q.  And that's the portion of the article that I specifically
6  want you to -- I'm asking you about, and to the best of your
7  recollection, that's what you said on that occasion; am I
8  correct?
9  A.  Well, we were talking about, just before this, the
10  enforcement actions that had been taken against foreign banks
11  for violating U.S. sanctions, which were controversial, again,
12  because we were acting against foreign banks.
13        And the point that I was making here was that the
14  basis for those actions, which were both civil actions by the
15  banking regulators, by OFAC, and as well as criminal
16  dispositions, was that the transactions involved -- the conduct
17  involved the United States in some fashion.
18  Q.  Sure.  And if it doesn't involve the United States, it's
19  fair to say that OFAC, the Department of Treasury, has no
20  jurisdiction over it; am I correct?
21        MR. LOCKARD: Objection.
22        THE COURT: If you know, I'll allow it.
23  A.  So, again, this is -- this is a legal issue here we're
24  talking about.  The civil enforcement authority of the Treasury
25  Department is over U.S. institutions and U.S. persons.  For

1  some of our sanctions programs, it's U.S. persons anywhere in
2  the world.  For others, it's within the territory of the United
3  States.
4         But that's not the entirety of how the sanctions --
5  the entire scope of the sanctions programs are enforced.
6  Q.  Well, we're talking about -- I'm talking about secondary
7  sanctions, just to make --
8  A.  That's not what this is about.
9  Q.  But when you're talking about activities of foreign
10  financial institutions outside the United States --
11        THE COURT: Such as Halkbank?
12        MR. ROCCO: Such as Halkbank, I'm sorry, Judge.
13  Q.  -- such as Halkbank, Halkbank, certainly there's nothing
14  wrong with Halkbank dealing with Iran on a day-to-day basis,
15  correct?
16        MR. LOCKARD: Objection.
17  Q.  U.S. --
18        THE COURT: If you know.
19  A.  I don't know what you mean by "nothing wrong."
20  Q.  I think it's fair to say that Halkbank can deal with third
21  nations, businesses or banks in third nations, without the U.S.
22  having any interest in those activities?
23        THE COURT: I don't understand.
24  Q.  Am I correct?
25        THE COURT: I don't understand your question.

1  Q.  Well, in a typical commercial transaction, the United
2  States would have no interest in a transaction between Halkbank
3  and an entity -- and a bank in South Africa; am I correct?
4  A.  Generally, yes, unless it had -- that transaction was
5  somehow, somehow implicates one of our sanctions programs.
6  Q.  Well, if that transaction does not implicate a sanctions
7  program, the United States has no interest in it, correct?
8  A.  I don't want to quibble with you about the reach of U.S.
9  criminal jurisdiction and other laws.  If you just want to talk
10  about sanctions programs --
11  Q.  I mostly -- sorry.
12  A.  Right.  If you just want to talk about sanctions programs,
13  if it doesn't implicate one of our sanctions program like
14  Iran -- in your example, if that transaction between
15  Halkbank and the South African bank is someone who's financing
16  a terrorist organization, we would be interested in it.  If
17  it's just a normal commercial transaction for the sale of
18  furniture between Turkey and South Africa and nobody involved
19  in that transaction is otherwise subject to our sanctions, then
20  we would not be interested in it.
21  Q.  Okay.  You can take that down.  So let's talk a little bit,
22  if we can -- and I'd like to come back to this topic later on,
23  but let's move on to talk about OFAC specifically, and OFAC's
24  ability to investigate or to learn facts.  Am I correct?  So it
25  certainly is -- it certainly is true, is it not, that OFAC has

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI2          Cohen - Cross          Page 1177

1  the ability to seek information and verify information?
2       MR. LOCKARD: Objection.
3  Q. I had --
4       THE COURT: Just generally?
5       MR. ROCCO: Sure, just generally.
6  Q. You have the right?
7  A. It has subpoena authority.
8  Q. It has subpoena authority. You can conduct investigations?
9  A. Yes.
10 Q. You interact with, you mentioned yesterday, something
11   called OIA, I believe?
12 A. Yes.
13 Q. That's an intelligence arm of Treasury; is it not?
14 A. It is an analytic intelligence agency, which the
15   distinction is important. It doesn't collect intelligence. It
16   relies on other intelligence that's collected by others
17   collected in the analysis; so it produces an analysis so it
18   doesn't itself collect information.
19 Q. It analyzes information that it doesn't --
20 A. It doesn't --
21 Q. If I may. If I finish the question, I may get it right.
22        It's information that it's collected or collected for
23   it by other agencies, such as the CIA or FBI?
24 A. Right.
25 Q. NSA?

HC8PATI2          Cohen - Cross          Page 1178

1  A. Right.
2  Q. They, essentially, feed information to OIA and OIA analyzes
3   that information?
4  A. Generally speaking, that's right.
5  Q. And how about the Commerce Department, does Treasury
6   interact with Commerce Department so that, let's say, there's a
7   commerce official in Dubai who has -- inspects -- has the
8   authority to inspect shipments and the like; am I correct?
9  A. I believe that's right.
10 Q. OFAC interfaces with foreign country intelligence agencies
11   and foreign regulators, correct, something called the Egmont
12   Pact?
13 A. So OFAC will not interact with foreign intelligence
14   agencies. It does interact with foreign -- with counterpart
15   regulatory agencies.
16 Q. And how about foreign governments, foreign bank regulators?
17 A. Right.
18 Q. In the instance of Halkbank, the Turkish bank regulator, I
19   think it's called BRSA.
20 A. BRSA.
21 Q. Or BDDK?
22 A. Right.
23 Q. And OFAC, or Treasury, interacts with that regulator as
24   well?
25 A. It does.

HC8PATI2          Cohen - Cross          Page 1179

1  Q. Okay. And you mentioned -- I think you mentioned in your
2   testimony earlier the SWIFT system, and if you didn't, I
3   apologize. But SWIFT is also a way of collecting information;
4   am I correct?
5  A. Not for these purposes.
6  Q. Well, is it used for transparency?
7  A. I don't know what you mean.
8  Q. Is it a way of allowing OFAC or the Department of Treasury
9   to look at transactions that occur all over the world?
10 A. No.
11 Q. Well, does OFAC interact with -- does it have access to
12   SWIFT?
13        MR. LOCKARD: Objection.
14 A. No.
15 Q. Well --
16        THE COURT: I'll allow this. I don't know what you
17   mean.
18 Q. Well, can you take a moment, Mr. Cohen --
19 A. Yes.
20 Q. -- and explain what the SWIFT system is?
21 A. Sure. SWIFT is a private company that is the means by
22   which banks communicate with one another with respect to the
23   transmission -- essentially of wire transfers.
24        So the way I think the best way to understand what
25   SWIFT does is it's basically a big e-mail system where, if you

HC8PATI2          Cohen - Cross          Page 1180

1  want to send money from bank A to bank B, bank A sends a
2  message to a bank B saying, my customer, Mr. Rocco, wants to
3  make money available to your customer, Mr. Cohen, and that
4  message goes across the SWIFT system.
5        SWIFT is a secured messaging system that facilitates
6   those communications between and among banks.
7  Q. And does SWIFT also facilitate communications within the
8   bank so that intra-bank transactions are accessible through the
9   SWIFT system?
10 A. I don't -- so if, for instance, if we both have an account
11   at bank A and I want to make money available to you, we're both
12   within the same bank, I don't believe SWIFT handles an
13   intra-bank transaction like that. My understanding is it
14   inter-bank, not intra-bank, but I may not be right about that.
15 Q. I like the fact that you're making money available to me.
16 A. I think it was the other way around, actually.
17 Q. Well, it's all in the eye of the beholder, I suppose.
18   There certainly is nothing that stops OFAC itself from asking
19   banks questions; am I correct?
20 A. Nothing that stops them from asking questions, right.
21 Q. And in dealing with foreign banks, like Halkbank, is it
22   fair to say that Halkbank is not under any obligation to
23   provide information to OFAC with the Department of Treasury; am
24   I correct?
25 A. I think the answer to that question depends on the context,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI2          Cohen - Cross          Page 1181

1  Mr. Rocco.
2  Q.  Well, can you give me a context where it would be required
3    to?
4  A.  Sure.  If Halk -- if OFAC were investigating a transaction
5    that ran through the United States, okay?  So Halk's -- so a
6    U.S. dollar transaction, for instance, my understanding -- and
7    it's just that -- is that if there is a transaction that runs
8    through a U.S. institution to Halk, running money through
9    Citibank here in New York, that Halk -- sorry, that OFAC could
10   request from Halk information related to that transaction.
11  Q.  Well, in that instance, you're not saying more than could?
12   You're saying Halk would be required to provide the
13   information?
14  A.  So I believe so, Mr. Rocco, but I am not a -- I was never
15   an OFAC enforcement lawyer.
16  Q.  Well, how about a transaction that occurred purely outside
17   the United States, the transaction between Halkbank and a bank
18   in South Africa?
19  A.  And is the question could OFAC demand --
20  Q.  Could it require -- well, the question is, would Halk be
21   required to answer a question that Treasury or OFAC has with
22   respect to that transaction?
23  A.  So again, I do think the context could matter, but I think
24   as a general matter, if there's no -- if there isn't any
25   jurisdiction within the U.S. over the transaction, I don't

HC8PATI2          Cohen - Cross          Page 1182

1    believe OFAC has the authority to demand a response.
2  Q.  Let me see if I can put this into some better context and
3    make it easier on myself.
4  A.  Okay.
5  Q.  You don't have any problem.  I'm the one that has the
6    problem.  So let's say that part of secondary sanctions -- and
7    the sanction program, we agree, are essentially part of
8    Treasury's mission is to get other countries, financial
9    institutions from other countries to cooperate with the
10   American sanctions program; am I correct?
11  A.  Yes.
12  Q.  And it would be fair to say that OFAC, or people within
13   Treasury, including yourself, take proactive role -- proactive
14   steps to educate foreign financial institutions; am I correct?
15  A.  Yes.
16  Q.  And I think you described your meetings with -- certainly
17   with Halkbank?
18       THE COURT:  You described your?
19       MR. ROCCO:  Meetings.  I apologize.
20  Q.  With Halkbank.  And the purpose of those meetings was, is
21   it fair to say, to educate banks, foreign financial
22   institutions?  Was the purpose of these meetings, when you met
23   in Washington or when you met in Turkey, was the purpose of
24   that -- those meetings to investigate?
25  A.  So it involved both education of the institution that we

HC8PATI2          Cohen - Cross          Page 1183

1    were meeting with, as well as gathering information for our
2    purposes as well.
3  Q.  Well, when you met with foreign institutions, did you tell
4    people -- did you tell Halkbank, for instance, representatives
5    from Halkbank, including Mr. Atilla, that you were conducting
6    an investigation?
7  A.  I was not conducting an investigation.
8  Q.  I'm sorry?
9  A.  I was not conducting an investigation in any sort of law
10   enforcement sense.
11  Q.  Sure.  So it's fair to say that in these meetings with
12   Halkbank, which were educational, that you never told anyone
13   that you were conducting an investigation because you weren't
14   conducting an investigation, correct?
15  A.  So in the sense of it being an OFAC enforcement action, an
16   investigation in support of an enforcement action, that's
17   correct.  I was, quite clearly, seeking to elicit information
18   so that we understood better, you know, in the context of the
19   Halkbank meetings, what Halkbank was doing with whom and how.
20  Q.  And you were -- in that context, you were free to ask
21   whatever questions you wanted to ask of Halkbank; am I correct?
22  A.  I felt free to ask whatever I wanted to ask, yes.
23  Q.  And you did ask whatever you wanted to ask; am I correct?
24  A.  Sure.
25  Q.  And, obviously, these meetings weren't long meetings, you

HC8PATI2          Cohen - Cross          Page 1184

1    would meet for 45 -- I think you said 45 minutes to as long as
2    an hour and a half; so there wasn't time constraints, right?
3  A.  Right.
4       THE COURT:  He said two hours.
5       MR. ROCCO:  Thank you, your Honor, two hours.
6  A.  That was about the length of these meetings, yes.
7  Q.  And let me ask you, has there ever been a prosecution, that
8    you're aware of, or a Treasury enforcement action for a bank
9    engaging in purely -- what activity is purely sanctionable?
10       MR. LOCKARD:  Objection.
11  Q.  I mean, just sanctionable?
12       THE COURT:  I'll allow it, if you know.
13  A.  Yes.
14  Q.  And can you give me an example of that?
15  A.  Well, BNP Paribas, a large French bank, was prosecuted,
16   pled guilty for sanctions violations.
17  Q.  And the sanctions violation, what was the nature of the
18   sanctions violation?
19  A.  As I recall, it involved violations of the Iran, Cuba and
20   Sudan sanctions.
21  Q.  Was this a primary sanctions violation or a secondary
22   sanctions violation?
23  A.  I believe primary sanctions violations.
24  Q.  How about a secondary violations sanctions, are you aware
25   of any criminal prosecution of a secondary sanctions violation?

A588

HC8PATI2          Cohen - Cross          Page 1185

1   A. I'm not.
2   Q. And you've read the indictment in this case; am I correct?
3   A. I have not.
4   Q. Has anybody described the indictment to you in this case?
5   A. No.
6   Q. Do you have an understanding of what the nature of the
7   sanctions violation here is?
8       MR. LOCKARD: Objection.
9   Q. Primary or secondary?
10      THE COURT: I'll allow it.
11  A. No.
12  Q. There was a Greek businessman by the name of Dimitris
13  Cambis, name sound familiar to you?
14  A. Yes.
15  Q. And Dimitris Cambis was sanctioned; am I correct?
16  A. I believe that's right.
17  Q. And he was sanctioned, do you recall for what?
18  A. Something having to do with Iran sanctions, although I do
19  not recall precisely what.
20  Q. Engaging in sanctionable activity?
21  A. Yes.
22  Q. Am I correct?
23  A. Yes.
24  Q. Do you remember telling people at Halkbank about Dimitris
25  Cambis?

HC8PATI2          Cohen - Cross          Page 1186

1   A. Not offhand I do not.
2   Q. And do you know if Dimitris Cambis was ever prosecuted?
3       MR. LOCKARD: Objection.
4       THE COURT: If you know.
5   A. I think he was; although, I'm not certain of that.
6   Q. What makes you say you think he was?
7   A. That's my best recollection. But just to be clear,
8   Mr. Rocco, I don't know for sure.
9   Q. So the answer is?
10  A. I believe so, but I don't know for sure.
11  Q. But you don't know; am I correct?
12      MR. ROCCO: I'm not trying to put words in the
13  witness' mouth, your Honor.
14      THE COURT: No, he said what he said.
15  A. I believe so. I don't know for sure.
16  Q. All right. So well, by the way, if activity is
17  sanctionable, am I right, that it doesn't mean that it is
18  unlawful or illegal? Am I correct?
19      MR. LOCKARD: Objection.
20  Q. In itself?
21      THE COURT: If you know. If you know.
22  A. I believe -- I've always thought that activity that is
23  sanctionable is unlawful.
24  Q. Well, have you, in your public statements to that, do you
25  say that -- do you recall saying that sanctionable activity is

HC8PATI2          Cohen - Cross          Page 1187

1   unlawful or illegal?
2   A. I don't recall one way or the other addressing that
3   publicly.
4   Q. And how about in your conversations with Halkbank, did you
5   tell Halkbank ever that sanctionable activity was unlawful or
6   illegal or criminal?
7   A. Yes.
8   Q. And when did you do that?
9   A. So let me be precise. I think I testified earlier part of
10  the standard presentation that I would make to and did make to
11  Halkbank, as well as other banks around the world, was to
12  describe our sanctions programs in a comprehensive fashion.
13  That includes, for most of our sanctions programs are based on
14  the statute we were talking about, IEEPA.
15      IEEPA has, as part of the potential consequences of
16  violating a sanction program that's based on IEEPA, a criminal
17  prosecution. So as part of my standard presentation about our
18  sanctions programs, one of the things that I would say is, you
19  know, and if you violate the sanctions, it is potentially a
20  criminal violation under U.S. law.
21  Q. And that's primary sanctions, IEEPA; is it not?
22  A. Yes.
23  Q. Okay. It's not secondary sanctions; am I correct?
24  A. That is correct.
25      MR. LOCKARD: Objection.

HC8PATI2          Cohen - Cross          Page 1188

1   Q. So, Mr. White, can you bring up Tab 10?
2   A. I'm sorry, Mr. Rocco. I've actually never really parsed
3   IEEPA that way. I'm not sure that you can't do secondary
4   sanctions under IEEPA, but that's -- but as we were talking
5   earlier, there is CISADA, which is a different statute than
6   IEEPA, and that's where the secondary sanctions first arose.
7   So I'm just trying to be precise.
8   Q. Thank you. And I appreciate that. And I'm not trying
9   to -- I'm trying to draw a distinction about IEEPA, which
10  apparently is the foundational sanctions legislation and
11  CISADA, which came later and modified it, and CISADA deals
12  specifically with secondary sanctions; am I correct?
13  A. Yes.
14      MR. LOCKARD: Objection.
15      THE COURT: I'll allow it.
16  Q. So can I direct your attention to the document that's in
17  front of you.
18      MR. ROCCO: This is already in evidence, Judge. It's
19  Government Exhibit 7005. So can we display this to the jury.
20  Q. And I want to direct your attention to the second
21  paragraph.
22  A. Mmm, hmm.
23  Q. And your language in the last sentence of that paragraph
24  that starts: "Any Turkish sales" --
25      MR. ROCCO: I'm sorry, Judge?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

---

HC8PATI2          Cohen - Cross          Page 1189

1    THE COURT: No, I was still reading the other --
2    MR. ROCCO: Sorry, sorry.
3    THE COURT: Just roll it back for a minute.
4    MR. ROCCO: I apologize.
5    (Pause)
6    BY MR. ROCCO:
7 Q. Do you recall that -- obviously, you recalled the letter?
8 A. I did.
9 Q. Obviously, you testified earlier you recalled the letter?
10 A. Yes.
11 Q. And just directing your attention to the last sentence of
12  the second paragraph. Can we bring that up? In that sentence
13  you're telling Mr. Aslan that there are circumstances in which
14  any Turkish sales of gold to the government of Iran, as part of
15  a payment mechanism for the purchase of Iranian petroleum,
16  could expose those involved to U.S. sanctions. There you're
17  telling, again Mr. Aslan, about the sanctions, correct?
18 A. Yup.
19 Q. And you're not telling him that it would subject anyone to
20  a criminal prosecution; am I correct?
21 A. That's what it says, yes.
22 Q. And there are typically, when you were dealing with foreign
23  banking institutions -- let's talk about Halkbank. When you
24  spoke to Halkbank about the consequences of engaging in
25  activity that violated U.S. sanctions, you would tell the bank

---

HC8PATI2          Cohen - Cross          Page 1190

1   that the activity was potentially sanctionable; am I correct?
2 A. That's typically the description, yes.
3 Q. Well, is there an instance where you told -- that comes to
4   your mind, as you sit here today, where you told Halkbank or
5   anyone at Halkbank they could be criminally prosecuted for
6   violating U.S. sanctions?
7 A. As I testified just a moment ago, part of my standard
8   presentation on U.S. sanctions programs was that IEEPA-based
9   sanctions, which includes executive order 13622, which was in
10  this letter, that the violation of IEEPA-based sanctions can
11  expose the violator to sanctions or potentially criminal
12  prosecution.
13 Q. Well, what I'm trying to do is understand what the context
14  was that you made that your general presentation. Did you make
15  the general presentation every time you met with somebody from
16  Halkbank?
17 A. No.
18 Q. And is it fair to say that when you were dealing with
19  specific issues such as this, right, there's a specific concern
20  that you're addressing?
21 A. Right.
22 Q. Do you have a recollection of ever telling anyone at
23  Halkbank, that Halkbank or anyone associated with Halkbank
24  could be criminally prosecuted, as opposed to exposing the bank
25  to U.S. sanctions and being blocked from the U.S. financial

---

HC8PATI2          Cohen - Cross          Page 1191

1   system?
2 A. So I don't have a specific recollection of telling anyone
3   at Halkbank, including Mr. Atilla, that specifically if you
4   violate the gold sanctions, that that itself could lead to
5   criminal prosecution. That's what we're talking about here,
6   though, isn't exposing Halkbank to secondary sanctions. We're
7   talking about exposing the persons involved -- could expose
8   those involved; so the bank, or the individuals, to U.S.
9   sanctions that's a primary sanction under Executive Order
10  13622.
11 Q. Thank you for that clarification. I'm more interested in
12  knowing -- there was a mantra, that was a -- when you met with
13  banks and your principal concern was discouraging banks from
14  engaging in sanctionable activity; am I correct?
15 A. Yes.
16 Q. And you would -- and essentially, the hammer you used, if I
17  can use a metaphor, in trying to communicate that to banks was
18  that they would be blocked from the U.S. financial system; am I
19  correct?
20 A. So it varied depending on the sanctions that we were
21  talking about, but that's right. For banks, the hammer, to use
22  your phrase, was that they could be blocked from the U.S.
23  financial system.
24 Q. Well, I want to talk -- I'm sorry, because I just want to
25  make it clear that I'm talking about Halkbank, and do you have

---

HC8PATI2          Cohen - Cross          Page 1192

1   a specific recollection of telling Halkbank, using a threat of
2   criminal prosecution in your conversations with Halkbank?
3 A. As I've tried to be clear, I don't recall the specific
4   instance where I did that general overview of the U.S.
5   sanctions regime for Halkbank or for Mr. Atilla specifically.
6       It was part of my normal presentation, particularly
7   sort of early on in the -- if it was a bank with which we had
8   ongoing conversations, it would be something I would have done
9   early on. If it's a bank that I only had a one-off
10  conversation with, it would be in that one-off conversation.
11  But I don't have a specific recollection of doing -- of talking
12  about potential criminal prosecution with Mr. Atilla or
13  Halkbank, but I also don't have any doubt that, at some point,
14  I did that.
15 Q. Well, you mean, in a more general discussion of --
16 A. Correct.
17 Q. -- of potential --
18 A. Go ahead.
19 Q. No, I'm sorry. You started to say?
20 A. And I think I testified just a moment ago, I don't have any
21  specific recollection of having a conversation specifically
22  with respect to gold transactions themselves, that -- where I
23  said, you know, if you do gold transactions or violate our
24  sanctions, that you can be criminally prosecuted. I don't have
25  a recollection of that specific conversation.

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

| HC8PATI2 | Cohen - Cross | Page 1193 |
| --- | --- | --- |

1 Q. Let's turn, if we can, just to sanctions evasion?

2 A. Mmm, hmm.

3 Q. There were --

4        THE COURT: Could I interrupt you just for one minute

5 and ask you a question at sidebar.

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| HC8PATI2 | Cohen - Cross | Page 1194 |
| --- | --- | --- |

1        (At the side bar)

2        THE COURT: I'm trying to figure out the timing and

3 lunch, and I think I told them 2:30.

4        MR. ROCCO: You did. I'm not sure, Judge. I'm not

5 sure how much longer I'm going to be with him. I actually

6 thought that the direct was going to be shorter than it was.

7 So it's 12:30. I think I can be another two hours with him.

8        MR. LOCKARD: Your Honor, I think the government wants

9 to renew its objection. Mr. Rocco has gone on probably a half

10 hour of cross about strictly legal opinion in a way that I

11 think is both not correct to the law and very confusing to the

12 jury. And we would ask that any further questioning about

13 legal opinions be precluded, and I think the record that has

14 been created is going to be so confusing to the jury.

15        THE COURT: Well, you'll straighten them out on

16 redirect.

17        MR. ROCCO: Your Honor, if I may. What I'm trying to

18 do is --

19        THE COURT: I don't --

20        MR. ROCCO: I'm sorry.

21        THE COURT: I did rule, and I said limited beyond --

22        MR. ROCCO: I'm trying what I --

23        THE COURT: Wait. The other thing is, you know, and

24 rightly so, everybody is an advocate, but you have asked the

25 same question maybe five times now.

| HC8PATI2 | Cohen - Cross | Page 1195 |
| --- | --- | --- |

1        MR. ROCCO: Well, what I'm trying to do is really get

2 to the statements.

3        THE COURT: You're trying to get the answer you

4 want --

5        MR. ROCCO: Thank you, your Honor. You're being kind.

6        THE COURT: -- instead of the answer that you've

7 gotten, and I understand that. So you are overdoing some parts

8 of it.

9        MR. ROCCO: What I'm trying to do, really, is get to

10 the statements that he made to the bank and/or Mr. Atilla.

11        MR. LOCKARD: I think that's --

12        MR. ROCCO: Excuse me, Mr. Lockard. That's what I'm

13 trying to do.

14        THE COURT: Okay.

15        MR. ROCCO: I'm not trying to elicit a legal opinion.

16        MR. LOCKARD: But we haven't gotten that. We've been

17 spending a lot of time talking about things that are just

18 Mr. Cohen's legal opinions.

19        MR. ROCCO: Thank you.

20        THE COURT: So I think what I'm going to do, do you

21 think it's smarter to break now or later? Do you think you're

22 going to go two more hours? Maybe I'll take a half-hour break

23 and let them eat something.

24        MR. ROCCO: I think you should do that.

25        THE COURT: I'll do that now.

| HC8PATI2 | Cohen - Cross | Page 1196 |
| --- | --- | --- |

1        MR. ROCCO: That's fine.

2        THE COURT: Sure, sure.

3        MR. ROCCO: Because, quite frankly, Judge, I don't

4 want you to break the promise to them.

5        THE COURT: No, no. We'll just have to bring him back

6 on Monday.

7        MR. ROCCO: Thank you. Thank you.

8        MR. DENTON: We can't do that.

9        MR. LOCKARD: Your Honor --

10        THE COURT: I'm sorry?

11        MR. LOCKARD: Just in terms of timing, we sort of

12 rearranged everybody's schedule so that Mr. Cohen would be done

13 today, and we strongly want that to happen.

14        THE COURT: I know, but this is trial and stuff

15 happens.

16        MR. LOCKARD: We did start him yesterday afternoon,

17 and this goes to our objection about the irrelevant legal

18 opinion in his testimony, but it has delayed Mr. Cohen being

19 able to go home and is also not legally relevant testimony for

20 the jury, we think.

21        THE COURT: Yes. There's also a question about his

22 accuracy, to be perfectly honest with you, but we could debate

23 that.

24        MR. ROCCO: We could, your Honor, and also, just for

25 the record, I mean, Mr. Atilla's life is at stake here. I'm

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 8, 2017

HC8PATI2          Cohen - Cross          Page 1197

1    not so concerned about Mr. Cohen's schedule.
2         THE COURT: And that's why I wanted to give you
3    latitude on your cross-examination.
4         MR. ROCCO: Sure, Judge.
5         THE COURT: And the ruling.
6         MR. ROCCO: Thank you, Judge.  I appreciate it.
7         (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HC8PATI2          Cohen - Cross          Page 1198

1              (In open court)
2         THE COURT: So I think we'll take a short lunch break.
3    There is some snack material, so to speak, for you in the jury
4    room.  If you want something else, you're certainly free to go
5    to the cafeteria or whatever.  So why don't we say, I think
6    we'll do 45 minutes.  Can you handle that?  So let's pick up
7    again at 1:15.  It's 12:30 now.
8              (Jury not present)
9              (Luncheon recess)
10             (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HC83ATI3          Cohen - Cross          Page 1199

1              AFTERNOON SESSION
2                  1:15 p.m.
3         (In open court; jury present)
4         MR. ROCCO: With your Honor's permission?
5         THE COURT: Go ahead, Mr. Rocco.  Continue with the
6    cross-examination by Mr. Rocco.
7    BY MR. ROCCO:
8    Q.  Hello again, Mr. Cohen.
9    A.  Hello.
10   Q.  Maybe I should say Dr. Cohen with that signature.
11   A.  Thank you.
12   Q.  So, we were talking about the meetings that you had with
13   Halkbank in the four years that you were undersecretary.  And
14   there were communications between Halkbank also that we looked
15   at quickly, we'll come back to them, you did on direct
16   examination, e-mails and letters and such.
17            In communications --
18        THE COURT: Is there a question coming?
19        MR. ROCCO: Yes.
20   Q.  In the communications there was --
21        MR. ROCCO: Thank you, your Honor.  You're always a
22   couple of steps ahead of me.
23        THE COURT: Well.
24   Q.  In the communications with the bank, there were times
25   where, is it fair to say, that the bank was -- Halkbank, we're

HC83ATI3          Cohen - Cross          Page 1200

1    talking about -- was praised by OFAC for its cooperation and
2    transparency?  Do you have a recollection of that?
3    A.  I don't have a specific recollection of that.  I think we
4    had -- we had, I thought, a good and open communication with
5    Halkbank.  But I don't know of OFAC praising them.  I just
6    don't know.
7    Q.  Let's see if we can refresh your recollection.
8         MR. ROCCO: So can we bring up tab 15 and not for the
9    jury.  This is Government Exhibit 701-A.  I believe this is
10   already in evidence.
11        MR. DENTON: It's not.
12        MR. ROCCO: We'll put it in evidence, thank you.
13   Q.  Can you read that letter to yourself.
14            (Pause)
15   A.  Can I see the second page?
16            Okay.
17   Q.  Do you recognize that document?
18   A.  I don't recognize it as a document that I've ever seen
19   before.
20   Q.  Do you know who Barbara Hammerle was?
21   A.  She was the deputy director of OFAC at the time.
22   Q.  In looking at that letter, does that refresh your
23   recollection about an Italian bank called Sace?
24        MR. LOCKARD: Objection for failure of recollection.
25        MR. ROCCO: I just asked if it refreshed his

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 8, 2017

HC83ATI3          Cohen - Cross          Page 1201

1  recollection.
2  A. I'm familiar with the issue here. I'm not familiar with
3  this document.
4  Q. So, do you recall that Halkbank provided the Department of
5  Treasury or OFAC specifically with information about an Italian
6  bank and an Iranian transaction?
7  A. I don't recall that.
8          MR. LOCKARD: I don't object to the introduction of
9  this document.
10         MR. ROCCO: I'll move it in evidence, your Honor.
11         THE COURT: He said he did not recall the transaction.
12         MR. ROCCO: I believe -- I'm sorry, Judge. I don't
13  want --
14         THE COURT: Why don't we have a readback. Everybody's
15  talking at the same time. Could you read the question and the
16  answer.
17         (The record was read)
18  Q. I thought you said that you recalled the transaction. Do
19  you recall the transaction?
20  A. What I recall is there being an issue with Sace, which is
21  the Italian export support agency, and a repayment issue on
22  loans that they had extended that Iran owed back to Sace. I
23  don't recall Halkbank's involvement in that issue.
24  Q. Then we'll move on. Thank you.
25         MR. ROCCO: Can we bring up tab 18. We marked it as

HC83ATI3          Cohen - Cross          Page 1202

1  Defendant Exhibit 211 not for the jury. I thought I asked for
2  tab 16. I apologize if I misspoke.
3          Can you bring it up on the screen for Mr. Cohen.
4  Q. Do you recall that document?
5  A. Yes, I do.
6  Q. Does it refresh your recollection about a transaction --
7          MR. LOCKARD: Objection.
8  Q. -- advice?
9  A. I'm sorry, your question?
10 Q. This memorializes a conversation that you had with
11  Mr. Suleyman?
12 A. That's correct.
13 Q. This was back on November 8, 2012?
14 A. Right.
15 Q. This is a telephone conversation?
16 A. Yes.
17 Q. Who is Eytan Fisch?
18 A. "Eytan."
19 Q. Thank you.
20 A. That's okay. He was a -- he was in OFAC at the time. I
21  don't know precisely his title.
22 Q. Can you walk us through what this is about, Mr. Cohen.
23         MR. LOCKARD: Objection.
24         THE COURT: This is a document?
25         MR. ROCCO: This is a document that memorializes a

HC83ATI3          Cohen - Cross          Page 1203

1  conversation that Mr. Cohen had with -- this is an OFAC
2  document.
3          THE COURT: You can ask him about his current
4  recollection.
5          MR. ROCCO: I'm going to ask him about his current
6  recollection of the events that are discussed in this
7  memorandum. I am asking him to walk us through the events.
8  A. I think I testified about this on direct. This was a call
9  that I placed to Mr. Aslan as we saw other banks in Turkey
10  exiting their business with Iranian counterparties. And given
11  Halk's role as the designated bank in Turkey to handle the oil
12  payments, I called Mr. Aslan to raise and to sort of reinforce
13  the concern we had that the Iranians would try to use Halkbank
14  and its services to evade sanctions.
15         So that was the purpose of the call. There was -- at
16  this time, it was in the runup to the February 6, 2013,
17  effective date of the bilateral trade restriction, so I raised
18  that issue as well. And Mr. Aslan raised the issue of gold
19  sales with me.
20 Q. Just directing your attention to that portion of the
21  e-mail -- I'm sorry. The portion of the document that speaks
22  about Halk's sanctions compliance as being significant. Can we
23  highlight that.
24         You're talking about your conversation with
25  Mr. Suleyman, and in fact you're telling Mr. Suleyman that OFAC

HC83ATI3          Cohen - Cross          Page 1204

1  appreciates, am I correct, the significant compliance efforts
2  with international sanctions. Did you commend him on that in
3  that conversation?
4  A. I wouldn't say I commended him. I would say that they
5  had -- "they" being Halkbank, so Mr. Aslan, Mr. Atilla -- had
6  described to us what they -- what they presented as their
7  significant efforts to comply with U.S. and there were a whole
8  set of international sanctions as well from the E.U. and from
9  the U.N.
10         So that's what I was referencing here.
11 Q. By the way, while we're on the subject, do you know if
12  Turkey has ever ascribed or agreed with U.S. sanctions against
13  Iran?
14         MR. LOCKARD: Objection.
15         THE COURT: I don't understand the question.
16 Q. Has Turkey ever agreed to comply with U.S. sanctions with
17  Iran?
18         THE COURT: If you know.
19 A. So, that is a very complicated question, Mr. Rocco. I've
20  had senior Turkish government officials who have told me that
21  they, back in this time period, were fully in favor of the
22  efforts that we were undertaking to put pressure on Iran to try
23  to bring about a diplomatic negotiation. I know there are
24  other Turkish official who at times have taken -- have said
25  things to the contrary.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
December 8, 2017

| HC83ATI3 | Cohen - Cross | Page 1205 |
| --- | --- | --- |

1    But, I can, if you'd like, I can give you a longer
2  answer on the number of different Turkish officials who have
3  told me that they were fully in favor of what we were doing on
4  the sanctions front.
5  Q.  So, it would be fair to say -- and I don't want to put
6  words in your mouth.  Would it be fair to say that you got
7  mixed messages?
8  A.  I did not.  I got a consistent message from the Turkish
9  officials that I dealt with that they were supportive of our
10  efforts.
11  Q.  Did you hear from others then that they -- that Turkish,
12  there were Turkish officials that were not supportive of it?
13    MR. LOCKARD: Objection.
14  A.  I read press accounts of other officials taking a different
15  position.
16    THE COURT: We're talking about this case.
17    MR. ROCCO: We're talking about this case.  U.S.
18  sanctions, I'm sorry.  Your Honor, I don't want to make a
19  speech.  Thank you.
20    Relax, David.
21    THE COURT: In this case, dealing with you, did
22  Halkbank ever say "No, we're not going to deal with you because
23  we don't believe in sanctions against Iran"?
24    THE WITNESS: Not at all, your Honor.
25  Q.  Let me direct your attention to Government Exhibit 7010.  I

| HC83ATI3 | Cohen - Cross | Page 1206 |
| --- | --- | --- |

1  believe this is already in evidence.
2    MR. LOCKARD: No.
3    MR. ROCCO: Okay.
4  Q.  Can you bring it up just for Mr. Cohen.
5    Have you seen this document before, are you familiar
6  with it?  Take a moment and read it to yourself.
7  A.  I've never -- I don't think I've ever seen this document
8  before.
9  Q.  Are you familiar with the transaction that it references?
10  A.  No.
11    MR. ROCCO: We'll pass it and go on.  Thank you.
12  Q.  Is it fair to say that over the years that Halkbank
13  provided intelligence information to the Department of Treasury
14  on certain transactions involving Iran?  Do you have a
15  recollection of that?
16  A.  I do not believe Halk provided intelligence information.
17  Q.  Do you recall, are you familiar with an individual by the
18  name of Hossein Tanideh?
19  A.  Does not ring a bell.
20    MR. ROCCO: Can we bring up tab 19, Government Exhibit
21  7017.
22  Q.  Directing your attention to this document and ask you if
23  you are familiar with it.  You're not copied on it.
24  A.  Yeah.
25    I don't believe I ever saw this document, and I'm not

| HC83ATI3 | Cohen - Cross | Page 1207 |
| --- | --- | --- |

1  familiar with the transaction.
2  Q.  Then we'll pass it on.  Thank you.
3    Do you have any recollection, Mr. Cohen, of Halkbank
4  seeking guidance on transactions, whether transactions were
5  permitted or not permitted under secondary sanctions, or more
6  generally, U.S. Iranian sanctions from time to time?
7  A.  Yes.
8  Q.  Was that a frequent occurrence, would you say?
9  A.  I mean, it was -- I mean, they asked questions.  I don't
10  know frequent, I don't know what you mean by "frequent."  But
11  there was a stream of questions from Halkbank I would say.
12  Q.  I'm not trying to be difficult.
13  A.  I'm not trying to be difficult either, I'm trying to be
14  precise.  They asked questions from time to time that we tried
15  to answer.
16  Q.  When you say from time to time, was it -- I hate to use --
17  was it a regular occurrence?  I mean, did it happen on a
18  monthly basis, an annual basis?
19    THE COURT: As best you can recall.
20  A.  Yeah.  My best recollection is that when in the meetings
21  that I had with Halkbank executives, there were certainly
22  questions about compliance issues.
23    My understanding is that outside of those meetings,
24  some of the folks who worked in Treasury and OFAC also had
25  meetings with Halkbank, and that there were also some

| HC83ATI3 | Cohen - Cross | Page 1208 |
| --- | --- | --- |

1  communications with Halkbank during which there were also some
2  questions asked in those communications.
3  Q.  What I'm trying to get at is were there times when Halkbank
4  was seeking guidance on particular transactions, and what, if
5  anything, sanctions allowed or did not allow?
6  A.  Sure.
7  Q.  And typically, I understand your testimony to be, and
8  again, I don't want to put words in your mouth, is these
9  transactions would be handled by people at lower levels at
10  OFAC; am I correct?
11  A.  Yeah.  Just to be clear, Mr. Rocco.
12    THE COURT: Hold on a second.  I didn't get the
13  question.
14    MR. ROCCO: I was asking is it clear that these
15  transactions would be run by people at lower levels at OFAC.
16    THE COURT: You mean from the bank?
17    MR. ROCCO: From the bank to OFAC.
18    THE COURT: If this is okay or not okay or
19  interpretations, that kind of thing?
20    MR. ROCCO: Yes, sir.
21    THE COURT: Okay.
22  A.  Yeah.  Just I want to be clear.  My understanding is that
23  they asked broader questions about the application of the
24  sanctions, not "here's a particular transaction with these
25  parties, can we do this or can we not do this."  It was a

A594

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                         December 8, 2017

HC83ATI3         Cohen - Cross         Page 1209

1  broader -- it tended to be broader conversations.
2  Q.  Can we bring up -- I was going to show you a document but
3    in the interest of time I'm not, because I see that you're not
4    copied on it.
5         So can we bring up tab 26 and show it to Mr. Cohen.
6    To take a moment.  This is Government Exhibit 7013.  I'm going
7    to ask you if you're familiar with the transaction, with the
8    document or with the transaction that's discussed.
9         THE COURT:  Could we do that in two separate
10   questions?
11        MR. ROCCO:  Yes, your Honor.  I'm asking him to bear
12   it in mind while he looks at the document.
13  A.  I don't believe I've ever seen this document before.
14  Q.  The second question is are you familiar with the events
15   that it discusses?
16  A.  I have a vague recollection of the events.  But not this
17   specific episode.
18  Q.  Then we'll spare everyone and we'll move on.
19  A.  Okay.
20  Q.  7015.  I'm going to show you what's been marked Government
21   Exhibit 7015.  Can we bring it up for Mr. Cohen.  Again, can
22   you look at the document, and I am just going to ask you one
23   question.  Are you familiar with the events that that document
24   discusses?
25  A.  I will give you the same answer.  This is just a follow-on

HC83ATI3         Cohen - Cross         Page 1210

1  to the e-mail exchange from the prior document.  I'm vaguely
2  familiar with the general topic, but not the specific episode.
3  Q.  Do you know if OFAC ever responded to these inquiries?
4  A.  I see here there is an e-mail --
5         I don't know.  Sorry, I don't.
6         THE COURT:  That's fine.
7  Q.  You don't, okay.  So that takes care of that.  Thank you.
8         In terms of Treasury's dealings with Mr. Atilla
9  specifically, do you recall times where Mr. Atilla would make
10   inquiries of Treasury and with respect to the particular
11   transaction?
12  A.  Again, in my interaction with Mr. Atilla, it was not
13   transaction specific.  It was on broader principles of the
14   sanctions.  And I just don't know whether he had conversations
15   with others on a more transaction-specific basis.
16  Q.  Well, did you ever discuss or have discussions with
17   Mr. Atilla about -- or anybody at the bank -- about the bank
18   seeking guidance and OFAC being dilatory in its responses?
19  A.  I don't recall that.
20  Q.  When you met with the bank and there would be these, I
21   suspect, higher-level discussions, meaning more policies?  Is
22   that what you were saying, your discussions were more policy
23   oriented?
24  A.  Principle oriented.  The legal principles involved.
25  Q.  Right.  And did it ever come up that the bank had

HC83ATI3         Cohen - Cross         Page 1211

1  complaints that it registered with OFAC or with you?
2  A.  Not that I recall.
3  Q.  It was clear, was it not, in your discussions with Halkbank
4    that Halkbank played a major role in the economic relationship
5    between Turkey and Iran; am I correct?
6  A.  Absolutely.
7  Q.  That's something that the Department -- that DOT and
8    yourself were very mindful of; am I correct?
9  A.  Yes.
10  Q.  It was part and parcel of the dialogue, for lack of a
11   better word, between Treasury and between Halkbank.  So it was,
12   so to speak, out there that you would have discussions about
13   the economic relations and the importance of Halkbank to the
14   economic relations between Turkey and Iran, correct?
15        THE COURT:  Hold it.  I think there's two questions.
16        MR. ROCCO:  It was a horrible question.  I withdraw
17   it.  It was horrible.
18        THE COURT:  Sure.  I didn't say that.
19        MR. ROCCO:  I did.  I'm happy to admit it.
20  Q.  So, you in particular had an understanding that Halkbank
21   was very important in the relationship between the economic
22   relationship between Turkey and Iran?
23  A.  I did.
24        MR. ROCCO:  That was a little better, your Honor.
25  Q.  So to speak, it was not something that was concealed.  It

HC83ATI3         Cohen - Cross         Page 1212

1  was conspicuous; am I correct?
2  A.  Absolutely.
3  Q.  And it was for that, in part, one of the reasons that
4    Treasury was so concerned about what Halkbank was doing,
5    correct?
6  A.  Yes.
7  Q.  Treasury knew that Halkbank in Turkey were major
8    economic -- had a major economic relationship, correct?
9  A.  With Iran?
10  Q.  Yes.  I'm sorry.
11  A.  Yes.
12  Q.  I apologize.  I may have misspoken.  Another bad question.
13   But, it was self-corrected.
14        THE COURT:  We're here to help.
15        MR. ROCCO:  Thank you.  Your Honor, it's pretty
16   obvious I need all the help I can get.
17  Q.  It's because they're neighbors, they share a common border,
18   correct?  And they share a common culture and they share a
19   common faith; am I correct?
20  A.  I would say border, yes.  Culture, eh.  Faith, depends.
21  Q.  Fair enough.  I shouldn't have wondered out of my lane.
22   You mentioned that there were times that there were
23   conversations between OFAC and Halkbank about gold trade.
24   Correct?
25  A.  There were conversations between myself and Halkbank about

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

1  the gold trade.  I believe there were also conversations that
2  people in OFAC had, in particular Mr. Szubin, with Halkbank
3  regarding gold trade.
4  Q.  Well, I think you -- again, I don't want to mischaracterize
5  anything that you've said.  But it sounds -- I believe that
6  your testimony this morning was that Treasury had significant
7  concerns about what was going on with respect to the gold trade
8  between Turkey and Iran, correct?
9  A.  That's right.
10  Q.  Did you ever articulate those suspicions to Halkbank?
11  A.  I did.
12  Q.  Did you say that you were suspicious of what was going on?
13  A.  I don't know if I used the word "suspicious," but I
14  certainly raised with Halkbank concerns that we had about the
15  gold trade between Turkey and Iran and Halkbank's role in it.
16  Q.  I understand that.  To the best of your recollection, and
17  certainly you're not going to remember what you said to them
18  verbatim, but words, you know, are very important.
19      So can I ask you to the best of your recollection what
20  did you say, what do you recall saying?
21      THE COURT:  At any particular meeting?
22  Q.  At any or all.  If you have a specific recollection, I'll
23  start by saying do you have a specific recollection on any
24  occasion of what you said and in terms as precise as you can
25  recall.

1  A.  So you're right, I do not recall anything I said verbatim.
2  I -- so to take it back from that spring of '13 meeting that we
3  were talking about earlier, in sum and substance what I said to
4  Mr. Atilla was, we've seen an increase in the gold exports from
5  Turkey to Iran, we are concerned that that reflects an effort
6  by the Iranian government to acquire gold and not simply
7  purchases by truly private Iranian parties.  My recollection is
8  that I -- I told him we had other reasons to be concerned that
9  I was not prepared to share with him.
10      And I inquired into the -- a couple of things.  One
11  was their willingness to adhere to U.S. sanctions, and assuming
12  the answer to that was "yes," their means for ensuring that
13  they were complying with U.S. sanctions.
14  Q.  And you recall specifically having conversations, a
15  conversation with Mr. Atilla about this very subject; am I
16  correct?  As opposed to anyone else at Halkbank?
17  A.  Correct.
18  Q.  But you don't recall at what particular meeting you had
19  this discussion; am I correct?
20  A.  No.  I think that -- I do recall in the spring of '13
21  meeting in Turkey, having this conversation with Mr. Atilla.
22  Q.  What was Mr. Atilla's response to you, as best as you can
23  recall?
24  A.  Again, I don't remember verbatim.
25  Q.  As close as you can to what he said.

1  A.  That they were also aware of the increase in the gold
2  trade, that they had customers that sold gold to private
3  parties in Iran, that they had the means to ensure that their
4  customers were selling to private individuals in Iran, not to
5  the government of Iran, that they understood what the sanctions
6  permitted and forbade, and that they were committed to
7  complying.
8  Q.  Do you recall asking Mr. Atilla whether or what means they
9  had of verifying who the customer was?
10  A.  Yes.
11  Q.  I think who the seller was, if I understood your question
12  correctly.
13      THE COURT:  Do you mean the bank customer?
14      MR. ROCCO:  Yes, sir.
15  Q.  Who the bank customer was, yes.
16  A.  So both the bank's customer and the customer of the bank's
17  customer.
18      So what was important to us was not necessarily who
19  was selling the gold.  It was who was purchasing the gold.  And
20  a compliance program that is geared to ensuring that the
21  purchaser of a good is someone who is not -- is someone who is
22  permissible, needs to have within its scope the ability to sort
23  of inquire into the bank's customer and to get comfortable that
24  the bank's customer knows who they're dealing with on the other
25  end, which is not an easy thing to do.  Right.  Because it's

1  not your customer.  It is your customer's customer.
2      I had conversations with Mr. Atilla about how they can
3  be confident that as they are intermediating substantial
4  amounts of gold to Iran, they can be confident that the
5  purchaser is in fact a private Iranian individual and not the
6  government or someone acting on behalf of the government.
7  Q.  What did Mr. Atilla say?  How did Mr. Atilla address your
8  concern?
9  A.  So, again, in sum and substance, what he told us was that
10  we should be assured that they had the compliance function,
11  they had a robust compliance function, so that they knew who
12  their customers were, and were confident that their customers
13  understood what the sanctions were, and that their customers
14  were selling to permissible purchasers in Iran.
15  Q.  I'm sorry, but that's what my question is.  Did he explain
16  what that robust compliance function was or did you ask him
17  what that robust compliance function was?  Did you drill down?
18  A.  Yeah.  Not all the way down to bedrock.  But we did ask, I
19  asked how can you be confident.  And as I recall, the response
20  was we know who we are dealing with as customers of Halkbank,
21  and we make an effort to not just know our customer, but to
22  also do spot checks on goods that are leaving Turkey for Iran,
23  in sort of a range of ways in which a bank can assure itself
24  that it knows the type of trade that it's intermediating.
25  Q.  Did Mr. Atilla explain to you how they did that?  How they

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 8, 2017

HC83ATI3          Cohen - Cross          Page 1217

1  confirmed those transactions, whether they used -- the kind of
2  documentation that they used?
3  A.  So as I recall, there was discussion about looking at bills
4  of lading, which are the forms that describe what is being
5  exported.  And as I recall some spot checks at the dock
6  essentially, the port where things are being exported.
7          But, as I say, I didn't spend an enormous amount of
8  time doing a compliance review of Halkbank's compliance
9  program.
10         What I was interested in was ensuring that they
11  understood what the sanctions were, and trying to understand
12  whether they both had the willingness and the capability to
13  comply with the sanctions.
14 Q.  Were you asking these questions in reference to the gold
15  trade?
16 A.  Yes.
17 Q.  You're saying it's your recollection that that's what
18  Mr. Atilla himself said, that they were checking bills of
19  lading and loading documents at ports; am I correct?
20 A.  Yeah.  Not that he was doing it, but that people working
21  for the bank were doing that.
22 Q.  So, by the way, I think that's an important point worth
23  asking.  Did Mr. Atilla tell you that he was doing it?
24 A.  No.
25 Q.  You certainly didn't believe that he was doing it?

HC83ATI3          Cohen - Cross          Page 1218

1  A.  I would not have expected that he would be doing that
2  himself.
3  Q.  You would expect that someone at the lower level of the
4  bank was doing it?
5  A.  Correct.
6  Q.  Did you know whether Halkbank had a compliance department?
7  A.  I had an understanding that it did, based on my
8  conversations with Mr. Atilla.
9  Q.  Do you know how large that department was?
10 A.  No.
11 Q.  You are you aware of whether their software programs and
12  the like that the bank subscribed to that would help them, the
13  bank, that is, comply with U.S. sanctions?
14 A.  I believe that they had a screening, software screening
15  program so that they were able to identify if a counter party
16  in a transaction was someone for whom sanctions had been
17  applied.  But we did not discuss what program they used.
18 Q.  That program would be consistent with the representations
19  you say Mr. Atilla made to you about what their compliance
20  efforts were; am I correct?
21 A.  Yes.
22 Q.  By the way, just for sake of clarity, you said before, you
23  mentioned international sanctions.  And again, this is not a
24  trick question.  But is it fair to say that U.S. sanctions are
25  a bit more complicated than international sanctions with

HC83ATI3          Cohen - Cross          Page 1219

1  respect to Iran?
2  A.  Yes.
3  Q.  Would it be fair to say that U.S. sanctions have been
4  changing pretty regularly -- strike "pretty regularly."
5          That there have been changes in the U.S. sanction
6  regime since 2010, 2011?
7  A.  Yes.
8  Q.  It's all been part of your meetings with the bank in terms
9  of trying to update the bank and keep the bank informed as to
10  those changes, correct?
11 A.  Yes.
12 Q.  Because those changes have been significant?
13 A.  Yes.
14 Q.  Correct?
15         And the changes, by and large, until 2015, the
16  sanctions regime was I believe you testified to kind of
17  tightened?
18 A.  Yeah.
19 Q.  Am I correct?
20 A.  Yes.
21 Q.  By the way, did you know that Mr. Atilla directed that
22  there should be no transactions involving Iran that be sent
23  through New York -- U.S. banks at Halkbank, that he issued a
24  directive to that effect?
25         MR. LOCKARD: Objection.

HC83ATI3          Cohen - Cross          Page 1220

1          THE COURT: I'll allow it, if you know.
2  A.  I don't know that.
3  Q.  Did OFAC ever tell Halkbank that it was violating U.S.
4  sanctions?
5  A.  I can speak to what I did.  You know, there's -- as I think
6  I testified, there were other people in OFAC who had -- there
7  are people in OFAC, rather, who had communications with
8  Halkbank.
9          To the best of my recollection, I never made the
10  declarative statement to Halkbank that they are violating U.S.
11  sanctions.
12 Q.  In meeting with Halkbank, in the meetings that you had with
13  Mr. Atilla and others at Halkbank, did you ever tell them they
14  were doing something wrong?  I don't mean illegally or unlawful
15  or even sanctionable.  But as how they were approaching
16  transactions, it wasn't the right way to do it?
17         THE COURT: I don't get that.
18         MR. ROCCO: Withdrawn, your Honor.  It was another one
19  of my bad questions.
20 Q.  We spoke about diligence and representations that you had
21  that the bank was doing diligence on customers, on bank
22  customers.
23         In your conversations with Mr. Atilla, did you ever
24  make specific recommendations to him as to what the bank could
25  be doing to improve diligence?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

1  A.  So I don't recall any significant step that I recall
2  telling them, "you need to start doing this, you're not doing
3  it."
4       I'm sure in the course of our conversation about their
5  compliance program, we talked about, you know, how well they
6  were doing it.  But I don't remember me saying, for instance,
7  you've got to screen names against the OFAC list or some
8  significant hole in their compliance program.
9  Q.  That's an interesting point.  Did you get assurances from
10  anyone at Halkbank that they were screening names against the
11  sanctions list?
12  A.  Yes.
13  Q.  And those are things that Mr. Atilla told you?
14  A.  I believe so, yes.
15  Q.  So, am I correct that in 2012, OFAC had considerable
16  concerns about what was happening in gold trade between Iran
17  and Turkey?
18  A.  Mr. Rocco, I don't mean to be difficult here.  So in my
19  role, I was at the Treasury.  I wasn't in OFAC.  OFAC reported
20  to me.  So you keep on asking me about OFAC.
21  Q.  Withdrawn, and I'll make a rule, I'll only talk about
22  Treasury.
23  A.  Thank you.
24  Q.  Can we amend my question to say is it fair to say that
25  Treasury had significant concerns about the extent of gold

1  trade between Turkey and Iran in 2012 and into 2013?
2  A.  Yes.
3  Q.  As I believe you've testified, this was the subject of
4  dialogue between Halkbank specifically and Treasury?
5  A.  Yes.
6  Q.  Do you remember testifying in front of Congress in May of
7  2013?
8  A.  I'm sure I did.
9  Q.  Okay.  So can we bring up tab 47 just for Mr. Cohen.  Let's
10  go to page 39.
11       I'm going to ask you to read, we'll blow it up for you
12  and ask you to read it to yourself.
13       (Pause)
14  Q.  That's the question and your answer.
15  A.  Yes.
16       MR. ROCCO: Can we highlight it?
17       (Pause)
18  A.  Okay.
19  Q.  Do you recall being asked that question and giving that
20  answer, Mr. Cohen?
21  A.  I don't actually recall it, but it is entirely consistent
22  with my general recollection of my interaction with Congress.
23  Q.  Is it fair to say that you recall being asked questions
24  about the gold trade with Iran?
25  A.  Generally, yes.

1  Q.  Let me do this a little bit differently.  Maybe we can make
2  it easier.
3  A.  Sure.
4  Q.  This is a transcript.  Do you recall testifying before the
5  Senate Committee on -- I'm sorry.  The House Committee on
6  Foreign Relations back in May of 2015?
7  A.  So I testified before the House Foreign Relations Committee
8  on several occasions.  I have no doubt at all that I testified
9  in May of 2013 and about this.  I just, you know, couldn't tell
10  you that I did that on that date.
11       MR. ROCCO: Your Honor, I'd like to move this into
12  evidence.
13       THE COURT: I'll allow it.
14       MR. ROCCO: Defendant's Exhibit 229.
15       (Defendant's Exhibit 229 received in evidence)
16       MR. ROCCO: Can we highlight chairman Royce's -- why
17  don't we go to the cover page so the jury can see where
18  Mr. Cohen was that day.
19       This is the Committee on Foreign Affairs in the House
20  of Representatives and the date.  Can we highlight it, please,
21  Mr. White.
22       And we have the date.  And now we can go to page 39.
23  And the question is from Chairman Royce.  And directing your
24  attention to that last paragraph of Chairman Royce's question.
25       Just to make this clear for the jury, the first part

1  of that is the end of Chairman Royce's question to Mr. Cohen.
2  And the question is:  There have been reports that there has
3  been a pickup in gold sales, and that is the question that I
4  want to ask you.
5       Who specifically have you sanctioned for gold or
6  related transactions with the government of Iran, and given
7  that the transfer of any precious metals or gold to Iran will
8  be in violation of U.S. law after the 1st of July, what is the
9  Obama administration going to do before July 1st to prohibit
10  transfer of gold to Iran?
11       And your answer is, can we scroll down a little bit.
12  Let's go a little bit further and let's highlight and "I can
13  assure you."
14       We're obviously aware of those reports and we're
15  tracking very closely the sale of gold to Iran, because as you
16  note, as of last July, the executive order adopted by the
17  president makes sanctionable the sale of gold to the government
18  of Iran.  We've been very clear with our counterparts around
19  the world -- just stopping there.
20  Q.  Can you tell us what you mean by counterparts?
21  A.  Government, governments.
22       MR. ROCCO: Counterparts around the world with the
23  private sector actors, that this provision is one that we take
24  very seriously and that we intend to enforce, and I can assure
25  you that we are looking very, very carefully at any evidence

**A598**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 8, 2017

| HC83ATI3 | Cohen - Cross | Page 1225 |
|---|---|---|

1   that anyone outside of Iran is selling gold to the government
2    of Iran.
3   Q.  You recall making remarks like that?
4   A.  Yes.
5          MR. ROCCO: Can we move down and scroll down a little
6    bit further.  I apologize.  Can you go to 41.
7   Q.  Can you read that to yourself.
8   A.  Hmm-hmm.
9          (Pause)
10  Q.  Do you recall making -- do you recall testifying to that
11   effect when you appeared before the House?
12  A.  I have no doubt that I said this.
13  Q.  Thank you.
14         MR. ROCCO: Can we go a little bit beyond that.
15  Q.  With respect to whether Turkey is paying Iran, this is
16   still your testimony, for its gas imports in gold.
17         This is natural gas we're talking about, correct?
18  A.  Yes.
19  Q.  We can go into this in greater detail in the closed
20   session, but I think the short answer is what we do not see
21   this occurring.
22         Can you tell me what you meant by that?  We're talking
23   about using proceeds for natural gas to purchase gold.  Am I
24   correct?
25  A.  Yes.

| HC83ATI3 | Cohen - Cross | Page 1226 |
|---|---|---|

1   Q.  Here you've been specifically asked gold imports and how
2    gold imports are being paid for by Iran.  Correct?
3   A.  I don't see the question here, but I think that's generally
4    right.
5   Q.  Can you tell me what you had in mind when you made this
6    statement that you made here: But I think the short answer is
7    that we do not see that occurring.
8   A.  The question as I recall and --
9   Q.  If you want, we can go back to it, if you want?
10  A.  Just right above the highlighted portion here.  So, what
11   Congressman Engel was asking, was whether Turkey was paying for
12   natural gas imports from Iran by with gold.
13  Q.  Right.  Do you mean directly or indirectly?  In answering
14   the question, well, in answering the question, did you have in
15   mind whether it was direct, whether the payments were direct or
16   indirect?
17  A.  I don't know that I had a view on direct or indirect.  I'm
18   not sure I know what the question that you are asking me means.
19  Q.  You made a statement, as I read this, the short answer is
20   that we do not see that Turkey -- that Iran is paying for its
21   natural gas imports in gold.  Am I correct?
22  A.  Yes.
23  Q.  You made that statement based on something.  Am I correct?
24  A.  Yes.
25  Q.  Can you tell the jury what that statement was based on?

| HC83ATI3 | Cohen - Cross | Page 1227 |
|---|---|---|

1   A.  The whole collection of information available to me at that
2    time.
3   Q.  What was that information?  Was that information based on
4    investigations that were being -- that intelligence agencies
5    were gathering and provided to you?
6          MR. LOCKARD: Objection.
7          THE COURT: I'll allow it.  In part or in whole?
8   A.  Yeah.  So my information base at that point consisted of
9    what I had been told, what people who were working for me were
10   told and they conveyed to me, and I suspect, although I don't
11   have a specific recollection, what our intelligence agencies
12   were able to collect.
13  Q.  Would you agree with me that that's a pretty broad
14   statement, and in effect are you not saying that to the best of
15   your knowledge at that point that sanctions weren't being
16   violated in connection with the sale of natural gas?
17  A.  I'm sorry, Mr. Rocco.  Was it my recollection that at that
18   point I did not believe that sanctions were being violated?
19  Q.  Yes.  With respect to whether Turkey is paying Iran, this
20   is your statement.  "With respect to whether Turkey is paying
21   Iran for its gas imports in gold, we can go into this in
22   greater detail in the closed session."  And we're not asking
23   about what happened in the closed session.  "But I think the
24   short answer to that is that we do not see that occurring."
25  A.  I think that's right.  I think at that point, with respect

| HC83ATI3 | Cohen - Cross | Page 1228 |
|---|---|---|

1   to gas imports into Turkey, we -- I did not have reason to
2    think that the gas that Turkey was importing from Iran, that
3    Turkey was paying Iran for that gas with gold.
4   Q.  At that point, was Iran allowed to pay for gold in natural
5    gas?
6   A.  Other way around?  Gas --
7   Q.  Yes.
8   A.  No.
9   Q.  And how about the other way around, petroleum products?
10  A.  Natural gas and oil were handled the same way.
11         (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

HC8PATI4    Cohen - Cross    Page 1229

1  Q.  At that point, there was a gap, was there not, for --
2  A.  Yeah.
3  Q.  -- roughly six months or so, where they were not handled
4   the same way?
5  A.  I think that's right.
6  Q.  Thank you on that.  By the way, do you know the Iranian
7   entity that's responsible for selling natural gas?  Is it NICO
8   or NIOC?  Are you aware of the --
9  A.  I was.  It was -- NIOC was the entity that was responsible
10   for selling --
11  Q.  Natural gas?
12  A.  I believe that's right.
13       MR. ROCCO: I'm sorry, your Honor, may I?
14       (Pause)
15  Q.  You testified earlier about the rial being devalued at this
16   point --
17       THE COURT: I'm not sure he did.  I think it came from
18   the transcript.
19  A.  Yes.
20  Q.  Yes.  Can we bring it back up just for a moment?
21  A.  You don't need to.
22  Q.  Can you bring it back up, or can you tell us what you had
23   in mind at the time you testified to that?
24  A.  Sure.  One of the metrics that we were tracking very
25   closely as we were trying to assess how effective our sanctions

HC8PATI4    Cohen - Cross    Page 1230

1   were was the value of the rial, the Iranian currency.
2       As it was devaluing against the dollar, that was an
3   indication that we were putting economic pressure on Iran, and
4   in the spring, as I recall, the spring of 2013 -- and
5   consistently over this period of time, you could see the rial
6   weakening.  One of the reasons that we were focused on precious
7   metals, and gold in particular, was that one way that the
8   Iranian government can support the value of the rial, try to
9   prevent it from devaluing, is by acquiring gold, selling gold
10   into the market in Iran and purchasing rials off the market.
11   That tends to support the value of the rial.
12       That's why we were trying to cut off the gold trade to
13   the government of Iran.  So at this point, in the spring of
14   2013, you could see the rial weakening, devaluing against the
15   dollar, and we were, like I said, intent on trying to prevent
16   the Iranians from preventing that devaluation.
17  Q.  And the devaluation was the result of the sanctions program
18   being somewhat successful; am I correct?
19  A.  Yes.
20  Q.  Let's turn to another point, Reza Zarrab.  To the best of
21   your recollection, were you aware of Reza Zarrab as early as
22   2013?
23  A.  To the best of my recollection, I was.
24  Q.  I think you testified on direct that you were actually in
25   Istanbul the day that there were some arrests, December 17th,

HC8PATI4    Cohen - Cross    Page 1231

1   2013?
2  A.  Correct.
3  Q.  And I believe you testified that Suleyman Aslan, the former
4   general manager of Halkbank, was arrested that day?
5  A.  Yes.
6  Q.  Am I correct?
7  A.  Yes.
8  Q.  And were you aware of the fact that Reza Zarrab had also
9   been arrested that day?
10  A.  So I don't recall that, but I believe that's right.
11  Q.  At or about the time that you learned of Mr. Aslan's
12   arrest, did you know that Reza Zarrab was a customer of
13   Halkbank?
14  A.  To the best of my recollection, Mr. Rocco, I knew that in
15   the spring.  I believe that the conversation that I'd had when
16   I was at Halkbank in the spring of '13 and we were discussing
17   the gold trade, that Mr. Zarrab came up in that conversation.
18  Q.  And -- I'm sorry.
19  A.  Yeah, so my best recollection is that I knew of Mr. Zarrab
20   by the spring of '13.
21  Q.  And you knew that he was a gold trader; am I correct?
22  A.  Yes.
23  Q.  And you knew that he was a large gold trader; am I correct?
24  A.  Yes.
25  Q.  And do you recall what it was that brought Reza Zarrab into

HC8PATI4    Cohen - Cross    Page 1232

1   that conversation in the spring of 2013?
2  A.  I don't.
3  Q.  And do you recall whether that meeting was with Mr. Atilla
4   or with Mr. Aslan?
5  A.  So my recollection is it was with Mr. Atilla.
6  Q.  And do you recall -- when is the first time that you
7   associated -- well, withdrawn.
8       Mr. Zarrab had a history with OFAC; am I correct?  Do
9   you recall something called Al Nafees Exchange?
10  A.  I'm sorry, which?
11  Q.  Al Nafees.
12  A.  I do recall vaguely Al Nafees Exchange, yes.
13  Q.  Do you recall Mr. Zarrab having anything to do with Al
14   Nafees?
15  A.  I don't.
16  Q.  Do you recall Al Nafees Exchange having come under
17   enforcement proceedings by Treasury or OFAC?
18  A.  I remember the name Al Nafees Exchange.  The only reason
19   that I would have ever heard of Al Nafees Exchange is because
20   it somehow came to my attention as a business that we were
21   concerned about, but beyond that, I don't recall any specifics.
22  Q.  Do you recall Al Nafees Exchange -- let me see if I can
23   refresh your recollection.
24       Do you recall Al Nafees Exchange coming to your
25   attention as a result of violations of the ITSR?

A600

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

| HC8PATI4 | Cohen - Cross | Page 1233 |
| --- | --- | --- |

1 A. Again, I think the only reason I would have heard about
2  Al Nafees Exchange is likely because of some potential issue
3  with compliance with the Iran sanctions, but I just don't
4  remember that with any specificity.
5 Q. Do you recall a penalty being imposed on Al Nafees Exchange
6  and the penalty not being paid?
7 A. I don't.
8 Q. Do you remember -- do you recall any connection between
9  Reza Zarrab and Al Nafees Exchange -- I'm sorry, Al Nafees
10  Exchange?
11 A. I do not.
12 Q. Can you place a year on your vague recollection of
13  Al Nafees Exchange? Was it 2012?
14  THE COURT: Sorry, I can't.
15 Q. What I'm trying to posit is, at the time that you spoke
16  about Al Nafees Exchange -- about Reza Zarrab and Mr. -- with
17  Mr. Atilla in March of 2013, did you have Mr. Zarrab in mind
18  because of what occurred with Al Nafees Exchange in 2012?
19  MR. LOCKARD: Objection.
20  THE COURT: I'll allow it.
21 A. Yeah, I just don't know, Mr. Rocco. It's possible. I just
22  don't recall.
23 Q. Were you aware of Mr. Zarrab being investigated by the FBI
24  in 2013?
25 A. I don't believe so.

| HC8PATI4 | Cohen - Cross | Page 1234 |
| --- | --- | --- |

1 Q. When did you first -- did you know at any time that
2  Mr. Zarrab was under investigation by the American authorities?
3 A. By the FBI or by any American --
4 Q. By anyone.
5  MR. LOCKARD: Objection.
6  THE COURT: I'll allow it.
7 A. So can I take this in parts? So by 2014, so post the
8  arrests and heading into that meeting in the fall of '14, where
9  we asked Mr. Atilla and the new general manager of Halkbank
10  about Mr. Zarrab, I expect that -- let me rephrase that.
11  My best recollection is that within Treasury folks,
12  were looking at -- and within OFAC, in particular folks were
13  looking at Zarrab. So on the Treasury side of things, I think
14  by 2014, post those December 13 arrests, at least by then we
15  were looking at Zarrab. I think it may have predated that, and
16  if we had a conversation in the spring of 2013 with Halkbank about
17  Mr. Zarrab, we may have been also conducting something of an
18  investigation into Mr. Zarrab within the Treasury Department.
19  The FBI and law enforcement interest in Mr. Zarrab, I
20  don't think I knew about until I read in the papers that he had
21  been arrested and indicted.
22 Q. Was there -- when you spoke to Mr. Atilla in the spring of
23  2013, did you tell Mr. Atilla to stop dealing with Mr. Zarrab?
24 A. I don't believe I did, no.
25 Q. Did you warn him about dealing with Mr. Zarrab?

| HC8PATI4 | Cohen - Cross | Page 1235 |
| --- | --- | --- |

1 A. You know, I think that -- I mean, did I say: Be careful,
2  don't deal with that guy? I don't believe so. I think I asked
3  questions about what the nature of the relationship was between
4  Zarrab and Halkbank. As I recall, we didn't, to use your
5  phrase, I don't think we drilled down on it very hard at the
6  time. I think Mr. Atilla assured us that there was nothing to
7  be concerned about.
8 Q. Well, at that point, did you know that Mr. Zarrab was a
9  gold trader?
10 A. I believe so, yes.
11 Q. And did you know that he was a significant gold trader?
12 A. I believe we had suspicions that he was a large gold
13  trader. I just can't say with precision exactly what we knew
14  at that point.
15  THE COURT: Mr. Rocco, how much time?
16  MR. ROCCO: Judge, maybe an hour.
17  THE COURT: Well, then I'll see you at the side.
18  (Continued on next page)
19
20
21
22
23
24
25

| HC8PATI4 | Cohen - Cross | Page 1236 |
| --- | --- | --- |

1  (At the side bar)
2  THE COURT: So given my commitment to the jury, I'm
3  going to stop now, but I have to say this, so in the rulings
4  that I made with respect to the motion in limine, in particular
5  with respect to this witness and others, I think we considered,
6  on two separate occasions, and the government's view was that
7  your cross should be related to the direct and you said,
8  particularly on the second occasion, that you thought you
9  needed to go beyond the direct and to go into other topics,
10  which I have to say -- well, I agreed that you could do that on
11  a limited basis, go beyond the direct.
12  I think you've gone so way beyond what I ever imagined
13  would be that limited basis, but I still I haven't stopped you.
14  But I am going to say that when we resume with this witness,
15  that you need to come back to the direct. Now, I'm giving you
16  so much latitude, and you've been going all over the place,
17  that I think it's time to come back.
18  MR. ROCCO: Well, your Honor, I would never disagree
19  with you.
20  THE COURT: No, you can, you absolutely can.
21  MR. ROCCO: I'm trying my best to stay within the
22  parameters of this witness' direct testimony and, quite
23  frankly --
24  THE COURT: Let me give you an example.
25  MR. LOCKARD: I think that is demonstratively not the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 8, 2017

| HC8PATI4 | Cohen - Cross | Page 1237 |
|---|---|---|

1 case.

2      MR. ROCCO: Oh, give me a break.  Come on.

3      THE COURT: No.

4      MR. ROCCO: Stop the side.  Yes, sir.

5      THE COURT: Not in front of the jury.  So -- well,

6 never mind.

7      MR. ROCCO: Thank you, Judge.

8      THE COURT: You don't need an example from me.

9      MR. ROCCO: You're more tolerant than Mr. Lockard.

10 I'm glad you're the judge.

11      THE COURT: But we are going to break.  We're going to

12 have to have him come back.  I hope he can come.  If he can't

13 come first thing Monday, we'll fit him in during the week at

14 his convenience, and then he'll finish, and you'll be able to

15 do redirect.

16      MR. ROCCO: And I have no objection to that, your

17 Honor.

18      THE COURT: Okay.

19      MR. LOCKARD: So since he is still on cross, we'll

20 only discuss timing logistics of when he can come back with his

21 counsel.

22      MR. ROCCO: I have no objection to that, Judge.

23      THE COURT: Yes.

24      MR. ROCCO: Thank you.

25      (Continued on next page)

| HC8PATI4 | Cohen - Cross | Page 1238 |
|---|---|---|

1      (In open court)

2      THE COURT: So we're going to stop.  It's 2:30.  I

3 said we were going to go to 2:30, and it's 2:30; so I'll see

4 you on Monday at 9:15.

5      In the interim, please remember not to talk to each

6 other about this case or about anyone who has anything to do

7 with it until the end of the case when you go to the jury room

8 to deliberate.

9      Second, please do not talk with anyone else about this

10 case or about anyone who has anything to do with it until the

11 trial has ended and you have been discharged as jurors.

12      Third, do not let anyone talk to you about the case or

13 about anyone who has anything to do with it.  If someone should

14 try to talk to you about the case, please report that to myself

15 or Chelsea or Christine, who will be back on Monday.

16      And, fourth, do not read any news or internet stories

17 or articles or blogs or listen to any radio or TV or cable or

18 internet reports about the case or about anyone who has

19 anything to do with it.

20      And, fifth, do not do any type of research or any type

21 of investigation about the case on your own.

22      So we're making good progress.  My anticipation is

23 that the government will conclude its case sometime next week.

24 The defense has no obligation to put on a case or not, and so

25 we don't ask until we get to that point, whether they wish to

| HC8PATI4 | Cohen - Cross | Page 1239 |
|---|---|---|

1 do that or not.  So there we are.  I think we're very much on

2 schedule.  So great to work with you, and I'll see you all 9:15

3 on Monday.

4      (Jury not present)

5      THE COURT: So we have to impose upon you, Mr. Cohen,

6 to have you back, and you'll talk with the government counsel

7 and we'll try and make something that's convenient for you.

8      THE WITNESS: I appreciate that.

9      THE COURT: It doesn't necessarily have to be first

10 thing Monday.  The parties have agreed to fit you in, you know,

11 when it's convenient next week.  So I anticipate that there's

12 further cross, and then there's probably some redirect after

13 that.  I think if I had to guess, somewhere between an hour and

14 two hours still to go.

15      THE WITNESS: Okay.

16      THE COURT: Okay.

17      THE WITNESS: Thank you.

18      THE COURT: Thank you very much.  You're excused,

19 thank you.

20      THE WITNESS: Well, not really.

21      THE COURT: That's true.  That's true.

22      THE WITNESS: Thank you, your Honor.

23      (Witness temporarily excused)

24      THE COURT: So I think I'll ask you all to sit down

25 because there's often a groan at this point.  I'm anticipating

| HC8PATI4 | Cohen - Cross | Page 1240 |
|---|---|---|

1 that we're heading to the end of, as I said to the jury, the

2 government's case next week and perhaps the whole case or

3 perhaps not.  But just as a heads up, so if there are any rule

4 29 motions, in my practice, there's no gap in time between

5 whenever the government ends or whenever.

6      So if you all need to, you should have one of you --

7 well, however you have to deal with that, that's up to you.

8 But you might have somebody thinking about that starting maybe

9 this weekend or whatever so that there will be no

10 discontinuity.  So your motion will be there whenever, assuming

11 there is one, and I would rule pretty instantaneously.  Okay?

12 Okay.  Good to see you all.

13      MR. ROCCO: Thank you, Judge.

14      MS. FLEMING: Thank you, your Honor.

15      (Adjourned to Monday, December 11, 2017, at 9:15 a.m.)

**A602**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                          December 8, 2017

```
                                        Page 1241
 1                    INDEX OF EXAMINATION
 2   Examination of:                         Page
 3    DAVID COHEN
 4   Direct By Mr. Lockard . . . . . . . . . . .1099
 5   Cross By Mr. Rocco . . . . . . . . . . . . .1154
 6                  GOVERNMENT EXHIBITS
 7   Exhibit No.                      Received
 8    7002   . . . . . . . . . . . . . . . . .1109
 9    7001   . . . . . . . . . . . . . . . . .1112
10    7005   . . . . . . . . . . . . . . . . .1128
11    7022   . . . . . . . . . . . . . . . . .1141
12    7011   . . . . . . . . . . . . . . . . .1143
13                   DEFENDANT EXHIBITS
14   Exhibit No.                      Received
15    200   . . . . . . . . . . . . . . . . .1171
16    201   . . . . . . . . . . . . . . . . .1173
17    229   . . . . . . . . . . . . . . . . .1223
18
19
20
21
22
23
24
25
```

**A603**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

---

*December 11, 2017*

---

*Southern District Court Reporters*

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

---

HCBPATI1                                            Page 1242

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4          v.                      S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                Defendant.
 7   ------------------------------x
 8
 9                           December 11, 2017
                                    9:25 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                               District Judge
                                   and a jury
15
16
17              APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

---

HCBPATI1          Trial                            Page 1243

```
 1
 2
 3          (APPEARANCES Continued)
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

---

HCBPATI1          Trial                            Page 1244

1    (Trial resumed.  In open court; jury not present)

2    THE COURT: So we have almost all the jurors, missing
3 one or two, but this is a preliminary legal matter that I
4 wanted to discuss with you.  It's a response to the letters
5 back and forth, dated December 10, first from the government
6 objecting to some of the cross-examination by Mr. Rocco and
7 then Mr. Rocco's letter in response.

8    So the ruling is as follows.  As I say, I have
9 reviewed the government and defense letters dated December 10
10 regarding Mr. Cohen's cross-examination, and while I still need
11 to review these letters against the transcripts of the
12 examination, which I've started doing but have not finished, I
13 do have some preliminary responses and concerns with the
14 cross-examination.

15    No. 1, the Court, as you know, has the principal
16 responsibility of determining and instructing the jury with
17 respect to the applicable law.  The jury has been so advised,
18 as you also know, preliminarily and the Court's views of the
19 sanctions laws applicable to this case is clearly stated in two
20 rulings, one dated October 17, 2017, with respect to
21 Mr. Zarrab's motion to dismiss, and the other dated
22 November 16, 2017, issued in response to Mr. Atilla's motion to
23 dismiss.

24    Point two, the jury takes the law as provided by the
25 Court and is not the arbiter of any counsel's disagreement with

---

HCBPATI1          Trial                            Page 1245

1 the Court as to either, in this case, the law of conspiracy
2 and/or the laws relating to sanctions against Iran or any other
3 legal matter in that regard.

4    No. 3, my preliminary reaction is that the cross of
5 Mr. Cohen exceeded the Court's, I think it was, December 6th,
6 2017, ruling as to the scope of cross of Mr. Cohen and also
7 potentially of Mr. Szubin, and I think it may tend to confuse
8 the jury as to the jury's role in this matter and, also, as to
9 the applicable law that applies in this case.  You will recall
10 I so advised defense counsel of this concern at the sidebar on
11 December 8 and am reviewing the transcripts in this regard.

12    No. 4, defense counsel is hereby placed on notice that
13 while it will not do so now, the Court will likely sustain
14 objections to the cross and give an instruction to the jury as
15 to applicable legal principles along the lines of the
16 instruction proposed by the government in its December 10
17 letter if the defense proceeds along its current path with
18 respect to Mr. Cohen or Mr. Szubin or other witnesses that the
19 government may call.

20    No. 5, I would like to review also the exhibit, I
21 think it's 2010.  It was a defense exhibit, and if you have a
22 copy, I'd like you to hand it up.  As I recall, it's a detailed
23 letter or e-mail sent by Mr. Atilla to the U.S. government
24 regarding sanctions.  And I would also like to review any
25 written information or materials that the government may have

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

| HCB3ATI2 | Korkmaz - Direct | Page 1286 |
|---|---|---|

1  did you have additional training that you took?
2  A. Yes.
3  Q. Can you describe some of the additional training that you
4  received while in the financial crimes unit.
5  A. The financial crimes unit was under the umbrella of KOM,
6  which stood for antismuggling and organized crimes directorate.
7  And within the KOM, then there was an international training
8  unit called TADOC. And within that TADOC, I received training
9  under many titles.
10 Q. Just to help out the record, can you explain what TADOC is,
11  including how to spell it?
12 A. T-A-D-O-C. TADOC is an English name that I don't remember
13  what it stood for. But the spelling is as such, T-A-D-O-C.
14  And through this place, expert training was being provided at
15  the international level and also in fields that would fall
16  under the KOM.
17 Q. Can you give us just a couple of examples of the kinds of
18  training you received through that program.
19 A. I had received a two-week training that pertained to KOM
20  branch. And I also had received training on analysis of
21  criminal data. I had received training on an expert in
22  economic crimes. I had received training on crimes pertaining
23  to corruption. I also received training on operational police
24  tactics and shooting.
25 Q. During your time in the financial crimes unit, did you

| HCB3ATI2 | Korkmaz - Direct | Page 1287 |
|---|---|---|

1  provide training to others?
2  A. Yes.
3  Q. Can you describe the training that you provided to others?
4  A. TADOC took me as an instructor, and I provided training in
5  battling economic crimes.
6  Q. So let's turn back to the investigation that you started
7  describing earlier.
8      When did that investigation originate?
9  A. This investigation had started in 2013. I'm sorry, it was
10  2012. In September of 2012.
11 Q. When the investigation began, who were the principal
12  suspects of the investigation?
13 A. When the investigation initially began, it was an
14  investigation on Reza Zarrab and his organization as the
15  nucleus of the organization.
16 Q. What was the type of conduct that was principally being
17  investigated at the outset?
18 A. At the outset, the conducts that were being investigated
19  were smuggling, laundering of criminal proceeds or money
20  laundering, and committing these crimes as an organized crime
21  unit.
22 Q. When you say "smuggling," smuggling of what?
23 A. Gold.
24 Q. When you first became involved in the investigation, did
25  you have any familiarity with Mr. Zarrab prior to that time?

| HCB3ATI2 | Korkmaz - Direct | Page 1288 |
|---|---|---|

1  A. Prior to the investigation, I did not know Mr. Reza Zarrab.
2  But that may not be an objective observation because,
3  apparently, the rest of the team knew him through magazine
4  news, through entertainment news, and I was not into those
5  news, so I did not know much about Mr. Zarrab.
6  Q. I think you said that as the investigation went on, the
7  people who were the suspects of the investigation changed; is
8  that right?
9  A. That is correct.
10 Q. And grew to include Mr. Caglayan, Mr. Aslan, Mr. Guler,
11  Mr. Alacaci, Mr. Erdogan, and others; is that right?
12      MR. HARRISON: Objection to form, your Honor.
13      THE COURT: I'll allow it.
14 A. I actually did not understand the question fully.
15 Q. I'll ask a different question to get us there.
16      Did the type of conduct being investigated change as
17  the investigation went along?
18 A. Yes.
19 Q. What additional types of conduct came to be under the scope
20  of the investigation?
21 A. Bribery and document forgery.
22 Q. As the types of conduct that were being investigated grew,
23  did additional individuals come within the scope of the
24  investigation as well?
25 A. Yes.

| HCB3ATI2 | Korkmaz - Direct | Page 1289 |
|---|---|---|

1  Q. What additional individuals became within the scope of the
2  investigation?
3  A. Suleyman Aslan, Muammer Guler, Salih Khan Caglayan, Ozgur
4  Ozdemir, Hikmet Tuner, Onur Kaya, Mustafa Behcet Kaynar.
5  Q. Is it fair to say a number of individuals came within the
6  scope of the investigation?
7      MR. HARRISON: Objection, your Honor.
8      THE COURT: Overruled.
9  A. It's actually many more. If I had more time, I would
10  probably count more names.
11      THE COURT: Do you know how many people were
12  investigated or who were subject of the investigation, all
13  together?
14      THE WITNESS: Your Honor, what I remember as the count
15  of suspects that were listed within the scope of an operation
16  that was conducted on December 17, that was about 32 to the
17  best of my recollection. But as far as individuals that were
18  suspects within the investigation itself, that was between 50
19  and 100.
20 A. Shall I continue with other names that I remember?
21 Q. I think we can try and draw out particular people as they
22  come up. I think one of the people you mentioned earlier was
23  Suleyman Aslan.
24 A. Yes.
25 Q. The general manager of Halkbank at the time?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

HCB3ATI2          Korkmaz - Direct          Page 1290

1  A.  Yes.
2  Q.  For what type of conduct was Mr. Aslan being investigated?
3  A.  Leading an organization, bribery, document forgery, and
4    also laundering, money laundering.
5  Q.  Were there others at Halkbank whose conduct was also within
6    the scope of the investigation?
7        MR. HARRISON: Objection, your Honor.
8        THE COURT: Overruled.
9  A.  Yes.
10  Q.  Who were those other individuals?
11  A.  Mr. Hakan Atilla, Levent Balkan, Hakan Aydogan.
12  Q.  You described one of the offenses being investigated was
13    bribery.
14  A.  Yes.
15  Q.  What, if anything, did your investigation show about
16    whether Mr. Aslan was receiving bribes?
17  A.  It was very high and it was in various ways.
18  Q.  What, if anything, did your investigation show about
19    whether Mr. Atilla was receiving bribes?
20  A.  That was not something that had come up.
21  Q.  What, if anything, did your investigation show about
22    whether Mr. Balkan was receiving bribes?
23  A.  No.  No, in fact the individual had refused a matter that
24    could be construed as bribery.
25  Q.  What do you mean by that?

HCB3ATI2          Korkmaz - Direct          Page 1291

1  A.  It was in relation to a transaction that was conducted, and
2    an individual named Nesteren Zarei Deniz had wanted to send him
3    some boxes of sweets.
4        THE COURT: To who?
5        THE INTERPRETER: Send to him.
6        THE COURT: Who is "him"?
7        THE WITNESS: To Levent Balkan.
8        MR. HARRISON: I'm going to object based on foundation
9    and hearsay.
10        THE COURT: Thanks.  Overruled.
11  A.  So, Nesteren offered to give boxes of sweets in return for
12    the transaction that was being conducted by the individual
13    named Levent Balkan, and Balkan took care of the transaction
14    anyway, but said that receiving the sweets would not be
15    appropriate and refused it.
16  Q.  Lastly, Mr. Aydogan.  What, if anything, did your
17    investigation show about whether Mr. Aydogan was receiving
18    bribes?
19        MR. HARRISON: Objection to foundation and hearsay.
20        THE COURT: Overruled, counsel.
21  A.  We had suspicions on that matter.  Taha Ahmet Alacaci, who
22    was one of the suspects in the investigation, invited this
23    individual out to the restaurant to meet with him.  And the
24    person that had made this reservation for this restaurant was
25    this individual named Taha Ahmet Alacaci.

HCB3ATI2          Korkmaz - Direct          Page 1292

1  Q.  Did you develop any further evidence that Mr. Aydogan had
2    received bribes besides the restaurant invitation?
3        MR. HARRISON: Objection to foundation and hearsay and
4    lack of personal knowledge.
5        THE COURT: Overruled.
6  A.  I'm not that sure about this, but I believe there was
7    something about moving a house also, but I'm not sure about
8    this one.
9  Q.  I'd like to talk a little bit about what was received in
10    exchange for the bribes.  Before we do that, let me just ask
11    you a few questions generally about how the investigation was
12    conducted.
13        MR. HARRISON: Objection to form.
14        THE COURT: Overruled.
15        (Continued on next page)
16
17
18
19
20
21
22
23
24
25

HCBPATI3          Korkmaz - Direct          Page 1293

1  Q.  What were the principal investigative techniques that you
2    used in your investigation?
3  A.  Identification of communications and interception of such
4    communications, surveillance through technical tools, physical
5    surveillance, security camera footage, analysis of mails,
6    documents that were obtained through institutions, auditor and
7    expert reports, pieces of evidence that were seized during the
8    searches within the operation, and also the digital evidence
9    that were seized during the operation.
10        THE COURT: Did you say digital?
11        THE INTERPRETER: Digital evidence.
12  Q.  And when you talk about things that you learned from the
13    investigation, are you describing things that you learned from
14    these investigative techniques?
15  A.  Yes.
16  Q.  And from that evidence, what did it show about what types
17    of benefits were provided in exchange for payments that were
18    made?
19        MR. HARRISON: Objection, your Honor.
20        THE COURT: Overruled.
21        MR. HARRISON: Foundation, hearsay.
22        THE COURT: I'm sorry?
23        MR. HARRISON: Foundation, hearsay, lack of personal
24    knowledge.
25        THE COURT: Oh, okay.  Overruled.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

| HCB3ATI4 | Page 1326 |
|---|---|

1  if there are tape recordings, the witness mentioned that there
2  were court orders secured in advance of wiretaps. We would
3  have to know a little bit more about that. And we'd have to
4  know a little bit more -- I'm not sure how significant this
5  is -- but how these materials wind up in this court. We should
6  hear a little bit more about that.
7      So, before we continue with further testimony, I think
8  that these issues need to be addressed through the witness. If
9  you need to or want to make a proffer before he resumes the
10  witness stand, that's fine. If not, we can just bring these
11  issues out before he continues his testimony.
12      MR. LOCKARD: Sure. And your Honor, you've
13  actually -- I don't think you're reading the outline of the
14  testimony, but that's exactly where we're headed next.
15      So, I think the witness has been describing the
16  investigation, and this is partly in response to certain
17  arguments that were made in opening statements about the nature
18  of this evidence and the nature of this witness.
19      The witness is going to go on to describe I think in
20  very short order how the investigation concluded, how he
21  obtained copies of the evidence that we've been talking about
22  and will continue to talk about, and this is laying the
23  groundwork for how it is that the investigation concluded the
24  way that it did and how it is --
25      THE COURT: This is the investigation in Turkey?

| HCB3ATI4 | Page 1327 |
|---|---|

1      MR. LOCKARD: That's correct, your Honor.
2      THE COURT: I would start, though, before we resume
3  testimony, with the positioning or the relevance of this
4  information to the case brought against Mr. Atilla.
5      MR. LOCKARD: Yes, your Honor. I think he sort of
6  broadly described how these payments relate to the Iranian oil
7  proceeds. And that's what we're going to focus in throughout
8  the rest of the testimony.
9      THE COURT: My other understanding is that when we
10  resume after the lunch break it will be with Mr. Cohen, is that
11  right? Is he on the premises so to speak?
12      MR. LOCKARD: I think he's not quite on the premises,
13  but we expect him to be on the premises within the hour.
14      THE COURT: Okay. All right. So, we'll see you at
15  2 o'clock.
16      (Luncheon Recess)
17      (Continued on next page)
18
19
20
21
22
23
24
25

| HCBPATI5 | Cohen - Cross | Page 1328 |
|---|---|---|

1      A F T E R N O O N   S E S S I O N
2                2:08 P.M.
3      (In open court; jury present)
4      THE COURT: So be seated, everybody. We have
5  Mr. Cohen back to conclude his examination.
6      THE DEPUTY CLERK: Sir, before we continue, I'd like
7  to remind you that you're still under oath.
8      THE WITNESS: Thank you.
9      THE COURT: We will continue with the
10  cross-examination by Mr. Rocco.
11      MR. ROCCO: May I proceed, your Honor?
12      THE COURT: Yes.
13  DAVID COHEN,
14      called as a witness by the Government,
15      having been previously duly sworn, testified as follows:
16  CROSS-EXAMINATION RESUMED
17  BY MR. ROCCO:
18  Q. Mr. Cohen, good afternoon.
19  A. Good afternoon.
20  Q. Welcome back.
21  A. Thank you.
22  Q. So, Mr. Cohen, you met with representatives of the U.S.
23  Attorney's Office in preparation for your testimony in this
24  case; am I right?
25  A. That's correct.

| HCBPATI5 | Cohen - Cross | Page 1329 |
|---|---|---|

1  Q. And how often did you meet with them?
2  A. I would say about a half dozen times.
3  Q. And in that half-dozen times, where did you meet with them?
4  A. I met with them in Washington, D.C. and here in New York.
5  Q. Okay. And where, at your office in Washington, D.C.?
6  A. At the U.S. Attorney's Office in Washington.
7  Q. And at the U.S. Attorney's Office here in New York; am I
8  correct?
9  A. Correct.
10  Q. How long did these meetings take, on average?
11  A. The first couple of meetings were probably two hours long
12  or so, in that vicinity, one to two hours each one.
13  Q. I'm sorry, did you say there was a half-dozen meetings,
14  six?
15  A. That's about it, yes.
16  Q. And at those six meetings, you were shown documents?
17  A. I was.
18  Q. And the documents you were shown during those meetings,
19  include the documents that you have been shown here during your
20  testimony on direct examination?
21  A. Yes.
22  Q. And so when you were asked, had you reviewed those
23  documents, you were referring to the times that you reviewed
24  the documents with the prosecutors in connection with your
25  pretrial preparation; am I correct?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                   December 11, 2017

HCBPATI5          Cohen - Cross          Page 1330

1  A. I'm sorry, Mr. Rocco, when I was asked by whom?
2  Q. When you were on the stand and you were asked whether you
3   had reviewed the documents --
4  A. Right.
5  Q. -- you answered the question, as I recall, that you had?
6  A. Yes. Sorry, I didn't understand your question.
7  Q. I'm referring to the fact that you had -- are you saying
8   that you viewed those documents in preparation for your
9   testimony here?
10 A. Yes.
11 Q. Correct?
12 A. Yes; uh-huh.
13 Q. Now, it is correct, is it not, Mr. Cohen, that you and I
14  have never met before?
15 A. It is correct that I made the offer to meet with you twice
16  and you declined.
17 Q. You did, and I thank you for that opportunity. I wasn't
18  accusing you of refusing to meet with me. That wasn't my
19  question. My question was, you and I had not met before,
20  right?
21 A. No, we had not. I had made myself available twice to meet
22  with you.
23 Q. Yes, I understand that.
24        THE COURT: We got it. The answer is no.
25        MR. ROCCO: I think we got it.

HCBPATI5          Cohen - Cross          Page 1331

1        THE COURT: Right?
2        MR. ROCCO: Yes, the answer is no.
3  BY MR. ROCCO:
4  Q. And I didn't have the opportunity to review with you
5   documents that --
6  A. You did have the opportunity. You didn't take it.
7  Q. Excuse me, if I may?
8  A. Yes.
9  Q. Let me finish the question, you can --
10 A. Sure.
11 Q. But you and I did not review documents before you
12  testified; is that correct?
13 A. That's correct.
14 Q. That was my only point. So now, when we broke last, we
15  were talking about Reza Zarrab. You testified, I believe, that
16  you had heard at some point that Mr. Zarrab was an important
17  gold trader --
18        THE COURT: Hold on one second. I think your client
19  is having trouble with the sound system.
20        THE INTERPRETER: Your Honor?
21        THE COURT: Do you need another one?
22        THE INTERPRETER: We need new batteries.
23        THE COURT: Oh, okay.
24  (Pause)
25  Okay.

HCBPATI5          Cohen - Cross          Page 1332

1        MR. ROCCO: Thank you, your Honor.
2        THE COURT: We're good.
3  BY MR. ROCCO:
4  Q. I believe you had testified that you had heard that
5   Mr. Zarrab was an important gold trader; am I correct?
6  A. That's right.
7  Q. And am I correct that you heard that sometime in or before
8   2013?
9  A. I think that is correct.
10 Q. And do you recall -- and you also testified to the fact
11  that you had discussed Mr. Zarrab at a meeting at Halkbank
12  sometime in the spring of 2013; am I correct?
13 A. That is my best recollection.
14 Q. And do you recall the date that you discussed -- had this
15  discussion with Mr. Atilla?
16 A. So I believe I only met with Halkbank once in the spring of
17  2013. I think it was the end of February of 2013; so it would
18  have been at that meeting.
19 Q. And that meeting took place in Istanbul?
20 A. Either in Istanbul or Ankara but I don't recall.
21 Q. In any event, it was in Turkey?
22 A. Yes.
23 Q. So can we bring up 3505-006 for Mr. Cohen. I think this is
24  a document that was shown to you on direct examination. I
25  would direct your attention to the date of the document, and

HCBPATI5          Cohen - Cross          Page 1333

1  then in the body of the document there's a date, and I'm going
2  to ask you if that date refreshes your recollection as to the
3  date that you met with Mr. Atilla or with representatives of
4  Halkbank?
5  A. This is the meeting I was referring to.
6  Q. Okay. And does it refresh your recollection that the
7   meeting occurred on February 28th, 2013?
8  A. My recollection is that it was in the early-ish spring of
9   2013; so it seems likely that's the right date.
10 Q. Close enough.
11 A. Yes.
12 Q. And that's -- by the way, that's a document that you were
13  shown on direct examination, if I recall?
14 A. I think that's right.
15 Q. And I think you said that that meeting looked like it
16  lasted more than your -- longer than your average meeting?
17 A. Yeah, my recollection is this meeting was at least an hour
18  long.
19 Q. And just take a moment, if you will, I know you recently
20  reviewed the document, but tell us, if you take a moment and
21  look at it, if there's anything in the document that refreshes
22  your recollection as to the substance of what was discussed in
23  your meeting regarding Mr. Zarrab?
24  (Pause)
25 A. Can we flip to the next page.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

HCBPATI5          Cohen - Cross          Page 1334

1  Q.  Sure.  Please keep scrolling.
2      Does that document help contextualize your comments
3  about -- and what was discussed, if anything, about Mr. Zarrab
4  at that meeting?
5  A.  So my recollection is in the course of this meeting, when
6  we were discussing gold trade with Iran and discussing the fact
7  that the July to come, or the July of 2013, that the sanctions
8  would change and it would be, at that point, sanctionable to
9  trade gold with Iran altogether.
10     And in the course of that conversation, I discussed
11  the fact that there had been a significant increase in the
12  amount of gold that was being exported from Turkey to Iran.
13  And I think in the course of that conversation is where the --
14  as best I recall, Mr. Zarrab came up in the course of that
15  conversation.
16  Q.  And do you remember what was said about Mr. Zarrab, by
17  either you or Mr. Atilla, at that meeting?
18  A.  So I don't recall whether I brought him up or whether
19  Mr. Atilla brought him up, but I think the substance of the
20  conversation was that there was a significant gold trader,
21  Mr. Zarrab, that, as was reflected in this document and as I
22  recall, that they had -- they, Halkbank, had in place the
23  mechanisms to ensure that that trade was, at that point,
24  permissible gold trade to private Iranian purchasers, not to
25  the government of Iran; and that one of the reasons that they

HCBPATI5          Cohen - Cross          Page 1335

1  were comfortable with that was that they knew Mr. Zarrab's
2  business and knew with whom he was trading.
3  Q.  Okay.  And do you recall anything else about Mr. Zarrab?
4  Did you, in that conversation, tell Mr. Atilla that Mr. Zarrab
5  was under investigation by any United States authorities?
6  A.  I don't believe so.
7  Q.  Did you tell Mr. Zarrab that Halkbank should not be dealing
8  with Mr. -- I'm sorry, Mr. Atilla, did you tell Mr. Atilla that
9  Halkbank shouldn't be dealing with Mr. Zarrab?
10  A.  No.
11  Q.  Did you tell Mr. Atilla in that meeting that Halkbank
12  should be careful of its dealings with Mr. Zarrab --
13  A.  Yes.
14  Q.  -- particularly?  Particularly, did you say that about
15  Mr. Zarrab?
16  A.  So I think as I testified last Friday, I don't recall the
17  precise words that I used, but the tenor of that conversation,
18  I'm sure, was that they needed to be careful of Mr. Zarrab, as
19  well as anyone else who they were -- who was a customer of
20  Halkbank who was selling gold to Iran.
21  Q.  Let's move on.  You say that you were in Istanbul on
22  December 17th, 2013; am I correct?
23  A.  I believe that's the date.
24  Q.  And that you had a scheduled meeting with Suleyman Aslan at
25  Halkbank; am I correct?

HCBPATI5          Cohen - Cross          Page 1336

1  A.  I believe that's correct.
2  Q.  And I think that you testified that Mr. Aslan was arrested
3  that day; am I correct?
4  A.  Yes.
5  Q.  And that because he was arrested and because you were stuck
6  in traffic, the meeting was canceled?
7  A.  More the traffic.  I mean, I don't recall actually if it
8  was the day before or the day of that I arrived that the arrest
9  occurred, but in any event, my planned meetings with Halkban,
10  as well as I think others in the Turkish private sector, were
11  canceled because I was stuck in traffic getting in from the
12  airport.
13  Q.  And do you remember when you learned that Mr. Aslan was
14  arrested?
15  A.  Not precisely.
16  Q.  And do you remember what he was arrested for?
17  A.  I remember he was arrested as part of a corruption sweep,
18  essentially, that occurred and that he was arrested at home
19  with at least the reports that I read, public media reports,
20  where he was arrested at home with shoeboxes full of cash.
21  Q.  And were these reports that you were reading at or about
22  the time that Mr. Aslan had been arrested?
23  A.  Yes.
24  Q.  Did you learn that Mr. Zarrab had been arrested with
25  Mr. Aslan?

HCBPATI5          Cohen - Cross          Page 1337

1  A.  I believe so.
2  Q.  Did you learn that at the time that you learned of
3  Mr. Aslan's arrest, or did you learn that subsequently?
4  A.  I believe I learned it at the same time, although, my -- I
5  was more focused on Mr. Aslan than Mr. Zarrab because that was
6  with whom I was planning to meet.
7  Q.  Did you discuss with anyone at Treasury Mr. Aslan's arrest?
8  A.  I'm sure I did.
9  Q.  Do you have a recollection of who that was with?
10  A.  I don't precisely.  The folks who were traveling with me,
11  I'm sure I talked to them about it.  I think one of my senior
12  advisors was with me.
13  Q.  So it's fair to say that you learned of the arrests while
14  you were still abroad, while you were still in Turkey?
15  A.  Yeah, I actually don't know if I learned about the arrests
16  before I arrived in Turkey or after I arrived in Turkey, but I
17  was definitely abroad when I learned of it.
18  Q.  Subsequent to the arrest -- or learning of the fact that
19  Mr. Aslan was arrested, in the days or weeks that follow, were
20  you or, to the best of your knowledge, anybody at Treasury, in
21  touch with Halkbank to find out what had happened?
22  A.  I was not, and I imagine others at Treasury were, but I was
23  not.
24  Q.  You imagine?
25  A.  I don't know for sure.

# A610

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

| HCBPATI5 | Cohen - Cross | Page 1338 |
|---|---|---|

1 Q. Okay. And do you have a recollection of ever discussing it
2 with anyone?
3 A. Discussing why Mr. Aslan was arrested?
4 Q. No. Just the fact of the arrest and contacting Halkbank as
5 a result of the arrest. And I'm limiting my time period here
6 to the immediate aftermath of the arrest, within a couple of
7 weeks or a month or so.
8 A. Yeah, my recollection, Mr. Rocco, because my trip to Turkey
9 was aborted, and I didn't get to do the meetings that I was
10 planning to do, that early in the next year we had tried to
11 essentially reschedule the trip to Turkey. And one of the
12 things that I wanted to do on that trip was to meet with the
13 new CEO of Halkbank. So I know there was communications that I
14 had with my staff and with the embassy in Ankara to tie to set
15 that up. So in that context, I think there were conversations
16 about Mr. Aslan's arrest and who was succeeding him at
17 Halkbank.
18 Q. To the best of your recollection, when were you next in
19 touch with anyone at Halkbank?
20 A. I don't believe that I was next in touch with anyone at
21 Halkbank -- that was December '13 -- until the fall of '14.
22 Q. And in the fall of '14 you had a meeting with the new
23 general manager?
24 A. Correct.
25 Q. Am I correct? And this was at your office here in DC,

| HCBPATI5 | Cohen - Cross | Page 1339 |
|---|---|---|

1 correct?
2 A. That's right.
3 Q. And with the new general manager was Mr. Atilla; am I
4 correct?
5 A. No, the new general manager --
6 Q. No, with the new general manager.
7 A. Yes. Was Mr. Atilla? Yes.
8 Q. And Mr. Atilla, if I recall your direct examination, served
9 as an interpreter; am I correct, or at least helped
10 translate --
11 A. Right.
12 Q. -- some conversation with the new general manager?
13 A. Right. A portion of that meeting, where I was trying to
14 converse with the new general manager, Mr. Atilla served as his
15 translator.
16 Q. I'm going to ask to bring up Defendant's Exhibit 212, and
17 I'm going to ask you to look at that document, read it to
18 yourself, if you will, Mr. Cohen.
19 A. Mmm, hmm.
20      (Pause)
21 Q. Tell us when you want us to scroll to the second page.
22 It's up.
23 A. Yes, thank you.
24      (Pause)
25      Okay.

| HCBPATI5 | Cohen - Cross | Page 1340 |
|---|---|---|

1 Q. And can you tell us what that document is?
2 A. That's an e-mail summary prepared by someone on my staff of
3 my meeting with Mr. Atilla and the new general manager and a
4 third person from Halk.
5 Q. Have you reviewed that document before?
6 A. I have.
7 Q. Is that document accurate? Does it accurately reflect what
8 happened at that meeting?
9 A. It's consistent with my recollection.
10      MR. ROCCO: Your Honor, I move Defendant's Exhibit 212
11 in evidence.
12      THE COURT: Sure.
13      (Defendant's Exhibit 212 received in evidence)
14 BY MR. ROCCO:
15 Q. Now, let's talk about the document, if we can, and go
16 through it with the jury.
17      MR. ROCCO: Can we bring it up for the jury.
18 Mr. White?
19      THE COURT: How about making it a little bigger?
20      MR. ROCCO: I have my glasses on.
21      THE COURT: I'm at that age, Mr. Rocco, do you know
22 what I mean?
23      MR. ROCCO: Indeed, I do, your Honor.
24      THE COURT: Can we get it bigger?
25      MR. ROCCO: Oh, to be young, Mr. White. You can't do

| HCBPATI5 | Cohen - Cross | Page 1341 |
|---|---|---|

1 better than that?
2      THE COURT: I was going to say that.
3      MR. WHITE: Is there a certain paragraph you want to
4 read?
5      MR. ROCCO: Sure. Let's go down to the last paragraph
6 on the page. That makes it easier. Excellent.
7 BY MR. ROCCO:
8 Q. So now directing your attention to what, in effect, is the
9 last paragraph on that page, starting U/S Cohen?
10 A. Yes.
11 Q. It says that you noted that Mr. Zarrab transacted
12 essentially business through Halkbank, and in the first line
13 there's a reference to Mr. Zarrab having been accused of
14 leading efforts to evade sanctions on Iran; am I correct?
15 A. That's what it says.
16 Q. And can you tell me, is that what you said during that
17 meeting?
18 A. So just to be clear, I didn't write this document. It was
19 written by Michael Lieberman, who worked for me, and so far as
20 I know, I never edit -- I didn't edit it or review it before he
21 sent it out. I don't have any doubt that I said something
22 along those lines, but I don't know that I said precisely that.
23 So I just want to be precise.
24 Q. Okay. So give me sum and substance of what you recall
25 say --

**A611**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                December 11, 2017

| HCBPATI5 | Cohen - Cross | Page 1342 |
| --- | --- | --- |

1 A. So -- I'm sorry.
2 Q. Perhaps I can make it a little easier, at least try to make
3   it a little easier. Do you recall if, during the meeting --
4   does this refresh your recollection as to who brought up
5   Mr. Zarrab? It would appear that you did --
6 A. Yeah.
7 Q. -- because it says "U/S Cohen noted that Iranian national"?
8 A. Right; so my recollection is I brought up Zarrab. I don't
9   know that I -- precisely how I phrased it. Although, I'm not
10  going to dispute the way that Mr. Lieberman described it here,
11  but I brought up Mr. Zarrab, expressed concern that he had been
12  accused of being -- violating the Iran sanctions, that he had
13  done so through Halkbank.
14      And I was interested in learning from Mr. Atilla and
15  from the new general manager whatever they were prepared to
16  share with me about Mr. Zarrab's activity.
17 Q. What I want to direct your attention to is the word
18  "accused." Because, can you tell me, at that point, who had
19  accused Mr. Zarrab of efforts to evade sanctions?
20 A. I don't know anyone who had accused him at that point.
21 Q. And do you recall whether you said that or not?
22 A. I suspect I did not use the word "accused."
23 Q. And it's fair to say that, to your knowledge, as of the
24  date of this meeting, Mr. Zarrab had not been charged with
25  evading sanctions by any -- at least here in the United States;

| HCBPATI5 | Cohen - Cross | Page 1343 |
| --- | --- | --- |

1   am I correct?
2 A. I think that's correct.
3 Q. And certainly, he hadn't been charged in this case; am I
4   correct?
5 A. Yes, I believe that's right.
6 Q. And I think it would be a little bit unorthodox for Turkey
7   to charge him with your sanctions, correct?
8 A. I don't know whether Turkey would --
9 Q. I'll ask the correct question differently.
10      To your knowledge, at that point, had Turkey charged
11  Mr. Zarrab with violating your sanctions?
12 A. I don't know. I don't think so. You know, I think he had
13  been accused in Turkey of some -- or at least investigated in
14  Turkey related to the corruption investigation. I don't know
15  if he had been formally charged, and I don't know what the
16  charges were, if there were.
17 Q. So it's fair to say that this memorandum is inaccurate, at
18  least in terms of recounting whether Mr. Zarrab had been
19  accused of leading efforts to evade sanctions?
20 A. I think Mr. Lieberman might have been referring to press
21  reports about Mr. Zarrab and using the word "accused" a little
22  loosely here, but as a matter of U.S. accusations, U.S.
23  charges, I think it's correct that he had not been charged with
24  a crime here in the United States.
25 Q. Okay. Thank you. Let's go on.

| HCBPATI5 | Cohen - Cross | Page 1344 |
| --- | --- | --- |

1      And you used the phrase "facilitated trade for
2   Halkbank." Can you tell us what you meant by that term
3   "facilitated trade"?
4 A. I don't see that, Mr. Rocco.
5 Q. You have to go back.
6      Mr. White, can we go back to the earlier. I got it.
7   Do you see at the end -- it's the following page. I'm sorry.
8   I got ahead of myself.
9 A. I believe that is recounting what -- I'm sorry to make you
10  do this, but I think the sentence is recounting what Halkbank
11  representatives said to me. If you wouldn't mind going back to
12  the preceding page. It says: Atilla responded that Zarrab
13  received a loan from Halk to finance the acquisition and
14  redesign of a building in tourist district, as well as
15  financing loan to lease a plane, Halk also dealt with Zarrab to
16  facilitate foreign trade.
17 Q. Well, it's not clear to me. Perhaps it's clear to you.
18  The words "Halk also dealt with Zarrab to facilitate foreign
19  trade," you're saying that's something Mr. Atilla said, to the
20  best of your recollection, correct?
21 A. Yes.
22 Q. What did you understand Mr. Atilla to be saying in that
23  regard?
24 A. That Halk had been the trade finance bank, essentially, for
25  Zarrab in his export business to Iran, and I'm sure we were

| HCBPATI5 | Cohen - Cross | Page 1345 |
| --- | --- | --- |

1   talking about gold at this point.
2 Q. That was going to be my next question; so thank you. And
3   you think that this discussion is in the context of gold trade;
4   am I correct?
5 A. I believe so.
6 Q. Okay. And the memo goes on to say that -- I'm sorry, you
7   asked earlier whether Halkbank continued to deal with
8   Mr. Zarrab, and in response Mr. Atilla told you, in the
9   following respects; am I correct? And that includes a loan, a
10  financing loan, and it also included dealing with Mr. Zarrab to
11  facilitate foreign trade. And you're saying that the foreign
12  trade, as you recall it, referred to gold trade?
13 A. Correct.
14 Q. And did you have -- was there any discussion about the
15  volume of gold trade at that point?
16 A. Not that I recall.
17 Q. Now, the conversation goes on to say: "Mr. Atilla noted
18  that Zarrab was not on the U.S. Specially Designated Nationals
19  List," and what was that in response to? Was that something --
20  that wasn't something that Mr. Atilla volunteered, is it?
21 A. Yes, it is, as I recall.
22 Q. It is? There was nothing in the conversation to that
23  point, to the best of your recollection, that suggested that
24  Halkbank should not be dealing with Mr. Zarrab?
25 A. So as I recall the conversation, and this is a summary of

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

| HCBPATI5 | Cohen - Cross | Page 1346 |
|---|---|---|

1 the conversation, I raised the question of Zarrab and what
2 Halkbank's business was with Zarrab. Mr. Atilla explained that
3 they had this loan for the building, for the airplane, and as
4 well as facilitating foreign trade.
5      And then Mr. Atilla said that Zarrab's not on the
6 Specially Designated Nationals List. That's the list of people
7 who have been sanctioned by the Treasury Department. And as I
8 recall in the conversation, said essentially, what do you want
9 us to do; you haven't imposed sanctions on him, so how can we
10 not do business with him? So that was the -- as I recall, what
11 the conversation essentially centered around.
12 Q. And your response -- well, was it your understanding that
13 Mr. Atilla was asking you to add Mr. Zarrab to the Specially
14 Designated Persons List? Because in the earlier -- in the
15 immediately preceding unredacted sentence --
16 A. Mmm, hmm.
17 Q. -- it seems Mr. Atilla says: "And that, as a result, there
18 was not much that Halk could do"?
19 A. Right.
20 Q. So was he, in that conversation, asking you to add
21 Mr. Zarrab to the Specially Designated Nationals List?
22 A. That's not how I understood it. I think what I understood
23 was that he was saying he's not on the Specially Designated
24 Nationals List. If he were on that list, that's the list of
25 people who have been sanctioned, they would not have done

| HCBPATI5 | Cohen - Cross | Page 1347 |
|---|---|---|

1 business with him.
2     But what I took from this was that Mr. Atilla's tune
3 had changed with respect to Mr. Zarrab, which was to say, gee,
4 if you have designated Zarrab, then we wouldn't do business
5 with him, but otherwise, there's nothing we can do. Whereas,
6 in my previous meetings with Mr. Atilla, he had said, we
7 understand U.S. sanctions. We intend to comply with U.S.
8 sanctions, and we will not allow anyone, including Mr. Zarrab,
9 who's violating U.S. sanctions to make use of Halkbank's
10 facilitation of trade.
11 Q. Well, at this point, Mr. Zarrab was under investigation by
12 the United States; am I correct? This is October 2014.
13 A. By the Treasury Department or by the Justice Department?
14 Q. By --
15 A. I have no --
16 Q. We'll start with the Treasury Department?
17 A. I assume so; although, I don't have a specific recollection
18 that he was. But I can't imagine that he wouldn't have been.
19 Q. I'm sorry, and I don't want to put words in your mouth, but
20 do you recall testifying on direct that as early as 2013, your
21 meeting with Halkbank in February of 2013, that you thought
22 Mr. Zarrab was under investigation at that point?
23 A. I don't think that's what I testified.
24 Q. So tell me --
25 A. Yeah.

| HCBPATI5 | Cohen - Cross | Page 1348 |
|---|---|---|

1 Q. -- do you recall him being under investigation at the time
2 that you met with Halkbank in February of 2013?
3 A. So I don't -- I don't specifically know, and I don't know
4 whether he was under investigation in the sense that OFAC would
5 have opened a formal case with respect to Mr. Zarrab. It seems
6 likely that Mr. Zarrab was a significant enough player in the
7 gold trade with Iran that, at that point, someone in OFAC, I
8 imagine, was focused on Mr. Zarrab. Whether that constituted a
9 formal investigation or not, I just don't know. And, likewise,
10 by -- this meeting was in October of '14.
11 Q. October 2014?
12 A. Yeah, by October 2014, as I said, I can't imagine that he
13 wasn't under investigation. I was not, you know, monitoring
14 OFAC's investigations.
15 Q. Well, let's go back. Let's go to the next sentence in the
16 memorandum: "U/S Cohen noted, however, that Treasury did need
17 to investigate Zarrab's activities." Do you remember saying
18 that?
19 A. I think the whole purpose of this line of inquiry in this
20 meeting was we were interested in learning more about
21 Mr. Zarrab --
22 Q. Excuse me, Mr. Cohen. Sorry. My question was, do you
23 recall saying that Treasury did need to investigate Zarrab's
24 activities, yes or no?
25 A. So I don't recall saying that verbatim, Mr. Rocco. I think

| HCBPATI5 | Cohen - Cross | Page 1349 |
|---|---|---|

1 what I told Mr. Atilla and his new general manager was that we
2 needed to learn as much as we could about Mr. Zarrab. Whether
3 I used the word "investigate" or not, I don't know. I doubt it
4 because my job wasn't to be an investigator.
5 Q. And, again, this is a memo that you say was written by Mike
6 Lieberman; am I correct?
7 A. Yes.
8 Q. It's a memo that you didn't review at the time; am I
9 correct?
10 A. That's correct.
11 Q. And you're saying that the memo is inaccurate?
12 A. No.
13 Q. Imprecise?
14 A. I'm saying it's a summary of the conversation.
15 Q. Okay. And to the extent that -- you don't have any
16 recollection of saying that Treasury needed to investigate
17 Mr. Zarrab's activities, in those words; am I correct?
18 A. I don't have a recollection saying those precise words,
19 that's correct.
20 Q. And you also -- again, in this summary of conversation,
21 says that you asked Halk if it could provide any information;
22 am I correct?
23 A. Yes, I'm sure I did.
24 Q. Do you recall making that request?
25 A. Yes.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                          *December 11, 2017*

HCBPATI5          Cohen - Cross          Page 1350

1  Q. Do you recall that, saying that, asking if Halk could
2    provide you with any information; am I correct?
3  A. Yes.
4  Q. And the response you got from that is that, apparently -- I
5    won't even try to pronounce the name, Taskinoglu -- I'll call
6    him "Mr. T" -- Mr. T replied that Turkish regulations prevent
7    such information sharing, especially in these days.  Do you
8    recall Mr. T saying that to you?
9  A. In substance, yes.
10 Q. Yes.  And did the Treasury Department ever follow up and
11   request any information from Halkbank about Reza Zarrab?
12 A. I don't know.
13 Q. So is it fair to say, to your knowledge, it did not?
14 A. I don't -- again, I don't have personal knowledge of that.
15   I just don't know.
16 Q. Do you have a recollection that during this discussion with
17   the new general manager of the bank and Mr. Atilla, having a
18   discussion about ISIS?
19       MR. LOCKARD: Objection.
20       THE COURT: I'll allow it, if you remember.
21 A. I suspect we did, yeah.
22 Q. You expect we did?
23 A. Yeah.
24 Q. But that's not reflected in the memorandum, correct?
25 A. So there's aspects of this memorandum that are redacted.

HCBPATI5          Cohen - Cross          Page 1351

1  Q. That's true.  Can you tell us why the portions of the
2    memorandum were redacted?
3        MR. LOCKARD: Objection, your Honor.
4        THE COURT: Sustained.
5        MR. ROCCO: I asked him why he --
6        THE COURT: Sustained.
7        MR. ROCCO: Thank you.
8  BY MR. ROCCO:
9  Q. You testified last week about your standard presentation.
10   You referred to something --
11 A. I'm sorry, I missed that.  My what presentation?
12 Q. Your standard presentation.
13 A. Standard.  Yes, I'm with you.  Thank you.
14 Q. And can you tell us what your standard presentation was?
15   Was it a document?  Was it a power point?  You're shaking your
16   head.  The reporter needs --
17 A. I'm waiting for you to finish your question.
18 Q. A first.  Was it a written statement?
19 A. No.
20 Q. Was it a power point presentation?
21 A. No.
22 Q. Was it ever committed to writing?
23 A. Not in -- not something that's labeled David Cohen's
24   standard presentation.  I had talking points that were prepared
25   for these various meetings that would sort of lay out, usually,

HCBPATI5          Cohen - Cross          Page 1352

1    the -- in specifics what I was going to cover.  They were
2    sometimes followed, sometimes not, and there may have been some
3    reference to sort of my general schpeel in those talking
4    points, but I didn't have a document that I handed over.
5  Q. You used the word, and I'm sorry if I'm misquoting you,
6    these presentations or these situations, what do you mean by
7    that?
8  A. Meetings with foreign banks or foreign regulators or
9    foreign government officials.
10 Q. So essentially it was a template of something that you
11   would use for your remarks when you met with foreign --
12   representatives of foreign banks?
13 A. Right.
14 Q. And that would change from time to time because the
15   sanctions changed from time to time; am I correct?
16 A. Some of the details of the sanctions changed from time to
17   time.  The sort of the foundation of them didn't.
18 Q. Okay.  So, to your knowledge, did you or anyone from
19   Treasury ever tell Halkbank to stop trading gold?
20 A. To outright stop trading gold?
21 Q. To outright stop trading gold.
22 A. With Iran?
23 Q. To outright stop trading gold.
24 A. I think we certainly told them that, post July 2013, that
25   any sale of gold to Iran, to anybody in Iran, was potentially

HCBPATI5          Cohen - Cross          Page 1353

1    sanctionable.
2  Q. But prior to July 2013, there were private sales that were
3    allowed; am I correct?
4  A. Correct.
5  Q. As long -- as of February of 2013, Halkbank abided with the
6    bilateral trade restrictions; am I correct?
7  A. That is correct.
8  Q. And, in fact, up until July 1st of 2017 -- 2013, no one had
9    told Halkbank that it could not intermediate gold transactions
10   for anyone, correct?
11 A. That's -- I did not tell them that they could not do that.
12 Q. Did you or anyone from Treasury, to your knowledge, ever
13   tell anyone at Halkbank, specifically Mr. Atilla, to stop
14   trading food or medicine?
15 A. No.
16 Q. Did anybody from Treasury -- did you or anyone from
17   Treasury ever tell Mr. Atilla or Halkbank to stop dealing with
18   Reza Zarrab?
19 A. No.
20 Q. Did you or anyone from Treasury, to your knowledge, ever
21   tell Mr. Atilla about Al Nafees Exchange?
22 A. I don't -- I think as we talked about last Friday, I don't
23   have a particularly crisp recollection of the discussions about
24   Al Nafees Exchange.  So I would refer back to my testimony
25   there.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    *December 11, 2017*

| HCBPATI5 | Cohen - Redirect | Page 1354 |
| --- | --- | --- |

1    I just don't remember exactly what we talked about
2  with Al Nafees Exchange, but I can't imagine -- well, I don't
3  know whether Al Nafees Exchange was designated. If it were
4  designated, then I think we probably would told them not to
5  deal with Al Nafees Exchange.
6  Q. And if it hadn't been designated, you would not?
7  A. No.
8        MR. ROCCO: Your Honor, no further questions.
9        THE COURT: Any redirect?
10        MR. LOCKARD: Yes, your Honor.
11        THE COURT: Okay.
12    REDIRECT EXAMINATION
13  BY MR. LOCKARD:
14  Q. Good afternoon, Mr. Cohen.
15  A. Good afternoon.
16  Q. So Mr. Rocco ended his cross-examination by asking you some
17    questions about what you had or had not told Halkbank. Do you
18    recall him asking you if you, or anyone from Treasury, had told
19    Halkbank not to deal with Reza Zarrab?
20  A. Yes.
21  Q. And whether you or anyone from Treasury had told Halkbank
22    not to intermediate gold transactions?
23  A. Yes.
24  Q. Is the United States Treasury Department a compliance unit
25    for Halkbank?

| HCBPATI5 | Cohen - Redirect | Page 1355 |
| --- | --- | --- |

1  A. No.
2  Q. I'd like to turn to Defense Exhibit 201, which you looked
3    at yesterday. If we could go to, I believe, page 3 of that
4    exhibit. So Mr. Rocco had asked you about a statement in this
5    article about the extraterritorial affect of sanctions?
6  A. Yes.
7  Q. Now, remind us, what was the context of these statements?
8  A. I think this was an interview that was conducted by a Wall
9    Street Journal reporter.
10  Q. Was Mr. Atilla present at that interview?
11  A. No.
12  Q. So when you're talking about the extraterritorial affect of
13    U.S. sanctions, in what context is that statement made?
14        MR. ROCCO: Your Honor, I'm going to object in light
15    of what occurred this morning.
16        THE COURT: It's redirect.
17        MR. ROCCO: I understand. Only in light of your
18    Honor's direction.
19        MR. LOCKARD: It was raised.
20        THE COURT: It's redirect.
21        THE WITNESS: I'm sorry, can you ask the question
22    again.
23  BY MR. LOCKARD:
24  Q. In what context -- in what sanctions context was the
25    question of extraterritoriality raised?

| HCBPATI5 | Cohen - Redirect | Page 1356 |
| --- | --- | --- |

1  A. So my recollection is that this was a -- the question that
2    I was responding to here, or the one just before it, had to do
3    with these significant criminal and civil actions that had been
4    taken by Treasury and by bank regulators and by the Justice
5    Department against foreign banks for violating U.S. sanctions.
6        One of the critiques was -- and so one of the
7    critiques was we were exercising extraterritorial jurisdiction.
8    My point was that the banks that were involved in these
9    settlements had transacted through the United States and had
10    effected the United States, and that the actions that we were
11    taking, as a result, were not extraterritorial. I think that
12    is what I was referring to here.
13  Q. And is the answer specifically in response to a question
14    regarding blocking transactions?
15  A. Yes.
16  Q. And can you describe what blocking is?
17  A. So blocking is the technical term that applies to when an
18    entity is sanctioned, is designated. The assets of that person
19    or entity are blocked, which means that they can't be
20    withdrawn, they can't be traded. And so if a person had a bank
21    account in the United States and their assets were blocked,
22    those assets are frozen, no U.S. person can engage in any
23    business involving that person or that person's assets.
24  Q. Can blocking ever take place outside the United States?
25  A. Not outside of a U.S. institution.

| HCBPATI5 | Cohen - Redirect | Page 1357 |
| --- | --- | --- |

1  Q. So a U.S. institution acting outside the United States can
2    block a transaction?
3  A. In certain contexts, yes.
4  Q. Are there other sanctions, penalties and remedies besides
5    blocking?
6  A. Yes.
7  Q. Do any of those penalties and remedies focus on conduct
8    outside the United States?
9  A. Yes.
10  Q. And do they focus on entities and persons outside the
11    United States?
12  A. Yes.
13  Q. And is sanctioning one of those remedies?
14  A. Yes.
15  Q. Can a sanction have a significant impact on a foreign
16    entity or individual?
17  A. Yes.
18  Q. If we can turn to the next page of Defense Exhibit 201.
19        Mr. Chang-Frieden, if you can bring up first the
20    second paragraph on that page.
21        In this article, did you describe being sanctioned as
22    possibly a mortal wound?
23  A. Apparently so.
24  Q. Is that something that's true even if the entity is not in
25    the United States and is engaging in transactions that are not

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                        *December 11, 2017*

1   in the United States?
2   A. Yes.
3   Q. If we could look at Defense Exhibit 200.
4       So this is another -- I suppose this is an article
5   that Mr. Rocco asked you about yesterday?
6   A. It's an interview.
7       MR. ROCCO: Friday.
8       MR. LOCKARD: On Friday. I'm sorry. It feels like
9   yesterday.
10      THE COURT: Not to me.
11      MR. LOCKARD: Every day feels like yesterday right
12  now.
13  BY MR. LOCKARD:
14  Q. If we could turn to page 7 -- actually, I'm sorry. If we
15  could turn to page 9.
16      So is this a discussion about the Treasury
17  Department's sanctioning authorities, and specifically focusing
18  on the paragraph that says: "Now, what we have been doing"?
19  A. Yeah, just give me one second.
20      (Pause)
21      Right. This was -- at this point, we were discussing
22  the serious sanctions.
23  Q. And are the serious sanctions a secondary sanction, a
24  primary sanction, or both?
25  A. I think principally primary sanctions. I actually don't

1   recall as I sit here. I don't believe we had secondary
2   sanctions in this series context.
3   Q. If you look at the clause of the first sentence, where you
4   describe certain actions that have been taken under those
5   authorities?
6   A. Yes.
7   Q. You're talking about close to 50 entities and individuals
8   being designated under the new authorities?
9   A. Yes.
10  Q. Do you recall whether those entities or individuals were
11  principally U.S. based or principally foreign?
12  A. I suspect every one of them was foreign, and those would
13  have been primary sanctions designations.
14  Q. And, Mr. Chang-Frieden, if we can look at the
15  second-to-last paragraph on this page.
16      All right. Here, you have a reference to the Lebanese
17  Canadian Bank action?
18  A. Yes.
19  Q. Is that something that you're somewhat familiar with?
20  A. I am.
21  Q. And is the Lebanese Canadian Bank a U.S. bank or a foreign
22  bank?
23  A. It's a foreign bank.
24  Q. And did Treasury take certain actions targeting Lebanese
25  Canadian Bank?

1   A. We did.
2   Q. And what did Treasury do?
3   A. I think we exercised a different authority under section
4   311, under the Patriot Act, to essentially cut off Lebanese
5   Canadian Bank in the U.S.
6   Q. And were there other U.S. agencies also involved in actions
7   against the Lebanese Canadian Bank?
8   A. Yes, I believe the Justice Department was also involved in
9   that.
10  Q. And is it your understanding that the Justice Department
11  action had the same basis or a different basis than the
12  Treasury's action?
13  A. Different.
14  Q. And do you have an understanding of whether
15  extraterritorial jurisdiction principles that apply to Treasury
16  apply to actions by other U.S. agencies?
17  A. I think there are different principles that apply.
18  Q. Now, Mr. Rocco also asked about some Congressional
19  testimony that you had given. I believe it's Defense Exhibit
20  229.
21      If we could turn to page 41 of that record. Maybe
22  numerical page 41.
23      And there was a question about whether Turkey was
24  paying Iran for natural gas using gold?
25  A. Right.

1   Q. So first, as a clarifying question, were there distinctions
2   between the way sanctions applied to natural gas sales versus
3   oil sales?
4   A. There were at one point in time.
5   Q. And we had talked about your letter to Halkbank in December
6   of 2012, about public statements that had been made by Turkish
7   government officials, about buying oil with gold; do you recall
8   that?
9   A. Yes.
10  Q. Is buying oil with gold a different issue than buying
11  natural gas with gold?
12  A. Yes, it's different. I mean, natural gas is different than
13  oil. As I recall, at one point, mostly because of a drafting
14  error in the legislation, natural gas and oil were treated
15  differently. That got fixed at some point in the legislation.
16  I don't recall exactly when natural gas and oil ended up being
17  treated the same, but there was a point in time when they were
18  treated differently.
19  Q. At this time, when you're talking about buying either
20  natural gas or oil from Iran, when we're talking about Turkey
21  buying natural gas or oil from Iran, what is the bank that we
22  would be talking about?
23  A. Halkbank.
24  Q. And to what extent would your statements to Congress about
25  how Halkbank is paying for natural gas or oil, to what extent

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

HCBPATI5          Cohen - Redirect          Page 1362

1  would that be based on representations from Halkbank?
2  A.  To some extent.
3  Q.  Would your statements to Congress in 2013 have been based
4  on any of the evidence that has been introduced at this trial?
5          MR. ROCCO: Objection.
6  A.  I can't possibly answer that question.
7          MR. ROCCO: Thank you.
8  Q.  Do you have any idea what evidence has been introduced at
9  this trial?
10  A.  I don't.
11  Q.  If we could turn now to Defense Exhibit 211.  So this is a
12  summary of a November 2012 phone call with Mr. Aslan, the
13  then-general manager of Halkbank; is that right?
14  A.  Yes.
15  Q.  Now, Mr. Rocco had asked you about a reference in the first
16  paragraph to Halkbank's significant efforts to comply with
17  international sanctions, towards the bottom of that paragraph?
18  A.  Yes.
19  Q.  At that time, what had Halkbank told you about the
20  significance of its efforts to comply with international
21  sanctions?
22  A.  I think, as I testified, at every occasion where I spoke
23  with, met with or had communications from Halkbank, I was
24  assured that Halkbank was making significant efforts to comply
25  with international sanctions and with our sanctions, in

HCBPATI5          Cohen - Redirect          Page 1363

1  particular.
2          We had, you know, at these various meetings that I
3  testified about, had relatively lengthy conversations where
4  Halkbank would describe both their commitment to complying with
5  the sanctions and the ways in which they would go about
6  ensuring that they could.  And so that was sort of the basis
7  for my belief that Halk was making significant efforts to
8  comply.
9  Q.  And in your discussions with Halkbank, let's take gold
10  exports specifically, did Mr. Atilla ask you questions relating
11  to guidance about gold exports to Iran?
12  A.  That's my recollection, yes.
13  Q.  Did Mr. Atilla ask you questions for guidance about
14  financing gold exports to Iranian banks?
15  A.  I don't recall the distinction between Iranian banks versus
16  others in the Iranian private sector versus the Iranian
17  government.  I don't recall Iranian banks coming up
18  specifically in the gold trade context.
19  Q.  And at the time, to you, as the Undersecretary for the
20  Office of Terror Finance and Intelligence, would it have made a
21  difference if the gold exports had been to Iranian banks as
22  opposed to Iranian jewelers?
23  A.  It would have -- it would have piqued my interest, because
24  if the purchaser -- I think we talked about this on direct.  If
25  the purchaser was the bank, rather than the bank being the

HCBPATI5          Cohen - Redirect          Page 1364

1  intermediary for the jeweler being the purchaser, but if the
2  purchaser were actually the bank, I would be concerned because
3  of what I knew about the Iranian banking sector and how closely
4  it was tied to the government of Iran.
5          MR. LOCKARD: Your Honor, if I may approach?
6          THE COURT: Yes.
7  Q.  I'm going to hand you what has been marked as Government's
8  Exhibit 701 and 702.
9  A.  Thank you.
10  Q.  And these are marked only for identification.
11          (Pause)
12          Do you recognize those?
13  A.  I do.
14  Q.  Okay.  So let's start with 7031.
15  A.  Okay.
16  Q.  Now, on Friday Mr. Rocco had asked you some questions about
17  which sanctions were authorized under which statute?
18  A.  Yes.
19  Q.  So I want to start by asking you about the July 2012
20  executive order that we had talked about during your direct,
21  13622.  Do you recall what that order did with respect to
22  sanctions and gold transactions?
23  A.  Yes, I do.
24  Q.  And at a very basic level, what did that July 2012 order
25  do?

HCBPATI5          Cohen - Redirect          Page 1365

1  A.  It made sanctionable any sales of precious metals, which I
2  think in the definition section, I think probably includes --
3  certainly it includes gold, to the government of Iran or any
4  entity working on its behalf.
5  Q.  And is that order promulgated pursuant to the authority of
6  the International Emergency Economic Powers Act?
7  A.  Yes.
8  Q.  Now, we talked about how the gold sanctions changed between
9  this 2012 order and enactment of the Iran Freedom and
10  Counter-Proliferation Act, the IFCA?
11  A.  Yes.
12  Q.  And when did the IFCA come about?
13  A.  As I recall, it was enacted on January 2nd and became
14  effective July 1st, 2013.
15  Q.  And what is the difference between the gold sanctions in
16  the July 2012 order and the IFCA passed in January of 2013?
17  A.  That expanded the prohibition on -- the prohibition on the
18  sale of gold, and it made sanctionable the sale of gold to
19  anybody in Iran, not just the government of Iran, or those
20  working on its behalf.
21  Q.  And why was that sanction broadened?
22  A.  Well, it was broadened because Congress legislated a
23  broadening of the sanction.  I think the intent of the
24  expansion by Congress was to address what Congress felt was a
25  loophole, for lack of a better word, in the sanctions that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 11, 2017

| HCBPATI5 | Cohen - Redirect | Page 1366 |
| --- | --- | --- |

1 allowed gold to be sold to Iran purportedly to private
2 purchasers but, in fact, on behalf of the government of Iran.
3 Q. Is that a loophole in the sense that indirectly supplying
4 gold to the government of Iran would not violate the sanctions,
5 or a loophole in the sense that it's hard to detect?
6 A. The latter; it's hard to detect.
7 Q. Are you aware of any factual examples that motivated that
8 concern about the existence of a loophole?
9         MR. ROCCO: Objection, your Honor, relevance.
10        THE COURT: I think you're almost done, right?
11        MR. LOCKARD: We're almost done.
12        MR. ROCCO: Goes beyond my cross-examination.
13        THE COURT: Go ahead.
14 A. I don't recall any specific factual examples, sitting here
15 today, and I just don't remember whether there had been some
16 sort of reference at the time.
17 Q. So just a few more questions about your discussions with
18 Mr. Atilla. In those discussions, did Mr. Atilla ever express
19 any lack of knowledge about Halkbank's own sanctions compliance
20 programs?
21 A. No.
22 Q. Did Mr. Atilla ever express a lack of knowledge about
23 Halkbank's clients?
24 A. No.
25 Q. Did Mr. Atilla ever express a lack of knowledge about

| HCBPATI5 | Cohen - Redirect | Page 1367 |
| --- | --- | --- |

1 Halkbank's clients' clients?
2 A. Not in the sense that it was raised in terms of a
3 compliance concern on his behalf.
4 Q. And Mr. Rocco asked you a few questions about the
5 discussion with Mr. Atilla and his new general manager in
6 October of 2014?
7 A. Yes.
8 Q. And Mr. Atilla's questioning about whether Mr. Zarrab was a
9 specially designated national on the blacklist, for lack of a
10 better word?
11 A. Right.
12 Q. In your prior discussions with Mr. Atilla, was an entity or
13 a person, their being on the SDN List, ever the only factor
14 relevant to a sanctions compliance?
15 A. No.
16        MR. LOCKARD: One moment, your Honor.
17        (Pause)
18        So, your Honor, various summaries and read-outs of the
19 meeting that Mr. Cohen has just talked about have been moved
20 into evidence. We would offer the remaining read-outs,
21 Government's Exhibit 7028 and 7029, which are the
22 September 2012 and February 2013 tables.
23        THE COURT: It's okay with me.
24        MR. ROCCO: I'd like to see them, your Honor.
25        MR. LOCKARD: They're also marked as 3505-005 and

| HCBPATI5 | Cohen - Redirect | Page 1368 |
| --- | --- | --- |

1 3505-006.
2        MR. ROCCO: Your Honor, I'm going to object based on
3 the basis of the discussion this morning. I'd like you to see
4 the exhibits.
5        THE COURT: Take a look.
6        MR. ROCCO: No, I have them.
7        THE COURT: Oh.
8        MR. ROCCO: I thought your Honor would like to see
9 what they are.
10        THE COURT: Why don't you all come up.
11        (Continued on next page)

| HCBPATI5 | Cohen - Redirect | Page 1369 |
| --- | --- | --- |

1        (At the side bar)
2        MR. ROCCO: Judge, this is it, if I may.
3        THE COURT: Yes, I saw that on the screen.
4        MR. ROCCO: These are fulsome discussions of the law,
5 and what I tried to do, perhaps unartfully, was elicit
6 statements that Mr. Cohen made to people at Halkbank only
7 because it went to Mr. Atilla's state of mind. These are legal
8 opinions and invade the province of the Court and go precisely
9 to the objection that the government imposed over the weekend
10 to my line of cross-examination.
11        MR. LOCKARD: These are summaries of discussions with
12 Mr. Atilla. These are not legal documents. These are
13 recordings of meetings and, in fact, Mr. Rocco has offered and
14 moved into evidence two e-mail summaries written by somebody
15 else. These are cables that were reviewed and cleared by the
16 witness, Mr. Cohen.
17        THE COURT: I think I'm going to allow it.
18        MR. ROCCO: Your Honor, you've been --
19        THE COURT: He's just trying to tip the balance back,
20 so to speak. So this is what happens, you know.
21        MR. ROCCO: That's why we should let you charge on the
22 law and not go into these issues, but I think it's very
23 confusing, but...
24        THE COURT: Are you going to ask him any questions
25 about it, or just move it into the record?

**A618**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

*December 11, 2017*

| HCBPATI5 | Cohen - Redirect | Page 1370 |
|---|---|---|

1      MR. LOCKARD: That's it.
2      MR. ROCCO: Thank you.
3      THE COURT: I'll note the objection, though.  All
4  right.
5      (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCBPATI5 | Cohen - Redirect | Page 1371 |
|---|---|---|

1      (In open court)
2      THE COURT: I'll allow that.
3      (Government's Exhibits 7028 and 7029 received in
4  evidence)
5      MR. LOCKARD: Your Honor, just very two quick
6  questions to complete the record on these exhibits, and if I
7  may approach?
8      THE COURT: Yes.
9  BY MR. LOCKARD:
10 Q.  Okay.
11 A.  Yes.
12 Q.  So, Mr. Cohen, we had looked at those on Friday, I believe;
13  is that right?
14 A.  Yes.
15 Q.  And do you recognize what those are?
16 A.  I do.
17 Q.  And what are they?
18 A.  These are State Department cables that are summaries of
19  meetings that I had in Turkey on two different trips.
20 Q.  And did you review and approve those summaries before they
21  were published?
22 A.  I did.
23      MR. LOCKARD: No further questions, your Honor.
24      THE COURT: Okay.  I will allow them, and thank you
25  very much, Mr. Cohen.  You're excused.

| HCBPATI5 | Korkmaz - Direct | Page 1372 |
|---|---|---|

1      THE WITNESS: Thank you, your Honor.
2      THE COURT: We'll ask for the government's next
3  witness.
4      (Witness excused)
5      THE DEPUTY CLERK: Sir, before you begin, I'd like to
6  remind you that you're still under oath.
7      THE WITNESS: Yes.
8      THE DEPUTY CLERK: Thank you.  You may be seated.
9  HUSEYIN KORKMAZ,
10     called as a witness by the Government,
11     having previously been duly sworn, testified as follows:
12 DIRECT EXAMINATION (Resumed)
13 BY MR. LOCKARD:
14 Q.  Good afternoon, Mr. Korkmaz.
15 A.  You too, as well.
16 Q.  So before the lunch break, we had been talking about your
17  investigation in 2012 and 2013?
18 A.  Yes.
19 Q.  And you'd been describing some of the evidence gathered in
20  your investigation about bribery payments made to various
21  government officials and bank officials?
22 A.  Yes.
23 Q.  Now, you had also described something that you referred to
24  as "the operation" on December 17th, 2013?
25 A.  Yes.

| HCBPATI5 | Korkmaz - Direct | Page 1373 |
|---|---|---|

1 Q.  Can you describe what you mean by an operation?
2 A.  Yes.  An operation is a judicial process through which
3  searches are conducted in homes or business places of suspects,
4  and also it pertains to the capture and detention of suspects,
5  and these suspects may be, in part or in whole, part of the
6  investigation.
7 Q.  And approximately how many locations were searched as part
8  of the operation?
9 A.  I can't remember the exact total count of the searches that
10  were conducted that day, but if you'll allow me, I can count
11  them one by one as to my recollection of all the searches that
12  were conducted.
13 Q.  If you can give us an approximate number, if not an exact
14  number?
15 A.  I recall that to be approximately 20.
16 Q.  And were there individuals who were questioned as part of
17  the operation?
18 A.  Yes.
19 Q.  And did the searches and the individuals questioned, did
20  any of those people have family or professional relationships
21  with some of the ministers that you had described earlier?
22      MR. HARRISON: Objection, relevancy.
23      THE COURT: Overruled.
24 A.  Yes.
25 Q.  So the operation was on December 17th, 2013?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

HCBPATI5      Korkmaz - Direct      Page 1378

1  the Police Departments, to be given to the prosecutor on
2  December 20th.
3  Q. And can you explain what you mean by a tip for the
4  parliament?
5  A. Yes. We did not have authority to investigate the three
6  ministers that had been named within this investigation and,
7  also, about the prime minister, and the prosecutor over the
8  investigation had requested that a report be prepared in terms
9  of a tip to be provided to the parliament with regard to these
10  three ministers and the prime minister.
11  Q. And just to clarify, is that an informal or a formal
12  document?
13  A. It's an official document.
14  Q. And you also described a second report that you prepared?
15  A. Yes.
16  Q. And what was the purpose of preparing that report?
17  A. It's a police report that is sent to the prosecutor's
18  office that explains the investigation that led up to the
19  operation.
20      MR. LOCKARD: May I approach, your Honor?
21      THE COURT: Yes.
22  Q. I show you what's been marked for identification as
23  Government's Exhibit 101. All right. Mr. Korkmaz, do you
24  recognize that?
25  A. Yes.

HCBPATI5      Korkmaz - Direct      Page 1379

1  Q. And what is it?
2      MR. HARRISON: Objection, your Honor.
3      THE COURT: Overruled.
4  A. This is the case summary that includes the operational
5  summary that we had sent to the prosecutor on December 20th,
6  2013.
7  Q. And did you receive any instructions from your new
8  supervisors concerning that report?
9      MR. HARRISON: Objection, relevance, hearsay, your
10  Honor.
11      THE COURT: Overruled.
12  A. Yes.
13  Q. And what were those instructions?
14  A. I was instructed to not deliver this report to the
15  prosecutor's office, while I was on my way to the prosecutor's
16  office to deliver this report, and that is despite the fact
17  that this was a signed report with the cover page also signed
18  for it to be delivered.
19  Q. And did you follow that instruction?
20  A. No.
21  Q. And what date did that happen?
22  A. It's December 20th, 2013.
23      THE COURT: And what does it mean that you did not
24  follow the instruction? Did you deliver the report anyway?
25      THE WITNESS: That is correct, your Honor. I

HCBPATI5      Korkmaz - Direct      Page 1380

1  delivered it to the prosecutor.
2      THE COURT: Personally, or to the office, or what?
3      THE WITNESS: I presented it or delivered it in person
4  over there but, of course, it was his clerk that received it
5  from me.
6      BY MR. LOCKARD:
7  Q. And when you were reassigned after December 23rd, what was
8  your next assignment?
9  A. I was sent to the bridge protection unit directorate.
10  Q. And what were your duties and responsibilities at the
11  bridge protectorate unit?
12  A. It was to protect the bridge. I'm not sure how to expand
13  that any further than that. It might include -- so the
14  pedestrians did not go on the bridge. So there are police
15  checkpoints, and if a pedestrian were to approach the bridge to
16  cross it at those checkpoints, they would be stopped.
17      THE COURT: Excuse me. And what about the report to
18  the parliament, did you do that, too? Did you prepare one?
19      THE WITNESS: Yes, your Honor, I prepared it.
20      THE COURT: And what did you do with that?
21      THE WITNESS: Your Honor, the morning of
22  December 18th, we did send that to the prosecutor's office.
23      THE COURT: No, I asked about the parliament.
24      THE WITNESS: That is correct, your Honor. This
25  report that was prepared for the parliament was dated the 18th

HCBPATI5      Korkmaz - Direct      Page 1381

1  of the December, and it was delivered to the prosecutor's office on
2  that date, and later it was delivered to the chief prosecutor's
3  office for it to then be delivered to the parliament.
4      THE COURT: Okay.
5      BY MR. LOCKARD:
6  Q. So, Mr. Korkmaz, for how long were you assigned to the
7  bridge protection unit?
8  A. Six to seven months.
9  Q. And did there come a time when you were again reassigned?
10  A. Yes.
11  Q. And when did that reassignment happen?
12  A. I recall that to be in July of 2014.
13  Q. And what was your next assignment?
14  A. I was assigned to the Cukurca district of the province of
15  Hakkari.
16  Q. And, Mr. Chang-Frieden, if you could show Mr. Korkmaz
17  Government Exhibit 52.
18      Mr. Korkmaz, does that show where Hakkari is?
19  A. Yes, that's correct.
20      MR. LOCKARD: The government offers Exhibit 52.
21      THE COURT: I'll allow it.
22      MR. HARRISON: No objection, your Honor.
23      MR. LOCKARD: I ask that it be published?
24      THE COURT: Yes, I'm going to allow it, and you can
25  publish it to the jury.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
December 11, 2017

HCBPATI5          Korkmaz - Direct          Page 1382

1      (Government's Exhibit 52 received in evidence)
2          THE COURT: Is that the circled piece in the lower
3  right?
4          THE WITNESS: Yes.
5          MR. LOCKARD: And, Mr. Chang-Frieden, if you could
6  also draw a circle around Istanbul.
7  BY MR. LOCKARD:
8  Q.  So, Mr. Korkmaz, you were reassigned to Hakkari, I believe
9    you said, in July of 2014?
10  A.  That is correct.  I went to Hakkari as of July 2014.
11  Q.  And I'd like to direct your attention to early September of
12    2014?
13  A.  Yes.
14  Q.  Where were you in early December of 2014?
15  A.  I was in prison.
16  Q.  Did I say December or September?
17          THE INTERPRETER: You said September first and then
18    December next.
19  Q.  So in September of 2014, you were in prison?
20  A.  Yes.
21  Q.  And when were you arrested?
22  A.  I was detained on September 1st, 2014, and I was arrested
23    on September 4th, 2014.
24  Q.  And where were you when you were detained?
25  A.  I was in Istanbul at that time.

HCBPATI5          Korkmaz - Direct          Page 1383

1  Q.  And if you were assigned to the Hakkari province, why were
2    you in Istanbul on September 1st, 2014?
3  A.  I was unable to move my family over to Hakkari, and an
4    operation had been carried out against members of other police
5    units in Istanbul on July 22nd, and we were expecting an
6    operation to be carried out against the former members of the
7    financial crimes units around that time also.
8          MR. HARRISON: Objection, move to strike, Judge, based
9    on relevance and hearsay.
10          THE COURT: Overruled.
11  A.  I wanted to spend time with my family, that's why.
12  Q.  Did there come a time when you were bailed?
13  A.  Yes.
14  Q.  And when was that?
15  A.  Excuse me.  So when you mean bail, you mean conditional
16    release?
17  Q.  I mean, did there come a time when you were released from
18    the custody of the prison?
19  A.  Yes, I was released.
20  Q.  And when was that?
21  A.  It was February of 2016.  It was February 9th.
22  Q.  And what were the conditions of your release?
23  A.  I was banned from international travel.
24  Q.  Were you allowed to keep your passport?
25  A.  No.  It was requested from me; so I had surrendered it.

HCBPATI5          Korkmaz - Direct          Page 1384

1  Q.  Did there come a time when you left Turkey?
2  A.  Yes.
3  Q.  When was that?
4  A.  It was in the August of 2016.
5  Q.  And why did you leave Turkey in August of 2016?
6  A.  I did not feel legally secure in any way for myself.
7    During that time, the prosecutor had requested an order for
8    arrest for myself based on a different investigation.  I
9    understood this time to be a time where rights to defend one's
10    own and freedoms of an individual and freedoms as a human were
11    taken away.  So I took my wife and my daughter, and I left the
12    country that I dearly love.
13  Q.  Now, Mr. Korkmaz, before your arrest in September of 2014,
14    had you expected to be arrested?
15  A.  Yes.
16  Q.  At that time, did you have your passport?
17  A.  Yes.
18  Q.  At that time, did you leave the country?
19  A.  No.
20          MR. LOCKARD: Your Honor, I don't know if you intend
21    to take an afternoon break, but this might be a good place to
22    do it.
23          THE COURT: Okay.  Take five minutes.
24          (Jury not present)
25          THE COURT: Okay.  We're going to take a five-minute

HCBPATI5          Korkmaz - Direct          Page 1385

1  break.
2          (Recess)
3          (Jury present)
4          THE COURT: Please be seated, everybody.
5          THE DEPUTY CLERK: Sir, again, I'd like to remind you
6    that you're still under oath.
7          THE WITNESS: Yes.
8          MR. LOCKARD: Should I continue, your Honor?
9          THE COURT: Yes.
10  BY MR. LOCKARD:
11  Q.  So, Mr. Korkmaz, you were describing your decision in
12    August of 2016 to leave Turkey?
13  A.  Yes.
14  Q.  What, if anything, did you bring with you when you left
15    Turkey?
16  A.  I brought the evidence that I could obtain with regards to
17    the December 17th investigation, and I brought those.
18  Q.  And how were you able to obtain that information, that
19    evidence?
20  A.  Some of them from the prosecutor of the investigation and
21    the other part from an expert employee who was working in the
22    investigation.
23  Q.  Could you describe generally what it is, what types of
24    evidence it is that you obtained from the prosecutor who had
25    been assigned to the investigation?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    *December 11, 2017*

| HCBPATI5 | Korkmaz - Direct | Page 1386 |
| --- | --- | --- |

1     MR. HARRISON: Objection, your Honor, relevance,
2  hearsay.
3     THE COURT: Overruled.
4  A.  Yes.  Audio that constituted criminal elements and the
5  scanned version of the investigative file that was available at
6  the courthouse, photographs of the evidence that were seized
7  during the operation, digital and scanned versions of some of
8  the expert's reports, and some digital versions of evidence
9  such as statements and such.
10 Q.  Were you able to make a copy of the entire investigative
11  file?
12 A.  No.  I was able to get only what had been scanned as of
13  that time, and I had thought that I had picked up all the
14  audio, but turns out I was able to get only the first CD.
15 Q.  And did the scanned investigative file also include
16  transcripts of the audio intercepts?
17 A.  Yes.  Yes, but I noticed that some of the suspects'
18  transcripts had not been scanned at that time and, also, there
19  was one more suspect in the investigation whose transcripts had
20  not been scanned that I realized later.
21 Q.  So if there are portions of the investigative file that had
22  not been scanned, you were not able to get a copy of that
23  portion of the file?
24 A.  That is correct, exactly.
25 Q.  And you were able to obtain a copy of one CD of audio

| HCBPATI5 | Korkmaz - Direct | Page 1387 |
| --- | --- | --- |

1  intercepts; is that right?
2  A.  That is correct.
3  Q.  And how many other disks were there?
4  A.  There were two CDs.  I thought that I picked up both of
5  them.  I understand that I had not picked up the second one.
6  Q.  You also described obtaining some evidence from an
7  individual who worked at the digital evidence lab; is that
8  right?
9  A.  Yes.
10 Q.  And when did you obtain that digital evidence?
11 A.  After I was released from jail.
12 Q.  And were you able to compare that digital evidence to the
13  other investigative records that you had obtained from the
14  prosecutor?
15     MR. HARRISON: Objection, Judge, lack of foundation,
16  403.
17     THE COURT: Overruled.
18 A.  Yes.
19 Q.  And what did that comparison show?
20 A.  I understood that they matched.
21 Q.  And generally speaking, what was contained in the digital
22  evidence that you obtained from the digital evidence lab
23  person?
24 A.  These were the reports that forensic experts had prepared
25  on the digital evidence, and also what they prepared as exports

| HCBPATI5 | Korkmaz - Direct | Page 1388 |
| --- | --- | --- |

1  after these reports.
2  Q.  And what do you mean by exports?
3  A.  Export is a process through which the computer files that
4  are obtained through the image are sorted by their file
5  extensions.
6  Q.  Mr. Korkmaz, why did you obtain copies of the investigative
7  file and other evidence from the prosecutor?
8  A.  Both the prosecutor and I believed that the evidence would
9  never be brought up in court, and that they would be damaged or
10  destroyed; so I took initiative in order to preserve the
11  evidence.
12     MR. HARRISON: Judge, I'm just going to object and
13  move to strike based on relevance, hearsay and opinion
14  testimony.
15     THE COURT: You got it.  And foundation, probably,
16  right?
17     MR. HARRISON: Yes, your Honor.
18     THE COURT: Okay.  Overruled.
19 BY MR. LOCKARD:
20 Q.  So, Mr. Korkmaz, when you left Turkey without a passport,
21  can you describe for us generally how you were able to
22  accomplish that?
23     THE COURT: Counsel, we do have a prior discussion of
24  this, right?  And ruling on this issue?
25     MR. LOCKARD: We do, and so --

| HCBPATI5 | Korkmaz - Direct | Page 1389 |
| --- | --- | --- |

1     THE COURT: Okay.
2  BY MR. LOCKARD:
3  Q.  So generally, Mr. Korkmaz, could you describe for us the
4  method by which you were able to leave the country?
5  A.  Yes.
6  Q.  And what is that method?
7  A.  I found a smuggler, and I asked him to smuggle me out, and
8  I fled through a border crossing.
9  Q.  Now, did there come a time when you were able to obtain
10  another passport?
11 A.  Yes.
12 Q.  And how was it that you were able to obtain another
13  passport?
14 A.  It was not possible in the first country that I had
15  entered, and then I went on to another country, and then I went
16  on to another country.  And the reason why I actually went to
17  that third country was because there was a loophole, legally,
18  that would give me this opportunity.
19 Q.  And so did there come a time when you actually did obtain a
20  passport in that country?
21 A.  Yes.
22 Q.  Was that passport in your true name?
23 A.  No.
24 Q.  So if you obtained a passport in a name other than your
25  actual name, what do you mean by legally obtaining a passport?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 11, 2017

HCBPATI5          Korkmaz - Direct          Page 1390

1  A. Not necessarily legal, but through a legal or through a
2     loophole in the legal system.
3  Q. Was it actually issued by the government authority?
4  A. Yes.
5  Q. Now, did there come a time when you began communicating
6     with United States law enforcement?
7  A. Yes.
8  Q. And what did you come to understand from those
9     communications?
10 A. I understood that I cannot come to the United States
11    without a passport.
12 Q. Now, what, if any, concerns did you have about not having a
13    passport, other than ability to travel to the United States?
14        MR. HARRISON: Objection.
15 A. I was afraid of extradition. Turkey had -- the Turkish
16    government had good relations with these countries, and the
17    extradition was a possibility. At higher levels, it could have
18    happened.
19 Q. Now, you testified earlier about the concerns that you had
20    that had motivated you to leave Turkey in August of 2016?
21 A. Yes.
22 Q. Concerns for your, I think, freedom and safety?
23 A. Yes.
24 Q. How, if at all, did the steps that you took after leaving
25    Turkey, including bringing the evidence with you, how would

HCBPATI5          Korkmaz - Direct          Page 1391

1     that affect the risks that you thought you would face if you
2     were returned to Turkey?
3         MR. HARRISON: Objection, relevance and 403, your
4     Honor.
5         THE COURT: Overruled.
6         THE INTERPRETER: Could you please repeat that
7     question.
8  Q. How, if at all, did the risks that you perceived from
9     returning to Turkey change as a result of the additional steps
10    you took by leaving Turkey and by bringing the evidence with
11    you?
12 A. During that time, in the public arena, in the press, there
13    were news published about individuals in custody who were being
14    tortured. I was aware of the bad treatments that I would be
15    subject to, and I could call that torture, actually. The high
16    risks that I would face if I were to be extradited, even
17    through official channels, if I were to be extradited, I knew
18    what I would face. But what made me really uneasy in these
19    countries was anything that could be done against me through
20    unofficial means, and for that reason, I was not going out of
21    the house much in these countries.
22 Q. Did there come a time when you traveled to the United
23    States?
24 A. Yes.
25 Q. Was that with the assistance of U.S. law enforcement?

HCBPATI5          Korkmaz - Direct          Page 1392

1  A. Yes.
2  Q. And what, if anything, did you bring with you?
3  A. I brought the evidence that I had mentioned.
4  Q. And what did you do with it when you arrived?
5  A. I delivered them at the airport.
6  Q. All right. So let's talk a little bit about what that
7     evidence is. Can you remind us again what some of the
8     investigative techniques were that were employed in your
9     investigation?
10 A. Yes, identification of communications and surveillance of
11    such communications, surveillance through technical tools,
12    physical surveillance, security camera footage, and analysis of
13    mails and obtaining of documents from entities, and also, the
14    evidence and documents and additional evidence that were
15    collected during the operation.
16 Q. So let's start with the evidence that was obtained through
17    the searches.
18 A. Yes.
19 Q. And I think we've touched on that just a little bit
20    already. When did the searches take place?
21 A. On December 17th, 2013.
22 Q. And who was principally responsible for organizing the
23    searches?
24 A. As the team lead, it was me.
25 Q. And who was principally responsible for choosing the search

HCBPATI5          Korkmaz - Direct          Page 1393

1     teams?
2  A. As an organizer, I was the one responsible in listing them.
3  Q. And how many, approximately, search teams were there?
4  A. I recall that we had sent at least two and -- between two
5     and five teams to each of the addresses involved.
6  Q. And who chose the team leaders of each of those teams?
7  A. I had selected them, but I made the selection based on the
8     lists that were brought to me from my unit and from other
9     units.
10 Q. So let's talk about a typical search.
11 A. Yes.
12 Q. In fact, before we talk about these searches, approximately
13    how many operations have you participated in as a Turkish -- as
14    an officer with the financial crimes unit?
15 A. Are you referring to the ones that I have conducted, or
16    ones that I may have joined doing their searches for
17    investigations that were conducted by other units?
18 Q. Let's do both. How many operations did you personally plan
19    and organize?
20 A. Prior to December 17th, during a three to three-and-a-half
21    year period, I led ten to 15 such operations, simultaneous
22    operations, that I took part in as a team lead.
23        And as far as other operations that were conducted by
24    our unit or other units, the number of that is very high, and I
25    cannot remember exactly how many.

**A623**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 11, 2017

HCB3ATI6                                          Page 1402

1 thousands of e-mails and an even larger number of bank records
2 as part of the investigation.
3      So the summary witness is our effort to condense and
4 streamline all of that into a short summary presentation as
5 opposed to a whole stack of documents.
6      THE COURT: How does that contrast to your summation?
7 I thought that's what you do.
8      MS. FLEMING: Better organized.
9      THE COURT: Well --
10     MR. LOCKARD: The difference is that I think it's
11 somebody who can, as a fact witness, summarize things and
12 compile things in a way that I think might just sound like
13 argument coming from closing.
14     THE COURT: We'll continue the discussion of the
15 summary issue witness issue.
16     MS. FLEMING: Perhaps you'd like to look at this
17 overnight?
18     THE COURT: Thanks.  I have to read one of the
19 transcripts overnight, so I'll pass.
20     We'll see you tomorrow at 9:15.
21     MS. FLEMING: Thank you, your Honor.
22     (Adjourned until December 12, 2017, at 9:15 a.m.)
23
24
25

                                                Page 1403

1                INDEX OF EXAMINATION
2 Examination of:                            Page
3 JOSHUA KIRSCHENBAUM
4 Direct By Mr. Denton . . . . . . . . . . . .1250
5 Cross By Mr. Rocco . . . . . . . . . . . . .1266
6  HUSEYIN KORKMAZ
7 Direct By Mr. Lockard . . . . . . . . . . .1278
8 DAVID COHEN
9 Cross (Resumed) By Mr. Rocco . . . . . . . .1328
10 Redirect By Mr. Lockard . . . . . . . . . .1354
11 HUSEYIN KORKMAZ
12 Direct (Resumed) By Mr. Lockard . . . . . . .1372
13               GOVERNMENT EXHIBITS
14 Exhibit No.                          Received
15  7021   . . . . . . . . . . . . . . .1255
16  106   . . . . . . . . . . . . . . . .1299
17  105   . . . . . . . . . . . . . . . .1300
18  971-16   . . . . . . . . . . . . . .1302
19  971-15   . . . . . . . . . . . . . .1305
20  971-78   . . . . . . . . . . . . . .1306
21  971-79   . . . . . . . . . . . . . .1315
22  971-71   . . . . . . . . . . . . . .1317
23  970-14   . . . . . . . . . . . . . .1320
24  7028 and 7029   . . . . . . . . . . .1371
25  52   . . . . . . . . . . . . . . . .1382

                                                Page 1404

1              DEFENDANT EXHIBITS
2 Exhibit No.                          Received
3  212   . . . . . . . . . . . . . . . . .1340
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A624**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 12, 2017*

*Southern District Court Reporters*

Original File HCCpATIf.txt

Min-U-Script® with Word Index

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 12, 2017

| HCC3ATI1 | Page 1405 |
|---|---|

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                  Defendant.
 7   ------------------------------x
 8
 9                              December 12, 2017
                                     9:15 a.m.
10
11
12   Before:
13                 HON. RICHARD M. BERMAN,
14                               District Judge
                                 and a jury
15
16
17                    APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19          Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

| HCC3ATI1 | Page 1406 |
|---|---|

```
 1
 2        (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
           - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
           - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15        MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

| HCC3ATI1 | Szubin - Direct | Page 1407 |
|---|---|---|

1      (In open court; jury present)
2      THE COURT: We're going out of turn and have a next
3  government witness, Mr. Szubin.
4      MR. DENTON: Your Honor, the United States calls Adam
5  Szubin.
6      THE DEPUTY CLERK: Sir, if you could step up to the
7  witness stand, remain standing for a moment, and then raise
8  your right hand, please.  Thank you.
9      Do you solemnly swear that the testimony that you
10  shall give this court and jury in this issue now on trial shall
11  be truth, the whole truth, and nothing but the truth, so help
12  you God?
13      THE WITNESS: I do so swear or affirm.
14      THE DEPUTY CLERK: Could you state your name for the
15  record.
16      THE WITNESS: Adam Szubin.  S-Z-U-B-I-N.
17  ADAM SZUBIN,
18      called as a witness by the Government,
19      having been duly sworn, testified as follows:
20  DIRECT EXAMINATION
21  BY MR. DENTON:
22  Q.  Good morning, Mr. Szubin.
23  A.  Good morning.
24  Q.  Where do you work?
25  A.  I am a professor at Johns Hopkins School of Advanced

| HCC3ATI1 | Szubin - Direct | Page 1408 |
|---|---|---|

1   International studies, and I'm of counsel part-time at a law
2   firm, Sullivan & Cromwell.
3  Q.  How long have you been doing those jobs?
4  A.  Since May of this year.
5  Q.  Where did you work before that?
6  A.  At the U.S. Treasury Department.
7  Q.  What did you most recently do at the Treasury Department?
8  A.  Most recently I was the acting secretary of the Treasury
9   Department just for a few weeks until Secretary Mnuchin was
10   confirmed.
11      Before that I was the acting undersecretary overseeing
12   the Office of Terrorism and Financial Intelligence for about
13   two years.
14  Q.  So approximately when did you start your service as the
15   acting undersecretary supervising the Office of Terrorism and
16   Financial Intelligence?
17  A.  It would have been about February of 2015.
18  Q.  Did you work at the Treasury Department before you began in
19   that position?
20  A.  Yes, sir.
21  Q.  Where did you work at the Treasury Department before 2015?
22  A.  For nine years I was the director of the Office of Foreign
23   Assets Control, or as it's often known, OFAC.  Before that I
24   was a senior advisor to the former undersecretary for TFI.
25  Q.  Could you describe some of your general duties and

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI1          Szubin - Direct          Page 1409

1  responsibilities as the director of the Office of Foreign
2  Assets Control.
3  A. Sure. That's the office at Treasury that is charged with
4  administering U.S. economic and financial sanctions. So, our
5  job would be to help advise on the formulation of new
6  sanctions, to issue the regulations that set out what the
7  requirements of sanctions are, to help draft executive orders
8  for the president when it came to sanctions, and then all of
9  the nuts and bolts on implementing sanctions, such as enforcing
10  civil penalties, issuing licenses, and designating those who
11  were viewed as a threat to U.S. national security or foreign
12  policy interests.
13  Q. During your tenure as the director of the Office of Foreign
14  Assets Control, was there a particular country that was a
15  particular focus of economic sanctions that you worked on?
16  A. Yes. Iran, probably more than any other country, was what
17  I spent my time on.
18  Q. Broadly speaking, what were the economic sanctions on Iran
19  during your tenure designed to do?
20  A. They had a number of goals. Obviously, even when I arrived
21  at Treasury in 2004, Iran was already under sanctions because
22  of its state sponsorship of terrorism. But in the period from
23  2005, especially late 2005 forward, there was an intense focus
24  and concern in the U.S. government about Iran's growing nuclear
25  program. And there were a number of other concerns to the

HCC3ATI1          Szubin - Direct          Page 1410

1  development, obviously, of longer range missile programs, their
2  continued sponsorship of terrorism groups like Hezbollah, human
3  rights abuses at one point obtained its own executive order and
4  its own sanctions, and regional intervention as we've seen in
5  places like Bahrain and Syria.
6      But the point of our concern, the biggest concern from
7  2006 forward, was that Iran not develop a military nuclear
8  program.
9  Q. How were economic sanctions supposed to help address those
10  concerns?
11  A. The intent is to put a thumb on the scale of Iran's
12  decision-making calculus, and sometimes a very heavy thumb in
13  order to influence their behavior. Ideally, it's a way of
14  bringing a country to the negotiating table to pursue a
15  diplomatic resolution to concerns that our government had.
16  Q. From a more granular perspective, what is the mechanism by
17  which economic --
18      THE COURT: Could I ask you both to slow down a little
19  bit to make it easier to interpret.
20      MR. DENTON: Of course, your Honor. I'm sorry.
21  Q. From a more granular level, what is the mechanism by which
22  economic sanctions seek to exert that pressure?
23  A. There are a number of sort of points of leverage that we
24  try to use or that the Treasury Department, the U.S.
25  government, tries to use when it comes to sanctions to apply

HCC3ATI1          Szubin - Direct          Page 1411

1  that kind of pressure. It can be through banking sanctions, it
2  can be through trade sanctions, it can be through investment
3  sanctions.
4      But, the idea is to put pressure on, first, bad
5  actors, those who might be helping Iran try to obtain illicit
6  materials, or longer range missiles or nuclear weapons parts.
7  But also, as the program grew, to put pressure on the Iranian
8  government and its sources of revenue, so that it would see
9  very substantial costs to continuing to ignore the
10  international community when it came to its nuclear program.
11  Q. You just referred to the program growing. Did the economic
12  sanctions on Iran change during the time period that you were
13  the director of OFAC?
14  A. Yes. Quite a bit.
15  Q. Broadly speaking, how did they change?
16  A. So, from that period I was mentioning earlier, 2006
17  forward, there was a steady escalation in sanctions, both from
18  the U.S. and I would add the U.N. Security Council also issued
19  a series of escalating sanctions against Iran. This was an
20  international concern. And the European Union and other
21  countries did as well.
22      But for our part at OFAC, our sanctions continued to
23  target new entities, new individuals, who were helping Iran
24  either try to evade sanctions or try to obtain illicit
25  material. And ultimately, we began to try to pressure Iran's

HCC3ATI1          Szubin - Direct          Page 1412

1  primary sources of revenue, such as crude oil and gas sales,
2  and try to pressure Iran's banks.
3  Q. In addition to implementing new economic sanctions, did
4  your work at OFAC involve steps to promote compliance with
5  sanctions?
6  A. Yes, absolutely.
7  Q. What sort of steps did that work involve?
8  A. So, we had, I would say, a domestically focused compliance
9  effort which entailed speaking regularly to U.S. companies,
10  U.S. banks, about their obligations, reminding them of any
11  recent changes, and ensuring that they understood clearly what
12  sanctions required and what they allowed.
13      In the Iran context, where there was such a heavy
14  international aspect to this, both because of non-U.S.
15  sanctions and because our sanctions began to have more and more
16  international effect, a large part of our role at OFAC, and my
17  role as the director, was to travel overseas and talk to
18  international companies and international banks about how U.S.
19  sanctions applied to them.
20  Q. I want to ask you about one particular foreign institution.
21  Did you meet with representatives of the Turkish bank Halkbank
22  to discuss compliance with U.S. sanctions?
23  A. Yes.
24  Q. In approximately what time period did you meet with
25  representatives of Halkbank?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

1  A.  2013 and 2014.
2  Q.  Roughly, how many times do you think you met with
3    representatives from Halkbank?
4  A.  In person, two or three times.  But I also had phone calls
5    and there were occasional e-mails and letters.
6  Q.  Was there any one person who was the principal
7    representative of Halkbank in your communications with the
8    bank?
9  A.  More than any other, I met with a Mr. Atilla who I believe
10    was the deputy general manager.  But I also met with the
11    general manager, Mr. Aslan.
12  Q.  Why did you start meeting with Halkbank?
13  A.  By the period of late 2012, there were a decreasing number
14    of major international banks who were hosting significant
15    financial and commercial activity with Iran.  Halkbank was one
16    of them.  And Halkbank was a pretty significant player at that
17    point, relative to what we saw going on in the rest of the
18    world.  We also had specific concerns about Halkbank's behavior
19    and how careful it was being vis-a-vis international sanctions,
20    including U.S. sanctions.
21  Q.  We're going to get into specific meetings in a moment but I
22    want to ask you, across the timeline of your discussions with
23    Mr. Atilla, were there particular subjects that recurred?
24  A.  Yes.
25  Q.  What were they?

1  A.  We spoke with Mr. Atilla about the propensity that Iran had
2    shown to, for lack of a better word, defraud foreign banks.  To
3    lie and manipulate payment instructions.  And the need,
4    therefore, for any foreign bank who was still doing business
5    with Iran to exhibit very strong due diligence, to make sure
6    that the transactions they were handling were indeed what they
7    appeared to be and not something else.  That was one thread of
8    the conversation.
9        We also talked about specific sanctions developments,
10    such as the executive order that prohibited -- or I shouldn't
11    say prohibited.  The executive order that targeted sales of
12    gold first to the government of Iran and then later to any
13    Iranian person.
14        We spoke to them about handling of crude oil sale
15    revenues, in terms of what that could mean for Halkbank and its
16    exposure to secondary sanctions.
17        And then the final example that comes to mind is
18    talking to them about dealings with the Central Bank of Iran.
19  Q.  So let's take those substantive areas one by one.
20        What were the issues that you discussed with respect
21    to the gold trade?
22  A.  So, there was an executive order that President Obama
23    issued that targeted sales of gold to the government of Iran,
24    this was I believe February 2012, or came into effect in
25    February 2012.  And it authorized the U.S. government, and that

1    authority was delegated to the Treasury Department, to sanction
2    foreign companies who were helping Iran obtain gold.
3        A year later, approximately, that executive order was
4    extended to target any Iranian person who was obtaining gold,
5    because we were concerned that the Iranian government was
6    circumventing this sanction using cut outs, using front
7    companies and individuals, to obtain gold in a way that could
8    undermine our sanction.
9  Q.  What specifically about that did you discuss with
10    Mr. Atilla during your conversations?
11  A.  Well, we saw quite a bit of activity from Turkey in terms
12    of selling of gold to Iran.  And given that Halkbank was the
13    primary commercial or primary bank that Iran was using in
14    Turkey, we -- and I reminded Mr. Atilla of the importance of
15    adhering to these executive orders, not running afoul of these
16    executive orders, given the risks that that could pose for
17    Halkbank.
18  Q.  Then I think the second area you mentioned was crude oil
19    sales.  What did you discuss with Mr. Atilla with respect to
20    Iran and crude oil sales?
21  A.  So, here, too, the sanctions were tightening over time.
22    And in -- I'm sorry.  I think I had the dates wrong because
23    we're now several years out.  But, February of 2013 is when the
24    sanctions go into effect with respect to crude oil sales and
25    the need to escrow those funds.

1        Basically, in layman's terms, what this means is if
2    Turkey is purchasing crude oil from Iran, which they were at
3    the time, any revenues from those sales needed to be held in
4    Turkey, and only used for one of two allowable purposes:  The
5    first was bilateral trade, so that would be selling Turkish
6    goods or Turkish services to Iran.  The second allowable
7    purpose was humanitarian sales, such as food or medicine or
8    medical devices which didn't need to come from Turkey.  Those
9    could come from any country in the world.  But, those were the
10    only two categories that a Turkish bank would have been able to
11    do with Iran's crude oil revenues without exposing itself to a
12    risk of U.S. sanctions.
13  Q.  I think the final category you mentioned were dealings with
14    the Central Bank of Iran.  What did you discuss with Mr. Atilla
15    about dealings with the Central Bank of Iran?
16  A.  The Central Bank of Iran, pursuant to that same set of
17    sanctions, was also an area that required a lot of diligence
18    from foreign banks.  Dealings with the Central Bank of Iran's
19    moneys that didn't fit into one of those two categories could
20    also expose a foreign bank, like Halk, to U.S. sanctions.
21  Q.  Before we dive into specific meetings, I want to ask you
22    some more general questions about your meetings with
23    Mr. Atilla.
24        What language were your meetings with Mr. Atilla held
25    in?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                    December 12, 2017

| HCC3ATI1 | Szubin - Direct | Page 1417 |
|---|---|---|

1 A. English.
2 Q. Was there a translator present?
3 A. Not that I recall.
4 Q. Based on your meetings, what was your impression of
5  Mr. Atilla's understanding of English?
6 A. He seemed pretty conversant.
7 Q. Based on your meetings, what was your impression of
8  Mr. Atilla's understanding of the sanctions you discussed with
9  him?
10 A. I would say pretty strong. I'll say that -- I'm comparing
11  him here to other senior officials from foreign banks, and I
12  talked to many. But Mr. Atilla had clearly studied and been
13  briefed on the latest developments in U.S. sanctions, over a
14  period where they were changing, and increasing. And he spoke
15  with some familiarity about these individual provisions, asking
16  detailed questions. One instance that comes to mind involved
17  this provision on handling Iran's crude oil sales, only using
18  it for bilateral trade between Turkey and Iran. And he asked
19  me what exactly is the definition of a Turkish origin good.
20  How is that defined. If China makes a product and it's shipped
21  through Turkey to Iran, does that count as a Turkish good. And
22  in conversations like that, I would say he exhibited a fair
23  degree of sophistication and familiarity with U.S. sanctions at
24  the time.
25 Q. How would you describe Mr. Atilla's demeanor in your

| HCC3ATI1 | Szubin - Direct | Page 1418 |
|---|---|---|

1  meetings with him?
2 A. He seemed somewhat nervous.
3 Q. Was that true across the board, across your meetings with
4  him?
5 A. Yes. I'll say that -- that would not have put him in a
6  unique category. When foreign banks were dealing with U.S.
7  sanctions over this period, I wasn't always the person they
8  were most happy to see coming to visit them. But, yes, he was,
9  he seemed to me fairly nervous over this period.
10 Q. So let's talk about some of your specific communications
11  with Mr. Atilla. I want to direct your attention first to
12  March 14, 2012. Did you meet with Halkbank officials on that
13  day?
14 A. I believe so.
15 Q. Do you remember which Halkbank officials you met with?
16 A. No. It's hard for me to recall individual meetings by
17  date.
18      MR. DENTON: Your Honor, may I approach?
19      THE COURT: Sure.
20 Q. I'm showing you what's been marked as 3513-002. Read that
21  to yourself and just look up when you're done.
22      Does that help refresh your recollection about which
23  Halkbank officials you met with on that day?
24 A. Yes.
25 Q. Who did you meet with on March 14, 2012?

| HCC3ATI1 | Szubin - Direct | Page 1419 |
|---|---|---|

1 A. The director general of Halkbank, Suleyman Aslan, and the
2  deputy director general, Mr. Atilla.
3 Q. Do you remember what was discussed during that meeting?
4 A. At the time, we were talking to them about the importance
5  of what we would have called enhanced due diligence when it
6  came to any transactions with Iran. But, I can't recall the
7  agenda for the meeting.
8 Q. What does "enhanced due diligence" mean?
9 A. Due diligence, ordinary due diligence, is what banks employ
10  when handling customer accounts. It refers to the level of
11  care that you would exhibit when a customer comes in and asks
12  to do a new transaction or asks to open a new account.
13      Enhanced due diligence is what's called for by
14  international standards, is when you're dealing with a
15  high-risk country or a high-risk customer. If you are going to
16  handle their transactions, you need to be applying a great deal
17  of care to make sure that the transactions are legitimate.
18 Q. Why was that an issue of concern with respect to Iran at
19  that time?
20 A. Well, as I mentioned earlier, Iran had demonstrated its
21  willingness to basically manipulate trade documents, to falsify
22  documents, to hire people outside of Iran or inside of Iran, to
23  do transactions on Iran's behalf. Whether to make it look like
24  the trade was going to a different country, UAE, Oman, Turkey,
25  or whether it was to disguise payments.

| HCC3ATI1 | Szubin - Direct | Page 1420 |
|---|---|---|

1      So, that was a situation that called for seriously
2  enhanced due diligence.
3 Q. Were those concerns that you communicated to Mr. Atilla in
4  that meeting?
5 A. As I said, it's hard for me to distinguish one meeting with
6  Mr. Atilla from another now many years later. But certainly,
7  that was a message that ran through my conversations with
8  Mr. Atilla.
9 Q. Focusing just on that March 14, 2012 meeting, were you the
10  only senior representative of the Treasury Department in that
11  meeting?
12 A. No. In fact, the principal host of the meeting was my
13  boss, Undersecretary David Cohen.
14 Q. In meetings where the two of you were both present, who
15  would typically lead the meeting?
16 A. Undersecretary Cohen.
17 Q. Let's move ahead to a meeting, another meeting you were
18  involved in. I want to direct your attention to February 2012,
19  2013. Did you meet with Mr. Atilla on that day?
20 A. Yes, I believe that was the date of a trip I made to
21  Turkey.
22 Q. So where did you meet with Mr. Atilla?
23 A. At Halkbank's headquarters I believe in Istanbul.
24 Q. Were there other people from the Treasury Department with
25  you?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI1 | Szubin - Direct | Page 1421 |
| --- | --- | --- |

1  A. Yes.
2  Q. What about other people from Halkbank at that meeting?
3  A. I don't recall the names of the people that Mr. Atilla had
4   with him, but yes, he had a number of people on his side of the
5   table as well.
6  Q. Was Mr. Atilla the most senior Halkbank representative in
7   that meeting?
8  A. Yes.
9  Q. I want to talk a little bit about the process when you meet
10   with bank officials in a foreign country. After those meetings
11   take place, are they documented in any way?
12  A. Yes.
13  Q. How are they typically documented?
14  A. With a meeting in a foreign country, we would have a
15   representative from the State Department, the local embassy
16   with us, in addition to my own support staff. My own staff
17   would be taking notes and that could be written up or would be
18   written up afterwards in a record of the meeting.
19      But the State Department for its purposes is also
20   going to write up what's known as a cable. Sort of a formal
21   writeup of a meeting in a foreign country, to be transmitted
22   back to main State Department and the main Treasury Department
23   and any other departments that are following the issue.
24  Q. Was it a regular practice to record meetings in those
25   cables?

| HCC3ATI1 | Szubin - Direct | Page 1422 |
| --- | --- | --- |

1  A. Yes.
2  Q. Were the text of those cables written by people who
3   personally participated in the meetings?
4  A. Yes.
5  Q. How long after a meeting takes place is a cable typically
6   prepared?
7  A. It could be that night. It could be in the next day or so.
8  Q. Was it your regular practice to review cables pertaining to
9   meetings that you participated in?
10  A. Yes.
11      MR. DENTON: Mr. Chang-Frieden, can we show Mr. Szubin
12   what's been marked as Government Exhibit 7020.
13  Q. Mr. Szubin, do you recognize this?
14  A. Yes.
15  Q. What is it?
16  A. This is a cable from the American Embassy in Ankara dated
17   April 12, 2013, that is summarizing meetings I had in Turkey on
18   this trip.
19  Q. When you say "this trip," is that the February 2013 trip
20   that you were describing earlier?
21  A. Yes.
22  Q. How are cables like this used after your trip is completed?
23  A. Well, it is helpful to have a writeup for us of what was
24   discussed in terms of the work of OFAC. So that if we see
25   concerns later on, we can make sure that those were areas we

| HCC3ATI1 | Szubin - Direct | Page 1423 |
| --- | --- | --- |

1   had discussed with our foreign interlocutors. But they're also
2   useful to other agencies in the U.S. government so that they
3   have general awareness of what's going on in a field like Iran
4   sanctions. That was something that not just the Treasury
5   Department was watching but also State Department, the Justice
6   Department, and others.
7  Q. Is it important that the content of these cables be
8   accurate?
9  A. Yes.
10  Q. Why is that?
11  A. Well, for all the reasons I was just saying. If you have
12   inaccuracies in the cable, it undermines the whole purpose.
13  Q. Does this particular cable -- withdrawn.
14      MR. DENTON: Mr. Chang-Frieden, can we go to the next
15   page, second page.
16  Q. Mr. Szubin, does this cable reflect statements made by
17   Mr. Atilla to you during this meeting?
18  A. Yes.
19      MR. DENTON: The government offers Government Exhibit
20   7020.
21      MR. ROCCO: No objection, your Honor.
22      THE COURT: I'll allow it.
23      (Government's Exhibit 7020 received in evidence)
24      MR. DENTON: If we could publish that starting at page
25   two.

| HCC3ATI1 | Szubin - Direct | Page 1424 |
| --- | --- | --- |

1  Q. So, I'd like to start at paragraph five. First of all,
2   Mr. Szubin, where this indicates "Halk officials noted that
3   they had been well briefed on the changes that went into effect
4   on February 6," what Halk official communicated that to you?
5  A. That would be Mr. Atilla.
6  Q. Is that also true with respect to the following sentence
7   indicating that "they had also closely read the recently
8   released OFAC questions and answers on the changes that went
9   into effect on that date"?
10  A. Yes. I don't recall any of the other Halkbank employees
11   speaking during this meeting. So any time it says "Halk" for
12   this meeting, it would have been Mr. Atilla.
13  Q. So then, let's talk about the last clause of that sentence
14   after the highlighting. "Halk understands that the bank will
15   need to carefully check trade-related documents from customers
16   on any trade with Iran."
17      Does that refer to the enhanced due diligence
18   conversation you were describing earlier?
19  A. Yes. And in particular here, I discussed with Mr. Atilla
20   the need to look at -- I believe they're called certificates of
21   origin, which is a government-issued document when it comes to
22   an export that certifies it is what it purports to be. So if
23   someone's exporting air conditioning units to Iran from Turkey,
24   a certificate of origin would say this is a pallet with 200 air
25   conditioners on it.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                          December 12, 2017

| HCC3ATI1 | Szubin - Direct | Page 1425 |
| --- | --- | --- |

1      MR. DENTON: Mr. Chang-Frieden, if we can could then
2   move to paragraph six.
3   Q.  Starting at the top here, where there is a reference in the
4   first sentence to "the requirements to set up a separate
5   payment channel for oil."  What did you understand Mr. Atilla
6   to be saying there?
7   A.  So when I talked earlier about the need to escrow funds,
8   this is what he's talking about.  That basically, money that
9   was made by Iran through selling its crude oil needed to be
10  treated differently, needed to be escrowed or put into a
11  special account where it could only be used for those two
12  purposes that I was describing earlier.
13  Q.  I don't want to have you read everything here.  That will
14  take us too long.  But if we can just go down to the sentence
15  in describing the mechanisms Halk is using, it says "CBI has
16  explained to Halk that it cannot just use one bank as no
17  Iranian bank has a sufficiently high credit limit to handle the
18  total amount, but must instead use six or seven non-designated
19  Iranian banks to handle the volumes."
20      What does that mean?
21  A.  So here you get into some of the intricacies of trade
22  finance.  But, basically, CBI, which refers to the Central Bank
23  of Iran, was the bank that was receiving payment for Iran's oil
24  sales because Iran was selling them out of government
25  companies.  But, the Iranian purchasers who were looking to buy

| HCC3ATI1 | Szubin - Direct | Page 1426 |
| --- | --- | --- |

1   Turkish goods would be using different commercial banks in
2   Turkey.  I'm sorry, in Iran.  And they would use their
3   commercial bank in Iran, for example, Bank Keshavarzi, put up
4   the money in Iran in rials, and then look for Bank Keshavarzi
5   in Turkey to make a payment to a Turkish exporter of, for
6   example, air conditioners.
7      The Central Bank of Iran is the one receiving the
8   Turkish currency, and it is then apportioning it out to Bank
9   Keshavarzi and a number of other Iranian commercial banks with
10  accounts in Turkey, so that their own customers back in Iran
11  can use that to pay for Turkish goods.
12  Q.  When you said at the start that this is getting into the
13  intricacies of trade finance, again, are these statements by
14  Mr. Atilla?
15  A.  Yes.
16  Q.  So, just moving a little further down the paragraph where
17  it states "Szubin took the opportunity to review in some detail
18  the requirement that Turkish companies be selling Turkish
19  goods, rather than re-exports, from a third country."
20      What are we talking about there?
21  A.  That's the requirement that if you're using crude oil sales
22  to pay for Turkish goods, that they be true Turkish goods.
23  Goods that are -- goods or services that are of Turkish origin,
24  not just Chinese or Singaporean or Canadian goods that have
25  come to rest briefly in Turkey.

| HCC3ATI1 | Szubin - Direct | Page 1427 |
| --- | --- | --- |

1   Q.  How did Mr. Atilla respond about how Halkbank would address
2   that concern?
3   A.  Mr. Atilla explained that Halk would check for certificates
4   of origin issued by the Turkish chamber of commerce to ensure
5   that the goods were indeed Turkish.
6      MR. DENTON: Mr. Chang-Frieden, if we could move to
7   paragraph seven which I think is on page three.
8   Q.  What discussion did you have with Mr. Atilla about
9   third-country food and medicine exporters?
10  A.  So, this relates to the second category of uses that are --
11  that would have been consistent with our sanctions at the time.
12  So not just Turkish bilateral trade, but purchases of food or
13  medicine, here it refers to pharmaceutical exports, to Iran.
14  That could be from any country.  So it was permissible for a
15  bank like Halkbank to use these escrowed funds to buy American
16  or Brazilian or European medicine for export to Iran, even
17  though they weren't from Turkey.
18  Q.  If you go down about two-thirds of the way down there is a
19  sentence that reads "Halk said that Turkish good exporters had
20  largely completed all of their exchanges, which had also
21  reduced the totals available in Iranian accounts."
22      What does that mean, Mr. Szubin?
23  A.  This is happening during the period when our executive
24  order made sanctionable sales to the government of Iran, but
25  not to individual Iranian companies who were private or

| HCC3ATI1 | Szubin - Direct | Page 1428 |
| --- | --- | --- |

1   individual Iranian persons.  And here, Mr. Atilla is saying
2   that Turkish sales to Iran of gold, which had spiked
3   dramatically, were winding down.  But those sales had reduced
4   the amounts of funds available in Iran's accounts at Halkbank.
5   Q.  Let's talk a little more about that gold trade.
6      MR. DENTON: Mr. Chang-Frieden, if we could go to
7   paragraph eight, please.
8   Q.  What did Mr. Atilla ask you about the gold trade with Iran?
9   A.  Here he's asking about what were then upcoming changes to
10  tighten the gold sanctions.  I referred to these earlier, but
11  as of July 1 of 2013, it would become sanctionable to sell gold
12  to any Iranian person, and Mr. Atilla was asking questions
13  about what that meant.  For example, does it have to be a
14  person located in Iran or could it be an Iranian person
15  visiting Turkey.
16  Q.  What, if any, admonitions did you give him about how to
17  proceed with that trade?
18  A.  Well, if Halkbank didn't want to face U.S. sanctions, it
19  would have needed to terminate that trade entirely by July 1st.
20  Q.  Down at the bottom where it says "Szubin encouraged Halk to
21  continue being extremely careful --"
22  A.  Ah.
23  Q.  "-- noting concerns in the USG that the GOI may be the
24  ultimate buyer of the gold."
25      What is that referring to?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI1          Szubin - Direct          Page 1429

1   A.  So, that is referring to what were already the sanctions
2     that were already then in place at the time of this meeting, I
3     was warning Mr. Atilla that the government of Iran could well
4     be using front companies or agents to purchase gold from Turkey
5     on the government of Iran's behalf, and that that was already
6     sanctionable, even before we got to the new changes, because
7     the government of Iran was the ultimate buyer.
8   Q.  Did you discuss any particular examples of things that had
9     given rise to concerns during this meeting?
10  A.  Concerns about Iranian evasion?
11  Q.  Yes.
12  A.  Yes.
13       MR. DENTON: If we could bring up paragraph nine,
14    Mr. Chang-Frieden.
15  Q.  This indicates that you and Mr. Atilla discussed the South
16    Korea case at length.  What does the South Korea case refer to?
17  A.  So, this refers to a pretty large-scale fraud that Iran
18    perpetrated in order to evade the sanctions I've been talking
19    about today, in particular, to be able to syphon money from
20    South Korea from funds that had been set aside or escrowed
21    exclusively for South Korea-Iran bilateral trade.
22       Iran had worked out a scheme to falsify trade
23    documents to make it look like there were funds debited from
24    Iranian accounts in South Korea to pay for South Korean
25    exports, but in reality, those weren't South Korean legitimate

HCC3ATI1          Szubin - Direct          Page 1430

1     exports, and Iran was using either fake companies or fake
2     documents to take money out of South Korea for other purposes.
3     The ultimate alleged total here was $1 billion of fraud by
4     Iran.
5   Q.  Where it indicates that you discussed this at length, did
6     you communicate these particular features of the South Korea
7     case to Mr. Atilla?
8   A.  Yes.
9   Q.  What did Mr. Atilla tell you about how Halkbank would avoid
10    a similar problem?
11  A.  So, you can see here a number of representations by
12    Mr. Atilla about how diligent, how careful Halk was being and
13    would be.  "Halk noted it is extremely careful dealing with
14    trading companies and banks.  It checks carefully to see what
15    policies potential bank partners have with regard to foreign
16    transfers.  Halk wants to see tight controls on foreign
17    transfer, and organic ties to their customers."
18       That means that Halk wouldn't do business on behalf of
19    an unknown strange company.  They wanted to see, they wanted to
20    be doing business with companies who had a history of having an
21    account at Halk, where Halk would have known them better and
22    been able to have more confidence that they were legitimate.
23       "If Halk sees a lot of unexplained flows, it closes
24    the company's accounts.  Halk never allows transfers of dollar
25    accounts, nor does it allow third-country transfers without a

HCC3ATI1          Szubin - Direct          Page 1431

1     lot of checking of written records.  Halk also refuses to deal
2     with new exporters, insisting on seeing five years of
3     commercial history."
4        So this is another aspect of diligence, not just that
5     Halk was saying it only wanted to deal with its own organic
6     customers, but that if there was a new company, ABC Export
7     Company in Turkey that sprung up, Halk was saying it would
8     refuse to do business with it because it could be a
9     fly-by-night, a disreputable company.  It wanted to deal with
10    those who had an established history.  Here five years of
11    history of doing legitimate business.
12       "Halk noted that some Turkish exporters are
13    suffering."  So this doesn't go to their due diligence.  But I
14    can continue going through it if that's helpful.
15  Q.  I think at a higher level of generality, what does the rest
16    of this paragraph talk about?
17  A.  In part as a result of the gold sales we talked about
18    earlier, Halk had less Iranian money on its books, and so,
19    there was a need to triage, in other words, a need to
20    prioritize certain payments over others.  Because Iran didn't
21    have Turkish currency to cover all of the things it would have
22    wanted to buy.  And here Mr. Atilla is commenting that Iran has
23    changed its priorities to food and pharmaceutical imports, away
24    from iron and steel.
25       MR. DENTON: Mr. Chang-Frieden, if we can go to

HCC3ATI1          Szubin - Direct          Page 1432

1     paragraph 10 on the next page.
2   Q.  What was the topic of discussion reflected in paragraph 10,
3     Mr. Szubin?
4   A.  Here, Mr. Atilla's asking if Iranian customers at Halk
5     could use these escrowed funds to buy Turkish treasury bonds.
6   Q.  Why was that a subject of conversation?
7   A.  I assume because the Iranian customers had asked Halk to do
8     this.
9   Q.  What did you advise Mr. Atilla about that?
10  A.  I, you know, again urged that they be very careful about
11    checking the identity of the individuals, and making sure that
12    this wasn't a scheme to circumvent the sanctions we've talked
13    about earlier.  If it was a legitimate attempt to buy Turkish
14    treasury bonds, I noted there was no problem in the law.
15       MR. DENTON: We can take that down, Mr. Chang-Frieden.
16  Q.  Mr. Szubin, during this same February 2013 trip to Turkey,
17    did you meet with any Turkish government officials?
18  A.  Yes.
19  Q.  Which Turkish government agency did you meet with?
20  A.  I met with the Turkish Ministry of Economy I believe it's
21    called.
22  Q.  Do you remember who you met with there?
23  A.  The minister.  But I have trouble pronouncing his name.
24  Q.  We don't need to get into the same level of detail that you
25    just talked about with your meeting with Mr. Atilla.  But what

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 12, 2017

HCC3ATI1          Szubin - Direct          Page 1433

1  did you talk about with the Minister of the Economy in that
2  meeting?
3  A.  We covered many of these same areas, because the government
4  of Turkey was obviously keenly interested in making sure that
5  Turkish companies, especially a prominent bank like Halkbank,
6  not run afoul of U.S. sanctions.  And so, we thought it was
7  very important, we in the American government, to inform the
8  Turkish government about what the changes in sanctions were,
9  what they were -- what the upcoming changes would be, and what
10  our concerns were.
11  Q.  So you identified three general topics that we saw also
12  reflected in Government Exhibit 7020 dealing with gold sales,
13  the use of Iranian oil money, and dealings with the Central
14  Bank of Iran.  Were those three subjects also the subjects of
15  your discussions with the Minister of the Economy?
16  A.  Yes.
17  Q.  After your February 2012 meeting with Mr. Atilla and your
18  similarly timed meeting with the Minister of the Economy, did
19  you send any followup communications to Halkbank?
20  A.  Yes.  I recall forwarding to Halkbank officials a article
21  that came out about a -- another scheme, and U.S. efforts or a
22  U.S. sanctions against that network of sanctions evasion.
23        MR. DENTON:  Mr. Chang-Frieden, if we could show
24  Mr. Szubin what's been marked as Government Exhibit 7006.
25  Q.  Mr. Szubin, do you recognize this?

HCC3ATI1          Szubin - Direct          Page 1434

1  A.  Yes.
2  Q.  What is it?
3  A.  This is a copy of an e-mail that I sent on March 15 of
4  2013, so a month after the meeting we just talked about, and I
5  sent this to Mr. Aslan and Mr. Atilla at Halkbank.
6  Q.  Was anything attached to this e-mail?
7  A.  Yes.  I attached an -- a public source article about
8  sanctions that we imposed on a Greek businessman, Dimitris
9  Cambis, who was operating a very sophisticated scheme to help
10  Iran evade oil sanctions.
11        MR. DENTON:  Mr. Chang-Frieden, if we can go to the
12  second page of this exhibit.
13  Q.  Mr. Szubin, do you recognize the second page of this
14  exhibit?
15  A.  Yes.
16  Q.  What is this?
17  A.  This is a letter to the general manager of Halkbank that I
18  sent to Halk to follow up on both the meeting that I had in
19  Turkey and a meeting that my boss Undersecretary Cohen had to
20  confirm our understanding of Halkbank's posture with respect to
21  adhering to Iran sanctions.
22        MR. DENTON:  Government offers Government Exhibit
23  7006.
24        MR. ROCCO:  No objection.
25        THE COURT:  I'll allow it.

HCC3ATI1          Szubin - Direct          Page 1435

1        (Government's Exhibit 7006 received in evidence)
2        MR. DENTON:  You can publish that starting at page
3  one, Mr. Chang-Frieden.
4  Q.  First of all, Mr. Szubin, was it a common practice to send
5  letters confirming your understanding of things from meetings?
6  A.  Yes.  If it was a significant meeting.
7  Q.  Why was that something that you did?
8  A.  It greatly reduces the risk that the participants in the
9  meeting later claim that they didn't hear it, they weren't
10  aware of it, or that that's not what we discussed.
11  Q.  Before we get into the letter I want to talk a little bit
12  about this e-mail here.  Why did you include this notable
13  recent action with respect to Dimitris Cambis?
14  A.  Well, this was an example of a sanctions evasion scheme
15  that was, in our view, typical of the lengths that Iran was
16  going to, at this time, to try to evade sanctions.
17        We had discussed, as I've talked about here today,
18  Iranian sanctions evasion efforts with Halkbank, so we wanted
19  them to see this as a example of sanctions evasion.  But at the
20  same time, it was also meant to demonstrate for Halkbank the
21  Treasury Department's seriousness when it came to evasion and
22  our willingness to take action.
23  Q.  With respect to the Treasury Department's seriousness and
24  its willingness to take action, I want to go back to your
25  meeting in February of 2013 with Mr. Atilla.  During the

HCC3ATI1          Szubin - Direct          Page 1436

1  meeting, I think you indicated earlier that there were other
2  people present both from his side and from your side?
3  A.  Yes.
4  Q.  On that occasion, did you have the opportunity to have a
5  private discussion with Mr. Atilla?
6  A.  I did.
7  Q.  Tell us about that meeting.
8  A.  So this part was unusual.  We had a pretty long meeting
9  covering all of these sanctions issues that I was talking about
10  earlier.  And I felt like Mr. Atilla was nodding along and
11  saying he understood and they would do all of the right things,
12  but he didn't seem to clearly understand how serious an issue
13  this was from our perspective.  So, I asked Mr. Atilla if we
14  could speak one-on-one at the end of the meeting to have a more
15  candid discussion, and he agreed.
16  Q.  What did you discuss with him during that candid
17  discussion?
18  A.  I told Mr. Atilla that to the extent he was viewing this as
19  kind of a routine discussion or a routine visit that Treasury
20  Department officials were making across the globe, that wasn't
21  the case.  That this was a -- a very conscious visit to
22  Halkbank, by me, because of concerns that were pretty serious
23  about what was going on at Halk.  And that we viewed them in
24  sort of a category unto themselves, that I wasn't having this
25  same level of conversation with any other bank around the world

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI1 | Szubin - Direct | Page 1437 |

1  at this time.  To, in a sense, underscore how serious this was,
2   make sure that he wasn't in doubt.
3  Q.  How did Mr. Atilla react to that warning?
4  A.  He seemed pretty taken aback.  You know, I think sweating,
5   if I can use that term.
6  Q.  So let's go back to Government Exhibit 7006.  And I think
7   you identified Dimitris Cambis as the example of the sort of
8   serious action that Treasury takes.  What was the particular
9   mechanism of sanctions evasion described here with respect to
10   Dimitris Cambis?
11  A.  OFAC imposed sanctions on Cambis and a number of front
12   companies and vessels.  When I say "imposed sanctions," that
13   means we added him and these companies to basically OFAC's
14   blacklist, which is sometimes called the Specially Designated
15   Nationals or SDN list.  That's a public list that OFAC
16   maintains that banks in the U.S. and banks, frankly, around the
17   world consult.  It is a list of what we call designated actors,
18   and a U.S. bank or U.S. person anywhere in the world has to
19   freeze the assets of someone who is added to that list.  So by
20   adding Cambis to this list, we were directing all U.S. persons
21   worldwide to freeze any assets of Mr. Cambis or any of the
22   named companies, and prohibited any further dealings with them
23   by U.S. persons.
24  Q.  Is that generally a significant action for the person or
25   entity that is the target of that Treasury action?

| HCC3ATI1 | Szubin - Direct | Page 1438 |

1  A.  Yes.
2  Q.  So if we can move to your letter.  We can move to the next
3   page.  First of all, the letter is addressed to General Manager
4   Aslan; is that right?
5  A.  Yes.
6  Q.  Do I also remember correctly that it was transmitted in an
7   e-mail that was also sent to Mr. Atilla?
8  A.  Yes.
9  Q.  What does the first paragraph say about the overall topic
10   of this meeting?
11  A.  That this letter is to follow up on the two meetings, the
12   meeting that I had had with Mr. Atilla, the meeting that
13   Undersecretary Cohen had with Mr. Aslan, and that we wanted to
14   recount and confirm our understanding of several issues.
15  Q.  So let's goes paragraph by paragraph.  What is being
16   discussed in the first paragraph that you are confirming your
17   understanding about?
18  A.  This is the sanction that went into effect as of
19   February 6, under the NDAA, the National Defense Authorization
20   Act of 2012, that required sales of Iranian crude oil to only
21   be used for bilateral trade or humanitarian trade.  And this
22   applied also to any accounts of the Central Bank of Iran.
23  Q.  I want to focus you on one particular thing reflected here.
24   Was it your understanding, based on your conversation with
25   Mr. Atilla, that Halkbank had determined that it would not

| HCC3ATI1 | Szubin - Direct | Page 1439 |

1  allow transfers within Turkey to another financial institution
2   of the proceeds of Iranian oil sales?
3  A.  Yes.
4  Q.  What purposes were those accounts to be used for?
5  A.  Only for bilateral trade between Turkey and Iran, or
6   humanitarian exports to Iran.
7  Q.  What did you indicate in this letter was your understanding
8   of Halkbank's intention to conduct due diligence with respect
9   to bilateral Turkish exports?
10  A.  That Halk will require certificates of origin to document
11   that any bilateral exports are indeed bilateral exports.
12  Q.  This next paragraph refers to something we haven't talked
13   about as much involving accounts held in a third country.  It
14   says that "Mr. Atilla asked whether it would be potentially
15   sanctionable to allow a private non-designated Iranian bank to
16   transfer funds from an account it holds in a third country to
17   its account at Halkbank, where the account holder and nature of
18   the transaction do not have a facial link to Iran's petroleum
19   trade."
20       What is this issue, Mr. Szubin?
21  A.  So, this requirement that I've been talking about that went
22   into effect on February 6, related to any Central Bank of Iran
23   accounts, or funds that were the revenues from Iran's crude oil
24   sales.
25       Theoretically, if Iran held money in a different bank,

| HCC3ATI1 | Szubin - Direct | Page 1440 |

1  a private bank, like Bank Keshavarzi in a third country, let's
2   say Malaysia, if it wasn't -- if that money wasn't earnings
3   from their crude oil sales, this February 6 restriction didn't
4   apply.  And Halkbank, any other third-country bank, would have
5   been -- it would not have been sanctionable for them to handle
6   those funds and move them across borders.
7       That question was posed to me by Mr. Atilla, can
8   Halkbank receive such money from private banks if it doesn't
9   appear to be Iran's crude oil revenues.  My answer was,
10   technically, yes, but you have to be very careful, because the
11   bulk of Iran's money that it earns outside of Iran, in other
12   words, its foreign earnings, comes from its crude oil sales.
13   And given the pattern of evasion, there is a real likelihood
14   that Iran has taken its crude oil money in, let's say Malaysia
15   in my example, moved it into a private bank's account, and is
16   now trying to move it into Halk.
17  Q.  So then, the next paragraph refers to a discussion with
18   Undersecretary Cohen so let's move on to what follows that.
19       THE COURT: If they did seek to move it from Malaysia
20   to Halk, how would they do that?
21       THE WITNESS: How would the bank transaction be
22   processed?
23       THE COURT: And how would it be described?
24       THE WITNESS: Ah.  If it was an evasion scheme, then
25   the movement of payment would have no mention of the government

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI1          Szubin - Direct          Page 1441

1  of Iran or crude oil.  The people involved in the scheme would
2  ostensibly say we just want to reallocate private commercial
3  funds of Iranian companies.  We have too much money in
4  Malaysia, we want some of it now to be in Turkey.  But, if
5  successful, this would be an attempt to put more money into
6  Turkey that wasn't under the escrow.
7          THE COURT: Would they not only not say that this is
8  proceeds from the sale of oil, but would they say it's proceeds
9  from the sale of milk, for example?
10         THE WITNESS: Sure.  Or carpets or pistachios, any
11 other Iranian export.
12         THE COURT: Would they have to say something to get it
13 from Malaysia to Halkbank?
14         THE WITNESS: Ordinarily, if it was the funds of a
15 different country than Iran, no.  A bank would -- ordinary due
16 diligence wouldn't require knowing where those funds came from.
17         But, in the case of Iran, they were so circumscribed
18 in terms of banks who would handle their money, that there were
19 some very extreme efforts underway to, as I said, evade
20 sanctions, and falsely document what payments were.
21         So this comes back to what I had talked about earlier
22 with Mr. Denton about what's required in enhanced due
23 diligence.  So the ordinary requirement wouldn't be to ask.
24 But in a case like this, we would urge foreign banks to ask.
25 Now, maybe not if it is $500, but if it is a substantial amount

HCC3ATI1          Szubin - Direct          Page 1442

1  of money, what's the origin of that money and how do you know
2  it's not from crude oil sales.
3  Q.  Is it fair to say across sort of the universe of
4  transactions and concerns that we've been discussing that there
5  was always an underlying concern that these were transactions
6  on behalf of the government of Iran in oil proceeds?
7  A.  That what do you mean by "these"?  I just want to be sure
8  I'm answering accurately.
9  Q.  We've talked about a variety of things involving gold sales
10 and bilateral trade and humanitarian trade.  Separate from
11 those specific restrictions, was there also an overarching set
12 of restrictions dealing with the National Iranian Oil Company
13 and the government of Iran using these funds?
14 A.  Yes.
15 Q.  So then, finally, I want to talk about this last
16 substantive paragraph with respect to the conversation of
17 Undersecretary Cohen.  In terms of how you addressed the
18 questions about U.S. sanctions related to the exports to Iran
19 of agricultural commodities, medicine or medical devices, what
20 admonitions did you give to Halkbank in this letter?
21 A.  It's right in line with what we've talked about today in
22 terms of enhanced due diligence.  But here it's particular to
23 humanitarian sales from companies that are in another country.
24         It was permissible, under our sanctions at the time,
25 for Halkbank to release money, even from a Central Bank of Iran

HCC3ATI1          Szubin - Direct          Page 1443

1  account or from crude oil sales, to buy aspirin from Bayer or
2  to buy goods from Johnson & Johnson, humanitarian goods in the
3  United States, to buy wheat from Cargill or Bunge, even though
4  those were in other countries.
5          What Halkbank had asked, and so this is now Mr. Aslan
6  had asked Undersecretary Cohen, is can Halkbank be an
7  intermediary in those types of transfers where the funds are
8  originating in escrowed funds, let's say in India or South
9  Korea, can Halkbank pass those funds along to purchase
10 humanitarian goods from a Johnson & Johnson or from a Cargill.
11         And our answer is legally, technically yes.  But it's
12 a risky situation, because Halkbank doesn't -- isn't in the
13 same country as where the funds are starting or where the funds
14 are going.  And if there is fraud going on, Halkbank can be
15 held responsible.  Halkbank can be sanctioned.
16         The example I would often give is if Iran were to set
17 up a pharmaceutical company, let's say in Greece or in
18 Argentina, we'll call it the XYZ Pharmaceutical Company, that
19 would be a very easy way for Iran to take tens or even hundreds
20 of millions of dollars out of Turkey, that should have been
21 escrowed, make payments for fake supplies of pharmaceutical
22 goods, when really, those payments were going to an Iranian
23 front actor, in that country, who was then using the money for
24 God knows what.
25         So, here, what we were saying, what I was saying in

HCC3ATI1          Szubin - Direct          Page 1444

1  this letter, is relevant sanctions laws do allow for
2  humanitarian exports, but we would urge you only to work with
3  reputable and internationally known companies in these sectors
4  to mitigate the well-documented risk of Iranian fraud.
5          (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                      *December 12, 2017*

| HCCPATI2 | Szubin - Direct | Page 1445 |

1  Q. So let's move ahead from this March letter to your next
2   communication, and I want to direct your attention to May 17th,
3   2013. Did you speak with Halkbank officials on that day?
4  A. I believe so.
5  Q. How did you communicate with them on that occasion?
6  A. By telephone.
7  Q. Who from Halkbank arranged the call?
8  A. I don't recall.
9       MR. DENTON: May I approach, your Honor?
10      THE COURT: Yes.
11  Q. Showing you what's been marked as 3513-11, does that
12   refresh your recollection about who from Halkbank arranged the
13   call on May 17, 2013?
14  A. Yes, Mr. Atilla.
15  Q. Do you remember who you actually spoke with from Halkbank
16   on that day?
17  A. I believe Mr. Atilla.
18  Q. What was discussed during that call?
19  A. I don't recall the specific agenda. It would have been on
20   the subjects we've been covering today.
21  Q. Did you take notes during that call?
22  A. Yes.
23  Q. Would those notes help refresh your recollection about some
24   of the specifics you discussed?
25  A. Yes.

| HCCPATI2 | Szubin - Direct | Page 1446 |

1       MR. DENTON: May I approach, your Honor?
2       THE COURT: Yes.
3  Q. I show you what's been marked as 3513-12. Does that help
4   refresh your recollection about that call, Mr. Szubin?
5  A. Yes.
6  Q. What were some of the things you discussed during that
7   call?
8  A. So, first, my recollection is this call was with
9   Mr. Atilla. I know I wrote here Aslan, but I don't -- I think
10   that was writing quickly and in error. The subjects that we
11   covered -- so this is recounting what Mr. Atilla told me.
12   Overall funds at Halkbank are decreasing day by day. They
13   currently are holding less than $2 billion in the equivalent
14   of U.S. dollars. The decrease in purchases of humanitarian
15   goods may be due to the shortage of funds and may be because of
16   metal precious payments. So that gets back to the gold
17   purchases that had brought down the balances that we talked
18   about earlier.
19       Halkbank says, we will stop intermediation two to
20   three weeks before July 1st, which was when the new sanctions
21   would go into effect on any gold sales to any Iranian person,
22   not just the government. And then the final line is, "Right
23   now, sales are only to privately owned companies;" so that
24   would be sales of gold, I assume.
25  Q. And were those subjects that you had previously discussed

| HCCPATI2 | Szubin - Direct | Page 1447 |

1   with Mr. Atilla?
2  A. Yes.
3  Q. So apart from the meetings and calls that you had with
4   Mr. Atilla that we've been discussing, did you also communicate
5   with him by e-mails?
6  A. Yes.
7       MR. DENTON: Could we show Mr. Szubin what's been
8   marked for identification as Government Exhibit 7009?
9  Q. Mr. Szubin, do you recognize this?
10  A. Yes.
11  Q. What is it?
12  A. This is an e-mail chain. It includes an e-mail I received
13   from Mr. Atilla on July 1, which is the day that the new gold
14   sanctions went into effect. It's Mr. Atilla saying that
15   Halkbank stopped mediating the transactions of exporters
16   related to trade in precious metals as of June 2013. So two to
17   three weeks before July 1 is his representation.
18  Q. And does this also reflect your response?
19  A. Yes. I said, thank you for this update.
20       MR. DENTON: Your Honor, the government offers
21   Government Exhibit 7009.
22       MR. ROCCO: No objection.
23       THE COURT: I'll allow it.
24       (Government's Exhibit 7009 received in evidence)
25       MR. DENTON: Publish that, please.

| HCCPATI2 | Szubin - Direct | Page 1448 |

1  BY MR. DENTON:
2  Q. So starting with the e-mail at the bottom, the first e-mail
3   in this chain, who sent it, Mr. Szubin?
4  A. Mr. Atilla.
5  Q. And who did he send it to?
6  A. Me.
7  Q. Was there anyone copied on this e-mail?
8  A. Yes, Mr. Aslan.
9  Q. What was the subject of this e-mail?
10  A. Halkbank and NDAA, which is the National Defense
11   Authorization Act, June 2013.
12  Q. What did Mr. Atilla represent to you in this e-mail?
13  A. That Halkbank had stopped mediating transactions for gold,
14   precious metals, as of June 10th of that year, 2013.
15  Q. And how did you respond?
16  A. I thanked him for the update.
17       MR. DENTON: Mr. Chang-Frieden, could we put up what
18   is in evidence as Government Exhibit 2511-4.
19  Q. Mr. Szubin, have you ever seen this document before?
20  A. I don't believe so.
21       MR. DENTON: Mr. Chang-Frieden, if we could take some
22   examples and go down to line 3250. If you could scroll down so
23   we could see a little more of the page, please.
24  Q. Mr. Szubin, in his July 1st e-mail representing that
25   Halkbank had stopped transactions in gold as of June 10th,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCCPATI2 | Szubin - Direct | Page 1449 |
| --- | --- | --- |

1  2013, did Mr. Atilla inform you about the transactions for
2  Toseh Tejarat on June 11, 2013, reflected here?
3       MR. ROCCO: Objection, your Honor.
4       THE COURT: Overruled. I think you need to go through
5  this chart a little before. Actually, I'll sustain it. I
6  think you need to go through the chart, say it's in Turkish and
7  all of that.
8  BY MR. DENTON:
9  Q. Mr. Szubin, do you recognize language of the headers in
10  this chart?
11  A. It looks to be in Turkish. I don't speak Turkish.
12  Q. So you don't understand what these mean specifically, do
13  you?
14  A. No.
15  Q. If you can look at the Column D, not the headers, but the
16  specific information reflected there. Do you recognize what is
17  listed in all of the entries in that column?
18  A. Yes, it says "Iran."
19  Q. And then, if we could go to Column J, do you recognize the
20  symbol in parenthesis there?
21  A. That's a Euro symbol.
22  Q. And do you recognize the format of the numbers reflected in
23  Column J?
24  A. It looks like a financial entry.
25  Q. If we could go back to column A. Mr. Szubin, have you ever

| HCCPATI2 | Szubin - Direct | Page 1450 |
| --- | --- | --- |

1  heard of Toseh Tejarat?
2  A. I don't believe so. I know of a Bank Tejarat.
3  Q. What is Bank Tejarat?
4  A. That is an Iranian -- a large Iranian bank.
5       THE COURT: Private or government?
6       THE WITNESS: I believe government.
7  Q. So again, Director Szubin, I'll ask you. Did Mr. Atilla's
8  July 1st e-mail indicate anything about the transactions listed
9  here dated June 11th, 2013?
10      MR. ROCCO: Objection, your Honor. I don't know how
11  this witness can respond to that question on the basis of this
12  document. He doesn't know.
13      THE COURT: Yes, I think you could rephrase the
14  question and get where you're trying to go, I think.
15  Q. Director Szubin, based on what you can tell from this
16  document, does it reflect transactions dated, as highlighted
17  here, June 11th, 2013?
18      MR. ROCCO: Objection, your Honor.
19      THE COURT: Yes, sustained.
20  Q. What do these entries appear to you to be, Director Szubin?
21      MR. ROCCO: Objection, your Honor.
22  Q. Director Szubin, do these appear to be financial entries?
23      MR. ROCCO: Objection, your Honor.
24      THE COURT: Yes, I think there's an easier way to get
25  there.

| HCCPATI2 | Szubin - Direct | Page 1451 |
| --- | --- | --- |

1  Q. Mr. Szubin, can I ask you just to read entry 3250?
2  A. Yes. Toseh Tejarat, 39800, 35.41, Iran, Kulce Altin, looks
3  like, June 11th, 2013, 2884, June 11th, 2013, 2849, 1,409,318.
4  Q. And then, Mr. Chang-Frieden, if we could go down the page a
5  little bit.
6       And, Mr. Szubin, do you see entries reflecting the
7  dates -- the date of June 13th?
8  A. Yes.
9  Q. And what about June 25th?
10  A. Yes.
11  Q. Keep going down. Are there entries for the date June 28th?
12  A. Yes.
13  Q. Are there entries for July 5th?
14  A. Yes.
15  Q. Are there entries for July 8th?
16  A. Yes.
17  Q. Are there entries for July 10th?
18  A. Yes.
19  Q. And are there entries for July 16th?
20  A. Yes.
21  Q. If we could go back to Government Exhibit 7009,
22  Mr. Chang-Frieden.
23       Did Mr. Atilla's e-mail to you say anything about any
24  transactions pertaining to gold after June 10th, 2013?
25  A. No.

| HCCPATI2 | Szubin - Direct | Page 1452 |
| --- | --- | --- |

1  Q. Let's talk about your next communication with Mr. Atilla,
2  and I'd like to direct your attention to October 29th, 2013.
3  Did you speak with anyone from Halkbank on that day?
4  A. I believe so.
5  Q. Who did you speak with?
6  A. I believe Mr. Atilla, but again, it's hard for me to recall
7  conversations matched to dates.
8       MR. DENTON: Mr. Chang-Frieden, if we could put up
9  what is in evidence as Government Exhibit 7021. If we can go
10  to the next page, please.
11  Q. Who did you speak with on that day?
12  A. Mr. Atilla.
13  Q. Now, starting at the top here with the subject of gold
14  sales, what did you discuss with Mr. Atilla about gold sales on
15  that day?
16  A. I cited Turkish customs data showing that while there was a
17  significant decline in Turkish gold sales to Iran, there did
18  seem to be continued exports from Turkey to Iran in July and
19  August of this year, which would have been after the U.S.
20  sanctions went into effect that made that type of transaction
21  sanctionable. So I was asking Mr. Atilla, is Halkbank involved
22  in those payments.
23  Q. And what did he tell you?
24  A. He said that Halk was not involved, that they had ceased
25  the facilitation of gold sales prior to July 1st.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        December 12, 2017

HCCPATI2          Szubin - Direct          Page 1453

1  Q.  And then, next, there's a discussion of securities
2  transactions.  Does this refer back to the issue that was
3  referenced in your earlier letter, not the purchase of Turkish
4  securities?
5  A.  Yes.
6  Q.  Moving down to the discussion of the humanitarian trade --
7          THE COURT:  Oh, could I ask a question?
8          MR. DENTON:  Of course, your Honor.
9          THE COURT:  I can't find the place, but did you just
10  say that where the overall gold sales were decreasing, there
11  was evidence of gold sales?
12         THE WITNESS:  Yes.
13         THE COURT:  Is that evidence that you independently
14  collected, or how did you know that?
15         THE WITNESS:  So here, I'm citing Turkish customs
16  data.  They publish, like many countries, openly every month
17  levels of trade with various countries, and Turkey had openly
18  published in both July and August continued level of sales,
19  though diminished, from Turkey to Iran.
20         THE COURT:  Does it say who was involved in those
21  sales?
22         THE WITNESS:  No.  It only goes to the level of the
23  good, the country of origin and the country of destination.
24  And so I was, here, asking is Halk involved in those sales.
25         THE COURT:  I got it.

HCCPATI2          Szubin - Direct          Page 1454

1  BY MR. DENTON:
2  Q.  Did Mr. Atilla make any representations about his
3  understanding of who was involved in those purchases?
4  A.  Yes.  He said that Halk was not involved at all, and he
5  speculated that any continued sale of gold to Iran probably
6  didn't go through banks at all but was, instead, cash based and
7  used jewelry merchants.
8  Q.  So let's go down and talk about the humanitarian trade.
9  What did Mr. Atilla tell you on October 29th about Halk's
10  involvement in humanitarian trade?
11  A.  Mr. Atilla told me that as of October 14th, Halk had told
12  third-country exporters of food and medicine that Halk would no
13  longer facilitate trade for them.  Halk had already implemented
14  this change for food and would be stopping to finance
15  third-country medicine payments at the end of 2013.
16  Non-Turkish companies with a physical presence in Turkey, an
17  affiliate or subsidiary; so if a Bayer or Johnson and Johnson
18  had a subsidiary in Turkey, Halk would continue to allow them
19  to use Halk for such sales, even if the goods weren't coming
20  through Turkey.
21  Q.  Did Mr. Atilla indicate what motivated this decision at
22  Halkbank?
23  A.  Yes.  He indicated that the Turkish ministry of economy was
24  concerned about the decreased level of Iranian funds at Halk,
25  and wanted to be sure that remaining Iranian funds were

HCCPATI2          Szubin - Direct          Page 1455

1  prioritized for Turkish exports.
2  Q.  Mr. Szubin, are you aware of any particular relationship
3  between Halkbank and the Turkish government?
4  A.  No.
5  Q.  Moving down, what does Mr. Atilla indicate about the source
6  of the funds and their remaining value at Halkbank?
7  A.  He indicates that Halk believes current trade levels
8  between Turkey and Iran are $7 billion of imports from Iran; so
9  that's Turkish purchases, would have been primarily oil or gas,
10  and $3 billion in exports from Turkey to Iran, both down from 9
11  billion, leaving a $4 billion annual balance in Iran's favor.
12  Q.  And what was your understanding of what it meant to refer
13  to a $4 billion annual balance in Iran's favor?
14  A.  Well, those would have been additional funds left over in
15  Turkey that Turkey -- that Iran could use for bilateral trade
16  or for humanitarian purchases.
17  Q.  If we could go to the last page, Mr. Chang-Frieden.
18         And here, what did Mr. Atilla tell you about
19  Iran's imports and their affect on those numbers?
20  A.  Mr. Atilla estimated that Iran's imports of food and
21  medicine totaled $10 billion and $5 billion, respectively,
22  annually.  Halk did not state the value of the third-country
23  trade that it was facilitating for Iran, but the Turkish
24  government had expressed concern that this type of
25  third-country trade would overwhelm Turkish trade and eat up

HCCPATI2          Szubin - Direct          Page 1456

1  the surplus in the CBI account.
2  Q.  Did Mr. Atilla propose any methods for addressing any
3  deficiencies in the CBI account?
4  A.  Yes.  He proposed two possibilities.  One was to move
5  escrowed funds, which here are referred to as locked-up sale
6  surpluses, to a special purpose account at Halk to be used for
7  humanitarian trade.
8          The second would be to allow for Halk to facilitate
9  third-country purchases of Iranian oil to allow for more money
10  to come into the Iranian accounts at Halk.
11  Q.  And what did you indicate you would do with respect to
12  those proposals?
13  A.  I would take them back for review and get back to Halk to
14  continue the discussion.
15  Q.  Did you, in fact, have further communications with
16  Mr. Atilla about that subject?
17  A.  I believe so.
18         MR. DENTON:  Mr. Chang-Frieden, if we could show
19  Mr. Szubin what's been marked for identification as Government
20  Exhibit 7015.
21  Q.  Mr. Szubin, do you recognize this?
22  A.  Yes.
23  Q.  Without getting into the content, what is it?
24  A.  An e-mail chain between Mr. Atilla and myself.
25  Q.  And generally, what does it pertain to?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                           *December 12, 2017*

| HCCPATI2 | Szubin - Direct | Page 1457 |
|---|---|---|

1  A.  Indian oil purchases from Iran.
2      MR. DENTON: Your Honor, the government offers
3  Government Exhibit 7015.
4      MR. ROCCO: No objection, your Honor.
5      THE COURT: I'll allow it.
6      (Government's Exhibit 7015 received in evidence)
7  BY MR. DENTON:
8  Q.  So let's start with the first e-mail in the chain.  What is
9   this e-mail, Mr. Szubin?
10  A.  This is an e-mail from Mr. Atilla to me dated
11   November 13th, 2013.
12  Q.  And what is he telling you in this e-mail?
13  A.  He's attaching a wire story, a news story that reports that
14   Iran was asking Indian refiners to pay for Iran's oil in Euros
15   via Halkbank.
16  Q.  And was that an issue that was a source of concern for
17   OFAC?
18  A.  If true, it would have been, and the article asserts that
19   the National Iranian Oil Company said Halkbank was ready to
20   restart oil payments for India.
21  Q.  And what did Mr. Atilla tell you about that representation
22   in the article?
23  A.  He says it's not true.  He says:  We have seen the news
24   today.  We would like to inform you that Halkbank did not take
25   any decision to accept Indian payments.

| HCCPATI2 | Szubin - Direct | Page 1458 |
|---|---|---|

1  Q.  If we could go to the e-mail above that and show how you
2   responded.
3      How did you respond to Mr. Atilla?
4  A.  I said:  Thank you for your note.  That is good to know.
5  Q.  And did you discuss other issues that you had previously
6   raised with him?
7  A.  Yes.  So I said, thank you for your patience on the
8   questions he had posed to me in our telephone call.  I said
9   that, as a general matter, U.S. government policy supports the
10   export of food, medicine and medical devices to Iran.  In the
11   course of recent negotiations -- so that refers to U.S.
12   discussions with Iran -- we, the U.S. government, have received
13   input from the government of Iran about their financing of
14   humanitarian transactions.  We expect to learn more over the
15   coming week and would hope to get back to you once we have more
16   information.
17  Q.  And you noted here that the sanctions do not generally
18   prohibit transactions in support of legitimate trade in these
19   goods; is that right?
20  A.  That's right.
21  Q.  So just to close the loop, if we can look at the top e-mail
22   and see how Mr. Atilla responded to you.  And what was the date
23   of this e-mail chain, Mr. Szubin?
24  A.  December 5, 2013.
25  Q.  That's a little more an a month after your phone call?

| HCCPATI2 | Szubin - Direct | Page 1459 |
|---|---|---|

1  A.  I believe the phone call was in October; so yes.
2  Q.  Continuing in the same vein, I'd like to show you what's
3   been marked for identification as Government Exhibit 7016.  Do
4   you recognize that?
5  A.  Yes.
6  Q.  What is it?
7  A.  This is an e-mail from Mr. Atilla to me dated April 30th,
8   2014.
9  Q.  And generally speaking, what does it pertain to?
10  A.  Iranian-Indian payments.
11  Q.  Is that the same subject that was discussed in Government
12   Exhibit 7015?
13  A.  Is that the previous chain we were looking at?
14  Q.  Yes.
15  A.  Yes.
16      MR. DENTON: The government offers Government
17  Exhibit 7016.
18      MR. ROCCO: No objection, your Honor.
19      THE COURT: I'll allow it.
20      (Government's Exhibit 7016 received in evidence)
21  BY MR. DENTON:
22  Q.  Mr. Szubin, can you tell us what Mr. Atilla is informing
23   you about in this message?
24  A.  He says that Indian and Iranian parties have approached
25   Halkbank asking Halk to intermediate humanitarian payments, but

| HCCPATI2 | Szubin - Direct | Page 1460 |
|---|---|---|

1   that Halk had sent an e-mail to the Indian parties that he
2   wanted me to see.
3  Q.  And what did that message say?
4  A.  So Halkbank's quoted e-mail to the Indian party said Halk
5   had been receiving inquiries requesting to mediate, I guess
6   intermediate, humanitarian -- I'm sorry, crude oil payments
7   made by India to Iran.  However, due to the current
8   international sanctions, we are unable to mediate financial
9   transactions related to the crude oil purchase of third
10   countries from Iran.
11      Therefore, we are not in a position to receive funds
12   from the accounts of Indian oil companies to the accounts of
13   the Central Bank of Iran held with us.  On the other hand, we
14   are glad -- this is Halk still talking -- to state that we are
15   ready to accept the already accumulated funds of Iran held at
16   your counters, into the accounts of CBI at Halkbank.  Those
17   funds will be available to be used just for the payments of
18   transactions related to the sales of humanitarian need items,
19   i.e. food, medicine, medical devices and agricultural products
20   to Iran.
21  Q.  Just to be clear, what was the date that Mr. Atilla sent
22   you this e-mail?
23  A.  April 30th.
24  Q.  Was this issue of bringing Iranian funds into Halkbank
25   still a concern in April of 2014?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCCPATI2 | Szubin - Direct | Page 1461 |
| --- | --- | --- |

1 A. Yes.
2 Q. And, again, why was that?
3 A. Because the U.S. had sanctions that pertained to the
4 movement of Iranian oil funds, or Central Bank of Iran funds,
5 internationally.
6 Q. You mentioned earlier that some of your initial discussions
7 with Mr. Atilla were motivated by concerns about Halkbank; is
8 that right?
9 A. Yes.
10 Q. What did it indicate to you, in light of those concerns,
11 that Mr. Atilla was raising this prospect of bringing Iranian
12 funds into Halkbank?
13     MR. ROCCO: Objection, your Honor.
14     THE COURT: I'll allow it.
15     MR. ROCCO: "Indicate to you."
16     THE COURT: I'll allow it.
17 A. So the baseline level of concern that we had vis-a-vis
18 Halkbank, was still in place, and we approached any
19 conversation with Halkbank officials through that light.
20 Q. And specifically, how did that effect your view of this
21 particular proposal with respect to third-country funds coming
22 into Halkbank?
23 A. We were skeptical about whether this is something that
24 should be allowed.
25     THE COURT: Why?

| HCCPATI2 | Szubin - Direct | Page 1462 |
| --- | --- | --- |

1     THE WITNESS: Because we had concerns that Halkbank
2 might not be taking the appropriate precautions such that they
3 would verify these were indeed going for humanitarian
4 transactions only.
5 BY MR. DENTON:
6 Q. And you've discussed a number of representations that
7 Mr. Atilla made to you about the precautions that Halkbank was
8 going to take. In view of those representations, what led you
9 to have this ongoing concern?
10 A. Of course, there's always the risk that a foreign party
11 isn't dealing with you in good faith and that they're saying
12 they're going to take special precautions but, in reality,
13 they're not.
14     MR. DENTON: Nothing further, your Honor.
15     THE COURT: Do you want to take a five-minute break,
16 and then we'll go to the cross?
17     (Jury not present)
18     (Recess)
19     (Jury present)
20     THE COURT: Please be seated. We're trying to warm
21 the place up a little. Not possible. I mean, we're trying.
22     THE DEPUTY CLERK: I'd just like to remind you that
23 you're still under oath.
24     THE WITNESS: Thank you.
25     MR. ROCCO: Your Honor, may I proceed?

| HCCPATI2 | Szubin - Cross | Page 1463 |
| --- | --- | --- |

1     THE COURT: Yes.
2 CROSS-EXAMINATION
3 BY MR. ROCCO:
4 Q. Good morning, Mr. Szubin.
5 A. Good morning.
6 Q. My name is Victor Rocco. I represent Hakan Atilla.
7     Is it correct, Mr. Szubin, that prior to your
8 testimony here today, you met with representatives of the U.S.
9 Attorney's Office in preparation for your testimony?
10 A. Yes.
11 Q. And how many meetings did you have with the prosecutors?
12 A. I believe four or five.
13 Q. And where did those meetings take place?
14 A. Two took place at the Department of Justice office
15 building, and two took place in the offices of the law firm I
16 work with in Washington.
17 Q. Okay. So the government came on -- I'm sorry. There were
18 four meetings in total?
19 A. That's what I recall, yes.
20 Q. How about telephone conferences?
21 A. Yes, a few short telephone calls as well.
22 Q. And how long did your meetings last, each meeting?
23 A. Typically, about an hour.
24 Q. And your telephone conferences?
25 A. Those could be a few minutes or ten minutes, sometimes

| HCCPATI2 | Szubin - Cross | Page 1464 |
| --- | --- | --- |

1 something like travel, how I was getting up here, making sure
2 the logistics were covered.
3 Q. When you say the Department of Justice building, you mean
4 the Department of Justice building in DC, correct?
5 A. Yes, but they have several office buildings in DC.
6 Q. Right. And your office is in DC, as well?
7 A. Yes, sir.
8 Q. So the prosecutors came to meet with you; am I correct?
9 A. Yes.
10 Q. And when you met with the prosecutors, you discussed the
11 transactions that have been the subject of your testimony here
12 today; is that correct?
13 A. The conversations.
14 Q. The conversations and -- well, conversations can be
15 transactions. If it's conversations -- yes, the conversations
16 that you've testified to today?
17 A. Yes.
18 Q. And the e-mails, the letters, the cables or memoranda of
19 meetings; am I correct?
20 A. Yes, exactly.
21 Q. Those are all documents that you reviewed with the
22 government in the course of the four meetings that you had and
23 the few telephone conferences that you had; am I correct?
24 A. Yes.
25 Q. Now, when you refer to certain of the documents that have

**A640**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCCPATI2 | Szubin - Cross | Page 1465 |
| --- | --- | --- |

1  been identified and moved into evidence here this morning, you
2  were familiar with them and you had reviewed them?  Those are
3  documents that you had reviewed in the course of your
4  preparation for your testimony here today, correct?
5  A.  Yes.
6  Q.  And you and I have never met before; is that correct?
7  A.  Yes.
8  Q.  We never had any conversations about this case, correct?
9  A.  Correct.
10  Q.  So when OFAC -- and you were the director of OFAC, I think
11  you testified, before you became acting undersecretary and
12  acting secretary?  You were director of OFAC for nine years; am
13  I correct in that?
14  A.  Yes.
15  Q.  So when OFAC representatives interact with foreign banks, I
16  believe you testified that there were some records made of
17  those interactions, correct?
18  A.  Yes.
19  Q.  And by the way, prior to your meetings with foreign bank
20  officials, is it fair that you prepare for the meetings?
21  A.  Yes.
22  Q.  And tell me, what steps would you take, typically, in
23  preparation for a meeting with a foreign bank?
24  A.  I would typically talk with my staff about what we wanted
25  to cover, what were the key points we wanted to deliver, how

| HCCPATI2 | Szubin - Cross | Page 1466 |
| --- | --- | --- |

1  we'd respond to anticipated questions that could come up.
2  Q.  Now, your dealings over the years with Halkbank,
3  specifically, how would you prepare for those meetings?
4  A.  In that same way.
5  Q.  Would you talk to Mr. Cohen, who was your superior at
6  Treasury at that time?
7  A.  Yes.
8  Q.  Did you talk to him before every meeting that you had with
9  representatives of Halkbank?
10  A.  Probably, but I can't remember now, with accuracy, to say
11  for sure.
12  Q.  Well, there was a -- is it fair to say that there was a
13  continuing dialogue between you and Mr. Cohen about Halkbank?
14  A.  Yes.
15  Q.  And that went on for a number of years?
16  A.  Yes.
17  Q.  And can you tell me when that continuing dialogue started,
18  roughly what year?
19  A.  Probably 2011.
20  Q.  And lasted until you and/or Mr. Cohen left Treasury?
21  A.  At some point, we get to the Iran deal, the joint
22  comprehensive plan of action, which renders a lot of these
23  issues moot because the secondary sanctions are lifted.
24  Q.  And that, the secondary sanctions, were lifted effectively
25  when?

| HCCPATI2 | Szubin - Cross | Page 1467 |
| --- | --- | --- |

1  A.  That would be the implementation day of the agreement; so I
2  don't want to get the dates wrong, but that happens before I
3  leave Treasury.  So that's about 2016, January 2016.
4  Q.  And in your ongoing dialogue with Mr. Cohen, did you
5  discuss the problems that I believe you say you were having
6  with Halkbank over the years?
7  A.  Yes.
8  Q.  And did you discuss the specifics of the problems with
9  Mr. Cohen?
10  A.  Yes.
11  Q.  Now, are you familiar with the structure of Halkbank?
12  A.  No, not in any detail.
13  Q.  Are you familiar with the ownership of Halkbank?
14  A.  No.
15  Q.  Do you know that it's a state-owned bank, 51 percent owned
16  by the Turkish government?
17  A.  I don't know that.
18  Q.  And in the course of your preparation for meetings with
19  Halkbank, did you ever discuss the structure of the bank, the
20  way the bank is organized?
21  A.  No.
22  Q.  Did you ever discuss the management structure of the bank?
23  A.  I'm not sure I'm following, I'm sorry.
24  Q.  I'll rephrase it, sorry.
25      So did you ever discuss who held what position with

| HCCPATI2 | Szubin - Cross | Page 1468 |
| --- | --- | --- |

1  Halkbank?
2  A.  We were doing regular calls and meetings, as I was talking
3  about earlier, with the director general, the deputy director
4  general.  So in that sense, it would come up, but I don't
5  recall a meeting specifically about their org chart or
6  structure.
7  Q.  Do you know how many -- do you know who the general manager
8  of Halkbank was in the period that you were dealing with the
9  bank between 2009 and, let's say, 2015?  Let me be specific.
10  A.  I believe it's the Mr. Aslan that we were talking about
11  earlier.
12  Q.  And did you ever meet with anyone other than Mr. Aslan who
13  identified himself or herself as the general manager of the
14  bank?
15  A.  No.
16  Q.  You had meetings with Mr. Aslan?
17  A.  Yes.
18  Q.  And how about Mr. Atilla, how many times -- in your
19  meetings with Mr. Atilla, you understood him to be the deputy
20  general manager of the bank?
21  A.  Yes.
22  Q.  Do you know if there's more than one deputy general manager
23  of the bank?
24  A.  I don't believe there is or was.
25  Q.  I'm sorry?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCCPATI2 | Szubin - Cross | Page 1469 |
| --- | --- | --- |

1 A. I did not, at the time, believe that there was a second or
2   a third deputy general manager.
3 Q. If I told you that there were eight deputy general managers
4   of the bank, would that surprise you?
5       MR. DENTON: Objection.
6 A. As I said at the outset, I was not conversant with the org
7   structure of Halkbank. He was the deputy that we dealt with.
8 Q. And is it fair to say that you made no effort to
9   familiarize yourself with the structure or organization of
10   Halkbank; is that correct?
11 A. I suppose. I mean, we would have made sure that we were
12   dealing with responsible officials who could speak for the
13   bank.
14 Q. So let's go back to the discussion we were having about
15   memos. Am I correct that when you contact the bank, you or
16   someone under -- in your charge at OFAC, that a memorandum is
17   made of that contact?
18 A. Yes.
19 Q. And the memorandum is based on notes that are taken at the
20   time of the contact; am I correct?
21 A. Also, the fresh recollections of the conversation by the
22   participants.
23 Q. Well, the memoranda are a combination of notes and
24   recollection; am I correct?
25 A. Yes.

| HCCPATI2 | Szubin - Cross | Page 1470 |
| --- | --- | --- |

1 Q. And the memoranda are prepared roughly at the time that the
2   meetings occur?
3 A. Yes.
4 Q. And the memoranda -- it's important that the memoranda be
5   accurate and complete; am I correct?
6 A. Yes.
7 Q. And I think you testified that in the course of your
8   duties, that you would receive memoranda of meetings or
9   telephone conferences, and you would review them; am I correct?
10 A. Yes. I think those questions went to a formal cable coming
11   back from the embassy, and I said I do generally review those.
12   Memoranda of meetings that I participated in, yes, I had the
13   practice of generally reviewing those.
14 Q. And does that include the cables, as well?
15 A. Yes.
16 Q. And you reviewed them for accuracy?
17 A. Yes.
18 Q. And you reviewed them for completeness, correct?
19 A. Yes.
20 Q. And would you make changes to the memoranda or the cable?
21 A. Sometimes, yes.
22 Q. And the cable or memoranda would be corrected to reflect
23   those changes; am I correct?
24 A. Yes.
25 Q. And in the course of your meetings with representatives

| HCCPATI2 | Szubin - Cross | Page 1471 |
| --- | --- | --- |

1   from Halkbank, is it fair to say that you took notes?
2 A. Yes.
3 Q. If you were the meeting leader, would you take notes?
4 A. Usually, but those notes were not typically the best record
5   of what would happen in a meeting where I was the main
6   participant from the U.S. government because it's hard to take
7   notes carefully while you're also talking and listening.
8 Q. Would you designate someone at the meeting to take notes?
9 A. Yes.
10 Q. And so there would be, it would be fair to say, a
11   designated note taker at all the meetings that you had with
12   Halkbank; am I correct?
13 A. Yes.
14 Q. And the designated note taker would take -- would that
15   person also be the person that was responsible for drafting the
16   cable or the memorandum of the meeting?
17 A. Generally.
18 Q. And that would be based, as you said earlier, in part on
19   the notes that were taken by the designated note taker and the
20   designated note taker's recollection of the conversation,
21   correct?
22 A. That's right.
23 Q. And when you were at a meeting and you took notes and there
24   was a designated note taker at the meeting, did you give your
25   notes to the designated note taker as he was preparing or she

| HCCPATI2 | Szubin - Cross | Page 1472 |
| --- | --- | --- |

1   was preparing the memoranda?
2 A. No.
3 Q. So that you would receive the memorandum that would be
4   based on the notes and the recollection of the designated note
5   taker; am I correct?
6 A. Yes.
7 Q. And you would review it, and you would compare that
8   memorandum with your notes of the meeting; is that correct?
9 A. And my recollection, yes.
10 Q. And then you would make -- if necessary, you would make
11   changes?
12 A. Yes.
13 Q. So, again, the question is, is it fair to say that the
14   notes and the memoranda -- I'm sorry, the memoranda of your
15   meetings with foreign banks, foreign financial institutions,
16   were important to be accurate; am I correct?
17 A. Yes.
18 Q. And to the best of your recollection, is it fair to say
19   that those memoranda are accurate?
20 A. That seems a little open ended, but --
21 Q. It is actually intended to be open ended. To the best of
22   your knowledge, as you sit here today?
23       MR. DENTON: Your Honor --
24 A. You're asking about all records of all meetings that I had
25   at Treasury, are they correct?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 12, 2017

1 Q. No. I'm asking specifically about the meetings with
2 Halkbank.
3 A. Oh.
4       THE COURT: That he was involved in?
5       MR. ROCCO: Absolutely, your Honor.
6 A. Yes, yes.
7 Q. Now, if there is an important matter that's not in a
8 memorandum, is it fair to say that it didn't occur so that if
9 there is a significant omission -- that's a terrible question.
10 I'll withdraw it.
11       MR. ROCCO: Thank you, your Honor. It's the unwritten
12 record.
13       THE COURT: Well, you're learning.
14       MR. ROCCO: Now, I keep plugging at it, Judge.
15 Q. Let's talk a little bit about Mr. Atilla and your
16 interactions with him over the years. What's your earliest
17 recollection of meeting Mr. Atilla? When did you first meet
18 him?
19 A. I believe towards the end of 2011.
20 Q. And I believe your testimony on direct was that you met him
21 two or three times over the years; is that correct?
22 A. In person, yes.
23 Q. In person. And these meetings, they were, again, where?
24 Where did your meetings with Mr. Atilla occur? And you can do
25 it one by one if it was different locations.

1 A. Yes, so it would have been either in Washington at the
2 Treasury Department offices, or in Turkey at Halkbank's
3 offices.
4 Q. Do you have a specific recollection of ever meeting with
5 Mr. Atilla in Washington?
6 A. I believe so.
7 Q. And do you have a specific recollection of meeting with
8 Mr. Atilla at Halkbank?
9 A. Yes.
10 Q. And do you have a specific recollection of meeting
11 Mr. Atilla at the U.S. embassy in Istanbul?
12 A. No.
13 Q. Did you meet with him in the Turkish embassy here in the
14 United States?
15 A. No.
16 Q. So the meetings were at Halkbank or at Treasury?
17 A. Yes.
18 Q. And when you met with Mr. Atilla, these were group
19 meetings?
20 A. Yes.
21 Q. Aside from the pull-aside that you referenced earlier, did
22 you ever meet with Mr. Atilla one-on-one, where it was just you
23 and Mr. Atilla at a meeting?
24 A. Just that one time.
25 Q. Did you socialize with him ever?

1 A. No.
2 Q. Did you ever have, aside from that one one-on-one
3 discussion that you had -- you testified earlier that you had
4 with Mr. Atilla, did you ever engage him in any kind of social
5 dialogue?
6 A. No.
7 Q. So your exposure to Mr. Atilla was on two or three
8 occasions; am I correct?
9       THE COURT: Face-to-face?
10 A. In person.
11 Q. Face-to-face?
12 A. Yes.
13       MR. ROCCO: Thank you, Judge. As I say, I'm still
14 trying.
15 Q. And these meetings lasted how long?
16 A. Typically an hour or more; so it could be 90 minutes, it
17 could be two hours.
18 Q. And in these meetings that ran an hour or more, 90 minutes
19 or two hours, it's fair to say that other people were present,
20 correct?
21 A. Yes.
22 Q. And in these meetings, did other people speak?
23 A. Other than the two principals?
24 Q. Other than yourself and Mr. Atilla.
25 A. Perhaps. The primary people talking would have been myself

1 and Mr. Atilla.
2 Q. Do you recall meetings that you attended with Mr. Atilla
3 and with Mr. Aslan?
4 A. Yes.
5 Q. And in meetings that Mr. Atilla attended with Mr. Aslan,
6 did Mr. Aslan speak?
7 A. Yes.
8 Q. In those meetings, is it fair to say that Mr. Aslan was the
9 principal participant?
10 A. Yes.
11 Q. And how many times did you meet with Mr. Aslan and
12 Mr. Atilla both?
13 A. I believe twice.
14 Q. Okay. So there's only one occasion, then, where
15 Mr. Aslan -- where Mr. Atilla was present with you and
16 Mr. Aslan was not, correct?
17 A. I believe so. It's certainly true for the meeting I had
18 with him in Turkey.
19 Q. Would it be fair to say that you don't know Mr. Atilla very
20 well?
21 A. At a personal level, no, I don't know him.
22 Q. At all, is that fair to say, on a personal level?
23 A. I don't know him at all on a personal level, yes.
24 Q. So is it also fair to say that you can't tell, or you don't
25 know, whether Mr. Atilla is a nervous-type person; am I

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

---

HCCPATI2        Szubin - Cross        Page 1477

1  correct?
2  A.  Correct.
3  Q.  So when you say that Mr. Atilla exhibited nervous
4  characteristics during meetings with you, how do you know that
5  Mr. Atilla was nervous?
6  A.  That could -- he could have those nervous characteristics
7  all the time, I wouldn't know.
8  Q.  Right.  And you said it was not -- it was not unusual for
9  banking officials, and I'm sure you don't take it personally,
10  to be nervous in your presence; is that correct?
11  A.  That's correct.
12  Q.  That's because when you had these meetings, in part, you
13  were the principal focus of the meeting, correct?
14  A.  Yes.
15  Q.  You were imparting information about U.S. sanctions,
16  correct?
17  A.  Yes.
18  Q.  You were imparting information about what is, in fact, a
19  pretty complicated set of rules; am I correct?
20  A.  Yes.
21  Q.  And these rules are important to the banks that you would
22  meet with, banking officials that you would meet with; am I
23  correct?
24  A.  Yes.
25  Q.  Because the banking people that you would meet with wanted

---

HCCPATI2        Szubin - Cross        Page 1478

1  to access -- continued access to the U.S. financial system; am
2  I correct?
3  A.  Correct.
4  Q.  It was very important to them, correct?
5  A.  Yes.
6  Q.  And if they were cutoff from the U.S. financial system, it
7  would be pretty much the equivalent of a death sentence to a
8  foreign financial institution in these days; is that correct?
9  A.  Depending on the institution but, yes, for instance --
10  Q.  How about for Halkbank?
11  A.  For Halk, yes.
12  Q.  So these were important meetings, correct?
13  A.  Yes.
14  Q.  And is it fair to say that Halkbank was important to the
15  sanctions enforcement effort of the U.S., Iranian sanctions
16  enforcement to the U.S.?
17  A.  I'm sorry, what do you mean by "important"?
18  Q.  Important in the sense that U.S. officials, Treasury
19  officials like yourself, were looking for Halkbank's
20  cooperation?
21  A.  It was viewed as a significant concern by Treasury
22  Department officials with respect to Iran sanctions.
23  Q.  And is it fair to say that you made that imperative or that
24  need clear to the people that you meet with at Halkbank?
25  A.  No, I'm not following you again.

---

HCCPATI2        Szubin - Cross        Page 1479

1  Q.  I'll put the question differently, or maybe move to a
2  different question.
3      So in your meetings with Halkbank, when you met with
4  Mr. Atilla and Mr. Aslan, you would discuss matters that
5  Treasury was particularly interested in with respect to the
6  sanctions regime; is that correct?
7  A.  Yes.
8      (Continued on next page)

---

HCC3ATI3        Szubin - Cross        Page 1480

1  Q.  You would discuss changes in the sanctions regime as the
2  sanctions changed from time to time; is that correct?
3  A.  Yes.
4  Q.  By the way, is it fair to say that Mr. Aslan spoke English
5  as well as Mr. Atilla?
6  A.  I don't recall the level of Mr. Aslan's English as well.
7  But the meetings we had with him were also done in English,
8  yes.
9  Q.  Is it fair to say that both Mr. Aslan and Mr. Atilla speak
10  with heavy accents?  Speak English with heavy accents?
11  A.  I was able to understand Mr. Atilla fairly well.
12  Q.  Did he speak with a heavy Turkish accent?
13  A.  So, I would say with a Turkish accent, but not heavy.
14  Q.  So, let's talk about some of the meetings that you had --
15  before I leave Halkbank.
16      Did you ever speak to a legal representative of
17  Halkbank?  Did you ever speak to a lawyer who represented
18  Halkbank?
19  A.  In other words, was there a lawyer at the group meetings
20  that I had with Halkbank?
21  Q.  I'll start with that question.  My question was a little
22  broader, but that's a good question.  Did you -- was a lawyer
23  present at the meetings that you had with Halkbank?
24  A.  I don't know.
25  Q.  Were you, did you ever talk to someone who identified

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI3        Szubin - Cross        Page 1481

1  himself or herself as a lawyer for Halkbank?
2  A. It could be. I don't know. In other words, at the
3  beginning of those meetings, people would introduce themselves
4  and often hand over business cards. But my focus would have
5  been on Mr. Atilla or Mr. Aslan.
6  Q. My question is --
7       THE COURT: Do you know if either of them is a lawyer?
8       THE WITNESS: I don't know.
9       MR. ROCCO: That's a good question, thank you. I was
10  getting there, Judge.
11       THE COURT: Has to say it is a good question if I ask
12  it.
13       MR. ROCCO: Of course.
14  Q. My question was, did anybody identify themselves as a
15  lawyer? As you sit here now, do you recall anybody identifying
16  himself or herself as a lawyer?
17  A. I don't recall that. But what I'm also telling you is I
18  don't recall the jobs that people identified themselves as
19  having.
20  Q. In the course of your dealings with Halkbank, did you ever
21  come to learn whether Halkbank has a legal department?
22  A. Not that I recall.
23  Q. Let's talk about some of the meetings that you had with
24  Mr. Atilla. And if I can direct you to, ask Mr. White to pull
25  up Government Exhibit 7020.

HCC3ATI3        Szubin - Cross        Page 1482

1       By the way, when you testified earlier to Mr. Atilla's
2  nervousness at meetings with you, was that at one meeting that
3  you have a distinct recollection of him being nervous or was it
4  at more than one meeting?
5  A. That recollection pertains primarily to the February 2013
6  meeting that I had with him. And then in sort of heightened
7  nervousness in our pull aside meeting that was one-on-one. But
8  that's on the same day.
9  Q. Right. Those both were February 12, 2013, correct?
10  A. Correct.
11  Q. You don't recall Mr. Atilla being nervous prior to that
12  February 12, 2013 meeting, do you?
13  A. That's what stands out for me is the February 2013 meeting.
14  Q. Let's talk about that meeting. Can I ask you, this is in
15  evidence, so why don't we publish it to the jury. I'm going to
16  direct your attention to the first page of the document.
17       So, what is this?
18  A. This is a State Department writeup or cable from my
19  meetings in Turkey.
20  Q. We know that it is a State Department cable how?
21  A. The headers where it says from American Embassy Ankara.
22  Q. Is it fair to say when we see a document like this with
23  that kind of a header, we can assume that it is a State
24  Department document, in this instance a State Department
25  document from the American Embassy in Ankara?

HCC3ATI3        Szubin - Cross        Page 1483

1  A. Yes.
2  Q. Do you know who prepared this document?
3  A. Typically it would be the control officer assigned to my
4  delegation, so it would be a foreign service officer in our
5  embassy in Ankara who worked for either the political or the
6  economic section.
7       MR. ROCCO: Mr. White, if we can go to the first page
8  of the document.
9  Q. And I'll ask you to just, if you will, skim it or read it,
10  and tell me if Mr. Atilla's name appears anyplace on that page.
11  In fact, I'm going to ask you do it for the entire document.
12  Point out if you can find it where Mr. Atilla's name appears.
13  A. I don't see Mr. Atilla's name.
14  Q. Can we go to the second page.
15  A. I don't see his name.
16  Q. Can we go to the third page.
17  A. Again, I don't see his name.
18  Q. Can we go to the end.
19  A. I don't see his name.
20  Q. So it is fair to say his name is not mentioned there at
21  all; am I correct?
22  A. In the unredacted sections, that's correct.
23  Q. We don't know what's in the redacted sections.
24  A. Correct.
25  Q. And we don't know why the sections are redacted. Do you?

HCC3ATI3        Szubin - Cross        Page 1484

1  A. I don't. I wasn't responsible for these redactions.
2  Q. By the way, at the end of the cable, there is a name
3  Ricciardone?
4  A. Yes.
5  Q. That is the United States embassador?
6  A. It was at the time, yes.
7  Q. Let's go back into the document if we can. Now, we agree
8  that this is an important document, correct?
9  A. I had said that I agreed that this would be a reliable
10  record of the meeting.
11  Q. With whom?
12  A. With Mr. Atilla and Halkbank.
13  Q. But Mr. Atilla's not referenced here; is that correct?
14  A. Yes.
15  Q. This is a meeting where you had the pull aside with
16  Mr. Atilla; am I correct?
17  A. Yes.
18  Q. Do we need to go through it line by line, page by page, to
19  find a reference to the pull aside?
20       Is the pull aside, in other words, is the pull aside
21  referenced in this document in any place?
22  A. No, it is not.
23  Q. Is there any document that you are aware of that references
24  the pull aside, Mr. Szubin?
25  A. I don't think so. No.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

1  Q. Is there any other document that as you sit here today
2  relates to this meeting on February 12, 2013, with Halkbank?
3  A. I'm sure there are handwritten notes from that meeting from
4  various participants.
5  Q. Did you do handwritten notes of that meeting?
6  A. Yes.
7  Q. Did you give the handwritten notes of that meeting to the
8  government? To the prosecutor, the prosecution team?
9  A. Yes.
10 Q. And you did that during one of your prep sessions?
11 A. Yes.
12        MR. ROCCO: Mr. White, can you pull up Defense Exhibit
13 220 not for the jury.
14 Q. I'm going to ask you to take a look at that document if you
15 will, Mr. Szubin. And I want to ask you if you can identify
16 it.
17 A. Yes.
18 Q. Is it a document that you've seen before?
19 A. Yes.
20 Q. Is it a document that you saw in preparation for your
21 testimony here today?
22 A. I believe so, yes.
23 Q. Is it a document that you discussed with prosecutors in
24 this case in preparation for your testimony here today?
25 A. I believe so.

1  Q. Now, you're familiar with the document?
2  A. Yes.
3  Q. Is what the document says, is it accurate?
4  A. This would generally be an accurate record. This is a
5  record of a two-hour meeting with Halk that I did, done by my
6  senior advisor at the time.
7        MR. ROCCO: Your Honor, I move Defendant's Exhibit 220
8  into evidence.
9        MR. DENTON: No objection, your Honor.
10       THE COURT: I'll allow it.
11       (Defendant's Exhibit 220 received in evidence)
12       MR. ROCCO: Can we publish it for the jury.
13 Q. Can you tell us what the document is.
14 A. This is a record done by my senior advisor of the meeting
15 we've talked about at Halkbank. Done that day. And it's
16 basically the notes from the meeting.
17 Q. Right. And I'm going to ask you, is this document fresh in
18 your mind? If it's not, take a moment and why don't you go
19 through it. Peruse it and we can talk about it.
20 A. Okay.
21 Q. So, by the way, who is John Smith?
22 A. He was another senior official at OFAC at the time.
23 Q. The people that are copied on this document, Dennis Wood,
24 Michael Dondarski, Yamam Fadl, and Susan Demske, David Tessler
25 you already told us who he is.

1        Are those other named individuals people who work or
2  worked for OFAC at the time?
3  A. Yes.
4  Q. Can I ask you, does this memorandum in any way refer to the
5  pull aside that you say you had with Mr. Atilla on February 12,
6  2013?
7  A. No.
8  Q. It does not. And these are notes, whose notes? This
9  reflects whose notes did you say?
10 A. David Tessler.
11 Q. At the time at the bottom of the memo, the last paragraph
12 which is the sentence that says "Will write a more detailed
13 readout when we get home. Not on BB but hopefully this is
14 helpful."
15        Was there, did Mr. Tessler or anyone else prepare a
16 more detailed readout of this meeting?
17 A. I don't know. But, typically, Mr. Tessler or others who
18 are on my delegation would work with the embassy staff and to
19 get the formal readout cable that we talked about earlier and
20 that we looked at earlier.
21 Q. I didn't mean to interrupt you.
22 A. That's fine.
23 Q. So, it would be fair to say that to the best of your
24 recollection that the formal readout is what in effect has been
25 referenced in Government Exhibit 7020, right; is that correct?

1  A. I'm sorry. You'll have to help me with the numbers.
2        MR. ROCCO: We can go back to 7020.
3  A. If that's the American Embassy cable, yes.
4  Q. That's the American Embassy cable that you and I just
5  reviewed where I referenced Mr. Ricciardone's name at the end.
6  A. Yes, that would be the formal writeup of our meeting.
7  There might be another more detailed Treasury readout, but I
8  haven't seen it or at least not recently.
9  Q. So, as far as you know, on the two documents that we've
10 reviewed here today, there is no reference at all to either
11 Mr. Atilla or to the pull aside; am I correct?
12 A. Correct.
13 Q. This pull aside occurred, as you say, now approaching five
14 years ago, correct?
15 A. Yes.
16 Q. Fifth anniversary would be on 12 -- 2/12/2018. And in that
17 time period, you obviously had more important meetings with
18 Halkbank, correct? With representatives from Halkbank; am I
19 correct?
20 A. More important than this?
21 Q. No. Additional important meetings. Not more important
22 meetings. Thank you. Additional important meetings.
23 A. Yes.
24 Q. And you've met with, literally, I imagine, in that
25 five-year period, hundreds of foreign financial institutions,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                              December 12, 2017

1    correct?
2    A. Probably more than 100, yes.
3    Q. Last time you met with representatives from Halkbank was
4    when?
5    A. 2013, maybe the beginning of 2014.
6    Q. Do you recall meeting with representatives of Halkbank in
7    2016 in January, February of 2016?
8    A. I don't.
9    Q. We'll come back to that.
10       Your last meeting with Mr. Atilla, is it fair to say
11   then, as you sit here today, is in February of 2013; is that
12   correct?
13   A. I don't think that's the last time we spoke.
14   Q. How about the last time you saw him?
15   A. Yes, it could be.
16   Q. In preparation for your testimony here today, you met with
17   representatives of the United States attorney's office,
18   correct?
19   A. Yes.
20   Q. And I think you said that you reviewed documents with them,
21   including the cables and Mr. Tessler's notes; am I correct?
22   A. Yes.
23   Q. In the course of the meeting that you had with the
24   prosecutors in August of 2017, of this year, do you have a
25   recollection of talking to them about the pull aside?

1    A. You know, as with before, it's hard for me to remember
2    which meetings with them I discussed it. But I did raise the
3    pull aside with them, yes.
4    Q. Is it fair to say that you discussed the pull aside with
5    them more than once?
6    A. Yes.
7    Q. Did you discuss the pull aside with them at each meeting
8    that you had, each of the four meetings, face-to-face meetings
9    that you had?
10   A. I don't think so, no.
11   Q. Did you discuss it with them on more than one occasion?
12   A. Yes.
13   Q. In the course of your discussing the pull aside, were you
14   asked about who you pulled aside?
15   A. Yes.
16   Q. Do you recall saying that you pulled aside the chief
17   executive officer of Halkbank in one of the prep sessions that
18   you had with the prosecutors?
19   A. I don't recall saying that, but it's possible.
20       MR. ROCCO: Can we bring up government tab 2, 3513-24.
21   Q. Can you see it, Mr. Szubin?
22   A. Yes.
23   Q. Can you read it?
24       MR. DENTON: Objection.
25   Q. Not aloud. To yourself.

1        MR. ROCCO: Thank you, Mr. Denton.
2    Q. Directing your attention specifically to page two of these
3    handwritten notes. We'll highlight a portion of it just in one
4    moment. It is the last item on page two.
5        MR. ROCCO: Can we highlight that, Mr. White?
6    Q. Do you recognize, before we go to that specific topic, do
7    you recognize the handwriting?
8    A. No.
9    Q. It's fair to say you never saw this before?
10   A. Yes.
11   Q. Can you read those roughly two lines in that memorandum or
12   those -- in those notes?
13   A. I'm sorry, I've got five.
14   Q. Okay. So just direct your attention to the first two lines
15   in the blow up.
16       MR. DENTON: To himself?
17       MR. ROCCO: To himself, of course.
18   A. Yes.
19   Q. Does that refresh your recollection that on August 3, 2017,
20   you told the prosecution team here that the pull aside was with
21   the CEO of Halkbank, not the deputy general manager of
22   Halkbank?
23   A. So, this is what's recorded in the notes and that could
24   well be what I said to them at the meeting.
25   Q. So, I'm asking you, do you recall telling the prosecutors

1    that, saying that it was the CEO, not the deputy general
2    manager that you had the pull aside with?
3    A. No.
4    Q. Do you have any recollection of correcting -- you have no
5    recollection of making that mistake; am I correct?
6    A. Correct.
7    Q. And it's fair to say that you have no recollection of ever
8    having to correct that misrecollection for lack of a better
9    word?
10       MR. DENTON: Objection.
11       THE COURT: Overruled.
12   A. I'm happy to address this.
13   Q. I just asked you a simple question.
14       THE COURT: What was the question?
15   Q. Do you have a recollection of making that statement to
16   members of the prosecution team?
17   A. So, given that I had numerous --
18   Q. Just a yes or no.
19       THE COURT: He just wants to know if you remember
20   saying that.
21   Q. Yes or no.
22       THE WITNESS: But I think he's also asking do I
23   remember correcting it.
24       THE COURT: Trust me, I know what he's asking. He
25   really would like you to say yes or no, whether you remember

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI3 | Szubin - Cross | Page 1493 |
|---|---|---|

1 saying that.
2 A. So, I remember at meetings with the assistant --
3 Q. Just yes or no, Mr. Szubin.
4 THE COURT: I know him very well.
5 A. I know. But I need to make sure that what I'm saying is
6 accurate. And I want to give you an accurate answer.
7 Q. And I appreciate that. That's why I am asking for a simple
8 yes or no. It is not a trick question.
9 A. So --
10 Q. Do you recall -- here's the question. Do you recall
11 telling the prosecutors in this case that you had a pull aside
12 on February 12, actually, this says February 13, 2013, with the
13 CEO of Halkbank. Yes or no. You either remember it or you
14 don't.
15 A. I remember telling them about a pull aside with a senior
16 Halkbank official. I don't recall --
17 Q. That's not yes or no, Mr. Szubin.
18 A. Well, it doesn't --
19 Q. This doesn't say senior official from Halkbank. This says
20 the CEO.
21 MR. DENTON: Objection, your Honor. He's reading from
22 the document.
23 THE COURT: We got it. Just take it easy.
24 MR. ROCCO: Thank you, Judge.
25 THE COURT: We can probably get by this.

| HCC3ATI3 | Szubin - Cross | Page 1494 |
|---|---|---|

1 MR. ROCCO: I think we're done with it. You can take
2 it down, Mr. White. Thank you.
3 Q. By the way, the pull aside that you say took place in the
4 February 12, 2013 meeting with Halkbank, do you recall using
5 the words "pull the trigger"?
6 A. I don't recall how I framed the prospect of applying
7 sanctions and whether I would have used that in the meeting.
8 It sounds more informal than I would have used in a foreign
9 bank meeting.
10 Q. Let's talk a little bit if we can about Reza Zarrab.
11 You're familiar with Mr. Zarrab; am I correct?
12 A. I know of him, yes.
13 Q. In the course of your dealings with anyone from Halkbank,
14 did you ever discuss Mr. Zarrab with anyone from Halkbank?
15 A. Not that I recall.
16 Q. Were you aware of the fact that Mr. Zarrab was associated
17 with something known as Al Nafees Exchange?
18 A. Yes.
19 Q. Is it fair to say that you knew that Mr. Zarrab had an
20 ownership interest in Al Nafees Exchange?
21 A. I believe so.
22 Q. Is it fair to say that Mr. Zarrab -- that Al Nafees
23 Exchange was sanctioned?
24 A. Yes.
25 Q. Do you have a recollection of that? Do you have a

| HCC3ATI3 | Szubin - Cross | Page 1495 |
|---|---|---|

1 recollection of that happening in 2012?
2 A. I don't recall the date.
3 Q. Do you recall why Al Nafees Exchange was sanctioned?
4 A. I believe for helping Iran evade sanctions.
5 Q. Do you recall if it was fined as well as part of the
6 sanction, whether a fine was levied against Al Nafees Exchange?
7 A. By the U.S. government?
8 Q. By the U.S. government.
9 A. I don't believe so.
10 Q. Are you aware of any fine being assessed against Al Nafees
11 Exchange by any government?
12 A. No.
13 Q. Do you have a recollection of a fine being assessed and not
14 being paid?
15 A. I don't recall.
16 Q. In your role as director of OFAC, were you aware of the
17 fact that Reza Zarrab was investigated by Treasury Department
18 at any time?
19 A. I'm not following the question.
20 Q. Well, are you aware of any Treasury Department
21 investigation of Reza Zarrab?
22 A. Yes.
23 Q. When did you become aware of the fact that Reza Zarrab was
24 under investigation by the Treasury Department?
25 A. I don't know the date for that.

| HCC3ATI3 | Szubin - Cross | Page 1496 |
|---|---|---|

1 Q. Is it fair to say -- can you give me an approximate date,
2 roughly 2012, 2013?
3 A. Yes, that's fair.
4 Q. Are you aware of the fact that Mr. Reza was arrested in
5 Turkey in 2013?
6 A. Yes.
7 Q. Are you aware that Mr. Reza was arrested in 2013 with
8 Suleyman Aslan, who was the general manager of Halkbank?
9 A. I believe so.
10 Q. And are you familiar with what they were arrested for?
11 A. By the Turkish authorities?
12 Q. By the Turkish authorities.
13 A. I believe it's relating to a sanctions evasion scheme.
14 Q. When did you first become aware of the fact that Mr. Aslan
15 and Mr. Zarrab were arrested by the Turkish authorities?
16 A. Reading the newspapers.
17 Q. That was back in roughly the time that the arrests
18 occurred?
19 A. Yes.
20 Q. Would you think of that -- withdrawn.
21 At the time that you became aware of the fact that
22 Mr. Aslan and Mr. Zarrab were arrested, did you have occasion
23 to discuss the arrests or their prosecution by Turkish
24 authorities with anybody else at Treasury Department?
25 A. I'm sure that I did.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
December 12, 2017

HCC3ATI3          Szubin - Cross          Page 1497

1  Q. Do you have a specific recollection of talking to David
2    Cohen about it?
3  A. No, but it's very likely that I did.
4  Q. Because that was a pretty significant event; am I correct?
5  A. Yes, yes.
6  Q. Tell me, what did you learn about the Turkish
7    investigation?
8        MR. DENTON: Objection.
9        THE COURT: When?
10        MR. ROCCO: Back in 2013.
11  Q. The arrests in 2013. What did you learn?
12  A. I just recall learning about it through public reporting.
13    I didn't have any behind-the-scenes conversation with Turkish
14    authorities about their investigation.
15  Q. Did you talk to any American authorities about an
16    investigation?
17        MR. DENTON: Objection.
18        THE COURT: Overruled.
19  A. In other words, did I talk to colleagues in the U.S.
20    government about these arrests in the news? Yes.
21  Q. Who were the colleagues that you spoke with?
22        MR. DENTON: Objection.
23        THE COURT: Overruled.
24  A. I can't recall.
25  Q. You'll agree with me David Cohen was one of them; am I

HCC3ATI3          Szubin - Cross          Page 1498

1    correct?
2  A. What I said is I believe it's likely that I would have
3    talked to him about it.
4  Q. So you have no specific recollection of that?
5  A. Correct.
6  Q. Do you have a recollection as you sit here today of having
7    a conversation with anybody in the U.S. government about the
8    arrest of Suleyman Aslan and/or Reza Zarrab in 2013?
9  A. I don't have a specific recollection.
10  Q. Well, it's significant, it was significant if they were
11    arrested for sanctions evasion; am I correct?
12  A. Yes.
13  Q. And it would have been significant to OFAC's enforcement
14    efforts here if Suleyman Aslan was arrested in 2013, am I
15    correct, for sanctions evasion?
16  A. Yes.
17  Q. So what I'm trying to get to is what did OFAC do, if
18    anything, following Mr. Aslan's arrest, following Mr. Zarrab's
19    arrest, about contacting Halkbank, we'll start with, to discuss
20    the arrests.
21  A. I don't recall what OFAC's response was to the arrests in a
22    formal way.
23  Q. Did you have any response to it in a formal way?
24  A. No.
25  Q. As director of OFAC, would you have had a response to it in

HCC3ATI3          Szubin - Cross          Page 1499

1    a formal way?
2        THE COURT: What does that mean?
3        MR. ROCCO: I'm using his words, "formal way."
4        THE COURT: No. What did your question just say?
5        MR. ROCCO: I'll restate it, your Honor, or reframe
6    it.
7  Q. Did you do anything as director of OFAC to learn about,
8    aside from reading newspaper reports, did you do anything to
9    actually learn about what happened in connection with
10    Mr. Aslan's arrest in 2013?
11  A. So, the other sources I would have consulted about that
12    would have been classified sources, which I'm not free to
13    discuss.
14  Q. Well, did you contact -- let's stay away from classified
15    sources. And just for the remainder of my questions, you can
16    assume I have no interest in your contact with classified
17    sources.
18        I want to know, if you can help me, what did you do in
19    reference to the arrests? Did you contact Halkbank?
20  A. I don't believe so, no.
21  Q. Did you ever ask anyone at Halkbank what happened?
22  A. No.
23  Q. Did you ask anybody at Halkbank -- by the way, to speak a
24    little more broadly, to your knowledge, did anybody from
25    Treasury contact Halkbank and ask what happened?

HCC3ATI3          Szubin - Cross          Page 1500

1  A. I don't know.
2  Q. Did you direct anyone to do it?
3  A. No.
4  Q. So it's fair to say you did nothing to contact Halkbank,
5    and you directed no one to contact Halkbank?
6  A. Correct.
7  Q. And any effort that you made to learn what happened you're
8    saying would be, would involve contacting classified sources in
9    government, correct?
10        THE COURT: I thought you were going to stay away from
11    that.
12  Q. I'm not asking what the contact was. I'm not asking about
13    any information that you learned.
14  A. Typically in a case where there is an ongoing law
15    enforcement action, we're very sensitive about not getting in
16    the way.
17  Q. Well, you mean an ongoing law enforcement action by U.S.
18    authorities or an ongoing law enforcement action by Turkish
19    authorities?
20  A. In this case Turkish authorities.
21  Q. So, what you're saying is that the United States stepped
22    back to let Turkey proceed with an investigation in a matter
23    that may have involved the United States' interests?
24  A. No. What I said is we at OFAC, that's the sanctions
25    implementing office, would not in a situation like this, where

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 12, 2017

1  a foreign government is stepping in through criminal means to
2  investigate a case, we would not be calling the bank's
3  officials to ask about it.
4  Q. Okay. So, did there come a time that you learned that the
5  criminal case in Turkey was dismissed?
6  A. Yes.
7  Q. How long after Mr. Aslan's arrest did you learn that?
8  A. When I read about it in the newspaper.
9  Q. It would be fair to say that was in the spring, February or
10 March of 2014?
11 A. I don't recall the date.
12 Q. When you learned that the case against Mr. Aslan and
13 Mr. Zarrab was dismissed, what, if anything, did you do about
14 pursuing with Halkbank the fact that Mr. Aslan had been
15 arrested? What did you do to learn about what the
16 circumstances were?
17        THE COURT: I don't understand the question.
18 Q. The question is, did you contact Halkbank to inquire into
19 the circumstances surrounding Mr. Aslan's arrest?
20        THE COURT: After --
21 Q. After the case was dismissed. And after there was no --
22 after the case was dismissed.
23 A. I did not.
24 Q. Did you ask anybody at Halkbank or did you contact anybody
25 at the Turkish government to ask them about what was involved

1  in the arrests?
2  A. I did not.
3  Q. Did anybody to your knowledge who -- anybody at your
4  direction contact Turkish government?
5  A. No one at my direction.
6  Q. Was -- to your knowledge, was there any effort on the part
7  of anyone at Treasury after the case was dismissed in Turkey to
8  find out what happened?
9  A. In -- it would be likely that our embassy would be
10 discussing the case with the Turkish government, and
11 potentially law enforcement to law enforcement. But neither of
12 those are under my supervision or were under my supervision.
13 Q. But you have access, do you not, to information from law
14 enforcement at OFAC?
15 A. Not -- not as a general matter, no.
16 Q. But if you need information, can you go to -- doesn't OFAC
17 have the ability and doesn't OFAC interact with other
18 government agencies and will speak about -- I'm talking about
19 United States government agencies.
20 A. Very definitely they interact. OFAC interacts with other
21 government agencies. But OFAC does not have open access to
22 criminal files.
23 Q. I didn't ask for open access and I didn't ask anything
24 about criminal files. I'm asking what, if anything, was done
25 after Mr. Aslan was arrested to find out what happened, what

1  was involved in the alleged sanctions violations.
2        MR. DENTON: Objection.
3        THE COURT: Sustained.
4  Q. Did you make any effort to contact Halkbank and ask anybody
5  at Halkbank what happened?
6  A. No.
7  Q. When did you first hear about Reza Zarrab, by the way,
8  Mr. Szubin? When did you first learn about him?
9  A. I would have first read about him through information I'm
10 not free to discuss.
11 Q. Did you learn about him -- how about this. What year was
12 it?
13 A. I don't recall.
14 Q. Is it fair to say it was as early as 2012?
15        MR. DENTON: Objection.
16        THE COURT: If you remember.
17        MR. DENTON: Your Honor, he said it was from sources
18 he can't discuss.
19        MR. ROCCO: I think we have the right to ask a more
20 specific question.
21        THE COURT: If you remember.
22 A. Around that period.
23 Q. In the course of your -- so around that period you're
24 saying, around the period of 2012?
25 A. Yes.

1  Q. From 2012 until through 2014, do you have any recollection
2  of ever discussing with anybody from Halkbank Reza Zarrab?
3  A. No.
4  Q. Do you recall ever discussing with -- did you ever have a
5  conversation with Halkbank -- I'm sorry, with David Cohen about
6  Reza Zarrab?
7  A. Yes.
8  Q. Did you discuss with Mr. Cohen Reza Zarrab's relationship
9  with Halkbank?
10 A. Probably.
11 Q. Can you tell me what those conversations -- what did you
12 discuss?
13        MR. DENTON: Objection.
14 A. I can't.
15        THE COURT: Overruled. If you recall.
16 A. We would have been discussing information that I can't talk
17 about in open court.
18        MR. ROCCO: Your Honor, I'm going to need some
19 guidance from you on this. Can we come to the sidebar?
20        THE COURT: Sure.
21        (Continued on next page)
22
23
24
25

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 12, 2017

| HCC3ATI3 | Szubin - Cross | Page 1505 |
| --- | --- | --- |

1      (At the sidebar)
2      MR. ROCCO: Judge, this is critical stuff. Fact of
3  the matter is, that there were discussions going on regularly
4  obviously at this point about Reza Zarrab. And nobody is going
5  to the bank and telling them not to deal with Reza Zarrab.
6      THE COURT: You made that point.
7      MR. DENTON: It was classified.
8      MR. ROCCO: Not everything is classified.
9      THE COURT: Just wait a minute. Relax. You already
10 made that point about seven times.
11     MR. ROCCO: Thank you, Judge. I am very happy. I
12 quite frankly would like to know.
13     THE COURT: I get what you are saying and you said it.
14     MR. ROCCO: Judge, I think it's worse than that.
15     THE COURT: You asked him, I know you think it's
16 terrible that it happened. I get that. But it is not you on
17 the witness stand. You asked him, I promise you, four times,
18 five times, six times.
19     MR. ROCCO: I did.
20     THE COURT: Did you or did you direct anybody to find
21 out. And he said no. What do you want him to say, yes?
22     MR. ROCCO: No, but what I'm interested specifically
23 in is he says he had discussions with Mr. Cohen about this.
24     THE COURT: Okay.
25     MR. ROCCO: Mr. Cohen, after the arrests of Reza

| HCC3ATI3 | Szubin - Cross | Page 1506 |
| --- | --- | --- |

1  Zarrab, yesterday testified that he didn't discuss this with
2  anyone. He didn't have any recollection of this.
3      THE COURT: Okay. So if I'm the defense lawyer, okay,
4  and I already have a contradiction, why I would want to improve
5  on that?
6      MR. ROCCO: Because --
7      THE COURT: If you think that's valuable. And you're
8  going to use it. You already have it.
9      MR. ROCCO: Your Honor, I do not want to impinge --
10 I'm not interested in any confidential information. I am
11 interested in --
12     THE COURT: How about the question I just asked?
13     MR. ROCCO: That gives me one argument. I think there
14 are other arguments. I think the fact -- what I want to
15 impress on the jury is the fact that OFAC had all this
16 information available to it, and it never warned -- Mr. Szubin,
17 who had principal responsibility for dealing with Halkbank,
18 never warned them off of Reza Zarrab.
19     THE COURT: You made that point.
20     MR. DRATEL: One second. Your Honor, with respect to
21 the classified aspect, if it's --
22     THE COURT: What difference does it make, is the
23 point. I know what he's trying to pursue. You've said it now
24 three times. He asked that -- take a look at the transcript
25 and see. So when you get to your summation, it's in the

| HCC3ATI3 | Szubin - Cross | Page 1507 |
| --- | --- | --- |

1  transcript.
2      MR. DRATEL: I just want to make the point that the
3  fact that it's classified doesn't make it off limits. It is
4  Brady material it has to be disclosed and then we work it out
5  through CIPA.
6      THE COURT: It is a very sensitive area for the
7  government. And it doesn't matter. Because the point he's
8  trying to make, whether it's classified or whatever, he's
9  already made. He just doesn't know when he is ahead.
10     MR. ROCCO: Well, with all due respect, your Honor,
11 this is -- I think this is -- I understand it is a sensitive
12 area but I think it's important to the defense.
13     There were detailed discussions about Reza Zarrab's
14 activities, and none of those activities were brought to the
15 attention of Halkbank. And we have a situation where we have
16 testimony that Halkbank is a bad player under suspicion by the
17 government and by OFAC, specifically by OFAC, for years. And
18 they never tell Halkbank stop dealing with Reza Zarrab. It is
19 almost like OFAC is playing gotcha. It is basically like
20 they're being --
21     THE COURT: Okay. Who do you think knows Reza Zarrab
22 better, this guy from Washington, who doesn't know that
23 Halkbank is 51 percent owned by the State of Turkey, or
24 Mr. Atilla who lives around the corner from him? Who do you
25 think?

| HCC3ATI3 | Szubin - Cross | Page 1508 |
| --- | --- | --- |

1      MR. ROCCO: I will tell you that I'm not sure how much
2  my client knew about Mr. Atilla, and we may find out -- I'm
3  sorry. Mr. Zarrab.
4      THE COURT: Whatever, listen. I don't think it is
5  worth going into.
6      MR. ROCCO: All right.
7      THE COURT: If I thought -- seriously, if I thought
8  you were being hurt in some way in the point you're trying to
9  make, because I don't really know how to deal with classified
10 information either, to be honest with you. You do. Okay.
11     MR. ROCCO: I'm going to ask Mr. Dratel for a primer.
12     THE COURT: Like I said, if I thought you were being
13 hurt, your client was being hurt in some way, then I'd say it's
14 worth pursuing. But I don't think it is.
15     MR. DRATEL: Your Honor, the only point I was trying
16 to make, if the content of the conversations would be helpful
17 to make Mr. Rocco's point and helpful to Mr. Atilla, then the
18 government couldn't hide behind that. They would have to --
19     THE COURT: Just being helpful is not the issue. I
20 know enough to know that.
21     MR. DRATEL: It actually is a lower standard for
22 discovery purposes for admissibility. The Court would have
23 to -- but we should get that material. I have clearance. We
24 could work out a substitution for purposes -- that's the way
25 it's done through the Classified Information Procedures Act.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI3 | Szubin - Cross | Page 1509 |
|---|---|---|

1 But so all I'm saying is the government can't hide behind it as
2 a way to make it off limits entirely.
3     MR. DENTON: Just for the sake of the record on that,
4 I will note that the Court has our CIPA briefing which
5 addresses all of the applicable legal standards and the
6 products at issue.
7     THE COURT: I think we should move on.
8     MR. ROCCO: Thank you, Judge, and I thank you for your
9 patience.
10     THE COURT: Are we almost done? Not to be rude to all
11 of you. But it's now, we're now three hours in.
12     MR. ROCCO: Well, your Honor.
13     THE COURT: To what in my opinion is a one-hour
14 witness, direct and cross.
15     MR. ROCCO: The government had him for an hour and a
16 half.
17     THE COURT: I don't mean to be rude and it is easy for
18 a judge to say, because I don't have to be in the trenches like
19 you guys.
20     MR. ROCCO: I would never join in that statement,
21 Judge.
22     THE COURT: But I think you've stretched the one-hour
23 witness into three, three now going on three and a half hours.
24     MR. ROCCO: We collectively.
25     THE COURT: Yes.

| HCC3ATI3 | Szubin - Cross | Page 1510 |
|---|---|---|

1     MR. DENTON: Sorry for that, your Honor.
2     THE COURT: No, no, I don't say it that way. I'd say
3 it would have been better for you and for you, it is harder to
4 be short than to be long.
5     MR. DENTON: That's certainly true.
6     MR. ROCCO: Especially when you haven't seen the
7 witness before. That's right.
8     MR. DRATEL: Lincoln's old line "If I had more time I
9 would have written a shorter letter."
10     MR. ROCCO: Your Honor, if you want to break now.
11     THE COURT: No, I want to get it over with.
12     MR. ROCCO: I might be able to end it, but I can't
13 say. I want to look at my notes.
14     THE COURT: So you'll say for now.
15     MR. ROCCO: Oh no. No. Thank you, Judge.
16     (Continued on next page)

| HCC3ATI3 | Szubin - Cross | Page 1511 |
|---|---|---|

1     (In open court)
2     MR. ROCCO: I'm sorry, your Honor. I'm actually
3 seeing if I can shorten this.
4     THE COURT: Take your time.
5 BY MR. ROCCO:
6 Q. Mr. Szubin, I'm not interested in any classified
7 information. We're not going there.
8     Did you know that Reza Zarrab was a gold trader?
9 A. Yes.
10 Q. Back in -- let me give you some context. Back in 2012,
11 2013?
12 A. I believe so.
13 Q. Did you know that he was a significant gold trader?
14 A. I don't know. How do you define "significant"?
15 Q. Let me ask you if you regarded him as a significant gold
16 trader, and we'll use your definition of significant.
17 A. We would have viewed him as notable because of his
18 activity, not because of the scale.
19 Q. His activities were suspected violations of sanctions?
20 A. Yes.
21 Q. And were you aware of the fact that Mr. Zarrab was doing
22 business with Halkbank; am I correct, in 2012, 2013?
23 A. I don't know the dates on which I would have been aware of
24 that, but that most likely is right.
25 Q. Were you aware of the fact that Mr. Cohen spoke to Halkbank

| HCC3ATI3 | Szubin - Cross | Page 1512 |
|---|---|---|

1 representatives on at least one occasion, perhaps two, at
2 length about Reza Zarrab?
3 A. That sounds correct.
4 Q. Is it fair to say that Mr. Cohen told you about those
5 discussions?
6 A. Yes.
7 Q. Can you tell us what Mr. Cohen told you about those
8 discussions?
9     MR. DENTON: Objection.
10     THE COURT: If he can.
11 A. I can't recall.
12 Q. You don't recall anything that he told you?
13 A. No. Other than the fact that he would have talked to
14 Halkbank about Mr. Zarrab.
15 Q. Was it, was that because Mr. Zarrab was a significant
16 customer of Halkbank?
17 A. Is that why I can't recall?
18 Q. No. Did you have your discussion with -- in your
19 discussions with Mr. Cohen, did he tell you that Reza Zarrab
20 was a significant customer of Halkbank?
21 A. I don't recall.
22 Q. Did you have an understanding that Mr. Zarrab was a
23 significant customer of Halkbank?
24 A. I don't recall.
25 Q. Would you regard Mr. Zarrab as a red flag in 2012, 2013

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI3          Szubin - Cross          Page 1513

1  when it comes to sanctions violations?
2  A. We regarded him as a subject of concern, yes.
3  Q. Subject of concern, it's fair to say, is a red flag,
4  correct?
5  A. Yes.
6  Q. So, I wanted to go back, if we can, to the meeting on
7  February 12, 2013. Maybe, let me ask you first some broader
8  questions. You testified that --
9       MR. ROCCO: I'm trying to find the document.
10  One second. Can we bring up, Mr. White, Government Exhibit
11  7009. I believe it's in evidence. If it is, please publish it
12  to the jury.
13  Q. This is an e-mail, actually an e-mail string, an
14  interaction with Mr. Atilla back on July 10, 2013.
15  A. It looks like it's from July 1st.
16  Q. Oh. My dyslexia. July 1st. In that e-mail, Mr. Atilla is
17  advising you directly that Halkbank stopped mediating the
18  transactions of exporters related to the trade of special
19  metals; am I correct?
20  A. He says precious metals.
21  Q. And he says mediating, correct, he uses that --
22  A. Correct.
23  Q. Can you tell me what the word "mediating" means in that
24  context?
25  A. Facilitating or processing.

HCC3ATI3          Szubin - Cross          Page 1514

1  Q. Well, can you explain what facilitating or processing a
2  metal, a precious metal trade is; what does it consist of?
3  A. For a bank, it would mean releasing funds from one of their
4  customer accounts to make payment or receiving payment into one
5  of their customer's accounts in payment for trade in precious
6  metals.
7  Q. Is that the only meaning that "mediating" has?
8  A. I'm not following your question.
9  Q. In this context, "mediating" relates only to the receipt of
10  payment or the making of a payment?
11  A. It theoretically could also mean being a pass through on a
12  payment.
13  Q. What do you mean by pass through?
14  A. Well, for example, major clearing house banks, Deutsche
15  Bank, for example, acts as an intermediary on international
16  payments between typically two smaller banks. But, this isn't
17  that context. So I would have read it as meaning issuing or
18  receiving payment.
19       MR. ROCCO: Mr. White, can we go to Government Exhibit
20  7021. You can publish this to the jury as well.
21  Q. Page two. In that e-mail this is a readout; am I correct?
22  A. Correct.
23  Q. You testified to earlier.
24       This is a readout not of a meeting but a readout of a
25  telephone conversation you had with Mr. Atilla?

HCC3ATI3          Szubin - Cross          Page 1515

1  A. Correct.
2  Q. Am I correct? And this was a followup to a telephone call
3  that you had with Mr. Atilla on -- was it October 28,
4  October 29, 2013?
5  A. This is a readout of a telephone call from that date.
6  Q. In that call you discussed with Mr. Atilla a number of
7  topics, including the sale of gold?
8  A. Correct.
9  Q. And directing your attention to the second sentence under
10  "gold sales".
11       MR. ROCCO: Can we highlight the second sentence.
12  "Atilla confirmed."
13  Q. To the best of your recollection, what did Mr. Atilla say?
14  Did he say in that conversation that he ceased intermediation
15  or did he say in that conversation that he ceased facilitation
16  of gold sales?
17  A. I can't recall the word that he used in 2013.
18  Q. And this doesn't help refresh your recollection?
19  A. No, this is a summary of the call. So we would have used
20  what we believed to be the most accurate term.
21  Q. So can you tell me what you recall Mr. Atilla said about
22  gold in that conversation, independent of this, if you have a
23  recollection? You may not.
24  A. Yeah, that Halk was no longer going to be making payments
25  or receiving payments for gold sales involving Iran.

HCC3ATI3          Szubin - Cross          Page 1516

1  Q. Did he go to that level of detail that he would neither
2  make payment or --
3       THE COURT: Whoa, wait. You asked him and that was
4  the answer.
5       MR. ROCCO: All right, your Honor. I won't press it
6  any further at this point. Or maybe ever.
7  Q. You testified earlier that the last meeting you had at
8  Halkbank you believe was in 2013; am I correct?
9  A. Yes.
10  Q. I asked you if you remember any subsequent meetings with
11  anyone at Halkbank after 2013. Do you have a recollection as
12  you sit here now of a later meeting with representatives of
13  Halkbank?
14  A. I recall a call in 2014, an in-person meeting I don't
15  recall.
16       MR. ROCCO: Mr. White, can we bring up 3513-031. Just
17  for Mr. Szubin, not for the jury.
18  Q. Just take a look at that document and read it to yourself.
19  A. I'm at the bottom of page one.
20  Q. We'll scroll to page two.
21  A. Okay.
22  Q. Does that refresh your recollection that you had a meeting
23  with representatives of Halkbank in Turkey in 2016?
24  A. Yes.
25  Q. Do you recall who you met with?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI3          Szubin - Cross          Page 1517

1  A. Ali Fuat Taskesenlioglu. My apologies for the
2  pronunciation.
3  Q. Anyone else? Was anyone else at the meeting?
4  A. Officials from the Ministry of Economy.
5  Q. Was there any other representative of Halkbank at the
6  meeting?
7  A. It suggests yes, but I can't tell you who.
8  Q. You don't recall meeting with Mr. Atilla that day, do you?
9  A. No.
10 Q. Then do you recall what the discussion involved?
11 A. The discussion involved how U.S. sanctions had changed in
12 light of the joint comprehensive plan of action and the
13 lessening of U.S. sanctions, but the fact that there were still
14 considerable sanctions to guard against.
15 Q. How long was that meeting?
16 A. I don't know.
17 Q. You don't know?
18 A. I don't know. Typically those meetings would be about 45
19 minutes to an hour.
20 Q. You testified on direct examination about a series of
21 notes. We're going to bring it up. This is 3513-12. These
22 are your notes; am I correct?
23 A. Yes.
24 Q. These notes were in connection with a conversation you had;
25 is that correct?

HCC3ATI3          Szubin - Cross          Page 1518

1  A. Yes.
2  Q. And that conversation took place, when was that; do you
3  recall?
4  A. This is May I believe of 2013.
5  Q. This was before gold sales to anyone in Iran to Iran or
6  anyone in Iran were obligated to cease; am I correct, by
7  July 1st?
8  A. Yes.
9  Q. In this conversation, where you indicate that you had a
10 telephone conversation, is that Halk?
11 A. Yes.
12 Q. And your notes indicate, these are contemporaneous notes,
13 that the conversation was with Mr. Aslan; is that correct?
14 A. Yes.
15 Q. And your testimony here today is that your conversation was
16 not with Mr. Aslan, it was with Mr. Atilla, and that was an
17 error?
18 A. Correct.
19 Q. You distinctly recall that that conversation was with
20 Mr. Atilla and not with Mr. Aslan; am I correct?
21 A. Yes.
22 Q. When did you first realize that, Mr. Szubin, realize that
23 error? Was it when you were preparing for your testimony here
24 today with prosecutors?
25 A. Yes. That's when I would have looked back at my

HCC3ATI3          Szubin - Cross          Page 1519

1  handwritten notes.
2  Q. This was in the past couple of months that you met with the
3  prosecutors and you recall that a conversation that you had
4  back in 2013 was not with Mr. Aslan, but was with Mr. Atilla?
5  A. Correct.
6  Q. You recall that these notes are incorrect; am I correct?
7  A. Yes.
8  Q. Is it fair to say that in your dealings with Halkbank over
9  the years, that Halkbank was responsive to inquiries that were
10 made of it by OFAC?
11 A. Yes.
12 Q. And that is inquiries that were made to Mr. Atilla or to
13 members of -- other members of management at Halkbank; am I
14 correct?
15 A. Mr. Atilla was responsive. Mr. Aslan was responsive. I
16 can't comment on other levels.
17 Q. In the course of your dealings, again, these are more
18 general questions, did you ever or to your knowledge did anyone
19 from Treasury ever ask Halkbank or Mr. Atilla to stop mediating
20 gold trade? Just stop it?
21 A. We did point out to Mr. Atilla that to continue to
22 facilitate gold sales to any Iranian person, after the new
23 sanctions went into effect, so that's June of 2013, or July 1st
24 of 2013, could expose Halkbank to sanctions. And we had
25 pointed out previously that selling gold, facilitating the

HCC3ATI3          Szubin - Cross          Page 1520

1  sales of gold to the Iranian government as of June, July 2012,
2  could expose Halkbank to sanctions.
3  Q. You knew that Halkbank was dealing with Reza Zarrab,
4  correct, at some point starting as early as 2012 or 2013. You
5  knew that Halkbank was dealing with Reza Zarrab; am I correct?
6  A. I had testified earlier that I can't recall when I learned
7  about Zarrab and his dealings with Halkbank.
8          MR. ROCCO: I have four questions, Judge. I'm
9  wrapping it up.
10 Q. But at some point you learned that Halkbank was dealing
11 with Mr. Zarrab?
12         THE COURT: That's been established now three or four
13 times.
14         MR. ROCCO: It is a basis for a question, Judge.
15         THE COURT: Three or four times this has already been
16 answered.
17 Q. Did you ever tell Halkbank to stop selling --
18         THE COURT: That's the question you've asked probably
19 four times.
20         MR. ROCCO: I won't ask it again, your Honor.
21 Q. Did you tell -- did you discuss with Halkbank the food
22 trade?
23 A. Yes.
24 Q. With Iran?
25 A. Yes.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

HCC3ATI3    Szubin - Redirect    Page 1521

1  Q. And humanitarian exceptions. Did you have suspicions in
2  the course of your dealing with Halkbank that Halkbank was not
3  properly following the humanitarian exception in its trade
4  facilitating or intermediating trade with Iran?
5        MR. DENTON: Objection to form, your Honor.
6        THE COURT: If you understand that.
7        THE WITNESS: Were we suspicious -- the question is
8  were we suspicious of Halkbank and whether it was appropriately
9  ascertaining that humanitarian trade was indeed legitimate?
10        THE COURT: That was the question.
11        THE WITNESS: Yes. We were suspicious.
12  Q. Did you discuss it with Mr. Atilla, or anyone else at
13  Halkbank?
14  A. Yes.
15  Q. Did you tell them to stop dealing in humanitarian -- trade
16  of humanitarian goods with Iran?
17  A. No, we told them they needed to be extremely careful. And
18  that if they weren't careful, they could face various
19  consequences.
20        MR. ROCCO: One moment. No further questions.
21        THE COURT: Any redirect?
22        MR. DENTON: Very briefly, your Honor.
23  REDIRECT EXAMINATION
24  BY MR. DENTON:
25  Q. Mr. Szubin, Mr. Rocco asked you some questions about your

HCC3ATI3    Szubin - Redirect    Page 1522

1  one-on-one pull aside meeting with Mr. Atilla. Do you remember
2  that?
3  A. Yes.
4  Q. There was something more you wanted to explain that he
5  wouldn't let you in order to be accurate.
6        MR. ROCCO: Objection.
7        THE COURT: Well, yes.
8  Q. Why don't you give us the explanation you wanted to give,
9  Mr. Szubin.
10  A. I'm sorry. At this point I'm not remembering.
11        THE COURT: You can be forgiven.
12  Q. Mr. Szubin, do you have any doubt in your mind as you sit
13  here that that pull aside in fact occurred?
14  A. I have no doubt. I would request a pull aside extremely
15  rarely. So, while it is difficult for me sitting here today,
16  as you can see, to remember the contents of different meetings
17  on different dates, this might have been one of two times in my
18  13 years at Treasury that I asked to see somebody one-on-one
19  after a larger meeting.
20  Q. Just to be clear, that pull aside meeting was with
21  Mr. Atilla; is that right?
22  A. Correct.
23        MR. DENTON: Mr. Chang-Frieden, if we could very
24  briefly put up Government Exhibit 7020. If we can just go the
25  to second page.

HCC3ATI3    Szubin - Redirect    Page 1523

1  Q. Mr. Szubin, do you remember Mr. Rocco asked you some
2  questions about whether Mr. Atilla's name appeared in this
3  document?
4  A. Yes.
5  Q. I don't want to go through every instance where it appears,
6  but where this document reflects representations made by
7  Halkbank in this meeting, who is the person at Halkbank who
8  made those representations?
9  A. Mr. Atilla.
10  Q. Then finally, do you remember Mr. Rocco asked you some
11  questions about actions taken by the Treasury Department in
12  2014 after the arrest of Reza Zarrab and Suleyman Aslan?
13  A. Yes.
14  Q. I want to direct your attention to October 10, 2014. Do
15  you know if David Cohen had a meeting with Mr. Atilla on that
16  day?
17  A. I don't know the date, but I know that he had meetings
18  around that period.
19        MR. DENTON: Just a moment, your Honor. Nothing
20  further, your Honor.
21        THE COURT: Okay. We are going to excuse the witness.
22  Thank you.
23        (Witness excused)
24        THE COURT: And we're going to -- I think I can't
25  decide if we're having lunch or we're going to go to the bar.

HCC3ATI3    Szubin - Redirect    Page 1524

1  But it's 12:55. If you can be back at 2 o'clock. We'll break
2  for lunch.
3        (Recess)
4        (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                              December 12, 2017

| HCCPATI4 | Sloan - Direct | Page 1545 |
|---|---|---|

1     MS. FLEMING: Yes, but it won't be long, but it's --
2     THE COURT: Okay.
3     (Continued on next page)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCCPATI4 | Sloan - Direct | Page 1546 |
|---|---|---|

1          (In open court)
2     BY MR. DENTON:
3     Q. Again, Mr. Sloan, just at a very high level, you talked
4     about entities that are listed. Are there sanctions compliance
5     concerns, other than just not dealing with listed entities?
6     A. Sanctions compliance concerns other than not dealing with
7     listed entities?
8     Q. That was a bad question. Are you familiar with sanctions
9     that prohibit dealing with people acting on behalf of
10    designated entities?
11    A. Yes. You've got sanctions programs that forbid the direct
12    or indirect facilitation of any prohibited party under the
13    sanctions regulations. So what's interesting, I suppose in my
14    profession, is the moment that those matters include both
15    sanctions issues but also anti-money laundering or money
16    laundering issues.
17         To the extent that you have a company, a front company
18    perhaps or a third company, that is actually conducting
19    business on behalf of a sanctioned party, with the intent to
20    disguise or conceal or otherwise help make sure that the dollar
21    flows and, in our case, in Deutsche New York's case, are
22    facilitated.
23    Q. And, again, without getting into the nuts and bolts, does
24    Deutsche Bank take steps in order to avoid that kind of
25    sanctions evasion?

| HCCPATI4 | Sloan - Direct | Page 1547 |
|---|---|---|

1     A. Yes, we do.
2     Q. Focusing on a particular sanctions program, specifically
3     the sanctions with respect to Iran, are there particular
4     concerns for Deutsche Bank that that sanctions program
5     implicates?
6     A. Absolutely. We are forbidden to directly or indirectly
7     facilitate any transaction involving Iran, the government of
8     Iran, the persons and entities of Iran, to the extent that they
9     are in accordance with the Iranian transaction regulations and
10    other related political sanctions.
11    Q. And do transactions involving, or potentially involving,
12    Iran implicate any particular concerns for detecting sanctions
13    evasion?
14    A. Could you repeat the question, sir?
15    Q. Are there particular difficulties in detecting sanctions
16    evasion, as focused on Iran specifically?
17    A. Absolutely. Look, the Iranian economy is predominantly
18    petroleum based. The petroleum industry is predominantly U.S.
19    dollar based. In order for the Iranian economy to function,
20    it, therefore, must conduct a lot of its business in U.S.
21    dollars.
22         Because of the prohibitions involving trading
23    transaction facilitating on behalf of Iranians and Iranian
24    persons, and because their economy is dependent on U.S.
25    dollar-denominated transactions because of the oil, third

| HCCPATI4 | Sloan - Cross | Page 1548 |
|---|---|---|

1     parties are often utilized to disguise the transactions.
2          Deutsche Bank is a correspondent banking provider.
3     We're not talking about our customers. We're talking about our
4     customers' customers. Right? We don't know our customers'
5     customer on the other side of the planet. We have to -- and,
6     therefore, it becomes extremely difficult for us, in our
7     capacity, to make a determination, is this customer on the
8     other side of the world truly engaging in business for its own
9     behalf, or is it also engaging in business that, were we to
10    know, we would be prohibited under U.S. law from facilitating
11    it.
12    Q. Is it fair to say that you depend on your customer banks to
13    provide you with information about that?
14    A. It is absolutely critical.
15         MR. DENTON: No further questions, your Honor.
16         MS. FLEMING: Briefly, your Honor.
17    May I proceed?
18         THE COURT: Sure.
19    CROSS-EXAMINATION
20    BY MS. FLEMING:
21    Q. Good afternoon, Mr. Sloan.
22    A. Good afternoon.
23    Q. My name is Cathy Fleming, and we met very briefly over the
24    lunch break, correct?
25    A. Yes, ma'am.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                     December 12, 2017

| HCCPATI4 | Sloan - Cross | Page 1549 |
| --- | --- | --- |

1 Q. Now, you've told us your background at Deutsche Bank. You
2  worked there for a number of years, correct?
3 A. Yes, ma'am.
4 Q. Deutsche Bank is a very large bank, correct?
5 A. Yes, ma'am.
6 Q. Has lots and lots of employees, correct?
7 A. Yes, ma'am.
8 Q. And there are many departments within Deutsche Bank?
9 A. Yes.
10 Q. Isn't that also true?
11 A. Yes, ma'am.
12 Q. So Deutsche Bank has not only an employment department, it
13  has a compliance department, correct?
14 A. Yes, ma'am.
15 Q. And it has a sanctions group, doesn't it, sir?
16 A. Yes.
17 Q. And it has a Treasury Department that also deals with some
18  of the operations you've described; isn't that true?
19 A. Yes, ma'am.
20 Q. And does Deutsche Bank have a SWIFT room that takes these
21  SWIFT memos that come in to Deutsche Bank with instructions on
22  SWIFT memoranda?
23 A. Yes.
24 Q. And you told us earlier that there are millions of
25  transactions that come in, did you say, on a daily basis to

| HCCPATI4 | Sloan - Cross | Page 1550 |
| --- | --- | --- |

1  Deutsche Bank?
2 A. Globally, there are millions of payments that are
3  facilitated throughout the world. I don't have the exact
4  figure or the average running rate for Deutsche Bank here in
5  New York.
6 Q. Do you happen to know how many people, for example, work in
7  the New York headquarters SWIFT room, just getting these SWIFT
8  messages at Deutsche Bank every day?
9 A. I do not know the exact number. It would certainly be
10  dozens, at least.
11 Q. And you talked about some of the anti-money laundering
12  programs that Deutsche Bank employs to help it in making sure
13  that it is complying with numerous sanction programs, correct?
14 A. Yes.
15 Q. And to be clear, it's not only United States' sanctions
16  programs; there are other sanctions programs globally, correct?
17 A. Yes.
18 Q. So the UN has sanctions programs, correct?
19 A. Yes.
20 Q. And the United Kingdom has sanctions programs, correct?
21 A. Yes.
22 Q. And I think Canada has sanctions programs, correct?
23 A. I believe so.
24 Q. And fair to say the United States is far more complex than
25  any of the rest of them?

| HCCPATI4 | Sloan - Cross | Page 1551 |
| --- | --- | --- |

1       THE COURT: I don't get the question.
2       MS. FLEMING: All right. I'll withdraw.
3 Q. More difficult to read and understand than the rest of
4  them?
5       THE COURT: What, the United States?
6       MS. FLEMING: Withdrawn. Bad question, your Honor.
7  I'll move on.
8       THE COURT: I mean, I'd love to help you. I just
9  didn't understand.
10       MS. FLEMING: Judge, I'll take all the help I can get.
11 BY MS. FLEMING:
12 Q. Is it fair to say that the United States' sanctions regime
13  is more complex in terms of its instructions than, for example,
14  the UK sanctions regime?
15       THE COURT: If you know.
16 A. Thank you. To the extent that I have been engaged in the
17  various sanctions requirements that have come across -- that
18  have come to my attention, I would tend to agree that the U.S.
19  sanctions regime tends to have a lot of technical elements to
20  it that increase its complexity relative to those that I have
21  seen in the European union, the United Kingdom, the United
22  Nations.
23 Q. And when you talked about the various procedures and tools
24  that are used by Deutsche Bank to help it prevent being in
25  violation of these various sanctions, you used the term that

| HCCPATI4 | Sloan - Cross | Page 1552 |
| --- | --- | --- |

1  there are some blocked transactions, correct?
2 A. If I said blocked, that is a term. We would have to define
3  it.
4 Q. A blocked transaction is when a transaction comes in that
5  one of the tools, one of the systems in place picks up that's a
6  prohibited transaction? That's at least one kind of a blocked
7  transaction, correct?
8 A. I think I used the word stopped or tagged. Okay?
9  Transaction, we have various names and variations of the names
10  on our systems. When a payment comes in, if there's any
11  similarity to a name or a series of characters on the payment
12  message, right, the SWIFT message, that comes close to -- what
13  do I mean by that? I mean there is an algorithm. There are
14  different algorithms in the computer system that determines
15  with what degree of probability a name in the payment message
16  matches up to a name on any of the sanctions list, that payment
17  will stopped. The payment is essentially held in suspense,
18  right, until such time it's been reviewed by a series of
19  individuals, in different control functions, in the
20  payments department, the dedicated team, as well as the
21  sanctions compliance department, to the extent that there's any
22  escalation to it. Right?
23       A block can mean just stop the payment and kick it
24  back. In OFAC, specific OFAC technical jargon, it will mean
25  seize it, seize the funds. Now, there are some sanctions

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 12, 2017

HCC3ATI5          Sloan - Cross          Page 1557

1 Q. And that is the first transaction that Deutsche Bank sees,
2    correct?
3 A. The first --
4 Q. That payment instruction?
5 A. The payment instruction has the entire story.
6 Q. Well, it has the story as to who is asking -- the Ziraat
7    Bank is asking you to pay its customer, correct?
8 A. Ziraat Bank is giving us instructions from -- with all the
9    parties involved, from who it starts to and who it ends to and
10   the originating bank and the beni bank, and according to the
11   SWIFT rules of what is required to be -- there are rules that
12   SWIFT puts out as to what the minimum requirements in every
13   payment message would have to have. If it fails a SWIFT
14   regulation, regardless of sanctions, regardless of money
15   laundering, that payment should not be processed. It should be
16   stopped and corrected or rejected and returned, so it could be
17   corrected by the appropriate party.
18 Q. By the way, SWIFT -- SWIFT messages are able to be viewed
19   by American regulatory authorities; isn't that correct?
20          MR. DENTON: Objection, your Honor.
21          THE COURT: If you know.
22          THE WITNESS: Is the question if I know?
23          THE COURT: If you know. She's asking all SWIFT
24   messages, if I understand the question, can be viewed by
25   American authorities.

HCC3ATI5          Sloan - Cross          Page 1558

1          THE WITNESS: I do not believe that's true, unless
2    they've been subpoenaed, SWIFT has been subpoenaed, and they've
3    complied with the subpoena.
4 Q. If SWIFT is subpoenaed, SWIFT is in the United States,
5    correct?
6 A. I believe they still have their offices on the Eastern
7    Seaboard, yes.
8 Q. In the United States. On the Eastern Seaboard?
9 A. Yes, ma'am. There was a debate after 9/11 whether they
10   would leave the United States. Because of --
11 Q. I'm sorry to direct you. I'm trying to focus, all right?
12 A. Okay.
13          THE COURT: But where are you leading, is the
14   question. You want to focus him.
15          MS. FLEMING: Your Honor, my question was is they're
16   in the United States, correct.
17          THE WITNESS: I believe they are.
18 Q. Thank you. Now, with the transaction that we saw before,
19   with the transaction that we saw -- could I impose on you to
20   bring up the exhibit again with Centrica.
21          This is Centrica General Trading. I don't know the
22   exhibit number. I'm sorry. 101-4. This is the transaction
23   that you went through on direct examination. Do you recall
24   that?
25 A. Yes, ma'am.

HCC3ATI5          Sloan - Cross          Page 1559

1 Q. This is a dollar transaction, correct?
2 A. Yes, ma'am.
3 Q. It started out in a dollar account, correct?
4 A. It started as a dollar denominated account at the
5    originating bank according to this.
6 Q. And the originating bank is?
7 A. Ziraat Bank. That would be further to the right column J,
8    perhaps. I'm not exactly sure which column. It is Ziraat
9    Bankasi.
10 Q. Ziraat Bankasi in Turkey, correct?
11 A. Yes.
12 Q. Ziraat Bankasi had a dollar account, correct?
13 A. They, they -- Ziraat Bankasi offered a dollar account,
14   dollar denominated account for Centrica General Trading, and
15   Ziraat Bankasi maintains a dollar denominated account at
16   Deutsche Bank Trust Company Americas, and possibly other U.S.
17   money center banks.
18 Q. You talked about all of the procedures and tools that
19   Deutsche Bank uses to try to prevent any kind of violations of
20   sanctions and other rules, correct?
21 A. Yes.
22 Q. But even despite all of that, Deutsche Bank has had its
23   violations of sanctions and other rules, hasn't it?
24 A. Yes it has.
25 Q. In fact, Deutsche bank had a $7.2 billion settlement with

HCC3ATI5          Korkmaz - Direct          Page 1560

1    the Department of Justice within the last several years,
2    correct, for violations?
3 A. Not for sanctions.
4 Q. Didn't they have a $630 million sanctions settlement
5    related to Russian money laundering within the last two years?
6          MR. DENTON: Objection.
7          THE COURT: Sustained.
8          Relevance. Foundation.
9          MS. FLEMING: Subject to connection? Opinion?
10   Nothing further, your Honor. Thank you.
11         MR. DENTON: Nothing further, your Honor.
12         THE COURT: Thanks a lot, Mr. Sloan.
13         THE WITNESS: Thank you, your Honor.
14   (Witness excused)
15         THE COURT: Next witness would be who?
16         MR. LOCKARD: We're going to resume with Mr. Korkmaz.
17         THE DEPUTY CLERK: Sir, before we begin, I'd like to
18   remind you that you're still under oath.
19         THE WITNESS: Yes.
20         THE DEPUTY CLERK: Thank you.
21   HUSEYIN KORKMAZ,
22      called as a witness by the Government,
23      having been previously sworn, testified as follows:
24 DIRECT EXAMINATION (Continued)
25 BY MR. LOCKARD:

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI5 | Korkmaz - Direct | Page 1561 |

1 Q. Good afternoon, Mr. Korkmaz.
2 A. You too as well, sir.
3 Q. So, yesterday you testified about your arrest in Turkey in
4 September of 2014.
5 A. Yes.
6 Q. Could you briefly describe the basis of that arrest in
7 September of 2014.
8 A. Certainly. Apparently there was another investigation that
9 is known by the public as the December 25 investigation. That
10 was conducted by the Financial Crimes Unit also, but that was
11 not related to the investigation that I was conducting on
12 Mr. Reza Zarrab.
13     And apparently, this investigation known as the 25th
14 of December investigation, involved corruption by certain
15 individuals including the then prime minister Recep Tayyip
16 Erdogan, also Bilal Erdogan, and other ministers, such as
17 Binali Yildirim, and this was somewhat like the corruption case
18 in Reza Zarrab.
19 Q. Were you arrested as part of an operation against the
20 investigators who had conducted that December 25 investigation?
21 A. Yes, exactly so.
22     THE COURT: Counsel, could you repeat the question or
23 could we have a readback.
24     (The record was read).
25 Q. So in other words --

| HCC3ATI5 | Korkmaz - Direct | Page 1562 |

1     THE COURT: There was a third investigation? Is that
2 what that means?
3     MR. LOCKARD: Depending on whether you count the
4 investigation against the investigation.
5     I'll ask a couple additional questions to clarify.
6     THE COURT: I am trying to get it straight.
7 Q. Mr. Korkmaz, you had described another investigation,
8 another corruption investigation known as the December 25
9 investigation; is that right?
10 A. Yes.
11 Q. Could you just explain why was it called the December 25
12 operation or the December 25 investigation?
13 A. After we were removed from duty, the prosecutor for that
14 investigation had given the go ahead to conduct an operation
15 for that investigation. And the go ahead was given on
16 December 25, hence it was called the December 25 investigation.
17 Q. That was on December 25 of 2013?
18 A. Yes, sir.
19 Q. On the date that you were arrested, were there a number of
20 additional arrests of investigators who had participated in the
21 investigation known as the December 25 investigation?
22 A. Yes, sir.
23 Q. Had you participated in any way in that December 25
24 investigation or the operation on December 25 of 2013?
25 A. No.

| HCC3ATI5 | Korkmaz - Direct | Page 1563 |

1 Q. Can you just remind us in fact where you were assigned on
2 December 25 of 2013?
3 A. I had been assigned to the Bridge Protection Unit
4 Directorate.
5 Q. Did there come a time when you were also charged with
6 crimes allegedly arising out of your participation in the
7 investigation that you conducted that resulted in the operation
8 on December 17 of 2013?
9 A. Later on I did, yes.
10 Q. Just to be clear, are both sets of charges still pending?
11 A. Yes.
12 Q. Also yesterday you had talked about some supervisors in the
13 Financial Crimes Unit who were reassigned in the days following
14 the December 17 operation; do you recall that?
15 A. Yes, sir.
16 Q. What about in the prosecutor's office? Were there any
17 reassignments following the December 17 operation?
18 A. Yes.
19 Q. And can you describe who was reassigned and when that
20 happened?
21 A. On December 18, the day after the operation, two other
22 prosecutors were added to the prosecutor that had been assigned
23 to the investigation.
24 Q. Was the original prosecutor at some point reassigned from
25 the case?

| HCC3ATI5 | Korkmaz - Direct | Page 1564 |

1 A. Yes, sir.
2 Q. Are criminal charges also pending against that prosecutor
3 and other investigators who, along with you, participated in
4 that investigation?
5 A. That is correct.
6 Q. So, Mr. Korkmaz, just a couple more questions before we
7 turn back to the evidence that you gathered.
8     Since you've come to the United States, have you been
9 employed?
10 A. No.
11 Q. Since you have come to the United States, have you applied
12 for work authorization?
13 A. Yes.
14 Q. Have you received it?
15 A. Yes, I received a response recently, yes.
16 Q. When did you receive the work authorization?
17 A. It's about two weeks, maybe a few days more than two weeks.
18 I received it about that time.
19 Q. Since you've come to the United States, have you received
20 assistance with living expenses?
21 A. Yes.
22 Q. Can you briefly describe what that assistance has been.
23 A. The prosecutor's office has provided $300 on three
24 occasions for a total of $900. And the FBI has provided
25 $50,000.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

| HCC3ATI5 | Korkmaz - Direct | Page 1577 |
|---|---|---|

1    MR. LOCKARD: Mr. Chang-Frieden, if you can send us to
2  page 10.
3  Q.  Mr. Korkmaz, do you see an entry for August 31 of 2013?
4  A.  I apologize for not waiting first, but yes, the answer is
5   yes.
6  Q.  For 1.5 million Turkish lira?
7  A.  That is correct.
8  Q.  If we could look at page 15.  Do you see another entry for
9   August 31 of 2013?
10  A.  Yes.
11  Q.  How much is that for?
12  A.  It is 2 million euros.
13  Q.  Mr. Korkmaz, yesterday you had described a delivery of
14   money on August 30 of 2013.  Do you recall that?
15  A.  Yes, sir.
16  Q.  The victory day delivery?
17  A.  That is correct.
18  Q.  How do those three entries that we just looked at compare
19   to the money that was delivered on that day?
20       MR. HARRISON: Objection to form.  I don't think I
21  understand the question.
22       THE COURT: I don't either.  Could you rephrase.
23       MR. LOCKARD: Yes.
24  Q.  Mr. Korkmaz, what was the amount of the money delivered on
25  August 30, 2013?

| HCC3ATI5 | Korkmaz - Direct | Page 1578 |
|---|---|---|

1  A.  It was $2 million, 2 million euros, and one and a half
2   million Turkish liras.
3  Q.  Who were the individuals who delivered the money?
4  A.  It was Mohammed Sadik Rastgarshishegh, with the code name
5   Sadik, and also it was Ahmet Murat Ozis.
6  Q.  Mr. Korkmaz, in describing your investigation, you also
7   talked about intercepted telephone communications as part of
8   that investigation; is that right?
9  A.  Yes.
10  Q.  What types of telephone communications were intercepted?
11  A.  I'm sorry, you mean regarding this particular topic?
12  Q.  No, not about any particular subject matter.  Let me ask a
13   slightly different question.
14       Did the intercepts include electronic communication as
15   well as voice calls?
16  A.  That is correct.
17  Q.  Did it include electronic communications by app such as
18   WhatsApp or Viber?
19  A.  No.
20  Q.  Earlier you had described the approximate number of
21   telephone lines that were intercepted during the course of the
22   investigation; is that right?
23  A.  Yes.
24  Q.  Were any Halkbank office numbers subject to interception?
25  A.  No, we did not intercept any landlines as a target there.

| HCC3ATI5 | Korkmaz - Direct | Page 1579 |
|---|---|---|

1  Q.  Would a telephone call placed to or from a Halkbank office
2   be intercepted if they were placed to or from another telephone
3   that was being intercepted?
4  A.  Yes.
5  Q.  During the course of the investigation, did you listen to
6   recordings of audio that had been intercepted from the
7   wiretaps?
8  A.  Yes.
9  Q.  Did you review transcripts of calls that had been
10   intercepted?
11  A.  Yes.
12  Q.  Approximately how many telephone calls and transcripts did
13   you review during the entire course of the investigation,
14   approximately?
15  A.  I would say that it was probably between 250 and 1,000.
16  But, the more correct way to say that might be to say hundreds
17  of them.  But it could also be 2,000.  I can't really set a
18  certain number.
19  Q.  Fair to say it was a lot?
20       Withdrawn.
21  A.  It was a lot based on the -- the audio recordings that
22  constituted an element of crime within the investigation.
23       MR. LOCKARD: Your Honor, if I may approach?
24       THE COURT: Sure.
25       MR. LOCKARD: I'm handing the witness two discs that

| HCC3ATI5 | Korkmaz - Direct | Page 1580 |
|---|---|---|

1  have been marked for identification as Government's Exhibit 150
2  and 200.
3  Q.  Mr. Korkmaz, do you recognize those two discs?
4  A.  Yes.
5  Q.  What's contained on Government's Exhibit 150?
6  A.  I couldn't remember the contents of 150 at this point.  But
7   when you had given them to me, I had compared it to the
8   evidence that I had.
9  Q.  It's been a lot of discs.  Do you remember the contents of
10   Government's Exhibit 200?
11  A.  Yes.
12  Q.  What is contained on Government's Exhibit 200?
13  A.  It had audio recordings and transcripts.
14  Q.  Were they audio recordings of telephone calls intercepted
15   as part of the investigation that you had conducted?
16  A.  Yes.
17  Q.  Did you review the transcripts that had been provided to
18   you relating to those calls?
19  A.  That is right.
20  Q.  Did those transcripts include both Turkish language
21   transcription and English language translation?
22  A.  That is correct.
23  Q.  Did you compare the Turkish language transcription against
24   the audio?
25  A.  Yes.

**A660**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 12, 2017

---

HCC3ATI7 — Page 1617

1   never have approved it. But I guess it happened.
2       MR. ROCCO: Mr. Atilla's wife is getting phone calls
3   and that's what brought it to our attention. We had no idea
4   that they had accessed it and YouTube had it and played it.
5       THE COURT: Okay. I thought he was suggesting that
6   you said it was okay.
7       MS. FLEMING: No.
8       THE COURT: But you did not.
9       MS. FLEMING: No.
10      THE COURT: That's good to know. So now they're
11  asking for the same for Zarrab, which I don't think is in
12  evidence.
13      MS. FLEMING: That's right.
14      THE COURT: Either in the case. So, but I may ask you
15  to comment on that. Do you feel that they should have that?
16      MR. LOCKARD: No. So I can explain my understanding
17  of what happened with the post-arrest video for Mr. Atilla.
18      THE COURT: Let's do it at another time. I'll come
19  back to you if I need a comment or if you want -- do you have a
20  thought about that?
21      MR. ROCCO: No.
22      MS. FLEMING: We didn't think anything was
23  intentional. We thought it was an inadvertent unfortunate
24  problem.
25      THE COURT: In your opinion, it should not have

---

HCC3ATI7 — Page 1618

1   happened.
2       MR. ROCCO: It absolutely should not have happened.
3       THE COURT: Just shorthand, are you for it or against
4   it, so to speak?
5       MR. LOCKARD: So I'm not sure if we are talking about
6   Mr. Atilla's or Mr. Zarrab's.
7       THE COURT: Well, Atilla's -- I would be against both
8   as well. So okay. Good. All right. There you go.
9       MS. FLEMING: While we're off the record.
10      THE COURT: That was on record.
11      MS. FLEMING: While we're off.
12      (Discussion off the record)
13      (Adjourned until December 13, 2017, at 9:15 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 1619

1                INDEX OF EXAMINATION
2   Examination of:                          Page
3   ADAM SZUBIN
4   Direct By Mr. Denton . . . . . . . . . . . .1407
5   Cross By Mr. Rocco . . . . . . . . . . . . .1463
6   Redirect By Mr. Denton . . . . . . . . . . .1521
7   DOUGLAS SLOAN
8   Direct By Mr. Denton . . . . . . . . . . . .1526
9   Cross By Ms. Fleming . . . . . . . . . . . .1548
10  HUSEYIN KORKMAZ
11  Direct By Mr. Lockard . . . . . . . . . . .1560
12              GOVERNMENT EXHIBITS
13  Exhibit No.                          Received
14  7020    . . . . . . . . . . . . . . . . . .1423
15  7006    . . . . . . . . . . . . . . . . . .1435
16  7009    . . . . . . . . . . . . . . . . . .1447
17  7015    . . . . . . . . . . . . . . . . . .1457
18  7016    . . . . . . . . . . . . . . . . . .1459
19  8101-4  . . . . . . . . . . . . . . . . . .1535
20  701-832 . . . . . . . . . . . . . . . . . .1566
21  901-930, 601-604, 606, 608, 609, 611-614   .1569
22  960-964 . . . . . . . . . . . . . . . . . .1574
23  950, 605, 607  . . . . . . . . . . . . . . .1575
24
25

---

Page 1620

1   201 through 269-A and -T, 273 and 274-A . . .1586
2           and -T, 276 through 279-A and
3           -T, 288-A and -T, 291-A and
4           -T, 293 through 295-A and -T,
5           297 through 298-A and -T, 300
6           and 301-A and -T, 304 through
7           306-A and -T, 308 and 309-A
8           and -T, 316-A and -T, 326-A
9           and -T, 336 through 357-A and
10          -T, 359-A and -T, and 380 and
11          381-A and -T
12              DEFENDANT EXHIBITS
13  Exhibit No.                          Received
14  220   . . . . . . . . . . . . . . . . . . .1486
15
16
17
18
19
20
21
22
23
24
25

---

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 13, 2017*

*Southern District Court Reporters*

Original File HCD3ATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

HCDPATI1          Trial                Page 1621

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4        v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6             Defendant.
 7   ------------------------------x
 8
 9                          December 13, 2017
                                 9:15 a.m.
10
11
12   Before:
13             HON. RICHARD M. BERMAN,
14                         District Judge
                            and a jury
15
16
17             APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25

HCDPATI1          Trial                Page 1622

 1
 2        (APPEARANCES Continued)
 3
 4   HERRICK, FEINSTEIN LLP (NYC)
          Attorneys for defendant Atilla
 5   BY:  VICTOR J. ROCCO, Esq.
          THOMAS ELLIOTT THORNHILL, Esq.
 6             - and -
     FLEMING RUVOLDT, PLLC
 7   BY:  CATHY ANN FLEMING, Esq.
          ROBERT J. FETTWEIS, Esq.
 8             - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10             Of counsel
11
12   Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15
16
17
18
19
20
21
22
23
24
25

HCDPATI1          Trial                Page 1623

 1        (Trial resumed; jury not present)
 2        (At the side bar)
 3        MR. KAMARAJU: Morning, your Honor.
 4        MS. FLEMING: Hi, Judge.
 5        THE COURT: Hi, how are you today?
 6        MS. FLEMING: Good.
 7        MR. KAMARAJU: So I think the parties are stipulating
 8   to a number of testimonial stips to trim down the trial,
 9   including internet service providers with respect to e-mails,
10   bank record custodians with respect to those kinds of
11   foundational requirements, and the FDIC status of the various
12   victim banks.
13        Pursuant to those stipulations, the government intends
14   to move in the exhibits that are sort of -- the foundation is
15   laid for through those.  Defense counsel, I think, and I'll let
16   her speak for herself, but defense counsel had a question as to
17   how to sort of preserve an objection.
18        MS. FLEMING: They put in here that, therefore, it may
19   be admitted in evidence.  We want to preserve our subject to
20   and relevance objections on certain of them.  So we can either
21   add the language "subject to" but that takes it out of your --
22   it's kind of presumptuous to say "they may be admitted subject
23   to."
24        THE COURT: I don't mind.
25        MS. FLEMING: As long as you didn't mind, we didn't

HCDPATI1          Trial                Page 1624

 1   want to be presumptuous.
 2        THE COURT: No problem.  Are you going to read them as
 3   part of the direct case?
 4        MR. KAMARAJU: Yes, we're going to read the
 5   stipulation.
 6        THE COURT: You can make that change.
 7        MS. FLEMING: Okay.  I just wanted to make sure that
 8   we didn't waive anything, and we were preserving our
 9   objections.
10        THE COURT: Okay.  Thanks.
11        MR. KAMARAJU: Thanks, Judge.
12        THE COURT: We don't have all the jurors yet, that's
13   what we're waiting for.
14        MR. KAMARAJU: Okay, thanks.
15        (In open court)
16        (Pause)
17        MR. HARRISON: Judge, can we approach just briefly?
18        THE COURT: Yes, sure.
19        (At the side bar)
20        MR. HARRISON: I just sort of wanted to front
21   something briefly, Judge.  Mr. Lockard, I think with this
22   witness, and he and I have talked, is going to try to elicit
23   from this witness his recollection of what was on some
24   audiotapes that we don't have.
25        THE COURT: Okay.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

HCDPATI1          Korkmaz - Direct          Page 1641

1  October, and between the 4th and 6th of October 2012 they had
2  meetings, and I understand this based on the evidence that's in
3  the investigation.
4      THE COURT: And you understand what?
5      THE INTERPRETER: And I understand this based on the
6  evidence that is in the investigation.
7      THE COURT: Okay. Yes.
8      THE WITNESS: And then in the 11th month, November, on
9  November 8th, 2013, they had a meeting.
10     THE COURT: Oh, 2013?
11     THE WITNESS: I apologize. That was 2012.
12 BY MR. LOCKARD:
13 Q. And then again, just to complete the timeline, what were
14  the dates of the meetings in April and May of 2013?
15 A. It was April 10th, 2013; May 3rd, 2013.
16 Q. And I think you said earlier that we know from the call
17  about the Tupras payments, that the Iranian delegation was
18  still in Turkey on the 14th of April as well?
19     MR. HARRISON: Objection to leading, your Honor.
20     THE COURT: Overruled.
21 A. That is correct. That is what was understood from me.
22 Q. I believe I asked if you were able to determine from the
23  investigation, one way or another, whether Mr. Atilla was at
24  those meetings?
25     MR. HARRISON: Objection, your Honor.

HCDPATI1          Korkmaz - Direct          Page 1642

1      THE COURT: Overruled.
2 A. No.
3 Q. So let's now turn to early July of 2013. I believe you
4  had -- well, did your investigation develop evidence relating
5  to food transactions involving Iranian oil money during that
6  time period, July of 2013?
7 A. Yes. So as far food, was the question referring to any
8  real food trades? Because that's not what I meant.
9 Q. Did your investigation develop evidence relating to
10  purported food transactions in July of 2013?
11 A. That is correct.
12 Q. In your investigation, did you learn of a call on July 2nd,
13  2013, between --
14     THE COURT: I'm sorry, I can't hear you, counsel.
15 Q. Sorry. Did you learn of a call on July 2nd of 2013 between
16  Mr. Zarrab and Mr. Atilla?
17 A. There was a high volume of conversations during that time
18  with regards to food; so in terms of which specific
19  conversation you might be referring to, I don't know.
20 Q. Do you recall there being such calls at that time?
21 A. Yes.
22     MR. LOCKARD: Your Honor, if I may approach?
23     THE COURT: Yes.
24 Q. So, Mr. Korkmaz, I'm going to hand you what's been marked
25  for identification as Government's Exhibit 115.

HCDPATI1          Korkmaz - Direct          Page 1643

1      (Pause)
2      So does that refresh your recollection as to a
3  particular call between Mr. Zarrab and Mr. Atilla on July 2nd,
4  2013?
5 A. Yes, I do recall the content of this conversation.
6 Q. All right. Is that a call that was intercepted in the
7  course of your investigation?
8 A. That is correct.
9 Q. Is that a call that you listened to during the
10  investigation?
11 A. Yes, I remember checking this audio before the operation.
12 Q. So --
13     THE COURT: Is there an audio of this call?
14     MR. LOCKARD: Yes, your Honor.
15 Q. Were you able to keep a copy of that recording after the
16  investigation?
17 A. No.
18 Q. Okay.
19     THE COURT: Then you can ask if, apart from the
20  exhibit, his recollection has been refreshed.
21     MR. LOCKARD: Exactly, your Honor.
22 Q. So, Mr. Korkmaz, if you could please put Exhibit 115 to the
23  side. I'll ask you some questions about your recollection of
24  that recording.
25 A. Mmm, hmm.

HCDPATI1          Korkmaz - Direct          Page 1644

1 Q. What was the general topic of discussion in that
2  conversation between Mr. Zarrab and Mr. Atilla?
3      MR. HARRISON: Objection based on hearsay.
4      THE COURT: Overruled.
5 A. They were talking about the transit food trade that they
6  would actively get involved in during that time.
7 Q. And was there any particular aspect of that trade that was
8  discussed in this call?
9 A. That is correct.
10 Q. And what was that?
11 A. It is mentioned that a payment had been received for
12  150,000 tons of wheat, and Mr. Hakan then says that this was
13  not practically physically possible, based on what Mr. Reza had
14  told him before about transporting the goods on wooden ships
15  with 5,000 or 10,000 capacity. And Reza Zarrab says but this
16  is how it's done over there.
17      And I recall that Mr. Hakan Atilla had said, in that
18  case, the vessel would have to go back and forth 30, 40 times.
19  And I recall that Mr. Reza had said that they made a technical
20  error in terms of the transfer amount, and I recall that early
21  in the conversation there was an explanation such as this. And
22  Reza Zarrab says that we had already said that we cannot
23  provide bill of lading because, as I had mentioned to you
24  before, these are small vessels. They are not like those large
25  vessels. And I recall that Mr. Hakan had responded to that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

| HCDPATI1 | Korkmaz - Direct | Page 1645 |
|---|---|---|

1  when he had said that 150,000 tons is not really physically
2  practically possible.
3  Q. Mr. Korkmaz, do you remember, or are you familiar with,
4  another call between Mr. Zarrab and Mr. Atilla that same day?
5  A. I do remember that there was another call on that day based
6  on the investigation.
7  Q. Another call between Mr. Zarrab and Mr. Atilla on July 2nd,
8  2013?
9  A. That is correct.
10 Q. And is that a call that you -- that was intercepted in the
11 course of the investigation?
12 A. That is correct.
13 Q. Is that a recording that you listened to during the course
14 of the investigation?
15 A. I recall checking all the sound recordings, including Hakan
16 Atilla, that already reported the transit trade, and I've been
17 checking these calls prior to the operation.
18       (Continued on next page)
19
20
21
22
23
24
25

| HCD3ATI2 | Korkmaz - Direct | Page 1646 |
|---|---|---|

1  Q. Were you able to keep a copy of that recording after the
2  investigation was over?
3  A. No, I believe this was among those audio files that I could
4  not obtain.
5  Q. What do you remember was the topic of that conversation?
6  A. I remember that it was related to this conversation. I
7  recall that I --
8       MR. HARRISON: Same objection to hearsay.
9       THE COURT: Overruled.
10 A. I recall in this conversation, the previous conversation,
11 Mr. Hakan Atilla said let me talk to my colleagues and get back
12 to you.
13      THE COURT: I'm sorry. In which conversation?
14      THE INTERPRETER: When he says "this" he's pointing at
15 the one he has in front of him.
16      THE COURT: You mean what you just described a few
17 minutes ago?
18      THE WITNESS: That is correct, your Honor.
19      THE COURT: So, start it again.
20 A. I recall that in the conversation that we discussed
21 earlier, that Mr. Hakan Atilla had said I'm not familiar with
22 this topic, let me talk with the colleagues and get back to
23 you. And I recall this other conversation to be a callback
24 from that call. I recall that they talked about a problem
25 coming up, because of what Reza Zarrab's people had sent to

| HCD3ATI2 | Korkmaz - Direct | Page 1647 |
|---|---|---|

1  Halkbank on documents showed that origin of the goods was
2  Dubai, and that this was not necessarily related to the
3  shipment, but it was related to the origin being mentioned on
4  the document.
5  Q. Can you remind us what were the goods?
6  A. Wheat.
7  Q. Mr. Korkmaz, do you remember a third call also on July 2nd
8  of 2013 between Mr. Atilla and Mr. Aslan?
9  A. I can't recall exactly.
10      MR. LOCKARD: Your Honor, may I approach?
11      THE COURT: Yes.
12 Q. Mr. Korkmaz, I'm handing you what's been marked for
13 identification as Government's Exhibit 118.
14      (Pause)
15 Q. Mr. Korkmaz, does that refresh your recollection as to a
16 particular call on July 2nd of 2013 between Mr. Atilla and
17 Mr. Aslan?
18 A. That is right.
19 Q. Is that a conversation that was intercepted in the course
20 of your investigation?
21 A. That is right.
22 Q. Did you listen to the recording of that call during your
23 investigation?
24 A. That is right. I had checked it prior to the operation.
25 Q. Were you able to keep a copy of that recording after the

| HCD3ATI2 | Korkmaz - Direct | Page 1648 |
|---|---|---|

1  investigation?
2  A. I understand that this was not among the section that I had
3  obtained.
4  Q. So Mr. Korkmaz, if you could just put the document 118 to
5  the side, I'll ask you a few questions about what you remember
6  about that call.
7       What was the topic being discussed by Mr. Atilla and
8  Mr. Aslan?
9       MR. HARRISON: Same objection, hearsay.
10      THE COURT: Overruled.
11 A. Mr. Hakan Atilla had said that he had talked to Mr. Reza
12 Zarrab during that day, and there was this joke back and forth
13 between the individuals in the call --
14      THE COURT: Between which individuals?
15      THE WITNESS: This is between Mr. Suleyman Aslan and
16 Mr. Hakan Atilla.
17 A. They had joked about this conversation having been done
18 with Jabbar.
19      MR. HARRISON: Objection to speculation, Judge.
20      THE COURT: Overruled.
21 A. So, what I'm saying is based on that reference, I have a
22 specific recollection of this.
23      THE COURT: Based on the reference to Jabbar?
24      THE WITNESS: That is correct.
25      So I recall that they had said Jabbar, your Honor.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 13, 2017

HCD3ATI2          Korkmaz - Direct          Page 1649

1       THE COURT: What does Jabbar mean?
2       THE WITNESS: Jabbar is a name, your Honor. This is a
3   name that is used in our region, including the Arabic region.
4   And it's a name that is understood as being used in jokes.
5   Q. What did Mr. Atilla tell to Mr. Aslan in this conversation
6   about Mr. Atilla's conversation with Mr. Zarrab?
7       MR. HARRISON: Same objection, Judge.
8       THE COURT: Go ahead.
9  A. He mentioned that the impracticality of sending --
10      THE COURT: Who is "he."
11      THE WITNESS: Mr. Hakan Atilla.
12 A. Said that he had talked about the impracticality of using
13   small vessels with the tonnage capacity of 5,000 to 10,000, in
14   order to transport a load of 100 to 250,000 tons.
15      Suleyman Aslan asked whether bill of lading had been
16   provided. And I recall Mr. Hakan saying that it had not been
17   provided. I recall that Mr. Hakan Atilla mentioned that an
18   inspection document had been requested.
19      I recall that there was a conversation in which
20   Suleyman Aslan was asking whether the inspection document
21   should come from a private company or a company affiliated with
22   the government.
23      I recall that Mr. Hakan Atilla had mentioned that
24   obtaining this document through a private company such as SGS
25   would be better than obtaining it from a government agency.

HCD3ATI2          Korkmaz - Direct          Page 1650

1   And because he had also said that obtaining documentation from
2   government agencies in Dubai is very easy.
3       And I recall that he also conveyed that he had heard
4   from the other individual --
5       THE COURT: Who is "he?"
6       THE WITNESS: Your Honor, Mr. Hakan Atilla is talking
7   to Suleyman Aslan about Reza Zarrab.
8       THE COURT: Okay.
9       THE WITNESS: And I recall him saying about --
10      THE COURT: You recall who saying?
11      THE WITNESS: Hakan Atilla, Mr. Hakan Atilla said
12  this.
13      THE COURT: Said what?
14 A. What I recall Mr. Hakan Atilla saying is that he is
15   aware about the tonnage and the loading issue, but of course,
16   to me, that's what I remember him saying.
17 Q. Mr. Korkmaz, you mentioned a discussion about an inspection
18   report.
19 A. Yes.
20 Q. From your investigation, did you learn any evidence of
21   whether Mr. Zarrab provided Halkbank with inspection reports?
22      MR. HARRISON: Objection, your Honor.
23      THE COURT: Overruled.
24 A. No.
25 Q. Let's turn to Government's Exhibit 261. This is a July 9,

HCD3ATI2          Korkmaz - Direct          Page 1651

1   2013 call between Mr. Zarrab and Mr. Atilla; is that right?
2  A. That is correct.
3  Q. So, we had looked at this call earlier, and the part of the
4   discussion about the companies and whether they were registered
5   for the food trade or the gold trade; do you remember that?
6  A. Yes.
7       MR. LOCKARD: If we can turn to page three of the
8   transcript.
9  Q. Do Mr. Atilla and Mr. Zarrab also discuss bills of lading
10   again?
11 A. That is correct.
12 Q. And looking at the sentence beginning "Now of course with
13   regard to the vessels." What does Mr. Atilla tell Mr. Zarrab
14   about the shipment of the purported goods?
15 A. What I understand is that the documents submitted to the
16   bank involved large cargo ships with the tonnage capacity of
17   50,000, 80,000, 90,000. I understand that it is also said that
18   these are not the small ships that had been mentioned before.
19 Q. If we look on page four, at the bottom half of the
20   transcript, what does Mr. Atilla say about the quantities that
21   had been listed for the smaller ships?
22 A. He's saying that based on the smaller vessels as well, it
23   appears that there were large loads being put on these small
24   tonnage capacity vessels.
25      MR. HARRISON: Objection. Move to strike based on

HCD3ATI2          Korkmaz - Direct          Page 1652

1   speculation, your Honor.
2       THE COURT: Overruled. It's what it says right on the
3   exhibit.
4       MR. HARRISON: Judge --
5       THE COURT: I'm not going to debate it with you, but I
6   think you have to get more precise with your objections.
7  A. He says you should have this looked into, there are large
8   loads being placed on small tonnages.
9       MR. LOCKARD: Mr. Chang-Frieden, if we can look just a
10  couple lines up from this portion of the conversation.
11 Q. What did Mr. Atilla say about large ships and bills of
12   lading?
13 A. Here's what he had said. There are some large vessels that
14   are mentioned on the submitted documents. We had talked about
15   this before, you were sending through small vessels and we were
16   not requiring bills of lading. Because this was established
17   based on previous conversations that bills of lading would not
18   be required from the small vessels. So, now it's being said
19   here, that aside from that plan, now there are larger vessels
20   being utilized. And he's saying that I kindly request that the
21   guys take a look at this situation with the bills of lading.
22 Q. Mr. Korkmaz, are you familiar with another call after this
23   call on July 9 of 2013 between Mr. Zarrab and Mr. Happani?
24 A. I remember.
25 Q. Is that a call that was intercepted in the course of your

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

HCD3ATI4          Peri - Direct          Page 1697

1   truth, so help you God?
2        THE WITNESS:  I do.
3        THE DEPUTY CLERK: Could you please state your full
4   name for the record.
5        THE WITNESS:  Robert Michael Peri.  P-E-R-I.
6        THE DEPUTY CLERK:  You may be seated.
7   ROBERT M. PERI,
8     called as a witness by the Government,
9     having been duly sworn, testified as follows:
10  DIRECT EXAMINATION
11  BY MR. SOVOLOS:
12  Q.  Good afternoon, Mr. Peri.
13  A.  Hi.
14  Q.  Sir, where do you currently work?
15  A.  Citibank.
16  Q.  When did you join Citibank?
17  A.  I joined Citibank in September of 2015.
18  Q.  What is your current title?
19  A.  My current title is director of OFAC compliance and
20    investigations.
21  Q.  How long have you been serving as director of OFAC
22    compliance and investigations?
23  A.  Since April of this year.
24  Q.  What title did you have before your role as director of
25    OFAC compliance?

HCD3ATI4          Peri - Direct          Page 1698

1   A.  I was a senior vice president in OFAC compliance.
2   Q.  That's within Citibank, correct?
3   A.  Correct.
4   Q.  Thank you.  Who was your employer before Citibank?
5   A.  The U.S. Department of the Treasury.
6   Q.  When did you begin working at the U.S. Department of the
7     Treasury?
8   A.  In January of 2012.
9   Q.  When you were hired in January of 2012, what was your
10    title?
11  A.  I was a policy advisor.
12  Q.  What were your principal responsibilities and duties as a
13    policy advisor?
14  A.  I worked in the Office of Terrorism and Financial
15    Intelligence, I supported the undersecretary providing policy
16    advice on issues related to illicit finance, money laundering,
17    and sanctions evasion.
18  Q.  Thank you.  Did you oversee any programs in the Office of
19    Terrorism Financing?
20  A.  Eventually, yes.  I, after a year as a policy advisor, I
21    became the assistant director for Asia and Africa.  So I
22    oversaw all of the Treasury programs in that area.  Eventually
23    became the director of global affairs overseeing the global
24    relations of that part of the Treasury Department.
25  Q.  That definitely sounds like a promotion.  It was?

HCD3ATI4          Peri - Direct          Page 1699

1   A.  It was.
2   Q.  Okay.  Are there any other additional duties and
3     responsibilities you had in that position?
4   A.  No.  It was managing a team of about 25 policy advisors.
5     That was the position in which I started.  But in supporting
6     the undersecretary for terrorism and financial intelligence,
7     and other senior staff in their work on sanctions and money
8     laundering and terrorist financing.
9   Q.  Was that the highest professional title you attained?
10  A.  Yes, that's correct, it was a senior executive service
11    position.
12  Q.  When did your tenure at the U.S. Department of the Treasury
13    come to an end?
14  A.  In September of 2015 when I joined Citibank.
15  Q.  Thank you.  So, before we get into the details of your role
16    at Citibank, can you give us an overview of what type of bank
17    Citibank is?
18  A.  Sure.  Citibank is a U.S. bank but with a large global
19    footprint.  Citi has physical operations in over 90 countries
20    around the world.  It is one of the largest U.S. banks by
21    assets and by asset measure, and the largest by geographic
22    footprint.  But it is headquartered here in the United States.
23  Q.  Do you have an estimate of how many transactions are
24    processed by Citibank on a daily basis?
25  A.  In terms of value, the estimate that's generally given is

HCD3ATI4          Peri - Direct          Page 1700

1     that Citibank processes $4 trillion in transactions a day.
2   Q.  Does Citibank process transactions for correspondent banks?
3   A.  Yes.
4   Q.  Mr. Peri, can you explain what a correspondent bank is?
5   A.  Sure.  A correspondent bank is a bank that has a
6     relationship, an agreement with Citibank, or with any other
7     bank, to provide mutual financial services.  So that can be the
8     transmission of wires, wiring of money, it can be other
9     services as well, including check clearing.  And other things
10    of that nature.
11  Q.  Can you give us a little bit of a sense of Citibank's
12    correspondent banking space globally?
13  A.  Sure.  Citibank has a number of foreign correspondent banks
14    that it holds relationships with.  I'm not sure of the exact
15    count, but it's well over 1,000.
16  Q.  How does Citibank rank as a correspondent bank in United
17    States dollar currency banking?
18  A.  I wouldn't be able to give you the exact ranking.  But it's
19    in the top two or three.
20  Q.  What, if any, relationship is there between correspondent
21    banking and payments in foreign currencies?
22  A.  Well, payments in foreign currencies are a fundamental part
23    of correspondent banking.  When you think that correspondent
24    bank -- one of the main roles of correspondent banking is to
25    move money from one country to another.  The remitter of that

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                December 13, 2017

| HCD3ATI4 | Peri - Direct | Page 1701 |
|---|---|---|

1   money may be holding it in one currency, and the person who is
2   receiving the money on the other end may want to receive it in
3   a different currency. If that's the case, then during that
4   transaction, a foreign exchange transaction will occur.
5   Q. Based on your experience, do you have a sense of how likely
6   it is foreign transactions denominated in U.S. dollars would be
7   cleared through a U.S. bank?
8   A. It's highly likely. I think most, but not all, would be
9   processed through a U.S. bank.
10  Q. With Citibank, where specifically does Citibank process
11  U.S. dollar denominated correspondent transactions?
12  A. I would say that the majority of those are processed
13  through New York.
14  Q. Are some or all of those through Manhattan?
15  A. A significant portion are. I'm not sure that all of them
16  are, but a significant portion would pass through New York.
17  Q. Going back to your employment with Citibank. You testified
18  that your first position was senior vice president?
19  A. Correct.
20  Q. What were your principal duties and responsibilities as
21  senior vice president?
22  A. I managed a small team that was responsible largely for
23  investigations within the sanctions compliance program. So
24  understanding particular vulnerabilities or particular areas of
25  concern related to sanctions, and then also responding to

| HCD3ATI4 | Peri - Direct | Page 1702 |
|---|---|---|

1   administrative subpoenas from the Department of the Treasury,
2   primarily.
3   Q. Can you describe for us what the sanctions investigations
4   team does.
5   A. Sure. So one of those is that when we receive an
6   administrative subpoena, the Office of Foreign Assets Control,
7   which is responsible for sanctions, may send Citibank a
8   subpoena asking for certain bank records.
9       My team was responsible not for pulling those records,
10  but for analyzing them and providing a comprehensive response
11  to the Office of Foreign Assets Control on the transactions in
12  question.
13  Q. So, you're promoted out of the position of senior vice
14  president, correct?
15  A. Correct.
16  Q. That was directly to the director of OFAC compliance?
17  A. Correct.
18  Q. Tell us a little bit about what the OFAC compliance unit
19  does, please.
20  A. Sure. So now, we do two things. I manage that team that I
21  had previously which was responsible for investigations, but
22  now I've been given responsibility for a team that does what we
23  would call level three transaction review. Which essentially
24  means that in the $4 trillion of transactions that are
25  processed every day, those are screened for sanctions concerns.

| HCD3ATI4 | Peri - Direct | Page 1703 |
|---|---|---|

1   And if one of -- if there is a flag, if a sanctions hit occurs,
2   it may be escalated ultimately to my team, and we are the
3   ultimate decisionmakers whether or not a transaction is
4   permissible or would violate sanctions, and then we instruct
5   the operations of Citibank either to process that transaction
6   or to block it.
7   Q. So you said level three. Is that correct?
8   A. Correct.
9   Q. Which begs the question, is there a level one and two?
10  A. Sure. Of course. So the way that it works is when a
11  transaction passes through Citi, it is screened against
12  sanctions lists. Lists that give names of individuals,
13  companies, or governments or countries in certain cases. If
14  there is a match, if something in that transaction matches
15  against something in one of those lists, it stops for review.
16  First it stops at level one.
17      And to give you a basic example, what level one is
18  able to do, because keep in mind this is millions and millions
19  of transactions a day, is they can say the targeted party that
20  designated party is named Maria. In the payment we've just
21  received Maria is a vessel, is a boat. Therefore, that can't
22  be the same Maria. This is okay to process.
23      Beyond that, they have to send it to level two. Level
24  two has a similar process with a bit more ability to try to
25  investigate whether the name Maria on the list is the same as

| HCD3ATI4 | Peri - Direct | Page 1704 |
|---|---|---|

1   the one in the transaction. And if not, it comes to my team,
2   and my team has greater bandwidth to analyze the transaction
3   and make the ultimate determination.
4   Q. So you say greater bandwidth. How many people work under
5   you?
6   A. Sanctions compliance at Citibank is a function of over 200
7   people now. On my team, all told, we have just over 20.
8   Q. So, you talked about your team. Are there other teams?
9   A. Sure. There is -- sanctions compliance is complex, so we
10  have people who work in Citi's various lines of business to
11  help implement sanctions compliance. We have people who work
12  in the various regions in which Citi is present to help
13  implement sanctions compliance. And then we have my team.
14  Q. You testified earlier that you mentioned OFAC. Just to be
15  clear, is OFAC administering the sanctions regimes?
16  A. That's right. So OFAC stands for the Office of Foreign
17  Assets Control. It is a division within the Department of the
18  U.S. Treasury that administers as the primary administrator of
19  U.S. sanctions programs.
20  Q. Would you describe sanctions regimes as strict liability?
21  A. Yes. They are strict liability, and this is a unique
22  feature of sanctions compared to other areas of compliance.
23  Q. What is strict liability?
24  A. Strict liability essentially means that Citibank, or any
25  U.S. person, is responsible for complying with the sanctions

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                         December 13, 2017

HCDPATI5        Korkmaz - Cross        Page 1729

1  of that question?
2  Q. It wasn't a trick question. Sometime after you left the
3  police force, about nine months after, you were charged with
4  crimes in Turkey, correct?
5  A. It is correct that I received such charges, but I'd like to
6  exclude the first part of your question because that was while
7  I was still with the police force, and I was not out of the
8  police force yet.
9  Q. Okay. But sometime after you were out of the police force,
10  you were charged with crimes, correct?
11      THE COURT: Maybe I could help you a little. So when
12  were you charged with crimes in Turkey?
13      THE WITNESS: It was September 1st, 2014.
14  Q. And you left the police force at the end of 2013, correct?
15  A. No, sir. As I said here for two days now, I was exiled to
16  the bridge unit, that I was exiled out to the province of
17  Hakkari. So at the time that I was arrested, I was still
18  within the police force.
19  Q. You're right. My mistake. So at the end of 2013, you left
20  your post in Istanbul, correct?
21  A. That is correct, I was reassigned.
22  Q. It was nine months after that that you were first charged
23  with crimes in Turkey, correct?
24  A. Judicially, that is correct.
25  Q. And then you spent some time in prison, correct; about 17

HCDPATI5        Korkmaz - Cross        Page 1730

1  months, I think you testified on direct?
2  A. That is correct.
3  Q. And then you were released from prison on February 9th of
4  2016, correct?
5  A. That is correct.
6  Q. And then, at some point, you mentioned on your direct
7  examination that you were charged again, or were going to be
8  charged again was your understanding in Turkey?
9      THE COURT: Now, wait a minute. Are you saying
10  charged again?
11      MR. HARRISON: That's my understanding of his direct
12  testimony, your Honor.
13      THE COURT: That he was charged twice?
14      MR. HARRISON: Or he was going to.
15      THE COURT: Maybe you could ask that.
16      MR. HARRISON: Sure.
17  BY MR. HARRISON:
18  Q. Were you charged with crimes in Turkey after you were
19  released from prison in February of 2016?
20  A. Yes.
21  Q. When was that?
22  A. I remember that to be at the end of June.
23  Q. Of 2016, correct?
24  A. That is correct.
25  Q. And then in July of 2016, there was a coup attempt in

HCDPATI5        Korkmaz - Cross        Page 1731

1  Turkey, correct?
2      THE COURT: Excuse me, just one second. Could I ask
3  one thing? Were you charged with crimes before you went to
4  prison?
5      THE WITNESS: There were many investigations that were
6  conducted about me between the disciplinary ones.
7      THE COURT: Disciplinary ones?
8      THE WITNESS: As well as other judicial ones.
9      THE COURT: But were you charged with any crimes
10  before you went to prison?
11      THE WITNESS: So based on our legal system -- shall I
12  understand your question to be whether I was indicted?
13      THE COURT: Well, the technical term, I'm just trying
14  to figure out why you went to prison, for what?
15      THE WITNESS: Okay. Then I'll explain that. In our
16  criminal law system, we have two phases. One is the
17  investigation. The next one is prosecution, and with
18  indictment, the investigation phase ends and the prosecution
19  phase begins, but the arrest can happen during the
20  investigation phase. For example, I was arrested on
21  September 1st.
22      THE COURT: Of what year?
23      THE WITNESS: In 2014. This was an investigation, and
24  this becoming a charge against me or the indictment actually
25  happened about a year after -- after I was arrested.

HCDPATI5        Korkmaz - Cross        Page 1732

1      So with relation to that, then back to the question
2  that was asked of me earlier. What happened is while I was
3  incarcerated, there was an investigation against me, and by the
4  time I received the charges from that investigation, that
5  happened after I was released. What I understand is that after
6  I was relieved from duty, there were many investigations about
7  me that were conducted during that period.
8  Q. And just so we're clear, what were the charges in that
9  first indictment?
10  A. My reason for arrest was a coup.
11  Q. Well, the first time you were arrested was in
12  September 1st -- the first time you were detained was
13  September 1st of 2014, correct?
14  A. Yes.
15  Q. And there were a number of specific charges in the
16  indictment that -- the charging instrument that you were
17  eventually charged with, correct?
18  A. Referring to the indictment that was put out against me
19  about a year later? Yes, that is correct.
20  Q. How many different charges against you were there in that
21  indictment?
22  A. Those included a coup, it included terrorist organization,
23  espionage and misuse of authority.
24  Q. And the misuse of authority was for performing illegal
25  wiretaps, correct, in violation of Turkish law?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                          December 13, 2017

HCDPATI5          Korkmaz - Cross          Page 1733

1  A. Yes.
2  Q. We'll come back to that. What were the charges, if you
3    remember them, from the second indictment that you have
4    referred to that came down in June of 2016?
5  A. I did not have a good chance to look thoroughly at that
6    indictment, but -- so I can't remember the charges section very
7    well, but I remember terrorist organization was one of them,
8    and coup again was one of them, violation of secrecy, as well
9    as misuse of authority were also among them, I believe.
10 Q. So and again, in that second indictment, you were also
11   charged with illegal wiretapping, just like you were in the
12   first indictment, correct?
13 A. Yes.
14 Q. And when you refer to a charge of a coup in both of those
15   indictments, you mean that you were trying to perform a coup or
16   trying to overthrow the Turkish government, correct?
17 A. That is correct. There were such allegations, and all of
18   these allegations were baseless and among them, I said.
19 Q. And after you were released from prison in July of 2016,
20   one month after that second indictment, there actually was a
21   coup in Turkey, wasn't there?
22 A. It was not one month later.
23 Q. It started on July 15th of 2016, didn't it, Mr. Korkmaz?
24 A. That is correct, on July 15, 2016, there was a calamity
25   that happened in Turkey.

HCDPATI5          Korkmaz - Cross          Page 1734

1  Q. And that was about a month after you got the second
2    indictment in June of 2016, correct?
3  A. It occurred after the indictment was written up, but I had
4    not received a copy of the indictment at that time.
5  Q. And then in that coup attempt in July of 2016, a group of
6    military officers tried to overthrow the Turkish government,
7    correct?
8         MR. LOCKARD: Objection.
9         THE COURT: I'll allow it.
10 A. That's what it appeared to be, and since I'm not a coup
11   investigation expert, I don't know what the details behind that
12   may have been.
13 Q. But you were in Turkey at the time, correct?
14 A. Yes.
15 Q. Where were you in Turkey during the -- from July 15th of
16   2016 to July 21st of 2016, when the coup ended?
17        THE INTERPRETER: Could you repeat the dates again,
18   please?
19        THE COURT: It went to the 21st?
20        MR. HARRISON: Yes, sir, of July.
21 A. I was in Istanbul on July 15th.
22 Q. And that was the -- sorry. Go ahead.
23 A. And I went to Afyon on July 16th.
24        THE COURT: What is that, a place?
25        THE WITNESS: It's a city.

HCDPATI5          Korkmaz - Cross          Page 1735

1  Q. Just so the record reflects it, you had to pause there for
2    a while. Are you having a hard time remembering where you were
3    during the coup?
4         THE COURT: Counsel, this is not Law and Order. Just
5    ask the questions. All right?
6  A. What happened is I wanted to ensure whether the date was
7    the 16th or the 17th of July.
8  Q. And it was shortly after that coup attempt that you left
9    Turkey, correct?
10 A. Yes.
11 Q. I think you testified on direct that it was in August of
12   2016, approximately two weeks after the end of the coup
13   attempt, that you left Turkey, right?
14 A. That is correct.
15 Q. And the coup attempt was by a group called the Gulenists,
16   correct?
17 A. In order for me to verify that, I'd have to have taken part
18   in those investigations.
19 Q. We'll come back to that. After you left Turkey, I think
20   you testified on direct that you went to several other
21   countries, correct?
22 A. Yes.
23 Q. How many other countries did you go to before you came to
24   the United States?
25 A. It was three plus one.

HCDPATI5          Korkmaz - Cross          Page 1736

1  Q. I'm not sure what that means. Is it four countries in
2    between the time you left Turkey and got to the United States,
3    or are you counting Turkey and the United States?
4  A. I went to three countries, and what I meant by the plus one
5    was on my way to the United States, I was on a transit flight.
6  Q. And what was the time period between the time that you left
7    Turkey and the time that you entered the United States; how
8    long was that?
9  A. Seven months.
10 Q. And then how long have you been in the United States?
11 A. Ten months, maybe a little more than ten months, but ten
12   months. Ten months.
13 Q. And it's still your testimony to this jury that you have
14   your own independent recollection of listening to those two
15   phone calls from back in 2013; is that correct?
16 A. Yes, that is so, and because I have many reasons for that.
17 Q. And how many times did you meet with or talk to the members
18   of the prosecution team from the government to prepare to
19   testify in court before you appeared?
20 A. Many times.
21 Q. More than 40, correct?
22 A. I would estimate that to be the case. It would be more
23   than that.
24 Q. And how long -- approximately how long were each of those
25   more than 40 sessions preparing with the U.S. Attorney's

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

---

HCDPATI5      Korkmaz - Cross      Page 1737

1   Office?
2 A. It varied based on the day, sometimes two hours, sometimes
3   four hours, sometimes longer than that.
4 Q. Mr. Korkmaz, let me turn to another area. You testified on
5   your direct examination about physical surveillance that people
6   on your team did in Turkey when you were conducting this
7   investigation that you've been talking about, correct?
8 A. That is correct. There are physical surveillance teams,
9   and I would get in contact with the chief of the physical
10   surveillance teams and, yes.
11 Q. Okay. And just so I understand how it worked, you,
12   yourself, it sounds like -- as I understand it, you, yourself,
13   were not going out and doing surveillance on people, correct?
14 A. That is correct.
15 Q. You were already relatively high up when you were running
16   this investigation, right? You were supervisor?
17 A. I was the lead for the team that was conducting the
18   investigation.
19 Q. And just so I understand one of your previous answers, it
20   sounds like the person who was supervising the physical
21   surveillance was beneath you, correct?
22 A. No.
23 Q. Can you explain that? Were you guys equal, or how did it
24   work?
25 A. No. He was ranked higher than me, and he was chief over a

---

HCDPATI5      Korkmaz - Cross      Page 1738

1   section.
2 Q. So there was a whole separate surveillance section; is that
3   right?
4 A. Correct.
5 Q. And as part of your investigation, there was a lot of
6   physical surveillance done of the people that you're talking
7   about that were suspects, correct?
8 A. That is correct.
9 Q. And there were a lot of surveillance photos taken like the
10   ones you went through on direct with Mr. Lockard, correct?
11 A. That is correct.
12 Q. And as the supervisor of the unit, can you tell us, please,
13   how many surveillance photos were taken as part of your
14   investigation?
15 A. Are you asking about photographs or videos?
16 Q. Let's start with photographs.
17 A. I already said the photographs are frames taken out of
18   videos.
19 Q. So all of these photographs are taken from videos?
20 A. Yes, those that belong to the technical surveillance
21   activities. That's the case all the time.
22 Q. Okay. There were no still photos taken, only videos, is
23   that what you're saying?
24 A. Some of our cameras had the ability to be able to take
25   still pictures, along with taking the video, but whether that

---

HCDPATI5      Korkmaz - Cross      Page 1739

1   feature was utilized or not, I don't know.
2 Q. Okay. So is it fair to say you don't remember whether any
3   still photographs were taken?
4 A. Yes.
5 Q. How many videos were taken as part of the surveillance, the
6   physical surveillance, for your investigation?
7 A. There would be no videos in a physical surveillance.
8 Q. Well, maybe I'm misunderstanding what you mean by physical
9   surveillance. Why don't you tell us, when were the videos
10   taken?
11 A. The videos were shot during the activities of surveillance
12   through technical tools and, also, the security camera footage.
13 Q. And can you give us some sense, or can you tell us the
14   number of security -- videos of security camera footage and
15   videos of surveillance that was taken by your teams as part of
16   the investigation?
17 A. What I remember is that in our investigation there were
18   about four security camera recordings, and the videos that
19   would have been shot through the technical tools there during
20   those surveillance activities would have been over 30, I
21   believe.
22 Q. Let me turn your attention to --
23      MR. HARRISON: Mr. White, can you bring up Government
24   Exhibit 106, please.
25 Q. Do you remember seeing this, Government's Exhibit 106, on

---

HCDPATI5      Korkmaz - Cross      Page 1740

1   your direct examination?
2 A. Yes.
3 Q. Okay. And Mr. Atilla, my client, is not depicted anywhere
4   in that photograph, correct?
5 A. That is correct.
6 Q. And this money that's depicted in the photograph did not go
7   to Mr. Atilla, correct?
8 A. Yes.
9 Q. And it did not come from Mr. Atilla, correct?
10 A. Yes.
11      MR. HARRISON: Mr. White, 105, please.
12 Q. Mr. Korkmaz, do you remember testifying about Government's
13   Exhibit 105 on direct?
14 A. Yes.
15 Q. Mr. Atilla is not depicted in this photo, correct?
16 A. Yes.
17 Q. And the money depicted in 105 neither came from or went to
18   Mr. Atilla, correct?
19 A. Yes.
20      MR. HARRISON: Mr. White, 970-14, please.
21 Q. Mr. Korkmaz, do you remember testifying about 970-14 on
22   direct?
23 A. Yes.
24 Q. And Mr. Atilla is not depicted anywhere in this photograph
25   either, correct?

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

| HCDPATI5 | Korkmaz - Cross | Page 1745 |
|---|---|---|

1 Q. In the office, correct?
2 A. Yes. I was working while the intercept was going on, and
3 when the video was brought in, I watched it.
4 Q. Okay. But you weren't the one who actually took the video,
5 correct?
6 A. That was not me, no.
7 Q. So but how do you know, as you sit here today, that this
8 photograph, taken from a video, was between 3:00 and 5:00 and
9 not at 9:55 at night?
10 A. That's because there was another camera that was taking
11 footage from a different angle during that time.
12 Q. Okay. So the other camera you think was correct?
13 A. I recall that to be correct.
14 Q. So what time did that other camera say?
15 A. What I remember is that that would be between the hours
16 that I mentioned. If I could see the report that I had written
17 up, I can look at it and it would refresh my mind, and I could
18 tell you exactly what time it was.
19     MR. HARRISON: Mr. White, 971-71, please.
20 Q. Mr. Korkmaz, do you remember testifying on direct about
21 971-71?
22 A. Yes.
23 Q. And Mr. Atilla is not depicted in this picture either,
24 correct?
25 A. Yes.

| HCDPATI5 | Korkmaz - Cross | Page 1746 |
|---|---|---|

1 Q. And, in fact, there are no surveillance photos or videos
2 that depict Mr. Atilla at all, correct?
3 A. Yes.
4     MR. HARRISON: You can take down 971-71. Thank you,
5 Mr. White.
6 Q. And Reza Zarrab is in these surveillance pictures a lot,
7 correct?
8 A. That is correct.
9 Q. And I think, and correct me if I'm wrong, you testified on
10 direct about his plane and people meeting on his plane,
11 correct?
12 A. That is correct.
13 Q. And Mr. Atilla has never been on Mr. Zarrab's plane,
14 correct?
15 A. I don't know. I don't have any information that it might
16 have happened.
17 Q. In fact, Mr. Atilla has never met Mr. Zarrab in person, as
18 far as you know, correct?
19     MR. HARRISON: Let me withdraw, and I'll rephrase it,
20 Judge.
21 Q. Mr. Atilla never met personally, face to face, with
22 Mr. Zarrab, correct?
23 A. I -- I don't recall such an occurrence.
24 Q. So as far as you know, from your surveillance, all the
25 surveillance that you did and the investigation that you did,

| HCDPATI5 | Korkmaz - Cross | Page 1747 |
|---|---|---|

1 my client, Mr. Atilla, never met face to face with Mr. Zarrab,
2 correct?
3 A. There's nothing that I remember pertaining to whether he
4 had met with him.
5 Q. And on your direct examination, you referred a couple of
6 times to a Mr. Happani that works for Mr. Zarrab, correct?
7     THE INTERPRETER: Could you please repeat that
8 question? I'm sorry.
9 Q. Sure. On your direct examination with Mr. Lockard, you
10 testified -- you discussed a couple of times a Mr. Happani, who
11 works for Mr. Zarrab, correct?
12 A. I don't recall how many times I brought him up, but I
13 remember talking about Abdullah Happani, yes.
14     (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

| HCD3ATI6 | Korkmaz - Cross | Page 1748 |
|---|---|---|

1 Q. My client, Mr. Atilla, has never met face to face with
2 Mr. Happani either, correct?
3 A. I don't believe that he did.
4 Q. With all the surveillance, you never saw anybody else who
5 you considered a suspect in this investigation going to
6 Mr. Atilla's home, correct?
7 A. That is correct.
8 Q. You testified on direct that you are -- withdrawn.
9     You testified on direct, I believe, that Mr. Atilla
10 was never given any money as part of the scheme or never took
11 any bribes, correct?
12 A. He did not receive any bribes. There is not such a thing.
13 Q. Let me direct your attention to April 10 of 2013.
14 A. Yes.
15 Q. As part of your team's surveillance on that day, there was
16 a photo, photos taken of Mr. Reza Zarrab going into Halkbank,
17 at approximately 4:10 and then leaving again at approximately
18 5:15, correct?
19     p.m. in the afternoon, evening.
20 A. Yes, I remember that and I remember the vehicle to be a
21 large vehicle.
22 Q. I just want to ask you a couple questions about --
23 withdrawn.
24     As part of your direct, you testified that there were
25 a lot of wiretaps done, right? A lot of recording of people's

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                              December 13, 2017

| HCD3ATI6 | Korkmaz - Cross | Page 1749 |
| --- | --- | --- |

1  phone calls, right?
2  A. Yes.
3  Q. Can you describe for us, because I didn't really understand
4  it from direct, the process by which you would record people's
5  phone calls? How did it actually work?
6         THE COURT: The equipment?
7         MR. HARRISON: What, Judge?
8         THE COURT: Do you mean the equipment?
9         MR. HARRISON: Who actually did the
10  recording, who monitored it, things like that.
11  A. Certainly. The intercepts would be requested by the
12  prosecutor from a court, and the judge would make a decision on
13  that petition. And after receiving that order, then the
14  prosecutor would provide a tasking --
15         THE COURT: What?
16         THE INTERPRETER: Tasking. Tasking of such activity.
17      And so the sentence was continuing, Judge, I will just
18  add to this.
19  A. So then the prosecutor would issue a tasking in terms of
20  who would carry out this activity. After that, this decision
21  as well as the instruction would then be sent by the technical
22  office within the financial crimes unit to KOM in Ankara. And
23  the KOM directorate would then send the instructions, as well
24  as the order, the decision, to TIB. So TIB has a law office,
25  and they would review the details of this order. After that,

| HCD3ATI6 | Korkmaz - Cross | Page 1750 |
| --- | --- | --- |

1  the TIB fulfills that order. And after that, once TIB fulfills
2  that order, then the police officer would be able to see what
3  TIB provides through a secure line and through the KDM, what's
4  been intercepted.
5         So, at this point, the audios are not downloaded, they
6  are maintained by TIB. So, the staff who is doing the
7  monitoring would select the recordings that constitute an
8  element of crime. And they would also select ones that would
9  not be used in witnessing. And with any developments, the
10  officer would inform his supervisor, so that the prosecutor's
11  office could be notified. And these recordings containing
12  elements of crime would then be transcribed through the system.
13  Then these tapes or transcripts get printed out, and then the
14  audio files would get downloaded as all audio as well as audio
15  that contains elements of crime.
16         So, after the sound is downloaded to these data media,
17  the administrator would order that all the sound recordings on
18  the system be erased. And at this point we would have the
19  transcripts, all the sound files, and sound files that contain
20  elements of crime.
21         For the one containing all sound files, that one would
22  exclude any sound bites that were marked as not for witnessing.
23  In other words, those would get erased. And so then you could
24  monitor these sound recordings on this data media that you
25  have.

| HCD3ATI6 | Korkmaz - Cross | Page 1751 |
| --- | --- | --- |

1         In fact, within the knowledge of the prosecutor, it is
2  also possible to use these sound bites in the all sounds data
3  media, and to identify any crime, elements of crime that may
4  not have been identified earlier.
5         No intercepts or no monitoring could be done without a
6  court order in any way. And a review of the court order gets
7  done by TIB anyway. And the system itself is one that is
8  designed by TIB, all in compliance with the applicable law.
9  All intercepts within our investigation were carried out based
10  on court orders. Within the investigation of December 17,
11  there are more than 30 court orders and judge orders that were
12  in that investigation.
13         Thus, when you were referring to the charges against
14  me and one of them being illegal intercepts, all these
15  allegations were baseless and they are slanders and all the
16  intercepts were done with court orders.
17  Q. Okay. In relation to that, Mr. Korkmaz, those charges, as
18  you mentioned on direct, are still open against you in Turkey,
19  correct?
20  A. Yes.
21         THE COURT: Could I just ask a question. So, were you
22  ever put on trial?
23         THE WITNESS: Yes, your Honor. I did, and I was
24  released. Because in that 25th of December investigation for
25  which I had been arrested --

| HCD3ATI6 | Korkmaz - Cross | Page 1752 |
| --- | --- | --- |

1         THE COURT: 2013?
2         THE WITNESS: That is correct, your Honor.
3         In which I was arrested, I had not even taken part in
4  that investigation at all. In other words, for an
5  investigation, the 25th of December investigation, which is one
6  that I had learned through the media just like everyone else,
7  an investigation where I had not taken part or investigation
8  that I had not even provided a single signature, I was
9  prosecuted, and I was given charges such as a coup or illegal
10  intercepts and such in this very investigation where I had not
11  taken part.
12         So, sir, you mentioned terrorist, you mentioned coup,
13  you mentioned illegal intercepts. I'm a police officer, and I
14  studied eight years for it. And in order to give back the
15  value of the salary that I was receiving from the government, I
16  did my job, and just like all the police officers, I did what I
17  was supposed to do as a police officer.
18         And you mentioned that there was some charges against
19  me, nine months after the December 17. No, these charges were
20  being brought against me as of December 18. The politicians
21  and other higher ups that had been implicated in this
22  corruption, the only way that they could find was to call the
23  police officers members of the Jamaat, also terrorists and
24  agents. And that's what I've been facing since December 18,
25  sir.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 13, 2017

| HCD3ATI6 | Page 1765 |
|---|---|

1    THE COURT: Is that right?

2    MS. FLEMING: We think they control it.

3    MR. LOCKARD: We think, you know, barring -- we think

4  we're going to rest tomorrow.

5    THE COURT: I thought you already had.

6    MR. LOCKARD: So we hadn't rested. We still have

7  redirect of Mr. Korkmaz and I think we've discussed we still

8  had one very short witness that we were mentioning earlier.

9    THE COURT: I think more experts really just clutter

10  it up.

11    MR. LOCKARD: But even if we did call that expert,

12  still tomorrow we would be resting.

13    THE COURT: So we're going to continue with the cross,

14  how long do you think?

15    MR. HARRISON: Not a ton, Judge. Let me talk to

16  counsel and figure it out, but it is not going to be too

17  lengthy.

18    THE COURT: So some time tomorrow morning you think?

19    MR. HARRISON: Don't hold me to it. But probably yes.

20    THE COURT: Okay.

21    MS. FLEMING: Should we plan to start our case if

22  we're putting one on on Friday morning?

23    THE COURT: No, I think tomorrow.

24    MS. FLEMING: Hope springs eternal for Rule 29 or

25  mistrial.

| HCD3ATI6 | Page 1766 |
|---|---|

1    THE COURT: But you just said when.

2    MS. FLEMING: I said if we put one on.

3    THE COURT: No, I think meet and confer with

4  Mr. Harrison and figure out when you think he'll be finished

5  and then I know the government won't be long on redirect. So,

6  I think we could have more witnesses tomorrow.

7    MS. FLEMING: If they're calling the person that we

8  talked about at sidebar, that will be a sizable cross. We

9  didn't do the first one. We're going to do the second one.

10    THE COURT: No. I don't think they -- well, you know,

11  do you want to decide that now? I think you should think that

12  over, overnight.

13    MR. LOCKARD: I don't think that the defense has

14  anticipated cross should prejudice our ability to put someone

15  on.

16    THE COURT: It doesn't impact me at all. I took the

17  position even before I heard her say there was going to be any

18  cross.

19    MR. LOCKARD: I think the government would also

20  appreciate some level of heads up on who is going to be called

21  and what if any exhibits are going to be introduced through

22  those people.

23    MS. FLEMING: We're happy to. That's what I'm trying

24  to figure out when it will be, because it depends.

25    THE COURT: I think tomorrow. They should be

| HCD3ATI6 | Page 1767 |
|---|---|

1  available tomorrow. I don't know about "they." I don't know

2  how many you have. I remembered two from the motion practice.

3    MS. FLEMING: We will have to see who is here.

4    THE COURT: No.

5    MS. FLEMING: We'll see who is here.

6    THE COURT: Oh.

7    MS. FLEMING: We'll check.

8    THE COURT: Whatever. But anyway, see if you can get

9  somebody ready, available tomorrow. Because I think there is

10  going to be -- and here's what I'm really saying. It would be

11  so much better if we could get this thing done this week in

12  fact. And maybe that's even possible. But I don't know how

13  long your witnesses will be.

14    Let me say it another way. I want two full trial

15  days, one tomorrow, and one Friday. No short days. So, figure

16  out how to fill that time. And that's the best guide I can

17  give you.

18    All right? Thanks. All right. Thanks a lot.

19    (Adjourned until December 14, 2017, at 9:15 a.m.)

|  | Page 1768 |
|---|---|

1              INDEX OF EXAMINATION

2  Examination of:                              Page

3  HUSEYIN KORKMAZ

4  Direct (Resumed) By Mr. Lockard . . . . . . .1627

5  ROBERT M. PERI

6  Direct By Mr. Sovolos . . . . . . . . . . .1697

7  Cross By Ms. Fleming . . . . . . . . . . . .1713

8  Cross By Mr. Harrison . . . . . . . . . . .1725

9          GOVERNMENT EXHIBITS

10  Exhibit No.                              Received

11  137 . . . . . . . . . . . . . . . . . . .1639

12  1004  . . . . . . . . . . . . . . . . . .1656

13  2006 through 2054 . . . . . . . . . . . .1674

14  9701, 9702, 9703 . . . . . . . . . . . .1696

15  8101-1 through 8101-10  . . . . . . . . .1696

16  2501 through 2529, 3001 through 3329  . . .1696

17  3501 through 3815, 4001 . . . . . . . . .1696

18  4501 through 6904 . . . . . . . . . . . .1696

**A674**

In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 14, 2017*

*Southern District Court Reporters*

Original File HCEPATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4          v.                      S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6              Defendant.
 7   ------------------------------x
 8
 9                           December 14, 2017
                                  9:15 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                              District Judge
                                and a jury
15
16
17                   APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

```
 1
 2        (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                    Of counsel
          -and-
11   McDERMOTT WILL & EMERY
     BY:  TODD HARRISON
12
     Also Present:
13   JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14   MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter
15   MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

1    (Discussion at the sidebar off the record)

2    (At the sidebar)

3    MS. FLEMING: Our application is to figure out a way,

4 either at the MCC, where it is even colder than this courtroom,

5 Judge, you can see your breath it is so cold over there, to

6 work later. Their rules only permit 7:30. They let us stay

7 until about 10 of 8 last night.

8    THE COURT: For you to stay there?

9    MS. FLEMING: For us to stay there. Or preferably,

10 frankly, to work here at the courthouse with our client. He's

11 going on the stand. During the course of the trial and right

12 before it, we've gotten a ton of documents in the case that he

13 doesn't have. The method for him to be getting documents is

14 they get loaded on his laptop by the government. And that just

15 hasn't happened in this case. So we need to be showing him

16 things.

17    In addition, the protective order was such that we

18 couldn't give him things or leave them with him. He was unable

19 to see or know who Korkmaz was until he took the stand. So we

20 are way behind where we ordinarily would be with a defendant or

21 helping to prepare somebody. So we're really handicapped by --

22 we leave court, it takes some time for him to get over there,

23 we get over there, and we only have an hour or an hour and a

24 half to meet with him and he is going to take the stand.

25    MR. LOCKARD: We don't oppose the application. I want

1 to clarify for the record, because this has happened a number

2 of times, the government has not produced new documents. We

3 have identified documents from discovery. So the defendant

4 does have the discovery. To the extent we produced 3500,

5 obviously that is a trial disclosure, but I wanted to clarify

6 that portion of the record.

7    THE COURT: Two things. One is just an observation.

8 Unlike other witnesses, your client has had the enormous

9 advantage of being present at every moment of the trial, so

10 he's heard everything and been privy to everything. But number

11 two is I don't know the answer, so did you make an application

12 to the MCC? That's the way it should start.

13    MR. ROCCO: We'll do it today.

14    THE COURT: Okay. Then if it doesn't succeed, then

15 ask me, and in the meantime I'll do some background -- not

16 investigating, but asking what's probable, possible, whatever.

17 But I think you should do it in the first instance with them.

18    MS. FLEMING: Every time we've made a request for

19 anything over there, it takes forever.

20    MR. ROCCO: Josh Dratel has an associate that's very

21 helpful with this.

22    MR. LOCKARD: Your Honor, if we may, there is one

23 other thing we wanted to raise before the jury came in. So

24 there are a number of exhibits that have been received subject

25 to connection. And before the jury comes in, we wanted to

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                              *December 14, 2017*

---

| HCE3ATI1 | Korkmaz - Cross | Page 1789 |

1   and it is most likely that he had called me over.
2   Q.   But you don't remember how that communication was
3   initiated, whether it was by you or by the prosecutor?
4   A.   In terms of whether it was him that called me over or I
5   went over, I don't recall.   But, it is most likely that we
6   would have had that communication, and based on that I would
7   have gone.   Because I did not go to him, only once.   There was
8   also the time afterwards.
9   Q.   Let's focus on this first time on December 25.   Whoever
10  initiated the communication, what was discussed?   What was the
11  discussion that brought you over to the prosecutor's office
12  that day?
13  A.   When I went there, the best of my recollection, it was the
14  afternoon.   There was a resignation statement made by Erdogan
15  Bayraktar on TV.   And I had pointed out to the prosecutor
16  during this statement that Erdogan Bayraktar had --
17          THE COURT:   What did you say after "Erdogan"?
18          THE INTERPRETER:   Bayraktar.   That's the last name.
19          THE WITNESS:   The individual was the urban planning
20  minister during that time period, your Honor.
21          THE COURT:   And the name of that person?
22          THE INTERPRETER:   Erdogan Bayraktar.
23          THE COURT:   That's not the prime minister?
24          THE INTERPRETER:   It is not.
25  A.   In his resignation, Erdogan Bayraktar had said that

---

| HCE3ATI1 | Korkmaz - Cross | Page 1790 |

1   whatever he had done, he had done it at the direction of the
2   prime minister.   And when I heard that, I recall telling to the
3   prosecutor that this matches up with that transcript that
4   contains the number one in it.   Because there was this
5   transcript, this conversation, and it pertained to a phone
6   conversation between Suleyman Aslan and Reza Zarrab that took
7   place on December 16.
8          And then after that, the prosecutor had said why don't
9   you show me that transcript among the transcripts.   We looked
10  through, and we realized that somehow it had not been
11  transcribed.   And then the prosecutor said then I should send
12  someone to go ahead and transcribe this conversation from the
13  financial crimes unit.
14          So, during the evening time, two staff members from
15  the financial crimes unit arrived.   And when I say "evening,"
16  it could be evening or night.   It could be between 8 or 10,
17  what I remember is that it was dark.   And these two officers
18  from the financial crimes unit came over, and they found that
19  conversation from among the files on the hard disc that
20  contained all audio.   And at the prosecutor's direction they
21  transcribed that call, and then the transcription and the audio
22  file for that conversation was copied onto the first CD.   Thus,
23  the transcript and the audio of that call was added to, entered
24  into evidence.
25          And at that point, the prosecutor also had said that

---

| HCE3ATI1 | Korkmaz - Cross | Page 1791 |

1   he'd like to have these all scanned in order to preserve the
2   evidence.   And as this was happening, I requested from him
3   whether I could preserve a copy as well, because based on the
4   conjecture of how things were going, both he and I were
5   concerned that the evidence may be destroyed, and I wanted to
6   preserve it, and he agreed.
7          So, while that CD was being copied already for that
8   transcript, I asked him whether I could get a copy for myself.
9   That was actually another copy being made to be sent to the
10  Parliament at that time as well, and he agreed, and a copy was
11  made for me at that time.
12          (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

| HCEPATI2 | Korkmaz - Cross | Page 1792 |

1   Q.   But you had been told -- excuse me.   You had been told
2   three days earlier, on December 22nd, as you testified, that
3   you were no longer with the financial crimes unit, right; that
4   you were being reassigned, correct?
5   A.   Yes.
6   Q.   And so you were no longer authorized at that time,
7   according to Turkish law and the wiretapping protocols in
8   Turkey, to have your own copy of those wiretap telephone calls,
9   correct?
10  A.   Yes, I knew that, and I still went ahead.
11  Q.   Just so I understand, I think we can agree that you were a
12  police officer who took wiretap evidence without authorization,
13  in violation of Turkish law, at that time, on December 25th,
14  correct?
15  A.   That is correct, and that is exactly related to me being a
16  police officer.   I received eight years of education in the
17  government system to be a police officer in a board school, in
18  uniform since I was 15.   And while I was on duty serving as a
19  deputy inspector, I also always worked to give the best to my
20  country.
21          As I was graduating from the police academy, I took an
22  oath for justice, and I did not agree with the possibility that
23  this evidence may be destroyed one day while I had the
24  opportunity to be able to preserve them.
25  Q.   There's no --

---

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

HCEPATI2          Korkmaz - Cross          Page 1793

1      MR. HARRISON: He answered the question. There's no
2  question pending.
3      THE COURT: Let it go for a brief whatever.
4      MR. HARRISON: Okay.
5  A. That would have caused me heartache that would last through
6  the rest of my life. Let me just say one last thing.
7      THE COURT: Okay.
8  A. Throughout my education, on the cover of every textbook
9  that I read, I read something that is the address that was
10  given from Atatürk to the Turkish youth, and what I was
11  supposed to do was taught to me through these trainings. And
12  just because a corruption investigation was touching on some
13  politicians, I could not look away from it, and I knew, of
14  course, that this was a crime, but I still went ahead with it.
15      THE COURT: Could I just ask a question? The
16  prosecutor, did he remain as the prosecutor?
17      THE WITNESS: No, your Honor.
18      THE COURT: What happened? Where did he go?
19      THE WITNESS: First, he was sent to another unit.
20  Then he was sent to another province, and later, I learned that
21  there was an arrest warrant for him, and he had fled out of the
22  country.
23  BY MR. HARRISON:
24  Q. I'm sorry, I missed that last part. The prosecutor fled
25  out of the country?

HCEPATI2          Korkmaz - Cross          Page 1794

1  A. While I was in prison, I saw it on the news, that the news
2  reporting was that he had fled out of country.
3  Q. And the fact that you took the wiretap evidence, in
4  violation of Turkish law on December 25th, later became the
5  basis of some of the charges against you in the later
6  indictments, correct?
7  A. No, there was never a charge against me about obtaining
8  this evidence from any judicial body.
9  Q. Well, as we discussed, I think yesterday, you were charged
10  in both of those indictments with illegal wiretapping or
11  stealing secret communications, correct?
12      THE COURT: Did we discuss that yesterday?
13      MR. HARRISON: I believe we did, Judge. I'm pretty
14  sure.
15      THE COURT: I know we did the wiretapping. I may not
16  remember, but why don't we ask the question.
17      MR. HARRISON: Sure, Judge.
18  BY MR. HARRISON:
19  Q. Well, there were charges in both of these later indictments
20  against you for illegal wiretapping and stealing secret
21  communications, correct?
22  A. Let me repeat. That neither in any of those indictments or
23  in any other investigation, there was no reference to me
24  obtaining information from, or the evidence from, the
25  investigation.

HCEPATI2          Korkmaz - Cross          Page 1795

1  Q. Let me just ask you this. What's your understanding of the
2  illegal wiretapping charges that were brought against you in
3  those two indictments?
4  A. I'll explain it this way. The allegations were that during
5  the investigation prior to December 17th, it was alleged that
6  the wiretaps were conducted outside of the bounds of law, which
7  was all baseless to begin with.
8      And I already mentioned to you yesterday that all of
9  the wiretaps had been conducted through court orders, through
10  the knowledge of TIB and through the approval of TIB, and that
11  everything was done in its legal manner.
12  Q. But then when you took -- when you illegally took the
13  copies of those wiretaps on December 25th, that was in
14  violation of those court orders and the TIB protocols, correct?
15  A. No, that would have nothing to do with TIB because me
16  obtaining these recordings at that time would not mean that
17  I -- would not mean that this evidence had been collected
18  through illegal means. So just because I had obtained this
19  information does not change, and it does not make it into an
20  illegal wiretap issue.
21  Q. But it was in violation of the court order, correct?
22  A. I don't understand what you're referring to because the
23  court order was for the collection of the recordings, and it
24  had already been served and the sounds had already been
25  collected.

HCEPATI2          Korkmaz - Cross          Page 1796

1  Q. You testified that when you took those wiretap calls on
2  December 25th, it was in violation of Turkish law, correct?
3  A. Yes. Yes, I did. That is correct, and I've been saying it
4  from the beginning.
5  Q. Okay. Which Turkish laws did it violate?
6      THE COURT: If you know.
7  A. I don't know what Turkish law it violates as it pertains to
8  me, but I know which law it violates with regards to the
9  prosecutor himself.
10  Q. Which law was that?
11  A. The crime that was committed by the prosecutor?
12  Q. Correct.
13  A. It was violation of privacy.
14  Q. And you knew, at the time that you were assisting him to do
15  that, that you were in violation of that law as well, correct?
16  A. No. He allowed it to happen. I requested it, and he
17  approved it and gave it to me; so I just took it.
18  Q. Mr. Korkmaz, you were a police officer who stole evidence
19  of wiretap calls, correct? You stole police evidence, didn't
20  you?
21      MR. LOCKARD: Objection.
22      THE COURT: Overruled.
23  A. Sir, I have been saying from the very beginning that this
24  was actually part of me being a police officer. I have not
25  been hiding anything. I've been saying this openly from the

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    December 14, 2017

| HCEPATI2 | Korkmaz - Cross | Page 1797 |
|---|---|---|

1   beginning, that this was part of my training.  I did this
2   knowingly.  I did not agree with these pieces of evidence to be
3   taken away from justice being served, and I was afraid that
4   this evidence would be altered or destroyed.
5          MR. HARRISON: Can we have the witness stop and have a
6   sidebar, Judge?
7          THE COURT: Yes, sure.
8          (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCEPATI2 | Korkmaz - Cross | Page 1798 |
|---|---|---|

1          (At the side bar)
2          THE COURT: I think you've established a pretty clear
3   record on this point.
4          MR. HARRISON: Okay.
5          THE COURT: We've been going over it.  I don't think
6   you're going to get any further.
7          MR. HARRISON: I think that's right, Judge.
8          THE COURT: All right.
9          (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCEPATI2 | Korkmaz - Cross | Page 1799 |
|---|---|---|

1          (In open court)
2          MR. HARRISON: May I proceed, Judge?
3          THE COURT: Sure.
4   BY MR. HARRISON:
5   Q.  Mr. Korkmaz, at the time that you took that evidence on
6   December 25th, as far as you know, no one from the government
7   had destroyed or taken away any of that wiretap evidence,
8   correct?
9   A.  The illegal orders that had been made by the new leaders
10  that had been brought to the unit on December 19th, 2013, and
11  December 20th, 2013, are ones that I had mentioned here before.
12  Q.  Okay.  But you decided that those orders were illegal,
13  right?  Nobody else?  No court decided those orders were
14  illegal.  You decided that on your own, didn't you?
15  A.  Sir, I was a police officer.  I am a police officer, and I
16  was part of the law enforcement force, and the order that had
17  been issued was given by the deputy provincial police chief at
18  that time, who had just been assigned to that position, and
19  this person is not part of the law enforcement branch.  And the
20  person in charge of the law enforcement branch of the process
21  is the prosecutor.  This person, who is not in the law
22  enforcement branch cannot legally give me any orders in my law
23  enforcement duties.
24          MR. HARRISON: I'm going to ask the witness be
25  directed to answer my question.

| HCEPATI2 | Korkmaz - Cross | Page 1800 |
|---|---|---|

1   Q.  My question is, Mr. Korkmaz, you decided yourself that the
2   order was illegal; no court made that decision, correct?
3          THE COURT: Maybe take it in two pieces.
4          MR. HARRISON: Sure.
5   BY MR. HARRISON:
6   Q.  Mr. Korkmaz, for that -- withdrawn.
7   A.  (Speaking in Turkish).
8   Q.  Let me go back to my original question.  Mr. Korkmaz, on
9   December 25th, 2013, when you made the decision to violate
10  Turkish law, as far as you know, no evidence had been destroyed
11  or taken away, correct?
12  A.  There was an attempt to do so, and you had asked a question
13  about whether there was a court order deciding this.  What I
14  want to say is that in the Turkish criminal procedure code
15  there is a mention of a law enforcement officer, if he/she were
16  to be obstructed in the discharge of his duties, then he is, in
17  his own right, to use force, if needed, to do what he needs to
18  do.  So, in other words, the law does not require that there
19  needs to be an order for me to be able to do this.
20  Q.  All right.  One last question on this, then I'm going to
21  move on, Mr. Korkmaz.  We agree that when you took that wiretap
22  evidence on December 25th, it was in violation of Turkish law,
23  correct?
24  A.  I knew it.  I took initiative.  I did it knowingly.
25  Q.  When was the next time after December 25th, 2013, that you

**A679**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

| HCEPATI2 | Korkmaz - Cross | Page 1801 |
|---|---|---|

1 took evidence related to the December 17th, 2013,
2 investigation?
3 A. I obtained more on two occasions in January, but I don't
4 recall the exact dates on those.
5 Q. January of what year?
6 A. 2014, I apologize.
7 Q. And let's take those one at a time. The first time that
8 you obtained more evidence of the December 17th, 2013,
9 investigation in January, how did that happen?
10 A. What I recall is that I had stopped by to visit with the
11 prosecutor on the way from my duty on the bridge unit, and on
12 that date, on this first occasion, I obtained the scanned
13 documents.
14 Q. What type of scanned document?
15 A. This consisted of many types of documents that were in the
16 possession of the prosecutor at that time, and this was the
17 many types of documents that were in the case file as of that
18 date. And among these were documents such as the case summary
19 file, the transcripts, the reports that were brought back from
20 the physical surveillance activities, any communications, any
21 expert reports that were issued, court orders and many other
22 documents that had been presented to the prosecutor's office
23 over time.
24 Q. And at that time, in January, you were assigned to the
25 bridge unit, correct?

| HCEPATI2 | Korkmaz - Cross | Page 1802 |
|---|---|---|

1 A. Yes.
2 Q. And you no longer had any authority to have documents from
3 the financial crimes unit, correct?
4 A. Yes. Whether during this particular time or any other
5 times that I obtained information, I did not have
6 authorization, and I took them.
7 Q. And when you took the documents on that first date in
8 January, that was in violation of Turkish law as well, correct?
9 A. Yes. Whatever was applicable to the December 25th occasion
10 might have occurred to this particular occasion, and any other times it
11 might have occurred, it was still applicable.
12 Q. And on this date that we're talking about in January that
13 you got the documents from the prosecutor, was that from the
14 same prosecutor that you had gotten the wiretap recordings from
15 on December 25th or a different prosecutor?
16         THE INTERPRETER: I'm sorry, it's cutting out.
17         MR. HARRISON: I can't hear it. It's cutting out.
18         THE INTERPRETER: I'm speaking Turkish anyway, but, I
19 don't know, maybe I'll just stand here so maybe it will have a
20 better site connection.
21 A. It was the same prosecutor. In fact, I had told you that
22 on the 25th, the individual had told me that he was going to
23 get everything scanned, and I wanted to get copies of
24 everything; so this is part of that.
25 Q. This was part of the same plan, correct?

| HCEPATI2 | Korkmaz - Cross | Page 1803 |
|---|---|---|

1 A. No, this was just my thought, that it's not a plan. He
2 wanted to scan these into the case anyway.
3 Q. And when was the next time in January of 2014 that you got
4 more information from the December 17th, 2013, investigation?
5 A. That was towards the end of January as well. Both of these
6 occasions were at the end of January.
7 Q. What --
8 A. I don't recall the exact date, but it was in January.
9 Q. On that second date in January, what did you get from the
10 prosecutor at that time?
11 A. The photographs of what had been seized during the
12 searches. In fact, during that meeting, here's what the
13 prosecutor told me --
14 Q. Well, I'm going to ask that --
15         THE COURT: Wait, wait, wait.
16         MR. HARRISON: That's not responsive to my question.
17 A. He said if --
18         THE COURT: No, hold on. He just wanted to know what
19 he got.
20 A. Well, I took them and that's what the prosecutor said.
21 Q. And, again, like the first two times, I think we can agree
22 that that was not authorized, when you took the documents on
23 that second date in January, and it was in violation of Turkish
24 law, correct?
25 A. As I had mentioned in previous questions, yes.

| HCEPATI2 | Korkmaz - Cross | Page 1804 |
|---|---|---|

1 Q. When was the next time that you got evidence or documents
2 from the December 17th, 2013, investigation?
3 A. It was in the month of February.
4 Q. How did that happen?
5 A. The prosecutor had been removed from his present duty and
6 was in a new office, and I had come to that new office to see
7 him. And on that occasion, I obtained some other scanned
8 documents that I had not received earlier and also digital
9 formats of certain evidence, and these consisted mostly of the
10 digital versions of the expert reports and the scanned versions
11 of such expert reports.
12 Q. Again, when you took that information in February, that
13 was, again, without authorization and in violation of Turkish
14 law, correct?
15 A. Yes.
16 Q. When was the next time that you got information that you
17 took information relating to the December 17th, 2013,
18 investigation?
19 A. In 2014, and I remember it to be the month of July.
20 What I know is that it was the period of Ramadan, and I had
21 visited the prosecutor in his home. On that occasion, I
22 obtained many of the things that I had obtained before from
23 him, but also I obtained some additional documents, and among
24 those was the report that had been produced by the BDDK
25 auditor, and there were digital documents pertaining to some of

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

HCEPATI2          Korkmaz - Cross          Page 1805

1  the depositions, and there were digital files pertaining to the
2  reports and summary files, and I had obtained those.
3  Q. Again, when you obtained that information, it was without
4  authorization and in violation of Turkish law, correct?
5  A. Yes.
6  Q. When was the next time that you obtained information from
7  the December 17th, 2013, investigation?
8  A. It was after I was released from the prison. It was in
9  June of 2016.
10 Q. And what types of information did you obtain at that time?
11 A. The digital files for the digital analysis reports, and I
12 mean, all of them that I had not obtained from the prosecutor
13 in the past because I had already obtained some of them from
14 the prosecutor before and the exports.
15 Q. And who did you obtain -- excuse me. Who did you obtain
16 that information from in June of 2016?
17 A. From a forensic expert officer that had taken part in the
18 investigation.
19 Q. And he gave you that in June of 2016, after you had been
20 charged and in jail then released, correct?
21 A. Yes.
22 Q. And, again, when you got that information from that
23 forensic officer, that was without authorization and in
24 violation of Turkish law, correct?
25 A. I'm not sure about that one. I'm not sure whether this was

HCEPATI2          Korkmaz - Cross          Page 1806

1  against the law or not.
2  Q. Well, at this point, in June 2016, you were no longer a
3  police officer, correct?
4  A. Yes.
5  Q. So it was illegal for you, was it not, to receive police
6  evidence from the forensic expert officer when you were not a
7  police officer, right, and you had just been released from
8  prison?
9  A. Sir, the reason why I'm not sure here is because it's -- I
10 have a legal reason to be not sure about this because during
11 that time period, there was an investigation that had been
12 opened against me about December 17th.
13      And during my deposition, the prosecutor that was
14 present at my deposition, I asked him the following, and this
15 is taking place in December 2015. What the prosecutor told me
16 was that they had put the exhibits about December 17th into the
17 case that was against me, but I don't know what was entered
18 into that case or what wasn't. But within the Turkish law, as
19 a person implicated in an investigation, I have the right to
20 collect evidence that's in my favor and to use that evidence in
21 any way I need to use it.
22 Q. Well, you had the right to collect evidence through the
23 legal process, right? But this police officer, this officer
24 didn't give you --
25 A. (Speaking in Turkish).

HCEPATI2          Korkmaz - Cross          Page 1807

1  Q. Let me finish. That officer didn't give you that
2  information as part of your court proceedings, correct?
3  A. There's no need for her to have a court order to collect
4  information -- sorry, collect evidence in my favor, and what
5  I'm not sure about is whether this breaches any law, and I'm
6  under oath here.
7      Since I don't know what the answer to that is, that's
8  why I'm saying I don't know whether this is against the law or
9  not. I just don't know. So I told you what I knew about the
10 previous times I had obtained information. I'm telling you
11 what I know about this time that I obtained information. I'm
12 just telling you everything as is.
13 Q. Let me go back to -- let me ask you a question about the
14 evidence that you received on, I believe, the four different
15 occasions prior to the time that you went to prison. On what
16 sort of medium, or in what form, did you receive the evidence
17 that you got on December 25th, the two dates in January and the
18 date in February? How did you receive that? Was it on a flash
19 drive?
20 A. On December 25th, I had obtained a copy of a CD, and then I
21 had copied that then onto my password protected flash disc and
22 to my hard disc.
23 Q. Okay. What about the two dates in January?
24 A. In January, the prosecutor copied personally the files onto
25 a CD for these scanned documents; so I received that in CD

HCEPATI2          Korkmaz - Cross          Page 1808

1  format.
2  Q. What about the second date in January?
3  A. The photographs had come from the Police Department on a CD
4  on that date -- for that date, I'm sorry, and I had copied it,
5  copied this information onto my flash memory. On that date, I
6  had copied from the CD to the computer and from the computer
7  down to my flash drive.
8  Q. What about on the date in February, on what medium did you
9  receive the information on the date in February?
10 A. The prosecutor had the information on a CD, and in the same
11 manner as I described with the previous occasion, I copied that
12 onto my flash drive.
13 Q. And then you went to prison from September of 2014 until
14 February 9th of 2016, correct?
15 A. Yes.
16 Q. Where were all of those CDs and flash drives from the
17 December, January and February dates that you had collected
18 while you were in prison?
19 A. I was destroying the CDs after I would copy the information
20 onto my flash drive and onto my hard disc anyway. And this
21 flash drive and the hard disc of mine were both password
22 protected. I had left them in my home in Istanbul when I went
23 to Hakkari. During that time, my mother had gone to Istanbul,
24 where my wife was, and I had told my mother to preserve these
25 two flash drives and the hard disc.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

HCEPATI2     Korkmaz - Cross     Page 1809

1 Q. Okay. So fair to say that you did not have custody of that
2 information while you were in prison, correct?
3 A. They were in the custody of my mother, yes.
4     MR. HARRISON: Judge, this would be a good place for
5 the mid-morning break, if that's what your Honor wants.
6     THE COURT: Okay. About how much more do you think?
7     MR. HARRISON: If I can have a few minutes at the
8 break, Judge, to check, I can let you know better.
9     THE COURT: Okay. Let's take five minutes.
10     (Jury not present)
11     (Recess)
12     THE COURT: So, Mr. Harrison, what's your best
13 estimate?
14     MR. HARRISON: Judge, I think I'll be done before
15 lunch, but how far before lunch depends on how long his answers
16 are.
17     (Continued on next page)
18
19
20
21
22
23
24
25

HCE3ATI3     Korkmaz - Cross     Page 1810

1     (Jury present)
2     THE DEPUTY CLERK: Sir, I'd like to remind you, you're
3 still under oath.
4     THE WITNESS: Yes.
5     MR. HARRISON: May I proceed, your Honor?
6     THE COURT: Yes.
7 BY MR. HARRISON:
8 Q. Mr. Korkmaz, when you were in prison and you left the
9 evidence with your mother, some of that evidence was encrypted
10 I think you said, correct?
11 A. Yes.
12 Q. But some of it was not encrypted, correct?
13 A. That's the one that I had, anyway. And there was no
14 evidence in it, anyway.
15 Q. Well, at some point, some of the files that you ended up
16 giving to the prosecutor's office were altered, correct?
17 A. I did not understand.
18 Q. For instance, the prosecutor removed some information from
19 the documents, like signatures and other things, before he gave
20 them to you, correct?
21 A. I don't know what you're referring to exactly. I don't
22 understand the question.
23 Q. Well, do you remember telling members of the U.S.
24 attorney's office in one of your prep sessions on November 3 of
25 2017, this year, that the prosecutor had deleted the signature

HCE3ATI3     Korkmaz - Cross     Page 1811

1 block from some reports before giving them to you?
2 A. No. What I understand is there might be an error in
3 recording that. The person that had done so was the expert,
4 not the prosecutor.
5 Q. The expert had changed the document?
6 A. So here's how it was. The expert told me that in the
7 export -- the expert analysis report, not in the export, that
8 he had made changes and he had removed the signature block or
9 the name block from those expert reports.
10 Q. Do you know what metadata is for electronic documents?
11 A. Yeah, I don't know what the term "meta" means.
12 Q. Well, the electronic profile of a document.
13     Do you recall telling members of the U.S. attorney's
14 office in that same proffer session on November 3 of this year
15 that some of the metadata details, the author and other things,
16 had been changed on some of the documents that you gave to
17 them?
18 A. That is correct. That's what the expert said as well.
19 Q. Since we're talking about the U.S. attorney's office. When
20 was the first time, Mr. Korkmaz, that you or anyone on your
21 behalf, had contact or communications with the United States
22 government?
23 A. To the best of my recollection, in April of 2016, my lawyer
24 had informed me about this. And he had said that he had been
25 contacted.

HCE3ATI3     Korkmaz - Cross     Page 1812

1 Q. By whom?
2 A. The prosecutor's office that you had referred to.
3 Q. By the U.S. attorney's office in New York?
4 A. Well, I don't know the names but from that place, yes.
5 Q. Who was your attorney at that time?
6     MR. LOCKARD: Objection.
7     MR. HARRISON: Can we approach for one second, Judge?
8     THE COURT: Yes.
9     MR. HARRISON: Judge, it's okay. I'll withdraw it.
10     THE COURT: Okay.
11 Q. Mr. Korkmaz, do you know what the U.S. attorney's office
12 said to your lawyer at that time?
13 A. I don't know to what types of conversations they may have
14 had. It's my lawyer just informed me about it. And he had
15 said that he was contacted, and I don't recall whether there
16 was anything mentioned in those conversations about being a
17 witness, for example, but I believe that there might have been
18 some reference to whether being a witness might be a
19 possibility.
20 Q. Okay. And this was in April of 2016, which was about two
21 months after you had gotten out of prison, correct?
22 A. That is correct.
23 Q. About two months before the second indictment was going to
24 be served on you, correct?
25 A. That is correct. And that investigation was already

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

*December 14, 2017*

| HCE3ATI3 | Korkmaz - Cross | Page 1813 |
| --- | --- | --- |

1  ongoing. And I had already provided a statement for that
2  investigation at that time.
3  Q. So April 2016, that was about three months before the armed
4  coup attempt happened in Turkey, correct?
5      MR. LOCKARD: Objection.
6      THE COURT: If you know.
7  A. As far as timeline, that is the case. But it has nothing
8  to do with this.
9  Q. Did your lawyer communicate to you at that time why the
10  U.S. attorney's office in New York was reaching out to you in
11  particular?
12  A. It was a preliminary conversation that was had, and there
13  was nothing that had materialized about becoming a witness.
14  What I understand is that there was a conversation about
15  whether I knew the information, whether I had taken part in the
16  investigation and such.
17  Q. If you know, did --
18      THE COURT: Could I just see you for a minute.
19      (Page 1814 SEALED by order of the Court)
20      (Continued on next page)
21
22
23
24
25

| HCE3ATI3 | Korkmaz - Cross | Page 1816 |
| --- | --- | --- |

1  A. I know of one conversation my lawyer had in July.
2  Q. With the U.S. attorney's office in New York?
3  A. With the individuals from the prosecutor's office.
4  Q. Do you know the subject matter of that communication?
5  A. My lawyer had then informed me that during this
6  conversation, there was more material --
7      THE COURT: Could you hold on for one second.
8      (Pages 1817-1821 SEALED by order of the Court)
9      (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCE3ATI3 | Korkmaz - Cross | Page 1815 |
| --- | --- | --- |

1      (In open court)
2      MR. HARRISON: May I proceed?
3      THE COURT: Yes.
4  BY MR. HARRISON:
5  Q. Mr. Korkmaz, did you communicate in any way at that time to
6  the U.S. attorney's office that you were in possession of
7  evidence from the December 17, 2013, or materials from the
8  December 17, 2013 investigation?
9  A. I did not communicate with them during that time at all. I
10  only talked with my lawyer.
11  Q. Okay. Well, do you know whether it was communicated in any
12  fashion at that time to the U.S. attorney's office that you in
13  fact were in possession of materials related to the
14  December 17, 2013 investigation?
15  A. This is only a guess, but I would guess that my lawyer may
16  have said something.
17  Q. When was the -- that was April 2016 --
18  A. Excuse me. Just based as a response to your previous
19  question again. I am speaking particularly about that first
20  contact in April. I know that my lawyer told them afterwards,
21  but I'm speaking only to that first contact that you were
22  asking me about. Just so that there is no misunderstanding.
23  Q. When was the next time after April 2016 that you or anyone
24  on your behalf had communications with the U.S. attorney's
25  office or anyone from the U.S. government?

| HCE3ATI3 | Korkmaz - Cross | Page 1822 |
| --- | --- | --- |

1      (In open court)
2      MR. HARRISON: Judge, if I could just have one minute.
3      THE COURT: Sure.
4  BY MR. HARRISON:
5  Q. Mr. Korkmaz, there came a time -- you were released from
6  prison on February 9, 2016, correct?
7  A. Yes.
8  Q. You were released from jail on bail conditions, essentially
9  at that time, correct?
10  A. So, there were conditions. Not necessarily bail as far as
11  a bail amount, but there were conditions.
12  Q. What were the conditions at that time of your release?
13  A. International travel ban.
14  Q. That's it?
15  A. And I was also obligated to attend the hearings.
16      THE COURT: To attend what hearings?
17      THE WITNESS: So the court proceedings are stretched
18  out over time, in our system, your Honor. And there are one-
19  or two-day hearings, and there are one month, two months or
20  five, six months in between each of those hearings. And I was
21  obligated to attend each of those hearings regarding that court
22  procedure.
23      THE COURT: Are these hearings related to what has
24  been referred to as the first indictment or the second
25  indictment?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,
December 14, 2017

HCE3ATI3          Korkmaz - Cross          Page 1823

1       THE WITNESS: The first indictment, your Honor.
2 Q.  And then you did stay in Turkey from February 9 of 2016
3    until August of that year, correct?
4 A.  Yes.
5 Q.  It was in August that you violated the international travel
6    ban that you had, and smuggled yourself out of the country,
7    correct?
8 A.  Yes.
9 Q.  You left in August close in time to the end of the failed
10   coup attempt which ended on July 21 of 2016, correct?
11 A.  First of all, I don't have any information as to whether
12   there was an end to anything on July 21.  And second, I'm not a
13   coup analyst.  I'm not one that was participating in a coup.  I
14   was not taking part in a coup investigation.  So, I don't know
15   whether there was any sort of controlled coup attempt anywhere.
16 Q.  Let's clarify what we're talking about.  So the coup was an
17   attempt by military officers in the Turkish military who were
18   part of the Gulenist movement to the overthrow the Erdogan
19   Turkish government, correct?
20 A.  Can you translate the question one more time, please?
21 Q.  So, the coup attempt in July of 2016, in Turkey, happened
22   when some military officers who were part of the Gulenist
23   movement tried to overthrow the Turkish government, run by
24   Mr. Erdogan.  Correct?
25       THE COURT: If you know the answer to that.

HCE3ATI3          Korkmaz - Cross          Page 1824

1 A.  So I don't have any information about the judgments that
2    are in your question.
3 Q.  Well, the coup started on July 15 and it centered around
4    Istanbul, Turkey, correct?  The coup attempt?
5 A.  I don't know about it being centered in Istanbul.  But I
6    know that there was an incident in Istanbul.
7 Q.  You were in Istanbul, you testified previously, on July 15
8    when that coup attempt started, correct?
9 A.  Yes, I was there along with 15 million other people.
10 Q.  And the coup was done by military, folks in the military,
11   Turkish military with tanks and guns and helicopters, correct?
12       MR. LOCKARD: Objection.
13       THE COURT: If you know that.
14 A.  With regards to this attempted coup, I don't have any
15   information as to whether it was a coup attempt, whether it was
16   a controlled coup, I was not a witness to it.  I was not a
17   person that took part in its investigation.  I have no
18   information as to this coup attempt.
19 Q.  During that coup attempt, there were tanks that were
20   shooting at the Turkish Parliament building, correct?
21       MR. LOCKARD: Objection.
22       THE COURT: If you know that.
23 A.  I don't know that there was any shooting that took place
24   from a tank at that time.  I don't know.
25 Q.  So you are not aware, is it your testimony that you're not

HCE3ATI3          Korkmaz - Cross          Page 1825

1    aware of this coup attempt that happened in Turkey between
2    July 15 of 2016 and July 21 of 2016?
3       MR. LOCKARD: Objection.  Objection, your Honor.
4       THE COURT: Sorry?
5       MR. LOCKARD: Sorry.  Objection.
6       THE COURT: If you know the answer.
7 A.  First of all, I don't know if this event ended on July 21.
8    I know that there was an incident that took place on the night
9    of July 15.  According to the media, this was a coup, some
10   media says this was a controlled coup.  But I was not part of
11   any of the individuals involved.  So, I don't know about -- I
12   don't have any information about this coup.
13       But with regards to this coup that is reported as a
14   coup, as a controlled coup, what I regard as event, actually,
15   is a coup that was against my rights, my personal rights in
16   terms of being able to defend myself.  I take this as a coup
17   that actually affected me personally.
18       MR. HARRISON: Judge, there is no question pending at
19   this point.
20       THE COURT: We're in a sort of a geopolitical
21   discussion here.
22       MR. HARRISON: I'll ask another question so we can
23   narrow the focus.
24 Q.  Mr. Korkmaz, after you were released from prison on
25   February 9, 2016, you stayed in Turkey for the month of

HCE3ATI3          Korkmaz - Cross          Page 1826

1    February, correct?
2 A.  Yes.
3 Q.  You stayed in Turkey for the month of March, correct?
4 A.  Yes.
5 Q.  You stayed in Turkey for the month of April, correct?
6 A.  Yes.
7 Q.  You stayed in Turkey for the month of May, correct?
8 A.  Yes.
9 Q.  And you stayed in Turkey for the month of June, correct?
10 A.  Yes.
11 Q.  Even though you learned in June of 2016, as you've
12   testified previously, that a second indictment was going to be
13   handed down on you, correct?
14 A.  I had not learned of that indictment in June of 2016 at
15   that date.  During that time, actually.
16 Q.  On what date did you first learn about the second
17   indictment?
18 A.  It was in early August, and I was in Turkey.
19 Q.  That indictment is dated June 29 of 2016, correct, the
20   second indictment?
21 A.  I recall that date to be so, yes.
22 Q.  You didn't leave in July -- withdrawn.
23       You stayed in Turkey for the month of July also,
24   correct?
25 A.  Yes.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

HCE3ATI3        Korkmaz - Cross        Page 1827

1  Q.  It wasn't until shortly after the coup ended that you left
2  in August, correct?  That you left Turkey in August?
3        MR. LOCKARD: Objection.
4  A.  Yes.  Yes, I had made contact with a smuggler on July 13,
5  and he had told me he would get back to me, and he got back to
6  me in August, and that's how it all occurred.
7  Q.  Let me take you back.  Although you were released on
8  February 9 of 2016, a judge had previously -- a judge in Turkey
9  named Judge Bazer had previously ordered your release in an
10  order dated April 26 of 2015.  Correct?
11        THE COURT: I'm sorry?  Could you do the whole
12  question again.
13        MR. HARRISON: Sure, Judge.
14  Q.  You were released from prison on February 9 of 2016,
15  correct?
16  A.  Yes.
17  Q.  But previously, a judge in Turkey named Judge Bazer had
18  issued an order for your release from prison on April 26, 2015,
19  correct?
20  A.  You said 26th of April?
21  Q.  Of 2015.  Yes.
22  A.  Yes.
23        MR. HARRISON: Mr. White, can you bring up Defense
24  Exhibit 5007, please.  Just for the witness, please, Mr. White.
25  Q.  Mr. Korkmaz, do you recognize Defense Exhibit 5007? Take a

HCE3ATI3        Korkmaz - Cross        Page 1828

1  minute if you want.
2  A.  I have not received such a decree in my hand before.  I had
3  learned of that whole process through my lawyer.
4  Q.  Okay.  Do you see your name on that document?
5  A.  Yes.
6  Q.  It's I guess listed on the first line of names there.
7        THE COURT: How about a date?
8  Q.  Do you see the date on there, Mr. Korkmaz?
9  A.  I can't see a date here.
10        MR. HARRISON: Can we go to page four, Mr. White.
11  Four of four.
12        I have a paper copy.  If you don't mind, I'll
13  approach.
14        MR. LOCKARD: Page five is on the screen.
15        MR. HARRISON: Can I just approach with a paper copy,
16  Judge?
17        THE COURT: Sure.
18  Q.  Mr. Korkmaz, just take a look at that page there, four of
19  four at the bottom, and see if you see a date there, sir.
20  A.  I see it.
21  Q.  That's April 26 of 2015, correct?
22  A.  No.
23  Q.  What's the date there?
24  A.  25th of April, 2015.
25  Q.  April 25 of 2015, my apologies.

HCE3ATI3        Korkmaz - Cross        Page 1829

1        This is the order where Judge Bazer ordered your
2  release from prison, correct?
3        MR. LOCKARD: Objection.  I believe the testimony is
4  he hasn't seen it.
5        THE COURT: Overruled.  If you know.
6  A.  I'm not aware of this particular decree, but I know that
7  there was a decree made on my behalf for me to be released.
8        MR. HARRISON: Judge, defense moves Defense Exhibit
9  5015 into evidence.
10        MR. LOCKARD: Objection.
11        MR. HARRISON: Sorry.  5007.
12        THE COURT: What are you saying that this is?
13        MR. HARRISON: An order by a judge in Turkey ordering
14  Mr. Korkmaz released on April 25 of 2015.
15        THE COURT: It is in Turkish.
16        MR. HARRISON: Yes, Judge.
17        MR. LOCKARD: The witness has not seen it.
18        THE COURT: So, I'll allow it subject to connection.
19  I don't know what to make of it because I don't speak Turkish.
20        MR. LOCKARD: Your Honor, I think there are also some
21  redactions that would be required to this document.
22        (Defendant's Exhibit 5007 received in evidence)
23  Q.  Mr. Korkmaz, Judge Bazer entered that order to release you
24  from prison on April 25 of 2015, because he had received a
25  letter from Fethullah Gulen, the leader of the Gulenist

HCE3ATI3        Korkmaz - Cross        Page 1830

1  movement, five days before, requesting that you and others be
2  released from prison, correct?
3  A.  This sounds very illogical to me.  I don't know Fethullah
4  Gulen.  I don't know Judge Bazer.  I don't know any of these
5  individuals and it just doesn't make any sense to me.  I don't
6  know them.
7  Q.  But it sounds logical to you?
8        THE COURT: Is the translation --
9        THE INTERPRETER: Illogical.
10        MR. HARRISON: Sorry.
11        Mr. White, can you bring up Defense Exhibit 5015,
12  please.
13  Q.  Mr. Korkmaz, do you see a letter dated April 19, 2015 in
14  there?  That's Exhibit 5015.
15        THE COURT: Your question was what?  Do you see this?
16  Q.  Do you see the letter dated April 19 of 2015.
17  A.  So, I see the date of April 19 on there.
18  Q.  That's a letter from Fethullah Gulen to Judge Bazer
19  requesting the release of certain -- of a number of prisoners,
20  correct?
21        MR. LOCKARD: Objection.
22        THE COURT: If you know.
23  A.  This is a ridiculous thing that I had heard about the first
24  time here today from you.
25  Q.  You've seen that letter before, haven't you, Mr. Korkmaz?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 14, 2017

| HCE3ATI3 | Korkmaz - Redirect | Page 1843 |
|---|---|---|

1 A. Yes, there was a conversation about, after this
2 conversation, regarding this topic.
3 Q. Was that about Mr. Zarrab's food business?
4 MR. HARRISON: Can I have a continuing objection to
5 hearsay, Judge, and scope?
6 THE COURT: Okay. I think you better make it whenever
7 you think there is hearsay.
8 MR. HARRISON: Okay.
9 Q. Was that conversation between Mr. Zarrab and Mr. Happani
10 also about Mr. Zarrab's food business?
11 A. It was about the fake food trade.
12 Q. What did Mr. Happani say about Mr. Atilla in that call?
13 MR. HARRISON: Objection. Hearsay, your Honor.
14 THE COURT: Overruled.
15 A. He had said "May God be pleased with him."
16 Q. Now, you testified yesterday about your efforts to compile
17 Mr. Zarrab's gold transactions from September of 2012 to
18 December of 2013. Do you remember that?
19 A. That is correct.
20 Q. Can you remind us what was the approximate value of gold
21 that Mr. Zarrab exported after July 1st, 2013 until December of
22 2013?
23 A. Based on --
24 MR. HARRISON: Objection, your Honor.
25 THE COURT: Overruled.

| HCE3ATI3 | Korkmaz - Redirect | Page 1844 |
|---|---|---|

1 A. Based on my own determination, that was between nine to
2 10 tons of gold.
3 Q. You also compiled Mr. Zarrab's fake food transactions from
4 April of 2013 through December of 2013?
5 A. That is correct.
6 Q. Can you remind us the approximate value of those
7 transactions.
8 MR. HARRISON: Objection to summary, Judge.
9 THE COURT: Overruled.
10 A. Based on my assessment, the amount was about 900 and some
11 million Turkish liras and 700 and some million euros. And at
12 that time I had run a quick calculation on what that comes to,
13 and based on the exchange rates of that time, that was about
14 one and a half billion dollars.
15 Q. Were any of the Iranian gold importers the same as the
16 Iranian food importers?
17 A. Based on the documents, I saw that those that appeared to
18 be gold exporters for Iran had become -- prior to July 1st, had
19 become food traders after July 1st.
20 Q. Were those gold exports and those fake food transactions
21 funded with Iranian oil money?
22 MR. HARRISON: Objection, hearsay.
23 THE COURT: Overruled.
24 A. That is correct.
25 MR. LOCKARD: If we can turn to Government's Exhibit

| HCE3ATI3 | Korkmaz - Recross | Page 1845 |
|---|---|---|

1 304-T.
2 Q. On May 6 of 2013, on page two, please. Did Mr. Zarrab and
3 Mr. Aslan discuss Mr. Atilla?
4 A. That is correct.
5 MR. LOCKARD: Just a moment, your Honor.
6 Nothing further, your Honor.
7 MR. HARRISON: Just two or three quick questions,
8 Judge.
9 THE COURT: Go ahead.
10 RECROSS EXAMINATION
11 BY MR. HARRISON:
12 Q. Mr. Korkmaz, you say the evidence against you in the two
13 indictments in Turkey was collected by the Turkish police,
14 correct?
15 THE COURT: Is this based on the redirect?
16 MR. HARRISON: Yes.
17 A. You did not ask such a question before so -- but that is
18 correct, yes.
19 Q. And you say that the evidence -- withdrawn.
20 The evidence against you in those two indictments in
21 Turkey was also pursuant to court order, correct?
22 A. In one of them, no. And in one of them, a part of the
23 evidence was based on court order.
24 Q. But that was done within the judicial system in Turkey,
25 supervised by the court system, correct?

| HCE3ATI3 | Korkmaz - Recross | Page 1846 |
|---|---|---|

1 A. I saw that there was a process that involved errors.
2 That's what I noticed.
3 Q. And you say that case against you, those two cases against
4 you were false, correct?
5 A. I can say clearly that the allegations are baseless, and
6 there is no evidence that is based on reality.
7 Q. And yet you stole evidence from the Turkish judicial system
8 and you want to use it against my client here in this case,
9 correct?
10 A. These are pieces of evidence that had been collected
11 legally within the investigation that I ran. And I brought
12 them, yes.
13 Q. Stolen by you in violation of Turkish law, correct?
14 A. Yes, I had already said so.
15 MR. HARRISON: No further questions.
16 THE COURT: Let's excuse the witness.
17 (Witness excused)
18 THE COURT: We're going to excuse the jury for lunch.
19 And ask you to be back at 2 o'clock. It is about five -- that
20 clock says 10 minutes to 1 now. So see you at 2 o'clock.
21 (Jury excused)
22 (Continued on next page)
23
24
25

**A686**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 14, 2017

<table>
<tr><td>HCE3ATI3</td><td align="right">Page 1847</td></tr>
</table>

1    THE COURT: Over the lunch break it is my complete
2  expectation that the matter we had discussed before will be
3  resolved by stipulation.  I can't imagine any set of
4  circumstances where it would not be the case.  So, if you need
5  an extra 10 minutes over lunch, you should take it.  That's
6  what I think needs to happen.
7    So who is the next witness?  The government is
8  finished I think, right?
9    MR. LOCKARD: We are, subject to the readmitting the
10  exhibits we intend to offer.  If we can resolve that over the
11  lunch break also and we can rest when we come back.
12    THE COURT: Okay.  But I think we need to do that or
13  at least advise the jury that that was done, agreed to,
14  stipulated to or whatever in some fashion.
15    MR. LOCKARD: We've given a list and we want to make
16  sure everybody agrees on the final list.
17    THE COURT: Right.
18    MR. ROCCO: It is going to take us a little bit.
19  Really, Judge.  There are a lot of exhibits.
20    THE COURT: All right.
21    MR. LOCKARD: A lot of them are groups of exhibits.
22    THE COURT: Wait.  So do you mind if that happens
23  later?
24    MR. ROCCO: I don't mind.
25    THE COURT: In other words --

<table>
<tr><td>HCE3ATI3</td><td align="right">Page 1848</td></tr>
</table>

1    MR. ROCCO: No, we have no intention of slowing down
2  the progress.
3    THE COURT: I understand.  But I'm concerned about the
4  other stipulation for now.  Because that would be a stipulation
5  of testimony or whatever.
6    MR. ROCCO: We'll work on it, Judge.
7    MR. LOCKARD: I'm not certain we can do it later.  So
8  we'll do as much as we can by lunch, and if it is not by
9  agreement, we'll move and they can object.  But we have to make
10  the motion.
11    THE COURT: Which motion?
12    MR. LOCKARD: To admit the evidence that is still
13  subject to connection.
14    THE COURT: Oh.  Okay.
15    MS. FLEMING: Judge, it is pages of exhibits.  It is
16  pages of exhibits.
17    THE COURT: I get it.  So then who is your first
18  witness?
19    MS. FLEMING: Mr. Atilla.
20    THE COURT: And he would be ready to start this
21  afternoon?
22    MS. FLEMING: He'll be ready to start.
23    THE COURT: See you then.
24    (Recess)
25    (Continued on next page)

<table>
<tr><td>HCEPATI4</td><td align="center">Trial</td><td align="right">Page 1849</td></tr>
</table>

1    A F T E R N O O N   S E S S I O N
2    2:00 P.M.
3    (Trial resumed; jury not present)
4    THE COURT: Counsel, we have the jury here.  We're
5  ready to proceed.  What have you accomplished?
6    MR. ROCCO: Judge, we're trying to work out the
7  stipulation.
8    (Pause)
9    THE COURT: Okay.  So we're about to start.  Where are
10  you?
11    MR. LOCKARD: So, your Honor, on the matter that we
12  had discussed prior to the break, I think we have a proposed --
13  some proposed language that we're going to review and see if we
14  can nail that issue down.
15    THE COURT: I thought that was the point of the break?
16    MR. ROCCO: We worked mightily to get it done, your
17  Honor.
18    THE COURT: But didn't?
19    MR. ROCCO: Well, we think we did, but we put it in
20  writing, and we want the government to look at it.
21    THE COURT: So what would be the timing of that
22  process?
23    MR. ROCCO: Now, your Honor.
24    THE COURT: No, no, we're not going to wait for now.
25    MR. ROCCO: I've gone as far --

<table>
<tr><td>HCEPATI4</td><td align="center">Trial</td><td align="right">Page 1850</td></tr>
</table>

1    THE COURT: We have witnesses.  We're going to move
2  forward with the trial.
3    MR. ROCCO: Yes, your Honor.  We understand that.
4    MR. LOCKARD: My proposal would be -- I just got
5  e-mailed to me the draft language.  There are a couple of
6  things that we need to do, and I can step out or review it at
7  the table, but there are a couple of things that the government
8  needs to do before we rest.
9    THE COURT: Can somebody else do that while you're
10  doing that?
11    MR. DENTON: I can do that.
12    MR. LOCKARD: I think it falls to Mr. Denton.
13    THE COURT: That would be the evidence?
14    MR. DENTON: Yes, your Honor.  I guess there are two
15  issues with respect to the evidence.  There are the
16  government's exhibits that are subject to connection, and then
17  there's one thing we wanted to raise with respect to some new
18  defense exhibits that were produced last night.
19    But with respect to the exhibits that are subject to
20  connection, my understanding is that defense counsel has not
21  had an opportunity to review this.  There are essentially
22  categories of exhibits which were offered subject to
23  connection.  There were objections to connections, more of
24  them, which the Court overruled at the time and received
25  exhibits in their entirety.

A687

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                      December 14, 2017

HCEPATI4        Trial        Page 1875

1  presentation of defense witnesses.  So that's where we are,
2  just so you know.
3        I thought we might have concluded the issue that's
4  going to be dealt with in the morning this afternoon, but it
5  didn't happen, and as I say, it didn't happen, but everybody
6  has been pursuing it as diligently as they could.  So with
7  that, did you want to do the stipulation first or the video
8  first?
9        MR. LOCKARD: We'll do the stipulation, your Honor,
10  and then publish the video.
11        THE COURT: And you'll recall, ladies and gentlemen, a
12  stipulation, as I've said before, is something that's agreed to
13  by both sides.
14        MR. LOCKARD: In the matter of the United States v.
15  Mehmet Hakan Atilla, 15 CR 867, it is stipulated between the
16  parties, the United States and Mr. Atilla, by his defense
17  counsel, that:  If called to testify, Huseyin Korkmaz would
18  testify that a representative of his was in contact with
19  representatives of the United States Attorney's Office for the
20  Southern District of New York beginning in approximately
21  April 2016;
22        And that prior to his departure from Turkey,
23  Mr. Korkmaz knew that the representative discussed the
24  possibility of Mr. Korkmaz bringing to the United States
25  investigative files and materials, which Mr. Korkmaz has

HCEPATI4        Trial        Page 1876

1  acknowledged were stolen from the Turkish police investigation
2  files.
3        THE COURT: Okay.
4        MR. LOCKARD: And with that, the government asks for
5  permission to publish a portion of Government's Exhibit 70.
6        THE COURT: And could you just preview what this is
7  for everybody, and particularly the jury, what this video is
8  going to be?
9        MR. LOCKARD: It is a portion of a video dated the
10  27th of March, 2017, reflecting statements of Mr. Atilla.
11        THE COURT: Okay.  Does everybody see it on their
12  screen?
13        JUROR: Yes.
14        (Videotape played)
15        MR. LOCKARD: And that's the end of the portion of the
16  tape that we'll publish, your Honor.
17        THE COURT: Did you all hear it?  All right.  Then
18  that concludes the government's case, with the exception of
19  those exhibit issues that we're going to deal with in the
20  morning; is that correct?
21        MR. LOCKARD: That's correct, your Honor.
22        THE COURT: Is that your understanding, as well,
23  counsel?
24        MR. ROCCO: Yes.  It is, your Honor.
25        THE COURT: Okay.  Then you're excused for today.

HCEPATI4        Trial        Page 1877

1  We'll see you at 9:15 tomorrow morning.  Thanks a lot.
2        (Jury not present)
3        THE COURT: Okay.  So would it be helpful,
4  Mr. Rocco -- well, no, I take it back.  So we'll see you at
5  9:15 tomorrow morning.
6        MS. FLEMING: Judge, I can address the issue of the
7  FBI agent right now, and I would ask that she step out of the
8  room.
9        THE COURT: We don't have to deal with it right now.
10  It would be part of your case?
11        MS. FLEMING: Yes.
12        MR. LOCKARD: It's been briefed, your Honor.
13        THE COURT: I'll take a look at that.  We don't need
14  to do that now.
15        (Adjourned to December 15, 2017, at 9:15 a.m.)

Page 1878

```
                INDEX OF EXAMINATION
Examination of:                              Page
  HUSEYIN KORKMAZ
Cross By Mr. Harrison . . . . . . . . . . .1775
Redirect By Mr. Lockard . . . . . . . . . .1831
Recross By Mr. Harrison . . . . . . . . . .1845
               DEFENDANT EXHIBITS
Exhibit No.                             Received
  5007  . . . . . . . . . . . . . . . . . .1829
```

**A688**

**In The Matter Of:**

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 15, 2017*

*Southern District Court Reporters*

Original File HCFPATIF.txt

**Min-U-Script® with Word Index**

**A689**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

| HCFPATI1 | Trial | Page 1879 |
| --- | --- | --- |

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4          v.                    S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                 Defendant.
 7   ------------------------------x
 8
 9                          December 15, 2017
                                 9:11 a.m.
10
11
12   Before:
13              HON. RICHARD M. BERMAN,
14                           District Judge
                              and a jury
15
16
17              APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

| HCFPATI1 | Trial | Page 1880 |
| --- | --- | --- |

```
 1
 2          (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
               - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
               - and -
 9   McDERMOTT, WILL & EMERY
     BY:  TODD HARRISON, Esq.
10             - and -
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
11   BY:  JOSHUA LEWIS DRATEL, Esq.
               Of counsel
12
13   Also Present:
          JENNIFER McREYNOLDS, Special Agent FBI
14        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
          MS. ASIYE KAY, Turkish Interpreter
15        MS. SEYHAN SIRTALAN, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

| HCFPATI1 | Trial | Page 1881 |
| --- | --- | --- |

```
 1        (Trial resumed; jury not present)
 2        THE COURT: If I could have your attention.  Is
 3   Mr. Atilla on his way?  Is he changing?
 4        MR. ROCCO: Yes, he is changing, your Honor.
 5        THE COURT: He's in the back?
 6        MR. ROCCO: Not yet, your Honor.
 7        THE COURT: I think I'll wait until he's here.
 8   (Pause)
 9        THE COURT: Is he here?
10        MR. ROCCO: He is here.
11        THE COURT: All right.  So I have just two things.  We
12   don't have all the jurors here yet.  As soon as we do, we'll
13   proceed with the conclusion of the government's case and then
14   proceed to the defense case.
15        I have one issue, one announcement or maybe two
16   comments.  So at the lunch break, I plan to rule orally on the
17   motion for a mistrial.  I'm not suggesting anybody miss their
18   lunch for it, but I am going to do that.  I suspect it will
19   take the better part of the lunch hour.  So that's No. 1.
20        No. 2, I was disappointed, would be an understatement,
21   to receive the government's letter this morning, dated
22   December 15, advising that the parties were unable to reach any
23   accommodation or even process with respect to outstanding
24   objections by the defense to the government's admission of
25   exhibits.  This is certainly a legal matter, but it's also
```

| HCFPATI1 | Trial | Page 1882 |
| --- | --- | --- |

```
 1   somewhat of a technical matter, which I didn't think was that
 2   cumbersome, but here's the disappointing part.
 3        So we actually lost a half day of trial yesterday and,
 4   candidly, I think wasted a precious half day as we head toward
 5   the holiday season, because the defense was unwilling to either
 6   review the documents, which they said they wanted to do
 7   yesterday afternoon, or have the documents admitted over their
 8   objection, with their objection noted, which was another option
 9   made available to them.  The second option probably would have
10   taken less than ten seconds; so that is really troubling.
11        You should read the December 15 letter from the
12   government in detail.  I think it would behoove the defense to
13   submit a letter in response, if they don't agree with any of
14   the contents of the government's letter.  If I were a cynical
15   person, I would say that we didn't have a trial yesterday for a
16   half day, an important half day because the defense -- I'm not
17   a cynical person -- but the defense was looking for more time,
18   which, in fact, was given, and put us in exactly the same
19   position at this moment that we were in before we sent the jury
20   home.
21        While I'm not cynical, I'm not happy either, and you
22   can be sure that between now and next week, there will be full
23   days of trial, including you should count on going past the
24   5:00 hour on a daily basis to make up any time that we've
25   missed.  So that's all I have to say about that.  We'll see if
```

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

HCF3ATI2          Atilla - Direct          Page 1923

1  explain to them the developments and inform them about what's
2   going on.
3         And it is this department is formed, actually, to
4   represent the bank to the market and the investors.  And that's
5   why the people who work for this department needs to know over
6   all what's going on in every department of the bank.  Of
7   course, it is not possible to know every detail about every
8   department, but they need to be well informed so that they can
9   answer the questions of the investors.
10  Q.  What department are you referencing?
11  A.  Financial institutions and investors relations department.
12  Q.  Is that the department that you were manager?
13  A.  I was assigned there as the head of department.
14  Q.  So, did in fact Turkey do an IPO for 25 percent of the
15   shares of Halkbank?
16  A.  Halkbank did that, and they sold the shares of the Turkish
17   to the public.
18  Q.  Do you recall what year that was?
19         Thank you for the correction.
20  A.  Of course I remember.  It was 2007.  I remember it because
21   it was the first time.
22  Q.  It was the first time you worked on an IPO?
23  A.  Yes, and I gained a lot of experience doing that.
24  Q.  That first IPO for the 25 percent, without giving us names,
25   what kind of investors bought the first -- the 25 percent of

HCF3ATI2          Atilla - Direct          Page 1924

1   non-Turkish state-owned shares of Halkbank?
2  A.  May I tell you who we made the IPO with?  Is there a reason
3   I shouldn't mention any bank or company names?
4  Q.  Yes.  I just didn't want you to give us individual names.
5   Sure.  Again, thank you for the correction.
6  A.  We carried out the IPO process with an American bank.  We
7   worked together and they supported us a lot.  And most of the
8   part of that 25 percent that was open to public we sold those
9   parts to United Arab Emirates -- Europe.
10         THE INTERPRETER: Sorry.  Correction.  To United
11   Kingdom.
12  A.  To Europe, to American, and Asian companies or investors.
13  Q.  Who was your underwriter?
14  A.  May I tell the name?  I'm not sure.
15         THE COURT: Yes.
16  A.  Goldman Sachs.
17  Q.  And that IPO successfully closed, and the 25 percent shares
18   were in fact sold to the investors in the groups you just
19   described, correct?
20  A.  As far as I know, this was the best public offering done in
21   Turkey since that time.
22  Q.  Did there come a point when there was a second IPO of
23   Halkbank shares that you were involved in?
24  A.  Yes.  Five years later in 2012, the second one was done.
25  Q.  When in 2012 was the second IPO completed?

HCF3ATI2          Atilla - Direct          Page 1925

1  A.  I don't remember the exact time, but I remember it to be
2   the months of fall.  Because it was a very intense busy year.
3   We made the first euro bond export that year, issuance of first
4   euro bonds this year, and the public offering was done in that
5   same year.  And we also moved to the new headquarters of the
6   bank.  I also had to move my apartment.  It was a busy year.
7  Q.  Let's slow down a little bit.  So, in 2012, what was your
8   job at Halkbank?
9  A.  I was a deputy general manager and my responsibility was
10   the international banking.
11  Q.  You were the deputy general manager.  How many deputy
12   general managers at Halkbank were there in 2012?
13  A.  I'm not sure about the exact number.  Probably 10 to 12.
14  Q.  Just for one moment.  Is there a foreign operations
15   department at Halkbank in 2012?
16  A.  Yes, there was.
17  Q.  Did that foreign operations department report to you?
18  A.  No, they were not reporting to me.
19  Q.  Was there a sanctions team at Halkbank in 2012?
20  A.  More than one.
21  Q.  Did that sanctions, those sanctions teams, did they report
22   in the reporting chain up to you as deputy general manager?
23  A.  Maybe I need to make an explanation here if you'll let me.
24         THE COURT: Sure.
25  A.  Because there are two different structures, I have to

HCF3ATI2          Atilla - Direct          Page 1926

1   explain what it is.
2         There is a department called compliance department.
3   And this department reports to the board of directors, only to
4   the board of directors.  This department does not report to the
5   general manager, does not report to the deputy general manager.
6         And there is another department, the sanctions
7   department, which is located within the foreign operations
8   department.  And that team reports to the deputy general
9   manager who is responsible from the operations.
10  Q.  Maybe we could pull up Defense Exhibit 333.  Could you turn
11   to 2012.  2012, please.
12         Do you see a page that's been marked within Defense
13   Exhibit 333?
14  A.  Yes, I see it.
15  Q.  What is Defendant's Exhibit 333, and in particular the page
16   that we've identified within 333?
17  A.  It is the organization chart of the bank.
18  Q.  The entire exhibit --
19         MS. FLEMING: Your Honor, may I approach?
20         THE COURT: Sure.
21  Q.  Can you tell the dates that these organizational charts
22   cover?
23  A.  June of 2012.
24  Q.  Well, looking from the first page to the last page, are
25   there different years of organizational charts for Halkbank?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

HCF3ATI2     Atilla - Direct     Page 1931

1  right?
2  A. I don't remember exact dates, but I remember doing three,
3  four times after that date.
4  Q. And you also indicated that, we started talking about this,
5  this was the second IPO of Halkbank shares for the second
6  26 percent of Halkbank shares; is that correct, that took place
7  in 2012?
8  A. Yes, and that also took place that year.
9  Q. Would you describe what your role was in connection with
10  that second IPO.
11  A. I acted as part of the members in the first one who were
12  preparing the first IPO. On the second one, I also worked in
13  the details, let's say it in the kitchen of it, and I also did
14  the roadshows related to it. And that was a very successful
15  IPO as well. And we also break the records at that time, too.
16  Q. What is a roadshow?
17  A. There are two different ways to meet with the investors.
18  There are big financial organizations the big companies
19  provide, and the banks and investors attend to those
20  organizations. If I have -- if I have to give an example,
21  let's say there is a big financial institution in London, it
22  could be a bank or it could be another big financial
23  organization that they prepare a big meeting. And they will do
24  a meeting that it is called investor meetings in specific
25  locations. And all the investors and big companies would come

HCF3ATI2     Atilla - Direct     Page 1932

1  to these meetings and express their interest or their messages.
2  The big companies would come and express themselves.
3       As an alternative to that, there is another way. you
4  could go to the investors and visit them in their own offices,
5  in this example as Halkbank you would go and show your
6  abilities. If you go to investors' offices and you show your
7  abilities, that's called roadshow.
8  Q. Who was the underwriter on this second IPO?
9  A. Citibank. And there was a Turkish bank as a local partner.
10  Q. Was it 26 percent that was now sold so that -- I'm sorry.
11  24 percent, right?
12  A. Yes. And the first one it was 25, the second one there was
13  24 percent. In total 49 percent.
14  Q. So at the end of the two IPOs, the state of Turkey owns
15  51 percent of Halkbank and outside investors own 49 percent; is
16  that right?
17  A. That's correct.
18  Q. You described as part of your responsibilities, and I'm
19  going to focus on 2012 and 2013, 2014, that period, okay?
20       How many people were you supervising at that point in
21  your direct line?
22  A. About 25 to 30 people as I remember.
23  Q. I think you said earlier that part of your responsibilities
24  were dealing with other banks and dealing with investors; did I
25  get that right?

HCF3ATI2     Atilla - Direct     Page 1933

1  A. Yes. The first box actually manages the bank's financial
2  relations with other banks and with the managers with investor
3  relations. And the second box works for establishing bonds for
4  fund process. Establishing funds from abroad. And also
5  international bank takes care of the branches and departments
6  in abroad. The representative offices in abroad.
7  Q. To whom did you report?
8  A. I was giving a report to general manager about the daily
9  work flow. But he didn't have the position of taking me from
10  my position or giving me a different rank.
11       THE COURT: I didn't understand.
12       THE WITNESS: I will explain.
13       The deputy managers are assigned by board of
14  directors. And they would also take the position from them.
15       THE COURT: The deputy managers are appointed by the
16  board?
17       THE WITNESS: Yes, your Honor. The board of directors
18  decides who would be the deputy manager or who would take the
19  position away. In other words, the general manager wouldn't be
20  able to take the position away from the deputy general
21  managers.
22       THE COURT: Wouldn't be able to?
23       THE WITNESS: Take the position away. Fire.
24  Q. Who appoints a general manager?
25  A. The general manager would be assigned with the general

HCF3ATI2     Atilla - Direct     Page 1934

1  assembly of -- of the bank. Inside the bank. The
2  shareholders would go to the general assembly. And there will
3  be award in there. The Treasury, which represents the
4  51 percent of the shares, and usually they would suggest names
5  and those names would be taking the positions. Because most of
6  the work, really, most of the share owners --
7       THE COURT: Wait. Before that, what did you say
8  before that "most of the"?
9       THE WITNESS: Most of the shares owned by the state
10  and but -- the Treasury represented those shares.
11       THE COURT: The 51 percent?
12       THE INTERPRETER: Yes, your Honor.
13       THE WITNESS: Yes.
14       THE COURT: Okay. So the treasurer makes the
15  recommendations of candidates for GM?
16       THE WITNESS: The Treasury makes the suggestions for
17  the general assembly and suggestions of the general manager.
18  And board -- the board of directors would be general assembly
19  and the general manager would suggest. Board of directors will
20  suggest the general assembly and the general manager.
21       The Treasury suggests the candidates for general
22  manager and also for the board of director.
23       THE COURT: I see. The Treasury representing the
24  51 percent of the shareholders?
25       THE WITNESS: Yes, that's right, your Honor. The

**A692**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

| HCF3ATI2 | Atilla - Direct | Page 1939 |
| --- | --- | --- |

1  A. Findikli.
2  Q. Your old office building?
3  A. Yes.
4      MS. FLEMING: Your Honor, I'd move Defendant's Exhibit
5  307 into evidence.
6      THE COURT: I'll allow it.
7      (Defendant's Exhibit 307 received in evidence)
8      MS. FLEMING: Show it to the jury, please. I'd like
9  to ask that you bring up for Mr. Atilla Defense Exhibit 309.
10 Q. Do you recognize Defense Exhibit 309?
11 A. Yes, I do.
12 Q. How do you recognize it?
13 A. I was giving a speech related to a Swiss export agency.
14 Q. Do you remember when it was, when that speech was given,
15 approximately?
16 A. Looking at my weight, I'm guessing it to be between 2013
17 and 2015.
18     MS. FLEMING: Your Honor, I move Defendant's Exhibit
19 309 into evidence.
20     THE COURT: I'll allow it.
21     MR. DENTON: No objection.
22     (Defendant's Exhibit 309 received in evidence)
23     MS. FLEMING: Publish it for the jury, please.
24 Q. You said you were giving a speech on what?
25 A. There was this meeting about the Switzerland export --

| HCF3ATI2 | Atilla - Direct | Page 1940 |
| --- | --- | --- |

1  Switzerland -- Swiss export agency. When companies from Turkey
2  want to import anything from Switzerland, through this
3  institute, they're able to provide financing. And as Halkbank
4  we were trying to have the Turkish banks and Turkish
5  businessmen and also Swiss banks.
6  Q. Was one of your responsibilities during the period 2012 to
7  2015 at Halkbank to speak with people in the public about
8  bringing business to Halkbank?
9  A. Of course.
10 Q. Did you speak on topics other than Iranian sanctions?
11 A. Yes, so many other topics.
12     MS. FLEMING: Could I ask that you bring up for
13 Mr. Atilla Defendant's Exhibit 310, please.
14 Q. Do you recognize Defendant's Exhibit 310?
15 A. I do.
16 Q. How do you recognize 310?
17 A. We were the sponsor for an organization. I'm sorry, it is
18 a bit long, but it was an organization that we sponsored. It
19 was about fixed income investors. And that's taken over there
20 at the meeting. And the purpose of this organization was to
21 have the Turkish companies meet with the investors.
22 Q. Do you remember where this meeting took place?
23 A. It was in Istanbul, Turkey.
24 Q. Do you remember approximately when this meeting took place?
25 A. I am thinking it should be 2016 because I have my -- I have

| HCF3ATI2 | Atilla - Direct | Page 1941 |
| --- | --- | --- |

1  a beard.
2      MS. FLEMING: Your Honor, I move Defendant's 310 into
3  evidence.
4      MR. DENTON: No objection.
5      THE COURT: I'll allow it.
6      (Defendant's Exhibit 310 received in evidence)
7  Q. Publish it for the jury, please.
8      Mr. Atilla, can you please identify who the people are
9  in this photograph.
10 A. Do you need the names one by one?
11 Q. Are they all Halkbank employees?
12 A. They're all, as I mentioned before, the people who report
13 to me that I showed you in the little box just before.
14 Q. Which box, which department?
15 A. Financial institutions and investor relations. And the
16 other box was international banking.
17 Q. Would you please identify who they are.
18 A. The lady on my left works for the financial institutions as
19 a manager. And the gentleman on my right is the head of the
20 department of financial institutions. And the two ladies next
21 to him work for investor relations. And the gentleman on the
22 far left works for international banking.
23 Q. Maybe so we can save the court reporter from trying to get
24 all the spellings, have we heard the names of any of these
25 people other than you in this trial?

| HCF3ATI2 | Atilla - Direct | Page 1942 |
| --- | --- | --- |

1  A. No, we haven't.
2      MS. FLEMING: Will you pull up for Mr. Atilla, please,
3  Defendant's Exhibit 311.
4  Q. Mr. Atilla, do you recognize Defendant's Exhibit 311?
5  A. Yes, I do remember.
6  Q. What is Defendant's Exhibit 311?
7  A. This is a picture taken as a memory. They all work for the
8  departments that are connected to me. They report to me.
9  Q. Do you know when this photograph was taken, approximately?
10 A. Either the end of 2016 or the beginning of 2017.
11     MS. FLEMING: Your Honor, I move Defendant's Exhibit
12 311 into evidence.
13     THE COURT: I'll allow it.
14     MR. DENTON: No objection.
15     (Defendant's Exhibit 311 received in evidence)
16     MS. FLEMING: Can we publish for the jury please.
17 Q. I'm not going to ask you to identify names. Which
18 department did you identify all these people work for?
19 A. Financial institutions and investor relations,
20 international banking.
21 Q. Is there anybody from the sanctions team that is in this
22 photograph?
23 A. No, there isn't.
24 Q. Is there anybody from foreign operations in this team --
25 excuse me, in this photo?

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

| HCF3ATI2 | Atilla - Direct | Page 1943 |
|---|---|---|

1  A.  No, there isn't.
2  Q.  Mr. Atilla, directing your attention to the period 2012 to
3  2016, March 2016.  Approximately how much time did you spend
4  dealing with other banks and investors as you've described in
5  connection with your responsibilities at Halkbank?
6  A.  Meaning the -- when you say the other banks?  What do you
7  mean?
8      (In English)  Other than Iranian banks you mean?
9  Q.  I'll come at it a different way.  What were the kinds --
10  I'm going to direct your attention, again, let's focus on 2012
11  and 2013.  In general, what hours did you work for Halkbank?
12  A.  In the morning, at 9 a.m., in the evening at 8 p.m.
13  Q.  What was your salary at Halkbank during those years?
14  A.  I don't remember all of it, but I can tell you the last
15  salary I have.
16  Q.  All right.
17  A.  You would like me to tell you in annually?
18  Q.  Please.
19  A.  Approximately $100,000.
20  Q.  Did you receive bonuses?
21  A.  No.
22  Q.  What was your wife's salary at Halkbank during these years?
23  A.  I didn't ask, but I can assume if you'd like.
24  Q.  No.  If you don't know, don't say.
25  A.  I know that she receives less than I.

| HCF3ATI2 | Atilla - Direct | Page 1944 |
|---|---|---|

1  Q.  She was not a direct report to you, was she?  She wasn't in
2  your department?
3  A.  No, she works completely in different area.
4  Q.  She wasn't in sanctions or foreign operations, was she?
5  A.  No, she was working in credit section, such as credit cards
6  and deposits.
7  Q.  Was part of your responsibilities -- again, I'm focusing on
8  the period 2012 to the time you were arrested.  Was part of
9  your responsibilities for Halkbank to interact with
10  international banking organizations?
11  A.  Most of my time was spent for investor relations.  Because
12  the economy changes very fast in Turkey.  And there are many
13  subjects that we have to update the investors about these
14  changes.  And sometimes these are economic, sometimes
15  political.  And it takes a lot of time to follow up these
16  changes, to explain the investors and let them understand the
17  changes.  Most of my time was spent for this process, I would
18  say 70 percent of my time.  And also I'm including my travels
19  to this.
20  Q.  Did you use e-mail at work at Halkbank?
21  A.  Of course.
22  Q.  Can you give us an estimate, on average, of how many
23  e-mails you got a day during the time period 2012 to 2016?
24  A.  It's usually a lot that I cannot read all of them.  If I
25  have to estimate, it would be about 100.

| HCF3ATI2 | Atilla - Direct | Page 1945 |
|---|---|---|

1  Q.  100 per day?
2  A.  That's -- that's my estimate.  Yes.  That is my estimate,
3  there are a lot of e-mails about informative issues, about bank
4  relations, and about changes.  The value of the circulation is
5  high.  As I remember, I had about to 3,000 e-mails was unread.
6  Q.  We've heard a lot about Turkey's relationship with Iran in
7  this case.  When was the first time in your job at Halkbank
8  that you began to do anything that had anything to do with
9  Iran?
10  A.  Of course I heard a lot of things about Iran.  Of course I
11  heard a lot of things about Iran, but our relationship with
12  Iran started after a merge with another bank in 2004.
13  Q.  Would you explain, it was a merger between Halkbank and
14  another bank in 2004; is that what you just said?
15  A.  Yes, there was a merge with another bank in 2004.  We took
16  a role in an operation of merging with a private bank and
17  Halkbank.
18  Q.  What was the name of the private bank with which Halkbank
19  merged in approximately 2004?
20  A.  It was Pamuk Bank.
21  Q.  Can you spell it for the court reporter, please.
22      THE INTERPRETER: P-A-M-U-K B-A-N-K.
23  Q.  When Halkbank merged with Pamuk Bank, did Halkbank acquire
24  representative offices in Tehran?
25  A.  Did you mean that they required or they --

| HCF3ATI2 | Atilla - Direct | Page 1946 |
|---|---|---|

1      THE COURT: "Acquired."
2  Q.  Can you just describe what happened.
3  A.  I understood.  Yes.
4      Pamuk Bank had long-term relations in Iran.  And we
5  had not any information about Iran as Halkbank.  After we
6  merged in 2004 with Pamuk Bank, by 2005, all the asset of Pamuk
7  Bank were transferred to us.  And that included the
8  representatives abroad.  And we learned that they had a
9  representative office in Tehran.
10      At that period we didn't have many chance to do
11  anything because we were very busy.  We just did a preliminary
12  evaluation.  And we didn't take this to our daily responses for
13  us to look at later.  We were able to look at that subject in
14  2007, after the IPO.  And I know that at that time, the Iranian
15  banks had accounts in Pamuk Bank.  Therefore, they were
16  automatically transferred to us.  After the IPO, we started
17  having a relationship with this bank.
18      MS. FLEMING: Can we pull Defendant's Exhibit 333 back
19  up and put it back on.  And let's put it back on -- well.
20  Let's put it on the first page on 2009.
21  Q.  What department at Halkbank was responsible for
22  assimilating the Iranian accounts and offices into Halkbank
23  proper?
24  A.  In this chart, you can see the treasury management in the
25  seventh box.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 15, 2017

| HCF3ATI4 | Atilla - Direct | Page 1979 |
| --- | --- | --- |

1    THE COURT: How about spelling the names for the
2  reporter.
3    MS. FLEMING: Are you ready?
4  Q.  Under operations, there were three different departments,
5  right?
6  A.  Yes, three or four, depending on the period.
7  Q.  Could you explain what those departments were, and let's
8  focus on the time period 2012, 2013, 2014.
9  A.  Yes, branch operations, foreign operations, treasury
10  operations --
11  Q.  What did the foreign operations department do?
12  A.  The foreign operations took care of the transactions
13  related to international operations, preparation of the
14  documents, and arranging those documents.  They were also
15  responsible for following the bank's international branches
16  operations.  Transactions.
17    THE INTERPRETER: Correction.
18  A.  I'm not done.  Just a minute, please.
19  Q.  Sure.
20  A.  They were also responsible for the SWIFT communication
21  between the banks.  They were also responsible for the foreign
22  payments.  They were also responsible for following the
23  domestic and international legislations, regulations.  They
24  had -- it was a very busy department.  They have many more
25  other jobs, other than the ones I just mentioned.

| HCF3ATI4 | Atilla - Direct | Page 1980 |
| --- | --- | --- |

1  Q.  Was the foreign operations department responsible for
2  checking and approving documentation for foreign transactions?
3  A.  Yes.
4  Q.  You said that they would send and receive SWIFT messages?
5  A.  Correct.
6  Q.  What are SWIFT messages?
7  A.  A SWIFT is a communication program that is used between the
8  banks.  I think its origin is Belgium.  I'm not sure about the
9  exact number, but I believe it's being used over 200 different
10  countries.  Among the banks of 200 countries.  The -- it's
11  operated on the password protected manner, so the banks
12  exchange the password among themselves.  Once this exchange of
13  the codes is completed, then the banks have a correspondent
14  banking relationship established.  And after that date, if you
15  want to send a payment to another bank, this system is used.
16  Q.  At Halkbank headquarters, within the foreign operations
17  department, was there a SWIFT room?
18  A.  Yes, there is.  And only the authorized personnel is
19  allowed in that room.  The authorized personnel inspects the
20  messages and delivers them, delivers these messages to the
21  related departments.
22  Q.  In the time period we're talking about, 2012 to 2014, do
23  you know how many authorized personnel worked at Halkbank
24  headquarters in the SWIFT room?
25  A.  I don't know the exact number, but the number of people is

| HCF3ATI4 | Atilla - Direct | Page 1981 |
| --- | --- | --- |

1  very limited because it's done on a code protected system.
2  Q.  Do you know what the volume of SWIFT messages came to
3  Halkbank on average was during that time period, 2012 to 2014,
4  on a daily basis?
5  A.  I don't have an idea.  The bank has about five to six
6  million customers.  If you consider this number, this number,
7  it should be quite a large number, I would think.
8  Q.  Who was the head of foreign operations between the time
9  period of 2010 and the end of 2012, beginning of 2013?
10  A.  If I'm not mistaken, between 2011 and 2012, Levent Balkan
11  was there.  In the early part of 2013, he resigned.  And I
12  believe one or two months after that, Hakan Aydogan started.
13  Q.  You said that Levent Balkan resigned.  Do you have
14  knowledge as to whether he was fired as opposed to resigned?
15  A.  I know clearly that he wasn't fired.  I listened to
16  Mr. Zarrab's testimony about him, and I was very sad, and it
17  doesn't contain the truth.  And as far as I know, the bank also
18  requested, made a request to him not to resign.  They wanted
19  him to continue working there, and as far as I know, he
20  retired.
21  Q.  The sanctions department that you described, that is
22  underneath the foreign operations department; is that accurate?
23  A.  Correct.
24  Q.  Are you familiar a woman named Mehtap?  I'll never be able
25  to say her last name, but a woman named Mehtap.

| HCF3ATI4 | Atilla - Direct | Page 1982 |
| --- | --- | --- |

1  A.  I know the lady works for that department.
2  Q.  In the sanctions department?
3  A.  I'm guessing so.
4  Q.  I'd like to direct your attention to October of 2012.  Do
5  you remember hearing -- withdrawn.
6    Were you at a meeting on October 4, 2012, with Iranian
7  oil people, Suleyman Aslan and Reza Zarrab, where Suleyman
8  Aslan pointed to you, and said that the current system could
9  continue -- pointed to Reza Zarrab and said the current system
10  could continue?
11  A.  In none of the meetings I've attended such a thing have
12  happened.  You said October 4, right?
13  Q.  Yes.
14  A.  I don't have a memory about a meeting on that date.  But
15  I've never attended a meeting where Reza Zarrab was present and
16  where he was told to continue with the system.
17    MS. FLEMING: Can we pull up, please, Government
18  Exhibit 204.  It's in evidence so you can show it to the jury.
19  Q.  Do you remember Mr. Zarrab testifying that this
20  conversation where he asked -- that he asked for, he called and
21  got permission to use the emergency lane because he was on his
22  way to a meeting at Halkbank?
23  A.  I don't remember such a thing, but I read this in the
24  discoveries.
25  Q.  Do you remember Reza Zarrab testified that he lied about

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                          *December 15, 2017*

| HCF3ATI4 | Atilla - Direct | Page 1983 |
| --- | --- | --- |

1 having the oil minister in his car when he testified here in
2 court?
3 A. I remember.
4 Q. Could we go to the first page. So, this conversation was
5 October 4, 2012. Do we see that?
6 A. I see it.
7 Q. Now, do you remember that Reza Zarrab said that at this
8 meeting were you and Mr. Aslan, as well as three Iranians,
9 Mr. Nikousokhan, the head of the financial department at the
10 National Iranian Oil Company, Mr. Alipour, the second in
11 command at NIOC, and Mr. Rajaieh, the CEO of the Sarmayeh
12 Exchange. Do you remember him testifying that you were present
13 at a meeting with these three people and Mr. Zarrab?
14 A. I remember his testimony in here.
15 Q. Now, did you ever attend a meeting with those people?
16 A. I did not attend.
17 Q. I'd like to pull up 1-T that's in evidence conditionally,
18 please. It can be shown to the jury. Defense Exhibit 1-T.
19 You see that on Defense Exhibit 1-T, this transcript is two
20 days later, October 6, 2012, correct?
21       MS. FLEMING: Can we go to the next page.
22 A. I see the date, yes.
23 Q. Do you see on the fourth line down Mr. Aslan is saying that
24 he's going to the old office in Gayrettepe?
25 A. "Gayrettepe."

| HCF3ATI4 | Atilla - Direct | Page 1984 |
| --- | --- | --- |

1       Yes, I see it.
2 Q. That's his old office that we said we would call the old
3 headquarters?
4 A. That's correct.
5       MS. FLEMING: Could we now pull up, please, what's in
6 evidence as 206-T.
7 Q. You see on 206-T in evidence, this is dated 6:57 p.m. on
8 October 6. So, do you see that?
9 A. I see it.
10 Q. This call is between Mr. Zarrab and Mr. Happani; do you see
11 that?
12 A. I see it.
13       MS. FLEMING: Could we go to the next page, please.
14 Q. Do you see on the front at the top where Mr. Zarrab says
15 that place is taking care of the same arrangement as Abi?
16 A. I see it.
17 Q. Do you remember that Mr. Zarrab testified that he was --
18 Mr. Zarrab's testimony was that he was -- this was to make a
19 bribe, bribery arrangement with Suleyman Aslan?
20 A. I remember.
21       MS. FLEMING: Can we pull up 208-T, please, in
22 evidence.
23 Q. 208-T in evidence is between Reza Zarrab and Suleyman
24 Aslan, telephone call, two days later, on October 8, 2012; do
25 you see that?

| HCF3ATI4 | Atilla - Direct | Page 1985 |
| --- | --- | --- |

1 A. I see the date here, but of course I don't know if there
2 was a conversation at that day or not.
3 Q. So this is October 8, four days after the meeting where
4 Mr. Zarrab testified that you pointed and said we'll do the
5 existing system, right?
6 A. Yes, I see that it's four days after the date that he
7 testified that he suggested that it happened.
8       MS. FLEMING: Could we turn to the next page, please.
9 Q. Do you see on the top here, that Mr. Aslan tells Mr. Zarrab
10 "We were with Mr. minister and others. I defended the matter
11 just like we had talked about yesterday. Um, he said, 'We are
12 not doing those, such as opening accounts for every company and
13 so on.' However, I indicated that, um, you were ready in terms
14 of bringing and sending money through the existing system. I
15 didn't mention your name, but, um."
16       Could we go down a little bit. "I indicated that it
17 was you. We said that you would be able to make the payment
18 for this thing through the methods we have been using thus
19 far."
20       Do you see that?
21 A. I see it.
22 Q. You're not on this phone call, are you, Mr. Atilla?
23 A. I didn't even know this was a phone conversation, but I
24 know that this has nothing to do with me.
25       MS. FLEMING: Could we go down a little farther,

| HCF3ATI4 | Atilla - Direct | Page 1986 |
| --- | --- | --- |

1 please. To the next page, actually.
2 Q. If you look down, the third or third fourth entry,
3 Mr. Aslan says, "Um, the person who should have priority, just
4 a second, let me say," then Mr. Zarrab says is it Kiani Rad.
5 And then Mr. Aslan says "Nikousokhan." And do you see that
6 Mr. Zarrab says "Nikousokhan, I'm already talking with him, he
7 is my man. There is no problem there."
8       MS. FLEMING: Could you take the highlights down,
9 please.
10 Q. Then he says a little bit later down, "Nikousokhan, I'm
11 already in communication with Nikousokhan. There is no
12 problem." Then he says "I was with Nikousokhan even
13 yesterday."
14       Do you see that?
15 A. Yes.
16 Q. Were you present at any meeting on October 7 with
17 Mr. Zarrab and Mr. Nikousokhan?
18 A. I did not attend to such a meeting.
19 Q. Were you with any meeting with Mr. Aslan on October 8?
20       MS. FLEMING: Go to page two, please.
21 Q. Where, on October 8, Mr. Aslan indicated that Reza Zarrab
22 was ready in terms of bringing and sending the money through
23 the existing system?
24 A. I did not attend to any meetings where Suleyman Aslan said
25 these sentences.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 15, 2017

1      MS. FLEMING: Can we pull up, please, Government
2  Exhibit 1002 and 1002-T at page 23.  If we look at the entry at
3  7:25:55 on April 22.  On T, on the English it's on page 23.  It
4  starts at 7:11.  The third one down.  The next one too.
5  Q.  That says "No, we don't have a problem in the food.  Do you
6  have a problem with the method posed by Hakan Atilla."
7  A.  Yes, I see it.
8  Q.  And that is April 22, correct?
9  A.  Yes.  Yes, that's the date written here.
10 Q.  Did you have any meeting with Suleyman Aslan and Reza
11  Zarrab between that e-mail on April 15, and September -- I'm
12  sorry -- April 22, 2013 on the subject of any method proposed
13  by you?
14 A.  No, I wasn't at such a meeting and I don't know what he is
15  talking about.
16 Q.  Could you go, please, to the entry for 11:27:23 on 4/22.
17      Did you ever, other than the conversation that we
18  listened to on the morning of April 10 when you were inquiring
19  about the letter of credit, did you ever propose any kind of
20  methods or documentations to Reza Zarrab concerning food trade?
21 A.  No, I did not propose.  No, the bank had another opinion
22  about his demand to make the payment before the transfer of the
23  food, the bank had a counter proposition to his demand.  Like
24  in the detail Mr. Hakan Aydogan suggested.  And if the bank has
25  the capacity to find a solution, the bank would do this for

1  every customer.  It's not a method, and it is not a -- it's not
2  something proposed by me.
3      THE COURT: Ms. Fleming, I'm going to have to cut you
4  off.  I'm going to want to excuse the jury.  Friday, 4:35, and
5  it's snowing out there.  So we're going to let them go home.
6  We'll excuse the witness for today.
7      THE WITNESS: Thank you.
8      THE COURT: And ask everybody if they can be back on
9  Monday at 9:15 and remembering my instructions over the
10  weekend, particularly, please do not talk to each other about
11  the case or about anyone who has anything to do with it until
12  the end of the case when you go to the jury room to deliberate
13  on your verdict.
14      Second, do not talk with anyone else about this case,
15  or about anyone who has anything to do with it, until the trial
16  has ended, and you have been discharged as jurors.
17      Third, please do not let anyone talk to you about the
18  case, or about anyone who has anything to do with it, and if
19  someone should try and talk to you about the case, please
20  report that to Christine or me immediately.
21      Fourth, please do not read any news or internet
22  stories or articles or blogs or listen to any radio or TV or
23  internet or cable TV reports about the case or about anyone who
24  has anything to do with it.
25      Fifth, please not do any type of research or any type

1  of investigation about the case on your own.
2      So I'll see you Monday at 9:15.  Thanks so much.
3      (Jury excused)
4      THE COURT: For the lawyers, please don't leave
5  tonight until you get a copy of the draft jury instructions, we
6  haven't done all of them.  We've done half.  So we're going to
7  have a charge conference on this half on Monday at 8.  So meet
8  you here in the courtroom at 8 o'clock.  And let me tell you
9  what you'll have.  You have roughly pages 1 through 30, 1
10  through 29.  1 through 30.  And then you'll have some pages at
11  the end and we'll do those at 8 on Monday.  And then plan to
12  have the second charge conference on Tuesday for the balance of
13  the instructions.  So thanks.  See you Monday.
14      How many more witnesses do you have?
15      MR. ROCCO: We may have one more witness, Judge.
16      THE COURT: Have that witness here Monday.
17      MR. ROCCO: Absolutely, your Honor.
18      THE COURT: And will that be it?
19      MR. ROCCO: We believe so.
20      THE COURT: Have that person here on Monday.
21      MR. ROCCO: Yes, Judge.
22      (Adjourned until December 18, 2017, at 8 a.m.)
23
24
25

1              INDEX OF EXAMINATION
2  Examination of:                              Page
3  SAMRA IBRAHIMI HAMZA
4  Direct By Mr. Rocco . . . . . . . . . . . .1886
5  MEHMET HAKAN ATILLA
6  Direct By Ms. Fleming . . . . . . . . . . .1899
7              GOVERNMENT EXHIBITS
8  Exhibit No.                             Received
9  9704  . . . . . . . . . . . . . . . . . . .1884
10             DEFENDANT EXHIBITS
11 Exhibit No.                             Received
12  326 . . . . . . . . . . . . . . . . . . . .1888
13  336 . . . . . . . . . . . . . . . . . . . .1896
14  300 . . . . . . . . . . . . . . . . . . . .1914
15  302 . . . . . . . . . . . . . . . . . . . .1915
16  333 . . . . . . . . . . . . . . . . . . . .1927
17  307 . . . . . . . . . . . . . . . . . . . .1939
18  309 . . . . . . . . . . . . . . . . . . . .1939
19  310 . . . . . . . . . . . . . . . . . . . .1941
20  311 . . . . . . . . . . . . . . . . . . . .1942
21  329 . . . . . . . . . . . . . . . . . . . .2001
22  330 and 330-T . . . . . . . . . . . . . . .2012
23  331 and 331-T . . . . . . . . . . . . . . .2016
24  332 and 332-T . . . . . . . . . . . . . . .2017
25

**A697**

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 18, 2017*

*Southern District Court Reporters*

Original File HCI3ATIF.txt

**Min-U-Script® with Word Index**

**A698**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 18, 2017

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  UNITED STATES OF AMERICA,
 4          v.                     S4 15 Cr. 867 RMB
 5  MEHMET HAKAN ATILLA,
 6              Defendant.
 7  ------------------------------x
 8
 9                          December 18, 2017
                                 8:15 a.m.
10
11
12  Before:
13              HON. RICHARD M. BERMAN,
14                             District Judge
                                 and a jury
15
16
17              APPEARANCES
18  JOON H. KIM,
         United States Attorney for the
19         Southern District of New York
    MICHAEL D. LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID W. DENTON, JR.,
21  DEAN C. SOVOLOS,
         Assistant United States Attorneys
22
23
24
25
```

```
 1
 2          (APPEARANCES Continued)
 3
 4
    HERRICK, FEINSTEIN LLP (NYC)
 5       Attorneys for defendant Atilla
    BY:  VICTOR J. ROCCO, Esq.
 6       THOMAS ELLIOTT THORNHILL, Esq.
         - and -
 7  FLEMING RUVOLDT, PLLC
    BY:  CATHY ANN FLEMING, Esq.
 8       ROBERT J. FETTWEIS, Esq.
         - and -
 9  LAW OFFICES OF JOSHUA L. DRATEL, P.C.
    BY:  JOSHUA LEWIS DRATEL, Esq.
10                        Of counsel
         -and-
11  McDERMOTT WILL & EMERY
    BY:  TODD HARRISON
12
    Also Present:
13  JENNIFER McREYNOLDS, Special Agent FBI
    MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14  MS. ASIYE KAY, Turkish Interpreter
    MS. SEYHAN SIRTALAN, Turkish Interpreter
15  MR. BULENT BULUT, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

```
 1      (In open court; jury not present)
 2      THE COURT: First off, thanks for those draft
 3  instructions over the weekend.  That was helpful.
 4      And what we're going to do is look at the non-count
 5  instructions first.  And then hopefully some time today we're
 6  going to give you the instructions for the six counts.
 7      In going over the instructions, they're pretty complex
 8  or technical, as you are aware.  And what I'm likely to do is
 9  reorganize the instructions to do the following, and I will
10  advise the jury that I've done that.  I'm not going to order
11  the instructions in the order in which they appear in the
12  indictment.  I think that is very complicated to follow the
13  instructions if I do that.  So that the first count I think is
14  the Klein instruction, and immediately or soon thereafter you
15  get into the IEEPA instruction, and then if you're still
16  conscious, you get to the instructions after that.
17      So what I thought would be most understandable for the
18  jury, to instruct them but also to keep them engaged, and again
19  telling them I'm going out of order, is to give them the two
20  substantive counts first, everybody understands the substantive
21  counts, and then give them the six conspiracy counts, which one
22  will build on the other.  So, there are a lot of common
23  instructions in the each of the conspiracies that there can be
24  a conspiracy even if there is no underlying substantive act,
25  etc., etc.
```

```
 1      And then we'll pick up, do Klein first, IEEPA I think
 2  second, and then we'll pick up the substantive counts in the
 3  conspiracies that each relate to those two substantive counts.
 4  I think that is a way to instruct, to read it, and that is most
 5  understandable anyway.  So, you'll see what it looks like when
 6  it comes out, see if it works for you.
 7      What I typically do in a charge conference is to run
 8  through everything off the record, to see what we agree or
 9  disagree on, and then have the court reporter take down what
10  the disagreements are.  Instead of having all the back and
11  forth, if that's okay with you.  So anybody who has an
12  objection to how an instruction works out will get to lodge
13  that objection and even the wordage, but the back and forth is
14  very hard to follow, and so is that okay with you?
15      MR. LOCKARD: Yes, your Honor.
16      MS. FLEMING: Yes, your Honor.
17      THE COURT: So typically I say who has got a comment
18  on the earliest page and we can deal with it.
19      (Discussion off the record)
20      THE COURT: The record should reflect that we've just
21  conducted an off-the-record charge conference with respect to
22  draft instructions dated December 15, 2017, and in particular,
23  pages in that draft 1 through 30, and also 60 through 71.  We
24  made some changes I think unanimously agreed to, but if there
25  are any remaining objections to the charges set forth in these
```

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 18, 2017

1 A. I remember.

2 Q. You heard Reza Zarrab testify that one of the subjects of

3 that meeting was bringing more Iranian oil money into Halkbank,

4 right?

5 A. I remember with regards to the Indian money.

6 Q. And the second thing that was discussed at that meeting was

7 that the Iranians wanted to use correspondent banking

8 relationships to fulfill payment orders; do you remember that?

9 A. No, I do not remember, because the Iranian oil people have

10 nothing to do with correspondent banking.

11 Q. Do you remember that that's what Mr. Zarrab said was

12 discussed at the meeting with both banking and oil officials?

13 A. I don't recall. But if you say that's what it is, then it

14 must be what it is.

15 Q. Those two subjects are part of your job responsibilities,

16 right, Mr. Atilla?

17 A. It is true that I have had much correspondence with the

18 Central Bank. That is correct.

19 Q. This meeting in October of 2012 happened at a time when it

20 was important for you to know everything going on everywhere at

21 the bank, right?

22 A. So if you're referring to the IPO, and it happens to be at

23 the same time, I don't know. And of course I'd want to know

24 everything in general in the bank as much as possible.

25 Q. But despite it being your job, and despite you wanting to

1 know as much as possible about what was going on at the bank,

2 it is your sworn testimony here that you were not at that

3 meeting; is that right?

4 A. What I said was I do not have a memory of such a meeting on

5 October 10, and I had not said anything about Zarrab having

6 transactions with the names mentioned in that meeting and any

7 transactions that may be conducted that may be against the

8 sanctions.

9 And as far as when I said October 10, I don't know if

10 it is October 10 or 4. I may have mixed those up.

11 Q. Just be very clear. It is your testimony under oath that

12 you were not at the meeting that Mr. Zarrab described. Is that

13 right?

14 A. I did not take part in a meeting as described by Mr. Zarrab

15 at all. I have had many meetings with the Central Bank, and I

16 recall that there were individuals that would come and go from

17 NIOC as well, although these names are different, they're not

18 these name, I know some other names.

19 But I did not take part in any meeting where it was

20 mentioned or it could have been mentioned that Reza Zarrab

21 should be doing this or that Reza Zarrab should be the one

22 intermediating with these international payments. I did not

23 attend any such meeting.

24 I talked about the Indian oil. I talked about the

25 funds in Japan. We may have talked about funds in other

1 countries. But I did not talk about a system with regards to

2 international payments to be made by Reza Zarrab, and I did not

3 attend any such meeting, ever.

4 Q. You didn't talk about these subjects with Reza Zarrab at

5 all; is that your testimony?

6 A. Yes. That's what it is.

7 THE COURT: This is a good place to stop, Mr. Denton,

8 for the evening. It is quarter to five. Pick up first thing

9 in the morning. Ask the jury to be back at 9:15. And please

10 remember not to talk with each other about the case or about

11 anyone who has anything to do with it until the end of the case

12 when you go to the jury room to deliberate.

13 Second, do not talk with anyone else about the case or

14 about anyone who has anything to do with it until the trial has

15 ended and you've been discharged as jurors.

16 Third, do not let anyone talk to you about the case or

17 about anyone who has anything to do with it, and if someone

18 should try and talk to you about the case, please report that

19 to Christine or me immediately.

20 Fourth, do not read any news or internet stories or

21 articles or blogs or listen to any radio or TV or internet or

22 cable TV reports about the case or about anyone who has

23 anything to do with it.

24 Fifth, do not do any type of research online or

25 elsewhere or any type of investigation about the case on your

1 own.

2 So thanks, see you first thing tomorrow.

3 (Jury excused)

4 THE COURT: Tomorrow we're going to have to start a

5 little bit even earlier that be today. 7:45 we'll pick up with

6 the instructions. We'll give you before you leave tonight most

7 all of the instructions, not quite. But I'll have the rest for

8 you in the morning. And the ones I don't have, I won't call

9 them boilerplate, but they're toward the back end of my normal

10 instructions and they're mostly of that nature.

11 The one that probably requires a little more

12 discussion is the conscious avoidance charge. But, the rest

13 are pretty mechanical.

14 So we'll see you in the morning. I need to see

15 counsel for a moment up at the sidebar.

16 (At the sidebar)

17 THE COURT: We don't have to resolve it today but we

18 will tomorrow. That juror doesn't want to be -- is prepared to

19 show you his tickets and his plans and bring in everybody to

20 demonstrate that he was --

21 MS. FLEMING: Which one is it?

22 THE COURT: I think it's 10. Number 10.

23 MS. FLEMING: That's a bad seat I think.

24 THE COURT: I don't think there is much we can do

25 about it except let him go. So anyway. But we'll pick up

**A700**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                    December 18, 2017

| HCl3ATl7 | Page 2163 |

1          THE COURT: You bet.
2          MR. KAMARAJU: Thank you, your Honor.
3          (Adjourned until December 19, 2017, at 7:45 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

|  | Page 2164 |

1                    INDEX OF EXAMINATION
2     Examination of:                              Page
3      HAKAN ATILLA
4     Direct By Ms. Fleming . . . . . . . . . . . .2035
5     Cross By Mr. Denton . . . . . . . . . . . . .2137
6                   GOVERNMENT EXHIBITS
7     Exhibit No.                            Received
8      7003, 7004    . . . . . . . . . . . . . . .2072
9      7109   . . . . . . . . . . . . . . . . . .2074
10     2003, 2003-T   . . . . . . . . . . . . . .2140
11                   DEFENDANT EXHIBITS
12    Exhibit No.                            Received
13     321   . . . . . . . . . . . . . . . . . . .2084
14     324   . . . . . . . . . . . . . . . . . . .2098
15
16
17
18
19
20
21
22
23
24
25

# In The Matter Of:

*UNITED STATES OF AMERICA, v.*

*MEHMET HAKAN ATILLA,*

*December 19, 2017*

*Southern District Court Reporters*

Original File HCJ3ATIF.txt

**Min-U-Script® with Word Index**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                      S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6                 Defendant.
 7   ------------------------------x
 8
 9                             December 19, 2017
                                    9:56 a.m.
10
11
12   Before:
13                 HON. RICHARD M. BERMAN,
14                               District Judge
15                               and a jury
16
17                    APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

```
 1
 2         (APPEARANCES Continued)
 3
 4
     HERRICK, FEINSTEIN LLP (NYC)
 5        Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
 6        THOMAS ELLIOTT THORNHILL, Esq.
          - and -
 7   FLEMING RUVOLDT, PLLC
     BY:  CATHY ANN FLEMING, Esq.
 8        ROBERT J. FETTWEIS, Esq.
          - and -
 9   McDERMOTT, WILL & EMERY
     BY:  TODD HARRISON, Esq.
10        - and -
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
11   BY:  JOSHUA LEWIS DRATEL, Esq.
               Of counsel
12
13   Also Present:
          JENNIFER McREYNOLDS, Special Agent FBI
14        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
          MS. ASIYE KAY, Turkish Interpreter
15        MS. SEYHAN SIRTALAN, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

```
 1         (Trial resumed; jury not present)
 2         THE COURT: So please be seated. While you were all
 3   waiting, we were, as I say, myself and the lawyers,
 4   discussing the jury instructions in the charge conference, and
 5   I think we're pretty much there. We will have, later in this
 6   proceeding, probably at a break time, we will put the issues
 7   about the instructions on the record. We did not have a court
 8   reporter for the preliminary conference.
 9         So with that, we will pick up with the
10   cross-examination.
11         THE DEPUTY CLERK: Sir, before we begin, I'd like to
12   remind you that you're still under oath.
13         THE DEFENDANT: Yes, I know. Thank you.
14         MR. DENTON: May I proceed, your Honor?
15         THE COURT: Yes.
16         MR. DENTON: Mr. Chang-Frieden, could we bring up
17   Government Exhibit 7020 and if we could go to paragraph 5.
18   MEHMET HAKAN ATILLA,
19        called as a witness by the Defendant,
20        having been previously duly sworn, testified as follows:
21   CROSS-EXAMINATION (RESUMED)
22   BY MR. DENTON:
23   Q. Mr. Atilla, I want to talk some more about your
24       February 12th, 2013, meeting with Adam Szubin.
25   A. Of course. Go ahead.
```

```
 1   Q. You see here in paragraph 5 of Government Exhibit 7020
 2       where it says: "Halk officials noted that they had been well
 3       briefed on the changes that went into effect on February 6th"?
 4   A. Yes, that's what it says here.
 5   Q. That's a reference to what's called the bilateral trade
 6       restriction, right?
 7   A. So I don't know the full details of the regulations, but I
 8       know that it's about the bilateral trade.
 9   Q. Well, you know that the bilateral trade restriction means
10       you can only use Iranian oil money for transactions directly
11       between Turkey and Iran, right?
12   A. So I presume that's what it is, in its general outline.
13   Q. You couldn't use Iranian oil money to pay for goods shipped
14       from Turkey to someplace other than Iran, right?
15   A. So what I remember is that the goods from Turkey can only
16       be sold to Iran directly, and they could not be sold to a third
17       country. And, also, that the bank not intermediate for
18       transactions for third countries.
19   Q. So you couldn't use Iranian oil money to pay for goods
20       shipped from Turkey to Dubai, for example, right?
21   A. So that's what I assume. As I said, I don't know all the
22       details and the technical details. There might be exceptions
23       in the goods, for example, but in its general outline, I
24       believe that's correct.
25   Q. The bilateral trade restriction is something you discussed
```

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                     December 19, 2017

HCJ3ATI2          Atilla - Cross          Page 2201

1  you?
2  A. Because correspondent banking was under me. So, if there
3  were to be a transfer abroad, then they need to inform me about
4  it.
5  Q. You would have to approve it, right?
6  A. I did not approve the transaction. But if they need to use
7  a correspondent bank, they need to ask me for it.
8  Q. If a company is looking to set up a regular system for
9  transactions involving correspondent banking, you have to
10  approve the system, right?
11  A. I did not understand that fully, if you could please
12  restate.
13  Q. Companies sometimes want to do a lot of the same kind of
14  transaction, right?
15  A. So, I understand that to be they need to do the same type
16  of transaction over and over, and, yes.
17  Q. Those companies would come to the bank to talk about how
18  they want to do it, right?
19  A. Sometimes. Not always, but sometimes.
20  Q. If it involved correspondent banking and they came to the
21  bank to talk about it, you'd be a part of that, right?
22  A. Sometimes a customer, sometimes the branch or sometimes
23  another department, they would, yes.
24  Q. They would come to you, right?
25  A. Well, they could also make a phone call.

HCJ3ATI2          Atilla - Cross          Page 2202

1  Q. And you might not talk about a particular transaction, but
2  you would talk about the method that would be used for the
3  transactions, right?
4  A. There is no such thing as a method in the banking sector,
5  sir. There are only payments that are made, being made between
6  banks. And the payments work in the same way, regardless of
7  which country or which company is involved. So, there is no
8  specific method or specific way that is involved here.
9      For example, I'll provide an example. If a customer
10  wants to transfer euros, it is established as to how you can
11  transfer euros. Halkbank would use euro correspondent banks,
12  and would transfer the money through them.
13      With regard to that, the point at which we get
14  involved as a department is this: We would decide which
15  correspondent banks should be used or should be contacted, or
16  we would decide which banks should not be used.
17      Outside of this, the process regarding the
18  transactions for all the customers would be based on what the
19  operations would set.
20  Q. And the operations would ask for your approval, like Hakan
21  Aydogan did in that e-mail, right?
22  A. So, what Hakan Aydogan was asking here is different than
23  the payment system. What Hakan Aydogan was asking was about
24  the customer wanting to make a payment before the goods would
25  be delivered. And therefore, he was told that this request by

HCJ3ATI2          Atilla - Cross          Page 2203

1  customer was not feasible. Therefore, they found it fit that
2  the seller in Dubai should also open an account at Halkbank.
3  And they thought that way, a complaint from the seller in Dubai
4  saying that I sent the goods without receiving the money would
5  not be appropriate. Would not hold any water. Because if
6  there were to be a letter of credit involved here, there would
7  not have been any need for this kind of thing. Because then
8  the other party, when they load the goods, they would know that
9  they would be able to receive their money.
10      But since the gentleman Reza Zarrab did not want to
11  work through a letter of credit, he wanted to send money abroad
12  before the goods were delivered. And Halkbank did not allow
13  this. So, what Hakan Aydogan was explaining, this is that
14  matter.
15  Q. So let's fast forward and talk about July of 2013 for a
16  moment.
17  A. Of course.
18  Q. Hakan Aydogan still does not report to you at this point,
19  right?
20  A. That is correct.
21  Q. He's still not anywhere in your department, right?
22  A. That is correct.
23  Q. I think you've testified just now and many times that it
24  wasn't your job to deal with what documents were required,
25  right?

HCJ3ATI2          Atilla - Cross          Page 2204

1  A. So, which documents should be required or requested is not
2  part of my job. But as part of our routine work we do talk
3  with branches or the customers.
4  Q. You remember your lawyer showed you yesterday a transcript
5  of a call where you were talking to Reza Zarrab about bills of
6  lading, right?
7  A. Yes, I remember that.
8  Q. By the way, bills of lading as a component of due diligence
9  was something you had talked about with Adam Szubin, right?
10  A. Well, I don't remember that detail.
11  Q. You don't remember that one either?
12  A. Well, I'd already said that I did not remember all the
13  details about that conversation.
14  Q. You remember you told your lawyer during your direct
15  examination that the reason why you were having that
16  conversation with Reza Zarrab was because Hakan Aydogan was
17  busy doing something with other branches? Do you remember that
18  testimony?
19  A. Yes.
20  Q. So he just got the deputy general manager in charge of
21  international banking to cover his desk; is that your
22  testimony?
23  A. No, those that worked under him informed me. So it was a
24  lower level staff that had forwarded it to me.
25      (Continued on next page)

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                        *December 19, 2017*

| HCJPATI3          Atilla - Cross          Page 2205 | HCJPATI3          Atilla - Cross          Page 2207 |

1  Q. Now, Mr. Atilla, there came a time at the end of 2013 when
2  Suleyman Aslan and Reza Zarrab were arrested; isn't that right?
3  A. It was in December, yes.
4  Q. And that's the CEO and one of the biggest clients of the
5  bank, right?
6  A. That is correct.
7  Q. So after those allegations became public, did the bank do
8  an internal investigation?
9  A. Yes, it did conduct one.
10 Q. What did the internal investigation find?
11 A. They checked the procedures. In other words, let me put it
12 this way, there were two different topics; one was the review
13 that was conducted by the bank's auditors, inspectors, and the
14 other one was an independent auditor for the bank. And neither
15 of these individuals found or said anything about the matter at
16 hand after their review --
17        THE COURT: I'm sorry, what was that?
18        THE INTERPRETER: After their review.
19        THE COURT: What was the answer, neither of them found
20 what?
21        (Record read)
22        THE COURT: What was the matter at hand?
23        THE DEFENDANT: There were two matters. One was
24 improper granting of loan, and the other one was the procedure
25 that was followed in foreign trade, providing privilege to Reza

1  the independent auditor works this way. They do not produce a
2  report that explains how things are done this way or that way.
3  They only write it up if they find something that's negative.
4        THE COURT: The independent?
5        THE DEFENDANT: Yes. The independent -- yes, the
6  independent ones conduct a review, and if they find anything
7  that is improper or derogatory, they would put that into their
8  report as a note or as an opinion.
9        THE COURT: What did they find?
10       THE DEFENDANT: No, they did not put anything in their
11 reports as to anything negative that they had found because, as
12 I said, they only write it up if they find something. They do
13 not put it in their reports that they did not find something.
14       So in other words, they have a different way of
15 working. If they find something, then they note it down, and
16 if they don't find anything, they don't write it and it's
17 assumed that there was nothing wrong.
18       But the audit committee of the bank works differently.
19 They work to find things, and they write about what they find.
20 And that committee does not work for or report to the general
21 manager. They report to the board of directors.
22       The BDDK, which was the bank regulations entity during
23 that period, I believe that they also had run a review, but I
24 don't recall whether they found anything, or if they produced a
25 report or not. I don't remember that. In fact, if there had

| HCJPATI3          Atilla - Cross          Page 2206 | HCJPATI3          Atilla - Cross          Page 2208 |

1  Zarrab on behalf of somebody else, or in other words, providing
2  Reza Zarrab with a privilege by blocking others from trade
3  because they believed that Suleyman Aslan had -- alleged to
4  have received as bribes was related to that topic.
5        THE COURT: Did they make a finding about whether --
6        THE INTERPRETER: Shall I translate this?
7        THE COURT: Yes.
8        THE DEFENDANT: So the two issues were leaving the
9  competitors of Reza behind and providing a privilege to Reza
10 Zarrab, and the second one was --
11       THE INTERPRETER: I forgot, maybe you could --
12       THE DEFENDANT: It was the improper granting of loans.
13       THE COURT: Did they make a finding about whether
14 Aslan had done anything wrong?
15       THE DEFENDANT: They reviewed and said that the loan
16 had not been provided improperly. And they reviewed companies
17 that did foreign trade with Iran, and they said that both, in
18 food and gold trade, even though their volumes were not as high
19 as Reza Zarrab's, that they were also able to conduct their
20 trade in those sectors. And if I recall correctly, they even
21 said that the foreign companies were able to do more of the
22 volume.
23       And last, they said with regards to other companies
24 being blocked and Zarrab being given a privilege, there was no
25 basis that would constitute such a thing happening. And

1  been anything, it would have come up anyway. But I don't
2  recall whether there was any report produced or not.
3  Q. So you don't recall seeing a report from a BDDK expert
4  appointed as part of the December 17th investigation; is that
5  your testimony?
6  A. That has nothing to do with what I said. That's not what
7  I'm saying. What I'm saying here is that BDDK, as an entity --
8  the review that BDDK did as an entity, I have no idea what may
9  have come of that because they had auditors that work at the
10 bank. What you're saying is the expert that had been appointed
11 by the prosecutor and had worked with the prosecutor, that's
12 different.
13 Q. And the expert comes from BDDK, right?
14 A. Yes, that would be one that would be appointed from the
15 BDDK, correct.
16 Q. And that's your bank regulator, right?
17 A. That is correct.
18 Q. And you saw the expert report, right?
19 A. Yes, I saw it.
20 Q. So you remember that the report concluded that you violated
21 the resolutions imposing sanctions on Iran, right?
22       MS. FLEMING: Objection, Judge.
23       THE COURT: Overruled.
24       MS. FLEMING: That's outrageous. May I see you at
25 sidebar, please?

**A705**

| HCJPATI3 | Atilla - Cross | Page 2209 |
|---|---|---|

```
 1           (Continued on next page)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| HCJPATI3 | Atilla - Cross | Page 2211 |
|---|---|---|

```
 1   it.
 2           THE COURT: But what does it say?
 3           MR. DENTON: It says literally what I said.
 4           MR. HARRISON: Can you keep your voice down; so the
 5   jury can't hear you?
 6           THE COURT: What does it say, just so the record is
 7   clear.  Do you have it?
 8           MR. DENTON: Yes, I have it.
 9           THE COURT: Yes, let's have it; so we have it in the
10   record.
11           MR. DENTON: I'll get it.
12           MS. FLEMING: Unbelievable.
13           MR. DENTON: So the two things that it said, at
14   different points, I can get the full report are that Suleyman
15   Aslan and the defendant violated the resolutions imposing
16   sanctions on Iran and circumvented the aforementioned
17   sanctions.
18           MS. FLEMING: Could you get the report, please, and
19   show the report to the Court?
20           MR. DENTON: We can.
21           MS. FLEMING: And could you keep your voice down.
22           THE COURT: Do you think that he's not telling the
23   truth?
24           MS. FLEMING: I don't think that's a fair
25   representation of what the report represents.
```

| HCJPATI3 | Atilla - Cross | Page 2210 |
|---|---|---|

```
 1           (At the side bar)
 2           MS. FLEMING: Judge, I have not addressed this.  First
 3   of all, it's way beyond the scope of what I did on direct.
 4   Second, I believe this is a report by somebody who's a
 5   fugitive, and it's part of a -- it's part and parcel with this
 6   Turkish report.  It is filled with hearsay.  It quotes from the
 7   Turkish report.  It never entered the --
 8           THE COURT: Wait.  You're talking about what document?
 9           MR. DENTON: There was an expert auditor appointed as
10   part of a --
11           THE COURT: Did he write a written report?
12           MR. DENTON: Yes.
13           THE COURT: Are you going to introduce it?
14           MR. DENTON: Nope.
15           THE COURT: You're not.
16           MR. DENTON: I'm just asking him if he remembers
17   reading it.
18           THE COURT: If it refreshes his recollection.
19           MR. DENTON: I'm not even going to do that.  If he
20   doesn't remember it....
21           THE COURT: Okay.
22           MS. FLEMING: But, Judge, the question is suggesting
23   that that was the finding, which is just misleading and
24   dishonest.  And based on what's in that report, it's a
25   dishonest and misleading question.  I'm going to move to strike
```

| HCJPATI3 | Atilla - Cross | Page 2212 |
|---|---|---|

```
 1           THE COURT: He didn't say that.  Does the report say
 2   what he just said?
 3           MS. FLEMING: I need to check the exact words.
 4           THE COURT: Wait a minute.  How can you accuse him of
 5   being --
 6           MS. FLEMING: Because --
 7           THE COURT: Just a minute.  Of not telling the truth
 8   if you don't know if his statement is accurate or not?  How can
 9   you say it's outrageous and you don't know?
10           MS. FLEMING: Because I'm familiar enough with the
11   report to know what --
12           THE COURT: No, you're not.  I'm just asking you if
13   the statement he quoted in is in the report.
14           MS. FLEMING: I don't know if those exact words are in
15   it.  It is out of context.
16           THE COURT: But you jumped up and said it's
17   outrageous.
18           MS. FLEMING: Judge, the way he did that and the way
19   he suggested, given what the context and given what this report
20   is, the way he did it in front of the jury is really
21   inappropriate.
22           THE COURT: I'm trying to figure out how --
23           MR. ROCCO: Well, your Honor --
24           THE COURT: -- if it's an accurate statement.
25           MR. ROCCO: I didn't want to jump in, but I think
```

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  Mr. Denton by asking the question basically broadcast what the
2  result of that hearsay report is. That's what I reacted to.
3      THE COURT: That's what you lawyers do. You ask a
4  question.
5      MR. ROCCO: Not quite.
6      THE COURT: You ask a question: Didn't Mr. Gulen try
7  to get you released from jail? Right? And because you're
8  trying to say that the witness is a Gulenist and -- you know.
9      MR. ROCCO: That's not asking a hearsay. That's not
10  asking or publishing to the jury what's pure hearsay or
11  speculation, and that's what this report is. And that's what
12  was improper about what he said.
13      THE COURT: But he's saying there's a quote.
14      MR. ROCCO: But it's still hearsay, your Honor.
15  There's a way to do it, and that's not the way to do it.
16      MR. HARRISON: The question goes to the ultimate issue
17  of fact in this case.
18      MR. ROCCO: That's precisely right, precisely right.
19      THE DEPUTY CLERK: Excuse me, do you want to give the
20  jurors five minutes?
21      THE COURT: Where are you?
22      MR. DENTON: Very close to the end. I'm happy to move
23  on from this, your Honor. I just want to know if he remembers
24  it.
25      THE COURT: Yes, let's take five minutes.

1      (Jury not present)
2      MR. ROCCO: Todd is right, you may as well send the
3  jury home. Todd is absolutely right. That's precisely what
4  this case is about.
5      THE COURT: But why can't he ask the question?
6      MR. ROCCO: Because, one --
7      THE COURT: She asked the question. Incidentally,
8  Ms. Fleming asked the question four times: Did you violate any
9  sanctions? Did you engage in any conspiracy? Did you meet
10  with so and so? Did you ever do this? How is that any
11  different?
12      MR. ROCCO: Well, I think it doesn't call for hearsay,
13  and basically, I think she's entitled to ask a defendant, who's
14  on the witness stand, whether he's guilty of the crimes that
15  he's charged with.
16      THE COURT: Isn't he entitled to ask the defendant if
17  he remembers that conclusion?
18      MR. ROCCO: No. I think, your Honor --
19      THE COURT: So here's what I think, I think, you know,
20  candidly, it sounded like he was quite evasive about the
21  results of these various reports, the audit report, the
22  internal report, the external report and now this third report,
23  right? So what rule is he violating by asking that question,
24  if it's an accurate quote?
25      MR. ROCCO: Basically, he has no right putting that

1  kind of hearsay regarding the ultimate issues in this. It
2  calls for hearsay. It calls for conclusions with respect to
3  the ultimate issues that need to be decided by the jury in this
4  case. That's what's improper about it, your Honor, and that's
5  not asking the defendant whether he committed a crime, whether
6  he lied, whether he cheated doesn't call for hearsay.
7      It's asking a question that's directly apposite to the
8  issues that's presented in this case. We're not asking for
9  somebody's conclusions who's not here to be cross-examined. I
10  think this violates his 6th Amendment right.
11      THE COURT: It violates which?
12      MR. ROCCO: His 6th Amendment rights, his right to
13  confront the person who came to those conclusions that
14  Mr. Denton just broadcast to the jury. I think it's very
15  problematic, and I'm not trying to be melodramatic about it.
16      THE COURT: No, I get it. I'm trying to understand
17  it, though.
18      MR. ROCCO: I'm not objecting to the cross.
19      THE COURT: I know why you don't like it, of course,
20  but I'm just trying to figure out what's improper about it, or
21  whether it is proper.
22      MR. ROCCO: It implicates the hearsay and 6th
23  Amendment issue, confrontation issues. Whoever wrote that
24  report --
25      MS. FLEMING: Canitez.

1      MR. ROCCO: Canitez is not here to be cross-examined.
2  He just testified from the witness stand -- I'm sorry, from the
3  podium, where the prosecutor asked the question, that was
4  testimony.
5      MR. DENTON: Your Honor, if I may, just for a minute,
6  a couple of things here. First of all, no hearsay is being
7  introduced. There's no document that's being introduced.
8  There's no witness who's being asked questions that are
9  hearsay.
10      I'm asking him whether he remembers this, which goes
11  directly to the culpability of his state of mind in dealing
12  with Reza Zarrab from 2014 onwards. His claim is that all of
13  these investigations were about whether loans were proper or
14  whether there were certain advantages. The fact that he
15  knew --
16      THE COURT: And, as I heard it, is that they were all
17  exonerated, everybody in the bank, all of the studies and
18  reports that were done, three -- I mean, I don't know all.
19      MR. ROCCO: But that's not the issue. We can all have
20  our views, your Honor, about those reports.
21      THE COURT: Okay.
22      MR. ROCCO: I mean, it's not the United States, but he
23  didn't author those reports.
24      THE COURT: He, the witness?
25      MR. ROCCO: He did not author those reports. The fact

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    *December 19, 2017*

| HCJPATI3 | Atilla - Cross | Page 2217 |
| --- | --- | --- |

1  of the matter is, because the reports came to conclusions that
2  you and I might not agree with, that doesn't -- he's not
3  implicated in that, Mr. Atilla is not implicated in that. And
4  what was improper about this, really, is the hearsay and in the
5  conclusions.
6          How do we challenge that? How do we challenge those
7  statements that were just made to the jury in the form of a
8  question? It was improper that Mr. Denton was actually
9  testifying. It was improper that he was testifying to hearsay.
10  It was improper that he was testifying to conclusions by
11  somebody who's not here.
12          MS. FLEMING: And an expert.
13          MR. ROCCO: And a so-called expert. Framed, by the
14  way, in the context of an expert report.
15          MR. DENTON: He testified to a bunch of conclusions
16  from a bunch of reports that were favorable to him. He brought
17  up this report. I'm entitled to ask him about it.
18          MR. ROCCO: No, he didn't.
19          THE COURT: Take a couple of minutes and look at the
20  rules and tell me what rules did he violate.
21          MR. ROCCO: Thank you, Judge.
22          THE COURT: You tell me that he can't ask it, and you
23  tell me that you can.
24          (In open court)
25          (Recess)

| HCJPATI3 | Atilla - Cross | Page 2218 |
| --- | --- | --- |

1          THE COURT: So....
2          THE DEPUTY CLERK: Counsel, if you could approach,
3  please.
4          (At the side bar)
5          THE COURT: So let's first hear on behalf of the
6  objector.
7          MR. ROCCO: Your Honor, we have actually quoted
8  language from the report. We're able to bring it up, which
9  basically --
10          THE COURT: From the report itself?
11          MR. ROCCO: From the report that Mr. Denton just
12  referenced. And it's qualified. It says: In this context,
13  assuming that the documents that the companies belonging to
14  Reza submitted for payment of the costs related to the transit
15  trade transactions they were making to Iran, using the system
16  set up by Halkbank, were fictitious, assuming the documents
17  were fictitious, the following conclusions can be reached about
18  Halkbank. And essentially they go on to state what Mr. Denton
19  stated in front of the jury.
20          THE COURT: Okay.
21          MR. ROCCO: So that's the context. And what we're
22  saying is --
23          THE COURT: Can he ask that, about that?
24          MR. ROCCO: No, he cannot.
25          THE COURT: He can't even use that?

| HCJPATI3 | Atilla - Cross | Page 2219 |
| --- | --- | --- |

1          MR. ROCCO: Because he's essentially publishing the
2  conclusions of the report.
3          THE COURT: Okay.
4          MR. ROCCO: Or the assumptions that led to the
5  conclusions in the report, and we say the following, that
6  essentially the question was testimonial, put before, and
7  highly prejudicial, and interjected basically the conclusions
8  of an expert, Canitez, who is the author of this report. The
9  jury is being told, in that question, what this expert found,
10  right? The expert is not here to be cross-examined.
11          THE COURT: Okay. So?
12          MR. ROCCO: And, therefore, is hearsay. So we say
13  that it violates Federal Rules of Evidence 702 because no
14  proper foundation was laid; Federal Rule of Evidence 704B, it's
15  an expert conclusion in a criminal case as to an ultimate fact;
16  the 6th Amendment right to confront and cross-examine Canitez,
17  which is basically articulated best in Crawford.
18          THE COURT: Okay.
19          MR. ROCCO: And I have one more.
20          MS. FLEMING: Relevance.
21          MR. ROCCO: And relevance, under 401 and 403 because
22  it's highly prejudicial.
23          THE COURT: Okay. In response?
24          MR. DENTON: First of all, with respect to relevance,
25  it is obviously relevant, like I said, to his state of mind,

| HCJPATI3 | Atilla - Cross | Page 2220 |
| --- | --- | --- |

1  his knowledge about what was alleged with respect to Reza
2  Zarrab, and his continuing business with him after that point.
3          It's highly probative in light of the fact that he
4  volunteered similar expert conclusions about auditor reports
5  that he claimed were exonerating; so it's highly relevant.
6  With respect to --
7          THE COURT: Well, wait. Hold on one second.
8          MR. ROCCO: He wasn't asked that, and I disagree with
9  that. He wasn't asked that question, and he didn't offer any
10  testimony about exonerative reports. You asked him questions
11  on cross-examination about reports and what the results of the
12  reports were.
13          THE COURT: Okay. All right.
14          MR. DENTON: And he volunteered the results of
15  auditor's reports --
16          THE COURT: Okay. He just answered questions. What
17  else?
18          MR. DENTON: With respect to the expert objections,
19  he's obviously not testifying as an expert. I'm asking him
20  whether he remembers reading it. That is not something that
21  goes to the fact or the expert's conclusion. It goes to his
22  state of mind.
23          MR. ROCCO: Your Honor --
24          THE COURT: Wait, wait.
25          MR. ROCCO: I'm sorry.

**A708**

1    THE COURT: Anything else?
2    MR. DENTON: In this respect, your Honor, it's no
3  different than asking him if he read a textbook on banking that
4  talks about something.
5    THE COURT: I think it is.
6    MR. DENTON: But in terms of his reliance on expert
7  information --
8    THE COURT: Okay. So, you know, I could give you a
9  more authoritative decision later, but I think it's a not
10  proper question. I'm not going to require him to answer it,
11  and I think I'm going to strike the question from the record.
12  I think, at core, it's prejudicial, but it's other things too.
13  It is hearsay, and I think we should move on.
14    MR. DENTON: That's fine, your Honor.
15    MR. ROCCO: Your Honor, really, I don't think we have
16  any alternative but to move for a mistrial.
17    THE COURT: Oh, okay. You have to do that, as the
18  last one, on papers.
19    MR. ROCCO: We will do it. We will do it.
20    THE COURT: So where are we, though.
21    MR. DENTON: Not even ten minutes.
22    THE COURT: And then you're done. And then you want
23  redirect?
24    MS. FLEMING: Yes, and I'm going to stay off this
25  area, but I think the damage is done.

1    THE COURT: How long?
2    MS. FLEMING: Not long. Seriously, not long.
3    THE COURT: Okay. So I'd rather do that all before
4  lunch because if we miss this afternoon with summations, we're
5  going to be in big trouble.
6    MR. DENTON: Judge, just with respect to the concern
7  about mistrial or whatever, if your Honor is not going to allow
8  the question, it may be worthwhile to give a limiting
9  instruction that questions are not evidence, the report
10  referenced is not in evidence, it is only the witness' answers
11  that are in evidence.
12    THE COURT: Yes, I think I'll leave it for now. We
13  can always supplement the record later. I'm just going to
14  strike it, and say that the witness doesn't have to answer.
15    MR. DENTON: Okay.
16    THE COURT: I don't think he did, did he?
17    MR. DENTON: No.
18    THE COURT: He didn't answer the question, did he?
19    MS. FLEMING: No.
20    MR. ROCCO: No.
21    THE COURT: I think that's adequate.
22    (Continued on next page)
23
24
25

1    (In open court)
2    THE COURT: Okay.
3    (Jury present)
4    THE COURT: So please be seated.
5    THE DEPUTY CLERK: Sir, again, I'd like to remind you
6  that you're still under oath.
7    THE DEFENDANT: (In English) Thank you.
8    THE COURT: So with respect to the last question, I'm
9  directing Mr. Atilla not to answer it, and I'm going to order
10  the question stricken from the record. And let's move on to
11  the next question.
12  BY MR. DENTON:
13  Q. Mr. Atilla, we were talking about what happened after --
14    THE COURT: Do you need to interpret that?
15    THE INTERPRETER: I was just asking him, and it
16  appeared, no. We're good.
17  BY MR. DENTON:
18  Q. We were talking about what happened after the arrests on
19  December 17th, 2013. Do you remember that?
20  A. Yes, I remember.
21  Q. Now, in 2014, Halkbank continued to work with Reza Zarrab,
22  right?
23  A. That is correct.
24  Q. Even though you knew about the allegations against him?
25  A. The allegations had been rejected, and the indictment had

1  been dismissed during the period that covered --
2    THE COURT: I didn't hear you. The allegations you
3  were saying?
4    THE DEFENDANT: The allegations were rejected, and the
5  indictment was dismissed, but during the time --
6    THE COURT: Hold on one second. Was that against
7  Mr. Zarrab, right?
8    THE DEFENDANT: I believe it was Suleyman Aslan and
9  Reza Zarrab.
10    THE COURT: Okay.
11    THE DEFENDANT: And possibly others as well.
12  BY MR. DENTON:
13  Q. Now, during that time period --
14    THE INTERPRETER: I have not finished the answer.
15    THE COURT: Go ahead.
16  Q. Sorry.
17  A. And the indictment was dismissed, but during the time the
18  indictment was in effect and there was an investigation going
19  on, there was no business done with Mr. Zarrab. His
20  transactions had been suspended.
21    THE COURT: Do you remember what time period that was?
22    THE DEFENDANT: I don't recall the exact dates, but I
23  can give you an estimation.
24    THE COURT: Okay. As best you can remember.
25    THE DEFENDANT: In my estimation, maybe between

**A709**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJPATI3 | Atilla - Cross | Page 2225 |
|---|---|---|

1    December to February or March. I don't recall the exact dates,
2    but...
3        BY MR. DENTON:
4    Q.  And he was still doing Iran trade business when he started
5    up again, right?
6    A.  Apparently, he had come to the bank and discussed the
7    restarting of his business, but as I had said before, I did not
8    meet with him on this matter. I did not talk to him, and I had
9    no involvement.
10   Q.  Now, Suleyman Aslan was no longer at the bank then, right?
11   A.  That is correct. He resigned.
12   Q.  Levent Balkan had left the bank in 2013, right?
13   A.  Yes, I believe it was the beginning of 2013.
14   Q.  But you were still the deputy general manager in charge of
15   international banking, weren't you?
16   A.  Of course. There's no need for me to not continue in that.
17   So why wouldn't I?
18        THE COURT: And did Aslan ever come back after he was
19   arrested, or he never came back again?
20        THE DEFENDANT: He never returned, your Honor.
21   Q.  Now, Mr. Atilla, you've sat here through this entire trial,
22   haven't you?
23   A.  Yes.
24   Q.  And watched every witness, right?
25   A.  Correct.

| HCJPATI3 | Atilla - Cross | Page 2226 |
|---|---|---|

1    Q.  Looked at every exhibit, right?
2    A.  Supposedly. I don't remember if I looked at every single
3    one of them, but that's very possible, yes.
4    Q.  No other witness sat through this whole trial, did they?
5    A.  Are you talking about a defendant or a witness? Are you
6    asking as far as me or --
7    Q.  No other witness watched any other witness testify in this
8    trial, right?
9    A.  I believe that is correct.
10   Q.  Now, when you were sitting here, you heard Special Agent
11   Rob Tringale testify that you told him that he should talk to
12   David Cohen after you were arrested. Do you remember him
13   saying that from the witness stand?
14   A.  Yes. Apparently, that's what I had said, and I assumed
15   they could gather information from him about this matter.
16   Q.  But your testimony on direct examination, when your lawyer
17   asked you, was that you don't remember that ever happening; do
18   you remember testifying to that?
19   A.  Well, when a person is arrested, it's hard for the
20   individual to remember everything that comes after that.
21   Q.  Well, right after you were arrested, you met with Special
22   Agent McReynolds; do you remember that?
23   A.  Yes, I remember that lady.
24   Q.  And you remember watching the video where she showed you
25   the transcripts of the wiretaps? Do you remember that?

| HCJPATI3 | Atilla - Cross | Page 2227 |
|---|---|---|

1    A.  I don't recall that I was shown any transcripts.
2    Q.  You don't remember that you said: "No, you don't have
3    that"?
4    A.  I recall that, but what I meant was when the individual
5    said that they had this, what I was saying was it's not
6    something that you had done as far as an intercept. It may be
7    something that you had been given.
8    Q.  You heard Reza Zarrab testify that you were at a meeting in
9    October 2012 with Iranian bank and oil officials to discuss the
10   system for fulfilling payment orders; do you remember him
11   saying that?
12   A.  Yes, I remember.
13   Q.  And you've testified now many times that you were never at
14   such a meeting, right?
15   A.  What I had said was I do not recall the dates. I don't
16   have any information on the date of such a meeting, and I'd
17   also said that I did not attend any meeting where the
18   establishment of a system or providing direction regarding a
19   system involving Reza Zarrab, I had not attended any such
20   meeting. But I had been many meetings -- I've been in many
21   meetings with NIOC and the Central Bank.
22   Q.  What you're saying is the meeting Reza Zarrab described
23   with you and people from NIOC and people from Iranian banks to
24   talk about the system for making payments, that that meeting,
25   you say, never happened?

| HCJPATI3 | Atilla - Cross | Page 2228 |
|---|---|---|

1    A.  What I'm saying is that there is no meeting where the
2    system was discussed, or what Reza Zarrab may have referred to
3    as the establishment of a system, there was no such meeting.
4    Q.  You saw text messages from Suleyman Aslan asking Reza
5    Zarrab if he was okay with the method proposed by Hakan Atilla
6    for food payments; do you remember those messages?
7    A.  I remember that there was such a message, and I saw it
8    here.
9    Q.  But your testimony on Friday was that you never proposed
10   any method; isn't that right?
11   A.  That is correct.
12   Q.  And you heard Adam Szubin testify that he pulled you aside
13   for a private meeting to warn you that the U.S. government was
14   concerned that Halkbank was violating sanctions. You remember
15   him saying that, right?
16   A.  I remember.
17   Q.  But your testimony here today is that that never happened,
18   right?
19   A.  That is absolutely the case. Had there been such a thing,
20   we would have actually stopped those transactions right away as
21   of that date because our relationship with them was not such a
22   relationship anyway. The relationship that we had built up
23   between us was one that involved close exchange of information
24   and opinions on the matters.
25        If Mr. Szubin had such a concern, a serious concern

**A710**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJPATI3 | Atilla - Cross | Page 2229 |

1 about me or the bank, then he wouldn't have said in 2016 that
2 Halkbank could open dollar accounts for Iranian banks.  It is
3 true that in our relationship, the U.S. Treasury and the OFAC
4 did warn Halkbank about Iran's efforts in violating the
5 sanctions, and it is true that they had provided examples of
6 this.
7     And it is also true that we reviewed these examples in
8 detail and provided them with feedback.  And it is also true
9 that we provided them with detailed information that they did
10 not have on their own.  But they never made any statement
11 regarding them having any serious concerns about Halkbank or
12 that they would possibly take any action or do anything.  That
13 was never brought up.  I apologize.  I can stop here, if you
14 like.
15 Q. Let's just stick to the basic facts.  Your testimony is you
16 never had a private meeting with Adam Szubin, right?
17 A. Yes.
18     MR. DENTON: No further questions, your Honor.
19     THE COURT: Okay.  Thanks.
20     Ms. Fleming for redirect?
21     MS. FLEMING: Yes, your Honor.  Thank you, briefly,
22 and I really do mean briefly.
23     THE COURT: I have a stopwatch out.
24     MS. FLEMING: Okay.  Got it.  I'm a little older now,
25 but I can still move.

| HCJPATI3 | Atilla - Redirect | Page 2230 |

1     THE COURT: Don't feel any pressure, though.
2 REDIRECT EXAMINATION
3 BY MS. FLEMING:
4 Q. Mr. Atilla, do you remember Mr. Denton just asked you some
5 questions about are you sure, sure, sure, about this meeting in
6 October with -- that you were never at any meeting with the
7 Iranians and Reza Zarrab?  Do you remember those questions?
8 A. Yes, I remember.
9     (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| HCJ3ATI4 | Atilla - Redirect | Page 2231 |

1 Q. Regardless of the date, do you ever remember being in a
2 meeting with Suleyman Aslan, Iranians and Reza Zarrab, where
3 Suleyman Aslan said, pointing to Reza Zarrab, we can just keep
4 doing the existing system, referring to violating sanctions?
5     THE COURT: That's a long question.  You're
6 comfortable with it?
7 Q. Do you understand the question and can you answer it yes or
8 no?
9 A. Madam, I'm 47 years old, and up until this point,
10 throughout my life, I have never been in a meeting or anywhere
11 where violating the sanction was discussed, anybody had pointed
12 to Reza Zarrab or that I had pointed to Reza Zarrab, and there
13 was never any point where I had reached an agreement with
14 Mr. Reza Zarrab about anything about these things.
15     And this does not involve the United States, either,
16 but I did not have any meetings with anybody with regards to
17 violating any Turkish laws either.
18 Q. And do you recall there were a lot of questions by
19 Mr. Denton about these e-mails that went back and forth in
20 August of 2012 from Mr. Balkan to you and to Mr. Aslan; do you
21 remember those questions?
22 A. Yes.
23 Q. Those e-mails are all in 2012, and they're before the
24 April 10, 2013 call where Reza Zarrab is still lying to you;
25 isn't that correct?

| HCJ3ATI4 | Atilla - Redirect | Page 2232 |

1 A. That is correct.
2     MS. FLEMING: Could we please bring up Government
3 Exhibit 922, which is in evidence.  The jury can see it.
4 Q. Do you remember Mr. Denton asking you some questions about
5 bills of lading?
6 A. Yes.
7 Q. Do you recall Reza Zarrab identifying Government Exhibit
8 922 as a bill of lading?
9 A. I remember.
10 Q. Is this a bill of lading to your knowledge, Government
11 Exhibit 922?
12 A. To the best of my understanding, this is a customs
13 declaration.
14 Q. This is a document that's given to the customs officers
15 when exports are going out of the country; is that correct?
16 A. Well, I don't have any information about how customs in
17 Dubai work, but a declaration would be one that the customer
18 would prepare, and would submit to the customs as a customs
19 declaration and would submit to them.  And then the customs
20 would do their own inquiries and reviews on this, but I don't
21 know what type of procedure that they would follow.
22     And in Turkey, the bank would be able to look up the
23 documents that are submitted to the customs, but they would not
24 be able to look up any documents from other countries that were
25 submitted in other countries.

# A711

HCJ3ATI4          Atilla - Redirect          Page 2233

1 Q. Thank you.
2      MS. FLEMING: You can take that down.
3 Q. Do you remember being asked questions about various
4 accounts at various banks through Halkbank?
5 A. Yes, I remember.
6 Q. Mr. Denton asked you some questions about wasn't it true
7 that sometimes Halkbank actually had transactions involving
8 dollars that got stopped or blocked or suspended. Do you
9 remember those questions?
10 A. Yes, I remember.
11      MS. FLEMING: Would you pull up just for Mr. Atilla,
12 please, Defendant's Exhibit 320 and 320-T on the screen.
13 Q. Mr. Atilla, do you recognize Defendant's Exhibit 320?
14 A. Yes, I recognize it.
15 Q. Is that an e-mail that you sent during the course of
16 business at Halkbank to various other people at Halkbank on
17 May 16, 2013?
18 A. Yes, it is an e-mail, and it's one that I am mentioning
19 that no transactions should be sent to the U.S. banks, it's an
20 electronic message that contains that information.
21      MS. FLEMING: Your Honor, we'd move Government Exhibit
22 320 and 320-T into evidence.
23      MR. DENTON: No objection.
24      THE COURT: I'll allow it.
25      (Defendant's Exhibit 320, 320-T received in evidence)

HCJ3ATI4          Atilla - Redirect          Page 2234

1      MS. FLEMING: Would you publish to the jury, please.
2 Q. Will you explain briefly what happened in this transaction
3 that caused you to send the e-mail to your colleagues.
4 A. Of course. I will.
5      A U.S. company had sold food to Iran. And Halkbank is
6 sending the payment for this to the U.S. company. And I'm
7 saying that even though the seller is a U.S. company, still do
8 not do this.
9 Q. Do not do what?
10 A. I'm telling them that they should not use American dollars
11 or the American banking system.
12 Q. Why?
13 A. Because I did not want the U.S. banks to be a party to
14 anything that involves Iran. But in this transaction there is
15 nothing that's violating the sanctions anyway. But it is our
16 policy at our bank that U.S. dollars or the U.S. financial
17 system should not be used in anything that involves Iran.
18 Sometimes the operations may conduct a transaction assuming
19 that this is -- this transaction is not subject to sanctions,
20 because the seller is a U.S. company. And I'm saying that even
21 if that's the case, do not use this.
22 Q. The transaction reflected in 320 and 320-T, that has
23 nothing to do with Reza Zarrab or any of his companies, does
24 it?
25 A. That is correct. Yes, that is correct. It's a company

HCJ3ATI4          Atilla - Redirect          Page 2235

1 called PS International. And the company in Turkey is
2 Turiakyi.
3      MS. FLEMING: Could we please pull up Government
4 Exhibit 2018 for the jury.
5 Q. Mr. Denton showed you Government Exhibit 2018 and asked you
6 questions about a lot of news articles that were out talking
7 about trade with various -- with the gold trade in Iran. Do
8 you remember that?
9 A. Yes, I remember.
10 Q. He also, this is in July 2012, this is also before
11 April 10, 2013, correct?
12 A. That is correct.
13 Q. And date of this e-mail to you and Mr. Aslan and Mr. Levent
14 Balkan is dated July 13, 2012, right?
15 A. That's what it says here, yes.
16      MS. FLEMING: Can we pull up, please, Government
17 Exhibit 2026 and 2026-T, I believe they're both in evidence.
18 Q. Do you see this Reuters article that the same person from
19 Halkbank forwarded to you Mr. Balkan and Mr. Aslan a couple of
20 weeks later on July 31, 2012?
21 A. Yes, I see that.
22 Q. If you look down a little further, at least on 2026-T in
23 the English, it says "No findings are reached confirming that
24 gold exportation to Iran is used as payment tool for the
25 importation of raw petroleum or natural gas." Do you see that?

HCJ3ATI4          Atilla - Redirect          Page 2236

1 A. Yes, I see that.
2 Q. Would you remind the jury, please, who the author of this
3 e-mail is, again I'm going to apologize for murdering names,
4 but Murat Uysal. Who is that person?
5 A. This individual was the deputy general manager responsible
6 for treasury at that time.
7 Q. Was that person over foreign operations at that time?
8 A. No, he had no connection to that.
9 Q. Was the discussion of what was going on with regard to the
10 economy, exports, imports in Turkey, during all of these years,
11 important to all of you as bankers in various departments?
12      THE COURT: If you have just a second.
13      (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

**A712**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                                      December 19, 2017

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2245 |
|---|---|---|

1    MR. DENTON: The government has no rebuttal case.
2    (In open court; jury present)
3    THE COURT: Both the government and the defense have
4    rested their case, and we're ready for summations. We start
5    with the government, then we go to the defense, and it is our
6    practice to give the government a short rebuttal following. We
7    will end promptly at 4:45.
8    MR. LOCKARD: May I proceed, your Honor?
9    THE COURT: Mr. Lockard.
10    MR. LOCKARD: This is a case about lies. That was so
11    when my colleague Mr. Denton delivered his opening statements
12    three, almost three and a half weeks ago, and after several
13    days of the defendant's testimony, that is even more so.
14    This is a case about the lies that Mr. Atilla told to
15    cover up a multibillion dollar sanctions busting scheme
16    operating out of his bank, Halkbank, a bank owned by the
17    government of Turkey. Lies that Mr. Atilla told to U.S.
18    Treasury officials. Lies that he told to protect an agreement
19    to provide services to the government of Iran in violation of
20    sanctions that were enacted because of the unusual and
21    extraordinary threat that government poses to our nation's
22    national security foreign policy and economy. Lies that were
23    built into the very architecture of the method that Mr. Atilla
24    devised to further that agreement, and to further that scheme
25    into the documents that he and his bank knowingly accepted from

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2246 |
|---|---|---|

1    their co-conspirator, Reza Zarrab. Lies that Mr. Atilla told
2    you during his testimony over these past two days.
3    Why did Mr. Atilla tell all those lies? For simple
4    reasons. To help his bank, to help his bank's customers,
5    customers like Mr. Zarrab, customers like the government of
6    Iran, the Central Bank of Iran, the National Iranian Oil
7    Company, lies that he told to keep his bank from being
8    blacklisted from the American financial system, a blacklisting
9    that would have been a deathblow to his employer, a
10    blacklisting that would have cost him his position, his
11    prestige, his job.
12    Now, you've heard a lot about what those schemes were.
13    Those schemes to help the government of Iran take huge pools of
14    restricted oil money that were locked up at Halkbank and to
15    funnel that money to Dubai where Iran could use it. So we
16    don't need to go through all that again in detail, but you've
17    seen the elaborate, the complicated system that was devised and
18    that was executed within Halkbank both to use gold exports, to
19    carry that money down to Dubai in cargo planes and in gold
20    bricks, loaded into carry-on luggage, and carried onto
21    passenger airplanes. And through fake food transactions,
22    papered over with fraudulent documents, to simply wire the
23    money to Dubai for Iran's benefit.
24    So let's touch briefly on what were Mr. Atilla's lies
25    to Treasury. And we'll come back to this because this is an

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2247 |
|---|---|---|

1    important point.
2    He lied about Halkbank's due diligence. He lied about
3    the nature of the gold business, how it worked and what he knew
4    about who the customers were. He lied about the fake food
5    trade. And what it is that he told Treasury about the bank's
6    policies and practices when it came to foreign trade, the kinds
7    of customers that they dealt with.
8    What did Mr. Atilla tell Treasury about the due
9    diligence at the bank? He said that it was rigorous. It was
10    careful. They demand documents to understand every part of a
11    transaction, the relationship between commercial entities, in
12    order to minimize the risk that they were unwittingly involved
13    in financing sanctioned activities.
14    But what did you see actually happened at this trial?
15    You saw that Mr. Atilla and the bank exempted Reza Zarrab from
16    exactly these requirements.
17    He told Treasury that their due diligence efforts
18    included getting copies of the bills of lading, commercial
19    documents that describe the goods that are being exported.
20    Spot checks. A whole host of ways that a well-functioning
21    compliance program operates. And you saw that none of that
22    happened with Reza Zarrab.
23    He lied about the gold business when Treasury
24    Department became aware, because it was impossible not to be
25    aware, of the massive gold exports going from Turkey to Dubai

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2248 |
|---|---|---|

1    and to Iran, that it was private Iranian citizens who are
2    buying a lot more gold. But Mr. Atilla knew that these gold
3    exports were actually for the government of Iran, and for the
4    National Iranian Oil Company.
5    You saw that not only in what it is that David Cohen
6    testified, but in Mr. Atilla's draft response to a letter that
7    the general manager of the bank had received from David Cohen
8    about the gold trade, where again, he says carried on between
9    privately owned companies dealing in jewelry business.
10    And he lied about the fake food trade. Mr. Atilla
11    told Treasury officials that Halk refuses to deal with new
12    exporters, insisting on seeing five years of commercial
13    history.
14    The bank emphasized, and Mr. Atilla emphasized, that
15    only large, well-known customers were permitted to transact
16    business through Halkbank.
17    Mr. Zarrab was not large, he was not well known, his
18    history at the bank was approximately a year when he began the
19    food business, but he quickly became one of the biggest
20    purported food traders at the bank.
21    And of course Mr. Atilla never told the Treasury
22    officials that the same Iranian financial institutions, the
23    same Iranian banks that were the receivers of the gold exports
24    were suddenly the buyers of the food trade. Banks like the
25    Credit Institution for Development, Bank Pasargad, Bank

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                   December 19, 2017

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2249 |
| --- | --- | --- |

1    Sarmayeh, Bank Parsian.
2           Now, Mr. Atilla also lied during his testimony. Some
3    of those lies were small, some of them were medium, some of
4    them were whoppers.
5           He said, for example, his English language is good,
6    but not that great. Why did he tell that you? Why did he tell
7    you that? He told you that because he knows that his meetings
8    with the Treasury Department are important, and he wants to
9    preserve the ability to tell you that he didn't understand what
10   they told him. Or maybe they didn't understand what he told
11   them. So he told you I speak English, I'm comfortable with
12   financial language, but when we get to legal language, I'm not
13   so comfortable. When we talk about sanctions, I'm not so
14   comfortable.
15          You know that that's not true. You know it because
16   you watched him testify. You watched him answer questions
17   before they were translated. You watched him correct the
18   interpreters' translations. You watched him answer in English.
19   And you watched him correct translations on documents.
20          And all of that is consistent with what you heard from
21   the Treasury witnesses. David Cohen told you that Mr. Atilla
22   spoke English perfectly well, and in fact, translated for other
23   officials at the bank who did not speak English. Mr. Szubin
24   told you that. Mr. Kirschenbaum told you that.
25          Mr. Atilla's sanction expertise. He tried to persuade

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2250 |
| --- | --- | --- |

1    you he's got enough expertise to get by, but certainly not what
2    he would call an expert.
3           You know that that's not true. You know that first,
4    again, because you watched him testify. You watched him give
5    extremely sophisticated answers to questions about sanctions.
6    Extremely sophisticated answers. And you know that he has
7    sanctions expertise based on his history. There is no one at
8    Halkbank who has been in more meetings with more high-level
9    Treasury officials about sanctions than Mr. Atilla.
10          Starting in September of 2010, before Mr. Suleyman
11   Aslan was the general manager, Mr. Atilla is meeting with
12   Daniel Glaser from Treasury to talk about the sanctions. And
13   who was Mr. Glaser? Mr. Cohen told you that he was the head of
14   one of the offices within the Treasury Department's Office of
15   Terrorism and Financial Intelligence. A senior Treasury
16   official.
17          You know that Mr. Atilla met with both Mr. Cohen and
18   Mr. Szubin in March of 2012 to talk about the importance of
19   enhanced due diligence when it came to transactions with Iran.
20          Mr. Atilla met again with Mr. Cohen in September of
21   2012, to talk about a whole host of issues under the sanctions.
22   To reaffirm its strong commitment to do nothing that would
23   violate the sanctions. To tout its due diligence. And it was
24   Mr. Atilla who said those things. It was Mr. Atilla who was
25   the principal counterpart at these meetings.

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2251 |
| --- | --- | --- |

1           When Treasury Department was concerned about the gold
2    going from Turkey to Iran and the UAE, Mr. Cohen wrote a letter
3    to the general manager Mr. Aslan. And it was Mr. Atilla who
4    drafted a proposed response.
5           In February of 2013, Mr. Atilla was at two important
6    meetings with Treasury officials to talk about the new
7    sanctions coming into effect on February 6, that bilateral
8    trade restriction that you heard about and that we'll talk
9    about a little bit more. And confirmed that he had read it and
10   he understood it. And again, that was Mr. Atilla.
11          Again in February with Mr. Cohen, again committing
12   that the bank is not in the business of ensuring that the
13   government of Iran has access to its profits. Mr. Atilla.
14          And then there's more. Mr. Atilla e-mails in July of
15   2013 to confirm that the bank purportedly has stopped the gold
16   trade as of the 10th of June. Another e-mail in October of
17   2013, asking for Treasury's green light to transfer oil
18   proceeds from other countries to the bank. A phone call on
19   October 30 with then-OFAC director Adam Szubin about
20   humanitarian trade, the sale of food and medicine to Iran.
21   Mr. Atilla.
22          He is an expert. He showed you he's an expert. His
23   ability to understand the sanctions and to comply with the
24   sanctions is not in issue in this case.
25          Now let's talk about some of the whoppers that Mr.

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2252 |
| --- | --- | --- |

1    Atilla told you on the stand.
2           He told you that the bank no longer facilitated gold
3    exports to Iran or Iranians after July of 2013. In fact, he
4    said June 10 of 2013.
5           Ladies and gentlemen, Mr. Zarrab told you that he was
6    still exporting gold for Iranians after July 2013.
7    Mr. Korkmaz, who ran the investigation in Turkey, told you
8    that Mr. Zarrab was still exporting gold after July of 2013.
9    He calculated almost a half a billion dollars' worth of gold
10   between July and December of 2013 alone.
11          And how do you know that they are both right? Not
12   only because Mr. Zarrab is the one who did it and Mr. Korkmaz
13   is the one who investigated it? Because Halkbank's own records
14   show you that gold went out after July of 2013. At least as
15   late as October, according to the customs declarations, to the
16   Credit Institute for Development, an Iranian bank.
17          How else do you know that the gold went out, because
18   they were directed to send gold out? You remember the meeting
19   that Mr. Aslan had in September of 2016, with the minister of
20   the economy and the prime minister, where he was directed to
21   boost the exports. And he talked about that with Mr. Zarrab.
22   And they boosted it with gold. And you can see in the
23   evidence, the other evidence that's in the record, here is an
24   invoice from April of 2014, 40 kilograms of gold being exported
25   by Mr. Zarrab's company. Safir Altin.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2253 |
| --- | --- | --- |

1    Now a quick segue on this export. This goes to the
2  UAE. As you know, Mr. Zarrab always sent his gold for Iranians
3  to Dubai. Sometimes he said it was going to Iran, sometimes he
4  said it was going to Dubai, but it was always going to Dubai.
5  And he told you why that was. Because gold in Iran is not that
6  much use. Gold in Dubai can be sold, and it can be spent. And
7  that is what the Iranians wanted and Mr. Atilla knew that.
8    You saw that in Government's Exhibit 229 a call in
9  February of 2013, where Mr. Zarrab is talking to his business
10  partner, Mr. Happani. And what are they talking about?
11  Mr. Zarrab's conversation with Mr. Hakan. Hakan Atilla. And
12  what do they talk about? How to do the documents for the gold
13  exports. And what did Mr. Atilla tell Zarrab? To write it
14  down as transit to Iran through Dubai.
15    We may have to go back to using passengers. You know
16  what that means, that means couriers. Happani is not happy
17  about that. He says oh, that would be bad. It is more
18  expensive to send it by couriers. If it is more expensive,
19  then what's the reason for doing it? The regulations. In
20  February of 2013, the bilateral trade requirement meant that if
21  Iranian oil proceeds are going to be used to buy gold, the gold
22  has to go to Iran. So they have to make it look on the
23  documents like the gold is going to Iran, and that is what
24  Mr. Atilla is telling Mr. Zarrab. Mr. Atilla knows exactly how
25  the gold business works.

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2254 |
| --- | --- | --- |

1    You can see that that gets carried out again at
2  Halkbank's own records. Where in February of 2013, it all
3  switches. It switches from BAE, which are the Turkish acronyms
4  for the United Arab Emirates, to Iran on Mr. Atilla's
5  instructions.
6    Another whopper: Halkbank complied with the
7  sanctions. That literally cannot be true. It cannot be true.
8  You heard from Mr. Zarrab for several days telling you exactly
9  how he violated the sanctions and how he did it with Halkbank.
10  Mr. Atilla sat there through all that testimony, and then still
11  took the stand and told you Halkbank never violated the
12  sanctions.
13    Now, Mr. Atilla is going to argue that he didn't know,
14  that he wasn't involved, and we'll get to that pretty soon, but
15  he cannot possibly tell you that Halkbank didn't violate the
16  sanctions.
17    Mr. Atilla told you that he didn't know what
18  Mr. Zarrab's business was in 2014 and 2015. You remember this
19  is after Mr. Zarrab's arrest in Turkey in December of 2013.
20  And despite the fact that Mr. Zarrab was arrested, despite the
21  fact that these allegations of document forgery and gold
22  exports to Iran and bribery were all publicly aired, business
23  went right back to usual in the middle of 2014. Mr. Atilla
24  knew that. But he stood here, or sat here in the courtroom,
25  and told you he didn't know what Zarrab's business was. You

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2255 |
| --- | --- | --- |

1  know that's a lie. It is a lie because he knew what it was in
2  2013. He was at the meetings where the business restarted in
3  2014.
4    Let's talk about a couple more aspects of Mr. Atilla's
5  meetings with the U.S. Treasury Department. What happened at
6  those meetings? The sanctions laws were explained in detail,
7  at length, up to date, up to the minute with the gold
8  restrictions and the oil restrictions. So just very briefly,
9  let's talk about what those restrictions were.
10    First, as you know, in July of 2012, any foreign bank
11  that facilitated the export of gold for the government of Iran
12  could be sanctioned.
13    Now, what does that mean? It means they could lose
14  their access to the U.S. financial system. They could lose
15  their ability to have the correspondent accounts that are
16  critical for the bank to be able to do U.S. dollar
17  transactions. Critical for a bank that does international
18  business. Critical for Mr. Atilla's bank.
19    As you also know, Halkbank's ability to do
20  transactions involving Iranian oil and Iranian gas proceeds
21  also got more restricted.
22    First, they could only deal with the Central Bank of
23  Iran or the National Iranian Oil Company if Turkey was reducing
24  its oil imports. Then, by February of 2013, those funds could
25  only be used for two things: To buy goods from Turkey, or to

| HCJ3ATI4 | Summation - Mr. Lockard | Page 2256 |
| --- | --- | --- |

1  buy food or medicine. And as you also know, by July of 2013,
2  the gold ban became even tighter and Halkbank was no longer
3  able to facilitate gold to Iran period, whether for private or
4  public purchasers.
5    What else did Treasury and Mr. Atilla talk about at
6  these meetings? They talked about how Iran was trying to avoid
7  those restrictions by acquiring gold, by engaging in
8  transactions with fake documents. In other words, about
9  exactly what was happening at Halkbank.
10    What else happened at these meetings? Treasury warned
11  Mr. Atilla, warned him that his bank was being watched, warned
12  him that his bank was at risk. And you heard Mr. Atilla lie
13  about that, too. He described an always positive relationship.
14  It was a friendly, information-sharing atmosphere.
15    Ladies and gentlemen, that was not true. Halkbank was
16  under heat. You heard that from Mr. Cohen and you heard that
17  from Mr. Szubin, and you see it in the documents.
18    The first shot was from December 20 of 2012. Again,
19  this is after the public reports about the massive gold exports
20  to Iran became public. And Mr. Cohen wrote a letter to the
21  general manager of the bank warning the U.S. Treasury
22  Department is troubled by these reports. That is a polite way
23  of saying we are watching you and we want to know what's going
24  on.
25    In February 2012 it got a little bit less polite.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  This is the pull aside. The pull aside that Mr. Atilla denies
2  ever happened. What did Mr. Szubin do in February of 2013 in
3  Turkey? He had a one-on-one meeting with Mr. Atilla and warned
4  him that Halkbank was in a category of one. Mr. Atilla's
5  response? Was sweaty, as it should have been.
6       Now, Mr. Atilla says this meeting never happened. Not
7  sure what you're supposed to make of that. Maybe he says that
8  that meeting was actually with Mr. Aslan. I'm pretty sure that
9  Mr. Szubin would not mistake Suleyman Aslan for Hakan Atilla.
10 And Mr. Szubin is sure he wouldn't mistake Mr. Aslan for
11 Mr. Atilla. As he told you, he has done this sort of thing
12 maybe twice in his whole career.
13      It happened, and Mr. Atilla lied to you about it. Why
14 did he lie to you about it? Because he knows that if Treasury
15 is clearly and pointedly and explicitly looking at his bank, he
16 should have done something different. He told you himself, if
17 I had been warned about these things, I would have stopped. He
18 has to admit that. He has to admit that he would comply with
19 the law if he knew what was going on.
20      This meeting proves that he was warned, that he should
21 have known, and that he did know. And that's why he's denying
22 that it ever happened.
23      That wasn't the last of the warnings. Mr. Cohen
24 warned him again at another February meeting saying our level
25 of concern is high, and our ability to overlook issues is low.

1  What did Mr. Atilla say? Mr. Atilla assured Mr. Cohen the
2  bank intends to continue fully complying with U.S. sanctions
3  and explained that the bank is not in the business to profit
4  Iran.
5       As you know, that is exactly what the bank was in the
6  business of doing for Iran.
7       One more warning. This time in an e-mail from
8  Mr. Szubin writing a letter to respond to the meetings and
9  conversations that they had just had in February. He includes
10 a warning about another individual that OFAC had sanctioned
11 under the very same sanctions programs that were being
12 discussed with Halkbank for helping Iran evade international
13 oil sanctions through front companies. Why did Mr. Szubin
14 bring Mr. Cambis to Halkbank's attention? To warn them. We
15 have done this. It could happen to you.
16      So let's talk about how it is that Mr. Atilla and his
17 bank did get into the business of giving Iran access to its
18 profits. We're going to start with the meetings that happened
19 in October of 2012. The meetings where the head of the
20 National Iranian Oil Company, its finance director, the head of
21 NICO, the company that operates for NIOC internationally, and
22 as you heard later, the director of the Central Bank later
23 joined in those meetings as well.
24      These are the meetings that were held with Mr. Aslan,
25 Mr. Atilla, Mr. Zarrab, and these oil officials, to talk about

1  bringing other Iranian oil money held at other banks in other
2  countries, into Halkbank.
3       (Continued on next page)

1       MR. LOCKARD: And as you heard from Mr. Zarrab,
2  Halkbank was willing to go through with that plan, as long as
3  there wasn't any publicity about it. Unfortunately for the
4  bank, there was publicity about it and the bank backed out. So
5  these meetings are about a deal that never happened.
6       So why are we going to spend so much time talking
7  about it, and why did Mr. Atilla try so hard to deny that he
8  was at these meetings? The answer is because even though the
9  deal didn't happen, some very important things did happen at
10 these meeting to tell you exactly what Mr. Atilla knew, exactly
11 what his purpose was, and those things tell you exactly why he
12 lied repeatedly and adamantly that he was not at these
13 meetings.
14      Here's what Mr. Zarrab described about the purpose of
15 the meetings. The purpose was, No. 1, to bring the money in
16 from India into Halkbank, but also, No. 2, to send it back out
17 again, to do the wire transfers. And when the Iranians asked
18 Halkbank to do those wire transfers, Mr. Aslan said no,
19 Halkbank is not going to do those wire transfers. There is
20 already a system for doing those wire transfers, and that
21 system's name is Reza Zarrab. And Mr. Atilla said the same
22 thing at that same meeting.
23      Now, this is important. The purpose of this meeting
24 was not just to transfer oil money. What good does it do Iran
25 to transfer oil money from one restricted account to another

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

 1  restricted account?  They're no better off.  What's different
 2  between India and Turkey?  The difference is Halkbank, and the
 3  difference is Reza Zarrab.
 4       The purpose of this is not just to move the money,
 5  it's to use the money, and Mr. Zarrab was the way that Iranians
 6  could use the money, the system to use gold exports to move
 7  NIOC's money to Dubai, so that NIOC could direct how and where
 8  it gets spent.  And you heard Mr. Atilla deny that he was a
 9  part of those discussions again and again and again.
10       Now, how do you know that Mr. Atilla really was at
11  these meetings?  First of all, it was his business to be at
12  these meetings.  You heard him testify about the bank's
13  discussions in August of 2011 about trying to process payments
14  by foreign companies to buy Iranian oil, and you heard him
15  testify that he was familiar with this issue.  You know that he
16  had meetings about it in March of 2012 with the Treasury
17  Department, and one of the things that they talked about was
18  other countries wanting to use Halkbank.
19       In October of 2013, Mr. Atilla is still talking about
20  it, and he asks the Treasury Department to greenlight
21  Halkbank's desire to bring pooled Iranian oil money into the
22  bank.  This is an issue that Mr. Atilla is familiar with and
23  that he deals with.
24       It's also his business because the Central Bank of
25  Iran is his business and NIOC is his business.  As you know

 1  from the evidence, up until about 2013, the way that Turkey
 2  paid for oil was to make deposits into the Central Bank of Iran
 3  account at Halkbank, the account that Mr. Atilla is responsible
 4  for managing that relationship.  Which means if you're
 5  responsible for the Central Bank of Iran relationship, you're
 6  responsible for the NIOC relationship because that's where all
 7  of NIOC's money is, and that is almost everything that's in the
 8  Central Bank of Iran account.
 9       That changed.  That changed in April of 2013 because
10  NIOC wanted the payments to go to its own account, not to the
11  Central Bank account.  Why did NIOC want to do that?  You heard
12  that from the testimony and from the evidence.  So that
13  Mr. Zarrab would have sole access to those funds.  You see,
14  when the payments were going to the Central Bank of Iran
15  account, Mr. Zarrab's competitors were in the running to be
16  able to do transactions with that money, and Mr. Zarrab and
17  NIOC agreed that those payments were going to go to NIOC alone
18  so that they could be almost all used in Mr. Zarrab's system.
19       The problem was, after they made that decision, there
20  was a payment coming in, and it was going to go to the Central
21  Bank of Iran account.  So Halkbank had to hold that payment up
22  long enough for the instructions to come in and something like
23  200 million Turkish Lira would go to NIOC instead of the
24  Central Bank of Iran.  And the person who held up that payment
25  was Mr. Atilla.  All right?  So that's one reason why you know

 1  that Mr. Atilla was at these meetings with NIOC in October of
 2  2012.
 3       You also know that these meetings did, in fact,
 4  happen.  Sorry, before we go there, this is another call about
 5  Mr. Atilla's involvement in the NIOC relationship.  So shortly
 6  after Mr. Atilla holds up that Tupras payment so it will go to
 7  NIOC instead of the Central Bank of Iran, he calls Mr. Aslan
 8  because he needs to tell Mr. Aslan that NIOC has tried to
 9  transfer 70 million Lira directly into Reza's account.
10  Mr. Atilla is the one who learns that information, and
11  Mr. Atilla is the one who shares it with the general manager of
12  the bank.
13       Now, why is that a problem?  Because this is against
14  the system.  The system is not for NIOC to give money directly
15  to Reza Zarrab.  That is a problem.  That is a big problem
16  under the sanctions.  The system is to send the money to
17  private Iranian banks, and then the private Iranian banks send
18  it to Mr. Zarrab.
19       Now, how else do you know that Mr. Atilla was at this
20  meeting?  Because Mr. Zarrab talks about it.  So part of the
21  proposal was that when the money came in from India, it would
22  go to Mr. Zarrab, and he would transfer it to a second bank.
23  Remember, Halkbank was not going to do the wire transfers
24  itself.  Mr. Zarrab was going to handle that part at a
25  different bank.  So Mr. Zarrab was talking to a high official

 1  at another Turkish bank about this proposal.  He's describing
 2  the agreement that they reached at these meetings.
 3       Now, this is 2012, Mr. Zarrab doesn't know he's being
 4  wire tapped.  He has no reason to lie to his bank official
 5  friend.  And what does he say?  He's waiting on Suleyman to
 6  wrap things up, but he's already talked it out with Hakan and
 7  Hakan's colleagues.  Hakan knows about this.  Hakan is okay
 8  with this.  Suleyman is the only person they're waiting on.
 9       Mr. Aslan talks about these meetings.  He tells
10  Mr. Zarrab that he had described it to Turkish government
11  officials, and he describes exactly what Mr. Zarrab told you
12  happened.  Halkbank is not going to directly do these
13  transfers.  We are not opening accounts for every company, but
14  Mr. Zarrab is there for the existing system.  Mr. Zarrab can
15  make the payments through the methods they have already been
16  using.
17       Now, what does that tell you?  Well, it tells you that
18  the system works exactly the way they talked about in these
19  meetings, and Mr. Atilla is still describing the system, in
20  part, to Treasury when he's describing the restrictions that
21  they have inside the banks so that they don't get in trouble
22  under the sanctions.  No transfers within Turkey to another
23  financial institution.  What does that mean?  That means that
24  all these transfers are happening inside of Halkbank, where
25  nobody except for Halkbank can see what's happening.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1      All right? That is the Halkbank part of the system
2   where it goes from being government of Iran oil money to
3   private Iranian bank money, to Reza Zarrab money, on paper.
4   What this meeting shows is that Mr. Atilla knows the other part
5   of the system. The whole purpose of this is not for Mr. Zarrab
6   to have the money. It's for NIOC to have the money, and
7   Mr. Atilla knows it. The whole purpose of this is to get that
8   money to Dubai. That is the payment system.
9      That is the agreement that Mr. Atilla and Mr. Aslan
10  and the others have reached with NIOC and with Reza Zarrab, for
11  that money to go to Dubai, to be sent out by Dubai trading
12  companies and exchange houses in Euro and dollar and other
13  currency payments all over the world at the direction of the
14  government of Iran and of the Iranian banks. Mr. Atilla knows
15  this. Mr. Atilla knows what this meeting means, and Mr. Atilla
16  lied about it.
17     What this means is every time Reza Zarrab's companies
18  do a U.S. dollar transaction that goes through United States
19  banks, who unwittingly process it because they don't know it's
20  for Iran, Mr. Atilla knows that that's happening. He agreed
21  that it was going to happen that way. So that's why we spent
22  so much time on that October 2012 meeting.
23     There's another important series of calls and
24  transactions that happens in the middle of 2013. You know
25  extremely well by now what happened and why it happened. What

1   happened is the sanctions changed. What does Halkbank do when
2   the sanctions change? They give Mr. Zarrab instructions about
3   how to change his business. So, first, Mr. Aslan informs
4   Mr. Zarrab in February when they know the change is coming but
5   it hasn't taken effect yet.
6      First, the famous date, the bilateral trade date has
7   arrived. That's the reason why Mr. Atilla calls Mr. Zarrab,
8   change the documents on your gold exports. That date is here.
9   We can't use oil money for gold anymore. The amount is
10  limited. We can only channelize the oil money to food and
11  medication. He's talking about that exception to the bilateral
12  trade requirement.
13     And he tells Reza Zarrab, the gold trader, to get into
14  the food business. And as you know, it's a bumpy ride.
15  Mr. Zarrab may have done a little bit of tea trading in his
16  teenage days, but he's not a food trader. He doesn't know how
17  this business works. It's not as easy as he thought it was
18  going to be, and it takes some time to get the documents, to
19  forge the stamps, to figure out how this is going to work, and
20  he needs some help along the way.
21     Now, we're going to focus right in on what it is that
22  Mr. Atilla has tried to tell you about his role and his
23  involvement in this scheme. So we're going to go straight to
24  that call on April 10th between Mr. Zarrab and Mr. Happani,
25  where Mr. Zarrab describes his meeting at Halkbank, when

1   they're trying to get the food trade started, when they're
2   running into roadblocks and Mr. Zarrab goes to the general
3   manager to get it removed.
4      "Hakan Atilla threw a wrench in the gears; so
5   Mr. Aslan made the call in my presence and said 'You will do
6   the job.'" This is how Mr. Atilla is removed as a roadblock,
7   and that's exactly what Mr. Zarrab told to Mr. Happani in a
8   call from 2013, again, when Mr. Zarrab has no idea he's being
9   wiretapped. He has no reason to lie to Mr. Happani. In fact,
10  he speaks very openly with Mr. Happani about all kinds of
11  things, including forging documents and cikinova and bribing
12  public officials. He describes this phone call happening to
13  Mr. Atilla, and he described it to you when he testified.
14     Now, why did Mr. Atilla throw that wrench? Because he
15  had spoken to Mr. Zarrab earlier that day, on April 10th, and
16  at this time, it is clear from the call, and as Mr. Zarrab
17  candidly told you, Mr. Atilla did not yet know exactly how bad
18  this was going to be. First, Mr. Zarrab tells Atilla, we're
19  starting the food transactions, and what's Mr. Atilla's
20  response? I know. I'm aware of it. This isn't a surprise to
21  Mr. Atilla. He knew that this was happening, but he didn't
22  know the way that Mr. Zarrab was going to do it.
23     And when he learns about it, he's troubled because it
24  is obvious that what Mr. Zarrab is describing is not real.
25  "The structure is not what I thought it was going to be. It

1   makes no sense for this payment to be coming in to Turkey.
2   This is a strange structure."
3      Now, why does Mr. Atilla react that way? Because this
4   is not the first time he has been involved in the food
5   business. He had just recently been at Treasury meetings where
6   he described the kinds of food business that Halkbank does, and
7   they do it with big companies, with international companies,
8   companies like Cargill, companies like Bunge, companies who do
9   this professionally, companies who get bills of lading and use
10  letters of credit and ship food from the place where it's
11  produced to the place where it's going to be consumed.
12     Mr. Zarrab is describing none of those things.
13  Mr. Zarrab is describing sending hundreds or thousands or
14  hundreds of thousands of tons of food from South America or
15  from Ukraine not to Iran. They're going to send it to Dubai.
16  They're going to take these huge ships of food, send them to a
17  weigh station, unload them, store them. I suppose, at some
18  point, reload them onto these small wooden ships and ferry them
19  one by one across the Persian Gulf into Iran. That doesn't
20  make any sense. It doesn't make any sense, and Mr. Atilla
21  knows it, and he's taken aback by it, and he talks to Mr. Aslan
22  about it.
23     Now, Mr. Atilla wants you to believe that this call
24  that Mr. Zarrab described didn't happen, and he's gone through
25  this elaborate effort to construct some airtight timeline

**A718**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    December 19, 2017

| HCIPATI5 | Summation - Mr. Lockard | Page 2269 |
|---|---|---|

1  showing that he couldn't possibly have received a phone call.
2  You should take that for whatever it's worth.
3       I think you can conclude a couple of things from this
4  timeline. The first is Mr. Atilla is, in fact, on the ground
5  in Barcelona for about an hour before Mr. Zarrab describes this
6  phone call to Mr. Happani. I think the other thing that you
7  can conclude is that Mr. Atilla has a cell phone. It does have
8  a voicemail function. But the most important thing that you
9  should conclude is Mr. Atilla was removed as a roadblock, and
10  that is the most important way that you know that that call
11  happened. On April 10th, he's a roadblock. On April 22nd,
12  he's the author of the method. That's less than two weeks
13  later.
14       Now, Mr. Atilla, again, has said, I don't know what
15  Mr. Aslan is talking about. There's no such thing as a method.
16  I don't know why he would say that. Right? Was Mr. Atilla
17  lying? Is he lying to Mr. Zarrab in these 2013 chats? Does he
18  have any reason to lie to Mr. Zarrab? No, of course not. Is
19  Mr. Aslan mistaken? Well, in June they're saying exactly the
20  same thing. This time, Mr. Zarrab is the one who says we spoke
21  with Mr. Hakan, and we have no problems related to the methods
22  and the documentation. This is not a mistake. This is a
23  thing. This is a thing that Mr. Atilla did to help the fake
24  food transactions happen, after he knows what they really are.
25       Of course, Mr. Aslan gives Mr. Zarrab a warning, don't

| HCIPATI5 | Summation - Mr. Lockard | Page 2270 |
|---|---|---|

1  start too fast. That was an impression because Mr. Zarrab does
2  start too fast, and it causes a lot of problems. And we'll
3  talk about that in a second, but in the meantime, let's look at
4  what is the method.
5       What is it that Mr. Atilla did? So one day after the
6  roadblock is removed, Mr. Atilla gets an e-mail from
7  Mr. Aydogan describing the list of documents and the
8  transaction sequence for how Mr. Aydogan proposes for these
9  food transactions to work. There's a big problem here.
10  Mr. Aydogan is proposing a transportation document, that's a
11  bill of lading, and he's proposing an inspection certificate,
12  two things that Mr. Zarrab doesn't want to provide and can't
13  provide.
14       So Mr. Aydogan tries again. Four days later
15  Mr. Atilla is back from vacation. There's no dispute that he's
16  able to have these discussions now. And Mr. Aydogan presents a
17  revised proposal for Mr. Atilla's approval. The problem is it
18  still requires a transportation document. That's a bill of
19  lading. That's the thing that Mr. Zarrab can't provide. He
20  can't provide it because Mr. Atilla told him those things can
21  be tracked. It's like a Fed Ex number. You can check and see
22  if it is gone, where it came from, where it was going.
23       So what is the method? You saw it in the documents
24  that were recovered from the search of Mr. Aslan's office. An
25  invoice from Turkey, an invoice from Dubai and a customs

| HCIPATI5 | Summation - Mr. Lockard | Page 2271 |
|---|---|---|

1  document. That's it. No inspection, no bill of lading. None
2  of the things that Mr. Atilla has repeatedly and for months
3  been emphasizing to Treasury is part of their rigorous due
4  diligence to guard against sanctions evasion.
5       When does the money go out? Instantly, there is no
6  waiting. What is the standard process? What is it that
7  Mr. Zarrab has been exempted from? Bills of lading, inspection
8  certificates and documents certified by the local consulate.
9  When does the money go out? After all of those documents have
10  been received by the bank and after all of them have been
11  reviewed and approved. That, ladies and gentlemen, is Atilla's
12  method. The method to avoid the very same due diligence
13  process that he has been describing to Treasury.
14       Now, when things really get rolling in early July,
15  there's a little bit of the "Gang can't shoot straight" problem
16  here, and there are a lot of problems, a lot of big problems
17  that come up right away, and Mr. Atilla deems with all of them.
18       The first one is the documents say that 150,000 tons
19  of wheat are being carried on 5,000-ton ships, and Mr. Atilla
20  does some quick math in his head and realizes it's going to
21  take 30 or 40 of these purported shipments to get 150,000 tons
22  of wheat from Dubai to Iran, and that is a problem.
23       Mr. Zarrab apologizes. He describes it as a technical
24  error. What does he mean it is a technical error? How can it
25  be a technical error to ship 150,000 tons of wheat? It's a

| HCIPATI5 | Summation - Mr. Lockard | Page 2272 |
|---|---|---|

1  technical error because this is not driven by the amount of
2  wheat. It's driven by the amount of money, and the way that
3  you get to the amount of wheat is to take the money you want to
4  send, divide it by the price of wheat, and that tells you what
5  to write down on the documents, and Mr. Atilla knows that.
6  This is plain as day.
7       So why doesn't Mr. Zarrab use bigger ships? Because
8  he can't use bigger ships because then he would have to give a
9  bill of lading. But that's not it. There's another problem
10  the very same day. The wheat is coming from Dubai, and
11  Mr. Atilla has to remind Mr. Zarrab that wheat doesn't grow in
12  Dubai. If you're going to say that you're shipping wheat,
13  you've got to say it came from somewhere else.
14       So what did Mr. Atilla do after these two pretty big
15  problems? He reports to his boss, Mr. Aslan. He explains the
16  impracticality of the system that Mr. Zarrab was describing.
17  He confirms that he still can't provide a bill of lading. They
18  talk about whether they should get another document.
19  Mr. Atilla says maybe we should get an inspection report
20  because, in Dubai, you can get anything. Right?
21       Mr. Atilla knows that these are not legitimate
22  documents, and he's worrying about papering the file at
23  Halkbank so that they don't get in trouble for not having
24  requested the right kinds of documents. But what happens?
25  They don't request inspection reports. They just plow right

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 19, 2017

1  ahead.
2      And on July 9th, Atilla has to practically coach
3  Mr. Zarrab through this process to keep these problems from
4  happening again.  First, the bills of lading.  Remember, they
5  have talked about this a number of times now.  If you're using
6  big ships, you're going to have to give me a bill of lading.
7  What is he saying?  He's saying, don't use big ships.  If you
8  use small ships, don't overload them.  Tell your guys to make
9  sure the numbers match.
10     Now, remember, these are numbers that are showing up
11 on customs documents, and Mr. Atilla explained to you earlier
12 today his understanding of how customs documents work, which is
13 that the customs office checks them to make sure that they're
14 accurate.  So if there are problems in the customs documents,
15 the customs office should be fixing it.  Mr. Atilla knows that
16 Mr. Zarrab's people need to fix this.
17     Now, is this due diligence?  Is any of this
18 investigating?  There's been a huge red flag, after a huge red
19 flag, after a huge red flag thrown at Mr. Atilla.  Does he do
20 anything like what a good-faith compliance officer would do,
21 what somebody who takes sanctions seriously would do, what
22 somebody who honestly believes these to be real transactions
23 do?  No, he doesn't investigate.  He doesn't have to
24 investigate.  He knows what's happening.  He knows he can't
25 ask for more documents.  He knows he can't get them.  He just

1  tells Mr. Zarrab to fix the mistakes, and Mr. Zarrab knows
2  exactly what Mr. Atilla is telling him, and so does
3  Mr. Happani.
4      And when Mr. Zarrab describes this conversation with
5  Mr. Atilla, Mr. Atilla said:  "Don't stick it in our eyes,
6  don't sink the ships," and Mr. Happani said:  "May God be
7  pleased with that man."  Thank God for Mr. Atilla.
8      Now, they hit another bump in this business in
9  December of 2013.  As you know, Mr. Zarrab, Mr. Aslan and a
10 whole bunch of other folks were arrested.  Mr. Aslan leaves the
11 bank, and Mr. Zarrab restarts his business with the bank.  Now,
12 this is a problem for Mr. Atilla.  This is a big problem.
13     To the extent that he was trying to pretend before
14 that he didn't know what was going on, it's very hard to
15 pretend now that he doesn't know what's going on.  But he still
16 took that stand, and he still lied to you, and he still told
17 you, I didn't know what Mr. Zarrab was doing.  I wasn't at
18 those meetings.
19     How do you know that he was at those meetings?  Again,
20 contemporaneous communications.  Mr. Zarrab is talking to
21 people about what's going on, and you have some of those
22 communications.  All right?  Here's an electronic communication
23 where Mr. Zarrab is describing some of the problems he's
24 encountering starting the business again, and you heard
25 Mr. Zarrab talk about this.

1      The new general manager, Ali Fuat Taskinoglu, did not
2  want to do it; so Mr. Zarrab had to go higher.  He had to go
3  much higher.  Remember, Halkbank is a government-owned bank.
4  The shares are majority owned by the government of Turkey.  The
5  general manager and the deputy general manager are nominated by
6  the Treasury Department.  And Mr. Zarrab goes to the Turkish
7  government.
8      And he has support from the team.  The general manager
9  was against it, but his team was for it.  You know who his team
10 was because you've heard the evidence.  You know what
11 Mr. Atilla's role was at the bank.  You know that Mr. Atilla is
12 part of that team, and you know it because Mr. Zarrab told you
13 that Mr. Atilla was part of that team.
14     Now, I want to say a word about just a couple of
15 things before we move on to what it is that Mr. Atilla then
16 tells the Treasury Department in October of 2014.  The first is
17 this.  I've spoken to you a lot about Mr. Atilla's testimony,
18 and one thing I want to make clear is that the fact that
19 Mr. Atilla testified does not change the government's burden in
20 this case.  The burden remains with the government at all
21 times, but the fact that Mr. Atilla testified means that you
22 can evaluate his testimony just like you would any other
23 witness' testimony, and you're entitled to ask yourself:  Do I
24 find him credible?  Do I think he's being honest with me?  Do I
25 think he's being straight with me?  Do I think that his

1  testimony is consistent with other witnesses' and with other
2  evidence?  And you should do that.
3      The other thing that I want to say is that there is --
4  I think the evidence makes it extremely clear that Mr. Atilla
5  was under no mistake at any time during his relationship with
6  Mr. Zarrab about what was happening, what the purpose was of
7  these relationships, what the purpose was of the food system
8  and the gold system.
9      Now, Mr. Atilla has argued to you that he didn't
10 actually know, and you're going to get an instruction from
11 Judge Berman about something called willful blindness or
12 conscious avoidance, which is a concept basically that you
13 can't ignore what's obvious in an effort to avoid confirming
14 what it is you already deep down know is going on.
15     To the extent that you credit Mr. Atilla's testimony
16 at all, I submit to you that this is a clearcut case of doing
17 exactly that.  I also submit to you that it is impossible to
18 believe that that's what actually happened.  It is impossible
19 to believe from the evidence that you've seen, and from the
20 testimony that you've heard, that Mr. Atilla had any doubt
21 whatsoever about what was happening at his bank.
22     Now, you also heard some testimony earlier today about
23 what did the bank do after Mr. Zarrab's arrest and Mr. Aslan's
24 arrest?  You heard some testimony about some auditor reports.
25 You heard some testimony about some kind of internal

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

HCIPATI5          Summation - Mr. Lockard          Page 2277

1  investigation, and I fully expect that Mr. Atilla is going to
2  argue to you that that was his attempt to investigate, but I
3  think there are two things you should keep in mind about that
4  argument.
5       The first is, what is the kind of investigation that
6  you heard about?  Did you hear any investigation about
7  Mr. Zarrab's gold business?  Did you hear about any
8  investigation at the bank about Mr. Zarrab's food business?
9  No, no.  What you heard about was the bank investigating was
10 there an attempt to block other people from being able to do
11 exactly what Mr. Zarrab was doing, was there some effort to
12 obtain an improper loan.
13      These are investigations that are entirely beside the
14 point.  They have nothing to do with figuring out what actually
15 happened, were these real transactions, was gold being exported
16 to Dubai for the National Iranian Oil Company?  Those questions
17 were not asked.  Why weren't they asked?  Because this was
18 being directed from the top.  Of course it's not going to be
19 asked.
20      That leads us into Mr. Atilla's meeting with the
21 Treasury Department in October of 2014.  In some ways, this is
22 a simple meeting because they didn't talk about very much.
23 They mostly talked about Mr. Zarrab.  In another way, it's a
24 more complicated meeting because of the different things that
25 Mr. Atilla has tried to tell you about it throughout the course

HCIPATI5          Summation - Mr. Lockard          Page 2278

1  of this trial.
2       He told you at one point, I think during opening
3  statements, that Mr. Atilla actually suggested to Mr. Cohen
4  that Mr. Zarrab should be put on the Specially Designated
5  Nationals list, that Mr. Atilla tried to tell the Treasury
6  Department to blacklist Reza Zarrab.  Well, you see how quickly
7  Mr. Cohen shot that down.  What did Mr. Cohen say?  Mr. Cohen
8  said, well, Mr. Atilla had changed his tune about Reza Zarrab.
9       When Mr. Atilla was asked about the bank's
10 relationship with Mr. Zarrab, a relationship that had now been
11 going on since early 2012, what did Mr. Atilla say?  He
12 described him like an ordinary bank customer.  He's got some
13 construction loans.  He has an airplane loan.  He does a little
14 bit of foreign trade.  Is that very much to say about somebody
15 who's been doing, far and away, the biggest gold export
16 business at the bank, who's been doing huge food or purported
17 food transactions at the bank?
18      So Mr. Atilla has changed his tune about this meeting
19 here in this trial as well.  Mr. Atilla's changed his tune
20 about a lot of things.  Before his arrest, he's an important
21 man.  He's got a staff of 30 people at the bank.  He's a deputy
22 general manager.  He's the lead person on the two biggest IPOs
23 in the history of Turkey.  He's the leadman in Halkbank's
24 relationships with the highest level government officials at
25 Treasury.  He is important.

HCIPATI5          Summation - Mr. Lockard          Page 2279

1       At this trial, he's tried to tell you he's not that
2  important.  There are eight other deputy general managers.  IT
3  has a deputy general manager.  HR has a deputy general manager,
4  tomato, tomato.  He's tried to tell you that he's peripheral.
5  He's tried to tell you that his involvement was by coincidence,
6  by happenstance, by accident.  If there's a letter of credit,
7  they might call me in.  If it involves a correspondent account,
8  they might call me in.  You know that none of that is true.
9       Mr. Atilla had some of the most significant
10 responsibilities at Halkbank.  The Central Bank of Iran account
11 is a significant responsibility.  It is an account that held
12 billions of dollars, billions of dollars.  The National Iranian
13 Oil Company is a significant relationship for that bank.
14 Mr. Atilla was deeply responsible for that relationship.  Reza
15 Zarrab was an important relationship for that bank, and
16 Mr. Atilla was deeply involved in that relationship.  The
17 bank's relationship with the U.S. Treasury Department was an
18 extremely important relationship.  It's a relationship that if
19 it went poorly, could result in the death of the bank.
20 Mr. Atilla was the lead person in that relationship.
21      Now, Mr. Atilla's a smart man.  I think that's clear.
22 Mr. Atilla knows how to lie.  I think that's also clear.  He's
23 had a lot of practice with it in his meetings with Treasury,
24 and he tried to do it here with you, ladies and gentlemen,
25 during this trial.  The problem with his lies isn't that he's

HCIPATI5          Summation - Mr. Lockard          Page 2280

1  not smart, and it's not that his lies aren't good.  It's that
2  you have seen the evidence.
3       You have seen the evidence that the Treasury
4  Department did not know.  You have the evidence that proves
5  that Mr. Atilla knew that billions of dollars in gold exports
6  were for the government of Iran and for the National Iranian
7  Oil Company.  You have seen the evidence that proves that
8  Mr. Atilla knew that the purpose of that was for NIOC and the
9  government of Iran to be able to access that money, to be able
10 to send it out into the international financial system, to be
11 able to send it through the U.S. financial system.
12      And you know that he's not just a part of the crowd.
13 In October of 2012, at that meeting with the oil officials and
14 the Indian bankers, Mr. Atilla was a deputy general manager.
15 Levent Balkan, who you heard a little bit about, is a step
16 lower.  He's a department head.  Suleyman Aslan is the general
17 manager.  When the food trade starts, Mr. Balkan is gone.  He's
18 been replaced by Hakan Aydogan, who's also a department head.
19 Mr. Aslan, who's the general manager, and Mr. Atilla, who is
20 still the deputy general manager.
21      When Mr. Zarrab is arrested, Mr. Aslan exits the
22 picture, and when the food business starts up again, Mr. Aslan
23 is gone.  There's a new general manager with no history with
24 Mr. Zarrab, with no history with the gold exports, with no
25 history with the fake food trade, and Mr. Atilla and

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                                    December 19, 2017

| HCIPATI5 | Summation - Mr. Lockard | Page 2281 |
| --- | --- | --- |

1  Mr. Aydogan.  The only person who has been there the entire
2  time, the only person who's been involved at every step is
3  Mr. Atilla.
4       So let me give you just a brief word about the charges
5  before I wrap up.  Now, the charges against Mr. Atilla are
6  going to be described to you by Judge Berman, and it's his
7  description of the law that controls.  It's his description of
8  the law that you are obligated and sworn to follow in your
9  deliberations; so I'm just going to share a couple of
10  observations about them in an effort to be helpful during your
11  deliberations.
12      One of the charges you're going to hear about is that
13  Mr. Atilla is charged with conspiring to obstruct, impede or
14  impair the functions of the U.S. Department of the Treasury and
15  the Office of Foreign Assets Control.  He's also charged with
16  conspiring to violate the International Emergency Economic
17  Powers Act, and the prohibitions, licenses and regulations that
18  are adopted under that statute.
19       Both of these charges have to do with Mr. Atilla's
20  lies.  He lied to Treasury so that they would not be able to
21  investigate the sanctions evasion that they were concerned
22  about, to obstruct them from being able to enforce and
23  administer those sanctions regulations.
24       He conspired with others to violate the IEEPA in two
25  ways.  The first way is to avoid being penalized by the

| HCIPATI5 | Summation - Mr. Lockard | Page 2282 |
| --- | --- | --- |

1  Treasury Department, to avoid the prohibitions that come with
2  being blacklisted, the prohibitions on being able to maintain
3  access to the U.S. financial system.  That is one part of that
4  conspiracy.
5       There is a second part, and that is the agreement to
6  make money available for Mr. Zarrab to send out on behalf of
7  Iran and the government of Iran.  All that money that gets
8  sucked down into Dubai, all those billions and billions of
9  dollars in gold and fake food transfers went to Dubai for a
10  reason.  It went to Dubai so that Iran could use it and could
11  use it through the U.S. financial system.  That's the second
12  piece of the IEEPA charge.  Either one is enough.  They both
13  happened, but you don't have to find both.
14       You're going to hear the charges with respect to bank
15  fraud and bank fraud conspiracy and money laundering and money
16  laundering conspiracy.  That also relates to the Dubai part of
17  the system.  Mr. Atilla's knowledge and his agreement that that
18  money would go from Halkbank to Dubai, would go through the
19  United States, where U.S. banks unwittingly would process
20  financial transfers on behalf of Iran, the government of Iran,
21  and money would be sent from outside the United States into the
22  United States to promote that bank fraud and to promote those
23  sanctions violations.
24       All right.  So I'm minutes away from wrapping up, but
25  before I do that, just a couple more words.  You're going to

| HCIPATI5 | Summation - Mr. Lockard | Page 2283 |
| --- | --- | --- |

1  hear from defense counsel, who's going to present some
2  arguments to you.  After that, Mr. Kamaraju is going to have a
3  little bit of time to share a few more thoughts with you, and
4  then probably tomorrow morning Judge Berman is going to charge
5  you on the law.
6       So before I sit down, I want to remind you of
7  something.  I want to remind you of something Mr. Denton, my
8  colleague, asked you to do at the beginning of this trial when
9  he delivered his opening statement.  The first thing Mr. Denton
10  asked you to do was to pay close attention to the evidence, and
11  that you absolutely have done.  I can tell by the number of
12  notebooks that I see in everyone's laps.
13      (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

| HCJ3ATI6 | Summation - Mr. Rocco | Page 2284 |
| --- | --- | --- |

1       MR. LOCKARD:  Mr. Denton asked you to follow Judge
2  Berman's instructions, and I'll ask you to do that as well.
3  And Mr. Denton asked you to use your common sense.  The same
4  common sense that you use every day in your own lives.
5       If you do those things, if you continue to pay close
6  attention to the evidence, if you continue to use your common
7  sense, and if you follow Judge Berman's instructions on the
8  law, Mr. Atilla will get the fair trial that he deserves.  And
9  if you do those things, you will reach the only verdict that is
10  consistent with the evidence in this case, which is that
11  Mr. Atilla is guilty of the offenses that he's charged with.
12  Thank you.
13      THE COURT:  Thank you, Mr. Lockard.
14      Mr. Rocco is up next.
15      MR. ROCCO:  I have to cut myself down to size.
16  Your Honor, may I proceed?
17      THE COURT:  Yes, sure.
18      MR. ROCCO:  Judge Berman, ladies and gentlemen of the
19  jury, good afternoon.
20      On behalf of Mr. Atilla, on behalf of the other
21  members of our defense team, I'd like to thank you, each and
22  every one of you, for the time, the energy, and the attention
23  that you've paid for the past three weeks.  Thank you also for
24  your patience.  I suspect that you now know why we refer to
25  practicing law.  Because it seems no matter how long you do it,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJ3ATI6 | Summation - Mr. Rocco | Page 2285 |

1  no matter how hard you practice, no one ever gets it right.
2     This has been in my mind, and obviously it's your
3  minds, your collective minds that make all the difference in
4  the world, the Reza Zarrab show. For the past three weeks,
5  witnesses have been paraded before you, you've been inundated
6  with documents, physical evidence, recorded conversations,
7  transcripts, most of which involve the government's principal
8  witness in this case, Reza Zarrab, and his vast criminal
9  enterprise.
10    The staggering trail of lies and deception and
11  corruption that he's left behind on three continents while he
12  amassed an unimaginable fortune in the process, I think he said
13  when he testified here that he made something like 100 or 150
14  million dollars. $50 million here or there.
15    That same master criminal who joined Iran's economic
16  jihad against the United States is now embraced by our
17  government, as he tries to earn his way out of jail, earn his
18  freedom by bartering the fate of another human being. And that
19  human being is Hakan Atilla.
20    Ironically, paradoxically, maybe, the man who
21  relentlessly pursued Reza Zarrab, his personal Inspector
22  Jarvet, and who punched a huge hole in Zarrab's vast criminal
23  enterprise, and was removed from his job for his zealotry,
24  Huseyin Korkmaz has fled Turkey, leaving it in political
25  turmoil, and he's found asylum here in the United States. He,

| HCJ3ATI6 | Summation - Mr. Rocco | Page 2286 |

1  too, is being embraced by the government for taking the law in
2  his own hands and stealing evidence that he says he developed
3  during his investigation.
4    He gets safe passage to the United States, $50,000
5  from the FBI, $900 from the prosecutor's office, free rent, and
6  employment -- and work papers, employment papers.
7    Lastly, there is a Hakan Atilla the lone defendant in
8  this case. He comes to the United States on a routine business
9  trip in March of this year, and is locked up now for nine
10  months and facing criminal charges that have devastated him and
11  his family. His crime was doing his job.
12    Hakan Atilla is a blameless pawn, collateral damage in
13  a story that belongs in the Twilight Zone, not in an American
14  courtroom.
15    Indeed, until Hakan Atilla took the stand last Friday
16  and testified, this case was almost exclusively about Reza
17  Zarrab and his worldwide conspiracy money laundering and
18  sanctions evasion.
19    When we stood here two weeks ago -- three weeks ago
20  now, actually more than three weeks ago, in our opening
21  statements to you, Mr. Denton promised what this case would
22  show. Mr. Denton made a contract with you that he was bound to
23  keep. The government has broken that promise to you in very
24  important and significant ways. Most importantly, it's failed
25  to prove Hakan Atilla's guilt beyond a reasonable doubt.

| HCJ3ATI6 | Summation - Mr. Rocco | Page 2287 |

1    You might remember that the government promised you
2  that it was going to prove that Hakan Atilla was the architect
3  of this economic jihad. This economic sanction evasion scheme.
4    Did it? The evidence that was submitted in the court
5  in the course of this trial, piles of it, showed I think one
6  person was the architect of this scheme, and that was Reza
7  Zarrab. He sat in that witness stand, actually, came out of
8  the witness stand, walked into the well of the court, and you
9  might remember drew for you his floor plan. Should I say floor
10  plans. Basically, his scheme for evading sanctions. The
11  scheme that made him a mega millionaire, maybe a billionaire.
12    The government also promised in its opening statement,
13  told you, that this was all part and parcel of the economic
14  jihad that was declared by Iran in a holy year, I believe 2011,
15  2012. And for that jihad, for that holy economic war, Iran
16  didn't need soldiers. It needed bankers. And that banker,
17  Mr. Denton told you, was Hakan Atilla.
18    Well, that's not what the evidence showed. The
19  evidence showed that Iran needed a banker, and that banker was
20  Suleyman Aslan. That banker was the man who Reza Zarrab
21  bought, and bought for millions and millions and millions of
22  dollars in bribes.
23    Now, the government has failed to prove that
24  Mr. Atilla committed the crimes that he's charged with. He's
25  not corrupt, he's never been bribed. He is an honest,

| HCJ3ATI6 | Summation - Mr. Rocco | Page 2288 |

1  hardworking man who goes to work every day, and has a
2  responsible position at a major bank in Turkey. A state-owned
3  bank in Turkey. How did he get that position? He worked for
4  it. He spent the past 22 years of his life toiling at the bank
5  and he started at the bottom of the bank and worked his way to
6  near the top.
7    The government told you, and just now again, spoke
8  about the important position that Mr. Atilla occupied at the
9  bank as a deputy general manager. In his opening statement
10  Mr. Denton told you that Mr. Atilla was the deputy general
11  manager of the bank. And what we've learned here is that in
12  2012 and 2013, the core of the period that's involved in the
13  crimes that allegedly were committed, or that were committed by
14  Mr. Zarrab, there were as many as 12 other deputy general
15  managers at Halkbank.
16    And Mr. Atilla's responsibilities, Mr. Atilla's job
17  was basically to manage the bank's relationship with other
18  banking institutions and investors. And that's where he spent
19  the bulk of his time. That's where he spent 25 percent of his
20  time, dealing with other banks and dealing with investors.
21  Going on roadshows, trying to raise money for the bank, and did
22  twice apparently in 2012 initially with a public offering, the
23  first public offering that the bank did, and the second public
24  offering that the bank did a couple of years later.
25    His responsibility wasn't to monitor transactions,

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  ordinary commercial transactions, even if those transactions
2  took place internationally.  Even if counterparties to these
3  transactions were located in different parts of the world.
4  Those transactions were handled by a department within the bank
5  called the foreign operations department.  And the foreign
6  operations department had a head, actually we heard of two of
7  them.  The first was Levent Balkan and the second was someone
8  by the name of Hakan Aydogan.  They reported not to Mr. Atilla,
9  but to another deputy general manager.
10      That was not Mr. Atilla's area of responsibility, and
11  no one has suggested to you in the course of the trial, and
12  certainly not in the course of Mr. Atilla's testimony, that he
13  was cabined someplace away from other transactions in the bank
14  or he was not knowledgeable of what was happening at other
15  parts of the bank.  Of course he knew what was happening, but
16  not in great detail.
17      Halkbank, bear in mind, is a large bank.  It is the
18  sixth or eighth largest bank in Turkey.  There are 17,000
19  employees.  I believe 1,000 branches.  And management in the
20  bank is very diffuse.  Mr. Atilla doesn't get up in the morning
21  and worry about a specific transaction, a specific banking
22  transaction.  He has other responsibilities.  That doesn't mean
23  that he doesn't learn of them, and because of his experience in
24  the bank, long experience in the bank, obviously, his knowledge
25  is important.  He's got institutional knowledge, he's got a

1  sense of how the bank does its business.  He has a sense of the
2  bank's important customers.  He wants to do his job and he
3  wants to do his job well.
4      Now, when we're talking, when we were talking about
5  what Mr. Atilla's role allegedly was in this conspiracy, and
6  you were told that he was the architect of this plan, this
7  sanctions evasion plan, that I'm sure created in your mind some
8  idea or some thoughts about, well, what was he doing?  What was
9  he planning?  How was the plan executed?
10      Well, we have a description of what the plan was, and
11  how it worked, and as I said, that was a plan that was
12  conceived of and drawn by in great detail by Reza Zarrab.  That
13  was his floor plan.  Mr. Atilla's role here, as I heard the
14  testimony, and it is your -- not my -- recollection that
15  controls, it is your collective recollection that controls.
16  But the evidence here, and the government's theory is that
17  Mr. Atilla helped Reza Zarrab falsify documents and falsify
18  documents that were used in connection with bogus food
19  shipments.
20      Well, as I said to you in my opening statement, and I
21  think as the evidence here suggests, did Reza Zarrab need
22  somebody to teach him how to cheat?  Did Reza Zarrab need
23  somebody to teach him how to falsify documents?
24      Let's stop there for a minute and I'm sorry for my
25  low-tech presentation, but I'm old school, and I do better

1  talking than I do having a running commentary.  But I'll remind
2  you of some things that may help refresh your recollection as
3  you deliberate.  And our request is, just like the
4  government's, you'll take the law from Judge Berman, but it's
5  your recollection of the facts that control, and our request to
6  you, Mr. Atilla's request to you, is that you determine his
7  fate on the basis of the evidence that you have before you.
8  The evidence that's been produced in this courtroom.  The
9  evidence that he gave you when he testified and subjected
10  himself to cross-examination earlier today.
11      Did Mr. Atilla help Reza Zarrab design a secret system
12  for laundering money?  Did Reza Zarrab need Mr. Atilla to help
13  him design that system?
14      So let's talk about some of the conversations that you
15  heard about in the course of this trial, the conversations that
16  were recorded, secretly recorded, and were played for you.
17  Let's talk about Reza Zarrab and Reza Zarrab's associates
18  Abdullah Happani and Ruchan Bayar.  You might remember that in
19  the early part of 2013, before that famous October 10 -- I'm
20  sorry -- April 10 date that we'll come back to, April 10 was
21  the day that Mr. Zarrab tells you he stopped, he stopped, lying
22  to Mr. Atilla.
23      But, prior to that date, what was Mr. Zarrab doing?
24  He was off in China trying to bribe his way into a commercial
25  relationship with Chinese banks, and trying to basically get

1  involved in another sanctions scheme in China.
2      He didn't have Mr. Atilla in his back pocket.  He
3  didn't have Mr. Atilla to consult with to ask how to phony up
4  documents.  He and Ruchan Bayar had everything under control.
5  They knew just what they needed to do to cheat.
6      And Mr. Zarrab's solution or his approach, and this
7  was his approach all over the world, was basically if I don't
8  have you, I can buy you.  And you might remember that there was
9  a conversation where he was saying every man has a price.
10  There was somebody who was a monkey wrench or a wrench in the
11  gears like Mr. Atilla was, and Mr. Zarrab's solution to that
12  was go around him.  Go above him.  Go to his boss.  If he's
13  going to give you a hard time, you don't need to deal with him.
14  You can go right to his boss.
15      That's precisely what he did when he dealt with
16  Mr. Atilla at Halkbank.  What did he do?  He bought Suleyman
17  Aslan.  And you'll remember the conversation that he had with
18  Suleyman Aslan and -- I'm sorry, with Abdullah Happani in
19  October of 2012.  You might recall that they spoke about how
20  they were going -- he spoke about his reasons for bribing
21  Suleyman Aslan.  And he told him and said he was the important
22  man, he was the man to get it done, he was the man, Mr. fixit
23  man.  If you needed -- if you had a problem, who did you get go
24  to?  You went to Suleyman Aslan.
25      And in the course of the schemes that the government

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1 has offered evidence of in this case, the gold scheme, and in
2 connection with the food scheme, who did Reza Zarrab go to?
3 Who did he go to constantly? Who did he go to endlessly? Who
4 did he go to without reprieve? Suleyman Aslan. If he couldn't
5 get him on the phone, he chatted with him. He used WhatsApp
6 and Viber messages.
7        And as I said to you in my opening statement to you,
8 they were like two young lovers. There are thousands of back
9 and forths, any time there was a problem, any time that Reza
10 Zarrab needed something done, he didn't go to Hakan Atilla. He
11 went directly to the man. He went directly to the guy he
12 bought. He went directly to the person he owned. And he did
13 it shamelessly, and he did it continuously.
14       And you'll see in the conversations, in the telephone
15 conversations, in April of 2013, when there is a discussion
16 about Mr. Atilla being a wrench in the works in slowing Zarrab
17 down, Zarrab doesn't go to Hakan Atilla and work it out with
18 Hakan Atilla. Zarrab goes directly to Suleyman Aslan. And
19 we'll come back to this in a little bit.
20       For the gold trade, and setting up meetings in October
21 of 2012, who is the man that Reza Zarrab goes to? Suleyman
22 Aslan.
23       In July of 2013, when there are problems in the food
24 business, who does Reza Zarrab go to? He doesn't go to Hakan
25 Atilla. When the problems start, and there are questions about

1 documents, the question -- the questions are raised, and who
2 does Zarrab go to? He goes to the guy he bought. He goes
3 directly to Suleyman Aslan.
4        The predicate for the government's theory of its case
5 against Hakan Atilla is the testimony that you heard from Reza
6 Zarrab. That's the lynchpin. If you believe Reza Zarrab, then
7 Mr. Atilla is guilty. The question is, should you believe Reza
8 Zarrab?
9        Let's talk about him. He is what he is. He is what
10 he told you he is. He's the king of bribes. On the witness
11 stand, he was pretty much what one would expect of somebody
12 like Reza Zarrab. In the courtroom, he was polite and
13 deferential and cautious.
14       On the recorded conversations that you have, and you
15 heard him on, he's something quite different. He's a bully and
16 he's blustering and he's insistent and he's crude. And he knew
17 how to get his way.
18       You'll hear him in conversations, and that's why it's
19 important to listen to the conversations, even though they're
20 in Turkish, and even though the transcripts that capture the
21 conversations, knowing his tone and his bluster is very
22 important to interpret the dynamic, what was going on between
23 him and his confidantes, and I think actually help identify for
24 you who are his confidantes and who were not.
25       If you listen to the conversations, and there is a

1 problem, you can hear him on some occasions sweet talking
2 Suleyman Aslan. The chats sound like sweet talk. When Reza
3 Zarrab wants to get something from someone, he knows how to be
4 charming. When Reza Zarrab wants his own way and is getting
5 some resistance though, he will talk over people and through
6 people and insist that they talk about what he wants to talk
7 about. As I say, listen to the tapes, read the transcripts of
8 the tapes -- of the recordings. I'm dating myself by talking
9 about tapes. But read the transcripts and read the transcripts
10 in the context of listening to some of these recordings because
11 they're very enlightening.
12       Much of what the government has to say comes from not
13 only what Reza Zarrab has to say, and Reza Zarrab looks at
14 Hakan Atilla as his EZ Pass. A way to shorten his jail
15 sentence if he's sentenced to jail, a way of perhaps avoiding
16 jail completely, because Reza Zarrab, when Reza Zarrab was
17 arrested, and languished in jail for a year, he tried his
18 darndest to get out. Tried to retain powerful lawyers, had
19 lawyers in touch with people outside the United States. It
20 didn't work.
21       But, a year into his jail, what happens is Hakan
22 Atilla comes to the United States, Hakan Atilla is arrested,
23 and the rest is, as they say, history. Because at that point,
24 Reza Zarrab realizes that there is a way that he can barter
25 himself out of jail. Reza Zarrab, who is the king of deals,

1 who is the deal master extraordinaire, understands something he
2 can now barter with. He can barter with somebody who he knew
3 with Halkbank. Who he dealt with at Halkbank. Despite the
4 fact that he had no relationship with Hakan Atilla. Despite
5 the fact that they rarely spoke. Despite the fact that they
6 rarely met.
7        I think Mr. Atilla testified to one meeting or two
8 meetings with Mr. Zarrab. And Mr. Zarrab's testimony, if I
9 recall, is they met a handful of times, and when he was
10 cross-examined, a handful became two handfuls. But they don't
11 know each other. Their relationship was incidental. Their
12 relationship was casual in the sense that it was incidental.
13 But their relationship was driven primarily by Mr. Zarrab's
14 relationship with Halkbank, and his corrupt relationship with
15 Suleyman Aslan.
16       As I say, when you think of Reza Zarrab, you think of
17 him as the Bernie Madoff of bribes. Guy who has everything,
18 and he's shown himself time and again to get what he wants and
19 to pay whatever price he has to pay to get what he wants.
20       And that comes true especially when it comes to Hakan
21 Atilla. Because as I say, it becomes an easy way for
22 Mr. Zarrab to make his way, to earn his way, to strike a deal
23 with the government and get himself released from jail and free
24 to return to his lifestyle of the rich and famous.
25       So, let's talk a little bit, though, about the

1 government's recordings, because they do tell an amazing story
2 of corruption, they tell an amazing story about many, many
3 people. But, when they come to Hakan Atilla, they tell us
4 virtually nothing. When they come to Hakan Atilla, I think
5 there are eight recordings in all that involve Mr. Atilla,
6 either Hakan is on the phone I think six times with Reza
7 Zarrab. The conversations in total are 22 minutes and
8 51 seconds long. They average less than four minutes a
9 conversation, less than five minutes a conversation.
10      By listening to them, you get a sense of the
11 relationships, the relationship that Zarrab had with different
12 people. As I say, the embracing way he talks to Suleyman
13 Aslan, the familiar way he talks to Abdullah Happani, the very
14 formal and direct way that he talks to Hakan Atilla. The
15 conversations with Hakan Atilla are short, to the point,
16 they're directed.
17      And think of this, ladies and gentlemen. If these
18 conversations were conversations between people who are
19 colleagues in crimes, confederates in crime, why do they
20 talk -- why don't they speak directly? Why don't they, if
21 they're talking about things that are illegal, the way Zarrab
22 talks to Happani, when he's talking about forging documents, he
23 has no problem in saying that documents are being forged. Why
24 doesn't he do the same when he talks to Hakan Atilla? When
25 these conversations that the government is urging you to

1 consider as corroborative of Mr. Zarrab's testimony on the
2 witness stand, Zarrab's testimony on the witness stand, there
3 is nothing in those conversations that corroborate a criminal
4 enterprise or knowledge on the part of Hakan Atilla that he's
5 involved in wrongdoing. Knowledge on the part of Hakan Atilla
6 that there is wrongdoing going on around him. Knowledge on the
7 part of Hakan Atilla that even Suleyman Aslan is involved in
8 wrongdoing.
9      There is no doubt, no evidence in this case, that
10 suggests to you that Hakan Atilla knew that Suleyman Aslan was
11 being bribed by Zarrab. There is no reason for Suleyman Aslan
12 to compromise himself with Hakan Atilla or anyone else. That
13 was a well-guarded secret between Zarrab and Suleyman Aslan.
14      So, what is it in the evidence here that would suggest
15 that Hakan Atilla should know of a corrupt relationship, or
16 should know that Zarrab is involved in a gold, in a bogus gold
17 scheme to avoid sanctions and a bogus food scheme to avoid U.S.
18 sanctions? There is no reason at all.
19      That comes back, again, in part to the way that
20 Halkbank is organized, and it comes back to the fact that it is
21 not Mr. Atilla's responsibility to examine transactions.
22 Mr. Atilla relies on people who work for him. And Mr. Atilla
23 relies on people in the foreign operations department and the
24 sanctions group or sanctions team in the foreign operations
25 department that deal with these problems every day. That flag

1 the problems. That bring the problems to the attention of
2 their supervisors, and ultimately, to people in the bank who
3 are responsible for dealing with problems like this.
4      Mr. Atilla was asked, obviously, asked by people, and
5 I think he testified this morning to the fact, that people on
6 staff came to him with problems and documents, in July of 2013,
7 to discuss with him these problems. And he treated it like he
8 would treat any other problem that percolated from below. He
9 looked into it, he gave instructions, and he sent the matter
10 back on its way, and asked the people who worked for him to
11 follow through with the transactions, to process them.
12      There is no evidence here to suggest that Mr. Atilla
13 was the one who defined what documents accompanied food
14 transactions. That wasn't his call. He would -- if he
15 discussed them, he would say, and I think the evidence is
16 plain that it was people in lower levels of staff who had the
17 responsibility of following up with proper documentation. It
18 was people on staff who were responsible for deciding whether
19 the documentation of these transactions was appropriate or
20 proper. It was not Mr. Atilla who made the final decision as
21 to what appropriate documentation was.
22      And in the conversation that the government referenced
23 on July 9, you heard about it, where Mr. Atilla is talking
24 about these little boats that go back and forth between Iran
25 and Dubai, across the Persian Gulf. Which, by the way, if you

1 look at the map, isn't such a long distance. It's certainly
2 feasible that in transit trade, that these boats would take
3 produce across the Persian Gulf. I think there is no testimony
4 in the record, but you can see from the map that it is not a
5 long distance.
6      If the food was delivered in Iran, or if the food was
7 delivered in Dubai, there isn't much of a difference. The food
8 still crosses the Persian Gulf and it is not a long or
9 hazardous trip.
10      So, when you put into context the evidence that you've
11 heard here, and when you put into context where it comes from,
12 when you put into context the gloss that the government wants
13 you to put on the evidence here is really unwarranted and
14 unsupported by the facts, and is predicated in the end on the
15 testimony of someone like Reza Zarrab, you have to ask
16 yourself, has the government sustained the burden, the high
17 burden that's required for a conviction in a court of law,
18 guilt beyond a reasonable doubt.
19      If we can talk just a second about Mr. Atilla's
20 testimony. Judge Berman will tell you on his instruction on
21 the law that Mr. Atilla, the defendant in this case, has no
22 burden. The burden of proof is on the prosecution, it is on
23 the prosecution at the beginning of the case, and it never
24 leaves the prosecution's table. The burden of proof remains
25 constant, guilt must be proved beyond a reasonable doubt to

**A726**

 1   your satisfaction, and the presumption of innocence, that
 2   that's the foundation of the burden of proof.  And that high
 3   standard of evidence remains with the defendant unless or until
 4   you decide to the contrary.
 5        A defendant needn't waive his privilege against
 6   self-incrimination.  He needn't testify.  He's got no burden in
 7   the case to do anything.
 8        Here, Hakan Atilla decided that he would testify,
 9   waived his privilege against self-incrimination, took the
10   witness stand, and testified for roughly two days and subjected
11   himself to cross-examination.
12        The decision to take the witness stand by a defendant
13   in a criminal case isn't the act of a guilty man.  It certainly
14   is consistent with the mindset of someone who is innocent.  It
15   is the act of a man who believes he's innocent, and wants to
16   proclaim his innocence to the entire world.  He does so because
17   he believes he's innocent.
18        Would a guilty man come to the United States like
19   Hakan Atilla did earlier this year knowing, as he did, that
20   Reza Zarrab had been arrested a year before and charged with
21   violating sanctions and was languishing in jail?  When Zarrab
22   came to the United States, he didn't know what he was exposing
23   himself to, he didn't know that he would be arrested.  He
24   didn't know that the United States was on to his sanctions
25   evasion scheme.

 1        By contrast, when Hakan Atilla came to the United
 2   States, a year later, he knew that Zarrab had already been
 3   arrested.  In fact, he first came to the United States in
 4   September of 2016, six, roughly six months after Zarrab had
 5   been originally arrested.  He didn't come to the United States
 6   once.  He came to the United States twice.  And when he came to
 7   the United States the second time is when he was arrested.
 8        But would a man who is guilty of a crime expose
 9   himself to arrest by coming to the United States?  Why wouldn't
10   he have stayed outside the United States?  That's not the act
11   of a guilty man.  It is the act of an innocent man.
12        And, you might remember, after he was arrested, and he
13   was at the FBI office out at J.F.K., the case agent Jennifer
14   McReynolds confronted him, offered him the opportunity to
15   cooperate.  Said that the government had evidence against him,
16   and that he could help himself, essentially help himself with
17   his problem.  That he could work his way -- there were people
18   that were more involved and he could help himself with his
19   problem.
20        Hakan Atilla didn't say yes, didn't pop up and didn't
21   say in a heartbeat that he was ready to cooperate.  And the
22   reason he didn't, and the reason he chose not to cooperate, is
23   because he had nothing to cooperate about because he had
24   nothing, done nothing wrong.  He believed in his innocence.
25   That's, again, the act of an innocent man.

 1        And, by the way, you can look at the recording of his
 2   arrest.  We played roughly eight minutes of it.  You can look
 3   at it and ask yourself, does he look like a guilty man?  Is he
 4   nervous?  Is he sweating the way Adam Szubin said that Hakan
 5   was sweating when he spoke to him when he did his pull aside in
 6   Istanbul back in 2013?  We'll come back to that in a bit.  No.
 7   He's calm, cool and collected.  Just as he was when he
 8   testified in this courtroom in front of you, not only on direct
 9   examination, but when he was subject to a rigorous and
10   hard-pressing cross-examination by Mr. Denton.  You didn't see
11   him break a sweat.  You didn't see him start acting nervously.
12   He answered the questions, he answered all of Mr. Denton's
13   questions just like he'd answered the questions on direct
14   examination.
15        Let's talk about a couple of the specifics of the
16   evidence that you heard here about Mr. Atilla's role and how it
17   was that, as late as April 10, 2013, that Reza Zarrab admits
18   that he was lying to Mr. Atilla.
19        He admits that when he spoke to Mr. Atilla on the
20   morning of April 10, 2013, you might remember Mr. Atilla was on
21   his way to the airport, Mr. Atilla was in his car on the way to
22   the airport, leaving with his family for Barcelona.  In the
23   conversation, Mr. Atilla speaks to Mr. Zarrab about the food,
24   the food trade.  And they have a discussion about what's
25   involved in the food trade.  And they discuss what Mr. Zarrab's

 1   plans are.
 2        And in that conversation there is no discussion of
 3   forging documents or bogus food shipments.  Mr. Zarrab is
 4   telling Mr. Atilla that he's shipping food and they're talking
 5   about what the food, what the process is going to be, what the
 6   payment is going to be.  And Zarrab tells Mr. Atilla that the
 7   payment is going to be not handled by letter of credit, as food
 8   transactions commonly are, but this was different.  It was
 9   going to be advance payment.  This is something that Mr. Atilla
10   has not wrapped his head around, doesn't understand it.
11        Well, the conversation is brief, Mr. Atilla goes off
12   to Barcelona to return on the 14th of April, and in the
13   interim, we know that that's the day that Zarrab goes to
14   Suleyman Aslan, to the man he bought, and says to him Atilla's
15   throwing a wrench into our arrangement.  He needs to be
16   straightened out.
17        And you remember Mr. Zarrab testified that right in
18   front of him, that Suleyman Aslan picked up the phone, called
19   Hakan Atilla, and told him get with the program.  You're going
20   to go ahead and you are going to do it.  And apparently, he was
21   so proud of it, that after the conversation, you might
22   remember, Zarrab called call his buddy Abdullah Happani and
23   says right in front of me Suleyman called, made a phone call to
24   Hakan and straightened him out.
25        Well, it was tough.  It was a tough thing to do

**A727**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  because Mr. Atilla, Hakan Atilla, was still on an airplane.
2      Now, in his closing remarks to you, Mr. Lockard just
3  told you that Mr. Atilla got off the plane at 4:48 p.m. and we
4  know that it may have been 4:48, but it was 4:48 p.m. in
5  Barcelona. That was 5:48 in Istanbul. And that hour makes a
6  big difference because that day there is surveillance,
7  Mr. Korkmaz's surveillance has Mr. Zarrab showing up at the
8  bank at roughly 4 and leaving at 5:15. Now we're talking
9  Istanbul time. That's, by my calculation, a half hour before
10 this alleged phone call was made to Hakan Atilla.
11     But there's better evidence, I think, of who
12 Mr. Suleyman called that day. Because at 8:02 p.m., after the
13 meeting, and after the call that Zarrab made to Happani, at
14 8:02, Zarrab calls another Hakan, but it is not, as I say,
15 Hakan Atilla, it is Hakan Aydogan. And in that conversation,
16 that conversation is similar to the conversation that he had
17 with Mr. Atilla earlier in the day. And he's talking to him
18 about the food shipments. As I recall, the food shipments and
19 what he's going to do, as I recall the testimony -- again, it's
20 your recollection that controls, not mine -- Mr. Zarrab
21 testified that he was lying to Hakan Aydogan as well when he
22 spoke to him about the food shipment.
23     (Continued on next page)
24
25

1      MR. ROCCO: So here we have, it's April, and six
2  months earlier, we have Zarrab testifying, that's six months
3  later, in October, on October 4th, 2012, there was a meeting
4  with Iranians at Halkbank, where the plot to continue gold and
5  the plot to continue to divert money out of Turkey and into
6  Dubai, so that Iran could use the money to make international
7  payments is hatched, where Zarrab initially testified that
8  Hakan Atilla was recruited to be part of the conspiracy.
9      You might remember, they were talking about the
10 Iranians wanted to access their funds directly, and the bank
11 did not want that to happen. This is according to Zarrab. And
12 Zarrab's testimony is he pointed to Mr. Suleyman Aslan, was
13 asked: How are we going to do this? And Aslan refused to make
14 payments directly, and he pointed to Zarrab, and he said:
15 We'll continue to use Zarrab. We'll use the old system. And
16 apparently in the same meeting, the same question was asked of
17 Hakan Atilla, and Hakan Atilla did the same thing, he pointed
18 to Reza Zarrab and said: We will continue to use the old
19 system.
20     Well, if, in fact, that was the case, if, in fact, in
21 October of 2012 Hakan Atilla was part of the conspiracy, a
22 conspiracy with Zarrab, why is Zarrab lying to him six months
23 later? Why is he lying to him in April of 2010? Why does he
24 admit that he was lying to him on April 10th, 2010? He tries
25 to put -- he says things were corrected that day, but we know

1  they couldn't have been corrected that day because they
2  couldn't have had a conversation.
3      So we go to option three, which is the period between
4  April 10th and April 22nd, and you might remember that on
5  April 22nd there was allegedly a chat, where Suleyman Aslan
6  asks Zarrab if he's satisfied with the method. The method, the
7  method. We've heard repeatedly about the method, and the
8  method sounds very sinister. And the method, as the government
9  would spin it, is something that's sinister, but the answer is
10 much simpler than that.
11     These were advance payments for food. The payment was
12 coming in to the bank. Zarrab went to Hakan Atilla and said
13 that he wanted the money released from the banks and sent to
14 Dubai immediately. Hakan Atilla was not comfortable doing
15 that; so he suggested to Zarrab that if the supplier of the
16 food wanted to be paid immediately, that's not a problem, but
17 the money is not going to leave Turkey. The money is not going
18 to leave Halkbank until the proper documentation arrives at the
19 bank. And says that the food supplier, the company called
20 Atlantis, if it wants to be paid immediately, there's no
21 problem with that, but Atlantis has to open an account at
22 Halkbank, and that the money will be deposited into Atlantis'
23 account at Halkbank. This way, the money does not leave the
24 bank. This way, the money does not leave Turkey until proper
25 documentation is presented for the transactions.

1      That's the system that is put into place. That's the
2  so-called method. That's the discussion that Hakan Atilla has
3  with Reza Zarrab sometime in April of 2010, and it's in direct
4  response and follows naturally from the fact that on
5  April 10th, there's a whole new notion introduced to Hakan
6  Atilla that these payments are going to be made in advance.
7  There are no letters of credit. There's no security. There's
8  no way of securitizing the shipment or the bank.
9      So the simple solution is if we get paid, the money
10 goes into an account and stays at Halkbank. If we get paid in
11 advance, the money stays at Halkbank until we get satisfactory
12 proof that the goods are delivered, and we receive notification
13 or documentation that the goods have been delivered. That's
14 not a sinister method. There's nothing illegal or sinister
15 about it. It's Hakan Atilla doing what Hakan Atilla is paid to
16 do, which essentially is protect the interests of the bank.
17     And it's important that we understand that that
18 distinction is drawn and you understand that that's what was
19 going on here and nothing more sinister because everything, as
20 I said earlier, everything in the government's case is
21 predicated on the fact that Reza Zarrab is telling the truth
22 and that, more importantly, that Hakan Atilla knew that there
23 were sanctions violations going on in the sale of gold and
24 later knew that there were sanctions violations going on with
25 the sale of food.

**A728**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1      Let's talk, if we can, about OFAC and Mr. Atilla's
2  conversations with the people from OFAC. There were three, as
3  I recall. There were three witnesses from OFAC, three fact
4  witnesses, Adam Szubin, David Cohen and Joshua --
5      THE COURT: I think it was Kirschenbaum.
6      MR. ROCCO: I apologize, your Honor. A Joshua
7  Kirschenbaum. There was a fourth witness by the name of Lisa
8  Palluconi. None of those witnesses, none of the fact witnesses
9  testified that they were familiar with the Halkbank or how
10 Halkbank was organized. They weren't familiar with Halkbank.
11 They weren't familiar with how it's organized. They weren't
12 familiar with Hakan Atilla's role at the bank. They knew him
13 to be someone important, called him, referred to him as the
14 deputy general manager, as the government did in its opening.
15 But we know that he was not the deputy general manager. He was
16 one of, at the time, 12 deputy general managers.
17     As I say, they certainly had no idea that it was Hakan
18 Atilla's job to oversee the kinds of transactions that are
19 involved in this case. None of the witnesses testified about
20 the foreign operations department or what the department does
21 or the sanctions team or the so-called -- the compliance
22 department. Hakan Atilla met regularly, twice a year it seems
23 like, with people from OFAC, whether it was David Cohen
24 sometimes; other times it was Adam Szubin. They met in
25 Washington, D.C. when Hakan Atilla was here to attend IMF

1  meetings. They met in Istanbul, at Halkbank, when apparently
2  members of Treasury would go to Turkey.
3      You might remember that David Cohen and Adam Szubin
4  testified, and I don't think there's any dispute, so did
5  Mr. Atilla, that representatives from Treasury tried to impress
6  on Halkbank how important it was to understand that Iran was
7  working overtime to evade U.S. sanctions.
8      And there is testimony about two meetings, where in
9  one meeting, on February 12th, 2013, Adam Szubin took
10 Mr. Atilla aside and, what did he call, a pull-aside and warned
11 him, and that Treasury was about to take some drastic actions
12 against Halkbank. Described it, I think, as, in substance,
13 OFAC was prepared to pull -- was getting prepared to pull a
14 trigger.
15     And a meeting a couple of weeks later with David
16 Cohen, where David Cohen said that he gave representatives of
17 Halkbank a stern warning about sanctions violations,
18 essentially telling Halkbank that it was being watched
19 carefully.
20     Now, when Mr. Szubin testified, we asked Mr. Szubin
21 about his so-called pull-aside and what happened at the
22 pull-aside and how the pull-aside was documented, and you might
23 remember that there are two memoranda that documented this
24 meeting, a short memoranda that made no mention at all of the
25 pull-aside, and a longer memorandum, a State Department cable

1  that similarly made no mention of the pull-aside.
2      Now, David Cohen and Adam Szubin are, obviously,
3  important people. At the time that Szubin did his pull-aside,
4  he was the director of OFAC, and here, we haven't set the scene
5  for you. We have the director of OFAC meeting with senior
6  representatives of Halkbank, including certainly Mr. Atilla,
7  and warning Mr. Atilla that OFAC is prepared to pull a trigger,
8  but doesn't document that warning in a memorandum or in notes,
9  or actually in two memorandum.
10     Now, it doesn't take long to figure out that Adam
11 Szubin is a very cautious, meticulous, well-trained lawyer,
12 somebody that knows that it's important to document
13 communications like this, especially between high-level
14 government officials and high-level banking authorities in a
15 foreign country. This wasn't a casual, well, you know, why
16 don't we have a little chat. This was serious, serious
17 business.
18     In fact, it's serious enough where not only would it
19 be documented, one would think that if you had that kind of a
20 complaint against a foreign state-owned bank, that you would
21 take it to the highest levels of that bank, and you would take
22 it directly to the government. Mr. Szubin didn't do that.
23 Mr. Szubin didn't document the pull-aside. Mr. Szubin didn't
24 go to anybody in Turkish government and say we have a problem
25 here.

1      Same with Mr. Cohen. Mr. Cohen says that he gave a
2  stern warning to Halkbank. Now, look, stern warnings may be in
3  the eye of the beholder, and we are dealing with cultural
4  differences. And by the way, you've not heard from me today,
5  and you haven't heard from the defense in this case, that
6  Mr. Atilla doesn't understand English or that he's hiding from
7  speaking English -- I'm sorry, that he doesn't understand
8  English and that there was some confusion between him and the
9  people in Treasury when he spoke to them, or there was some
10 confusion when he met the FBI agents and was arrested by the
11 FBI agents and didn't understand what was going on, or that he
12 didn't understand something that was going on in this
13 courtroom.
14     He's not hiding under a language difference, and I'm
15 not saying that language has anything to do with what happened
16 here, in terms of what these stern warnings are. But I really
17 urge you to consider if this really happened, if there was a
18 pull-aside, and if there was a stern warning to a high-level
19 official of a foreign bank by a high-level official of the
20 United States government, wouldn't that be documented?
21 Wouldn't it be meticulously documented? Wouldn't it be
22 something that would be brought to the attention of a foreign
23 official, a state official, as opposed to simply a bank
24 official?
25     Now, this is serious stuff, and there's no doubt, no

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  doubt that OFAC and the United States Treasury was concerned
2  about what was going on in 2011, 2012, 2013 with Iran and
3  Iranian sanctions. There's no question that Iranian sanctions
4  were changing; that the sanctions were becoming more vigorous;
5  that Iran was feeling the heat; that Iran was straining under
6  the impact of these sanctions.
7      And it wouldn't be surprising at all that there was a
8  discussion, but the question is a stern warning and in talking
9  about this stern warning and in talking about the interaction
10  between Halkbank and OFAC, bear in mind that in the same
11  February 12th meeting with Adam Szubin, when he met with
12  Mr. Atilla, Mr. Atilla brought to his attention the fact -- in
13  talking about gold, the fact that Halkbank was having a hard
14  time determining the origin and the ultimate destination of the
15  gold shipments. That's documented.
16      That's documented in the cable of that meeting, and
17  that's memorialized in the cable of that meeting. And the
18  reason he did it is because he wasn't trying to hide things
19  from OFAC. His testimony this morning was the conversations
20  that he felt that he had an open and free exchange with the
21  Treasury Department, with representatives of the Treasury
22  Department. And, in fact, there's an odd fact here that
23  corroborates that because when he is arrested in 2017, who does
24  Mr. Atilla ask for on his way to MCC with Special Agent
25  Tringale, but David Cohen.

1      Now, if Hakan Atilla has spent years lying to David
2  Cohen and knows that he's been arrested for violating U.S.
3  sanctions, why would the first name that comes to mind be David
4  Cohen? Why would he be asking for him unless he trusted him,
5  unless he felt that he never misled him? And that's what that
6  demonstrates, and it's consistent with other things that
7  Halkbank did for years.
8      Halkbank would bring to U.S. Treasury, or to OFAC,
9  problems with potential sanctions violations, give information
10  to OFAC, serve as a conduit for information to OFAC. There was
11  some reason that Mr. Atilla believed that he had a trusting and
12  trustful relationship with OFAC and the Department of Treasury,
13  something supporting the reason that he said that he would ask
14  for David Cohen at the time that he was arrested. And it was
15  precisely that.
16      And that raises another issue, and it's the issue of
17  Reza Zarrab. The fact of the matter is that OFAC never told
18  Halkbank that it had information or was investigating Reza
19  Zarrab. Reza Zarrab was arrested in December of 2013, along
20  with the president of the bank in a broad-ranging criminal
21  investigation that was being conducted in Turkey. He was
22  arrested, and there is no contact.
23      OFAC learns of an arrest of Reza Zarrab, who is a
24  customer of the bank, and David Cohen knew that Reza Zarrab was
25  a customer of the bank. And Zarrab and Suleyman Aslan, who was

1  then the general manager of the bank, are arrested in an
2  investigation and OFAC doesn't contact the bank? Has no
3  questions to ask the bank? Has no questions to ask what
4  happened, to inquire into the circumstances of the arrest or
5  the facts that led to the arrest?
6      Now, OFAC knows precisely who Reza Zarrab is. OFAC
7  had been investigating him, or was investigating him, and if
8  they weren't investigating him at the end of 2013 when he was
9  arrested, Mr. Cohen admitted that they would have started or
10  did start an investigation of him almost immediately. What's
11  the reason that the bank is not contacted? There is no
12  meeting, no meeting between the bank and OFAC from February of
13  2013 until October of 2014. That's over 18 months.
14      And why? Why does OFAC stay away from Halkbank? Why
15  isn't there follow up? Why isn't there discussion? This
16  trusting relationship that Mr. Atilla had with OFAC, obviously,
17  wasn't reciprocated, and Mr. Atilla is no fool. What led
18  Mr. Atilla to believe that he could trust David Cohen, that he
19  could trust Adam Szubin, and apparently they didn't trust him?
20      So I think you have to think about the so-called --
21  the dynamic of what was going on here. I think you have to
22  think about what was driving OFAC to behave the way it did and
23  what was driving Mr. Atilla to believe that he could confide in
24  people from OFAC, telling them about problems with things like
25  gold shipments, determining origin and destination? Why would

1  he invite scrutiny by OFAC if, in fact, what he was doing was
2  trying to hide things from them?
3      Why would -- and we'll go to the October 10th, 2014,
4  meeting with Mr. Cohen, where Mr. Atilla discusses with
5  Mr. Cohen the relationship that Zarrab had with Halkbank. He's
6  asked the question: Are you still doing business with Reza
7  Zarrab? Mr. Atilla answers the question and answers the
8  question directly. They're doing foreign business, and you can
9  look at the memo of the meeting. They're involved in foreign
10  transactions, not some, not a little, not a tiny bit.
11      The memo, the cable that memorializes that meeting,
12  speaks about they're doing foreign transactions, intermediating
13  foreign transactions. Reza Zarrab has loans with the bank.
14  And Mr. Atilla, in reading that memorandum and reading the
15  cable, Mr. Atilla essentially says to Cohen, if Zarrab is a bad
16  guy and you don't want us dealing with him, tell us about him
17  and we'll stop dealing with him. Put him on the sanctions
18  list. That's clear in the memo.
19      Mr. Cohen spins it, for some reason, when he testifies
20  and suggests that's not really what Mr. Atilla was asking.
21  Well, what else could he be asking? Put him on the sanctions
22  list, then we can't deal with him. It didn't happen. Instead,
23  Mr. Cohen asks for information that Halkbank has about Zarrab
24  when, in fact, OFAC is sitting on a ton of information about
25  Zarrab that it's not sharing with Halkbank. Why didn't it do

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

1  it?  Why didn't it shut down the relationship in October of
2  2014?  Why did the relationship continue from October 2014
3  until March or -- March of 2016, when Zarrab is arrested here
4  in the United States, roughly a year and a half later?
5       As I said, Hakan Atilla took the witness stand here,
6  testified, told you he's done none of the things that he's
7  charged with.  He told you that he never accepted a bribe.  He
8  said that Zarrab never bribed him, and he did not know whether
9  Zarrab had bribed Suleyman Aslan.  Hakan Atilla had no motive
10 to break the law or do anything wrong.  To say that he did it,
11 that he committed serious crimes that the government has
12 charged him with because prestige reasons or because he wanted
13 to keep his job is pure speculation.  There's no evidence in
14 the record to support it.
15      The only evidence in the record that you've heard is
16 that he was not corrupted, that he did his job.  That's what
17 we've heard here, ladies and gentlemen.  We haven't heard
18 anything about a motive.  Why would Hakan Atilla take a 22-year
19 career and throw it in the garbage?  Why would he take a risk
20 of ruining his career, ruining his life by doing something as
21 crazy as what happened here?
22      We know why Suleyman Aslan did it.  We know why other
23 people -- we know how Zarrab was able to corrupt other people.
24 The linchpin is motive.  Ask yourself, in this case, where is
25 the motive for Hakan Atilla to do any of the things that the

1  government suggests he did?  What does the government tell you?
2  Where is it said in the evidence, the conversations, the
3  recordings that the government references, the testimony of
4  Reza Zarrab, the exhibits, the testimony of the people from
5  OFAC?
6       I say to you, don't support the fact that Hakan Atilla
7  did what he's charged with.  I think it's easy to put Mr. Cohen
8  and Mr. Szubin up as pillars of what is correct and what is
9  right and what is truthful, and to believe that Hakan Atilla
10 lied to them.  You have to first come to the conclusion that
11 Hakan Atilla knew what was going on at Halkbank, and there is
12 nothing to support that fact in the evidence that you've heard
13 in the course of this trial over the past three weeks.
14      To believe Reza Zarrab, the person who has lived a
15 life of lies, who lies so much that when he tells you he's
16 lying, you don't want to believe him, who basically corrupts
17 people, who knows how to buy his way out of any situation.  The
18 more desperate he is, the more likely he is to lie and to
19 finagle and to weasel his way out of a bad situation, just like
20 he's doing here.
21      I'd like to close by saying, reminding you, members of
22 the jury, a quote from Daniel Webster that I mentioned in my
23 opening statement that "Justice is man's greatest enterprise on
24 earth."  It truly is.  You've heard all of the evidence these
25 past three weeks, the testimony, the recordings, the documents,

1  the photographs.
2       On Hakan Atilla's behalf, I'm asking each and every
3  one of you to look closely at the evidence, to look at all the
4  evidence that bears on the question of Mr. Atilla's guilt or
5  innocence.  Scrutinize it, scrutinize it closely.  Scrutinize
6  it under the brightest of all lights.  Do this, and while you
7  do it, while you are analyzing this evidence, bear in mind that
8  the prosecution always has the burden of proof, the burden of
9  overcoming the presumption of innocence and proving guilt
10 beyond a reasonable doubt.
11      When you're done, I'm confident that you'll do this,
12 and that when you're done, you'll say that the government has
13 failed to carry its heavy burden in this case to prove Hakan
14 Atilla's guilt beyond a reasonable doubt.  You will return a
15 verdict, I'm sure, of not guilty and allow this innocent man,
16 this pawn in a cosmic game of chess, to return to his wife and
17 his son and his home in Turkey.  Thank you.
18      THE COURT: Thank you, Mr. Rocco.
19      Let's take five minutes, and then we'll have a brief
20 rebuttal.
21      (Jury not present)
22      (Recess)
23      (Jury present)
24      THE COURT: Okay.  Please be seated, everybody.  The
25 government has a brief rebuttal.

1       MR. KAMARAJU: Thank you, your Honor.  May I proceed,
2  your Honor?
3       THE COURT: Yes, sure.
4       MR. KAMARAJU: Thank you.  I'd like to pick up right
5  where defense counsel left off, with the idea of reasonable
6  doubt.  Reasonable doubt is one of the cornerstones of our
7  country's justice system.  It's what separates us from those
8  countries that don't have the rule of law.  Reasonable doubt is
9  critical.  It is a standard, and it is a hallowed standard, but
10 it is not a mystical one or a magical one.  It's one that's
11 applied in courtrooms all around this country, and we embrace
12 that burden.  It is ours to prove to you, and we submit that we
13 have.
14      But even though it's our burden, when the defense
15 chooses to make arguments to you, you should think about them
16 carefully.  You should scrutinize them.  You should pay
17 attention.  You should ask yourself the fundamental question:
18 Do they make any sense?  And I think what you're going to see
19 is, in this case, what you just heard makes no sense, and the
20 primary reason why it makes no sense is because while defense
21 counsel stood up here and argued a number of things to you,
22 they were totally inconsistent with what the defendant has been
23 saying since the moment he got arrested, all the way through
24 when he took that stand.  They can't get their stories
25 straight.

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2321 |
| --- | --- | --- |

1      MR. KAMARAJU: Because you can't fake the truth. And
2 that's what you saw. And we're going to go through examples of
3 that. That's what I'd like to focus my rebuttal on, so you can
4   see exactly what's happened.
5      So let's go right to it. Let's go right to defense
6 counsel's invitation for you to ask who is Hakan Atilla. Hakan
7 Atilla is an important person. Make no doubt about that. They
8 showed you pictures during his testimony about his house, and
9 how much money he made and his family. I'm not going to
10 quibble with any of that. But that's not what this case is
11 about. This case isn't about what happened at Hakan Atilla's
12 home. This case is about what happened at Halkbank.
13      And at Halkbank, Hakan Atilla was an important and
14 powerful man. He was a deputy general manager of international
15 banking.
16      Now, something that the defense has said over and over
17 and over again is, well, there were other deputy general
18 managers. You're right, there were sometimes as many as I
19 guess 13. So what does that mean? That, at the most, Hakan
20 Atilla was one of the most 13 powerful employees at a bank that
21 employed thousands of people? That's a powerful man.
22      And those deputy general managers, they are not all
23 created equal. No. Some of them, and take a look at the org
24 charts that the defense counsel put in through Mr. Atilla's
25 testimony. Some of them are responsible for HR. Some of them

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2322 |
| --- | --- | --- |

1 are responsible for IT. Important positions, don't get me
2 wrong, but not the position that you put the man who claims to
3 have been responsible for the two biggest IPOs in Turkey's
4 history. You put that man at a job that you care about. And
5 they did. They put him in an incredibly important job. A job
6 to protect the bank's lifeblood, to protect its relationships
7 with foreign banks. The very thing that an international bank
8 needs to survive. He told you that. That's where Hakan Atilla
9 was during all this.
10      And you know what threatens a bank's ability to do
11 that? You heard it over and over again from multiple
12 witnesses. Violating sanctions. And that's why this "I'm not
13 an expert at sanctions," that's why he was in every major
14 meeting with the Department of Treasury to talk about what?
15 Sanctions. To talk about OFAC's concerns with the way Halkbank
16 was doing things. To talk about OFAC's concerns that Halkbank
17 was violating sanctions. And Hakan Atilla was there to calm
18 OFAC down. Because you want to know how important Hakan Atilla
19 is? Hakan Atilla is Halkbank's sanctions fixer. That's what
20 he did. And you saw it in meeting after meeting, and in call
21 after call, and with witness after witness.
22      And he couldn't help himself. This so-called guy who
23 has a little bit of knowledge about sanctions testified for
24 hours about his nuanced appreciation for sanctions. He even
25 told you at one point that Adam Szubin, who is the

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2323 |
| --- | --- | --- |

1 undersecretary for the Department of Treasury, got a sanctions
2 issue wrong, but he got it right because he knew better. But
3 no, he's not an expert. He's a fixer. And that's what he is.
4 And when there is a problem, he fixed it.
5      And whatever it took, whether it was OFAC's asking
6 questions, let's shut that down, call Hakan Atilla. When it
7 was Reza Zarrab -- and we'll talk about Reza Zarrab -- but when
8 it was Reza Zarrab has an issue, let's get Hakan Atilla.
9 Because his job was protecting Halkbank from losing its access
10 to the world's financial system. And that meant sanctions was
11 very much his business.
12      Now, something else that defense counsel did near the
13 end was he talked about the acts of an innocent man. And he
14 said, well, an innocent man wouldn't have flown to the United
15 States if he thought that he was going to get arrested, if he
16 had done anything wrong. An innocent man wouldn't have done
17 that.
18      Again, that's not what Hakan Atilla said. That's not
19 what Hakan Atilla said on the stand and that's not what Hakan
20 Atilla said to the FBI.
21      What did Hakan Atilla say? Well, on the stand, he
22 told you that when Reza Zarrab got arrested, people at Halkbank
23 took a look at the indictment. They scoped it out. That's
24 another way of saying they checked if the coast was clear. And
25 they figured it out. They figured that the indictment didn't

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2324 |
| --- | --- | --- |

1 talk about them. They were okay. And Hakan Atilla had a very
2 important job. He had to get to the United States. Because he
3 told you, or he told the FBI, and you, there was a huge bond
4 offering that he was responsible for.
5      What do you say to your boss then? I can't go to the
6 United States to do that big thing because I'm worried I'm
7 going to get arrested? No. You hope.
8      But there was another reason and Hakan Atilla told
9 that reason when it served him to the FBI. And you saw his
10 post-arrest video. When he learned that he was under arrest,
11 what did he do? He dared the FBI. He said do your best. I'm
12 a government official. The Turkish government's going to
13 follow this case. It's going to be an international incident.
14 That's what he told the FBI. Because he thought that was the
15 way that he was going to get out.
16      Hakan Atilla did not come to the United States because
17 he thought he was innocent. No, backed by a powerful bank and
18 an even more powerful government, Hakan Atilla came to the
19 United States because he thought he was too big to jail. And
20 he was wrong.
21      Now, something that defense counsel spent a lot of
22 time on is the idea that this is the Reza Zarrab show. Right?
23 We are going to talk a little bit how you know you can believe
24 Reza Zarrab.
25      But one of the things that defense counsel talked

**A732**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2325 |

1 about was the different roles that people played. Judge Berman
2 will instruct you on the law, but I expect what you're going to
3 hear is that the roles people played in a conspiracy is
4 irrelevant to their guilt. What matters is they joined the
5 conspiracy. And Hakan Atilla did.
6     Now, again, when it suits him, Hakan Atilla is more
7 than willing to play the I'm-a-big-shot card. But then here,
8 when he needs you to believe that he's not that big a deal,
9 what happens? Well, Mr. International Incident then wants you
10 to believe that he's just another Who from Whoville. That he
11 doesn't matter.
12     You know that's not true. Because people who don't
13 matter don't meet with David Cohen. They don't meet with Adam
14 Szubin. They don't meet with one of Halkbank's biggest
15 customers, Reza Zarrab. That's not what happens.
16     But let's be clear. Reza Zarrab was incredibly
17 important to this scheme. There is no doubt about that. Reza
18 Zarrab was not just the Turkish businessman. He was basically
19 a business. When he walked in, he gave Halkbank and Hakan
20 Atilla the opportunity to realize millions of dollars' worth of
21 commissions on money that was basically dead, because the
22 Iranians couldn't do anything with it, and they wanted to do
23 things with it. They wanted to do exactly what they wanted to
24 do. And so they needed to get it out. And yes, Reza Zarrab
25 was part of a system. He told you that himself.

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2326 |

1     But you know the other thing you heard, and you might
2 not have paid a lot of attention to it at the time, but Reza
3 Zarrab wasn't the only person doing this. He had competitors.
4 There were other people extracting the oil money from Halkbank.
5 You see, Reza Zarrab was important, but he wasn't
6 irreplaceable.
7     Now, on the other hand, let's talk about Hakan Atilla
8 and his role. Now, you heard David Cohen tell you that there
9 were only a little more than a handful of banks that were
10 allowed to receive this money, these Iranian oil proceeds,
11 without running afoul of U.S. sanctions. Right. It was
12 like -- I think the number was around eight. Right. Halkbank
13 was one of them. And there were some in other countries, too.
14     But, at every one of those banks, the Iranians
15 couldn't do what they wanted to do with the money, which was
16 make the payments they wanted to make. And the reason why they
17 couldn't do that is because of sanctions. U.S. sanctions, E.U.
18 sanctions, U.N. sanctions, but sanctions that cut Iran off from
19 the world's financial system. That's what the Iranians wanted,
20 but they couldn't do it. They needed somebody at a bank to
21 help them, to help them figure out how am I going to get this
22 out.
23     Now, there was a lot of discussion about Reza Zarrab
24 being the architect. Reza Zarrab's never worked at a bank.
25 Reza Zarrab started tea trading at 16. He didn't have the same

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2327 |

1 education as Hakan Atilla. He hadn't started from the ground
2 up at Halkbank. How would he know what banking regulations
3 would be? How would he know? No, because Reza Zarrab needed
4 somebody at the bank.
5     And Mr. Rocco, he alluded to the idea that Reza Zarrab
6 had gone off to China to do this sanctions evasions work over
7 there and that he didn't have a Hakan Atilla in his pocket,
8 right. So he was trying to bribe people there, but he didn't
9 have Hakan Atilla in his pocket. And he's right. There was no
10 Hakan Atilla in China. But Reza Zarrab sure wished there was.
11 Because you know what happened? Within months of the Chinese
12 banks learning of the Iranian connection to this trade,
13 learning what was happening, that was the exact same as what
14 happened at Halkbank, within months, the Chinese banks shut the
15 business down.
16     But not Halkbank. Not Halkbank with Hakan Atilla.
17 And that's because at Halkbank, the Iranians, Reza Zarrab, and
18 people at Halkbank, including Hakan Atilla, had figured out a
19 way around it. They had figured out a way to get that money
20 out. They had figured out the system and the method. Reza
21 Zarrab was the system, and Hakan Atilla was the method.
22     And the thing about it is, while you could replace
23 Reza Zarrab, while he was valuable, Hakan Atilla was
24 indispensable. Because you needed somebody who knew what was
25 going on at the bank, and could understand it. But you also

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2328 |

1 needed somebody who could sit in meetings with some of the most
2 senior people at OFAC and the Department of Treasury and could
3 deflect their concerns. Could hide the truth. That's what you
4 needed.
5     And they conceded that there was this sanctions
6 evasion scheme going on at Halkbank, though we'll come back to
7 the fact that Atilla didn't. His lawyer did. But they
8 conceded that it was happening. So, for it to work, you needed
9 somebody at the bank to be able to devise a method.
10     Now, defense counsel said, look, Reza Zarrab, he
11 doesn't need anybody's help faking documents. That might be
12 right. Reza Zarrab might know how to Photoshop all day long.
13 But you know what he doesn't know? What he doesn't know is
14 what's the important information that needs to be faked.
15 Because that information is what OFAC cares about. That's what
16 OFAC is looking at. That's what Halkbank is trying to guard
17 itself in, to protect itself when OFAC comes knocking. But you
18 know who did know that? The guy who went to all those
19 meetings, the guy who told OFAC, over and over again, so get
20 you. We're looking at all this stuff. We're requiring all
21 these documents. We're requiring due diligence. He knew what
22 OFAC needed, and he knew what the scheme needed, and what would
23 be best for documents to be faked.
24     Reza Zarrab didn't know that. Reza Zarrab had no way
25 of knowing that. Because you know what? Reza Zarrab has never

**A733**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,                                                December 19, 2017

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2329 |
|---|---|---|

1  met David Cohen. He's never met Adam Szubin. He's never met
2  Joshua Kirschenbaum. He's never had a conversation with an
3  OFAC person.
4       But he did. And he talked about these exact same
5  subjects. Look at the evidence. Look at the facts. Take, for
6  example, February 2013. In February of 2013, you will find
7  Hakan Atilla talks to OFAC on one day about bilateral trade
8  requirements, essentially the fact that you got to go from
9  Turkey to Iran. You can't route this stuff all over the world.
10  Within a matter of days, he's then talking to Reza Zarrab, and
11  you know that because Reza Zarrab is describing the
12  conversation. He's telling Abdullah Happani, look, I talked to
13  Hakan, this is the way we got to do it. We got to switch it.
14  We got to write Iran one day, or we got to write Dubai one day.
15  Maybe we got to write Iran through Dubai. That's all a matter
16  of days.
17       You know then that it happened, because you saw
18  Government Exhibit 2511, you saw these gold spreadsheets where
19  you can run down the list, and I encourage you to do it, look
20  at the dates. As soon as Hakan Atilla told him what needed to
21  happen, it happened. And next thing you know, now the gold
22  looks like it's being shipped to Dubai. It looks like it's
23  being shipped to Iran. On his instruction. Because he's the
24  one who knew what OFAC cared about.
25       Now, most of defense counsel's summation was focused

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2330 |
|---|---|---|

1  on Reza Zarrab. Because they want you to believe that our case
2  is entirely Reza Zarrab. Ladies and gentlemen, you would not
3  have sat here for three-plus weeks if we only had Reza Zarrab.
4  You heard from all kinds of different witnesses.
5       You saw evidence, not that was tainted by some
6  Gulenist plot as you remember them cross examining Huseyin
7  Korkmaz about. But evidence of the FBI, evidence of the
8  scheme, e-mails showing bribes paid, e-mails showing the flow
9  of money, e-mails showing important communications that were
10  part of the scheme. You saw bank records that showed that as
11  part of the activity that was happening out of Halkbank,
12  hundreds of millions of dollars flowed through U.S. banks, and
13  they flowed through U.S. banks right here in New York. And you
14  heard that those were transactions that would have never, ever
15  been approved had the banks known that they were really for the
16  benefit of Iran.
17       You know who else knew that? Hakan Atilla. He knew
18  that, too.
19       Now, the other thing that's interesting about
20  Mr. Atilla's post-arrest is when confronted with the evidence,
21  he doesn't say I was in Barcelona, I don't know what you're
22  talking about. He says you don't have that. Someone gave it
23  to you. And he was right. Someone did give it to us, Huseyin
24  Korkmaz gave it to us. And you heard about how he traveled
25  here to do that. And you heard how they cross-examined Huseyin

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2331 |
|---|---|---|

1  Korkmaz to try to discredit him as a member of some sort of
2  Turkish cult. They walked away from that argument in closing,
3  you didn't hear them talk about that. What they said instead
4  was Huseyin Korkmaz shouldn't be believed because he stole this
5  evidence.
6       Well, what difference does that make? Ask yourself,
7  does a tape recording change because it came to you through
8  Huseyin Korkmaz? Of course not. And the way you know that is
9  because the main target of that investigation, Reza Zarrab,
10  told you all those conversations happened. He told you I had
11  those communications through WhatsApp with Aslan.
12       The guy with the biggest incentive to say those things
13  were false, told you under oath that they were true.
14       So, you have the FBI evidence, and you have the
15  Turkish evidence, and now, you have Reza Zarrab. Reza Zarrab
16  testified at this trial for a long time. But, what's
17  interesting, and I don't know if you heard it, but in defense
18  counsel's closing, he said, essentially, if you believe Reza
19  Zarrab's testimony, if you believe what he said, my client's
20  guilty. That's what he said. And there are plenty of reasons
21  for you to believe what Reza Zarrab told you.
22       First of all, you watched him. You saw him testify.
23  You were able to evaluate for yourself. Was he evasive? Did
24  he appear to be lying?
25       Second, you saw that everything that Reza Zarrab told

| HCJ3ATI8 | Rebuttal - Mr. Kamaraju | Page 2332 |
|---|---|---|

1  you was corroborated, it was backed up by something that was
2  totally independent of Reza Zarrab. If Reza Zarrab told you
3  that a meeting happened, you saw a phone call that described
4  the meeting. If Reza Zarrab told that you bribes were paid,
5  you saw accounting spreadsheets that showed you the bribes. If
6  Reza Zarrab told you that this scheme happened, you saw the
7  documents that walked through every aspect of it from the top,
8  in Iran, with the payment instructions, all the way down to the
9  bottom, with the transaction through a U.S. bank. You saw
10  that.
11       You know this scheme happened and, frankly, they don't
12  even really contest that the scheme happened. Except that's
13  another instance in which defense counsel and the defendant
14  just can't get their stories straight. Because while defense
15  counsel tells you, well, there was a sanctions evasion scheme
16  but it's really all about Reza Zarrab. It is really all about
17  Suleyman Aslan. Hakan Atilla took the stand and told you my
18  bank complied with sanctions. My bank did what we were
19  supposed to do. You know that's not true.
20       Now, the other thing about Reza Zarrab, besides the
21  fact that you watched him, besides the fact that he's
22  corroborated, you saw him testify and you saw him get
23  cross-examined. You watched him stripped of all the power and
24  wealth that defense counsel threw at you. You watched him tell
25  you why he was testifying forthrightly. He told you that. It

**A734**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

HCJ3ATI8          Rebuttal - Mr. Kamaraju          Page 2333

1    didn't have to be drawn out of him. He told you that.
2          So think about this, ladies and gentlemen. If Reza
3    Zarrab thought that he was going to get free by giving Hakan
4    Atilla as a down payment, I think the phrase that Mr. Rocco
5    used in his closing was an EZ Pass. If that's what Reza Zarrab
6    thought, I'm going to get back to my wife and my family and
7    those riches by testifying against Hakan Atilla, by making that
8    testimony as valuable as possible, then think about why he told
9    you some of the things that he did.
10         First of all, remember that April 10 phone call that
11   we've talked about a lot. April 10, 2013? If Reza Zarrab
12   wanted to tell you that Hakan Atilla was in it right from the
13   start, why didn't he testify to that? He could have. There
14   was just two men on the phone. He could have told you, yeah,
15   he knew everything. He didn't. He told you, remember, that
16   Hakan Atilla didn't know that the food was fake at that time.
17   He told you that.
18         And if Reza Zarrab wanted to stick the knife in Hakan
19   Atilla as deeply as he could, why would he say that he never
20   bribed him? These are events that are occurring across an
21   ocean in Turkey with shoeboxes stuffed with cash. How hard
22   would it have been for Reza Zarrab in that moment to say, yeah,
23   you know, there was this meeting once, and afterwards I pulled
24   Hakan aside and I said here's $100,000 for your good works.
25   Nobody would have known. No one could have disproven that as a

HCJ3ATI8          Rebuttal - Mr. Kamaraju          Page 2334

1    lie. But he didn't. He answered that on direct and
2    cross-examination the exact same way.
3          Because Reza Zarrab was doing everything he could to
4    make sure he told you the truth. Because he understood that
5    that was the way that he got the relief that he wanted. Not
6    making up lies. Because if he was going to make them up,
7    ladies and gentlemen, he would have made up a lot better ones
8    than the ones he told. He would have not said I didn't bribe
9    the guy.
10         THE COURT: Mr. Kamaraju, you've got five minutes
11   left.
12         MR. KAMARAJU: Thank you, your Honor.
13         I want to talk specifically about the idea of bribes
14   and motive. You're going to hear Judge Berman tell you about
15   the elements of the crime. I suspect you're not going to hear
16   him say motive is an element of the crime. I don't think
17   you're going to hear that.
18         But the interesting thing about that argument is
19   throughout this trial, Hakan Atilla has tried to lay the blame
20   for what happened at everybody else's feet. So now it's
21   Suleyman Aslan, but during the trial you also heard about
22   Levent Balkan. You also heard about Hakan Aydogan. You heard
23   about all of those people who supposedly were part of this
24   sanctions evasion scheme that happened. And you also heard
25   that none of them got bribed. And that's because being bribed

HCJ3ATI8          Rebuttal - Mr. Kamaraju          Page 2335

1    was not a prerequisite to joining this conspiracy. Being
2    bribed was not a membership card to the Iranian sanctions club.
3    That's not the way it worked.
4          Because everybody at Halkbank who was involved, only
5    one got bribed, and Reza Zarrab told you why he did that.
6    Because you buy the top.
7          And I only have a couple minutes left, so I want you
8    to think hard about the explanations that defense counsel gave
9    you. I want you to think hard about some of the testimony that
10   Hakan Atilla gave you. Right. When defense counsel gave you a
11   whole explanation about what the method was. Right. Hakan
12   Atilla took that stand and told you I don't know what Suleyman
13   Aslan is talking about. I have no idea. But now all of a
14   sudden, defense counsel knows what the method is. Hakan Atilla
15   didn't know just a few days ago.
16         The only way this makes any sense, ladies and
17   gentlemen, is if Hakan Atilla was somehow the unluckiest person
18   in the world. If right under his nose at Halkbank, one of the
19   world's largest sanctions evasion schemes was going on, rivers
20   of Iranian oil money flowing out of the bank, under his nose,
21   and surprisingly, for a guy that everybody tried to keep out,
22   keep in the dark, they kept contacting him. He was involved.
23   He is talking about in the July 9 call, he is talking about tonnages
24   on customs documents. Why is the deputy general manager
25   talking about that?

HCJ3ATI8          Rebuttal - Mr. Kamaraju          Page 2336

1          And think about how much worse it gets. Because all
2    those communications in 2012 and 2013, where Suleyman Aslan and
3    Reza Zarrab are describing actions taken by Hakan Atilla, they
4    had no reason to lie then. To believe the story is to believe
5    that way back then they concocted a plan to frame him.
6          And to believe Hakan Atilla's story is to believe that
7    David Cohen and Adam Szubin, men who have no interest in this,
8    deliberately decided to perjure themselves to set up Hakan
9    Atilla. That makes no sense.
10         What makes sense, ladies and gentlemen, is that Hakan
11   Atilla made a choice. Conspiracies aren't measured by minutes
12   on a phone or a period of time. They're not measured by roles.
13   You are guilty or not guilty. And Hakan Atilla made a choice
14   to join these conspiracies. He made a choice when he lied to
15   OFAC. He made a choice when he helped design the system. He
16   made a choice when he coached Reza Zarrab. Those were his
17   choices.
18         And now the time has come for you to make a choice.
19   And when you go back and when you deliberate, when you look at
20   all of the evidence, when you look at all those tape
21   recordings, when you look at the testimony, when you think
22   about what he told you, when you go through all of that, we
23   would submit that there is only one right choice here, ladies
24   and gentlemen. And that is that Hakan Atilla is guilty as
25   charged beyond a reasonable doubt. Thank you.

**A735**

UNITED STATES OF AMERICA, v.
MEHMET HAKAN ATILLA,

December 19, 2017

HCJ3ATI8                                            Page 2337

1           THE COURT: Thank you, Mr. Kamaraju.
2           Okay, ladies and gentlemen, so here's what's left.
3    Tomorrow, 9:15, and I will give you the jury instructions.
4    They're long and they're complicated.  It will take me probably
5    an hour and a half to do it.  I know you're big note takers and
6    you're welcome to take notes, but I'm also going to give you a
7    verbatim copy of all of the instructions that I read for you to
8    take into the jury room.  So you'll have every instruction in
9    there to consider.
10          So, good day.
11          First, do not talk to each other about this case or
12   about anyone who has anything to do with it until the end of
13   the case when you go to the jury room to deliberate.  That
14   should be tomorrow around 11 o'clock or so.  And we'll order
15   for you an early lunch.
16          Second, do not talk with anyone else about this case
17   or about anyone who has anything to do with it until the trial
18   has ended, and you've been discharged as jurors.
19          Third, do not let anyone talk to you about the case,
20   or about anyone who has anything to do with it, and if someone
21   should try and talk to you about the case, please report that
22   to me or Christine immediately.
23          Fourth, do not read any news or internet stories or
24   articles or blogs or listen to any radio or TV or internet
25   reports about the case or about anyone who has anything to do

HCJ3ATI8                                            Page 2339

1    sides, and we'll just bring in one of the alternates.  And on
2    their behalf, I express our gratitude for you to sit patiently
3    and observe the trial.
4           JUROR NO. 10: My pleasure.
5           THE COURT: And we hope you have a good trip.
6           JUROR NO. 10: It's busy.
7           THE COURT: I think that's all I can think of.  Thanks
8    so much for your service.
9           JUROR NO. 10: Thank you, your Honor.  Like I said,
10   it's been a pleasure.  It's been interesting to see this in
11   action.
12          THE DEPUTY CLERK: Juror Number 10 for the record.
13          THE COURT: You are Juror number 10.  That's great.
14   Thanks a lot.  Christine will show you out.
15          (adjourned until December 20, 2017, at 8 a.m.)
16
17
18
19
20
21
22
23
24
25

HCJ3ATI8                                            Page 2338

1    with it.
2           And fifth, do not do any type of research or any type
3    of investigation about the case on your own.
4           So, see you tomorrow morning.  Thanks a lot.
5           (Jury excused)
6           THE COURT: I'll see the lawyers tomorrow at 8.  We
7    should be able to wrap up quick the jury instructions, we're
8    looking for some names of banks and one instruction or so, so I
9    think we'll very much be on schedule.  8 o'clock tomorrow.
10          MR. DENTON: If we work out that one issue, would you
11   like us to e-mail that to chambers?
12          THE COURT: That would be great.  Then it will take us
13   less than --
14          MS. FLEMING: I think you have to put on the record at
15   least orally your ruling on our request to put in the
16   inconsistent statement of the recording.  We did it in the
17   robing room but you didn't put it on the record.
18          THE COURT: I'm happy to do it.  Do you want to do it
19   now or tomorrow morning?
20          MS. FLEMING: Whatever your Honor wants.
21          THE COURT: Let's do it in the morning.
22          MS. FLEMING: Fine.
23          (In the robing room; The Court and Juror No. 10
24   present)
25          THE COURT: I spoke to the lawyers, they agree, both

Page 2340

1                    INDEX OF EXAMINATION
2    Examination of:                              Page
3    MEHMET HAKAN ATILLA
4    Cross (Resumed) By Mr. Denton . . . . . . . .2167
5    Redirect By Ms. Fleming . . . . . . . . . .2230
6                    DEFENDANT EXHIBITS
7    Exhibit No.                              Received
8     320, 320-T   . . . . . . . . . . . . . . .2233
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A736**

# In The Matter Of:

*UNITED STATES OF AMERICA, V*

*MEHMET HAKAN ATILLA,*

*December 20, 2017*

*Southern District Court Reporters*

Original File HCK3ATIF.txt

**Min-U-Script® with Word Index**

**A737**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

---

HCKPATI1                                                    Page 2341

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4         v.                        S4 15 Cr. 867 RMB
 5   MEHMET HAKAN ATILLA,
 6               Defendant.
 7   ------------------------------x
 8
 9                            December 20, 2017
                                  8:20 a.m.
10
11
12   Before:
13                HON. RICHARD M. BERMAN,
14                             District Judge
                                and a jury
15
16
17                    APPEARANCES
18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22
23
24
25
```

---

HCKPATI1                                                    Page 2342

```
 1
 2         (APPEARANCES Continued)
 3
 4   HERRICK, FEINSTEIN LLP (NYC)
          Attorneys for defendant Atilla
 5   BY:  VICTOR J. ROCCO, Esq.
          THOMAS ELLIOTT THORNHILL, Esq.
 6            - and -
     FLEMING RUVOLDT, PLLC
 7   BY:  CATHY ANN FLEMING, Esq.
          ROBERT J. FETTWEIS, Esq.
 8            - and -
 9   McDERMOTT, WILL & EMERY
     BY:  TODD HARRISON, Esq.
10            - and -
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
11   BY:  JOSHUA LEWIS DRATEL, Esq.
                 Of counsel
12
13   Also Present:
          JENNIFER McREYNOLDS, Special Agent FBI
14        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
          MS. ASIYE KAY, Turkish Interpreter
15        MS. SEYHAN SIRTALAN, Turkish Interpreter
16
17
18
19
20
21
22
23
24
25
```

---

HCKPATI1          Trial                                     Page 2343

1          (Trial resumed)
2          (In open court; jury not present)
3          MS. FLEMING: Judge we've also reached an agreement on
4   how to do the indictment thing if it's okay with you, how to
5   send the indictment back, just send the charging party
6   indictment back instead of the whole front part.
7          THE COURT: Good.
8          MR. DENTON: So we're working on a redacted indictment
9   that's just the charging language.
10         THE COURT: Okay.
11         MR. DENTON: And then we'll bring that up.
12         MS. FLEMING: We gave Christine just the bribery.
13         THE COURT: All right. I'm going to go back down,
14   then, because you obviously have to read this. This draft
15   incorporates what we talked about yesterday. It does entail
16   the bribery and all that stuff, and you may as well just call
17   it a redacted -- not redacted, but a copy of the indictment.
18   If it's still a copy of the indictment, just leave the
19   language.
20         MR. DENTON: I think you can just refer to a copy of
21   the legal charges in the indictment.
22         THE COURT: Fine, something like that. I have some
23   edits, taking some underlining out. That's an editorial for me
24   to read but not for them.
25         MS. FLEMING: Okay.

---

HCKPATI1          Trial                                     Page 2344

1          THE COURT: Yes and some other thing. Let's put some
2   things on the record, then.
3          MS. FLEMING: Sure, whatever you'd like.
4          THE COURT: So we'll get that out of the way.
5          MS. FLEMING: We will waive Mr. Atilla's presence on
6   the record.
7          THE COURT: Okay. So I guess it's my inadvertence. I
8   didn't send you a copy of the updated charges reflecting what
9   we discussed yesterday, but we are preparing copies now, and
10  you can take a look at that. We'll push back the conference
11  until you're able to do that.
12         There is a motion for a mistrial in writing from the
13  defense based on one of the questions that Mr. Denton asked
14  yesterday of Mr. Atilla. That was, I believe, the subject of
15  an interim ruling at sidebar. I'm not sure, but in any event,
16  what we really do need is to have the government respond in
17  writing, since it's an application for a mistrial. So I did
18  endorse the defense letter asking the government to respond by
19  5:00 p.m. today.
20         MR. DENTON: We'll do that, your Honor. We'll see if
21  we can do it even a little sooner.
22         MS. FLEMING: Judge, can I tell you why? Because in
23  the absence of a mistrial, we really think that at least the
24  Court needs to give a curative instruction on what happened
25  with that question.

---

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1      THE COURT: Well, I'll entertain a proposal --
2      MS. FLEMING: Okay.
3      THE COURT: -- as to what I would say.  Okay.  And
4  you'll see if the government agrees with that.
5      I think I ruled on the record with respect to the
6  so-called jailhouse tapes yesterday.
7      MS. FLEMING: I don't think so.
8      THE COURT: Did I not?
9      MS. FLEMING: No, you did it in the back.
10      THE COURT: So anyway, I was going to say it probably
11  is appropriate for me to do a written ruling, and I'm in the
12  process of having one of the clerks draft something.  So that's
13  two.
14      I did speak to juror No. 10 yesterday, as we
15  discussed, and I excused him.  And that's the juror, you'll
16  recall, that during voir dire said he had a trip coming in
17  January and I guess I -- I think we discussed it.  I can't
18  remember if we did, but....
19      MR. ROCCO: We did.
20      THE COURT: Assured him, so to speak, that his trip
21  would not be interrupted.  Since it's already Wednesday, nobody
22  knows how long deliberations would go, if they began and didn't
23  get it completed by Friday, his trip would be in jeopardy, and
24  it would be a big mess; so we excused him.
25      Then, a couple of hours later, I got a call from a

1  another juror, who is sick.  So I got a voicemail actually
2  about 8:00 or 9:00 last night from that juror, and we didn't
3  get back to him.  This morning he called chambers, and I took
4  the call.  I was there at the time, around 7:00, and he said
5  it's that juror.  He hadn't heard back, and my intention was
6  somebody would call him and say he would have to have a
7  doctor's note or have to be sick, et cetera, et cetera.
8      He said he had 103 fever and the flu and a doctor's
9  note.  He said he had a very good experience here, and I'm not
10  joking, he sincerely said that it was a wonderful experience,
11  and he really regretted that he couldn't come.  And I said,
12  well, don't come, obviously, if you're sick.  So we're down
13  another juror.  I think we have one or two to spare, maybe one.
14  So anyway, that's where things stand.  I hope you will confirm
15  I did the right thing with the sick juror.
16      MS. FLEMING: Absolutely.
17      MR. DENTON: Yes, your Honor.
18      MR. HARRISON: Judge, which juror was it, do you know?
19      THE COURT: I think it was juror No. 11, in the 11th
20  seat.  He called himself juror No. 13, but I think those
21  numbers have changed, and I think he's the fellow who was
22  sitting next to the juror that is going on the trip.  I'm
23  tempted to say something funny, but I usually --
24      MR. ROCCO: Regret it?
25      THE COURT: I usually regret it; so I won't, and it

1  may not even be funny.  So, okay.
2      So you tell me when you'd be ready.  Look through the
3  charges.
4      There is one other thing, which I don't know if it's
5  going to be possible to happen, but very early yesterday
6  morning, it turns out, before trial, a very dear friend of mine
7  passed away.  So there is a memorial service today at 1:00,
8  which I'm toying with whether I could go or not and then come
9  back.
10      So I think, realistically, I'd be out of the office
11  from 11:30 to, the latest I think would be 3:30.  So, first, I
12  want to see if it would be okay with you.  What we would do in
13  the interim is, I would, first of all, tell the jury I'll be
14  out, and they should go about their deliberation business, but
15  that I personally wouldn't be here for that period of time.
16  They should do what they would normally do, and if we get any
17  notes, Christine would text them to me or e-mail them to me.
18  And in the worst case, we wouldn't be able to act on the notes
19  unless we could figure out a way that -- you know, who knows
20  what the note might say.
21      Then, as a backup, I thought I would ask if one of --
22  I don't think it would be necessary -- one of my colleagues to,
23  you know, if there was some sort of emergency that required a
24  judge, to be here or something as a result of one of the notes
25  or whatever, if that's okay with you.

1      So there's a couple of pieces to that, seeking your
2  okay.  I'm not sure I'm going to do it.  The way I would do it
3  is I would get a car, an Uber, or something like that, and have
4  them wait for me at the funeral home.
5      MR. ROCCO: Can we take a moment to talk about that,
6  your Honor?
7      THE COURT: Sure.
8      (Pause)
9      Incidentally, I should add one more thing.  Don't feel
10  obliged to say yes.  No, no, just because you think I'm asking.
11  If you think in any way it could disadvantage Mr. Atilla, then
12  I wouldn't do it.  So only if you're comfortable, from his
13  point of view, would that be okay.
14      MS. FLEMING: Judge, we all think you should go.  What
15  we're debating is we don't think you ought to tell the jury
16  you're not going to be here.  In the event there is no note, no
17  harm, no foul.  If there is a note, we can just deal with it,
18  and if we have to delay something until you get back, we delay
19  it.
20      MR. ROCCO: If there's an emergency, I have no problem
21  having a colleague cover it.
22      THE COURT: Okay.  Sometimes they send nervous if they
23  send a note and then they send another note and say, where's
24  the answer to our note.
25      MR. DENTON: I think for that reason it's probaly

**A739**

HCKPATI1          Trial          Page 2349

1 better, actually, to tell them that the Court will not be
2 available to respond to notes for that time period.
3          THE COURT: No?
4          MS. FLEMING: I don't think they should know you're
5 not going to be here. If there's a note, we'll deal with it or
6 you'll deal with it with them. You're still going to be
7 dealing with the note. I don't want them to feel the pressure
8 of they shouldn't be sending anything out for three or four
9 hours.
10          THE COURT: Okay. I understand that.
11          MR. DENTON: I'll just say, I think the more common
12 situation that this arises is with judges who observe lunch
13 breaks scrupulously, and tell the jury that, you know, from
14 1:00 to 2:00 you should feel free to give any notes you have to
15 the marshal, but you should be aware but the parties will not
16 be available and the Court will not be available to respond to
17 them until 2:00.
18          This is just a slightly longer version of that, and so
19 I don't think there's any reason to tell them don't send out
20 notes, but I think informing them that the Court and the
21 parties will not be able to address them seems reasonable so
22 that they're not wondering what is going on.
23          THE COURT: Okay. Well, I'll think about it.
24          MS. FLEMING: The reason I just don't like that,
25 Judge, is I don't want to discourage them from sending a note.

HCKPATI1          Trial          Page 2350

1          THE COURT: I see your point.
2          MR. HARRISON: Just the other thing, Judge, is they
3 could conceivably, during that time, send out a note that we
4 could deal, with even though your Honor is not physically here.
5 If they say we would like to see exhibit whatever, we could get
6 on the phone with you, if necessary, and agree that we can send
7 the exhibit in or whatever so things could still get done. And
8 that's a common type of note to get during the early hours.
9          THE COURT: Okay. So you probably should run that by
10 Mr. Atilla, too.
11          MS. FLEMING: Yes, we will.
12          THE COURT: Okay. So, yes, that's it. You'll let me
13 know when you're ready to talk about the charges.
14          (Pause)
15          THE COURT: Did you get copies yet?
16          MS. FLEMING: We have one set, Judge.
17          MR. ROCCO: One.
18          THE COURT: I'll give you each two.
19          MR. ROCCO: Thank you, Judge.
20          MR. DENTON: Thank you, Judge.
21          (Pause)
22          THE COURT: Do you mind going into the robing room
23 because there's press and audience outside.
24          MR. ROCCO: Sure.
25          MS. FLEMING: Do you want us to review it first and

HCKPATI1          Trial          Page 2351

1 then go in?
2          THE COURT: I'm going to go downstairs; so you can be
3 there. Actually, I suppose you could stay here. We'll just
4 keep them out.
5          MS. FLEMING: Okay.
6          THE COURT: You should know that these are live. I
7 didn't realize.
8          MS. FLEMING: So I can't yell at Mr. Rocco?
9          (Pause)
10          THE COURT: Are you guys all set?
11          MR. ROCCO: Just a little bit, your Honor.
12          THE COURT: Okay. I think the only changes in there
13 are the ones we agreed to yesterday.
14          (Pause)
15          (In open court; jury not present)
16          THE COURT: Please be seated. So as is my practice,
17 we had the balance of the jury charge conference in the robing
18 room without a stenographer, and it is also my practice to
19 allow the parties to indicate for the record, with the
20 stenographer, any objections that they have remaining to the
21 jury instructions that I'm about to read to the jury. So we'll
22 start with the defense, and you may state any objections that
23 you have.
24          Before you do, Mr. Rocco, I indicated to the parties
25 off the record and now on the record, I don't know if it was on

HCKPATI1          Trial          Page 2352

1 the record before, that there has been an application for a
2 mistrial, and I endorsed the defense application today and
3 asked for a government written response by 5:00 p.m. today.
4          No. 2, I told the parties that there would be a
5 written decision today or tomorrow, certainly whenever there's
6 time, no later than tomorrow, with respect to the jailhouse
7 conversations of Mr. Zarrab.
8          And with that, Mr. Rocco, if there are no objections,
9 that means that the parties agreed with the instructions, with
10 the exception of those that they may have objections to.
11          MR. ROCCO: Thank you, your Honor. So on page 46 --
12 these are lengthy; so I will read them slowly -- at the bottom
13 of the page --
14          THE COURT: You have to speak into the microphone, I
15 think.
16          MR. ROCCO: At the bottom of the page, on page 46, we
17 object to the language at the end of the first full paragraph
18 on the page and ask that the last sentence of that paragraph,
19 starting "In addition" -- the sentence starting "In addition"
20 should be stricken, and the sentence that should be stricken
21 reads: "In addition, during the relevant time period, the
22 sanctions allowed penalties against foreign financial
23 institutions with bank accounts in the United States if those
24 foreign financial institutions violated certain rules on
25 assisting transactions with or for the benefit of Iran."

**A740**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1          On --
2          THE COURT: May I make this suggestion?  Without
3  waiving any rights, would you be comfortable just reading the
4  language that you think should be in, instead of saying "on
5  page" or do you want to do it page by page?
6          MR. ROCCO: It's easier for me to do it that way.
7          THE COURT: Okay.
8          MR. ROCCO: Because that's how I noted it.
9          THE COURT: Okay.  No problem.
10          MR. ROCCO: I'll do it as quickly as I can.
11          THE COURT: No problem.
12          MR. ROCCO: On the next page, page 47, after the
13  enumerated -- the paragraph starting "Third," we would like to
14  add a paragraph denominated "fourth," saying:  "Fourth, that
15  the activity for which the defendant is charged had some
16  connection to the United States either by involving a United
17  States person in the conduct or by causing goods, services or
18  technology to be exported or re-exported from the United States
19  as part of the defendant's scheme.  In other words, the
20  violative conduct has to go through the United States.  A
21  United States correspondent account not connected to the
22  conduct at issue is not enough."
23          And at the end of the next paragraph, starting, "as I
24  have mentioned," adding a full sentence saying:  "Conspiring to
25  do activity that is merely sanctionable is not a crime."

1          On page 48, at the end of the first full paragraph,
2  add this sentence:  "If you find Mr. Atilla did not know the
3  transactions were sent through the U.S., then you must acquit
4  him on the charge of conspiring to export U.S. services to Iran
5  or to the government of Iran."
6          On page 49, at the end of the first full paragraph,
7  starting "Second," add the sentence:  "Mere statements that
8  fail to disclose sanctionable activity are not sufficient to
9  convict because they are not transactions within the meaning of
10  the evasion avoidance regulation."
11          And the sentence starting the third paragraph on the
12  page:  "Beginning on July 31, 2012," the word "required" should
13  be changed to "permitted."
14          On the following page, at the end of the paragraph --
15  I'm sorry, at the end of the runover paragraph, following the
16  words "the government of Iran," adding the sentence:  "Two
17  things to keep in mind:  First, the activity I just described
18  could only get a person sanctioned, not convicted of a crime;
19  and second, if the purchaser or acquirer was a private Iranian
20  individual or company, it would not be sanctionable."
21          At the end of the next paragraph, add the following
22  sentence:  "The conduct I have just described would have, at
23  most, led to the financial institution being sanctioned, not
24  convicted of a crime, and if the conduct was conducted with the
25  proceeds of sales of natural gas by Iran, it would not have

1  been sanctionable."
2          At the end of the next paragraph, which starts
3  "beginning on July 1st, 2013," at the end of that paragraph add
4  the language:  "In this period, if the foreign financial
5  institution facilitated the payment for the sale of gold before
6  July 31st, 2013, it would not have been sanctionable or
7  prosecutable, even if the shipment of gold occurred after
8  July 1, 2013."
9          And following that, striking the language starting
10  with "Fourth" through the first runover paragraph onto page 51,
11  and that's it, your Honor.  Thank you for your patience.
12          THE COURT: Very well.  Anybody else from the defense?
13          MR. HARRISON: Just one second, please, your Honor.
14          (Pause)
15          Judge, just for the record, it's already in the
16  record, but we do object to the conscious avoidance charge.
17          THE COURT: Yes.  How about the government?
18          MR. DENTON: The government requests that the Court
19  retain the so-called Pinkerton instruction originally included
20  in the instructions at pages 29 to 31 distributed this morning.
21  Obviously, the Court's instruction is a correct statement of
22  the applicable law.  We think it's particularly appropriate in
23  this case, where it is an entirely appropriate conclusion for
24  the jury to reach that bank fraud and money laundering, as
25  substantive offenses, were the reasonably foreseeable acts in

1  co-conspirators in furtherance of the charged conspiracies,
2  both to obstruct the enforcement of the sanctions laws and to
3  violate the IEEPA.
4          THE COURT: So in the conference that we had, I agreed
5  with the defense to delete that instruction.  Among other
6  reasons, I thought it was very complicated for jurors or any of
7  us to grasp, and I just thought it would cause more confusion
8  than not.
9          I take it the government is opposed to the changes
10  suggested by Mr. Harrison and Mr. Rocco?
11          MR. DENTON: Yes, your Honor.  We believe the
12  conscious avoidance instruction is appropriate, and that the
13  Court's instructions on IEEPA is an accurate statement of the
14  law.
15          THE COURT: Is the defense in disagreement with the
16  removal of the so-called Pinkerton charge?
17          MR. ROCCO: We agree with the removal of the Pinkerton
18  charge.
19          THE COURT: You agree with the removal.
20          MR. ROCCO: Yes.
21          THE COURT: So I think that's it.  We worked fast, but
22  not that fast.  So we're retyping the corrections to the
23  instructions, and when that's ready, we'll call in the jury.
24          MS. FLEMING: There were still just two issues that we
25  had to discuss, one was the one we discussed before that you

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1  asked us to discuss with the client. He's fine with it. He
2  has no issues.
3      THE COURT: Okay. Great.
4      MS. FLEMING: And the second was that we had requested
5  a curative instruction. We don't think it cures the issue that
6  was before the jury, and we would move for a mistrial. We
7  can't agree on the language.
8      THE COURT: Was that in your motion?
9      MS. FLEMING: No. We don't think it cures it, but if
10 the Court is considering doing a curative instruction, it's the
11 last clear chance.
12     THE COURT: Did you discuss that with the government?
13     MS. FLEMING: We showed what we would propose as
14 language.
15     THE COURT: Hold on one second. So did you agree
16 with --
17     MR. DENTON: Your Honor, there's one sentence in the
18 proposed instruction that we disagree with.
19     I'll also note that, I think, that given that early in
20 the Court's charge you instruct them that questions are not
21 evidence and that, in particular, any question that was
22 objected to or stricken should not be considered, that a
23 separate instruction is not necessary.
24     THE COURT: Right. So, why don't you take a look at
25 her language and see if there is consensus. I think that it's

1  hard to say without seeing the written opposition to the
2  motion. As a gut reaction, gut-level reaction, one question
3  asked and not answered and objected to and the objection
4  granted and directed the question be stricken from the record,
5  in my experience, certainly is adequate, along with what I say
6  in these instructions generally. But if you both can agree on
7  something, we have a couple of minutes. Since we don't have
8  the instructions done yet, I'd be happy to consider it.
9      MR. HARRISON: Judge, I just had a couple more
10 quick --
11     THE COURT: One second.
12     (Pause)
13     MR. ROCCO: Your Honor, so we spent a minute talking
14 about the proposed curative instruction. We discussed it
15 before we had our conference on the charge. We cannot agree.
16 I can give you what our proposed language is.
17     THE COURT: I'll take a look, but I think I'm going to
18 rely on -- well, first, I'm going to see the opposition, but as
19 I said before, one question that hasn't been answered and that
20 was directed be stricken from the record, I can't imagine --
21 there may be some question that could give rise to a mistrial
22 but certainly not that one, in my opinion.
23     MR. ROCCO: Well, that's the issue we addressed in the
24 letter, and we understand that, your Honor.
25     THE COURT: Right.

1      MR. ROCCO: But we think the question was a peculiar
2  question, and that's why we raised it to the Court.
3      THE COURT: Okay. I'll hear you. I'll take what you
4  have.
5      MR. ROCCO: We didn't write it out for your Honor, or
6  I can give you by hand. You're a wise man, Judge. We'll write
7  it out. Thank you.
8      THE COURT: That's it. Store is closed.
9      MR. HARRISON: Judge?
10     THE COURT: Store is closed, Mr. Harrison.
11     MR. HARRISON: I just wanted to put on the record a
12 couple of objections that we discussed, just quick ones that we
13 discussed, for the record.
14     THE COURT: Okay.
15     MR. HARRISON: On page 16 of the current draft, we had
16 requested that the second sentence on the "Foreign Evidence
17 Admitted" section be struck.
18     On page 42, defense had requested that in the run-on
19 sentence at the top of page 42, that either the words
20 "improper" or "unlawful" be inserted before "purpose."
21     And then on page 52, we had asked that the first full
22 sentence be stricken, the sentence that starts "The defendant
23 does not have to know" because it's our understanding that,
24 under IEEPA, the defendant does have to know that it's
25 unlawful.

1      THE COURT: Okay. Thanks a lot. So give me a couple
2  of minutes, and we'll see what we can do.
3      (Recess)
4      THE COURT: We're going to call in the jury now.
5      (Jury present)
6      THE COURT: Great. Please be seated, everybody. As I
7  mentioned to you yesterday, and as I'm about to give the jury
8  instructions, I am going to give a complete set to each of you
9  to take into the jury room at the conclusion of this portion of
10 the trial.
11     So, ladies and gentlemen of the jury, you've now heard
12 all of the evidence in the case, as well as the final arguments
13 of the lawyers for the parties.
14     My duty at this point is to instruct you as to the
15 law. It is your duty to accept these instructions of law and
16 apply them to the facts as you determine them, just as it has
17 been my duty to preside over the trial and decide what
18 testimony and what evidence is relevant under the law for your
19 consideration.
20     On these legal matters, you must take the law as I
21 give it to you. If any attorney has stated a legal principle
22 different from any that I state in my instructions, it is my
23 instructions that you must follow.
24     You should not single out any instruction as alone
25 stating the law, but you should consider my instructions as a

**A742**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCKPATI1 | Charge | Page 2361 |
|---|---|---|

1 whole when you retire to deliberate in the jury room. As I
2 mentioned, you will receive a copy of these instructions
3 verbatim, along with a verdict sheet to be filled out by the
4 jury to take with you into the jury room. Your decision, or
5 your verdict, must be unanimous.
6      You should not, any of you, be concerned about the
7 wisdom of any rule that I state, regardless of any opinion that
8 you may have as to what the law may be or ought to be. It
9 would violate your sworn duty to base a verdict upon any other
10 view of the law than the one I give you.
11      Your role, as I've said before, is to consider and
12 decide the fact issues in this case. You, the members of the
13 jury, are the sole and exclusive determiners of the facts. You
14 pass upon the evidence. You determine the credibility or
15 believability of the witnesses. You resolve whatever conflicts
16 may exist in the testimony. You draw whatever reasonable
17 inferences and conclusions you decide to draw from the facts as
18 you have determined them, and you determine the weight of the
19 evidence.
20      In determining the facts, you must rely upon your own
21 independent recollection of the evidence. What the lawyers
22 have said in their opening statements, in their closing
23 arguments, in their objections, or in their questions is not
24 evidence. Nor is anything I may have said during the trial or
25 may say during these instructions about a fact issue, to be

| HCKPATI1 | Charge | Page 2362 |
|---|---|---|

1 taken instead of your own independent recollection.
2      What I say is not evidence. In this connection,
3 remember that a question put to a witness is never evidence.
4 Only the answer is evidence. But you may not consider any
5 answer as to which I sustained an objection or that I directed
6 you to disregard or that I directed be struck from the record.
7      If there is any difference or contradiction between
8 what any lawyer has said in their arguments to you and what you
9 decide the evidence showed, or between anything I may have said
10 and what you decide the evidence showed, it is your view of the
11 evidence, not the lawyers' and not mine, that controls.
12      I also ask you to draw no inference from the fact that
13 upon occasion I may have asked questions of certain witnesses.
14 These questions were intended only for clarification or to move
15 things along, and certainly were not intended to suggest any
16 opinions on my part as to the verdict you should render or
17 whether any of the witnesses may have been more credible than
18 any of the other witnesses. It is important that you
19 understand that I wish to convey no opinion as to the verdict
20 you should render in this case and that if you, nevertheless,
21 believe that I did convey an opinion, you should not, in any
22 way, follow it.
23      In determining the facts, you must weigh and consider
24 the evidence without regard to sympathy, prejudice or passion
25 for or against any party, and without regard to what the

| HCKPATI1 | Charge | Page 2363 |
|---|---|---|

1 reaction of the parties or the public to your verdict may be.
2 I will later discuss with you how to pass upon the credibility
3 of witnesses.
4      I remind you that the indictment in this case is not
5 evidence. It merely describes the charges made against the
6 defendant. It is a set of accusations. It may not be
7 considered by you as evidence of the guilt of the defendant.
8 Only the evidence, or lack of evidence, decides that issue.
9      A copy of the statutory allegations in the indictment
10 will be furnished to you when you begin your deliberations. In
11 summary, the counts set forth in the indictment allege as
12 follows:
13      Count One charges that from at least in or about 2010,
14 up to and including in or about 2015, the defendant,
15 Mr. Atilla, participated in a conspiracy to defraud the United
16 States. It is alleged that the defendant agreed with others to
17 impair, impede and obstruct the lawful and legitimate
18 governmental functions and operations of the United States
19 Department of the Treasury, in violation of what's called Title
20 18, United States Code, Section 371.
21      That's a summary. These are each going to be
22 summaries of the counts set forth in the indictment.
23      Count Two charges that, from at least in or about
24 2010, up to and including in or about 2015, the defendant
25 participated in a conspiracy to violate a license, order,

| HCKPATI1 | Charge | Page 2364 |
|---|---|---|

1 regulation or prohibition issued pursuant to the International
2 Emergency Economic Powers Act, referred to in this trial as
3 IEEPA, I-E-E-P-A.
4      Count Three charges, in summary, that from at least in
5 or about 2010, up to and including in or about 2015, the
6 defendant engaged in the substantive offense of bank fraud.
7      I'm going to explain the difference between a
8 substantive offense and conspiracy offenses in a couple of
9 minutes.
10      Count Four charges that, from at least in or about
11 2010, up to and including in or about 2015, the defendant
12 participated in a conspiracy to commit bank fraud.
13      Count Five charges that, from at least in or about
14 2010, up to and including in or about 2015, the defendant
15 engaged in the substantive count of money laundering.
16      Count Six charges that, from at least in or about
17 2010, up to and including 2015, the defendant participated in
18 the conspiracy to commit money laundering. Six counts.
19      The evidence from which you are to decide what the
20 facts are in this case consists of, first, the sworn testimony
21 of witnesses on both direct and cross-examination; two, the
22 documents and exhibits that were received in evidence; and
23 three, any stipulations of testimony. Nothing else is
24 evidence.
25      You should draw no inference or conclusion, for or

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

 1  against, any party by reason of lawyers making objections or my
 2  rulings on such objections. Counsel have not only the right
 3  but the duty to make legal objections when they think that such
 4  objections are appropriate. You should not be swayed for or
 5  against either side simply because counsel for any party has
 6  chosen to make an objection. Nor should you be swayed by any
 7  ruling I made on an objection. Whether or not I may have
 8  sustained more objections for one side or the other has no
 9  bearing on your function to consider all of the evidence that
10  was admitted.
11        Further, do not concern yourself with what was said at
12  sidebar conferences or during my discussions with counsel. Nor
13  does it make any difference whether any lawyer or I asked for a
14  sidebar conference. Those discussions related to rulings of
15  law and not to matters of fact.
16        At times, I may have admonished a lawyer or a witness
17  or directed a witness to be responsive to questions or to keep
18  his or her voice up. At times, I may have questioned a witness
19  myself or made comments to a lawyer. Any questions that I
20  asked or instructions or comments that I gave were intended
21  only to move things along or to clarify the presentation of
22  evidence and to bring out something which I thought was
23  unclear.
24        You should draw no inference or conclusion of any
25  kind, favorable or unfavorable, with respect to any witness or

 1  the defendant, you must find the defendant not guilty.
 2        I have said that the government must prove the
 3  defendant guilty beyond a reasonable doubt, and the question
 4  naturally is: What is reasonable doubt? The words almost
 5  define themselves. It is a doubt based upon reason and common
 6  sense. It is a doubt that a reasonable person has after
 7  carefully weighing all of the evidence. It is a doubt which
 8  would cause a reasonable person to hesitate to act in a matter
 9  of importance in his or her own life.
10        Proof beyond a reasonable doubt must, therefore, be
11  proof of such a convincing character that a reasonable person
12  would not hesitate to rely and act upon it in the most
13  important of his or her own affairs. A reasonable doubt is not
14  a caprice or a whim. It is not a speculation or a suspicion.
15  It is not an excuse to avoid the performance of an unpleasant
16  duty, and it is not sympathy.
17        In a criminal case, the burden is, at all times, upon
18  the government to prove guilt beyond a reasonable doubt. The
19  law does not require the government to prove guilt beyond all
20  possible doubt. Proof beyond a reasonable doubt is sufficient
21  to convict. The burden never shifts to the defendant, which
22  means that it is always the government's burden to prove each
23  of the elements of the crimes charged beyond a reasonable
24  doubt.
25        If, after fair and impartial consideration of all of

 1  any party in the case by reason of any comment, any question or
 2  any instruction of mine. Nor should you infer that I have any
 3  views as to the credibility of any witness, as to the weight of
 4  the evidence, or as to how you should decide any issue that is
 5  before you. That is entirely your role.
 6        The defendant has pleaded not guilty to the charges in
 7  the indictment. As a result of his plea of not guilty, the
 8  burden is upon the prosecution, which is to say the government,
 9  to prove the defendant's guilt beyond a reasonable doubt. This
10  burden never shifts to the defendant for the simple reason that
11  the law never imposes upon a defendant in a criminal case any
12  burden or duty of testifying himself or calling any witnesses
13  or of locating or producing any evidence.
14        The law presumes the defendant to be innocent of the
15  charges against him. I, therefore, instruct you that the
16  defendant is to be presumed by you to be innocent when the
17  trial began and throughout your deliberations and until such
18  time, if it comes, that you, as a jury, are unanimously
19  satisfied that the government has proved him guilty beyond a
20  reasonable doubt.
21        The presumption of innocence alone is sufficient to
22  acquit the defendant unless you, as jurors, are unanimously
23  convinced beyond a reasonable doubt of his guilt, after a
24  careful and impartial consideration of all of the evidence in
25  this case. If the government fails to sustain its burden as to

 1  the evidence, you have a reasonable doubt, it is your duty to
 2  acquit the defendant. On the other hand, if, after a fair and
 3  impartial consideration of all of the evidence, you are
 4  satisfied of the defendant's guilt beyond a reasonable doubt,
 5  you should vote to convict.
 6        You have had the opportunity to observe all the
 7  witnesses, including the expert witnesses, and it is now your
 8  job to decide how believable each witness was in his or her own
 9  testimony. You are the sole determiners of the credibility of
10  each witness and of the importance of witness testimony.
11        So how do you determine where the truth lies? You
12  should use all the tests for truthfulness that you would use in
13  determining matters of importance to you in your everyday
14  lives. You should consider any bias or hostility that a
15  witness may have shown for or against any party, as well as any
16  interest the witness has in the outcome of the case. It is
17  your duty to consider whether the witness has permitted any
18  such bias or interest to color his or her testimony.
19        You should consider the opportunity that the witness
20  had to see, hear, and know the things about which they
21  testified, the accuracy of their memory, their candor or lack
22  of candor, their intelligence, their reasonableness and
23  probability of their testimony, and its consistency, or lack of
24  consistency, and its corroboration, or lack of corroboration,
25  with other believable testimony.

# A744

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

HCKPATI1          Charge          Page 2369

1      You watched the witnesses testify. Everything a
2  witness said or did on the witness stand counts in your
3  determination. How did the witness appear? What was the
4  witness' demeanor while testifying? Often, it is not what
5  people say, but how they say it that moves us.
6      In deciding whether to believe a witness, keep in mind
7  that people sometimes forget things. You need to consider,
8  therefore, whether in such a situation the witness' testimony
9  reflects an innocent lapse of memory or an intentional
10 falsehood, and that may depend on whether it has to do with an
11 important fact or with only a small detail. It is not the
12 number of witnesses called in a case but, rather, their
13 credibility when called to the witness stand that is directly
14 at issue.
15      In addition, the fact that a witness may be employed
16 as a law enforcement official does not mean that his or her
17 testimony is deserving of more or less consideration, or a
18 greater or lesser weight, than that of an ordinary witness.
19      If you find that any witness has willfully testified
20 falsely as to a material fact, that is to say an important
21 matter, the law permits you to disregard completely the entire
22 testimony of that witness upon the principle that one who
23 testifies falsely about one material fact, is likely to testify
24 falsely about everything.
25      You are not required, however, to consider such a

HCKPATI1          Charge          Page 2370

1  witness as totally unworthy of belief. You may accept so much
2  of the witness' testimony as you deem true and disregard what
3  you feel is false. As the sole judges of the facts, you must
4  decide which of the witnesses you will believe, what portion of
5  their testimony you accept and what weight you will give to it.
6      You've heard from the government witness, Reza Zarrab,
7  who testified that he actually committed crimes in the past,
8  including the crimes charged in the indictment in this case.
9      The government argues, as it is permitted to do, that
10 it must take its witnesses as it finds them. It argues that
11 frequently only people who themselves take part in criminal
12 activity have the knowledge required to show criminal behavior
13 by others.
14      For those very reasons, the law allows the use of
15 testimony by people who have committed crimes. Indeed, it is
16 the law in federal courts that such testimony may be enough, in
17 and of itself, for a conviction, if the jury finds that the
18 testimony establishes guilt of the defendant beyond a
19 reasonable doubt.
20      However, it is also the case that such testimony is of
21 such a nature that it must be scrutinized with great care and
22 viewed with particular caution when you decide how much of the
23 testimony to believe.
24      I've given you some general instructions on
25 credibility, and I will not repeat them all here. However, let

HCKPATI1          Charge          Page 2371

1  me say a few things to consider during your deliberations on
2  the subject of testimony from a cooperating witness.
3      You should ask yourselves whether the witness would
4  benefit more by lying or by telling the truth. Was the
5  witness' testimony made up in any way because the witness
6  believed or hoped that he would somehow receive favorable
7  treatment by testifying falsely? Or did the witness believe
8  his interests would best be served by testifying truthfully?
9  If you believe that the witness was motivated by hopes of
10 personal gain, was the motivation one that would cause him to
11 lie, or was it one that would cause him to tell the truth? Did
12 these motivations color the witness' testimony?
13      You should look at all of the evidence in deciding
14 what credence and what weight, if any, you want to give to the
15 witness' testimony.
16      Also, you heard testimony about an agreement between
17 the government and the cooperating witness. I must caution you
18 that it is of no concern of yours why the government made an
19 agreement with the witness. Your sole concern is whether a
20 witness has given truthful testimony, in part or in whole, here
21 in this courtroom before you.
22      There has been evidence introduced at trial that the
23 government used, and that was Mr. Huseyin Korkmaz, as a
24 confidential source in this case. I instruct you that there is
25 nothing improper in the government's use of confidential

HCKPATI1          Charge          Page 2372

1  sources and, indeed, certain criminal conduct never would be
2  detected without the use of such confidential sources.
3      You, therefore, should not concern yourself with how
4  you personally feel about the use of confidential sources
5  because that is really beside the point. Put another way, your
6  concern is to decide whether the government has proved the
7  guilt of the defendant beyond a reasonable doubt, regardless
8  of whether the evidence was obtained by the use of confidential
9  sources.
10      On the other hand, where confidential sources testify,
11 as happened here, the testimony must be examined with greater
12 scrutiny than the testimony of an ordinary witness. You should
13 consider whether the confidential source received any benefits
14 or promises from the government which would motivate them to
15 testify falsely against the defendant. For example, they may
16 believe that they will only continue to receive these benefits
17 if they produce evidence of criminal conduct.
18      If you decide to accept their testimony, after
19 considering it in the light of all the evidence in the case,
20 then you may give it whatever weight, if any, you find it
21 deserves.
22      You've also heard testimony from what we call expert
23 witnesses. They included Lisa Palluconi, she testified as to
24 Iran sanctions, as an Iran sanctions program as an expert;
25 also, Mark Dubowitz testified about Iran and Iranian sanctions

**A745**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCKPATI1 | Charge | Page 2373 |
|---|---|---|

1 as an expert; Anush Djahanbani, D-j-a-h-a-n-b-a-n-i, testified
2 as a foreign language expert, the language was Farsi; and
3 Bulent Bulut, B-u-l-u-t, also a foreign language expert
4 testified about Turkish language.
5      An expert is allowed to express his or her opinion on
6 matters about which he or she has specialized knowledge or
7 training. Expert testimony is presented to you on the theory
8 that someone who is experience in the field can assist you in
9 understanding the evidence or in reaching an independent
10 decision on the facts.
11      In weighing the expert's testimony, you may consider
12 the expert's qualifications, his or her opinions, his or her
13 reasons for testifying, as well as all of the other
14 considerations that ordinarily apply when you are deciding
15 whether to believe a witness' testimony.
16      You may give expert testimony whatever weight, if any,
17 you find it deserves in light of all of the evidence in this
18 case. You should not, however, accept this witness testimony,
19 the expert witness' testimony, merely because he or she is an
20 expert. Nor should you substitute it for your own reason,
21 judgment and common sense. The determination of the facts in
22 this case rests solely with you, the jurors.
23      There are two kinds of evidence; one is called direct
24 and the other circumstantial. Direct evidence is direct proof
25 of a fact, such as testimony by a witness about what that

| HCKPATI1 | Charge | Page 2374 |
|---|---|---|

1 witness personally experienced through his or her own senses,
2 which is to say something seen, felt, touched, heard or tasted.
3 Direct evidence may also be in the form of an exhibit, where
4 the fact to be proven is its present existence or condition.
5      Circumstantial evidence is evidence which tends to
6 prove a disputed fact by proof of other facts. There's the
7 simple example of circumstantial evidence which I use, and
8 others do also, other judges do, as well, and it goes something
9 like this.
10      Assume that when you came into the courthouse this
11 morning, the sun was shining and it was a nice day. Assume
12 that the courtroom blinds were drawn, as they are, and you
13 could not look outside. But assume further that, as you are
14 sitting here, someone walks into the courtroom with an umbrella
15 that is dripping wet, and then a few minutes later another
16 person also were to enter the courtroom, let's assume, with a
17 wet umbrella. Now, you cannot look outside the courtroom on
18 the facts that I gave you because the blinds are drawn, and so
19 you cannot see whether or not it's raining for yourselves. So
20 you have no direct evidence of that fact. But on the
21 combination of facts which I suggested to you and asked you to
22 assume, it would be reasonable for you to conclude that it had
23 been raining.
24      That is all there is to circumstantial evidence. You
25 infer on the basis of reason and experience and common sense

| HCKPATI1 | Charge | Page 2375 |
|---|---|---|

1 from one established fact the existence or non-existence of
2 some other fact.
3      The matter of drawing inferences from facts in
4 evidence is not a matter of guesswork or speculation. An
5 inference is a logical, factual conclusion which you might
6 reasonably draw from other facts that have been proved.
7      Circumstantial evidence is of no less value than
8 direct evidence, and the law makes no distinction between
9 direct evidence and circumstantial evidence, but simply
10 requires that your verdict must be based on all the evidence
11 presented.
12      You have heard testimony about evidence that was
13 recovered as a result of a foreign, in this case Turkish,
14 investigation. This evidence was properly admitted into this
15 case and may be properly considered by you. Whether you
16 approve or disapprove of how it was obtained should not enter
17 into your deliberations because I now instruct you that the use
18 of this evidence is entirely lawful. However, it is up to you,
19 the jurors, to decide the weight, if any, to be provided by any
20 foreign evidence.
21      We have, among the exhibits received in evidence, some
22 documents that are redacted. Redacted means that part of the
23 document or recording was taken out, and you are to concern
24 yourself only with the part of the item that has been admitted
25 into evidence. You should not consider any possible reasons

| HCKPATI1 | Charge | Page 2376 |
|---|---|---|

1 why the other part of it has been deleted.
2      The defendant is, as reflected in the summary of
3 counts that I mentioned earlier, charged in what are referred
4 to as two substantive counts, and substantive counts are
5 contrasted with what are called conspiracy counts, and they are
6 as follows:
7      The two substantive counts are found in Count Three,
8 which charges the defendant with the substantive offense of
9 bank fraud, and Count Five, which charges the defendant with
10 the substantive offense of money laundering.
11      For purposes of ease of your understanding of these
12 instructions, as will become hopefully clear, I'm starting with
13 the substantive counts and then following with the conspiracy
14 counts. So there are two substantive counts and then four
15 conspiracy counts, and I'll deal with them in that order. It's
16 a little bit different order than is set forth in the
17 indictment.
18      Although, as you've heard, this is not the order in
19 which the counts are presented in the indictment, the ordering
20 of the counts is of no legal significance in these
21 instructions. So starting with the two substantive counts, and
22 this is true of all of the counts, they are somewhat detailed;
23 so bear with me.
24      Bank fraud, that's found in Count Three of the
25 indictment. It's the substantive count. Count Three charges

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

HCKPATI1  Charge  Page 2377

1  that from, at least in or about 2010, up to and including in or
2  about 2015, the defendant executed and attempted to execute a
3  scheme to defraud one or more United States financial
4  institutions and, in particular, HSBC Bank U.S.A., Deutsche
5  Bank Trust Company Americas, UBS Bank U.S.A., BNY Mellon,
6  Citibank, JP Morgan Chase Bank, Bank of America and Wells Fargo
7  Bank.
8      The defendant, as noted, is also charged with a
9  separate count of conspiracy to commit bank fraud, and you
10  should bear in mind that the law relating to bank fraud
11  discussed here will also apply with regard to the conspiracy to
12  commit bank fraud that is charged against the defendant, as
13  will be explained when I discuss that alleged conspiracy.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

HCK3ATI2  Jury Charge  Page 2378

1      THE COURT: So that in fact is why I put the
2  substantive counts first, because they, in two instances of the
3  two counts, they also come up in conspiracies later on. So
4  what I explain in connection with the substantive counts will
5  also apply with the conspiracy that relates to those two
6  counts.
7      So here are the elements of bank fraud. To meet its
8  burden of proof with respect to bank fraud, the government must
9  prove beyond a reasonable doubt three essential elements which
10  I'll explain to you in some detail.
11      The first element of bank fraud is this: The first
12  element that the government has to prove beyond a reasonable
13  doubt is that the defendant executed or attempted to execute a
14  scheme or artifice to defraud a bank, and here the banks again
15  are HSBC Bank U.S.A., Deutsche Bank Trust Company of the
16  Americas, UBS Bank U.S.A., BNY Mellon, Citibank, JPMorgan Chase
17  Bank, Bank of America, and Wells Fargo Bank, or, this is in the
18  alternative, (2) that he executed or attempted to execute a
19  scheme or artifice to obtain money owned by or under the
20  custody and control of one or more of such banks, by means of
21  false or fraudulent pretenses, representations or promises that
22  were material to the scheme.
23      So let me say that again so you can follow it perhaps
24  a little more easily.
25      The first element that the government must prove

HCK3ATI2  Jury Charge  Page 2379

1  beyond a reasonable doubt is that the defendant (1) executed or
2  attempted to execute a scheme or artifice to defraud a bank,
3  the banks that I listed before, or (2) that he executed or
4  attempted to execute a scheme or artifice to obtain money owned
5  by or under the custody and control of one or more of such
6  banks by means of false or fraudulent pretenses,
7  representations or promises that were material to the scheme.
8      Before I define these terms for you, let me explain
9  that the government needs to prove either of these two
10  alternatives, one or two, that there existed a scheme or
11  artifice to defraud a bank, or that there was a scheme or
12  artifice to obtain money, funds, credits or asset under the
13  custody or control of that bank by means of fraudulent
14  pretenses, representations or promises. These two concepts are
15  not necessarily mutually exclusive. If you find that either
16  one of the schemes or artifices or both existed, then the first
17  element of bank fraud is satisfied. However, you must be
18  unanimous in your view as to the type of scheme or artifice
19  that existed.
20      Let me explain these terms. A "scheme or artifice" is
21  simply a plan, device or a course of conduct to accomplish an
22  objective.
23      A "scheme to defraud a bank" is a pattern or course of
24  conduct designed to deceive a bank into releasing money or
25  property. It is a term that embraces all possible means --

HCK3ATI2  Jury Charge  Page 2380

1  however ingenious, clever or crafty -- by which a person seeks
2  to gain some improper advantage. For example, a scheme to
3  defraud can be accomplished through trickery, deceit,
4  deception, or swindle. It includes intentional
5  misrepresentation and false suggestion, suppression or
6  concealment of the truth.
7      The second of the two types of schemes mentioned
8  includes one to obtain a bank's money by means of a false or
9  fraudulent pretense, representations or promises. The
10  government must show that these false or fraudulent pretenses,
11  representations or promises were directed at the bank with the
12  intention of deceiving it. The misrepresentations may be
13  written, oral, or arise from a course of conduct intended to
14  communicate false facts to the bank. The deceptive means that
15  are prohibited are not limited to active misrepresentations or
16  lies told to the bank. Just as affirmatively stating facts as
17  true when the facts are not true may constitute a false
18  representation, the law recognizes that false representations
19  need not be based on spoken or written words alone. The
20  deception may arise from the intentional omission or
21  concealment of facts that make what was written, said or done
22  deliberately misleading.
23      False representations and pretenses must be material.
24  We use the word "material" to distinguish between the kinds of
25  statements we care about and those that are of no real

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1 importance. So a material fact is one which reasonably would
2 be expected to be capable of influencing a reasonable and
3 prudent person relying on the statement in making a decision.
4 That means that if you find a particular statement of fact to
5 have been untruthful, before you can find that statement or
6 omission to be material, you must also find that the statement
7 or omission was one that would have been capable of influencing
8 a reasonable person in making such a decision. Actual reliance
9 by the bank on the representations is not required. It is
10 sufficient if the misrepresentation is one that is capable of
11 influencing the bank's decision and is intended to do so.
12     In order to establish the existence of a scheme, the
13 government is not required to establish that the scheme
14 actually succeeded -- that is, that a schemer realized any gain
15 from the scheme or that the intended victim suffered any loss.
16 The issue is whether there was such a scheme. Thus, it is not
17 necessary for the government to prove that the scheme
18 succeeded, just that the scheme was devised and employed.
19     If you find that the government has sustained its
20 burden of proof that a scheme to defraud a bank or to obtain
21 money by false pretenses did exist as charged, you next should
22 consider the second element of bank fraud. And that is as
23 follows:
24     To meet its burden of proof with respect to the bank
25 fraud, the second element that the government must prove beyond

1 a reasonable doubt is that the defendant executed, attempted to
2 execute, or participated in the scheme, knowingly, willfully,
3 and with specific intent to defraud the bank or to obtain money
4 owned or possessed by the bank, or under the bank's custody or
5 control.
6     To act with "intent to defraud" means to act willfully
7 and with intent to deceive.
8     The government is not required to prove that the
9 defendant intended permanently to deprive the banks of their
10 property or that the banks suffered a loss or that the
11 defendant personally profited by his acts. It is sufficient if
12 the defendant intended through the scheme to defraud to obtain
13 the use of the victim's money or property for a period of time,
14 even if he ultimately intended to return it, or if the
15 defendant intended to obtain the use of the victim's money or
16 property by deliberately depriving them of information that was
17 material to their decision on how to use or invest their money
18 or property.
19     If you find that the defendant did not intend to
20 deprive the banks of their property or that the bank suffered
21 no loss or that the defendant did not profit by his acts, you
22 may consider this evidence in determining whether the defendant
23 had the intent to defraud the banks.
24     To "participate" in a scheme to defraud means to
25 associate oneself with it with a view and intent to make it

1 succeed.
2     An act is done "knowingly" if it is done deliberately
3 and purposefully. That is, a defendant's act must have been
4 the product of his conscious objective, rather than the product
5 of a mistake or accident or mere negligence, carelessness or
6 recklessness or some other innocent reason.
7     And "willfully" means to act with knowledge that one's
8 conduct is unlawful and with the intent to do something the law
9 forbids, that is to say with a bad purpose to disobey or
10 disregard the law.
11     "Unlawfully" means simply contrary to law. A
12 defendant need not have known that he or she was breaking any
13 particular law or any particular rule. A defendant need only
14 have been aware of the generally unlawful nature of his or her
15 acts or plans.
16     I said there were three elements of bank fraud.
17 That's two. Here's the third:
18     To meet its burden of proof with respect to bank
19 fraud, the third and final element that the government must
20 also prove beyond a reasonable doubt is that the banks in
21 question, HSBC Bank U.S.A., Deutsche Bank Trust Company
22 Americas, UBS Bank U.S.A., BNY Mellon, Citibank, JPMorgan Chase
23 Bank, Bank of America and Wells Fargo Bank, that is, the banks
24 that were subject of the scheme or artifice to defraud, were,
25 at the time of the execution or attempted execution of the

1 fraudulent scheme, federally insured financial institutions.
2 This simply means that the banks deposits had to be insured by
3 the United States Federal Deposit Insurance Corporation.
4     The government need not show that the defendant knew
5 that the banks in question were federally insured to satisfy
6 this third element.
7     So that's one count. I said there are six. I said
8 you need patience. So, five to go.
9     So the second count is the second substantive count.
10 After we finish the second count, we'll turn to the conspiracy
11 counts.
12     The second substantive count is found in Count Five of
13 the indictment and it's called money laundering. The second
14 substantive count is money laundering. Count Five of the
15 indictment charges the defendant with unlawfully transporting
16 or attempting to transport funds or monetary instruments to or
17 from the United States, with an intent to promote certain
18 criminal offenses. And that was done in violation of 18,
19 United States Code, Section 1956 (a)(2)(A). This crime is
20 commonly called money laundering.
21     Title 18, United States Code, Section 1956 (a)(2)(A)
22 provides in pertinent part as follows:
23     Whoever transports, transmits, or transfers, or
24 attempts to transport, transmit, or transfer, a monetary
25 instrument or funds from a place outside the United States to a

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1 place in the United States, from or through a place outside the
2 United States, with the intent to promote the carrying on of
3 specified unlawful activity, is guilty of an offense against
4 the United States.
5       Apart from his alleged participation in substantive
6 count of money laundering, as I said before, the defendant is
7 also charged with a separate offense of a conspiracy to commit
8 money laundering which will be discussed later on. You should
9 bear in mind that the law relating to money laundering, that is
10 to say, the substantive elements which I've been going over
11 with you, those elements of money laundering discussed here
12 also apply with regard to the conspiracy to commit money
13 laundering also charged against the defendant.
14       In order to prove the defendant guilty of money
15 laundering, the government must prove beyond a reasonable doubt
16 the following two elements which I will describe in detail:
17       The first element that the government must prove
18 beyond a reasonable doubt is that the defendant transported,
19 transmitted or transferred, or attempted to transport, transmit
20 or transfer, a monetary instrument or funds from a place in the
21 United States to or through a place outside the United States
22 or to a place in the United States from or through a place
23 outside the United States.
24       Second, the government must prove beyond a reasonable
25 doubt that the defendant did so with the intent to promote the

1 carrying out of a specified unlawful activity.
2       I'm going to discuss those two elements in more
3 detail.
4       The first element of money laundering. The first
5 element, which the government must prove beyond a reasonable
6 doubt, is that the defendant transported, transmitted, or
7 transferred or attempted to transport, transmit, or transfer, a
8 monetary instrument or funds from a place in the United States
9 to or through a place outside the United States, or to a place
10 in the United States from or through a place outside the United
11 States.
12       A "monetary instrument" includes, among other things,
13 currency or a coin of the United States, for example U.S.
14 dollars, or any other country, travelers checks, cashiers
15 checks, bank checks, personal checks, investment securities,
16 and other negotiable instruments.
17       "Funds" refers to money or negotiable paper which can
18 be converted into currency.
19       "Transport," "transmit" and "transfer" are not really
20 words that require definition. They are words that have an
21 ordinary, every day meaning.
22       The government need not prove that the defendant
23 physically carried the funds or monetary instruments in order
24 to prove that the defendant is responsible for transporting or
25 transmitting it. All that is required is proof that the

1 defendant caused the funds or monetary instrument to be
2 transported, transmitted, or transferred.
3       I said there were two elements to money laundering.
4 Here's the second one: The second element that the government
5 must prove beyond a reasonable doubt is that the defendant
6 acted with the intent to promote the carrying out of specified
7 unlawful activity.
8       And I instruct you as a matter of law that the term
9 "specified unlawful activity" includes (1) bank fraud and the
10 conspiracy to commit bank fraud, as charged in Counts Three and
11 Four respectively in the indictment, and (2) a conspiracy to
12 violate the IEEPA as charged in Count Two.
13       To act knowingly and intentionally means to act
14 deliberately and purposefully, not by mistake or accident, with
15 a deliberate purpose of promoting, facilitating or assisting
16 the carrying on of the specified unlawful activity, namely
17 here, (i) bank fraud and/or bank fraud conspiracy; and (ii) a
18 conspiracy to violate IEEPA.
19       Now there is a concept that I want to explain to you
20 which is referred to as "aiding and abetting" the substantive
21 offenses of bank fraud and money laundering. So this applies
22 to the two substantive counts which I've just explained to you.
23       With respect to the substantive bank fraud charge,
24 Count Three of the indictment, and the substantive money
25 laundering charge, Count Five of the indictment, I need to

1 instruct you about what is called aiding and abetting the
2 commission of those crimes. Aiding and abetting is an
3 alternative theory on which somebody can be convicted of a
4 substantive crime. In other words, you may also find the
5 defendant guilty of the bank fraud and/or the money laundering
6 counts if you find that he aided and abetted the commission of
7 those crimes.
8       The aiding and abetting statute is Section 2(a) of
9 Title 18 of the United States Code, which provides that:
10       Whoever commits an offense against the United States,
11 or aids, abets, counsel, commands, induces or procures its
12 commission, is punishable as a principal.
13       Under the aiding and abetting statute, it is not
14 necessary for the government to show that defendant himself
15 personally committed the bank fraud or the money laundering
16 with which he is charged in order for you to find him guilty.
17       A person who aids, abet, counsels, commands, induces
18 or procures another to commit an offense is just as guilty of
19 that offense as if he committed it himself.
20       Accordingly, you may find the defendant guilty on the
21 substantive crimes of bank fraud or money laundering if you
22 find beyond a reasonable doubt that the government has proved
23 that another person actually committed the crime, and that
24 defendant knowingly aided and abetted that person in the
25 commission of either of those offenses.

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2389 |
|---|---|---|

1      As you can see, the first requirement is that another
2 person has in fact committed the crime charged. Obviously, no
3 one can be convicted of aiding and abetting the criminal act of
4 another if no crime was committed by the other person in the
5 first place. But if you do find that a crime was committed,
6 then you must consider whether the defendant aided or abetted
7 the commission of that crime. And here we're talking about the
8 two substantive offenses. In order to aid or abet another to
9 commit a crime, it is necessary that the defendant willfully
10 and knowingly associated himself in some way with the crime,
11 and that he willfully and knowingly and with the specific
12 intent required for the commission of the substantive crime
13 seeks by some act to help make the crime succeed.
14      Participation in a crime is willful if action is taken
15 voluntarily and intentionally and with the specific intention
16 to do something that the law forbids, or, in the case of a
17 failure to act, with the specific intent to fail to do
18 something the law requires to be done; that is to say, with a
19 bad purpose, either to disobey or to disregard the law.
20      The mere presence of the defendant where a crime is
21 being committed, even coupled with knowledge by the defendant
22 that a crime is being committed, or the mere acquiescence by
23 the defendant in the criminal conduct of others, even with
24 guilty knowledge, is not sufficient to establish aiding and
25 abetting.

| HCK3ATI2 | Jury Charge | Page 2390 |
|---|---|---|

1      An aider and abettor must have some interest in the
2 criminal venture. You may not infer that the defendant was
3 guilty of participating in criminal conduct merely from the
4 fact that he associated with another person who was guilty of
5 wrongdoing.
6      To determine whether defendant aided or abetted the
7 commission of bank fraud or money laundering, the two
8 substantive counts, ask yourselves these questions:
9      Did he participate in the crime charged as something
10 he wished to bring about? Did he associate himself with the
11 criminal venture, knowingly and willfully and with the specific
12 intent to commit the crime? And did he seek by his actions to
13 make the criminal venture succeed?
14      If the defendant did, then he is an aider and abettor
15 and therefore guilty of the offense. If he did not, then he is
16 not an aider and abettor and is not guilty of that offense.
17      I'm going to pause for a second and catch my breath
18 before we turn to the conspiracy counts.
19      So let's turn to the conspiracy counts, they are
20 charged in Counts One, Two, Four and Six of the indictment.
21 There is four conspiracies charged.
22      Defendant Mr. Atilla is also charged in four
23 conspiracy counts. He's charged in participating in
24 conspiracies to (i) violate federal statutes that make it
25 unlawful to defraud the United States; (ii) violate the

| HCK3ATI2 | Jury Charge | Page 2391 |
|---|---|---|

1 International Emergency Economic Powers Act, IEEPA; (iii)
2 commit bank fraud; and (iv) commit money laundering.
3      Three and four, those are the substantive counts that
4 I addressed earlier.
5      Each of the four conspiracy counts will be discussed
6 in some detail below. It may be helpful when you get in the
7 jury room to read through the indictment when considering these
8 counts. Indeed, that may help you with respect to any or all
9 of the counts, so I encourage you to do that.
10      A conspiracy to commit a crime is an entirely separate
11 and different offense from the substantive crime or crimes that
12 may be the objective of the conspiracy. The essence of the
13 crime of conspiracy is an agreement or understanding to violate
14 the law, and thus, a conspiracy may exist even if it should
15 fail in its purposes.
16      Consequently, in a conspiracy, there is no need to
17 prove that the crime or crimes that were the objective of the
18 conspiracy were actually committed. The point is that the
19 crime or crimes that were the objectives of the conspiracy need
20 not have been actually committed for a conspiracy to exist.
21 So, for example, even if you do not find that the defendant
22 committed the substantive count of bank fraud, you may still
23 find him guilty of committing the alleged conspiracy to commit
24 bank fraud.
25      So the first conspiracy count charges that from at

| HCK3ATI2 | Jury Charge | Page 2392 |
|---|---|---|

1 least in or about 2010, up to and including in or about 2015,
2 the defendant agreed with others to impair, impede, and
3 obstruct the lawful and legitimate governmental functions and
4 operations of the United States Department of Treasury.
5      And with regard to Count One, we refer to Title 18 of
6 the United States Code, Section 371, which provides as follows:
7      If two or more persons conspire to defraud the United
8 States, and one or more of such persons do any act to effect
9 the object of the conspiracy, each is guilty of an offense
10 against the United States.
11      So let's talk about the elements of this first
12 conspiracy. There is going to be three elements.
13      To sustain its burden of proof with respect to the
14 crime of conspiracy to defraud the United States, the
15 government must separately prove beyond a reasonable doubt that
16 follow the following elements:
17      First, the existence of the conspiracy charged, that
18 is, with respect to Count One of the indictment, the existence
19 of an agreement or understanding to impair, impede, obstruct or
20 defeat the lawful and legitimate functions and operations of
21 the United States Department of Treasury; and
22      Two, that the defendant knowingly and willfully became
23 a member of that conspiracy.
24      In addition, with respect to the conspiracy charged in
25 Count One of the indictment, the conspiracy to defraud the

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

1  United States, the government must also prove beyond a
2  reasonable doubt a third element, which is as follows:
3       Third, that some member of the conspiracy, not
4  necessarily the defendant, knowingly committed at least one
5  overt act in furtherance of the conspiracy during the life of
6  the conspiracy.
7       So let's consider these three elements with respect to
8  Count One of the indictment, that Count One conspiracy, we'll
9  consider the three separately.
10      Element one.  The existence of a conspiracy.
11      What is a conspiracy?  A conspiracy is a combination,
12  agreement, or an understanding of two or more persons to
13  accomplish by concerted action a criminal or unlawful purpose.
14  In the first conspiracy, the conspiracy to defraud the United
15  States, the unlawful purpose alleged to have been the object of
16  the conspiracy, which is charged in Count One, was to impair,
17  impede or obstruct the lawful and legitimate governmental
18  functions and operations of the United States Department of
19  Treasury by deceit, craft, or trickery, or means that are
20  dishonest.
21      The gist or essence of the crime of conspiracy is the
22  unlawful combination or agreement to violate the law.  The
23  conspiracies alleged here are the agreements to commit certain
24  crimes, and as I said before, they are entirely distinct and
25  separate offenses from the actual commission of any of the

1  alleged crimes.  In order to show that a conspiracy existed,
2  the evidence must show that two or more persons in some way or
3  manner, through any contrivance, explicitly or implicitly, came
4  to an understanding to violate the law and to accomplish an
5  unlawful plan.
6       To show a conspiracy, the government is not required
7  to show that two or more persons sat around a table and entered
8  into a solemn pact, orally or in writing, stating that they had
9  formed a conspiracy to violate the law and spelling out all of
10  its details.  Common sense tells you that when people in fact
11  agree to enter a criminal conspiracy, much is left to the
12  unexpressed understanding.  It is rare that a conspiracy can be
13  proven by direct evidence of an explicit agreement.
14      It is sufficient if two or more persons in some way or
15  manner, formally or informally, impliedly or tacitly came to a
16  common understanding, a common plan that will violate the law.
17      In determining whether there has been an unlawful
18  agreement as alleged, you may consider the alleged acts and the
19  conduct of the alleged co-conspirators that were done to carry
20  out the criminal purpose.  The adage "actions speak louder than
21  words" applies here.  Often the only evidence that is available
22  with respect to the existence of a conspiracy is that of
23  disconnected acts and conduct on the part of the alleged
24  individual co-conspirators.  When taken all together and
25  considered as a whole, those acts and conduct may warrant the

1  inference that a conspiracy existed as conclusively as would
2  direct proof.
3       So, you must first determine whether or not the proof
4  established beyond a reasonable doubt the existence of the
5  conspiracies as charged in the indictment.  In considering this
6  first element, you should consider all the evidence which has
7  been admitted with respect to the conduct and statements of
8  each of the alleged co-conspirators, and such inferences as may
9  reasonably be drawn from them.  It is sufficient to establish
10  the existence of the conspiracy, if, from the proof of all the
11  relevant facts and circumstances, you find beyond a reasonable
12  doubt that the minds of two alleged co-conspirators met in an
13  understanding way to accomplish, by the means alleged, at least
14  one of the unlawful objectives of the conspiracy.
15      The objects of a conspiracy are the illegal goals the
16  co-conspirators agree or hope to achieve.  Count One charges
17  that the goal or object of the conspiracy was to impair,
18  impede, or obstruct the lawful and legitimate governmental
19  functions and operations of the United States Treasury in its
20  enforcement of economic sanctions laws and regulations against
21  Iran administered by that agency.
22      In order to find the defendant impaired, impeded, or
23  obstructed a legitimate governmental function, you must find
24  beyond a reasonable doubt that the object of the conspiracy was
25  to interfere with or obstruct one of the United States' lawful

1  government functions by deceit, craft or trickery, or by means
2  that are dishonest.  The specific intent to obstruct includes
3  making it more difficult for the government to carry out its
4  lawful functions and that the scheme depend on dishonest or
5  deceitful means.  Actual contact between the defendant and an
6  official of the United States government is not an element of
7  the crime, nor is it necessary for you to find that the
8  government was subjected to any loss of money or property as a
9  result of the conspiracy.  It is also not necessary for you to
10  find that the impairment violated any separate law.  What is
11  required is that the object of the conspiracy was to interfere
12  with or obstruct one of the United States lawful governmental
13  functions by deceit, craft or trickery, or by means that are
14  dishonest.
15      As I will explain in more detail when we come to Count
16  Two, the United States has imposed economic sanctions or legal
17  restrictions on trade and transactions involving the Islamic
18  Republic of Iran.  The United States Department of Treasury
19  administers and enforces these laws, including two offices
20  called the Office of Foreign Assets Control, often referred to
21  by its initials OFAC, and the Office of Terrorism and Financial
22  Intelligence.
23      I instruct you, as a matter of law, that the
24  administration of the economic sanctions against the Islamic
25  Republic of Iran constitutes a legitimate function of the

**A751**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,                                    December 20, 2017

 1  government of the United States.
 2       Element two.  Membership in the conspiracy.
 3       If you conclude that the government has proven beyond
 4  a reasonable doubt that the conspiracy charged in Count One of
 5  the indictment existed, you must next determine whether the
 6  defendant has been shown beyond a reasonable doubt to have
 7  participated in the conspiracy with knowledge of its unlawful
 8  purposes and in furtherance of its unlawful objectives.
 9       To satisfy its burden, the government must prove
10  beyond a reasonable doubt that the defendant knowingly,
11  willfully and unlawfully entered into the conspiracy, into the
12  agreement, and that he did so with a criminal intent, that is,
13  with a purpose to violate the law, and that he agreed to take
14  part in the conspiracy to promote and cooperate in its unlawful
15  objectives.
16       I've previously defined the terms "knowingly,"
17  "willfully," and "unlawfully," and those same definitions apply
18  here.
19       Before a defendant can be found to have been a
20  conspirator, you must first find that he or she knowingly
21  joined the unlawful agreement or plan.  The key question is
22  whether the defendant joined the conspiracy with an awareness
23  of at least some of the basic aims and purposes of the unlawful
24  agreement.
25       Knowledge is often a matter of inference from proven

 1  facts.  We cannot look into a person's mind and know what that
 2  person is thinking.  It is not necessary that a defendant be
 3  fully informed as to all the details of the conspiracy in order
 4  to justify an inference of guilty knowledge on his or her part.
 5  To have knowledge of the conspiracy, a defendant need not have
 6  known the full extent of the conspiracy or all of its
 7  activities or all of its participants.  Nor is it necessary
 8  that a defendant know every other member of the conspiracy.  In
 9  fact, a defendant may know only one other member of the
10  conspiracy, and still be a co-conspirator.  Nor is it necessary
11  that a defendant receive any monetary benefit from
12  participating in the conspiracy or have a financial stake in
13  the outcome, as long as he in fact participated in the
14  conspiracy in the manner I have explained.  If you find that
15  the defendant has a financial stake in the outcome of the
16  alleged conspiracy, then you may consider that as a factor in
17  deciding whether he was a member of the conspiracy.
18       For the co-conspirators to have acted with specific
19  intent to deceive or defraud means that they must have known of
20  the fraudulent nature of the scheme and acted with the intent
21  that it succeed.  In other words, to act with an intent to
22  defraud means to act knowingly and with a specific intent to
23  deceive, ordinarily, but not necessarily, for the purpose of
24  causing some loss to another or to bring some gain to oneself.
25       It is not required that the government show that the

 1  co-conspirators, in addition to knowing what they were doing
 2  and deliberately doing it, also knew that they were violating
 3  some particular federal statute.
 4       Let me say that again.
 5       It is not required that the government show that the
 6  co-conspirators, in addition to knowing what they were doing
 7  and deliberately doing it, also knew that they were violating
 8  some particular federal statute.  But the co-conspirators must
 9  have acted with the intent to help carry out some essential
10  step in the execution of the scheme to defraud that is alleged
11  in the indictment.
12       The question of a co-conspirator's intent is a
13  question of fact that you are called upon to decide, just as
14  you determine any other fact at issue.  Intent to defraud
15  involves the state of a person's mind, and the purpose with
16  which he acted at the time of the acts in question and at the
17  time they occurred.  Direct proof of knowledge and fraudulent
18  intent is almost never available, and is not required to find
19  that such proof existed.  It would be a rare case where it
20  could be shown that a person wrote or stated that as of a given
21  time in the past he committed an act with fraudulent intent.
22  Such direct proof is not required.
23       The ultimate facts of knowledge and criminal intent,
24  though subjective, may be established by circumstantial
25  evidence based on a person's outward manifestations, his or her

 1  words, his or her conduct, his or her acts, and all the
 2  surrounding circumstances disclosed by the evidence, and the
 3  rational or logical inferences that may be drawn therefrom.
 4  Circumstantial evidence, if believed, is, as I noted before, of
 5  no less value than direct evidence.
 6       Hold on.
 7       Relevant in this regard may be the conduct of the
 8  persons you find to be members of the conspiracies charged,
 9  which, in light of the other evidence in the case, may tend to
10  prove knowledge, intent, or willfulness.  Thus, for example,
11  you may consider as relevant any conduct engaged in by the
12  co-conspirators which has the effect of concealing their
13  activities, including false statements made to others
14  concerning material facts or false notations and reports or
15  other documents submitted to others concerning material facts.
16  All are conduct from which willfulness may be inferred.
17       On the other hand, you may consider any evidence that
18  the co-conspirators engaged in certain activities openly and
19  without an attempt to conceal or voluntarily and honestly
20  brought their full involvement to light as evidence of a lack
21  of willfulness.
22       The duration and extent of a defendant's participation
23  in a conspiracy has no bearing on the issue of defendant's
24  guilt.  A defendant need not have joined the conspiracy at the
25  outset.  A defendant may have joined it for any purpose at any

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

HCK3ATI2      Jury Charge      Page 2401

1 time in its progress, and that defendant will still be held
2 responsible for all that was done before that defendant joined,
3 and all that was done during the conspiracy's existence while
4 the defendant was a member.
5      Each member of a conspiracy may perform separate and
6 distinct acts and may perform them at different times. Some
7 conspirators play major roles, while others play minor roles in
8 the scheme. An equal role is not what the law requires. In
9 fact, even a single act may be sufficient to draw defendant
10 within the ambit of the conspiracy.
11      However, I want to caution you that mere association
12 by one person with one who is a conspirator does not make that
13 person, the first person, a member of the conspiracy, even when
14 he or she knows that a conspiracy is taking place. Mere
15 presence at the scene of a crime, even when coupled with
16 knowledge that a crime is taking place, is not sufficient to
17 support a conviction of that crime. In other words, knowledge
18 without participation is not sufficient to convict a person of
19 conspiracy. What is required or necessary is that the
20 defendant, the alleged conspirator, participated in the
21 conspiracy with knowledge of its unlawful purposes, and with an
22 intent to aid in the accomplishment of its unlawful objective.
23      In sum, the government has the burden to prove beyond
24 a reasonable doubt that the defendant, with an understanding of
25 the unlawful character of the conspiracy, must have

HCK3ATI2      Jury Charge      Page 2402

1 intentionally engaged, advised, or assisted in them for the
2 purpose of furthering an illegal undertaking. The government
3 has the burden to prove beyond a reasonable doubt that the
4 defendant thereby became a knowing and willing participant in
5 the unlawful agreement -- that is to say, a conspirator.
6      A conspiracy, once formed, is presumed to continue
7 until either its objective is accomplished or there is some
8 other affirmative act of termination by its members. So, too,
9 once a person is found to be a member of a conspiracy, that
10 person is presumed to continue being a member in the venture
11 until the venture is terminated, unless it is shown by some
12 affirmative proof that the person withdrew and disassociated
13 himself from it.
14      Element three of the first conspiracy which we're
15 still considering. This is the third element. And with
16 respect only to this conspiracy, that is to say the conspiracy
17 to defraud the United States as set forth in Count One of the
18 indictment, the government must show beyond a reasonable doubt
19 that at least one overt act was committed in furtherance of the
20 conspiracy to defraud the United States as set forth in Count
21 One of the indictment by at least one of the co-conspirators,
22 and was committed in the Southern District of New York.
23      I instruct you, as a matter of law, that Manhattan
24 falls within the geographic boundaries of the Southern District
25 of New York.

HCK3ATI2      Jury Charge      Page 2403

1      The purpose of the overt act requirement, which
2 applies in this first conspiracy, but not in the others --
3 we'll get to that -- but the purpose of the overt act
4 requirement in Count One of the indictment is that the law
5 requires there to have been something more than mere agreement
6 to reach a conviction of this conspiracy. There must also be
7 some overt act or action that must have been taken by at least
8 one of the conspirators in furtherance of the conspiracy. If
9 you find that an overt act has been committed, you must be
10 unanimous as to which act it was. You must find that the
11 government has proven beyond a reasonable doubt that one of the
12 members of the charged conspiracy, not necessarily the
13 defendant in this case, took some step or action in furtherance
14 of the conspiracy in the Southern District of New York at some
15 point in time during the life of the conspiracy. In
16 determining whether an overt act occurred within the Southern
17 District of New York, you need not find that any co-conspirator
18 was physically present within this district, as long as you
19 find that some overt act in furtherance of the conspiracy
20 occurred within the district.
21      The overt act element is a requirement that the
22 agreement went beyond the mere talking stage, the mere
23 agreement stage. The requirement of an overt act is a
24 requirement that some action be taken during the life of the
25 conspiracy by one of the co-conspirators to further the

HCK3ATI2      Jury Charge      Page 2404

1 conspiracy.
2      You are further instructed that the overt act need not
3 have been committed at precisely the time alleged in the
4 indictment. It is sufficient if you are convinced beyond a
5 reasonable doubt that it occurred at or about the time and
6 place stated, as long as it occurred while the conspiracy was
7 still in existence.
8      You should bear in mind that the overt act, standing
9 alone, may be an innocent, lawful act. Frequently, however, an
10 apparently innocent act loses its harmless character if it is a
11 step in carrying out, promoting, aiding or assisting the
12 conspiratorial scheme.
13      Let's talk a minute about the time of a conspiracy.
14 The indictment charges that the conspiracy charged in Count
15 One, and, for that matter, Counts Two, Four and Six, and all
16 the conspiracies, occurred from at least in or about 2010, up
17 to and including in or about 2015. It is not essential that
18 the government prove that the conspiracies started and ended on
19 those specific dates. Indeed, it is sufficient if you find
20 that in fact the charged conspiracies were formed and that they
21 existed for some time within the period set forth in the
22 indictment, and with respect to Count One, that at least one
23 overt act occurred in the conspiracy to defraud the United
24 States, and that it was committed in furtherance of the charged
25 conspiracy within that time period.

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2405 |
|---|---|---|

1     One down in the conspiracy area. Now I'm turning to
2 the second conspiracy alleged in the indictment.
3     This is called a conspiracy to violate a license,
4 order, regulation, or prohibition pursuant to the International
5 Emergency Economic Powers Act, IEEPA. And it is set forth in
6 Count Two of the indictment.
7     Count Two of the indictment charges the defendant with
8 participating in a conspiracy from at least in or about 2010 up
9 to and including in or about 2015 to violate a license, order,
10 regulation, or prohibition issued pursuant to the International
11 Emergency Economic Powers Act, otherwise known as IEEPA.
12     Under the authority of IEEPA, among other things, the
13 United States has adopted certain restrictions called economic
14 sanctions on transactions with or involving the Islamic
15 Republic of Iran. Among other things, these sanctions prohibit
16 causing the export of a service directly or indirectly to Iran
17 or the government of Iran from the United States or by a United
18 States person. In addition, during the relevant time period,
19 the sanctions allowed penalties against foreign financial
20 institutions with bank accounts in the United States if those
21 foreign financial institutions violated certain rules on
22 assisting transactions with or for the benefit of Iran.
23     I've already instructed you as to what a conspiracy is
24 and how you should go about determining whether one existed and
25 whether the defendant knowingly joined and participated in it,

| HCK3ATI2 | Jury Charge | Page 2406 |
|---|---|---|

1 and those same principles apply to Count Two as they did to
2 Count One. However, no overt act is required for this second
3 conspiracy count. One was required for the first conspiracy.
4 It is not required for not second conspiracy.
5     As I've stated, the object of the conspiracy charged
6 in Count Two is the violation of IEEPA. A violation of IEEPA
7 has itself the following elements:
8     First, the violation of any license, order,
9 regulation, or prohibition issued pursuant to IEEPA; and
10     Second, that the violation was committed willfully; and
11     Third, that the Office of Foreign Assets Control,
12 OFAC, had not issued a license to engage in the charged
13 transactions.
14     As I've mentioned, you need not find that a
15 substantive violation of the IEEPA actually occurred, only that
16 the defendant knowingly and willfully participated in a
17 conspiracy to engage in conduct that would have violated IEEPA.
18     Let's talk a minute about license, order, regulation,
19 and prohibitions. In order to prove that the defendant
20 conspired to commit an IEEPA offense, the government must prove
21 that defendant agreed with others to violate a license, order,
22 regulation or prohibition issued pursuant to IEEPA. I instruct
23 you that the following orders, regulations, and prohibitions
24 were in effect at all times relevant to Count Two:
25     First, orders, regulations, or prohibitions issued

| HCK3ATI2 | Jury Charge | Page 2407 |
|---|---|---|

1 pursuant to IEEPA provided that the exportation, reexportation,
2 sale or supply, directly or indirectly, from the United States
3 or by a United States person, wherever located, of any goods,
4 technology or services to Iran, or the government of Iran, is
5 prohibited unless the transaction was for the export of
6 agricultural commodities, medicine and medical devices or was
7 authorized by a license from OFAC. In this regard, I instruct
8 you that the execution of dollar denominated money transfers
9 from the United States on behalf of another, whether or not
10 performed for a fee, constitutes the exportation of a service.
11 Services may be provided indirectly, for example, if funds are
12 transferred to Iran on or behalf of an Iranian person or
13 business through an intermediary, or if they are transferred to
14 a third party for the benefit of, or on behalf of, the
15 government of Iran, or if they are transferred to a third party
16 acting as an agent of the government of Iran.
17     The government of Iran means the state and the
18 government of the Islamic Republic of Iran as well as any
19 political subdivision, agency, or instrumentality of the
20 government of the Islamic Republic of Iran, including the
21 Central Bank of Iran, and the National Iranian Oil Company,
22 also referred to as NIOC. The government of Iran also includes
23 any entity or business owned or controlled directly or
24 indirectly by the government of Iran, and any person acting or
25 purporting to act directly or indirectly for or on behalf of

| HCK3ATI2 | Jury Charge | Page 2408 |
|---|---|---|

1 the government of the Iran.
2     I was instructing you that the following orders,
3 regulations and prohibitions were in effect at the times
4 relevant to this Count Two, and that was the first set of
5 orders, regulations, or prohibitions that were in effect.
6     The second set of orders, regulations, or prohibitions
7 issued pursuant to IEEPA prohibited any transaction that evades
8 or avoids, has the purpose of evading or avoiding, causes a
9 violation of or attempts to violate, any of the prohibitions
10 I've just described as well as any conspiracy formed to violate
11 those prohibitions.
12     And third, it includes orders, regulations or
13 prohibitions issued pursuant to the IEEPA required the U.S.
14 Secretary of the Treasury to prohibit a foreign financial
15 institution's use of correspondent banking accounts or
16 so-called payable-through bank accounts in the United States,
17 or to impose strict conditions on the use of correspondent
18 banking accounts or payable-through accounts in the United
19 States, if the foreign financial institution knowingly
20 conducted or facilitated certain types of financial
21 transactions with Iran, or for the benefit of the government of
22 Iran.
23     Beginning on July 31, 2012, the U.S. Secretary of the
24 Treasury was required to impose sanctions against any person if
25 there was a determination that the person materially assisted,

**A754**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2409 |
|---|---|---|

1 sponsored or provided financial, material or technological
2 support for or goods or services in support of NIOC, the
3 National Iranian Oil Company, NICO, Naftiran Intertrade
4 Company, or the Central Bank of Iran, or the purchase or
5 acquisition of United States bank notes or precious metals by
6 the government of Iran.
7        And beginning on or about February 6, 2013, the U.S.
8 Secretary of Treasury was required to impose sanctions against
9 foreign financial institutions if the foreign financial
10 institutions knowingly conducted or facilitated any financial
11 transaction with respect to the sale or purchase of petroleum
12 or petroleum products to or from Iran, unless the funds were
13 used only for bilateral trade between the foreign country and
14 Iran with any funds owed to Iran deposited in an account within
15 that foreign country, and unless the transaction was for the
16 export of agricultural commodities, medicine or medical
17 devices.
18        Then beginning on July 1, 2013, the United States
19 Secretary of the Treasury was required to impose sanctions
20 against any person if there were a determination that the
21 person who sold, supplied or transferred, directly or
22 indirectly, precious metals directly or indirectly to or from
23 Iran.
24        We're still under the category I was giving you
25 instances of licenses, orders, regulations, etc. There is a

| HCK3ATI2 | Jury Charge | Page 2410 |
|---|---|---|

1 fourth category that includes any transaction which avoided,
2 had the purpose of avoiding, caused a violation of, or
3 attempted to violate any of the prohibitions that I have
4 already described, or any conspiracy formed to violate any of
5 the prohibitions, was prohibited.
6        Under this last or this fourth provision or category,
7 the government must establish that the conspirators agreed to
8 engage in transactions for the purpose of avoiding the
9 prohibition. It is not necessary for the government to prove
10 that the conspirators' only reason for agreeing to engage in
11 the transaction was to avoid the prohibition. It is sufficient
12 if it was a dominant reason for the conspirators to have agreed
13 to engage in the transaction. By the same token, it is not
14 necessary for the foreign financial institutions to have been
15 sanctioned before the conspirators agreed to engage in the
16 transaction for the purpose of evading or avoiding the
17 prohibitions that could result in the imposition of sanctions.
18 It is sufficient if the conspirators believed that the
19 sanctions could be imposed, and acted in that belief in
20 agreeing to engage in a transaction or transactions designed to
21 avoid the imposition of those sanctions. In other words,
22 avoiding the imposition of sanctions by unlawfully concealing
23 the true nature of a transaction would violate the prohibition
24 on evading or avoiding the prohibition.
25        The second element of an IEEPA violation is that the

| HCK3ATI2 | Jury Charge | Page 2411 |
|---|---|---|

1 defendant acted willfully. A defendant acts willfully if he
2 acted intentionally and purposefully with the intent to do
3 something the law forbids, that is, with bad purpose to disobey
4 or to disregard the law. And here, it would be to violate the
5 U.S. embargo on certain transactions with Iran. However, the
6 government does not need to prove that the defendant was aware
7 of the specific law or rule that his conduct would violate.
8 The defendant does not have to know that his conduct would
9 violate a particular law, executive order or federal
10 regulation, but he must act with the bad purpose to disobey or
11 disregard the law.
12        And the third element that the government must prove
13 to establish the IEEPA conspiracy is that at the time of the
14 transactions at issue, the defendant had not obtained a license
15 to conduct such transactions from the Department of Treasury's
16 Office of Foreign Assets Control, or OFAC.
17        With regard to this, I've said it before, but with
18 regard to this second conspiracy, no overt act is required. So
19 unlike the case of the Count One conspiracy, where, as I said,
20 an overt act must be proven, it is not necessary for the
21 government to prove the commission of any overt act in
22 furtherance of the conspiracy to violate IEEPA set forth in
23 Count Two, as long as the government proves that the conspiracy
24 charged in Count Two existed, and that the defendant was a
25 knowing and intentional member of that conspiracy.

| HCK3ATI2 | Jury Charge | Page 2412 |
|---|---|---|

1        A defendant's conduct -- we're talking now about the
2 IEEPA conspiracy -- is not willful if it was the result of a
3 good-faith understanding that he was acting within the
4 requirements of the law. A defendant may not be held liable
5 for a violation of IEEPA if the defendant acted, or chose not
6 to act, in a good-faith belief that he was complying with the
7 licenses, orders, regulations, or prohibitions issued pursuant
8 to IEEPA.
9        In other words, if you find that the defendant acted
10 in good faith, then he may not be convicted of a conspiracy to
11 violate IEEPA.
12        We move along to the next conspiracy, next two
13 conspiracies, the bank fraud conspiracy and the money
14 laundering conspiracy.
15        The bank fraud conspiracy is set forth in Count Four
16 of the indictment. Count Four of the indictment charges the
17 defendant with participating in a conspiracy to commit bank
18 fraud. In summary, Count Four charges that from at least in or
19 about 2010, up to and including in or about 2015, the defendant
20 agreed with others to execute a scheme to defraud a United
21 States financial institution, namely HSBC Bank U.S.A., Deutsche
22 Bank Trust Company Americas, UBS Bank U.S.A., BNY Mellon,
23 Citibank, JPMorgan Chase Bank, Bank of America, and Wells Fargo
24 Bank.
25        I've already instructed you as to what a conspiracy is

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2413 |
| --- | --- | --- |

1 and how you should go about determining whether one existed and
2 whether the defendant knowingly joined and participated in it.
3 Those same principles apply to Count Four as they did to Counts
4 One and Two. And it is not necessary in a bank fraud
5 conspiracy for the government to prove an overt act was
6 committed.
7      The object of the conspiracy charged in Count Four is
8 bank fraud in violation, as we've discussed, of Title 18,
9 United States Code, Section 1344, and I've already explained to
10 you the elements of bank fraud when we discussed Count Three at
11 the beginning. You should rely on those instructions in
12 connection with Count Four, the conspiracy to commit bank fraud
13 as well.
14      And now moving to money laundering conspiracy, which
15 is Count Six of the indictment. I'll turn to the money
16 laundering conspiracy charged in Count Six. I've already
17 instructed you as to what a conspiracy is and how you should go
18 about determining whether one existed and whether the defendant
19 knowingly joined and participated in it. Those same principles
20 apply to Count Six. It is not necessary in a money laundering
21 conspiracy for the government to prove an overt act was
22 committed.
23      The object of the conspiracy charged in Count Six is
24 money laundering in violation of Title 18, United States Code,
25 Section 1956 (a)(2)(A), and I've already explained the elements

| HCK3ATI2 | Jury Charge | Page 2414 |
| --- | --- | --- |

1 of money laundering to you when discussing Count Five at the
2 beginning of these instructions. It was actually the second
3 count that we talked about. You should rely on those
4 instructions in connection with Count Six as well.
5      I remind you that the crime of conspiracy to violate
6 federal law is an independent offense. It is separate from the
7 actual violation of any specific federal laws. You may find
8 defendant guilty of the crime of conspiracy to commit money
9 laundering, even if you find that the money laundering itself
10 that was an object of the conspiracy was not actually
11 committed.
12      Now we're going to talk about something called
13 conscious avoidance.
14      So this relates to the conspiracy counts, the four
15 conspiracy counts that I've talked to you about, and the
16 concept of knowledge. I need to say one more thing about that
17 concept of knowledge.
18      In determining whether the defendant acted with the
19 necessary knowledge, you may consider whether the defendant
20 deliberately closed his eyes to what otherwise would have been
21 clear. I've told you before that acts done knowingly must be a
22 product of a defendant's conscious intention, not the product
23 of carelessness or negligence, for example.
24      A person, however, cannot willfully blind himself to
25 what is obvious and disregard what is plainly before him. A

| HCK3ATI2 | Jury Charge | Page 2415 |
| --- | --- | --- |

1 person may not intentionally remain ignorant of facts that are
2 material and important to his conduct in order to escape the
3 consequences of the criminal law.
4      If you find beyond a reasonable doubt that the
5 defendant intentionally participated in a conspiracy, but that
6 the defendant deliberately and consciously avoided learning or
7 confirming certain facts about the specific objectives of the
8 conspiracy, then you may infer from his willful and deliberate
9 avoidance of knowledge that the defendant understood the
10 objectives or goals of the conspiracy.
11      We refer to this notion of blinding yourself to what
12 is staring you in the face as "conscious avoidance." An
13 argument of conscious avoidance, however, is not a substitute
14 for proof. It is simply another fact you may consider in
15 deciding what the defendant knew.
16      There is a difference between knowingly participating
17 in a conspiracy, on the one hand, and knowing the object or
18 objects or the purpose or purposes of the conspiracy on the
19 other. Conscious avoidance cannot be used as a substitute for
20 finding that the defendant knowingly joined the conspiracy,
21 that is, that the defendant knew that he was becoming a party
22 to an agreement to accomplish an alleged illegal purpose. It
23 is in fact logically impossible for a defendant to join a
24 conspiracy unless he knows the conspiracy exists. The
25 defendant must know that the conspiracy is there.

| HCK3ATI2 | Jury Charge | Page 2416 |
| --- | --- | --- |

1      However, in deciding whether the defendant knew the
2 objectives of the conspiracy, you may consider whether the
3 defendant was aware of a high probability that an objective of
4 the conspiracy was to commit the crime or crimes charged in the
5 object of the conspiracy, and nevertheless participated in the
6 conspiracy. You must judge from all of the circumstances and
7 all of the proof whether the government did or did not satisfy
8 its burden of proof beyond a reasonable doubt.
9      So, in other words, if you find that the defendant was
10 aware of a high probability that a fact was so, and that the
11 defendant acted with deliberate disregard of the facts, you may
12 find that the defendant acted knowingly. However, if you find
13 that the defendant actually believed the fact was not so, then
14 he may not have acted knowingly with respect to whatever charge
15 you are considering.
16      So those are the six crimes or charges alleged in the
17 indictment.
18      We have some more general instructions and we're
19 almost there.
20      As I noted at the beginning, the defendant is charged
21 in six counts in the indictment. Each count charges the
22 defendant with a different crime. You must consider each count
23 of the indictment separately, and you must return a separate
24 verdict on each count. The case on each count stands or falls
25 upon the proof or lack of proof on that count. Your verdict on

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2417 |
| --- | --- | --- |

1 any count should not control your decision on any other count.
2     In addition to all of the elements that I've been
3 describing to you as elements of the various crimes we've been
4 talking about, alleged crimes, with respect to each count
5 charged in the indictment, you must consider the issue of
6 venue, namely, whether any act in furtherance of the unlawful
7 activity occurred within the Southern District of New York. As
8 I said before, the Southern District of New York includes
9 Manhattan.
10     If the crime charged was committed in more than one
11 district, venue is proper in any district in which the crime
12 was begun, continued or completed. And thus, venue will lie in
13 the Southern District of New York if you find that any part of
14 the crime took place here.
15     The government's burden of proof with respect to
16 establishing venue under each count of the indictment is by
17 what we call a preponderance of the evidence. With respect to
18 venue, it's not proof beyond a reasonable doubt, it is by
19 preponderance of the evidence. To prove something by a
20 preponderance of the evidence means to prove that something is
21 more likely true than not true. This only applies to venue.
22 It is determined by considering all the evidence and deciding
23 which evidence is more convincing. If the evidence appears to
24 be equally balanced or if you cannot say on which side it
25 weighs heavier, you decide the issue of venue against the

| HCK3ATI2 | Jury Charge | Page 2418 |
| --- | --- | --- |

1 government. If you find that venue has not been proven, then
2 you must find the defendant not guilty as to that particular
3 count.
4     Your verdict must be based solely on the evidence
5 presented in this courtroom in accordance with my instructions.
6 You must disregard completely any report that you may have read
7 in the press, seen on TV or on the internet, or heard on the
8 radio, assuming there were any. Indeed, it would be unfair to
9 consider such reports since they are not evidence, and the
10 parties have no opportunity to contradict their accuracy or
11 otherwise address them. In short, it would be a violation of
12 your oath as jurors to allow yourselves to be influenced in any
13 manner by such publicity.
14     You've heard evidence during the trial that witnesses
15 have discussed the facts of the case and their testimony with
16 the lawyers before the witnesses appeared in court. Although
17 you may consider that fact when you are evaluating a witness's
18 credibility, you should keep in mind that there is nothing
19 either unusual or improper about a witness meeting with lawyers
20 before testifying so that the witness can be aware of the
21 subjects he or she will be questioned about, focus on those
22 subjects, and have the opportunity to review relevant exhibits
23 before being questioned about them. Such consultation helps
24 conserve your time and the Court's time. And in fact, it would
25 be unusual for a lawyer to call a witness without having such a

| HCK3ATI2 | Jury Charge | Page 2419 |
| --- | --- | --- |

1 consultation beforehand.
2     Again, the weight you give to the fact or the nature
3 of the witness's preparation for his or her testimony and what
4 inferences you draw from such preparation are matters
5 completely within your discretion.
6     In this case you've heard evidence in the form of
7 stipulations of testimony. A stipulation of testimony is an
8 agreement among the parties that, if called as a witness, the
9 person would have given certain testimony. You must accept as
10 true the fact that the witness would have given that testimony.
11 However, it is for you, the jurors, to determine the effect to
12 be given that testimony.
13     Recordings of conversations and transcripts of those
14 recordings have been admitted into evidence in this case. In
15 connection with these recordings, you heard testimony that
16 parts, if not all of the conversations, were in Turkish. For
17 that reason, it was necessary to obtain translations of those
18 conversations into English. These transcripts were admitted
19 into evidence. Remember that the jury is the ultimate fact
20 finder, and as with all of the evidence, you may give the
21 transcripts such weight, if any, as you believe they deserve.
22     The defendant in a criminal case never has any duty to
23 testify or come forward with any evidence. This is because, as
24 I've told you, the burden of proof beyond a reasonable doubt
25 remains with the government at all times, and the defendant is

| HCK3ATI2 | Jury Charge | Page 2420 |
| --- | --- | --- |

1 presumed innocent. In this case, the defendant did testify,
2 and he was subject to cross-examination like other witnesses.
3 You should examine and evaluate the testimony of the defendant
4 just as you would the testimony of any witness.
5     In determining whether the government has proven the
6 charges beyond a reasonable doubt, you should not consider the
7 question of possible punishment in the event you were to find
8 the defendant guilty of one or more of the counts. Under our
9 system, sentencing or punishment is exclusively the function of
10 the Court, it is not your concern, and you should not give any
11 consideration to that issue in determining what your verdict
12 will be.
13     Let's talk about charts, summaries, and drawings for a
14 moment. Some charts, summaries, and drawings were shown to you
15 to make the other evidence more meaningful and to aid you in
16 considering that evidence. They are no better than the
17 testimony or the documents upon which they are based, and are
18 not themselves independent evidence. Therefore, you are to
19 give no greater consideration to these charts, summaries or
20 drawings than you would give to the evidence upon which they
21 are based.
22     It is for you to decide whether the charts, summaries
23 or drawings correctly present the information in the testimony
24 or the documents on which they were based. You're entitled to
25 consider the charts, summaries and drawings if you find that

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,

December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2421 |
| --- | --- | --- |

1 they are of assistance to you in analyzing the evidence and
2 understanding the evidence.
3        You've heard testimony about evidence that was seized
4 in various searches. Evidence obtained from these searches was
5 properly admitted in this case and may be properly considered
6 by you. Whether you approve or disapprove of how it was
7 obtained should not enter into your deliberations, because I
8 now instruct you that the government's and the defense's use of
9 this evidence is entirely lawful.
10        Under your oath as jurors, you are not to be swayed by
11 sympathy. You are to be guided solely by the evidence in the
12 case and the crucial question that you must ask yourselves as
13 you sift through this evidence is has the government proven its
14 case beyond a reasonable doubt. You are to determine this
15 solely on the basis of the evidence and subject to the law as I
16 have charged you.
17        You've heard the testimony of various members or past
18 members of law enforcement. The fact that a witness may be or
19 was employed by the government as a law enforcement official or
20 employee does not mean that his or her testimony is necessarily
21 deserving of more or less consideration or greater or lesser
22 weight than that of an ordinary witness. At the same time, it
23 is quite legitimate for counsel to try to attack the
24 credibility of a law enforcement witness on the grounds that
25 his or her testimony may be colored by a personal or

| HCK3ATI2 | Jury Charge | Page 2422 |
| --- | --- | --- |

1 professional interest in the outcome of the case.
2        It is your decision, after reviewing all of the
3 evidence, whether to accept the testimony of the law
4 enforcement or government employee witnesses, as it is with
5 every other type of witness, and to give to that testimony the
6 weight you find it deserves.
7        So now, ladies and gentlemen, you're about to go into
8 the jury room and begin your deliberations. All of the
9 evidence and exhibits will be given to you at the start of
10 deliberations.
11        If you want any of the testimony read back or
12 recording of an exhibit played, you may request that also. But
13 please remember that if you do ask for testimony, the reporter
14 must search through his or her notes, the court reporter, and
15 the lawyers must agree on what portions of testimony may be
16 called for. And if they disagree, then I must resolve those
17 disagreements. That can be a time-consuming process. So
18 please try to be as specific as you possibly can in requesting
19 portions of the testimony, if in fact you do.
20        Your request for testimony, and in fact any
21 communication with the Court, should be made to me in writing,
22 and signed by your foreperson -- I'm going to come back to the
23 foreperson in a minute -- and given to one of the marshals
24 outside the jury room.
25        In any event, do not tell me or anyone else how the

| HCK3ATI2 | Jury Charge | Page 2423 |
| --- | --- | --- |

1 jury stands on any issue until after a verdict is reached.
2        Many of you have taken notes during parts of the
3 trial. Please recall my earlier instruction regarding note
4 taking. It is entirely appropriate. Notes can be useful to
5 focus a note taker's attention and may aid the recollection of
6 the note taker, but they are not evidence. Notes should be
7 used solely to refresh the note taker's recollection of the
8 testimony, and are not a substitute for the transcript of the
9 testimony which has been taken down verbatim by the court
10 reporter.
11        And please remember that if notes were taken of the
12 lawyers' arguments, the lawyers' arguments are not evidence.
13        The government, to prevail, must prove the essential
14 elements of any crime charged beyond a reasonable doubt as has
15 been explained in these instructions. If it succeeds, your
16 verdict should be guilty. If it fails, your verdict should be
17 not guilty.
18        A verdict must be unanimous. Your verdict must
19 represent the considered judgment of each juror; whether your
20 verdict is guilty or not guilty, it must be unanimous.
21        Your function is to weigh the evidence in the case and
22 determine whether the defendant is guilty or not guilty solely
23 upon the basis of such evidence. Each juror is entitled to his
24 or her opinion. Each should, however, exchange views with his
25 or her fellow jurors. That is the very purpose of jury

| HCK3ATI2 | Jury Charge | Page 2424 |
| --- | --- | --- |

1 deliberations -- to discuss and consider the evidence, to
2 listen to the arguments of fellow jurors, to present your
3 individual views, to consult with one another, and to reach an
4 agreement based solely and entirely on the evidence, if you can
5 do so without surrendering your own individual judgment.
6        Each of you must decide the case for yourself, after
7 consideration with your fellow jurors of the evidence in the
8 case. But you should not hesitate to change an opinion that,
9 after discussion with your fellow jurors, appears incorrect. To
10 If, after carefully considering the evidence and arguments of
11 your fellow jurors, you hold a conscientious view that differs
12 from the others, you are not required to change your position
13 simply because you are outnumbered. Your final vote must
14 reflect your conscientious belief as to how the issues should
15 be decided.
16        I said a minute ago we'd come back to the foreperson
17 and now let me talk about that. When you get into the jury
18 room, before you begin your deliberations, I request that you
19 select someone to be the foreperson. Your foreperson will
20 preside over the deliberations and speak for you all in open
21 court. The foreperson has no greater voice or authority than
22 any other juror. The foreperson will send out and sign any
23 notes, and when the jury has reached a verdict, he or she will
24 notify the marshal that the jury has reached a verdict.
25        I'm going to give you a verdict sheet form to be

**A758**

UNITED STATES OF AMERICA, V
MEHMET HAKAN ATILLA,                                                        December 20, 2017

| HCK3ATI2 | Jury Charge | Page 2425 |
| --- | --- | --- |

1 filled in by the jury and signed by each juror when you're
2 finished.  The purpose of the questions on the form is to help
3 us, that is to say, counsel and myself, to understand what your
4 findings are.  I will hand this form to Christine who will give
5 it to you so that you may record the decision of the jury with
6 respect to each count in each question.
7         The order of the questions corresponds to the order
8 that the six counts were described to you in these
9 instructions.
10        No inference is to be drawn from the way the questions
11 are worded as to what the answer should be.  The questions are
12 not to be taken as any indication that I have any opinion as to
13 how they should be answered.  I have no such opinion.  And even
14 if I did, it would be not be binding on you, the jury.
15        Before the jury attempts to answer any question, you
16 should read all the questions on the verdict form and make sure
17 that everybody understands each question.
18        Before you answer the questions, you should deliberate
19 in the jury room and discuss the evidence that relates to the
20 questions that you must answer.  And when you've considered the
21 questions thoroughly, and the evidence that relates to those
22 questions, record the answers to the questions on the form that
23 I will give you.  Remember, all answers must be unanimous.
24        So I'm almost finished with these charges and my
25 instructions to you.  And I thank you once again for your

| HCK3ATI2 | Jury Charge | Page 2426 |
| --- | --- | --- |

1 patience and attentiveness over these past three-plus weeks.
2         And now, finally, I say this not because I think it is
3 necessary, but because it is the tradition of this court.  I'll
4 remind the jurors to be polite and respectful to each other, as
5 I'm sure you will be, in the course of your deliberations and
6 so that each juror may have his or her position made clear to
7 all the others.
8         I also remind you once again that your oath is to
9 decide without fear or favor and to decide the issues based
10 solely on the evidence and my instructions on the law.
11        So I thank you very much.  I ask you to just remain
12 seated for a minute or two while I talk to the lawyers briefly.
13        (At the sidebar)
14        THE COURT: Does either side have any objection to the
15 way the instructions were read as opposed to the content of the
16 instructions?
17        MS. FLEMING: No, your Honor.
18        MR. DENTON: No, your Honor.
19        THE COURT: Have you all collected the exhibits?
20        MR. ROCCO: Yes.
21        THE COURT: Great.
22        (In open court)
23        THE COURT: Will the marshal please step forward.
24        THE DEPUTY CLERK: Sir, if you can raise your right
25 hand, please.

| HCK3ATI2 | | Page 2427 |
| --- | --- | --- |

1         Do you solemnly swear that you will keep the jurors
2 impaneled and sworn in this cause together in some private and
3 convenient place, that you shall suffer no one to speak to
4 them, nor shall you speak to them yourself without direction of
5 this Court, unless it is to ask them if they have agreed upon a
6 verdict, so help you God?
7         THE MARSHAL: I do.
8         THE COURT: At this point I'm going to ask the first
9 12 of you, that is to say everybody in the first row, everybody
10 in the second row, and the two of you in the third row, to go
11 with the marshal to the jury room.
12        (Jury begins deliberations.  Time noted 12:35 p.m.)
13        THE COURT: So you two jurors, as to whom we are very
14 grateful, turn out to be our alternates.  And we thank you for
15 your patience and your participation.
16        We usually, and I am in this instance as well, not
17 going to discharge you as jurors.  We're going to let you go
18 home, but we're not going to discharge you until the jury has
19 finished and reached a verdict.  It does occur on occasion that
20 one of the jurors can't function as a juror for whatever
21 reason, and that we may nevertheless call on one of you or both
22 as alternates.
23        So we will thank you again, and we'll call you when
24 the jury has reached a verdict or in the event that there is a
25 need for your service back down here, if that's okay with you.

| HCK3ATI2 | Deliberations | Page 2428 |
| --- | --- | --- |

1 Thanks again.
2         (Alternate jurors excused)
3         THE COURT: It's 12:35.  We ordered lunch for the
4 jury.  And if you would just leave how we can contact the
5 lawyers in case we get a note or hear from the jury.  Christine
6 will call you or somebody will.  So we probably have your
7 contact information or no?
8         MR. KAMARAJU: We'll give it to Christine again just
9 to make sure.
10        THE COURT: What about the defense?
11        MR. ROCCO: Same, your Honor.
12        THE COURT: Cell phone or whatever.
13        MS. FLEMING: I have a contact sheet with everybody's
14 information.  I'll give it to Christine.
15        THE COURT: Thanks so much everybody.
16        MS. FLEMING: Thank you, your Honor.
17        MR. KAMARAJU: Thank you, your Honor.
18        (Recess pending verdict)
19        (In open court; jury not present)
20        THE COURT: So, what I thought I would do is call in
21 the jury and tell them that we usually end at 4:45 and to come
22 back tomorrow at 9:15.  So that's essentially my plan.
23        We got a note early, unsigned, but it is from the jury
24 asking for supplies.  I'll read it to you.  It just says:
25 Could we have need glasses seat one -- I think somebody left a